## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NEW JERSEY; STATE OF RHODE ISLAND; STATE OF MARYLAND; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF MAINE; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; AND STATE OF WISCONSIN, | No. 1:25-cv-_____ |
| *Plaintiffs*, | |
| v. | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as Secretary of Transportation, | |
| *Defendants*. | |

1.     The States of California, Illinois, New Jersey, Rhode Island, Maryland, Colorado, Connecticut, Delaware, Hawaii, Maine, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, and Wisconsin (Plaintiff States) bring this complaint to prevent the Trump Administration from trying to strong-arm them into participating in federal immigration enforcement by threatening to cut off billions of dollars in transportation funding if they refuse to comply. The funding at issue was authorized by Congress, and Congress imposed no requirement for States to cooperate with immigration enforcement as a condition for receiving funding. Indeed, the statutes and funding at issue—

1

which sustain roads, highways, bridges, and other transportation projects—have nothing to do with immigration enforcement. Plaintiff States therefore challenge the Trump Administration's unlawful attempt to usurp Congress's power by imposing an immigration enforcement requirement on billions of dollars in annual United States Department of Transportation (U.S. DOT) funding.

2.      To protect the liberties of States and their residents, the United States Constitution delineates a separation of powers between the Executive Branch and Legislative Branch. "Among Congress's most important authorities is its control of the purse." *Biden v. Nebraska*, 600 U.S. 477, 505 (2023). The Appropriations, Legislation, and Spending Clauses of the U.S. Constitution assign to Congress the authority to create legislation authorizing and appropriating the distribution of federal funds. *See* U.S. Const. art. I, § 1; *id.* § 8, cl. 1; *id.* § 9, cl. 7. While Congress may, at times, delegate some of its authority to the Executive Branch through statute, the Executive Branch possesses no inherent authority to rewrite statutes Congress has written. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

3.      These provisions in the U.S. Constitution have the "fundamental and comprehensive purpose . . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990). The Constitution places this power in the hands of Congress "to secure regularity, punctuality, and fidelity, in the disbursements of the public money." 2 Commentaries on the Constitution of the United States § 1348 (3d ed. 1858) (Story, J.). "If it were otherwise, the executive would possess an unbounded power over the public purse of the nation" and "might apply all its moneyed resources at his pleasure" with no check upon " corrupt influence[.]" *Id.*

4.      For more than a century, Congress has used its constitutional authority to enact numerous statutes that direct federal funding to the States to promote the development, maintenance, and safety of our nation's transportation infrastructure. State and local governments have relied on these federal funding programs—totaling more than $100 billion

annually—to support the roads, highways, railways, airways, ferries, and bridges that connect their communities and carry their residents to their workplaces and their homes.

5. All of these federal programs provide funding to Plaintiff States pursuant to statutes that Congress enacted. All of these statutes direct Defendants to distribute funding according to the means Congress specified. And none of these statutes concerns immigration enforcement or identifies State cooperation with immigration enforcement as a prerequisite for federal funding.

6. Despite these constraints imposed by Congress and the Constitution, Defendants are now attempting to seize Congress's power of the purse by imposing a federal immigration enforcement condition on transportation funds—funds like those intended to replace decaying bridges, repair roads and highways, and ensure safe air travel—that have nothing to do with federal immigration enforcement. And despite the detailed statutory schemes specific to each federal program at issue here, Defendants effectively seek to rewrite those laws by categorically and unlawfully imposing the same federal immigration enforcement condition across all of them.

7. On April 24, 2025, United States Secretary of Transportation Sean Duffy issued a letter (the "Duffy Directive") to all recipients of U.S. DOT funding announcing its policy, for the first time, of imposing an immigration enforcement condition on all U.S. DOT funding. The Letter states that all U.S. DOT funding recipients would be required to "cooperate with Federal officials in the enforcement of . . . Federal immigration law" (the "Immigration Enforcement Condition"). Secretary Duffy's letter cites no governing statute or statutory provisions that authorize this new requirement. Nor could he. None of the U.S. DOT funding statutes contemplate any connection whatsoever between transportation funding and federal civil immigration enforcement. Nor do they require States to use their own resources to participate in immigration enforcement as a condition of receiving federal transportation funds.

8. Consistent with the Duffy Directive, U.S. DOT and its subagencies have begun imposing the Immigration Enforcement Condition—using language nearly identical to that in the Duffy Directive—across their standard terms and conditions for federal funding, as well as

within the terms and conditions for specific U.S. DOT grants that are being awarded (or likely soon will be awarded) to Plaintiff States.

9.    The Duffy Directive's announcement of the new Immigration Enforcement Condition across all U.S. DOT funding programs, and the incorporation of the Immigration Enforcement Condition into U.S. DOT grant agreements, exceeds Defendants' legal authority, is arbitrary and capricious, and is unconstitutional in several respects. The Immigration Enforcement Condition contemplates requirements that go well beyond the statutory purposes of the funding programs—none of which was designed to further federal civil immigration enforcement—and exceeds the limited bases on which U.S. DOT is permitted to withhold funding.

10.    If Plaintiff States reject Defendants' unlawful Immigration Enforcement Condition, they will collectively lose billions in federal funding that is essential to sustain critical public safety and transportation programs, including highway development, airport safety projects, protections against train collisions, and programs to prevent injuries and deaths from traffic accidents. The loss of this funding will cause state and local providers to scale back or even terminate many of these programs and projects. More cars, planes, and trains will crash, and more people will die as a result, if Defendants cut off federal funding to Plaintiff States.

11.    If Plaintiff States agree to the unlawful Immigration Enforcement Condition, Plaintiff States will likewise be harmed. The condition is vague, and if read broadly, agreement could commit Plaintiff States' law enforcement or state agency personnel to federal immigration enforcement, incurring administrative costs and burdens by diverting limited personnel time and resources to federal immigration responsibilities that transportation personnel have no expertise in and have never had to handle before. Doing so could also expose States to potential civil liability for acts in connection with federal immigration enforcement. Further, entanglement of state and local law officials in federal immigration efforts will undermine cooperation in criminal investigations, especially among immigrant communities. This, in turn, will undermine public

safety, and in some States, expose state and local officials to potential violations of state laws enacted to encourage immigrants to report crimes they have witnessed or suffered.

12.     The Duffy Directive and Immigration Enforcement Condition thereby place Plaintiff States' officials in an untenable position. The Immigration Enforcement Condition requires state and local officials to choose between undermining public safety and diverting transportation resources to unrelated federal immigration functions, on the one hand, or potentially losing billions of dollars in federal funding, on the other.

13.     Courts have repeatedly rejected similar attempts by the first Trump Administration to unlawfully withhold federal funding from States in its attempts to strong-arm States into diverting their limited resources to civil immigration enforcement. *See, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020); *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 291 (3d Cir. 2019); *City of Chicago v. Barr*, 961 F.3d 882, 931 (7th Cir. 2020); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 761 (9th Cir. 2020); *City of Los Angeles v. Barr*, 941 F.3d 931, 944 (9th Cir. 2019); *Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 2d 1034, 1040 (D. Colo. 2020); *City of Evanston v. Sessions*, No. 18 C 4853, 2018 WL 10228461, at *1 (N.D. Ill. 2018); *City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163, 1181-82 (D. N.M. 2021).

14.     This Court should reject this further attempt by Defendants to hold hostage federal funding appropriated by Congress for Defendants' own ends.

15.     Plaintiff States therefore bring this action to put a stop to the federal government's unconstitutional and unlawful campaign to withhold federal funds that bear no relation to immigration enforcement in an attempt to coerce Plaintiff States into enforcing the federal government's preferred immigration policy.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction under 28 U.S.C. § 1331. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief against the Defendants pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. §§ 701-06.

17.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because this is a civil action in which Defendants are agencies of the United States or officers of such an agency, no real property is involved in this action, Plaintiff State of Rhode Island resides in this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Rhode Island. This action seeks relief against federal agencies and federal officials acting in their official capacities.

**PARTIES**

**I.    PLAINTIFFS**

18.    Plaintiff the State of California, represented by and through its Attorney General Rob Bonta, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

19.    Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

20.    Plaintiff the State of New Jersey, represented by and through its Attorney General, Matthew J. Platkin, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

21.    Plaintiff the State of Rhode Island, represented by and through its Attorney General Peter F. Neronha, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

22.    Plaintiff the State of Maryland is a sovereign State of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

23.    Plaintiff the State of Colorado is a sovereign State of the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

6

24.     Plaintiff the State of Connecticut is a sovereign State of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Conn. Gen. Stat. § 3-125 to pursue this action on behalf of the State of Connecticut.

25.     Plaintiff the State of Delaware is a sovereign State of the United States of America. Delaware is represented by Attorney General Kathy Jennings, who is the chief law enforcement officer of Delaware.

26.     Plaintiff the State of Hawai'i is a sovereign State of the United States of America. Hawai'i is represented by Attorney General Anne E. Lopez, who is the chief law enforcement officer of Hawai'i.

27.     Plaintiff the State of Maine is a sovereign State of the United States of America. Maine is represented by Attorney General Aaron M. Frey, who is the chief law enforcement officer of Maine.

28.     Plaintiff the Commonwealth of Massachusetts is a sovereign State of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

29.     Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

30.     Plaintiff the State of Minnesota is a sovereign State of the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

31.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State of the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. §§ 228.110 and Nev. Rev. Stat. 228.170.

32.     Plaintiff State of New Mexico is a sovereign State of the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

33.     Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

34.     Plaintiff the State of Oregon, represented by and through its Attorney General Dan Rayfield, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

35.     Plaintiff State of Vermont is a sovereign State of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is the chief law enforcement officer and is authorized by law to initiate litigation on behalf of the State.

36.     Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign State of the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Wash. Rev. Code §§ 43.10.05-43.10.801.

37.     Plaintiff the State of Wisconsin, represented by and through its Attorney General Josh Kaul, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

38.     Plaintiff States have standing to bring this action because Defendants' Duffy Directive and their decisions to require the Immigration Enforcement Condition harm the States' sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of this policy is permanently enjoined.

## II.  DEFENDANTS

39.    Defendant United States Department of Transportation is an executive department of the United States. 49 U.S.C. § 102(a). U.S. DOT is a federal agency and engages in agency action within the meaning of 5 U.S.C. § 702. U.S. DOT is responsible for administering federal funding programs at issue in this complaint.

40.    Defendant Sean Duffy is the Secretary of Transportation for the United States and the head of U.S. DOT. *See* 49 U.S.C. § 301. He is sued in his official capacity.

## BACKGROUND

## I.  FOR MORE THAN A CENTURY, STATES HAVE RELIED ON FEDERAL FUNDING APPROPRIATED BY CONGRESS TO SUPPORT THE DEVELOPMENT, MAINTENANCE, AND SAFETY OF TRANSPORTATION INFRASTRUCTURE

41.    For more than a century, Congress has authorized and directed federal funding to support States' development of transportation infrastructure to knit this nation's communities together. *See, e.g.*, Federal Aid Road Act of 1916, Pub. L. No. 64–156, 39 Stat. 355 (Jul. 11, 1916).

42.    Congress has consistently and steadily increased the federal government's financial assistance to state and local governments, and has expanded that aid to cover all aspects of travel across this nation's roads, railroads, bridges, highways, waterways, and airways.

43.    Indeed, Congress enacted these statutes recognizing that American communities need such infrastructure, and that neither the federal government nor the States can develop this critical infrastructure alone.

44.    Consistent with the statutes created by Congress over the course of many decades, state and local governments annually receive more than $100 billion to build and maintain reliable, safe, and efficient transportation systems for their residents.

45.    This federal funding typically supports transportation programs or projects that would not exist but for the federal funds. State transportation budgets are largely committed to preexisting priorities—including, for example, the maintenance of existing state infrastructure.

And Plaintiff States do not have sufficient funding or budgetary flexibility to cover the loss of U.S. DOT funding if Defendants were to deny that funding.

46.    The breadth of projects funded by the federal government is reflected in the many different sub-agencies within U.S. DOT that administer the dozens of different funding programs to support Plaintiff States' transportation systems, including: the Federal Highway Administration; the Federal Transit Administration; the Federal Railroad Administration; the Federal Motor Carrier Safety Administration; the National Highway Traffic Safety Administration; the Federal Aviation Administration; the Federal Maritime Administration; and the Pipeline and Hazardous Materials Administration.[1]

### A.    Federal Funding from the Federal Highway Administration

47.    Recognizing the need for federal support to develop an interconnected system of roads throughout the States, Congress first created the Federal-Aid Highway program in 1916. Federal Aid Road Act of 1916, Pub. L. No. 64–156, 39 Stat. 355. When signing the program into law, President Woodrow Wilson observed that federal funding would contribute to a "more effective highway machinery in each State," and that "the development of good road building" would "add greatly to the convenience and economic welfare of all the people, and strengthen the national foundations." Richard F. Weingroff, U.S. Dep't of Transp., Creation of a Landmark: The Federal Aid Road Act of 1916 74-75 (quoting Letter from President Woodrow Wilson to A. F. Lever, *in* Agricultural Legislation in the First Wilson Administration, DOCUMENTS OF AMERICAN HISTORY 295-96 (Commanger ed., 3d Ed. 1947)).

48.    Since then, Congress has regularly passed legislation providing federal funding to States to further develop the nation's highways, enacting dozens of statutes to that end. *See, e.g.*, U.S. DEP'T OF TRANSP., FEDERAL HIGHWAY ADMIN., AMERICA'S HIGHWAYS 1776-1976: A HISTORY OF THE FEDERAL-AID PROGRAM, 546-47 (1977); The Federal Highway Act of 1921, Pub. L. No. 67-87, 42 Stat. 212; Federal-Aid Highway Act of 1956, Pub. L. No. 84-627, 70 Stat.

---

[1] Below, Plaintiff States discuss many of the U.S. DOT funding programs upon which they rely. The sources of U.S. DOT funding discussed below are illustrative, not exhaustive, and Plaintiff States seek relief as to all funding administered by Defendants, not merely those discussed here.

374; Federal-Aid Highway Act of 1973, Pub. L. No. 93-87, 87 Stat. 250; Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021).

### 1.  Federal Highway-Aid Program

49.     The primary means by which Congress allocates highway funding to the States is through the Federal Highway-Aid Program. The program provides federal formula funding to the States for the construction, maintenance and operation of the country's 3.9 million-mile highway network, including the Interstate Highway System, primary highways, and secondary local roads.

50.     The Federal Highway-Aid Program is administered by the Federal Highway Administration, a sub-agency within U.S. DOT. *See* 49 U.S.C. § 104(a).

51.     The Infrastructure Investment and Jobs Act authorized $356.5 billion for fiscal years 2022 through 2026 to be used for the Federal Highway-Aid Program.

52.     Currently, there are nine core formula funding programs within the Federal Highway-Aid Program: the National Highway Performance Program, 23 U.S.C. § 119; the Surface Transportation Block Grant Program, 23 U.S.C. § 133; the Highway Safety Improvement Program, 23 U.S.C. § 148; the Railway-Highway Crossings Program, 23 U.S.C. § 130 and 23 C.F.R. Part 924; the Congestion Mitigation and Air Quality Improvement Program, 23 U.S.C. § 149; the Metropolitan Planning Program, 23 U.S.C. § 104(d); the National Highway Freight Program, 23 U.S.C. § 167; the Carbon Reduction Program, 23 U.S.C. § 175; and the PROTECT Formula Program, 23 U.S.C. § 176.

53.     Each of the core formula programs has unique purposes, none of which are related to immigration enforcement. For example, the purposes of the National Highway Performance Program are to provide support for the condition and performance of the National Highway System; to provide support for the construction of new facilities on the National Highway System; to ensure that investments of federal funds in highway construction support progress toward performance targets established in a State's asset management plan for the National Highway System; and to provide support for activities to increase the resiliency of the National

Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters. 23 U.S.C. § 119(b).

54.     Congress directed funding for all core Federal-Aid Highway programs to be apportioned among the States by formula. *See* 23 U.S.C. § 104. Because federal highway-aid funding is disbursed through formula funding, and not competitive grants, each State is entitled to a specific allocation of funding by law. *See id.*

55.     The Federal-Aid Highway statutes do not authorize U.S. DOT to impose the Immigration Enforcement Condition as a requirement for participation in Federal-Aid Highway funding.

56.     Plaintiff States receive and rely upon substantial sums of funding from these federal highway formula programs. Tallying both the actual amounts received in fiscal years 2022 and 2023 with estimated funds awarded for fiscal years 2024 through 2026, Plaintiff States expect to receive the following amounts on average each year from federal highway formula funds:[2]

- California: $5,712,406,670
- Colorado: $802,058,625
- Connecticut: $824,220,886
- Delaware: $281,784,462
- Hawaii: $309,599,980
- Illinois: $2,287,392,926
- Maine: $303,389,649
- Maryland: $939,441,101
- Massachusetts: $1,093,675,864
- Michigan: $1,595,420,115
- Minnesota: $977,931,098

---

[2] As reported on U.S. DEP'T OF TRANSP., FEDERAL HIGHWAY ADMIN., FY 2022 - FY 2023 ACTUAL AND FY 2024 - 2026 ESTIMATED STATE-BY-STATE FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM, NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58, *available at* https://tinyurl.com/4j9sryyw.

- Nevada: $553,285,185

- New Jersey: $1,643,735,917

- New Mexico: $559,033,747

- New York: $2,758,572,196

- Oregon: $757,332,328

- Rhode Island: $357,117,356

- Vermont: $329,090,548

- Washington: $1,079,603,509

- Wisconsin: $1,098,227,514

57.     Plaintiff States have applied for or intend to apply for federal-aid highway funds in fiscal year 2025 and future fiscal years when these funds are available.

### 2.  Other Federal Highway Grant Programs

58.     In addition to the billions of dollars in annual funding Congress directs U.S. DOT to provide to Plaintiff States through federal highway-aid formula funding programs, Congress also authorized the Federal Highway Administration to administer other highway funding.

59.     For instance, Congress enacted and appropriated federal funding for the Infrastructure for Rebuilding America (INFRA) grant program to assist States in developing improvements to freight and highway projects of national or regional significance. 23 U.S.C. § 117; *see also* Fixing America's Surface Transportation Act of 2015, Pub. L. No. 114-94, § 1105, 129 Stat. 1312, 1332. In creating INFRA, Congress authorized U.S. DOT to issue grants to state and public agencies for various highway and bridge projects to improve the safety, efficiency, and reliability of the movement of freight and people across rural and urban areas; generate national and regional economic benefits; and address the impact of population growth on the movement of people and freight. *See* 23 U.S.C. § 117(c)-(d).

60.     Another example is the Wildlife Crossing Pilot Program. When enacting the Infrastructure Investment and Jobs Act of 2021, Congress authorized funding for the Wildlife

Crossing Pilot Program to aid States in improving safety for motorists by reducing the number of wildlife-vehicle collisions. *See* 23 U.S.C. § 171.

61. None of the statutes underlying these other Federal Highway Administration funding programs describe immigration enforcement as a purpose for which the funds are awarded. None of the statutes underlying these other Federal Highway Administration funding programs describe immigration enforcement as a condition or criterion for U.S. DOT awarding funding under these programs.

62. For instance, the statute authorizing INFRA grants requires the Secretary to only consider a project's funding sources, cost-effectiveness, and other factors relating to the project. 23 U.S.C. § 117(g)-(h). It provides no authority for U.S. DOT to place additional conditions on grant funding determinations, and certainly not conditions relating to immigration enforcement.

63. Similarly, the statutory provisions authorizing wildlife crossing grants state that the primary criteria for selecting grant recipients is "the extent to which the proposed project of an eligible entity is likely to protect motorists and wildlife by reducing the number of wildlife-vehicle collisions and improve habitat connectivity for terrestrial and aquatic species." 23 U.S.C. § 171(e)(1); *see also id.* § 171(f)(1) (Secretary of Transportation "shall ensure that a grant received under the pilot program is used for a project to reduce wildlife-vehicle collisions").

64. Plaintiff States receive and rely upon substantial federal grants from these and other Federal Highway Administration programs for critical projects.

65. For example, such funding has supported bridge restoration or replacement projects. In Rhode Island, INFRA grants have been key to funding the reconstruction of the Washington Bridge, which abruptly closed due to severe safety concerns. Reconstruction of this bridge is vital for ensuring the safe travel of persons and goods in and out of Rhode Island's capital city and port. Without a full capacity bridge crossing the Seekonk River, Providence and the West Bay of Rhode Island remain cut off from the East Bay of Rhode Island and critical points in southeastern Massachusetts, including Fall River and Cape Cod.

66.    In fiscal year 2024, Michigan received $196,005,837 in INFRA grants for its River Raisin Bridge and Interstate 75 Revitalization Project. The River Raisin Bridge carries about 61,000 vehicles daily—about a quarter of which are trucks—between Detroit and Toledo. Built in 1955, the bridge's combination of age and high use presents safety concerns that the replacement project aims to address, in addition to reconstruction of more than three miles of the connecting Interstate 75.

67.    Similarly, in fiscal year 2024, Minnesota and Wisconsin were awarded just over $1 billion in INFRA grants for the replacement of Blatnik Bridge. The Blatnik Bridge connects Minnesota and Wisconsin and serves an average of 33,000 cars traveling between the two States each day. Built in 1961, the aging Blatnik Bridge is now in poor condition, has weight restrictions and traffic safety issues, and is nearing the end of its service life. Without the replacement project—and the funds to support it—the Blatnik Bridge is predicted to close by 2030.

68.    Oregon, too, has recently been awarded more than $2 billion in Bridge Investment Project and other federal highway grants to support the replacement of the I-5 Columbia River Interstate Bridge connecting Oregon and Washington. The current bridge is a major corridor between communities, with over 120,000 average daily crossings and over $132 million in freight commodity value crossing the bridge daily in 2020. Replacement of the interstate bridge is necessary to replace the aging structure with an earthquake-resistant bridge that can address heavy congestion, safety issues, and limited public transit options. And federal funding is essential for the replacement project, as the project previously suffered interruptions due to insufficient funding.

69.    Federal Highway Administration funding has supported other vital infrastructure projects as well. For instance, California has been granted an INFRA award of $105,000,000 to improve state and U.S. highways, create jobs, and improve freight movement. Specifically, the $105,000,000 award funds the State Route 84 – Interstate 101 Interchange project in San Mateo County to replace ramps, widen local roads connected to them, add signals, and add pedestrian

and bicycle paths on local connecting roads. These developments will alleviate significant freight bottlenecks to the nearby Port of Redwood City and reduce congestion in the Redwood City to South San Francisco Bay region, a fast growing area. Though California is being awarded the $105,000,00, U.S. DOT has not yet obligated the funds.[3]

70.    In fiscal year 2024, Illinois received INFRA grants totaling $81,589,533 to make improvements along a three-mile elevated rail corridor on Chicago's South Side.

71.    Further, U.S. DOT has allocated $350 million in funding to the States for fiscal years 2022 through 2026 to assist with the Wildlife Crossing Pilot Program. These funds support programs including the building of overpasses and underpasses, the restoration of habitat to facilitate animal crossings, and other types of efforts including safety innovation research and the mapping of wildlife-vehicle collisions.

72.    For instance, the California Department of Transportation received an $8 million wildlife crossing grant in fiscal years 2022 and 2023 for work on the Gaviota Pass Wildlife Connectivity and Vehicle Collision Reduction Project. The project aims to reduce vehicle collisions and connect wildlife habitat on State Park lands across either side of Highway 101, including through expansion of a culvert and construction of miles of fencing that allows animals to cross the highway without endangering either drivers or wildlife.

73.    Similarly, the Maryland State Highway Administration has been awarded a Wildlife Crossing Pilot Program grant of $387,424 for federal fiscal years 2024 and 2025.

74.    Moreover, in 2022-2023, the Vermont Agency of Transportation received a $1.6 million award to design a wildlife crossing to reduce wildlife vehicle collisions and reestablish wildlife connectivity in the heart of the Green Mountains, between some of the largest and least fragmented forest blocks in the northeastern United States.

---

[3] Federal funds are "obligated" when the federal government has taken a legal commitment to pay those funds. *See* 23 U.S.C. § 106(a)(3).

75.     Plaintiff States have applied or intend to apply for federal highway funds under these various funding programs in fiscal year 2025 and future fiscal years when these funds are available.

**B.     Federal Funding from the Federal Transit Administration**

76.     Congress created the Federal Transit Administration to administer federal funding to support transit systems across the States—including buses, subways, light rail, commuter rail, trolleys, and ferries—and the millions of Americans who rely upon them every day. *See* 49 U.S.C. § 5301 ("It is in the interest of the United States . . . to foster the development and revitalization of public transportation systems . . . ."). The Federal Transit Administration is a sub-agency within U.S. DOT. 49 U.S.C. § 107(a).

77.     The Federal Transit Administration oversees thousands of grants provided to States, tribes, and local public agencies to support public transportation. Among other funding programs, the Federal Transit Administrations administers formula grants for urban areas, rural areas, and the enhanced mobility of seniors and individuals with disabilities. *See, e.g.*, 49 U.S.C. §§ 5307, 5310, 5311.

78.     For example, the Federal Transit Administration oversees formula grants for rural areas to ensure that all communities, not just urban centers, have access to public transportation. 49 U.S.C. § 5311. Entities eligible for funding under these grants include States and Indian tribes. 49 U.S.C. § 5311(a).

79.     For the Federal Transit Administration's formula grants, each State is entitled to a specific allocation by law. *See, e.g.*, 49 U.S.C. § 5311(c).

80.     The statutes authorizing these grants do not authorize U.S. DOT to impose the Immigration Enforcement Condition as a requirement for the Federal Transit Administration's formula funding.

81.     Plaintiff States receive and rely upon substantial sums of funding from Federal Transit Administration grant programs. For fiscal year 2025, Plaintiff States expect to receive the following funding apportioned from all Federal Transit Administration formula grants:[4]

- California: $2,085,116,209
- Colorado: $200,765,144
- Connecticut: $265,353,760
- Delaware: $37,469,784
- Hawaii: $65,879,982
- Illinois: $860,700,111
- Maine: $50,281,879
- Maryland: $364,735,296
- Massachusetts: $545,571,942
- Michigan: $203,427,466
- Minnesota: $174,069,813
- Nevada: $105,591,696
- New Jersey: $868,923,367
- New Mexico: $78,497,808
- New York: $2,331,328,789
- Oregon: $164,236,846
- Rhode Island: $59,539,397
- Vermont: $16,014,805
- Washington: $390,420,253
- Wisconsin: $120,360,892

82.     The Federal Transit Administration also administers several other major competitive grants, in addition to the formula funds it distributes to States. For instance, the Federal Transit

---

[4] As reported on U.S. DEP'T OF TRANSP., FEDERAL TRANSIT ADMINISTRATION, FY 2025 FULL YEAR APPORTIONMENT STATE TOTALS, available at https://tinyurl.com/ysdfthsa.

Administration authorized a grant of $7,407,963 to Rhode Island in fiscal year 2024 to support the State's replacement, repair, or purchase of buses and bus facilities. Oregon similarly received a bus and bus facility grant of $3,743,883 in fiscal year 2022. Maryland also received an award of $213,696,341 for replacement of aging light rail vehicles for federal fiscal years 2024 and 2025.

83.    No statute authorizes U.S. DOT to impose the Immigration Enforcement Condition as a requirement for Federal Transit Administration funding. Neither the purpose of these programs, nor their grant criteria, are in any way connected to immigration enforcement.

84.    Plaintiff States have applied or intend to apply for Federal Transit Administration federal grant funding, including formula grants for rural areas, in fiscal year 2025 and future fiscal years when these funds are available.

### C.    Federal Funding from the Federal Railroad Administration

85.    The United States has long subsidized the development of railroads systems connecting the country. *See, e.g.*, Pacific Railway Act, 12 Stat. 489 (July 1, 1862); Darwin P. Roberts, *The Legal History of Federally Granted Railroad Rights-of-Way and the Myth of Congress's '1871 Shift'*, 82 U. Colo. L. Rev. 85, 97-98 (2011). While newer forms of transportation have emerged since the advent of the railroad, railroads and railcars continue to provide a vital means of overland transport, covering nearly 140,000 miles across the country and carrying 1.9 billion tons of raw material every year. Brian Chansky and Michael Schultz, *Tracking Productivity in Line-Haul Railroads*, BEYOND THE NUMBERS: PRODUCTIVITY, U.S. Bureau of Labor Statistics, Mar. 2024.

86.    To ensure safety and efficiency throughout these railroad networks, a sub-agency within U.S. DOT, the Federal Railroad Administration, administers federal funding to support both passenger and freight rail development, maintenance, and safety throughout the States. *See* 49 U.S.C. § 103. These include, among other grants, federal grants to Amtrak; the Consolidated Rail Infrastructure and Safety Improvement Program; Corridor Identification and Development Program; Federal-State Partnership for Intercity Passenger Rail Grant Program; Railroad

Crossing Elimination Grant Program; Railroad Safety State Participation Grant Program; and Special Transportation Safety Circumstances Grant Program.

87.    None of the statutes underlying these Federal Rail Administration funding programs describes immigration enforcement as a criterion for U.S. DOT awarding federal funds under these programs. None of these statutes announce program purposes nor grant criteria involving immigration enforcement.

88.    For instance, the Rail Crossing Elimination Grant Program was created by Congress to eliminate the dangers caused by stopped trains blocking rail grade crossings. *See* 49 U.S.C. § 22909(b).

89.    Congress has made such funding available to the States to eliminate the hazards of railway crossings since at least the 1970s. *See, e.g.*, Federal-Aid Highway Act of 1973, Pub. L. No. 93-87, § 203(b), 87 Stat. 283 (appropriating $175 million "for projects for the elimination of hazards of railway-highway crossings"). More recently, in 2021, Congress appropriated $3 billion over five years, and authorized to be appropriated an additional $500 million per year over that same period, to fund grants under a program to eliminate especially problematic grade crossings. *See* Passenger Rail Expansion and Rail Safety Act of 2021, Pub. L. No. 117-58, 135 Stat. 720 (codified at 49 U.S.C. 22909(b)(1)); *see also* Pub. L. No. 117-58, 135 Stat. 695-696 (authorizing to be appropriated $500 million each fiscal year from 2022 through 2026 for the program); Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 1436 (appropriating $3 billion for the program).

90.    The authorizing statute for rail crossing elimination grants states that the Secretary "shall" evaluate certain criteria for selecting projects funded by the grants, including, among other things, whether the proposed projects would "improve safety at highway-rail or pathway-rail crossings"; "grade separate, eliminate, or close highway-rail or path-way rail crossings"; "improve the mobility of people or goods"; "reduce emissions, protect the environment, and provide community benefits, including noise reduction"; "improve access to emergency services"; "provide economic benefits"; and "improve access to communities separated by rail

crossings." 49 U.S.C. § 22909(f). None of these criteria include federal immigration enforcement.

91.    Plaintiff States receive and rely upon substantial sums of funding from Federal Rail Administration grant programs, including from the Rail Crossing Elimination Grant Program. For instance, Illinois has been awarded $43,125,000 in Rail Crossing Elimination Grant funding for grade crossing and bridge-related improvements in the Greater Chicago region. Illinois has also been awarded $38,629,295 under the Restoration and Enhancements Grants program to support the development of a new daily roundtrip Amtrak Borealis service from Chicago, Illinois, to Minneapolis-St. Paul, Minnesota. Separately, under the Consolidated Rail Infrastructure and Safety Improvement Program, New York has been awarded $215,104,000 for its projects ensuring and improving the safety of its rail systems.

92.    Maryland has received funding awards from the Federal Rail Administration including: Rail Crossing Elimination Grants of $1,534,280 for federal fiscal years 2022 to 2025 and $3,108,969 for federal fiscal year 2024; and Consolidated Rail Infrastructure and Safety Improvement Program grants of $8,800,000 for federal fiscal year 2022, $800,000 for federal fiscal year 2024, and $11,584,317 for federal fiscal years 2022 to 2026.

93.    Plaintiff States have applied or intend to apply for Federal Rail Administration funds, including railroad crossing elimination grants, in fiscal year 2025 and future fiscal years when these funds are available.

**D.    Federal Funding from the Federal Motor Carrier Safety Administration**

94.    Established in 2000, the Federal Motor Carrier Safety Administration's primary mission is to prevent injuries and deaths that result from crashes involving commercial vehicles, such as large trucks and buses. *See* Motor Carrier Safety Improvement Act of 1999, Pub. L. No. 106-159, 113 Stat. 1748. According to a 2017 report, more than 11 million large trucks travel U.S. roads, with almost four million people holding commercial driver's licenses. David Randall Peterman, Cong. Research. Serv., R44792, Commercial Truck Safety: Overview 1 (2017). In

2015, large trucks were involved in more than 400,000 motor vehicle crashes, with nearly 100,000 of those crashes causing injuries and 3,600 resulting in fatalities. *Id.*

95.    The Federal Motor Carrier Safety Administration is a sub-agency within U.S. DOT. 49 U.S.C. § 113(a). Though the Federal Motor Carrier Safety Administration promulgates regulations to govern commercial drivers, the volume of commercial vehicles in this country requires the federal agency to rely heavily on state partners to enforce safety measures nationwide. *See* David Randall Peterman, Cong. Research Serv., R43026, Federal Traffic Safety Programs: In Brief 3-4 ( 2024). To enable state partners to fulfill the Federal Motor Carrier Safety Administration's safety mission, the agency awards grants to state and local law enforcement offices to support on-site and roadside inspections, measures to secure the integrity of state commercial driver's license programs, and commercial driver safety trainings.

96.    None of the statutes underlying these Federal Motor Carrier Safety Administration grant programs describes federal immigration enforcement as a criterion for U.S. DOT awarding a federal grant under these programs. None of these statutes announce program purposes nor grant criteria involving federal immigration enforcement.

97.    For instance, the Motor Carrier Safety Administration administers the Motor Carrier Safety Assistance Program. The program provides grants to promote the safe transportation of passengers and hazardous materials and reduce the number and severity of crashes, and resulting injuries and fatalities, involving commercial motor vehicles. 49 U.S.C. § 31102(b); 49 C.F.R. § 350.201.

98.    Motor Carrier Safety Assistance Program funds have been available to States since Congress first authorized the program in 1982. *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, 96 Stat. 2097, 2155.

99.    Congress has authorized funds be used to carry out the Motor Carrier Safety Assistance Program, including approximately $487 million for fiscal year 2025. *See* 49 U.S.C. § 31104(a)(1).

100. The Secretary of Transportation is required to allocate Motor Carrier Safety Assistance Program funds pursuant to allocation criteria that the Secretary must prescribe through regulation. 49 U.S.C. § 31102(j); *see* 49 C.F.R. § 350.217. The Secretary is prohibited from decreasing a State's funding levels from the allocation amount by more than three percent in a fiscal year, with exceptions. 49 U.S.C. § 31102(j).

101. The Motor Carrier Safety Assistance Program statutes do not authorize U.S. DOT to impose the Immigration Enforcement Condition as a requirement for Motor Carrier Safety Assistance Program funding.

102. Plaintiff States receive and rely upon substantial sums of funding from Federal Motor Carrier Safety Administration grant programs, including the Motor Carrier Safety Assistance Program. For instance, for fiscal year 2024, U.S. DOT estimated that it would award Plaintiff States the following amount of funding from all Motor Carrier Safety Administration Program grants:[5]

- California: $30,491,529
- Colorado: $7,915,874
- Connecticut: $4,268,837
- Delaware: $1,849,251
- Hawaii: $1,849,251
- Illinois: $17,435,739
- Maine: $2,525,332
- Maryland: $7,968,726
- Massachusetts: $8,169,109
- Michigan: $13,997,207
- Minnesota: $9,814,543
- Nevada: $4,319,104

---

[5] As reported on U.S. DEP'T OF TRANSP., MOTOR CARRIER SAFETY ADMIN., FY 2024 ESTIMATED MCSAP FUNDING - ROUNDED, available at https://tinyurl.com/24xt3y39.

- New Jersey: $11,157,256

- New Mexico: $6,742,920

- New York: $19,850,351

- Oregon: $6,320,241

- Rhode Island: $1,849,251

- Vermont: $2,086,673

- Washington: $9,835,684

- Wisconsin: $9,636,095

103.   Plaintiff States depend upon these funds to sustain their programs ensuring commercial vehicle safety. For instance, the Washington State Patrol relies on annual Motor Carrier Safety Assistance Program funding to promote traffic safety programs in the State. The Washington State Patrol expects to deplete its current Motor Carrier Safety Assistance Program funding by mid-June 2025; if unable to draw from the $5.4 million in Motor Carrier Safety Assistance Program funding that it has been awarded for fiscal year 2025, the Washington State Patrol may not be able to sustain programs necessary to prevent commercial vehicle crashes.

104.   Similarly, in fiscal year 2024, Vermont received over $1.7 million from the Motor Carrier Safety Assistance Program through its High Priority Innovative Technology Deployment program, which provides financial assistance to States to deploy advanced technological safety solutions and intelligent transportation systems for commercial vehicle operations.

105.   Plaintiff States have applied or intend to apply for Motor Carrier Safety Administration funds, including Motor Carrier Safety Assistance Program grants, in fiscal year 2025 and future fiscal years when these funds are available.

**E.    Federal Funding from the National Highway Traffic Safety Administration**

106.   "The development of the automobile gave Americans unprecedented freedom to travel, but exacted a high price for enhanced mobility." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 32-33 (1983). Since 1929, car accidents have

become a "leading cause of accidental deaths and injuries in the United States." *Id.* at 33; *see also* Ctrs. for Disease Control and Prevention, About Transportation Safety (Nov. 19, 2024), https://tinyurl.com/348kk847 ("In the United States, motor vehicle crashes are a leading cause of death, and kill over 120 people every day.").

107.   To protect the lives of Americans as they travel freely throughout the country, Congress created the National Highway Traffic Safety Administration, a sub-agency of the U.S. DOT, in 1966. *See* National Traffic and Motor Vehicle Safety Act of 1966, Pub. L. No. 89-563, 80 Stat. 718 (codified at 49 U.S.C. § 105(a)). Among other functions, the National Highway Traffic Safety Administration's Office of Regional Operations and Program Deliveries administers state highway safety formula grant programs to the States to support data-driven, evidence-based programs to save lives, prevent injuries, and reduce economic costs due to traffic crashes.

108.   None of the statutes underlying the National Highway Traffic Safety Administration's grant programs describe federal immigration enforcement as a purpose or criterion for U.S. DOT awarding a federal grant under these programs.

109.   The National Highway Traffic Safety Administration's largest safety grant programs include its National Priority Safety Program and its State and Community Highway Safety Program.

110.   First, the National Priority Safety Program provides several grants to encourage States to take specific actions promoting use of seat belts and child restraints; reduce impaired or distracted driving; require graduated licenses for teen drivers; address the safety of motorcyclists, bicyclists, and pedestrians; and improve the quality of state traffic safety information systems. 23 U.S.C. § 405(a).

111.   Funds appropriated to carry out the National Priority Safety Program shall be apportioned to States pursuant to a statutory formula based on population and total public road mileage of each State, subject to a minimum apportionment for all States that meet certain requirements. 23 U.S.C. § 405(a). Because National Priority Safety grants are formula grants and

not competitive grants, each State is entitled to a specific allocation when the State authority files an application for such funding. 23 U.S.C. § 405(a).

112.    Second, the Highway Safety Program provides grants to reduce traffic crashes and deaths, injuries, and property damage resulting from those crashes. 23 U.S.C. § 402(a)(1)(i).

113.    Funds appropriated to carry out the Highway Safety Program "shall be used" to aid States' implementation of their approved highway safety programs. 23 U.S.C. § 402(c)(1); 23 C.F.R. § 1300.15.

114.    Funds appropriated to carry out the Highway Safety Program "shall be apportioned" to States pursuant to a statutory formula based on population and total public road mileage of each State, subject to a minimum apportionment for all States. 23 U.S.C. § 402(c)(2). Because Highway Safety Program grants are formula grants and not competitive grants, each State is entitled to a specific allocation when the State authority files an application for such funding.

115.    The National Priority Safety and Highway Safety Program statutes do not authorize U.S. DOT to impose the Immigration Enforcement Condition as a requirement for Highway Safety Program funding.

116.    Plaintiff States receive and rely upon substantial sums of funding from National Highway Traffic Safety Administration grant programs. For instance, Congress authorized a total of $395 million for fiscal year 2024 to carry out the Highway Safety Program. In fiscal year 2024, the below States were awarded the following amounts of federal funding under the Highway Safety Program[6]:

- California: $35,835,906
- Colorado: $6,662,797
- Connecticut: $3,376,382
- Delaware: $2,960,775
- Hawaii: $2,960,775

---

[6] As reported on U.S. DEP'T OF TRANSP., NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., FY 2024 GRANT FUNDING TABLE, available at https://tinyurl.com/yc79fyzc (figures rounded to the nearest dollar).

- Illinois: $13,588,437

- Maine: $2,960,775

- Maryland: $5,692,502

- Massachusetts: $6,473,201

- Michigan: $10,851,031

- Minnesota: $7,827,576

- Nevada: $3,564,794

- New Jersey: $8,328,358

- New Mexico: $3,336,441

- New York: $18,792,047

- Oregon: $5,194,602

- Rhode Island: $2,960,775

- Vermont: $2,960,775

- Washington: $7,983,382

- Wisconsin: $7,354,781

117.    Plaintiff States employ National Highway Traffic Safety Administration funds for a range of programs that seek to reduce traffic injuries and deaths. For instance, California's Office of Traffic Safety subgrants Highway Safety Program funds to entities promoting educational campaigns on safe driving; it also subgrants funds to support law enforcement efforts to police and prevent traffic violations, like driving under the influence, that could endanger drivers on the road. Federal funding sustains a substantial majority of California's traffic safety program administration—of California's 47 Office of Traffic Safety employees, 32 are 100 percent federally funded, and the remaining 15 employees are majority-funded by federal funding (more than 70 percent).

118.    Similarly, Vermont uses Highway Traffic Safety funds to address safety risks associated with unrestrained passenger vehicle occupants, impaired driving, speeding, and distracted and reckless driving.

119.    The Washington Traffic Safety Commission also receives and subgrants National Highway Traffic Safety Administration funding. It subgrants that funding to 143 entities—including law enforcement agencies, tribes, non-profits, state agencies, universities, and city and county governments—to develop and coordinate statewide and local behavioral traffic safety programs. Among other things, this federal funding has helped expand traffic enforcement units by resulting in the creation or hiring of 9.5 positions across seven local law enforcement agencies; funded positions at the Department of Licensing, the Office of the Administrator of the Courts, and toxicologists at the Washington State Patrol Toxicology Lab; and helped expand the number of young driver traffic safety programs to more middle schools, high schools, and colleges, as well as to drivers under age 25 through an app-based rewards program.

120.    In fiscal year 2024, the Washington Traffic Safety Commission also received $358,117 in funding to support a Fatality Analysis Reporting System and Crash Reporting Sampling System that supplies data for a nationwide, annual census that informs the creation of public policies to further reduce fatal injuries from traffic crashes. The Washington Traffic Safety Commission anticipates receiving $368,452 in fiscal year 2025 to support the same data collection systems.

121.    During its most recent budget cycle for 2023 to 2025, 80 percent of the Washington Traffic Safety Commission's operating budget originates from funds awarded by the National Highway Traffic Safety Administration.

122.    Plaintiff States have applied or intend to apply for National Highway Traffic Safety Administration grants in fiscal year 2025 and future fiscal years when these funds are available.

**F.    Federal Funding from the Federal Aviation Administration**

123.    Congress created the Federal Aviation Agency in 1958 to form an entity that would focus solely on ensuring civil aviation safety. *See* Federal Aviation Act of 1958, Pub. L. No. 85-726, 85 Stat. 726. The Agency was later renamed the Federal Aviation Administration and transferred to the purview of U.S. DOT in 1966. *See* 49 U.S.C. § 106(a). In its most recent reauthorization of the agency in 2024, Congress charged the Federal Aviation Administration

with a number of duties, including the hiring and training of air traffic controllers; the modernization of the national airspace system; the administration of aviation workforce development grants to train future pilots and maintenance technicians; and the establishment of aviation safety initiatives, including inspections of repair stations, qualifications for aircraft maintainers, and aircraft certification processes. FAA Reauthorization Act of 2024, Pub. L. No. 118-63, 138 Stat. 1025.

124.    Recent tragedies highlight the importance of the Federal Aviation Administration's safety mission. On January 29, 2025, an American Airlines plane and U.S. Army Black Hawk helicopter collided mid-air over the Potomac River in Washington, D.C. All 67 passengers on board both aircraft were killed in the tragic crash. A week later, a regional airline flight crashed off the coast of Alaska, resulting in the deaths of all 10 passengers onboard. And several small plane crashes have occurred since then, in Arizona, Florida, Pennsylvania, and New York.

125.    To prevent such disasters, the Federal Aviation Administration seeks to ensure safe airways by, among other things, administering federal funding programs to state and local governments to improve airport needs and safety under the Airport Improvement Program. The Airport Improvement Program has provided federal funding to the States for airport development and planning since 1982. Airport and Airway Improvement Act of 1982, Pub. L. No. 97-248, 95 Stat. 671.

126.    The Airport Improvement Program provides federal funding to States to maintain a safe and efficient system of public-use airports that meets the present and future needs of civil aeronautics. Its funding generally supports airport runways, taxiways, noise abatement, and safety or emergency equipment. In doing so, the federal funding program allows States to improve the safe operation of their airports and increase the capacity of their facilities to accommodate passenger and cargo traffic.

127.    The Federal Aviation Administration funds both formula and competitive grants under the Airport Improvement Program.

128.   For its formula funding, the Airport Improvement Program provides several formula grants, including those supporting primary airports (large airports that satisfy a certain passenger volume), cargo service airports, and general aviation airports. 49 U.S.C. § 47114.

129.   Because these airport grants are formula grants and not competitive ones, each State is entitled to a specific allocation when the State authority files an application for such funding. 49 U.S.C. § 47114.

130.   Additionally, the Airport Improvement Program includes grants awarded on a competitive basis. These funds are granted on a per-project basis by the Secretary of Transportation from the Airport and Airway Trust Fund. 49 U.S.C. § 47104.

131.   States, local governments, public agencies, and private owners of public-use airports are eligible to apply for Airport Improvement Program grants. 49 U.S.C. §§ 47102, 47105. States can receive and administer funds from the Airport Improvement Program through the state block grant program for airports in the State classified as non-primary by the Federal Aviation Administration. 49 U.S.C. § 47128.

132.   The Secretary can only place specific conditions on the issuance of Airport Improvement Program grants; these conditions are spelled out in the Airport Improvement Program statutes. 49 U.S.C. §§ 47106, 47107. These conditions are all related to the projects funded by the Airport Improvement Program. *Id.* § 41707. The Secretary is authorized to modify these conditions, but these changes must be published in the Federal Register and open to a comment period. *Id.* § 41707(h)(1).

133.   Additionally, the Secretary is authorized to impose terms on a grant offer, but only those terms necessary to carry out the priorities of the Airport Improvement Program. *Id.* at § 47108(a).

134.   The Airport Improvement Program statutes do not authorize U.S. DOT to impose the Immigration Enforcement Condition as a requirement for Airport Improvement Program funding. None of the statutes underlying the Federal Aviation Administration's grant programs

describe immigration enforcement as a purpose or criterion for U.S. DOT awarding a federal grant under these programs.

135.    Plaintiff States receive and rely on Airport Improvement Program grants for critical airport projects within their States. In Fiscal Year 2024, Plaintiff States received the following formula apportionments under the Airport Improvement Program:[7]

- California: $18,861,826

- Colorado: $5,222,633

- Connecticut: $1,431,328

- Delaware: $422,708

- Hawaii: $845,270

- Illinois: $6,262,073

- Maine: $1,565,306

- Maryland: $2,541,522

- Massachusetts: $2,782,647

- Michigan: $6,500,087

- Minnesota: $4,671,007

- Nevada: $4,488,870

- New Jersey: $3,516,075

- New Mexico: $4,482,919

- New York: $8,741,925

- Oregon: $4,509,547

- Rhode Island: $431,216

- Vermont: $520,827

- Washington: $4,888,477

- Wisconsin: $4,076,549

---

[7] As reported on U.S. DEP'T OF TRANSP., FEDERAL AVIATION ADMINISTRATION., FISCAL YEAR 2024 STATE APPORTIONMENT, available at https://tinyurl.com/2v9y6ks4.

136.   Plaintiff States have applied or intend to apply for Federal Aviation Administration grants, including the Airport Improvement Program, in fiscal year 2025 and future fiscal years when these funds are available.

###    G.    Federal Funding from the Federal Maritime Administration

137.   The Maritime Administration is the sub-agency within U.S. DOT responsible for the nation's waterborne transportation systems. 49 U.S.C. § 109(a). It supports the nation's ships, shipyards, ports, and shipping lanes and waterways, and it oversees other related issues like environmental protection and vessel safety.

138.   As part of its responsibilities, the Maritime Administration administers federal funding to state and local governments related to water transportation.

139.   None of the statutes underlying the Maritime Administration's funding programs describe federal immigration enforcement as a purpose or criterion for U.S. DOT awarding a federal grant under these programs.

140.   For instance, the Port Infrastructure Development Program (PIDP) exists to provide federal grants to states, local governments, and public agencies for the purpose of improving the safety, efficiency, or reliability of the movement of goods through ports and intermodal connections to ports. 46 U.S.C. § 54301(a)(1). In 2022, nearly 300 ports throughout the United States handled 2.6 billion short tons of cargo. Bureau of Transp. Statistics, U.S. Dep't of Transp., Port Performance Freight Statistics: 2025 Annual Report  6 (2025).

141.   PIDP was authorized by Congress as part of the National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 3512, 123 Stat. 2190, 2722-24. The program is codified at 46 U.S.C. § 54301.

142.   U.S. DOT gives these grants for port projects and projects directly related to port operations or to an intermodal connection to a port. 46 U.S.C. § 54301(a)(3)(A)(i). Recipients of PIDP funds must use the funds to improve the safety, efficiency, or reliability of the loading and unloading of goods at the port, the movement of goods into, out of, around, or within a port,

operational improvements, environmental and emission mitigation measures, and port infrastructure. *Id.* § 54301(a)(3)(A)(ii).

143.    The PIDP statute only requires and authorizes the Secretary of Transportation to impose grant conditions related to maintenance of records related to the grant project. *Id.* § 54301(a)(10).

144.    The PIDP statute does not authorize U.S. DOT to impose the Immigration Enforcement Condition as a requirement for PIDP funding.

145.    Plaintiff States receive and rely upon substantial sums of Maritime Administration funding, such as PIDP funding, for important projects developing their ports, harbors, and shipyards. For instance, Rhode Island has been awarded $26,380,000 in total PIDP funding throughout fiscal years 2022, 2023, and 2024 for its port development projects. In fiscal year 2024, Rhode Island received $11.25 million to improve the Port of Davisville's terminal access; build a new 8.6-acre terminal to facilitate greater transport of large cargo; support the development of the new Frys Cove Road to provide further access to another 19.3 acres of area around the port; and add improvements to reinforce the port's security and resilience against sea level rise.

146.    Plaintiff States have applied or intend to apply for Maritime Administration grants, including PIDP, in fiscal year 2025 and future fiscal years when these funds are available.

### H.    Federal Funding from the Pipeline and Hazardous Materials Safety Administration

147.    The United States has approximately 3.3 million miles of pipelines transporting natural gas, crude oil, and other hazardous liquids onshore throughout the country. To guarantee that these pipelines can power the States' communities safely and reliably, Congress charged the Pipeline and Hazardous Materials Safety Administration, a sub-agency within U.S. DOT, with developing and enforcing regulations to ensure safe, reliable, and environmentally sound transportation of energy and other hazardous materials. *See* 49 U.S.C. § 108.

148.   Pipeline accidents may cause devastating environmental damage and harm to public safety. For instance, in 2023, a natural gas pipeline-related explosion and fire at a factory in West Reading, Pennsylvania, killed seven people and caused 10 others to be hospitalized. In 2018, overpressure in a natural gas pipeline in Merrimack Valley, Massachusetts led to explosions and fires that killed one person, injured 21 others, damaged 131 structures, and forced 30,000 residents to evacuate. And in 2015, the Aliso Canyon Underground Storage Facility in Los Angeles County experienced an uncontrolled natural gas leak that released about 109,000 metric tons of methane. This noxious gas leak forced the temporary relocation of over 8,000 households and two schools in the nearby Porter Ranch community.

149.   To prevent and mitigate such accidents, the Pipeline and Hazardous Materials Safety Administration's pipeline safety program "relies heavily on state partnerships" to maintain safe and reliable energy pipelines throughout the country. Paul W. Parfomak, Cong. Research Serv., R44201, DOT's Federal Pipeline Safety Program: Background and Issues for Congress, (2023). The statute provides for States to assume authority to oversee the safety of intrastate gas pipelines, hazardous liquid pipelines, and underground natural gas storage pursuant to certifications and agreements formed with the federal government establishing, among other things, minimum federal pipeline safety standards. The District of Columbia, Puerto Rico, and all States except Alaska and Hawaii participate in this pipeline safety program, overseeing over 85 percent of the pipeline infrastructure subject to the agency's authority.

150.   As part of this partnership, the Pipeline and Hazardous Materials Safety Administration administers the distribution of federal funding through several funding programs, including the Pipeline Safety Program State Base Grant (State Pipeline Safety Grants). The statute requires the agency to provide these federal grants to reimburse States up to 80 percent of the total cost of the personnel, equipment, and activities reasonably required "to provide adequate protection against risks to life and property," including through the "design, installation, inspection, emergency plans and procedures, testing, construction, extension,

operation, replacement, and maintenance of pipeline facilities." 49 U.S.C. §§ 60102(a)(1), (a)(2)(B), 60107(a)(1)-(2).

151.    State Pipeline Safety Grant funds have been available to States since 2003. *See* Pub. L. No. 108-7, 117 Stat. 11, 405 (codified at 49 U.S.C. § 60107).

152.    Because State Pipeline Safety Grants are formula grants and not competitive grants, each State is entitled to a specific allocation when the State authority files an application for such funding. 49 U.S.C. § 60107(a).

153.    No statute authorizes U.S. DOT to impose the Immigration Enforcement Condition as a requirement for State Pipeline Safety Grant funding. Neither the purpose of the program nor the grant criteria are in any way connected to federal immigration enforcement.

154.    Plaintiff States rely on funding from Pipeline and Hazardous Materials Safety Administration, including through Pipeline Safety grants, to ensure the safety of their communities. For example, in fiscal year 2024, California's Office of the State Fire Marshal, a division of the Department of Forestry and Fire Prevention, received $6,375,627 in reimbursements under State Pipeline Safety Grants for the regular safety inspections of oil pipelines running throughout the State, including personnel costs, equipment, training, and travel. Rhode Island was also awarded nearly $400,000 in total from fiscal years 2022 through 2024, under the Hazardous Material Emergency Preparedness program, to support the State's training and emergency protocols for handling and transporting hazardous materials.

155.    Plaintiff States have applied for or intend to apply for Pipeline and Hazardous Materials Administration grants, including State Pipeline Safety and Hazardous Material Emergency Preparedness grants, in fiscal year 2025 and future fiscal years when these funds are available.

## II.    STATES HAVE EXERCISED THEIR SOVEREIGN PREROGATIVE TO CHOOSE HOW TO DEPLOY LAW ENFORCEMENT RESOURCES IN THEIR STATES

156.    In our "system of dual sovereignty between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), States retain the general police power "to protect

the people, property, and economic activity within [their] borders," *New York v. New Jersey*, 598 U.S. 218, 225 (2023). "[I]n the exercise of such powers the state has wide discretion in determining its own public policy and what measures are necessary for its own protection and properly to promote the safety, peace and good order of its people." *Terrace v. Thompson*, 263 U.S. 197, 217 (1923). That means "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). Nor may the federal government "impress into its service—and at no cost to itself—the police officers of the 50 states." *Id.* at 922.

157.    When exercising that police power, one critical choice that Plaintiff States must make is whether to task their state agencies or law enforcement officers with assisting the federal government in enforcing federal immigration law.

158.    Many Plaintiff States and their political subdivisions, for decades, have chosen to limit their entanglement in the enforcement of federal immigration law. *See, e.g.*, Cal. Penal Code § 422.93(a), (b); Cal. Gov't Code §§ 7282-7282.5, 7284-7284.12; 5 Ill. Comp. Stat. 805/1 to /20; N.J. Att'y Gen. Directive 2018-6 (rev. 2019); Md. Code Ann., Crim. Proc. § 5-104; Colo. Rev. Stat. § 24-76.6-102 to -103; Conn. Gen. Stat. § 54-192h; D.C. Code § 24-211.07; N.Y. Exec. Orders 170 and 170.1; Or. Rev. Stat. §§ 181.850, 181A.820; R.I. State Police Gen. Order 56A10; Vt. Stat. Ann. tit. 20, §§ 2366, 4651; Wash. Rev. Code Ann. §§ 10.93.160, 43.10.315. These laws and policies uniformly authorize state and local authorities to comply with applicable federal laws but impose limitations on the circumstances under which state and local officers can devote their own, limited resources to assisting the federal government in enforcing federal immigration law.

159.    These laws and policies are based on the considered experience of state agencies and law enforcement officers, who found that immigrants are less likely to participate in public health programs or to report crimes if they fear that the responding official or officer will turn them over to immigration authorities. For the latter, this reluctance makes it increasingly difficult

for officers to solve crimes and bring suspects to justice, putting all residents at risk. *See, e.g.*, N.J. Att'y Gen. Directive 2018-6, at 1; Cal. Gov. Code § 7284.2.

160.   These States' determinations are also well-supported by empirical data. Numerous studies have confirmed that laws entangling state agencies with immigration enforcement deters immigrants from seeking necessary healthcare, harming the health of the entire community. *See, e.g.*, Steven Asch et al., *Does Fear of Immigration Authorities Deter Tuberculosis Patients from Seeking Care?*, 161 W. J. of Med. 373 (1994). Studies have also confirmed that immigration-related fears prevent witnesses, victims, and others from reporting crimes. Surveys of law enforcement officers and analyses of victim reporting data conclude that fear of immigration enforcement decreased immigrant victims' likelihood of making police reports and reporting domestic violence, participating in investigations, and working with prosecutors. *See* Rafaela Rodrigues et al., Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey,  National Immigrant Women's Advocacy Project 72-73 (2018). One study estimated that policies designed to foster greater cooperation between immigrant communities and police could cause an additional 90,000 violent incidents per year to be reported to law enforcement nationwide. *See* Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement*, *1980 to 2004*, 86 Am. Sociological Rev. 154, 170 (2021). And one study examined 2,492 counties throughout the United States and found that counties with such policies had statistically significant lower levels of crime—35.5 fewer crimes per 10,000 people—than comparable counties without such policies. Tom K. Wong, The Effects of Sanctuary Policies on Crime and the Economy, Ctr. for Am. Progress 4-6 (Jan. 26, 2017).

161.   Participation in federal immigration enforcement efforts also imposes substantial costs on state and local law enforcement by diverting their limited resources and exposing them to potential civil liability for acts connected to immigration enforcement.

162.   For example, California enacted Senate Bill 54, known as the California Values Act, Cal. Gov't Code §§ 7284-7284.12, to foster "trust between California's immigrant community and state and local agencies," to "ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California," and "to direct the state's limited resources to matters of greatest concern to state and local governments." *Id.* § 7284.2. In furtherance of those objectives, the Values Act sets the parameters under which California law enforcement agencies may assist in immigration enforcement. For example, the Values Act: (a) prohibits compliance with detainer hold requests, *id.* § 7284.6(a)(1)(B); (b) defines when California law enforcement agencies may comply with requests by immigration authorities seeking the release date and time of a person in advance of the person's release, *id.* §§ 7282.5(a), 7284.6(a)(1)(C); (c) defines when California law enforcement agencies may transfer an individual to immigration authorities—including when authorized by a judicial warrant or judicial probable cause determination, *id.* §§ 7282.5(a), 7284.6(a)(4); and (d) restricts California law enforcement agencies from "[p]roviding personal information . . . about an individual" for "immigration enforcement purposes," unless that information is publicly available, *id.* § 7284.6(a)(1)(D).

163.   The Values Act, however, does not prohibit California law enforcement agencies from asserting its own jurisdiction over criminal law enforcement matters, *id.* § 7284.6(f), and permits other forms of cooperation with immigration authorities. It does not restrict law enforcement agencies from responding to requests from immigration authorities for a specific person's criminal history. *Id.* § 7284.6(b)(2). The Values Act permits law enforcement agencies to participate in task forces with immigration authorities and share confidential information if the "primary purpose" of the task force is not immigration enforcement. *Id.* § 7284.6(b)(3). And it expressly authorizes compliance with all aspects of 8 U.S.C. §§ 1373 and 1644. *Id.* § 7284.6(e).

164.   Illinois has codified its commitment to building trust between immigrant communities and state and local law enforcement officers in the TRUST Act, which was enacted in 2017 by the Illinois General Assembly and signed into law by Bruce Rauner, then the Republican Governor of Illinois. The TRUST Act provides that law enforcement agencies and

officers in Illinois may not detain a person solely on the basis of an "immigration detainer" or a civil immigration warrant, 5 Ill. Comp. Stat. 805/15(a), and generally prohibits them from detaining people solely on the basis of citizenship or immigration status, *id.* § 805/15(b). The statute also prohibits state and local law enforcement officials from assisting federal immigration agents in any enforcement operations, *id.* § 805/15(h)(1); providing access to detained individuals to immigration agents, *id.* § 805/15(h)(2); and giving immigration agents non-public information about the release dates of detained individuals, *id.* § 805/15(h)(7). But the TRUST Act expressly allows state and local law enforcement officers to cooperate with federal immigration enforcement actions when "presented with a federal criminal warrant" or "otherwise required by federal law," *id.* § 805/15(h), and also expressly states that it should not be read to "restrict" information-sharing regarding "citizenship or immigration status" in accordance with two federal statutes, 8 U.S.C. § 1373 and § 1644, *id.* § 805/5.

165. Maryland law enables law enforcement to investigate crime regardless of immigration status while also encouraging immigrant communities to cooperate with law enforcement. Maryland law generally prohibits law enforcement agents from inquiring about an individual's "citizenship, immigration status, or place of birth during a stop, a search, or an arrest," while engaging in the performance of "regular police functions." Md. Code Ann., Crim. Proc. § 5-104. It also prohibits law enforcement agents from detaining, or extending the detention of, an individual for the purposes of "investigating the individual's citizenship or immigration status, or based on the suspicion that the individual has committed a civil immigration violation." *Id.* Maryland law further prohibits law enforcement agents from intimidating, threatening, or coercing any individual on the basis of the actual or perceived immigration status of the individual or their family member, legal guardian, or someone for whom they serve as a guardian, and from transferring an individual to federal immigration authorities unless specifically required to do so by federal law. *Id.* The law specifically states, "Nothing in this subsection shall prevent a law enforcement agent from inquiring about any information that is material to a criminal investigation." *Id.*

166.    Moreover, Maryland law restricts State and local officials from sharing an individual's photograph or "personal information," such as their address, with a federal agency seeking to enforce the immigration laws. Md. Code Ann., Gen Prov. § 4-320.1(b). However, it will share such information with a federal agency seeking to enforce immigration laws when a judicial warrant is presented. *Id.*

167.    Other Plaintiff States have made different decisions or are subject to different rules in this context. For instance, some Plaintiff States must comply with state court rulings that prevent them from cooperating with civil immigration detainer requests. *See Lunn v. Commonwealth*, 477 Mass. 517, 518-19 (2017).

168.    Still other Plaintiff States without codified directives of the kind described above have not imposed categorical limitations on the use of law-enforcement or state agency resources to assist in the enforcement of federal immigration law. However, they nonetheless do not to impose categorical *requirements* of this kind on their law enforcement officers and state agency employees, either.

169.    Some of these States have concluded that participating in federal immigration enforcement efforts imposes substantial costs on local jurisdictions, not only in the form of personnel and resources but also in the form of potential civil liability. And some such States have reasoned that even where law enforcement resources are dedicated to assisting with enforcement of federal immigration law, it is preferable to retain critical decision-making authority regarding when to offer those resources and how many resources to offer.

170.    Thus, although Plaintiff States have made different decisions regarding the use of their law enforcement and agency resources, all Plaintiff States' decisions in this area are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz*, 521 U.S. at 928—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

III.  **THE FEDERAL GOVERNMENT'S ATTEMPTS TO DEFUND STATE AND LOCAL JURISDICTIONS FOR EXERCISING THEIR SOVEREIGN PREROGATIVES**

171.  Through the Duffy Directive and Immigration Enforcement Condition, Defendants seek to unilaterally restrict all federal funding intended to support States' roads, highways, railways, waterways, and airways for entirely unrelated federal immigration ends. Defendants' actions challenged here are the latest of many attempts by the Trump Administration, in both its first and second terms, to coerce States and local governments into becoming mere extensions of the federal government's civil immigration enforcement efforts.

A.  **The First Trump Administration's Efforts to Defund and Take Enforcement Actions Against State and Local Officials for Declining to Enforce Federal Immigration Law**

172.  In January 2017, President Trump issued Executive Order 13,768. 82 Fed. Reg. 8,799 (Jan. 25, 2017) (2017 Executive Order). The 2017 Executive Order directed the U.S. Attorney General and Secretary of Homeland Security to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants . . . ." *Id.* at 8801. It also directed the U.S. Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." *Id.*

173.  In response, the City and County of San Francisco and County of Santa Clara filed suits challenging the 2017 Executive Order. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1230 (9th Cir. 2018). The Ninth Circuit held that the 2017 Executive Order violated the constitutional separation of powers because Congress did not authorize the administration to "redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* at 1235.

174.  Nonetheless, the Trump Administration took several other actions targeting several Plaintiff States.

175.  The Trump Administration brought a civil lawsuit against California, seeking to invalidate the California Values Act and other state laws under the Supremacy Clause. *United*

*States v. California*, 921 F.3d 865, 872-73 (9th Cir. 2019). As to the Values Act, the district court denied the United States' motion for a preliminary injunction and dismissed its complaint, and the U.S. Court of Appeals for the Ninth Circuit affirmed, holding that the Act is not preempted, and it "does not directly conflict with any obligations that the INA or other federal statutes impose on state or local governments," including 8 U.S.C. § 1373. *Id.* at 887-93.

176.   Moreover, the federal government repeatedly endeavored to defund many Plaintiff States—in particular, by imposing immigration enforcement conditions on funding Plaintiff States received from the Byrne Justice Access Grants Program. These immigration enforcement conditions prompted extensive litigation, in which courts, including the First Circuit, repeatedly held the immigration enforcement conditions to exceed the United States Department of Justice's statutory authority. *City of Providence v. Barr*, 954 F.3d 23, 42 (1st Cir. 2020); *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 291 (3d Cir. 2019); *City of Chicago v. Barr*, 961 F.3d 882, 931 (7th Cir. 2020); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020); *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019); *Colorado v. U.S. Dep't of Justice*, 455 F. Supp.3d 1034, 1053-54 (D. Colo. 2020); *see also City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163, 1180 (D.N.M. 2021) (granting preliminary injunction); *City of Evanston v. Sessions*, No. 18 C 4853, 2018 WL 10228461, at * (N.D. Ill. 2018) (same). *But see New York v. U.S. Dep't of Justice*, 951 F.3d 84, 123 (2d Cir. 2020).

**B.    The Current Trump Administration's Efforts to Defund and Threaten Enforcement Actions Against Plaintiff States**

177.   Hours after the inauguration, the current Trump Administration quickly renewed its efforts to defund so-called sanctuary jurisdictions. On January 20, 2025, President Trump signed Executive Order 14,159. 90 Fed. Reg. 8,443 (Jan. 20, 2025) (2025 Executive Order). The 2025 Executive Order commands the Attorney General and the Secretary of Homeland Security to "undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds," and to "undertake any other lawful actions, criminal or civil, that they deem

warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law." *Id.* at 8,446.

178.    On January 29, 2025, Secretary of Transportation Sean Duffy issued an order to "update[] and reset[] the principles and standards underpinning U.S. Department of Transportation (Department or DOT) policies, programs, and activities." **Ex. A** (Duffy Order). The Order states that, "[t]o the maximum extent permitted by law, DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State Contracts, shall prioritize projects and goals" that "require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary."

179.    On April 24, 2025, Secretary Duffy issued a letter to "all recipients" of U.S. DOT funding to "clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements," including "terminat[ion of] funding." **Ex. B** at 1 (Duffy Directive).

180.    The Duffy Directive announces U.S. DOT's policy of imposing an Immigration Enforcement Condition as a requirement for all U.S. DOT funding. The Duffy Directive asserts that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *Id.* at 2. The Duffy Directive further claims that there are "reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement." *Id.* It warns that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued

receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT." *Id.* at 3.

181.    Numerous state agencies within Plaintiff States received a copy of the Duffy Directive directly from U.S. DOT. Additionally, the Duffy Directive was published on the U.S. DOT website along with a press release quoting Secretary Duffy as stating, among other things, that "Federal grants come with a clear obligation to adhere to federal laws," that recipients must "enforce our immigration rules," and that Secretary Duffy "will take action to ensure compliance." **Ex. C** (U.S. DOT Press Release).

182.    In recent weeks, U.S. DOT has added substantially similar immigration enforcement language to its general terms and conditions for federal funding programs and grants.

183.    On April 16, 2025, the Federal Railroad Administration amended its general terms and conditions for all federal grants administered by the agency. Specifically, it amended the language in section 20.2, governing "Federal Law and Public Policy Requirements." **Ex. D** (Excerpts of Federal Railroad Administration General Terms and Conditions). The new language requires recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law."

184.    A few days later, on April 22, 2025, the Federal Highway Administration amended its general terms and conditions for all competitive grant programs administered by the agency. In doing so, it added the same new language to section 18.2(a), governing "Federal Law and Public Policy Requirements," amending it to require recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law." **Ex. E** (Excerpts of Federal Highway Administration General Terms and Conditions).

185.    On April 25, 2025, the Federal Transit Administration followed suit and amended its Master Agreement—which provides the terms and conditions governing all Federal Transit Administration grants—to include, for the first time, the Immigration Enforcement Condition. It amended section 12(m) to change a civil rights provision to instead address "Federal Law and Public Policy Requirements," including new language requiring recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Customs and Immigration Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." **Ex. F** (Excerpts of Federal Transit Administration Master Agreement); **Ex. G** (Excerpts of Federal Transit Administration Master Agreement Changes, version 33).

186.    On the same day—April 25, 2025—the Federal Aviation Administration posted its fiscal year 2025 grant agreement template on the agency's website. This grant agreement template also includes the Immigration Enforcement Condition under condition number 32, requiring recipients of funding to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Customs and Immigration Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." **Ex. H** (Excerpts of Federal Aviation Administration Template Grant Agreement for Fiscal Year 2025).[8]

187.    Nearly identical language was also recently added to the terms and conditions of specific grant award documents.

188.    For example, on May 2, a Federal Transit Administration staff person orally informed a staff member of the Maryland Transit Administration, a component of the Maryland Department of Transportation, that the Immigration Enforcement Condition in the revised Master Agreement would apply to all future and *existing* Federal Transit Administration funding. In response to this oral representation about the immigration condition, Maryland Transit

---

[8] In addition, the Federal Aviation Administration grant agreement template requires recipients to "follow applicable laws" in the Immigration and Nationality Act, including "the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter." **Ex. H**.

Administration staff requested that the representation be provided in writing, but Maryland has not received a response as of the date of this filing.

189.   Since issuing the revised Master Agreement, the Federal Transit Administration has issued administrative amendments to several existing grants made to the Maryland Transit Administration. These amendments have the effect of conditioning Maryland's access to hundreds of millions of dollars in funding—which have already been allocated and awarded— upon acceptance of the Immigration Enforcement Condition.

190.   Federal officials have also pressured Maryland transportation officials to quickly execute pending grant agreements that contain the Immigration Enforcement Condition and have warned that failure to do so would be seen as a refusal to cooperate that could broadly jeopardize Maryland's Department of Transportation funding, which totals more than a billion dollars annually.

191.   These experiences are not isolated—they are echoed throughout Plaintiff States. In the last few weeks, U.S. DOT has also imposed the Immigration Enforcement Condition on specific grants in the process of being awarded to: California (Bridge Investment Program and Advanced Transportation Technology and Innovation); Illinois (Rail Crossing Elimination Program); Massachusetts (Rail Crossing Elimination Program); Michigan (Advanced Transportation Technology Innovation, Wildlife Crossing Pilot Project, Rail Crossing Elimination Program, and Consolidated Rail Infrastructure and Safety Improvement); Minnesota (Airport Infrastructure Grants and Airport Improvement Project Grants); New York (Motor Carrier Safety Assistance Program, Railroad Crossing Elimination Program, and Wildlife Crossing Pilot Program); Rhode Island (Bridge Investment Program); Washington (Motor Carrier Safety Assistance Program); and Wisconsin (Advanced Transportation Technology and Innovation and Motor Carrier Safety Assistance Program).

192.   In some of these instances, U.S. DOT staff have demanded that state officials execute these grant agreements containing the Immigration Enforcement Condition in a matter of days.

193.   Other federal agencies—including the Department of Homeland Security (DHS) and Department of Housing and Urban Development—have issued similar conditions, threatening to withhold federal funding unless Plaintiff States partake in federal immigration enforcement actions. For instance, on March 27, 2025, the Department of Homeland Security issued its fiscal year 2025 "Standard Terms and Conditions" that include several conditions relating to federal immigration enforcement.

194.   On April 28, 2025, President Trump issued another Executive Order rrequiring "the Attorney General, in coordination with [DHS]" to publish a list of "sanctuary jurisdictions" and to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* The Attorney General and DHS are to publish this list within 30 days of the issuance of the Executive Order—i.e., May 28, 2025. *Id.*

195.   Section 3(a) of the April 28 Executive Order then directs agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate," 90 Fed. Reg. at 18,761-62, expanding to all federal agencies a similar directive in the January 20 Executive Order that applied only to the Attorney General and DHS, 90 Fed. Reg. at 8,446.

## IV.   THE DUFFY DIRECTIVE AND IMMIGRATION ENFORCEMENT CONDITION IRREPARABLY HARM PLAINTIFF STATES

196.   Defendants' unlawful actions irreparably harm Plaintiff States by forcing them into an impossible dilemma. On the one hand, Plaintiff States can stand firm and collectively lose billions of dollars in critical funding for transportation and safety programs. On the other hand, Plaintiff States can capitulate to an unlawful Immigration Enforcement Condition that could divert Plaintiff States' limited resources to federal immigration enforcement, while undermining core public safety imperatives by eroding trust and cooperation between immigrant communities and state and local law enforcement.

197.   Plaintiff States have received and relied upon the federal funding at issue to support safe and extensive transportation infrastructure for decades—and in some cases, for more than a century. These funds enable Plaintiff States to develop safe and effective means of transportation for hundreds of millions of Americans in ways they could not without this financial support. These funds develop and sustain the highways that carry Plaintiff States' residents to and from home; the airports that enable them to cross the country and the globe; the safety measures that protect drivers from fatal accidents; the signals and barriers that prevent train collisions; and the firefighters that inspect and ensure safe pipelines that cross millions of miles throughout Plaintiff States. Due to the consistent, regular receipt of these funds, and the multi-year cycles for which these funds are granted, these federally funded activities are closely woven together with Plaintiff States' efforts to maintain, develop, and ensure the safety of their roads, bridges, highways, railroads, ferries, ports, and airports. There is no realistic way for Plaintiff States to borrow funds, shift existing funds, or obtain funds from other sources sufficient to counteract an abrupt and unlawful withdrawal of this federal funding.

198.   If Plaintiff States do not submit to Defendants' unlawful Immigration Enforcement Condition, Defendants threaten to restrict billions of dollars in transportation funding, posing an immediate risk to countless transportation systems, projects, and safety measures. *Supra* ¶¶ 41-156. A loss, even a temporary one, of this federal funding—and the resulting impacts to the public safety efforts that it enables—poses irreparable harm to the residents of Plaintiff States who will be exposed to greater risk of tragic accidents.

199.   Moreover, many of the federal funds at issue are passed on by Plaintiff States to subrecipient local governments whose projects or programs may be funded at least in large part by those federal funds, and which therefore may incur substantial harms in the wake of the Duffy Directive and Immigration Enforcement Condition. For example, California's Office of Traffic Safety subgrants National Highway Traffic Safety Administration funding to approximately 500 state, regional, and local agencies, including public health departments, fire departments, and law enforcement offices. These grant funds support safety initiatives targeted at the State's most

critical traffic-safety needs, including those that combat alcohol and drug-impaired driving; prevent distracted driving; ensure use of seat belts and child safety seats; guarantee bicycle and pedestrian safety; and provide emergency medical services. A loss of federal funding could result in these critical safety programs being terminated or scaled back.

200.   Further, the loss of these billions of dollars in federal funding constitutes irreparable harm because Plaintiff States lack any damages remedy that would enable them to recover these funds due to the federal government's sovereign immunity. The States also would be unable to obtain compensation for the harms they would suffer as a consequence of an abrupt and unlawful denial of funding.

201.   The unlawful condition also inflicts additional irreparable harm on the States by infringing their sovereign rights, damaging public trust, and harming public safety.

202.   First, Defendants' introduction of the unlawful condition interferes with Plaintiff States' sovereign right to enact policies that best protect their communities, potentially requiring state or local personnel to violate state laws limiting the use of state or local resources for federal civil immigration purposes. *See supra* ¶¶ 159-67; *cf. Printz*, 521 U.S. at 925 ("The Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.").

203.   Second, submitting to Defendants' unlawful condition would also cause Plaintiff States to incur administrative costs and burdens from the diversion of personnel time, the development and administration of new training programs, and the creation of new guidelines for how staff must participate in federal immigration enforcement. Submission to Defendants' unlawful condition may also result in limited state or local resources being diverted to pursue federal civil immigration enforcement activities, taking those resources away from Plaintiff States' commitments to ensuring the safety of their roads, highways, railroads, airways, or waterways. It could also expose Plaintiff States and their officers to civil liability for acts performed in connection with federal immigration enforcement. These, again, represent fiscal

losses that could not be recovered as damages due to the federal government's sovereign immunity.

204.   Third, accepting Defendants' unlawful condition would cause Plaintiff States to undermine the trust they have cultivated between law enforcement and immigrant communities. That breach of goodwill, trust, and cooperation cannot be easily restored once this litigation has concluded. Without that trust, members of immigrant communities will be less likely to participate in public health programs or help police officers, detectives, and prosecutors investigate crimes, identify offenders, or press charges. Accepting Defendants' unlawful condition could thus result in irreparable harm by exposing Plaintiff States' residents to greater incidents of illness and crime.

205.   In sum, Plaintiff States have relied upon U.S. DOT funding for more than a century to sustain vital transportation infrastructure that connects their communities and this country. The Duffy Directive and Defendants' adoption of the unlawful Immigration Enforcement Condition force the Plaintiff States into a Hobson's choice: forgo billions of dollars essential for critical transportation infrastructure or accept an unlawful and unconstitutional condition that surrenders the States' sovereignty, damages community trust, and undermines public safety.

## FIRST CAUSE OF ACTION

### *Ultra Vires* Agency Action Not Authorized by Congress

206.   Plaintiff States reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

207.   An executive agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Nat'l Fed. Indep. Business v. Dep't of Labor*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided.").

208.   Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are

to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

209.  Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

210.  As described above, Defendants lack any statutory authority to impose the Immigration Enforcement Condition as a requirement for federal funding. None of the statutes governing the federal funding at issue mentions state cooperation with federal immigration enforcement as a criterion for eligibility. Given that the Defendants adopted the Immigration Enforcement Condition to conscript the machinery of State government into federal immigration enforcement efforts, there is special reason to question the lawfulness of their actions. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (statutes should not be read to alter the "usual constitutional balance between the States and the Federal Government" unless that intention is "unmistakably clear in the language of the statute"); *see also Gonzales v. Oregon*, 546 U.S. 243, 275-76 (2006) (concluding that "the background principles of our federal system" foreclosed reading a statute to confer authority on a federal agency to regulate areas traditionally supervised by the States).

211.  Indeed, under the Trump Administration's first term, courts repeatedly held the administration's efforts to impose similar immigration enforcement conditions on U.S. Department of Justice grants to be *ultra vires*. *See supra* ¶ 177.

212.  Defendants' *ultra vires* actions have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Violation of the Spending Clause, U.S. Const. Art. I, § VIII, cl. 1.

213.  Plaintiff States reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

214. The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. Art. I, Sec. 8, cl. 1.

215. Even when Congress has delegated some of its federal funding authority to the Executive Branch, including the authority to condition funding, there are limits to the conditions that can be imposed by Congress. *See S. Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

216. Thus, even if Congress has delegated some authority to U.S. DOT to limit federal funds, Defendants have overstepped clear restrictions on Congress's spending authority. *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 n.6 (9th Cir. 2019).

217. First, the Spending Clause requires any conditions on federal funds to be imposed "unambiguously," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), so that States deciding whether to accept such funding can "exercise their choice knowingly, cognizant of the consequences of their participation," *Dole*, 483 U.S. at 207. This is because "legislation enacted pursuant to the spending power is much in the nature of a contract," where Congress's authority "to legislate . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17. Accordingly, Congress must provide States clear notice of the applicable funding conditions. *See, e.g.*, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Plaintiff States never received any clear notice from Congress that transportation funding would be conditioned on participation in federal immigration enforcement—which is unsurprising, because Congress never intended any such condition.

218. The Immigration Enforcement Condition is impermissibly vague, ambiguous, and retroactively imposed. The Duffy Directive, by asserting that funding may be "terminated" due to noncompliance with the Immigration Enforcement Condition, declares Defendants' decision to impose this new condition on already awarded federal funding to Plaintiff States. Doing so alters the terms upon which those funds were obligated and disbursed. Moreover, the

Immigration Enforcement Condition requires Plaintiff States to broadly "cooperate" in the enforcement of federal civil immigration law without providing any definitions or criteria that might suggest what conduct that would encompass, thereby imposing an ambiguous condition.

219.   Second, the Spending Clause requires conditions on federal funding to be related to "the federal interest in" the particular project or program. *Dole*, 483 U.S. at 207. Here, the Immigration Enforcement Condition is unlawful because it imposes a condition entirely unrelated to the transportation funding it encumbers.

220.   Third, the federal government may not impose conditions upon funding "so coercive [upon the States] as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211; *see also Nat. Fed. of Indep. Business v. Sebelius* (NFIB, 567 U.S. 519, 585 (2012) (opinion of Roberts, C.J.) (striking down individual mandate of Affordable Care Act on grounds that it exceeded the Spending Clause authority by "conscript[ing] state [agencies] into the national bureaucratic army").

221.   Here, Defendants' threat to restrict *all* U.S. DOT funding to Plaintiff States (collectively, more than $24 billion in just formula highway funds alone) "is much more than 'relatively mild encouragement'—it is a gun to the head" for the Plaintiff States. *NFIB*, 567 U.S. at 581 (opinion of Roberts, C.J.); *see also id.* (declaring funding threats to be coercive in violation of the Spending Clause where a State "stands to lose not merely 'a relatively small percentage'" of funding from the agency, "but *all* of it"). The Plaintiff States' recipient agencies do not have the budgets to offset this loss of federal funding, and much of their overall budgets are already committed to fixed expenditures, such as public safety staff salaries. Consequently, losing this federal funding "would have significant effects on [the States'] ability to provide services to [its] residents." *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1215 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

222.   Both the financial scale of the affected funding programs and the substantial human cost of forgoing them each render the Immigration Enforcement Condition

sufficiently coercive as to be unconstitutional. Such threats to Plaintiff States' critical infrastructure and safety programs constitute "economic dragooning that leaves the States with no real option but to acquiesce" to federal dictates. *NFIB*, 567 U.S. at 582 (opinion of Roberts, C.J.); *see also id.* at 582 n.12 ("'Your money or your life' is a coercive proposition, whether you have a single dollar in your pocket or $500.").

223.    Federal courts possess the power in equity to "grant injunctive relief … with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327; *see also Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935) (noting that plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials).

224.    Defendants' violations of the Spending Clause have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

### THIRD CAUSE OF ACTION

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C), in Excess of Statutory Authority

225.    Plaintiff States reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

226.    Defendant U.S. DOT is an "agency" under the Administrative Procedure Act (APA), 5 U.S.C. § 551(1), and the Duffy Directive and the Defendants' adoption of the Immigration Enforcement Condition constitute "[a]gency action made [judicially] reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704; *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

227.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

228.    As described above, Defendants exceed their statutory authority by issuing the Duffy Directive and introducing the Immigration Enforcement Condition as a requirement of federal funding. No statutory authority permits Defendant to threaten to deny billions of dollars unless

Plaintiff States comply with the Immigration Enforcement Condition. The Immigration

Enforcement Condition is unauthorized and should be set aside by this Court.

229.    Defendants' violations of the APA have caused and will continue to cause

ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Arbitrary and Capricious

230.   Plaintiff States reallege and incorporate herein by reference each and every

allegation and paragraph set forth previously.

231.   Defendant U.S. DOT is an "agency" under the APA, 5 U.S.C. § 551(1), and the

Duffy Letter and the Defendants' adoption of the Immigration Enforcement Condition constitute

"[a]gency action made [judicially] reviewable by statute and final agency action for which there

is no other adequate remedy in a court." *Id.* § 704; *see Bennett v. Spear*, 520 U.S. 154, 177-78

(1997).

232.   Under the APA, a "court shall . . . hold unlawful and set aside agency actions,

findings, and conclusions found to be . . . arbitrary, , capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

233.   An agency action is arbitrary or capricious where it is not "reasonable and

reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414,

423 (2021). Thus, an agency action is arbitrary and capricious if the agency "relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (citation omitted).

234.   Defendants' policy of imposing the Immigration Enforcement Condition as a

requirement for U.S. DOT funding is arbitrary and capricious because Defendants have provided

inadequate explanation for changing their position and imposing this condition on billions of

federal dollars in transportation funding for the first time. *See FCC*, 592 U.S. at 423. Further, the Immigration Enforcement Condition is arbitrary and capricious because Defendants imposed it by relying on factors that Congress did not intend, such as its policy preferences on federal civil immigration enforcement. Defendants' policy of imposing the Immigration Enforcement Condition is also arbitrary and capricious because Defendants failed to consider statutory authority, failed to consider the reliance interests of Plaintiff States, and failed to consider reasonable alternatives. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 29-31 (2020).

235.    Finally, Defendants' decision to impose the Immigration Enforcement Condition is arbitrary and capricious because Defendants fail to consider important aspects of the problem. Defendants fail to consider the significant harm this condition may threaten to Plaintiff States and their residents, who rely on the impacted federal funding for vital transportation programs and services. Defendants also fail to consider the significant harm this condition may threaten to Plaintiff States and their residents by deterring immigrant communities from reporting crimes to law enforcement or participating in public health programs.

236.    Defendants' violations of the APA have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B), Contrary to Constitutional Right or Power

237.    Plaintiff States reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

238.    Defendant U.S. DOT is an "agency" under the APA, 5 U.S.C. § 551(1), and the Duffy Directive and Immigration Enforcement Condition constitute "[a]gency action made [judicially] reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704; *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

239.   Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

240.   As described above, the Duffy Directive and the Defendants' adoption of the Immigration Enforcement Condition violate constitutional provisions and principles, including the Spending Clause.

241.   Defendants' violations of the APA have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States respectfully requests that this Court enter judgment in its favor and grant the following relief:

1.   Declare that the Defendants' adoption of the Immigration Enforcement Condition is unconstitutional and/or unlawful because it: (a) violates the APA; (b) is *ultra vires*; and (c) to the extent it relies on congressional authority, exceeds Congress's powers under the Spending Clause;

2.   Issue a preliminary and permanent injunction prohibiting Defendants from implementing or enforcing the Immigration Enforcement Condition as set forth in the Duffy Directive;

3.   Issue a preliminary and permanent injunction prohibiting Defendants from withholding or terminating federal funding based on the Immigration Enforcement Condition absent specific statutory authorization;

4.   Issue a preliminary and permanent injunction prohibiting Defendants from taking adverse action against any state entity or local jurisdiction, including debarring it or making it ineligible for federal funding, based on the Immigration Enforcement Condition, absent specific statutory authorization;

5.    Vacate the Defendants' decisions adopting the Immigration Enforcement Condition, and any actions taken by Defendants to implement or enforce the Immigration Enforcement Condition;

6.    Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

7.    Award Plaintiff States costs, expenses, and reasonable attorneys' fees; and

8.    Award such other relief as the Court deems just and proper.


May 13, 2025                                         Respectfully submitted,

**ROB BONTA**                                        **KWAME RAOUL**
  ATTORNEY GENERAL OF CALIFORNIA                       ATTORNEY GENERAL OF ILLINOIS

Michael L. Newman*                                  /s/ Alex Hemmer
  *Senior Assistant Attorney General*                 Alex Hemmer*
Joel Marrero*                                           *Deputy Solicitor General*
James E. Stanley*                                     Christopher G. Wells*
  *Supervising Deputy Attorneys General*                *Chief of the Public Interest Division*
Luke Freedman*                                        Darren Kinkead*
Newton Knowles*                                         *Public Interest Counsel*
Christopher Medeiros*                                 R. Sam Horan*
Alexis Piazza*                                        Michael M. Tresnowski*
Deylin Thrift-Viveros*                                R. Henry Weaver*
  *Deputy Attorneys General*                            *Assistant Attorneys General*
                                                     Office of the Illinois Attorney General
                                                     115 LaSalle Street
/s/ Delbert Tran                                     Chicago, IL 60603
Delbert Tran*                                        (773) 590-7932
  *Deputy Attorney General*                          alex.hemmer@ilag.gov
California Department of Justice
455 Golden gate Ave., Suite 11000
San Francisco, CA 94102                              *Attorneys for the State of Illinois*
(415) 229-0110
delbert.tran@doj.ca.gov


*Attorneys for the State of California*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy*
  *Deputy Solicitor General*
Mayur P. Saxena*
  *Assistant Attorney General*
Maryanne M. Abdelmesih*
Surinder K. Aggarwal*
Yael Fisher*
Nathaniel Rubin*
  *Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*


**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

/s/ James C. Luh
James C. Luh*
  *Senior Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorneys for the State of Maryland*


**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Patrick Reynolds
Kathryn M. Sabatini (RI Bar No. 8486)
  *Civil Division Chief*
  *Special Assistant Attorney General*
Patrick Reynolds (RI Bar No. 10459)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2109
preynolds@riag.ri.gov
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*


**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO

/s/ Sam Wolter
Sam Wolter*
  *Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
samuel.wolter@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Michael K. Skold
Michael K. Skold*
  *Solicitor General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
michael.skold@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail*
  *Deputy Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
vivian.mikhail@maine.gov

*Attorneys for the State of Maine*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks*
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of*
  *Massachusetts*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti*
Michael Dittenber*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
DittenberM@michigan.gov

*Attorneys for the People of the State of*
  *Michigan*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter*
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern*
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Attorneys for the State of Nevada*

**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

/s/ Steven Perfrement
Steven Perfrement*
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
sperfrement@nmdoj.gov

*Attorneys for the State of New Mexico*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Zoe Levine
Zoe Levine*
  *Special Counsel for Immigrant Justice*
Julie Dona*
  *Special Counsel*
Rabia Muqaddam*
  *Special Counsel for Federal Initiatives*
Mark Ladov*
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 907-4589
zoe.levine@ag.ny.gov

*Attorneys for the State of New York*

**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli*
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Julio A. Thompson*
  *Assistant Attorney General*
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3657
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

/s/ Benjamin Seel
Benjamin Seel*
Tyler Roberts*
Cristina Sepe*
Marsha Chien*
  *Assistant Attorneys General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov
Tyler.Roberts@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Marsha.Chien@atg.wa.gov

*Attorneys for the State of Washington*

**\* *pro hac vice* applications forthcoming**

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reynolds Colbert
Frances Reynolds Colbert*
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*