# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

*Defendants*.

Case No. 1:25-cv-00208

# INDEX OF EXHIBITS
# TO PLAINTIFF STATES' MOTION FOR A PRELIMINARY INJUNCTION
# VOLUME I OF II

## I. PUBLICATIONS

| No. | Document Title |
| --- | --- |
| 1 | Order from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Department Operating Administrations and Departmental Offices in the Office of the Secretary of Transportation (Jan. 29, 2025) (the "Duffy Order") |
| 2 | Letter from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Recipients of U.S. Department of Transportation Funding (Apr. 24, 2025) (the "Duffy Directive") |
| 3 | U.S. Department of Transportation Press Release (Apr. 24, 2025) |
| 4 | Federal Railroad Administration General Terms and Conditions (Apr. 23, 2025) |
| 5 | Federal Highway Administration General Terms and Conditions, Competitive Grants (Apr. 22, 2025) |
| 6 | Federal Transit Administration Master Agreement (Apr. 25, 2025) |
| 7 | Federal Transit Administration Master Agreement (Tracked Changes) (Apr. 25, 2025) |
| 8 | Federal Aviation Administration Airport Infrastructure Grant Template Agreement (May 6, 2025) |
| 9 | Maritime Administration Port Infrastructure Development Program General Terms and Conditions (Mar. 31, 2025) |
| 10 | Federal Highway Administration, FY 2022-2026 Estimated Highway Apportionments under the Infrastructure Investment and Jobs Act |
| 11 | Federal Transit Administration, FY 2025 Full Year Apportionments State Totals |
| 12 | Motor Carrier Safety Administration, FY 2024 Estimated MCSAP Funding - Rounded |
| 13 | National Highway Traffic Safety Administration, FY 2024 Grant Funding Table |
| 14 | Federal Aviation Administration, Fiscal Year 2024 State Apportionment |

## II. DECLARATIONS

| No. | Declarant Name | Declarant Title |
| --- | --- | --- |
| 15 | Stephanie Dougherty | Director at the California Office of Traffic Safety (OTS) |
| 16 | Keith Duncan | Chief, Caltrans Division of Budgets, California Department of Transportation (Caltrans) |
| 17 | Dee Lam | Chief, Caltrans Division of Local Assistance, California Department of Transportation (Caltrans) |
| 18 | Jeffrey F. Rosen | District Attorney, Santa Clara County, California |

| No. | Declarant Name | Declarant Title |
|-----|----------------|-----------------|
| 19 | Sally R. Chafee | Chief of Staff at the Colorado Department of Transportation (CDOT) |
| 20 | Ronnell A. Higgins | Commissioner, Connecticut Department of Emergency Services and Public Protection |
| 21 | Shanté A. Hastings | Cabinet Secretary at Delaware Department of Transportation (DelDOT) |
| 22 | Edwin H. Sniffen | Director, Hawai'i Department of Transportation (HDOT) |
| 23 | Adnan G. Khayyat | Chief Nuclear Officer of the Illinois Emergency Management Agency and Office of Homeland Security (IEMA-OHS) |
| 24 | Holly Bieneman | Director of the Office of Planning and Programming at the Illinois Department of Transportation (IDOT) |
| 25 | Brian Karr | Bureau Chief, Investigations & Compliance, at the Illinois Department of Transportation (IDOT) |
| 26 | Sarah C. Moore | Safety Programs Implementation Manager at the Illinois Department of Transportation (IDOT) |
| 27 | Jason Osborn | Director of the Office of Intermodal Project Implementation (OIPI) at the Illinois Department of Transportation (IDOT) |
| 28 | Lynsey M. Heffernan | Chief of Policy and Strategic Planning at the Massachusetts Bay Transportation Authority (MBTA) |
| 29 | David Mohler | Executive Director of the Office of Transportation Planning at the Massachusetts Department of Transportation (MassDOT) |
| 30 | Paul J. Wiedefeld | Secretary at the Maryland Department of Transportation (MDOT) |
| 31 | Bruce A. Van Note | Commissioner of the Maine Department of Transportation (MaineDOT) |
| 32 | Bradley C. Wieferich | Director of the Michigan Department of Transportation (MDOT) |
| 33 | James Cownie | Chief Counsel at the Minnesota Department of Transportation (MnDOT) |
| 34 | Cassandra O'Hern | Deputy Commissioner of the Minnesota Department of Public Safety (DPS) |
| 35 | Francis K. O'Connor | Commissioner of the New Jersey Department of Transportation (NJDOT) |
| 36 | Michael J. Rizol, Jr. | Director of the New Jersey Division of Highway Traffic Safety (NJDHTS) |

| No. | Declarant Name | Declarant Title |
|---|---|---|
| 37 | Juan R. Urena | Bureau Chief for Pipeline Safety, Division of Reliability and Security at the New Jersey Board of Public Utilities (NJBPU) |
| 38 | Janet Ho | Assistant Commissioner for Finance and Integrated Modal Services, New York Department of Transportation |
| 39 | Jackie Bray | New York State Division of Homeland Security and Emergency Services (DHSES) |
| 40 | Travis Brouwer | Assistant Director for Revenue, Finance, and Compliance, Oregon Department of Transportation (ODOT) |
| 41 | Kenji Sugahara | Director, Oregon Department of Aviation (ODAV) |
| 42 | Meredith Brady | Associate Director, Division of Statewide Planning at Rhode Island Department of Administration |
| 43 | Walter R. Craddock | Administrator of Rhode Island Department of Motor Vehicles |
| 44 | Steven King | Managing Director of Quonset Development Corporation, Rhode Island |
| 45 | Major Ronald Longolucco | Administrative Bureau Commander at Rhode Island Department of Public Safety, State Police |
| 46 | Marc R. Pappas | Director of Rhode Island Emergency Management Agency |
| 47 | Oscar L. Perez | Chief of Police, Providence, Rhode Island Police Department |
| 48 | Shelly Baldwin | Acting Director, Washington Traffic Safety Commission |
| 49 | Dennis Bosman | Captain of Commercial Vehicle Division for Washington State Patrol |
| 50 | Katherine Chapman-See | Director of the Washington Office of Financial Management |
| 51 | Mike Gribner | Deputy Secretary of Washington State Department of Transportation |
| 52 | Scott James Lawry | Deputy Secretary, the Wisconsin Department of Transportation (WisDOT) |
| 53 | Dr. Tom K. Wong | Associate Professor, University of California, San Diego |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants.* |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 1

Duffy Order from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Department Operating Administrations and Departmental Offices in the Office of the Secretary of Transportation (Jan. 29, 2025) (the "Duffy Order")



**U.S. Department
of Transportation**

Office of the Secretary
of Transportation

SUBJECT: ENSURING
RELIANCE UPON SOUND
ECONOMIC ANALYSIS IN
DEPARTMENT OF
TRANSPORTATION POLICIES,
PROGRAMS, AND ACTIVITIES



DOT Order

---

1. PURPOSE

This Order updates and resets the principles and standards underpinning U.S. Department of Transportation (Department or DOT) policies, programs, and activities to mandate reliance on rigorous economic analysis and positive cost-benefit calculations and ensure that all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts bolster the American economy and benefit the American people.

2. CANCELLATION

None

3. APPLICABILITY AND SCOPE.

This Order applies to all the Department's Operating Administrations (OA) and the Departmental Offices in the Office of the Secretary of Transportation (OST).[1]

4. EFFECTIVE DATE

This Order is effective upon its date of execution.

5. POLICIES.

The following principles govern the implementation and administration of all DOT policies, programs, and activities:

    a.  The Department's grantmaking, lending, policymaking, and rulemaking activities shall be based on sound economic principles and analysis supported by rigorous cost-benefit requirements and data-driven decisions. This requirement shall apply

---

[1] The terms "Operating Administration" and "OA" hereinafter refer to both the Department's operating administrations and the OST Departmental Offices.

regardless of whether the activities in question fall below the economic threshold required for review by the Office of Information and Regulatory Affairs.

b. To engage in grantmaking, lending, policymaking, or rulemaking, the benefits must be estimated to outweigh the costs. The calculation of the "social cost of carbon" is marked by logical deficiencies, a poor basis in empirical science, politicization, and the absence of a foundation in legislation. Consequently, the Administrator of the Environmental Protection Agency has been ordered by the President to issue guidance to address these harmful and detrimental inadequacies. Prior to issuance of that guidance, DOT shall ensure estimates to assess the value of changes in greenhouse gas emissions resulting from agency actions, including with respect to the consideration of domestic versus international effects and evaluating appropriate discount rates, are, to the extent permitted by law, consistent with the guidance contained in OMB Circular A-4 of September 17, 2003 (Regulatory Analysis).

c. Statutes governing DOT policies, programs, and activities shall be administered to identify and avoid, to the extent practicable, relevant, appropriate, and consistent with law, adverse impacts on families and communities. Adverse impacts may include, but are not limited to, noise; water pollution; soil contamination; a denial of or a reduction in transportation services; increased difficulty in raising children in a safe and stable environment; and destruction or disruption of community cohesion, safety, or economic vitality.

d. Statutes governing DOT policies, programs, and activities shall also be administered to maximize, to the extent practicable, relevant, appropriate, and consistent with law, benefits for families and communities. The benefits may include, but are not limited to, economic opportunities, such as increased access to jobs, healthcare facilities, recreational activities, commercial activity, or any actions or project components that will help alleviate poverty, enhance safety, and primarily benefit families and communities by improving the quality of their lives, raising their standard of living, or enabling them to participate more fully in our economy.

e. DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts, shall not be used to further local political objectives or for projects and goals that are purely local in nature and unrelated to a proper Federal interest. DOT programs and activities should instead prioritize support and assistance for projects and goals that are consistent with the proper role of the Federal government in our system of federalism, have strong co-funding requirements, adhere faithfully to all Federal statutory Buy America requirements, and not depend on continuous or future DOT support or assistance for improvements or ongoing maintenance.

f. To the maximum extent permitted by law, DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts, shall prioritize projects and goals that:

    i.   utilize user-pay models;

    ii.   direct funding to local opportunity zones where permitted;

    iii.   to the extent practicable, relevant, appropriate, and consistent with law, mitigate the unique impacts of DOT programs, policies, and activities on families and family-specific difficulties, such as the accessibility of transportation to families with young children, and give preference to communities with marriage and birth rates higher than the national average (including in administering the Federal Transit Administration's Capital Investment Grant program);

    iv.   prohibit recipients of DOT support or assistance from imposing vaccine and mask mandates; and

    v.   require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary.

6. <u>RESPONSIBILITIES</u>.

   a.  The General Counsel is the chief legal officer of the Department with final authority on all questions of law for all components of DOT. The Office of the General Counsel (OGC) shall provide the legal advice, support, and guidance necessary to implement and effectuate this Order, including via the issuance of additional orders as warranted.

   b.  OAs engaged in grantmaking, lending, policymaking, or rulemaking activities shall, in coordination and consultation with OGC, implement this Order and determine the most effective and efficient way of integrating the principles outlined in this Order with their existing regulations and guidance.

   c.  In undertaking the integration with existing operations, and in coordination and consultation with OGC, OAs shall:

      1.  Develop and issue guidance necessary to implement and effectuate this Order, or review and update any previously issued guidance to ensure consistency with this Order. OAs shall also engage in the notice-and-comment process, as appropriate and in accordance with DOT Order 2100.6B (Policies and Procedures for Rulemakings) and any corresponding regulations, to implement the requirements of this Order.

      2.  Update and revise all Notices of Funding Opportunity, grant agreements, loan agreements, and other program documents as necessary to ensure compliance with Federal law and consistency with this Order.

      3.  Review their existing grant agreements, loan agreements, and contracts, and, to the extent permitted by law, unilaterally amend the general terms and conditions as necessary to ensure compliance with Federal law and consistency with this Order, and provide corresponding notice of such to recipients.

d.  OAs shall prepare a report describing their efforts to comply with this Order and the impact of those efforts on their grantmaking, lending, policymaking, and rulemaking activities. The first of these reports shall be submitted to OGC no later than six months after the effective date of this Order, and each subsequent report shall be due no later than six months thereafter.

e.  OAs shall also observe the following principles:

1.  This Order should be implemented in a simple, transparent manner that avoids adding unnecessary procedural or regulatory steps or causing undue delay. The Order should not be interpreted to impose procedural or regulatory requirements that provide no benefit in the decision-making process. The Order should be carried out in a manner that considers the impact that delays in project delivery or rule-making may have on the economic vitality, safety, and well-being of the American people, their families, and communities.

2.  OAs shall strive to promote the economic opportunities of DOT programs, policies, and activities for families and communities. Procedures shall be established or modified, as necessary, to provide meaningful opportunities for public involvement by families and communities during the planning and development of programs, policies, and activities (including the identification of potential effects, alternatives, and mitigation measures).

3.  DOT shall ensure comprehensive public engagement, including with families and community stakeholders, and provide meaningful access to public information concerning both the costs and the benefits of DOT programs, policies, or activities.

4.  Compliance with the terms of this Order is an ongoing responsibility. OAs shall continuously monitor their programs, policies, and activities to ensure they are administered in a manner consistent with this Order. This Order does not alter existing assignments or delegations of authority to the Operating Administrations or other DOT components.

7.  DISCLAIMER.

This Order is intended to improve the internal management of DOT and is not intended to, nor does it, create any rights, benefits, or trust responsibility, substantive or procedural, enforceable at law or equity, by a party against the Department, its OAs, its officers, or any person. Nor should this Order be construed to create any right to judicial review involving the compliance or noncompliance with this Order by the Department, its Operating Administrations, its officers or any other person.

_____
Secretary of Transportation

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

                    *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                 *Defendants*.

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 2

Letter from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Recipients of U.S. Department of Transportation Funding (Apr. 24, 2025) (the "Duffy Directive")



## THE SECRETARY OF TRANSPORTATION
WASHINGTON, DC 20590

April 24, 2025

To All Recipients of U.S. Department of Transportation Funding:

The U.S. Department of Transportation (Department or DOT) distributes substantial Federal financial assistance for thousands of projects, programs, and activities operated or initiated by diverse entities, including but not limited to State and local governments. The Department administers this Federal financial assistance to support the development and maintenance of the Nation's transportation infrastructure, pursuant to statutory authority and in accordance with binding contractual agreements in the form of Federal financial assistance agreements, usually grants, cooperative agreements, and loans. Accordingly, I write to clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations.

The Equal Protection principles of the Constitution prohibit State and Federal governmental entities from discriminating on the basis of protected characteristics, including race. Indeed, as the Supreme Court declared in *Students for Fair Admission, Inc. v. Harvard (SFFA)*, 600 U.S. 181, 206 (2023), "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." The Court further noted that "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220. In ruling that race-based admissions programs at universities violated the Equal Protection Clause, the Court made clear that discrimination based on race is, has been, and will continue to be unlawful, except in rare circumstances. *Id.* at 220-21. Similarly, sex-based classifications violate the Equal Protection Clause absent "exceedingly persuasive" justification. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).

These constitutional principles are reinforced by the Civil Rights Act of 1964, which prohibits discrimination based on protected characteristics in the Federal funding and employment contexts in Title VI (42 U.S.C. § 2000d *et seq*.) and Title VII (42 U.S.C. § 2000e-2), as well as the applicable non-discrimination clauses in the Federal Aid Highway Act of 1973 (23 U.S.C. §§ 140 and 324 *et seq*.), the Airport and Airway Improvement Act of 1982, (49 U.S.C. § 47123), and Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681 *et seq*.).

Based on binding Supreme Court precedent and these Federal laws, DOT is prohibited from discriminating based on race, color, national origin, sex, or religion in any of its programs or activities. Moreover, because DOT may not establish, induce, or endorse prohibited discrimination indirectly,[1] it must ensure that discrimination based on race, color, national origin, sex, or religion does not exist in the programs or activities it funds or financially assists.

These same principles apply to recipients of Federal financial assistance from DOT, as both a matter of Federal law and by virtue of contractual provisions governing receipt of DOT funding. Accordingly, DOT recipients are prohibited from engaging in discriminatory actions in their own policies, programs, and activities, including in administering contracts, and their employment practices.

Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.

In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT

---

[1] *See SFFA*, 600 U.S. at 230; Norwood v. Harrison, 413 U.S. 455, 465 (1973).

financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law. The Department also expects its recipients to ensure that the Federal financial assistance they receive from DOT is provided only to subrecipients, businesses, or service providers that are U.S. Citizens or U.S. Nationals and Lawful Permanent Residents (LPRs) or legal entities allowed to do business in the U.S. and which do not employ illegal aliens.

This letter provides notice of the Department's existing interpretation of Federal law. The Department will vigorously enforce the law on equal terms as to all its recipients and intends to take appropriate measures to assess their compliance based on the interpretation of Federal law set forth in this letter. Adherence to your legal obligations is a prerequisite for receipt of DOT financial assistance. Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT.

The Department retains authority, pursuant to its oversight responsibilities and the terms of your agreements, to initiate enforcement actions, such as comprehensive audits and possible recovery of funds expended in a manner contrary to the terms of the funding agreement. DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest. These steps, within DOT's discretion, are intended to ensure accountability and protect the integrity of Federal programs.

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support through its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

DOT remains committed to advancing a transportation system that serves the public interest efficiently and unleashes economic prosperity and a superior quality of life for American families. This mission depends upon your strict adherence to the legal framework governing our partnership, and I trust you will take all necessary steps to comply with Federal law and satisfy your legal obligations.

Sincerely,

Sean P. Duffy

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants.* |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 3

U.S. Department of Transportation Press
Release (Apr. 24, 2025)

🇺🇸 An official website of the United States government <u>Here's how you know</u> ⌄

Home  \  Newsroom

## In This Section                                                                        +

---

### Media Contact

**Press Office**
US Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590
United States
Email: <u>pressoffice@dot.gov</u>
Phone: <u>1 (202) 366-4570</u> 📞

If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

---

## Trump's Transportation Secretary Sean P. Duffy: Follow the Law

Thursday, April 24, 2025

**WASHINGTON, D.C.** – U.S. Transportation Secretary Sean P. Duffy <u>issued a reminder</u> to all recipients of federal transportation funding that they must comply with federal laws. Non-compliance may lead to enforcement actions.

*"Federal grants come with a clear obligation to adhere to federal laws,"* said **U.S. Transportation Secretary Sean P. Duffy**. *"It shouldn't be controversial – enforce our immigration rules, end anti-American DEI policies, and protect free speech. These values reflect the priorities of the American people, and I will take action to ensure compliance."*

**Key Letter Excerpts:**
*"As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations."*

**On Immigration**
*"In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs."*
Cc: <u>WHITE HOUSE EO DIRECTING DHS AND AG TO DENY FEDERAL FUNDING TO SANCTUARY JURISDICTIONS</u>

**On DEI**
*"Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements."*
Cc: <u>WHITE HOUSE EO ENDING DEI PROGRAMS WITHIN GOVERNMENT</u> AND <u>FACT SHEET</u>

  

**U.S. DEPARTMENT OF TRANSPORTATION**

1200 New Jersey Avenue, SE
Washington, DC 20590
855-368-4200

**WANT TO KNOW MORE?**

Receive email updates about the latest in Safety, Innovation, and Infrastructure.

SUBSCRIBE NOW

**ABOUT DOT**

Meet the Secretary

Mission

Newsroom

Social Media

Leadership

Regulations

Transit Benefit Policy

Careers

Contact Us

**OPERATING ADMINISTRATIONS**

FAA

FHWA

FMCSA

FRA

FTA

GLS

MARAD

NHTSA

OIG

OST

PHMSA

**RESEARCH AND TECHNOLOGY**

Office of the Assistant Secretary for Research and Technology

Bureau of Transportation Statistics

Volpe Center

Ask-A-Librarian

**PRIORITIES**

Infrastructure Investment and Jobs Act

Cybersecurity

Safety

Transformation

**POLICIES, RIGHTS, AND LEGAL**

USA.gov

Privacy Policy

FOIA

Budget and Performance

No FEAR Act

Cummings Act Notices

Ethics

Web Policies and Notices

Vulnerability Disclosure Policy

Digital Accessibility

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>  *Defendants.* | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 4

Federal Railroad Administration General
Terms and Conditions (Apr. 23, 2025)



U.S. Department of Transportation
**Federal Railroad Administration**

---

## Attachment 1

---

# GENERAL TERMS AND CONDITIONS

Revision Date: April 16, 2025

**U.S. Department of Transportation**
**Federal Railroad Administration**

# General Terms and Conditions
# Table of Contents

ATTACHMENT 1 .................................................................................................................. 7

ARTICLE 1:  TERMS AND CONDITIONS .......................................................................... 7

1.1    General Terms and Conditions ............................................................................... 7

1.2    Project-Specific Terms and Conditions ................................................................. 7

1.3    Program-Specific Clauses ....................................................................................... 7

1.4    Exhibits ...................................................................................................................... 8

ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES ...................................................... 8

2.1    FRA Role .................................................................................................................... 8

2.2    FRA Professional Staff ............................................................................................ 8

ARTICLE 3:  RECIPIENT ROLE ........................................................................................ 9

3.1    Representations and Acknowledgments on the Project ..................................... 9

3.2    Representations on Authority and Capacity ........................................................ 9

The Recipient represents that: ............................................................................................ 9

3.3    FRA Reliance ........................................................................................................... 10

3.4    Project Delivery ...................................................................................................... 10

3.5    Rights and Powers Affecting the Project ............................................................ 10

3.6    Notification of Changes to Key Personnel .......................................................... 11

ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS ...................... 11

4.1    Federal Award Amount .......................................................................................... 11

4.2    Federal Obligations ................................................................................................ 11

4.3    Maximum Funding Amount .................................................................................... 11

4.4    Budget Period .......................................................................................................... 11

4.5    Period of Performance ........................................................................................... 11

ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES .......... 11

5.1    Notification Requirement ...................................................................................... 11

5.2    Scope and Statement of Work Changes .............................................................. 12

5.3    Schedule Changes ................................................................................................... 12

5.4    Budget Changes ...................................................................................................... 12

5.5    Project Cost Savings .............................................................................................. 13

5.6    FRA Acceptance of Changes .................................................................................. 13

U.S. Department of Transportation
**Federal Railroad Administration**

ARTICLE 6:  GENERAL REPORTING TERMS ........................................................................... 14

6.1    Alternative Reporting Methods ............................................................................. 14

6.2    Paperwork Reduction Act Notice ........................................................................... 14

ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING .......................................................... 14

7.1    Quarterly Project Progress Reports and Recertifications ............................................ 14

7.2    Final Progress Reports and Financial Information .................................................... 15

7.3    Real Property Reporting ..................................................................................... 15

ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING ........................................... 15

8.1    Baseline Performance Measurement ...................................................................... 15

8.2    Post-Project Performance Measurement ................................................................. 15

8.3    Project Outcomes Report .................................................................................... 16

8.4    General Performance Measurement Requirements ................................................... 16

8.5    Outcome Measurement and Reporting Survival ...................................................... 16

ARTICLE 9:  NONCOMPLIANCE AND REMEDIES ................................................................. 16

9.1    Noncompliance Determinations ........................................................................... 16

9.2    Remedies ........................................................................................................ 17

9.3    Other Oversight Entities ..................................................................................... 18

ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION ............................................. 18

10.1    Suspension of Award Activities .......................................................................... 18

10.2    FRA Termination ............................................................................................. 19

10.3    Closeout Termination ....................................................................................... 19

10.4    Post-Termination Adjustments ........................................................................... 19

10.5    Non-Terminating Events .................................................................................... 19

ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS ............ 20

11.1    Recipient Monitoring and Record Retention .......................................................... 20

11.2    Financial Records and Audits ............................................................................. 20

11.3    Internal Controls ............................................................................................. 21

11.4    FRA Record Access .......................................................................................... 21

11.5    Site Visits ...................................................................................................... 21

ARTICLE 12:  CONTRACTING AND SUBAWARDING .............................................................. 21

12.1    Buy America .................................................................................................... 21

12.2    Small and Disadvantaged Business Requirements ................................................... 22

12.3    Engineering and Design Services [Reserved] ......................................................... 22

U.S. Department of Transportation
**Federal Railroad Administration**

12.4    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment ... 22

12.5    Pass-Through Entity Responsibilities ........................................................................... 22

12.6    Local Hiring Preference for Construction Jobs ............................................................ 22

12.7    Procurement ............................................................................................................... 22

ARTICLE 13:  COSTS, PAYMENTS, AND UNEXPENDED FUNDS ............................................ 23

13.1    Limitation of Federal Award Amount ......................................................................... 23

13.2    Project Costs .............................................................................................................. 23

13.3    Timing of Project Costs .............................................................................................. 23

13.4    Recipient Recovery of Federal Funds ......................................................................... 23

13.5    Unexpended Agreement Federal Funds ...................................................................... 23

13.6    Interest Earned .......................................................................................................... 24

13.7    Timing of Payments to the Recipient .......................................................................... 24

13.8    Payment Method ........................................................................................................ 24

13.9    Information Supporting Expenditures ......................................................................... 24

13.10   Reimbursement Request Timing Frequency ............................................................... 24

13.11   Program Income ........................................................................................................ 24

ARTICLE 14:  PROPERTY AND EQUIPMENT ........................................................................ 25

14.1    General Requirements ................................................................................................ 25

14.2    Relocation and Real Property Acquisition .................................................................. 25

14.3    Use for Originally Authorized Purpose ....................................................................... 25

14.4    Maintenance .............................................................................................................. 25

14.5    Real Property Disposition .......................................................................................... 26

14.6    Equipment Disposition ............................................................................................... 26

14.7    Recordkeeping ........................................................................................................... 26

14.8    Encumbrance ............................................................................................................. 26

ARTICLE 15:  AMENDMENTS .............................................................................................. 27

15.1    Bilateral Amendments ............................................................................................... 27

15.2    FRA Unilateral Amendments ..................................................................................... 27

15.3    Other Amendments .................................................................................................... 27

ARTICLE 16:  [RESERVED] .................................................................................................. 27

ARTICLE 17:  [RESERVED] .................................................................................................. 27

ARTICLE 18:  LABOR AND WORK ........................................................................................ 27

18.1    Labor and Work .......................................................................................................... 27


U.S. Department of Transportation
**Federal Railroad Administration**

ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE ........................................................ 28

19.1    Critical Infrastructure Security and Resilience ........................................................................ 28

ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE,  AND NATIONAL POLICY
REQUIREMENTS ...................................................................................................................................... 28

20.1    Uniform Administrative Requirements for Federal Awards .................................... 28

20.2    Federal Law and Public Policy Requirements ........................................................... 28

20.3    Federal Freedom of Information Act ......................................................................... 29

20.4    History of Performance .............................................................................................. 29

20.5    Whistleblower Protection .......................................................................................... 29

20.6    External Award Terms and Obligations ..................................................................... 30

20.7    Incorporated Certifications ....................................................................................... 30

ARTICLE 21:  ASSIGNMENT ..................................................................................................................... 30

21.1    Assignment Prohibited .............................................................................................. 30

ARTICLE 22:  WAIVER ............................................................................................................................... 30

22.1    Waivers ....................................................................................................................... 30

ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS ............................................................................. 31

23.1    Disclaimer of Federal Liability ................................................................................... 31

23.2    Environmental Review ............................................................................................... 31

23.3    Project Maintenance Requirement ........................................................................... 32

23.4    Appropriations Act Requirements ............................................................................ 32

23.5    Standards of Conduct ................................................................................................ 32

23.6    Changed Conditions of Performance ....................................................................... 33

23.7    Litigation ..................................................................................................................... 33

23.8    [Reserved] ................................................................................................................... 33

23.9    Equipment and Supplies ............................................................................................ 33

23.10   Safety and Technology Data ...................................................................................... 33

23.11   Intellectual Property .................................................................................................. 33

23.12   Liquidation of Recipient Obligations ........................................................................ 33

ARTICLE 24:  CONSTRUCTION AND DEFINITIONS ................................................................................... 34

24.1    Agreement .................................................................................................................. 34

24.2    Construction ............................................................................................................... 34

24.3    Integration .................................................................................................................. 34

24.4    Definitions ................................................................................................................... 34

U.S. Department of Transportation
**Federal Railroad Administration**

24.5     Calendar Dates ................................................................................................. 35

24.6     Communication in Writing ................................................................................ 35

24.7     Severability ...................................................................................................... 35

ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE .................................... 35

25.1     Counterparts .................................................................................................... 35

25.2     Effective Date ................................................................................................... 36

ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES ................................................................ 36

26.1     Interstate Rail Compacts Grant Program ......................................................... 36

26.2     Railroad Crossing Elimination Program Clauses ............................................. 38

26.3     Consolidated Rail Infrastructure and Safety Improvements Grants Clauses ............................ 40

26.4     Restoration and Enhancement Grants Clauses ............................................. 42

26.5     Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State
of Good Repair Clauses ................................................................................................. 45

U.S. Department of Transportation
**Federal Railroad Administration**

## ATTACHMENT 1

This Grant Agreement (Agreement) is between the Federal Railroad Administration (FRA) and the Recipient identified in Attachment 2: Project-Specific Terms and Conditions. This Agreement, including the Agreement cover sheet, this Attachment 1, Attachment 2, and Exhibits A–C, constitutes the entire Agreement between FRA and the Recipient regarding the Project as defined in Attachment 2. All prior discussions and understandings concerning the scope and subject matter of this agreement are superseded by this Agreement.

This Agreement is governed by and subject to 2 C.F.R. part 200, Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, and the U.S. Department of Transportation (USDOT) implementing regulations at 2 C.F.R. part 1201.

## ARTICLE 1:  TERMS AND CONDITIONS

**1.1      General Terms and Conditions**

This Attachment 1: General Terms and Conditions, is part of the Agreement between FRA and the Recipient. This Attachment 1 contains the standard terms and conditions governing the administration of this Agreement and the execution of the Project. The General Terms and Conditions incorporate by reference the information contained in Attachment 2 and the Exhibits to this Agreement.

**1.2      Project-Specific Terms and Conditions**

Attachment 2: Project-Specific Terms and Conditions, is part of the Agreement between FRA and the Recipient. Attachment 2 contains Project-Specific Terms and Conditions, which may include special terms and conditions.

**1.3      Program-Specific Clauses**

Article 26 of this Attachment 1 contains the applicable program-specific clauses. The Recipient will comply with the program-specific clauses below that are associated with the grant program identified in Attachment 2 of this Agreement. In the event that the Recipient's grant is not authorized under a program listed below, Article 26 does not apply.

(a)  For Projects funded under the Interstate Rail Compacts program (49 U.S.C. § 22910), the Recipient will comply with the program-specific clauses in Article 26.1.

(b)  For Projects funded under the Railroad Crossing Elimination program (49 U.S.C. § 22909), the Recipient will comply with the program-specific clauses in Article 26.2.

(c)  For Projects funded under the Consolidated Rail Infrastructure and Safety Improvements program (49 U.S.C. § 22907), the Recipient will comply with the program-specific clauses in Article 26.3.

(d)  For Projects funded under the Restoration and Enhancement program (49 U.S.C. § 22908), the Recipient will comply with the program-specific clauses in Article 26.4.



U.S. Department of Transportation
**Federal Railroad Administration**

(e)  For Projects funded under the Federal-State Partnership for Intercity Passenger Rail program (49 U.S.C. § 24911) and Federal-State Partnership for State of Good Repair (as authorized in Sections 11103 and 11302 of the Passenger Rail Reform and Investment Act of 2015 (Title XI of the Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94 (2015))), the Recipient will comply with the program-specific clauses in Article 26.5.

### 1.4     Exhibits

Exhibits A–C are part of the Agreement between FRA and the Recipient. The Recipient will comply with Exhibits A–C.

## ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES

### 2.1     FRA Role

(a)  FRA is responsible for funding disbursements to the Recipient under this Agreement. FRA will also conduct oversight and monitoring activities to assess Recipient progress against established performance goals and to assess compliance with terms and conditions, including the Statement of Work and other requirements of this Agreement.

(b)  If this award is made as a Cooperative Agreement, FRA will have substantial programmatic involvement. Substantial involvement means that, after award, technical, administrative, or programmatic staff will assist, guide, coordinate, or otherwise participate with the Recipient in Project activities.

(c)  If this award is made as a Grant, FRA will not have substantial programmatic involvement.

### 2.2     FRA Professional Staff

FRA may provide professional staff to review work in progress, completed products, and to provide or facilitate access to technical assistance when it is available, feasible, and appropriate. FRA professional staff may include the following:

(a)  Financial Analyst. The Financial Analyst will serve as the Recipient's point of contact for systems (e.g., GrantSolutions and the Delphi eInvoicing System) access and troubleshooting as well as for financial monitoring.

(b)  Grant Manager. The Grant Manager will serve as the Recipient's point of contact for grant administration and will oversee compliance with the terms and conditions in this Agreement. The Grant Manager reviews financial reports, performance reports, and works with the Project Manager to facilitate effective Project delivery.

(c)  Project Manager. The Project Manager will serve as the Recipient's point of contact for the technical aspects of Project delivery. The Project Manager coordinates Project deliverable review, provides technical assistance to the Recipient, and generally assesses Project progress and performance.


U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 3:  RECIPIENT ROLE

**3.1      Representations and Acknowledgments on the Project**

(a)  The Recipient represents that:

(1)  all material statements of fact in the Application were accurate when the Application was submitted and now; and

(2)  the Recipient read and understands the terms and conditions in Attachment 1 and Attachment 2 of this Agreement, the applicable program-specific clauses in Article 26 of this Attachment 1, and the information and conditions in the Exhibits.

(b)  The Recipient acknowledges that:

(1)  the terms and conditions impose obligations on the Recipient and that the Recipient's non-compliance with the terms and conditions may result in remedial action, including terminating the Agreement, disallowing costs incurred for the Project, requiring the Recipient to refund Federal contributions to FRA, and reporting the non-compliance in the Federal-government-wide integrity and performance system. Recipient acknowledges that the terms and conditions impose such obligations on the Recipient whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

(2)  The Recipient acknowledges that the requirements of this Agreement apply to the entire Project, including Project costs satisfied from sources other than Agreement Federal Funds.

(c)  By entering into this Agreement with FRA, the Recipient agrees to comply with the terms and conditions in Attachment 1 and Attachment 2, including applicable program-specific clauses in Article 26 of this Attachment 1, Exhibits A–C, and all applicable Federal laws and regulations, including those identified in this Agreement. The Recipient will ensure compliance with all terms of this Agreement and all of its parts for all tiers of subawards and contracts under this Agreement, as appropriate. The Recipient understands that the terms and conditions of this Agreement apply regardless of whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

**3.2      Representations on Authority and Capacity**

The Recipient represents that:

(a)  it has the legal authority to receive Federal financial assistance under this Agreement;

(b)  it has the legal authority to complete the Project;

(c)  all representations and warranties made in the Federal System for Awards Management (SAM.gov) and in the Application are true and correct;

9

U.S. Department of Transportation
**Federal Railroad Administration**

(d)  it has the capacity, including legal, technical, institutional, managerial, and financial capacity, to comply with its obligations under this Agreement and complete the Project;

(e)  the Non-Federal Funds listed in Article 6 of Attachment 2 of this Agreement are committed to fund the Project;

(f)  it has sufficient funds available to ensure that equipment and infrastructure funded under this Agreement will be operated and maintained in compliance with this Agreement and applicable Federal law;

(g)  it has sufficient funds available to ensure that operations funded under this agreement are conducted in compliance with this Agreement and applicable Federal law; and

(h)  the individual executing this agreement on behalf of the Recipient has the legal authority to enter this Agreement and make the statements and certifications in this Agreement on behalf of the Recipient.

**3.3      FRA Reliance**

The Recipient acknowledges that:

(a)  FRA relied on statements of fact in the Application and SAM.gov to select the Project to receive this award;

(b)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient and the Project are eligible to receive financial assistance under this Agreement;

(c)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient has the legal authority to implement the Project; and

(d)  FRA relied on statements of fact in both the Application and this Agreement to establish the terms of this Agreement; and

(e)  FRA's selection of the Project to receive this award may have prevented awards to other eligible applicants.

**3.4      Project Delivery**

(a)  The Recipient will implement and complete the Project to FRA's satisfaction under the terms of this Agreement.

(b)  The Recipient will ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

**3.5      Rights and Powers Affecting the Project**

(a)  The Recipient will not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this Agreement without written approval of FRA.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**19.1    Critical Infrastructure Security and Resilience**

(a)  Consistent with the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021) and the National Security Memorandum on Critical Infrastructure Security and Resilience (April 30, 2024), the Recipient will consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b)  If the Security Risk Designation in Section 1.3 of Attachment 2 of this Agreement is "Elevated," then not later that than two years after the date of this Agreement the Recipient will submit to FRA a report that:

(1)  identifies a cybersecurity point of contact for the transportation infrastructure being improved in the Project;

(2)  summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

(3)  summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)  documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)  describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**20.1    Uniform Administrative Requirements for Federal Awards**

The Recipient will comply, and will ensure that other entities receiving funding under this agreement will comply, with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201, regardless of whether the Recipient or other entity receiving funding under this agreement is a Non-Federal entity as defined in 2 C.F.R. § 200.1, except that subpart F of part 200 does not apply if the Recipient or Subrecipient is a for-profit entity.

**20.2    Federal Law and Public Policy Requirements**

(a)  The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not

28



U.S. Department of Transportation
**Federal Railroad Administration**

impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

(b) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d)  The failure of this Agreement to expressly identify Federal law applicable to the Recipient or activities under this Agreement does not make that law inapplicable.

**20.3    Federal Freedom of Information Act**

(a)  FRA is subject to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

(b)  The Recipient acknowledges that the Application and materials submitted to FRA by the Recipient related to this Agreement will become FRA records that may be subject to public release under 5 U.S.C. § 552. If the Recipient submits any materials to FRA related to this Agreement that the Recipient considers to include trade secret or confidential commercial or financial information, the Recipient should note that the submission contains confidential business information, mark each affected page, and highlight or otherwise denote the portions of the submission that contain confidential business information.

**20.4    History of Performance**

Under 2 C.F.R. § 200.206, any Federal awarding agency may consider the Recipient's performance under this Agreement, when assessing the risks of making a future Federal financial assistance award to the Recipient.

**20.5    Whistleblower Protection**

(a)  The Recipient acknowledges that it is a "Recipient" within the scope of 41 U.S.C. § 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b)  The Recipient will inform its employees in writing of the rights and remedies provided under 41 U.S.C. § 4712, in the predominant native language of the workforce.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                        *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                        *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 5

Federal Highway Administration General
Terms and Conditions, Competitive Grants
(Apr. 22, 2025)

**FEDERAL HIGHWAY ADMINISTRATION**

**COMPETITIVE GRANT PROGRAM GENERAL TERMS AND CONDITIONS**

**Date: April 22, 2025**

**TABLE OF CONTENTS**

GENERAL TERMS AND CONDITIONS ................................................................. 6
Article 1 PURPOSE ................................................................................................... 6
   1.1   Purpose ........................................................................................................ 6
Article 2 FHWA ROLE ............................................................................................ 6
   2.1   Federal Highway Administration (FHWA) Responsibilities. ...................... 6
Article 3 RECIPIENT ROLE .................................................................................... 6
   3.1   Statements on the Project ............................................................................ 6
   3.2   Statements on Authority and Capacity ....................................................... 6
   3.3   USDOT FHWA Reliance ............................................................................ 7
   3.4   Project Delivery. ......................................................................................... 7
   3.5   Rights and Powers Affecting the Project. ................................................... 7
   3.6   Subaward to Designated Subrecipient ........................................................ 8
   3.7   Designated Subrecipient Statements and Responsibilities ......................... 8
Article 4 AWARD AMOUNT, OBLIGATION, AND TIME PERIODS ................... 8
   4.1   Federal Award Amount ............................................................................... 8
   4.2   Federal Obligations. ................................................................................... 8
   4.3   Budget Period. ............................................................................................ 9
   4.4   Period of Performance. ............................................................................. 10
Article 5 STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES ... 10
   5.1   Notification Requirement ......................................................................... 10
   5.2   Scope and Statement of Work Changes ................................................... 10
   5.3   Schedule Changes ..................................................................................... 10
   5.4   Budget Changes. ....................................................................................... 11
   5.5   FHWA Acceptance of Changes. ............................................................... 12
Article 6 GENERAL REPORTING TERMS ........................................................... 12
   6.1   Report Submission .................................................................................... 12
   6.2   Alternative Reporting Methods ................................................................ 12
Article 7 PROGRESS AND FINANCIAL REPORTING ........................................ 12
   7.1   Project Progress and Financial Reports and Recertifications. ................... 12
   7.2   Final Progress Reports and Financial Information ................................... 13
Article 8 PERFORMANCE REPORTING .............................................................. 13
   8.1   Baseline Performance Measurement. ....................................................... 13
   8.2   Post-construction Performance Measurement. ......................................... 14
   8.3   Project Outcomes Report. .......................................................................... 14
   8.4   General Performance Measures ................................................................ 14
   8.5   Performance Reporting Survival. ............................................................. 15
Article 9 NONCOMPLIANCE AND REMEDIES .................................................. 15
   9.1   Noncompliance Determinations. ............................................................... 15
   9.2   Remedies. .................................................................................................. 15
   9.3   Other Oversight Entities .......................................................................... 16
Article 10 AGREEMENT TERMINATION............................................................. 16
   10.1   FHWA Termination. ................................................................................. 16
   10.2   Closeout Termination. .............................................................................. 17
   10.3   Post-Termination Adjustments ................................................................ 17
   10.4   Non-Terminating Events............................................................................ 17

10.5    Other Remedies ................................................................................................ 18

Article 11 MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS
................................................................................................................................. 18

11.1    Recipient Monitoring and Record Retention. .................................................. 18
11.2    Financial Records and Audits. ......................................................................... 18
11.3    Internal Controls .............................................................................................. 19
11.4    USDOT Record Access .................................................................................... 19
11.5    Title 23 Oversight Responsibilities ................................................................. 19

Article 12 CONTRACTING AND SUBAWARDS .................................................... 19
12.1    Minimum Wage Rates ...................................................................................... 19
12.2    Buy America. .................................................................................................... 19
12.3    Small and Disadvantaged Business Requirements ........................................... 19
12.4    Engineering and Design Services ..................................................................... 20
12.5    Prohibition on Certain Telecommunications and Video Surveillance Services or
          Equipment. ....................................................................................................... 20
12.6    Pass-through Entity Responsibilities ................................................................ 20
12.7    Subaward and Contract Authorization. ............................................................ 20

Article 13 COSTS, PAYMENTS, AND UNEXPENDED FUNDS ............................ 20
13.1    Limitation of Federal Award Amount. ............................................................. 20
13.2    Projects Costs. .................................................................................................. 21
13.3    Timing of Project Costs. .................................................................................. 21
13.4    Recipient Recovery of Federal Funds ............................................................. 21
13.5    Unexpended Federal Funds .............................................................................. 21
13.6    Timing of Payments to the Recipient. .............................................................. 21
13.7    Payment Method. .............................................................................................. 21
13.8    Information Supporting Expenditures. .............................................................. 22
13.9    Reimbursement Frequency ............................................................................... 22

Article 14 LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY .......... 22
14.1    Liquidation of Recipient Obligations. .............................................................. 22

Article 15 AGREEMENT MODIFICATIONS ........................................................... 23
15.1    Bilateral Modifications .................................................................................... 23
15.2    Unilateral Contact Modifications. .................................................................... 23
15.3    FHWA Unilateral Modifications. ..................................................................... 23
15.4    Other Modifications. ......................................................................................... 23

Article 16 Civil Rights and Title VI ............................................................................ 23
16.1    Title VI. ............................................................................................................ 23
16.2    Legacy Infrastructure and Facilities. ................................................................ 24

Article 17 CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE .......... 24
17.1    Critical Infrastructure Security and Resilience. ............................................... 24

Article 18 FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL
POLICY REQUIREMENTS. ...................................................................................... 25
18.1    Uniform Administrative Requirements for Federal Awards ............................. 25
18.2    Federal Law and Public Policy Requirements. ................................................. 25
18.3    Implementation of Executive Order 14025 ...................................................... 25
18.4    Implementation of Executive Order 14173 ...................................................... 25
18.5    Federal Freedom of Information Act. ................................................................ 26

18.6    History of Performance .................................................................................. 26
18.7    Whistleblower Protection............................................................................. 26
18.8    External Award Terms and Obligations...................................................... 26
18.9    Incorporated Certifications .......................................................................... 27
Article 19 ASSIGNMENT ........................................................................................... 27
19.1    Assignment Prohibited. ................................................................................ 27
Article 20 WAIVER ..................................................................................................... 27
20.1    Waivers. ........................................................................................................ 27
Article 21 ADDITIONAL TERMS AND CONDITIONS ............................................ 27
21.1    Effect of Urban or Rural Designation .......................................................... 27
21.2    Disclaimer of Federal Liability.................................................................... 28
21.3    Relocation and Real Property Acquisition. ................................................. 28
21.4    Equipment Disposition. ............................................................................... 28
21.5    Environmental Review. ................................................................................ 28
21.6    Railroad Coordination ................................................................................. 30
Article 22 MANDATORY AWARD INFORMATION ................................................ 30
22.1    Information Contained in a Federal Award ................................................. 30
22.2    Federal Award Identification Number. ........................................................ 30
22.3    Recipient's Unique Entity Identifier. .......................................................... 30
Article 23 CONSTRUCTION AND DEFINITIONS ................................................... 31
23.1    Schedules ..................................................................................................... 31
23.2    Exhibits ........................................................................................................ 31
23.3    Construction. ................................................................................................ 31
23.4    Integration. ................................................................................................... 31
23.5    Definitions .................................................................................................... 32
Article 24 AGREEMENT EXECUTION AND EFFECTIVE DATE ........................... 32
24.1    Counterparts................................................................................................. 32
24.2    Effective Date .............................................................................................. 32

**Index of Definitions**

Environmental Review Entity ........................................................................................ 29
Federal Share ............................................................................................................ 12
FHWA ........................................................................................................................ 6
General Terms and Conditions ................................................................................... 32
Grant ......................................................................................................................... 32
Grant Amount ........................................................................................................... 32
Grant Program .......................................................................................................... 32
Program Statute ........................................................................................................ 32
Project ....................................................................................................................... 32
Project Closeout ........................................................................................................ 17
Project Cost Savings ................................................................................................. 11
Technical Application ................................................................................................. 32
Title VI ...................................................................................................................... 24

## GENERAL TERMS AND CONDITIONS

These General Terms and Conditions are incorporated by reference in this grant agreement under the Grant Program. The term "Recipient" is defined in this grant agreement. This grant agreement includes schedules A through H. The grant agreement may include special terms and conditions in grant agreement articles or schedules.

## ARTICLE 1
## PURPOSE

1.1 **Purpose.** The purpose of this award is to fund the eligible project defined in this grant agreement that has been selected to receive an award for the Grant Program. The parties will accomplish that purpose by achieving the following objectives:

(1)     timely completing the Project; and

(2)     ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, as modified by schedule E.

## ARTICLE 2
## FHWA ROLE

2.1     **Federal Highway Administration (FHWA) Responsibilities.**

(a)     The FHWA is the operating administration under the United States Department of Transportation ("USDOT") responsible for the administration of the Grant Program, the approval and execution of this grant agreement, and any modifications to this grant agreement under section 15.1.

## ARTICLE 3
## RECIPIENT ROLE

3.1     **Statements on the Project.** The Recipient states that:

(1)     all material statements of fact in the Technical Application were accurate when that application was submitted; and

(2)     schedule E documents all material changes in the information contained in that application.

3.2     **Statements on Authority and Capacity.** The Recipient states that:

(1)     it has the authority to receive Federal financial assistance under this grant agreement;

(2)     it has the legal authority to complete the Project;

(3)     it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this grant agreement;

(4)     not less than the difference between the total eligible project costs listed in section 3 of schedule D and the Grant Amount listed in section 1 of schedule D is committed to fund the Project;

(5)     it has sufficient funds available to ensure that infrastructure completed or improved under this grant agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)     the individual executing this grant agreement on behalf of the Recipient has authority to enter this grant agreement and make the statements in this article 3 and in section 18.9 on behalf of the Recipient.

**3.3     USDOT FHWA Reliance.** The Recipient acknowledges that:

(1)     the USDOT FHWA relied on statements of fact in the Technical Application to select the Project to receive this award;

(2)     the USDOT FHWA relied on statements of fact in both the Technical Application and this grant agreement to determine that the Recipient and the Project are eligible under the terms of the Notice of Funding Opportunity ("NOFO") in section 7 of schedule D.

(3)     the USDOT FHWA's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**3.4     Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this grant agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all Federal laws, regulations, and policies that are applicable to the Project.

**3.5     Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprive it of any rights or powers necessary to the Recipient's performance under this grant agreement without written approval of the FHWA.

(b) The Recipient shall act promptly, in a manner acceptable to the FHWA, to

(4)     documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)     describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 18
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**18.1    Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

**18.2    Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with the enforcement of Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) The failure of this grant agreement to expressly identify Federal law applicable to the Recipient or activities under this grant agreement does not make that law inapplicable.

**18.3    Implementation of Executive Order 14025.** Consistent with Executive Order 14025, "Worker Organizing and Empowerment" (Apr. 26, 2021), Schedule H, Labor and Work, documents the consideration of job quality and labor rights, standards, and protections related to the Project.

**18.4    Implementation of Executive Order 14173**

(a) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(b) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                  *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                  *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 6

Federal Transit Administration
Master Agreement (Apr. 25, 2025)

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**MASTER AGREEMENT**

**For Federal Transit Administration Agreements authorized by**
**49 U.S.C. chapter 53 and Title 23, United States Code (Highways), as amended by**
**the Infrastructure Investment and Jobs Act of 2021 (IIJA), the Fixing America's Surface**
**Transportation (FAST) Act, the Moving Ahead for Progress in the 21st Century Act**
**(MAP-21), the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy**
**for Users (SAFETEA-LU), the SAFETEA-LU Technical Corrections Act of 2008, or other**
**federal laws that FTA administers.**

**FTA MA(33)**
**April 25, 2025**

http://www.transit.dot.gov

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Preface ........................................................................................................................... 1

Statutory Authorities ...................................................................................................... 1

Purpose of this Master Agreement ................................................................................. 1

Generally Applicable Provisions .................................................................................... 3

Section 1.     Terms of this Master Agreement and Compliance ................................. 3

Section 2.     Definitions ............................................................................................. 4

Section 3.     Implementation. ................................................................................... 12

Section 4.     Ethics, Political Activity, Disqualification, and Certain Criminal Activity. ............... 19

Section 5.     Federal Assistance ............................................................................... 27

Section 6.     Non-Federal Share. ............................................................................. 28

Section 7.     Payments to the Recipient. ................................................................. 30

Section 8.     Records and Reports Related to the Award and the Underlying Agreement. ........... 41

Section 9.     Record Retention and Access to Sites of Performance. ....................... 47

Section 10.    Completion, Audit, Settlement, and Closeout. ..................................... 48

Section 11.    Right of the Federal Government to Terminate. ................................... 50

Section 12.    Civil Rights. ........................................................................................ 51

Section 13.    Planning. ............................................................................................. 59

Section 14.    Private Enterprise. .............................................................................. 60

Section 15.    Preference for United States Products and Services. ........................... 61

Section 16.    Procurement. ....................................................................................... 62

Section 17.    Patent Rights. ...................................................................................... 68

Section 18.    Rights in Data and Copyrights. ........................................................... 69

Section 19.    Use of Real Property, Equipment, and Supplies. ................................. 72

Section 20.    Transit Asset Management. ................................................................. 77

Section 21.    Insurance. ............................................................................................ 77

Section 22.    Relocation and Real Property ............................................................. 78

Section 23.    Construction. ....................................................................................... 79

Section 24.    Employee Protections. ........................................................................ 80

Section 25.    Early Systems Work Agreement. ........................................................ 82

Section 26.    Environmental Protections. ................................................................ 84

Section 27.    State Management and Monitoring Systems. ....................................... 87

Section 28.    Charter Service. .................................................................................. 87

Section 29.    School Bus Operations. ................................................................................ 88

Section 30.    Geographic Information and Related Spatial Data. .................................... 88

Section 31.    Federal "$1 Coin" Requirements. .............................................................. 89

Section 32.    Public Transportation Safety .................................................................... 89

Section 33.    Motor Carrier Safety. ............................................................................... 89

Section 34.    Safe Operation of Motor Vehicles. ........................................................... 90

Section 35.    Substance Abuse. ...................................................................................... 91

Section 36.    Protection of Sensitive Security and Other Sensitive Information. ........... 92

Section 37.    Special Notification Requirements for States. .......................................... 92

Section 38.    Freedom of Information. ............................................................................ 93

Section 39.    Disputes, Breaches, Defaults, and Litigation. ........................................... 94

Section 40.    Amendments to the Underlying Agreement. ............................................. 95

Section 41.    FTA's Transit Award Management System (TrAMS). ............................... 95

Section 42.    Information Obtained through Internet Links. ........................................... 96

Section 43.    Severability. .............................................................................................. 96

Special Provisions for Specific Programs ........................................................................ 97

Section 44.    Special Provisions for All Public Transportation Innovation, Technical Assistance or Workforce Development Programs. ...................................................................... 97

Section 45.    Special Provisions for the State Safety Oversight Grant Program. ............ 99

Section 46.    Special Provisions for the State Infrastructure Bank (SIB) Program. ........ 99

Section 47.    Special Provisions for the TIFIA and RRIF Programs. ........................... 100

Section 48.    Special Provisions for the Joint FTA–FRA Program. .............................. 101

Appendix A Tribal Transit Program—Applicable Provisions ........................................ 103

## UNITED STATES DEPARTMENT OF TRANSPORTATION
## FEDERAL TRANSIT ADMINISTRATION

## MASTER AGREEMENT

## PREFACE

### Statutory Authorities

This is the official Federal Transit Administration (FTA) Master Agreement that applies to each Underlying Agreement (Grant Agreement, Cooperative Agreement, Loan Agreement, Loan Guarantee Agreement, or Line of Credit Agreement) for a specific Award authorized by:

(a)    Federal transit laws, 49 U.S.C. chapter 53, as amended, including the following:

    (1)    The Infrastructure Investment and Jobs Act of 2021 (IIJA), Public Law No. 117-58, November 15, 2021, and other authorizing legislation that may be enacted;

    (2)    The Fixing America's Surface Transportation (FAST) Act, Public Law No. 114-94, December 4, 2015;

    (3)    The Moving Ahead for Progress in the 21st Century Act (MAP-21), Public Law No. 112- 141, July 6, 2012, as amended by the Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Public Law No. 114-41, July 31, 2015; and

    (4)    The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Public Law No. 109-59, August 10, 2005, as amended by the SAFETEA-LU Technical Corrections Act of 2008, Public Law No 110-244, June 6, 2008.

(b)    Continuing Resolutions or Other Appropriations Resolutions or Acts funding the Department of Transportation during Fiscal Year 2025.

(c)    Title 23, United States Code (Highways).

(d)    Other federal legislation that FTA administers, as FTA so determines.

### Purpose of this Master Agreement

This FTA Master Agreement contains the standard terms and conditions that apply to the Underlying Agreement with the Recipient, which Underlying Agreement may take the form of an:

(a)     FTA Grant Agreement, including an FTA Grant Agreement for an award of federal assistance under the Tribal Transit Program;

(b)     FTA Cooperative Agreement; or

(c)     Transportation Infrastructure Finance Innovation Act (TIFIA) or Railroad Rehabilitation and Improvement Financing (RRIF) Loan, Loan Guarantee, Line of Credit, Master Credit Agreement for a Project overseen by FTA, or State Infrastructure Bank (SIB) Cooperative Agreement.

THEREFORE, in consideration of the mutual covenants, promises, and representations herein, FTA and the Recipient agree as follows:

## GENERALLY APPLICABLE PROVISIONS

**Section 1.    Terms of this Master Agreement and Compliance.**

(a)    The Recipient must comply with all applicable federal laws, regulations, and requirements, and should follow applicable federal guidance, except as FTA determines otherwise in writing.

(b)    To assure compliance with federal laws, regulations, and requirements, the Recipient must take measures to assure that other participants in its Underlying Agreements (e.g., Third Party Participants) comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing.

(c)    FTA may take enforcement action if the Recipient or a Third Party Participant violates an applicable federal law, regulation, or requirement, or does not follow applicable federal guidance.

(d)    FTA and the Recipient agree that not every provision of this Master Agreement will apply to every Recipient or Underlying Agreement.

    (1)    FTA has divided this Master Agreement into the "Preface," "Generally Applicable Provisions," and "Special Provisions for Specific Programs."

    (2)    This Master Agreement has an Appendix A illustrating the specific provisions of this Master Agreement that apply to the Tribal Transit Programs.

    (3)    Criteria determining which federal laws, regulations, requirements, and guidance apply include the type of Award, the federal law authorizing federal assistance for the Award, the federal law, regulations, or requirements governing how the Award must be implemented, the federal guidance pertaining to the Award, and the Recipient's legal status as a "state," "state instrumentality," a "local government," a federally recognized Indian Tribe (Indian Tribe), a "private nonprofit entity," a "private for-profit entity," or an individual.

(e)    As provided in federal laws, regulations, requirements, and guidance, FTA will enforce only those federal laws, regulations, requirements, and guidance that apply to the specific FTA Recipient, its Third Party Participants, or to any Project and related activities encompassed in the Award, the accompanying Underlying Agreement, and any Amendments thereto.

(f)     Each provision of this Master Agreement must be interpreted in context with all other provisions of this Master Agreement and the Underlying Agreement. If a single provision is read apart from the rest of this Master Agreement or the Underlying Agreement, that provision might not convey the extent of the Recipient's responsibility to comply with the requirements of this Master Agreement and the Underlying Agreement.

(g)     This Master Agreement does not have an Expiration Date. This Master Agreement continues to apply to the Recipient and its Underlying Agreement, until modified or superseded by a more recently enacted or issued applicable federal law, regulation, requirement, or guidance, or Amendment to this Master Agreement or the Underlying Agreement.

**Section 2.     Definitions.**

(a)     *List of Definitions*. In addition to the definitions provided in 49 U.S.C. § 5302, as amended, or in previous legislation if circumstances may require, the Recipient agrees that the following definitions apply:

   (1)     *Application* means the request for federal assistance submitted that is signed and dated by the Applicant or an official authorized to act on the behalf of the Applicant, and includes all explanatory, supporting, and supplementary documents filed with FTA by or on behalf of the Applicant, and has been reviewed by FTA staff and addresses FTA's comments and concerns. An application for federal assistance in the form of a Grant or Cooperative Agreement must be submitted in FTA's Transit Award Management System (TrAMS).

   (2)     *Approval*, unless FTA determines otherwise in writing, means a written statement of an authorized federal official transmitted electronically or in typewritten hard copy expressly permitting the Recipient to take or omit an action in connection with its Underlying Agreement, and signed by a federal official authorized to permit the Recipient to take or omit an action that may not be taken or omitted without the Federal Government's permission. Approval does not mean permission to take or omit a similar action other than the specific action for which approval was given and does not include an oral permission or interpretation, which has no legal force, authority, or effect. For purposes of this Master Agreement, the definition of "approval" also applies to "concurrence" and "waiver."

   (3)     *Associated Transit Improvement* means, with respect to a Project or an area to be served by a Project, an activity that is designed to enhance transit service or use and that is physically or functionally related to transit facilities.

4

(2)    The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, as amended, 42 U.S.C. § 4541, et seq.; and

(3)    The Public Health Service Act, as amended, 42 U.S.C. §§ 290dd – 290dd-2.

(j)    *Access to Services for Persons with Limited English Proficiency*. The Recipient agrees to provide meaningful access to public transportation services to persons with limited understanding of English to comply with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq.*, and its implementing regulation at 28 CFR § 42.405(d), and appliable U.S. Department of Justice guidance.

(k)    *Other Nondiscrimination Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow federal guidance prohibiting discrimination.

(l)    *Remedies*. Remedies for failure to comply with applicable federal Civil Rights laws, regulations, and requirements, and failure to follow guidance may be enforced as provided in those federal laws, regulations, requirements, or guidance.

(m)    *Federal Law and Public Policy Requirements*. The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(n)    *Federal Anti-Discrimination*.

(1)    Pursuant to section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(2)    Pursuant to section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants.* |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 7

Federal Transit Administration Master
Agreement (Tracked Changes) (Apr. 25, 2025)

**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL TRANSIT ADMINISTRATION**

**MASTER AGREEMENT**

> **Commented [A1]:** This tracked-changes document is provided as a convenience to the reader, to show clearly the differences between versions of the Federal Transit Administration's Master Agreement. This document does not have the force and effect of law and is not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

**For Federal Transit Administration Agreements authorized by
49 U.S.C. chapter 53 and Title 23, United States Code (Highways), as amended by
the Infrastructure Investment and Jobs Act of 2021 (IIJA), the Fixing America's Surface
Transportation (FAST) Act, the Moving Ahead for Progress in the 21st Century Act
(MAP-21), the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy
for Users (SAFETEA-LU), the SAFETEA-LU Technical Corrections Act of 2008, or other
federal laws that FTA administers.**

**FTA MA(3~~2~~3)**
~~March 26, 2025~~DATE

http://www.transit.dot.gov

## TABLE OF CONTENTS

Table of Contents.............................................................................................................i

Preface ...........................................................................................................................1

    Statutory Authorities................................................................................................1

    Purpose of this Master Agreement............................................................................1

Generally Applicable Provisions ...................................................................................3

    Section 1.    Terms of this Master Agreement and Compliance.........................................3

    Section 2.    Definitions.................................................................................................4

    Section 3.    Implementation. .......................................................................................12

    Section 4.    Ethics, Political Activity, Disqualification, and Certain Criminal Activity..............19

    Section 5.    Federal Assistance....................................................................................27

    Section 6.    Non-Federal Share. ..................................................................................28

    Section 7.    Payments to the Recipient. ......................................................................30

    Section 8.    Records and Reports Related to the Award and the Underlying Agreement...........41

    Section 9.    Record Retention and Access to Sites of Performance. ..........................47

    Section 10.    Completion, Audit, Settlement, and Closeout............................................48

    Section 11.    Right of the Federal Government to Terminate. .......................................50

    Section 12.    Civil Rights. ............................................................................................51

    Section 13.    Planning. .................................................................................................59

    Section 14.    Private Enterprise. ...................................................................................60

    Section 15.    Preference for United States Products and Services. ................................61

    Section 16.    Procurement. ...........................................................................................62

    Section 17.    Patent Rights. ..........................................................................................68

    Section 18.    Rights in Data and Copyrights..................................................................69

    Section 19.    Use of Real Property, Equipment, and Supplies. .....................................72

    Section 20.    Transit Asset Management........................................................................77

    Section 21.    Insurance. ................................................................................................77

    Section 22.    Relocation and Real Property...................................................................78

    Section 23.    Construction. ...........................................................................................79

    Section 24.    Employee Protections. .............................................................................80

    Section 25.    Early Systems Work Agreement................................................................82

    Section 26.    Environmental Protections. ......................................................................84

    Section 27.    State Management and Monitoring Systems..............................................87

    Section 28.    Charter Service........................................................................................87

Section 29.    School Bus Operations. .................................................................................. 88

Section 30.    Geographic Information and Related Spatial Data. ................................... 88

Section 31.    Federal "$1 Coin" Requirements. ................................................................ 89

Section 32.    Public Transportation Safety. ...................................................................... 89

Section 33.    Motor Carrier Safety. ................................................................................... 89

Section 34.    Safe Operation of Motor Vehicles. .............................................................. 90

Section 35.    Substance Abuse. ........................................................................................... 91

Section 36.    Protection of Sensitive Security and Other Sensitive Information. ........... 92

Section 37.    Special Notification Requirements for States. ............................................. 92

Section 38.    Freedom of Information. ............................................................................... 93

Section 39.    Disputes, Breaches, Defaults, and Litigation. .............................................. 94

Section 40.    Amendments to the Underlying Agreement. ............................................... 95

Section 41.    FTA's Transit Award Management System (TrAMS). ................................ 95

Section 42.    Information Obtained through Internet Links. ............................................ 96

Section 43.    Severability. .................................................................................................. 96

Special Provisions for Specific Programs ............................................................................ 97

Section 44.    Special Provisions for All Public Transportation Innovation, Technical Assistance or Workforce Development Programs. ....................................................................... 97

Section 45.    Special Provisions for the State Safety Oversight Grant Program. ............ 99

Section 46.    Special Provisions for the State Infrastructure Bank (SIB) Program. ........ 99

Section 47.    Special Provisions for the TIFIA and RRIF Programs. ............................. 100

Section 48.    Special Provisions for the Joint FTA–FRA Program. ............................... 101

Appendix A Tribal Transit Program—Applicable Provisions ........................................ 103

ii

**UNITED STATES DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**MASTER AGREEMENT**

**PREFACE**

**Statutory Authorities**

This is the official Federal Transit Administration (FTA) Master Agreement that applies to each Underlying Agreement (Grant Agreement, Cooperative Agreement, Loan Agreement, Loan Guarantee Agreement, or Line of Credit Agreement) for a specific Award authorized by:

(a)    Federal transit laws, 49 U.S.C. chapter 53, as amended, including the following:

      (1)    The Infrastructure Investment and Jobs Act of 2021 (IIJA), Public Law No. 117-58, November 15, 2021, and other authorizing legislation that may be enacted;

      (2)    The Fixing America's Surface Transportation (FAST) Act, Public Law No. 114-94, December 4, 2015;

      (3)    The Moving Ahead for Progress in the 21st Century Act (MAP-21), Public Law No. 112- 141, July 6, 2012, as amended by the Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Public Law No. 114-41, July 31, 2015; and

      (4)    The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Public Law No. 109-59, August 10, 2005, as amended by the SAFETEA-LU Technical Corrections Act of 2008, Public Law No 110-244, June 6, 2008.

(b)    Continuing Resolutions or Other Appropriations Resolutions or Acts funding the Department of Transportation during Fiscal Year 2025.

(c)    Title 23, United States Code (Highways).

(d)    Other federal legislation that FTA administers, as FTA so determines.

**Purpose of this Master Agreement**

This FTA Master Agreement contains the standard terms and conditions that apply to the Underlying Agreement with the Recipient, which Underlying Agreement may take the form of an:

1

(a)     FTA Grant Agreement, including an FTA Grant Agreement for an award of federal assistance under the Tribal Transit Program;

(b)     FTA Cooperative Agreement; or

(c)     Transportation Infrastructure Finance Innovation Act (TIFIA) or Railroad Rehabilitation and Improvement Financing (RRIF) Loan, Loan Guarantee, Line of Credit, Master Credit Agreement for a Project overseen by FTA, or State Infrastructure Bank (SIB) Cooperative Agreement.

THEREFORE, in consideration of the mutual covenants, promises, and representations herein, FTA and the Recipient agree as follows:

2

## GENERALLY APPLICABLE PROVISIONS

**Section 1.    Terms of this Master Agreement and Compliance.**

(a)    The Recipient must comply with all applicable federal laws, regulations, and requirements, and should follow applicable federal guidance, except as FTA determines otherwise in writing.

(b)    To assure compliance with federal laws, regulations, and requirements, the Recipient must take measures to assure that other participants in its Underlying Agreements (e.g., Third Party Participants) comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing.

(c)    FTA may take enforcement action if the Recipient or a Third Party Participant violates an applicable federal law, regulation, or requirement, or does not follow applicable federal guidance.

(d)    FTA and the Recipient agree that not every provision of this Master Agreement will apply to every Recipient or Underlying Agreement.

(1)    FTA has divided this Master Agreement into the "Preface," "Generally Applicable Provisions," and "Special Provisions for Specific Programs."

(2)    This Master Agreement has an Appendix A illustrating the specific provisions of this Master Agreement that apply to the Tribal Transit Programs.

(3)    Criteria determining which federal laws, regulations, requirements, and guidance apply include the type of Award, the federal law authorizing federal assistance for the Award, the federal law, regulations, or requirements governing how the Award must be implemented, the federal guidance pertaining to the Award, and the Recipient's legal status as a "state," "state instrumentality," a "local government," a federally recognized Indian Tribe (Indian Tribe), a "private nonprofit entity," a "private for-profit entity," or an individual.

(e)    As provided in federal laws, regulations, requirements, and guidance, FTA will enforce only those federal laws, regulations, requirements, and guidance that apply to the specific FTA Recipient, its Third Party Participants, or to any Project and related activities encompassed in the Award, the accompanying Underlying Agreement, and any Amendments thereto.

3

(f)     Each provision of this Master Agreement must be interpreted in context with all other provisions of this Master Agreement and the Underlying Agreement. If a single provision is read apart from the rest of this Master Agreement or the Underlying Agreement, that provision might not convey the extent of the Recipient's responsibility to comply with the requirements of this Master Agreement and the Underlying Agreement.

(g)     This Master Agreement does not have an Expiration Date. This Master Agreement continues to apply to the Recipient and its Underlying Agreement, until modified or superseded by a more recently enacted or issued applicable federal law, regulation, requirement, or guidance, or Amendment to this Master Agreement or the Underlying Agreement.

**Section 2.     Definitions.**

(a)     *List of Definitions*. In addition to the definitions provided in 49 U.S.C. § 5302, as amended, or in previous legislation if circumstances may require, the Recipient agrees that the following definitions apply:

(1)     *Application* means the request for federal assistance submitted that is signed and dated by the Applicant or an official authorized to act on the behalf of the Applicant, and includes all explanatory, supporting, and supplementary documents filed with FTA by or on behalf of the Applicant, and has been reviewed by FTA staff and addresses FTA's comments and concerns. An application for federal assistance in the form of a Grant or Cooperative Agreement must be submitted in FTA's Transit Award Management System (TrAMS).

(2)     *Approval*, unless FTA determines otherwise in writing, means a written statement of an authorized federal official transmitted electronically or in typewritten hard copy expressly permitting the Recipient to take or omit an action in connection with its Underlying Agreement, and signed by a federal official authorized to permit the Recipient to take or omit an action that may not be taken or omitted without the Federal Government's permission. Approval does not mean permission to take or omit a similar action other than the specific action for which approval was given and does not include an oral permission or interpretation, which has no legal force, authority, or effect. For purposes of this Master Agreement, the definition of "approval" also applies to "concurrence" and "waiver."

(3)     *Associated Transit Improvement* means, with respect to a Project or an area to be served by a Project, an activity that is designed to enhance transit service or use and that is physically or functionally related to transit facilities.

4

     (1)     The Drug Abuse Office and Treatment Act of 1972, as amended, 21 U.S.C. § 1101, et seq.;

     (2)     The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, as amended, 42 U.S.C. § 4541, et seq.; and

     (3)     The Public Health Service Act, as amended, 42 U.S.C. §§ 290dd – 290dd-2.

(j)     *Access to Services for Persons with Limited English Proficiency*. The Recipient agrees to provide meaningful access to public transportation services to persons with limited understanding of English to comply with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq.*, and its implementing regulation at 28 CFR § 42.405(d), and appliable U.S. Department of- Justice guidance.

(k)     *Other Nondiscrimination Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow federal guidance prohibiting discrimination.

(l)     *Remedies*. Remedies for failure to comply with applicable federal Civil Rights laws, regulations, and requirements, and failure to follow guidance may be enforced as provided in those federal laws, regulations, requirements, or guidance.

(m)     *~~Promoting Free Speech and Religious Liberty~~Federal Law and Public Policy Requirements*. The ~~F~~Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(n)     *Federal Anti-Discrimination*.

     (1)     Pursuant to section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

     (2)     Pursuant to section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this Agreement, the Recipient certifies that it does not operate any programs

58

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                    *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                    *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 8

Federal Aviation Administration
Airport Infrastructure Grant
Template Agreement (May 6, 2025)



**U.S. Department
of Transportation
Federal Aviation
Administration**

**FY 2025 AIRPORT INFRASTRUCTURE GRANT**
***TEMPLATE ONLY ** GRANT AGREEMENT ** TEMPLATE ONLY***
**Part I - Offer**

Federal Award Offer Date   {{DateTime_es_:signer1:calc(now()):format(date," mmmm d, yyyy")}}

Airport/Planning Area   [Selection Criteria: Airport Name or Planning Area]

Airport Infrastructure Grant Number   [Selection Criteria: Grant Number Formatted]

Unique Entity Identifier   [Selection Criteria: DUNS Number]

TO:   [Selection Criteria: Sponsor Name]

**(herein called the "Sponsor") (For Co-Sponsors, list all Co-Sponsor names. The word "Sponsor" in this Grant Agreement also applies to a Co-Sponsor.)**
[Please Enter Co-Sponsor Name(s)]

FROM:   **The United States of America** (acting through the Federal Aviation Administration, herein called the "FAA")

**WHEREAS**, the Sponsor has submitted to the FAA a Project Application dated [Selection Criteria: Project Application Date], for a grant of Federal funds for a project at or associated with the [Selection Criteria: Airport Name or Planning Area], which is included as part of this Grant Agreement; and

**WHEREAS**, the FAA has approved a project for the [Selection Criteria: Airport Name or Planning Area] (herein called the "Project") consisting of the following:

[Selection Criteria: Project Description]

which is more fully described in the Project Application.

**NOW THEREFORE**, Pursuant to and for the purpose of carrying out the Infrastructure Investment and Jobs Act (IIJA) (Public Law number (P.L.) 117-58) of 2021; FAA Reauthorization Act of 2024 (P.L. 118-63); and the representations contained in the Project Application; and in consideration of: (a) the Sponsor's adoption and ratification of the attached Grant Assurances dated April 2025, interpreted, and applied consistent with the FAA Reauthorization Act of 2024; (b) the Sponsor's acceptance of this Offer; and (c) the benefits to accrue to the United States and the public from the accomplishment of the Project and compliance with the Grant Assurance and conditions as herein provided;

1

**THE FEDERAL AVIATION ADMINISTRATION, FOR AND ON BEHALF OF THE UNITED STATES, HEREBY OFFERS AND AGREES to pay [%Selection Criteria: Federal Share Percent%] % of the allowable costs incurred accomplishing the Project as the United States share of the Project.**

**Assistance Listings Number (Formerly CFDA Number): 20.106**

**This Offer is made on and SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:**

## CONDITIONS

1. **Maximum Obligation.** The maximum obligation of the United States payable under this Offer is $[Selection Criteria: Obligation Amount].

   The following amounts represent a breakdown of the maximum obligation for the purpose of establishing allowable amounts for any future grant amendment, which may increase the foregoing maximum obligation of the United States under the provisions of 49 U.S.C. § 47108(b):
   $[Selection Criteria: Planning Amount] for planning
   $[Selection Criteria: Noise Amount] airport development or noise program implementation; and,
   $[Selection Criteria: Land Acquisition Amount] for land acquisition.

2. **Grant Performance.** This Grant Agreement is subject to the following Federal award requirements:

   a. Period of Performance:

      1. Shall start on the date the Sponsor formally accepts this Agreement and is the date signed by the last Sponsor signatory to the Agreement. The end date of the Period of Performance is 4 years (1,460 calendar days) from the date of acceptance. The Period of Performance end date shall not affect, relieve, or reduce Sponsor obligations and assurances that extend beyond the closeout of this Grant Agreement.

      2. Means the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions or budget periods (2 Code of Federal Regulations (CFR) § 200.1)except as noted in 49 U.S.C § 47142(b).

   b. Budget Period:

      1. For this Grant is 4 years (1,460 calendar days) and follows the same start and end date as the Period of Performance provided in paragraph 2(a)(1). Pursuant to 2 CFR § 200.403(h), the Sponsor may charge to the Grant only allowable costs incurred during the Budget Period and as stated in 49 U.S.C § 47142(b). Eligible project-related costs incurred on or after November 15, 2021, that comply with all Federal funding procurement requirements and FAA standards are allowable costs.

      2. Means the time interval from the start date of a funded portion of an award to the end date of that funded portion during which Sponsors are authorized to expend the funds awarded, including any funds carried forward or other revisions pursuant to 2 CFR § 200.308.

   c. Close Out and Termination

      Unless the FAA authorizes a written extension, the Sponsor must submit all Grant closeout documentation and liquidate (pay-off) all obligations incurred under this award no later than 120 calendar days after the end date of the Period of Performance. If the Sponsor does not submit all required closeout documentation within this time period, the FAA will proceed to close out the grant within one year of the Period of Performance end date with

2

the information available at the end of 120 days (2 CFR § 200.344). The FAA may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

(a)   (1) The Sponsor fails to obtain or provide any Sponsor grant contribution as required by the agreement;

(2) A completion date for the Project or a component of the Project is listed in the agreement and the Recipient fails to meet that milestone by six months after the date listed in the agreement;

(3) The Sponsor fails to comply with the terms and conditions of this agreement, including a material failure to comply with the Project Schedule even if it is beyond the reasonable control of the Sponsor;

(4) Circumstances cause changes to the Project that the FAA determines are inconsistent with the FAA's basis for selecting the Project to receive a grant; or

(5) The FAA determines that termination of this agreement is in the public interest.

(b) In terminating this agreement under this section, the FAA may elect to consider only the interests of the FAA.

(c) The Sponsor may request that the FAA terminate the agreement under this section.

3.   **Ineligible or Unallowable Costs.** In accordance with P.L. 117-58, Division J, Title VIII  49 U.S.C. § 49 U.S.C. § 47110, the Sponsor is prohibited from including any costs in the grant funded portions of the project that the FAA has determined to be ineligible or unallowable, including costs incurred to carry out airport development implementing policies and initiatives repealed by Executive Order 14148, provided such costs are not otherwise permitted by statute.

4.   **Indirect Costs - Sponsor.** The Sponsor may charge indirect costs under this award by applying the indirect cost rate identified in the project application as accepted by the FAA, to allowable costs for Sponsor direct salaries and wages.

5.   **Determining the Final Federal Share of Costs.** The United States' share of allowable project costs will be made in accordance with 49 U.S.C. § 47109, the regulations, policies, and procedures of the Secretary of Transportation ("Secretary"), and any superseding legislation. Final determination of the United States' share will be based upon the final audit of the total amount of allowable project costs and settlement will be made for any upward or downward adjustments to the Federal share of costs.

6.   **Completing the Project Without Delay and in Conformance with Requirements.** The Sponsor must carry out and complete the project without undue delays and in accordance with this Agreement, IIJA (P.L. 117-58), and the regulations, policies, and procedures of the Secretary. Per 2 CFR § 200.308, the Sponsor agrees to report and request prior FAA approval for any disengagement from performing the project that exceeds three months or a 25 percent reduction in time devoted to the project. The report must include a reason for the project stoppage. The Sponsor also agrees to comply with the grant assurances, which are part of this Agreement.

b. certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

32. **Federal Law and Public Policy Requirements.** The Sponsor shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Sponsor will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

33. **National Airspace System Requirements.**

(a) The Sponsor shall cooperate with FAA activities installing, maintaining, replacing, improving, or operating equipment and facilities in or supporting the National Airspace System, including waiving permitting requirements and other restrictions affecting those activities to the maximum extent possible, and assisting the FAA in securing waivers of permitting or other restrictions from other authorities. The Sponsor shall not take actions that frustrate or prevent the FAA from installing, maintaining, replacing, improving, or operating equipment and facilities in or supporting the National Airspace System.

(b) If the FAA determines that the Sponsor has violated subsection (a), the FAA may impose a remedy, including:

1) additional conditions on the award;

2) consistent with 49 U.S.C. chapter 471, any remedy permitted under 2 CFR 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs; requiring refunds from the Recipient to the DOT; suspension or termination of the award; or suspension and debarment under 2 CFR part 180; or

3) any other remedy legally available.

(c) In imposing a remedy under this condition, the FAA may elect to consider the interests of only the FAA.

(d) The Sponsor acknowledges that amounts that the FAA requires the Sponsor to refund to the FAA due to a remedy under this condition constitute a debt to the Federal Government that the FAA may collect under 2 CFR 200.346 and the Federal Claims Collection Standards (31 CFR parts 900–904).

34. **Signage Costs for Construction Projects.** The Sponsor agrees that it will require the prime contractor of a Federally assisted airport improvement project to post signs consistent with a DOT/FAA-prescribed format, as may be requested by the DOT/FAA, and further agrees to remove any signs posted in response to FAA requests received prior to February 1, 2025.

35. **Title 8 - U.S.C., Chapter 12, Subchapter II - Immigration.** The sponsor will follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter.

11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 1:25-cv-00208-JJM-PAS |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| *Defendants.* | |

# EXHIBIT 9

Maritime Administration Port Infrastructure
Development Program General Terms and
Conditions (Mar. 31, 2025)

**U.S. DEPARTMENT OF TRANSPORTATION**
**MARITIME ADMINISTRATION**

**GENERAL TERMS AND CONDITIONS UNDER THE**
**FISCAL YEAR 2024 PORT INFRASTRUCTURE DEVELOPMENT PROGRAM**
**GRANTS**

**March 31, 2025**

## Table of Contents

Article 1 Purpose........................................................................................................... 6
  1.1   Purpose. .......................................................................................................... 6
Article 2 MARAD Role ................................................................................................. 7
  2.1   Administration. ............................................................................................... 7
  2.2   MARAD Program Contacts. ........................................................................... 7
Article 3 Recipient Role................................................................................................. 7
  3.1   Statements on the Project. .............................................................................. 7
  3.2   Statements on Authority and Capacity........................................................... 7
  3.3   MARAD Reliance. .......................................................................................... 8
  3.4   Project Delivery.............................................................................................. 8
  3.5   Rights and Powers Affecting the Project. ...................................................... 8
  3.6   Notification of Changes to Key Personnel. .................................................... 8
Article 4 Award Amount, Obligation, and Time Periods .............................................. 9
  4.1   Federal Award Amount. ................................................................................. 9
  4.2   Federal Funding Source. ................................................................................. 9
  4.3   Federal Obligations. ....................................................................................... 9
Article 5 Statement of Work, Schedule, and Budget Changes ...................................... 9
  5.1   Change Notification Requirement. ................................................................. 9
  5.2   Scope and Statement of Work Changes. ......................................................... 9
  5.3   Schedule Changes. ........................................................................................ 10
  5.4   Budget Changes. ........................................................................................... 10
  5.5   MARAD Acceptance of Changes. ................................................................ 11
Article 6 General Reporting Terms.............................................................................. 11
  6.1   Report Submission. ....................................................................................... 11
  6.2   Alternative Reporting Methods. ................................................................... 11
  6.3   Paperwork Reduction Act Notice. ................................................................ 11
Article 7 Progress and Financial Reporting ................................................................ 12
  7.1   Quarterly Project Progress Reports and Recertifications............................. 12
  7.2   Final Progress Reports and Financial Information ....................................... 12
Article 8 Performance Reporting ................................................................................. 12
  8.1   Baseline Performance Measurement. ........................................................... 12
  8.2   Post-construction Performance Measurement.............................................. 12
  8.3   Project Outcomes Narrative. ........................................................................ 13
Article 9 Civil Rights and Title VI.............................................................................. 13
  9.1   Civil Rights and Title VI. ............................................................................. 13
  9.2   Legacy Infrastructure and Facilities. ........................................................... 14
Article 10 Critical Infrastructure Security and Resilience .......................................... 14
  10.1  Critical Infrastructure Security and Resilience. .......................................... 14
Article 11 PIDP Designations ..................................................................................... 15
  11.1  Effect of Urban or Rural Designation. ......................................................... 15
  11.2  Effect of Discretionary or CPF Designation…………………………………15
Article 12 Contracting and Subawards ....................................................................... 16
  12.1  Minimum Wage Rates. ................................................................................. 16
  12.2  Buy America. ................................................................................................ 16
  12.3  Small and Disadvantaged Business Requirements....................................... 17

| | | |
|---|---|---|
| 12.4 | Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment. | 17 |
| 12.5 | Pass-through Entity Responsibilities. | 17 |
| 12.6 | Disclosing Conflict of Interest. | 18 |
| 12.7 | Securing Logistics Information Data of the United States. | 18 |
| Article 13 | Noncompliance and Remedies. | 19 |
| 13.1 | Noncompliance Determinations. | 19 |
| 13.2 | Remedies. | 19 |
| 13.3 | Other Oversight Entities. | 20 |
| Article 14 | Agreement Termination | 20 |
| 14.1 | MARAD Termination. | 20 |
| 14.2 | Closeout Termination. | 21 |
| 14.3 | Post-Termination Adjustments. | 21 |
| 14.4 | Non-Terminating Events. | 21 |
| 14.5 | Other Remedies. | 22 |
| Article 15 | Costs, Payments, and Unexpended Funds | 22 |
| 15.1 | Limitation of Federal Award Amount. | 22 |
| 15.2 | Projects Costs. | 22 |
| 15.3 | Timing of Project Costs. | 22 |
| 15.4 | Recipient Recovery of Federal Funds. | 22 |
| 15.5 | Unexpended Federal Funds. | 23 |
| 15.6 | Timing of Payments to the Recipient. | 23 |
| 15.7 | Payment Method. | 23 |
| 15.8 | Information Supporting Expenditures. | 23 |
| 15.9 | Reimbursement Request Timing Frequency. | 24 |
| Article 16 | Liquidation, Adjustments, and Funds Availability | 24 |
| 16.1 | Liquidation of Recipient Obligations. | 24 |
| 16.2 | Funds Cancellation. | 24 |
| Article 17 | Agreement Modifications | 25 |
| 17.1 | Bilateral Modifications. | 25 |
| 17.2 | Unilateral Contact Modifications. | 25 |
| 17.3 | MARAD Unilateral Modifications. | 25 |
| 17.4 | Other Modifications. | 25 |
| Article 18 | Federal Financial Assistance, Administrative, and National Policy Requirements | 25 |
| 18.1 | Uniform Administrative Requirements for Federal Awards. | 25 |
| 18.2 | Federal Law and Public Policy Requirements. | 25 |
| 18.3 | Federal Freedom of Information Act. | 26 |
| 18.4 | History of Performance. | 26 |
| 18.5 | Whistleblower Protection. | 26 |
| 18.6 | External Award Terms and Obligations. | 26 |
| 18.7 | Incorporated Certifications. | 27 |
| 18.8 | Labor and Work. | 27 |
| Article 19 | Monitoring, Financial Management, Controls, and Records | 27 |
| 19.1 | Recipient Monitoring and Record Retention. | 27 |
| 19.2 | Financial Records and Audits. | 28 |
| 19.3 | Internal Controls. | 28 |

19.4    MARAD Record Access. ............................................................................... 28
Article 20 Notices ........................................................................................................... 29
20.1    Form of Notice. ........................................................................................... 29
20.2    Method of Notice to MARAD. .................................................................... 29
20.3    Method of Notice to Recipient. ................................................................... 29
20.4    Recipient Contacts for Notice. .................................................................... 30
20.5    Additional Mandatory Notices to MARAD. ................................................ 30
20.6    Scope of Notice Requirements. ................................................................... 30
Article 21 Information Requests ...................................................................................... 30
21.1    MARAD Information Requests. ................................................................... 30
Article 22 Assignment .................................................................................................... 31
22.1    Assignment Prohibited. ............................................................................... 31
Article 23 Waiver ........................................................................................................... 31
23.1    Waivers. ...................................................................................................... 31
Article 24 Additional Terms and Conditions ................................................................... 31
24.1    Disclaimer of Federal Liability. .................................................................. 31
24.2    Relocation and Real Property Acquisition. ................................................. 31
24.3    Real Property and Equipment Disposition. .................................................. 32
24.4    Environmental Review. ............................................................................... 32
Article 25 Mandatory Award Information ........................................................................ 33
25.1    Information Contained in a Federal Award. ................................................. 33
25.2    Federal Award Identification Number. ........................................................ 34
25.3    Recipient's Unique Entity Identifier. .......................................................... 34
25.4    Budget Period. ............................................................................................ 34
25.5    Period of Performance. ............................................................................... 34
Article 26 Construction and Definitions .......................................................................... 34
26.1    Schedules. ................................................................................................... 34
26.2    Exhibits. ...................................................................................................... 34
26.3    Construction. ............................................................................................... 34
26.4    Integration. ................................................................................................. 35
26.5    Definitions. ................................................................................................. 35
26.6    References to Times of Day. ....................................................................... 36
Article 27 Agreement Execution and Effective Date ....................................................... 36
27.1    Counterparts. .............................................................................................. 36
27.2    Effective Date. ............................................................................................ 36

## Index of Definitions

Federal Share ...................................................................................................................... 11

General Terms and Conditions ............................................................................................ 34

MARAD ................................................................................................................................ 7

NOFO ................................................................................................................................... 6

OMB ................................................................................................................................... 12

PIDP Grant ......................................................................................................................... 35

Program Statute .................................................................................................................. 34

Project ................................................................................................................................ 35

Project Closeout ................................................................................................................. 21

Project Cost Savings .......................................................................................................... 10

Recipient ............................................................................................... Project-Specific Recitals

Technical Application ......................................................................................................... 35

Title VI ............................................................................................................................... 14

USDOT ................................................................................................................................. 6

**GENERAL TERMS AND CONDITIONS**

The Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), and the Consolidated Appropriations Act, 2024, Pub. L. No. 118-42 (Mar. 9, 2024) ("**Consolidated Appropriations Act, 2024**" or "**the Act**") appropriated funds to the United States Department of Transportation (the "**USDOT**") Maritime Administration ("**MARAD**") for fiscal year (FY) 2024 under the heading "Port Infrastructure Development Program." Of the amount appropriated, $500,000,000 is available to make grants to improve port facilities at coastal seaports, inland river ports, or Great Lakes ports. The Consolidated Appropriations Act, 2024 also appropriated $70,460,124 for Port Infrastructure Development Program (PIDP) grants for Community Project Funding (CPF), also known as Congressionally Directed Spending. The list of projects selected for CPF are found in the table entitled "Community Project Funding/Congressionally Directed Spending" included in the Act's accompanying explanatory statement. The MARAD program administering these funds is the Port Infrastructure Development Program (the "**PIDP**").

On December 27, 2023, MARAD posted a funding opportunity at Grants.gov with funding opportunity title "Port Infrastructure Development Program" and funding opportunity number MA-PID-24-001. The notice of funding opportunity posted at Grants.gov (the "**NOFO**") solicited applications for Federal financial assistance under the FY 2024 PIDP for the available FY 2024 PIDP discretionary funding.

These general terms and conditions are incorporated by reference in a project-specific agreement under the FY 2024 PIDP. The term "Recipient" is defined in the project-specific portion of the agreement. The project-specific portion of the agreement includes schedules A through H. The project-specific portion of the agreement may include special terms and conditions in project-specific articles.

**ARTICLE 1**
**PURPOSE**

1.1    **Purpose.** The purpose of this award is to make grants to improve port facilities at coastal seaports, inland river ports, or Great Lakes ports. The parties will accomplish that purpose by achieving the following objectives:

    (1)    timely completing the Project; and

    (2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, if applicable, as modified by schedule D.

(c) Section 4.2 identifies the specific source or sources of funding for this award.

## ARTICLE 17
## AGREEMENT MODIFICATIONS

**17.1**  **Bilateral Modifications.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by MARAD and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**17.2**  **Unilateral Contact Modifications.**

(a)  The Recipient may update the contacts who are listed in section 3 of schedule A by written notice to all of the MARAD contacts who are listed in section 5 of schedule A and section 2.2.

(b)  MARAD may update the contacts who are listed in section 5 of schedule A and section 2.2 by written notice to all of the Recipient contacts who are listed in section 3 of schedule A.

**17.3**  **MARAD Unilateral Modifications.**

(a)  MARAD may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b)  To unilaterally modify this agreement under this section 17.3, MARAD must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**17.4**  **Other Modifications.** The parties shall not amend, modify, or supplement this agreement except as permitted under sections 17.1, 17.2, or 17.3. If an amendment, modification, or supplement is not permitted under section 17.1, not permitted under section 17.2, or not permitted under section 17.3, it is void.

## ARTICLE 18
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL
## POLICY REQUIREMENTS

**18.1**  **Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 CFR Parts 200 and 1201.

**18.2**  **Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

(c) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(d) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

**18.3    Federal Freedom of Information Act.**

(a) MARAD is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to MARAD by the Recipient related to this agreement may become MARAD records subject to public release under 5 U.S.C. 552.

**18.4    History of Performance.** Under 2 CFR 200.206, any Federal awarding agency may consider the Recipient's performance under this agreement, when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**18.5    Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**18.6    External Award Terms and Obligations.**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 10

Federal Highway Administration, FY 2022-2026
Estimated Highway Apportionments under the
Infrastructure Investment and Jobs Act

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION

FY 2022 - FY 2023 ACTUAL AND FY 2024 - 2026 ESTIMATED STATE-BY-STATE FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS
AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,  NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT
HIGHWAY SYSTEM  UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58

| State | Actual FY 2022 | Actual FY 2023 | Estimated FY 2024 | Estimated FY 2025 | Estimated FY 2026 | FY 2022- FY 2026 Total | FY 2022- FY 2026 Average |
|---|---|---|---|---|---|---|---|
| Alabama | 1,135,711,148 | 1,160,967,961 | 1,181,473,491 | 1,202,389,028 | 1,223,722,892 | 5,904,264,520 | 1,180,852,904 |
| Alaska | 717,034,371 | 733,726,742 | 747,278,962 | 761,102,159 | 775,201,831 | 3,734,344,065 | 746,868,813 |
| Arizona | 1,025,628,311 | 1,049,985,683 | 1,069,760,974 | 1,089,931,671 | 1,110,505,798 | 5,345,812,437 | 1,069,162,487 |
| Arkansas | 754,076,243 | 771,312,121 | 785,305,604 | 799,578,887 | 814,137,647 | 3,924,410,502 | 784,882,100 |
| California | 5,494,022,066 | 5,616,200,254 | 5,715,408,918 | 5,816,593,087 | 5,919,801,027 | 28,562,033,352 | 5,712,406,670 |
| Colorado | 769,878,276 | 787,883,181 | 802,501,025 | 817,411,151 | 832,619,492 | 4,010,293,125 | 802,058,625 |
| Connecticut | 794,336,060 | 811,056,620 | 824,631,729 | 838,478,269 | 852,601,752 | 4,121,104,430 | 824,220,886 |
| Delaware | 271,719,442 | 277,350,821 | 281,922,831 | 286,586,258 | 291,342,958 | 1,408,922,310 | 281,784,462 |
| Dist. of Col. | 258,853,235 | 264,165,037 | 268,477,590 | 272,876,372 | 277,363,132 | 1,341,735,366 | 268,347,073 |
| Florida | 2,592,029,587 | 2,655,103,711 | 2,706,312,404 | 2,758,545,009 | 2,811,822,310 | 13,523,813,021 | 2,704,762,604 |
| Georgia | 1,789,195,485 | 1,832,537,410 | 1,867,596,826 | 1,903,193,111 | 1,939,770,298 | 9,332,293,130 | 1,866,458,626 |
| Hawaii | 299,536,432 | 305,166,987 | 309,738,329 | 314,401,073 | 319,157,077 | 1,547,999,898 | 309,599,980 |
| Idaho | 428,346,424 | 437,868,204 | 445,598,758 | 453,483,884 | 461,526,718 | 2,226,823,988 | 445,364,798 |
| Illinois | 2,202,798,566 | 2,250,129,111 | 2,288,555,888 | 2,327,751,005 | 2,367,730,058 | 11,436,964,628 | 2,287,392,926 |
| Indiana | 1,351,621,574 | 1,383,342,389 | 1,409,095,921 | 1,435,364,391 | 1,462,158,254 | 7,041,582,529 | 1,408,316,506 |
| Iowa | 752,097,213 | 768,458,085 | 781,741,170 | 795,289,848 | 809,109,512 | 3,906,695,828 | 781,339,166 |
| Kansas | 551,483,145 | 564,063,348 | 574,277,220 | 584,695,180 | 595,321,510 | 2,869,840,536 | 573,968,107 |
| Kentucky | 998,656,077 | 1,021,128,611 | 1,039,245,926 | 1,057,563,088 | 1,076,512,716 | 5,193,106,418 | 1,038,621,284 |
| Louisiana | 1,159,746,350 | 1,183,111,312 | 1,202,080,885 | 1,221,429,752 | 1,241,165,613 | 6,007,533,912 | 1,201,506,782 |
| Maine | 292,406,247 | 298,551,460 | 303,540,644 | 308,629,585 | 313,820,310 | 1,516,948,246 | 303,389,649 |
| Maryland | 904,624,136 | 924,735,113 | 941,024,697 | 957,591,494 | 969,230,067 | 4,697,205,507 | 939,441,101 |
| Massachusetts | 1,057,538,628 | 1,077,757,412 | 1,094,172,661 | 1,110,916,132 | 1,127,994,486 | 5,468,379,319 | 1,093,675,864 |
| Michigan | 1,532,773,711 | 1,567,824,375 | 1,596,281,349 | 1,625,307,315 | 1,654,913,827 | 7,977,100,577 | 1,595,420,115 |
| Minnesota | 939,132,075 | 960,840,129 | 978,464,488 | 996,441,246 | 1,014,777,554 | 4,889,655,492 | 977,931,098 |
| Mississippi | 703,499,949 | 712,509,812 | 722,387,151 | 735,720,418 | 749,320,362 | 3,623,437,692 | 724,687,538 |
| Missouri | 1,373,497,925 | 1,405,013,473 | 1,430,600,353 | 1,456,698,839 | 1,483,319,318 | 7,149,129,908 | 1,429,825,982 |
| Montana | 594,906,217 | 608,565,114 | 619,654,515 | 630,965,648 | 642,503,013 | 3,096,594,507 | 619,318,901 |
| Nebraska | 432,394,258 | 442,016,586 | 449,828,773 | 457,797,164 | 465,924,929 | 2,247,961,710 | 449,592,342 |
| Nevada | 531,679,480 | 543,767,872 | 553,582,209 | 563,592,784 | 573,803,578 | 2,766,425,923 | 553,285,185 |
| New Hampshire | 266,445,004 | 271,945,376 | 276,411,025 | 280,965,963 | 285,612,004 | 1,381,379,372 | 276,275,874 |
| New Jersey | 1,584,327,338 | 1,617,566,438 | 1,644,552,638 | 1,672,078,424 | 1,700,154,749 | 8,218,679,587 | 1,643,735,917 |
| New Mexico | 537,183,609 | 549,408,761 | 559,334,133 | 569,457,960 | 579,784,273 | 2,795,168,736 | 559,033,747 |
| New York | 2,658,697,807 | 2,714,577,528 | 2,759,945,221 | 2,806,220,036 | 2,853,420,386 | 13,792,860,978 | 2,758,572,196 |
| North Carolina | 1,512,678,170 | 1,548,003,284 | 1,576,464,501 | 1,605,216,850 | 1,634,999,697 | 7,877,362,502 | 1,575,472,500 |
| North Dakota | 377,745,465 | 386,010,391 | 392,720,527 | 399,564,833 | 406,546,031 | 1,962,587,247 | 392,517,449 |
| Ohio | 1,919,351,031 | 1,964,813,284 | 2,001,420,018 | 2,038,373,122 | 2,076,697,098 | 10,000,654,553 | 2,000,130,911 |
| Oklahoma | 907,613,189 | 928,726,370 | 945,867,765 | 963,351,898 | 981,185,730 | 4,726,744,952 | 945,348,990 |
| Oregon | 727,592,337 | 744,231,862 | 757,741,179 | 771,520,612 | 785,575,648 | 3,786,661,638 | 757,332,328 |
| Pennsylvania | 2,569,505,061 | 2,624,822,928 | 2,669,482,647 | 2,714,715,118 | 2,761,376,958 | 13,339,902,712 | 2,667,980,542 |
| Puerto Rico | 47,020,490 | 47,915,577 | 47,909,472 | 47,908,724 | 47,906,890 | 238,661,153 | 47,732,231 |
| Rhode Island | 344,104,764 | 351,385,309 | 357,296,247 | 363,325,373 | 369,475,087 | 1,785,586,780 | 357,117,356 |
| South Carolina | 956,720,483 | 979,012,552 | 997,111,062 | 1,015,571,451 | 1,034,401,064 | 4,982,816,612 | 996,563,322 |
| South Dakota | 422,971,713 | 432,359,994 | 439,982,162 | 447,756,734 | 455,686,805 | 2,198,757,408 | 439,751,482 |
| Tennessee | 1,227,957,438 | 1,256,554,233 | 1,279,603,284 | 1,302,899,377 | 1,327,011,765 | 6,394,026,097 | 1,278,805,219 |
| Texas | 5,343,578,031 | 5,473,439,501 | 5,578,871,584 | 5,686,411,768 | 5,796,102,848 | 27,878,403,732 | 5,575,680,746 |
| Utah | 510,396,451 | 521,956,240 | 531,341,415 | 540,914,245 | 550,860,884 | 2,655,286,891 | 531,057,378 |
| Vermont | 317,014,677 | 323,771,127 | 329,256,562 | 334,851,677 | 340,558,699 | 1,645,452,742 | 329,090,548 |
| Virginia | 1,499,438,296 | 1,534,295,136 | 1,562,240,646 | 1,590,294,635 | 1,619,647,537 | 7,805,916,250 | 1,561,183,250 |
| Washington | 1,039,267,462 | 1,061,835,481 | 1,080,158,030 | 1,098,846,937 | 1,117,909,637 | 5,398,017,547 | 1,079,603,509 |
| West Virginia | 732,670,553 | 749,907,732 | 762,930,651 | 774,978,420 | 789,291,628 | 3,809,778,984 | 761,955,797 |
| Wisconsin | 1,053,457,774 | 1,078,506,444 | 1,098,842,987 | 1,119,586,158 | 1,140,744,208 | 5,491,137,571 | 1,098,227,514 |
| Wyoming | 388,355,601 | 396,884,068 | 403,808,170 | 410,870,718 | 418,074,523 | 2,017,993,080 | 403,598,616 |
| Apportioned Total [1] | 58,653,315,375 | 59,973,076,683 | 61,043,833,217 | 62,136,004,881 | 63,250,019,844 | 305,056,250,000 | 61,011,250,000 |

[1] Amounts attributed to the Federal-aid Highway Program apportionments are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2022 FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,**
**NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM**
**UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,005,097,347 | 45,000,000 | 11,738,801 | 73,875,000 | 1,135,711,148 |
| Alaska | 664,276,131 | 45,000,000 | 7,758,240 | - | 717,034,371 |
| Arizona | 969,307,549 | 45,000,000 | 11,320,762 | - | 1,025,628,311 |
| Arkansas | 685,903,768 | 60,161,625 | 8,010,850 | - | 754,076,243 |
| California | 4,862,447,187 | 574,785,473 | 56,789,406 | - | 5,494,022,066 |
| Colorado | 716,509,999 | 45,000,000 | 8,368,277 | - | 769,878,276 |
| Connecticut | 665,399,513 | 121,165,205 | 7,771,342 | - | 794,336,060 |
| Delaware | 224,102,103 | 45,000,000 | 2,617,339 | - | 271,719,442 |
| Dist. of Col. | 211,384,428 | 45,000,000 | 2,468,807 | - | 258,853,235 |
| Florida | 2,510,041,078 | 52,673,067 | 29,315,442 | - | 2,592,029,587 |
| Georgia | 1,710,585,738 | 45,000,000 | 19,978,342 | 13,631,405 | 1,789,195,485 |
| Hawaii | 224,069,212 | 72,850,264 | 2,616,956 | - | 299,536,432 |
| Idaho | 378,920,913 | 45,000,000 | 4,425,511 | - | 428,346,424 |
| Illinois | 1,883,531,823 | 297,268,565 | 21,998,178 | - | 2,202,798,566 |
| Indiana | 1,262,335,681 | 74,542,768 | 14,743,125 | - | 1,351,621,574 |
| Iowa | 651,082,865 | 93,410,180 | 7,604,168 | - | 752,097,213 |
| Kansas | 500,636,086 | 45,000,000 | 5,847,059 | - | 551,483,145 |
| Kentucky | 880,232,681 | 94,549,890 | 10,280,470 | 13,593,036 | 998,656,077 |
| Louisiana | 929,811,198 | 219,075,640 | 10,859,512 | - | 1,159,746,350 |
| Maine | 244,550,089 | 45,000,000 | 2,856,158 | - | 292,406,247 |
| Maryland | 796,122,349 | 88,130,751 | 9,298,080 | 11,072,956 | 904,624,136 |
| Massachusetts | 804,613,425 | 243,527,965 | 9,397,238 | - | 1,057,538,628 |
| Michigan | 1,394,849,821 | 121,633,126 | 16,290,764 | - | 1,532,773,711 |
| Minnesota | 863,876,119 | 65,166,538 | 10,089,418 | - | 939,132,075 |
| Mississippi | 640,731,237 | 45,000,000 | 7,483,268 | 10,285,444 | 703,499,949 |
| Missouri | 1,254,165,237 | 104,684,966 | 14,647,722 | - | 1,373,497,925 |
| Montana | 543,557,867 | 45,000,000 | 6,348,350 | - | 594,906,217 |
| Nebraska | 382,922,015 | 45,000,000 | 4,472,243 | - | 432,394,258 |
| Nevada | 481,061,066 | 45,000,000 | 5,618,414 | - | 531,679,480 |
| New Hampshire | 218,888,554 | 45,000,000 | 2,556,450 | - | 266,445,004 |
| New Jersey | 1,322,761,164 | 246,117,384 | 15,448,790 | - | 1,584,327,338 |
| New Mexico | 486,501,632 | 45,000,000 | 5,681,977 | - | 537,183,609 |
| New York | 2,223,753,281 | 408,972,882 | 25,971,644 | - | 2,658,697,807 |
| North Carolina | 1,381,698,847 | 98,692,801 | 16,137,196 | 16,149,326 | 1,512,678,170 |
| North Dakota | 328,904,113 | 45,000,000 | 3,841,352 | - | 377,745,465 |
| Ohio | 1,775,790,242 | 104,290,441 | 20,739,853 | 18,530,495 | 1,919,351,031 |
| Oklahoma | 840,201,301 | 57,598,954 | 9,812,934 | - | 907,613,189 |
| Oregon | 662,172,634 | 57,686,024 | 7,733,679 | - | 727,592,337 |
| Pennsylvania | 2,173,656,077 | 353,377,923 | 25,386,631 | 17,084,430 | 2,569,505,061 |
| Puerto Rico | - | 45,000,000 | 2,020,490 | - | 47,020,490 |
| Rhode Island | 289,730,682 | 50,990,247 | 3,383,835 | - | 344,104,764 |
| South Carolina | 887,115,380 | 59,244,248 | 10,360,855 | - | 956,720,483 |
| South Dakota | 373,608,250 | 45,000,000 | 4,363,463 | - | 422,971,713 |
| Tennessee | 1,119,497,252 | 80,654,726 | 13,074,884 | 14,730,576 | 1,227,957,438 |
| Texas | 5,167,860,243 | 115,361,082 | 60,356,706 | - | 5,343,578,031 |
| Utah | 460,023,720 | 45,000,000 | 5,372,731 | - | 510,396,451 |
| Vermont | 268,874,430 | 45,000,000 | 3,140,247 | - | 317,014,677 |
| Virginia | 1,348,139,636 | 115,591,255 | 15,745,244 | 19,962,161 | 1,499,438,296 |
| Washington | 898,099,090 | 130,679,262 | 10,489,110 | - | 1,039,267,462 |
| West Virginia | 578,956,849 | 109,616,748 | 6,761,785 | 37,335,171 | 732,670,553 |
| Wisconsin | 996,815,713 | 45,000,000 | 11,642,061 | - | 1,053,457,774 |
| Wyoming | 339,391,760 | 45,000,000 | 3,963,841 | - | 388,355,601 |
| **Apportioned Total** | 52,484,565,375 | 5,307,500,000 | 615,000,000 | 246,250,000 | 58,653,315,375 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2023 FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,**
**NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM**
**UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,025,200,694 | 45,000,000 | 16,892,267 | 73,875,000 | 1,160,967,961 |
| Alaska | 677,562,547 | 45,000,000 | 11,164,195 | - | 733,726,742 |
| Arizona | 988,694,979 | 45,000,000 | 16,290,704 | - | 1,049,985,683 |
| Arkansas | 699,622,792 | 60,161,625 | 11,527,704 | - | 771,312,121 |
| California | 4,959,702,186 | 574,785,473 | 81,720,595 | - | 5,616,208,254 |
| Colorado | 730,841,136 | 45,000,000 | 12,042,045 | - | 787,883,181 |
| Connecticut | 678,708,366 | 121,165,205 | 11,183,049 | - | 811,056,620 |
| Delaware | 228,584,441 | 45,000,000 | 3,766,380 | - | 277,350,821 |
| Dist. of Col. | 215,612,396 | 45,000,000 | 3,552,641 | - | 264,165,037 |
| Florida | 2,560,245,393 | 52,673,067 | 42,185,251 | - | 2,655,103,711 |
| Georgia | 1,744,799,753 | 45,000,000 | 28,749,059 | 13,988,598 | 1,832,537,410 |
| Hawaii | 228,550,894 | 72,850,264 | 3,765,829 | - | 305,166,987 |
| Idaho | 386,499,844 | 45,000,000 | 6,368,360 | - | 437,868,204 |
| Illinois | 1,921,204,920 | 297,268,565 | 31,655,626 | - | 2,250,129,111 |
| Indiana | 1,287,584,098 | 74,542,768 | 21,215,523 | - | 1,383,342,389 |
| Iowa | 664,105,422 | 93,410,180 | 10,942,483 | - | 768,458,085 |
| Kansas | 510,649,497 | 45,000,000 | 8,413,984 | - | 564,063,481 |
| Kentucky | 897,838,554 | 94,549,890 | 14,793,712 | 13,946,455 | 1,021,128,611 |
| Louisiana | 948,408,712 | 219,075,640 | 15,626,960 | - | 1,183,111,312 |
| Maine | 249,441,417 | 45,000,000 | 4,110,043 | - | 298,551,460 |
| Maryland | 812,045,826 | 88,130,751 | 13,380,042 | 11,178,494 | 924,735,113 |
| Massachusetts | 820,706,715 | 243,527,965 | 13,522,732 | - | 1,077,757,412 |
| Michigan | 1,422,748,656 | 121,633,126 | 23,442,593 | - | 1,567,824,375 |
| Minnesota | 881,154,805 | 65,166,538 | 14,518,786 | - | 960,840,129 |
| Mississippi | 653,546,748 | 45,000,000 | 10,768,508 | 3,194,556 | 712,509,812 |
| Missouri | 1,279,250,270 | 104,684,966 | 21,078,237 | - | 1,405,013,473 |
| Montana | 554,429,767 | 45,000,000 | 9,135,347 | - | 608,565,114 |
| Nebraska | 390,580,978 | 45,000,000 | 6,435,608 | - | 442,016,586 |
| Nevada | 490,682,911 | 45,000,000 | 8,084,961 | - | 543,767,872 |
| New Hampshire | 223,266,616 | 45,000,000 | 3,678,760 | - | 271,945,376 |
| New Jersey | 1,349,218,071 | 246,117,384 | 22,230,983 | - | 1,617,566,438 |
| New Mexico | 496,232,332 | 45,000,000 | 8,176,429 | - | 549,408,761 |
| New York | 2,268,231,158 | 408,972,882 | 37,373,488 | - | 2,714,577,528 |
| North Carolina | 1,409,334,688 | 98,692,801 | 23,221,608 | 16,754,187 | 1,548,003,284 |
| North Dakota | 335,482,642 | 45,000,000 | 5,527,749 | - | 386,010,391 |
| Ohio | 1,811,308,387 | 104,290,441 | 29,844,883 | 19,369,573 | 1,964,813,284 |
| Oklahoma | 857,006,493 | 57,598,954 | 14,120,923 | - | 928,726,370 |
| Oregon | 675,416,987 | 57,686,024 | 11,128,851 | - | 744,231,862 |
| Pennsylvania | 2,217,132,087 | 353,377,923 | 36,531,648 | 17,781,270 | 2,624,822,928 |
| Puerto Rico | - | 45,000,000 | 2,915,577 | - | 47,915,577 |
| Rhode Island | 295,525,686 | 50,990,247 | 4,869,376 | - | 351,385,309 |
| South Carolina | 904,858,917 | 59,244,248 | 14,909,387 | - | 979,012,552 |
| South Dakota | 381,080,922 | 45,000,000 | 6,279,072 | - | 432,359,994 |
| Tennessee | 1,141,888,715 | 80,654,726 | 18,814,906 | 15,195,886 | 1,256,554,233 |
| Texas | 5,271,224,439 | 115,361,082 | 86,853,980 | - | 5,473,439,501 |
| Utah | 469,224,819 | 45,000,000 | 7,731,421 | - | 521,956,240 |
| Vermont | 274,252,276 | 45,000,000 | 4,518,851 | - | 323,771,127 |
| Virginia | 1,375,104,236 | 115,591,255 | 22,657,583 | 20,942,062 | 1,534,295,136 |
| Washington | 916,062,271 | 130,679,262 | 15,093,948 | - | 1,061,835,481 |
| West Virginia | 590,536,780 | 109,616,748 | 9,730,285 | 40,023,919 | 749,907,732 |
| Wisconsin | 1,016,753,387 | 45,000,000 | 16,753,057 | - | 1,078,506,444 |
| Wyoming | 346,180,057 | 45,000,000 | 5,704,011 | - | 396,884,068 |
| **Apportioned Total** | 53,534,326,683 | 5,307,500,000 | 885,000,000 | 246,250,000 | 59,973,076,683 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2024 ESTIMATED FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,**
**NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM**
**UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,045,706,107 | 45,000,000 | 16,892,384 | 73,875,000 | 1,181,473,491 |
| Alaska | 691,114,690 | 45,000,000 | 11,164,272 | - | 747,278,962 |
| Arizona | 1,008,470,158 | 45,000,000 | 16,290,816 | - | 1,069,760,974 |
| Arkansas | 713,616,196 | 60,161,625 | 11,527,783 | - | 785,305,604 |
| California | 5,058,902,284 | 574,785,473 | 81,721,161 | - | 5,715,408,918 |
| Colorado | 745,458,896 | 45,000,000 | 12,042,129 | - | 802,501,025 |
| Connecticut | 692,283,397 | 121,165,205 | 11,183,127 | - | 824,631,729 |
| Delaware | 233,156,425 | 45,000,000 | 3,766,406 | - | 281,922,831 |
| Dist. of Col. | 219,924,924 | 45,000,000 | 3,552,666 | - | 268,477,590 |
| Florida | 2,611,453,794 | 52,673,067 | 42,185,543 | - | 2,706,312,404 |
| Georgia | 1,779,698,048 | 45,000,000 | 28,749,258 | 14,149,520 | 1,867,596,826 |
| Hawaii | 233,122,210 | 72,850,264 | 3,765,855 | - | 309,738,329 |
| Idaho | 394,230,354 | 45,000,000 | 6,368,404 | - | 445,598,758 |
| Illinois | 1,959,631,478 | 297,268,565 | 31,655,845 | - | 2,288,555,888 |
| Indiana | 1,313,337,483 | 74,542,768 | 21,215,670 | - | 1,409,095,921 |
| Iowa | 677,388,431 | 93,410,180 | 10,942,559 | - | 781,741,170 |
| Kansas | 520,863,178 | 45,000,000 | 8,414,042 | - | 574,277,220 |
| Kentucky | 915,796,546 | 94,549,890 | 14,793,815 | 14,105,675 | 1,039,245,926 |
| Louisiana | 967,378,177 | 219,075,640 | 15,627,068 | - | 1,202,080,885 |
| Maine | 254,430,572 | 45,000,000 | 4,110,072 | - | 303,540,644 |
| Maryland | 828,287,771 | 88,130,751 | 13,380,134 | 11,226,041 | 941,024,697 |
| Massachusetts | 837,121,871 | 243,527,965 | 13,522,825 | - | 1,094,172,661 |
| Michigan | 1,451,205,467 | 121,633,126 | 23,442,756 | - | 1,596,281,349 |
| Minnesota | 898,779,064 | 65,166,538 | 14,518,886 | - | 978,464,488 |
| Mississippi | 666,618,569 | 45,000,000 | 10,768,582 | - | 722,387,151 |
| Missouri | 1,304,837,004 | 104,684,966 | 21,078,383 | - | 1,430,600,353 |
| Montana | 565,519,105 | 45,000,000 | 9,135,410 | - | 619,654,515 |
| Nebraska | 398,393,121 | 45,000,000 | 6,435,652 | - | 449,828,773 |
| Nevada | 500,497,192 | 45,000,000 | 8,085,017 | - | 553,582,209 |
| New Hampshire | 227,732,239 | 45,000,000 | 3,678,786 | - | 276,411,025 |
| New Jersey | 1,376,204,117 | 246,117,384 | 22,231,137 | - | 1,644,552,638 |
| New Mexico | 506,157,647 | 45,000,000 | 8,176,486 | - | 559,334,133 |
| New York | 2,313,598,592 | 408,972,882 | 37,373,747 | - | 2,759,945,221 |
| North Carolina | 1,437,523,246 | 98,692,801 | 23,221,768 | 17,026,686 | 1,576,464,501 |
| North Dakota | 342,192,740 | 45,000,000 | 5,527,787 | - | 392,720,527 |
| Ohio | 1,847,536,896 | 104,290,441 | 29,845,089 | 19,747,592 | 2,001,420,018 |
| Oklahoma | 874,147,790 | 57,598,954 | 14,121,021 | - | 945,867,765 |
| Oregon | 688,926,227 | 57,686,024 | 11,128,928 | - | 757,741,179 |
| Pennsylvania | 2,261,477,616 | 353,377,923 | 36,531,901 | 18,095,207 | 2,669,482,647 |
| Puerto Rico | - | 45,000,000 | 2,909,472 | - | 47,909,472 |
| Rhode Island | 301,436,590 | 50,990,247 | 4,869,410 | - | 357,296,247 |
| South Carolina | 922,957,324 | 59,244,248 | 14,909,490 | - | 997,111,062 |
| South Dakota | 388,703,046 | 45,000,000 | 6,279,116 | - | 439,982,162 |
| Tennessee | 1,164,728,007 | 80,654,726 | 18,815,036 | 15,405,515 | 1,279,603,284 |
| Texas | 5,376,655,920 | 115,361,082 | 86,854,582 | - | 5,578,871,584 |
| Utah | 478,609,941 | 45,000,000 | 7,731,474 | - | 531,341,415 |
| Vermont | 279,737,680 | 45,000,000 | 4,518,882 | - | 329,256,562 |
| Virginia | 1,402,608,129 | 115,591,255 | 22,657,740 | 21,383,522 | 1,562,240,646 |
| Washington | 934,384,716 | 130,679,262 | 15,094,052 | - | 1,080,158,030 |
| West Virginia | 602,348,309 | 109,616,748 | 9,730,352 | 41,235,242 | 762,930,651 |
| Wisconsin | 1,037,089,814 | 45,000,000 | 16,753,173 | - | 1,098,842,987 |
| Wyoming | 353,104,119 | 45,000,000 | 5,704,051 | - | 403,808,170 |
| **Apportioned Total** | 54,605,083,217 | 5,307,500,000 | 885,000,000 | 246,250,000 | 61,043,833,217 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2025 ESTIMATED FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM, NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,066,621,629 | 45,000,000 | 16,892,399 | 73,875,000 | 1,202,389,028 |
| Alaska | 704,937,877 | 45,000,000 | 11,164,282 | - | 761,102,159 |
| Arizona | 1,028,640,841 | 45,000,000 | 16,290,830 | - | 1,089,931,671 |
| Arkansas | 727,889,469 | 60,161,625 | 11,527,793 | - | 799,578,887 |
| California | 5,160,086,384 | 574,785,473 | 81,721,230 | - | 5,816,593,087 |
| Colorado | 760,369,012 | 45,000,000 | 12,042,139 | - | 817,411,151 |
| Connecticut | 706,129,928 | 121,165,205 | 11,183,136 | - | 838,478,269 |
| Delaware | 237,819,849 | 45,000,000 | 3,766,409 | - | 286,586,258 |
| Dist. of Col. | 224,323,703 | 45,000,000 | 3,552,669 | - | 272,876,372 |
| Florida | 2,663,686,363 | 52,673,067 | 42,185,579 | - | 2,758,545,009 |
| Georgia | 1,815,294,309 | 45,000,000 | 28,749,282 | 14,149,520 | 1,903,193,111 |
| Hawaii | 237,784,951 | 72,850,264 | 3,765,858 | - | 314,401,073 |
| Idaho | 402,115,475 | 45,000,000 | 6,368,409 | - | 453,483,884 |
| Illinois | 1,998,826,568 | 297,268,565 | 31,655,872 | - | 2,327,751,005 |
| Indiana | 1,339,605,935 | 74,542,768 | 21,215,688 | - | 1,435,364,391 |
| Iowa | 690,937,100 | 93,410,180 | 10,942,568 | - | 795,289,848 |
| Kansas | 531,281,131 | 45,000,000 | 8,414,049 | - | 584,695,180 |
| Kentucky | 934,113,696 | 94,549,890 | 14,793,827 | 14,105,675 | 1,057,563,088 |
| Louisiana | 986,727,031 | 219,075,640 | 15,627,081 | - | 1,221,429,752 |
| Maine | 259,519,510 | 45,000,000 | 4,110,075 | - | 308,629,585 |
| Maryland | 844,854,556 | 88,130,751 | 13,380,146 | 11,226,041 | 957,591,494 |
| Massachusetts | 853,865,330 | 243,527,965 | 13,522,837 | - | 1,110,916,132 |
| Michigan | 1,480,231,414 | 121,633,126 | 23,442,775 | - | 1,625,307,315 |
| Minnesota | 916,755,809 | 65,166,538 | 14,518,899 | - | 996,441,246 |
| Mississippi | 679,951,827 | 45,000,000 | 10,768,591 | - | 735,720,418 |
| Missouri | 1,330,935,473 | 104,684,966 | 21,078,400 | - | 1,456,698,839 |
| Montana | 576,830,230 | 45,000,000 | 9,135,418 | - | 630,965,648 |
| Nebraska | 406,361,506 | 45,000,000 | 6,435,658 | - | 457,797,164 |
| Nevada | 510,507,760 | 45,000,000 | 8,085,024 | - | 563,592,784 |
| New Hampshire | 232,287,174 | 45,000,000 | 3,678,789 | - | 280,965,963 |
| New Jersey | 1,403,729,884 | 246,117,384 | 22,231,156 | - | 1,672,078,424 |
| New Mexico | 516,281,467 | 45,000,000 | 8,176,493 | - | 569,457,960 |
| New York | 2,359,873,375 | 408,972,882 | 37,373,779 | - | 2,806,220,036 |
| North Carolina | 1,466,275,575 | 98,692,801 | 23,221,788 | 17,026,686 | 1,605,216,850 |
| North Dakota | 349,037,041 | 45,000,000 | 5,527,792 | - | 399,564,833 |
| Ohio | 1,884,489,975 | 104,290,441 | 29,845,114 | 19,747,592 | 2,038,373,122 |
| Oklahoma | 891,631,912 | 57,598,954 | 14,121,032 | - | 963,351,898 |
| Oregon | 702,705,651 | 57,686,024 | 11,128,937 | - | 771,520,612 |
| Pennsylvania | 2,306,710,056 | 353,377,923 | 36,531,932 | 18,095,207 | 2,714,715,118 |
| Puerto Rico | - | 45,000,000 | 2,908,724 | - | 47,908,724 |
| Rhode Island | 307,465,712 | 50,990,247 | 4,869,414 | - | 363,325,373 |
| South Carolina | 941,417,700 | 59,244,248 | 14,909,503 | - | 1,015,571,451 |
| South Dakota | 396,477,613 | 45,000,000 | 6,279,121 | - | 447,756,734 |
| Tennessee | 1,188,024,084 | 80,634,726 | 18,815,052 | 15,405,515 | 1,302,899,377 |
| Texas | 5,484,196,031 | 115,361,082 | 86,854,655 | - | 5,686,411,768 |
| Utah | 488,182,764 | 45,000,000 | 7,731,481 | - | 540,914,245 |
| Vermont | 285,332,791 | 45,000,000 | 4,518,886 | - | 334,851,677 |
| Virginia | 1,430,662,099 | 115,591,255 | 22,657,759 | 21,383,522 | 1,590,294,635 |
| Washington | 953,073,610 | 130,679,262 | 15,094,065 | - | 1,098,846,937 |
| West Virginia | 614,396,069 | 109,616,748 | 9,730,361 | 41,235,242 | 774,978,420 |
| Wisconsin | 1,057,832,970 | 45,000,000 | 16,753,188 | - | 1,119,586,158 |
| Wyoming | 360,166,662 | 45,000,000 | 5,704,056 | - | 410,870,718 |
| **Apportioned Total** | 55,697,254,881 | 5,307,500,000 | 885,000,000 | 246,250,000 | 62,136,004,881 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2026 ESTIMATED  FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,**
**NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM**
**UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,087,955,458 | 45,000,000 | 16,892,434 | 73,875,000 | 1,223,722,892 |
| Alaska | 719,037,526 | 45,000,000 | 11,164,305 | - | 775,201,831 |
| Arizona | 1,049,214,934 | 45,000,000 | 16,290,864 | - | 1,110,505,798 |
| Arkansas | 742,448,205 | 60,161,625 | 11,527,817 | - | 814,137,647 |
| California | 5,263,294,154 | 574,785,473 | 81,721,400 | - | 5,919,801,027 |
| Colorado | 775,577,328 | 45,000,000 | 12,042,164 | - | 832,619,492 |
| Connecticut | 720,253,388 | 121,165,205 | 11,183,159 | - | 852,601,752 |
| Delaware | 242,576,541 | 45,000,000 | 3,766,417 | - | 291,342,958 |
| Dist. of Col. | 228,810,456 | 45,000,000 | 3,552,676 | - | 277,363,132 |
| Florida | 2,716,963,577 | 52,673,067 | 42,185,666 | - | 2,811,822,310 |
| Georgia | 1,851,602,490 | 45,000,000 | 28,749,342 | 14,418,466 | 1,939,770,298 |
| Hawaii | 242,540,947 | 72,850,264 | 3,765,866 | | 319,157,077 |
| Idaho | 410,158,296 | 45,000,000 | 6,368,422 | - | 461,526,718 |
| Illinois | 2,038,805,555 | 297,268,565 | 31,655,938 | - | 2,367,730,058 |
| Indiana | 1,366,399,754 | 74,542,768 | 21,215,732 | - | 1,462,158,254 |
| Iowa | 704,756,741 | 93,410,180 | 10,942,591 | - | 809,109,512 |
| Kansas | 541,907,443 | 45,000,000 | 8,414,067 | - | 595,321,510 |
| Kentucky | 952,797,188 | 94,549,890 | 14,793,858 | 14,371,780 | 1,076,512,716 |
| Louisiana | 1,006,462,859 | 219,075,640 | 15,627,114 | - | 1,241,165,613 |
| Maine | 264,710,226 | 45,000,000 | 4,110,084 | - | 313,820,310 |
| Maryland | 861,752,674 | 88,130,751 | 13,380,174 | 5,966,468 | 969,230,067 |
| Massachusetts | 870,943,656 | 243,527,965 | 13,522,865 | - | 1,127,994,486 |
| Michigan | 1,509,837,877 | 121,633,126 | 23,442,824 | - | 1,654,913,827 |
| Minnesota | 935,092,087 | 65,166,538 | 14,518,929 | - | 1,014,777,554 |
| Mississippi | 693,551,748 | 45,000,000 | 10,768,614 | - | 749,320,362 |
| Missouri | 1,357,555,908 | 104,684,966 | 21,078,444 | - | 1,483,319,318 |
| Montana | 588,367,576 | 45,000,000 | 9,135,437 | - | 642,503,013 |
| Nebraska | 414,489,258 | 45,000,000 | 6,435,671 | - | 465,924,929 |
| Nevada | 520,718,537 | 45,000,000 | 8,085,041 | - | 573,803,578 |
| New Hampshire | 236,933,208 | 45,000,000 | 3,678,796 | - | 285,612,004 |
| New Jersey | 1,431,806,163 | 246,117,384 | 22,231,202 | - | 1,700,154,749 |
| New Mexico | 526,607,763 | 45,000,000 | 8,176,510 | - | 579,784,273 |
| New York | 2,407,073,648 | 408,972,882 | 37,373,856 | - | 2,853,420,386 |
| North Carolina | 1,495,602,947 | 98,692,801 | 23,221,836 | 17,482,113 | 1,634,999,697 |
| North Dakota | 356,018,227 | 45,000,000 | 5,527,804 | - | 406,546,031 |
| Ohio | 1,922,182,110 | 104,290,441 | 29,845,177 | 20,379,370 | 2,076,697,098 |
| Oklahoma | 909,465,714 | 57,598,954 | 14,121,062 | - | 981,185,730 |
| Oregon | 716,760,663 | 57,686,024 | 11,128,961 | - | 785,575,648 |
| Pennsylvania | 2,352,847,139 | 353,377,923 | 36,532,008 | 18,619,888 | 2,761,376,958 |
| Puerto Rico | - | 45,000,000 | 2,906,890 | - | 47,906,890 |
| Rhode Island | 313,615,416 | 50,990,247 | 4,869,424 | - | 369,475,087 |
| South Carolina | 960,247,282 | 59,244,248 | 14,909,534 | - | 1,034,401,064 |
| South Dakota | 404,407,671 | 45,000,000 | 6,279,134 | - | 455,686,805 |
| Tennessee | 1,211,786,080 | 80,654,726 | 18,815,091 | 15,755,868 | 1,327,011,765 |
| Texas | 5,593,886,930 | 115,361,082 | 86,854,836 | - | 5,796,102,848 |
| Utah | 497,947,043 | 45,000,000 | 7,731,497 | - | 550,678,540 |
| Vermont | 291,039,804 | 45,000,000 | 4,518,895 | - | 340,558,699 |
| Virginia | 1,459,277,145 | 115,591,255 | 22,657,806 | 22,121,331 | 1,619,647,537 |
| Washington | 972,136,279 | 130,679,262 | 15,094,096 | - | 1,117,909,637 |
| West Virginia | 626,684,783 | 109,616,748 | 9,730,381 | 43,259,716 | 789,291,628 |
| Wisconsin | 1,078,990,986 | 45,000,000 | 16,753,222 | - | 1,140,744,208 |
| Wyoming | 367,370,456 | 45,000,000 | 5,704,067 | - | 418,074,523 |
| **Apportioned Total** | 56,811,269,844 | 5,307,500,000 | 885,000,000 | 246,250,000 | 63,250,019,844 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

                        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                       *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 11

Federal Transit Administration, FY 2025
Full Year Apportionments State Totals

**FEDERAL TRANSIT ADMINISTRATION**

**FY 2025 FULL YEAR APPORTIONMENTS BY STATE FOR SELECTED FTA PROGRAMS THROUGH SEPTEMBER 30, 2025.**

The information in this table includes apportionments for formula programs published **in May of 2025.**

| State | State Total |
|---|---|
| Alabama | $82,303,735 |
| Alaska | $84,962,312 |
| American Samoa | $1,451,600 |
| Arizona | $196,328,909 |
| Arkansas | $49,193,649 |
| California | $2,085,116,209 |
| Colorado | $200,765,144 |
| Commonwealth of the Northern Mariana Islands | $1,437,838 |
| Connecticut | $265,353,760 |
| Delaware | $37,469,784 |
| District Of Columbia | $479,149,329 |
| Florida | $651,696,770 |
| Georgia | $289,752,651 |
| Guam | $4,506,144 |
| Hawaii | $65,879,982 |
| Idaho | $44,153,394 |
| Illinois | $860,700,111 |
| Indiana | $138,916,541 |
| Iowa | $63,702,680 |
| Kansas | $52,676,837 |
| Kentucky | $78,587,980 |
| Louisiana | $96,319,595 |
| Maine | $50,281,879 |
| Maryland | $364,735,296 |
| Massachusetts | $545,571,942 |
| Michigan | $203,427,466 |
| Minnesota | $174,069,813 |
| Mississippi | $42,270,372 |
| Missouri | $145,125,329 |
| Montana | $37,368,388 |
| Nebraska | $40,672,455 |
| Nevada | $105,591,696 |
| New Hampshire | $24,609,806 |
| New Jersey | $868,923,367 |
| New Mexico | $78,497,808 |
| New York | $2,331,328,789 |
| North Carolina | $186,613,080 |
| North Dakota | $23,517,871 |
| Ohio | $275,075,377 |
| Oklahoma | $72,364,888 |
| Oregon | $164,236,846 |
| Pennsylvania | $630,696,438 |
| Puerto Rico | $78,251,101 |
| Rhode Island | $59,539,397 |
| South Carolina | $79,197,074 |
| South Dakota | $26,469,118 |
| Tennessee | $132,363,425 |
| Texas | $722,277,349 |
| Utah | $141,537,101 |
| Vermont | $16,014,805 |
| Virgin Islands | $3,162,685 |
| Virginia | $241,825,074 |
| Washington | $390,420,253 |
| West Virginia | $41,467,863 |
| Wisconsin | $120,360,892 |
| Wyoming | $19,181,366 |

*State Totals include apportionments for the following programs:

| | |
|---|---|
| Section 5303 | Metropolitan Transportation Planning Program |
| Section 5304 | Statewide Transportation Planning Program |
| Section 5307+5340 | Urbanized Area Formula Program |
| Section 5310 | Enhanced Mobility of Seniors and Individuals with Disabilities |
| Section 5311 + 5340 | Formula Grants for Rural Areas |
| Section 5311(b)(3) | Rural Transit Assistance Program (RTAP) |
| Section 5311(c)(3) | Appalachian Development Public Transportation Assistance Program |
| Section 5311(c)(2)(B) | Public Transportation on Indian Reservations Formula |
| Section 5337 | State of Good Repair Formula |
| Section 5339 | Buses and Bus Facilities Formula |
| Section 5329 | State Safety Oversight Program |
| Section 601, Division B, PRIIA | Passenger Rail Investment and Improvement (WMATA) |

* This table includes all amounts apportioned to a State, including those apportioned to large Urbanized Areas (UZAs) in each State. Amounts attributable to each State of a multi-state UZA with a population of at least 200,000 are for illustrative purposes only. They are not intended to indicate any preference by FTA for suballocation amounts, nor do they have any force of law or indication of expected practice. Designated recipients in large UZAs shall continue to suballocate funds apportioned to a UZA based on a locally determined process, consistent with Section 5307 statutory requirements. Each State's share of a multi-state UZA was calculated based on the percentage of population attributable to the respective State in the UZA, as determined by the Census.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, <br><br> *Defendants*. | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 12

Motor Carrier Safety Administration, FY 2024 Estimated MCSAP Funding - Rounded

| State | Federal Grant (95%) | | | State Match (5%) | Total (100%) |
|---|---|---|---|---|---|
| | Federal Grant (No Supplemental) Rounded | $80 M Supplemental Rounded | Total Federal Grant (BIL + 80M) Rounded | State Match Rounded | BIL + 80M + State Match Rounded |
| **FY 2024 Estimated MCSAP Funding - Rounded** | | | | | |
| Alabama | $ 7,326,788.00 | $ 1,441,926.00 | $ 8,768,714.00 | $ 461,511.00 | $ 9,230,225.00 |
| Alaska | $ 1,632,175.00 | $ 321,215.00 | $ 1,953,390.00 | $ 102,810.00 | $ 2,056,200.00 |
| Arizona | $ 13,144,753.00 | $ 2,586,913.00 | $ 15,731,666.00 | $ 827,982.00 | $ 16,559,648.00 |
| Arkansas | $ 5,199,142.00 | $ 1,023,201.00 | $ 6,222,343.00 | $ 327,492.00 | $ 6,549,835.00 |
| California | $ 25,477,506.00 | $ 5,014,023.00 | $ 30,491,529.00 | $ 1,604,817.00 | $ 32,096,346.00 |
| Colorado | $ 6,614,189.00 | $ 1,301,685.00 | $ 7,915,874.00 | $ 416,625.00 | $ 8,332,499.00 |
| Connecticut | $ 3,566,870.00 | $ 701,967.00 | $ 4,268,837.00 | $ 224,676.00 | $ 4,493,513.00 |
| Delaware | $ 1,545,160.00 | $ 304,091.00 | $ 1,849,251.00 | $ 97,329.00 | $ 1,946,580.00 |
| District of Columbia | $ 1,545,160.00 | $ 304,091.00 | $ 1,849,251.00 | $ 97,329.00 | $ 1,946,580.00 |
| Florida | $ 17,361,979.00 | $ 3,416,872.00 | $ 20,778,851.00 | $ 1,093,624.00 | $ 21,872,475.00 |
| Georgia | $ 14,592,547.00 | $ 2,871,842.00 | $ 17,464,389.00 | $ 919,178.00 | $ 18,383,567.00 |
| Hawaii | $ 1,545,160.00 | $ 304,091.00 | $ 1,849,251.00 | $ 97,329.00 | $ 1,946,580.00 |
| Idaho | $ 3,098,532.00 | $ 609,797.00 | $ 3,708,329.00 | $ 195,175.00 | $ 3,903,504.00 |
| Illinois | $ 14,568,608.00 | $ 2,867,131.00 | $ 17,435,739.00 | $ 917,670.00 | $ 18,353,409.00 |
| Indiana | $ 8,963,192.00 | $ 1,763,974.00 | $ 10,727,166.00 | $ 564,588.00 | $ 11,291,754.00 |
| Iowa | $ 5,935,448.00 | $ 1,168,108.00 | $ 7,103,556.00 | $ 373,871.00 | $ 7,477,427.00 |
| Kansas | $ 5,345,324.00 | $ 1,051,970.00 | $ 6,397,294.00 | $ 336,700.00 | $ 6,733,994.00 |
| Kentucky | $ 5,952,485.00 | $ 1,171,461.00 | $ 7,123,946.00 | $ 374,945.00 | $ 7,498,891.00 |
| Louisiana | $ 5,509,841.00 | $ 1,084,348.00 | $ 6,594,189.00 | $ 347,063.00 | $ 6,941,252.00 |
| Maine | $ 2,110,067.00 | $ 415,265.00 | $ 2,525,332.00 | $ 132,912.00 | $ 2,658,244.00 |
| Maryland | $ 6,658,350.00 | $ 1,310,376.00 | $ 7,968,726.00 | $ 419,407.00 | $ 8,388,133.00 |
| Massachusetts | $ 6,825,782.00 | $ 1,343,327.00 | $ 8,169,109.00 | $ 429,953.00 | $ 8,599,062.00 |
| Michigan | $ 11,695,508.00 | $ 2,301,699.00 | $ 13,997,207.00 | $ 736,695.00 | $ 14,733,902.00 |
| Minnesota | $ 8,200,641.00 | $ 1,613,902.00 | $ 9,814,543.00 | $ 516,555.00 | $ 10,331,098.00 |
| Mississippi | $ 5,216,647.00 | $ 1,026,646.00 | $ 6,243,293.00 | $ 328,594.00 | $ 6,571,887.00 |
| Missouri | $ 8,940,243.00 | $ 1,759,457.00 | $ 10,699,700.00 | $ 563,142.00 | $ 11,262,842.00 |
| Montana | $ 3,662,763.00 | $ 720,839.00 | $ 4,383,602.00 | $ 230,716.00 | $ 4,614,318.00 |
| Nebraska | $ 4,374,204.00 | $ 860,852.00 | $ 5,235,056.00 | $ 275,529.00 | $ 5,510,585.00 |
| Nevada | $ 3,608,871.00 | $ 710,233.00 | $ 4,319,104.00 | $ 227,321.00 | $ 4,546,425.00 |
| New Hampshire | $ 1,659,534.00 | $ 326,599.00 | $ 1,986,133.00 | $ 104,533.00 | $ 2,090,666.00 |
| New Jersey | $ 9,322,558.00 | $ 1,834,698.00 | $ 11,157,256.00 | $ 587,224.00 | $ 11,744,480.00 |
| New Mexico | $ 5,634,115.00 | $ 1,108,805.00 | $ 6,742,920.00 | $ 354,890.00 | $ 7,097,810.00 |
| New York | $ 16,586,162.00 | $ 3,264,189.00 | $ 19,850,351.00 | $ 1,044,755.00 | $ 20,895,106.00 |
| North Carolina | $ 12,366,879.00 | $ 2,433,826.00 | $ 14,800,705.00 | $ 778,984.00 | $ 15,579,689.00 |
| North Dakota | $ 3,244,314.00 | $ 638,487.00 | $ 3,882,801.00 | $ 204,358.00 | $ 4,087,159.00 |
| Ohio | $ 13,090,235.00 | $ 2,576,184.00 | $ 15,666,419.00 | $ 824,548.00 | $ 16,490,967.00 |
| Oklahoma | $ 7,036,896.00 | $ 1,384,875.00 | $ 8,421,771.00 | $ 443,251.00 | $ 8,865,022.00 |
| Oregon | $ 5,280,941.00 | $ 1,039,300.00 | $ 6,320,241.00 | $ 332,644.00 | $ 6,652,885.00 |
| Pennsylvania | $ 14,237,777.00 | $ 2,802,022.00 | $ 17,039,799.00 | $ 896,832.00 | $ 17,936,631.00 |
| Puerto Rico | $ 1,889,326.00 | $ 371,823.00 | $ 2,261,149.00 | $ 119,008.00 | $ 2,380,157.00 |
| Rhode Island | $ 1,545,160.00 | $ 304,091.00 | $ 1,849,251.00 | $ 97,329.00 | $ 1,946,580.00 |
| South Carolina | $ 6,605,469.00 | $ 1,299,969.00 | $ 7,905,438.00 | $ 416,076.00 | $ 8,321,514.00 |
| South Dakota | $ 2,795,165.00 | $ 550,094.00 | $ 3,345,259.00 | $ 176,066.00 | $ 3,521,325.00 |
| Tennessee | $ 8,844,186.00 | $ 1,740,553.00 | $ 10,584,739.00 | $ 557,092.00 | $ 11,141,831.00 |
| Texas | $ 41,365,988.00 | $ 8,140,908.00 | $ 49,506,896.00 | $ 2,605,626.00 | $ 52,112,522.00 |
| Utah | $ 4,127,175.00 | $ 812,236.00 | $ 4,939,411.00 | $ 259,969.00 | $ 5,199,380.00 |
| Vermont | $ 1,743,541.00 | $ 343,132.00 | $ 2,086,673.00 | $ 109,825.00 | $ 2,196,498.00 |
| Virginia | $ 9,302,446.00 | $ 1,830,740.00 | $ 11,133,186.00 | $ 585,957.00 | $ 11,719,143.00 |
| Washington | $ 8,218,305.00 | $ 1,617,379.00 | $ 9,835,684.00 | $ 517,668.00 | $ 10,353,352.00 |
| West Virginia | $ 2,844,479.00 | $ 559,799.00 | $ 3,404,278.00 | $ 179,173.00 | $ 3,583,451.00 |
| Wisconsin | $ 8,051,537.00 | $ 1,584,558.00 | $ 9,636,095.00 | $ 507,163.00 | $ 10,143,258.00 |
| Wyoming | $ 2,430,407.00 | $ 478,309.00 | $ 2,908,716.00 | $ 153,090.00 | $ 3,061,806.00 |
| **States Total** | **$398,440,530.00** | **78,413,878.00** | **$ 476,854,408.00** | **$ 25,097,599.00** | **501,952,007.00** |
| | | | | | |
| American Samoa | $ 389,512.00 | $ 76,657.00 | $ 466,169.00 | $ - | $ 466,169.00 |
| Guam | $ 691,701.00 | $ 136,128.00 | $ 827,829.00 | $ - | $ 827,829.00 |
| Northern Marianas | $ 382,602.00 | $ 75,297.00 | $ 457,899.00 | $ - | $ 457,899.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Virgin Islands | $ | 498,157.00 | $ | 98,038.00 | $ | 596,195.00 | $ | - | $ | 596,195.00 |
| Territories Total | $ | 1,961,972.00 | $ | 386,120.00 | $ | 2,348,092.00 | $ | - | $ | 2,348,092.00 |
| | | | | | | | | | | |
| National Total | $400,402,502.00 | $ | 78,799,998.00 | $ | 479,202,500.00 | $ | 25,097,599.00 | $ | 504,300,099.00 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 1:25-cv-00208-JJM-PAS |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| *Defendants*. | |

# EXHIBIT 13

National Highway Traffic Safety
Administration, FY 2024 Grant Funding Table

National Highway Traffic Safety Administration
Office of Grants Management and Operations
Table of the Authorized Not-To-Exceed Grant Amounts for FY 2024 Sections 402, 405, 1906, 154 and 164
For the Period of October 1, 2023 to September 30, 2024

| | S. 402 | S. 402 | S. 402 | S. 405b | S. 405b | S. 405b | S. 405c | S. 405c |
|---|---|---|---|---|---|---|---|---|
| State | HTF Formula Grants | Supplemental Formula Grants | Total 402 Formula Grants | HTF Occupant Protection | Supplemental Occupant Protection | Total Occupant Protection | HTF State Traffic Safety Information Systems | Supplemental State Traffic Safety Information Systems |
| Alabama | $5,983,567.36 | $319,319.44 | $6,302,886.80 | $778,693.55 | $48,461.83 | $827,155.38 | $881,696.20 | $54,872.18 |
| Alaska | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Arizona | $7,049,493.69 | $376,203.73 | $7,425,697.42 | $751,355.01 | $46,760.42 | $798,115.43 | $850,741.42 | $52,945.71 |
| Arkansas | $4,428,382.46 | $236,325.34 | $4,664,707.80 | $584,856.01 | $36,398.39 | $621,254.40 | $662,218.56 | $41,213.03 |
| California | $34,020,372.18 | $1,815,533.37 | $35,835,905.55 | $4,309,450.65 | $268,197.77 | $4,577,648.42 | $4,879,488.54 | $303,673.96 |
| Colorado | $6,325,243.82 | $337,553.36 | $6,662,797.18 | $736,164.83 | $45,815.06 | $781,979.89 | $833,541.94 | $51,875.31 |
| Connecticut | $3,205,326.63 | $171,055.66 | $3,376,382.29 | $444,905.85 | $27,688.62 | $472,594.47 | $503,756.32 | $31,351.17 |
| Delaware | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| District of Columbia | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Florida | $19,062,080.57 | $1,017,321.58 | $20,080,402.15 | $2,149,342.62 | $133,763.89 | $2,283,106.51 | $2,433,649.56 | $151,457.68 |
| Georgia | $10,895,778.41 | $581,464.81 | $11,477,243.22 | $1,261,696.91 | $78,521.44 | $1,340,218.35 | $1,428,589.42 | $88,907.96 |
| Hawaii | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Idaho | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Illinois | $12,900,014.27 | $688,422.99 | $13,588,437.26 | $1,797,388.05 | $111,860.07 | $1,909,248.12 | $2,035,139.76 | $126,656.50 |
| Indiana | $7,254,293.73 | $387,133.10 | $7,641,426.83 | $959,957.33 | $59,742.74 | $1,019,700.07 | $1,086,936.87 | $67,645.29 |
| Iowa | $4,906,901.28 | $261,862.01 | $5,168,763.29 | $655,014.96 | $40,764.72 | $695,779.68 | $741,657.87 | $46,156.92 |
| Kansas | $5,233,026.70 | $279,266.04 | $5,512,292.74 | $702,319.23 | $43,708.69 | $746,027.92 | $795,219.38 | $49,490.31 |
| Kentucky | $5,146,489.14 | $274,647.87 | $5,421,137.01 | $679,640.46 | $42,297.28 | $721,937.74 | $769,540.74 | $47,892.21 |
| Louisiana | $4,967,118.46 | $265,075.56 | $5,232,194.02 | $677,881.73 | $42,187.83 | $720,069.56 | $767,549.37 | $47,768.27 |
| Maine | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Maryland | $5,404,106.19 | $288,395.87 | $5,692,502.06 | $686,767.58 | $42,740.83 | $729,508.41 | $777,610.61 | $48,394.43 |
| Massachusetts | $6,145,253.08 | $327,947.97 | $6,473,201.05 | $818,946.56 | $50,966.97 | $869,913.53 | $927,273.72 | $57,708.69 |
| Michigan | $10,301,291.18 | $549,739.36 | $10,851,030.54 | $1,467,434.50 | $91,325.48 | $1,558,759.98 | $0.00 | $0.00 |
| Minnesota | $7,431,011.95 | $396,563.86 | $7,827,575.81 | $948,026.62 | $59,000.24 | $1,007,026.86 | $1,073,428.01 | $66,804.57 |
| Mississippi | $3,929,930.83 | $209,724.94 | $4,139,655.77 | $533,260.70 | $33,187.37 | $566,448.07 | $603,798.41 | $37,577.27 |
| Missouri | $7,544,496.93 | $402,620.11 | $7,947,117.04 | $998,673.88 | $62,152.26 | $1,060,826.14 | $1,130,774.70 | $70,373.53 |
| Montana | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Nebraska | $3,552,907.01 | $189,604.66 | $3,742,511.67 | $458,741.53 | $28,549.68 | $487,291.21 | $519,422.13 | $32,326.13 |
| Nevada | $3,384,193.30 | $180,601.07 | $3,564,794.37 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| New Hampshire | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| New Jersey | $7,906,423.23 | $421,934.69 | $8,328,357.92 | $1,059,833.61 | $65,958.52 | $1,125,792.13 | $1,200,024.41 | $74,683.27 |
| New Mexico | $3,167,408.73 | $169,032.13 | $3,336,440.86 | $399,641.29 | $24,871.59 | $424,512.88 | $452,504.33 | $28,161.51 |
| New York | $17,839,996.15 | $952,050.38 | $18,792,046.53 | $2,465,112.33 | $153,415.76 | $2,618,528.09 | $2,791,188.10 | $173,709.01 |

National Highway Traffic Safety Administration
Office of Grants Management and Operations
Table of the Authorized Not-To-Exceed Grant Amounts for FY 2024 Sections 402, 405, 1906, 154 and 164
For the Period of October 1, 2023 to September 30, 2024

| | S. 402 | S. 402 | S. 402 | S. 405b | S. 405b | S. 405b | S. 405c | S. 405c |
|---|---|---|---|---|---|---|---|---|
| State | HTF Formula Grants | Supplemental Formula Grants | **Total 402 Formula Grants** | HTF Occupant Protection | Supplemental Occupant Protection | **Total Occupant Protection** | HTF State Traffic Safety Information Systems | Supplemental State Traffic Safety Information Systems |
| **North Carolina** | $10,280,399.66 | $548,624.47 | **$10,829,024.13** | $1,205,282.07 | $75,010.48 | **$1,280,292.55** | $1,364,712.24 | $84,932.58 |
| **North Dakota** | $2,810,775.00 | $150,000.00 | **$2,960,775.00** | $355,322.16 | $22,113.40 | **$377,435.56** | $402,322.84 | $25,038.47 |
| **Ohio** | $11,630,578.62 | $620,678.20 | **$12,251,256.82** | $1,637,230.09 | $101,892.67 | **$1,739,122.76** | $1,853,796.72 | $115,370.65 |
| **Oklahoma** | $5,503,079.32 | $293,677.68 | **$5,796,757.00** | $710,569.69 | $44,222.15 | **$754,791.84** | $804,561.17 | $50,071.69 |
| **Oregon** | $4,931,431.02 | $263,171.06 | **$5,194,602.08** | $556,073.81 | $34,607.13 | **$590,680.94** | $629,629.16 | $39,184.84 |
| **Pennsylvania** | $12,524,660.55 | $668,391.84 | **$13,193,052.39** | $1,731,777.32 | $107,776.80 | **$1,839,554.12** | $1,960,850.30 | $122,033.11 |
| **Puerto Rico** | $2,931,846.76 | $156,461.12 | **$3,088,307.88** | $476,469.26 | $29,652.96 | **$506,122.22** | $539,494.82 | $33,575.34 |
| **Rhode Island** | $2,810,775.00 | $150,000.00 | **$2,960,775.00** | $355,322.16 | $22,113.40 | **$377,435.56** | $402,322.84 | $25,038.47 |
| **South Carolina** | $5,587,107.08 | $298,161.91 | **$5,885,268.99** | $641,188.75 | $39,904.25 | **$681,093.00** | $726,002.79 | $45,182.63 |
| **South Dakota** | $2,810,775.00 | $150,000.00 | **$2,960,775.00** | $0.00 | $0.00 | **$0.00** | $402,322.84 | $25,038.47 |
| **Tennessee** | $7,338,550.89 | $391,629.58 | **$7,730,180.47** | $901,041.66 | $56,076.14 | **$957,117.80** | $1,020,228.05 | $63,493.68 |
| **Texas** | $29,155,313.21 | $1,555,904.32 | **$30,711,217.53** | $3,223,108.94 | $200,589.52 | **$3,423,698.46** | $3,649,449.65 | $227,122.75 |
| **Utah** | $3,546,554.99 | $189,265.68 | **$3,735,820.67** | $377,807.09 | $23,512.74 | **$401,319.83** | $427,781.99 | $26,622.92 |
| **Vermont** | $2,810,775.00 | $150,000.00 | **$2,960,775.00** | $355,322.16 | $22,113.40 | **$377,435.56** | $402,322.84 | $25,038.47 |
| **Virginia** | $8,199,325.99 | $437,565.76 | **$8,636,891.75** | $1,005,503.48 | $62,577.30 | **$1,068,080.78** | $1,138,507.69 | $70,854.79 |
| **Washington** | $7,578,924.34 | $404,457.36 | **$7,983,381.70** | $902,469.18 | $56,164.98 | **$958,634.16** | $1,021,844.40 | $63,594.27 |
| **West Virginia** | $2,810,775.00 | $150,000.00 | **$2,960,775.00** | $355,322.16 | $22,113.40 | **$377,435.56** | $402,322.84 | $25,038.47 |
| **Wisconsin** | $6,982,170.11 | $372,610.94 | **$7,354,781.05** | $931,540.23 | $57,974.21 | **$989,514.44** | $0.00 | $0.00 |
| **Wyoming** | $2,810,775.00 | $150,000.00 | **$2,960,775.00** | $355,322.16 | $22,113.40 | **$377,435.56** | $402,322.84 | $25,038.47 |
| **American Samoa** | $936,925.00 | $50,000.00 | **$986,925.00** | $0.00 | $0.00 | **$0.00** | $134,107.61 | $8,346.15 |
| **Guam** | $936,925.00 | $50,000.00 | **$986,925.00** | $118,440.72 | $7,371.13 | **$125,811.85** | $0.00 | $0.00 |
| **Northern Mariana Islands** | $936,925.00 | $50,000.00 | **$986,925.00** | $118,440.72 | $7,371.13 | **$125,811.85** | $134,107.61 | $8,346.15 |
| **Virgin Islands** | $936,925.00 | $50,000.00 | **$986,925.00** | $118,440.72 | $7,371.13 | **$125,811.85** | $134,107.61 | $8,346.15 |
| **Bureau of Indian Affairs** | $7,495,400.00 | $400,000.00 | **$7,895,400.00** | $0.00 | $0.00 | **$0.00** | $0.00 | $0.00 |
| **Grand Total** | $ 374,769,999.82 | $ 19,999,999.82 | **$ 394,769,999.64** | $ 45,954,999.76 | $ 2,859,999.77 | **$ 48,814,999.53** | $ 49,719,774.78 | $ 3,094,299.66 |
| | | | **50 States, DC, PR, 4 Terr., BIA** | | | **49 States, DC, PR, 3 Terr.** | | |

| S. 405c | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S. 405e | S. 405e | S. 405e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total State Traffic Safety Information Systems | HTF Impaired Driving Countermeasures | Supplemental Impaired Driving Countermeasures | Total Impaired Driving Countermeasures | HTF Impaired Driving Ignition Interlock | Supplemental Impaired Driving Ignition Interlock | Total Impaired Driving Ignition Interlock | HTF Impaired Driving 24-7 | Supplemental Impaired Driving 24-7 | Total Impaired Driving 24-7 | HTF Distracted Driving Laws | Supplemental Distracted Driving Laws | Total Distracted Driving Laws |
| $936,568.38 | $3,109,563.94 | $194,040.91 | $3,303,604.85 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $903,687.13 | $3,000,392.71 | $187,228.49 | $3,187,621.20 | $420,988.47 | $26,270.23 | $447,258.70 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $703,431.59 | $2,335,510.76 | $145,738.97 | $2,481,249.73 | $271,341.87 | $16,932.09 | $288,273.96 | $0.00 | $0.00 | $0.00 | $375,479.44 | $35,024.14 | $410,503.58 |
| $5,183,162.50 | $17,208,967.78 | $1,073,862.43 | $18,282,830.21 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,383,340.57 | $129,035.88 | $1,512,376.45 |
| $885,417.25 | $2,939,733.60 | $183,443.27 | $3,123,176.87 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $535,107.49 | $1,776,646.51 | $110,865.10 | $1,887,511.61 | $196,130.13 | $12,238.78 | $208,368.91 | $0.00 | $0.00 | $0.00 | $285,630.98 | $26,643.21 | $312,274.19 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $171,601.53 | $10,708.16 | $182,309.69 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $2,585,107.24 | $8,582,989.08 | $535,589.91 | $9,118,578.99 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $1,517,497.38 | $5,038,345.53 | $314,399.44 | $5,352,744.97 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $2,161,796.26 | $7,177,525.75 | $447,887.13 | $7,625,412.88 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $288,482.22 | $26,909.17 | $315,391.39 |
| $1,154,582.16 | $3,833,406.19 | $239,209.63 | $4,072,615.82 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $787,814.79 | $2,615,677.10 | $163,221.72 | $2,778,898.82 | $0.00 | $0.00 | $0.00 | $75,073.99 | $4,684.71 | $79,758.70 | $0.00 | $0.00 | $0.00 |
| $844,709.69 | $2,804,577.69 | $175,009.37 | $2,979,587.06 | $322,025.01 | $20,094.78 | $342,119.79 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $817,432.95 | $2,714,014.33 | $169,358.09 | $2,883,372.42 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $815,317.64 | $2,706,991.17 | $168,919.84 | $2,875,911.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $228,117.97 | $21,278.49 | $249,396.46 |
| $826,005.04 | $2,742,475.12 | $171,134.08 | $2,913,609.20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $984,982.41 | $3,270,306.61 | $204,071.47 | $3,474,378.08 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $525,766.32 | $49,042.67 | $574,808.99 |
| $0.00 | $5,859,919.29 | $365,666.74 | $6,225,586.03 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $1,140,232.58 | $3,785,763.19 | $236,236.64 | $4,021,999.83 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $152,159.03 | $14,193.16 | $166,352.19 |
| $641,375.68 | $2,129,474.72 | $132,882.04 | $2,262,356.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $1,201,148.23 | $3,988,013.36 | $248,857.32 | $4,236,870.68 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $42,900.38 | $2,677.04 | $45,577.42 | $0.00 | $0.00 | $0.00 |
| $551,748.26 | $1,831,896.66 | $114,312.78 | $1,946,209.44 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.18 | $88,541.95 | $1,507,453.13 | $207,545.52 | $12,951.11 | $220,496.63 | $51,886.38 | $3,237.77 | $55,124.15 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $228,117.97 | $21,278.49 | $249,396.46 |
| $1,274,707.68 | $4,232,243.05 | $264,097.58 | $4,496,340.63 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $680,416.58 | $63,468.21 | $743,884.79 |
| $480,665.84 | $1,595,891.15 | $99,585.72 | $1,695,476.87 | $193,847.22 | $12,096.32 | $205,943.54 | $0.00 | $0.00 | $0.00 | $256,570.99 | $23,932.54 | $280,503.53 |
| $2,964,897.11 | $9,843,955.09 | $614,275.86 | $10,458,230.95 | $1,089,949.99 | $68,014.32 | $1,157,964.31 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

| S. 405c | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S. 405e | S. 405e | S. 405e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total State Traffic Safety Information Systems | HTF Impaired Driving Countermeasures | Supplemental Impaired Driving Countermeasures | Total Impaired Driving Countermeasures | HTF Impaired Driving Ignition Interlock | Supplemental Impaired Driving Ignition Interlock | Total Impaired Driving Ignition Interlock | HTF Impaired Driving 24-7 | Supplemental Impaired Driving 24-7 | Total Impaired Driving 24-7 | HTF Distracted Driving Laws | Supplemental Distracted Driving Laws | Total Distracted Driving Laws |
| $1,449,644.82 | $4,813,063.66 | $300,341.56 | $5,113,405.22 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $42,900.38 | $2,677.04 | $45,577.42 | $228,117.97 | $21,278.49 | $249,396.46 |
| $1,969,167.37 | $6,537,965.55 | $407,977.72 | $6,945,943.27 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,051,106.97 | $98,045.64 | $1,149,152.61 |
| $854,632.86 | $2,837,524.31 | $177,065.28 | $3,014,589.59 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $668,814.00 | $2,220,574.54 | $138,566.79 | $2,359,141.33 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $357,001.17 | $33,300.52 | $390,301.69 |
| $2,082,883.41 | $6,915,521.86 | $431,537.74 | $7,347,059.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $573,070.16 | $1,902,688.98 | $118,730.31 | $2,021,419.29 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $228,117.97 | $21,278.49 | $249,396.46 |
| $771,185.42 | $2,560,464.79 | $159,776.40 | $2,720,241.19 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $42,900.38 | $2,677.04 | $45,577.42 | $0.00 | $0.00 | $0.00 |
| $1,083,721.73 | $3,598,137.70 | $224,528.56 | $3,822,666.26 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $3,876,572.40 | $12,870,869.74 | $803,159.35 | $13,674,029.09 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $454,404.91 | $1,508,700.44 | $94,144.91 | $1,602,845.35 | $0.00 | $0.00 | $0.00 | $54,163.77 | $3,379.89 | $57,543.66 | $242,553.36 | $22,625.00 | $265,178.36 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $228,117.97 | $21,278.49 | $249,396.46 |
| $1,209,362.48 | $4,015,286.03 | $250,559.17 | $4,265,845.20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $1,085,438.67 | $3,603,838.25 | $224,884.29 | $3,828,722.54 | $0.00 | $0.00 | $0.00 | $116,332.63 | $7,259.31 | $123,591.94 | $579,388.11 | $54,044.43 | $633,432.54 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $3,719,927.93 | $232,128.44 | $3,952,056.37 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $42,900.38 | $2,677.04 | $45,577.42 | $0.00 | $0.00 | $0.00 |
| $142,453.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $142,453.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $142,453.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $ 52,814,074.44 | $ 183,512,511.72 | $ 11,451,424.16 | $ 194,963,935.88 | $ 2,873,429.74 | $ 179,305.79 | $ 3,052,735.53 | $ 469,058.29 | $ 29,269.84 | $ 498,328.13 | $ 7,318,485.59 | $ 682,657.02 | $ 8,001,142.61 |
| | | | $198,514,999.54 | | | | | | | | | $26,91... |
| 48 States, DC, PR, 3 Terr. | | | 50 States, DC, PR | | | 7 States, DC | | | 8 States | | | 17 States |

| S. 405e | S. 405e | S. 405e | S. 405f | S. 405f | S. 405f | S. 405g | S. 405g | S. 405g | S. 405h | S. 405h | S. 405h | S. 405i |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HTF Distracted Driving Awareness | Supplemental Distracted Driving Awareness | **Total Distracted Driving Awareness** | HTF Motorcyclist Safety | Supplemental Motorcyclist Safety | **Total Motorcyclist Safety** | HTF Nonmotorized Safety | Supplemental Nonmotorized Safety | **Total Nonmotorized Safety** | HTF Preventing Roadside Deaths | Supplemental Preventing Roadside Deaths | **Total Preventing Roadside Deaths** | HTF Driver and Officer Safety Education |
| $0.00 | $0.00 | **$0.00** | $0.00 | $0.00 | **$0.00** | $0.00 | $0.00 | **$0.00** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $0.00 | $0.00 | **$0.00** | $0.00 | $0.00 | **$0.00** | $237,425.71 | $14,776.14 | **$252,201.85** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $0.00 | $0.00 | **$0.00** | $92,436.27 | $ 5,752.75 | **$98,189.02** | $502,054.25 | $31,245.24 | **$533,299.49** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $382,549.46 | $25,620.00 | **$408,169.46** | $71,952.55 | $ 4,477.95 | **$76,430.50** | $390,799.87 | $24,321.35 | **$415,121.22** | $97,733.42 | $6,082.41 | **$103,815.83** | $0.00 |
| $2,818,775.90 | $188,778.32 | **$3,007,554.22** | $530,174.91 | $ 32,995.32 | **$563,170.23** | $2,879,568.21 | $179,209.33 | **$3,058,777.54** | $0.00 | $0.00 | **$0.00** | $3,110,190.22 |
| $0.00 | $0.00 | **$0.00** | $90,567.48 | $ 5,636.44 | **$96,203.92** | $0.00 | $0.00 | **$0.00** | $139,178.37 | $8,661.73 | **$147,840.10** | $0.00 |
| $291,009.22 | $19,489.40 | **$310,498.62** | $54,735.03 | $ 3,406.42 | **$58,141.45** | $297,285.39 | $18,501.49 | **$315,786.88** | $70,643.23 | $4,396.46 | **$75,039.69** | $0.00 |
| $232,413.27 | $15,565.12 | **$247,978.39** | $43,713.90 | $ 2,720.52 | **$46,434.42** | $237,425.71 | $14,776.14 | **$252,201.85** | $61,808.39 | $3,846.63 | **$65,655.02** | $0.00 |
| $232,413.27 | $15,565.12 | **$247,978.39** | $0.00 | $   - | **$0.00** | $237,425.71 | $14,776.14 | **$252,201.85** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $1,405,867.16 | $94,153.36 | **$1,500,020.52** | $264,425.24 | $ 16,456.45 | **$280,881.69** | $1,436,187.39 | $89,380.82 | **$1,525,568.21** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $825,265.47 | $55,269.46 | **$880,534.93** | $155,221.65 | $ 9,660.18 | **$164,881.83** | $843,063.91 | $52,467.90 | **$895,531.81** | $240,603.81 | $14,973.92 | **$255,577.73** | $0.00 |
| $0.00 | $0.00 | **$0.00** | $43,713.90 | $ 2,720.52 | **$46,434.42** | $237,425.71 | $14,776.14 | **$252,201.85** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $232,413.27 | $15,565.12 | **$247,978.39** | $43,713.90 | $ 2,720.52 | **$46,434.42** | $0.00 | $0.00 | **$0.00** | $61,808.39 | $3,846.63 | **$65,655.02** | $0.00 |
| $1,175,656.60 | $78,735.77 | **$1,254,392.37** | $221,125.64 | $ 13,761.70 | **$234,887.34** | $1,201,011.89 | $74,744.72 | **$1,275,756.61** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $0.00 | $0.00 | **$0.00** | $118,099.80 | $ 7,349.91 | **$125,449.71** | $0.00 | $0.00 | **$0.00** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $0.00 | $0.00 | **$0.00** | $80,583.93 | $ 5,015.12 | **$85,599.05** | $0.00 | $0.00 | **$0.00** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $459,381.18 | $30,765.55 | **$490,146.73** | $86,403.59 | $ 5,377.31 | **$91,780.90** | $0.00 | $0.00 | **$0.00** | $115,988.75 | $7,218.53 | **$123,207.28** | $483,903.36 |
| $444,547.18 | $29,772.09 | **$474,319.27** | $83,613.51 | $ 5,203.67 | **$88,817.18** | $0.00 | $0.00 | **$0.00** | $108,358.28 | $6,743.65 | **$115,101.93** | $0.00 |
| $443,396.81 | $29,695.05 | **$473,091.86** | $83,397.14 | $ 5,190.20 | **$88,587.34** | $452,959.51 | $28,189.84 | **$481,149.35** | $61,808.39 | $3,846.63 | **$65,655.02** | $0.00 |
| $449,208.97 | $30,084.30 | **$479,293.27** | $84,490.33 | $ 5,258.23 | **$89,748.56** | $458,897.02 | $28,559.36 | **$487,456.38** | $118,856.64 | $7,397.01 | **$126,253.65** | $236,366.42 |
| $0.00 | $0.00 | **$0.00** | $100,751.80 | $ 6,270.26 | **$107,022.06** | $547,218.81 | $34,056.05 | **$581,274.86** | $135,219.73 | $8,415.37 | **$143,635.10** | $0.00 |
| $0.00 | $0.00 | **$0.00** | $180,532.74 | $ 11,235.41 | **$191,768.15** | $980,537.44 | $61,023.54 | **$1,041,560.98** | $226,867.60 | $14,119.05 | **$240,986.65** | $0.00 |
| $620,096.35 | $41,528.93 | **$661,625.28** | $116,632.01 | $ 7,258.56 | **$123,890.57** | $633,469.91 | $39,423.87 | **$672,893.78** | $163,208.40 | $10,157.24 | **$173,365.64** | $0.00 |
| $653,224.30 | $43,747.56 | **$696,971.86** | $122,862.95 | $ 7,646.35 | **$130,509.30** | $667,312.33 | $41,530.04 | **$708,842.37** | $166,213.10 | $10,344.23 | **$176,557.33** | $693,438.59 |
| $300,059.02 | $20,095.47 | **$320,154.49** | $56,437.18 | $ 3,512.35 | **$59,949.53** | $0.00 | $0.00 | **$0.00** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $232,413.27 | $15,565.12 | **$247,978.39** | $43,713.90 | $ 2,720.52 | **$46,434.42** | $237,425.71 | $14,776.14 | **$252,201.85** | $74,754.89 | $4,652.35 | **$79,407.24** | $0.00 |
| $232,413.27 | $15,565.12 | **$247,978.39** | $43,713.90 | $ 2,720.52 | **$46,434.42** | $237,425.71 | $14,776.14 | **$252,201.85** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $693,228.37 | $46,426.71 | **$739,655.08** | $130,387.19 | $ 8,114.62 | **$138,501.81** | $708,779.17 | $44,073.38 | **$752,852.55** | $174,068.82 | $10,833.13 | **$184,901.95** | $0.00 |
| $261,402.05 | $17,506.55 | **$278,908.60** | $49,166.31 | $ 3,059.85 | **$52,226.16** | $267,039.69 | $16,619.16 | **$283,658.85** | $0.00 | $0.00 | **$0.00** | $0.00 |
| $0.00 | $0.00 | **$0.00** | $303,273.15 | $ 18,874.14 | **$322,147.29** | $1,647,184.22 | $102,512.17 | **$1,749,696.39** | $0.00 | $0.00 | **$0.00** | $0.00 |

| S. 405e | S. 405e | S. 405e | S. 405f | S. 405f | S. 405f | S. 405g | S. 405g | S. 405g | S. 405h | S. 405h | S. 405h | S. 405i |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HTF Distracted Driving Awareness | Supplemental Distracted Driving Awareness | Total Distracted Driving Awareness | HTF Motorcyclist Safety | Supplemental Motorcyclist Safety | Total Motorcyclist Safety | HTF Nonmotorized Safety | Supplemental Nonmotorized Safety | Total Nonmotorized Safety | HTF Preventing Roadside Deaths | Supplemental Preventing Roadside Deaths | Total Preventing Roadside Deaths | HTF Driver and Officer Safety Education |
| $0.00 | $0.00 | $0.00 | $148,281.15 | $ 9,228.24 | $157,509.39 | $805,367.60 | $50,121.88 | $855,489.48 | $226,210.29 | $14,078.15 | $240,288.44 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $ 2,720.52 | $46,434.42 | $0.00 | $0.00 | $0.00 | $61,808.39 | $3,846.63 | $65,655.02 | $0.00 |
| $1,070,898.61 | $71,719.94 | $1,142,618.55 | $201,422.03 | $ 12,535.45 | $213,957.48 | $1,093,994.59 | $68,084.52 | $1,162,079.11 | $256,145.13 | $15,941.13 | $272,086.26 | $0.00 |
| $464,777.73 | $31,126.97 | $495,904.70 | $87,418.61 | $ 5,440.47 | $92,859.08 | $474,801.56 | $29,549.17 | $504,350.73 | $0.00 | $0.00 | $0.00 | $0.00 |
| $363,723.27 | $24,359.18 | $388,082.45 | $68,411.59 | $ 4,257.58 | $72,669.17 | $371,567.65 | $23,124.43 | $394,692.08 | $108,590.08 | $6,758.08 | $115,348.16 | $453,036.20 |
| $1,132,741.17 | $75,861.64 | $1,208,602.81 | $213,053.81 | $ 13,259.36 | $226,313.17 | $1,157,170.91 | $72,016.29 | $1,229,187.20 | $0.00 | $0.00 | $0.00 | $0.00 |
| $311,654.59 | $20,872.04 | $332,526.63 | $0.00 | $ - | $0.00 | $318,376.02 | $19,814.06 | $338,190.08 | $0.00 | $0.00 | $0.00 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $ 2,720.52 | $46,434.42 | $237,425.71 | $14,776.14 | $252,201.85 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $78,882.95 | $ 4,909.26 | $83,792.21 | $428,441.32 | $26,663.95 | $455,105.27 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $ - | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $396,526.52 | $ 24,677.74 | $421,204.26 | $2,153,676.37 | $134,033.60 | $2,287,709.97 | $161,536.80 | $10,053.20 | $171,590.00 | $0.00 |
| $247,120.48 | $16,550.09 | $263,670.57 | $46,480.13 | $ 2,892.68 | $49,372.81 | $252,450.11 | $15,711.18 | $268,161.29 | $78,036.03 | $4,856.55 | $82,892.58 | $325,565.19 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $ 2,720.52 | $46,434.42 | $237,425.71 | $14,776.14 | $252,201.85 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $123,703.17 | $ 7,698.64 | $131,401.81 | $671,875.86 | $41,814.05 | $713,689.91 | $180,485.75 | $11,232.49 | $191,718.24 | $0.00 |
| $590,297.60 | $39,533.25 | $629,830.85 | $111,027.26 | $ 6,909.75 | $117,937.01 | $603,028.50 | $37,529.35 | $640,557.85 | $167,605.33 | $10,430.88 | $178,036.21 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $ 2,720.52 | $46,434.42 | $0.00 | $0.00 | $0.00 | $61,808.39 | $3,846.63 | $65,655.02 | $0.00 |
| $0.00 | $0.00 | $0.00 | $114,603.76 | $ 7,132.34 | $121,736.10 | $0.00 | $0.00 | $0.00 | $153,845.10 | $9,574.51 | $163,419.61 | $0.00 |
| $0.00 | $0.00 | $0.00 | $43,713.90 | $ 2,720.52 | $46,434.42 | $0.00 | $0.00 | $0.00 | $61,808.39 | $3,846.63 | $65,655.02 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $ 17,729,014.19 | $ 1,187,342.83 | $ 18,916,357.02 | $ 5,302,499.82 | $ 329,999.76 | $ 5,632,499.58 | $ 24,744,999.81 | $ 1,539,999.85 | $ 26,284,999.66 | $ 3,534,999.89 | $ 219,999.85 | $ 3,754,999.74 | $ 5,302,499.98 |
| 7,499.63 | | | | | | | | | | | | |
| | | 30 States, DC, PR | | | 46 States | | | 34 States, DC, PR | | | 27 States | |

| S. 405i | S. 405i | S. 405 | S. 1906 | S. 154 | S. 164 | TOTAL |
|---|---|---|---|---|---|---|
| Supplemental Driver and Officer Safety Education | Total Driver and Officer Safety Education | Total 405 | Racial Profiling Data Collection | Open Container | Repeat Offender | FY 2024 |
| $0.00 | $0.00 | $5,067,328.61 | $0.00 | $0.00 | $0.00 | $11,370,215.41 |
| $0.00 | $0.00 | $2,564,451.83 | $0.00 | $0.00 | $0.00 | $5,525,226.83 |
| $0.00 | $0.00 | $5,968,170.97 | $0.00 | $0.00 | $0.00 | $13,393,868.39 |
| $0.00 | $0.00 | $5,508,250.27 | $0.00 | $0.00 | $0.00 | $10,172,958.07 |
| $193,562.05 | $3,303,752.27 | $39,489,271.84 | $1,150,000.00 | $0.00 | $41,298,661.00 | $117,773,838.39 |
| $0.00 | $0.00 | $5,034,618.03 | $0.00 | $0.00 | $895,275.00 | $12,592,690.21 |
| $0.00 | $0.00 | $4,175,323.31 | $1,150,000.00 | $5,888,910.00 | $0.00 | $14,590,615.60 |
| $0.00 | $0.00 | $2,924,519.66 | $0.00 | $1,410,758.00 | $0.00 | $7,296,052.66 |
| $0.00 | $0.00 | $2,994,739.91 | $575,000.00 | $0.00 | $0.00 | $6,530,514.91 |
| $0.00 | $0.00 | $17,293,263.16 | $0.00 | $0.00 | $0.00 | $37,373,665.31 |
| $0.00 | $0.00 | $10,406,987.00 | $0.00 | $0.00 | $0.00 | $21,884,230.22 |
| $0.00 | $0.00 | $2,610,886.25 | $0.00 | $1,258,331.00 | $1,258,331.00 | $8,088,323.25 |
| $0.00 | $0.00 | $2,672,317.81 | $0.00 | $0.00 | $0.00 | $5,633,092.81 |
| $0.00 | $0.00 | $14,776,884.97 | $0.00 | $0.00 | $0.00 | $28,365,322.23 |
| $0.00 | $0.00 | $6,372,347.76 | $0.00 | $0.00 | $2,903,969.00 | $16,917,743.59 |
| $0.00 | $0.00 | $4,427,851.04 | $0.00 | $0.00 | $0.00 | $9,596,614.33 |
| $30,115.62 | $514,018.98 | $6,131,598.35 | $0.00 | $0.00 | $0.00 | $11,643,891.09 |
| $0.00 | $0.00 | $4,985,879.56 | $0.00 | $0.00 | $0.00 | $10,407,016.57 |
| $0.00 | $0.00 | $5,569,228.69 | $575,000.00 | $1,760,316.00 | $1,760,316.00 | $14,897,054.71 |
| $0.00 | $0.00 | $2,921,714.27 | $575,000.00 | $0.00 | $0.00 | $6,457,489.27 |
| $14,710.21 | $251,076.00 | $5,902,951.14 | $575,000.00 | $0.00 | $0.00 | $12,170,453.20 |
| $0.00 | $0.00 | $6,736,015.03 | $0.00 | $0.00 | $0.00 | $13,209,216.08 |
| $0.00 | $0.00 | $9,258,661.79 | $0.00 | $0.00 | $2,171,627.00 | $22,281,319.33 |
| $0.00 | $0.00 | $7,967,386.73 | $0.00 | $0.00 | $9,523,828.00 | $25,318,790.54 |
| $0.00 | $0.00 | $3,470,180.51 | $0.00 | $6,045,664.00 | $0.00 | $13,655,500.28 |
| $43,156.00 | $736,594.59 | $8,948,320.50 | $0.00 | $5,895,944.00 | $0.00 | $22,791,381.54 |
| $0.00 | $0.00 | $2,404,261.82 | $0.00 | $0.00 | $1,731,591.00 | $7,096,627.82 |
| $0.00 | $0.00 | $3,365,352.93 | $1,150,000.00 | $0.00 | $0.00 | $8,257,864.60 |
| $0.00 | $0.00 | $3,213,892.68 | $575,000.00 | $0.00 | $2,125,934.00 | $9,479,621.05 |
| $0.00 | $0.00 | $3,108,261.10 | $0.00 | $0.00 | $0.00 | $6,069,036.10 |
| $0.00 | $0.00 | $9,456,036.62 | $0.00 | $0.00 | $0.00 | $17,784,394.54 |
| $0.00 | $0.00 | $3,701,896.27 | $0.00 | $0.00 | $7,287,950.00 | $14,326,287.13 |
| $0.00 | $0.00 | $19,271,464.14 | $0.00 | $0.00 | $0.00 | $38,063,510.67 |

| S. 405i | S. 405i | S. 405 | S. 1906 | S. 154 | S. 164 | TOTAL |
|---|---|---|---|---|---|---|
| Supplemental Driver and Officer Safety Education | Total Driver and Officer Safety Education | Total 405 | Racial Profiling Data Collection | Open Container | Repeat Offender | FY 2024 |
| $0.00 | $0.00 | $9,096,629.90 | $0.00 | $0.00 | $0.00 | $19,925,654.03 |
| $0.00 | $0.00 | $2,967,291.69 | $0.00 | $0.00 | $912,417.00 | $6,840,483.69 |
| $0.00 | $0.00 | $14,594,127.41 | $0.00 | $0.00 | $1,596,681.00 | $28,442,065.23 |
| $0.00 | $0.00 | $5,717,128.80 | $0.00 | $0.00 | $0.00 | $11,513,885.80 |
| $28,194.61 | $481,230.81 | $5,460,960.63 | $1,150,000.00 | $0.00 | $0.00 | $11,805,562.71 |
| $0.00 | $0.00 | $13,933,600.31 | $0.00 | $0.00 | $0.00 | $27,126,652.70 |
| $0.00 | $0.00 | $3,771,328.38 | $0.00 | $1,197,794.00 | $1,197,794.00 | $9,255,224.26 |
| $0.00 | $0.00 | $3,108,261.10 | $0.00 | $0.00 | $2,661,636.00 | $8,730,672.10 |
| $0.00 | $0.00 | $4,711,417.09 | $0.00 | $0.00 | $0.00 | $10,596,686.08 |
| $0.00 | $0.00 | $1,980,391.84 | $0.00 | $0.00 | $1,726,591.00 | $6,667,757.84 |
| $0.00 | $0.00 | $6,792,390.87 | $0.00 | $13,662,766.00 | $0.00 | $28,185,337.34 |
| $0.00 | $0.00 | $23,683,214.18 | $0.00 | $0.00 | $0.00 | $54,394,431.71 |
| $20,261.48 | $345,826.67 | $3,791,216.03 | $0.00 | $0.00 | $0.00 | $7,527,036.70 |
| $0.00 | $0.00 | $3,108,261.10 | $0.00 | $0.00 | $651,457.00 | $6,720,493.10 |
| $0.00 | $0.00 | $7,580,098.42 | $1,150,000.00 | $24,659,845.00 | $0.00 | $42,026,835.17 |
| $0.00 | $0.00 | $8,196,181.77 | $0.00 | $0.00 | $1,217,189.00 | $17,396,752.47 |
| $0.00 | $0.00 | $2,672,317.81 | $0.00 | $0.00 | $0.00 | $5,633,092.81 |
| $0.00 | $0.00 | $5,226,726.52 | $0.00 | $0.00 | $0.00 | $12,581,507.57 |
| $0.00 | $0.00 | $2,469,916.84 | $0.00 | $0.00 | $0.00 | $5,430,691.84 |
| $0.00 | $0.00 | $142,453.76 | $0.00 | $0.00 | $0.00 | $1,129,378.76 |
| $0.00 | $0.00 | $125,811.85 | $0.00 | $0.00 | $0.00 | $1,112,736.85 |
| $0.00 | $0.00 | $268,265.61 | $0.00 | $0.00 | $0.00 | $1,255,190.61 |
| $0.00 | $0.00 | $268,265.61 | $0.00 | $0.00 | $0.00 | $1,255,190.61 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,895,400.00 |
| $ 329,999.97 | $ 5,632,499.95 | $ 368,366,572.07 | $ 8,625,000.00 | $ 61,780,328.00 | $ 80,921,247.00 | $ 914,463,146.71 |
| | 6 States | | 9 States, DC | 8 States, PR | 16 States, PR | |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                 *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                 *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 14

Federal Aviation Administration,
Fiscal Year 2024 State
Apportionment

**Fiscal Year 2024**
**State Apportionment**

|  |  |
|---|---|
|  | **Total FY 2024 State Apportionment** |
| **State Apport. + Insular** | **$235,518,464.00** |
| State Apport.(99.38%) | $234,058,250.00 |
| Insular (0.62%) | $1,460,214.00 |

| State Code | State | Region | ADO | Total FY 2024 State Apportionment |
|---|---|---|---|---|
| AL | Alabama | SO | JAN | $3,370,084 |
| AK | Alaska | AL | AAL | $20,737,189 |
| AZ | Arizona | WP | PHX | $6,008,954 |
| AR | Arkansas | SW | AROK | $2,689,737 |
| CA | California | WP | LAX | $18,861,826 |
| CO | Colorado | NM | DEN | $5,222,633 |
| CT | Connecticut | NE | ANE | $1,431,328 |
| DE | Delaware | EA | HAR | $422,708 |
| DC | District Of Columbia | EA | WAS | $243,181 |
| FL | Florida | SO | ORL | $9,554,166 |
| GA | Georgia | SO | ATL | $5,574,195 |
| HI | Hawaii | WP | HNL | $845,270 |
| ID | Idaho | NM | HLN | $3,215,268 |
| IL | Illinois | GL | CHI | $6,262,073 |
| IN | Indiana | GL | CHI | $3,493,345 |
| IA | Iowa | CE | ACE | $2,847,507 |
| KS | Kansas | CE | ACE | $3,559,693 |
| KY | Kentucky | SO | MEM | $2,819,085 |
| LA | Louisiana | SW | LANM | $3,240,651 |
| ME | Maine | NE | ANE | $1,565,306 |
| MD | Maryland | EA | WAS | $2,541,522 |
| MA | Massachusetts | NE | ANE | $2,782,647 |
| MI | Michigan | GL | DET | $6,500,087 |
| MN | Minnesota | GL | DMA | $4,671,007 |
| MS | Mississippi | SO | JAN | $2,526,063 |
| MO | Missouri | CE | ACE | $4,297,471 |
| MT | Montana | NM | HLN | $4,905,004 |
| NE | Nebraska | CE | ACE | $3,066,571 |
| NV | Nevada | WP | PHX | $4,488,870 |
| NH | New Hampshire | NE | ANE | $769,379 |
| NJ | New Jersey | EA | HAR | $3,516,075 |
| NM | New Mexico | SW | LANM | $4,482,919 |
| NY | New York | EA | NYC | $8,741,925 |
| NC | North Carolina | SO | MEM | $5,306,363 |
| ND | North Dakota | GL | DMA | $2,448,507 |
| OH | Ohio | GL | DET | $5,505,038 |
| OK | Oklahoma | SW | AROK | $3,535,772 |
| OR | Oregon | NM | SEA | $4,509,547 |
| PA | Pennsylvania | EA | HAR | $5,963,537 |
| PR | Puerto Rico | SO | ATL | $1,312,698 |
| RI | Rhode Island | NE | ANE | $431,216 |
| SC | South Carolina | SO | ATL | $2,775,092 |
| SD | South Dakota | GL | DMA | $2,683,645 |
| TN | Tennessee | SO | MEM | $3,713,364 |
| TX | Texas | SW | TEX | $18,457,271 |
| UT | Utah | NM | DEN | $3,756,972 |
| VT | Vermont | NE | ANE | $520,827 |
| VA | Virginia | EA | WAS | $4,334,312 |
| WA | Washington | NM | SEA | $4,888,477 |
| WV | West Virginia | EA | BKW | $1,372,924 |
| WI | Wisconsin | GL | CHI | $4,076,549 |
| WY | Wyoming | NM | DEN | $3,212,400 |
| Insular | Insular | WP | HNL | $1,460,214 |
|  | **Total** |  |  | $235,518,464 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 15

Declaration of Stephanie Dougherty

## <u>DECLARATION OF STEPHANIE DOUGHERTY</u>

I, Stephanie Dougherty, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Director at the California Office of Traffic Safety (OTS). My job duties include serving as the Governor's Representative for Highway Safety at the federal level, managing an annual budget of approximately $120 million that supports hundreds of innovative, evidence-based education, enforcement, and other behavioral safety programs and technologies designed to improve road safety.

3.      I have been employed by OTS since January 2025, and I have served as Director since January 2025. Before starting at OTS, I served as Deputy Secretary for Transportation Safety and Enforcement at the California State Transportation Agency (CalSTA) from March 2016 to December 2024. The CalSTA is a cabinet-level agency and oversees the policies and activities of California's eight state organizations that deliver transportation-related programs and services. In my role as Deputy Secretary, I provided Agency-level policy and program oversight for the OTS and other safety and enforcement programs in other CalSTA departments. I also served in various roles with the California Department of Motor Vehicles (DMV) from February 2008 to February 2016, including Chief of Enterprise Planning and Performance. In total, I have over 16 years of experience in transportation-related policy and program analysis and administration.

## <u>Background</u>

4.      OTS works to make roadways safe for all users. This means administering traffic

1

safety programs that help prevent death and serious injury.

5.      The California Traffic Safety Program was enacted in 1967 to implement the requirements of the recent National Highway Safety Act. OTS was then created to administer the Traffic Safety Program. Over the years, OTS has grown and expanded its work, developing the deep expertise necessary to fulfill its role.

6.      Through grant funding from the National Highway Traffic Safety Administration, and the Federal Highway Administration, both Department of Transportation (DOT) subagencies, OTS programmed approximately $163 million in federal fiscal year 2025 for road safety programs in California.

7.      OTS carefully evaluates all potential programs to ensure funding is being put to the best use. Through this work, OTS partners with state and local agencies to effectively design, implement, and evaluate roughly 500 unique grants on an annual basis. In addition to the distribution of funding, OTS leads public awareness campaigns and represents California in traffic safety efforts at the local, state, and national levels.

8.      As part of my regular job duties, I oversee federal grant managers who manage grants issued by OTS to state and local agencies and funded through federal programs including the Highway Traffic Safety Program (23 USC § 402), National Priority Safety Program (23 USC § 405(b)-(i)), and Minimum Penalties for Repeat Offenders for Driving While Intoxicated or Driving Under the Influence Program Transfer (23 USC § 164). I have reviewed the FY (Federal Fiscal Year) 2025 grant awards for these grants that were issued to OTS and associated subawards to state and local agencies and am familiar with their contents.

9.      OTS is specifically responsible for the administration of approximately $150 million in annual federal awards for approximately 500 behavioral safety grants to state and local

agencies. These grant funds support safety initiatives targeted at California's most critical traffic safety needs, including alcohol and drug-impaired driving, distracted driving, usage of seat belts and child safety seats, bicyclist and pedestrian safety, emergency medical services, police traffic services, and traffic records. State and local recipients of OTS grant funds include law enforcement agencies, probation departments, public health departments, fire departments, district attorney's offices, toxicology laboratories, universities, public works departments, and transportation agencies. A loss of these grants would cripple traffic safety efforts at both the statewide and local level and create lasting challenges to California's continued efforts to eliminate traffic fatalities and serious injuries, even if funding were restored at a later date.

### California's Annual Receipt of DOT Grants

10.     The U.S. Department of Transportation (DOT) administers many grant programs where States are the primary grant recipients. The National Highway Traffic Safety Administration (NHTSA) is a subagency of the U.S. DOT whose mission is to save lives, prevent injuries, and reduce economic costs due to road traffic crashes, through education, research, safety standards, and enforcement. NHTSA supports the administration of state highway safety grant programs to the 50 states, the District of Columbia, Puerto Rico, the U.S. Territories, and the Bureau of Indian Affairs through the development and implementation of highway safety programs that use data-driven, evidence-based solutions to save lives, prevent injuries, and reduce economic costs due to traffic crashes.

11.     The Federal Highway Administration (FHWA) is a subagency of the U.S. DOT and supports state and local governments in the design, construction, and maintenance of the Nation's highway system and various federally and tribal owned lands. The Highway Safety Improvement Program (HSIP) is a core Federal-aid program with the purpose of achieving a

significant reduction in traffic fatalities and serious injuries on all public roads, including non-State-owned roads and roads on tribal land. The HSIP is legislated under Section 148 of Title 23, United States Code (23 USC § 148). Section 164 of Title 23 United States Code (23 USC § 164) requires states to enact and enforce a repeat intoxicated driver law that establishes, at minimum, certain specified penalties for second and subsequent convictions of driving while intoxicated or driving under the influence. States that fail to comply with these minimum requirements have a portion of their highway funds reserved. A noncompliant state may elect to use all or a portion of the reserved funds for alcohol-impaired driving programs and for highway safety improvement program activities under Section 148 activities by the state Department of Transportation. California law does not currently meet these federal requirements for minimum penalties for repeat offenders. Since the inception of the transfer program, California has split the transfer evenly between the OTS and California Department of Transportation.

12.    In total, accounting for all program funds, DOT has obligated the following grant amounts to OTS in recent federal fiscal years:

    a.  FY 23: $108,075,512.05

    b.  FY 24: $117,773,838.39

    c.  FY 25: $119,945,331.43

13.    OTS has also received an average of approximately $1,170,000 in annual state funding over the same three-year period. In total, approximately 99% of the OTS budget comes from federal funding. As such, the work of OTS is contingent on prompt and predictable access to these federal grants.

14.    The programs funded by these grants are vital to the safety and security of those who use California's roads. Traffic fatalities are a significant public health and safety concern.

According to NHTSA, 40,901 people were killed in motor vehicle traffic crashes on U.S.

roadways during 2023. In California, 4,061 people were killed in motor vehicle traffic crashes

during 2023. NHTSA's early estimates of traffic fatalities for 2024 project that 39,345 people

died in traffic crashes nationwide. This represents a decrease of about 3.8% compared to the

40,901 fatalities reported in 2023. Total road fatalities, however, remain significantly higher than

a decade ago. The early estimates for California project that 3,807 people died in traffic crashes

in 2024, a 6.3% decline but still higher than decade ago.

15.    A February 2023 report by NHTSA ("The Economic and Societal Impact of

Motor Vehicle Crashes, 2019") examined the costs of one year of crashes in 2019 that killed an

estimated 36,500 people, injured 4.5 million, and damaged 23 million vehicles.[1] The report

estimated the total economic costs of motor vehicle crashes in the United States was $340

billion. These estimated costs include medical care, lost productivity, legal and court costs,

insurance administrative costs, workplace costs, congestion impacts (travel delay, excess fuel

consumption, and pollution), and property damage.

16.    The report further noted, "…in cases of serious injury or death, medical care

cannot fully restore victims to their pre-crash status and human capital costs fail to capture the

intangible value of lost quality-of-life that results from these injuries. In the case of death,

victims are deprived of their entire remaining lifespan. In the case of serious injury, the impact

on the lives of crash victims can involve extended or even lifelong impairment or physical pain,

which can interfere with or prevent even the most basic living functions. These more intangible

effects can be valued using studies that examine the willingness of consumers to pay to avoid

risk of death or injury. Assessing the value of these impacts provides a more complete basis for

---

[1] Lawrence Blincoe et al., The Economic and Societal Impact of Motor Vehicle Crashes, DOT HS 813 403 (2023).

quantifying the harmful impacts of motor vehicle crashes on society. When these quality-of-life valuations are considered, the total value of societal harm from motor vehicle crashes in 2019 was $1.37 trillion."

17.     Given the devastating impact of traffic crashes on individuals, families, and communities, it is essential that OTS continues to invest in data-driven and evidence-based traffic safety programs and assure continued progress towards the State's goal of reaching zero traffic fatalities and serious injuries by 2050.

18.     In addition to using these U.S. DOT program funds themselves, States may pass funds through to subgrantees for the same purposes. OTS passes approximately 94 percent of the total program funds available to California through programs such as the Highway Traffic Safety Program, National Priority Safety Program, and Minimum Penalties for Repeat Offenders for Driving While Intoxicated or Driving Under the Influence Program Transfer on to other state and local entities. Based on each subrecipient's planned objectives and activities and allowable uses under federal rules, OTS may fund subawards to state and local agencies through one or more DOT grant programs. For FY 2025, across these grant programs, OTS is distributing funding to 379 unique state and local government entities through 494 open subawards. Only public entities are eligible to apply directly to OTS for subawards. State and local government subrecipients are allowed to act as host agencies for non-profit organizations. Accordingly, some OTS subrecipients may partner with non-profit organizations to plan and conduct project activities and distribute a portion of their OTS subaward to those non-profit organizations.

19.     If these funds were withheld, OTS would have to immediately reduce or terminate grant awards to state and local subrecipients. The loss of these grant funds would likely result in state and local entities reducing or completely eliminating critical traffic safety efforts that

6

prevent crashes, save lives, and reduce serious injuries. These actions include education and public awareness campaigns to educate California residents about safe travel behaviors and drive behavior change, data-driven and high visibility enforcement targeted at the riskiest driving behaviors, and other proven countermeasure strategies to address impaired driving, distracted driving, speeding, bicyclist and pedestrian safety, and other significant traffic safety problem areas.

### A.  Highway Safety Program (23 USC § 402)

20.    I am familiar with the Highway Safety Program grant funding. Highway Safety Program grants provide funding to support each State's highway safety program, which works to reduce traffic crashes and resulting deaths, injuries, and property damage.

21.    Highway Safety Program grant funding is administered in California by OTS.

22.    OTS was obligated the following total amount in Highway Safety Program grant funds for FY 2025.

   a.  FY 2025: $36,376,319.08

23.    In addition to using Highway Safety Program funds themselves, States may pass funds through to subgrantees for the same purposes. OTS passes the majority of Highway Safety Program funds on to state and local entities. These grants support education, enforcement, and other behavioral safety programs that target the primary causal factors for crashes and traffic fatalities and serious injuries. Current OTS priorities for Highway Safety Program funding include implementing education and public awareness campaigns, conducting coordinated and high visibility traffic enforcement activities focused on high-risk and dangerous driving behaviors, and implementing other proven countermeasure strategies with a particular focus on driving under the influence of alcohol or drugs, distracted driving, speeding, bicyclist and pedestrian safety, emergency medical services, occupant protection, and traffic records and

system improvements.

24.     For example, distracted driving is any activity that shifts a motorist's focus away from driving and can lead to roadway fatalities or injuries. In California, there were 148 people killed in distracted driving traffic crashes in 2022. Distracted driving enforcement, education, and other prevention programs educate the public on the dangers of different types of distractions and encourage focused and safe driving behind the wheel. Among the FY 2025 grants in this area, the University of California, Irvine School of Medicine's B3 DrivSim Lab and Program leads the Youth Thriving in Life Transitions with Transportation program. The program educates and trains youth in traffic safety by delivering interactive education on youth development and prevention of risky behaviors related to traffic safety and transportation. Attendees are provided with professional hands-on, skills-based driver safety training and interactive education.

25.     In 2022 in California, 26 percent (or 1,158) of all motor vehicle fatalities were pedestrians, and 4 percent (or 177) of all motor vehicle fatalities were bicyclists. FY 2025 subawards focused on the safety of these vulnerable road users include 56 pedestrian and bicyclist safety grants (ten of which also use National Priority Safety Program grant funding) throughout California. OTS works with a variety of partners through these grants including public health departments, public works, local transportation agencies, law enforcement agencies, and educational institutions. Activities funded include classroom education, bicycle rodeos, community events, presentations, and workshops to improve the safety of vulnerable road users. These countermeasures are encouraged to be conducted in communities with high numbers of pedestrian- and/or bicycle-related crashes, including underserved populations, older adults, and school-aged children. OTS prioritizes funding coordinated efforts such as Safe Routes to School initiatives that work to improve the safety of school neighborhood streets and

implement safety education in school communities, the Safe System Approach which emphasizes a comprehensive approach to roadway safety that involves reducing risks across all parts of the transportation system, and working with community-based organizations to most effectively implement messaging and programs.

26.     For example, a grant to the Southern California Association of Governments (SCAG) takes a community-driven approach to its "Go Human" campaign, which is focused on reducing traffic collisions and encouraging people to walk and bike more. The campaign provides resources directly to local communities and SCAG engages County Transportation Commissions (CTCs), Public Health departments, and local community organizations to ensure messages are appropriately localized. Additionally, SCAG's Go Human Kit of Parts program provides pop-up materials to temporarily demonstrate potential and planned street design treatments and safety infrastructure to create safer and more inviting public spaces. Finally, through a community grant program, SCAG provides grant funding to eligible applicants to implement traffic safety strategies through community engagement projects.

27.     Approximately 42% of people who die in crashes are alive when the first responders arrive, which reinforces the critical need to fund strategies to improve emergency response times and emergency medical services. Among the projects funded in FY 2025 are emergency medical services subawards to 36 city, county, and regional fire agencies to fund new equipment and training for those fire departments without extrication equipment or those that have existing equipment that has reached the end of its usable lifespan and is in need of replacement. These subawards will improve each of these agency's crash response time and the time to extricate the victims of traffic crashes, thus increasing survivability. OTS is also funding the University of California, Los Angeles Department of Emergency Medicine, in collaboration

9

with The Lundquist Institute/Harbor-UCLA Department of Emergency Medicine and Los Angeles County Emergency Medical Services (EMS) Agency, to conduct an evaluation of an EMS protocol mobile application that can be accessed and used to provide just-in-time training and decision support as first responders treat victims at the crash site.

28.    No later than August 1, 2025, OTS intends to apply for FY 2026 Highway Safety Program funding.

### National Priority Safety Program (23 USC § 405(b)-(i))

29.    I am familiar with the National Priority Safety Program grant funding. National Priority Safety Program grants provide funding to address safety priorities on public roadways including safety measures for vehicle occupants such as the use of seatbelts, impaired and distracted driving countermeasures, nonmotorized user safety, motorcyclist safety, and traffic records systems improvements.

30.    National Priority Safety Program grant funding is administered in California by OTS.

31.    OTS was obligated the following total amount of National Priority Safety Program grant funds for FY 2025.

    a.  FY 2025: $39,741,693.35

32.    OTS currently distributes the majority of National Priority Safety Program funding to state and local government entities to fund best practice strategies for each of the priority safety areas including vehicle occupant safety, impaired and distracted driving countermeasures, nonmotorized user safety, motorcyclist safety, and traffic records systems improvements. These strategies include education, enforcement, community engagement, and other behavioral safety programs targeted at the primary causal factors for crashes and traffic

fatalities and serious injuries in each of these priority areas. For example, funded strategies for
increasing the safety of children traveling in vehicles include providing educational materials,
child safety seat check-ups, community events, presentations, and training, properly fitting child
safety seats, and the distribution of child safety seats. For nonmotorized users, strategies to
improve the overall safety of bicyclists, pedestrians, and other vulnerable road users include
classroom education, bicycle rodeos, community events, presentations, and workshops, as well
as enforcement activities targeted at those behaviors that present the highest risk for pedestrians
and cyclists. Walk audits at locations identified to have a high incidence of serious crashes
involving pedestrians or bicyclists also help to identify potential improvements that could be
implemented.

33.    Best practice strategies to reduce the number of persons killed and injured in
crashes involving motorcycles include hands-on motorcyclist safety courses, motorcyclist helmet
usage training, classroom education, community outreach and public awareness campaigns,
educational presentations, and workshops.

34.    Strategies to improve California's core traffic record data systems (comprised of
crash, driver, vehicle, roadway, citation and adjudication, and injury surveillance systems)
include efforts to automate traffic crash database systems, promote data sharing and integration
of traffic records data systems between all traffic records stakeholders in California, and provide
traffic safety stakeholders the ability to analyze and map high-crash locations.

35.    FY 2025 subawards focused on impaired driving illustrate how California is
bringing a multi-layered approach to addressing our most critical traffic safety problems. In
California, 1,479 people were killed in alcohol-impaired traffic crashes in 2022, and 751 people
were killed in drug-involved traffic crashes in 2021. Impaired driving and associated traffic

crashes are best mitigated by early identification, education, and intervention strategies. Among the OTS FY 2025 subawards targeted at impaired driving is a subaward for the California Highway Patrol to train law enforcement personnel, school administrators, teachers, prosecutors, and other legal professionals to better recognize signs of alcohol and drug impairment and be better equipped to remove impaired drivers from the roadway before crashes and injuries occur. The California Department of Alcoholic Beverage Control, through presentations to youth, parents, school, and community organizations and other outreach, is educating and bringing awareness of the dangers of alcohol-impaired driving and underage drinking. Additionally, 18 District Attorney's offices and two City Attorney's offices throughout California are using Alcohol and Drug Driver Vertical Prosecution Program Project subawards to fund specialized teams to prosecute alcohol and drug impaired driving cases and deliver specialized training. These prosecutors handle cases throughout each step of the criminal process. OTS has heard from subgrantees that these specialized prosecutors have experienced a better prosecution rate, aided in part by increased communication with law enforcement.

36.     Selected examples of other FY 2025 subgrants that are supporting the delivery of strategies related to one or more traffic safety priority areas include the University of California, Berkeley SafeTREC's program, which is providing technical assistance to local jurisdictions, with an emphasis on underserved areas and populations, to reduce the number of people killed or seriously injured while walking and biking on California roads. The Community Pedestrian and Bicyclist Safety Program is a collection of community engagement programs that work with participants to develop safety action plans and local traffic safety champions.

37.     In 2022, 634 (or 14 percent) of all motor vehicle fatalities in California were motorcyclists. Through a FY 2025 project, the Hawthorne Police Department conducts hands-on

12

motorcyclist safety courses, motorcyclist helmet usage training, classroom education, community outreach and public awareness campaigns, educational presentations, and workshops to reduce the number of motorcyclist crashes. There are 14 other agencies conducting similar activities throughout the state.

38.     No later than August 1, 2025, OTS intends to apply for FY 2026 National Priority Safety Program funding.

### Minimum Penalties for Repeat Offenders for Driving While Intoxicated or Driving Under the Influence Program Transfer (23 USC § 164)

39.     I am familiar with the Minimum Penalties for Repeat Offenders for Driving While Intoxicated or Driving Under the Influence Program Transfer (23 USC § 164). Section 164 of Title 23 United States Code (23 USC § 164) requires states to enact and enforce a repeat intoxicated driver law that establishes, at minimum, certain specified penalties for second and subsequent convictions for driving while intoxicated or driving under the influence. States that fail to comply with these minimum requirements have a portion of their highway funds reserved. A noncompliant state may elect to use all or a portion of the reserved funds for Highway Safety Program (Section 402) alcohol-impaired driving initiatives and for Highway Safety Improvement Program activities under Section 148. California law currently does not meet these federal requirements for minimum penalties for repeat offenders. Since the inception of the Section 164 transfer program, California has split the transfer evenly between the OTS and the California Department of Transportation.

40.     The transfer of Section 164 funds reserved for alcohol-impaired driving programs as restricted to the Section 402 grant funding is administered in California by OTS.

41.     OTS was obligated the following total amount in Section 164 Transfer funds (23 USC § 164) for FY 2025.

13

b. FY 2025: $42,677,319.00

42.    OTS currently distributes the majority of Section 164 funding to state and local governments to support educational, enforcement, judicial, and other efforts to create awareness of the dangers of impaired driving and hold impaired drivers accountable for their unsafe actions. This includes strategies for enhanced DUI enforcement (such as DUI checkpoints, DUI saturation patrols, and DUI warrant operations) with an emphasis on areas with high levels of fatal alcohol-related crashes, intensive probation supervision for high-risk felony and repeat DUI offenders to ensure compliance with court ordered conditions of probation and to prevent rearrest on new DUI charges, and purchase of toxicology equipment to enhance testing capability in DUI cases.  As one example, FY 2025 projects include subgrants to the San Joaquin Collaborative Courts, San Mateo County Superior Court, and Fresno County Superior Court to implement or expand a comprehensive and dedicated impaired-driving court program that targets high-risk/need repeat impaired driving offenders. The goal of these programs is to reduce impaired-driving related recidivism and decrease impaired-driving related crashes, injuries, and fatalities by requiring multiple offenders to be actively supervised by the court and county probation, and to ensure that offenders participate in court mandated treatment, monitoring, and counseling programs as prescribed by the State.

43.    For FY 2026, OTS anticipates that California will request the Section 164 funds be split and transferred to OTS in a manner consistent with past practice.

### The FY 2025 Immigration Enforcement Requirements and its Impact on California Office of Traffic Safety Grant Administration

44.    I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal

14

law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

45.    OTS does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." OTS is not aware not aware of what limits there may be—if any—to "cooperating with . . . enforcement of Federal immigration law.

46.    I am not aware of OTS staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because OTS is responsible for duties related to the highway safety program planning and grant administration, OTS lacks any capacity to enforce civil immigration law.

47.    If OTS must enforce or participate in the enforcement of federal civil immigration law as a condition of receiving DOT funding, my understanding is that OTS is unable to comply with the federal government's new funding condition.

48.    Additionally, if similar requirements are applied to OTS's subrecipients, OTS could be required to monitor compliance with the new federal civil immigration enforcement condition as to all its many sub-grantees of federal funding. OTS currently does not have the capabilities or subject matter expertise to monitor sub-grantees' level of cooperation and coordination in federal civil immigration enforcement. In order to possess those capabilities, OTS would be required to allocate additional funds annually to hire staff to monitor these

15

specified duties. This, in turn, would result in further diversion of funding that OTS relies upon for its critical traffic safety programs.

49.    If OTS is unable to comply with the federal government's new funding condition, the State would be unable to claim programmed  FY 2025 or anticipated FY 2026 DOT grants and subawards, depriving the State of an estimated combined total of $273 million (approximately $117 million in FY 2025 programmed grants and subawards that are not yet claimed and a projected $156 million to be awarded in FY 2026) and frustrating its ability to maintain the critical programs described above.

50.    OTS does not have any other appropriation in its budget that could cover the loss of the grants discussed above. OTS is a majority federally funded office. Of the 47 OTS positions, 32 are 100% federally funded and 15 are match funded (71.32% federal and 28.68% state). Additionally, 30% of all operations expenses (rent, office supplies, shared IT equipment, etc.) are federal match funded.

51.    If OTS cannot access federal funds, OTS will not have funds to immediately cover at minimum approximately 500 unique grants funded by these programs. This, in turn, will result in interruptions and terminations of critical behavioral safety activities and programs throughout the state of California. The OTS budget for this year has relied on the availability of these program funds and we made plans and entered into subawards totaling approximately $163 million based on our continued ability to draw down on promised federal funding.

52.    Without access to FY 2025 or 2026 grant funding, OTS cannot commit funding for furtherance of programs. Any pause or termination in federal funding would interrupt core OTS program, planning, and administration functions that are necessary for the overall development and management of California's Highway Safety Program. This would in turn

16

interrupt state and local agencies efforts to plan and implement grant-funded safety projects and programs that improve safety for all Californians and reduce traffic fatalities and serious injuries.

53.    Without access to FY 2025 and previously obligated grant funding, OTS also will not have funds to immediately cover at minimum approximately 494 subawards to 379 subrecipients funded by the federal grant programs. The OTS grant program operates on a reimbursement basis. Grantees are required to pay for the program costs upfront and submit claims to OTS for approval and reimbursement. Federal funds for reimbursement are transferred to California on a weekly basis after NHTSA approves those expenses. California does not reimburse grantees until federal dollars are transferred to OTS. If OTS is not able to access federal funds timely to allow time to process reimbursement requests from subrecipients, it will be forced to stop funding programs and subrecipients prior to the end of their performance period, which could result in interruptions, terminations, and other harm to essential traffic safety programs and activities. Under the California Prompt Payment Act (Government Code, Section 927), State of California agencies are obligated to make payments within a 45-day payment period. If the federal funds transfer is delayed more than two weeks, the OTS may be subject to penalties or litigation.

54.    OTS is currently planning for the FY 2026 grant cycle that will begin on October 1, 2025. Any uncertainty about OTS' ability to receive FY 2026 funds may cause unnecessary delays in key OTS planning and application activities. These activities include development of the Annual Grant Application, which serves as a project-level planning document for the upcoming year and must be submitted to NHTSA by August 1, 2025. Once NHTSA approves the Annual Grant Application, OTS completes a collaborative process of developing subaward agreements for each of the approximately 500 state and local agencies subawards. Any delays in

the Annual Grant Application process could also delay the development and approval of subaward agreements with state and local entities prior to October 1, 2025. Subrecipient costs incurred and accrued prior to the negotiation, signature, and start date of the subaward agreement are not reimbursable. As such, any delays in subaward agreements will correspondingly delay the start of any grant-funded activities and may impact subrecipients' abilities to fully deliver project objectives within the time period remaining in the one-year grant cycle.

55.     The longer OTS cannot access funds, the greater the risk that additional programs will be interrupted or terminated. This may have a chilling effect on critical traffic safety programs in California. The impact will be felt not only by the state and local agencies who rely on OTS grants to deliver these proven behavioral safety countermeasure strategies, but also the public themselves who will directly suffer the harm and economic impacts from any increase in traffic crashes, fatalities, and serious injuries following the interruption or discontinuance of these essential safety programs.

56.     Losing these DOT grants would severely obstruct and undermine OTS' mission, even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 16, 2025 in Elk Grove, California.


Stephanie Dougherty

Stephanie Dougherty

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

                              *Plaintiffs*,

     v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                              *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 16

## Declaration of Keith Duncan

## DECLARATION OF KEITH DUNCAN

I, Keith Duncan, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am a resident of the State of California.  I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the California Department of Transportation (Caltrans) as Chief, Caltrans Division of Budgets.  I have been Chief of Caltrans Division of Budgets since June 2021.  Before that, I was the Chief of the Office of Capital and Finance within the Caltrans Division of Budgets for 2 years.

3.      Caltrans' mission is to improve lives and communities through transportation.  It is responsible for managing California's highway and inter-city rail programs and supporting public transportation throughout the state.  Caltrans Division of Budgets contributes to that mission by promoting responsible resource allocation and ensuring fiscal integrity.  In my position, I am delegated the authority, on behalf of the department, for the development, adoption and management of financial policy for Caltrans including, but not limited to, managing the responsibilities designated in all departmental policies and deputy directives for budgetary roles and responsibilities, the apportionment and use of state and federal transportation funds, and the development, monitoring and reporting of the annual State of California budget for Caltrans according to State statues and mandates.

4.      As Chief, Caltrans Division of Budgets, my knowledge of the federal funding received by Caltrans is based on my review of federal statute, agreements, authorizations, funding obligations, and communications with my staff, programs, and districts within the

department, and communications with the Federal Highway Administration (FHWA), both within their California Division and in their headquarters, Federal Transit Administration, and US Department of Transportation. It is within the course of my duties to supervise the Office of Federal Resources (OFR) which supports the full utilization of federal funding of State (and some local) transportation projects delivered on the federal-aid system. My knowledge includes matters relayed to me by Division of Budgets and OFR staff, along with Caltrans staff from other divisions and districts assigned to the federal programs and responsible for administering and spending federal funds discussed herein, with whom I have consulted.

5.      As part of my regular job duties, I oversee approximately $5.8 billion in Federal-aid Highway funds from core formula programs that are apportioned annually to the State of California, and oversee additional grant funds that are awarded to Caltrans for state highway system needs or grant funds that may be awarded to a local agency that must flow through Caltrans, as the State DOT. OFR works on behalf of the FHWA to ensure that State and some local projects that are delivered on the federal-aid system and federally funded conform to the requirements set forth in applicable federal laws and regulations, including Title 23 of the U.S. Code, Title 23 of the Code of Federal Regulations, and the Stewardship and Oversight Agreement between Caltrans and FHWA. Project costs are only federally reimbursable if they are incurred after the project, or project phase, is authorized by FHWA and costs are federal-aid eligible. A project manager tracks the project progress and conformance with federal-aid funding eligibility requirements.

6.      Funds are received for infrastructure projects through a variety of FHWA administered formula grant programs. Once such grant program is the National Infrastructure Project Assistance (Mega) discretionary grant program. The Mega grant program funds projects

2

that are too large or complex for traditional funding programs. Eligible projects include highway, bridge, freight, port, passenger rail, and public transportation projects that are a part of one of the other project types. The Mega program invests a total of $5 billion nationwide through 2026 to help rebuild the United States' infrastructure for the benefit of all Americans.

7.      One of the pending projects awarded with Federal Fiscal Year 2022 discretionary grant funds of $30 million to be obligated by September 30, 2025, is the Watsonville-Cruz Multimodal Corridor Program in Santa Cruz. This Mega project has two components: 1) constructing approximately 2.5 miles of State Route 1 auxiliary lanes and a Bus on Shoulder facility between Freedom Boulevard and State Park Drive; 2) constructing approximately 1.25 miles of the New Coastal Rail Trail within Santa Cruz Branch Rail Line right-of-way, including 4 pedestrian and bicycle overcrossings of State Route 1. As part of the overall corridor program, the applicant will also purchase four new zero emission buses for use in the corridor. The total estimate of project costs through completion is $211,100,000.

8.      Another federally funded program through FHWA is the Nationally Significant Freight & Highway Projects, also known as Infrastructure for Rebuilding America (INFRA). FHWA awards competitive grants for multimodal freight and highway projects of national or regional significance to improve the safety, efficiency, and reliability of the movement of freight and people in and across rural and urban areas. The INFRA grant program funding is made available under the Multimodal Project Discretionary Grant (MPDG) combined Notice of Funding Opportunity (NOFO).

9.      One of many INFRA projects administrated by Caltrans is the State Route 84 – Interstate 101 Interchange project in San Mateo County to replace ramps, widen local roads connecting to the ramps, signalize ramps, and add pedestrian and bicycle paths on the local

connecting roads. The current State Route 84-U.S. 101 Interchange configuration results in congestions, traffic merging issues, and traffic backup onto the U.S. 101 mainline. This area saw 195 collisions between 2018 and 2022. It will address significant freight bottlenecks to the nearby Port of Redwood City and reduce congestion in the Redwood City to South San Francisco Bay region of San Mateo County, a fast-growing area. Improvements to ramps, travel lines, and intersections work together to enhance safety and operational effectiveness, leading to fewer collisions and serious injuries. A total of $105 million was awarded for the project, but not yet obligated. $8 million was awarded for preconstruction work on January 10, 2025, but Caltrans sent the Project Authorization request to FHWA to obligate this $8 million a few times between mid-January 2025 and March 2025 in an attempt to keep the preconstruction work on schedule. The FHWA returned it to Caltrans unsigned for a 90-day pause.

10.    Another Project that was awarded is the Wildlife Crossing Pilot Program grant for the Gaviota Pass Wildlife Connectivity and Vehicle Reduction Project. Caltrans will receive $8 million to reduce wildlife vehicle collisions and connect animal habitats between protected State Park lands on either side of US 101 in and around the Gaviota Pass near Santa Barbara. This is an area, a recognized biodiversity hotspot, that has observed higher roadkill occurrences that include mountain lion, black bear, and other native species. Improvements include increasing the size of an existing culvert and installing approximately 2.5 miles of fencing, allowing wildlife to safely cross the highway and move between Gaviota State Park and the adjacent Los Padres National Forest. This project not only protects wildlife but also translates into substantial economic benefits, as the costs associated with wildlife-vehicle collisions exceed $8 billion annually in the U.S. alone. By investing in wildlife crossings, states can mitigate these costs while fostering safer travel for motorists.

4

11.     Caltrans was recently only given partial funding of $1,892,000 for work done late last year. A new grant agreement will be required when the additional funds are ready to be obligated.

12.     The projects funded by the various grant programs administered by FHWA are vital to develop, maintain, and ensure safety, access, and connectivity on and through roads, bridges, and critical infrastructure throughout the State. California's transportation system is vital to achieving the state's safety, climate, equity, and economic prosperity goals. California has immense infrastructure needs and these examples of grant awards to address transportation funding needs is imperative to ensure the State of California can maintain and sustain our multimodal transportation system. Without adequate investment from these Grant awards and other dedicated federal funding, the state will not be able to deliver a safe system for all users that reduces greenhouse gas emissions, promotes climate resiliency, achieves transportation equity, and supports a strong economy.

13.     State and local entities are dependent upon this funding to complete these projects.

14.     If these funds are withheld, Caltrans would have to cease preconstruction work associated to these projects, which would have drastic impacts as inflationary pressures that impact project costs when delays occur. In some instances, this may have fiscal impacts to several other highway and local transportation system projects as many of these anticipated grant funded projects are combined with other projects to gain time and fiscal efficiencies and reduce impacts to the travelling project to align construction timelines for projects within a corridor. These time and cost impacts could cost the State and local agencies millions.

15.    I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

16.    Since issuance of Secretary Duffy's April 24, 2025, letter, and as described above, Caltrans has begun to receive new terms and conditions for grant agreements for grants that were awarded, but not yet allocated, authorized or obligated. I anticipate receiving similar terms and conditions as a pre-requisite to obligate all discretionary federal grant funds awarded to Caltrans.

17.    It is not clear to me what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." I am not aware what limits there may be—if any—to "cooperating with . . . enforcement of Federal immigration law."

18.    In my years with Caltrans, I am not aware of Caltrans staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Caltrans is a transportation department, not an immigration enforcement agency.

19.    If Caltrans must enforce or participate in the enforcement of federal civil immigration law as a condition of receiving DOT funding, my understanding is that Caltrans is unable to comply with the federal government's new funding conditions.

20.    If Caltrans attempts to comply with the federal government's new funding condition, Caltrans would be required to obtain statutory authority from the state and federal government to enforce immigration law and increase its annual budget to establish an internal program to perform these specified duties, which Caltrans does not currently have the expertise or the necessary workforce infrastructure or the enforcement authority to accomplish.

21.    The additional costs associated with funding these additional responsibilities would directly impact funding availability for future infrastructure projects.

22.    If Caltrans is unable to comply with the federal government's new funding conditions, the State would be unable to support these grant funded projects.

23.    Caltrans does not have any other appropriation in its budget that could cover the loss of the grants to the local entities.  If Caltrans is unable to proceed, it will deprive the public of important safety enhancements and transportation improvements.

24.    Project planning takes place years in advance and require advanced commitment of Caltrans staffing and resources, including hiring staff and negotiating and implementing contracts before construction work commences.  If Caltrans cannot obtain DOT grants, then it will reduce the number of projects undertaken by Caltrans to improve the transportation system vital to California's economy, mobility, and connectivity.  Consequently, any denials or cuts in expected federal funds will negatively impact virtually all Caltrans operations.

25.    The longer Caltrans cannot access funds, the greater the risk that additional projects will be interrupted or terminated.

26.    Losing these federal grants, even if funding is restored at a later date, would severely obstruct and undermine Caltrans' mission to improve lives and communities through transportation.

7

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19, 2025, in Sacramento, California.

Keith Duncan

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                 *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 17

Declaration of Dee Lam

## DECLARATION OF DEE LAM

I, Dee Lam, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the California Department of Transportation (Caltrans) as Chief, Caltrans Division of Local Assistance. I have been Chief of Caltrans Division of Local Assistance since March of 2020. Before that, I was the Planning and Modal Programs Chief of Staff for 4 years.

3.      Caltrans' mission is to improve lives and communities through transportation. It is responsible for managing California's highway and inter-city rail programs and supporting public transportation throughout the state. Caltrans Division of Local Assistance contributes to that mission by empowering our partners (i.e., cities, counties, and other local entities) to deliver diverse mobility projects.

4.      As Chief, Caltrans Division of Local Assistance, my knowledge of the federal funding received by Caltrans is based on my review of agreements, authorizations, and communications with my staff and programs within the agency and externally with the local agencies. It is within the course of my duties to supervise Division of Local Assistance staff (DLA staff) responsible for interpreting and administering programs, policies, and procedures required to oversee federal-aid and state-funded local transportation projects. My knowledge includes matters relayed to me by DLA staff, along with Caltrans staff from other divisions assigned to the federal programs discussed herein, with whom I have consulted.

1

5.      As part of my regular job duties, I oversee discretionary federal grants from the Federal Highways Administration (FHWA) awarded to our local partners (cities, counties, and other local entities). Funds are first made available through FHWA's issuance of a Notice of Funding Opportunity (NOFO), whereupon local entities submit applications for qualifying projects. Upon FHWA selection process and acceptance of a local project for funding, the local entity then chooses the method of fund reimbursement, whether to be the direct recipient of the funds or utilize Caltrans' expertise and support to administer the funds as a pass through. As a "direct" recipient, the local project enters into a Recipient Agreement with FWHA, bypasses Caltrans, except for National Environmental Policy Act compliance. As a "Pass-Through" project, Caltrans enters into a Recipient Agreement with the FHWA for receipt of the discretionary grant funds. The Recipient Agreement identifies the project scope, schedule, cost, reporting, and post-construction maintenance, and makes Caltrans responsible for administering the funds and assuring completion of the project. I sign the Recipient Agreement on behalf of Caltrans. Caltrans then enters into a Designated Subrecipient Agreement with the local entity which I also sign on behalf of Caltrans. The Designated Subrecipient Agreement identifies the project scope, schedule, cost, reporting, and post-construction maintenance, and transfers the project award and administration responsibilities from Caltrans to the local agency. The DLA staff include grant managers who manage the oversight responsibilities of Caltrans for the local project. I have reviewed past and present award documents for these discretionary federal grants that were issued to our local partners and am familiar with their contents.

6.      The Division of Local Assistance is currently managing 28 discretionary grant projects awarding $705,247,028 to our local partners. Attached hereto as Exhibit A is a table prepared by DLA staff identifying the various grant programs awarded amounts, grant recipients,

project names, and obligation deadlines. Many local entities are dependent upon Caltrans expertise, staffing, and support in overseeing discretionary grants as "Pass-Throughs".

7.     The projects funded by these grants are vital to develop, maintain, and ensure safety, access, and connectivity on and through roads, bridges, and critical infrastructure through the State of California, including critical projects such as the Golden Gate Suspension Bridge Seismic Retrofit. The Golden Gate Bridge carries approximately 114,400 vehicles per day and is a vital transportation link on the National Highway System.

8.     Local entities, including but not limited to the Golden Gate Bridge Highway and Transportation District, City of San Diego, Sacramento County, are dependent upon this funding to complete these projects. The projects funded by these specific grants are described further below.

**Bridge Investment Program Grants**

9.     One such discretionary federal grant is the Bridge Investment Program (BIP). BIP is a competitive, discretionary program that focuses on existing bridges to reduce the overall number of bridges in poor condition. It also expands applicant eligibilities to create opportunity for all levels of government to be direct recipients of program funds. BIP makes it easier to advance projects at the local level to meet community needs.

10.     In 2022, FHWA opened the first Notice of Funding Opportunity (NOFO) for the competitive Bridge Investment Program, which includes the single largest dedicated investment in bridges since the construction of the Interstate highway system. The program will provide $12.5 billion over five years, with nearly $2.4 billion available in Fiscal Year 2022 to help plan, replace, rehabilitate, protect, and preserve some of the nation's largest bridges.

11.     One of the many BIP grants that "Pass-Through" Caltrans is for the City of San

Diego's bridge rehabilitation, safety, and mobility project at the Palm Avenue – Interstate 805

interchange, a major north-south bypass auxiliary of Interstate 5, running roughly through the

center of the Greater San Diego region from San Ysidro through Del Mar.  San Diego was

awarded $24 million from the FHWA.  As of May 15, 2025, those funds have not yet been fully

obligated.  The deadline to obligate the funds is September 30, 2025.

12.     On May 1, 2025, FHWA's California Division informed Caltrans that because the

funds have not been fully obligated, a new grant agreement must be executed for the Palm

Avenue – Interstate 805 Interchange project.  The new general terms for the grant agreement

includes the following provision:

> **18.2 Federal Law and Public Policy Requirements.**
> (a) The Recipient shall ensure that Federal funding is expended in full accordance with
> the United States Constitution, Federal law, and statutory and public policy
> requirements: including but not limited to, those protecting free speech, religious
> liberty, public welfare, the environment, and prohibiting discrimination; and the
> Recipient will cooperate with Federal officials in the enforcement of Federal law,
> including cooperating with and not impeding U.S. Immigration and Customs
> Enforcement (ICE) and other Federal offices and components of the Department of
> Homeland Security in the enforcement of Federal immigration law.
> (b) The failure of this grant agreement to expressly identify Federal law applicable to the
> Recipient or activities under this grant agreement does not make that law inapplicable.
> [¶]
> **18.4 Implementation of Executive Order 14173**
> (a) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal
> Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that
> its compliance in all respects with all applicable Federal anti-discrimination laws is
> material to the government's payment decisions for purposes of section 3729(b)(4)
> of title 31, United States Code.
> (b) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal
> Discrimination And Restoring Merit-Based Opportunity, by entering into this
> agreement, the Recipient certifies that it does not operate any programs promoting
> diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal
> anti-discrimination laws

**Advanced Transportation Technologies and Innovative Mobility Deployment Grants**

13.     Another discretionary federal grant program provided through the FHWA is the

Advanced Transportation Technologies and Innovative Mobility Deployment, also known as

Advanced Transportation Technology and Innovation (ATTAIN) program.  The ATTAIN

program provides grants to deploy, install, and operate advanced transportation technologies to

improve safety, mobility, efficiency, system performance, intermodal connectivity, and

infrastructure return on investment.

14.     The County of Sacramento was awarded $1,859,680 for a pedestrian project in

fiscal year 2023/24.  The funds have not yet been obligated; the deadline is September 30, 2026.

Recently, the FHWA provided Caltrans with new terms and conditions for inclusion in the grant

agreement that provide as follows:

**18.2 Federal Law and Public Policy Requirements.**
(a) The Recipient shall ensure that Federal funding is expended in full accordance with
the United States Constitution, Federal law, and statutory and public policy
requirements: including but not limited to, those protecting free speech, religious
liberty, public welfare, the environment, and prohibiting discrimination; and the
Recipient will cooperate with Federal officials in the enforcement of Federal law,
including cooperating with and not impeding U.S. Immigration and Customs
Enforcement (ICE) and other Federal offices and components of the Department of
Homeland Security in the enforcement of Federal immigration law.
(b) The failure of this grant agreement to expressly identify Federal law applicable to the
Recipient or activities under this grant agreement does not make that law inapplicable.
[¶]
**18.4 Implementation of Executive Order 14173**
(a) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal
Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that
its compliance in all respects with all applicable Federal anti-discrimination laws is
material to the government's payment decisions for purposes of section 3729(b)(4)
of title 31, United States Code.
(b) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal
Discrimination And Restoring Merit-Based Opportunity, by entering into this
agreement, the Recipient certifies that it does not operate any programs promoting
diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal
anti-discrimination laws.

15.    I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

16.    Since issuance of Secretary Duffy's April 24, 2025, letter, and as described above, Caltrans has begun to receive new terms and conditions for grant agreements that were previously granted but not yet obligated. I anticipate receiving similar terms and conditions as a pre-requisite to obligate all discretionary federal grant funds awarded to Caltrans' local partners.

17.    It is not clear to me what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." I am not aware of what limits there may be—if any—to "cooperating with . . . enforcement of Federal immigration law."

18.    In my years with Caltrans, I am not aware of Caltrans staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Caltrans is a transportation department, not an immigration enforcement agency.

19.    If Caltrans must enforce or participate in the enforcement of federal civil immigration law as a condition of receiving DOT funding, and further assure local entity cooperation through its oversight responsibilities on "Pass-Through" grants, my understanding is

that Caltrans is unable to comply with the federal government's new funding conditions. If Caltrans attempts to comply with the federal government's new funding condition, Caltrans would be required to monitor compliance with the new federal civil immigration enforcement condition as to all its many sub-recipients of grant awards. Caltrans currently does not have the capabilities or subject matter expertise to monitor sub-recipients' level of cooperation and coordination in civil immigration enforcement.

20.    If Caltrans is unable to comply with the federal government's new funding conditions, the State would be unable to support local projects. And since Caltrans support is critical in enabling most local entities to meet the federal obligations imposed through the grant terms and conditions, most local entities would be unable to proceed with the projects. *See* Exhibit A.

21.    Caltrans does not have any other appropriation in its budget that could cover the loss of the grants to the local entities. These are local projects depending upon local funds. Because sufficient local funding is often not available for such projects, local entities rely upon grants from the federal government. If Caltrans cannot access and distribute the federal funds, vital local projects will not be able to proceed, which will deprive the public of important safety enhancements and transportation improvements.

22.    The longer Caltrans cannot access funds, the greater the risk that additional projects will be interrupted or terminated.

23.    Losing these discretionary federal grants, even if funding is restored at a later date, would severely obstruct and undermine Caltrans' mission to improve lives and communities through transportation.

//

//

7

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19, 2025, in Sacramento, California.

Dee Lam

# Exhibit A

Declaration of Dee Larn—Exhibit A
Competitive Grant Programs (as of April 30, 2025)
Project List (2022-2024 award cycles)

| CT DIST NO. | GRANT PROG. | GRANT PROG. FULL NAME | GRANT OR PROJECT TYPE | AWARD FFY | AWARD AMOUNT | GRANT AWARDEE | TYPE OF REIMBURSEMENT (CALTRANS PASS-THROUGH (CT-PT)) | PROJECT NAME | MAY REQUIRE NEW AGREEMENT | OBLIGATION DEADLINE |
|---|---|---|---|---|---|---|---|---|---|---|
| 4 | BIP | Bridge Investment Program | Lg. Bridge | 2022 | $400,000,000 | GGBHTD | CT-PT | Golden Gate Suspension Bridge Seismic Retrofit | X | 9/30/2025 |
| 4 | RCN (RCP) | Reconnecting Communities Neighborhood Access and Equity Program | Capital | 2023 | $30,000,000 | Alameda County Transportation Commission (ACTC) | CT-PT | The East Bay Greenway Multimodal Project: Lake Merritt to Bayfair | X | 9/30/2026 |
| 12 | RAISE | Rebuilding American Infrastructure with Sustainability and Equity | Capital | 2024 | $25,000,000 | City of Santa Ana | CT-PT | Santa Ana Boulevard Grade Separation Project | X | 9/30/2028 |
| 3 | RAISE | Rebuilding American Infrastructure with Sustainability and Equity | Capital | 2024 | $25,000,000 | El Dorado Connector Authority | CT-PT | Grant Line Road Safety Improvements Project | X | 9/30/2028 |
| 6 | RSTG | Rural Surface Transportation Grant | MPDG | 2022 | $25,000,000 | Madera County | CT-PT | Madera 41 Expressway | | Fully Obligated |
| 11 | BIP | Bridge Investment Program | Bridge | 2022 | $24,000,000 | City of San Diego | CT-PT | Bridge Rehab, Safety, and Mobility Project at | X | 9/30/2025 |

10

Declaration of Dee Lam—Exhibit A
Competitive Grant Programs (as of April 30, 2025)
Project List (2022-2024 award cycles)

| CT Dist No. | Grant Prog. | Grant Prog. Full Name | Grant or Project Type | Award FFY | Award Amount | Grant Awardee | Type of Reimbursement (Caltrans Pass-Through (CT-PT)) | Project Name | May Require New Agreement | Obligation Deadline |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Palm Avenue/I-805 | | |
| 3 | PROTECT | Promoting Resilient Operations for Transformative, Efficient, and Cost-saving Transportation Discretionary Grants | Resilience Improvement | 2022-2023 | $23,989,290 | City of Davis | CT-PT | City of Davis Cool Pavement Project | X | 9/30/2025 (for FFY 2022 funds); 9/30/2026 (for FFY 2023 funds) |
| 4 | RAISE | Rebuilding American Infrastructure with Sustainability and Equity | Capital | 2022 | $23,000,000 | San Francisco Municipal Transportation Agency | CT-PT | Transforming Howard Street for Safe & Equitable Mobility | X | 9/30/2026 |
| 3 | RCN (NAE) | Reconnecting Communities Neighborhood Access and Equity Program | Regional Partnership | 2023 | $22,500,000 | Sacramento Area Council of Governments | CT-PT | SACOG Green Means Go: Green Zone Access and Equity Regional Planning Project | | Fully Obligated |

11

Declaration of Dee Lam—Exhibit A
Competitive Grant Programs (as of April 30, 2025)
Project List (2022-2024 award cycles)

| CT DIST NO. | GRANT PROG. | GRANT PROG. FULL NAME | GRANT OR PROJECT TYPE | AWARD FFY | AWARD AMOUNT | GRANT AWARDEE | TYPE OF REIMBURSEMENT (CALTRANS PASS-THROUGH (CT-PT)) | PROJECT NAME | MAY REQUIRE NEW AGREEMENT | OBLIGATION DEADLINE |
|---|---|---|---|---|---|---|---|---|---|---|
| 10 | CFI | Charging and Fueling Infrastructure Grant Program | EV Charging / Community | 2022-2023 | $15,000,000 | San Joaquin Council of Governments | CT-PT | Expanding Electrification for All in San Joaquin County | X | 9/30/2025 (for FFY 2022 funds); 9/30/2026 (for FFY 2023 funds) |
| 8 | RAISE | Rebuilding American Infrastructure with Sustainability and Equity | Capital | 2022 | $15,000,000 | City of Fontana | CT-PT | Building A Better Connected Inland Empire | X | 9/30/2026 |
| 4 | CFI | Charging and Fueling Infrastructure Grant Program | EV Charging / Community | 2022-2023 | $14,999,000.00 | Contra Costa County | CT-PT | Contra Costa County EV 4 All (EVSE at 15 County Library Sites) | X | 9/30/2025 (for FFY 2022 funds); 9/30/2026 (for FFY 2023 funds) |
| 4 | CFI | Charging and Fueling Infrastructure Grant Program | EV Charging / Community | 2022-2023 | $14,062,360.00 | San Francisco Bay Area Rapid Transit District | CT-PT | Bay Area Rapid Transit (BART) EV Charging Stations | X | 9/30/2025 (for FFY 2022 funds); 9/30/2026 (for FFY |

12

Declaration of Dee Lam—Exhibit A
Competitive Grant Programs (as of April 30, 2025)
Project List (2022–2024 award cycles)

| CT DIST NO. | GRANT PROG. | GRANT PROG. FULL NAME | GRANT OR PROJECT TYPE | AWARD FFY | AWARD AMOUNT | GRANT AWARDEE | TYPE OF REIMBURSEMENT (CALTRANS PASS-THROUGH (CT-PT)) | PROJECT NAME | MAY REQUIRE NEW AGREEMENT | OBLIGATION DEADLINE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 2023 funds) |
| 11 | RAISE | Rebuilding American Infrastructure with Sustainability and Equity | Planning | 2024 | $10,208,556 | North County Transit District | CT-PT | SPRINTER Corridor Service Improvement Project – San Marcos to Escondido | X | 9/30/2028 |
| 6 | RAISE | Rebuilding American Infrastructure with Sustainability and Equity | Capital | 2023 | $10,000,000 | City of Bakersfield | CT-PT | Chester Avenue Connectivity and Climate Adaptation Project | | Fully Obligated |
| 7 | RAISE | Rebuilding American Infrastructure with Sustainability and Equity | Capital | 2023 | $6,967,923 | City of Los Angeles Housing Authority | CT-PT | RAISE up Watts: Catalyzing Connectivity through Active Transportation | X | 9/30/2027 |
| 12 | RAISE | Rebuilding American Infrastructure with Sustainability and Equity | Planning | 2023 | $5,066,500 | City of Anaheim | CT-PT | Building Bridges to Transit Project | X | 9/30/2027 |

13

Declaration of Dee Lam—Exhibit A
Competitive Grant Programs (as of April 30, 2025)
Project List (2022–2024 award cycles)

| CT DIST NO. | GRANT PROG. | GRANT PROG. FULL NAME | GRANT OR PROJECT TYPE | AWARD FFY | AWARD AMOUNT | GRANT AWARDEE | TYPE OF REIMBURSEMENT (CALTRANS PASS-THROUGH (CT-PT)) | PROJECT NAME | MAY REQUIRE NEW AGREEMENT | OBLIGATION DEADLINE |
|---|---|---|---|---|---|---|---|---|---|---|
| 7 | PROTECT | Promoting Resilient Operations for Transformative, Efficient, and Cost-saving Transportation Discretionary Grants | Community Resilience and Evacuation Route | 2022-2023 | $3,178,400 | County of Los Angeles | CT-PT | Resilient Castaic-Santa Clarita Valley: An Integrated Corridor Management Approach to Strengthening Evacuation Routes Project | X | 9/30/2025 (for FFY 2022 funds); 9/30/2026 (for FFY 2023 funds) |
| 5 | RCN (NAE) | Reconnecting Communities Neighborhood Access and Equity Program | Planning | 2023 | $2,355,319 | City of Watsonville | CT-PT | Strengthening Watsonville Neighborhoods: Feasibility Study for Equitable, Just, Safe and Prosperous Future for All | X | 9/30/2026 |
| 4 | RCP | Reconnecting Communities Pilot Program | Planning | 2022 | $2,000,000 | City of San Jose | CT-PT | Monterey Road Highway to Grand Boulevard Design Study | X | 9/30/2025 |
| 4 | RCN (NAE) | Reconnecting Communities Neighborhood Access and | Capital | 2023 | $1,940,000 | City of San Rafael | CT-PT | Rafael Meadows Safe Crossing | X | 9/30/2026 |

14

Declaration of Dee Lam—Exhibit A
Competitive Grant Programs (as of April 30, 2025)
Project List (2022-2024 award cycles)

| CT DIST NO. | GRANT PROG. | GRANT PROG. FULL NAME | GRANT OR PROJECT TYPE | AWARD FFY | AWARD AMOUNT | GRANT AWARDEE | TYPE OF REIMBURSEMENT (CALTRANS PASS-THROUGH (CT-PT)) | PROJECT NAME | MAY REQUIRE NEW AGREEMENT | OBLIGATION DEADLINE |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | ATTAIN | Advanced Transportation Technologies and Innovative Mobility Deployment [a.k.a. Advanced Transportation Technology and Innovation (ATTAIN) program, & (previously known as) ATCMTD Equity Program | Capital | 2023-2024 | $1,859,680 | Sacramento County | CT-PT | Sacramento County Complete Pedestrian Trips project / Pathway Project | X | 9/30/2026 |
| 7 | RCN (RCP) | Reconnecting Communities Neighborhood Access and Equity Program | Planning | 2023 | $1,200,000 | City of Long Beach | CT-PT | Reconnecting North Long Beach - Hamilton Loop Project | X | 9/30/2026 |

Declaration of Dee Lam—Exhibit A
Competitive Grant Programs (as of April 30, 2025)
Project List (2022-2024 award cycles)

| CT DIST NO. | GRANT PROG. | GRANT PROG. FULL NAME | GRANT OR PROJECT TYPE | AWARD FFY | AWARD AMOUNT | GRANT AWARDEE | TYPE OF REIMBURSEMENT (CALTRANS PASS-THROUGH (CT-PT)) | PROJECT NAME | MAY REQUIRE NEW AGREEMENT | OBLIGATION DEADLINE |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | BIP | Bridge Investment Program | Planning | 2023-2024 | $800,000 | Sacramento County | CT-PT | Sunrise Blvd Bridge over American River Feasibility Study | X | 9/30/2026 |
| 7 | RCN (RCP) | Reconnecting Communities Neighborhood Access and Equity Program | Planning | 2023 | $800,000 | County of Los Angeles | CT-PT | Reconnecting East Los Angeles: 60 Green Bridge Project for Belvedere Park | X | 9/30/2026 |
| 6 | RCP | Reconnecting Communities Pilot Program | Planning | 2022 | $600,000 | City of Fresno | CT-PT | Parkway Drive at State Route 99 Pedestrian Bridge | X | 9/30/2025 |
| 7 | BIP | Bridge Investment Program | Planning | 2023-2024 | $400,000 | City of Pico Rivera | CT-PT | Telegraph Road over Rio Hondo Channel (Pico Rivera) | X | 9/30/2026 |
| 2 | BIP | Bridge Investment Program | Planning | 2022 | $320,000 | Tehama County | CT-PT | Tehama County Feasibility Study Woodson Bridge | X | 9/30/2025 |

16

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                        *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 18

Declaration of Jeffrey F. Rosen

## DECLARATION OF JEFFREY F. ROSEN

I, JEFFREY F. ROSEN, declare and state the following:

1.      I am a resident of the State of California. I have personal knowledge of all facts stated in this declaration, and if called to do so, I could and would testify to them competently under oath.

2.      I am the elected District Attorney of the County of Santa Clara. As District Attorney, I oversee the prosecution of all state crimes within Santa Clara County. I have served in this role since 2011 and have worked for the District Attorney's Office since 1995. During my tenure, I have prosecuted complex and high-profile criminal cases in drug trafficking, burglary, rape, child molestation, gang violence, and murder. In addition to my work as a prosecutor, I have served as president of a large synagogue, taught trial advocacy at Santa Clara University Law School, and trained police officers in report writing.

3.      The District Attorney's Office serves a population of nearly two million people. The office has 640 employees, including 195 prosecutors, and prosecutes more than 30,000 cases each year.

4.      I am familiar with the Executive Order on "Protecting the American People Against Invasion," issued by the President on January 20, 2025; the Executive Order on "Ending Taxpayer Subsidization of Open Borders," issued on February 19, 2025; and the Executive Order on "Protecting American Communities from Criminal Aliens," issued on April 28, 2025. I understand that the orders purport to restrict access to federal funds for so-called "sanctuary jurisdictions" that limit local entanglement with federal immigration authorities. I am also familiar with the letter issued by United States Secretary of Transportation Sean Duffy, on April 24, 2025, to all recipients of U.S. Department of Transportation funding. I am aware that Secretary Duffy's letter purports to restrict access to federal funding administered by the U.S. Department of Transportation unless recipients agree to cooperate with federal immigration enforcement.

1

## Policy of the District Attorney's Office

5.      The mission of the District Attorney's Office is to investigate and prosecute cases in pursuit of justice. This pursuit is improved when people do not fear that their participation in a criminal prosecution will lead to deportation or other adverse immigration consequences. For this reason, the District Attorney's Office does not ask about or formally track information on immigration status in the investigation or prosecution of any matter.

6.      Crimes happen in all communities. The whole community benefits when all people in the community feel safe to report crimes, to act as witnesses, and to participate in trials.

7.      To my knowledge and in my experience, undocumented people do not live in isolated, crime-ridden neighborhoods, nor do statistics indicate that they are more likely to commit crimes than people with lawful immigration status, including citizens.

8.      Fear of deportation has ripple effects on entire communities and families. This is because families and communities are often made up of members with various immigration statuses, and entire families or community networks may fear reporting crimes or serving as witnesses for fear that an undocumented family or community member may be deported. When a crime goes unreported, it still happens. It still hurts whole swaths of our communities. Every time an undocumented community member or their loved ones see a crime but do not report it for fear of immigration consequences, our community becomes less safe and loses yet another opportunity to hold perpetrators accountable.

9.      One context in which fear of deportation commonly comes up is domestic violence. In cases of domestic violence, abusers may use deportation as a threat to keep victims from reporting abuse to law enforcement, or victims may not report abuse for fear that the abuser—often a co-parent or family breadwinner—will be deported.

10.      Undocumented individuals can and do report and help with the prosecution of crimes committed by those with lawful status, from the commonplace (e.g., hit-and-runs on the freeway) to the rare and exceptionally harmful (e.g., murder).

2

11.     We cannot determine the exact number of crimes that are not reported to authorities because undocumented individuals or their family or community members fear deportation, but we know anecdotally of this phenomenon. Moreover, the District Attorney's Office has experienced instances in which its criminal prosecution falls apart from lack of witness cooperation, either because others who witnessed the crime are hesitant to come forward or because initial witnesses are afraid to come to court. Fear of deportation by victims, witnesses, and families and friends of undocumented victims and witnesses poisons our ability to detect and prosecute crime, thereby making the entire community less safe.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on  5/19/25  in San José, California.

Jeffrey F. Rosen

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 19

## Declaration of Sally R. Chafee

## DECLARATION OF SALLY R. CHAFEE

I, Sally R. Chafee, declare as follows:

1.      I am over the age of 18 years and a resident of the State of Colorado. I know the following facts based on my own personal knowledge and on my review of information and records gathered by agency staff, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Chief of Staff at the Colorado Department of Transportation ("CDOT"). My job duties include: lead manager on CDOT's executive management team; directing and approving grant applications CDOT submits for federal grants in both urban and rural areas; and, if federal grants are awarded, supervising the administration of federal grants on CDOT highway and bridge construction projects and other projects including highway, transit and other grants, as well as CDOT administration of federal subgrants. This includes pass-through dollars to local government entities and community-based organizations who rely on both Congressionally authorized formula dollars as well as competitive grants.

3.      I have been employed by CDOT since August 2019, and I have served as CDOT Chief of Staff since that time. Before starting at CDOT, I founded and was principal consultant for Counting & Compliance LLC and in this consulting practice, I oversaw regulatory compliance for more than a dozen state and federal candidate campaigns and organizations. I have also served in several nonprofit executive roles that included applying for and management of grants, compliance with grant requirements and organization budgetary management. In total, I have overseen and managed federal grants at CDOT for over five years, among other broad responsibilities, and I have significant experience advising on federal and state campaign laws and overall grant and budgetary guidance.

1

## Background

4.      CDOT aims to provide a safe and reliable transportation network that serves all people and respects the environment. CDOT maintains approximately 9,100 state highway miles within Colorado including U.S. highways and interstates, spanning about 23,000 lane-miles. In addition to state highways, CDOT also maintains 3,447 bridges and 20 state-owned tunnels. Apart from maintaining state highways and structures, CDOT's statewide traffic center employs 30 people who watch over all state highways using approximately 1,000 cameras, sharing real-time updates that help keep hundreds of thousands of drivers moving every day. This is in addition to the many traveler services provided by CDOT, which includes over 45,000 annual disabled vehicle assists, and approximately 350,000 annual transit passenger trips.

5.      As part of my regular job duties, I am a member of the executive management team that oversees CDOT grant specialists and project managers who are currently planning for or managing approximately $762.1 million in formula funding grants in State Fiscal Year (State FY)[1] 2025 plus hundreds of millions of funding through discretionary grant programs, including an average of $194 million awarded annually over the last three years. Notably, Colorado has historically received significantly lower per capita allocations of formula dollars than other states including nearby intermountain west states and, for many years, received fewer dollars than Coloradans contributed in taxes to the Federal Highway Trust Fund. Competitive grant dollars have helped Colorado achieve a fairer return on citizens' investment in recent years. Relevant programs include, but are not limited to, the Federal Highway Administration (FHWA) Federal Aid Highway Program, the Federal Transit Administration's (FTA) Section 5303 and 5304 Program, Section 5310 and 5311 Program for Formula Grants including 5310 and 5311

---

[1] State Fiscal Years run from July 1 through June 30.

2

Statewide and 5311(b) Rural Transportation Assistance Program (RTAP), FTA 5339 Bus and Bus Facilities formula and discretionary grants, the National Highway Traffic Safety Administration for Highway Traffic Safety Programs and National Priority Safety Programs, Better Utilizing Investments to Leverage Development (BUILD).

| Program | Type | Amount Awarded in State FY 2025* |
|---|---|---|
| Federal Aid Highway Program | Formula | $718,533,472 |
| FTA Section 5303 and 5304 Program | Formula | $3,496,194 |
| FTA Section 5310 and 5311 Program | Formula | $20,683,093 |
| FTA 5339 Bus and Bus Facilities | Formula | $5,374,872 |
| FTA 5339 Bus and Bus Facilities** | Discretionary | $41,955,300 |
| National Highway Traffic Safety Administration for Highway Traffic Safety Programs (NHTSA) | Formula | $14,060,011 |
| Better Utilizing Investments to Leverage Development (BUILD), formerly known as Rebuilding American Infrastructure with Sustainability and Equity (RAISE) | Discretionary | $4,800,000 |
| Advanced Transportation Technology and Innovation (ATTAIN) | Discretionary | $1,440,000 |
| Bridge Investment Program | Discretionary | $760,000 |
| Multimodal Project Discretionary Grants (MPDG)*** | Discretionary | $87,759,000 |

| Consolidated Rail Infrastructure and Safety Improvements (CRISI) Program | Discretionary | $66,400,000 |
|---|---|---|
| Low Carbon Transportation Materials Program | Discretionary | $31,933,577 |

\* CDOT defines its 2025 fiscal year as July 1, 2024 to June 30, 2025.

\*\* These are passthrough grants submitted by CDOT on behalf of local agencies.

\*\*\*The MPDG Program includes INFRA Grants as well as Rural Surface Transportation Grants.

6.     These funds are essential to CDOT fulfilling its mission to provide safe and efficient travel to all Colorado residents and visitors. Without these resources, people's vital need to reach important places such as work, school, retail shops, and health care is imperiled. People's freedom to visit friends, family, and the State's popular destinations for outdoor recreation would also be severely limited. Using CDOT's Division of Transit and Rail as an example, CDOT anticipates $29.6 million in formula funds in State FY 2025. CDOT's Division of Transit and Rail has used and plans to use these funds to provide support to transit projects in rural and small urban areas (under a 50,000 population) for both transit capital and operating assistance. Many of these grants make up a significant percentage of the Division of Transit and Rail's budget and often a greater percentage of local and regional budgets. Their loss would severely obstruct and undermine all of these agencies' missions, as well as the efficacy of local governance and decision making, and likely require cuts to service even if the funding were restored at a later date.

### Colorado's Annual Receipt of DOT Grants

7.     CDOT is responsible for administering numerous federal grants from the United States Department of Transportation (DOT), representing over $762.1 million in federal formula

funds in State FY 2025. In recent years, federal discretionary grant funding has represented an additional 4-5% of CDOT's total annual budget. Each grant helps us sustain critical programs and projects that ensure the safe and efficient operations of our roadways, airspace, transit systems, and pedestrian infrastructure throughout Colorado.

8.      For example, CDOT has been awarded $235.4 million in MPDG INFRA grants over the past three years and these grants support important highway construction projects, predominantly in rural areas with dangerous crash histories. The U.S. 160 Corridor Safety and Mobility Improvements project received a $58.9 million INFRA grant. For the U.S. 287 Corridor Safety Improvements project — a stretch that has seen tragic incidents, including a recent crash that took the lives of several University of Wyoming students, Larimer County received a $47.3M INFRA grant with support from both Colorado and Wyoming. For the I-76 Reconstruction and Improvements Project, a $29.2 million INFRA grant was awarded. For the I-70 Floyd Hill to Veterans Memorial Tunnels Improvement Project, a $100M INFRA grant was awarded. CDOT's ongoing annual funding for capital construction is approximately $825 million. Discretionary grants such as the $235.4 million in INFRA grants represent a significant augmentation of CDOT's ongoing annual capital construction program and if these funds are not available, it will harm Colorado, CDOT, contractors, and travelers across the state.

9.      Colorado collects federal fuel excise taxes on behalf of the federal government. The Colorado Department of Revenue manages the collection of 18.4 cents per gallon on gasoline and 24.4 cents per gallon on diesel for deposit into the Federal Highway Trust Fund. Taxes are returned to the states in the form of reimbursements from federal formula and discretionary grants. In State FY 2025, CDOT expects to receive $762.1 million in Federal formula funding, in addition to discretionary grant reimbursements. For State FY 2025 year to

5

date, CDOT has received approximately $657 million in reimbursements through federal formula and grant programs.

10.    CDOT uses formula and discretionary grant funds, such as the examples provided above, to fund state and local governmental entities and transit agencies to protect and improve Colorado's critical transportation network. Federal formula funds support programs that Colorado would otherwise be unable to sustain on its own. Discretionary grants, which have averaged an additional $194 million annually over the last three State Fiscal Years, significantly increased the impact of CDOT's budget. As an example, the US 50 SHIFT project was awarded $40.5 million in late 2024 through the MPDG Rural program. The US 50 SHIFT project is projected to eliminate nearly nine fatalities and 146 injury crashes over twenty years. CDOT and local entities partnered on the MPDG Rural application, applying for $40.5 million while leveraging a total of $27 million in state and regional funds, for a $67.5 million total project cost. Federal funding was a key component in successfully leveraging state and regional funds – without federal funding being obligated, there is a significant risk of project benefits not being delivered to rural communities. For the INFRA US 287 project, CDOT committed over $15.8 million in state funds as well as $15.6 million of its ten-year plan, HSIP, and FASTER funds in supporting the $78.8 million project. INFRA funding is critical to completing the significantly more expensive 'Upper' segment, which experiences an incredibly high rate of crashes (300+ in 5 years), with construction alone totaling an estimated $44.5 million. Without the provided INFRA grant, it is unlikely that the project would be completed as quickly and with as many project scope components, resulting in additional crashes.

11.    CDOT combines the above grants and state funding to fund nearly 50 different statewide programs. This includes CDOT administered and delivered construction programs

such as Surface Treatment or FASTER Safety, CDOT administered grant programs such as the Revitalizing Main Streets Program, and programs passing funds through to Metropolitan Planning Organizations (MPOs) for project selection such as STBG-Urban. Projects are selected through a variety of means including competitive grant applications and through an extensive transportation planning and public engagement process.

12.    The programs funded by these grants are vital to protect the residents of Colorado and those traveling through Colorado. As an example, the unfunded INFRA US 287 project would provide critical safety improvements on a portion of US 287 that saw 14 fatalities from 2019 - 2023; this project going unfunded will almost certainly result in additional fatalities. The INFRA US 160 project addresses a key rural highway in southwestern Colorado that serves as a major freight corridor and currently deals with severe bottlenecking issues and congestion that significantly impact national economic flow and commerce. The project area has also seen multiple severe turning crashes and fatal crashes due to poor intersection design, which would be fixed by the proposed activities to be funded. An unfunded RAISE project at 6th and Wadsworth in Lakewood would address severe safety issues that have resulted in multiple fatal crashes involving vulnerable road users, such as pedestrians and cyclists. The programs funded by these specific grants are described further below.

### A.    Colorado's Use of Federal Highway Administration Funds

13.    As CDOT Chief of Staff, I am part of the executive management team that oversees CDOT's administration of DOT grant funds and have knowledge of approving grant applications CDOT submits for federal grants in both urban and rural areas and, if federal grants are awarded, supervising the administration of federal grants, including transit grants, on CDOT highway, bridge, and other construction and safety projects.

7

14.    As part of my regular job duties, I am a member of the executive management team that oversees CDOT grant specialists and project managers who are currently planning for or managing approximately $718.5 million in FHWA formula funding from a variety of federal programs, in addition to federal discretionary grant funding administered by the FHWA.

15.    FHWA discretionary grant funding helps CDOT address Colorado's most pressing transportation and infrastructure issues. Federal grant funds are critical to leveraging CDOT's dollars for maximum impact, ensuring that major projects are executable, and that all Coloradans and those who use Colorado's roads can do so safely and efficiently. Most major discretionary federal grants require applicants to demonstrate their economic viability through a benefit-cost analysis (BCA), with projects needing to demonstrate higher benefits than costs. CDOT's awarded grants include BCAs that clearly or significantly surpass this threshold, with some awarded grants achieving up to six times more benefits than costs due to significant safety benefits and reductions in fatalities. The loss from withholding federal funds is not only reflected in award dollars lost, but also in lost benefits to communities such as fatality and injury reductions, travel time savings, and environmental benefits.

**B.    Colorado's Use of Federal Transit Administration Funds**

16.    For decades, CDOT has received formula allocations from the Federal Transit Administration (FTA) that are largely passed through to local partners. Similar to formula programs via the Federal Highway Administration, Congress approves FTA formula funds for each state and dictates overall parameters of state-by-state distribution. For State FY 2025, CDOT expects to receive $29.6 million in FTA formula funding including funding from the FTA Section 5303 and 5304 Programs, Section 5310 Program, Section 5311 Program for Formula Grants Statewide, 5311 (b) Rural Transportation Assistance Program (RTAP), and 5339

Program. These programs provide funding to states and federally recognized tribes to support public transportation in rural areas with populations less than 50,000. This program offers capital, planning, and operating assistance to enhance access to essential services and activities like healthcare, education, and employment. Each year, CDOT awards approximately 100 grantees funding from this program, with awards ranging from $100,000 to $2,000,000. Additionally, CDOT manages pass-through awards from discretionary programs such as the 5339 Bus and Bus Facilities program, which provides funding to transit agencies to replace, rehabilitate and purchase buses and related equipment and to construct bus-related facilities.

17.    CDOT applies for FTA Funds as federal apportionment notices are posted, typically in the spring.

### C.    Colorado's Use of National Highway Traffic Safety Administration Funds

18.    For State FY 2025, CDOT has been awarded $14.06 million in funds from the National Highway Traffic Safety Administration (NHTSA) for Highway Traffic Programs (23 U.S.C. 402), the National Priority Safety Programs (23 U.S.C. 405) and the Racial Profiling Data Collection (23 U.S.C. 1906) grant. Funds are awarded to agencies, organizations, and tribal governments within the State of Colorado that provide behavioral based programs, projects, services, and strategies that are intended to reduce the number of deaths and serious injuries resulting from traffic crashes on Colorado roads. For State FY 2025, CDOT funded 85 State, local government, and non-profit agencies for year-long education, awareness, and enforcement activities. An additional 40 law enforcement agencies were funded to conduct three "Click It or Ticket" enforcement waves. Total funds allocated for State FY 2025 to all subrecipients exceeded $15,000,000. The NHTSA supports nine FTE positions and up to three partially funded positions within CDOT. The 85 subrecipient grants fund full-time and part-time positions,

9

overtime for enforcement of traffic laws and outreach and education Statewide. The NHTSA funds are critical to continuing to increase safety and drive down the number of traffic fatalities and serious injuries on Colorado roadways. After a peak of 764 traffic fatalities in 2022, Colorado has experienced a decline over each of the past two years. In 2024, there were 687 fatalities, a 10% reduction from 2022. Serious injury crashes declined from 3,945 in 2023 to 3,881 in 2024. However, motorcycle fatalities in Colorado reached an all-time high of 165 in 2024, pedestrian fatalities accounted for 115 fatalities in 2024, and speed and distracted related fatalities remain persistent challenges. Impaired driving related crashes account for over 34% of all fatal crashes. The NHTSA funds are critical to continue to educate the traveling public about safe driving behaviors and without these funds the positive impact of these education campaigns will be lost.

**The State FY 2025 Immigration Enforcement Requirements and its Impact on CDOT Grant Administration**

19.    I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

20.    On April 28, 2025, my office received notice, as part of communication on an ATTAIN grant that CDOT has been awarded, that FHWA's Grant Program General Terms and

10

Conditions, dated April 22, 2025, contains the following specific language on immigration
enforcement conditions:

> The Recipient shall ensure that Federal funding is expended in full accordance with
> the United States Constitution, Federal law, and statutory and public policy
> requirements: including but not limited to, those protecting free speech, religious
> liberty, public welfare, the environment, and prohibiting discrimination; and the
> Recipient will cooperate with Federal officials in the enforcement of Federal law,
> including cooperating with and not impeding U.S. Immigration and Customs
> Enforcement (ICE) and other Federal offices and components of the Department of
> Homeland Security in the enforcement of Federal immigration law.

21.    CDOT believes that DOT's broad statement about, "cooperating with . . . U.S.
Immigration and Customs Enforcement (ICE) and other Federal offices and components of the
Department of Homeland Security in the enforcement of Federal immigration law" is unspecific
and impossible to operationalize. The condition does not provide definitions, citations, or criteria
that would indicate what activities may be included in "cooperating with . . . enforcement of
Federal immigration law," that clearly explain what is expected of CDOT.

22.    In my years with CDOT, I am not aware of CDOT staff ever being required to
enforce or participate in the enforcement of federal civil immigration law. Further, these
activities are outside of CDOT jurisdiction. We believe that it runs counter to Congressional
intent in authorizing DOT funding programs for a federal executive agency to make those funds
contingent upon actions that are outside of agency scope.

23.    CDOT does not have any other appropriation in its budget that could cover the
loss of the federal funds discussed above. If CDOT cannot access federal funds, CDOT will not
have funds to immediately cover ongoing projects and programs funded by the grants.

24.     The CDOT budget for this year has relied on $762.1 million in federal formula funds, plus a significant amount of discretionary grant funding, and we made plans and allocated funding for projects and programs based on our continued ability to draw down on promised federal funding.

25.     Without access to grant funding, CDOT cannot commit funding for furtherance of programs.

26.     For instance, if CDOT's US 287 Corridor Safety Improvements project lost its $47.3 million INFRA award, the Project would be delayed to allow CDOT to identify new funding sources. If the project continues to be delayed, the absence of necessary and urgent safety repairs will result in the continuation of frequent and dangerous crashes. Economic calculations, utilizing USDOT Benefit-Cost Analysis Methodology, calculated that the Project is needed to prevent 2.4 fatalities a year.

27.      The longer CDOT cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

28.     Losing these DOT grants would severely obstruct and undermine CDOT's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19, 2025 in Denver, Colorado.

Sally R. Chafee

Sally R. Chafee

12

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

*Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 20

Declaration of Ronnell A. Higgins

## DECLARATION OF RONNELL A. HIGGINS

I, Ronnell A. Higgins, pursuant to 28 U.S.C. § 1746, hereby, declare:

1.    I am over the age of 18 years and understand the obligations of an oath.

2.    I am the Commissioner of the State of Connecticut, Department of Emergency Services and Public Protection (hereinafter, "CT-DESPP"). I have held this role since November of 2023. I make this declaration based on personal knowledge and on my review of information and records gathered by my agency staff.

3.    CT-DESPP is an executive branch agency of the State of Connecticut. The chief executive of CT-DESPP is the Commissioner, who is appointed by the Governor of the State of Connecticut. CT-DESPP provides a broad range of public safety services through its six divisions, including two most relevant to this matter, the Connecticut State Police and the Division of Scientific Services (also known as Connecticut's forensic laboratory). In connection with its responsibility for traffic enforcement and safety on the state's highways, CT-DESPP applies for and receives a variety of federal grants administered by the United States Department of Transportation ("DOT"), including as a subgrantee through the State of Connecticut Department of Transportation ("CT-DOT").

### Background

4.    CT-DESPP provides the State of Connecticut with a broad range of public safety services, training, regulatory guidance, and scientific services through law enforcement, prevention, education, and state of the art science and technology. The Connecticut State Police ("CSP"), one of CT-DESPPP's six divisions, is the oldest state police force in the country. CSP's 930 troopers are responsible for patrolling Connecticut's highways from 11 barracks spread across the State. This patrol includes the Interstate 95 and Interstate 84 corridors, two heavily trafficked

1

roadways that are main travel routes linking New York and points west and south to major New England destinations, including Boston and Providence. In addition, CSP patrols Bradley International Airport, the second-largest airport in New England, serving 6.75 million passengers annually.

5.    CT-DESPP's Division of Scientific Services provides cutting-edge forensic support to local, state, and federal agencies throughout Connecticut. The lab's Toxicology Unit is responsible for analyzing evidence such as blood and urine to support driving under the influence investigations and prosecutions. The majority of the work within the unit involves analyzing this evidence for the presence of ethanol and other chemicals that may cause impairment. In addition, the Breath-Alcohol Sub-Unit oversees the training of instructors, operators, and facilities on the maintenance and use of statewide breathalyzer instruments.

6.    As Commissioner, I have command over the Connecticut State Police, the Division of Scientific Services, and agency-wide Fiscal Services. I am generally aware of the federal grants awarded to CT-DESPP, including those awarded to the Connecticut State Police in connection with highway safety and those awarded to the Division of Scientific Services in connection with DUI investigative support. These grants are awarded directly from the DOT and as passthrough grants from CT-DOT.

7.    CT-DESPP's Fiscal Services is responsible for the administration of approximately $8.6 million in open DOT federal awards related to commercial motor vehicle enforcement, impaired driving and prevention efforts, seatbelt enforcement, public education programs around safe driving efforts, and traffic fatality reduction initiatives.[1] A loss of these grants would severely

---

[1] The administration of federal grant programs is an ongoing, fluid process. The figures used herein are all approximate based upon the date of this Declaration. Figures reported as DOT "awards" are

obstruct and undermine CT-DESPP's mission even if the funding were restored at a later date.

## CT-DESPP's Receipt of DOT Grants

8.      As noted above, CT-DESPP receives direct federal grants from DOT and DOT passthrough grants via CT-DOT, which in total represent millions of dollars in federal funds. Each grant supports critical programs in Connecticut, keeping our roadways, transit systems, and our pedestrians safe by targeting unlawful and impaired driving. The programs funded by these specific grants are described further below.

9.      The grant programs discussed herein are intended to provide examples of the breadth and depth of recent and anticipated DOT grants as they related to CT-DESPP, the Connecticut State Police, and the Division of Scientific Services. The specific grants discussed herein, and the types of projects and activities funded by those grants, are not intended to be an exhaustive list of every DOT grant or activity supported by those grants.

**A.      CT-DESPP's Use of DOT High Priority Commercial Motor Vehicle Program Funds**

10.      I am familiar with DOT's High Priority Commercial Vehicle (HP-CMV) grant program, which provides assistance to enhance commercial vehicle safety and implement nationwide projects to improve commercial motor vehicle safety. The HP-CMV program seeks to target unsafe driving of commercial motor vehicles in areas identified as high-risk crash corridors, to ensure the safe and secure movement of hazardous materials, to improve safety of transportation of passengers and goods in commerce, and to demonstrate new technologies to improve commercial motor vehicle safety. It is funded by DOT through its Federal Motor Carrier Safety

---

the grant of financial assistance to be provided by DOT for a specified purpose to an eligible recipient.

Administration ("FMCSA") grant initiative (CFDA 20.237).

11.     CT-DESPP currently has two open HP-CMV grants, which it receives directly from DOT:

- FM-MHP-0803-23-01-00: performance period 9/1/23 to 9/30/25; total award $1,999,938; and

- FM-MHP-0886-24-01-00: performance period 9/1/24 to 9/30/26; total award $1,997,739.

12.     The HP-CMV grants are utilized by the Connecticut State Police's Traffic Services Unit for the purchase of equipment, vehicles, and reimbursement of overtime incurred as a result of commercial motor vehicle enforcement activities on Connecticut's highways.

13.     CT-DESPP intends to apply again for HP-CMV funds in federal fiscal year 2025 but DOT's notice of funding opportunity ("NOFO") release date is unknown.

**B.     CT-DESPP's Use of E-Citation Program Funds**

14.     I am familiar with the E-Citation grant program, which supports the implementation and maintenance of electronic citation (i.e., tickets or infractions) systems. It is funded by DOT's National Highway Traffic Safety Administration's ("NHTSA") National Priority Safety Programs grant initiative (CFDA 20.616).

15.     CT-DESPP currently has one open E-Citation grant, which it receives as a passthrough from DOT through CT-DOT:

- 0205-0742-AM: performance period 1/6/25 to 9/30/25; total award $499,770.

16.     The E-Citation funds are utilized by the Connecticut State Police to cover the costs of equipment including mobile computers, printers, and software upgrades associated with issuing electronic citations from Trooper's patrol vehicles during traffic enforcement operations, along

4

with training on the E-Citation system.

17.    CT-DESPP intends to apply again for E-Citation grant funds in federal fiscal year 2025 but DOT/ NHTSA's NOFO release date for the National Priority Safety Programs grant initiative is unknown.

**C.    CT-DESPP's Use of DUI Enforcement Funds**

18.    I am familiar with the DUI Enforcement grant program, which aims to reduce the number and severity of accidents due to alcohol impaired motorists. It is funded by DOT/ NHTSA's Alcohol Open Container Requirements grant program (CFDA 20.607).

19.    CT-DESPP currently has one open DUI Enforcement grant, which it receives as a passthrough from DOT through CT-DOT:

- 0205-0722-1-DT: performance period 11/21/24 to 9/6/25; total award $499,946.

20.    The DUI Enforcement Program grant is overseen by the Connecticut State Police's Traffic Services Unit to support DUI-specific enforcement across all 11 CSP troops and covers the costs of Trooper overtime.

21.    CT-DESPP intends to apply again for an anticipated $400,000 in DUI Enforcement grant funds from DOT/ NHTSA's Alcohol Open Container Requirements grant program for the next performance period of 10/3/25 to 9/7/26.

**D.    CT-DESPP's Use of Distracted Driving High Visibility Enforcement Program Funds**

22.    I am familiar with the Distracted Driving High Visibility Enforcement grant program. The purpose of this program is to decrease fatalities and injuries as a result of crashes caused by distracted drivers, primarily by the use of hand-held mobile phones and electronic devices. It is funded by DOT/ NHTSA's National Priority Safety Programs grant initiative (CFDA 20.616).

23.    CT-DESPP currently has one open Distracted Driving High Visibility Enforcement grant, which it receives as a passthrough from DOT through CT-DOT:

- 0205-0745-2-DW: performance period 4/1/25 to 4/30/25; total award $196,642.[2]

24.    Connecticut State Police's Traffic Services Unit oversees the Distracted Driving High Visibility Enforcement grant to support increased enforcement by Troopers in areas identified as having high rates of fatal and injury-related crashes. The program funds spay for Trooper overtime costs incurred during targeted enforcement efforts to mitigate distracted driving.

25.    CT-DESPP intends to apply again for an anticipated $150,000 in Distracted Driving High Visibility Enforcement funds from DOT/ NHTSA's National Priority Safety Programs grant initiative for the next performance period of 4/1/26 to 4/30/26.

**E.    CT-DESPP's Use of Click It or Ticket Enforcement Grant Funds**

26.    I am familiar with the Click It or Ticket grant program. The purpose of this program is to increase the use of seatbelts across Connecticut, decrease the number of unbelted drivers, and reduce fatalities and serious injuries in crashes. It is funded by DOT/ NHTSA's National Priority Safety Programs grant initiative (CFDA 20.616).

27.    CT-DESPP currently has one open Click It or Ticket grant, which it receives as a passthrough from DOT through CT-DOT:

- 0205-0741-1-1-AC: performance period 11/28/24 to 6/1/25; total award $146,818.

28.    Connecticut State Police's Traffic Services Unit oversees the Click It or Ticket grant to support increased enforcement by Troopers related to seatbelt use enforcement. The program funds support Trooper overtime costs incurred during targeted enforcement efforts to mitigate unbelted driving.

---

[2] This grant is currently in the liquidation period with the activities supported by the grant closed. CT-DESPP's reimbursement request is currently pending.

29.     CT-DESPP intends to apply again for an anticipated $140,000 in Click It or Ticket funds from DOT/ NHTSA's National Priority Safety Programs grant initiative for the next performance period of 11/28/25 to 6/1/26.

**F.    CT-DESPP's Use of Convincer/ Rollover Simulator Education and Equipment Grant Funds**

30.     I am familiar with the Convincer/ Rollover Simulator Education and Equipment ("Convincer") grant program. The purpose of this program is to conduct public education programs deploying a rollover simulator to exhibit the importance of using occupant protection systems like seatbelts. It is funded by DOT/ NHTSA's National Priority Safety Programs grant initiative (CFDA 20.616).

31.     CT-DESPP currently has one open Convincer grant, which it receives as a passthrough from DOT through CT-DOT:

- CT-DOT-0170-3700-AB: performance period 10/1/24 to 9/30/25; total award $199,272.

32.     Connecticut State Police's Traffic Services Unit oversees and implements the Convincer grant to support unit overtime costs associated with public education events at schools and community events.

33.     CT-DESPP intends to apply again for an anticipated $150,000 in Convincer funds from DOT/ NHTSA's National Priority Safety Programs grant initiative for the next performance period of 10/1/25 to 9/30/26.

**G.    CT-DESPP's Use of High Risk Rural Roads Grant Program Funds**

34.     I am familiar with the High Risk Rural Roads grant program. The purpose of this program is to reduce the number and severity of speed related crashes in the State of Connecticut on identified rural roads. It is funded by DOT's Federal Highway Administration ("FHWA") Highway Planning and Construction Federal-Aid Highway Program (CFDA 20.205).

35.    CT-DESPP currently has one open High Risk Rural Roads grant, which it receives as a passthrough from DOT through CT-DOT:

- CTDOT-0170-3700-AB: performance period 1/27/25 to 5/30/25; total award $500,000.

36.    Connecticut State Police's Traffic Services Unit oversees and implements the High Risk Rural Road grant to support costs associated with overtime in enforcing the grant.

37.    A subsequent NOFO for additional funding under this grant is not anticipated, but CT-DESPP would work with CT-DOT to apply for this funding should a NOFO be issued.

**H.    CT-DESPP's Use of Equipment and Warranties Grant Program Funds**

38.    I am familiar with the Equipment and Warranties grant program funds. The purpose of this program is support breathalyzer equipment purchases. It is funded by DOT/ NHTSA's Alcohol Open Container Requirements grant program (CFDA 20.607).

39.    CT-DESPP currently has one open Equipment and Warranties grant, which it receives as a passthrough from DOT through CT-DOT:

- 0205-0719-1-AD: performance period 10/1/24 to 9/30/25; total award $1,981,990.

40.    CT-DESPP's Division of Scientific Services uses the Equipment and Warranties grant program funds to support equipment and instrument purchases related to DUI investigations and prosecutions.

41.    CT-DESPP intends to apply again for an anticipated $1,000,000 in Equipment and Warranties grant funds from DOT/ NHTSA's Alcohol Open Container Requirements grant program for the next performance period of 10/1/25 to 9/30/26.

**I.    CT-DESPP's Use of Personnel, Operation Supplies and Consumables Program Funds**

42.    I am familiar with the Personnel, Operation Supplies and Consumables program funds. The purpose of these programs is to support salaries and supplies needed in the area of DUI

enforcement. The programs are funded by DOT/ NHTSA's National Priority Safety Programs grant initiative (CFDA 20.616).

43.    CT-DESPP currently has two open grants for Personnel, Operational Supplies and Consumables program funds, which it receives as passthroughs from DOT through CT-DOT:

- 0205-0743-5-BQ: performance period 10/1/24 to 9/30/25; total award $153,893; and
- 0205-0743-5-DO: performance period 10/1/24 to 9/30/25; total award $105,000.

44.    CT-DESPP's Division of Scientific Services uses the DOT Personnel grant program funds to offset costs in its Toxicology Unit with breathalyzer analysis and related backlogs. The funds support overtime costs and split-fund one full-time position. In addition, the Operational Supplies and Consumables funds are used for supplies associated with toxicology testing.

45.    CT-DESPP intends to apply again for an anticipated grant in the amount of $150,000 in Personnel grant funds from DOT/ NHTSA's National Priority Safety Programs grant initiative for the next performance period of 10/1/25 to 9/30/26. DOT's NOFO release date for the Supplies and Consumables program is unknown.

**J.    CT-DESPP's Use of Drug Enforcement Recognition Grant Funds**

46.    I am familiar with the Drug Enforcement Recognition (DER) grant program. The purpose of this program is to support activities related to addressing and reducing drug-impaired driving. It is funded by DOT/ NHTSA's Alcohol Open Container Requirements grant program (CFDA 20.607).

47.    CT-DESPP currently has one open DER grant, which it receives as a passthrough from DOT through CT-DOT:

- 0205-0724—2-AF: performance period 10/9/24 to 9/30/25; total award $100,000.

9

48.    CT-DESPP's Connecticut State Police use the DER grant program funds to cover the costs of overtime, straight time, and travel costs incurred by sworn troopers in the administration of the Drug Evaluation and Classification Program ("DECP"). In addition, Connecticut's 2025 Highway Safety Plan calls for the training of law enforcement officials in the latest methods of drug evaluation and classification and to certify law enforcement officers, including Connecticut State Troopers, as drug recognition experts (DREs).

49.    CT-DESPP intends to apply again for an anticipated $100,000 in DER grant funds from DOT/ NHTSA's Alcohol Open Container Requirements grant program for the next performance period of 10/1/25 to 9/30/26.

**K.    CT-DESPP's Use of Speed and Aggressive Driving Program Grant Funds**

50.    I am familiar with the Speed and Aggressive Driving grant program funds. The purpose of this program is to decrease fatalities and injuries as a result of crashes caused by excessive speed and aggressive driving. It is funded by DOT/ NHTSA's National Priority Safety Programs grant initiative (CFDA 20.616).

51.    Connecticut State Police's Traffic Services Unit oversees the Speed and Aggressive Driving grant to support increased enforcement by Troopers related to excessive speed and aggressive drivers. The program funds support trooper overtime costs.

52.    The last Speed and Aggressive Driving grant from DOT/ NHTSA's National Priority Safety Programs grant initiative ended on September 5, 2024, but CT-DESPP intends to apply again for an anticipated $250,000 in Speed and Aggressive Driving grant funds for the next performance period of 7/1/25 to 9/5/25.

**FY 2025 Immigration Enforcement Requirements and its Impact on CT-DESPP**

53.    I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy publicly issued a letter to "All Recipients of U.S. Department of Transportation Funding" stating that recipients' "legal obligations require cooperation generally with Federal authorities in the

10

enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

54.    CT-DESPP does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." I am not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

55.    As it relates to CT-DESPP's broad scope in providing public safety services to the State of Connecticut, I am not aware of how, agency-wide, we would be expected to cooperate with the enforcement of federal civil immigration law. For example, I cannot understand how employees of our Division of Scientific Services (forensic lab), would have the ability or capacity to enforce civil immigration law. The example cited in Secretary Duffy's letter—the issuance of driver's licenses to individuals present in the United States in violation of Federal immigration law—is simply inapplicable to forensic scientists working on breathalyzer analysis and training.

56.    If CT-DESPP, or one of its divisions, was deemed out of compliance with DOT's new funding conditions, it would be unable to receive FY 2025 DOT funds, depriving the State of Connecticut of millions of dollars, frustrating its ability to maintain the critical programs described above in the areas of highway traffic safety, DUI enforcement, and investigative forensic support.

57.    CT-DESPP does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If CT-DESPP cannot access federal funds, CT-DESPP will not have funds to immediately cover at minimum approximately 11 unique programs funded by the grants described above. This, in turn, will result in a reduction in the traffic safety programs

11

described herein, including enforcement activities on some of New England's most significant and
busiest highway corridors.

58.     Without access to FY 2025 grant funding, CT-DESPP cannot commit funding for
furtherance of programs. Any pause or termination in federal funding would mean an immediate
reduction of Connecticut State Police highway enforcement efforts related to speeding, aggressive
driving, and impaired driving, as well as a reduction in resources dedicated to forensic laboratory
support for DUI investigations and prosecutions.

59.     For example, the High Priority Commercial Vehicle (HP-CMV) grant program
funds Connecticut State Police, Traffic Services Unit's equipment, vehicles, and overtime
activities to enforce commercial vehicle safety in areas identified as high-risk crash corridors. *See
supra* ¶¶10-12. Without these grant funds, commercial vehicle enforcement on major Connecticut
highways connecting New York to points throughout New England would be significantly
curtailed.

60.     Similarly, DOT's National Highway Traffic Safety Administration's ("NHTSA")
National Priority Safety Programs grant initiative supports the use of the E-Citation program by
Connecticut State Police, *see supra* ¶¶ 14-16, efforts aimed at reducing distracted driving, *see
supra* ¶¶ 22-24, the Click It or Ticket seatbelt initiative, *see supra* ¶¶ 26-28, and Connecticut State
Police's efforts to curb speeding and aggressive driving, *see supra* ¶¶50-51. Collectively, these
efforts seek to reduce traffic fatalities on Connecticut's highways and provide safer, more secure
interstate paths of travel throughout the State for citizens and visitors alike.

61.     In addition, any potential loss of DOT/ NHTSA's Alcohol Open Container
Requirements grant program funds would hurt important public safety programs in Connecticut
related to DUI enforcement by Connecticut State Police Troopers, *see supra* ¶¶ 18-21, forensic lab
investigative support for DUI cases, *see supra* ¶¶ 38-40, and the training of law enforcement Drug

Recognition Experts aimed at reducing impaired driving on Connecticut roadways. *See supra* ¶¶ 46-48.

62.     Losing these DOT grants would severely obstruct and undermine CT-DESPP's public safety mission even if the funding were restored at a later date. CT-DESPP does not have the budgetary resources or flexibility to make up for any lost funding without diverting funding away from other important safety and law enforcement operations.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th of May 2025, in Middletown, Connecticut.

Ronnell A. Higgins
Commissioner
State of Connecticut, Department of Emergency Services
and Public Protection

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

Defendants.

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 21

Declaration of Shanté A. Hastings

<u>DECLARATION OF SHANTÉ A. HASTINGS</u>

I, Shanté A. Hastings, declare as follows:

1.    I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.    I am the Cabinet Secretary at the Delaware Department of Transportation ("DelDOT"). My job duties include:

- Strategic Oversight: Setting the overall direction for DelDOT's policies, programs, and long-term transportation planning in alignment with the Governor's priorities.

- Policy Development: Advising the Governor on transportation policy, legislation, and long-term planning.

- Leadership & Management: Overseeing DelDOT's divisions and programs, including project development, finance, planning, and community relations. This includes supervising senior leadership and managing agency-wide priorities.

- Budget and Finance Management: Developing and managing DelDOT's multi-million-dollar capital and operating budgets, including alignment with state and federal funding sources.

- Public Engagement & Stakeholder Collaboration: Coordinating with local governments, regional planning organizations, and community stakeholders to ensure transportation initiatives align with statewide and regional goals.

- Emergency Response & Resilience: Leading the department's efforts in emergency preparedness and response, including infrastructure resilience and climate adaptation strategies.

3.    My extensive experience within DelDOT includes:

- Chief Engineer and Deputy Secretary Roles: Prior to my current position, I served as DelDOT's Chief Engineer and Deputy Secretary, where I was instrumental in managing the department's capital projects and liaising with federal agencies.

- Leadership in National Organizations: I hold leadership positions in the American Association of State Highway and Transportation Officials, serving as Chair of the

1

Innovation Management Committee and the Committee on Design, and as Vice Chair of the Committee on Transportation System Operations.

- Recognition and Community Involvement: I have been honored with awards such as the Government Engineer of the Year by the Delaware Engineering Society and serves on various boards, including the University of Delaware Board of Trustees.

4.    I play a pivotal role in securing and administering federal transportation grants with responsibilities including:

- Grant Acquisition Strategy: Leading DelDOT's efforts to identify and apply for competitive federal grants, ensuring proposals align with both state priorities and federal funding criteria.
- Compliance and Oversight: Ensuring that federally funded projects adhere to all applicable regulations, including environmental assessments, civil rights requirements, and fiscal accountability.
- Subgrant Administration: Overseeing the distribution of federal funds to local governments and community-based organizations, providing guidance to ensure compliance and effective use of resources.

5.    My comprehensive understanding of both the technical and administrative aspects of transportation infrastructure, combined with my leadership experience, positions me to effectively manage federal grants and advance Delaware's transportation objectives.

6.    I have served as Secretary since January of  2025. Before being confirmed as Cabinet Secretary for DelDOT, I served as Deputy Secretary and Chief Engineer for the last five years. In total, I have over 25 years of experience with DelDOT. Over the course of my career, I have overseen the administration of  numerous grants and over $1 billion of federal funding obligations that the State has received from a variety of federal agencies including the Department of Transportation ("DOT").

**Background**

7.    DelDOT aims to provide a safe and reliable transportation network that serves all people and respects the environment. DelDOT maintains approximately 14,000 lane-miles. In

2

addition to state highways, DelDOT also manages over 5,500 structures, which include state-owned bridges, overhead sign structures, high mast lighting structures, dams, traffic signal support structures, and one ferry boat.

8.    Apart from maintaining state highways and structures, DelDOT's Integrated Transportation Management System is far reaching and includes a centralized, 24/7/365 Transportation Management Center, an extensive telecommunication system, the operation of a traffic signal system including approximately 1,200 DelDOT owned and 200 City of Wilmington owned signals, nearly 300 closed-circuit television cameras, 26 permanent dynamic message signs, various traffic detection systems, and an expanding number of weather and flood monitoring systems. This is in addition to the many traveler services provided by DelDOT, which includes providing real-time traveler data on the DelDOT website and app, disabled vehicle assists, 6,916,266 transit passenger trips, and $14,122,702 million in passenger fares collected in fiscal year ("FY") 2024.

9.    As part of the Department's responsibilities, our team is responsible for overseeing all apportioned highway and transit  funding directed to DelDOT. A list of this funding is extensive. Further information on these annual apportionments to Delaware can be found at the following websites:

- https://www.fhwa.dot.gov/infrastructure-investment-and-jobs-act/funding.cfm
- https://www.transit.dot.gov/funding/apportionments/current-apportionments

10.    Our team has reviewed the FY 2025 grant awards for these grants that were issued to DelDOT and are familiar with their contents.

11.    The Finance Division of DelDOT is specifically responsible for the administration of approximately $1.1 billion in open federal awards for Federal Highway Formula and Federal

Transit Formula Programs that are distributed under the Infrastructure Investment and Jobs Act ("IIJA"), as well as discretionary grant awards from the Federal Railroad Administration, the Federal Aviation Administration, and the Federal Motor Carrier Safety Administration ("FMCSA").

12.    The Division of Finance for DelDOT manages all federal grant programs. The Division of Finance oversees the planning, obligation and execution of all federal grants for the Department including applicable grant reporting and oversight.  These programs represent millions in statewide transit funds in FY 2025.  A loss of these grants would severely obstruct and undermine DelDOT's mission even if the funding were restored at a later date.

### Delaware's Annual Receipt of DOT Grants

13.    I oversee my office's administration of DOT grant funds and have knowledge of Federal DOT apportionments and appropriations for both the Federal Highway Administration ("FHWA") and the Federal Transit Administration ("FTA"), ensuring the effective utilization of funding to achieve key departmental goals.

14.    DelDOT is responsible for administering federal grants from DOT, representing over $325 million in federal funds annually, or 31 percent of DelDOT's total budget. While too numerous to list here, each grant supports critical programs in Delaware, keeping our roadways, airspace, waterways, transit systems, and our pedestrians safe.

15.    For example, DelDOT received $343.7 million in apportioned funding from the FHWA and FTA under the  IIJA in 2025. DelDOT uses grant funds to fund the Department's biannual Capital Transportation Program and to protect and improve Delaware's critical transportation network. These funds, which in total make up 31 percent of DelDOT's budget, support programs that Delaware would otherwise be unable to sustain on its own.

16.    Some additional program examples include Safety Programs, the Paving and

Rehabilitation Program, the Transportation Alternatives Program, the Signage and Pavement

Markings Program, the Transit Vehicles Program,  the Intersection Improvements Program,  the

Rail Crossing Safety Program, Bridge & Non-Bridge Structures Programs, Resiliency &

Sustainability Programs, and the individual Capital Transportation Program projects identified

through our project prioritization process. The programs funded by these grants are vital to protect

the residents of Delaware, which includes supplying critical state road and bridge repairs and

improvements, overseeing public transit agency services and maintenance, and providing electric

vehicle charge installation and maintenance through the National Electric Vehicle Infrastructure

Program.  Some of the programs funded by these specific grants are described further below.

### A.    Delaware's Use of Federal Highway Administration Funds

17.    DelDOT uses federal highway funding primarily for several key areas:

    a. Infrastructure Development: Funding is allocated for the construction, maintenance, and repair of highways, bridges, and related infrastructure to ensure safe and efficient transportation.

    b. Safety Programs: A portion of the funding supports initiatives aimed at improving road safety, including traffic management systems and safety audits.

    c. Environmental Initiatives: DOT invests in projects that promote environmental sustainability, such as reducing emissions and enhancing stormwater management in transportation projects.

    d. Research and Innovation: Federal funding facilitates research into new technologies and practices that enhance the safety and efficiency of the highway system.

Overall, DelDOT's use of federal highway funding focuses on improving transportation

infrastructure, ensuring safety, promoting environmental sustainability, and embracing

innovative solutions for future needs.

18.    DelDOT serves the entire population of Delaware, which is approximately 1

million residents. The Department manages transportation infrastructure, including roads, public

transit, and safety programs, impacting the daily commute and travel for all residents in the State of Delaware. Additionally, DelDOT supports twenty-nine million visitors and travelers passing through Delaware annually.

**B.    Delaware's Use of Federal Transit Administration Funds**

19.    DelDOT uses FTA funding primarily for a variety of transit-related projects and services. This includes:

   a.   Capital Improvements: Funding to purchase new buses, upgrade existing facilities, and improve transit infrastructure such as bus stops and terminals.

   b.   Operating Assistance: Support for day-to-day operations of public transit services to enhance service reliability and frequency.

   c.   Transit Planning: Investment in planning and research initiatives to improve public transportation systems and better meet the needs of the community.

   d.   Accessibility Initiatives: Funds allocated for projects aimed at enhancing accessibility for individuals with disabilities, ensuring that transit services are inclusive.

   e.   Innovative Transportation Solutions: Support for the development and implementation of new technologies and services, such as real-time tracking systems and on-demand transit options.

By leveraging FTA funding, DelDOT aims to improve public transportation, enhance mobility and safety, and foster economic growth throughout the state.

**C.    Delaware's Use of Federal Motor Carrier Safety Administration Funds**

20.    DelDOT's use of FMCSA funds includes the following:

   a.   Division of Motor Vehicles – FMCSA Commercial Driver's License Program Improvement ("CDLPI") grant:

      i.    FY2020 (FM-CDL-0403) - $88,415.00.
      ii.   FY2021 (FM-CDL-0451) - $317,302.00.
      iii.  FY2023 (FM-CDL-0529) - $253,217.00.
      iv.   FY2024 (FM-CDL-0558) - $251,537.00.

   b.   Division of Motor Vehicles – FMCSA CDLPI grant.  The 2020 CDLPI Grant (FM-CDL-0403-20-01-00) funds and supports three project efforts.

i.    The first performance objective is to upgrade and enhance the Delaware Department of Motor Vehicles ("DMV") electronic road exam tablets also known as RST. The system provides Delaware with the ability to electronically score, closely monitor, and track the testing history of all Delaware commercial driver's license ("CDL") applicants while supporting the prevention of testing fraud throughout the State. To ensure qualified drivers are eligible to receive and retain a CDL and that each holder has successfully met all testing requirements, the ability to track is a key element.

ii.   The second performance objective is for the purchase of CDL manuals and training supplies. Delaware DMV contracts with vendor(s) for print/reprint and translation services of the current or new releases of the CDL Driver's Manual approved by American Association of Motor Vehicle Administrators ("AAMVA"). The availability of training supplies such as toner and 3D filament which support Delaware's ability to create training binders and build 3D models of vehicle components to be utilized as tools during skills certification training.

iii.  The third objective is to support travel expenses for up to four staff members. Delaware is planning for the implementation of a Third Party CDL Testing Program. It is anticipated that staff will travel to other jurisdictions to discuss and observe their testing program. Travel will also support staff AAMVA meetings such as the CDLIS Reporting Group Annual Meeting.

c.    The 2021 CDLPI Grant (FM-CDL-0451-21-01-00) funds and supports four project efforts.

i.    The first objective of the proposal is to ensure Delaware DMV is prepared to meet the entry-level driving training compliance date as identified by the FMCSA. FMCSA regulations set minimum Federal training standards for entry-level drivers. Beginning February 7, 2022, these requirements impact drivers applying to obtain their CDL for the first time.

ii.   The second objective is for the development and implementation of a Third-Party Tester Program. Motor Vehicle agencies are increasing utilization of third-party agents to conduct skills exams on behalf of their jurisdictions. Delaware is working to implement an entirely new program with a strong framework. The Division will grant authority to third-party agents to act on DMV's behalf for specified services but will ultimately oversee the accuracy and completeness of driver data.

      iii.    The third objective is in support of the migration from a UNI-Mainframe version to either a UNI-Windows or Web-service. UNI is a tool that was built by AAMVA before the internet was widely available. Web-services are the current norm for exchanging data in government and industry, so there are multiple people familiar with the process and it is supported by many software vendors.

      iv.    The fourth objective is for the purchase of training supplies and equipment to enhance the current CDL training program which include 3D filament and printer toner.

d.    The 2023 CDLPI Grant (FM-CDL-0529-001) funds and supports three project efforts.

      i.    The first performance objective for the Drug and Alcohol Clearinghouse ("DACH") project was to ensure the DMV is prepared to meet the DACH compliance date of November 18, 2024, as identified by the FMCSA. Delaware implemented DACH on November 18, 2024. This rule prohibits Delaware from issuing, renewing, upgrading, or transferring a CDL or commercial learner's permit ("CLP") for any individual prohibited under FMCSA's regulations from performing safety-sensitive functions, including driving a commercial motor vehicle ("CMV"), due to one or more drug and alcohol program violations. In addition, upon receipt of notification that a driver is prohibited from operating a CMV due to a drug and alcohol program violation, the DMV must initiate the downgrade process to remove the CLP or CDL privilege from the driver's license within sixty days. DMV will reinstate the commercial driving privilege when notified by FMCSA that a driver has completed the return-to-duty requirements and is no longer prohibited. If notified that FMCSA removes a violation erroneously entered in the Clearinghouse, DMV will reinstate the commercial driving privilege and expunge the driving record accordingly.

      ii.    The second performance objective was to support programming changes to ensure compliance to meet the August 22, 2024, deadline for the Exclusively Electronic Exchange ("EEE") final rule (86 FR 38937) published July 23, 2021. Delaware implemented the EEE on August 19, 2024. The final rule established the requirements for state driver licensing agencies ("SDLAs") to implement a system and practices for the exclusively electronic exchange of driver history record information through the CDLIS, including the posting of convictions, withdrawals, and disqualifications. Delaware has already implemented system changes; however, additional programming changes are required to ensure full compliance. This will include modifications to four additional motor vehicle and license system processes to disallow paper mail notifications.

    iii.    The third performance objective is for the purchase of CDL manuals and training supplies. Delaware DMV contracts with vendors for printing, reprinting, and translation services of the current and new releases of the CDL Driver's Manual approved by AAMVA. CDL training supplies are required for both CDL Knowledge and Skills Certification Training. The availability of training supplies, such as printer toner, 3D filament, binders, dividers, flip chart pads, pencils, markers, whistles, clip boards, etc., supports Delaware's ability to create training binders and have tools available during both training as well as used during ongoing CDL Skills exams post training.

e.    The 2024 CDLPI Grant (FM-CDL-24-002-110632) funds and supports two project efforts.

    i.    The first objective is to ensure Delaware's compliance with the National Registry Solution Final Rule ("NRII"). The NRII rule requires certified medical examiners performing physical examinations of CMV drivers to use a newly developed Medical Examination Report Form MSCA-5875 and Medical Examiner's Certificate Form ("MEC") MSCA-5876. The medical examiner must electronically transmit the report results of all CMV drivers' physical examinations performed, including the results of examinations where the driver was found not to be qualified, to the FMCSA by midnight the next calendar day following the exam. The National Registry will electronically transmit MEC's data in respect of examinations performed to the SDLA. In addition, medical variance information for all CMV drivers will be transmitted electronically to the SDLAs.

    ii.    The second performance objective is to transition Delaware's current AAMVA 2005 CDL Skills Testing System to the approved AAMVA Modernized CDL Skills Testing System. In 2018, the FMCSA and AAMVA jointly decided to evaluate the existing vehicle inspection and basic control skills tests. The Modernized tests were evaluated using experienced drivers, new drivers, and student drivers as well as CDL examiners. Testing vehicles included a broad range of Class A and Class B commercial vehicles. Delaware is implementing the CDL Modernized Testing System. This change requires making updates to current RoadScholar application used to score the CDL Skills Exam by Delaware examiners. The four DMV locations also needed their test areas painted or striped to match the modernized Basic Control Skills dimensions. Delaware DMV also provides training to its existing examiners and trains any new CDL Third-Party Testing organizations with the modernized version of the skills exam. Delaware DMV plans has communicated these changes to the public in advance of the implementation change.

iii.    DMV will need to update the current Commercial Driver Manuals to reflect the new requirements for the Modernized Skills test. DMV contracts with vendors for printing, reprinting, and translation services of the current and new releases of the CDL Driver's Manual approved by AAMVA.

21.    In February of 2025, DelDOT/DMV, intended to apply for the FMCSA FY2025 Notice of Funding Opportunity CDPLI grant funds. However, due to FMCSA closing the application period, Delaware did not apply and is awaiting guidance for a future filing date.

**D.    Delaware's Use of National Highway Traffic Safety Administration Funds**

22.    DelDOT receives federal safety funding directly from the IIJA that places a significant emphasis on safety funding as a crucial component of enhancing the nation's transportation infrastructure. The Act allocated resources specifically aimed at improving road safety and reducing fatalities and injuries on highways. Key elements of safety funding under the IIJA include:

a.    Enhanced Safety Programs: The IIJA provides funding for various safety programs designed to address critical issues such as distracted driving, speeding, and impaired driving. These programs aim to implement evidence-based strategies to mitigate risks on the road.

b.    Vulnerable Road User Safety: The legislation underscores the importance of protecting vulnerable road users, including pedestrians and cyclists. Funding is directed toward initiatives that create safer environments for these individuals, such as improved crosswalks, bike lanes, and traffic calming measures.

c.    Highway Safety Improvement Program: The IIJA expands the existing HSIP, which offers states the flexibility to identify and address safety needs through data-driven approaches.

d.    Traffic Fatality Reduction Initiatives: The Act allocates funds for initiatives aimed at reducing traffic fatalities through comprehensive strategies, including public awareness campaigns and partnerships with local government agencies to enhance enforcement measures.

c.    Resilience Against Emerging Safety Risks: Recognizing the growing challenges posed by new technologies and evolving transportation patterns, the IIJA supports research and investments in safety measures to address

these emerging risks, including those related to autonomous vehicles and increased traffic congestion.

d.    Collaboration with Stakeholders: The Act encourages collaboration among federal, state, and local agencies, as well as private sector stakeholders, to develop innovative solutions for improving safety on the highways.

In summary, the safety funding provisions of the IIJA reflect a comprehensive approach to enhancing road safety, with a keen focus on protecting all roadway users and reducing traffic-related fatalities and injuries.

### The FY 2025 Immigration Enforcement Requirements And its Impact on DelDOT Grant Administration

23.    On April 24, 2025, I received a copy of the April 24, 2025 letter from Secretary of Transportation Sean Duffy stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

24.    DelDOT does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." DelDOT is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

25.    In my years with DelDOT, I am not aware of DelDOT staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because DelDOT is responsible for duties related to the development, maintenance, and/or safety of

11

transportation infrastructure, DelDOT lacks any capacity to enforce civil immigration law.

26.    If DelDOT does not receive future disbursements, it will substantially impact the many services DelDOT provides for the State. Additionally, if DelDOT is unable to comply with the federal government's new funding conditions, the State would be unable to receive FY 2025 DOT funds, depriving the State of significant funds, and frustrating its ability to maintain the critical programs described above.

27.    DelDOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above.

28.    The DelDOT budget for this year has relied on receipt of the grants, and DelDOT has made plans and allocated funding based on our continued ability to draw down on promised federal funding. Without access to grant funding, DelDOT cannot commit funding for furtherance of its important programs.

29.    If DelDOT does not receive federal funding, several impacts could occur:

  a.    Reduced Infrastructure Maintenance: Without federal funds, our agency would struggle to maintain roads, bridges, and public transit systems, leading to deterioration in infrastructure quality and safety.

  b.    Limited Project Implementation: Major transportation projects, such as highway expansions, Grade Separated Interchanges, or public transit upgrades, could be delayed or scaled back due to a lack of financial resources.

  c.    Increased Congestion: Ineffective maintenance and lack of new projects can lead to worsening traffic congestion, impacting commute times and overall mobility.

  d.    Economic Impact: Transportation is crucial for economic activity. A reduction in funding can lead to job losses in construction, engineering, and maintenance, as well as lower overall economic growth.

  e.    Safety Concerns: Insufficient funds can compromise safety. Poorly maintained roads and transit systems can increase the risk of accidents and injuries for travelers.

      f.     Disparities in Service: Areas that rely more on federal funding, often rural or underserved communities, may face greater service reductions, exacerbating existing inequalities in transportation access.

      g.     Environmental Impact: Reduced funding may limit efforts to implement environmentally friendly transportation solutions, such as improving public transit options and developing bike paths.

30.     The IIJA has a significant impact on safety across various sectors. By providing substantial federal funding for infrastructure projects, the IIJA aims to enhance the safety and reliability of transportation, utilities, and public facilities. As of now, DelDOT has recorded 35 fatalities on our roadways this year. A significant reduction in these fatalities is DelDOT's top priority. However, if DelDOT loses access to federal funding, it will greatly hinder the Department's efforts to achieve this goal and negatively affect the lives of many Delawareans.

31.     The longer DelDOT cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

32.     Losing these DOT grants would severely obstruct and undermine DelDOT's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on   5/19/2025   in   New Castle  , Delaware.

Shanté A. Hastings
DelDOT Secretary

13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants*.

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 22

Declaration of Edwin H. Sniffen

## DECLARATION OF EDWIN H. SNIFFEN

I, Edwin H. Sniffen, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of 18. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Director at the Hawai'i Department of Transportation (HDOT). My job duties include representing the major transportation modes and directing the design, construction, maintenance, and operation of the transportation facilities of the State, including airports, harbors, and highways.

3.      I have been employed by HDOT since January 2015, and I have served as Director since December 2022.

### Background

4.      HDOT is comprised of 3 modal divisions (Airport, Harbors, and Highways) and a Support Services or Administration division that, together, provide, operate, and maintain: 11 commercial service airports; 4 general aviation airports; 10 commercial harbors; and 2,450 lane miles of highway. The mission of the HDOT is to provide a safe, efficient, accessible, and sustainable inter-modal transportation system that ensures the mobility of people and goods and enhances and/or preserves economic prosperity and the quality of life.

5.      As the primary grantee of the Office of the Secretary of Transportation, the Federal Highway Administration, the Federal Transit Administration, the Federal Motor Carrier Safety Administration, the Federal Aviation Administration (FAA), and the Maritime Administration in Hawaii, HDOT administers a wide range of programs meant to responsibly plan, design, construct, operate, and maintain State facilities in all modes of transportation,

1

including air, water, and land.

6.      As part of my regular job duties, I oversee federal grant managers who manage

the following grant award programs:

- Advanced Transportation Technologies and Innovative Mobility Deployment (ATTAIN);

- Buses and Bus Facilities (BBF);

- Low or No Emission (Low-No);

- Commercial Driver's License Program Implementation (CDLPI);

- Electric Vehicle Charger Reliability and Accessibility Accelerator (EVCRAA);

- High Priority Commercial Motor Vehicle (HP-CMV);

- Low Carbon Transportation Materials (LCTM);

- Nationally Significant Multimodal Freight & Highway Projects (INFRA);

- Prioritization Process Pilot Program (PPPP);

- Promoting Resilient Operations for Transformative, Efficient, and Cost-Saving Transportation (PROTECT);

- Better Utilizing Investments to Leverage Development (BUILD) (formerly known as Rebuilding American Infrastructure with Sustainability and Equity (RAISE));

- Reconnecting Communities Pilot (RCP);

- Strategic Innovation for Revenue Collection (SIRC);

- Strengthening Mobility and Revolutionizing Transportation (SMART);

- Port Infrastructure Development Program (PIDP);

- Reduction of Truck Emissions at Port Facilities (RTEPF);

- FAA Contract Tower (FCT);

- Airport Infrastructure Grants (AIG);

- Airport Terminal Program (ATP); and

2

- Airport Improvement Program (AIP).

7.    I have reviewed past and present award documents for these grants that were issued to HDOT and am familiar with their contents.

### **Hawaii's Annual Receipt of U.S. Department of Transportation Grants**

8.    The U.S. Department of Transportation (DOT) administers many grant programs where States are the primary grant recipients.

9.    The Office of the Secretary of Transportation administers the BUILD (RAISE), INFRA, RCP, and SMART grant programs.

10.    The Federal Highway Administration (FHA) administers the ATTAIN, BUILD (RAISE), EVCRAA, LCTM, PPPP, PROTECT, RTEPF, and SIRC grant programs.

11.    The Federal Motor Carrier Safety Administration administers the HP-CMV and CDLPI grant program.

12.    The Federal Transit Administration administers the BBF and Low-No grant programs.

13.    The Federal Aviation Administration administers the FCT, AIG, ATP, and AIP grant programs.

14.    The Maritime Administration administers the PIDP grant program.

15.    In total, accounting for all program funds, DOT has awarded the following grant amounts to HDOT in recent fiscal years:

| | **FY 2021-22** | **FY 2022-23** | **FY 2023-24** | **FY 2024-25** |
|---|---|---|---|---|
| ATTAIN Grant Funds | | | $4,200,000 | |
| BBF and Low-No Grant Funds | | $55,186,682 | $20,000,000 | $5,000,000 |
| CDLPI Grant Funds | | | | $67,226 |
| EVCRAA Grant Funds | | $6,918,400 | | |
| HP-CMV Grant Funds | | | | $139,500 |
| LCTM Grant Funds | | $28,906,035 | | |
| INFRA Grant Funds | | | $74,634,000 | $33,007,500 |
| PPPP Grant Funds | | | $1,229,130 | |
| PROTECT Grant Funds | | $5,255,908 | | |
| BUILD (RAISE) Grant Funds | $22,000,000 | $49,837,010 | $50,000,000 | $61,222,506 |
| RCP Grant Funds | | | $19,145,625 | $1,600,000 |
| SIRC Grant Funds | | $5,760,000 | | |
| SMART Grant Funds | | | $1,290,000 | |
| PIDP Grant Funds | | $40,040,279 | $23,460,000 | |
| RTEPF Grant Funds | | $5,250,000 | | |
| FCT Grant Funds | | $1,000,000 | | |
| AIG Grant Funds | | $49,277,050 | $48,474,528 | $49,643,867 |
| ATP Grant Funds | | $10,000,000 | $1,200,000 | $31,600,000 |
| AIP Grant Funds | | $22,000,000 | | |
| **Total Contributed from Federal Grants Listed Above** | $22,000,000 | $279,401,364 | $243,633,283 | $182,280,599 |

4

16.     The programs funded by these grants are vital to develop, maintain, and ensure safety in the State's roads, highways, airways, and waterways.

17.     For example, the HDOT Harbors division was awarded a $23,460,000 PIDP grant to develop the new 84-acre Kapālama Container Terminal (KCT). The completion of KCT will improve the reliability of our port operations, increase safety and operational efficiencies, and build a resilient waterfront facility. KCT will transform how cargo moves into our State and between our islands, and support continued long-term economic growth for Hawaiʻi. Given that 85 percent of all goods consumed by Hawaiʻi families are imported and nearly 91 percent of these imported goods pass through the State's harbors, the development of KCT will ensure that the goods (food, clothing, cars, fuel, construction supplies, furniture, etc.) that Hawaii's families and businesses rely so heavily on can be delivered in the most efficient, cost-effective manner.

18.     Likewise, the HDOT Highways division was awarded a $22,000,000 BUILD (RAISE) grant to relocate an approximately 4.5-mile section of Honoapiʻilani Highway further inland on the west coast of Maui. Segments of Honoapiʻilani Highway, particularly in the southern portion of west Maui in the areas of Ukumehame, Olowalu, and Laniupoko, chronically suffer from service disruptions caused by multiple natural hazards such as coastal erosion, annual high wave flooding, storm surge, and wildfires. All of these natural hazards are exacerbated by perilous weather patterns and sea level rise. Service disruptions and suboptimal conditions, such as high wave wash, are regular occurrences on this low-lying highway.

19.     King tides and south swells overtop Honoapiʻilani Highway with seawater an average of 18 times a year, which causes traffic delays of several hours per incident, temporarily cutting off the residents on that side of the island from needed services and supplies. Without additional funds to support the realignment of Honoapiʻilani Highway, the residents, businesses,

and visitors to west Maui will face future challenges from sea-level rise, including increased
wave-inundation and erosion that will cause ongoing closures and increased costs to maintain the
function of the roadway.

20.     Additionally, the HDOT Airport division was awarded a $49,277,050 AIG grant
to reconstruct various runways and taxi shoulders at the Daniel K. Inouye International Airport –
the State's largest airport. This project, among other things, will remove excess pavement to
comply with FAA design criteria for Taxiway Shoulder dimensions and increase safety by
eliminating excess pavement that can be confusing to a pilot when navigating the airfield. The
funding for this project is vital to prevent the occurrence of aviation accidents or disasters, which
have become a much too common occurrence in the United States.

21.     If these funds were withheld, HDOT would have to shut down critical capabilities
due to: (1) health and safety concerns resulting from unfinished projects on HDOT's critical
infrastructure; and (2) the lack of appropriations to cover the costs and expenses for HDOT
projects and sub-grantees' projects. The programs funded by these specific grants are described
further below.

**ATTAIN Grants**

22.     ATTAIN grants provide funding to assist States in deploying, installing, and
operating advanced transportation technologies to improve safety, mobility, efficiency, system
performance, inter-modal connectivity, and infrastructure return on investment.

23.     ATTAIN funding is administered in Hawaii by HDOT.

24.     HDOT has 1 open ATTAIN award from FY 2023-24. The original award amount
was $4,200,000.

25.     HDOT passes 100 percent of this ATTAIN award on to the University of Hawai'i.

6

The University of Hawai'i plans to use ATTAIN funding to integrate reinforcement learn-based network-wide coordinated signal control with optimized real-time adaptive routing for HDOT's urban transportation systems, for the benefit of the people of the State.

**BBF and Low-No Grants**

26.    BBF grants provide funding to States to purchase, rehabilitate, or lease buses and related equipment, and to construct, purchase, rehabilitate, or lease bus-related facilities. Low-No grants provide funding to assist States in purchasing or leasing zero-emission and low-emission transit buses and acquiring, constructing, and leasing required support and workforce development facilities.

27.    BBF and Low-No funding is administered in Hawaii by HDOT.

28.    HDOT has 1 open BBF award from FY 2022, an original award of $12,000,000.

29.    HDOT passes 100 percent of this BBF award on to the counties of Kauai, Maui, and Hawaii.  These counties plan to use the BBF funds for bus stop improvements and the installation of equipment to help transition their current fleet to electric buses by 2035.

30.    HDOT has 3 open Low-No awards from FYs 2022 and 2024:

     a.    FY 2022: Original award of $23,186,682.73;

     b.    FY 2024: Original award of $20,000,000; and

     c.    FY 2024: Original award of $20,000,000.

31.    HDOT passes 100 percent of FY 2022 award of $23,186,682.73 Low-No award on to the counties of Kauai, Maui, and Hawaii. These counties will use the Low-No funding to purchase zero-emission buses and charging equipment to help transition their fleet to electric buses by 2035.

32.    HDOT passes 100% of the remaining Low-No awards in the aggregate amount of

7

$40,000,000 on to the City and County of Honolulu. The City and County of Honolulu will use
the Low-No funding to purchase battery-electric buses and charging equipment to enable riders
to work on buses while en route and in the Pearl City Bus Depot.

33.    The projects to be funded by the BBF and Low-No awards will support each of
the counties' climate goals and provide rides for those residing in historically disadvantaged
communities.

**CDLPI Grants**

34.    CDLPI grants provide funding to assist States in improving their CDL
(Commercial Driver's License) programs by reducing wait times, ensuring conviction and
disqualification data is electronically exchanged, implementing regulatory requirements,
combatting human trafficking, and achieving compliance with Federal Motor Carrier Safety
Administration regulations concerning driver's license standards and programs.

35.    CDLPI funding is administered in Hawaii by HDOT.

36.    HDOT has 1 open CDLPI award from FY 2024 in the original award amount of
$67,226.

37.    HDOT intends to use the CDLPI grant award to re-paint four existing commercial
motor vehicle test courses and create a new modernized commercial motor vehicle test course in
the City & County of Honolulu that will be used as a pilot for the State of Hawaii.

**EVCRAA Grants**

38.    EVCRAA grants provide funding to assist States in installing, maintaining, and
repairing EV (electric vehicle) infrastructure to ensure a charging network that is reliable.

39.    EVCRAA funding is administered in Hawaii by HDOT.

40.    HDOT has 1 open EVCRAA award from FY 2022-23 in the original award

amount of $6,918,400.

41.    HDOT passes 100 percent of this EVCRAA award on to OpConnect – operator of the largest network of charging stations in the State.  OpConnect plans to use EVCRAA funding to repair and replace 74 EV chargers.  Specifically, OpConnect will repair and replace 36 Level 2 EV chargers, and upgrade 38 Level 2 EV chargers to DC Fast chargers across various counties. An additional 30 EV chargers will also be added to comply with the Federal Highway Administration's regulations.  *See, e.g.*, 23 C.F.R. § 680.106.

### HP-CMV Grants

42.    HP-CMV grants provide funding to assist States in enhancing commercial vehicle safety and implementing innovative national-level projects that will have a positive impact on commercial motor vehicle safety.

43.    HP-CMV funding is administered in Hawaii by HDOT.

44.    HDOT has 1 open HP-CMV award from FY 2024 in the original award amount of $139,500.

45.    HDOT will use the HP-CMV funding to conduct a media and educational campaign to promote safe driving tips for drivers while on the roads and highways with a commercial motor vehicle.

46.    This campaign aims to ensure that drivers operate their commercial motor vehicles in a safe manner on the roads and highways in the State, given the increase in accidents on Hawaii's roads, and, in turn, protect pedestrians and other drivers.

### LCTM Grants

47.    LCTM grants provide funding to assist States in reducing air pollutions – specifically, greenhouse gas (GHG) emissions – through the use of low-carbon materials and

products used in transportation.

48.    LCTM funding is administered in Hawaii by HDOT.

49.    HDOT has 1 open LCTM award from FY 2022 in the original award amount of $28,906,035.00.

50.    HDOT will use the LCTM grant award to develop a comprehensive program to use construction materials and products that have "substantially lower" levels of embodied GHG emissions associated with the production stage as compared to the local average or estimated industry averages of similar materials or products.

## INFRA Grants

51.    I am familiar with the INFRA Grant Program. INFRA grants provide funding to assist States for multimodal freight and highway projects of national or regional significance to improve the safety, efficiency, and reliability of the movement of freight and people in and across rural and urban areas.

52.    INFRA funding is administered in Hawaii by HDOT.

53.    HDOT has 1 open INFRA awards from FYs 2023-24 in the original award amount of $74,634,000.

54.    HDOT applied for FY 2025-26 INFRA funding and was granted an award in the amount of $33,007,500, which has not yet been disbursed.

55.    HDOT, with the INFRA grant awards, plans to: (1) rehabilitate the deteriorating substructures supporting the Nanue and Hakalau stream bridges; and (2) rehabilitate the deteriorating Wailuku River Bridge.

## PPPP Grants

56.    PPPP grants provide funding to assist States in implementing data-driven

approaches to planning that, on completion, can be evaluated for public benefit.

57.    PPPP funding is administered in Hawaii by HDOT.

58.    HDOT has 1 open PPPP awards from FY 2023-24 in the original award amount of $1,488,00.

59.    HDOT passes 100 percent of this PPPP award to the Oahu Metropolitan Planning Organization (OMPO). The OMPO will use the PPPP funding to develop a new network model for a data-driven, publicly accessible, transparent prioritization process with an emphasis on community engagement and equity.

60.    This funding will enable OMPO to continue efforts to improve transportation infrastructure and ensure that projects are selected based on data-driven insights and public input. This initiative will enhance safety, transparency, and efficiency in the State's transportation planning efforts.

**PROTECT Grants**

61.    PROTECT grants provide funding to assist States in strengthening surface transportation to be more resilient to current and future weather events, like natural disasters, and changing conditions, such as wildfires and sea level rise.

62.    PROTECT funding is administered in Hawaii by HDOT.

63.    HDOT has 2 open PROTECT awards from FY 2022-23:

    a.   FY 2022-23: Original award of $2,400,000; and

    b.   FY 2022-23: Original award of $2,855,908.

64.    With these PROTECT awards, HDOT seeks to: (1) install a coastal barrier to prevent erosion from destabilizing the northbound lane of Kamehameha Highway; and (2) replace 1,000 feet of an existing rockfall impact fence to provide protection from rockfalls on a

heavily traveled corridor on Kamehameha Highway.

**BUILD (RAISE) Grants**

65.     BUILD (RAISE) grants provide funding to assist States and counties with surface transportation infrastructure projects with significant local or regional impact.

66.     BUILD (RAISE) funding is administered in Hawaii by HDOT.

67.     HDOT has 7 open BUILD (RAISE) awards from FY 2021 through FY 2024:

      a.   FY 2021: Original award of $22,000,000;

      b.   FY 2022: Original award of $24,837,010;

      c.   FY 2022: Original award of $25,000,000;

      d.   FY 2023: Original award of $25,000,000;

      e.   FY 2023: Original award of $25,000,000;

      f.   FY 2024: Original award of $17,592,506; and

      g.   FY 2024: Original award of $25,000,000.

68.     HDOT retains 100 percent of the BUILD (RAISE) awards in the amount of $22,000,000 from FY 2021 and in the amount of $17,592,506 from FY 2024. HDOT plans to use the $22,000,000 award to relocate an approximately 4.5-mile section of Honoapiʻilani Highway further inland on the west coast of Maui. HDOT plans to use the $17,592,506 award for the reconstruction of roadways at an intersection on Hilo Bayfront Highway.

69.     HDOT passes on the remainder of the BUILD (RAISE) awards as follows:

      a.   $24,837,010 award for FY 2022 to the County of Kauai;

      b.   $25,000,000 award for FY 2022 to the County of Maui;

      c.   $25,000,000 award for FY 2023 to the City and County of Honolulu;

      d.   $25,000,000 award for FY 2023 to the County of Maui; and

e.   $25,000,000 award for FY 2024 to the City and County of Honolulu.

70.    The County of Kauai plans to use its $24,837,010 BUILD (RAISE) award to complete roadway improvements and adding pedestrian and bicycle infrastructure, which will drastically improve safety for school children and commuters.

71.    The County of Maui plans to use its $25,000,000 awards for FY 2022 and 2023 to: (1) complete multimodal improvements – namely, two travel lanes, bike lanes, grass swales, and a shared-use path – to provide access to new housing developments, and link residential and commercial areas; and (2) extend Liloa Drive and its integrated shared-use path by 2,900 lineal feet.

72.    The City and County of Honolulu plans to use its $25,000,000 awards for FY 2023 and 2024 to: (1) construct an approximately 300-foot pedestrian and bicycle crossing of the Ala Wai Canal; and (2) complete construction of complete streets improvements along Salt Lake Boulevard.

73.    HDOT applied for FY 2025 BUILD (RAISE) funding and was granted an original award in the amount of $3,200,000. The County of Maui applied for FY 2025 BUILD (RAISE) funding and was granted an original award in the amount of $15,430,000.

74.    HDOT passes 100 percent of the $15,430,000 BUILD (RAISE) award to the County of Maui and the HDOT (Harbors division) will retain the $3,200,000 award.

**RCP Grants**

75.    RCP grants provide funding to assist States to advance community-centered transportation connection projects, with a priority for projects that benefit disadvantaged communities.

76.    RCP funding is administered in Hawaii by HDOT.

77.     HDOT has 2 open RCP awards from FY 2023 and FYs 2024-26:

    a.  FY 2023: Original award of $19,145,625; and

    b.  FYs 2024-26: Original award of $1,600,000.

78.     HDOT passed 100 percent of the RCP award in the amount of $19,145,625 to the City and County of Honolulu. The City and County of Honolulu will use this RCP funding to construct a pedestrian bridge to connect a historically disadvantaged community with the Pearl Highlands Waiawa Station on the Honolulu Rail Transit system.

79.     As indicated above, HDOT applied for FY 2024-26 RCP funding, which was awarded in the amount of $1,600,000.

80.     HDOT plans to use this portion of the RCP award to engage in significant public engagement and conceptual planning efforts toward implementing a cap over the sunken H-1 Freeway, which bifurcates the most disadvantaged communities of downtown Honolulu. This project – H-1 Cap Park Planning Project – will improve crossings that will allow residents from these communities to move more easily between the mountain and coastal areas.

**SIRC Grants**

81.     SIRC grants provide funding to assist States in testing the feasibility of a road usage fee and other user-based alternative revenue mechanisms to help maintain the long-term solvency of the Highway Trust Fund through pilot projects at the State, local and regional level.

82.     SIRC funding is administered in Hawaii by HDOT.

83.     HDOT has 1 open SIRC awards from FY 2022-23 in the original award amount of $5,760,000.

84.     HDOT plans to use the SIRC grant award to build on the State's policy alignment around road usage charge (RUC) as an equitable user-based revenue mechanism by supporting

continuous improvement in RUC program communications, implementation, and operations.

### SMART Grants

85.    SMART grants provide funding to assist States in conducting demonstration projects focused on advanced smart community technologies and systems to improve transportation efficiency and safety.

86.    SMART funding is administered in Hawaii by HDOT.

87.    HDOT has 1 open SMART award from FY 2024 in the original award amount of $1,290,000.

88.    HDOT will pass approximately 100 percent of this SMART award on to the University of Hawaiʻi.

89.    The University of Hawaiʻi will use this SMART funding to develop smart infrastructure and artificial intelligence-driven video analytics sensing systems around intersections to detect and predict vehicle, pedestrian, bicyclist position, speed, and trajectory for vehicle-pedestrian-bicycle collision avoidance. This technology will improve safety performance at intersections, especially for vulnerable road users – specifically, people walking (that make up 36 percent of deaths in crashes on Oʻahu) and elderly (that make up 41 percent of deaths in crashes on Oʻahu) in disadvantaged communities. The project will deploy this technology at three locations in Waipahu's disadvantaged communities on Oʻahu, which is the most populous island in the State with the highest number of traffic fatalities.

### PIDP Grants

90.    PIDP grants provide funding to assist States in improving port and related freight infrastructure to meet the nation's freight transportation needs and ensure that port infrastructure can meet anticipated growth in freight volumes.

15

91.    PIDP funding is administered in Hawaii by HDOT.

92.    HDOT has 2 open PIDP awards from FYs 2022 and 2023:

    a.  FY 2022: Original award of $40,040,279; and

    b.  FY 2023: Original award of $23,460,000.

93.    HDOT plans to use the PIDP funding to: (1) widen the highway adjacent to the port located at the Kawaihae Harbor; and (2) develop the new 84-acre Kapālama Container Terminal.

## RTEPF Grants

94.    RTEPF grants provide funding to assist States with reducing truck idling and emissions at ports, including through the advancement of port electrification.

95.    RTEPF funding is administered in Hawaii by HDOT.

96.    HDOT has 1 open RTEPF award from FY 2022-23 in the amount of $5,250,000.

97.    HDOT plans to use RTEPF funding for truck gate expansions and technology improvements to reduce the amount of gate processing time and queuing delays for trucks.

## FCT Grants

98.    FCT grants provide funding to assist States in modernizing airport traffic control towers located in small town or municipal airports.

99.    FCT funding is administered in Hawaii by HDOT.

100.    HDOT has 1 open FCT award from FY 2022 in the amount of $1,000,000.

101.    HDOT plans to use the FCT funding to complete various renovations to the airport traffic control tower at Kalaeloa Airport.

## AIG Grants

102.    AIG grants provide funding to assist States in enhancing safety and expanding

16

capacity in runways, taxiways, safety and sustainability projects, as well as terminal, airport transit connections, and roadway projects.

103.    AIG funding is administered in Hawaii by HDOT.

104.    HDOT has 3 open AIG awards from FYs 2022-24:

     a.  FY 2022: Original award of $49,277,050;

     b.  FY 2023: Original award of $48,474,528; and

     c.  FY 2024: Original award of $49,643,867.

105.    HDOT plans to use AIG funding to: (1) reconstruct various runways and taxiway shoulders at Daniel K. Inouye International Airport; (2) relocate runway 3-21 at the Lihue Airport to meet the FAA's Runway Safety Areas standards; and (3) rehabilitate runway 17-35 at the Kona International Airport.

106.    HDOT applied for FY 2025 AIG funding and was awarded an original award of $26,828,359.

## ATP Grants

107.    ATP grants provide funding to assist States with airport development projects that address aging infrastructure to ensure safe, sustainable, and accessible airport terminals, airport-owned airport traffic control towers, and on-airport rail and bus projects that improve multimodal connections.

108.    ATP funding is administered in Hawaii by HDOT.

109.    HDOT has 4 open ATP awards from FY 2023:

     a.  FY 2022: Original award of $10,000,000;

     b.  FY 2023: Original award of $1,200,000;

     c.  FY 2024: Original award of $23,000,000; and

17

d.  FY 2024: Original award of $8,600,000;

110.    HDOT plans to use ATP funding to: (1) reconfigure and repave roadway improvements at the Daniel K. Inouye International Airport; (2) replace and upgrade the fire alarm system at the Kona International Airport to meet current FAA requirements and standards; (3) repair the Terminal 2 roadways at the Daniel K. Inouye International Airport; and (4) construct a new security screening checkpoint facility at the Kahului Airport, which will include 6 new TSA screening lines.

111.    HDOT applied for FY 2025 ATP funding and was awarded original awards in the amount of $9,669,379 and $7,343,370.

### AIP Grants

112.    AIP grants provide funding to assist States with airport infrastructure projects, such as runways, taxiways, airport signage, airport lighting, and airport markings.

113.    AIP funding is administered in Hawaii by HDOT.

114.    HDOT has 2 open AIP awards from FYs 2022 and 2023:

a.  FY 2022: Original award of $22,000,000; and

b.  FY 2023: Original award of $14,304,854.

115.    HDOT plans to use AIP funding to: (1) construct a new security screening checkpoint facility at the Kahului Airport (to supplement the $8,600,000 ATP grant award from FY 2024); and (2) replace high-pressure sodium high mast lights at the Kahului International Airport to minimize light attraction impacts to threatened and endangered seabirds.

### Harms to the State Caused by DOT's Funding Condition

116.    On April 24, 2025, I received a copy of the April 24, 2025 letter from Secretary of Transportation Sean Duffy stating that recipients' "legal obligations require cooperation

generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

117.    It is not clear to me what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." I am not aware of what limits there may be – if any – to "cooperating with . . . enforcement of Federal immigration law."

118.    In my years with HDOT, I am not aware of HDOT staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because HDOT is responsible for duties related to highway, airport, and harbor infrastructure, HDOT staff has neither the expertise nor capacity to enforce immigration law.

119.    If HDOT is unable to comply with the federal government's new funding conditions, the State would be unable to receive FY 2025 DOT funds ($97,078,608) and funds not yet obligated from prior FYs ($365,140,098), depriving the State of at least $462,218,706, and frustrating its ability to maintain the critical programs described above.

120.    HDOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If HDOT cannot access federal funds, HDOT will not have funds to immediately cover, at minimum, approximately 41 unique projects and programs funded by the grants. This, in turn, will result in interruptions, terminations, and/or reductions in

transportation development, maintenance, or safety.

121.    For instance, the $74,634,000 INFRA grant was awarded to HDOT in FY 2023-24 for the rehabilitation of the quickly deteriorating Nanue and Hakalau stream bridges, both of which are listed on the National Register of Historic Places. Of that total grant award, $26,034,000 was obligated for the rehabilitation of Hakalau stream bridge. But, the remaining $48,600,000 for the rehabilitation of Nanue stream bridge has not yet been obligated. If HDOT is refused access to the remaining $48,600,000, the projected construction cost for the remaining portion of the project will surely rise due to (among other things) inflation, worsening condition of the Nanue stream bridge, and tariffs. Without this funding, the Nanue stream bridge will almost certainly become load restricted, forcing commercial freight operations to divert and take a longer, less efficient route to reach customers, destinations, and markets likely leading to localized consumer inflation as these additional operating expenses are passed on to the end customer.

122.    Without access to FY 2021-25 grant funding, HDOT also will not have funds to immediately cover, at minimum, approximately 14 subawards to 7 subrecipients under 14 unique programs funded by the federal grant programs. If HDOT is not able to access federal funds to allow time for it to process reimbursement requests from subrecipients, it will be forced to stop funding programs and subrecipients prior to the end of their performance period, which could result in interruptions, terminations, and other harm to the subrecipients.

123.    The longer HDOT cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

124.    Losing these DOT grants would severely obstruct and undermine the HDOT's mission even if the funding were restored later.

I declare under penalty of perjury that the foregoing is true and correct and that this

declaration was executed on May $\underline{19}$, 2025, in Washington, District of Columbia.

EDWIN H. SNIFFEN

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>               *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>               *Defendants.* | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 23

## Declaration of Adnan G. Khayyat

### DECLARATION OF ADNAN G. KHAYYAT

I, Adnan G. Khayyat, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of eighteen and understand the obligations of an oath.

2.      I am currently the Chief Nuclear Officer of the Illinois Emergency Management Agency and Office of Homeland Security ("IEMA-OHS"). From April 1 to May 14, 2025, I served as Interim Director, and before that time I was the Acting Chief of Staff of IEMA-OHS. In total, I have served in senior leadership positions with IEMA-OHS for over 13 years. I make this declaration based on personal knowledge and on my review of information and records gathered by IEMA-OHS staff.

3.      IEMA-OHS is an Illinois executive-branch state agency. IEMA-OHS coordinates the State's disaster mitigation, preparedness, response, and recovery programs, including the preparation for and response to hazardous materials incidents. IEMA-OHS is the state recipient for the Hazardous Materials Emergency Preparedness ("HMEP") Grant Program administered by the U.S. Department of Transportation ("USDOT") in Illinois.

#### The Hazardous Material Emergency Preparedness Grant Program

4.      I am familiar with the HMEP Grant Program. The HMEP Grant Program provides funding for States to develop training and planning programs to prepare for hazardous material incidents in the commercial transportation sector, including both trucking and rail. Hazardous materials, in general, are substances that present a substantial danger to the public health or welfare or the environment if released accidentally. As an example of the hazards that the HMEP Grant Program helps to mitigate, on Friday, September 29, 2023, a tractor-trailer carrying 7,500 gallons of anhydrous ammonia crashed on U.S. Highway 40 about a half mile east of Teutopolis, Illinois, leaking 4,000 gallons of its load. The plume of toxic ammonia gas forced the evacuation of 500 residents of the town.

5.      IEMA-OHS uses HMEP funds to provide hazardous materials training to all first responders in the State of Illinois so that as many local first responders as possible have a basic level of knowledge if a disaster were to occur in their community. IEMA-OHS is able to provide this training free of charge to local police, fire, and hazmat departments because of federal support through the HMEP program.

6.      IEMA-OHS sub-grants approximately 95 percent its HMEP grant funding to local jurisdictions to enable them to enhance implementation of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), a federal law that mandates the reporting of releases of hazardous chemicals. Under the EPCRA, IEMA-OHS facilitates the establishment of local emergency planning committees, which develop an emergency response plan for releases of chemicals in the community.

7.      Local emergency planning committees are composed of local officials, first responders, industry members, and community members. HMEP funds help them develop more sophisticated planning efforts by identifying hazardous material transportation routes in their community, outlining notification procedures and evacuation plans, exercising plans and conducting gap analysis, and creating their own training programs for local first responders.

8.      HMEP funding can also be used to support commodity flow studies, which survey the hazardous materials transported within and through a specific area, and attendant costs incurred by the state agency to enhance such studies.

9.      HMEP grants are awarded every three years for a three-year period of performance. IEMA-OHS currently has an open award for federal fiscal year ("FFY") 2022–2024. This award had an original balance of $3,121,320, which was made available for draw-down in three one-year increments.

10.     In the next 8 months, IEMA-OHS expects to request disbursements of approximately $1,241,044 on the current HMEP award.

11.     If IEMA-OHS did not receive such disbursements, 94 local emergency planning committees would face uncertainty about their ability to incur costs to plan for hazardous chemical incidents.

12.     On May 6, 2025, IEMA-OHS officials met with USDOT staff in part to prepare for the FFY 2025–2027 HMEP notice of funding opportunity. USDOT staff stated orally that they expected the FFY 2025–2027 HMEP notice of funding opportunity to issue during the week of May 19, 2025, with a 30-day deadline for state agencies to apply.

**The FY 2025 Immigration Enforcement Requirements and Their Impact on HMEP**

13.     I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate … in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

14.     On May 6, 2025, IEMA-OHS officials met with USDOT staff in part to prepare for the FFY 2025–2027 HMEP notice of funding opportunity. USDOT staff stated and later followed up with a Power Point presentation indicating that USDOT will be implementing a new "manual review process" for all grant payments and requests for drawdowns beginning on June 1, 2025.

15.     On May 19, 2025, the FFY 2025–2027 HMEP notice of funding opportunity issued, with a 30-day deadline for state agencies to apply.

3

16.     The notice of funding opportunity included terms and conditions revised May 15, 2025, which are attached as Exhibit A to this declaration. The revised terms include language that closely resembles the April 24, 2025 letter from Sean Duffy: "Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law." Ex. A § 7(a).

17.     USDOT has set a deadline of June 20, 2025 for IEMA-OHS to apply for FFY 2025–2027 HMEP funding.

18.     IEMA-OHS does not understand what DOT means to include within the broad phrase "cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in [] the enforcement of Federal immigration law."

19.     In my years with IEMA-OHS, I am not aware of IEMA-OHS staff ever being required to enforce or participate in the enforcement of federal civil immigration law. IEMA-OHS lacks any capacity to enforce federal civil immigration law.

20.     If IEMA-OHS is unable to comply with the federal government's new funding conditions, IEMA-OHS would be unable to receive FFY 2025 DOT funds, depriving the State of approximately $1.5 million and frustrating its ability to maintain the critical programs described above to keep local communities safe from dangerous chemical releases.

21.     Any pause or termination in federal funding for HMEP would lead to a reduction in planning, training, and emergency response capabilities, making our local communities and first responders vulnerable to transportation accidents involving hazardous materials. Discontinuing or

pausing this grant program would be devastating for Illinois, which as a major transportation hub leads all States in the quantity of hazardous materials transported through its state boundaries.

22.    Losing access to HMEP funds would obstruct and undermine the administration of the HMEP program in Illinois even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of May, 2025, in Springfield, Illinois.

_Adnan G. Khayyat_

Adnan G. Khayyat
Chief Nuclear Officer
Illinois Emergency Management Agency and Office of
    Homeland Security

# EXHIBIT A

# Department of Transportation
# Pipeline and Hazardous Materials Safety Administration (PHMSA)
### Hazardous Materials Grants

### Grant and Cooperative Agreement Terms and Conditions

### Table of Contents

1. Definitions ........................................................................................................................ 3
2. Recipient Responsibilities ............................................................................................... 3
3. Compliance with Award Terms and Conditions .............................................................. 3
4. Order of Precedence ........................................................................................................ 3
Terms and Conditions of this award. ..................................................................................... 4
5. Applicable Federal Law and Regulations ....................................................................... 4
6. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR 200) ........................................................................................... 5
7. Federal Law and Public Policy Requirements ................................................................ 6
8. Restrictions on Use of Funds for Lobbying, Support of Litigation, or Direct Advocacy costs associated with obtaining Federal assistance awards ............................................. 6
9. Nondiscrimination ........................................................................................................... 6
10. Government-wide Debarment and Suspension (Non-procurement) ................................ 7
11. Drug-Free Workplace ...................................................................................................... 7
12. Small and Disadvantaged Business Requirements .......................................................... 7
13. eInvoicing (PHMSA May 2024) ..................................................................................... 7
14. Payments ......................................................................................................................... 9
15. Advance Payment ............................................................................................................ 10
16. Advance Payment Process ............................................................................................... 11
17. Adherence to Original Project Objectives and Budget Estimates ................................... 11
18. Prior Approvals ............................................................................................................... 11
19. Seat Belt Use Policies and Programs .............................................................................. 12
20. Ban on Text Messaging While Driving ........................................................................... 12
21. Rights in Technical Data ................................................................................................. 13
22. Notice of News Releases, Public Announcements, and Presentations ............................ 13
23. Violation of Award Terms .............................................................................................. 13
24. Reporting Fraud, Waste, or Abuse ................................................................................. 13
25. Reporting Grantee Executive Compensation/First Tier Sub-Awards (PHMSA May 2024) ......... 13
26. 811, Call Before You Dig Program (PHMSA May 2024) ............................................... 16
27. Access to Electronic and Information Technology (PHMSA May 2024) ....................... 16
28. Combating Trafficking in Persons (PHMSA May 2024) ................................................ 16
29. Prohibition on Awarding to Entities that Require Certain Internal Confidentiality Agreements (PHMSA FEB 2015) ....................................................................................................... 17
30. Copyrights ....................................................................................................................... 18
31. American Materials Required (PHMSA MAY 2024) ...................................................... 18
32. Reporting ......................................................................................................................... 18

**Tentative Grant and Cooperative Agreement - Award Terms and Conditions**
**Revised: May 15, 2025**

1. **Definitions**
   a) **Recipient** – A non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program. The term "recipient" does not include subrecipients.
   b) **Program Authorizing Official (PAO) –** The PAO is the delegated authority to execute the grant agreement. Should any changes to the scope, budget, schedule, or any other terms become necessary, the PAO in coordination with the AO has the authority to amend the award agreement.
   c) **Agreement Officer (AO) –** The AO has the authority to obligate the Government to the expenditures of Federal funds under this award.
   d) **Grant Specialist (GS) –** The GS is responsible for the daily administration of the award. The GS is NOT AUTHORIZED to change the scope, budget, specifications, and terms and conditions as stated in the award, to make any commitments that otherwise obligates the Government or authorize changes which affect the award budget, delivery schedule, period of performance, or other terms and conditions.
   e) **Recipient Authorized Grantee Official –** The individual with the Recipient organization who has authority to bind the organization legally and financially. It is the Recipient's responsibility to follow their agency's policies and procedures for ensuring that authorized officials are up to date, sign the grant agreement, and endorse any prior approval actions.
   f) **Recipient Project Director –** The individual designated by the recipient who is responsible for the technical direction of the program or project.

2. **Recipient Responsibilities**
   In accepting a PHMSA financial assistance award (grant or cooperative agreement), the Recipient assumes legal, financial, administrative, and programmatic responsibility for administering the award in accordance with the laws, rules, regulations, and Executive Orders governing grants and cooperative agreements, and these Award Terms and Conditions, including responsibility for complying with any provisions included in the award.

3. **Compliance with Award Terms and Conditions**
   Submission of a signed Request for Advance or Reimbursement (payment request) form constitutes the Recipient's agreement to comply with and spend funds consistent with all the terms and conditions of this award. If PHMSA determines that noncompliance by the Recipient cannot be remedied by imposing additional conditions, PHMSA may take one or more of the following actions, as appropriate in the circumstances:
   a) Temporarily withhold cash payments pending correction of the deficiency by the Recipient.
   b) Disallow all, or part of, the cost of the activity or action not in compliance.
   c) Wholly or partly suspend or terminate the Federal award.
   d) Initiate suspension or debarment proceedings as authorized under 2 CFR part 180.
   e) Withhold further Federal awards for the project or program.
   f) Take other remedies that may be legally available.

4. **Order of Precedence**
   Any inconsistency or conflict in the terms and conditions specified in this award will be resolved according to the following order of precedence:

a) The Federal statute authorizing this award or any other Federal statutes, laws, regulations, or directives directly affecting performance of this award.

Terms and Conditions of this award.**Applicable Federal Law and Regulations**

By entering into this agreement for a FY 2025 Hazardous Material Emergency Preparedness Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

General Federal Legislation

a) Hatch Act - 5 U.S.C. §§ 1501, et seq., but see 49 U.S.C. § 5323(l)(2)
b) Age Discrimination Act of 1975 - 42 U.S.C. §§ 6101, et seq.
c) American Indian Religious Freedom Act, Pub. L. No. 95-341, as amended
d) Drug Abuse Office and Treatment Act of 1972, as amended, 21 U.S.C. §§ 1101, et seq.
e) The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, Pub. L. No. 91-616, as amended - 42 U.S.C. §§ 4541, et seq.
f) Sections 523 and 527 of the Public Health Service Act of 1912, as amended, 42 U.S.C. §§ 290dd through 290dd-2
g) Contract Work Hours and Safety Standards Act - 40 U.S.C. § 3701, et seq.
h) National Environmental Policy Act of 1969 - 42 U.S.C. §§ 4321, et seq.
i) Single Audit Act of 1984 - 31 U.S.C. §§ 7501, et seq.
j) Americans with Disabilities Act of 1990 - 42 U.S.C. § 12101, et seq.
k) Title IX of the Education Amendments of 1972, as amended - 20 U.S.C. § 1681 through § 1683, and § 1685 through § 1687
l) Section 504 of the Rehabilitation Act of 1973, as amended - 29 U.S.C. § 794
m) Title VI of the Civil Rights Act of 1964 - 42 U.S.C. §§ 2000d *et seq.*
n) Title IX of the Federal Property and Administrative Services Act of 1949 - 40 U.S.C. §§ 1101 -1104, 541, et seq.
o) Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. § 1352
p) Freedom of Information Act - 5 U.S.C. § 552, as amended
q) Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. 303 and 23 U.S.C. § 138
r) The Federal Funding Accountability and Transparency Act of 2006, as amended (Pub. L. No. 109-282, as amended by section 6202 of Pub. L. No. 110–252)
s) Cargo Preference Act of 1954 – 46 U.S.C. § 55305
t) Build America, Buy America Act, Pub. L. No. 117-58, div. G §§ 70901–70927
u) Bringing in and harboring certain aliens – 8 U.S.C. 1324
v) Aiding or assisting certain aliens to enter – 8 U.S.C. 1327

Executive Orders

a) Executive Order 11990 – Protection of Wetlands
b) Executive Order 12372 – Intergovernmental Review of Federal Programs
c) Executive Order 12549 – Debarment and Suspension

**Tentative Grant and Cooperative Agreement - Award Terms and Conditions**
**Revised: May 15, 2025**

    d)   Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
    e)   Executive Order 14025 – Worker Organizing and Empowerment
    f)   Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship
    g)   Executive Order 14154, Unleashing American Energy
    h)   Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing
    i)   Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
    j)   Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

General Federal Regulations

    a)   Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 CFR Parts 200, 1201
    b)   Non-procurement Suspension and Debarment – 2 CFR Parts 180, 1200
    c)   Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 CFR Parts 60, et seq.
    d)   New Restrictions on Lobbying – 49 CFR Part 20
    e)   Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 CFR Part 21, including any amendments thereto
    f)   Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 CFR Part 25
    g)   Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 CFR Part 27
    h)   Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 CFR Part 28
    i)   Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 CFR Part 32
    j)   DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 CFR Parts 37 and 38
    k)   Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 CFR Part 26 (as applicable under section 12 of this agreement), including any amendments thereto
    l)   National Environmental Policy Act implementing regulations– 40 CFR 1500 - 1508

Specific assurances required to be included in the FY 2025 Hazardous Material Emergency Preparedness Grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this agreement.

**6.**  **Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR 200)**
The recipient (and any subrecipients) must comply with these requirements including the cost principles which apply to the recipient, and the audit requirements the recipient must follow. A

recipient who expends $1,000,000 or more of federal funds, in the recipient's fiscal year, must
have an audit conducted.

**2 CFR 200** is incorporated by reference into this award

7. **Federal Law and Public Policy Requirements.**

   a) The Recipient shall ensure that Federal funding is expended in full accordance with the
   United States Constitution, Federal law, and statutory and public policy requirements:
   including but not limited to, those protecting free speech, religious liberty, public welfare,
   the environment, and prohibiting discrimination; and Recipient will cooperate with Federal
   officials in the enforcement of Federal law, including cooperating with and not impeding
   U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and
   components of the Department of Homeland Security in and the enforcement of Federal
   immigration law.

   b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-
   Based Opportunity, the Recipient agrees that its compliance in all respects with all
   applicable Federal anti-discrimination laws is material to the government's payment
   decisions for purposes of section 3729(b)(4) of title 31, United States Code.

   c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-
   Based Opportunity, by entering into this agreement, the Recipient certifies that it does not
   operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that
   violate any applicable Federal anti-discrimination laws.

   d) The failure of this agreement to expressly identify Federal law applicable to the Recipient
   or activities under this agreement does not make that law inapplicable.

8. **Restrictions on Use of Funds for Lobbying, Support of Litigation, or Direct Advocacy costs
   associated with obtaining Federal assistance awards.**
   The Recipient and its contractors may not use grant funds for lobbying in direct support of
   litigation, or in direct advocacy for, or against, a pipeline construction or expansion project.

   The Recipient and its contractors may not conduct political lobbying, as defined in the statutes,
   regulations, and **2 CFR 200.450** – "Lobbying," within the Federally-supported project. The
   Recipient and its contractors may not use Federal funds for lobbying specifically to obtain grants
   and cooperative agreements. The Recipient and its contractors must comply with 49 CFR 20, U.S.
   Department of Transportation "New Restrictions on Lobbying."

   **49 CFR 20** is incorporated by reference into this award.

9. **Nondiscrimination**
   The Recipient must comply with Title VI of the Civil Right Act of 1964, which provides that no
   person in the United States shall, on the grounds of race, color, or national origin, be excluded
   from participation in, be denied benefits of, be subject to discrimination under any program or
   activity receiving Federal financial assistance. The Recipient must comply with 49 CFR 21,

"Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964."

**49 CFR 21** is incorporated by reference into this award.

The purpose of Section 9 is to ensure that the Recipient has a plan to comply with Title VI and 49 C.F.R. part 21, including any amendments thereto.

If the Recipient is a non-State DOT and does not have a current Title VI Plan on file with PHMSA then as described in chapter II, section 2 of DOT Order 1000.12C, including any amendments or updates thereto, PHMSA must complete a Title VI Assessment of the Recipient before entering this grant agreement. Until DOT guidance on conducting such an assessment is finalized, PHMSA may rely on the date of Title VI assurances provided with the signing of the grant agreement.

To ensure that all Recipients of PHMSA funds are aware of their responsibilities under the various civil rights laws and regulations, the PHMSA Office of Civil Rights has developed an information tool and training. These documents are found on the PHMSA website at http://www.phmsa.dot.gov/org/civilrights/grantrecipientinformation. If you should have any questions concerning your responsibilities under the External Civil Rights Program, please contact Rosanne Goodwill, Civil Rights Director, at 202-366-9638 or by e-mail at rosanne.goodwill@dot.gov.

**10. Government-wide Debarment and Suspension (Non-procurement)**

The Recipient must review the "list of parties excluded from federal procurement or non-procurement programs" located on the System for Award Management (SAM) website before entering into a sub-award. https://www.sam.gov No sub-award may be issued to an entity or person identified in the "list of parties excluded from federal procurement or non- procurement programs."

**2 CFR 1200** is incorporated by reference into this award.

The Recipient must inform the PAO if the recipient suspends or debars a sub-awardee.

**11. Drug-Free Workplace**

The Recipient must comply with the provisions of Public Law 100-690, Title V, Subtitle D, "Drug-Free Workplace Act of 1988," which require the Recipient to take steps to provide a drug-free workplace. The Recipient must comply with **49 CFR 32**, "Government-wide Requirements for Drug Free Workplace (Financial Assistance)" which is incorporated by reference into this award.

**12. Small and Disadvantaged Business Requirements**

If any funds under this award are administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 49 CFR part 26, including any amendments thereto.

If any funds under this award are not administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 2 CFR 200.321, including any amendments thereto.

**13. eInvoicing (PHMSA May 2024)**

Recipients of PHMSA grants and cooperative agreements must use the DOT Delphi eInvoicing

System.
    a)  Recipients' Requirements:
       Recipients must:
        i.    Have internet access to register and submit payment requests through the Delphi eInvoicing system;
        ii.    Submit payment requests electronically and receive payment electronically.

        New Grant Recipient User: Once a grant is fully executed, the grant management specialist will submit the recipients' request (External Delphi UAR Form) to the PHMSA Delphi Access Administrator via email PHMSAinvoicing@dot.gov for a new user account to be granted Delphi. Once a Grantee has completed the registration process and obtained their username and password, they can access the Delphi eInvoicing System. Grantees should activate their system account within 3 days of receiving their credentials to prevent the account from being deactivated. A user account will remain valid unless it is deactivated due to a period of inactivity (it has not been logged into for 45 days) or your agency requests it to be deactivated. If a Grantees account has been deactivated due to a period of inactivity for any reason, they should contact the ESC Production Helpdesk, who can be reached at 866-641-3500, Option 4 , 3.

        NOTE: The "Delphi External Access Request" form should be completed at the time of grant award execution to ensure that the Grant Recipient has access to the system in order to submit invoices as needed. The following tutorial outlines the steps that each grant recipient user must take to become authenticated and activate his/her Delphi eInvoicing System account – Please share this link with new grantees who need new accounts in Delphi System: ESC: Delphi eInvoicing System - Home.

    b)  System User Requirements:
        iii.    Contact the assigned grant specialist directly to sign up for the system. PHMSA will provide the recipient's name and email address to the DOT Financial Management Office. The DOT Financial Management Office will then invite the recipient to sign up for the system;
        iv.    DOT will send the recipient a User Account Application form to verify identity. The recipient must complete the form and present it to a Notary Public for verification. The recipient will return the notarized form as follows:

        Via U.S. Postal Service (certified):
        DOT Enterprise Services Center
        FAA Accounts Payable
        AMZ-100 PO Box 25710
        Oklahoma City, OK 73125

        Via FedEx or UPS:
        DOT Enterprise Services Center MMAC-FAA/ESC/AMZ-150
        6500 S. MacArthur Blvd.
        Oklahoma City, OK 73169

**Note:** Additional information, including training materials, and helpdesk support can be found on the DOT Delphi eInvoicing website ESC: Delphi eInvoicing System - Home.

c) Waivers

DOT Financial Management officials may, on a case by case basis, waive the requirement to register, and use, the electronic payment system. Waiver request forms can be obtained on the DOT eInvoicing website (http://www.transportation.gov/cfo/delphi-einvoicing-system.html) or by contacting the PHMSA Agreement Officer. Recipients must explain why they are unable to use or access the internet to submit payment requests.

**14. Payments**

Reimbursement payments will be made after the electronic receipt via the DOTeInvoicing System of "Request for Advance or Reimbursement" (Standard Form SF-270).

a) Method of payment
   i) PHMSA will make all payments under this agreement by electronic funds transfer (EFT), except as provided by paragraph (a)(ii) of this clause. As used in this clause, the term "EFT" refers to the funds transfer and may also include the payment information transfer.
   ii) If PHMSA is unable to release one or more payments by EFT, the Recipient agrees either to –
       i) Accept payment by check or some other mutually agreeable method of payment; or
       ii) Request the Government to extend the payment due date until such time as the Government can make payment by EFT (but see paragraph d. of this clause).

b) Recipient's EFT information. The Government will make payment to the Recipient using the EFT information contained in the System for Award Management (SAM) database. If the EFT information changes, the Recipient is responsible for providing the updated information into the System for Award Management (SAM) at: https://www.sam.gov

c) Mechanisms for EFT payment. The Government may make payment by EFT through either the Automated Clearing House (ACH) network, subject to the rules of the National Automated Clearing House Association, or the Fedwire Transfer System. The rules governing Federal payments through the ACH are contained in 31 CFR Part 210.

d) Suspension of payment. If the Recipient's EFT information in the SAM database is incorrect, the Government is not obligated to make payment to the Recipient under this agreement until the correct EFT information is entered into the SAM database. An invoice or agreement-financing request is not a proper invoice for the purpose of prompt payment under this agreement.

e) Recipient EFT arrangements. If the Recipient has identified multiple payment receiving points (i.e., more than one remittance address and/or EFT information set) in the SAM database, and the Recipient has not notified the Government of the payment receiving point applicable to this agreement, the Government will make payment to the first payment receiving point (EFT information set or remittance address as applicable) listed in the SAM database.

f) Liability for uncompleted or erroneous transfers.
   i) If an uncompleted or erroneous transfer occurs because the Government used the Recipient's EFT information incorrectly, the Government remains responsible for –
       i) Making a correct payment;

    ii)  Paying any prompt payment penalty due; and

    iii)  Recovering any erroneously directed funds.

  ii)  If an uncompleted or erroneous transfer occurs because the Recipient's EFT information was incorrect, or was revised within 30 days of Government release of the EFT payment transaction instruction to the Federal Reserve System, and –

    i)  If the funds are no longer under the control of the payment office, the Government is deemed to have made payment and the Recipient is responsible for recovery of any erroneously directed funds; or

    ii)  If the funds remain under the control of the payment office, the Government will not make payment, and the provisions of paragraph d. of this clause apply.

g)  EFT and prompt payment. A payment will have been made in a timely manner in accordance with the prompt payment terms of this agreement if, in the EFT payment transaction instruction released to the Federal Reserve System, the date specified for settlement of the payment is on or before the prompt payment due date, provided the specified payment date is a valid date under the rules of the Federal Reserve System.

h)  EFT and assignment of claims. If the Recipient assigns the proceeds of this agreement, the Recipient must require, as a condition of any such assignment, that the assignee register in the SAM database and be paid by EFT in accordance with the terms of this clause. In all respects, the requirements of this clause will apply to the assignee as if it were the Recipient. EFT information that shows the ultimate recipient of the transfer to be other than the Recipient, in the absence of a proper assignment of claims acceptable to the Government, is incorrect EFT information within the meaning of paragraph d. of this clause.

i)  Liability for change of EFT information by financial agent. The Government is not liable for errors resulting from changes to EFT information made by the Recipient's financial agent.

j)  Payment information. The payment or disbursing office will forward to the Recipient available payment information that is suitable for transmission as of the date of release of the EFT instruction to the Federal Reserve System. The Government may request the Recipient to designate a desired format and method(s) for delivery of payment information from a list of formats and methods the payment office is capable of executing. However, the Government does not guarantee that any particular format or method of delivery is available at any particular payment office and retains the latitude to use the format and delivery method most convenient to the Government. If the Government makes payment by check in accordance with paragraph a. of this clause, the Government will mail the payment information to the remittance address contained in the SAM database.

## 15. Advance Payment

49 CFR § 110.50 authorizes PHMSA to issue advance payments to grant recipients. Recipient must receive prior approval from PHMSA and must meet the required criteria for advance payments be made.

a)  Recipient must possess financial management systems that meet the standards for fund control and accountability as established in 2 CFR 200.302 for awards issued after that date. Recipient must ensure that advance payment requests are limited to the minimum amounts needed and be timed to be in accordance with the actual, immediate cash

requirements in carrying out the purpose of the approved program or project. Recipient must deposit and maintain advance payments in insured accounts whenever possible unless the recipient receives less than $120,000 in federal awards from all sources or can demonstrate the best reasonably available interest-bearing account would not be expected to earn interest in excess of $500 per year on Federal cash balances. $250 for awards issued prior to December 26, 2014.

b) Recipient submits advance payments based on cash payment needs and not accrued liabilities.

c) Recipient must remain in compliance with the terms and conditions of their award.

d) Recipient is not indebted to the United States Government.

e) Recipient's SAM.gov registration is current and active at the time of the advance payment request.

f) The recipient maintains supporting documentation in their files and makes them available upon request to PHMSA in order to determine if the costs adhere to the applicable cost principles, statutes and regulations. PHMSA will also monitor to ensure grantee has not requested advance payments beyond immediate disbursing needs and that excess balances were promptly returned to the Treasury.

## 16. Advance Payment Process

To request an advance payment, log into the DOT Electronic Payment System (Delphi E-Invoicing), create and submit a standard invoice, and complete an SF270 form with the Advance Payment Request. This process is similar to requesting a reimbursement. The grant specialist assigned to your account will receive an email generated from the system with the invoice details.

a) Advance payments must be fully disbursed (example: checks written, signed, and issued to the payees) within 30 days of the date you receive the advance funds from the U.S. Treasury.

b) Advance payment requests should be submitted no earlier than 10 business days prior to the beginning of the period for which the funds are requested.

c) PHMSA will check for all of the following criteria:

   i. Your award balance is sufficient to meet the advance amount requested.

   ii. Evaluations will be based on cash payments and not on accrued liabilities.

   iii. You have satisfied program requirements including submission of required federal financial reports for prior quarters/periods.

   iv. The request is for allowable expenditures.

## 17. Adherence to Original Project Objectives and Budget Estimates

a) The Recipient is responsible for any commitments or expenditures it incurs in excess of the funds provided by an award. Pre-award costs are those incurred prior to the effective date of the Federal award directly pursuant to the negotiation and in anticipation of the Federal award where such costs are necessary for efficient and timely performance of the scope of work. Such costs are allowable only to the extent that they would have been allowable if incurred after the date of the Federal award, *and only with the written approval of the Program Authorizing Official or delegate.*

b) The Recipient must submit any proposed change, that requires PHMSA's written approval, 30 days prior to the requested effective date of the proposed change. PHMSA will not approve any change to the award during the last 30 days of the award period.

## 18. Prior Approvals

a) The following expenditures require the PAO's advance written approval:

   i) Changes in the scope, objective, or key personnel referenced in the Recipient's

              proposal.

    ii)  Change in the project period. PHMSA must receive this request no later than 30 calendar days prior to the end of the project period. The Recipient must submit a revised budget indicating the planned use of all unexpended funds during the extension period.

  b)  The Recipient must submit a revised financial estimate and plan for i) and ii) above.

  c)  PHMSA will notify the Recipient in writing within 30 calendar days after receipt of the request for revision or adjustment whether the request has been approved.

**19. Seat Belt Use Policies and Programs**

In accordance with Executive Order 13043, the Recipient is encouraged to adopt on-the-job seat belt use policies and programs for its employees when operating company-owned, rented, or personally owned vehicles. The National Highway Traffic Safety Administration (NHTSA) is responsible for providing leadership and guidance in support of this presidential initiative. For information on how to implement such a program or for statistics on the potential benefits and cost-savings to your company or organization, please visit the Buckle Up America section on NHTSA's website at www.nhtsa.dot.gov. Additional resources are available from the Network of Employers for Traffic Safety (NETS), a public-private partnership headquartered in Washington, D.C. dedicated to improving the traffic safety practices of employers and employees. NETS is prepared to help with technical assistance, a simple, user-friendly program kit, and an award for achieving the President's goal of 85 percent seat belt use. NETS can be contacted at 1-888-221-0045 or visit its website at www.trafficsafety.org.

**20. Ban on Text Messaging While Driving**

  a)  *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10 and the E.O. For clarification purposes, they may expand upon the definitions in the E.O.

    "Driving"-

      i)  Means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic, a traffic light, stop sign, or otherwise.

      ii)  It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

    "Text messaging" --- means reading from or entering data into any handheld or other electronic device, including for the purpose of short message service texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless the practice is prohibited by State or local law.

  b)  In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving, October 1, 2009, and DOT Order 3902.10, Text Messaging While Driving, December 30, 2009, financial assistance recipients and subrecipients of grants and cooperative agreements are encouraged to:

    1)  Adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving--

      i)  Company-owned or -rented vehicles or Government-owned, leased or

rented vehicles; or

    ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

  2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as-

    i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

    ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

c) *Assistance Awards.* All recipients and subrecipients of financial assistance to include: grants, cooperative agreements, loans and other types of assistance, shall insert the substance of this clause, including this paragraph (c), in all assistance awards.

## 21. Rights in Technical Data

Rights to intangible property under this agreement are governed in accordance with **2 CFR 200.315** - "Intangible Property."

## 22. Notice of News Releases, Public Announcements, and Presentations

The Recipient must have the PAO's prior approval for all press releases, formal announcements, or other planed written issuance containing news or information concerning this Agreement before issuance. The Recipient must provide two copies of the document to the PAO for review prior to release. Also, the PAO must approve any planned presentations/briefings related to this Agreement, as well as the actual presentation (e.g. slides/vu-graphs) to be used.

## 23. Violation of Award Terms

If the Recipient has materially failed to comply with any term of the award, the PAO may suspend, terminate, or take other remedies as may be legally available and appropriate in the circumstances.

## 24. Reporting Fraud, Waste, or Abuse

The DOT Inspector General maintains a toll-free hotline for receiving information concerning fraud, waste, or abuse under grants and cooperative agreements. Such reports are kept confidential and callers may decline to give their names if they choose to remain anonymous. The number is: (800) 424-9071.

The mailing address is:
DOT Inspector General Hotline
1200 New Jersey Ave SE
West Bldg. 7th Floor
Washington, DC 20590
Email: hotline@oig.dot.gov
Web: http://www.oig.dot.gov/Hotline

## 25. Reporting Grantee Executive Compensation/First Tier Sub-Awards (PHMSA May 2024)

a) *Definitions.* As used in this provision:

"Executive" means an officer or any other employee in a management position.

"First-tier sub-award" means an award issued directly by the prime Awardee to a sub-awardee to provide support for the performance of any portion of the substantive project or program for which the award was received. A sub-award includes an agreement that the prime Awardee or a sub-awardee considers a contract.

"Total compensation" means the cash and noncash dollar value earned by the executive during the Awardee's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

    i)   Salary and bonus.

    ii)   Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Financial Accounting Standards Board's Accounting Standards Codification (FASB ASC) 718, Compensation-Stock Compensation.iii) Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives, and are available generally to all salaried employees.

    iii)  Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

    iv)  Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

    v)   Above-market earnings on deferred compensation which is not tax-qualified.

    vi)  Other compensation, if the aggregate value of all such other compensation (*e.g.*, severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

b)  *System for Award Management (SAM).* As a recipient of a Federal award you are required to register in the System for Award Management (SAM) at: https://www.sam.gov

c)  *Notification to Sub-Awardees.* Awardees are required to report information on sub-awards. The law requires all reported information be made public; therefore, the Awardee is responsible for notifying its sub-awardees that the required information will be made public.

d)  *Reporting of First-Tier Sub-Awards.* By the end of the month following the month of award of a first-tier sub-award with a value of $25,000 or more, the Awardee shall report the information below at http://www.fsrs.gov for each first-tier sub-award. (The Awardee shall follow the instructions at http://www.fsrs.gov to report the data.) If the Awardee, in the previous tax year, had gross income from all sources under $300,000, the Awardee is exempt from the requirement to report subcontractor awards. If a sub-awardee, in the previous tax year had gross income from all sources under $300,000, the

**Tentative Grant and Cooperative Agreement - Award Terms and Conditions**

**Revised: May 15, 2025**

Awardee does not need to report awards made to that sub-awardee.

      i)   Unique Entity Identifier (The Unique Entity ID is a 12-character alphanumeric ID assigned to an entity by SAM.gov) for the sub-awardee receiving the award, and for the sub-awardee's parent company, if the sub-awardee has a parent company.

      ii)  Name of the sub-awardee.

      iii) Amount of the sub-award.

      iv) Date of the sub-award.

      v)   A description of the effort being provided under the sub-award, including the overall purpose and expected outcome or result of the sub-award.

      vi) Sub-award number (assigned by the Awardee).

      vii) Sub-awardee's physical address including street address, city, state, country, 9-digit zip code, and congressional district.

      viii)   Sub-awardee's primary performance location including street address, city, state, country, 9-digit zip code, and congressional district.

      ix) The prime award number (assigned by PHMSA)

      x)   Awarding agency name. (PHMSA)

      xi) Funding agency name. (PHMSA)

      xii) Government awarding office code. (56)

      xiii)   Treasury account symbol (TAS) as reported in Federal Assistance Award Data System.

      xiv) The applicable North American Industry Classification System (NAICS) code.

e)   *Reporting Executive Compensation of Awardee.* If the Awardee, in the previous tax year, had gross income from all sources under $300,000, the Awardee is exempt from the requirement to its executive compensation.

By the end of the month following the month of receipt of a prime award, and annually thereafter, the Awardee shall report the names and total compensation of each of the five most highly compensated executives for the Awardee's preceding completed fiscal year at https://www.sam.gov if, in the Awardee's preceding fiscal year, the Awardee received:

      i)   80 percent or more of its annual gross revenues from Federal contracts (and subcontracts), loans, grants (and sub-awards), cooperative agreements, other transaction agreements; and

      ii)  $25,000,000 or more in annual gross revenues from Federal contracts (and subcontracts), loans, grants (and sub-awards), cooperative agreements, other transaction agreements; and

      iii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

f) *Reporting Executive Compensation of Sub-Awardees.* If the Awardee, in the previous tax year, had gross income from all sources under $300,000, the Awardee is exempt from the requirement to report the executive compensation of sub-awardees. If a sub-awardee, in the previous tax year had gross income from all sources under $300,000, the Awardee does not need to report the executive compensation of that sub-awardee.

By the end of the month following the month of a first-tier sub-award with a value of $25,000 or more, and annually thereafter, the Awardee shall report the names and total compensation of each of the five most highly compensated executives for each first-tier sub- awardee for the sub-awardee's preceding completed fiscal year at http://www.fsrs.gov, if in the sub-awardee's preceding fiscal year, the sub-awardee received:

    i) 80 percent or more of its annual gross revenues from Federal contracts (and subcontracts), loans, grants (and sub-awards), cooperative agreements, other transaction agreements; and

    ii) $25,000,000 or more in annual gross revenues from Federal contracts (and subcontracts), loans, grants (and sub-awards), cooperative agreements, other transaction agreements; and

    iii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

## 26. 811, Call Before You Dig Program (PHMSA May 2024)

Damage to pipelines during excavation is a leading cause of accidents resulting in serious injuries and fatalities, but these accidents are preventable, and you can help in preventing them.  811 is designated as the national call-before-you-dig number. Every state has a one-call law requiring excavators to have underground utilities marked before digging.  The recipient is encouraged to adopt the "811, Call Before You Dig" program for its employees and contractors when digging on company-owned, leased, or personally owned property. For information on how to implement such a program please visit the *811 – Call Before You Dig* section of Pipeline and Hazardous Materials Safety Administration's (PHMSA's) website at www.phmsa.dot.gov.

## 27. Access to Electronic and Information Technology (PHMSA May 2024)

Each Electronic and Information Technology (EIT) product or service, furnished under this award, must be in compliance with the Electronic and Information Technology Accessibility Standard (36 CFR 1194), which implements Section 508 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794d. The PHMSA Office of Civil Rights will respond to any questions and will certify Section 508 compliance for the requirement. You can reach the PHMSA Office of Civil Rights at phmsa.civilrights@dot.gov, or 202-366-9638.

## 28. Combating Trafficking in Persons (PHMSA May 2024)

PHMSA may terminate grants, cooperative agreements, or take any of the other remedial actions authorized under 22 U.S.C. 7104(g), without penalty, if the grantee or any subgrantee, engages in, or uses labor recruiters, brokers, or other agents who engage in-

a) severe forms of trafficking in persons;
b) the procurement of a commercial sex act during the period of time that the grant, or cooperative agreement is in effect;
c) the use of forced labor in the performance of the grant or cooperative agreement; or
d) acts that directly support or advance trafficking in persons, including the following acts:

    i) Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents.
    ii) Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless-

        1) exempted from the requirement to provide or pay for such return transportation by the Federal department or agency providing or entering into the grant, or cooperative agreement; or
        2) the employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action.

    iii) Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment.
    iv) Charging recruited employees unreasonable placement or recruitment fees, such as fees equal to or greater than the employee's monthly salary, or recruitment fees that violate the laws of the country from which an employee is recruited.
    v) Providing or arranging housing that fails to meet the host country housing and safety standards.

## 29. Prohibition on Awarding to Entities that Require Certain Internal Confidentiality Agreements (PHMSA FEB 2015)

a) The Recipient shall not require employees or subcontractors seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting such waste, fraud or abuse to a designated investigative or law enforcement representative of a federal department or agency authorized to receive such information.

b) The Recipient shall notify employees that the prohibitions and restrictions of any internal confidentiality agreements covered herein are no longer in effect.

c) The prohibition in paragraph (a) above does not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d) In accordance with section 743 of Division E, Title VII, of the Consolidated and Further Continuing Resolution Appropriations Act, 2015 (P.L. 113-235), use of funds appropriated (or otherwise made available) under that or any other Act may be prohibited, if the Government determines that the Recipient is not in compliance with the provisions herein. The Government may seek any available remedies in the event the Recipient fails to

comply with the provisions herein.

30. **Copyrights**

PHMSA reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use, for Federal government purposes:

    a) The copyright in any work developed under a grant, sub award, or contract under a grant or sub award; and

    b) Any rights of copyright to which a Recipient, sub recipient or a contractor purchases ownership with grant support.

31. **American Materials Required (PHMSA MAY 2024)**

If articles, materials, or supplies, are required: Per 41 USC 8302, only unmanufactured articles, materials, and supplies, that have been mined or produced in the United States, and only manufactured articles, materials, and supplies that have been manufactured in the United States substantially all from articles, materials, or supplies minded, produced, or manufactured in the United States, shall be acquired under this award unless PHMSA determines their acquisition to be inconsistent with the public interest of their cost to be unreasonable.

This requirement does not apply:

    a) to articles, materials, or supplies for use outside the United States;
    b) if articles, materials, or supplies of the class or kind to be used, or the articles, materials, or supplies from which they are manufactured, are not mined, produces, or manufactured in the United States in sufficient and reasonably available commercial quantities and are not of a satisfactory quality; and
    c) to manufactured articles, materials, or supplies procured under any contract with an award value that is not more than the micro-purchase threshold.

32. **Reporting**

    a) *Annual Federal Financial Report (FFR) (SF-425)* – The Annual FFR provides an update on the status of funds for the performance period. This report is cumulative. The Annual FFR is due no later than 11:59pm Eastern Standard Time (EST), December 30th of the performance year.

    b) *Annual Progress Reports* – Each grant recipient is required to submit a progress report to show progression of approved projects and activities. Grant recipients with a performance period longer than twelve (12) months are required to submit an annual progress report and must follow the instructions outlined in the terms and conditions of the grant award.

    c) *Final FFR*– The Final FFR closes-out the financial reporting for the performance period. A Final FFR is due no later than 11:59pm Eastern Standard Time (EST), 120 days after the end of the performance period.

    d) *Final Progress Report* – The Final Progress Report provides the status of the activities performed during the entire performance period. The final progress report is due no is due no later than 11:59pm Eastern Standard Time (EST), 120 days after the end of the performance period.

A request for extension of the due date for a mid and end of year reports must be made in writing to PHMSA no later than **15 days** before the reports are due. The request must include the reason for the request and the requested due date.

(End of provision)

**Tentative Grant and Cooperative Agreement - Award Terms and Conditions**

**Revised: May 15, 2025**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 24

Declaration of Holly Bieneman

## DECLARATION OF HOLLY BIENEMAN

I, Holly Bieneman, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Director of the Office of Planning and Programming at the Illinois Department of Transportation ("IDOT"). My job duties include developing long range transportation plans and modal plans, identifying priority highway and bridge projects for the department to implement, managing the condition of the IDOT's highway and bridge assets, forecasting available federal highway funds, and accessing federal highway formula and discretionary funds. My role includes managing the people who access Federal Highway Administration (FHWA) funds through the federal Fiscal Management and Information Systems. My role includes supervising a team that forecasts FHWA funds for future transportation needs and in turn prioritizing projects to use those funds over the next six years. I participate in departmental conversations about priority projects to be considered for federal discretionary funds and then serve as an advisor to staff for accessing those funds and meeting federal requirements.

3.      I have been employed by IDOT since April 16, 2016, and I have served as Director of the Office of Planning and Programming since September 16, 2020.  Before starting at IDOT, I served as a Senior Program Analyst at the Chicago Metropolitan Agency for Planning, managing local federal funding project prioritization and accomplishment.  In total, I have over 19 years of experience in project prioritization for federal highway funding, managing federal highway funded projects and forecasting federal highway funds for future needs at IDOT and the Chicago Metropolitan Agency for Planning. Over the course of my career, I have had experience

1

administering billions of dollars of funds that the State has received from the FHWA within the United States Department of Transportation (USDOT).

**<u>Background</u>**

4.      In Illinois, IDOT has statutory responsibility for the vast majority of planning, construction, operation, and maintenance of Illinois's extensive transportation network, which encompasses highways and bridges, airports, public transit, rail freight and rail passenger systems. This vast transportation system supports Illinois residents and more than 100 million visitors annually.

5.      IDOT is the Illinois grantee from the USDOT, which includes the following divisions: FHWA, Federal Transit Administration (FTA), Federal Motor Carrier Safety Administration (FMCSA), National Highway Traffic Safety Administration (NHTSA), the Federal Aviation Administration (FAA), and the Federal Railroad Administration (FRA). IDOT administers a wide range of grant programs meant to ensure safe, cost-effective transportation for Illinois in ways that enhance the quality of life, promote economic prosperity, and demonstrate respect for our environment.

6.      As part of my regular job duties, I oversee staff that forecast funds from FHWA, including federal highway funds, access federal highway funds, and manages federal highway funds.  I have reviewed the FY2022-2025 formula federal highway funds and competitive grant awards that were issued to IDOT and am familiar with their contents.

7.      IDOT is specifically responsible for the administration of billions in money from the federal government annually.  For FY2025, IDOT expects expenditures from federal funds to exceed $2.6 billion, which amounts to over 30% of IDOT's total expenditures. A loss of these grants would severely obstruct and undermine IDOT's mission even if the funding were restored

2

at a later date.

8.     IDOT is responsible for administering thousands of projects funded by federal grants from USDOT, including both competitive grant programs and formula grant programs. While too numerous to list in full, each grant supports critical programs in Illinois, keeping roadways, airspace, waterways, transit systems, and pedestrians safe.

9.     IDOT uses federal grant funds for IDOT projects, and it also passes these funds through to other entities including thousands of local governments, rural and urban public transit agencies, airports, universities, and nonprofit entities. The programs funded by these federal grants are vital to protect the residents of Illinois.

### IDOT Relies on FHWA Funding

10.    IDOT is awaiting obligation to administer numerous competitive grants awarded by FHWA, including those as shown in Table 1 below:

| Table 1: Competitive FHWA Grants Awarded to IDOT Since FY2022 | | |
|---|---|---|
| **Grant Program** | **Award Amount** | **Federal Fiscal Year in which funds were awarded** |
| FHWA-Federal STIC (State Transportation Innovation Council) | $96,000 | 2022 |
| Rural Surface Transportation Grant Program | $52,860,638 | 2023 |
| PROTECT Grant Program | $8,646,190 | 2023 |
| FHWA-Federal STIC (State Transportation Innovation Council) | $100,000 | 2023 |
| Congestion Relief Grant Program | $15,800,000 | 2024 |

| FHWA-Federal STIC (State Transportation Innovation Council) | $80,800 | 2024 |
|---|---|---|
| MEGA Grant | $95,589,533 | 2024 |
| MEGA Grant | $209,877,984 | 2024 |
| INFRA Grant | $81,301,065 | 2024 |
| Pollinator-Friendly Practices Grant | $150,000 | 2025 |

11.     These FWHA competitive grants provide critical funding to meet Illinois's transportation infrastructure needs.

12.     For example, IDOT plans on using Federal STIC (State Transportation Innovation Council) funds to procure and test different roadway debris removal systems to expedite road and lane clearance after traffic incidents. If this funding were cut off, IDOT will be required to procure the roadway debris removal systems completely with state funds, pulling resources away from other projects and initiatives across the state.

13.     IDOT plans to use the $52 million from a Rural Surface Transportation Grant Program for a roadway improvement project in Bloomington, Illinois, for resurfacing, curb and gutter replacement, and sidewalk and accessibility improvements consistent with the Americans with Disabilities Act ("ADA"). The FHWA has not yet signed the grant agreement for this project. If there is a delay in finalizing the grant agreement, there is a risk other projects will not be constructed due to funds being diverted to finance this project.

14.     IDOT plans on using the over $8 million federal PROTECT award to upgrade sewers to reduce flooding in the Village of Maywood, Illinois. This award is currently unobligated and on hold. A long-term delay in completing the sewer upgrade project would increase the risk of flooding in Illinois communities during high rainfall events.

4

15.    IDOT plans on using the over $15 million FHWA Congestion Relief Program award to complete the necessary investigations and design documents for a complete track modernization of the Forest Park Branch of the Chicago Transit Authority ("CTA"), restoring service reliability and speed, as well as providing greater environmental resilience. The transit line will serve as an alternative to the congested interstate corridor that it parallels. This project is currently on hold. A delay in funding will delay the CTA's ability to design the track work supported by this funding.

16.    IDOT plans on using the over $95 million awarded under the MEGA program to reconstruct portions of interstate I-290 as well as reconstruct the I-290 at Illinois Route 171 interchange.  A long-term cut-off would delay this project.

17.    IDOT plans on using the $209.8 million MEGA grant and an $81.3 million INFRA grant for the Chicago Region Environmental and Transportation Efficiency ("CREATE") Program's EW2A project, which will: make improvements along a three-mile elevated rail corridor on Chicago's South Side; reconfigure track segments and signals at Belt Junction; add a third track to the Norfolk Southern railway line; replace and restore 14 aging bridge and viaduct structures; and implement mobility improvements on surface streets throughout the corridor. This project is currently in the design phase with construction expected to begin in 2026. Without these grant funds, the work completed to date will be wasted, and the CREATE program's goals—improving safety, efficiency, and passenger and freight mobility in and through the Chicago rail hub and local streets—will be jeopardized.

18.    IDOT receives and administers formula grants awarded by FWHA, as shown in the Table 2 below:

5

| Table 2: Formula FHWA Grants Awarded to IDOT Since FY2022 | | | | |
|---|---|---|---|---|
| Grant Program | FY2022 | FY2023 | FY2024 | FY2025 |
| National Highway Performance Program | $1,071,721,819 | $1,019,504,733 | $1,039,894,827 | $1,060,692,724 |
| Surface Transportation Block Grant Program | $522,483,822 | $495,975,275 | $505,894,781 | $516,012,677 |
| Highway Safety Improvement Program | $108,970,294 | $104,245,906 | $106,722,536 | $109,009,408 |
| Railway-Highway Crossings Program | $12,267,161 | $11,358,649 | $11,196,571 | $11,270,541 |
| CMAQ Program | $129,938,202 | $122,356,739 | $124,803,873 | $127,299,951 |
| Metropolitan Planning | $24,065,563 | $22,959,914 | $23,419,112 | $23,887,494 |
| National Highway Freight Program | $53,830,875 | $50,292,860 | $51,298,717 | $52,324,691 |
| Carbon Reduction Program | $43,357,316 | $44,224,462 | $45,108,951 | $46,011,130 |
| PROTECT Formula Program | $49,300,375 | $50,286,382 | $51,292,110 | $52,317,952 |
| Bridge Formula Program | $297,268,565 | $297,268,565 | $297,268,565 | $297,268,565 |
| National Electric Vehicle Infrastructure Formula Program | $21,998,178 | $31,655,626 | $31,655,845 | $31,655,872 |
| TOTAL | $2,202,798,566 | $2,250,129,111 | $2,288,555,888 | $2,327,751,005 |

19.    Congress has apportioned over $2 billion for FY2026 under the same programs identified in Table 2.

20.     IDOT uses formula grant funding from FHWA for a wide array of projects, including: (1) the construction of new I-74 corridor bridges over the Mississippi River in the Quad Cities region; (2) a single bridge replacement with dual bridges carrying I-270 over the Mississippi River to/from Missouri; (3) an interchange reconstruction and bridge replacement reconstruction on I-57 at the I-74 Interchange; (4) the reconstruction of the I-39/US 20 System Interchange; (5) roadway reconstruction and bridge rehabilitation on I-64 from Washington County Line to I-57; (6) the reconstruction and widening of I-80 from Rowell Avenue to Gougar Road, including traffic signal modernization, lighting and other improvements; (7) interchange rehabilitation and reconstruction at I-57 and I-74; (8) bridge replacement on US 150 (McClugage Bridge) over the Illinois River in Peoria; (9) bridge replacement/rehabilitation, reconstruction, and retaining walls at various locations on I-90/94 from the southbound Taylor exit ramp to the eastbound Taylor exit ramp; and  (10) removal and replacement of structures carrying I-64 over the Wabash River.

21.     The above projects are the 10 largest active projects using federal highway formula funds. They total over a billion dollars in federal funding to complete.  The projects will be delayed, or will not be completed, without federal formula funding. There are currently 9,786 active projects with federal highway funds that will be delayed or will not be completed without federal highway funding.

22.     IF FHWA cut off all funding under the formula funding grant programs, the size of IDOT's program will decrease significantly, by over 50%. IDOT receives reimbursement of federal funds into the state Road Fund. This becomes revenue IDOT counts on for future programs. Last year, IDOT received $1,813,112,656.86 in federal reimbursements. IDOT would need to decrease its capital program to accommodate that lost funding.

23.     IDOT forecasts and relies on future formula grant funds administered by the FHWA

7

to maintain Illinois' transportation system.

### The FY 2025 Immigration Enforcement Requirements and its Impact on IDOT Grant Administration

24.     I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

25.     I am aware that on April 22, 2025, the FHWA amended its general terms and conditions for all competitive grant programs administered by the agency.  It added language to section 18.2(a), governing "Federal Law and Public Policy Requirements," which requires recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

26.     IDOT does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." IDOT is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

27.     If IDOT is unable to comply with the federal government's new funding conditions

8

and the State would be unable to receive FY2025 DOT funds, the State of Illinois would be deprived of essential funds and would be unable to maintain the critical programs described above.

28.    FHWA representatives have specifically stated that IDOT must agree to a grant agreement that includes the new funding conditions to receive funds from the $209.8 million MEGA grant and an $81.3 million INFRA grant referenced above. FHWA leadership stated they would like a signed agreement as soon as possible.

29.    IDOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If IDOT cannot access federal funds, IDOT will not have funds to immediately cover the unique programs funded by the grants. This, in turn, will result in project delays, depriving Illinois residents of transit investment and improvements.

30.    Without access to FY2025 grant funding, IDOT cannot commit funding for the furtherance of programs.

31.    The longer IDOT cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

32.    Losing the federal grants described above would severely obstruct and undermine IDOT's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May  20  in  Springfield  , Illinois.

Holly Bieneman
Director of the Office of Planning and Programming
Illinois Department of Transportation

9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

                *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 25

## Declaration of Brian Karr

# DECLARATION OF BRIAN KARR

I, Brian Karr, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Bureau Chief, Investigations & Compliance, at the Illinois Department of Transportation ("IDOT"). My job duties include oversight of internal and external investigations of wrongdoing, fraud detection and deterrence programs, and departmental compliance in various areas of IDOT. I supervise a team of individuals in administering grants received by IDOT from the United States Department of Transportation ("USDOT"), including Motor Carrier Safety Assistance Program ("MCSAP") grants from the Federal Motor Carrier Safety Administration ("FMCSA").

3.      I have been employed by IDOT since April 17, 2017, and I have served as Bureau Chief, Investigations & Compliance since April 1, 2023. Before starting at IDOT, I served 30 years with Crystal Lake, Illinois Police Department, in various capacities as Grant Manager, Commander, Sergeant, Detective, and Patrol Officer. In total, I have over seven years of experience managing grants at either IDOT or the Crystal Lake Police Department. Over the course of my career, I have had experience administering four grants that IDOT has received from the USDOT.

## Background

4.      In Illinois, IDOT has statutory responsibility for the vast majority of planning, construction, operation, and maintenance of Illinois's extensive transportation network, which encompasses highways and bridges, airports, public transit, rail freight and rail passenger systems.

1

This vast transportation system supports Illinois residents and more than 100 million visitors annually.

5.      IDOT is the Illinois grantee from the USDOT, which includes the following divisions: Federal Highway Administration (FHWA), Federal Transit Administration (FTA), National Highway Traffic Safety Administration (NHTSA), the Federal Aviation Administration (FAA), and the FMCSA. IDOT administers a wide range of grant programs meant to ensure safe, cost-effective transportation for Illinois in ways that enhance the quality of life, promote economic prosperity, and demonstrate respect for our environment.

6.      As part of my regular job duties, I oversee federal grant managers who manage grants from USDOT's FMCSA. I have reviewed the FY2022-2025 grant awards for these grants that were issued to IDOT and am familiar with their contents.

## IDOT Relies on FMCSA Funding

7.      IDOT receives and administers a grant awarded by the FMCSA. Specifically, IDOT has received funds annually under the Motor Carrier Safety Assistance Program (MCSAP), including an award of $16,974,055 awarded in FY23 and an award of $17,157,244 awarded in FY2024. An award of $17,090,502 is pending for FY2025.

8.      MCSAP is a formula grant program that provides financial assistance to State and local law enforcement agencies to increase commercial motor vehicle (CMV)-related enforcement and safety activities nationwide.

9.      MCSAP funds support numerous IDOT projects and safety-related duties, including roadside CMV inspections, compliance reviews, new entrant safety audits, traffic crash data entry, and data quality reviews.

10.     MCSAP funds support 27 current full-time IDOT positions and authorizes additional positions for expansion of the program.

11.     If MCSAP funds were cut off, IDOT would not be able to submit for reimbursement from FMCSA for safety-critical functions and would rely on the Illinois State Road Fund to cover costs, thereby potentially drawing resources from other projects and initiatives dependent on the Road Fund.

12.     IDOT has submitted and received this funding for at least 10 years, and it intends to continue to submit for future years.

### The FY 2025 Immigration Enforcement Requirements and its Impact on IDOT Grant Administration

13.     I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

14.     IDOT does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." IDOT is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

15.     If IDOT is unable to comply with the federal government's new funding conditions

3

and the State would be unable to receive FY2025 DOT funds, the State of Illinois would be deprived of essential funds and would be unable to maintain the critical programs described above.

16.    IDOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If IDOT cannot access federal funds, IDOT will not have funds to immediately cover the unique programs funded by the grants. This, in turn, will result in project delays, depriving Illinois residents of transit investment and improvements.

17.    Without access to FY2025 grant funding, IDOT cannot commit funding for the furtherance of programs.

18.    The longer IDOT cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

19.    Losing the federal grants described above would severely obstruct and undermine IDOT's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May *19, 2025* in *Holiday Hills*, Illinois.


*Brian Karr*

Brian Karr
Bureau Chief, Investigations & Compliance
Illinois Department of Transportation

4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 26

## Declaration of Sarah C. Moore

## DECLARATION OF SARAH C. MOORE

I, Sarah C. Moore, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Safety Programs Implementation Manager at the Illinois Department of Transportation ("IDOT"). My job duties include ensuring federal funds fall within the scope of the Triennial Highway Safety Plan and Strategic Highway Safety Plan, identifying highway crash problems, development of appropriate countermeasures, finalization of highway safety agreements with grantees, monitoring goals and objectives to ensure projects and programs are properly tracked.

3.      I have been employed by IDOT since October 1, 2012, and I have served as Safety Programs Implementation Manager since April 1, 2024. Before starting in my current position, I served as the Traffic Records Coordinator and Support Service Manager within the same bureau where I currently work. In total, I have over 3.5 years of experience managing grants at IDOT and 7.5 years working directly with National Highway Traffic Safety Administration ("NHTSA") grant funds awarded to IDOT. Over the course of my career, I have had experience working with the federal NHTSA funds that the State has received including grant preparation, application submissions, required publications, administering grants, merit-based reviews, ensuring adherence to federal and state requirements, proposing new grant opportunities, and spearheading the safety program grants for IDOT. My role is tasked with supervising the Safety Programs Implementation Unit which includes the safety program grants from NHTSA (sections 402, 405, and 1906), the Cycle Rider Safety Training Program, DUI Prevention and Education Commission grant funds,

1

and program specifics such as occupant protection and impaired driving. I work closely with the Administrative Services Unit to determine federal funding forecasting, priority projects, and advising staff and grantees of state and federal requirements to ensure compliance with the Triennial Highway Safety Plan, Strategic Highway Safety Plan, and submission of the Annual Report. My position also works closely with the IDOT Office of Communications to promote safety education and awareness through paid media, awareness campaigns, press releases, media events, and outreach opportunities.

### Background

4.    In Illinois, IDOT has statutory responsibility for the vast majority of planning, construction, operation, and maintenance of Illinois's extensive transportation network, which encompasses highways and bridges, airports, public transit, rail freight and rail passenger systems. This vast transportation system supports Illinois residents and more than 100 million visitors annually.

5.    IDOT is the Illinois grantee from the USDOT, which includes the following divisions: Federal Highway Administration (FHWA), Federal Transit Administration (FTA), Federal Motor Carrier Safety Administration (FMCSA), the Federal Aviation Administration (FAA), and the Federal Railroad Administration (FRA) and NHTSA. IDOT administers a wide range of grant programs meant to ensure safe, cost-effective transportation for Illinois in ways that enhance the quality of life, promote economic prosperity, and demonstrate respect for our environment.

6.    As part of my regular job duties, I am accountable for directing and assisting in the development and oversight of highway safety programs with the goal of reducing fatalities and serious injuries on Illinois roadways. This includes oversight of funds including the NHTSA safety

program budget of $23 million, the state safety program budget of $4 million, and the motorcycle safety program budget of $5.2 million. To accomplish the goal of reducing deaths and injuries resulting from vehicle crashes on Illinois roadways, I am responsible for supervising the development of a comprehensive plan to address highway safety issues in the state of Illinois and ensuring projects and programs conducted by state and local agencies that utilize federal highway safety funds fall within the scope of the Triennial Highway Safety plan. I also aid in developing, revising, and implementing relevant areas of the Strategic Highway Safety Plan. I represent IDOT's Bureau of Safety Programs and Engineering both within Illinois and nationwide. I also ensure IDOT meets all requirements laid out in the 23 C.F.R. 1300, specifically § 1300.4 State highway safety agency—authority and functions.

### IDOT Relies on NHTSA Funding

7.     IDOT receives and administers grants awarded by the NHTSA, including those identified in Table 1 below:

| Table 1: Formula NHTSA Grants Awarded to IDOT Since FY2022 | | | | |
|---|---|---|---|---|
| **Grant Program** | **FY2022** | **FY2023** | **FY2024** | **FY2025** |
| Section 402 Highway Safety Grants Program | $13,746,224.90 | $14,014,144.29 | $13,588,437.26 | $13,819,270.06 |
| Section 405 National Priority Safety Program | $10,366,554.54 | $12,690,320.15 | $14,776,884.97 | $13,932,326.50 |
| Section 1906 Racial Profiling Prohibition Grants | $1,150,000.00 | $1,150,000.00 | - | $1,150,000.00 |

8.     Section 402 State Highway Safety grants support State highway safety programs designed to reduce traffic crashes and resulting deaths, injuries, and property damage. Section 405 National Priority Safety Program grants address selected national priorities for reducing highway

deaths and injuries. IDOT spends money from these grants on high visibility enforcement and an emphasis on impaired driving and occupant protection. Section 1906 grants encourage states to maintain and allow public inspection of statistical information on the race and ethnicity of the driver for all motor vehicle stops made on all public roads except local or minor rural roads

9.      If these funds were cut, the safety risk to those using Illinois roadways would greatly increase. These funds ensure high visibility enforcement throughout the state. High visibility enforcement is consistently a top NHTSA-identified countermeasure for risky driving behaviors. For impaired driving, NHTSA-funded programming includes sobriety checkpoints, high-visibility saturation patrols, alcohol measuring devices, alcohol vendor compliance checks, and enforcement regarding drug-impaired driving. For occupant protection, NHTSA-funded programming includes short-term high-visibility seat belt and child passenger safety law enforcement, nighttime high-visibility seat belt enforcement, and sustained seat belt enforcement. High visibility enforcement reduces speeding and distracted driving while increasing safety at pedestrian crossings. NHTSA-funded programming supports court monitors for DUI cases, DUI courts to assist with getting repeat offenders off the roadways, and equipment such as breath alcohol ignition interlock devices to require DUI offenders to perform a breathalyzer test in their vehicle before they can even begin driving. NHTSA funds support Child Passenger Safety Technicians who ensure all children are in the correct car or booster seat and that they are properly installed. These technicians also use the grant funds for child restraint inspection stations so anyone can stop by and ensure their child is riding safely and properly restrained, free of charge. Illinois residents who are unable to afford a proper car seat booster, or other restraint, are able to obtain the necessary equipment to ensure their child is safe while being transported. Some children require specialized seats or restraints due to various physical, mental, and/or behavioral needs that

can be extremely costly. NTHSA funding ensures programming is available to make these seats or restraints available to parents.  NTHSA funding also supports technician training. NTHSA funds support programming to raise awareness in schools through assemblies, drivers' education class presentations, and crash re-enactments.  The programs are also able to ensure there is additional outreach in communities and through different mediums from informational brochures to paid media. These outreach efforts raise awareness and education to help keep roadway users safe.

10.    IDOT intends to apply for future formula grants administered by NTHSA.

## The FY 2025 Immigration Enforcement Requirements and its Impact on IDOT Grant Administration

11.    I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

12.    IDOT does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." IDOT is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

13.    If IDOT is unable to comply with the federal government's new funding conditions and the State would be unable to receive FY2025 DOT funds, the State of Illinois would be

5

deprived of essential funds and would be unable to maintain the critical programs described above.

14.    IDOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If IDOT cannot access federal funds, IDOT will not have funds to immediately cover the unique programs funded by the grants. This, in turn, will result in project delays, depriving Illinois residents of transit investment and improvements.

15.    Without access to FY2025 grant funding, IDOT cannot commit funding for the furtherance of programs.

16.    The longer IDOT cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

17.    Losing the federal grants described above would severely obstruct and undermine IDOT's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19, 2025 in Springfield _____, Illinois.

Sarah C. Moore
Safety Programs Implementation Manager
Illinois Department of Transportation

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

                *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 27

Declaration of Jason Osborn

## DECLARATION OF JASON OSBORN

I, Jason Osborn, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Director of the Office of Intermodal Project Implementation ("OIPI") at the Illinois Department of Transportation ("IDOT"). My job duties include planning, developing, implementing, and coordinating all activities and programs of OIPI to promote and continually improve transit, passenger and freight rail, and aviation through programs, safety, and education to the people of Illinois. OIPI pursues, manages, and administers a wide range of grants received by IDOT from the United States Department of Transportation (USDOT) through the Federal Highway Administration ("FHWA"), Federal Transit Administration ("FTA"), the Federal Railroad Administration ("FRA"), and the Federal Aviation Administration ("FAA") to state and locally sponsored operating, maintenance, and capital projects. This work includes aligning procurement procedures with federal and state requirements, modifying contract templates to meet changing state and federal requirements, verifying re-imbursement eligibility, and negotiating change order financial obligations.

3.      I have been employed by IDOT since January 18, 2022, and I have served as Director of the Office of Intermodal Project Implementation since January 18, 2022. Before starting at IDOT, I served as the Department Head of System Performance and Data at Metra Commuter Rail in Chicago, Illinois, as the Principal Transportation Planner for the McHenry County Division of Transportation in Woodstock, Illinois, and as a Principal Transportation Planner at Wilbur Smith Associates in Chicago, Illinois. In total, I have over 25 years of experience

1

working directly on federally funded transportation planning, operations, maintenance, and capital projects at IDOT, Metra Commuter Rail, and McHenry County Division of Transportation. At IDOT and the McHenry County Division of Transportation, I gained experience managing and administrating federal grants to units of local government. Over the course of my career, I have had experience administering hundreds of grants that the State has received from a variety of federal agencies including the USDOT.

**Background**

4.      In Illinois, IDOT has statutory responsibility for the vast majority of planning, construction, operation, and maintenance of Illinois's extensive transportation network, which encompasses highways and bridges, airports, public transit, rail freight and rail passenger systems. This vast transportation system supports Illinois residents and more than 100 million visitors annually.

5.      IDOT is the Illinois grantee of the USDOT, which includes the following divisions: FHWA, FTA, FRA, FAA, and Federal Motor Carrier Safety Administration (FMCSA). IDOT administers a wide range of grant programs meant to ensure safe, cost-effective transportation for Illinois in ways that enhance the quality of life, promote economic prosperity, and demonstrate respect for our environment.

6.      As part of my regular job duties, I oversee federal grant managers who manage grants from USDOT's various divisions including the FHWA, FTA, FAA, and FRA. I have reviewed the FY2022-2025 grant awards for these grants that were issued to IDOT and am familiar with their contents.

**IDOT Relies on FTA Funding**

7.    IDOT receives and administers competitive grants awarded by FTA, including those shown in Table 1 below:

| Table 1: Competitive FTA Grants Awarded by IDOT Since FY2023 | | |
|---|---|---|
| **Grant Program** | **Award Amount** | **Federal Fiscal Year in which funds were awarded** |
| Bus and Bus Facilities Program | $12,600,000 | 2023 |
| Low or No Emissions Program | $12,299,377 | 2023 |
| Innovative Coordinated Access & Mobility | $1,824,640 | 2024 |
| RAISE | $1,200,000 | 2024 |

8.    For the Bus and Bus Facilities grant, IDOT used pre-award authority to order buses for 110 public transit providers and non-profit agencies awarding 523 buses across the state. IDOT had not been able to provide buses for its partners during the pandemic and was severely behind in the replacement schedule as a result. The vast majority of these buses went to small rural systems.  If funding under this grant program were cut off, transit agencies suffering ongoing replacement delays from the pandemic will not receive buses, which may result in cancelation of service.

9.    For the Innovative Coordinated Access and Mobility grant, IDOT will be piloting an access to mobility program whereby IDOT connects five transit agencies covering more than 30 counties in Southern Illinois to a platform that will increase access and ease of travel for some of the more isolated parts of our state. The goal is to remove access barriers so that people can more easily make it to doctors, hospitals, grocery stores, etc.

10.     IDOT receives and administers formula grants awarded by FTA, as shown in

Table 2 below:

| Table 2: Formula FTA Grants Awarded to IDOT Since FY2022 | | | | |
|---|---|---|---|---|
| Grant Program | FY2022 | FY2023 | FY2024 | FY2025 |
| Section 5305 Statewide Planning | $8,660,684 | $8,819,310 | $8,342,015 | $8,524,953 |
| Section 5311/5340 Formula Grants Rural Areas | $24,594,543 | $24,957,931 | $24,867,902 | $25,026,531 |
| Section 5310 Enhanced Mobility | $4,401,769 | $4,397,285 | $4,311,951 | $4,336,814 |
| Section 5339 Bus Formula | $5,623,324 | $5,672,472 | $5,428,546 | $5,474,494 |
| Section 5329 Safety Oversight | $3,609,952 | $3,713,442 | $3,754,181 | $3,724,984 |
| TOTAL | $45,940,706 | $46,748,072 | $45,889,609 | $47,087,776 |

11.     IDOT uses FTA formula funding—through programs like Section 5310 Enhanced

Mobility, Section 5339 Bus Formula, and Section 5311 Formula Grants for Rural Area—to support

the vehicle replacement and expansion needs of small urban and rural transit providers, as well as

non-profit organizations such as senior centers, Community Integrated Living Arrangements, and

adult day center providers. If these funds are withheld, seniors and individuals with developmental

disabilities will lose access to services and enrichment activities.

12.     A portion of the Section 5311 Rural Area Formula funding supports up to 50% of

operating cost for IDOT's 45 public transit agencies in rural Illinois. The loss of this funding would

require these agencies to reduce or cancel service. The loss of this service would cause Illinois

residents to miss doctor's appointments and frustrate their ability to get groceries or make it to

work.

4

13.     IDOT uses formula funds for planning under Sections 5304 and 5305 and a portion of the 5311 Rural Area Formula funds for planning and technical assistance for transit agencies. Adherence to USDOT requirements is crucial, and requirements are vast. Without these funds, transit agencies may not be aware of new or changed requirements, have resources to train their staff, and would not be able to plan strategically.

14.     IDOT passes FTA formula funding through and awards ADA accessible vehicles to 45 rural transit agencies, approximately 60 non-profit agencies, and 11 small urban transit agencies.

15.     There is currently $3,490,948 in Section 5310 FTA formula funding unobligated that IDOT had programmed to supply accessible vehicles to non-profit agencies who serve seniors and those with disabilities. These funds will lapse due to a statutorily set lapse date of September 30, 2025, if not obligated.

16. IDOT intends to apply for future grants administered by the FTA.

**IDOT Relies on FRA Funding**

17.     IDOT receives and administers grants awarded by the FRA.

18.     These grants include three awards under the Corridor Identification and Development Program. These three grants of $500,000 each fund projects in the Chicago to Carbondale Corridor, the Chicago to St. Louis Higher-Speed Rail Corridor, and the Chicago to Quad Cities Corridor.

19.     IDOT has also received an award of $43,125,000 under the Railroad Crossing Elimination Grant Program.  The proposed project was selected for final design, right-of-way acquisition, and construction, and includes activities to support grade crossing and bridge-related improvements in the greater Chicago region as part of the Chicago Region Environmental and

Transportation Efficiency ("CREATE") Program's EW2A project. The project will improve infrastructure owned by the Belt Railroad of Chicago. The project will help improve the mobility of people and goods and access to communities by: reducing vehicle delay due to gate-down time; improving railroad crossing safety; promoting mobility and connectivity; and advancing sustainability and resiliency within Chicago's Clearing West neighborhood, the Village of Bedford Park, and the Village of Summit.

20.     A kick-off meeting for the Railroad Crossing Elimination Grant Program project is set for May 29, 2025.

21.     If IDOT loses access to these funds these needed rail at-grade elimination projects will not be built, wasting previous expenditures on engineering and right-of-way, and perpetuating hazardous and congested traffic crossing conditions.

22.     IDOT intends to apply for future grants administered by the FRA.

**IDOT Relies on FAA Funding**

23.     IDOT receives and administers grants awarded by the FAA, including those shown in Table 3 below:

| Table 3: FAA Grants Awarded to IDOT Since FY2022 | | | |
|---|---|---|---|
| **Grant Program** | **FY2022** | **FY2023** | **FY2024** |
| Airport Infrastructure Grant Program (formula) | $1,108,383 | $7,994,581 | $6,295,881 |
| Airport Terminals Program (competitive) | $1,039,404 | - | $4,244,567 |
| Airport Improvement Program, State Block Grant Program (formula) | $15,294,527 | $12,952,469 | $15,412,073 |
| Airport Improvement Program, State Block Grant Program (competitive) | $16,807,230 | $14,784,302 | $16,777,825 |

| Airport Improvement Program, Primary Airport (formula) | $14,059,395 | $13,950,911 | $8,477,312 |
| Airport Improvement Program, Primary Airport (competitive) | $23,809,307 | $24,309,195 | $15,524,462 |
| Airport Improvement Program, State System Planning | $285,708 | - | $300,000 |

24.     FAA grants fund a variety of aviation safety programs, including approximately 32 runway/taxiway improvements at both large and small airports. These projects have a direct impact on the safety, efficiency, and effectiveness of the national and state aviation system and would put that system at risk if these funds were cut off.

25.     If IDOT loses access to these funds, it would jeopardize the national and state aviation system, and in turn jeopardize its efficiency and effectiveness. To maintain adequate safety levels and the wellbeing of the flying public, State and/or local units of government as airport sponsors would have to cover the federal share, typically 90% of total project cost. Additionally, this would deplete state and local resources from projects that are of low priority or ineligible for federal funds but are still economically and/or operationally critical for the state or local unit of government that is the airport sponsor.

26.     IDOT-Aeronautics has been directed that IDOT must sign for applications for federal assistance by May 30 for expiring Formula Airport Infrastructure Grants, which includes agreeing to the immigration cooperation conditions being challenged in this case.

27.     IDOT intends to apply for future grants administered by the FAA.

**The FY 2025 Immigration Enforcement Requirements and its Impact on IDOT Grant Administration**

28.     I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of USDOT funding stating that recipients' "legal obligations require

7

cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

29.    I am aware that on April 16, 2025, the FRA amended its general terms and conditions for all federal grants administered by the agency. The new language requires recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

30.    I am aware that on April 25, 2025, the FTA amended its Master Agreement, amending section 12(m) requiring recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Customs and Immigration Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." FTA refers to this amended agreement as "Master Agreement 33."

31.    I am aware that on April 25, 2025, the FAA posted its FY2025 grant agreement template, now requiring recipients of funding to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Customs and Immigration Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

8

32.     IDOT does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." IDOT is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

33.     If IDOT is unable to comply with the federal government's new funding conditions and the State would be unable to receive FY2025 DOT funds, the State of Illinois would be deprived of essential funds and would be unable to maintain the critical programs described above.

34.     IDOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If IDOT cannot access federal funds, IDOT will not have funds to immediately cover the unique programs funded by the grants. This, in turn, will result in project delays, depriving Illinois residents of transit investment and improvements.

35.     Without access to FY2025 grant funding, IDOT cannot commit funding for the furtherance of programs.

36.      The longer IDOT cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

37.     Losing the federal grants described above would severely obstruct and undermine IDOT's mission even if the funding were restored at a later date.

9

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May **20**, 2025____ in **Chicago**_____, Illinois.

Jason Osborn
Director of the Office of Intermodal Project
Implementation
Illinois Department of Transportation

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

     *Plaintiffs*,

  v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

     *Defendants*.

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 28

Declaration of Lynsey M. Heffernan

## DECLARATION OF LYNSEY M. HEFFERNAN

I, Lynsey M. Heffernan, declare as follows:

1.     I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.     I am the Chief of Policy and Strategic Planning at the Massachusetts Bay Transportation Authority ("MBTA" or the "Authority"), a body politic and corporate and a political subdivision of the Commonwealth of Massachusetts established by Mass. Gen. Laws ch. 161A, and I sit on the Executive Team at the MBTA.

3.     My job duties include the development of all the Authority's public-facing policies, such as rider privacy and fare policy, and I direct the Authority's mid- and long-range planning. A key part of that work entails directing the development of our Capital Strategy for funding, the creation of the Authority's annual five-year rolling Capital Investment Plan ("CIP"), and the generation of new resources through a robust discretionary grant approach. I supervise thirty-two individuals at the MBTA, sixteen of whom work on our Capital Strategy team. A key responsibility of that team includes the allocation of capital resources, on a yearly and monthly basis, to address the state of good repair and modernization needs of the MBTA. The source of these funds includes both federal formula funds which flow through the Commonwealth to the MBTA and discretionary grants which combined make up more than 40% of our funding. On the Capital Strategy team, there exists a Grants Team of six individuals who conduct analysis and complete the technical components necessary for competitive grants, of which 95% of our awards are distributed by the United States Department of Transportation ("USDOT"), predominately through USDOT's divisions of the Federal Transit Administration ("FTA"), the

1

Federal Highway Administration ("FHWA") or the Federal Railroad Administration ("FRA").

4.      Given my leadership role, my signature has been on all grant applications submitted by the MBTA to granting authorities since 2021. Moreover, I advise our General Manager and CEO, and our Board of Directors, on the best strategies to invest our available funds, and provide predictions on the sources of future funding for the Authority, resulting in strategic and targeted critical investments in our aging legacy system.

5.      I have been employed at the MBTA for six years, since June of 2019, in positions of progressive responsibility, beginning as a Deputy Director of Strategic Planning, then in 2020 becoming the Acting Assistant General Manager for Policy and Transit Planning, and finally becoming the Chief of Policy and Strategic Planning in 2023. I have served on the Executive Team, as a direct report to the General Manager, since December of 2020. I came to the MBTA with nearly fifteen years of government experience of both as a practicing lawyer and as a senior advisor in the Health and Human Service Secretariate. I hold a law degree from the Brooklyn Law School and a Master's in Public Administration degree from the Harvard Kennedy School of Government. In total, I have 19 years of government experience in the Commonwealth of Massachusetts, supervising people, programs and strategy in various roles.

## Background

6.      The MBTA's mission is to serve the public by providing safe, reliable and accessible transportation. The MBTA is the largest provider of public transit in New England and the oldest provider of transit in North America with roots dating back to the 1890s. Today, we provide service to nearly 800,000 weekday riders on seven modes including bus, bus rapid transit, heavy rail, light rail, regional commuter rail, ferry, and paratransit. Our service area is over 3,200 square miles, representing 175 communities. To provide this service the MBTA has

2

over 75,000 assets and employs nearly 8,000 staff to operate and maintain our services. Specifically, capital dollars received from the federal government are utilized to maintain and modernize 128 miles of revenue track on the heavy and light rail subway system with over 718 revenue trains; over 1,050 bus routes with 1,020 bus vehicles in the fleet; nearly 700 miles of commuter rail track and 105 locomotives and 452 passenger coach cars; 13 ferry terminals and 4 ferry vessels; and 711 vans and automobiles for paratransit services. To support our services for passengers we have 261 passenger facilities, 125 parking facilities, and 341 support or maintenance facilities. In addition, we have many non-revenue vehicles supporting our service including over 1,400 rubber-tired vehicles, such as cars, trucks, snowplows and construction equipment, and 118 steel-wheeled vehicles designed to move on the rail system such as maintenance vehicles, cranes and tampers. Moreover, the MBTA has numerous critical structures to support transit services including 82 tunnels, 587 bridges, over a thousand culverts and two dams, which require inspection, maintenance, repair and replacement to ensure safe transit operations.

7.    Due to my role in planning our capital program, I am personally familiar with all sources of federal dollars flowing into the MBTA. As part of my duties, I oversee multiple divisions of our Capital Strategy team, including our Grants Team which consists of six staff supplemented by consultant support for some larger grant applications. In the past three federal fiscal years, this team, on behalf of the MBTA, has submitted 37 federal grants and been successful in 16, resulting in a $702.3M infusion of federal resources to the MBTA capital program. I personally have signed every grant application and am familiar with their contents. Moreover, the MBTA receives federal formula funding, which is either directly apportioned to the MBTA by the FTA, or passed through the Commonwealth to the MBTA, and the MBTA is

3

the recipient of funds flexed from the FHWA to the FTA for the purposes of supporting transit services and infrastructure. The MBTA is a voting member of the Boston Region Metropolitan Planning Organization (MPO), which determines which projects are included on the Boston Region Transportation Investment Plan (TIP) and ultimately the Massachusetts State Transportation Investment Plan (STIP). On behalf of the Authority's General Manager, I serve as MBTA designee to the Boston Region MPO; my staff is designated to vote on behalf of the Authority.

8.      The MBTA's Capital Finance and Accounting team is responsible for managing the financial and administrative aspects of grants received by the MBTA; this team reports to the General Manager through the Chief Financial Officer. Today, the Capital Finance and Accounting team is administering $5.6B federal dollars through 93 specific grant items, the vast majority of which are distributed through the USDOT. These dollars are formally accounted for within the FTA's Transit Asset Management System (TrAMS), or within FRA and FHWA's "Grant Solutions" system, both of which are web-based grants management tools that allow recipients to apply for federal funds and manage programs in accordance with federal requirements. The Capital Finance and Accounting team manages federal funds to support transit services in the municipalities we serve from multiple sources: three formula-based funds from the MBTA (5307, 5337, 5339), federal discretionary funds, and federal earmarks. Additionally, the MBTA is the recipient of funds "flexed" from the Federal Highway Administration to the Federal Transit Administration as awarded by the Commonwealth and the Boston Region MPO. These funds, administered by the Capital Finance and Accounting team, support specific transit improvement projects. A total loss of these grants, which make up forty-one percent (41%) of the MBTA's planned capital budget over the next five years, SYF26-30, would severely hamper and

4

undermine the MBTA's mission even if the funding were restored at a later date.

## MBTA's Annual Receipt of USDOT Grants

9.     I oversee planning of all USDOT grant funds for the MBTA and have knowledge

of the processes for the coordination of regional, state and federal agencies in the creation of the

TIP and the STIP. Both plans are fiscally constrained, must list every dollar of federal funds

invested in transportation through the MPO processes, and must meet public participation

requirements per 23 CFR 450 *et seq*.  USDOT formula and discretionary grants support the

MBTA's Capital Investment Plan (CIP), a fiscally constrained, short-term, MBTA Board-

approved, document which includes over 600 unique planning, construction, and capital

maintenance projects spanning all of our delivery modes over the coming five years. These

investments aim to maintain a state of good repair, modernize our assets, improve service, and

meet our strategic priorities and performance goals. CIP programs span structures, guideways,

signal and power, facilities (maintenance and administrative), passenger facilities, vehicles,

business and operational support, and technology and innovation. These investments are critical

to address asset needs, maintain our existing infrastructure, and deliver meaningful

improvements to the rider's experience. The use of USDOT federal funding is critical to ensure

safe, efficient, and reliable transit service.

10.     The MBTA is responsible for administering 86 federal grants from USDOT,

representing over $5.56B in federal funds or future federal funds. These grants account for more

than 40% percent of the Authority's total capital budget. While too numerous to list here, each

grant, whether formula or discretionary, supports critical programs in Massachusetts, keeping our

transit systems safe and reliable.

11.     USDOT federal formula dollars account for the largest percentage of federal

5

grants in the MBTA's Capital Investment Plan. The MBTA receives Urbanized Area Formula

Grant (5307), State of Good Repair Formula Grant (5337) and Bus and Bus Facilities Formula

Grant (5339), which total over $400M annually.

12.    The MBTA is also a recipient of discretionary federal funds. To increase available

funding for key capital projects and programs, the MBTA aggressively pursues discretionary

grant funding opportunities. In the last three federal fiscal years, the MBTA has been awarded 16

unique awards, resulting in a $702.3M infusion of federal resources to the MBTA capital

program. For example, the MBTA received one grant under the Multimodal Project

Discretionary Grant (MPDG) Program totaling $472.3M to replace the North Station rail Draw

Bridge. Within the FTA Low and No Emissions Grant Program, the MBTA received two awards

totaling $156M. Under the FTA All Stations Accessibility Grant Program (ASAP), a program

developed specifically for legacy systems like the MBTA, the Authority won two awards totaling

$134.2M for accessibility improvements along the MBTA's historic Green Line – America's

first subway. The MBTA was awarded ASAP funding in each of the last two rounds. The MBTA

is the recipient of three awards from the FRA Federal State Partnership – State of Good Repair

Program, which account for more than $78.2M in federal funding. The MBTA is the recipient of

several FHWA formula funding programs as awarded to the MBTA via the Advanced

Transportation Technologies and Innovative Mobility Deployment Program (ATTAIN) as well

as funds directly apportioned to the Commonwealth. Statewide, FHWA funding is competitively

awarded and appropriated by the Massachusetts Secretary of Transportation and the MPO

including funding from the Carbon Reduction Program (CRP), Congestion Air Quality

Mitigation funds (CMAQ), as well as Protecting Resilient Operations for Transformative,

Efficient, and Cost-saving Transportation Program (PROTECT) funding.

13.     The services provided by the MBTA are vital to the Commonwealth's residents, employers, students and taxpayers. The federal government requires that the MBTA conduct a census of our riders regularly.  In 2023, the MBTA's latest census demonstrated that a full 42% of our respondents said that their households did not own a car. That census reflects that 75% of our riders in 2023 are below 80% of the Area Median Income (AMI); 61% of riders are between 18 and 34 years old; 56% identify as women; and 61% identify as a federally protected population on the basis of race or ethnicity. The service is critical to the Commonwealth's residents and the projects funded by these grants are vital to ensure assets are in a state of good repair and to ensure the continuity of safe, reliable and accessible service. The programs funded by these specific grants are described further below.

**MBTA's Use of USDOT Awards**

14.     The MBTA is a direct recipient of FTA's public transportation assistance programs as authorized by federal transit law and Chapter 53 of Title 49, U.S. Code and Congress. The most recent authorization, the Infrastructure Investment and Jobs Act (2021) authorizes surface transportation programs for Federal Fiscal Year 2022 through 2026. Apportionments of allocations of formula 5307, 5337, and 5339 for the Boston Urbanized Area are published in the Federal Register. The MBTA relies on our annual FTA Apportionments as they are the MBTA's primary source of federal funding.

15.     FTA funds support MBTA's Capital Investment Plan (CIP), a fiscally constrained five-year investment plan. CIP investments aim to maintain a state of good repair, modernize our assets, improve service, and meet our strategic priorities and performance goals. Investments to MBTA structures, including bridges and tunnels, guideways, signal and power, facilities (maintenance and administrative), passenger facilities, vehicles, business and operational

7

support, and technology and innovation are critical to address asset needs, maintain our existing infrastructure, and allow us to deliver safe, efficient, and reliable transit service.

16.     In addition, to increase available funding for key capital projects and programs, the MBTA aggressively pursues discretionary grant funding opportunities, especially from USDOT agencies: FTA, FHWA and FRA. In the last three federal fiscal years, the MBTA has been awarded 14 unique USDOT discretionary awards ultimately administered by FTA totaling $688.6M to support the state of good repair, accessibility improvements, and Transit Oriented Development efforts. These discretionary awards support capital investments for: passenger stations, revenue vehicle replacement, revenue vehicle overhaul, drawbridge replacement, bus rapid transit corridors, passenger ferry overhaul, passenger ferry dock renovation and replacement.

17.     The MBTA is also a participant in the FTA's Capital Investment Grants ("CIG") Program, established under 49 U.S.C §5309, within two of the Congressionally-created CIG programs "Core Capacity" and "Small Starts."  Each of these programs is a multi-year, multi-step process which projects must go through to become eligible for and receive discretionary CIG program funding from the FTA. The MBTA entered the Core Capacity program in 2022 with a collection of 17 different projects focused on the Green Line Transformation. These projects within the Green Line programs have a current budget of $3.8B and the MBTA anticipates receiving up to 50% reimbursement for eligible expenses on projects planned to be delivered through 2034. Currently the project is seeking approval from the FTA to 'Enter into the Engineering' phase of this program. Similarly, in March of 2025 the MBTA was accepted to join Project Development of the Small Starts program, focused on the development of a bus corridor for the Blue Hill Avenue area of Boston.

18.     The MBTA is also a recipient of FHWA funds. In some cases, FHWA funds are 'flexed,' or transferred, to the FTA to administer transit projects, but the Congressional appropriations were initially made to FHWA. When FHWA funds are repurposed to transit

8

projects those allocations must be approved on the TIP and reported on the STIP. The MBTA

also directly receives FHWA funds, such as through the ATTAIN grant program. The MBTA

also takes advantage of loan programs such as through the Build American Bureau of USDOT,

resulting in favorable financing for projects such as the building of a new Quincy Bus Garage.

19.    The MBTA receives FRA funding through numerous grants programs designed

to support passenger rail service and modernize our infrastructure. The rail network that carries

the MBTA commuter rail trains work in tandem with inter-city rail carriers such as Amtrak, and

freight rail service providers. FRA funding often targets projects which support each of these

transportation uses. Currently the MBTA is the recipient of three awards from the FRA Federal

State Partnership – State of Good Repair Program, which account for more than $78.2M in

federal funding.

20.    On January 10, 2025, FRA announced that the MBTA was selected for a $4M

award to support the development of a Master Rail Crossing Elimination Plan through the Rail

Crossing Elimination Grant Program.

**The FY 2025 Immigration Enforcement Requirements and its Impact on MBTA Grant
Administration**

21.    On April 18, 2025, my office received notice that the Federal Railroad

Administration planned to add language to a not yet executed discretionary grant agreement. The

grant award was for $4M through the Rail Crossing Elimination Program, and specifically the

MBTA applied for the funds to create a High-Risk Grade Crossing Elimination Master Plan to

evaluate and address safety and operational concerns at 52 high risk grade crossing locations

where the commuter rail system crossed over a roadway.

22.    On April 18, 2025, the FRA shared a new version of its General Terms and

Conditions, dated April 16, 2025, along with a redlined version of changes from the prior

version, with the MBTA Capital Finance and Accounting staff who typically process grant

9

agreements. Article 20 of that document is titled *Federal Financial Assistance, Administrative, And National Policy Requirements.*

23.    Within Article 20 a new provision was added to the General Terms and Conditions document stating, "the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law."

24.    MBTA staff were told that the processing of the grant agreement, and the ultimate distribution of the funds for the Rail Crossing Elimination program, would be contingent upon the MBTA agreeing to the new General Terms and Conditions document dated April 16, 2025.

25.    On April 24, 2025, I received a copy of the April 24, 2025 letter from Secretary of Transportation Sean Duffy that was reportedly issued to all recipients of USDOT funding. The letter states that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

26.    The MBTA does not understand what USDOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." The MBTA is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal

10

immigration law."

27.     In my years with the MBTA, I am not aware of MBTA staff, including MBTA Transit Police Department staff, ever being required to enforce or participate in the enforcement of federal civil immigration law. The 8,000 employees of the MBTA are responsible for the operations and maintenance of the region's public transit system, the safety of its 800,000 daily riders and 8,000 employees, and the security of its infrastructure. The 450 members of the MBTA's Transit Police Department are specifically responsible for the safety of the 800,000 daily riders and the MBTA's 8,000 employees, and the security of the MBTA's transportation infrastructure.

28.     Additionally, if the MBTA is unable to comply with the federal government's new funding conditions and USDOT then withholds USDOT funds from the Authority on that basis, the State would be deprived of $1.7B in currently executed grants with significantly more planned for the future, frustrating its ability to maintain the critical programs described above.

29.     The MBTA receives disbursement, as reimbursements, in different time intervals for each USDOT entity; for instance, for the FTA, we submit invoices for reimbursement weekly, yet for the FRA we submit for reimbursements regularly based on the level of spending as reviewed on a monthly basis. Future payments, therefore, are based upon outlays of MBTA capital dollars, for which the federal agencies supply reimbursements. In the first four months of calendar year 2025, the MBTA received over $180M in reimbursements.

30.     The MBTA does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If the MBTA cannot access USDOT federal funds, the Authority will not have funds to immediately cover at minimum approximately 116 active CIP projects funded by the FTA, FHWA or FRA grants. This, in turn, will reduce access for hundreds

of thousands of our riders to safe, reliable, accessible transportation across the greater New England region.

31.     The impact of this loss of funds would be felt through the Greater Boston region. The MBTA is a cornerstone of regional economic development, connecting our riders to jobs, housing, and medical, educational, and social opportunities. The MBTA attracts investment along its corridors connecting and strengthening local economies. The reduction of or inability to access federal funding ultimately interrupts the regional economy impacting both rural and urban communities in Massachusetts and beyond. The majority of federally funded MBTA programs directly impact our riders, including our paratransit riders, our most vulnerable and transit dependent riders. Should the Authority be unable to replace assets in a timely manner, service disruptions are likely to occur.

32.     The MBTA's capital budgets for this year, and within the next five-year plan, have relied on numerous USDOT sources of federal revenue as described above. We have made plans and allocated funding for over a hundred current projects based on our continued ability to draw down on promised federal funding. These funds include both formula funding and specific discretionary programs to support the state of good repair program and the modernization of essential assets.

33.     Without access to federal grant funding, the MBTA cannot commit funding for furtherance of programs. Any pause or termination in federal funding would cause substantial, irreparable, and immediate harm to the MBTA, our riders, our staff, as well as to the regional design and construction industries.

34.     For instance, if federal formula funds are stopped, delays to projects would increase costs, and critical maintenance and safety projects would be impacted. Further a drastic

12

pause in federal funding would drive up risks for our contracting community, meaning future contracts, even if the funding were restored, would likely be at a higher cost for the MBTA.

35.     The loss of federal dollars would also directly impact employers and jobs in the region, as most construction projects are performed by third-party contractors. Finally, municipal partners would be impacted by the reduction in transit priority projects, accessibility projects, and bus stops improvement projects. There would be a reduction in projects to create new commuter rail stations, or increase bike-pedestrian paths, many of which are championed by municipalities due to local transportation needs.

36.     The longer the MBTA cannot access funds, the greater the risk that additional projects and programs will be interrupted or terminated.

37.     Losing these USDOT grants would severely obstruct and undermine MBTA's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on _May 13, 2025_ in _Boston_ , Massachusetts.

Lynsey M. Heffernan

13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

            *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 29

Declaration of David Mohler

## DECLARATION OF DAVID MOHLER

I, David Mohler, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge or through review of documents kept by MassDOT in the ordinary course of its business, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Executive Director of the Office of Transportation Planning at the Massachusetts Department of Transportation (MassDOT). My office is responsible for the annual preparation of the State Transportation Improvement Program, a federally endorsed five-year program that identifies the transportation projects to be undertaken with federal funding apportioned by Congress or provided by USDOT through its discretionary programs. My office also annually prepares the MassDOT Capital Investment Plan, a five-year program of the estimated spending of federal and state funds on transportation projects throughout the Commonwealth. In addition, my office manages the process whereby proposals are selected for submission of discretionary grants to USDOT by MassDOT; maintains a grants.gov account for the submission of discretionary grant applications and a Grant Solutions account for the management of awarded grants; and submits grant applications on behalf of MassDOT.

3.      I have been employed by MassDOT since June 22, 2003, and I have served as Executive Director of the Office of Transportation Planning since April 7, 2008. Before starting at MassDOT, I worked at the Boston Region Metropolitan Planning Organization managing the Transportation Improvement Program and doing long-range financial planning. Prior to that I served as an analyst and eventually as Staff Director for the Florida Senate Transportation Committee. In total, I have over forty years of experience in transportation policy, planning, and

programming with an emphasis on the federal-state relationship.

### Background

4.    MassDOT aims to provide a safe and reliable transportation network that serves all people and respects the environment. MassDOT maintains the state road and bridge network, which includes approximately 9,523 lane-miles of roadways and 5,192 bridges. In addition, MassDOT is the cognizant agency for federal highway formula funding and, as such, is responsible for managing all roadway and bridge capital projects using federal highway formula funds regardless of facility ownership. MassDOT also owns approximately 240 miles of railroad tracks and provides funding for the operation of four Amtrak rail services: the Hartford Line, the Vermonter, the Valley Flyer and the Berkshire Flyer.

### Massachusetts's Award of USDOT Grant Funds

5.    Since the enactment of the Infrastructure Investment and Jobs Act, MassDOT has been awarded 24 competitive grants from USDOT with a total value of $1.963 billion across all of its constituent divisions: the Highway Division has been awarded eight grants totaling $1.795 billion; the Rail & Transit Division has been awarded ten grants totaling $162.3 million; the Registry of Motor Vehicles has been awarded four grants totaling $3.5 million; and the Aeronautics Division has been awarded two grants totaling $3.0 million. I have reviewed these grant awards and am familiar with their contents.

6.    In coordination with the Highway Division, my office assisted in the preparation and handled the submission of seven awarded grants with a total value of $1.763 billion. We are also involved in the preparation and review of the grant agreements for these projects. These projects include the replacement of a major bridge, reconstruction of an Interstate interchange,

construction of a new commuter rail station, implementation of flood protection, creation of a wildlife crossing, installation of electric vehicle charging infrastructure, and multimodal improvements to enhance neighborhood connectivity. In addition to these grants, MassDOT Divisions have been awarded grants for railroad grade crossing improvements, intercity rail infrastructure improvements, low/no emission bus purchases, rail service development planning, improvements to our commercial driver licensing system, development of a low carbon microgrid at a regional airport, increased use of drone technology, and innovation of the use of low carbon materials in highway construction. A loss of these grants would severely obstruct and undermine MassDOT's mission, even if the funding were restored at a later date, and could result in our inability to carry out specific projects funded by these grants.

### Massachusetts's Annual Receipt of USDOT Formula Funds

7.      As Executive Director of the Office of Transportation Planning, I oversee my office's programming of federal transportation formula funds and have knowledge of the amount of funding received each year and the projects selected to utilize such funding.

8.      MassDOT is responsible for administering 14 federal highway formula programs. In State Fiscal Year 2025, the reimbursement of these federal funds is projected to finance $710 million in construction expenditures, or approximately 47% percent of MassDOT's highway construction program, supporting 350 distinct projects that are critical to maintaining a safe and effective transportation system.

9.      As an example, in Federal Fiscal Year 2025 (FFY25), MassDOT received an apportionment of $243.5 million under the Bridge Formula Program. These funds are used for the rehabilitation, reconstruction or replacement of bridges in poor condition or to repair bridges to keep them from falling into poor condition. The total amount of highway formula funding

apportioned to Massachusetts for FFY25 is approximately $1.11 billion and is made up of the following programs: National Highway Performance Program, Surface Transportation Block Grant Program, Highway Safety Improvement Program, Railroad/Highway Crossings Program, Congestion Mitigation and Air Quality Improvement Program, National Highway Freight Program, PROTECT Formula Program, Transportation Alternatives Set-Aside, State Planning and Research, Metropolitan Planning Program, Bridge Formula Program, and National Electric Vehicle Infrastructure (NEVI) Program. These funds have been annually apportioned to Massachusetts since the enactment of the Infrastructure Investment and Jobs Act, and most of these programs predate that legislation. These funds support MassDOT's ability to maintain a safe and efficient transportation network.

10.    As detailed in Paragraph 9, Federal highway apportionments are provided in specific programs. The amount of spending permitted under apportioned programs is annually limited by Congress through the imposition of an obligation authority. The core federal highway programs (those listed in Paragraph 9, with the exception of the Bridge Formula Program and the NEVI Program) receive a single lump sum obligation authority that is less than the total apportionment, while the Bridge Formula Program and the NEVI Program are authorized to obligate 100% of their apportionments. In FFY25 Massachusetts's Federal Obligation Authority for the core Federal Highway Administration formula programs was approximately $743.1 million, 87% of apportioned amounts.

11.    In addition to the highway funding detailed above, MassDOT also receives a direct allocation of federal transit formula funds for enhanced mobility for seniors and persons with disabilities and for the provision of rural transit services. In FFY25 this allocation totaled $37.3 million. The annual allocation of these funds predates the enactment of the Infrastructure

Investment and Jobs Act and was carried forward into that Act. These funds are critical to MassDOT's ability to fund transit programs for elder residents, persons with disabilities and persons living in rural communities, and the loss of this funding would have a negative impact on those populations. In addition to this funding, other transit formula funding is provided directly to the 16 independent transit authorities within Massachusetts. In FFY25 this funding exceeded $600 million. The loss of this funding would impact those agencies' delivery of transit services across the Commonwealth.

12.    MassDOT uses transportation formula funds to fund projects and programs for state, local and regional entities to maintain and improve the state's transportation network. These funds support projects and programs that Massachusetts would otherwise be unable to sustain on its own. As an example, in FFY25 MassDOT currently has programmed $298.6 million in National Highway Performance Program formula funds to repair and improve the state's roadways, ranging from major Interstates to local intersections; $140.0 million in Surface Transportation Block Grant formula funds for projects including complete streets, bicycle and pedestrian facilities, and local roadway improvements; and $292.3 million in Bridge Formula Program funds to rehabilitate, reconstruct or replace bridges across the state, from large complex structures to small local bridges.

13.    MassDOT annually adopts the State Transportation Improvement Program (STIP) that allocates federal formula funds and the required state matching funds to specific projects and programs across the state. The STIP is a compilation of 13 regional Transportation Improvement Programs (TIPs) as required by federal laws and regulations. The TIPs are discussed and approved at public meetings and subject to public review and comment prior to final adoption. Each project that is included in the TIPs/STIP is subject to MassDOT's project development

process that reviews projects at 25% design, 75% design and 100% design, and includes at least one public hearing in the project's location to discuss the design. Once design is complete projects are bid through a public selection process.

14.     MassDOT's federally funded bridge program is prioritized for projects that reduce the structurally deficient bridge surface area. Additionally, given that travel patterns across Massachusetts are inherently multimodal, MassDOT's federal-aid infrastructure investments reflect that need. Our modernization program investments in safety, complete streets, and non-vehicular infrastructure not only save lives, but have also been quantified to reduce vehicular congestion year-over-year.

### A.    Massachusetts's Use of Federal Highway Administration Funds

15.     For FFY25, MassDOT has programmed approximately $1.1 billion in federal highway formula funds. These funds support critical transportation projects across the state including, but not limited to, safety improvements, bridge repairs and replacements, roadway resurfacing and reconstruction, resiliency improvements, bicycle and pedestrian infrastructure and electric vehicle infrastructure.

16.     Since the enactment of the Infrastructure Investment and Jobs Act, the MassDOT Highway Division has been awarded eight competitive grants from USDOT with a total value of $1.795 billion. These grants include a $372.0 million Mega grant and a $993.1 million Bridge Investment Program grant to fund the replacement of the Sagamore Bridge, a federally owned structure that connects Cape Cod to the rest of Massachusetts; a $335.4 million Reconnecting Communities grant to relocate a portion of Interstate 90 in the City of Boston and make significant rail improvements; a $3.7 million PROTECT grant to address severe recurring flooding at a critical local interchange in the City of Worcester; a $1.7 million Wildlife Crossings grant for the Appalachian Trail over Interstate 90; a $14.4 million Charging and Fueling

Infrastructure grant to deploy over 450 electric vehicle charging locations in park-and-ride lots and transit parking lots; a $43.2 million Reconnecting Communities grant to replace an overhead highway with an at-grade facility to improve access to health care, education and jobs in the City of Somerville; and a $31.9 million Low Carbon Transportation Materials grant to pilot the use of low carbon materials in bridge decks, bridge abutments and concrete pavement.

17.     Five of the grants described in Paragraph 16 have not yet been executed. The total value of those grants is $94.9 million. The other three grants have been executed but only partially obligated. The unobligated value of those grants is $1.655 billion.

**B.     Massachusetts's Use of Federal Transit Administration Funds**

18.     For FFY25, MassDOT has programmed approximately $19.3 million in federal transit formula funds for which MassDOT is the direct recipient. These funds are critical to MassDOT's ability to fund transit programs for elder residents, persons with disabilities and persons living in rural communities, and the loss of this funding would have a negative impact on those populations. In addition to this funding, other transit formula funding is provided directly to the 16 independent transit authorities within Massachusetts. In FFY25 this funding exceeded $600 million. The loss of this funding would impact those agencies' delivery of transit services across the Commonwealth.

19.     Since the enactment of the Infrastructure Investment and Jobs Act, the MassDOT Rail and Transit Division has been awarded 10 competitive grants from USDOT with a total value of $162.3 million. These grants include a $1.2 million Railroad Crossing Elimination grant to close the last two remaining passive crossings on Amtrak's routes in the Northeast; a $1.8 million Consolidated Rail Infrastructure and Safety Improvement (CRISI) grant for the preliminary design of a project to reconfigure track in Springfield; a $4.1 million Low or No Emission grant to purchase buses for the Nantucket Regional Transit Authority; a $2.0 million

SMART grant to use drone technology for environmental sensing on Cape Cod; a $108.1 million CRISI grant to make rail improvements on the Inland Route; a $500,000 Corridor ID grant to develop a scope for a service development plan for the Boston & Albany Route; a $360,800 ICAM grant to pilot a Statewide Mobility Management Program; a $3.9 million Low or No Emission grant to purchase buses for the Vineyard Transit Authority; a $36.8 million CRISI grant for the final design of a project to reconfigure track in Springfield; and a $3.6 million Corridor ID grant to create a service development plan for the Boston & Albany Route.

20.    Four of the grants described in Paragraph 20 have not yet been executed. The total value of those grants is $44.1 million.

## The FY 2025 Immigration Enforcement Requirements and its Impact on MassDOT Grant Administration

21.    On April 24, 2025, I received a copy of the April 24, 2025 letter from Secretary of Transportation Sean Duffy stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

22.    On April 23, 2025, my office received notice that the Federal Railroad Administration had issued new General Terms and Conditions to be included in the execution of an already awarded Railroad Grade Crossing Elimination grant. Likewise, on April 25, 2025, my

office received notice that the Federal Highway Administration had issued new General Terms and Conditions to be included in the execution of an already awarded Wildlife Crossings grant. Both of those documents assert that grant recipients are required to certify that they will cooperate with U.S. Immigration and Customs Enforcement agents and other federal officials in the enforcement of federal immigration law.

23.    MassDOT does not understand what USDOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." MassDOT is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

24.    In my years with MassDOT, I am not aware of MassDOT staff ever being required to enforce or participate in the enforcement of federal civil immigration law.

25.    MassDOT has 11 grants awarded by USDOT that have not yet been executed totaling approximately $142.0 million. Given the issuance of new General Terms and Conditions by both FRA and FHWA, if MassDOT is unable to comply with the federal government's new funding conditions, the State would be unable to receive those funds, frustrating its ability to maintain the critical programs described above. MassDOT also has three grants that have been only partially obligated. The unobligated amount for these grants totals approximately $1.655 billion. If USDOT imposes its new funding conditions on the remaining obligations under these grants, it would significantly jeopardize MassDOT's ability to deliver these major projects. MassDOT does not have any other funding in its budget that could cover the loss of these grants.

26.    Further, if MassDOT becomes unable to access federal formula funds, MassDOT will not have funds to undertake 711 highway construction projects planned over the next five

years. This situation would have significant adverse impacts on the Massachusetts economy and the quality of life for our residents.

27.    The MassDOT capital budget for this year has relied on $711 million in federal highway reimbursements for work on 354 distinct capital projects.

28.    Losing these USDOT grants or any access to federal transportation formula funding would severely obstruct and undermine MassDOT's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 13, 2025 in Boston, Massachusetts.

David Mohler