## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,

*Defendants*.

Case No. 1:25-cv-00208

## INDEX OF EXHIBITS
## TO PLAINTIFF STATES' MOTION FOR A PRELIMINARY INJUNCTION
## VOLUME II OF II

## I. PUBLICATIONS

| No. | Document Title |
|-----|----------------|
| 1 | Order from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Department Operating Administrations and Departmental Offices in the Office of the Secretary of Transportation (Jan. 29, 2025) (the "Duffy Order") |
| 2 | Letter from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Recipients of U.S. Department of Transportation Funding (Apr. 24, 2025) (the "Duffy Directive") |
| 3 | U.S. Department of Transportation Press Release (Apr. 24, 2025) |
| 4 | Federal Railroad Administration General Terms and Conditions (Apr. 23, 2025) |
| 5 | Federal Highway Administration General Terms and Conditions, Competitive Grants (Apr. 22, 2025) |
| 6 | Federal Transit Administration Master Agreement (Apr. 25, 2025) |
| 7 | Federal Transit Administration Master Agreement (Tracked Changes) (Apr. 25, 2025) |
| 8 | Federal Aviation Administration Airport Infrastructure Grant Template Agreement (May 6, 2025) |
| 9 | Maritime Administration Port Infrastructure Development Program General Terms and Conditions (Mar. 31, 2025) |
| 10 | Federal Highway Administration, FY 2022-2026 Estimated Highway Apportionments under the Infrastructure Investment and Jobs Act |
| 11 | Federal Transit Administration, FY 2025 Full Year Apportionments State Totals |
| 12 | Motor Carrier Safety Administration, FY 2024 Estimated MCSAP Funding - Rounded |
| 13 | National Highway Traffic Safety Administration, FY 2024 Grant Funding Table |
| 14 | Federal Aviation Administration, Fiscal Year 2024 State Apportionment |

## II. DECLARATIONS

| No. | Declarant Name | Declarant Title |
|-----|----------------|-----------------|
| 15 | Stephanie Dougherty | Director at the California Office of Traffic Safety (OTS) |
| 16 | Keith Duncan | Chief, Caltrans Division of Budgets, California Department of Transportation (Caltrans) |
| 17 | Dee Lam | Chief, Caltrans Division of Local Assistance, California Department of Transportation (Caltrans) |
| 18 | Jeffrey F. Rosen | District Attorney, Santa Clara County, California |

| No. | Declarant Name | Declarant Title |
|-----|----------------|-----------------|
| 19 | Sally R. Chafee | Chief of Staff at the Colorado Department of Transportation (CDOT) |
| 20 | Ronnell A. Higgins | Commissioner, Connecticut Department of Emergency Services and Public Protection |
| 21 | Shanté A. Hastings | Cabinet Secretary at Delaware Department of Transportation (DelDOT) |
| 22 | Edwin H. Sniffen | Director, Hawaiʻi Department of Transportation (HDOT) |
| 23 | Adnan G. Khayyat | Chief Nuclear Officer of the Illinois Emergency Management Agency and Office of Homeland Security (IEMA-OHS) |
| 24 | Holly Bieneman | Director of the Office of Planning and Programming at the Illinois Department of Transportation (IDOT) |
| 25 | Brian Karr | Bureau Chief, Investigations & Compliance, at the Illinois Department of Transportation (IDOT) |
| 26 | Sarah C. Moore | Safety Programs Implementation Manager at the Illinois Department of Transportation (IDOT) |
| 27 | Jason Osborn | Director of the Office of Intermodal Project Implementation (OIPI) at the Illinois Department of Transportation (IDOT) |
| 28 | Lynsey M. Heffernan | Chief of Policy and Strategic Planning at the Massachusetts Bay Transportation Authority (MBTA) |
| 29 | David Mohler | Executive Director of the Office of Transportation Planning at the Massachusetts Department of Transportation (MassDOT) |
| 30 | Paul J. Wiedefeld | Secretary at the Maryland Department of Transportation (MDOT) |
| 31 | Bruce A. Van Note | Commissioner of the Maine Department of Transportation (MaineDOT) |
| 32 | Bradley C. Wieferich | Director of the Michigan Department of Transportation (MDOT) |
| 33 | James Cownie | Chief Counsel at the Minnesota Department of Transportation (MnDOT) |
| 34 | Cassandra O'Hern | Deputy Commissioner of the Minnesota Department of Public Safety (DPS) |
| 35 | Francis K. O'Connor | Commissioner of the New Jersey Department of Transportation (NJDOT) |
| 36 | Michael J. Rizol, Jr. | Director of the New Jersey Division of Highway Traffic Safety (NJDHTS) |

| No. | Declarant Name | Declarant Title |
|-----|----------------|-----------------|
| 37 | Juan R. Urena | Bureau Chief for Pipeline Safety, Division of Reliability and Security at the New Jersey Board of Public Utilities (NJBPU) |
| 38 | Janet Ho | Assistant Commissioner for Finance and Integrated Modal Services, New York Department of Transportation |
| 39 | Jackie Bray | New York State Division of Homeland Security and Emergency Services (DHSES) |
| 40 | Travis Brouwer | Assistant Director for Revenue, Finance, and Compliance, Oregon Department of Transportation (ODOT) |
| 41 | Kenji Sugahara | Director, Oregon Department of Aviation (ODAV) |
| 42 | Meredith Brady | Associate Director, Division of Statewide Planning at Rhode Island Department of Administration |
| 43 | Walter R. Craddock | Administrator of Rhode Island Department of Motor Vehicles |
| 44 | Steven King | Managing Director of Quonset Development Corporation, Rhode Island |
| 45 | Major Ronald Longolucco | Administrative Bureau Commander at Rhode Island Department of Public Safety, State Police |
| 46 | Marc R. Pappas | Director of Rhode Island Emergency Management Agency |
| 47 | Oscar L. Perez | Chief of Police, Providence, Rhode Island Police Department |
| 48 | Shelly Baldwin | Acting Director, Washington Traffic Safety Commission |
| 49 | Dennis Bosman | Captain of Commercial Vehicle Division for Washington State Patrol |
| 50 | Katherine Chapman-See | Director of the Washington Office of Financial Management |
| 51 | Mike Gribner | Deputy Secretary of Washington State Department of Transportation |
| 52 | Scott James Lawry | Deputy Secretary, the Wisconsin Department of Transportation (WisDOT) |
| 53 | Dr. Tom K. Wong | Associate Professor, University of California, San Diego |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, <br><br> *Defendants.* | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 30

Declaration of Paul J. Wiedefeld

## DECLARATION OF PAUL J. WIEDEFELD

I, Paul J. Wiedefeld, pursuant to 28 U.S.C. § 1746, hereby declare:

1.    I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge and information that has been provided to me in my official capacity, and if called as a witness, I could and would testify competently to the matters set forth below.

2.    I am the Secretary at the Maryland Department of Transportation (MDOT). My job duties include overseeing a staff of 10,000, advising the Governor of Maryland on transportation policy issues, and managing the implementation of the Department's $21,200,000,000 six-year capital plan, known as the Consolidated Transportation Program (CTP). The federal government and the U.S. Department of Transportation (USDOT) play a significant role in supporting capital projects, ensuring the safety of our multi-modal transportation system, and developing regulations that support the general welfare of the United States. Federal funding comprises a significant source of our CTP, making up over 40% of the program when excluding certain local-aid programs. Federal funds include formula dollars supported by the Highway Trust Fund and by current and past surface transportation authorizations; the advanced appropriations contained in the Infrastructure Investment and Jobs Act (IIJA); and competitive discretionary grants awarded to MDOT.

3.    I have been employed by MDOT since February 2023, serving in the capacity of Secretary. Over the course of my career, I have led major aviation and transit agencies like the Maryland Transit Administration, the Maryland Aviation Administration, and the Washington Metropolitan Area Transit Authority that administer hundreds of federally funded grants and programs funded through a variety of federal agencies including USDOT.

### Background

4.      MDOT is a multi-modal transportation agency made up of modal administrations. MDOT's five modes are the Maryland Aviation Administration (MAA); the Maryland Port Administration (MPA); the Motor Vehicle Administration (MVA); the State Highway Administration (SHA); and the Maryland Transit Administration (MTA), in addition to the Secretary's Office (TSO). MDOT also supports authorities in formalized governance and funding including the Maryland Transportation Authority (MDTA) and the Washington Metropolitan Area Transit Authority (WMATA). This unique approach provides the State of Maryland's leadership with the ability to develop a coordinated and balanced approach to transportation in the region. It is MDOT's mission to provide safe, reliable, accessible, equitable, and sustainable transportation options to Marylanders and those who utilize Maryland's transportation infrastructure and services up and down the Eastern Seaboard.  Collectively, MDOT is responsible for managing over 17,300 lane miles of roadway, 5.3 million registered vehicles and 5.1 million driver license and identification cardholders, and, on an annual basis, 68 million transit trips, 2.6 million commercial airline passenger trips, and the movement of over 52 million tons in foreign cargo through the Port of Baltimore.

### State's Receipt of U.S. Department of Transportation Funding

5.      As part of my regular job duties, I oversee modal administrations and work with transportation authorities that administer billions of dollars in federal aid over the life of our FY 2025-2030 CTP, MDOT's six-year capital plan. Annually, this includes approximately $1.4 billion in multi-modal federal assistance.

6.      From the Federal Aviation Administration (FAA), Maryland receives formula dollars through the Airport Infrastructure Grant (AIG) Program.

7.      From the National Highway Traffic Safety Administration (NHTSA), Maryland receives formula funds through the State and Community Highway Safety Program (Section 402) and the National Priority Safety Program (Section 405).

8.      From the Federal Highway Administration (FHWA), Maryland receives formula dollars from the National Highway Performance Program (NHPP), Surface Transportation Block Grant Program (STBG), Highway Safety Improvement Program (HSIP), Rail-Highway Crossings Program (Section 130), Congestion Mitigation & Air Quality Improvement Program (CMAQ), Metropolitan Planning Program (MPP), National Highway Freight Program (NHFP), Carbon Reduction Program (CRP), and the Promoting Resilient Operations for Transformative, Efficient, and Cost-Saving Transportation (PROTECT) Formula Program. The STBG funds formula grants to sub-recipients under the Transportation Alternatives, Recreational Trails and Safe Routes to School programs. The CRP funds formula grants to sub-recipients under that program.

9.      The FHWA Fiscal Year 2025 formula funding apportionment for the State of Maryland is $844,906,008 across programs.

10.     From the Federal Transit Administration (FTA), Maryland receives formula dollars under Section 5303 – Metropolitan Transportation Planning Program; Section 5304 – Statewide Transportation Planning Program; Section 5307 + 5340 – Urbanized Area Formula Program; Section 5310 – Enhanced Mobility of Seniors and Individuals with Disabilities; Section 5311 + 5340 – Formula Grants for Rural Areas; Section 5311(b)(3) Rural Transit Assistance Program (RTAP); Section 5311(c)(3) Appalachian Development Public Transportation Assistance Program; Section 5337 – State of Good Repair Formula; Section 5339(a) Buses and Bus Facilities Formula; and Section 5329 – State Safety Oversight Program.

3

**Federal Transit Administration Master Agreement**

11.    On behalf of the State of Maryland, the MTA is a designated recipient of FTA funding. MTA and WMATA administer most of the FTA federal funding in the State, with limited exceptions for planning funds distributed by TSO to Metropolitan Planning Organizations (MPOs).

12.    The FTA issued an update to its Master Agreement, dated April 25, 2025. Section 12(m) of the revised Master Agreement states, "the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

13.    FTA utilizes the Transit Award Management System (TrAMS) grant management tool, which allows recipients to apply for federal funds and manage their programs in accordance with federal requirements and enables FTA's review, oversight, and approval of funds.

14.    On May 1, 2025, through TrAMS, FTA provided MTA, as a condition of obligation of $27,505,976 in Fiscal Year 2020 and $57,900,858 in Fiscal Year 2021 Section 5307 funds, that it accept Section 12(m) of the Master Agreement. These funds are facing upcoming obligation deadlines, and Maryland has already expended $68,000,000 under the provisions of the funding programs. Even a temporary pause in the normal flow of these funds would open an immediate budget hole for MTA and would force Maryland to cut or reduce critical and significant transportation projects and services because of the gap.

15.    FTA formula funding supports the day-to-day operation of the MTA and its local partners, ensuring a well-maintained transit system that Maryland transit riders rely on. Section 5307 Urbanized Area Formula funds provide MTA critical capital funding to support the

4

replacement of buses past their useful service life, agency-wide rehabilitation projects like elevator modernizations, purchases of paratransit vehicles to enable mobility for all system users, and capital purchases, as well as limited operating support, for small urban transit systems around the State. Section 5311 Nonurbanized Area Formula funds support local jurisdictions in the operation of transit in rural areas, ensuring mobility options for all populations in the State of Maryland. Section 5337 State of Good Repair Formula funds support regular, preventive maintenance on MTA's light rail, metro, and commuter rail systems. Specifically, these funds support the mid-life overhaul of MTA's existing light rail vehicle fleet and the full replacement of metro cars and its train control system, supporting reliability and safety for both MTA workers and transit users.

16.    Based on FTA's May 5, 2025, Full Year Apportionment State Table for Fiscal Year 2025, reflecting the passage of a full-year Continuing Resolution, the State of Maryland will receive $364,735,296 across FTA formula programs, approximately $267,000,000 of which will directly support MTA activities. The Master Agreement applies to each Underlying Agreement (Grant Agreement, Cooperative Agreement, Loan Agreement, or Line of Credit Agreement) for specific Award funding authorized by the IIJA, prior surface transportation authorizations, and annual Congressional appropriations. It is MDOT's understanding that USDOT seeks to make all of these funds subject to Section 12(m) of the Master Agreement.

### Restriction of U.S. Department of Transportation Discretionary Grants

17.    MDOT maintains a robust discretionary grants program that coordinates and tracks grant submissions through TSO. Since the passage of the IIJA, MDOT has been awarded nearly $1 billion in direct recipient discretionary grant assistance. I have reviewed grant awards for these grants that were issued to MDOT and am familiar with their contents.

5

18.    USDOT administers many grant programs where States are the primary grant recipients. MDOT is awarded competitive discretionary grant funding through agencies including the FAA, FHWA, Federal Railroad Administration (FRA), FTA, Maritime Administration (MARAD), NHTSA, and Office of the Secretary (OST). Examples of these programs include the Local and Regional Project Assistance Program (also known as Better Utilizing Investments to Leverage Development (BUILD)) (49 U.S.C. § 6702), the National Infrastructure Project Assistance (Mega) Program (49 U.S.C. § 6701), Grants for Buses and Bus Facilities (49 U.S.C. § 5339(b)), the Airport Improvement Program (49 U.S.C. § 47104), the Consolidated Rail Infrastructure and Safety Improvement program (49 U.S.C. § 22907), the State Electronic Data Collection Grant Program (P.L. 117-58 Section 24018(d)(3)), and the Port Infrastructure Development Program (46 U.S.C. § 54301). Collectively, these programs provide competitively earned funding to the State of Maryland to advance critical multi-modal transportation projects that enhance the use and safety of the entire State's transportation infrastructure and services network.

19.    There are approximately 41 MDOT projects, representing $515 million in federal funding, that have previously been announced as awarded by USDOT that USDOT is conditioning upon a new requirement that federal funding recipients participate in federal law enforcement efforts. MDOT has delayed the execution of these agreements while considering the implications of the new requirement.

| Program Name | Project Name | MDOT Recipient | Award Date | Funding Amount |
|---|---|---|---|---|
| Local and Regional Project Assistance (BUILD) | MD 210 Bicycle and Pedestrian Connectivity Project: Phase I Improvements | SHA | 1/11/2025 | $11,850,000 |

| Program Name | Project Name | MDOT Recipient | Award Date | Funding Amount |
|---|---|---|---|---|
| Railroad Crossing Elimination (RCE) | Kensington MARC Station Overpass Feasibility Study | MTA | 1/10/2025 | $150,000 |
| RCE | Rosedale Maryland Grade Crossing Improvement Project | TSO | 1/10/2025 | $2,958,969 |
| Charging and Fueling Infrastructure | MD-NJ-PA-WV Charging Ahead Partnership: I-81 & I-71 Freight Corridor | SHA | 1/8/2025 | $14,400,000 |
| Prioritization Process Pilot Program | Maryland Surface Transportation Project Prioritization Process | SHA | 12/11/2024 | $2,000,000 |
| State Electronic Data Collection | Automated Crash Reporting System | MVA | 12/11/2024 | $13,200,000 |
| Wildlife Crossing Pilot Program | Reducing Wildlife-Vehicle Collisions in Maryland through Planning, Design and Technology | SHA | 12/10/2024 | $387,424 |
| Roadside Pollinator Program | Development and Implementation of Pollinator-Friendly Practices on Maryland Roads | SHA | 12/5/2024 | $150,000 |
| Low Carbon Transportation Materials (LCTM) Program | Material Progress: Advancing Maryland's Carbon Reduction Strategy through LCTM | SHA | 11/14/2024 | $31,933,577 |
| Advanced Digital Construction Management Systems | P3DSETI Pilot Expansion Project | SHA on behalf of (obo) Montgomery County DOT | 11/4/2024 | $1,000,000 |
| Pilot Program for Transit Oriented Development (TOD) Planning | Preparing for the Purple Line: An Anti-Displacement Plan | MTA obo University of Maryland | 11/4/2024 | $1,649,931 |
| Consolidated Rail Infrastructure and Safety Improvement (CRISI) | Maryland Trespassing Safety Study | TSO | 10/29/2024 | $800,000 |

7

| Program Name | Project Name | MDOT Recipient | Award Date | Funding Amount |
|---|---|---|---|---|
| Airport Terminal Program (ATP) | Martin State Airport Traffic Control Tower Replacement | MAA | 10/24/2024 | $1,000,000 |
| National Infrastructure Project Assistance (INFRA) | Curtis Creek Drawbridge Rehabilitation and Resiliency Project | MDTA | 10/21/2024 | $7,500,000 |
| INFRA | Dundalk Marine Terminal Reconstruction of Berths 11-13: Phase 1 | MPA | 10/21/2024 | $30,906,706 |
| Electric Ferry Program | Annapolis – Baltimore – Matapeake Park Ferry Service | MTA obo Anne Arundel County | 9/19/2024 | $3,895,000 |
| Airport Improvement Program – Supplemental | DX-DY Apron Reconstruction at BWI | MAA | 9/6/2024 | $19,349,912 |
| Commercial Driver's License Program Implementation (CDLPI) | Maryland Commercial Driver's License Program Implementation | MVA | 9/1/2024 | $256,966 |
| Bridge Investment Program | Rethinking the I-68 Viaduct: A Plan to Reconnect Cumberland | SHA | 8/7/2024 | $1,600,000 |
| Bus and Bus Facilities Discretionary | Bus Acquisition for Route 409 | MTA obo Howard County | 7/26/2024 | $960,000 |
| Low or No Emission Grant Program | Battery-electric Bus Purchases | MTA obo Prince George's County | 7/9/2024 | $25,475,520 |
| BUILD | Aberdeen TOD: Station Square Phase II | MTA obo City of Aberdeen | 6/24/2024 | $800,000 |
| BUILD | BWI Multi-modal Ground Transportation Center and Automated People Mover Study | MAA | 6/24/2024 | $800,000 |

8

| Program Name | Project Name | MDOT Recipient | Award Date | Funding Amount |
|---|---|---|---|---|
| BUILD | Opportunities for Access and Connectivity at Reisterstown Plaza Station | MTA | 6/24/2024 | $4,690,700 |
| Reduction of Truck Emissions at Port Facilities | Reduction of Heavy-Duty Emissions – Equipment Replacement | SHA obo MPA | 4/24/2024 | $642,258 |
| Reconnecting Communities and Neighborhoods Program | Enhancing Easton Neighborhood Access on US 50 | SHA | 3/13/2024 | $3,309,759 |
| Rail Vehicle Replacement (FY 25) | Light Rail Vehicle Replacement Project | MTA | 2/21/2024 | $165,243,009 |
| ATP | Martin State Airport Traffic Control Tower Replacement | MAA | 2/15/2024 | $5,400,000 |
| Passenger Ferry Grant | Hybrid-electric Ferry Replacement and ADA Station Improvements | MTA obo Baltimore City | 2/12/2024 | $5,086,250 |
| Electric/Low Emitting Ferry Pilot Grant | Eastport – City Dock Ferry Service Pilot Project | MTA obo City of Annapolis | 2/12/2024 | $2,975,000 |
| Mega | I-895 Baltimore Harbor Tunnel at the Frankfurst Avenue Interchange Improvement projects | MDTA | 1/24/2024 | $80,000,000 |
| NEVI Set-aside | Electric Vehicle Infrastructure Accessibility and Reliability Project | SHA | 1/18/2024 | $4,360,176 |
| CRISI | Penn Camden Connector: Design | MTA | 9/25/2023 | $8,800,000 |
| CRISI | Port of Baltimore Strategic Acquisition of Battery Electric Locomotives | MPA obo TSO | 9/25/2023 | $11,584,317 |
| Area of Persistent Poverty (AOPP) Grant | Harford Transit LINK: Microtransit Plan | MTA obo Harford County | 7/20/2023 | $127,500 |

9

| Program Name | Project Name | MDOT Recipient | Award Date | Funding Amount |
|---|---|---|---|---|
| AOPP Grant | Shore Transit: System Design | MTA obo Shore Transit | 7/20/2023 | $327,600 |
| BUILD | Mondawmin Transit Hubb | MTA | 6/30/2023 | $20,000,000 |
| Pilot Program for TOD Planning | Purple Line Corridor Equitable Analysis | MTA obo UMD | 11/17/2022 | $1,498,000 |
| BUILD | Building Baltimore Penn Station Connections | MTA | 9/20/2022 | $6,000,000 |
| BUILD | New Carrollton Multi-modal Transportation Hub | MTA obo Prince George's County | 8/11/2022 | $20,500,000 |
| Bus and Bus Facilities Discretionary | Bus Replacement Project | MTA obo Harford County | 3/22/2022 | $1,498,000 |
|  |  |  |  |  |
| Total federal funding amounted |  |  |  | **$515,055,574** |

20.    The programs funded by the USDOT are vital to develop, maintain, and ensure safety in the State's roads, highways, transit systems, railways, airports, and ports.

21.    The $80,000,000 Mega award for the I-895 Baltimore Harbor Tunnel and the Frankfurst Avenue Interchange Improvement projects will upgrade aging bridge infrastructure, enhance highway safety for both passenger and freight vehicles, and complete MDTA's implementation of automatic electronic tolling (AET) on its toll facility network, estimated to both enhance safety and reduce greenhouse gas emissions by reducing vehicle idling. The INFRA award for the Dundalk Marine Terminal Reconstruction of Berth 11 will replace a 60-year-old berth that is aging and becoming a growing maintenance burden on the State of Maryland and support the recovery and growth of the Port of Baltimore in the wake of the tragic collapse of the Francis Scott Key Bridge. The CRISI award for the Penn Camden Connector will

10

support preliminary engineering and National Environmental Policy Act activities to advance a

transformative passenger rail project by connecting two MARC commuter lines, creating new

operating efficiency for both MARC and Amtrak, and enable the potential for innovative

commuter rail operations connecting Washington, D.C, Baltimore, Western Maryland and other

commuter rail systems along the Northeast Corridor.

22.    If these previously awarded funds are withheld, even temporarily, MDOT would

have to cease critical engineering activities to support both future Amtrak and MARC operations,

be at risk of losing service at Dundalk Marine Terminal Berth 11 (the largest publicly owned

terminal in the Port of Baltimore that directly supports 650 high-wage and high-skill jobs), and

would have to delay implementation of AET and state of good repair investments at I-895

Baltimore Harbor Tunnel.  These disruptions to critical infrastructure projects would cause

irreversible harm to Maryland that could not be erased by a later restoration of funding.

23.    For the vast majority of these grant awards, if MDOT is unable to move forward

with the awards, the funding may be lost to MDOT forever if USDOT decides to pull the award

or award the money to another state or entity. Discretionary grant opportunities allow MDOT to

advance projects for federal funding that would, otherwise, not advance with just state or local

contributions. This cost share partnership is a fundamental foundation of the USDOT federal-aid

program. MDOT utilizes discretionary funding opportunities to strategically advance projects

that advance the national interest and maintain a safe, reliable, and efficient transportation

network.

24.    In its normal course of business, MDOT and USDOT process amendments and

partial year funding obligations of discretionary grants. These amendments may include

negotiated changes to project scopes, schedules, and funding timelines.

11

25.    On April 29, 2025, MTA requested obligation of its remaining balance of $165,243,009 for its Fiscal Year 2025 of its Rail Vehicle Replacement Grant (49 U.S.C. § 5337) to replace its aging light rail vehicle fleet with modern, accessible transit vehicles. As a condition of this obligation on the existing award, however, FTA has required MTA to accept Section 12(m) in the Master Agreement. As a result, MTA cannot access these funds, although it needs them urgently. The current light rail vehicle fleet is at or approaching the end of its useful life and has become increasingly difficult to maintain in safe and operable condition. In the last year, MTA lacked a sufficient number of vehicles to operate full service on several days. A delay in MTA's receipt of the $165,243,009 left to obligate on this grant will cause a corresponding delay in the procurement of new vehicles and a day-for-day delay in new vehicles arriving, triggering more service interruptions and safety concerns.

26.    Based on communications with USDOT since April 24, 2025 (including the letter from U.S. Transportation Secretary Sean Duffy referenced below, amendments, etc.), MDOT believes that USDOT will continue to require the State's concurrence with federal immigration enforcement terms and conditions any time MDOT or USDOT seeks to amend or obligate funding from existing executed grants and grant agreements. This would represent an unprecedented and devastating interruption of MDOT's normal course of business in receiving and administering federal aid for the State of Maryland and local jurisdictions.

**Local Aid Grants**

27.    I am familiar with the Transportation Alternatives (23 U.S.C. § 133(h)), Recreational Trails (23 U.S.C. § 206), Congressionally Directed Spending or Highway Infrastructure (42 U.S.C. § 5133(I)(1)), and Carbon Reduction (23 U.S.C. § 175) grant programs. SHA administers these funds on behalf of FHWA and makes them competitively available for

local governments and jurisdictions in the State of Maryland, as authorized by statute, or provides funding to local governments as directed by Congress.

28.    I am familiar with Section 5307, 5339, 5310, and 5311 formula funds and discretionary programs such as Buses and Bus Facility and Low or No Emission Grant (49 U.S.C. § 5339) Programs, Local and Regional Project Assistance, Reconnecting Communities Pilot Program (Pub. L. 117–58 §11509), Passenger Ferry Grants (49 U.S.C. § 5307(h)), Electric of Low-Emitting Ferry Pilot Program (P.L. 117-58 § 71102), Pilot Program for Transit-Oriented Development Planning (49 U.S.C. § 5303 note), Areas of Persistent Poverty, and Congressionally Directed Spending through the Transit Infrastructure Grant (TIG) and Economic Development Initiative (EDI) programs. In certain cases, the MTA administers these funds on behalf of local jurisdictions and entities or provides funding to local governments as directed by Congress.

29.    Annually, MTA coordinates submissions from local jurisdictions and entities that seek competitive funding from the FTA's Buses and Bus Facility and Low or No Emission and Passenger Ferry Grant Programs.

30.    Several of the aforementioned grants are non-competitive formula funds or consist of funding to projects designated by Congress.

31.    Based on FHWA apportionments for Fiscal Year 2025, Maryland will receive $19,245,517 in Carbon Reduction Program funds and $21,675,025 in Transportation Alternative funds, of which a statutorily defined percentage may be used to support Recreational Trails program grants.  Based on FHWA apportionments for Fiscal Year 2024 Highway Infrastructure Grants, or Congressionally Directed Spending, Maryland will receive $33,546,279 in funding for projects as directed by Congress. Since Fiscal Year 2022, SHA has received over $79,000,000 to

13

support both MDOT projects as well as local jurisdiction projects. MTA has five Congressionally Directed Spending projects, totaling $14,250,000 in Fiscal Year 2022-2024 funds, that have not yet been obligated, in support of local jurisdiction projects.

32.    SHA currently distributes funding to all of Maryland's 23 counties and the City of Baltimore and numerous community-based organizations and non-profits through subawards. These programs allow local governments to advance active transportation, pedestrian safety, and defined carbon-reducing projects through design and construction. Collectively, these efforts enhance access to the roadway network for all users and advance the State of Maryland's climate goals and greenhouse gas reduction efforts.

33.    Both SHA and MTA enter into subrecipient agreements with eligible local governments and non-profits to advance these grants. This helps to ensure that projects meet the intent of local sponsors and assists localities in administering federal funds in which they may lack the capacity to do so. It is MDOT's understanding that USDOT seeks to subject these subrecipients to immigration enforcement conditions that were not included at the time of application or allocation or when Congress specifically directed funding, and that MDOT would be ultimately responsible for confirming their compliance as the direct recipient.

34.    On February 6, 2025, MDOT and SHA opened its competitive funding portal for local governments to apply for Fiscal Year 2024-2026 Carbon Reduction Program funding on the Maryland OneStop portal. The application period closed on March 26, 2025.

35.    On April 1, 2025, SHA opened its competitive funding portal for local governments to apply for Fiscal Year 2026 Transportation Alternative, Safe Routes to School, and Recreational Trails funding on the Maryland OneStop portal. The application period closed on April 30, 2025.

36.     Local governments submitted applications to these portals based on the existing FHWA grant terms and conditions at the time of application.

### Harms to the State Caused by USDOT's Funding Condition

37.     I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of USDOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT." The letter was also shared by various USDOT agencies, such as FRA and FTA, with the MDOT.

38.     In my 20-plus-years with MDOT or its modal administrations, I am not aware of MDOT staff ever being required as a condition for funding to enforce, certify, or participate in the enforcement of federal civil immigration law. Further, given that MDOT's mission is transportation, the vast majority of MDOT personnel lack the expertise, training, or capacity to take part in enforcing federal immigration law. Developing that capacity would incur untold costs in training, establishing procedures and guidelines, and lost personnel time.

39.     If MDOT were required to enforce or participate in the enforcement of federal civil immigration law as a condition of receiving USDOT funding, my understanding is that MDOT would be unable to comply with the federal government's new funding conditions, due to, among other reasons, lack of relevant agency capacities, limitations on state agency resources, and the requirements of Maryland state law.

15

40.     It also is not clear to me what USDOT means to include within the broad phrase "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." USDOT has not made clear what limits there may be—if any—to the "cooperating" that would be required.

41.     If MDOT were denied FY 2025 and previously awarded but unobligated USDOT funds because of the federal government's new funding conditions, the State would be unable to maintain the critical programs described above.

42.     As discussed above, USDOT's introduction of this new requirement has forced MDOT to delay execution of funding agreements, because MDOT faces a choice of either agreeing to terms it could not fulfill or losing vast amounts of essential funding.

43.     On May 7, 2025, MDOT received electronic communication from the FRA requesting MDOT's review and concurrence of its grant agreement to execute $800,000 in Rail Crossing Elimination (RCE) funds to advance a statewide trespassing study. The updated agreement terms contain additional immigration-enforcement language that were posted publicly with FRA's April 30, 2025, terms and conditions update. FRA provided MDOT with a deadline of May 13, 2025, to either concur with the agreement or to provide a response confined to "substantive edits" that "would prevent you from executing the agreement as drafted." According to the Fiscal Year 2023-2024 RCE Notice of Funding Opportunity (NOFO), there is no mandated obligation deadline or expenditure deadline. MDOT understood FRA's instructions to foreclose any possibility of eliminating the immigration-enforcement language.

44.     On April 22, 2025, MDOT received electronic communication from the FHWA Maryland Division (MD) seeking MDOT's review and concurrence of its grant agreement to

16

execute $387,424 in Wildlife Crossing Pilot Program (WCPP) funds to advance a statewide wildlife collision study and assessment. FHWA-MD set a two-week deadline for MDOT through SHA to complete an updated grant agreement, with additional immigration-enforcement language included. MDOT had communicated to FHWA-MD on January 17, 2025, requesting to advance grant agreement preparation, but did not receive any guidance until April 22, 2025. The Fiscal Year 2024-2026 WCPP NOFO provided obligation deadlines of within three years of the Fiscal Year in which the grant was awarded and noted funds were then available until expended.

45.    On May 6, 2025, a senior FHWA official verbally requested that SHA submit two pending grant agreements to FHWA by May 15 and May 17, stating that the failure to do so could endanger those two discretionary grants. SHA informed FHWA that the new grant agreement terms were under legal review, and that approval of the grants could be expedited if FHWA would allow for execution of the longstanding previous grant terms. The senior FHWA official indicated that Maryland must use the new template agreement terms, and that failure to submit the agreements expeditiously could endanger not only these two grants, but *all* federal funding, including formula funds and funding for the replacement of the Francis Scott Key Bridge, which collapsed in 2024 when the cargo ship Dali crashed into one of its piers.  Congress provided for FHWA to fund 100 percent of the reconstruction of the bridge through the Emergency Relief Program.  *See* American Relief Act, Pub. L. No. 118-158, 138 Stat. 1722, 1758 (2024).  The two pending agreements discussed in the May 6 conversation amount to only $1.75 million in grants.  Combined, the Key Bridge funding and the FHWA formula funds amount to billions of dollars in estimated annual funding.

46.    MDOT does not have any other appropriation in its budget that could cover the loss of federal formula and discretionary funding that Secretary Duffy has indicated will be

17

subject to terms that require the State to enforce federal immigration responsibilities. If MDOT cannot access federal funds, MDOT will not have funds to immediately cover at minimum approximately 31 unique programs funded by discretionary grants and projects and dozens of projects made available to local governments by USDOT.

47.    For instance, MVA does not have any other appropriations in its budget that could cover the loss of the grants discussed above.  If MVA cannot access federal funds, MVA will not have funds to immediately cover at a minimum approximately 202 programs funded by the grants. This, in turn, will result in the MVA's inability to award general safety grants that fund outreach initiatives focused on safe driver behaviors, and law enforcement grants that fund overtime enforcement, equipment, and other traffic safety initiatives.

48.    For grants with subrecipients, without access to FTA FFY 20-25 grant funding that is not yet obligated, MTA will not be able to support Locally Operated Transit Systems that provide urban and rural services in local jurisdictions across the State. MTA will not have funds to immediately cover $184,871,448 that it has awarded to local transit providers and non-profits. These MTA awards are funded by FTA programs that would be subject to the updated Master Agreement.

49.    The inability of MTA to access previously awarded and apportioned federal funds could cause the State to cancel any unspent awards, in turn, causing local governments and other subrecipients to stop funding programs vital to local community connectivity and access to individuals with disabilities and seniors  The lack of funding will result in interruptions, terminations, and other harm to citizens that would lose access to vital and safe transit services that carry them to jobs, school, worship, medical appointments, and other essential life activities.

50.    For grants with subrecipients, SHA would be unable to advance approximately

$77,500,000 in FFY 2022-2024 Congressionally Directed Spending, $19,245,517 in Carbon Reduction Program FFY 2025 funds and $21,675,025 in Transportation Alternative FFY 2025 funds to local governments due to immigration enforcement conditions. In addition to these formula and congressionally mandated funds, SHA does not have appropriations available to replace federal funding of approximately $1,000,000 for unobligated discretionary grants it has been asked to administer on behalf of local jurisdictions.

51.    The inability of SHA to access both formula and discretionary funds it administers on behalf of local governments, or for which it enters subrecipient agreements with local governments, would greatly disrupt the efforts of counties, towns, and cities to upgrade aging infrastructure and increase safety. For example, the Transportation Alternative (TA) program provides local jurisdiction regular and predictable funding to create safe walking and biking facilities for students to get to school and vulnerable road users. Examples of recent TA awards include $6,400,000 for Anne Arundel County to extend the BWI Marshall Airport Loop Trail, $1,243,324 for Allegany County to rehabilitate 11 miles of the C&O Canal Towpath, one of the most visited National Parks in the United States, and $630,000 to support safer routes to school in Baltimore City, Baltimore County, Caroline County, and at Mount St. Mary's University.

52.    The Carbon Reduction Program (CRP) provides local governments predictable funding to meet their environmental and sustainable goals, while enhancing the state of good repair and safety of their transportation systems. Examples of recent CRP awards include $252,000 to Anne Arundel County to upgrade traffic management and video detection systems, $400,000 to Harford County to purchase LED street lights, and $910,000 to Howard County to increase access to a Park-and-Ride facility near MD 32.

19

53.    Without access to FY 2025 grant funding, MVA's Highway Safety Office also will not have funds to immediately cover at a minimum approximately 202 subawards to 87 agencies under 2 unique programs funded by the federal grant programs.  If MVA's Highway Safety Office is not able to access federal funds by June 30, 2025, to allow time for it to process reimbursement requests from subrecipients, it will be forced to stop funding programs and subrecipients prior to the end of their performance period, which could result in interruptions, terminations, and other harm to initiatives to prevent motor vehicles crashes and eliminate roadway fatalities.  For instance, grant funding has contributed to safety performance targets including public marketing campaigns, such as the Baltimore Metropolitan Council's LOOK ALIVE campaign, high visibility enforcement programs, such as the Maryland State Police Impaired Driving Reduction Effort, and the development of local Strategic Highway Safety Plans to address specific traffic safety challenges.

54.    The longer MDOT cannot access funds, the more widespread the interruptions, terminations, and harm will become. Losing these USDOT funds would severely obstruct and undermine MDOT's mission even if the funding were restored at a later date.


I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19 , 2025 ~~in Hanover, Maryland~~.


Paul J. Wiedefeld

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants.*

---

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 31

Declaration of Bruce A. Van Note

## DECLARATION OF MAINE DEPARTMENT OF TRANSPORTATION

I, Bruce A. Van Note, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based
on my own personal knowledge, and if called as a witness, I could and would testify competently
to the matters set forth below.

2.      I am the Commissioner of the Maine Department of Transportation (MaineDOT).
My job duties are outlined in Maine statute and include among other responsibilities, to accept
and receive and be the sole administrator of all federal or other moneys for and on behalf of the
State of Maine or any political subdivision thereof now or hereafter available for purposes of
transportation.

3.      I have 32 years of professional transportation work experience in Maine,
including more than 22 years at MaineDOT. My MaineDOT experience includes 12 years as
Deputy Commissioner and 6 years as Commissioner.

### Background

4.      MaineDOT's mission is to responsibly provide our customers the safest and most
reliable transportation system possible, given available resources. MaineDOT has an extensive,
statewide, multimodal transportation system that includes 8,800 miles of state highway; 2,800
bridges and minor spans; six commercial airports; more than 1,300 miles of active railroad; 15
bus transit providers; passenger rail service; a state ferry service; three seaports; and miles of
active transportation corridors.

5.      Each year MaineDOT releases a three-year Work Plan document that includes
more than 2,700 work items covering three calendar years (for instance, the 2025 Work Plan
covers calendar years 2025, 2026, and 2027).  Included in these work items are all operational

and capital funding based upon information available in the fall of 2024. In the 2025 Work Plan total resources over the three years are estimated at roughly $4.8 billion, or an average of $1.6 billion per year. Federal funding supports 48 percent of the total resources needed for items outlined in the 2025 Work Plan.

### Maine's Receipt of USDOT Grants

6.      MaineDOT is responsible for administering 29 federal grants awarded by USDOT since the enactment of the Infrastructure Investment and Jobs Act (IIJA), representing over $576 million in federal funds. While too numerous to list here, each grant supports critical programs in Maine, keeping our roadways, waterways, transit systems, and our pedestrians safe.

7.      Discretionary federal funding is a critical component of federal funding for MaineDOT. In 2024, MaineDOT received more than $300 million in awards of grant funding and more than $121 million in Congressionally Directed Spending appropriations.

### Maine's Use of Federal Highway Administration Funds

8.      The IIJA calls for MaineDOT to eventually receive $1.3 billion in core federal highway (e.g., National Highway Performance Program, Surface Transportation Block Grant Program, Highway Safety Improvement Program, and Congestion Mitigation and Air Quality Program) and bridge program funding and an additional $225 million in dedicated bridge funding over five years (FY2022-2026). Funding for core federal highway programs from the Federal Highway Administration (FHWA) in this Work Plan is estimated at $1.045 billion.

9.      Included in FHWA's Stewardship and Oversight Agreement between MaineDOT and FHWA Maine Division Office, Section III notes that MaineDOT is to exercise any and all assumptions of the FHWA's responsibilities in accordance with Federal laws, regulations, policies, Executive Orders, and procedures that would apply if the responsibilities were carried out by FHWA.

**Maine's Use of Federal Multimodal Funds**

10.      In addition to highway-related programs, MaineDOT receives about $57 million of formula funding for non-highway modes over the three-year Work Plan period from the Federal Transit Administration (FTA), Federal Railroad Administration, Federal Motor Carrier Safety Administration, and U.S. Fish and Wildlife Service. Those modes include transit, rail, marine, and other programs that are administered by MaineDOT.

11.      On April 25, 2025, FTA updated its Master Agreements to include the *Federal Law and Public Policy Requirements* MaineDOT intends to apply for the remaining FY 25 Federal Transit Administration formula funds announced on May 5, 2025 to which the Master Agreement applies.

**Immigration Enforcement and its Impact on MaineDOT Grant Administration**

12.      I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of USDOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." It also stated "[w]hether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so called 'diversity, equity, and inclusion,' or 'DEI' goals, presumptively violates Federal law."

13.      This letter warned that "failure to cooperate . . . in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

3

14.     MaineDOT does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." MaineDOT is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

15.     In my years with MaineDOT, I am not aware of MaineDOT staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because MaineDOT is responsible for duties related to the development, maintenance, and safety of transportation infrastructure, MaineDOT lacks any capacity to enforce civil immigration law.

16.     Additionally, if MaineDOT is unable to comply with the federal government's new funding conditions, the State would be unable to receive federal funds, depriving the State of approximately $629 million in federal funding for roughly 1,290 projects that have been awarded but have not been closed out, frustrating its ability to maintain the critical programs described above.

17.     MaineDOT does not have any other appropriation in its budget that could cover the loss of the federal funding discussed above. If MaineDOT cannot access federal funds, MaineDOT will not have funds to immediately cover - at minimum - approximately 118 projects remaining to be advertised in 2025 representing roughly $577 million. This, in turn, will result in putting projects currently under construction at risk as MaineDOT would prioritize completing those projects with the highest safety and critical need.

18.     The MaineDOT budget for this year has relied on discretionary grant funds and we made plans and allocated funding for Calendar Year 2025 based on our continued ability to

draw down on promised federal funding. For instance, MaineDOT was awarded a FY22 Infrastructure for Rebuilding America (INFRA) award for $44.1M to complete Phase II of a commercial two-lane bypass route of Presque Isle's Main Street (US Route 1), constructing an approximately 6.3 mile long, two lane highway that will connect US Route 1 south of the city to the current bypass section already in service.  Absent federal funding, this $88 million project will not be able to be advertised in 2025.

19.    Without access to the federal funding, MaineDOT cannot commit funding for furtherance of roughly 118 remaining projects scheduled to be advertised. Any pause or termination in federal funding would increase costs to the project unnecessarily or cause them not to advertise.

20.    The loss of federal funding since the adoption of agreements with the new term would result in impacts to transit services and projects, highway and bridge projects set to advertise in 2025, suspension of current construction activities during the start of the construction season, and would put the traveling public at risk.

21.    The longer MaineDOT cannot access federal funds, the greater the risk that additional programs will be interrupted or terminated. Losing these DOT grants and formula funding would severely obstruct and undermine MaineDOT's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on May 12, 2025 in Augusta, Maine.

Bruce A. Van Note

5

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

            *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

            *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 32

## Declaration of Bradley C. Wieferich

## DECLARATION OF BRADLEY C. WIEFERICH

I, Bradley C. Wieferich, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of 18.  I know the following facts based on my personal knowledge and based on my review of information and records gathered by my staff.  If called as a witness, I could and would testify competently to the matters set forth below.

### Background

2.      I am the Director of the Michigan Department of Transportation (MDOT) and have held that position since 2023.

3.      MDOT is responsible for the construction, maintenance, and repair of the Michigan trunkline highway system.  In addition, MDOT receives federal transportation and grant funding for various transportation modes, including aviation, rail, and transit.  Finally, MDOT is responsible for distributing and administering federal transportation funding for Michigan counties, cities, and villages.

4.      As part of my regular job duties, I oversee grant managers who manage all federal grant awards to MDOT.  My staff has reviewed past and present award documents for grants issued to MDOT and is familiar with their contents.

### MDOT's Annual Receipt of U.S. Department of Transportation Grants

5.      The U.S. Department of Transportation (DOT) administers many discretionary grant programs where States are the primary grant recipients.  These grant programs are administered through various DOT subagencies, including the Federal Highway Administration (FHWA), the Federal Railroad Administration (FRA), the Federal Transit Administration (FTA), and the Federal Aviation Administration (FAA).

6.     Since 2021, DOT has awarded MDOT $771,675,734 in discretionary grants to MDOT under the Infrastructure Investment and Jobs Act (IIJA), Public Law 117-58. These grants include:

| | | | |
|---|---|---|---|
| Detroit New Center Intermodal Facility | RAISE | Rail | $10,000,000 |
| Michigan Accelerated Rail Bridge Construction Project | SOGR | Rail | $1,548,750 |
| Great Lakes Central Rail Improvements to Enhance Michigan's Rural Economy | CRISI | Rail | $21,340,300 |
| Detroit Mobility and Innovation Corridor | RAISE | Road and Bridge | $25,000,000 |
| Michigan Department of Transportation on behalf of Interurban Transit Authority and People's Express | B&B Facil. | Transit | $6,197,180 |
| I-375 Improvement and Community Reconnection Project | INFRA | Road and Bridge | $104,657,051 |
| Bridging I-696: Connecting Oak Park | Recon. Comm. | Road and Bridge | $21,704,970 |
| Michigan Department of Transportation on behalf of four rural transit agencies | B&B Facil. | Transit | $514,002 |
| One Bridge, Many Connections: Reinventing the Lafayette Bascule Bridge | BIP | Road and Bridge | $73,000,000 |
| Detroit/Pontiac – Chicago Corridor | Corridor ID | Rail | $500,000 |
| Grand Rapids – Chicago Corridor | Corridor ID | Rail | $500,000 |
| Port Huron – Chicago Corridor | Corridor ID | Rail | $500,000 |
| Grade Separation of M-85 and CN Railroad Project (RCE Grant) | Rail | Rail | $73,446,704 |

| Manistee River Bridge Replacement Project | CRISI | Rail | $20,389,500 |
| Electric Vehicle Charger Reliability and Accessibility Accelerator Program Grant | EVC-RAA | Road and Bridge | $1,836,043 |
| Construction of new ferry and engineering work for dock renovations for Beaver Island Transportation Authority | FSRC | Transit | $6,628,285 |
| Partnering Automated Work Zones | HP-ITD | Road and Bridge (ITS) | $2,000,000 |
| Blue Water Bridge International Smart Freight Corridor | SMART | Road and Bridge (ITS) | $1,806,218 |
| Advancing Rural Mobility: Michigan Public Transit Open Data Standards Program | SMART | Transit | $1,310,447 |
| Dock renovations for the Beaver Island Transportation Authority (BITA) in the State of Michigan | FSRC | Transit | $10,000,000 |
| Michigan Innovative Finance Asset Scan for Transportation (MI-FAST) | IFACGP | Road and Bridge | $2,000,000 |
| Pumping -Up 28th Street: Connecting Wyoming and Grand Rapids | PROTECT | Road and Bridge | $12,000,000 |
| Revitalize West Bayshore Drive | RURAL | Road and Bridge | $14,400,000 |
| Rattle Run Road Bridge Replacement Project | AID | Road and Bridge | $704,708 |
| Lafayette Bascule Bridge Project | AID | Road and Bridge | $815,404.00 |

| Thermal Imaging in Transit to Protect Vulnerable Road Users | ATTAIN | Transit | $551,732 |
| Michigan Urban Bridges Revitalization Project | BIP | Road and Bridge | $34,202,150 |
| Detroit RECHARGED - Realizing Environmental Changes Happening Around Railroads Generating Equitable Development | CRISI | Rail | $67,440,000 |
| Rural Electrification Vehicles and Charging Stations for Non-Emergency Medical Rides To Wellness, Phase Two | ICAM | Transit | $480,000 |
| Application for the Implementation of Low-Carbon Transportation Materials Program | LCTM | Road and Bridge | $31,933,577 |
| US-131 Freeway Crossing Improvements in Grand Rapids Planning Study | Recon. Comm. | Road and Bridge | $800,000 |
| The I-75 Cap Design Engineering Project | Recon. Comm. | Road and Bridge | $2,000,000 |
| Michigan Statewide Wildlife Vehicle Collision Hot Spot Analysis | Wildlife X-ing | Road and Bridge | $467,376 |
| River Raisin Bridge and Interstate 75 Revitalization Project | INFRA | Road and Bridge | $196,005,837 |
| Building a Better East Beltline Bridge | RAISE | Road and Bridge | $25,000,000 |

7.    Of these grant awards, 18 grants totaling $249,918,350 have been obligated and 17 grants totaling $521,757,384 have not yet been obligated.

8.    The projects funded by these grants are vital to develop, maintain, and

ensure safety on the State's roads, highways, railways, airways, and waterways. Examples of such grant-funded projects include:

a. Grade Separation of M-85 and CN Railroad Project (Railroad Crossing Elimination Grant). This project will eliminate a dangerous at-grade crossing on one of the Downriver Region's busiest traffic corridors, where freight tracks intersect with highway and pedestrian rights-of-way at M-85, a critical north-south route between Detroit and Trenton. MDOT was awarded $73,446,704 for final design and construction of this project.

b. Manistee River Bridge Replacement Project (CRISI Grant). This project will reconstruct the 100-year-old Manistee River Bridge to remove rail operational restrictions, improve system reliability, and increase economic output for the area. MDOT was awarded a CRISI Grant for $25,000,000 and received pre-award authority approval from FRA to start the project prior to obligation.

c. River Raisin Bridge and Interstate 75 Revitalization Project (INFRA Grant). The River Raisin bridge, which carries Interstate 75 over the River Raisin, is a crucial component of the State of Michigan's economy and the region's transportation system. With more than 61,000 vehicles traversing the bridge daily, it provides critical access to freight delivery throughout the region and to area residents for work commutes, shopping, and critical healthcare opportunities. MDOT was awarded an INFRA Grant totaling $196,005,837 for reconstruction of the bridge and associated interchange at this site.

9.     MDOT has applied for and intends to continue to apply for DOT discretionary grants that become available and that match its infrastructure needs and

resource availability.

## Harms to the State Caused by DOT's Funding Condition

10.    On April 24, 2025, I received a copy of Secretary of Transportation Sean Duffy's April 24, 2025 letter stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

11.    MDOT has since received revised grant terms and conditions from DOT subagencies, including FHWA, FTA, and FRA, which each require that "the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."  See FHWA's Competitive Grant Program General Terms and Conditions, § 18.2(a) (dated April 22, 2025); FRA's General Terms and Conditions, § 20.2 (revised April 23, 2025), FTA's Master Agreement FTA MA(33) § 12(m) (dated April 25, 2025).

12.    In addition, I am aware that FHWA has recently requested that MDOT expedite its execution of two grant agreements to which the FHWA's revised General Terms and Conditions will apply.  On May 7, 2025, FHWA requested that MDOT

execute the grant agreement for a Wildlife Crossing Pilot Program grant within 10 days.

In addition, on May 8, 2025, FHWA verbally requested that MDOT execute an

Advanced Transportation Technology and Innovation grant agreement on an expedited

basis.

13.    In my years with MDOT, I am not aware of MDOT staff ever being

required to enforce or participate in the enforcement of federal civil immigration law.

14.    If the federal government's new funding conditions require MDOT to

affirmatively enforce federal civil immigration law beyond its existing obligations under

federal and state law, including through the expenditure of restricted state transportation

funding, as a condition of receiving DOT funding, my understanding is that MDOT is

unable to comply with the federal government's new funding conditions.

15.    If MDOT is unable to comply with the federal government's new funding

conditions, the State may be unable to receive some or all of its unobligated DOT

discretionary grant awards, depriving the State of up to $521,757,384 in grant funding,

frustrating its ability to complete the critical projects described above.

16.    Additionally, for certain DOT grants, including FTA grants, MDOT passes

federal grant funding through to subrecipients, who use the funds for local transportation

programs and initiatives.  Thus, the loss of unobligated grant funding could also affect

Michigan municipalities, transit agencies, and other subrecipients.

17.    MDOT does not have any other appropriation in its budget that could

cover the loss of the grants discussed above.  If MDOT cannot access this federal grant

funding, MDOT will not immediately have funds to support the construction of up to 17

grant projects that have been awarded but not obligated.  This, in turn, could result in

MDOT having to delay or cancel other planned projects, or alternatively, being forced to reallocate already limited critical funding to projects of major infrastructure importance, including those described in Paragraph 8. Use of this funding would cause a domino effect of delaying projects in the program, canceling projects, or both. That could cause significant programmatic timing implications and result in internal and external cost escalations to the overall programs for both MDOT and its local partners.

18.    The longer MDOT cannot access federal grant funds, the greater the risk that additional programs will be interrupted or terminated.

19.    Losing these DOT grants would severely obstruct and undermine MDOT's mission even if the funding were later restored.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19, 2025, in Lansing Michigan.

_____
Bradley C. Wieferich, P.E.
Director, Michigan Department of Transportation

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 33

Declaration of James Cownie

## DECLARATION OF JAMES COWNIE

I, James Cownie, declare as follows:

1.    I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.    I am the Chief Counsel at the Minnesota Department of Transportation (MnDOT). My job duties include legal review and oversight of all of MnDOT's grants and contracts. I have been involved in grant and contract oversight at MnDOT for over 25 years. I lead a team that works on grants and contracts every day. This includes grants from every Operating Administration of the US Department of Transportation, such as the Federal Highway Administration, Federal Transit Administration, Federal Aviation Administration, and others. As part of this job, I am well-versed in the federal grant rules in 2 CFR part 200. My team is involved in all phases of grant oversight, from applying for and receiving federal grant money to approving grants to subrecipients.

3.    I have been employed by MnDOT since 1999, and I have served as Chief Counsel since October, 2024. Before starting at MnDOT, I served in legal positions with the League of Minnesota Cities, and the Minnesota State Senate as well as some private-sector employment where I was heavily involved with a wide variety of contracts. Over the course of my career, I have had experience reviewing and approving hundreds of grants that the State has received from a variety of federal agencies including the Department of Transportation (DOT).

### Background

4.    MnDOT aims to provide a safe and reliable transportation network that serves all people and respects the environment. MnDOT maintains approximately11,000 miles of state

highways within Minnesota. In addition to state highways, MnDOT also manages over 21,000

bridges over 10 feet in length. Minnesota's transportation system overall includes roads,

railroads, navigable waterways, public transit systems, and ports (including Mississippi River

ports and three Great Lakes Ports). Apart from maintaining state highways and structures,

MnDOT's Transportation Management System is far reaching and includes the operation of

closed-circuit television cameras and ramp meters to highway advisory radios and state-owned

traffic signals. This is in addition to the many traveler services provided by MnDOT, which

include safety rest areas and Freeway Incident Response and Safety Teams.

  5. As part of my regular job duties, I provide legal oversight of grant programs

funded by the DOT. This includes, but is not limited to, FHWA discretionary grants such as

BUILD (Better Utilizing Investments to Leverage Development) and INFRA (Infrastructure for

Rebuilding America), FTA grants to rural transit systems, Federal Railroad Administration

grants for Rail Crossing Safety Improvements, and FAA grants for Airport Improvement

Projects. I have reviewed the FY 2025 grant awards for these grants that were issued to MnDOT

and am familiar with their contents.

  6. The MnDOT Office of Chief Counsel provides legal review, advice, and legal

oversight concerning federal grants. Several MnDOT offices administer the grants, based on

federal and state laws and MnDOT's "Grants Management Policy". MnDOT administers a wide

variety of grant programs funded, at least in part, by DOT. A loss of these grant programs would

have a significant impact on MnDOT's ability to carry out its mission and its duties under state

law, even if the funding was later restored. In addition, the presence of the new DOT "general

terms" will have a chilling effect on MnDOT applying for new discretionary DOT grants. By

way of brief example, MnDOT is currently administering the following DOT discretionary

grants (the list is not all-inclusive):

    a.  Better Utilizing Investments to Leverage Development (BUILD), previously known as RAISE, funding surface transportation projects with significant local or regional impact;

    b.  INFRA grants, funding multimodal freight and highway projects of national or regional significance;

    c.  Bridge Investment Program grants, focusing on improving the state of repair of the nation's bridges;

    d.  Grants for Buses and Bus Facilities, funding capital projects to replace rehabilitate, or modify buses and bus facilities;

    e.  Low or No Emission Grant program – funding upgrading of buses to reduce emissions;

    f.  Passenger Ferry Grant Program – providing funding for ferry services, such as a ferry from Minnesota to the Isle Royale National Park in Lake Superior.

## MnDOT's Annual Receipt of DOT Grants

7.    As Chief Counsel, I provide legal oversight of MnDOT's administration of DOT grant funds and have knowledge of federal and state laws governing grant agreements and grant administration.

8.    MnDOT is responsible for administering a wide variety of federal grants from DOT, representing billions of dollars in federal funds. While too numerous to list here, each grant supports critical programs in Minnesota, keeping our roadways, airports, waterways, transit

systems, and our pedestrians safe.

9.      MnDOT received 14 discretionary grants, totaling over $1.3 billion, from the

FHWA during the Biden administration, some of which are not yet "obligated", or which require

amendments to give MnDOT access to the federal funds.

10.     In addition to federal grants, MnDOT also utilizes funds from the state tax on

gasoline to pay for highway projects. Most federal grant programs require the state to pay a

certain share of project costs as a "State match" for federal grant dollars. Minnesotans also pay

the federal gas tax, some of which comes back to Minnesota through "formula" distributions as

well as discretionary grants from the DOT. MnDOT currently has approximately $1.24 billion in

"awarded' but not yet "obligated" federal discretionary grants. With state match, these

discretionary grants support over $2.8 billion of projected construction costs.

11.     MnDOT uses grant funds such as these to fund its own transportation

infrastructure projects as well as passing grant funds through to state and local governmental

entities for their projects. All of these funds are used to build and improve Minnesota's critical

transportation network. These funds support projects and programs that Minnesota would

otherwise be unable to sustain on its own.

12.     MnDOT combines the above grants and state funding to fund a wide variety of

state projects. Minnesota's current State Transportation Improvement Plan ("STIP") reflects an

investment of $13 billion over four years, including federal "formula" and "discretionary grant"

programs as well as state and local funding. MnDOT uses an extensive planning process, with

significant public input to plan investments and develop the STIP.

13.     The projects and programs funded by these grants are vital to protect both the

residents and the economy of Minnesota. Without federal assistance, hazardous roadways will

not be improved, the condition of existing pavements will deteriorate, and MnDOT will be unable to act on important economic development activities, such as improving multi-modal shipments into and out of the Port of Duluth, which is the largest port on the Great Lakes. The projects and programs funded by these specific grants are described further below.

### A.    MnDOT's Use of Federal Highway Administration Funds

14.    In addition to the normal "formula" funds received from the FHWA, MnDOT has been successful in applying for and receiving "discretionary" grants from the FHWA. For example, MnDOT has been awarded over $1 billion in an "Infra" grant to replace the "Blatnik Bridge" which connects the Twin Ports cities of Duluth, Minnesota and Superior, Wisconsin. The bridge is old and in need of replacement.  MnDOT will not be able to afford this approximately $2 billion project with just state gas tax receipts – federal funding is critical. Without this funding, MnDOT will, in the very near future, be required to limit weight on the bridge or even close the bridge.  A bridge closure would create a detour of over 100 miles. MnDOT has been awarded funds under a variety of DOT programs created in the Inflation Reduction Act (IRA) and Infrastructure Investment and Jobs Act (IIJA).  This includes grants from "Infra", "Build" and other USDOT grant programs. A partial list of projects receiving FHWA discretionary grants includes:

- $1 billion Infra grant to replace the Blatnik Bridge, as noted above;
- $331 million in MPDG (Multimodal Project Discretionary Grant) and Infra grants to reconstruct I-494 and add EZ-Pass system in a very high-traffic corridor through the Twin Cities suburbs;
- $23.8 million Build grant to reconstruct Highway 197 in the Bemidji area;
- $56 million MPDG grant to reconstruct Highway 210 in Brainerd;
- $200 million Build grant to reconstruct an urban section of Highway 65 in the Minneapolis suburbs;

- $13.7 million "Protect" grant to improve rural safety by creating snow fences in rural areas to reduces the hazards of blowing and drifting snow;

- $2.3 Million in BIP (Bridge Improvement Program) grants to create Bridge Management Programs.

15.    All of the projects described above have a safety component. MnDOT holds safety paramount in transportation planning.  Cancelling or delaying these projects may have a human cost in injuries sustained as well as economic cost in property damages from crashes. Highway/Heavy construction supports thousands of high-paying construction jobs in Minnesota, so cancelling or delaying projects harms employment in Minnesota.  Cancelling or delaying projects also means contractors don't purchase materials, supplies, and services, further harming Minnesota's economy.

16.    For all of the projects described above, MnDOT will be required to sign the DOT "general terms" issued on April 23, 2025.  In addition, MnDOT intends to apply for other FHWA discretionary funding opportunities as those opportunities are released by FHWA in Notices of Funding Opportunities. MnDOT will be required to sign the "general terms" for those projects as well.  MnDOT may be forced to forego such funding opportunities due to certain clauses in those "general terms."

## B.    MnDOT's Use of Federal Transit Administration Funds

17.    Minnesota passes through millions of dollars in operating assistance to local and tribal public transit systems (approximately $600 million in 2025). MnDOT has also obtained discretionary grants which it will pass through to subrecipients.  Those grants include $2.3 million under the Low/No Emissions program and $6.2 million for bus facilities under the Bus/Bus Facilities Program.

18.    MnDOT obtained $2.3 million under the Low/No Emissions program to fund 9

propane buses and two fueling stations in rural Minnesota. MnDOT also obtained $6.2 million under the Bus/Bus Facilities Program for bus facilities in Austin and Waseca, Minnesota.

19.     MnDOT intends to apply for other Federal Transit Administration Funds as they become available, however the DOT's new general terms (contained in a new "FTA Master Agreement") may have a chilling effect on such applications.

### C.    MnDOT's Use of Federal Motor Carrier Safety Administration Funds

20.     MnDOT is a recipient and/or subrecipient of $2 million per year in federal funding from the Motor Carrier Safety Administration.

21.     This money supports 14 staff members involved with motor carrier safety enforcement and administration.  Without this money, MnDOT will likely be forced to lay staff off.  This will result in unsafe commercial vehicles operating on Minnesota roadways.

22.     MnDOT intends to apply for Federal Motor Carrier Safety Administration Funds again in future years.

### D.    MnDOT's Use of National Highway Traffic Safety Administration Funds

23.     MnDOT periodically applies for and receives federal funding from DOT under highway traffic safety programs.

24.     This funding supports programs to improve safety on highways in support of Minnesota's "Towards Zero Death" goals of Education, Enforcement, and Access to emergency services.

25.     MnDOT intends to apply for, or be a subrecipient of, National Highway Traffic Safety Administration Funds in future years as well.

### E.    MnDOT's Use of Federal Railroad Administration Funds

26.     MnDOT has received a discretionary grant of $800,000 under the Railroad

Crossing Elimination Program, to conduct a study of a busy freight train line running from Hinckley to the Lake Superior port at Duluth. If MnDOT is unable to access these federal funds, the study will likely be cancelled and MnDOT will miss an opportunity to improve safety in a busy rail corridor that serves the key multimodal hub of Duluth.

**The FY 2025 Immigration Enforcement Requirements and its Impact on MnDOT Grant Administration**

27.    On April 24th, I received a copy of the April 24, 2025 letter from Secretary of Transportation Sean Duffy to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT." DOT also created and/or revised "general terms" that grantees must sign in order to obligate awarded grant funds. Like Secretary Duffy's memo, the general terms require cooperation with federal enforcement authorities.

28.    On April 24, 2025, my office received notice from the Minnesota Divisions of the Federal Highway Administration that included the letter from Secretary Duffy and stated that "the attached letter from our Secretary is to clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations."

29.    MnDOT does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." MnDOT is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

30.    In my years with MnDOT, I am not aware of MnDOT staff ever being required to enforce or participate in the enforcement of federal civil immigration law. MnDOT's responsibilities and duties relate to the development, maintenance, and/or safety of transportation infrastructure.

31.    MnDOT has been awarded approximately $1.3 billion in DOT discretionary grants that it has not yet been able to obligate, but which it must obligate in the coming months to keep projects on schedule.  If MnDOT is unable to obtain obligation and disbursement of those funds it means that critical infrastructure projects will be delayed or cancelled.  This means that hundreds, if not thousands, of construction workers would not be hired or would even be laid off, inflicting substantial economic harm on Minnesota. If MnDOT is unable to obligate funds for the Blatnik Bridge, that critical project would likely be cancelled. At some point that will require MnDOT to close the bridge and send some traffic on a detour of over 100 miles. MnDOT is unable to simply switch to state-only funding of this project.  MnDOT's entire allocation of state gas tax receipts is insufficient to replace the federal grant, even if MnDOT was able to cancel all other projects for an entire year.

32.    Additionally, if MnDOT is unable to comply with the federal government's new funding conditions, the State would be unable to receive FY 2025 DOT funds, depriving the

State of more than $1.3 billion, frustrating its ability to maintain the critical programs described above.

33.    MnDOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If MnDOT cannot access federal funds, MnDOT will not have funds to immediately cover at a minimum the Blatnik Bridge and I-494 projects, and likely several other projects funded by the grants. This, in turn, will result in the inability to make roadway safety improvements, and to make other infrastructure improvements that will benefit the people and economy of Minnesota for generations to come.

34.    There is a lengthy and complex process of programming and budgeting MnDOT projects. MnDOT has a four-year State Transportation Improvement Program ("STIP"). The STIP programs and budgets projects for four years, maximizing MnDOT's use of state and federal money available for transportation projects each year. The inability to obligate awarded federal grants will cause severe disruption to the STIP. Due to the limitations of design and acquiring right-of-way it is not easy to simply move projects within the STIP to replace projects that have been delayed or cancelled. For the current STIP, MnDOT has made detailed plans and allocated state funding in reliance on the continued availability of significant federal funding, including discretionary grant funding. The inability to obligate awarded federal grant funding also means a less efficient allocation of state transportation funding.

35.    MnDOT's concerns about federal funding does not end with grants awarded during the Biden administration. On May 6, 2025, the USDOT announced new grant awards for MnDOT and several local governments in Minnesota, including $34 million to MnDOT to rehabilitate the Nicollet Avenue bridge over the Minnehaha Creek. These grant "awards" are illusory, at best, if MnDOT is unable to actually access the funds when needed. Any pause or

termination in federal funding means these projects will be delayed or cancelled.

36.    MnDOT also acts a conduit, passing federal funds through to local agencies for local transportation projects. If MnDOT cannot access the funds, or if subrecipients are unable to agree to the federal terms that "flow down" to the subrecipients, then those subrecipients also will not have funds to cover their planned projects.

37.    Highway/Heavy contractors in Minnesota rely on MnDOT's STIP projections in order to plan their workforce and plan for purchase of capital equipment. The uncertainty of continued federal funding for MnDOT will cause them to defer hiring and purchasing decisions, which also harms Minnesota's economy.

38.    The longer MnDOT cannot access funds, the greater the risk that additional projects will be interrupted or terminated.

39.    Losing these DOT grants would severely obstruct and undermine MnDOT's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 9th  in Maplewood, Minnesota.


James Cownie

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

        *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

        *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 34

Declaration of Cassandra O'Hern

## DECLARATION OF CASSANDRA O'HERN

I, Cassandra O'Hern, declare as follows:

1.      I am over the age of eighteen and a U.S. citizen. I make this declaration based on personal knowledge and on my review of information gathered by agency staff.

2.      I am the Deputy Commissioner of the Minnesota Department of Public Safety ("DPS"). As Deputy Commissioner, I am the second senior executive in the Department of Public Safety. Per Minn. Stat. § 15.06, subd. 7, I have been delegated all the powers and authorities of the Commissioner of Public Safety. My job duties include assisting the Commissioner of Public Safety in the general management of the entire department, speaking for the commissioner regarding agency matters, and working with department leaders on policy, budget, and management matters. I am familiar with the federal grants that the divisions within the Department of Public Safety receive and how those grants are used to promote public safety in Minnesota.

3.      I have been employed by DPS since 2005, and I have served as Deputy Commissioner since 2016. Before serving as deputy commissioner, I served as the department's Assistant Commissioner, and Director of Internal Affairs. Before joining DPS, I served as an assistant attorney general for the State of Minnesota where I advised and defended state agencies in civil litigation. In total, I have approximately ten years of experience with leadership responsibility for grants involving transportation safety at DPS. Over the course of my career, I have had experience administering hundreds of grants that the State has received from a variety of federal agencies including the Department of Transportation ("DOT").

4.      DPS aims to provide a safe and reliable transportation network that serves all people in Minnesota. The Minnesota State Patrol and the Minnesota Office of Traffic Safety are two divisions within DPS that have missions and functions dedicated to transportation safety.

1

5.      The Minnesota State Patrol is Minnesota's primary traffic enforcement agency. Its mission is to improve traffic safety through education, assistance, and enforcement. The Minnesota State Patrol's other key responsibilities include providing help at vehicle crashes, investigating and reconstructing serious crashes, conducting flight patrols and search and rescue missions, and inspecting school buses and commercial vehicles. To accomplish these functions, the Minnesota State Patrol employs more than 800 people, including more than 600 licensed troopers, commercial vehicle inspectors, 911 dispatchers, and support staff who work across the state.

6.      The DPS Office of Traffic Safety ("OTS") designs and implements public education and traffic law enforcement programs to prevent crashes, deaths, and injuries on Minnesota roads by improving driver behavior. OTS supports partner agencies, including the Minnesota State Patrol on traffic safety matters, serves as co-chair of the statewide Toward Zero Deaths traffic safety program, administers funding from the National Highway Traffic Safety Administration to change behavior related to traffic safety culture, provides subject matter expertise in critical traffic safety areas, conducts research, analysis and program evaluation to determine project effectiveness, traffic crash causation trends, and to identify emerging challenges, administers special revenue funding for the statewide motorcycle safety training program, and administers the child passenger safety special revenue account, which funds the statewide child passenger safety and occupant restraint program. As discussed below, OTS also provides subawards to local units of government to fund police officer enforcement shifts to prevent distracted driving, impaired driving, speeding, and enforce seatbelt use requirements. OTS also provides subawards to local units of government for resources and education for emergency medical services related to traffic incidents.

2

7.      DPS is responsible for administering 18 federal grants from DOT, representing over $66,155,281 in federal funds. While too numerous to list here, each grant supports critical programs in Minnesota, keeping our roadways, airspace, waterways, transit systems, and our pedestrians safe.

*Federal Motor Carrier Safety Administration*

8.      The Federal Motor Carrier Safety Administration, an agency of the DOT, administers the Motor Carrier Safety Assistance Programs ("MCSAP") which provides federal funding to States to help reduce the number and severity of crashes and hazardous materials incidents involving commercial motor vehicles ("CMV"). The goal of MCSAP is to reduce CMV-involved crashes, fatalities, and injuries through consistent, uniform, and effective commercial motor vehicle safety programs.

9.      MCSAP funding is administered in Minnesota by DPS.

10.     In addition to using MCSAP funds themselves, States may pass MCSAP funds through to subrecipients for the same purposes. DPS passes approximately two percent of MCSAP funds on to the Minnesota Department of Transportation ("MnDOT") for its New Entrant and Compliance Review programs.

11.     Minnesota has applied for and received funds from the MCSAP since federal fiscal year ("FFY") 1984.

12.     DPS has three open MCSAP awards from FFYs 2023, 2024, and 2025:

     a.      FFY 2023: award of $9,935,431.00;

     b.      FFY 2024: award of $9,798,494.00; and

     c.      FFY 2025: award of $5,208,638.00.

13.     In Minnesota, the State Patrol is the lead agency for commercial vehicle enforcement in Minnesota. About fifteen percent of all fatal crashes every year in Minnesota

3

involve a commercial vehicle. In 2024, Minnesota had 70 fatalities, 1,517 injury crashes, and 5,467 crashes overall, involving commercial motor vehicles. The State Patrol Commercial Vehicle section employs 100 officers who enforce federal safety regulations over trucks and commercial drivers using Minnesota's roadways. There is a vast amount of training, certification, and equipment that supports the unique role of these officers. They are trained to perform truck inspections to identify equipment violations and ensure that the drivers are qualified to operate these trucks and are not violating the rules of their allowable driving hours. These troopers are also responsible for enforcing aggressive driving of passenger cars around these commercial vehicles. To withhold millions of dollars per year in federal funding jeopardizes 70 of these officer positions. The State Patrol is the only agency in Minnesota with the jurisdiction, resources and personnel to take an effective role in the MCSAP safety program. Taking federal funding away from Minnesota for MCSAP will result in an increase in commercial vehicle related injury and fatality crashes. Denying funding means taking troopers from their role in keeping Minnesota's roads safer. It means allowing unsafe trucks and drivers to operate in our state unchecked. The State Patrol will no longer be able to support other law enforcement agencies when a commercial vehicle is involved in an incident and the citizens of Minnesota will see the result as fatalities rise.

14.     Even a temporary loss of funding for commercial vehicle enforcement would have an irreversible adverse impact on public safety in Minnesota. As discussed above, the officers who perform these functions receive special training, certification, and equipment to enable them to do their jobs. If this funding is lost, even temporarily, 70 out of 100 specially trained officers who do this work will need to be laid off. Even if the funding is eventually restored, vital traffic safety work will not be performed during the interim period. Additionally, if the funding is

4

ultimately restored, it will take a significant amount of time to post positions, interview, hire, and train replacement officers. Vital traffic safety work will go undone during that time.

15.    By August 2025, DPS intends to apply for the FY 2026 Federal Motor Carrier Safety Administration Funds. A Notice of Funding Opportunity ("NOFO") has not yet been released but is anticipated in May/June 2025.

*National Highway Traffic Safety Administration*

16.    The National Highway Traffic Safety Administration ("NHTSA"), a subagency of the DOT, provides federal funding to States for various efforts to improve traffic safety and reduce injuries and fatalities. These efforts benefit local entities such as cities counties, tribal entities, or universities. They also include activities directed at very specific driver behavior issues such as distracted driving, speeding, or impaired driving. NHTSA also provides federal funding to States for Congressionally identified priorities related to traffic safety. Examples include, but are not limited to, passenger restraint programs, impaired driver enforcement, motorcycle safety, and preventing roadside deaths.

17.    In addition to using NHTSA funds themselves, States may pass NHTSA funds through to subgrantees for the same purposes. DPS passes approximately 70 percent of NHTSA funds on to local units of government, other state entities, including courts, and nongovernmental entities. These partners use the funds for traffic safety purposes such as traffic law enforcement services, impaired driving enforcement, enforcement of seatbelt requirements, speeding enforcement, distracted driving enforcement, and traffic-safety court services.

18.    Several NHTSA awards are administered in Minnesota by DPS.

19.    DPS has two open awards for the State and Community Highway Safety program to facilitate a coordinated response to reduce traffic crashes, deaths, injuries, and property damage; at least 40 percent of the funds are used by local beneficiaries:

5

        a.     FFY 2024: $7,431,011.95; and

        b.     FFY 2025: $7,946,902.56

20.    DPS has four open awards for the National Priority Safety Programs to improve traffic safety information systems, carryout impaired driving countermeasures, foster motorcyclist safety, and the implement effective policies that improve traffic safety:

        a.     FFY 2022: $963,920.09;

        b.     FFY 2023: $6,352,405.73;

        c.     FFY 2024: $7,591,201.63; and

        d.     FFY 2025: $7,796,335.80.

21.    DPS has two open awards for the Minimum Penalties for Repeat Offenders for Driving While Intoxicated program enact and enforce related laws:

        a.     FFY 2024: $9,523,828.00; and

        b.     FFY 2025: $9,021,612.00.

22.    DPS has two open awards for the Discretionary Safety Grants and Cooperative Agreements programs:

        a.     Fatality Analysis Reporting System (FARS), FFY 2024–2026: $294,416.49; and

        b.     State Electronic Data Collection (SEDC), FFY 2025: $2,055,925.00.

23.    The DPS Office of Traffic Safety (OTS) operates primarily on federal funds that are appropriated by the U.S. Congress and are administered by the U.S. Department of Transportation, National Highway Traffic Safety Administration. Funds are awarded annually based on submittal of a triennial highway safety plan and annual application. The majority of the funds awarded to Minnesota are determined by a formula that NHTSA utilizes to ensure that each

6

state receives a proportional amount of the annual highway safety funding. Minnesota annually receives over $20 million in traffic safety funding from NHTSA.

24.     The loss of this funding, even on a temporary basis, would have an irreversible adverse impact on traffic safety in Minnesota. OTS receives a relatively small amount of state funding for traffic safety projects and programs. The majority of the state funding is used for federal matching requirements and for dedicated purposes. As a result, all OTS projects and programs are inextricably tied to the various federal funding streams. Some examples of the projects and programs that OTS currently coordinates and directs are general traffic law enforcement; impaired driving projects such as enforcement, driving while impaired courts ("DWI Courts"), ignition interlock support, child passenger safety programs, the statewide Toward Zero Deaths program, media and education programs, motorcycle safety training and education, speed, distracted driving, and occupant restraint enforcement and education programs. Each of these program areas is directly dependent upon federal funding. Any loss of funding would result in their elimination.

25.     OTS is also served by a Research and Analytics section. These staff are responsible for a wide array of research and development projects as well as all of the data requests that OTS receives. OTS owns and operates the statewide crash reporting system, known as MNCRASH, used by law enforcement and a variety of other agencies and stakeholders. The MNCRASH system is the single source for all crash data reported for incidents that occur in Minnesota and shared with the NHTSA federal crash records. This information facilitates the investigation of motor vehicle crashes in Minnesota and informs systemic improvements to traffic safety in Minnesota by providing critical data. Even a temporary loss of federal funding would adversely impact this function and make Minnesota's roads less safe.

7

26.     Any reduction in federal funds will result in project and program cancellations. It would also immediately result in the layoff of most, if not all, of this staff. Statewide Traffic Safety programs in Minnesota would essentially cease to exist. In the last 21 years the DPS-OTS efforts have reduced our traffic fatality numbers in Minnesota by almost 27 percent. Without these programs and the staff to implement them, it will only be a matter of time before the fatality rate will only become worse.

27.     By August 1, 2025, OTS intends to apply for the FFY 2026 National Highway Traffic Safety Administration Funds.

**The FY 2025 IMMIGRATION ENFORCEMENT REQUIREMENTS**

28.     I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

29.     DPS does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." DPS is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

30.     DPS personnel and its divisions do not have statutory authority to enforce federal civil immigration law.

8

31.     Additionally, if DPS is unable to comply with the federal government's new funding conditions, the State would be unable to receive FY 2025 DOT funds, frustrating its ability to maintain the critical programs described above.

32.     DPS does not have any other appropriations in its budget that could cover the loss of the grants discussed above. If DPS cannot access federal funds, DPS will not have funds to immediately cover the critical programs funded by the grants. This, in turn, will result in an immediate and irreparable adverse impact to public safety in Minnesota.

33.     The DPS budget for this year has relied on the federal funding described above and has made plans and allocated funding for critical public safety activities as described above based on a continued ability to draw down on promised federal funding. DPS does not have funding in its budget to cover the loss of the federal funding described herein. If that funding is not available, critical public safety functions will suffer as previously described.

34.     The longer DPS cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

35.     Losing these DOT grants would severely obstruct and undermine DPS's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on _May 20, 2025_ in _St. Paul_,
Minnesota.

_Cassandra O'Hern_
Cassandra O'Hern

9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, <br><br> *Defendants*. | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 35

Declaration of Francis K. O'Connor

## DECLARATION OF FRANCIS K. O'CONNOR

I, Francis K. O'Connor, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am over the age of 18 years and a U.S. citizen. The information in the statements set forth below were compiled through personal knowledge, through agency personnel who have assisted in gathering this information, or from documents that have been provided to and reviewed by me.

2.      I am the Commissioner of the New Jersey Department of Transportation (NJDOT). The NJDOT manages some of the highest volume roadways and bridges in the nation, as well as highly active ports and air spaces, and the many personnel, financial, engineering, construction, and educational components required to manage those transportation systems. As Commissioner, I oversee the entirety of NJDOT's portfolio, including all allocations of state and federal transportation funding for ongoing and future projects and investments. As part of my office duties, I also serve as the Chair of NJ Transit (the state's public transportation agency), the New Jersey Turnpike Authority (NJTA, the agency that maintains the state's major toll roads), the South Jersey Transportation Authority (SJTA, the agency that coordinates transportation in South Jersey), and the New Jersey Transportation Trust Fund Authority (TTFA, the agency responsible for financing the state's portion of capital programs), and as Vice Chair of the New Jersey Motor Vehicle Commission.

3.      I oversee all of the teams who have control over administration of funds from the United States federal government, as well as the teams who administer subgrants from NJDOT to localities and any other sub-awardees. This administration of federal funds is governed by Federal and State statues, internal controls, and subject to annual audit.

4.      I have served as Commissioner since February 2024, but started my career on the ground of the system I now manage: as a toll collector at the NJTA. After years of that hands-on customer service work, I became the Deputy Director of NJTA's Electronic Toll Collection Program, a role in which I led the launch of E-ZPass—the state's first electronic toll collection system. I spent sixteen years at the NJTA. I then worked in the private sector for many years, advising transportation agencies in other jurisdiction—from the Florida Turnpike Enterprise to the Texas Department of Transportation—on their infrastructure development and execution. This work frequently involved consulting on administration of both grant and formula federal funding.

5.      In total, I have over 40 of years of experience in the transportation sector, including 17 years in New Jersey's transportation agencies. Over the course of my career, I have administered or advised on hundreds of grants that New Jersey and other states have received from a variety of federal agencies, including the Department of Transportation (USDOT).

**Background**

6.      NJDOT aims to provide a world class transportation system that enhances the quality of life for New Jersey residents and the traveling public. To that end, NJDOT operates, develops, and maintains many of New Jersey's public roads, navigable waterways, and airports. NJDOT funds and executes major capital investments into new infrastructure, like bridges, pavement, and intelligent traffic systems. NJDOT plans and operates the systems that manage the flow of millions of vehicles through the state, as well as more than $850 billion of freight annually. NJDOT also provides emergency management support through the State, including providing direct assistance during and in the wake of large-scale emergencies.

7.      The NJDOT Capital Program is the funding plan for all of this work, through both anticipated direct allocations to NJDOT projects and anticipated subgrants of state and federal

funds to localities and other transportation stakeholders.

8.      NJDOT's Capital Program in state FY 2025 totaled $3.173 billion, of which $1.940 billion—61%—is federal funding. These funds support rehabilitation, maintenance, and building of state and local bridges and roads; key safety programs; improvement of highway infrastructure and response to accidents; and maritime, freight, rail, bicycle, and pedestrian developments.

9.      As part of my regular job duties, I oversee the Capital Program Management and Local Resources and Economic Development, which together are currently responsible for the administration of the majority of NJDOT's federal funding. For just the remainder of state FY 2025, that entails approximately $187 million in open federal formula funding and $144,000 in federal discretionary funding for ongoing infrastructure construction, maintenance efforts, transportation research, bridge inspection, safety programs, educational outreach, and more.

10.     I also oversee the Local Resources and Community Development Office, which manages and administers all subgrants to counties and municipalities, including Transportation Alternative Set-Asides, Safe Routes to School, Congestion Mitigation and Air Quality, and Local Lead Projects, as well as Congressional Discretionary Grants.

**NJDOT's Annual Receipt of DOT Grants**

11.     As Commissioner, I oversee NJDOT's administration of federal funds. The NJDOT financial management systems maintain information on the status of all DOT grants and formula funding our agency receives, our current portfolio of federally-funded projects, and the ongoing status of draw-downs, reimbursements, and future applications for federal funding. I have complete access to these systems and am consistently updated on major developments therein by our team.

12.     NJDOT is responsible for administering funds flowing from DOT programs as

prescribed in the Infrastructure Investment and Jobs Act (IIAJ) and previous federal transportation funding bills year. By the close of this fiscal year, NJDOT is expected to receive $1.9 billion in federal funds, comprising 61% percent of NJDOT's total budget. While too numerous to list here, each federal funding source supports critical programs in New Jersey, keeping our roadways, airspace, waterways, transit systems, and pedestrians safe.

13.    For example, NJDOT received and utilized between $300 and $600 in contract authority apportionments million under the National Highway Performance Program (NHPP) in the last three state fiscal years: $539 million in FY22, $534 million in FY23, and $389 million in FY2024. Under the Bridge Formula Program (BFP), New Jersey received $136 million in FY2024 and $364 million in FY23. Under the Surface Transportation Block Grant Program, NJDOT received $449 million in FY2024 and $351 million in FY2023. These distributions were consistent with the office IIJA notice tables sent to the State from the FHWA.

14.    These apportionments are authorized to support NJDOT's 1,296 active federally-funded projects across the state as of May 2025. Some of these federal projects are directly implemented by NJDOT, while others are implemented by localities that apply for and receive subgrants of federal DOT funding via NJDOT on an annual basis. NJDOT provides technical assistance to all local sub-awardees and conducts periodic reviews of projects to ensure compliance with federal grant requirements.

15.    The programs funded by these grants are vital to protect the safety of New Jersey residents and anyone who passes through our state. For example, NJDOT is better able to execute its goal of reducing traffic fatalities and serious injuries thanks to the Federal Transportation Authority doubling its annual apportionment of Highway Safety Improvement Program funds to New Jersey as of 2021. Similarly, NJDOT is reliant on federal funding to rehabilitate and

strengthen interstate bridges—which carry hundreds of thousands of vehicles and freight each day—that have become at higher risk of collapse due to changing climate and trade patterns. That includes, for just this year, $145 million for future bridge replacement projects, $70 million for preventative maintenance, and $49 million for deck and superstructure replacements. Also this year, New Jersey relied on hundreds of millions of dollars to replace particularly at-risk infrastructure, like $180 million from the Bridge Formula Program to begin the Hackensack River Bridge replacement project.

16.    Because NJDOT relies on USDOT for between 60-65% of its budget each year, and because dozens of subgrantees rely on NJDOT to execute their own projects, New Jersey's entire transportation maintenance, repair, and construction operation would be compromised were NJDOT unable to continue to draw down on federal funding or receive relied-upon grants. The thousands of contractors, professional services firms, law enforcement workers, utility workers, material suppliers, and NJDOT employees who are required to deliver these projects would lose their jobs. Moreover, millions of people who rely on functional roadways, bridges, tunnels, airspace, and waters would be interrupted from getting to work and schools, the economic ripple effect of which is incalculable. Beyond economic harm, widespread work stoppages resulting from suspended federal funding would make all roadway users more susceptible to physical injury resulting from incomplete, unmaintained, and otherwise unmonitored infrastructure.

17.    The NJDOT programs made possible by each USDOT funding stream are described in further detail below.

**A.    New Jersey's Use of Federal Highway Administration Formula Funds**

18.    As an inter-state transit and shipping hub, and with over 2.2 million residents operating registered vehicles, New Jersey's roadways, bridges, and tunnels are a critical asset to the State and national economies. Accordingly, the Federal Highway Administration (FHWA)

awards NJDOT hundreds of millions of dollars each year. During the last complete fiscal year, FHWA awarded NJDOT nearly $1 billion, comprising about one-third of the entire agency budget. This reflects an annual pattern of FHWA funds comprising a significant portion of NJDOT's operating and capital projects budget.

19.    In FY2024, NJDOT received $389,835,509 through the National Highway Performance Program (NHPP), after having received $534,379,773 from the same in FY2023 and $539,160,616 in FY22. This funding supports over fifty different projects and programs, including but not limited to: resurfacing projects, pavement preservation, guiderail upgrades, and general road upgrades, bridge inspection, maintenance, and replacement, statewide traffic system operations and maintenance, and ADA-compliance updates.

20.    For instance, the FHWA authorized $89,500,729 of NHPP funding to replace the bridge decks and superstructures of Route 76/676. This is a busy stretch of road that crosses Camden and Gloucester, just two miles from Philadelphia and thus a key point of interstate travel. NJDOT has only drawn down $225,044 of this funding so far, and is already in the midst of construction requiring continued use of the funds. Likewise, NJDOT is in the middle of constructing the six-lane mainline addition to the interchange between I-295 and various other highways, made possible by a decade-plus long federal commitment of $371,376,296, $112,829,961 of which remains to be invoiced.

21.    NJDOT also relies on the Surface Transportation Block Grant (STBG) program, having received in $449,546,363 in FY2024, $351,060,747 in FY2023, and $148,965,981 in FY2022. As one of the more flexible DOT formula grants, NJDOT can rely on STBG allocations to enable a wide range of infrastructure and operations goals, including general highway and road improvements, transportation alternatives like sidewalks and bike lanes, multimodal infrastructure like bus lanes, safety improvements like roadway lighting and signage, environmental mitigation, and more.

22.    For example, DOT has awarded NJDOT between $10 and $16 million each year to restripe the state highway system with long-life pavement markings and raised pavement markers,

and to concurrently establish ongoing staff wholly focused on ensuring effective and efficient annual striping. This is just one of dozens of ongoing initiative STBG funding makes possible.

23.     As one of the most traffic-congested stated in the country, New Jersey has in recent years invested tens of millions of dollars annually to build infrastructure mitigating bottlenecked areas and otherwise optimize vehicle flow. To that end, the state relies consistently on funds from the Congestion Mitigation and Air Quality Improvement Program: $19,296,639 in FY2024, $21,570,725 in FY2023, and $14,426,654 in FY2023.

24.     To plan for and execute the hundreds of active multi-year projects operating at any given time, NJDOT similarly relies on a number of other annual FHWA formula funding streams, including but not limited to Urbanized Area Formula Funding ($117,822,652 in FY2024), the Highway Safety Improvement Program ($124,575,612 in FY2024), the Bridge Formula Program ($136,319,185 in FY2024), and the National Highway Freight Program ($35,205,335 in FY2024).

25.     The projects made possible by FHWA funding touch every individual who transits on a highway or bridge in the state of New Jersey—millions each day. FHWA funding also supports the salaries of NJDOT's 3,352 employees.

**B.     New Jersey's Use of Federal Motor Carrier Safety Administration Funds**

26.     NJDOT also received significant federal funding through the Federal Motor Carrier Safety Administration, largely via the Motor Carrier Safety Assistance Program (MCSAP).

27.     In the last three fiscal years, NJDOT received between $9 and $12 million in MCSAP formula funds each year. These funds enable NJDOT to implement its annual Commercial Vehicle Safety Plan (CVSP) to reduce commercial vehicle crashes and corresponding injuries and fatalities. NJDOT's CVSP generally includes a combination of roadside inspection, traffic enforcement, compliance reviews, and educational outreach.

28.     NJDOT's MCSAP funding is a critical component in meeting NJDOT's goals of achieving zero roadway fatalities by 2040. Safer commercial vehicle and bus operations not only support economic activity but further ensure the safety of the travelling public.

29.     NJDOT expects to receive the FY2025 MCSAP Grant Agreement sometime later this year, pursuant to the agency's 2024 application.

**C.     New Jersey's Use of Competitive DOT Grants.**

30.     NJDOT also relies on discretionary funding awarded each year by DOT for discrete projects and initiatives.

31.     For instance, in 2024 the USDOT's Office of the Transportation Secretary (OST) and the FHWA awarded NJDOT $8 million under the Infrastructure for Rebuilding America Program (INFRA) to reconstruct and resurface a two-mile stretch of Route 168 in South Jersey, as well as to add bike lanes, ADA-accessible sidewalks, and eight signalized intersections.

32.     In 2022, OST awarded NJDOT a $26 million Better Utilizing Investments to Leverage Development (BUILD) Grant (then called the Rebuilding American Infrastructure with Sustainability and Equity (RAISE)) to construct a highway drainage system on an uncurbed section of Route 7 extremely prone to flooding. This grant, in combination with over $80 million in formula funding through NHP over the course of ten years, will help prevent the roadway runoff that, before this project's inception, discharged directly into the marshlands, adjacent property, and the road itself.

33.     These are just two examples of how competitive grants from across USDOT's agencies allow NJDOT to not only maintain but improve the vital infrastructure on which its constituents depend.

**The FY 2025 Immigration Enforcement Requirements and Their Impact on NJDOT's Grant Administration**

34.     I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of USDOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the

enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

35.     The phrase "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law" is vague and does not clearly set forth what exact sort of cooperation will be required. NJDOT is not aware of any additional information provided by DOT that clarifies what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

36.     In my years with NJDOT, I am not aware of NJDOT staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because NJDOT is not a law enforcement agency, it is not involved in the arrest or detention of individuals who may be subject to the enforcement of federal civil immigration law.

37.     That said, NJDOT does distribute a portion of the FMCSAP grants described above to NJ State Police, who may be asked by federal immigration authorities to assist in the enforcement of federal immigration law. Because NJ State Police is a subrecipient of NJDOT, they would be subject to the same funding conditions as NJDOT.

38.     In November 2018, the New Jersey Attorney General issued the Immigrant Trust Directive (ITD), which limits the type of voluntary assistance that New Jersey's state and local law enforcement officers may provide to federal immigration authorities. If USDOT requires any of its grantees to cooperate with federal immigration authorities in a manner prohibited by the ITD as a condition of receiving funding, subrecipients would risk being deprived of vital federal funding.

39.     Through the end of this fiscal year, we are scheduled to be reimbursed over $120 million in federal spending we have already-billed, plus tens of millions more that we plan to bill pursuant to federal grants and funds through the end of June.

40.     If NJDOT is unable to comply with the federal government's new funding conditions, the State would be unable to continue drawing down from FY 2025 USDOT funds, depriving the NJDOT of over 60% of its budget and frustrating its ability to maintain the critical programs described above.

41.     While NJDOT applies for federal funding from DOT on the basis that it will supplement, not supplant, existing State or local expenditures, in accordance with federal non-supplanting requirements, NJDOT does not have sufficient appropriation in its remaining FY 2025 or upcoming FY 2026 budgets that could cover the loss of the grants and formula funding discussed above.

42.     If NJDOT cannot access federal funds, NJDOT will not have funds to immediately cover the 1,296 unique active projects made possible in whole or in part by federal funding. This, in turn, will require immediate work stoppages, causing thousands of New Jerseyans to lose the jobs they have executing these projects, enormous interruptions to roadways and other modes of transit, and a major safety threat to commuters and commercial vehicles alike.

43.     Likewise, NJDOT's payroll relies heavily on federal funds via reimbursements for work performed by staff pursuant to federally-eligible activities. Any pause on our agency's ability to draw down on those funds would jeopardize the livelihoods of a significant portion of our over 3,000 employees, a majority of whose salaries are at least partially made possible by USDOT's funding obligations to NJDOT.

44.     NJDOT cannot carry the cost of any pause in federal funding for any amount of time, because even if the funds were to be reinstated at a later date, NJDOT would have to absorb the fiscal losses associated with re-starting projects that would have to be subject to stop-work orders during any federal funding pause. This would amount to hundreds of millions of dollars that are not accounted for anywhere in NJDOT's budget.

45.     Even NJDOT's access to state funding would be irreparably harmed by any pause in access to its federal funds. The Transportation Trust Fund Authority (TTFA) issues New Jersey's portion of funding for NJDOT's capital projects through state revenues and bond

proceeds. Currently, TTFA has over $2 billion in debt service outstanding on bonds already used to finance past NJDOT activity (Federal Highway Reimbursement Revenue and Revenue Refunding Notes), secured by future FHWA reimbursements that NJDOT receives. Assuming NJDOT continues to receive FHWA reimbursements, TTFA can continue assuring New Jersey financing of NJDOT's programs.

46.     But if NJDOT is not able to receive FHWA reimbursements, TTFA will not be able to meet its debt service obligations on the already-used bonds—and its credit rating will be downgraded accordingly. This would severely impact the State's ability to fund NJDOT's capital projects across the board. In other words, USDOT's conditions that prevent NJDOT from accessing federal funds would not only mean loss of federal funds, but a likely loss of significant state funding, too.

47.     With less than two more months of the fiscal year, NJDOT is in the midst of critical infrastructure repairs dependent on our continued ability to draw down on promised federal funding. For example, NJDOT is currently in the midst of rehabilitating the drainage and pavement of Route 18 in East Brunswick, a major commuter and commercial corridor, and is relying on FHWA reimbursing nearly $100 million to continue construction and complete the project by summer of 2026.

48.     Without access to FY2025 or FY2026 grant funding, NJDOT cannot commit funding for furtherance of the majority of its programs, including even funding to keep agency staff on payroll. Any pause or termination in federal funding would upend the agency's current function, as well as its ability to plan for and meet its legislatively-mandated goals under the ten-year Statewide Transportation Improvement Program (STIP).

49.     If NJDOT's is unable to access the federal funding underlying its statewide grant programs, counties and municipalities will not be reimbursed for moneys they have already expended in reliance on NJDOT's awards. This will impede local budgets that count on these reimbursements.

50.     If NJDOT cannot access federal funds for any amount of time, a substantial portion of its programs will be forced to halt, including active construction projects. Any such stoppages would cause hundreds of millions of dollars of instant fiscal harm to the state from a combination of thousands of employees' lost income, damages sought for contractors' lost work, costs to re-start construction if and when funding becomes accessible, and obstruction of the basic functionality of New Jersey's roadways.

51.     Such harms would severely impede NJDOT's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19, 2025 in TRENTON , New Jersey.

Francis K. O'Connor

Francis K. O'Connor

Commissioner, NJDOT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants*.

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 36

Declaration of Michael J. Rizol, Jr.

## DECLARATION OF MICHAEL J. RIZOL JR.

I, Michael J. Rizol, Jr., declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am over the age of 18 years and a U.S. citizen. The information in the statements set forth below was compiled through personal knowledge, through agency personnel who have assisted in gathering this information, or from documents that have been provided to and reviewed by me.

2.      I am the Director of the New Jersey Division of Highway Traffic Safety (NJDHTS). My job duties include overseeing the State and Community Highway Safety Program, which distributes approximately $18 million in federal funding each year to develop and implement a statewide highway safety plan. I work collaboratively with law enforcement and nonprofit agencies, and private sector partners to educate, prevent, and respond to the dangers posed to motorists. NJDHTS prioritizes reducing impaired driving, distracted driving, speeding, and other traffic safety-related concerns.  Additionally, I coordinate setting performance goals to reduce motor vehicle crashes and fatalities in New Jersey. I have been employed by NJDHTS since March 13, 2023, and I have served as Director since that date. Before starting at NJDHTS, I served as an academic specialist at Kean University and as a New Jersey State Trooper, retiring as a Captain in charge of the Traffic and Public Safety Office. In total, I have over 30 years of experience working to improve traffic safety in New Jersey at either NJDHTS Kean University or with the New Jersey State Police. Over the course of my career at NJDHTS, I have overseen all of the grants that the State has received from the U.S. Department of Transportation (DOT).

**Background**

3.      NJDHTS aims to prevent motor vehicle-related crashes and the resulting property damage, injuries, and fatalities on New Jersey's roadways. NJDHTS is responsible for administering the State & Community Highway Safety Program, which annually distributes approximately $18 million in federal funding from the National Highway Traffic Safety Administration (NHTSA), an agency within DOT, to develop and implement a statewide highway safety plan.

4.      To achieve these goals, NJDHTS promotes statewide traffic safety programs through education, engineering and enforcement activities, as well as administering and coordinating federal grant funding to subrecipients to support programs designed to reduce motor vehicle crashes, injuries, and fatalities on New Jersey's roadways.

5.      As part of my regular job duties, I oversee the receipt and utilization of NHTSA grant funding. I have reviewed the FY 2023, 2024, and 2025 NHTSA grant awards that were issued to NJDHTS and am familiar with their contents.

6.      NJDHTS is responsible for the administration of approximately $30 million in federal awards for statewide traffic safety programs, including projects for: alcohol and other drug countermeasures; vehicle occupant protection; pedestrian and bicycle safety; community traffic safety programs/public participation and engagement; police traffic services and training; traffic records; and other vulnerable road users.  A loss of these grants, which make up over 94 percent of NJDHTS's budget, would severely obstruct and undermine NJDHTS' mission even if the funding were restored at a later date.

2

**New Jersey's Annual Receipt and Use of**
**National Highway Traffic Safety Administration Funds**

7.       As Director, I oversee my office's administration of DOT grant funds and

facilitate the administration of these grants statewide and to subrecipients. NJDHTS receives two

types of federal funding from NHTSA: (1) funding for the State's Highway Safety Program,

pursuant to 23 U.S.C. § 402 ("Section 402"); and (2) funding under National Priority Safety

Programs, pursuant to 23 U.S.C. § 405(b)-(i) ("Section 405").

8.       NJDHTS is responsible for administering hundreds of subrecipient grants each

year with NHTSA funding, representing over $18 million in federal funds, or 94 percent of

NJDHTS's total budget. While too numerous to list here, each grant supports critical programs in

New Jersey, keeping our roadways and our pedestrians safe.

9.       For example, in FY 2023, NJDHTS awarded 155 grants under Section 402,

totaling $10.8 million, and 145 grants under Section 405(d) for impaired driving

countermeasures, totaling $6.1 million.

10.       With regard to Section 402 funding, I oversee the administration of the State &

Community Highway Safety Program and develop a highway safety plan (HSP) in accordance

with the U.S. Highway Safety Act of 1966, 23 U.S.C. § 402. To receive federal funding from

NHTSA, the HSP must address the national priority program areas of NHTSA and the Federal

Highway Administration (FHWA). The HSP serves as a framework for setting performance

goals and measures for reducing traffic crashes, fatalities, and injuries on New Jersey's

roadways, and proposes programs to achieve those performance goals and measures.

11.       I send the HSP to NHTSA and FHWA for approval on an annual basis. NHTSA

and FHWA approve the proposed activities and recommended expenditures eligible for federal

funding. After the HSP has been approved, NJDHTS uses any grant funds awarded to undertake

3

statewide traffic safety programs and to offer federal grant funding to subrecipients, including local governments and law enforcement agencies as well as nonprofit organizations, that wish to undertake programs designed to reduce motor vehicle crashes, injuries, and fatalities on New Jersey's roads.

12.    NJDHTS solicits grant proposals from these subrecipients through a competitive grant process. I oversee the application process, approval of projects, and disbursement of federal funds to approved subrecipients, who receive funds on a reimbursement basis. NJDHTS is required to report the progress based on the performance metrics used in the HSP.

13.    With regard to Section 405 funding, NJDHTS applies for and receives federal funding under the grant programs set forth at 23 U.S.C. § 405(b)-(f) & (h). Funds from these programs support projects in the following areas: (1) occupant protection programs to reduce highway deaths and injuries resulting from individuals riding unrestrained or improperly restrained in motor vehicles, § 405(b); (2) programs that improve state traffic information systems and the accuracy and usability of state traffic safety data, § 405(c); (3) programs to reducing driving under the influence or to support alcohol-ignition interlock laws, § 405(d); (4) programs to support education, signage, and law enforcement relating to distracted driving, § 405(e); (5) programs to reduce the number of crashes involving motorcyclists, § 405(f); and (6) programs to support education, equipment, data collection, and law enforcement relating to roadside deaths, § 405(h).NJDHTS also disburses these funds to approved subrecipients through the same process as Section 402 funding.

14.    Section 402 and Section 405 funding, which in total make up 94 percent of NJDHTS's budget and support over 450 programs statewide, support programs that New Jersey would otherwise be unable to sustain on its own.  The funding NJDHTS currently receives from

4

NHTSA works toward achieving the national goal of zero traffic fatalities by the year 2050. NJDHTS aims to meet this goal through critical data-driven safety programming. These programs serve the people who use New Jersey's roadways and fund 21 employees' salaries at NJDHTS. These programs also fund approximately 25 full and part time salaries in subrecipient agencies and organizations.

15.    On or before August 1, 2025, NJDHTS intends to apply for the FY 2026 NHTSA Funds.

**The FY 2025 Immigration Enforcement Requirements and
Their Impact on NJDHTS Grant Administration**

16.    I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

17.    The phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law" is vague and does not clearly set forth what exact sort of cooperation will be required. NJDHTS is not aware of any additional information provided by DOT that clarifies what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

5

18.     In my years with NJDHTS, I am not aware of NJDHTS staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because NJDHTS is not itself a law enforcement agency, NJDHTS is not involved in the arrest or detention of individuals who may be subject to the enforcement of federal civil immigration law.

19.     Many of NJDHTS's subrecipients are local law enforcement agencies, who may be asked by federal immigration authorities to assist in the enforcement of federal immigration law. As subrecipients, those local law enforcement agencies are subject to the same funding conditions as NJDHTS.

20.     In November 2018, the New Jersey Attorney General issued the Immigrant Trust Directive (ITD), which limits the type of voluntary assistance that New Jersey's state and local law enforcement officers may provide to federal immigration authorities. If DOT interprets the Duffy Directive to require cooperation with federal immigration authorities that is prohibited by the ITD, then subrecipients would risk being deprived of vital federal funding.

21.     Additionally, if NJDHTS is unable to comply with the federal government's new funding conditions, the State would be unable to receive FY 2026 DOT funds, depriving the State of approximately $18 million in federal funds, frustrating its ability to maintain the critical programs described above.

22.     NJDHTS does not have any other appropriation in its budget that could cover the loss of the grants discussed above. NJDHTS applies for federal funding from NHTSA on the basis that it will supplement, not supplant, existing State or local expenditures, in accordance with federal non-supplanting requirements.

23.     If NJDHTS cannot access federal funds, NJDHTS will not have funds to immediately cover at minimum approximately 12 unique programs funded by the grants. This, in

turn, will result in drastic reductions in transportation safety programs.

24.     Without access to FY 2026 grant funding, NJDHTS cannot commit funding for employee salaries. Any pause or termination in federal funding would cause payroll disruptions to NJDHTS staff and subrecipients, whose salaries are all at least 50% funded by these federal grants, and in some cases 100% funded. For instance, funds from Section 402 include the costs of the salaries of the management, fiscal and clerical support staffs and NJDHTS's operating costs. Without these funds, NJDHTS staff may experience pay cuts or layoffs.

25.     Without access to FY 2026 grant funding, NJDHTS also will not have funds to initiate, approximately 450 new subawards to 250 subrecipients under 12 unique programs funded by the federal grant programs. If NJDHTS is not able to access federal funds in FY 2026, all highway safety grants will be suspended.

26.      These subawards serve important purposes. For instance, in FY 2024, NJDHTS awarded $541,038 in Section 402 funds for crash investigation training for police officers, a traffic safety certification program, and a DWI dismissals case study. In FY 2024, NJDHTS also awarded $600,000 in Section 402 funds to many New Jersey counties for seat belt enforcement. These programs are entirely funded by federal funds and without federal funding, these types of traffic-geared programs would stop altogether. Even if subrecipients attempt to undertake these types of programs themselves, such programs cannot be administered at the same scale as NJDHTS because NJDHTS coordinates across New Jersey with dozens of partners and stakeholders to fill in identified gaps through a HSP.

27.     Most importantly, without access to FY 2026 grant funding, NJDHTS also cannot commit funding for furtherance of programs. Any pause or termination in federal funding would halt the overwhelming majority of the programs the State administers to promote roadway safety,

which could cause serious harm or death to the thousands of motorists on New Jersey roadways.

28.     For instance, funds from Section 402 include the costs of:  NJDHTS program managers to coordinate alcohol and drug countermeasure activities with local, State and community organizations; and pedestrian and bicycle safety countermeasures. Funds from Section 405(d) include the cost of law enforcement training to detect alcohol and drug impairment to reduce the total alcohol and drug related fatalities. Funds from Section 402 and 405 also fund: equipment and other support to law enforcement agencies to assist them in the detection and apprehension of impaired drivers; and the prosecution of traffic-related crimes, which remains one of the leading causes of accidental deaths in New Jersey and in the nation. These critical programs work together in educating relevant stakeholders and in the identification and apprehension of impaired drivers. Without federal funds, these programs cannot operate and motorists on New Jersey roadways may be at a greater risk of injury or fatality.

29.     NJDHTS also partners with many local law enforcement agencies and nonprofits in administering these programs. A loss of federal funds may strain these partnerships from uncertainty of not getting reimbursed.

30.      The longer NJDHTS cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

31.     Losing these DOT grants would severely obstruct and undermine NJDHTS's mission even if the funding were restored at a later date. NJDHTS would be considerably constrained in its ability to develop further highway safety plans because it would need to hire staff after any layoffs, retroactively assess state traffic data that could not be done comprehensively without federal funding and coordinate outreach with subrecipients, who would likely be unwilling to apply for programs that NJDHTS administers in fear that they would not

8

be reimbursed in the event of another loss of federal funding. This undertaking would require substantially more effort and resources from NJDHTS and undermine the effectiveness of these programs. In effect then, even if federal funding is restored, NJDHTS may not be able to develop HSPs on the same scale and may not have any agencies to administer these programs because of the perceived instability in federal reimbursements.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19, 2025.

_____

Michael J. Rizol Jr.

9

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                        *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 37

Declaration of Juan R. Urena

## DECLARATION OF JUAN R. URENA

I, Juan R. Urena, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am over the age of 18 years and a U.S. citizen. The information in the statements set forth below were compiled through personal knowledge, through agency personnel who have assisted in gathering this information, or from documents that have been provided to and reviewed by me.

2.    I am the Bureau Chief for Pipeline Safety with the Division of Reliability and Security at the New Jersey Board of Public Utilities ("NJBPU"). I am designated by NJBPU as Program Manager to oversee all activities of the Pipeline Safety Program. My job duties include providing technical, procedural and policy guidance for the Pipeline Safety Program. This includes but is not limited to: 1) overseeing pipeline safety inspections and investigations conducted by technical staff, and recommending enforcement actions for non-compliance with Federal and New Jersey Pipeline Safety Regulations; 2) supervising the training and instruction of technical staff in the methods used to conduct gas pipeline safety inspection, investigation, and enforcement tasks; and 3) administering NJBPU's Federal pipeline safety certification under 49 U.S.C. 60105 as well as the DOT Grant-in-Aid program by preparing Federal pipeline safety grant applications, reports, cost reimbursements of program expenses, program evaluations, and related annual reporting documentation in FedSTAR and/or any other required web application.

3.    I have been employed by NJBPU since February 2012, and I have served as Bureau Chief of Pipeline Safety since March 2021. In total, I have over 10 years of experience in pipeline safety, 5 of which I administered the DOT Grant-in-Aid program.

**Background**

4.    NJBPU is the New Jersey state agency with authority to oversee regulated utilities, which provide critical services such as natural gas, electricity, water, telecommunications, and cable television. NJBPU aims to ensure that safe, adequate, and proper utility services are provided at reasonable, non-discriminatory rates to the public.

5.    As part of my regular job duties, I oversee the State Pipeline Safety Base Grant, State Damage Prevention Grant, and Pipeline Safety One-Call Grant, all of which are administered by DOT. I have reviewed the 2024 awards for these grants that were issued to NJBPU and am familiar with their contents.

6.    For 2024, NJBPU is responsible for the administration of $1,818,873.00 in open federal awards for gas pipeline safety inspections, enforcement, and excavation damage prevention as well as liquified natural gas ("LNG") facility safety inspections.

**New Jersey's Annual Receipt of DOT Grants**

7.    As Bureau Chief for Pipeline Safety, I oversee my office's administration of DOT grant funds.

8.    NJBPU is responsible for administering 3 federal grants from DOT. Exact funding amounts received vary by year and over $1.8 million in federal funds were awarded for calendar year 2024. Each grant supports the funding for critical gas pipeline facilities and LNG facilities in New Jersey, keeping New Jersey's citizens and businesses safe.

9.    The programs funded by these grants are vital to maintain the safety of all New Jersey residents.

**A.   New Jersey's Use of State Pipeline Safety Base Grant Funds**

10.    Pipeline Safety Base Grants, which are received from DOT's Pipeline and Hazardous Materials Safety Administration ("PHMSA"), provide funding to States for up to

80% of the cost of personnel, equipment, and activities reasonably required to carry out inspection and enforcement activities of intrastate pipeline facilities under a certification or agreement with the Secretary of Transportation or to act as an agent of the Secretary with respect to interstate pipeline facilities. These grant opportunities are designed to improve damage prevention, develop new technologies, and improve pipeline safety. States inspect approximately 90% of the pipeline infrastructure under federal safety authority.

11.    Pipeline Safety Base Grant funding is administered in New Jersey by NJBPU.

12.    NJBPU uses Pipeline Safety Base Grants to inspect gas pipeline facilities to ensure compliance and enforcement of federal regulations. Nine NJBPU inspectors conduct daily inspections to ensure the safety of New Jersey gas pipeline facilities, which includes the design, construction, testing, operation, and maintenance, and related compliance enforcement.

13.    NJBPU has one open Pipeline Safety Base Grant award from 2024 totaling $1,685,745.00, of which $112,769.00 remains to be reimbursed. NJBPU anticipates requesting reimbursement for the balance of this award by June 2025.

14.    NJBPU applied for 2024 Pipeline Safety Base Grant funding on September 29, 2023. PHMSA provided notice of this funding opportunity through a FedSTAR email directed to the program managers for participating States. The email received from PHMSA for the 2024 Pipeline Safety Base Program Grant did not condition receipt of grant funding on cooperation with federal immigration enforcement.

15.    NJBPU applied for 2025 Pipeline Safety Base Grant funding on September 6, 2024. PHMSA's email for the 2025 Pipeline Safety Base Grant does not condition receipt of grant funding on cooperation with federal immigration enforcement.

**B.    New Jersey's Use of State Damage Prevention Grant Funds**

16.    PHMSA data shows that excavation damage has historically been a leading cause

of pipeline accidents that result in fatality or injury. State Damage Prevention ("SDP") Grants provide funding to assist States in establishing or improving state damage prevention programs by supporting projects such as the enforcement of state excavation damage prevention laws, stakeholder education about digging safely, technologies to improve efficiencies, and other related excavation safety initiatives. SDP Grant funding also assists States in protecting underground pipeline facilities from excavation damage.

17.    SDP Grant funding is administered in New Jersey by NJBPU.

18.    NJBPU uses SDP Grant awards to fund personnel expenses to enforce damage prevention laws and regulations for non-natural gas underground pipelines (such as for water or electric), conduct investigations of complaints relative to the New Jersey Underground Facility Protection Act, issue compliance actions, address responses to enforcement actions, assist with case preparation, and track investigations through the program database.

19.    NJBPU has one open SDP Grant award of $86,229.00 from 2024, of which $86,229.00 remains to be reimbursed. NJBPU anticipates requesting reimbursement for the full balance of this award by October 2025.

20.    NJBPU applied for 2024 SDP funding on April 3, 2024. The Notice of Funding Opportunity for the 2024 SDP Program Grant did not condition receipt of grant funding on cooperation with federal immigration enforcement.

21.    NJBPU intends to apply for 2025 SDP Grant funding.

**C.    New Jersey's Use of Pipeline Safety One-Call Grants**

22.    Underground pipeline excavation has historically been a leading cause of pipeline accidents resulting in fatality and injury. Pipeline Safety One-Call ("One-Call") Grants, also administered by PHMSA, provide funding to assist States in reducing damage to underground pipelines by excavators, including training, changing state underground damage prevention laws,

related compliance activities, and public education.

23.     "One-Call" Grants are administered in New Jersey by NJBPU.

24.     NJBPU uses One-Call Grant awards to offset salary expenses for personnel performing damage prevention compliance enforcement and related program activities, including conducting investigations of probable non-compliance and complaints related to the New Jersey Underground Facility Protection Act, issuing probable non-compliance enforcement actions, addressing responses to non-compliance enforcement actions, assisting with case preparation for proposed enforcement penalties for probable non-compliance with the New Jersey Underground Facility Protection Act, and tracking probable non-compliance and complaint investigations and actions through the NJBPU damage prevention program database.

25.     NJBPU has one open One-Call Grant award of $46,899.00 from 2024, of which $46,899.00 remains to be reimbursed. NJBPU anticipates requesting reimbursement for the balance of this award by October 2025.

26.     NJBPU applied for 2024 One-Call Grant funding on April 3, 2024. The Notice of Funding Opportunity for the 2024 One-Call Program Grant did not condition receipt of grant funding on cooperation with federal immigration enforcement.

27.     NJBPU intends to apply for 2025 One-Call Grant funding.

### The FY 2025 Immigration Enforcement Requirements and Their Impact on NJBPU Grant Administration

28.     I have read and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement ("ICE") and other Federal offices and components of the Department of Homeland Security in

the enforcement of Federal immigration law."  I am also aware that the letter provides that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

29.     The phrase "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law" is vague and does not clearly set forth what exact sort of cooperation will be required. I am not aware of any additional information provided by DOT that clarifies what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

30.     In my years with NJBPU, I am not aware of NJBPU staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, the  NJBPU is not involved in the arrest or detention of individuals who may be subject to the enforcement of federal civil immigration law.

31.     In the next six months, NJBPU anticipates being reimbursed $245,897.00 under PHMSA's open 2024 Pipeline Safety Base Grant, SDP Grant and One-Call Grant awards. This amount has already been appropriated, apportioned, and spent. If NJBPU does not receive this reimbursement, the NJBPU would be forced to curtail program activities or reallocate funds at the expense of other critical programs, or the New Jersey taxpayers or utility ratepayers could face additional costs to support essential pipeline safety efforts

32.     Additionally, if NJBPU is unable to comply with the federal government's new funding conditions and the State is unable to receive FY 2025 DOT funds, this would have a similar impact on NJBPU's ability to maintain the critical programs described above.

33. To the best of my knowledge, NJBPU does not currently have any other appropriation in its budget that could cover the loss of the grants discussed above.

34. If NJBPU cannot access federal funds, NJBPU would not be reimbursed for expenses related to compensation, benefits, materials, supplies and equipment funded by the grants. In turn, this may result in NJBPU conducting fewer gas pipeline safety inspections and a reduction of infrastructure replacement, thereby increasing the risk of potential hazards to life and property related to natural gas.

35. For example, in one incident reported to PHMSA in 2024, a vehicle struck a building and damaged a meter-set, creating a condition of uncontrolled gas that fed a fire on the premises and resulted in property damage totaling $152,496.00.

36. The NJBPU's Pipeline Safety Program, the only program of its type in New Jersey, is responsible for overseeing the safety of New Jersey's 462 miles of natural gas transmission pipelines, and 36,042.8 miles of natural gas mains with 2,419,298 associated service lines. To the best of my knowledge, through the Pipeline Safety Program, NJBPU plans and allocates funding for gas pipeline safety inspections, excavation damage prevention, and compliance enforcement, and relies on the federal government reimbursement and its continued ability to draw down on promised federal funding.

37. Any pause or termination in federal funding risks significantly curtailing the Bureau of Pipeline Safety's ability to conduct gas pipeline safety inspections, excavation damage prevention, and compliance enforcement which, in turn, would have a negative impact on the health and safety of the citizens of New Jersey.

38. For instance, a loss of funding could put at risk the tracking and identifying of pipeline safety areas that require additional improvement by utility operators in New Jersey. A

loss of funding also could threaten to cause payroll disruptions to inspectors, which could, in turn, result in a reduced number of inspection person days – that is, the amount of work one inspector can perform in a single day – and therefore, fewer pipeline safety inspections and less damage prevention compliance enforcement.

39.     Apart from safety, there may be an economic impact as well. Fewer pipeline safety inspections due to a loss of funding risks forestalling timely development projects undertaken by companies, which could result in lost revenue and layoffs. Further, if this reimbursement is not received, the NJBPU would be forced to curtail program activities or reallocate funds at the expense of other critical programs, or the New Jersey taxpayers or utility ratepayers could face additional costs to support essential pipeline safety efforts.

40.     The longer NJBPU cannot access funds, the greater the risk that programs could be interrupted or terminated.

41.     Losing these DOT grants could severely obstruct and undermine the necessary work done by the NJBPU's Bureau of Pipeline Safety which ensures the safety of the citizens of New Jersey, even if the funding were restored at a later date.


I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on 5/20/2025 in Piscataway New Jersey.


Juan R. Urena

8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 38

Declaration of Janet Ho

**DECLARATION OF JANET HO**

I, Janet Ho, declare as follows:

1.      I am the Assistant Commissioner for Finance and Integrated Modal Services for the New York State Department of Transportation ("NYSDOT").

2.      I have held this position for nearly three years. My responsibilities include overseeing transportation budgeting and accounting, as well as freight and passenger rail, aviation, local programs and the Public Transportation Bureau.

3.      As Assistant Commissioner, I am familiar with the funding provided by US DOT through both formula funding programs and competitive grant programs and with how those funds are allocated throughout the state. I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

**New York State Department of Transportation**

4.      NYSDOT works to ensure that those who live, work, and travel in New York State have a safe, efficient, and reliable transportation system. NYSDOT directly maintains and improves the State's approximately 44,500 State highway lane miles and nearly 7,700 bridges and coordinates federal funding eligibility and inspections for nearly all the 17,600 bridges carrying traffic, regardless of ownership. In addition, NYSDOT plays a significant role in the safety and funding of locally operated transit systems, local government highway and bridge construction, and rail and certain aviation travel.

5.      NYSDOT has an extremely broad set of responsibilities relating to travel in New York. In addition to performing critical infrastructure inspections, NYSDOT maintains, designs,

and constructs highways, bridges, and roads. NYSDOT ensures that highways are safe from snow and ice, flooding, falling trees, and other obstructions.

6.     NYSDOT also regulates commercial and passenger transportation, provides oversight of public transit systems, inspects school and charter buses, and owns two airports: Stewart Airport in Newburgh and Republic Airport on Long Island. It would be difficult to move from one place to another in New York without NYSDOT's work.

7.     While primarily known for highway travel, NYSDOT's rail service responsibilities in New York are far-reaching. There are 48 railroads operating in the New York, and NYSDOT is responsible for overseeing the safe operation of each. Indeed, New York State has the largest commuter rail and transit rail operations in the United States, with ridership of more than 1.2 billion passengers per year. NYSDOT provides significant funding for Amtrak in New York, which serves more than 2 million passengers annually. Additionally, there are 39 freight railroads in New York that operate along 3,765 route miles of track. Beyond safety oversight of this massive operation, NYSDOT's responsibility for rail extends to the management of rail-related capital and infrastructure projects. Currently, NYSDOT oversees or administers approximately $1.4 billion of rail-related infrastructure projects, of which $327.9 million is federally funded. In addition, NYSDOT is working with the United States Department of Transportation ("US DOT") currently on finalizing funding agreements for another $605 million worth of rail infrastructure projects, of which $265 million is federally funded.

8.     NYSDOT's spending on transportation results in jobs. The Federal Highway Administration ("FHWA"), a division of US DOT, employs a job creation multiplier that projects that every $1 million of highway investment supports 13 jobs. NYSDOT is planning to

award in federal fiscal year 2025 more than 400 construction contracts with an estimated cost of $3.9 billion, of which $1.9 billion is federal funding.

9.      Not only does NYSDOT utilize federal funds directly on its own projects, but it also sub-allocates federal funds to sub-recipients. Sub-allocation can occur by programming a sub-recipient's project on the state transportation improvement plan. It can also occur via a competitive grant solicitation administered by NYSDOT where awards are made to eligible sub-recipients. In both cases, a funding agreement is established between NYSDOT and the sub-recipient to allow federal funds to flow. Sub-recipients can be municipalities with federal aid eligible, locally-owned highway and bridge projects; transit providers with capital projects such as the purchase of new buses or facility upgrades; local human services providers receiving a grant to provide transportation services for individuals with disabilities; or other state agencies that assist with enforcing motor carrier safety requirements.

10.     New York State Executive Agencies, such as NYSDOT, exercise power that has been expressly granted to that agency.

11.     NYSDOT derives its power to act through specific grants of authority in the New York State Highway Law and New York State Transportation Law.

12.     For instance, Article II of the Highway Law, particularly Section 10, sets forth the NYSDOT Commissioner's powers and duties related to highways. More broadly, Article 2 of the Transportation Law describes NYSDOT's powers, duties and jurisdiction over New York transportation generally.

13.     While NYSDOT has broad powers related to transportation matters, there is no grant of authority to NYSDOT to interpret or enforce federal immigration law.

**Overview of Federal Funding to NYSDOT**

14.    It would be difficult to overstate the impact of federal funding on NYSDOT's work. Approximately 55% of NYSDOT's current five-year plan for road and bridge projects is funded federally, amounting to approximately $2.7 billion per year in aid – or $13.7 billion over the life of the five-year plan. The absence of that funding could impede a significant portion of important projects that directly benefit the public.

15.    As noted above in paragraph 10, in federal fiscal year 2025, NYSDOT is planning to award more than 400 construction contracts utilizing an estimated $1.9 billion in federal funding before the close of the fiscal year. This would fully utilize the current year federal obligation limits set by FHWA. These federal obligations will advance projects that address critical safety needs, improve overall system performance and promote economic growth for both the State and Nation. Interruption to federal funding to NYSDOT would interfere with the State's ability to advance federally eligible projects and could permanently jeopardize its ability to utilize the remainder of this year's federal obligation authority, as unused obligation limit is not carried over to following fiscal years.

16.    Many of the US DOT programs from which NYSDOT receives funding provide formula funds that are mandated by Congress under federal statutes. These are funding awards where the relevant substantive and appropriation statutes specify not only the total amount of funding available nationwide but also how that total amount is to be allocated to the various States.

17.    NYSDOT receives formula funds under both the Highway Act and the Transit Act, which are found, respectively, in Titles 23 and 49 of the United States Code. These statutes provide formula funding from the FHWA for a number of programs that support both NYSDOT

projects and are directed to localities with federal aid eligible road or highway and bridge projects within NYSDOT's local road and bridge capital program. NYSDOT also receives formula funding from the National Motor Carrier Safety Assistance Program (MCSAP), administered by the Federal Motor Carrier Safety Administration. Formula funds are also provided to NYSDOT through FTA to support local transit providers that offer services in rural areas, as well as to the elderly and individuals with disabilities.

18.    NYSDOT also receives a number of competitive grants from FHWA, the Office of the Secretary of Transportation (OST), and the Federal Railroad Administration, some of which are detailed below as examples.

19.    Generally, although each US DOT subagency handles its own approval processes, federal approval of a project under an apportioned formula grant follows a routinized process. NYSDOT must ensure the project is eligible for federal funds. The project must be added to the statewide transportation improvement plan and approved by FHWA and FTA. Depending on the phase of the project, appropriate environmental approvals under the National Environmental Policy Act (NEPA) may need to be obtained. Once appropriate federal approvals have been received, NYSDOT seeks "Federal Authorization" of the project, indicating that it intends to advance the project utilizing federal funds. "Federal Obligation" of the funds may occur simultaneously or at a later date as the project progresses and NYSDOT begins to spend against the project. Once the relevant US DOT subagency obligates the funds, we can seek reimbursement of eligible federal costs. For formula funds, federal grant funding terms and conditions are accepted once a grant project agreement has been executed in the federal funding portal at the time of either federal authorization or obligation.

*Federal Highway Administration (FHWA) Funding*

20.    NYSDOT receives the following formula funding from the FHWA:

a.    National Highway Performance Program, 23 U.S.C. § 119, for which the FHWA
has apportioned NYSDOT over $4.7 billion to date (encompassing federal fiscal
years 2022-2025) since the most recent authorization statute in 2021. The
apportionment for 2025 was $1.2 billion. These funds are used for core repairs to
highways, roadways, and bridges including repairs, rehabilitation, and
replacement.

b.    Surface Transportation Block Grant Program, including the Bridge Formula
Program, 23 U.S.C. § 144, and the National Electric Vehicle Infrastructure
Program, 23 U.S.C. § 133(b)(15), for which the FHWA has apportioned
NYSDOT a total of over $4.0 billion to date (encompassing federal fiscal years
2022-2025). The apportionment for 2025 was $1.0 billion. Surface Transportation
Block Grant Program funds permit core highway, roadway, and bridge work
including repairs, rehabilitation, and replacement. The Bridge Formula Program
provides capital funding only for bridges while NEVI funds electronic vehicle
network buildout.

c.    Congestion Mitigation and Air Quality Program (CMAQ), 23 U.S.C. § 149, for
which the FHWA has apportioned NYSDOT over $822 million to date
(encompassing federal fiscal years 2022-2025). The apportionment for 2025 was
$212 million. CMAQ funds are used for projects that help reduce traffic
congestion and improve air quality, like road projects that ensure less "stop and

go" traffic or improve traffic flow, and for sub-allocations to transit providers for

buses and road improvements that support transit.

d. Highway Safety Improvement Program, 23 U.S.C. § 148, for which the FHWA

has apportioned NYSDOT over $507 million to date (encompassing federal fiscal

years 2022-2025). The apportionment for 2025 was $131 million. This program's

funds are used for projects that improve traffic safety and help prevent serious

injuries and fatalities (i.e. signage, roadway markings, and safety installations),

e. National Highway Freight Program, 23 U.S.C. § 167, for which the FHWA has

apportioned NYSDOT over $239 million to date (encompassing federal fiscal

years 2022-2025). The apportionment for 2025 was $62 million. These funds are

used on projects that promote and improve the freight network, namely repair,

rehabilitation, and replacement of major freight corridors or connections to

intermodal distribution centers.

f. The PROTECT (Promoting Resilient Operations for Transformative, Efficient

and Cost-saving Transportation) Program, 23 U.S.C. § 176, for which the FHWA

has apportioned NYSDOT over $232 million to date (encompassing federal fiscal

years 2022-2025). The apportionment for 2025 was $59 million. PROTECT funds

are used on projects that build resiliency in the transportation network, like

investments in roads that flood to raise the roadway or culvert projects that help

ensure that the roads don't wash out.

g. Carbon Reduction Program, 23 U.S.C. § 175, for which the FHWA has

apportioned NYSDOT over $204 million to date (encompassing federal fiscal

years 2022-2025). The apportionment for 2025 was $52 million. These funds

support projects that reduce the carbon footprint, like investments in transit,
pedestrian and bike facilities, and traffic improvement projects that reduce idling
and reduce emissions.

h. Metropolitan Planning Program, 23 U.S.C. § 134, for which the FHWA has
apportioned NYSDOT over $135 million to date (encompassing federal fiscal
years 2022-2025). The apportionment for 2025 was $34 million. These are
planning funds that are provided to the regional metropolitan planning
organizations to help fund their mission and projects.

*Federal Transit Administration ("FTA") Funding*

21.    NYSDOT receives other formula funding from programs under the Transit Act,
Title 49 of the United States Code. Those programs are administered by the Federal Transit
Administration ("FTA"), which is also part of US DOT.

22.    NYSDOT receives the following formula funding from the FTA:

a. Formula funding from the Formula Grants for Rural Areas, which provides
capital, planning, and operating assistance to support public transportation in rural
areas, for which the FTA has apportioned NYSDOT over $91 million to date
(encompassing federal fiscal years 2022-2024, with the New York share based on
sub-regional apportionment agreement with New Jersey and Connecticut). The
apportionment for New York State's portion in 2024 was $30 million.

b. Grants for the Enhanced Mobility of Seniors and Individuals with Disabilities
Program, which provides funding to meet the transportation needs of older adults
and people with disabilities when the local transportation service provided is
unavailable, insufficient, or inappropriate to meet their needs, for which the FTA

has apportioned NYSDOT over $75 million to date (encompassing federal fiscal years 2022-2024, with the New York share based on sub-regional apportionment agreement with New Jersey and Connecticut). The apportionment for New York State's portion in 2024 was $25 million.

c. State Safety Oversight Program relating to certain rail and bus operations, to permit states to develop or carry out a safety program for rail transit related safety issues including best practices for working on the system and worker safety, for which the FTA has allocated NYSDOT over $15 million to date (encompassing federal fiscal years 2022-2024). The apportionment for 2024 was $5.3 million.

d. Metropolitan & Statewide Planning Program under Sections 5303 & 5304, which are planning funds provided to metropolitan planning organizations to assist with transit-related planning projects, for which the FTA has allocated NYSDOT over $40 million to date (encompassing federal fiscal years 2022-2024). The apportionment for 2024 was $13.5 million.

23.    In total, from these programs and others, Congress apportioned approximately $11.0 billion in formula funds to NYSDOT for fiscal years 2022 through 2025. NYSDOT relies on continued use of these formula funds in the future in order to deliver its five-year capital plan. This apportioned funding was fully programmed into NYSDOT's current capital plan which was developed and subsequently adopted in May of 2022. Terminating these funds would undermine much of NYSDOT's important safety and other work as described in further detail below.

24.    Some of the competitive grants awarded by USDOT include:

a. An FHWA Reconnecting Communities grant executed in 2024 for the I-81 Connecting Syracuse Project (over $180 million).

b. The Federal Railroad Administration (FRA) Consolidated Rail Infrastructure and Safety Improvements grant for the Livingston Avenue Bridge (over $215 million awarded in 2024 but not yet executed).

c. Office of the Secretary of Transportation (OST) Reconnecting Communities grant for Inner Loop North Transformation Project ($100 million awarded in January 2024 but not yet executed).

d. OST grant under the Mega Program (the National Infrastructure Project Assistance program) for the Cross Bronx Expressway's Multimodal Community Connector Roadway ($150 million awarded in 2024 but not yet executed).

25. NYSDOT intends to continue seeking these competitive grants as they are made available in the future.

**The FY 2025 Immigration Enforcement Condition and Its Impact**

26. In late April 2025, I became aware that the Federal Railroad Administration (FRA) had updated the General Terms and Conditions that are attached to all grant agreements that FRA executes with recipients for FRA funding, including with NYSDOT. The updated General Terms and Conditions added an immigration related condition to the federal grant agreements.

27. The condition (the "Immigration Enforcement Condition") included the following language: "[T]he Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law."

28.     In addition to the FRA General Terms and Conditions, I learned that a Federal

Motor Carrier Safety Administration (FMCSA) grant to NYSDOT awaiting execution, the

Federal Transit Administration (FTA) Master Grant Agreement that applies to all NYSDOT

grants and loans, and several FHWA Competitive Grant Program agreements with NYSDOT had

terms and conditions amended from prior versions to include the Immigration Enforcement

Condition.

29.     An April 24, 2025 letter from Secretary Duffy to "All Recipients of U.S.

Department of Transportation Funding" stating that recipients' "legal obligations require

cooperation generally with Federal authorities in the enforcement of Federal law, including

cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other

Federal offices and components of the Department of Homeland Security in the enforcement of

Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of

Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT

and could lead to a loss of Federal funding from DOT."

30.     NYSDOT does not understand what US DOT means to include within the broad

phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other

Federal offices and components of the Department of Homeland Security in the enforcement of

Federal immigration law." I am not aware of what limits there may be—if any—to "cooperating

with . . . enforcement of Federal immigration law." NYSDOT is responsible for duties related to

the development, maintenance, and safety of transportation infrastructure, and lacks the capacity

or authority to enforce federal civil immigration law, or to anticipate what that cooperation may

entail. NYSDOT cannot certify compliance with DOT's new immigration-related funding

conditions, which are unclear, may be burdensome, and may contravene state policy.

31.    NYSDOT is not accessing $10.8 million that, but for the Immigration

Enforcement Condition added to the Standard Terms and Conditions in the grant agreement

received for execution in late April, would be applied currently to advance the safety goals of the

Federal Motor Carrier Safety Assistance Program administered by FMCSA. The program

provides financial assistance to State and local enforcement agencies, like NYSDOT, to increase

commercial motor vehicle enforcement and safety activities. NYSDOT had been preparing to

execute this grant agreement and obligate FMCSA funds, but did not do so due to the imposition

of the new terms and conditions.

32.    A rail grade crossing planning project in New Castle, New York is currently not

being funded or progressed because, in late April, FRA added the Immigration Enforcement

Condition to the updated General Terms and Conditions included as part of the draft grant

agreement. The project would complete the necessary preliminary engineering and

environmental work for a highway-rail grade separation on Roaring Brook Road near the

intersection of the Saw Mill River Parkway in the Town of New Castle. The Roaring Brook

Road- Harlem Line grade crossing is 300 feet away from an interchange with the Saw Mill River

Parkway and is less than a half mile from Horace Greeley High School. Traffic converges at this

location and routinely backs up over the grade crossing and onto the Parkway, particularly

during the morning and evening rush hours. Total project cost is approximately $3.3 million with

a planned 80% Federal and 20% Local match ($2.6 million/$652,000). NYSDOT expected to

move this project toward a grant agreement, but the process will be stalled because NYSDOT

cannot agree to FRA's new immigration enforcement conditions.

33.    FHWA added the Immigration Enforcement Condition to its Competitive Grant

Program General Terms and Conditions in late April that is part of the grant agreement package

for a $320,000 wildlife crossing grant aimed at addressing highway safety risks associated with animal crossings. NYSDOT had been intending to work with FHWA to finalize this grant agreement for execution and obligate funds for this project but has not done so due to the new terms and conditions.

34.     Similarly, FTA updated its Master Agreement that applies to all FTA grants and loans on April 25, 2025 with the Immigration Enforcement Condition. Any grants executed by NYSDOT after this date would be subject to the new condition. This will impact programs that would generally be executed later this year that provide assistance to transit providers that operate in rural areas, as well as those that support the elderly and individuals with disabilities.

35.     Further focusing on just a small segment of NYSDOT's work illustrates the potential impact of Secretary Duffy's April 24 letter.

36.     As referenced above, NYSDOT has received funding awards from the Neighborhood Access and Equity grant program for the I-81 corridor, which runs from Tennessee to the United States' border with Canada. For the most part, I-81 bypasses major cities, and its largely rural path is heavily used as a trucking corridor. It is vitally important to United States manufacturing and shipping, with a proliferation of distribution centers along the corridor, as well as connections to rail transportation.

37.     NYSDOT's I-81 contracts are in the Syracuse area, where the agency is replacing an aging viaduct that carries a heavily used portion of the highway with a street-level highway and improvements to other nearby highways. This project is planned to consist of nine contracts with construction vendors, of which five have been awarded. The total value of those contracts currently is more than $2.25 billion, with up to 80 percent planned to be provided by formula fund programs administered by FHWA.

38.    Work began in 2023 and is expected to continue through 2028. There are
approximately 600 construction personnel working directly on the awarded I-81
contracts. Along with the construction employees, there are numerous designers working
directly on the job. In addition, the awarded contracts support jobs in industries supplying
fuel, materials, and other support to the project.

39.    Interruptions in federal funding would leave the I-81 corridor project in
limbo, with some but not all of the infrastructure designed to replace the aging Syracuse
viaduct in place or in process.

40.     For instance, a contract for partial demolition of the viaduct has been
awarded, and that partial demolition is scheduled to begin shortly. But critical
components of the project—improvement of the Syracuse local street grid to handle
traffic that will divert to those local streets and to the new Business Loop 81 as a result of
the viaduct demolition—would be halted if federal funds were imperiled, because any
stoppage of federal funding endangers NYSDOT's ability to advance and award the
remaining vendor contracts needed to complete this project.

41.    More broadly, the entire Phase 2 of the I-81 project (comprised of the
remaining four contracts) needs funding authorization, which is jeopardized by the
Immigration Enforcement Condition.

42.    Funding delays or interruptions would make the I-81 work more expensive
overall.  FHWA's Seasonally Adjusted National Highway Construction Cost Index
shows that for the two years ending with the second quarter of 2024—the most recent
information available—the inflation rate for highway construction costs has been

approximately 7 percent a year.[1]  For the I-81 corridor project contracts, where over $1 billion of

work remains, that is an annual increase of $70 million, a cost borne by both New York and the

federal government that cannot be recovered.

43.    Similarly, NYSDOT's project to replace and rehabilitate five bridges on the Cross

Bronx Expressway is receiving federal review. NYSDOT has planned, via its current 5-year

capital program, to advance this project utilizing federal funding, including approximately $180

million of federal formula (National Highway Performance Program) and $150 million of

discretionary funds (Mega grant). Withholding federal funding will prevent this project from

moving ahead when critical construction work needs to occur to ensure the safety of the traveling

public.

44.    Hundreds of smaller NYSDOT projects would also be impacted by an

interruption in federal funding.

45.    For instance, NYSDOT's recent projects include New York Route 347

Reconstruction from Hallock Road to County Route 97 near Lake Grove and Centereach on

Long Island. This project, estimated at approximately $50 million under the National Highway

Performance Program, will create new travel lanes, address traffic choke points, and enhance

safety. Federal funds planned for the project have yet to be officially obligated.

46.    Also on Long Island, NYSDOT has an approximately $4 million project under the

Highway Safety Improvement Program to add turn lanes and make other safety enhancements on

New York Route 101 in Flower Hill, near the St. Francis Hospital & Heart Center. NYSDOT has

---

[1]

https://explore.dot.gov/views/NHIInflationDashboard/NHCCI_1?%3Aiid=1&%3Aembed=y&%3AisGuestRedirectFromVizportal=y&%3Adisplay_count=n&%3AshowVizHome=n&%3Aorigin=viz_share_link.

put out a notice to contractors that it is advancing this project, and has received and is
currently reviewing bids from various highway construction firms to choose the winner.
However, federal funds planned for the project have yet to be officially obligated.

47.    In Hamilton County, NYSDOT recently accepted contractor applications for an
approximately $8.6 million contract under the National Highway Performance Program
and Transportation Alternatives Program to ensure pavement preservation along Route 30
from Long Lake to the Franklin County line. This investment in infrastructure will ensure
driver safety and prevent the taxpayers from having to bear higher road repair costs later.
Federal funds for the project have yet to be officially obligated.

48.    Also in the Adirondacks, NYSDOT recently advanced numerous paving
projects that use federal funding, among them an approximately $1 million project to
repave Route 190 near Devil's Den Road in Altona, and an $800,000 project to repave
Route 37 near Beaver Meadow Road in Akwesasne, both under the National Highway
Performance Program. Both projects will ensure resiliency of the traveling surface
throughout Adirondack winters to come. For both projects, federal funds planned for the
projects have yet to be officially obligated.

49.    In Jefferson County, NYSDOT is planning an approximately $18 million
project under the Bridge Formula Program improving Routes 3 and 12E in Jefferson
County. The 2025 project will replace six bridges and one culvert. Federal funds planned
for the project have not yet been authorized and still need to be officially obligated.

50.    In Washington County, NYSDOT will be assisting with two local projects
receiving federal funds: a $3.25 million replacement of the bridge carrying Gray Lane
over the Mettawee River in Whitehall, and a $1.6 million project to replace the

superstructure of the Lock 8 Road Bridge in Kingsbury, both under the Surface Transportation

Block Grant Program. For both local projects, federal funds planned for the projects have not yet

been authorized or officially obligated.

51.    Lastly, in the Hudson Valley, NYSDOT is planning on a project to transform the

current Route 17 to the future Interstate 86, with work including addressing congestion issues,

improving safety, and resolving non-standard design and operational elements. Much of this

work is anticipated to include federal funding although identification of the official federal

formula programs that will fund the project have not yet been finalized. Federal funds planned

for the construction of the project have not yet been authorized or officially obligated.

52.    All of these highway projects are vitally important to the communities

surrounding them. All of these highway projects—and the hundreds of other NYSDOT projects

like them—will be jeopardized by delay or cancellation.

53.    As noted above, all resumed or rescheduled projects will become more expensive,

even if approvals are eventually granted or funds are provided.

54.    NYSDOT also receives federal funding for more than 140 transit service

providers across New York. These entities provide transportation to senior citizens and

individuals with disabilities, as well as providing transportation in rural areas. Interruption in

federal funds would end or drastically curtail transit service funding, imposing disproportionate,

undue hardships on senior citizens and rural residents.

**Conclusion**

55.    NYSDOT has been put in the position of either: (1) accepting the Immigration

Enforcement Conditions and potentially exceeding its legal authority and coming into conflict

with state law, as well as diverting resources away from the State's important transportation and

safety needs to serve the federal government's civil immigration priorities; or (2) refusing

to accept the Conditions and suffering disruption to federal funds and grants that will

seriously affect NYSDOT's efforts to carry out its duties under state law to maintain and

improve New York's transportation infrastructure and services. This would in turn harm

virtually all New Yorkers, particularly senior citizens and rural residents; all people

traveling through New York, including truckers transporting goods to and from

distribution centers along the I-81 corridor; railroads; airports; users of common carriers

of people and goods; and anyone else who relies on transportation of any kind in New

York. Safety, security, and commerce will all be negatively affected. Losing US DOT

grants would severely obstruct and undermine NYSDOT's mission even if the funding

were restored at a later date.

   I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 15, 2025

Janet Ho

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

              *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 39

Declaration of Jackie Bray

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

          *Plaintiffs*,

  v.

U.S. DEPARTMENT OF
TRANSPORTATION, *et al.*,

          *Defendants*.

No. 1:25-cv-_____

## DECLARATION OF JACKIE BRAY

1.    I am the Commissioner of the New York State Division of Homeland Security and Emergency Services (DHSES or Division) and have the authority to administer the duties and powers of the Division as set forth in New York State Law including oversight and management of the Grants Program Administration (DHSES/GPA) and Disaster Recovery Programs (DHSES/DRP). DHSES/GPA administers two U.S. Department of Transportation (USDOT) grant programs that support states' emergency preparedness and emergency activities. I have held this position, or as Acting Commissioner, since November 2021. As DHSES' Commissioner, I am familiar with the USDOT Preparedness and Response Grants discussed herein and work regularly with DHSES/GPA and DHSES/DRP in administering these Programs. I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

2.    I submit this declaration to explain the significant negative impacts to New York State (State) if USDOT Emergency Preparedness or Emergency Response Grants are withheld or restricted.

1

*Hazardous Materials Emergency Preparedness (HMEP) Grant*

3.    I am familiar with the Hazardous Materials Emergency Preparedness (HMEP)

Grant. The HMEP Grant Program provides financial and technical assistance, as well as national

direction and guidance to enhance State, Territorial, tribal, and local governments planning and

training activities related to hazmat incidents in commercial transportation.

4.    This is a USDOT nationwide program that requires 20% state and local match of

total project costs.

5.    New York State received funding award under this program in FFY 2022 in the

amount of $520,563.00; and in FFY 2023 in the amount of $466,271.00; and in FFY 2024 in the

amount of $466,271.00.

6.    This funding has been instrumental for the State in developing it capabilities to

respond to hazmat incidents in commercial transportation.  DHSES has used this funding for

local planning, training and exercises as well as to fund the acquisition of equipment to train to

respond to hazmat incidents.  The loss of this funding will dimmish State and local government

capabilities to respond to these frequent, dangerous incidents and endanger public safety.

*Pipeline Emergency Response Grant (PERG)*

7.    I am familiar with the Pipeline Emergency Response Grant (PERG).  The PERG

Program focuses on preparedness activities related to the transportation of gas or hazardous

liquids by pipeline in high consequence areas.  This grant funds State equipment used to train

State and local emergency responders in pipeline emergency response.

8.    This is a USDOT competitive program.

2

9.      New York State received funding award under this program in FFY 2023 in the amount of $204,000.00; and in FFY 2024 in the amount of $79,464.00.

10.      The loss of this funding would have a direct effect on training, equipment and response to pipeline incidents, which will be further impacted by the construction and operation of additional pipelines.

*Immigration Condition*

11.      An April 24, 2025 letter from Secretary of Transportation Sean Duffy to "All Recipients of U.S. Department of Transportation Funding" stated that funding recipients that did not comply with USDOT's interpretation of federal legal authority, including enforcement of Federal immigration law, would be subject to having funding terminated. The letter asserts that "[recipients'] legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. . . . DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law." In addition to threatening future funding, the letter asserted that USDOT "retains authority, pursuant to its oversight responsibilities and the terms of [recipients'] agreements, to initiate enforcement actions, such as comprehensive audits and possible recovery of funds expended in a manner contrary to the terms of the funding agreement."

12.      It is my understanding that USDOT has been adding a new term to its grant agreements explicitly requiring recipients to cooperate with federal immigration authorities in the enforcement of federal immigration law.

3

13.     DHSES is not willing to certify compliance with this immigration-cooperation condition, which is burdensome, contrary to state policy, and beyond the federal government's authority to impose.

14.     As DHSES is the State Administrative Agency and I am the Homeland Security Advisor for New York State, I am familiar with the activities of State subrecipients funded by these federal grants. Even if DHSES were willing to accept this condition, New York State would be irreparably harmed because State agencies would have to divert resources away from their core missions in order to accommodate the federal government's civil immigration priorities.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 13 day of May 2025, in Albany, New York.


Jackie Bray
Commissioner
New York State
Division of Homeland Security &
Emergency Services

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants.* |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 40

Declaration of Travis Brouwer

## DECLARATION OF TRAVIS BROUWER

I, Travis Brouwer, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Assistant Director for Revenue, Finance, and Compliance at the Oregon Department of Transportation (ODOT). I have been in this position since 2019 and with ODOT for over 19 years. My job duties include overseeing three divisions within ODOT that administer federal grants. These include the Finance and Budget Division that administers many of ODOT's federal grants and manages the Statewide Transportation Improvement Program (STIP) in which Federal Highway Administration (FHWA) and Federal Transit Administration (FTA) funds are programmed. I also oversee the division that includes our Transportation Safety Office, which administers National Highway Transportation Safety Administration grants, and our Commerce and Compliance Division that administers the Motor Carrier Safety Assistance Program (MCSAP) grant from the Federal Motor Carrier Safety Administration. Over the course of my career, I have had experience overseeing the administration of grants that the State has received from a variety of federal agencies including the Department of Transportation (DOT).

## Background

3.      ODOT administers programs related to Oregon's system of highways, roads and bridges, railways, public transportation services, transportation safety, driver and vehicle licensing, and motor carrier regulation. ODOT's mission is to provide a safe and reliable multimodal transportation system that connects people and helps Oregon's communities and economy thrive. ODOT maintains state highways within Oregon, spanning nearly 8,000 center

line-miles. In addition to state highways, ODOT also manages office buildings, DMV field

offices, maintenance station buildings, storage buildings, and other structures across the state.

This is in addition to the many traveler and driver services provided by ODOT.

4.      ODOT's primary revenue sources are federal funding and State Highway Fund

dollars from fuels tax, weight-mile tax and DMV fees. ODOT receives grant funding from a

variety of agencies within DOT, including the Federal Transit Administration (FTA), Federal

Highway Administration (FHWA), National Highway Traffic Safety Administration (NHTSA),

and the Federal Motor Carrier Safety Administration (FMCSA). A loss of these grants, which

make up approximately 22.6% of the agency's proposed budget for the 2025-2027 biennium,

would severely obstruct and undermine ODOT's mission, even if the funding were restored at a

later date.

### Oregon's Annual Receipt of DOT Grants

5.      ODOT is responsible for administering a number of federal grants from DOT.

While too numerous to list here, each grant supports critical programs and projects in Oregon,

keeping our roadways, transit systems, and our pedestrians safe.

6.      For example, Oregon was awarded over 20 grants from the FHWA for road

construction and improvement projects, including grants for major highway projects like the I-5

Rose Quarter Improvement Project and the I-5 Interstate Bridge Replacement Program.

7.      The Rose Quarter Improvement Project seeks to improve safety and congestion

where three major interstates converge in the City of Portland. This 1.8-mile stretch of highway

is the only two-lane section of I-5 in a major urban area between Canada and Mexico. It has the

highest crash rate on any urban interstate in Oregon and is the state's worst traffic bottleneck.

The project addresses the critical need to keep Oregon's people and economy moving. The

Interstate Bridge Replacement Program seeks to replace the aging interstate bridge between

Oregon and Washinton over the Columbia River with a modern, seismically resilient, multimodal structure that provides improved mobility for people, goods, and services. The Interstate Bridge Replacement is a joint project of DOT and the Washington State Department of Transportation (WSDOT).

8.      ODOT uses grant funds such as these to fund state and local governmental entities and to protect and improve Oregon's critical transportation network. These funds support programs and projects that Oregon would otherwise be unable to sustain on its own.

9.      The programs funded by these grants are vital to protect the residents of Oregon. Loss of funding poses risks to life, safety, or infrastructure in the near and short term. For example, projects funded under the FHWA Bridge program are critical to the preservation of bridges across Oregon, while projects funded under the FHWA Highway Safety Improvement Program eliminate road hazards to save lives and reduce injuries. The programs funded by these specific grants are described further below.

A.      **OREGON's Use of Federal Highway Administration Funds**

10.     ODOT receives several grants from FHWA, including discretionary grants for specific highway construction or improvement projects and formula funds distributed under the FHWA Federal-Aid Highway Program (FAHP). The FAHP formula funds are distributed among states under statutory formulas set by Congress in the multi-year surface transportation act. The most recent of these was the Infrastructure Investment and Jobs Act of 2021. States and local governments that receive FAHP formula funds can select projects to receive funding that meet eligibility requirements. State transportation agencies, including ODOT, administer virtually all FHWA funds within their respective states, including most funds that flow to local government projects, so any impact on ODOT's ability to receive and administer FHWA funds could flow to local governments as well.

11.     Currently ODOT administers grants under the Rebuilding American Infrastructure

with Sustainability and Equity (RAISE) program, now known as the Better Utilizing Investments

to Leverage Development (BUILD) Transportation program. The program is intended to invest

in surface transportation infrastructure that will have a significant local or regional impact. DOT

awarded the following grants to Oregon under this program:

      a.  McGilchrist Complete Streets Project - $13,229,320.00;

      b.  Hawthorne Avenue Pedestrian and Bicyclist Overcrossing -
         $19,560,000.00; and

      c.  OR99: Glenwood Road - Matt Loop - $21,686,400.00.

     12.     ODOT administers grants under the National Culvert Removal, Replacement, and

Restoration Grants (Culvert AOP) program. The AOP grants provide funding for projects that

would meaningfully improve or restore passage for anadromous fish, which are fish species that

are born in freshwater such as streams and rivers, spend most of their lives in the marine

environment, and migrate back to freshwater to spawn. Salmon, an important fish both culturally

and economically to Oregon, are the most widely known examples of anadromous fish. DOT

awarded the following grants to Oregon under this program:

      a.  Clackamas County Oregon Culvert AOP Funding Application –
         $1,490,320.00;

      b.  Lane County, OR - Shaw Creek Crossing Culvert Replacement, Siuslaw
         Road MP 36.8 - $2,384,000.00; and

      c.  Beaver Creek Fish Passage Restoration at Troutdale Rd. - $1,430,000.00.

     13.     ODOT administers grants under the Neighborhood Access and Equity (NAE) and

the Reconnecting Communities Grant Program, which provide funds for projects that improve

walkability, safety, and affordable transportation access. DOT awarded the following grants to

Oregon under these inter-related programs:

      a.  Broadway Main Street and Supporting Connections - $38,394,00.00;

      b.  I-5 Rose Quarter Improvement Project - $ 450,000,000.

    14.    ODOT administers a grant for the I-5 Interstate Bridge Replacement Program from the Bridge Investment Program (BIP). BIP provides funding for bridge replacement, rehabilitation, preservation, and protection projects that reduce the number of bridges in poor condition, or in fair condition at risk of declining into poor condition. DOT awarded ODOT $1,499,000,000.00 in BIP funding for the Interstate Bridge. In addition, the Washington State Department of Transportation (WSDOT) administers a Mega program grant from DOT in the amount of $600,000,000.00 for the Interstate Bridge.

    15.    ODOT receives a grant under the Wildlife Crossings Pilot Program (WCPP). WCPP seeks to reduce wildlife vehicle collisions while improving habitat connectivity for terrestrial and aquatic species. DOT awarded ODOT a grant for the Mariposa Preserve Wildlife Overcrossing Project in the amount of $33,182,188.

    16.    ODOT receives a grant under the Promoting Resilient Operations for Transformative, Efficient, and Cost-saving Transportation (PROTECT) Grant program. PROTECT provides funding to ensure surface transportation resilience to natural hazards including climate change, sea level rise, flooding, extreme weather events, and other natural disasters through support of planning activities, resilience improvements, community resilience and evacuation routes, and at-risk coastal infrastructure. DOT awarded ODOT a grant for the US 101: Butte Creek Culvert Replacement Project in the amount of $6,100,000.00.

    17.    ODOT has received several other grants from FHWA under various programs. In total, discretionary grants administered by ODOT total over $2 billion.

18.     ODOT also receives annual apportionments of contract authority under the

FHWA Federal-Aid Highway Program. In federal fiscal year 2025, these apportionments total

$702,701,651 across a variety of grant programs, including the Highway Safety Improvement

Program mentioned above. In addition, ODOT receives funding under the Bridge Formula

Program (BFP). The BFP is a formula grant program established by the Infrastructure Investment

and Jobs Act to replace, rehabilitate, preserve, protect, and construct highway bridges. DOT has

awarded the following grants to ODOT:

       a.   FFY 2023 - $ 57,686,024;

       b.   FFY 2024 - $ 57,686,024; and

       c.   FFY 2025 - $57,686,024.

19.     ODOT intends to apply for additional discretionary grants for FY 2026 and to

receive future apportionments under the FHWA Federal-Aid Highway Program.

**B.     Oregon's Use of Federal Transit Administration Funds**

20.     ODOT receives grants from the FTA for various programs.  FTA administers

several grants that support public transportation programs. Some of Oregon's formula funding is

provided directly to public transportation providers in urban areas. ODOT is the direct recipient

of FTA funds for most of the state and administers funds to public transportation provider

subrecipients, particularly in rural areas. ODOT receives formula and discretionary funding from

FTA programs including Enhanced Mobility of Seniors and Individuals with Disabilities

(Section 5310), Rural Area Formula Apportionments (Section 5311), and Bus and Bus Facilities

(Section 5339), among a number of others.

21.     The FTA Master Agreement contains the standard terms and conditions that apply

to all grants that ODOT receives that are administered by FTA. The provisions in the Master

Agreement also apply to subawards and therefore establish binding requirements on

subrecipients. On April 25th, 2025 FTA issued a revised Master Agreement, version 33, that

includes the immigration conditions at issue in this lawsuit. An FTA grant to ODOT executed on April 24 reflects Version 33 of the Master Agreement, and ODOT believes that every new grant execution or amendment to an existing grant will require affirmation of Master Agreement 33.

22.     Oregon received the following apportionments from the FTA:

a.  FFY 2023 - $156,155,973.00;

b.  FFY 2024 -$162,130,356.00; and

c.  FFY 2025 - $164,236,846.00.

23.     ODOT intends to apply for the FY 2026 Federal Transit Administration Funds.

**C.     Oregon's Use of Federal Motor Carrier Safety Administration Funds**

24.     ODOT, through its Commerce and Compliance Division, is responsible for Oregon's Commercial Motor Vehicle Safety Program (CMV). Oregon deploys a multi-faceted program of driver and vehicle inspections, traffic enforcement, compliance reviews, new carrier entrant safety audits, public education and awareness campaigns, data collection, and other safety related activities all aimed at reducing truck and bus crashes in Oregon.

25.     ODOT employs 37 Safety Compliance Specialists and 74 Motor Carrier Enforcement Officers. Safety Compliance Specialists are State Safety Investigators. Their primary job functions are to conduct motor carrier safety compliance reviews, new entrant safety audits and truck/bus inspections. They are Level I certified truck inspectors and receive Hazardous Materials training. The primary duty of the Motor Carrier Enforcement Officers is to enforce CMV size and weight laws. However, these officers also maintain truck inspection certification because they have prime opportunities to identify and inspect unsafe drivers and vehicles.

26.     ODOT relies on the Federal Motor Carrier Safety Administration's (FMCSA)

Motor Carrier Safety Assistance Program (MCSAP) formula grant to fund a portion of these and other safety activities. Additionally, ODOT subcontracts law enforcement agencies as partners in Oregon's MCSAP program.

27.    ODOT is the sole recipient of MCSAP funding in Oregon.  Some of those MCSAP funds are passed through to nine law enforcement agencies to make traffic stops and inspections based on driver behavior.

28.    ODOT has received the following MSCAP grant awards in recent years:

    a.  FFY 2023 - $6,111,217.00;

    b.  FFY 2024 - $6,375,905.00;

    c.  FFY 2025 - $3,541,785.00.

29.    On April 23, 2025, the FMCSA sent out a partial award, as reflected above, for the FFY 2025 MCSAP grant of $3,541,785.00.  ODOT has not yet accepted that award. To receive those funds, ODOT has been asked to amend the grant agreement to add the immigration conditions at issue in this lawsuit.

30.    ODOT intends to apply for the FFY 2026 and future MCSAP funds from the Federal Motor Carrier Safety Administration.

**D.    Oregon's Use of National Highway Traffic Safety Administration Funds**

31.    ODOT receives grants from the National Highway Traffic Safety Administration (NHTSA) for various programs. NHTSA administers several grants that support the development and implementation of highway safety programs through data-driven, evidence-based solutions to save lives, prevent injuries and reduce economic costs due to traffic crashes.

32.    ODOT applies for grant funding related to racial profiling data collection; occupant protection; state traffic safety information system improvements; impaired driving countermeasures; distracted driving; motorcyclist safety grants; nonmotorized safety; preventing

roadside deaths; driver education; emergency medical services training; judicial and law enforcement training; speed management countermeasures; vehicle equipment safety standards education; and driver and officer safety education.

33.    ODOT received the following apportionments from the NHTSA:

a.    FFY 2023 - $14,547,612.22;

b.    FFY 2024 -$11,8058,562.71.

c.    FFY 2025 - $12,103,139.72

34.    ODOT intends to apply for the FY 2026 and future NHTSA safety funds.

### The FY 2025 Immigration Enforcement Requirements and its Impact on ODOT Grant Administration

35.    On April 24, 2025, I received a copy of the April 24, 2025 letter from Secretary of Transportation Sean Duffy stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

36.    ODOT does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." ODOT is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

37.    In the agency's next biennial budget, covering July 1, 2025 through June 30,

2027, ODOT estimates the agency will receive disbursements of $1.65 billion under current and planned federal grants. This includes grants from multiple DOT agencies, including FTA, FHWA, NHTSA, and FMCSA, and includes both discretionary grants for specific projects and grants provided by formula to the state. This includes funds from the current federal fiscal year and past fiscal years that are already obligated as well as funds, such as federal FY 2026 grants, that have been authorized under the Infrastructure Investment and Jobs Act but not yet appropriated by Congress or obligated.

38.    If ODOT is unable to comply with the federal government's new funding conditions, the State would be unable to receive FY 2025 DOT funds, depriving the State of hundreds of millions of dollars, frustrating its ability to maintain the critical programs described above.

39.    ODOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If ODOT cannot access federal funds, ODOT will not have funds to continue the programs and projects funded by the grants. This, in turn, will result in interruptions, terminations and reductions in programs critical to transportation development, preservation, and safety.

40.    For instance, ODOT will have to halt dozens of highway construction projects, including repairs to deficient bridges under the Bridge Formula Program and projects designed to save lives and reduce injuries by eliminating hazardous road conditions under the Highway Safety Improvement Program.

41.    Highway projects require years of development, including environmental review, permitting, and design before they go to construction, and federal law requires that states program federal funds in the Statewide Transportation Improvement Program (STIP) multiple

years in advance. ODOT has complied with this requirement by programming projected federal

funding through federal FY 2027 and will soon program projects through federal FY 2030.

ODOT has moved forward in good faith on projects and spent money on development with the

reasonable expectation of future federal funding to construct these projects, particularly as those

funds have been authorized in the Infrastructure Investment and Jobs Act through federal FY

2026. Loss of future federal funds would leave ODOT with significant expenditures on projects

that will not be able to move forward. Uncertainty as to the status of future federal funding

leaves ODOT in the position of having to spend significant resources on projects that may never

be funded. If the immigration conditions in the Duffy letter are applied to funds that are already

obligated to projects, ODOT could also expend significant funding based on existing

commitments and not be reimbursed by the federal government.

42.    ODOT will be unable to fund federal transit programs across the state, especially

for rural communities and for elderly and disabled individuals. It will not provide Bus and Bus

Facilities funds that keep vehicles in a state of good repair, which may result in increased

maintenance costs and impact services. Transit agencies have some local and state funds to

continue services; however, all services using federal funds will cease.

43.    The longer ODOT cannot access funds, the greater the risk that additional

programs will be interrupted or terminated.

44.    Losing these DOT grants would severely obstruct and undermine ODOT's

mission even if the funding were restored at a later date, as the process of developing

transportation projects would have been disrupted and restarting the projects would come with

additional costs, including construction cost inflation on any projects that were delayed.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration

was executed on May 20, 2025 in Salem, Oregon.

Travis Brouwer

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                  *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                  *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 41

## Declaration of Kenji Sugahara

## <u>DECLARATION OF Kenji Sugahara</u>

I, Kenji Sugahara, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Director at the Oregon Department of Aviation (ODAV). My job duties include directing all department functions including executing federal grants for Oregon's state-owned airports.

## <u>Background</u>

3.      ODAV has two primary functions. The first is to establish, maintain and operate Oregon's 28 state-owned airports. The second is to distribute state funds to public use airports in Oregon to assist with safety and other critical improvements necessary to keep these airports safely operational. An integral part of our operations is to secure federal funding for projects that are necessary to for the safe operations of state and other public use airports through federal grants from the Department of Transportation's (DOT) subagency, the Federal Aviation Administration (FAA).

4.      The Oregon State Aviation Board is responsible for setting Oregon's aviation policies and for authorizing the Director of ODAV to accept, receive, loan and spend funds, to acquire and dispose of property, to designate airport sites and to adopt rules for the Board and the Agency. Significantly, the Board is also the body with the authority to approve grant applications made by public airports for the distribution of state funds. The Board has seven members who are appointed by the Governor. Each member of the board represents aviation and community interests from the public and private sectors statewide.

5.      The aviation industry is a large part of Oregon's economy, contributing billions of dollars and supporting thousands of jobs.

6.      As part of my regular job duties, I oversee state and federal grants. State law (ORS 319.023) requires ODAV to establish and administer a portion of aircraft fuel taxes for qualifying airport related projects, which ODAV does through a grant program called the Aviation System Action Program. Seventy-five percent of ASAP funding is distributed through a subprogram called the Critical Oregon Airport Relief program ("COAR").

7.      By Agency rule, public airports seeking COAR grants to assist with a match requirement for FAA grants are given priority over all other projects. All applications for COAR funding are made to the Board in a public meeting, where the Board considers the total amount of funding available, the purpose of the application and the priority for that application based on Agency rules. For example, an applicant for COAR funding to meet an FAA match requirement will be selected over an applicant that is not seeking to meet a match requirement. If any COAR funds remain after Priority 1 grants are awarded, the Board will award the remaining funds based on other priorities set out in Agency rule.

8.      Significantly, an applicant seeking COAR funds to match an FAA grant may be approved for a COAR grant, but will not receive any funding until the recipient demonstrates that it has taken all necessary steps to secure the FAA funding

9.      For example, under a COAR agreement with the City of Albany, ODAV contributed 41,718.00 so that the Albany Municipal Airport would receive an FAA grant award of $417,187.00. The grant funds were allocated to fund the rehabilitation of the airport's hangar and buildings.

2

10.    ODAV also receives grant funding directly from the FAA under the Airport

Improvement Program (IAP) grants and Airport Infrastructure Grants (AIG).

11.    In the Federal Fiscal Year (FY) 2023, ODAV received two AIP grants totaling

$854,072.00.

    a.    $701,125.00 IAP grant award for the Cottage Grove State Airport to

        rehabilitate the east apron and part of the west apron.

    b.    $152,947.00 IAP grant award for ODAV to update the Oregon Airport

        System Plan.

12.    In FY 2024, ODAV received 3 IAP and 4 AIG grants totaling $3,847,682.00.

    a.    $872,419.00 IAP grant award for the Cottage Grove State Airport to

        reconstruct the main apron;

    b.    $1,896,565.00 IAP grant award for the Siletz Bay State Airport to

        rehabilitate a runway, install lighting and a visual guidance systems;

    c.    $83,401.00 IAP grant award for ODAV to update the State System plan,

        including the pavement management plan.

    d.    $ 664,023.00 AIG grant award for the Aurora State Airport to rehabilitate

        the parallel taxiway, connector taxiways, the north taxilane areas, and the

        general aviation apron;

    e.    $84,810.00 AIG grant award for the Brandon State Airport to rehabilitate

        a runway and taxiway;

    f.    $81,502.00 AIG grant award for the Cottage Grove State Airport to

        rehabilitate a runway and taxiway;

g.     $78,633.00 AIG grant award for the Independence State Airport to rehabilitate the main apron and a taxiway;

h.     $86,329.00 AIG grant award for the McDermitt State Airport to rehabilitate a runway. Taxiway, connectors and apron;

13.     FAA makes available to ODAV's NPIAS General Aviation airports an annual award of $150,000.00 that may be spent on critical airport improvement projects. ODAV has 11 airports that are allocated these entitlements annually. To receive these funds ODAV must submit a grant application to FAA requesting the funds for a particular project, previously approved on the airports Capitol Improve Plan (CIP), on an annual basis. These funds are on a 4-year expiration cycle. ODAV has determined to use all over $1,900,000 in expiring entitlements and AIG for a runway rehabilitation project at the Aurora Airport, a project that is critically necessary for the safety and efficiency of the users of this airport if ODAV is unable to complete this project, suspension of some airport activities will become necessary. Unfortunately, to secure any part of the $4,400,00.00 federal funds necessary to complete the project, ODAV must complete a grant application which requires it to commit to agreeing to all terms that will be set forth in FAA's new grant agreement, including the requirement that ODAV comply with federal policies regarding the enforcement of its immigration policies. The due date of this grant application is June 30th, 2025. Because ODAV may not be able to agree to these terms, it cannot submit this grant application which will result in ODAV losing more than $1,900,000.00 in expiring entitlement and AIG funds, the single source of funding for the Aurora Airport rehabilitation project.

4

14. ODAV intends to apply for the FY 2025 FAA grants. ODAV has planned projects

for FY 2025 totaling $10,277,577.72 across 10 airports. The projects include needed

rehabilitation and updating for runways, taxiways, and aprons. Without FAA funding, these

critical safety projects cannot move forward.

<u>The FY 2025 Immigration Enforcement Requirements</u>
<u>and its Impact on ODAV Grant Administration</u>

15. I have reviewed and am aware that on April 24, 2025, Secretary of Transportation

Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal

obligations require cooperation generally with Federal authorities in the enforcement of Federal

law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement

(ICE) and other Federal offices and components of the Department of Homeland Security in the

enforcement of federal immigration law." This letter warned that "failure to cooperate . . . in the

enforcement of Federal law" will "jeopardize your continued receipt of Federal financial

assistance from DOT and could lead to a loss of Federal funding from DOT."

16. On May 8, 2025, the Rogue Valley International-Medford Airport sent my office

a copy of the FY 2025 Airport Infrastructure Grant Agreement Template received from the FAA.

The template contains a provision which requires grant recipients to "cooperate with Federal

officials in the enforcement of Federal law, including cooperating with and not impeding U.S.

Immigration and Customs Enforcement (ICE) and other Federal offices and components of the

Department of Homeland Security in and the enforcement of Federal immigration law."

17. ODAV does not understand what DOT means to include within the broad phrase,

"cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal

offices and components of the Department of Homeland Security in the enforcement of Federal

immigration law." ODAV is not aware of definitions, citations, or criteria that might define what

5

activities may be included in "cooperating with . . . enforcement of Federal immigration law."

18.     In my tenure with ODAV, I am not aware of ODAV staff ever being required to enforce or participate in the enforcement of federal civil immigration law. ODAV's authority under state law is narrowly related to the establishment, development, maintenance, operations and, most important, safety of Oregon's aviation operations and infrastructure. Neither ODAV or the Board have any authority, capacity or even ability to enforce civil immigration law.

19.     Additionally, if ODAV is unable to comply with the federal government's new funding conditions, the State would be unable to receive FY 2025 FAA funds for state airport development, depriving the State of potentially millions of dollars necessary to keep the State's airports minimally functional and safe.

20.     ODAV does not have any other appropriation in its budget that could cover the loss of the grants that it anticipated would be awarded for State airport projects. If these federal funds are inaccessible to ODAV, ODAV does not have another source of uncommitted funding that to cover these programs funded by the grants. This, in turn, will result in interruptions in aviation development, maintenance, or safety.

21.     Municipal airports that rely on FAA funds for critical infrastructure projects may also be unable to comply with new conditions or ODAV may not be able to supply those public use airports with funds to satisfy FAA match requirements because of the conditions. ODAV does not have the statutory authority or budget to cover the loss of FAA grants to these public use airports or independently fund necessary infrastructure and improvement projects.

22.    ODAV's needs for funding and certainty of funding is immediate because most if not all of the federal grants that ODAV applies for and receives are for airport improvement projects that are necessary to guarantee the safety of airport users. As projects are delayed or cancelled, airports become unsafe and unusable. Flight traffic must be delayed or cancelled altogether causing massive interruptions in air traffic operations – which will impact not just Oregon but other regions with Oregon as a destination or origination point. Air traffic safety on the ground and in the air should be of paramount concern.

23.    Losing these FAA grants would severely obstruct and undermine ODAV's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 20th, 2025 in Salem, Oregon.

Kenji Sugahara
Director

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 1:25-cv-00208-JJM-PAS |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| *Defendants.* | |

# EXHIBIT 42

Declaration of Meredith Brady

## DECLARATION OF MEREDITH BRADY

I, Meredith Brady, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of eighteen and understand the obligations of an oath.

2.      I am the Associate Director, Division of Statewide Planning, at the Rhode Island Department of Administration ("RIDOA"). I have held this role since July 18, 2018. As the Associate Director, Division of Statewide Planning of DOA, I oversee the administration of a process which allocates grants received from the federal government including those from the Department of Transportation ("USDOT") that are provided to the Rhode Island Department of Transportation ("RIDOT").

3.      I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

### Background

4.      DOA provides supportive services to all Rhode Island State departments and agencies for the effective coordination and direction of state programs and is responsible for the statewide implementation of policy decisions affecting the organization and the delivery of services.

5.      The State Planning Council, as staffed by the Division of Statewide Planning, is responsible for overseeing and approving the State Transportation Improvement Program (STIP), which directs a significant portion of the federal funding received from the USDOT to priority infrastructure projects across the state.

6.      The Division of Statewide Planning tracks federally obligated funds, including by RIDOT, among other state entities.

7.      RIDOT designs, constructs, and maintains the state's surface transportation system.

This includes not only roads and bridges but also the State's rail stations, bike paths and ferry service.

8.      In furtherance of its mission, RIDOT has received a number of grants from USDOT in recent years. As explained further below, these federal grants have been used to expand, improve, and maintain the transportation infrastructure and system on which Rhode Islanders rely.

### Annual Receipt of USDOT Grants

9.      RIDOT is responsible for administering the majority of federal grants received by the State of Rhode Island from USDOT. While too numerous to list here, each grant supports critical programs in Rhode Island, keeping our roadways and transportation systems safe and supporting the social and economic fabric of the state.

10.     RIDOT receives several hundred million dollars annually in federal funding, primarily from the Federal Highway Administration (FHWA). In federal fiscal year 2024, RIDOT's total allocation exceeded $357,000,000, reflecting year-over-year increases driven by the Infrastructure Investment and Jobs Act (IIJA). In addition to these formula-based funds, RIDOT secured approximately $628,000,000 in competitive federal grant awards during the same period. All federal funds are programmed through the STIP and support a broad range of priorities—including highways, bridges, public transit, safety improvements, and resiliency. This ongoing federal investment is essential to maintaining, improving, and modernizing Rhode Island's transportation infrastructure.

11.     These federal investments are pivotal in addressing critical infrastructure needs across Rhode Island. For example, the Route 37 Improvements Project, spanning Cranston and Warwick, involves rehabilitating or replacing 22 bridges to enhance safety and reduce congestion

on this vital corridor. Similarly, the Route 146 Reconstruction Project in North Smithfield, with a total projected cost of $196,000,000, aims to modernize this key transportation artery. RIDOT is also advancing the I-95 15-Bridges project in Providence and Warwick, which will repair or replace a series of aging bridge structures along one of the state's busiest highway segments to improve safety and reduce long-term maintenance costs. Such initiatives underscore the essential role of federal funding in sustaining and advancing Rhode Island's transportation network.

12.    With more than 400 miles of coastline, Rhode Island is extremely vulnerable to extreme weather. Densely populated and highly developed, natural methods for absorbing excess water are severely limited across the state. Turning the Tide is a multidisciplinary $35,000,000 project that seeks to address this core resiliency challenge by deploying 97 nature-based stormwater treatment units spanning all 5 counties of the State. This project is a generational opportunity to invest in Rhode Island's future and the health of its watersheds by detaining more than 300,000 cubic feet of runoff in each future rainfall event.

13.    Collectively, the grants RIDOT receives from USDOT are critical for the safety, reliability, and efficiency of Rhode Island's transportation infrastructure and associated systems. These grants are essential to giving Rhode Islanders access to a transportation system that allows for the efficient transportation of goods and people.

## The FY2025 Immigration Enforcement Requirements and the Impact on RIDOT's Grant Administration

14.    I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of USDOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal

law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

15. It is not evident from the materials I have reviewed what USDOT intends to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." To date, I have not identified any definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

16. In my 24 years working for the State of Rhode Island, I am not aware of RIDOT staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because RIDOT is responsible for building and maintaining Rhode Island's transportation infrastructure, RIDOT lacks any capacity to enforce civil immigration law.

17. RIDOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If RIDOT cannot access federal funds, RIDOT will not have funds to immediately cover the critical programs funded by USDOT grants. This, in turn, will result in the cancellation, or at a minimum the delay, in critical public works projects to improve transportation infrastructure in Rhode Island.

18. Without access to the USDOT awards, RIDOT cannot commit funding for furtherance of all its planned projects. Any pause or termination in federal funding would put some projects on indefinite hold while others would be cancelled outright. This would have enormous

consequences for Rhode Island's residents' ability to safely and efficiently travel across the State.

19.     The longer RIDOT cannot access funds, the later these projects may be completed and the greater the risk that this delay will cause safety, efficiency, and capacity problems. Delays also put at risk the state-matched funds that have been obligated for these projects. Thus, losing these USDOT grants would severely obstruct and undermine RIDOT's mission, even if the funding were restored at a later date.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of May 2025, in Providence, Rhode Island

_____
Meredith E. Brady
Associate Director, Division of Statewide Planning
Rhode Island Department of Administration

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

        *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

        *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 43

Declaration of Walter R. Craddock

## DECLARATION OF WALTER R. CRADDOCK, ESQ.

I, Walter R. Craddock, Esq., pursuant to 28 U.S.C. § 1746, hereby declare:

1.    I am over the age of eighteen and understand the obligations of an oath.

2.    I am the Administrator of the Rhode Island Division of Motor Vehicles ("RI DMV"). I have held this role since June 2015. As the Administrator of RI DMV, I oversee the administration of all grants received by the agency from the federal government including the Department of Transportation ("DOT").

### Background

3.    RI DMV is a state agency responsible for managing motor vehicle registration, plates, and titles; issuing, adjudicating, and suspending licenses, permits, and IDs; and providing other related services. RI DMV always seeks to be at the forefront of providing exemplary services to its customers, who include both Rhode Island and non-Rhode Island residents.

4.    In furtherance of that purpose, RI DMV has received several grants from DOT related to commercial driver's licenses ("CDLs"). As explained further below, these federal grants have been used to plan several improvements to CDL-related databases, notification, and testing. These projects are meant to make the process of obtaining a CDL in Rhode Island accurate, updated, and more efficient for all involved. This helps ensure safety for everyone who uses Rhode Island's roads and stimulates economic activity in the State.

5.    As part of my regular job duties, I oversee my office's administration of these DOT grant funds. Specifically, I have knowledge of RI DMV's Federal Fiscal Years ("FFY") 2021, 2022, 2023, 2024, and Commercial Driver's License Program Implementation ("CDLPI") grants and FFY 2025 CDLPI grant application which is pending submission. I have reviewed the grant

1

awards and application for these grants and am familiar with their contents.

6.      RI DMV has approximately $3,253,093 in active federal awards through the CDLPI

program. A loss of this funding would severely obstruct and undermine RI DMV's mission to

ensure the safety of Rhode Island's roads and provide exemplary services to its customers.

### Rhode Island's Annual Receipt of DOT Grants

7.      RI DMV has received CDLPI grants through DOT's Federal Motor Carrier Safety

Administration ("FMCSA"). The goal of FMCSA's CDLPI program is to ensure that only

qualified drivers are eligible to receive and retain a CDL. Through the program, FMCSA provides

funding to assist States with achieving compliance with federal licensing and programmatic

standards. This is accomplished by awarding grant funding both directly to agencies charged with

managing State CDL programs (such as the RI DMV), as well as national organizations that further

compliance efforts. States, for example, are required to conduct knowledge and skills testing

before issuing a commercial learner's permit ("CLP") or CDL, maintain a complete and accurate

driver history record for anyone who obtains a CLP and/or CDL, and to impose driver

disqualifications as appropriate. The program focuses on maintaining the concept that each driver

has only one driving record and only one licensing document.

8.      In total, accounting for all program funds, FMCSA has obligated $3,253,093 to RI

DMV through the CDLPI program since FFY 2021.

9.      The projects funded by these grants are vital to ensure the safety of Rhode Island's

roads and the availability of CDLs to those who are qualified. If these funds were withheld, RI

DMV will not be able to complete projects essential to maintaining and improving its CDL

program in a timely manner, and the safety and economic prosperity of Rhode Island and its

residents will suffer.

**Commercial Driver's License Program Implementation Grants**

10.    RI DMV has four open CDLPI awards from FFYs 2021, 2022, 2023, and 2024.

      a.    FFY 2021: Original award of $1,784,361;

      b.    FFY 2022: Original award of $379,904;

      c.    FFY 2023: Original award of $465,100; and

      d.    FFY 2024: Original award of $623,728..

11.    RI DMV received the $1,784,361 FFY 2021 CDLPI award to fund two projects related to entry level driver training and the data integrity unit.

      a.    **Entry Level Driver Training.** The entry level driver training project allowed RI DMV to develop and create a field in the customer record to track the requirements for theory and behind the wheel training in accordance with federal law.

      b.    **Data integrity unit.** The CDLPI award funds the salaries and benefits for two full time employees in the data integrity unit, which ensures that violations are recorded in a timely manner and shared with other states.

12.    RI DMV received the $379,904 FFY 2022 CDLPI award to fund three projects related to the Commercial Skills Test Information Management System ("CSTIMS"), driving records check, and medical certificates. The automation functions of these projects, as described below, serve to ensure the safety of Rhode Island's roads.

      a.    **CSTIMS**. This project seeks to integrate two web services that CSTIMS offers (Test Result Service and Applicant Search Service) into the RI DMV's computer system ("RIMS"). This allows a CDL applicant's performance to be checked against the State's system to ensure the applicant

3

can be tested and that their information is correct. This saves the RI DMV

time and eliminates errors.

b. **Driving Records Check**. This project seeks to automate the records check

of in-state license history and violations during the permit/licensing process.

This project will improve the accuracy and efficiency of the driving records

check.

c. **Medical Certificates**. This project seeks to automate the medical

certificates, variances, and skills performance evaluations directly into

RIMS. This project will improve the accuracy and efficiency of maintaining

and verifying these types of records.

13.    RI DMV received the $465,100 FFY 2023 CDLPI award to fund four projects

related to the Drug and Alcohol Clearinghouse ("DACH"), knowledge exam, driving manuals, and

notification mailing.

a. **DACH**. This project automated the transmission of information from

DACH directly into RIMS in accordance with federal law. This project was

completed, but systematic upgrades will likely need to be implemented

based on user experience and functionality. RIMS now performs a

systematic check of DACH during each required transaction to see whether

an individual is prohibited from operating a commercial motor vehicle.

b. **Knowledge Exam.** This project seeks to upgrade the State's current CDL

knowledge tests. Without CDLPI funding, the upgrade to the testing system

will be delayed, and the RI DMV will continue using the outdated version

of the CDL knowledge test rather than following established best practices.

4

c. **Driving Manuals.** This project seeks to provide a printed FMCSA pre-approved driver's manual, which must be provided to every CLP or CDL applicant under 49 CFR § 383.131(a). Without CDLPI funding, driving manuals will not be printed and will remain online only, which can make them less accessible to some applicants.

d. **Notification Mailings.** This project seeks to allow the RI DMV to continue to provide proper notification to drivers pertaining to the CDL medical requirements, Hazardous Materials Endorsement security threat assessment, and the new DACH process. The RI DMV must comply with related regulations, and it is therefore important that the RI DMV properly notifies drivers of changes to their CDL related to medical, hazardous materials, skills performance evaluation, and/or drug and alcohol issues—either that their prohibition is set to expire or, in cases of noncompliance, that their CDL will be downgraded or an endorsement removed. As these are federally required notifications, RI DMV would have to absorb the costs if CDLPI funding was no longer available, which would negatively affect other RI DMV programs and goals.

14.    RI DMV received the $623,728 FFY 2023 CDLPI award to fund three projects related to medical examiner certification, text notifications, and CDL skills test site maintenance.

a. **Medical Examiner Certification.** This project automated the medical certification process by enabling RIMS to communicate electronically with the National Registry of Certified Medical Examiners.

b. **Text Notifications.** This project seeks to develop and implement an

5

automated test messaging system to notify CDL and CLP holders of status updates. Currently, RI DMV provides these notifications by mail only. The text message notification system will allow RI DMV to send required messages in a more efficient and timely manner. Without CDLPI funding, development of this system would not take place and text notifications will not be available.

    c.  **CDL Skills Test Site Maintenance.** This project seeks to maintain and update the CDL skills test site and courses. This includes sealcoating and re-striping the road test course, installing new signage, and providing high visibility all-weather gear for examiners to administer tests in various types of inclement weather. Without these improvements, Rhode Island will not be able to update its road test site to a modernized version like neighboring states have.

15.    In addition to the open FFY 2021-2024 CDLPI awards, RI DMV will apply for $4,392,513 in 2025 CDLPI funding when the Notice of Funding Opportunity is posted. This funding would be used to continue to fund the RI DMV's data integrity unit, train CDL skills examiners, and upgrade RIMS.

**<u>Harms to the State Caused by DOT's Funding Condition</u>**

16.    I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of

6

Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of

Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and

could lead to a loss of Federal funding from DOT."

17.    RI DMV does not understand what DOT means to include within the broad phrase,

"cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices

and components of the Department of Homeland Security in the enforcement of Federal

immigration law." RI DMV is not aware of definitions, citations, or criteria that might define what

activities may be included in "cooperating with . . . enforcement of Federal immigration law."

18.    In my nearly ten years with RI DMV, I am not aware of RI DMV staff ever being

required to enforce or participate in the enforcement of federal civil immigration law. Further,

because RI DMV is responsible for duties related to licensing and registration, RI DMV lacks any

capacity to enforce civil immigration law.

19.    RI DMV has an extremely limited ability to reallocate appropriations within its

budget to cover the loss of the grants discussed above. The RI DMV budget for this year has relied

on the receipt of CDLPI funds, and we made plans and allocated funding for both improvements

and routine services based on our continued ability to draw down on promised federal funding.

20.    Without access to the CDLPI awards, RI DMV cannot commit funding for

furtherance of all its planned improvements, some of which are mandated by federal law. Any

pause or termination in federal funding would put some projects on indefinite hold while others

would be cancelled outright. This would have enormous consequences for the safety and prosperity

of Rhode Island's residents, as it will result in continued inefficiencies, reduced services, and

safety concerns for the people who drive in Rhode Island. Further, the failure to complete projects

mandated by federal law could lead to a FMCSA determination that RI DMV's CDL program is

7

noncompliant with federal law, resulting in the potential loss of Federal-aid highway funds pursuant to 49 CFR § 384.401.

21.     For instance, without CDLPI funding, Rhode Island will have to absorb the costs for two full time employees in the data integrity unit. Several database integrations and upgrades will also be delayed, which will mean that the systems will continue to experience inefficiencies, potential duplicate records, and other errors. Rhode Island may never complete its automated text messaging system or print its driving manuals, meaning that communication with CDL holders and applicants will suffer inefficiencies and lack of access. Rhode Island also will fall behind its neighboring states if it cannot update its knowledge exam testing system, CDL skills course test site, or administer commercial skills tests to those who hold Skills Performance Evaluation certificates.

22.     Additionally, if RI DMV is unable to comply with the federal government's new funding conditions, the State would be unable to receive FFY 2025 CDLPI funds, depriving the State of a significant funding opportunity and frustrating its ability to improve CDL services for Rhode Island residents, maintain the safety of Rhode Island's roads, and comply with numerous federal requirements.

23.     The longer RI DMV cannot access funds, the more these projects will be delayed and the greater the risk that this delay will cause safety, efficiency, and capacity problems. For federally required projects, RI DMV will have to divert its own funds to address the shortfall to avoid the potential loss of Federal-aid highway funds pursuant to 49 CFR § 384.401, and other projects that seek to improve safety and efficiency may never be completed. Thus, losing these DOT grants would negatively impact and undermine RI DMV's mission, even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of May, 2025, in Cranston, Rhode Island.

Walter R. Craddock, Esq.
Administrator
Division of Motor Vehicles

9

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

                    *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                    *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 44

Declaration of Steven King

## DECLARATION OF STEVEN J. KING, P.E.

I, Steven J. King, P.E., pursuant to 28 U.S.C. § 1746, hereby declare:

1.     I am over the age of eighteen and understand the obligations of an oath.

2.     I am the Managing Director of the Quonset Development Corporation ("QDC"). I have held this role since June 2008. As the Managing Director of QDC, I oversee the administration of all federal grants received by the agency from a variety of federal agencies including the Department of Transportation ("DOT").

3.     I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

4.     QDC is a quasi-state agency of the State of Rhode Island. QDC is responsible for the development and management of the Quonset Business Park (including the Port of Davisville) in the best interest of the residents of Rhode Island to attract and retain successful businesses that provide diverse employment opportunities.

### QDC's Annual Receipt of DOT Grants

5.     I am familiar with the Port Infrastructure Development Program ("PIDP"). These funds are distributed by DOT's Maritime Administration. These funds are used to support efforts by ports to improve port and related freight infrastructure to meet the nation's freight transportation needs.

6.     PIDP funding is administered in Rhode Island by QDC.

7.     QDC has three open PIDP awards from DOT from FFYs 2022 to 2024:

      a.     Federal Fiscal Year ("FFY") FFY 2022: Original award of $11,250,000; balance of $11,250,000;

      b.     FFY 2023: Original award of $3,880,000; balance of $3,880,000; and

1

     c.     FFY 2024: Original award of $11,250,000; balance of $11,250,000.

8.     QDC intends to seek funds again for its PIDP program in FFY 2025.

9.     PIDP funds critical infrastructure improvements to the Port of Davisville.

10.     The Port of Davisville, Pier 1 was built by the U.S. Navy in 1943 and is well past its useful design life, however it continues to host cargo ships delivering finished automobiles to the United States. PIDP funds support a project to reconstruct the north berth at Pier 1. In order to construct the new structure, a portion of the existing timber pile foundation, pile caps, and concrete deck will be demolished and removed. New steel piles will be driven within the footprint of the demolished structure, and new high-performance marine-grade concrete pile caps, deck, and curbing will be installed, along with new fenders and mooring bollards.

11.     The reconstruction of the north berth is essential to maintain Pier 1 in a state of good repair. Condition assessments have documented severely deteriorated timber piles, widespread deterioration of the pier deck, and isolated areas of advanced deterioration of the concrete superstructure. Without PIDP funding, this project could not move forward resulting in serious safety concerns and the potential loss of use of the berthing area.

12.     PIDP funds support a project to construct a ramp on the north side of Pier 1 to accommodate stern off-load Roll-On/Roll-Off ("RO-RO") vessels.

13.     Currently, finished vehicles are brought to the Port of Davisville on RO-RO vessels in the Pure Car Carriers ("PCC") Class. Post-COVID, there is a documented worldwide shortage in RO-RO vessels in the PCC Class, which causes carriers to seek other vessel types to be able to supply finished automobiles to the United States. Experience shows that carriers have already begun utilizing smaller RO-RO vessels, equipped with side and/or stern off-load ramps. The Port temporarily modified Pier 1 to accommodate smaller vessels with side ramps, and is already

2

berthing multiple side ramp vessels each year. However, this temporary accommodation is not suited to the existing infrastructure at the Port, causing this off-load method to be inefficient and potentially unsafe. Without PIDP funding, this project could not move forward and this inefficient condition will continue.

14.     PIDP funds support a project for several improvements at the Port of Davisville, including 1) relocation of Maritime Way to accommodate relocation of the main Port entrance gate and construction of a new shared use terminal; 2) relocation of the Port Operations facility to increase efficiency, resiliency and security; 3) Construction of the new 8.6-acre Terminal 6; 4) Construction of a 5-acre expanded laydown area on Maritime Way; 4) Construction of the new Frys Cove Road to provide access to 14.3-acres of upland laydown area; and 5) Relocation and installation of lighting, security cameras, fencing, gates, and other assets at Terminals 4 and 5 to increase Port-wide resiliency and security.

15.     The Port of Davisville is one of Rhode Island's only active ports, and is generally constrained in its available land area with surrounding residential, industrial, and airport uses. This project seeks to expand the capacity of cargo operations at the Port of Davisville through roadway improvements and construction of new laydown areas, as well as implantation of improvements to increase resiliency and security. Without PIDP funding, this project could not move forward and this would severely limit the future growth of the Port and its capacity to support maritime shipping.

3

## The FY2025 Immigration Enforcement Requirements and its Impact on QDC's Grant

## Administration

16.     I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

17.     QDC does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." QDC is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

18.     In my nearly seventeen years as the Managing Director of QDC, I am not aware of QDC staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because QDC is responsible for duties related to the development and management of a commercial port and business park, QDC lacks any capacity to enforce civil immigration law.

19.     Additionally, if QDC is unable to comply with the federal government's new funding conditions, the State would be unable to receive FFY 2025 DOT funds, frustrating its ability to maintain the critical projects described above.

4

20.    QDC does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If QDC cannot access federal funds, QDC will not have funds to immediately cover the critical projects funded by DOT grants. This, in turn, will result in the termination of the critical infrastructure projects mentioned above resulting in serious safety concerns, the potential loss of use of the Pier 1 berthing area, and severe limitations on the future growth and capacity of the Port of Davisville.

21.    The QDC budget for this year has relied on PIDP funds, and we made plans and allocated funding for critical infrastructure projects based on our continued ability to draw down on promised federal funding.

22.    Without access to FFY 2025 grant funding, QDC cannot commit funding for furtherance of critical infrastructure projects.

23.    The longer QDC cannot access funds, the greater the risk that additional infrastructure projects will be interrupted or terminated.

24.    Losing these DOT grants would severely obstruct and undermine QDC's mission even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of May, 2025, in North Kingstown, Rhode Island.

_____

Steven J. King, P.E.
Managing Director
Quonset Development Corporation

5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>          *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION, *et al.*,<br><br>          *Defendants.* | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 45

Declaration of Major Ronald Longolucco

## DECLARATION OF MAJOR RONALD LONGOLUCCO

I, Major Ronald Longolucco, pursuant to 28 U.S.C. § 1746, hereby declare:

1.    I am over the age of eighteen and understand the obligations of an oath.

2.    I am the Administrative Bureau Commander at the Rhode Island State Police ("RISP"). I have served with the Rhode Island State Police since 1997 and have held this current role since 2023. I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

3.    The Rhode Island State Police is a state-wide law enforcement agency whose mission is to fulfill the law enforcement needs of the people with the highest degree of fairness, professionalism and integrity, and protect the inherent rights of the people to live in freedom and safety.

4.    The Rhode Island State Police is a part of the Rhode Island Department of Public Safety, State Police ("RIDPS"), which is a Rhode Island executive-branch state agency. RIDPS oversees all the State of Rhode Island's public safety agencies to ensure efficient delivery of the services those agencies provide.

5.    In my role, I oversee the administration of all federal grants received by the RISP and RIDPS from a variety of federal agencies including the Department of Transportation ("DOT").

### RIDPS's Annual Receipt of DOT Grants

6.    I am familiar with the Motor Carrier Safety Assistance Program ("MSCAP") administered by the Federal Motor Carrier Safety Administration. MSCAP is a federal formula grant program that provides financial assistance to States to reduce the number and severity of crashes involving commercial motor vehicles and to promote the safe transportation of passengers

1

and hazardous materials. In part, these funds are used to deal with threats and hazards posed by materials such as chemicals, explosives, flammable and combustible substances, poisons and radioactive materials.

7.    MSCAP funding is administered in Rhode Island by RIDPS.

8.    RIDPS has three open MSCAP awards from DOT from Federal Fiscal Years ("FFY") 2023 to 2024:

   a.    FFY 2023: $1,969,803.39;

   b.    FFY 2024: $1,947,451.29; and

   c.    FFY 2025: $1,018,233.00.

9.    RIDPS intends to continue seeking funds for its MSCAP programs in future years.

10.    MSCAP funding supports the RISP Commercial Enforcement Unit ("CEU"). The CEU patrols Rhode Island's roads to enforce federal regulations involving commercial vehicles to ensure the safe operation of commercial vehicles in Rhode Island.

11.    Additionally, RIDPS receives grant funding from the National Highway Traffic Safety Administration.

12.    RIDPS was awarded $191,060.48 for FFY 2025 for the RISP's Office of Highway Safety Patrols.

13.    RIDPS was awarded $1,867,767.12 for FFY 2025 for the RISP's Traffic Safety Unit.

14.    RIDPS was awarded $287,170 for FFY 2025 for RISP patrols on Rhode Island's highways.

15.    These grants support RISP patrols and units that are critical to ensuring the safety of motor vehicle traffic on Rhode Island's roads and highways. Ensuring the safety of motor

2

vehicle traffic, especially commercial vehicles, is vital for efficient commerce and the wellbeing of Rhode Islanders as they traverse the State's roads and highways.

16.     RIDPS was awarded $910,132.75 for FFY 2025 for RISP's Records Management System. This new Records Management System will be used statewide to ensure the modernized and efficient transfer of information and records used for law enforcement purposes.

17.     Collectively, these grants sustain a wide range of critical programs in Rhode Island, that keep our roadways, airspace, waterways, transit systems, and our pedestrians safe. Such programs include enforcing federal regulations involving commercial vehicles and hazardous materials; enforcing speed limits, seat belt usage, distracted driving, impaired driving, child passenger safety, and pedestrian safety laws; and paying the salaries of officers on patrol. These programs are therefore essential for the safety of all who live in and visit Rhode Island.

## The FY2025 Immigration Enforcement Requirements and its Impact on RIDPS's Grant

## Administration

18.     I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

19.     I do not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices

3

and components of the Department of Homeland Security in the enforcement of Federal

immigration law." I am not aware of definitions, citations, or criteria that might define what

activities may be included in "cooperating with . . . enforcement of Federal immigration law."

20.     I further do not understand whether this requirement applies only to RIDPS

personnel or to the State's personnel more broadly. In my two years as Administrative Bureau

Commander, I am not aware of RIDPS staff ever being required to enforce or participate in the

enforcement of federal civil immigration law. While RIDPS provides lawful cooperation and

information sharing with federal agencies, including with the Department of Homeland Security

and immigration officials, its cooperation is bounded by state and federal law, it also adheres to

the limits imposed by existing state and federal laws, including by the Federal District Court for

the District of Rhode Island's decision in *Morales v. Chadbourne*.

21.     Confirming compliance as required by DOT could pose direct conflict with Rhode

Island law and the United States Constitution pursuant to *Morales v. Chadbourne*. Additionally,

at this time RIDPS has not agreed to engage in voluntary joint operations with ICE for the purposes

of civil immigration enforcement. Investigating and enforcing violations of federal civil

immigration law is not the primary responsibility of RIDPS.

22.     RIDPS does not have any other appropriation in its budget that could cover the loss

of the grants discussed above. If RIDPS cannot access federal funds, RIDPS will not have funds

to immediately cover the critical programs funded by DOT grants. This, in turn, will result in a

reduction of law and safety enforcement for people in Rhode Island, whether they live here or are

passing through.

23.     Without access to FFY 2025 grant funding, RIDPS cannot commit funding for

furtherance of programs.

4

24.     The longer RIDPS cannot access funds, the greater the risk that additional programs will be interrupted or terminated.

25.     Losing these DOT grants would severely obstruct and undermine RIDPS-SP's mission even if the funding were restored at a later date, in part because our ability to fund personnel at the same levels would be significantly hindered.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of May, 2025, in North Scituate,

Rhode Island

Major Ronald Longolucco
Administrative Bureau Commander
Rhode Island State Police

5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>                         *Plaintiffs*,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION, *et al.*,<br><br>                         *Defendants.* | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 46

## Declaration of Marc R. Pappas

## DECLARATION OF MARC R. PAPPAS

I, Marc R. Pappas, pursuant to 28 U.S.C. § 1746, hereby declare:

1.   I am over the age of eighteen and understand the obligations of an oath.

2.   I am the Director of the Rhode Island Emergency Management Agency ("RIEMA"). I have held this role since 2018. As the Director of RIEMA, I oversee the administration of all federal grants received by the agency from a variety of federal agencies including the Department of Transportation ("DOT").

3.   I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

4.   The Rhode Island Emergency Management Agency is a Rhode Island executive-branch state agency. The mission of RIEMA is to reduce the loss of life and property for the whole community while ensuring that Rhode Island works to build, sustain, and improve its capability to prepare for, protect against, respond to, recover from, and mitigate all natural, human-caused, and technological hazards. RIEMA works on behalf of the Governor of Rhode Island to manage all activities and departments related to emergency management of the State in response to and in preparation for natural and technological emergencies. RIEMA also plays an integral role in training emergency responders.

### RIEMA's Annual Receipt of DOT Grants

5.   I am familiar with the Hazardous Material Emergency Preparedness ("HMEP") Grant Program. These funds are used to deal with threats and hazards posed by materials such as chemicals, explosives, flammable and combustible substances, poisons and radioactive materials.

6.   HMEP funding is administered in Rhode Island by RIEMA.

7.   RIEMA has three open HMEP awards from FEMA from FFYs 2022 to 2024:

1

      a.     Federal Fiscal Year ("FFY") FFY 2022: Original award of $137,761;

      b.     FFY 2023: Original award of $124,186; and

      c.     FFY 2024: Original award of $124,186.

8.     RIEMA intends to seek funds again for its HMEP program in FFY 2025.

9.     HMEP funds support for the Hazardous Material and Mass Decontamination Team ("HMMDT").

10.     The HMMDT is made up of six Hazardous Material Teams (Cranston, East Providence, Hope Valley, Providence, Warwick, and Woonsocket), and four Decontamination Teams (Hopkins Hill, Kingston, North Kingstown, and North Providence). The teams are used to assess and manage the consequences of a hazardous materials/weapons of mass destruction release, either accidental or as part of a terrorist attack. These can include, but are not limited to: white powder incidents, fuel spills, industrial chemical spills, carbon monoxide leaks, gas leaks, and unknown odors.

11.     HMEP funds support for the Rhode Island State Fire Academy ("Fire Academy").

12.     The Fire Academy serves the training needs of Rhode Island's 6,000 firefighters. The Fire Academy provides coordinated education and training to promote and enhance firefighter safety, and to develop and provide high quality training programs, including the use of a state-of-the-art live burn building.

**The FY2025 Immigration Enforcement Requirements and its Impact on RIEMA's Grant Administration**

13.     I have reviewed and am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal

2

law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

14.    RIEMA does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." RIMEA is not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

15.    In my seven years as the Director of RIEMA, I am not aware of RIEMA staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because RIEMA is responsible for duties related to the preparation for and response to natural and technological disasters and emergencies, RIEMA lacks any capacity to enforce civil immigration law.

16.    Additionally, if RIEMA is unable to comply with the federal government's new funding conditions, the State would be unable to receive FFY 2025 DOT funds, frustrating its ability to maintain the critical programs described above.

17.    RIEMA does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If RIEMA cannot access federal funds, RIEMA will not have funds to immediately cover the critical programs funded by DOT grants. This, in turn, will result in the termination, or at a minimum curtailing, of the operational capacity of the HMMDT and decreased training capabilities at the Fire Academy.

3

18.     The RIEMA budget for this year has relied on HMEP funds, and we made plans

and allocated funding for HMMDT and the Fire Academy based on our continued ability to draw

down on promised federal funding.

19.     Without access to FFY 2025 grant funding, RIEMA cannot commit funding for

furtherance of programs.

20.     The longer RIEMA cannot access funds, the greater the risk that additional

programs will be interrupted or terminated.

21.     Losing these DOT grants would severely obstruct and undermine RIEMA's

mission even if the funding were restored at a later date.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this ___ day of May, 2025, in Cranston, Rhode

Island.


Marc R. Pappas
Director
Rhode Island Emergency Management Agency

4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

                       *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                       *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 47

## Declaration of Oscar L. Perez

## DECLARATION OF OSCAR L. PEREZ

I, Oscar L. Perez, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I have personal knowledge of the facts stated herein or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am the Chief of Police for the Providence Police Department and have held this role since 2023. As Chief, I am responsible for all operational and administrative functions of the Providence Police Department.

4. I am a member of the International Association of Chiefs of Police, New England Association of Chiefs of Police, and the Rhode Island Police Chiefs Association, and am the vice chairperson for the Rhode Island Police Officers Commissioner on Standards and Training.

5. Before I was appointed Chief, I served for nearly 30 years in the Providence Police Department and received numerous commendations and letters of recognition for exemplary police work. In addition, I hold both a Bachelor's Degree in the Administration of Justice from Roger Williams University and a Master's Degree in Criminal Justice from Boston University.

6. I submit this declaration in response to U.S. Secretary of Transportation Sean Duffy's April 24, 2025 directive regarding new immigration enforcement conditions for Department of Transportation grants.

7. As Chief, I oversee a Department of approximately 540 employees, including approximately 438 full-time officers. My Department is committed to protecting the safety and welfare of the approximately 190,000 residents of Providence, Rhode Island, an ethnically diverse

community with a substantial population of first-, second-, and third-generation immigrants from around the world.

8. Our main priority as law enforcement officers is to deter and solve crime and bring criminals to justice. Based on my training and experience, it is my opinion that access to information, including information from members of the public, is a fundamental component in preventing and solving crime. I also believe this to be a proposition with which any law enforcement professional would agree. Both quantity and quality of information matters. To solve and prevent criminal activity, we aim to obtain the most information, and the most accurate information, possible.

9. Based on my training and experience, it is my opinion that a critical tool for obtaining access to more information, and more accurate information, is building and maintaining trust among our community members, who would be a primary source of that information.

10. Over my 30-plus-year career with the Providence Police Department, I have seen the problems that arise when members of the public are afraid to cooperate with police either due to fear of retaliation from the offenders, or, in this case, fear of deportation. On many occasions, we received calls from people who either were alleged victims of crime or had information pertaining to a criminal investigation. However, out of fear of being contacted again by police- and potentially bringing attention from immigration authorities to themselves, family members, or neighbors, those reporting information will offer aliases and/or inaccurate address information, preventing officers/detectives from following up and hindering investigations. Sometimes, the informants are eventually identified, but often, they are not. Information that cannot be verified is of little use to criminal investigations, causing many such investigations to go unsolved, allowing offenders to continue their criminal activity, and emboldening

criminals throughout our community. This pervasive distrust of the police endangers members, relatives, and friends of our immigrant population because criminals learn that they are more likely to get away with crimes committed against such individuals.

11. To better protect all members of the community, Providence has implemented various initiatives to build community trust.

12. Providence's community trust policies and practices help my officers solve crimes. We need victims and witnesses to fully cooperate with the police if we are going to arrest, charge, and ultimately convict criminals. By assuaging concerns about deportation, witnesses and victims can finally step forward to assist investigations and criminal proceedings.

13. Because of our community trust efforts, Providence is safer than ever before. Since 2023, we have approved U-Visas for 195 victims of crime, thus assisting in our crime enforcement efforts and ensuring we are able to hold criminal defendants responsible.

14. Moreover, any claim that our community trust efforts undermine public safety is inaccurate. I have seen no indication that Providence has experienced increased criminal activity from immigrant members of our community because of our policies. Rather, I have observed less criminal activity involving immigrants as the victims and witnesses in that population are more likely to come forward.

15. The City of Providence and the Providence Police Department fully comply with all relevant provisions of state and federal law.

16. The City of Providence and the Providence Police Department does not inquire or assume the immigration status of any individuals with whom its agents come into contact.

17. It is estimated that Providence receives approximately $35,000,000.00 in Federal funds through various DOT grants. Currently, Federal funding directly supports numerous public

safety initiatives, including projects within the Providence Department of Planning and Development.

18. If Providence were forced to choose between that funding and its community trust efforts, my training and experience tells me that Providence would be less safe and prosperous, either because Providence would no longer be able to fund the aforementioned projects or else because the Department would lose the cooperation of victims and witnesses who can no longer be assured that they or their loved ones will not face deportation in return for their assistance.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of May, 2025, in Providence, Rhode Island.

Oscar L. Perez
Chief of Police
City of Providence

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                    *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                    *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 48

Declaration of Shelly Baldwin

## DECLARATION OF SHELLY BALDWIN

I, Shelly Baldwin, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of 18. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Acting Director of the Washington Traffic Safety Commission (WTSC), which is a state commission comprised of thirty employees and ten Commissioners chaired by the Governor.

3.      WTSC is a state agency and Washington's designated State Highway Safety Office (SHSO). It is primarily responsible for developing and coordinating implementation of Washington's Strategic Highway Safety Plan (SHSP), Target Zero, which sets a goal of reducing traffic fatalities and serious injuries in Washington to zero by 2030.

4.      I was appointed to the position of WTSC Director in February 2021, after 14 years with WTSC. I have more than 25 years of experience with traffic safety policy issues, including the prevention of impaired and distracted driving.

5.      In addition to leading WTSC's implementation of Target Zero, as Director, I also serve as the Governor's Highway Safety Representative, which is a designated position each state is required to have in order to qualify for federal traffic safety funding.

### Background

6.      As the primary grantee of the National Highway Traffic Safety Administration (NHTSA) in Washington, WTSC administers a wide range of programs meant to improve the culture of traffic safety and reduce traffic-related fatalities and serious injuries.

7.      As part of my regular job duties, I oversee the management and implementation of

1

the federal support WTSC receives from the U.S. Department of Transportation (DOT) through NHTSA-administered grants and ensure that WTSC maintains eligibility for this critical funding.

8.    To maintain eligibility for NHTSA-administered grant funding, WTSC must have an approved triennial highway safety plan (3HSP) and Annual Grant Application (AGA), both of which flow from Washington's SHSP, Target Zero, and require coordination and collaboration between the WTSC, the Washington agencies represented on WTSC, and other stakeholders.

9.    WTSC receives DOT funding through several grant programs, but its primary federal support comes from two NHTSA-administered programs: (1) the Highway Traffic Safety Programs, authorized by 23 U.S.C. § 402 (HTSP or "Section 402"); and (2) the National Priority Safety Programs, authorized by 23 U.S.C. § 405(b)-(i) (NPSP or "Section 405").

10.    Both grants are distributed on a formula basis to WTSC, as Washington's designated SHSO. Accordingly, Washington is entitled to a specific 402 allocation annually based on roadway miles and population. We also receive a 405 allocation annually provided we meet and maintain eligibility requirements.

11.    NHTSA also provides funding for the Fatality Analysis Reporting System (FARS) and for the Crash Report Sampling System (CRSS). These data systems support a nationwide census providing NHTSA, Congress, and the American public yearly data regarding motor vehicle crashes and the fatal injuries in motor vehicle traffic crashes. The WTSC received $358,117 in 2024 and anticipates receiving $368,452 in 2025 under 20.614 – NHTSA Discretionary Safety Cooperative Agreements. The current cooperative agreement is for five years, starting July 1,2022 through June 30, 2027.

12.    Section 402 funds provide support for WTSC to address behavioral traffic safety issues it has identified as a priority in Washington including speeding and young drivers. Section

405, on the other hand, provides support to address traffic safety priorities that Congress has specifically identified, including Occupant Protection, State Traffic Safety Information System Improvements, Impaired Driving Countermeasures, Distracted Driving, Motorcyclist Safety, Nonmotorized Safety, and Preventing Roadside Deaths.

13.    I have reviewed documents related to WTSC's recent applications for and award of NHTSA grant funding under Sections 402 and 405 and am familiar with their contents.

14.    I have also reviewed WTSC's cooperative agreement for 20.614 FARS and CRSS programs and I am familiar with its content.

15.    WTSC has applied for and received funds from Sections 402 and 405 since 1967 under the federal Highway Safety Act of 1966 (Public Law 89-564; 80 Stat. 731).

16.    WTSC most recently applied for NHTSA formula grants in July 2024. Its application was approved, and it was awarded $8,123,492 in Section 402 funds and $8,332,830 in Section 405 funds, for a total award of $16,456,830.

17.    These award totals are consistent with prior fiscal years, where WTSC was awarded the following amounts under Sections 402 and 405:

   a. FFY 2024: $16,179,559

   b. FFY 2023: $14,715,890

   c. FFY 2022: $7,574,517

18.    The funding provided through these awards can be carried forward and used by the recipient in subsequent years, for up to five years. For instance, Washington "carried forward" $15,272,145 in funding from its past awards in 2025.

19.    Thus, the total amount of NHTSA funding WTSC can draw from during a given year is a combination of newly awarded funding and carry forward funding. At present, WTSC

3

has $13,544,087 in obligated but unspent funds from Section 402 and 405 awards made between FY 2023 and 2025. In May, WTSC should receive the final disbursement of our 2025 award. That should be about $8.5 million.

20.    During the most recent biennium budget cycle, 2023-2025, WTSC had an operating budget of $49,333,000, approximately 80 percent of which came from funds NHTSA awarded under Sections 402 and 405.

21.    With this critical federal support, WTSC has worked to reduce traffic fatalities and serious injuries on Washington roadways by:

    a. Leading programs designed to reduce traffic deaths and serious injuries in cooperation with our stakeholders across state, regional, local, and tribal governments; legislators, industry; advocacy organizations; research and academia; and the traveling public.

    b. Developing and coordinating statewide and local behavioral traffic safety programs by providing grant funding to 143 entities including law enforcement agencies, tribes, non-profits, state agencies, universities, and city and county governments.

    c. Promoting and funding law enforcement of impaired driving, speeding, distracted driving and seat belt traffic safety laws with the Washington State Patrol and local law enforcement agencies.

    d. Leading educational campaigns and programs to reduce impaired driving, speeding, and distracted driving, to improve seat belt use and child passenger safety, and increase safety for pedestrians, bicyclists, motorcyclists, and young drivers.

e. Establishing and managing the activities of 17 Target Zero Managers and local traffic safety coalitions working with city, county, and tribal communities to promote traffic safety and focus action on local needs assessments.

f. Managing the development of statewide data systems to provide timely and effective data analysis to support allocation of highway safety resources and collect detailed data on every deadly crash under the federal Fatality Analysis Reporting System (FARS) and the Crash Report Sampling System (CRSS).

22. Most recently, the WTSC has enjoyed many successes, including:

a. Coordinated with stakeholders and Washington residents to complete the 2024 State Strategic Highway Safety Plan, called Target Zero.

b. Expanded the WTSC traffic safety reach by funding Target Zero positions at the Department of Licensing, the Office of the Administrator of the Courts, and toxicologists at the Washington State Patrol Toxicology Lab.

c. Provided grants to local law enforcement agencies to expand traffic enforcement units by creating or hiring 9.5 positions in 7 local law enforcement agencies.

d. Developed new educational traffic safety campaigns to reduce impaired driving, improve motorcyclist safety, encouraging drivers to slow down and pay more attention to the safety of people walking and rolling, and to increase awareness of Washington's Slow Down, Move Over law.

e. Convened groups of hundreds of subject matter experts, business allies, advocates, and members of the public to advise the WTSC on councils for impaired driving, speeding, active transportation safety, and traffic data systems.

5

f. Developed traffic fatality data dashboards that are publicly available and easy to filter by location, demographics, and risk factors.

g. Conducted the first statewide traffic safety beliefs and attitude survey based on a behavioral culture model allowing us to measure successes in our education and programs.

h. Expanded young driver traffic safety programs to more middle school, high schools, and colleges, as well as any driver under age 25 through an app-based rewards program.

23.    These successes would not be possible without the critical funding support WTSC receives from NHTSA. If those funds are withheld, WTSC would have to shut down the following programs: community education and outreach; Target Zero manager's county network; Traffic Safety Resource Prosecutors; Drug Recognition Expert training; DUI Courts; law enforcement grants; non-profits education campaigns; state toxicology laboratory support; programs to support young driver, pedestrian and motorcycle safety. The programs funded by these specific grants are described further below.

**Harms to the State Caused by DOT's Funding Condition**

24.    On April 28, 2025, I received a copy of the April 24, 2025, letter from Secretary of Transportation Sean Duffy, which states that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." The letter warns that "failure to cooperate . . . in the enforcement of Federal law" will

"jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

25.    Although Section 402 and 405 funds are distributed through a formula, WTSC must still demonstrate its eligibility through its Annual Grant Application. As part of that application, WTSC is required to certify that it will comply with the terms and conditions NHTSA attaches to the grant funding.

26.    In my 18 years with WTSC, I am not aware of our staff ever being required to enforce or participate in the enforcement of federal civil immigration law as a condition of our receipt of federal funding.

27.    If WTSC must enforce or participate in the enforcement of federal civil immigration law as a condition of receiving DOT funding, my understanding is that WTSC would be unable to comply with the federal government's new funding conditions.

28.    If WTSC cannot certify that it will comply with the DOT's new funding conditions, NHTSA can stop payments on new or continuing federal funds and WTSC will be ineligible to receive FY 2026 funding.

29.    It is not yet clear how much funding WTSC would be eligible to receive through Sections 402 and 405 in FY 2026, but I anticipate that, under normal circumstances, our FY 2026 allocation would be similar to the $16,456,320 WTSC was awarded for FY 2025.

30.    NHTSA also allows recipients to carry forward obligated funds that were not spent for up to five years. It is not clear, however, that NHTSA would disburse previously awarded and obligated funds to a state that has become ineligible for new formula funding. If NHTSA takes that position, then the potential total loss to WTSC includes not just the approximately $16 million

anticipated in FY 2026 but also any obligated funds that WTSC has not spent from previous award cycles.

31.     Although I will not know the precise amount of NHTSA funding WTSC would otherwise carry forward until the end of the year, I expect that it might be similar to the amount WTSC carried forward from 2024 to 2025, which totaled $15,272,145.

32.     Thus, the imposition of new terms and conditions requiring WTSC to cooperate with federal immigration authorities in the enforcement of federal immigration law, might jeopardize as much as $31,728,456 in Sections 402 and 405 funding over the next year.

33.     Of this amount, WTSC would anticipate spending about $20,000,000 in 2026. WTSC's total one year budget is $25,551,000.

34.     This would be about 78 percent of the total 2026 budget for the WTSC.

35.     WTSC does not have, and is unlikely to receive, any other appropriation in its budget that could cover the loss of the grants discussed above. Thus, the loss of NHTSA traffic safety funding would result in about an 80 percent reduction in Washington's highway safety programming, including the elimination of many WTSC grant programs and staff positions.

36.     In practice, that would mean WTSC could no longer educate the community about important traffic safety issues, such as traffic safety law changes, upcoming focused traffic safety traffic patrols, or respond to questions from the public, researchers, the legislature, for example. We would have to cancel large public information campaigns on impaired driving, seat belt use, speeding, distracted driving, pedestrian safety, motorcycle safety, and young driver safety.

37.     WTSC would also no longer be able to support the network of 17 Target Zero Managers who are local traffic safety program managers that build coalitions to conduct traffic safety projects at the county and city level in response to local data and needs.

8

38.    WTSC would have to discontinue the Traffic Safety Resource Prosecutors program. These prosecutors provide support statewide to county prosecutors who are working on legally and scientifically complex DUI cases. The county prosecutors would also lose DUI training for new prosecutors as well as information on current DUI case law.

39.    Loss of federal funding would mean that WTSC could not continue to provide grants to state and local agencies to facilitate additional traffic safety patrols and dedicated full-time DUI law enforcement officers. WTSC would also likely have to eliminate funding law enforcement officer training for the Drug Recognition Expert training program, which trains officers to recognize when drivers might be under the influence of drugs.

40.    WTSC would have to stop grant funding for county and city DUI Courts. These specialty courts test DUI clients for alcohol and drugs, monitor clients to hold them accountable to their court orders, and provide substance use disorder treatment.

41.    WTSC would not be able to fund marijuana-driving prevention youth campaigns, or continue Teens in the Driver Seat middle school, high school and college-level traffic safety education courses. We would have to cancel an app-based application open to all drivers under 25 that rewards good driving behaviors.

42.    The loss of federal funding would also devastate WTSC's ability to study traffic crashes in Washington. Currently, WTSC tracks and codes every traffic death and fatal crash in Washington, which is critical for making evidence-based policy and programming decisions.

43.    The longer WTSC cannot access funds, the greater the risk that additional programs will be interrupted or terminated. WTSC has never before contemplated a loss of NHTSA funding. Therefore, our program planning is long term and grant funding relies on completing one step in one year and progressing from there in following years. Some grants cover multiple years,

9

especially grant funding for electronic record systems. Closing and restarting grants comes with extra expense, more time spent on duplicated work and administrative tasks, and less time spent on the actual traffic safety projects that work to eliminate traffic deaths.

44.     Losing funding for programming, even temporarily, will result in layoffs of program manager staff who require three years of working on complex NHTSA programming and funding structures to become truly efficient. Many staff have worked for the commission for 10 years or more and have become statewide and nationally recognized subject matter experts. It would take a decade to rebuild new staff to current skill and knowledge levels.

45.     Losing these DOT grants would severely obstruct and undermine WTSC's traffic safety mission, even if the funding were restored at a later date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 13th day of May, 2025 at Olympia, Washington.


_Shelly Baldwin_
Shelly Baldwin
Acting Director
Washington Traffic Safety Commission

10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, <br><br> *Defendants.* | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 49

Declaration of Dennis Bosman

## DECLARATION OF DENNIS BOSMAN

I, Dennis Bosman, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of 18. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Captain of the Commercial Vehicle Division (CVD) for the Washington State Patrol (WSP). My job duties include overseeing the CVD's various programs, as well as the day-to-day operations of the division. As part of these duties, I oversee the agency's Motor Carrier Safety Assistance Program (MCSAP) personnel who develop, submit, and manage our MCSAP grant.

3.      I have been employed by WSP since December 11, 1995, and I have served as CVD Captain since June 30, 2021. I have over 29 years of experience with the WSP, where I have served in various assignments as a trooper, sergeant, and lieutenant in the different districts and divisions throughout the agency.

### Background

4.      The WSP provides professional statewide law enforcement services to all people and communities within the state, which includes traffic enforcement activities, commercial motor vehicle (CMV) enforcement activities, emergency response, and major crime investigations. The CVD and Motor Carrier Safety Division (MCSD) are primarily responsible for promoting the safe travel of CMVs on state highways through education and enforcement to ensure compliance with CMV regulations to protect resources, prevent collisions, and save lives.

5.      WSP relies on federal grants administered by the U.S. Department of Transportation (USDOT), among other resources, to conduct its mission. WSP's largest source of

1

USDOT funding comes from the Motor Carrier Safety Assistance Program (MCSAP).

6.    As part of my regular job duties, I am familiar with WSP's use of this grant program and also understand the importance of federal funding to WSP's operations.

7.    In preparing this declaration, I have reviewed past and present award documents for the grants discussed herein and am familiar with their contents.

## Motor Carrier Safety Assistance Program Funding

8.    As noted above, WSP primarily receives USDOT grant funding through awards made under MCSAP.

9.    MCSAP is a federal grant program administered by the Federal Motor Carrier Safety Administration (FMCSA)—a component of USDOT—that provides financial assistance to States to help reduce the number and severity of crashes and hazardous materials incidents involving CMVs. The goal of the MCSAP is to reduce CMV-involved crashes, fatalities, and injuries through consistent, uniform, and effective CMV safety programs.

10.    As Washington's designated State lead MCSAP agency, WSP is eligible to apply for MCSAP's formula funding. WSP is also responsible for ensuring that Washington's Commercial Vehicle Safety Plan (CVSP) is complete and submitted on time each year to FMSCA.

11.    Washington's current CVSP, which covers Federal Fiscal Year (FFY) 2024 through 2026, was approved by FMCSA on August 2, 2024.

12.    MCSAP funds have allowed WSP to conduct a host of enforcement and inspection activities, including conducting safety audits for new motor carriers operating in interstate commerce and in-depth examinations of certain high-risk carriers to ensure compliance with state and federal safety-related laws and regulations.

13.    WSP also subawards approximately $160,000 of its MCSAP award to the

2

Washington Utilities and Transportation Commission (WUTC) to support WUTC's efforts to investigate CMV-related safety infractions and conduct roadside inspections of large trucks and buses to ensure those driving on Washington's roadways are complying with industry standards.

14.    WSP has applied for and received MCSAP funds since the mid-1980s. WSP submitted its most recent MCSAP grant application on August 29, 2024, and was subsequently awarded the first installment of $5,420,832 of an estimated $10,599,577 for FFY 2025. The grant agreement for WSP's FFY 2025 award, which WSP has not yet signed, is attached as **Exhibit A**.

15.    WSP also received substantial awards in prior years, in the following amounts:

    a. FFY 2024: $9,829,781

    b. FFY 2023: $9,591,098

    c. FFY 2022: $9,722,418

16.    During the most recent biennium budget cycle, 2023-2025, MCSAP funding accounted for approximately 31.4 percent of WSP's operating budget for CVD and MCSD.

17.    The importance of MCSAP funding to WSP's CMV-related safety activities is even more apparent when considered in terms of personnel. At current levels, WSP allocates approximately 254 FTEs to CMV-related safety activities, which yields, on an annual average, 25,000 passenger vehicle contacts, 75,000 inspections, 1,400 safety audits, and 120 compliance reviews. Of the 254 FTEs currently allocated to CMV-related safety activities, approximately 65 are funded through the MCSAP grant.

18.    Thus, if WSP is unable to accept MCSAP funding, the number of FTEs WSP can allocate to CMV-related activities could drop by more than 25 percent. This potential decrease will diminish WSP's ability to conduct essential safety related activities and increase the risk for those

3

travelling on our roads by those CMV carriers and drivers that are not in compliance with CMV related laws and regulations.

### FMSCA's Funding Condition Will Harm Washington

19.     On April 23, 2025, WSP received a grant agreement for the $5,420,832 in federal funds it has been awarded for FFY 2025. **Exhibit A.** The grant agreement incorporates and attaches FMCSA's "Standard Terms and Conditions," which were revised on February 12, 2025, and now state: "Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

20.     The grant agreement warns that the failure to comply with these new terms and conditions allows FMCSA to take any of the actions outlined in 2 CFR 200.339, which I understand could include withholding or terminating MCSAP funds or even preventing WSP from receiving further federal funding.

21.     On April 24, 2025, WSP also received a copy of an April 24, 2025 letter from Secretary of Transportation Sean Duffy, which states that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." The letter warns that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

4

22.     In my years with WSP, I am not aware of WSP staff ever being required to enforce or participate in the enforcement of federal civil immigration law.

23.     If WSP must enforce or participate in the enforcement of federal civil immigration law as a condition of receiving USDOT funding, my understanding is that WSP is unable to comply with the federal government's new funding conditions.

24.     If WSP is unable to comply with the federal government's new funding conditions, the WSP would be unable to accept the estimated $10,559,577 in MCSAP funds that will be awarded for FFY 2025, which will hinder WSP's ability to maintain the critical CMV programming described above. WSP is likely to deplete its current MCSAP funds in the next few months and does not have any other appropriation in its budget that could cover the loss of the grants discussed above.

25.     The longer WSP cannot access funds, the greater the risk that critical enforcement programs will be interrupted or terminated.

26.     Losing its MCSAP grant funds would severely obstruct and undermine WSP's mission, even if the funding is restored at a later date.


I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 19, 2025, in Olympia, Washington.


Dennis Bosman

5

# EXHIBIT A

**U.S Department of Transportation**

**Federal Motor Carrier Safety Administration**

# Grant Agreement

| | | |
|---|---|---|
| 1.   RECIPIENT NAME AND ADDRESS<br>WASHINGTON STATE PATROL<br><br>106 11th Ave SW<br>Olympia, WA 98501-2201 | 2.   AGREEMENT NUMBER: 69A3602531599MCG0WA | 3.   AMENDMENT NO. 0 |

| | |
|---|---|
| | 4.   PROJECT PERFORMANCE PERIOD:     FROM  10/01/2024   TO  09/30/2027 |
| | 5.   FEDERAL FUNDING PERIOD:     FROM  10/01/2024   TO  09/30/2027 |

| | |
|---|---|
| 1A.   IRS/VENDOR NO.  916001127 | 6.   PRE-AWARD AUTHORITY:   No     6A.   PRE-AWARD DATE: N/A |
| 1B.   UEI. SE54F8NNBH57    1C. DUNS.  808883854 | 7.   ACTION New |
| 8.   ASSISTANCE LISTING#:  20.218 | |

| | TITLE | | | |
|---|---|---|---|---|
| 9.   PROJECT TITLE<br><br>FY2025 MCSAP Grant Program | | **FEDERAL** | **NON-FEDERAL** | **TOTAL** |
| | 10.   PREVIOUS AGREEMENTS | 0.00 | 0.00 | 0.00 |
| | 11.   THIS AGREEMENT | 5,420,832.00 | 285,307.00 | 5,706,139.00 |
| | 12.   TOTAL AGREEMENT | 5,420,832.00 | 285,307.00 | 5,706,139.00 |

| | |
|---|---|
| 12A. OTHER FEDERAL FUNDING | 0.00 |

13.   INCORPORATED ATTACHMENTS

THIS AGREEMENT INCLUDES THE FOLLOWING ATTACHMENTS, INCORPORATED HEREIN AND MADE A PART HEREOF:

FMCSA Financial Assistance Agreement Standard Terms and Conditions, Recipient project narrative and indirect cost rate agreement (if applicable) are incorporated by reference unless/except as noted below.

14.   STATUTORY AUTHORITY FOR GRANT/ COOPERATIVE AGREEMENT

49 U.S.C. §§ 31102(a)-(k), 31104 (as amended by IIJA, Pub. L. No. 117-58 (2021), § 23001(b)), Title VIII of Division J of IIJA, and the Consolidated Appropriations Act, 2024, & P.L. 118-42 (2024), P.L. 118-83,118-158, 119-4, (2025)

15.   REMARKS

See Award Conditions

| **GRANTEE ACCEPTANCE** | **AGENCY APPROVAL** |
|---|---|
| 16.   NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL | 18.   NAME AND TITLE OF AUTHORIZED FMCSA OFFICIAL |
| 17.   SIGNATURE OF AUTHORIZED GRANTEE OFFICIAL | 17A.  DATE | 19.   SIGNATURE OF AUTHORIZED FMCSA OFFICIAL | 19A.  DATE |

| **AGENCY USE ONLY** | |
|---|---|
| 20.   OBJECT CLASS CODE:  41000 | 21.   ORGANIZATION CODE:  M500000000 |

22.   ACCOUNTING CLASSIFICATION CODES

| DOCUMENT NUMBER | FUND | BY | BPAC | AMOUNT |
|---|---|---|---|---|
| FM-MCG-0825-25-01-00 | 28172528MC | 2025 | 0905710MCG | 5,420,832.00 |

| RECIPIENT NAME: WASHINGTON STATE PATROL | AGREEMENT NUMBER: 69A3602531599MCG0WA |

| Federal Financial Report Cycle | | | |
|---|---|---|---|
| Reporting Period Start Date | Reporting Period End Date | Reporting Type | Reporting Period Due Date |
| 10/01/2024 | 12/31/2024 | Quarterly | 01/30/2025 |
| 01/01/2025 | 03/31/2025 | Quarterly | 04/30/2025 |
| 04/01/2025 | 06/30/2025 | Quarterly | 07/30/2025 |
| 07/01/2025 | 09/30/2025 | Quarterly | 10/30/2025 |
| 10/01/2025 | 12/31/2025 | Quarterly | 01/30/2026 |
| 01/01/2026 | 03/31/2026 | Quarterly | 04/30/2026 |
| 04/01/2026 | 06/30/2026 | Quarterly | 07/30/2026 |
| 07/01/2026 | 09/30/2026 | Quarterly | 10/30/2026 |
| 10/01/2026 | 12/31/2026 | Quarterly | 01/30/2027 |
| 01/01/2027 | 03/31/2027 | Quarterly | 04/30/2027 |
| 04/01/2027 | 06/30/2027 | Quarterly | 07/30/2027 |
| 07/01/2027 | 09/30/2027 | Final | 01/28/2028 |

| Performance Progress Report Cycle | | | |
|---|---|---|---|
| Reporting Period Start Date | Reporting Period End Date | Reporting Type | Reporting Period Due Date |
| 10/01/2024 | 12/31/2024 | Quarterly | 01/30/2025 |
| 01/01/2025 | 03/31/2025 | Quarterly | 04/30/2025 |
| 04/01/2025 | 06/30/2025 | Quarterly | 07/30/2025 |
| 07/01/2025 | 09/30/2025 | Quarterly | 10/30/2025 |
| 10/01/2025 | 12/31/2025 | Quarterly | 01/30/2026 |
| 01/01/2026 | 03/31/2026 | Quarterly | 04/30/2026 |
| 04/01/2026 | 06/30/2026 | Quarterly | 07/30/2026 |
| 07/01/2026 | 09/30/2026 | Quarterly | 10/30/2026 |
| 10/01/2026 | 12/31/2026 | Quarterly | 01/30/2027 |
| 01/01/2027 | 03/31/2027 | Quarterly | 04/30/2027 |
| 04/01/2027 | 06/30/2027 | Quarterly | 07/30/2027 |
| 07/01/2027 | 09/30/2027 | Final | 01/28/2028 |

## AWARD CONDITIONS

1. This action is to award the total amount in box 11 to implement Phase 1 incremental funding for the FY 2025 Motor Carrier Safety Assistance Program (MCSAP) Commercial Vehicle Safety Plan (CVSP).

   If the recipient is requesting indirect costs, the recipient may not request these costs for reimbursement until it has submitted a current approved indirect cost rate agreement to the FMCSA Division Office, and the appropriate GMO mailbox(see below).

   FMCSAESCGMOHelpDesk@dot.gov

   FMCSASSCGMOHelpDesk@dot.gov

   FMCSAMSCGMOHelpDesk@dot.gov

RECIPIENT NAME: WASHINGTON STATE PATROL                    AGREEMENT NUMBER: 69A3602531599MCG0WA

FMCSAWSCGMOHelpDesk@dot.gov

The recipient and any sub-recipient must also comply with the applicable FMCSA Financial Assistance
Agreement Standard Terms and Conditions attached to this NGA. Failure to comply with the terms and
conditions attached and any additional provisions directly reflected in this NGA may result in actions
outlined in 2 CFR 200.339.

# AWARD ATTACHMENTS

WASHINGTON STATE PATROL                    69A3602531599MCG0WA

1. Standard Terms and Conditions

rev. 12 FEB 2025

**FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION**
**FINANCIAL ASSISTANCE AGREEMENT STANDARD TERMS AND CONDITIONS**

**Section 1.    Grant Authority**

   **a.  Contract Authority.**

The Infrastructure Investment and Jobs Act (IIJA), Public Law 117-58, grants FMCSA contract authority. As codified in 49 U.S.C. §31104, the Secretary of Transportation's approval of the grant funds made available imposes a contractual obligation upon the United States for payment of the Government 's share of costs in carrying out the grant objectives.

   **b.  Lapse in Appropriations and/or Authorization.**

Except in limited circumstances, the absence of FMCSA appropriations and/or authorization prevents the continuation of Federal supervision and support to the performance of a grant. In the absence of such supervision or support, the Recipient may only continue to proceed with its work if (1) the performance of such grant is not incurring obligations from the lapsed appropriations; (2) if continued grant management supervision or support is not critical to the Recipient's continued performance of the work; (3) and FMCSA has approved the continuation of such work. FMCSA will make such determinations in accordance with the Executive Office of the President, Office of Management and Budget.

**Section 2.    Effective Date.**

Recipient acknowledges that Federal funds are obligated on the effective date of the Grant Agreement. The effective date is the date that the Grant Agreement contains the authorized signatures of both parties to this agreement. Where the dates accompanying the signatures differ from party to party, the effective date of the Grant Agreement shall be the most recent of these dates.

**Section 3.    Electronic Signatures.**

The Recipient understands that electronic signatures are binding. An electronic signature to the Grant Agreement commits the Recipient to these Provisions and Assurances, as well as all requirements denoted in Section 4.

**Section 4.    General Requirements.**

**a.  Obligation of Recipient to Comply.**

The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

The Recipient understands that by signing the Grant Agreement, the Recipient is agreeing to carry out the approved project plan and the approved budget and to comply with all applicable Federal laws and requirements imposed by the FMCSA concerning special requirements of law, program requirements, and other administrative requirements. This includes, but is not limited to: (1) 49 U.S.C. chapters 311 and 313 (2016), as applicable and denoted in the Notice of Grant Agreement; (2) IIJA; (3) U.S. Department of Transportation (DOT) regulations; (4) Federal Financial Assistance regulations (2 C.F.R. part 200); and
(5) the Federal Grant and Cooperative Agreement Act of 1977.

For all Federal awards, compliance with statutory and national policy requirements also includes the provisions of the Federal Funding and Accountability Transparency Act (FFATA), which includes requirements on executive compensation, and also requirements implementing the Act for the non-Federal entity, codified at 2 C.F.R. part 25 and 2 C.F.R. part 170. See also statutory requirements for whistleblower protections at 10 U.S.C. §§ 2324 and 2409 and 41U.S.C. § § 4304, 4310, and 4712.

**b.  Application of Federal, State, and Local Laws and Regulations.**

**i.    Federal Laws.**
The Recipient understands that Federal laws, Executive Orders, regulations, policies, and related administrative practices applicable to this Agreement on the date the Agreement was executed may be modified from time to time. The Recipient agrees that the most recent of such Federal requirements will govern the administration of this Agreement at any particular time. Likewise, new Federal laws, Executive Orders, regulations, policies, and administrative practices may be established after the date the Agreement has been executed and may apply to this Agreement. To achieve compliance with changing Federal requirements, the Recipient agrees to include in all Subrecipient agreements and third-party contracts financed with FMCSA assistance, specific notice that Federal requirements may change and the changed requirements will apply to the Project as required. All limits or standards set forth in this Agreement to be observed in the performance of the Project are minimum requirements.

**rev. 12 FEB 2025**

    **ii.**    **State or Territorial Law and Local Law.**

        Except to the extent that a Federal statute or regulation preempts State or territorial law, nothing in this Agreement shall require the Recipient to observe or enforce compliance with any provision thereof, perform any other act, or do any other thing in contravention of any applicable State or territorial law;

however, if any of the provisions of this Agreement violate any applicable State or territorial law, or if compliance with the provisions of this Agreement would require the Recipient to violate any applicable State or territorial law, the Recipient agrees to notify the FMCSA immediately in writing in order that FMCSA and the Recipient may make appropriate arrangements to proceed with the Project as soon as possible.

**c.**  **Subrecipients.**

State Recipients shall follow State law and procedures when awarding and administering subawards to local and Indian tribal governments including 2 C.F.R. § 200.317. All other non-federal entities, including Subrecipients of a State, will follow 2 C.F.R. § 200.318, General procurement standards, through § 200.326, Contract provision, as well as the Standards for Financial and Program Management, at §§ 200.300 through 200.309.

Subrecipient means a non-Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program. A Subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency.

**d.**  **Subawards.**

Subaward means an award provided by a pass-through entity to a Subrecipient for the Subrecipient to carry out part of a Federal award received by the pass-through entity. It does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program. A subaward may be provided through any form of legal agreement, including an agreement that the pass-through entity considers a contract.

**e.**  **Pass-Through Entity.**

Pass-through entity means a non-Federal entity that provides a subaward to a Subrecipient to carry out part of a Federal program. All Pass-Through Entities must comply fully with 2 C.F.R. §§ 200.330, 200.331, 200.332, and 200.505.

**f.**  **Prohibition Against Transferring An Award.**

The Recipient is prohibited from transferring or subrogating their rights and responsibilities of the grant program and funds associated with that grant to another entity. Subrogation is when a non-federal entity substitutes another entity, not awarded the subject grant by FMCSA, to a lawful claim, demand, or right, so that that entity succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or fund access. The act of sub-awarding to a Subrecipient is not considered as the subrogation of the Recipient's award.

**Section 5.     Internal Controls.  The Recipient must:**

   **a.**  Establish and maintain effective internal control over the Federal award that provides reasonable assurance that the non-Federal entity is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO);

   **b.**  Comply with Federal statutes, regulations, and the terms and conditions of the Federal awards;

   **c.**  Evaluate and monitor the non-Federal entity's compliance with statute, regulations and the terms and conditions of Federal awards;

   **d.**  Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings; and

   **e.**  Take reasonable measures to safeguard protected personally identifiable information and other information the Federal awarding agency or pass-through entity designates as sensitive or the non-Federal entity considers sensitive consistent with applicable Federal, state and local laws regarding privacy and obligations of confidentiality.

**Section 6.     Ethics.**

   **a.  Written Code of Ethics.**

The Recipient agrees to maintain a written code or standards of ethical conduct that shall govern the performance of its officers, inspectors, investigators, employees, board members, or agents engaged in the award and administration of contracts supported by Federal funds. The code or standards shall provide that the Recipient's officers, inspectors, investigators, employees, board members, or agents may neither solicit nor accept gratuities, favors or anything of monetary value from present or potential contractors, Subrecipients, or regulated entities. The Recipient may set minimum rules where the financial interest is not substantial or the gift is an unsolicited item of nominal intrinsic value. As permitted by State or local law or regulations, such code or standards shall provide for penalties, sanctions, or other disciplinary actions for violations, including removal by the Recipient's officers, inspectors, investigators, employees, board members, or agents, or by contractors or Subrecipients or their agents for any real or apparent conflict of interest.

   **b.  Personal Conflict of Interest.**

The Recipient's code or standards must provide that no employee, officer, inspector, investigator, board member, or agent of the Recipient may participate in the selection, award, or administration of a contract supported by Federal funds if a real or apparent conflict of interest would be

involved. Such a conflict would arise when any of the parties set forth below has a financial or other interest in the firm selected for award:

- **i.** The employee, officer, board member, or agent;
- **ii.** Any member of his or her immediate family;
- **iii.** His or her partner; or
- **iv.** An organization that employs, is considering to employ, or is about to employ, any of the above.

**c. Organizational Conflicts of Interest.**

The Recipient's code or standards of conduct must include procedures for identifying and preventing real and apparent organizational conflicts of interests, such as performing consulting on motor carrier matters, or ownership of commercial trucking companies. An organizational conflict of interest exists when the nature of the work to be performed under a proposed third-party contract or subaward, may, without some restrictions on future activities, result in an unfair competitive advantage to the contractor Subrecipient or impair the contractor's or Subrecipient's objectivity in performing the contract work.

**Section 7.     Hatch Act.**

The Recipient agrees to comply, as applicable, with provisions of the Hatch Act (5 U.S.C. §§ 1501-1508 and 7321-7326), which limit the political activities of state or local employees whose principal employment is in connection with programs financed in whole or in part by loans or grants made by the United States or a Federal agency. The Hatch Act specifically exempts employees of educational institutions, and the Hatch is not applicable to private, nonprofit organizations unless the statutes through which the nonprofit organizations derive their federal funding contain a provision stating that the recipient organizations are deemed to be state or local government agencies for purposes of the Hatch Act. On December 19, 2012, Congress passed the Hatch Act Modernization Act of 2012 (the Act). The Act became effective on January 27, 2013. Now, only state, D.C., or local government employees whose salaries are paid for entirely by federal funds are prohibited from running for partisan office. All other state, D.C., and local employees, even if they are otherwise covered by Hatch Act restrictions are free under the Hatch Act to run for partisan office.

**Section 8.     Limitation on Use of Federal Funds for Lobbying for Grants in Excess of $100,000.**

By signing this agreement, the Recipient declares that it is in compliance with 31 U.S.C. § 1352, which prohibits the use of federally appropriated funds to influence a Federal employee, officer, or Member of Congress in connection with the making or modification of any Federal grant, loan, contract, or cooperative agreement. Unless the payment of funds is otherwise reported to FMCSA, signing this agreement constitutes a declaration that no funds, including funds not federally appropriated, were used or agreed to be used to influence this grant.

Recipients of subawards in excess of $100,000 must make the same declarations to the Recipient. With respect to the payment of funds not federally appropriated by the Recipient and

**rev. 12 FEB 2025**

Subrecipients, the Recipient must report to the FMCSA the name and address of each person paid or performing services for which payment is made, the amount paid, and the activity for which the person was paid.

## Section 9.    Contracting (Federal Standards).

The Recipient and Subrecipients agree to comply with the Procurement Standards requirements set forth at 2 C.F.R. §§ 200.317 through 200.326 inclusive, whichever may be applicable, and with applicable supplementary U.S. DOT or FMCSA directives or regulations. If determined necessary for proper Project administration, FMCSA reserves the right to review the Recipient's technical specifications and requirements.

## Section 10.    Notification Requirement.

With respect to any procurement for goods and services (including construction services) having an aggregate value of $500,000 or more, the Recipient agrees to:

  **a.** Specify in any announcement of the awarding of the contract for such goods or services the amount of Federal funds that will be used to finance the acquisition; and

  **b.** Express the said amount as a percentage of the total costs of the planned acquisition.

## Section 11.    Debarment and Suspension.

The Recipient agrees to obtain certifications on debarment and suspension from its third-party contractors and Subrecipients and otherwise comply with U.S. DOT regulations, Government-wide Debarment and Suspension (Non-procurement) and Government-wide Requirements for Drug-Free Workplace (Grants), 49 C.F.R. part 32. This action of certification shall take place for each federal year, regardless of prior certification completed for a Subrecipient or contractor.

## Section 12.    Notification of Third-Party Contract or Subaward Disputes or Breaches.

The Recipient agrees to notify FMCSA of any current or prospective major dispute, breach, or litigation pertaining to any third-party contract or subaward. If the Recipient seeks to name FMCSA as a party to litigation for any reason, the Recipient agrees first to inform FMCSA before doing so. This provision applies to any type of litigation whatsoever, in any forum.

**Section 13.    Records Retention.**

**a.  Requirement to Retain Records.**

During the course of the Project and for three years after the final Federal financial report is submitted (form SF-425), the Recipient agrees to retain intact and to provide any data, documents, reports, records, contracts, and supporting materials relating to the Project as FMCSA may require. Reporting and record-keeping requirements are set forth in 2 C.F.R. § 200.333.

**b.  Access to Recipient and Subrecipient Records.**

The Recipient, and related subrecipients, will give FMCSA, the Secretary of Transportation, the Comptroller General of the United States, or any of their duly authorized representatives, and, if appropriate the State, through any authorized representative, access to and the right to examine all records, books, papers or documents related to the award and will establish a proper accounting system in accordance with generally accepted accounting standards. Access requirements to records are set forth in 2 C.F.R. § 200.336.

**Section 14.    Audit and Inspection.**

**a.  Inspector General Act of 1978.**

Under the Inspector General Act of 1978, as amended, 5 U.S.C. App. 3 § 1 et seq., an audit of the award may be conducted at any time.

**b.  Single Audit Act Amendments of 1996.**

The Recipient agrees to undergo the required financial and compliance audits in accordance with the Single Audit Act Amendments of 1996 and 2 C.F.R. § 200.501.

**c.  Other Audit Requirements.**

A Recipient that is: (a) a State, local government or Indian tribal government, an institution of higher education or nonprofit organization agrees to comply with the audit requirements of 2 C.F.R. § 200.501, and any revision or supplement thereto; (c) a private for-profit organization agrees to comply with the audit requirements of 2 C.F.R. § 200.501(h).

It is imperative that Recipients submit required Single Audits within the time limits specified in the Circular. The Recipient agrees to submit the data collection form and copies of the reporting package required under the Single Audit Act Amendments of 1996 and 2 C.F.R. § 200.501 to:

> The Federal Audit Clearinghouse Bureau of the Census 1201
> East 10 Street,
> Jefferson, IN 47132.

The Recipient agrees to obtain any other audits required by FMCSA. Project closeout will not alter the Recipient's audit responsibilities. Audit costs for Project administration and management are allowable under this Project to the extent authorized by 2 C.F.R. § 200.501.

The Recipient agrees to permit FMCSA, the Secretary of Transportation and the Comptroller General of the United States, or their authorized representatives, to inspect all Project work, materials, payrolls, and other data, and to audit the books, records, and accounts of the Recipient and its Subrecipients pertaining to the Project. The Recipient agrees to require each Subrecipient to permit the Secretary of Transportation and the Comptroller General of the United States, or their duly authorized representatives, to inspect all work, materials, payrolls, and other data and records involving that subaward, and to audit the books, records, and accounts involving that subaward as it affects the Project.

**Section 15.    Responsibility for Reporting Fraudulent Activity, Waste, and Abuse.**

The Recipient understands that the Federal government shall pursue administrative, civil, or criminal action under a variety of statutes relating to fraud and making false statement or claims.

The Recipient is required to contact the DOT, the Office of Inspector General (OIG), if the Recipient becomes aware of the existence (or apparent existence) of fraudulent activity, waste, or abuse.

The OIG has authority within the DOT to conduct criminal investigations. The DOT OIG maintains a post office box and a toll-free hotline for receiving information from individuals concerning fraud, waste, or abuse under DOT grants and cooperative agreements. The hotline is available 24 hours a day, 7 days a week at https://www.oig.dot.gov/Hotline. The identity of the caller is kept confidential, and callers are not required to give their names.

Examples of fraud, waste, and abuse that should be reported include, but are not limited to, embezzlement, misuse, or misappropriation of grant funds or property, and false statements, whether by organizations or individuals. Other examples include, but not limited to, theft of grant funds for personal use; using funds for non-grant-related purposes; theft of federally owned property or property acquired or leased under a grant; charging inflated building rental fees for a building owned by the Recipient; submitting false financial reports; and submitting false financial data in bids submitted to the Recipient (for eventual payment under the grant).

**Section 16.    Budget and Finance.**

The Recipient agrees to carry out Agreement activities and seek reimbursement in accordance with the Approved Project Budget after securing FMCSA written approval. The funding of items identified in the budget constitutes FMCSA 's authorization for the Recipient to incur these costs, if they are allowable, allocable, necessary, and reasonable. Furthermore, funds cannot be spent that violate any FMCSA policy or grants manual. Costs not specifically budgeted in this Agreement may be allowable if prior approval is not required and costs are

incurred consistently with the applicable cost principles.

Prior Approval means written permission provided by the designated FMCSA Grants Management Officer –Authorized Official  in advance of an act that would result in either (1) the obligation or expenditure of funds or (2) the performance or modification of an activity under the grant-supported project where such approval is required.  Prior approval must be obtained in writing from the designated FMCSA Grants Management Officer – Authorized Official for the grant involved.  Documentation of the approved budget on the Notice of Grant Award constitutes prior approval.  Prior approval applies for the performance of activities and expenditure of funds as described in the grant application, unless otherwise restricted by the terms and conditions of the Agreement.

In accordance with 2 C.F.R. § 200.407 and § 200.308, the Recipient must obtain prior , written approval from FMCSA before making any revisions to the approved project budget and/or project plan: (1) extending the project period of the grant beyond the project period end date specified in the most recent revision of the Agreement; (2) that would require any transfer of funds between Standard Form (SF) 424A (direct-cost budget categories) cumulatively greater than ten percent of the total approved project budget; or (3) that require the addition of expenditures for items or services not approved in the original project plan. Examples include: increased cost of equipment purchased; subawarding, transferring or contracting out of any work under a Federal award not included in the original approved budget; or a first-time request to recover indirect costs.

The Recipient agrees to submit a request for prior approval no less than 30 days prior to the expiration of the Agreement. The FMCSA will not process requests for prior approval received less than 30 days from the Agreement expiration date. Within 30 calendar days from the date of the Recipient's request for prior approval, FMCSA will review the request and notify the Recipient whether the request has been approved. If the revision is still under consideration at the end of 30 calendar days, FMCSA will inform the Recipient in writing of the date when the Recipient may expect the decision.

The Recipient may, without prior approval from FMCSA, make any reasonable and necessary modification to the project budget if such deviations do not cumulatively exceed, or expect to exceed, ten percent of the total approved project amount and provided that such deviations only involve the transfer of funds between expenditure items, cost objectives or categories authorized by FMCSA in the currently approved budget. The Recipient agrees to notify FMCSA of this change.

The Recipient agrees to establish and maintain for the Project either a separate set of accounts or accounts within the framework of an established accounting system, in a manner consistent with 2 C.F.R. § 200.302. Consistent with the provisions of 2 C.F.R.§ 200.305, the Recipient agrees to record in the Project Account, and deposit in a financial institution all Project payments received by it from FMCSA pursuant to this Agreement and all other funds provided for, accruing to, or otherwise received because the Project (Project Funds.

All costs charged to the Project, including any approved services contributed by the Recipient

or others, shall be supported by properly executed payroll documents, time and attendance records, invoices, contracts, or vouchers describing in detail the nature and propriety of the charges. All match expenditures shall be supported by appropriate records. The Recipient also agrees to maintain accurate records of all Program Income derived from Project implementation. The Recipient agrees that all checks, payrolls, invoices, contracts, vouchers, orders, or other financial documents pertaining in whole or in part to the Project shall be clearly identified, readily accessible, and, to the extent feasible, kept separate from documents not pertaining to the Project.

**Section 17.    Payments.**

  **a.  Request by the Recipient for Payment.**

The Recipient's request for payment of the Federal share of approved costs shall be made to FMCSA and will be acted upon by FMCSA as set forth in this section. Each payment made to the Recipient must be in compliance with Department of the Treasury regulations, "Rules and Procedures for Funds Transfers, 31 C.F.R. part 205. To receive a Federal assistance payment, the Recipient must:

  **i.**    Have demonstrated or certified that it has made a binding commitment of non-Federal funds, if applicable, adequate when combined with Federal payments, to cover all costs to be incurred under the Project to date. A Recipient required by Federal statute or this Agreement to provide contributory matching funds or a cost share agrees:

  **A.**  To refrain from requesting or obtaining Federal funds in excess of the amount justified by the contributory matching funds or cost share that has been provided; and

  **B.**  To refrain from taking any action that would cause the proportion of Federal funds made available to the Project at any time to exceed the percentage authorized under this Agreement. The requirement for contributory matching funds or cost share may be temporarily waived only to the extent expressly provided in writing by FMCSA.

  **ii.**    Have submitted to FMCSA all financial and progress reports required to date under this Agreement;

  **iii.**    Have identified the source(s) of financial assistance provided under this Project, if applicable, from which the payment is to be derived; and

  **iv.**    Have expended any earned Program Income before requesting any federal funds for reimbursement.

**rev. 12 FEB 2025**

    **b.  Delphi eInvoicing System for DOT Financial Assistance Awardees.**

Subject to the requirements in 2 C.F.R. § 200.305, payments will be made after receipt of required FMC SA reporting forms and supporting documentation. Each payment request must be made electronically via the Delphi e-invoicing System.

The following are the procedures for accessing and utilizing the Delphi e-invoicing System.

        **i.  Grant Recipient Requirements.**

           **A.** Recipient must have internet access to register and submit payment requests through the Delphi e-invoicing system.

           **B.** Recipient must submit payment requests electronically and FMCSA must process payment requests electronically.

        **ii.  System User Requirements.**

           **A.** Recipients should contact FMCSA to request access to the system.  The FMCSA will provide the Recipient's name and email address to the DOT Financial Management Office.  The DOT will then notify the Recipient to register for the system through an electronic invitation.  The Recipient must complete online training prior to DOT giving system access.

           **B.** The DOT will send the Recipient an email with an electronic form to verify the Recipient 's identity. The Recipient must complete the form, and present it to a Notary Public for verification.  The Recipient will return the notarized form to:

               DOT Enterprise Services Center
               FAA Accounts Payable, AMZ-1 00
               PO Box 25710
               Oklahoma City, OK 73125.

           **C.** The DOT will validate the form and email a user ID and password to the Recipient.  The Recipient should contact the FMCSA grants management office with changes to their system information.

           **D.** Note: Additional information, including access forms and training materials, can be found on the DOT e-invoicing website:
              https://www.transportation.gov/cfo/delphi-einvoicing-system

**E.** Waivers.

DOT Financial Management officials may, in highly limited circumstances and on a case by case basis, waive the requirement to register and use the electronic grant payment system. Waiver request forms can be obtained on the DOT e-invoicing website https://www.transportation.gov/cfo/delphi- e-invoicing-system or by contacting FMCSA.

Recipients must explain why they are unable to use or access the internet to register and enter payment requests.

**c. Reimbursement Payment by FMCSA. If the reimbursement method is used, the Recipient agrees to:**

    **i.**    Complete and submit Standard Form 3881, "Payment Information Form - ACH Payment Vendor Payment System," to FAA-ESC; and

    **ii.**    Complete and submit, on at least a quarterly basis, Standard Form 270, "Request for Advance or Reimbursement," to FMCSA.

    **iii.**    Possess and maintain a current UEI number and entity registration with the System for Award Management (www.sam.gov).

Upon receipt of a payment request and adequate accompanying information (invoices in accordance with applicable cost principles), FMCSA will authorize payment by direct deposit provided the Recipient: (i) is in compliance with its obligations under this Agreement, (ii) has satisfied FMCSA that it needs the requested Federal funds during the requisition period, and (iii) is making adequate and timely progress toward Project completion. If all these circumstances are present, FMCSA may reimburse approved costs incurred by the Recipient up to the maxi mum amount of FMCSA's share of the total Project funding. FMCSA will employ a payment term of 20 days. The clock will start running for payment on receipt of the invoice by FMCSA's financial processor.

**d. Other Payment Information.**

The Recipient agrees to adhere to and impose on its Subrecipients all applicable foregoing "Payment by FMCSA" requirements of this Agreement. If the Recipient fails to adhere to the foregoing "Payment by FMCSA" requirements of this Agreement, FMCSA may revoke the portion of the Recipient's funds that has not been expended.

**e. Effect of Program Income, Refunds, and Audit Recoveries on Payment.**

In accordance with 2 C.F.R. § 200.305(b)(5) State, local government, nonprofit organizations and Indian tribunal Recipients and Subrecipients shall disburse program income, rebates, refunds, contract settlements, audit recoveries and interest earned on

such funds before requesting additional cash reimbursements.

**f.   Reimbursable Costs.**

The Recipient's expenditures will be reimbursed only if they meet all requirements set forth below:

  **i.**    Conform with the Project description and the approved Project Budget and all other terms of this Agreement;

  **ii.**   Be necessary to accomplish the Project;

  **iii.**  Be reasonable for the goods or services purchased;

  **iv.**   Be actual net costs to the Recipient (i.e., the price paid minus any refunds, rebates, or other items of value received by the Recipient that have the effect of reducing the cost actually incurred);

  **v.**    Be incurred (and be for work performed) after the Federal Funding Period start date of this Agreement, unless specific prior authorization from FMCSA to the contrary is received in writing (pre-award costs);

  **vi.**   Unless permitted otherwise by Federal statute or regulation, conform with Federal guidelines or regulations and Federal cost principles as set forth below:

    **A.** For Recipients that are governmental organizations, institutions of higher education, private non-profit organizations, the cost principles of 2 C.F.R. § 200, subpart E; and

    **B.** For Recipients that are for-profit organizations, the standards of the Federal Acquisition Regulations, 48 C.F.R. part 31.2, "Contracts with Commercial Organizations" apply.

  **vii.**  Be satisfactorily documented; and

  **viii.** Be treated uniformly and consistently as non-Federal funds under accounting principles and procedures approved and prescribed by FMCSA for the Recipient, and those approved or prescribed by the Recipient for its Subrecipients and contractors.

**g.  Indirect Costs.**

If indirect costs are included in the approved budget, the Recipient may not request these costs for reimbursement absent a current approved indirect cost rate agreement submitted to the FMCSA Division Office, and included as part of the official grant record.(2 CFR 200.414)

Indirect costs will not be reimbursed without documentation of an approved indirect cost rate from the Recipient's cognizant agency; however, a Recipient or Subrecipient that has never had a negotiated indirect cost rate may elect to charge a de minimis rate of 15% of modified total direct costs (MTDC) which may be used indefinitely, without documentation. If chosen, this methodology once elected must be used consistently for all Federal awards until such time as a non-Federal entity chooses to negotiate for a rate, which the non-Federal entity may apply to do at any time. (2 CFR 200.414(f))

A governmental department or agency, such as a state or local Department of Transportation, that receives more that $35 million in direct Federal funding during its fiscal year must submit its indirect cost rate proposal to this cognizant agency for indirect costs. If the same agency receives $35 million or less in direct Federal funding during its fiscal year, it must develop an indirect cost proposal in accordance with the requirements of 2 CFR Appendix VII to Part 200 (D). The Federal agencies must not compel the government agency to accept the de minimis rate or some other rate established by the Federal agency.

  As described in 2 C.F.R. § 200.403, factors affecting allowability of costs, costs must be consistently charged as either indirect or direct costs, but may not be double-charged or inconsistently charged as both. Except as provided above, if a Recipient intends to request reimbursement of indirect costs, the Recipient must submit the proper documentation before vouchers are submitted for reimbursement. The Recipient must indicate in its budget that it will be seeking indirect costs, and a placeholder indirect cost rate will suffice until an approved rate can be determined.

The Recipient must obtain prior approval through formal amendment in order to recover indirect costs at an approved rate higher than the place holder indirect cost rate if the cumulative amount of such transfer exceeds or is expected to exceed 10 percent of the total approved budget.

The Recipient may not request additional grant funds to recover indirect costs that it cannot recover by shifting funding from direct costs to indirect costs. After this Grant Agreement has been signed, any request for changes to the indirect cost rate will require an amendment and must be approved by formal amendment if the change to the indirect cost rate is a new rate or would cause the cumulative amount of a budget transfer to exceed 10 percent of the total approved budget.

The cognizant agency for indirect costs may allow for a one-time extension of the current indirect cost rate of up to four years without further negotiation of a federally approved indirect cost rate. If the cognizant agency permits any one-time extension, the Recipient is locked in with that indirect cost rate until the end of the approved extension. (2 CFR 200.414(g))

**h. Pre-Award Costs. A Recipient may be reimbursed for obligations incurred before the effective date of the award if**:

    **i.**    The Recipient receives prior written approval from the FMCSA before the effective date of the grant agreement;

    **ii.**   The costs are necessary to conduct the project; and

    **iii.**    The costs would be allowable under the grant, if awarded.

If a specific expenditure would otherwise require prior approval before making the expenditure (i.e. pursuant to 2 C.F.R. § 200.407), then the Recipient must obtain FMCSA written approval before incurring the cost.

Recipient understands that the incurrence of pre-award costs in anticipation of an award is taken at the Recipient's risk and imposes no obligation on FMCSA to make the award or to increase the amount of the approved budget if (1) there is no award subsequently made;(2) an award is made for less than anticipated and is inadequate to cover the pre-award costs incurred; or (3) there are inadequate appropriations.

**i.**  **Disallowed Costs.**

In determining the amount of Federal assistance FMCSA will provide, FMCSA will exclude:

    **i.**    Any Project costs incurred by the Recipient before the effective date of this Agreement, or amendment or modification thereof, whichever is later, unless otherwise permitted by Federal Law or regulation, or unless an authorized representative of FMCSA states in writing to the contrary;

    **ii.**    Any costs incurred by the Recipient that are not included in the latest approved Project Budget; and

    **iii.**    Any costs attributable to goods or services received under a contract or other arrangement that is required to be, but has not been, concurred with or approved in writing by FMCSA.

The Recipient agrees that reimbursement of any cost under the "Payment by FMCSA," part of this Agreement does not constitute a final FMCSA decision about the allowability of that cost and does not constitute a waiver of any violation by the Recipient of the terms of this Agreement. The Recipient understands that FMCSA will not make a final determination about the allowability of any cost until an audit of the Project has been completed. If FMCSA determines that the Recipient is not entitled to receive any part of the Federal funds requested, FMCSA will notify the Recipient stating the reasons thereof. Project closeout will not alter the Recipient's obligation to return any funds due to FMCSA as a result of later refunds, corrections, or other transactions. Nor will Project closeout alter FMCSA's right to disallow costs and recover funds based on a later audit or other review. Unless prohibited by law,

FMCSA may offset any Federal assistance funds to be made available under this Project as needed to satisfy any outstanding monetary claims that the Federal Government may have against the Recipient. Exceptions pertaining to disallowed costs will be assessed based on their applicability, as set forth in the applicable Federal cost principals or other written Federal guidance.

**Section 18.     Program Income.**

Recipient agrees to comply with the regulations relating to program income, located at 2 C.F.R. §§ 200.305(b)(5) and 200.307 for State, local government, Indian tribunal recipients, and non-profit organizations, and their Subrecipients.

Program income means gross income earned by the Recipient, Subrecipient, or contractor under a grant that is directly generated by a grant-supported activity or earned because of the award during the award period. "During the grant period " is the time between the effective date of the award and the ending date of the award reflected in the final financial report.

Program income includes, but is not limited to, user charges or user fees, income from fees for services performed, the use or rental of real or personal property acquired under federally- funded projects, the sale of commodities or items fabricated under an award, license fees and royalties on patents and copyrights, and interest on loans made with award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal awarding agency regulations or the terms and conditions of the award, program income does not include the receipt of principal on loans, rebates, credits, discounts, etc., or interest earned on any of them. Per 2 C.F.R. § 200.307 (c), Governmental revenues, taxes, special assessments, levies, fines, and other such revenues raised by a non-Federal entity are not program income unless the revenues are specifically identified in the Federal award or Federal awarding agency regulations as program income.

Recipients agree to use the Program income in accordance with 2 C.F.R. §§ 200.305(b)(5) 200.307 for State, local government, nonprofit organizations and Indian tribunal recipients and subrecipients.

**Section 19.     Reports.**

**a. Performance Progress Reports.**

The Recipient will submit, at a minimum, quarterly performance progress reports and a final performance progress report at the completion of the award (within 120 days after) to the agency point of contact listed in the award document. Recipient must submit all performance progress report forms required by FMCSA. These reports will cover the period: January 1 -March 31, April 1-June 30, July 1- September 30, and October 1- December 31. The Recipient must submit quarterly performance progress reports via Grant Solutions, on or before the thirtieth (30th) calendar day of the month following the end of the quarter being reported. Each quarterly report shall set forth concise statements concerning activities relevant to the Project, and shall include, but not be limited to, the following:

i.   An account of significant progress (findings, events, trends, etc.) made during the reporting period;

ii.  A description of any technical and/or cost problem(s) encountered or anticipated

that will affect completion of the grant within the time and fiscal constraints as set forth in this Agreement, together with recommended solutions or corrective action plans (with dates) to such problems, or identification of specific action that is required by the FMCSA, or a statement that no problems were encountered;

iii.     An outline of work and activities planned for the next reporting period; and

iv.     A status update/resolution for all outstanding findings from program reviews and/or audits.

**b.  Quarterly Financial Status Reports.**

The Recipient must submit quarterly financial status reports via Grant Solutions, on or before the thirtieth (30th) calendar day of the month following the end of the quarter being reported.  The Recipient shall use SF-425, Federal Financial Report, to report the status of funds for all non-construction projects or programs. If the Recipient's accounting records are not normally kept on an accrual basis, the Recipient shall not be required to convert its accounting system, but shall develop such accrual information through an analysis of the documentation on hand. The Recipient shall certify to the expenditure of its proposed cost share for the period being reported, in the "Remarks" block.

**Section 20.     Non-Discrimination.**

The Recipient will comply with all Federal authorities relating to nondiscrimination.  These include, but are not limited to:

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 Stat. 252), which prohibits discrimination on the basis of race, color, or national origin, as implemented by 49 C.F.R . § 21.1 et seq. and 49 C.F.R. § 303;
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324, et seq.), which prohibits discrimination on the basis of sex;
- Title IX of the Education Amendments of 1972, as amended, (20 U.S.C. § 1681 et seq.), which prohibits discrimination on the basis of sex in education programs or activities, as implemented by 49 C.F.R. § 25.1 et seq.;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 et seq.), which prohibits discrimination on the basis of age;
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 et seq.), as amended, which prohibits discrimination on the basis of disability and 49 C.F.R. part 27;
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 - 12189), as implemented by Department of Justice regulations at 28 C.F.R. parts 35 and 36, and Department of Transportation

regulations at 49 C.F.R. parts 37 and 38;

- The Civil Rights Restoration Act of 1987, (102 Stat. 28.), "which restore[d] the broad scope of coverage and to clarify the application of title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and title VI of the Civil Rights Act of 1964.";
- Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000e et seq., 78 Stat. 252), which prohibits discrimination in employment on basis of race, color, national origin, religion, or disability, as implemented by 29 C.F.R. § 1601.1, et seq.
- The Recipient also agrees to comply with the FMCSA Standard Title VI/Non-Discrimination Assurances (DOT Order No. 1050.2A).

## Section 21.    Executive Orders on Equal Opportunity

The Recipient will comply with all Federal statutes and Executive Orders relating to Equal Employment Opportunity.

Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

## Section 22.    Employment Policies.

The Recipient further agrees that its own employment policies and practices will be without discrimination based on race, color, religion, sex, national origin, disability or age and will follow federal employment laws.

## Section 23.    Property.

### a.  General.

In general, title to equipment and supplies acquired by a Recipient with DOT funds vests in the Recipient upon acquisition, subject to the property management requirements of 2 C.F.R. §§ 200.302(b)(4); 200.307(d); 200.310; 200.313; 200.316; and 200.344(4).

A Recipient that is a State, local, or Indian tribal governments, institutions of higher education, and non-profits agrees to comply with the property management standards detailed in 2 C.F.R. §§ 200.312 and 200.313, including any amendments thereto, and with other applicable Federal regulations and directives. A Recipient that is a for-profit entity agrees to comply with property management standards satisfactory to FMCSA.

rev. 12 FEB 2025

**b. Use of Project Property.**

**i.** The State Recipient agrees to use Project property for the purpose for which it was acquired under the period of performance of the Grant. State Recipients acknowledge that the FMCSA may ensure that the purpose of the grant is being satisfied. State Recipients acknowledge that FMCSA may request a copy of the State statute and procedures in determining whether a State is in compliance with its own State procedures, and to assist the FMCSA in determining the allocability, reasonableness, and allowability of costs.

**ii.** The Non-State Recipient agrees to use Project property for appropriate Project purposes (which may include joint development purposes that generate program income, both during and after the award period, beginning on the effective date, and used to support public transportation activities) for the duration of the useful life of that property, as required by FMCSA. Should the Recipient unreasonably delay or fail to use Project property during the useful life of that property, the Recipient agrees that it may be required to return the entire amount of the Federal assistance expended on that property. The Non-State Recipient further agrees to notify FMCSA immediately when any Project property is withdrawn from Project use or when any Project property is used in a manner substantially different from the representations the Recipient has made in its Application or in the Project Description for the Grant Agreement or Cooperative Agreement for the Project.

**c. Maintenance.**

The State Recipient agrees to maintain Project property in accordance with State law and procedures.

The Non-State Recipient agrees to maintain Project property in good operating order, in compliance with any applicable Federal regulations or directives that may be issued.

**d. Records.**

The State Recipient agrees to maintain property records in accordance with State law and procedures. The Non-State Recipient agrees to keep satisfactory property records pertaining to the use of Project property, and submit to FMCSA upon request such information as may be required with this agreement.

**e. Incidental Use.**

Any incidental use of Project property will not exceed that permitted under applicable Federal laws, regulations, and directives.

**f. Encumbrance of Project Property.**

**i.** The State Recipient agrees to maintain satisfactory continuing control of Project property in accordance with State law and procedures. The State Recipient understands that an encumbrance of project property may not interfere with the purpose for which the equipment was purchased.

ii.   The Non-State Recipient agrees to maintain satisfactory continuing control of Project property as follows:

    **A.  Written Transactions.**

    The Non-State Recipient agrees that it will not execute any transfer of title, lease, lien, pledge, mortgage, encumbrance, third-party contract, subaward, grant anticipation note, alienation, innovative finance arrangement (such as a cross border lease, leveraged lease, or otherwise), or any other obligation pertaining to Project property, that in any way would affect the continuing Federal interest in that Project property.

    **B.  Oral Transactions.**

    The Non-State Recipient agrees that it will not obligate itself in any manner to any third-party with respect to Project property.

    **C.  Other Actions.**

    The Non-State Recipient agrees that it will not take any action adversely affecting the Federal interest in or impair the Recipient's continuing control of the use of Project property.

    **D.**  The Non-State Recipient agrees that no use under this section will interference with the purpose for which the equipment was purchased.

**g.  Transfer of Project Property.**

    i.   The State Recipient agrees to transfer Project property in accordance with State law and procedures.

    ii.  The Non-State Recipient understands and agrees as follows:

    **A.**  Transfers.

    The Non-State Recipient may transfer any Project property financed with Federal assistance authorized under 49 U.S.C. chapter 53 to a public body to be used for any public purpose with no further obligation to the Federal Government, provided the transfer is approved by the FMCSA Administrator and conforms with the requirements of 49 U.S.C. §§ 5334(h)(1) and (2). Any leasing or rental of equipment purchased by federal funds or state match/cost sharing, during the period of performance will be considered program income and will be managed, expended, and reported per 2 C.F.R. § 200.307.

    **B.**  Federal Government Direction.

    The Non-State Recipient agrees that the Federal Government may direct the disposition of, and even require the Recipient to transfer, title to any Project property financed with Federal assistance under the Grant Agreement or Cooperative Agreement.

**h. Leasing Project Property to Another Party.**

If the Non-State Recipient leases any Project property to another party, the Non- State Recipient agrees to retain ownership of the leased Project property, and assure that the lessee will use the Project property appropriately, either through a written lease between the Non-State Recipient and lessee, or another similar document. Any revenue resulting from this type of lease agreement, during the period of performance will be considered program income and will be managed, expended, and reported per 2 C.F.R. § 200.307.

Upon request by FMCSA, the Non-State Recipient agrees to provide a copy of any relevant documents. Any leasing or rental of equipment purchased by federal funds or state match/cost sharing, during the period of performance will be considered program income and will be managed, expended, and reported per 2 C.F.R. § 200.307.

**i. Disposition of Project Property.**

    **i.** The State Recipient may use its own disposition procedures, provided that those procedures comply with the laws of that State.

    **ii.** The Non-State Recipient agrees to dispose of Project property as follows:

        **A.** With prior FMCSA approval, the Non-State Recipient may sell, transfer, or lease Project property and use the proceeds to reduce the gross project cost of other eligible capital public transportation projects to the extent permitted by 49 U.S.C. §5334(h)(4). The Non-State Recipient also agrees that FMCSA may establish the useful life of Project property, and that it will use Project property continuously and appropriately throughout the useful life of that property.

        **B.** Project Property with Expired Useful Life. When the useful life of Project property has expired, the Non-State Recipient agrees to comply with FMCSA's disposition requirements.

        **C.** Project Property Prematurely Withdrawn from Use. For Project property withdrawn from appropriate use before its useful life has expired, the Recipient agrees as follows:

        **D.** Notification Requirement. The Non-State Recipient agrees to notify FMCSA immediately when any Project property is prematurely withdrawn from appropriate use, whether by planned withdrawal, misuse, or casualty loss.

        **E.** Calculating the Fair Market Value of Prematurely Withdrawn Project Property. The Non-State Recipient agrees that the Federal Government retains a Federal interest in the fair market value of Project property prematurely withdrawn from appropriate use. The amount of the Federal interest in the Project property shall be determined by the ratio of the Federal assistance awarded for the property to the actual cost of the property. The Non-State Recipient agrees that the fair market value of Project property prematurely withdrawn from use will be calculated as

follows:

1. **Equipment and Supplies.** The Non-State Recipient agrees that the fair market value of Project equipment and supplies shall be calculated by straight-line depreciation of that property, based on the useful life of the equipment, or supplies as established or approved by FMCSA. Information on straight line depreciation may be found in the Internal Revenue Code. The fair market value of Project equipment and supplies shall be the value immediately before the occurrence prompting the withdrawal of the equipment or supplies from appropriate use. In the case of Project equipment or supplies lost or damaged by fire, casualty, or natural disaster, the fair market value shall be calculated on the basis of the condition of that equipment or supplies immediately before the fire, casualty, or natural disaster, irrespective of the extent of insurance coverage.

2. **Real Property**. The Non-State Recipient agrees that the fair market value of real property shall be determined either by competent appraisal based on an appropriate date approved by the Federal Government, as provided by 49 C.F.R. part 24, or by straight line depreciation, whichever is greater.

3. **Exceptional Circumstances.** The Non-State Recipient agrees that the Federal Government may require the use of another method to determine the fair market value of Project property. In unusual circumstances, the Non-State Recipient may request that another reasonable valuation method be used including, but not limited to, accelerated depreciation, comparable sales, or established market values. In determining whether to approve such a request, the Federal Government may consider any action taken, omission made, or unfortunate occurrence suffered by the Non-State Recipient with respect to the preservation of Project property withdrawn from appropriate use.

**j.  Financial Obligations to the Federal Government.**

The Recipient agrees to remit to the Federal Government the Federal interest in the fair market value of any Project property prematurely withdrawn from appropriate use. In the case of fire, casualty, or natural disaster, the Recipient may fulfill its obligations to remit the Federal interest by either:

Investing an amount equal to the remaining Federal interest in like-kind property that is eligible for assistance within the scope of the Project that provided Federal assistance for the Project property prematurely withdrawn from use; or

Returning to the Federal Government an amount equal to the remaining Federal interest in the withdrawn Project property.

rev. **12 FEB 2025**

**k.  Insurance Proceeds.**

If the Recipient receives insurance proceeds as a result of damage or destruction to the Project property, the Recipient agrees to:

**i.**   Apply those insurance proceeds to the cost of replacing the damaged or destroyed Project property taken out of service, or

**ii.**  Return to the Federal Government an amount equal to the remaining Federal interest in the damaged or destroyed Project property.

**l.   Transportation of Hazardous Materials.**

The Recipient agrees to comply with applicable requirements of U.S. Pipeline and Hazardous Materials Safety Administration regulations, "Shippers - General Requirements for Shipments and Packaging," 49 C.F.R. part 173, in connection with the transportation of any hazardous materials.

**m.  Misused or Damaged Project Property.**

If any damage to Project property results from abuse or misuse occurring with the Recipient's knowledge and consent, the Recipient agrees to restore the Project property to its original condition or refund the value of the Federal interest in that property, as the Federal Government may require.

**n.  Responsibilities after Project Closeout.**

The Recipient agrees that Project closeout by FMCSA will not change the Recipient's Project property management responsibilities as stated in these Standard Terms and Conditions, and as may be set forth in subsequent Federal laws, regulations, and directives, except to the extent the Federal Government determines otherwise in writing.

**Section 24.     Davis-Bacon Act Requirements.**

The Recipient agrees to comply, as applicable, with the provisions of the Davis Bacon Act (40 U.S.C. § 3145 and 18 U.S.C. § 874), and the Contract Work Hours and Safety Standards Act (40 U.S.C. §§ 3701 et seq.) regarding labor standards for federally-assisted construction sub-agreements.

**Section 25.     Permitting Requirements.**

The Recipient agrees to comply, as applicable, with permitting standards which may be prescribed pursuant to federal statutes and current regulations and orders.

**Section 26.     Government Rights (Unlimited).**

FMCSA shall have unlimited rights for the benefit of the Government in all other work developed in the performance of this Agreement, including the right to use same on any other Government work without additional cost to FMCSA. The rights to any inventions made by a Recipient under an FMCSA financial assistance award are determined by the Bayh-Dole Act, Pub. L. 96-517, as amended, and codified in 35 U.S.C. § 200, et seq., except as otherwise provided by law.

**a.  Patent Rights.**

If any invention, improvement, or discovery of the Recipient or any of its third-party contractors is conceived or first actually reduced to practice in the course of or under this Project, and that invention, improvement, or discovery is patentable under the laws of the United States of America or any foreign country, the Recipient agrees to notify FMCSA immediately and provide a detailed report. The rights and responsibilities of the Recipient, third-party contractors and FMCSA with respect to such invention, improvement, or discovery will be determined in accordance with applicable Federal laws, regulations, policies, and any waiver thereof.

If the Recipient secures a patent with respect to any invention, improvement, or discovery of the Recipient or any of its third-party contractors conceived or first actually reduced to practice in the course of or under this Project, the Recipient agrees to grant to FMCSA a royalty-free, non- exclusive, and irrevocable license to use and to authorize others to use the patented device or process for Federal Government purposes.

The Recipient agrees to include the requirements of the "Patent Rights" section of this Agreement in its third-party contracts for planning, research, development, or demonstration under the Project.

**b.  Data Rights.**

The term "subject data" used in this section means recorded information, whether or not copyrighted, that is developed, delivered, or specified to be delivered under this Agreement. The term includes graphic or pictorial delineations in media such as drawings or photographs; text in specifications or related performance or design-type documents; machine forms such as punched cards, magnetic tape, or computer memory printouts; and information retained in computer memory. Examples include, but are not limited to: computer software, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identifications, and related information. The term does not include financial reports, cost analyses, and similar information incidental to Project administration **(See also, section 45 – Publications and Identification of Federal Assistance)**.

The following restrictions apply to all subject data first produced in the performance of this Agreement:

     **i.**  Except for its own internal use, the Recipient may neither publish or reproduce such data in whole or in part, or in any manner or form, nor may

the Recipient authorize others to do so, without the written consent of FMCSA, until such time as FMCSA may have either released or approved the release of such data to the public.

ii. As authorized by 2 C.F.R. § 200.315(b), FMCSA reserves a royalty-free, non-exclusive and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use, for Federal Government purposes:

    **A.** Any work developed under a grant, cooperative agreement, sub-grant, sub-agreement, or third-party contract, irrespective of whether or not a copyright has been obtained; and

    **B.** Any rights of copyright to which a Recipient, Subrecipient, or a third-party contractor purchases ownership with Federal assistance.

iii. When FMCSA provides assistance to a Recipient for a Project involving planning, research, or development of a system, program, document, enforcement concept, or any other activity provided for in the terms of this grant, it is generally FMCSA's intent to increase the body of knowledge, rather than to limit the benefits of the Project to those parties that have participated therein. Therefore, unless FMCSA determines otherwise, the Recipient understands and agrees that, in addition to the rights set forth in preceding portions of this section of this Agreement, FMCSA may make available to any FMCSA Recipient, Subrecipient, third-party contractor, or third-party subcontractor, either FMCSA's license in the copyright to the "subject data" derived under this Agreement or a copy of the "subject data" first produced under this Agreement. In the event that such a Project which is the subject of this Agreement is not completed, for any reason whatsoever, all data developed under that Project shall become subject data as defined herein and shall be delivered as FMCSA may direct.

iv. Unless prohibited by State law, the Recipient agrees to indemnify, save and hold harmless FMCSA, its officers, agents, and employees acting within the scope of their official duties against any liability, including costs and expenses, resulting from any willful or intentional violation by the Recipient of proprietary rights, copyrights, or right of privacy, arising out of the publication, translation, reproduction, delivery, use, or disposition of any data furnished under this Agreement. The Recipient shall not be required to indemnify FMCSA for any such liability arising out of the wrongful acts of employees or agents of FMCSA.

v. Nothing contained in this section on rights in data, shall imply a license to FMCSA under any patent or be construed as affecting the scope of any license or other right otherwise granted to FMCSA under any patent.

vi. The requirements of this section of this Agreement do not apply to material furnished to the Recipient by FMCSA and incorporated in the work carried out

under this Agreement, provided that such incorporated material is identified by the Recipient at the time of delivery of such work.

vii.     Unless FMCSA determines otherwise, the Recipient agrees to include the requirements of this section of this Agreement in its third-party contracts for planning, research, development, or demonstration under the Project.

**c.   Acknowledgment or Support and Disclaimer.**

i.     An acknowledgment of FMCSA support and a disclaimer must appear in any Recipient publication, whether copyrighted or not, based on or developed under the Agreement, in the following terms:

"This material is based upon work supported by the Federal Motor Carrier Safety Administration under a grant/cooperative agreement/subaward, dated (fill-in appropriate identification of grant/cooperative agreement);"

ii.     All Recipient publications must also contain the following:

"Any opinions, findings, and conclusions or recommendations expressed this publication are those of the author(s) and do not necessarily reflect the view of the Federal Motor Carrier Safety Administration and/or the U.S. Department of Transportation."

iii.     The Recipient agrees to cause to be erected at the site of any construction, and maintain during construction, signs satisfactory to FMCSA identifying the Project and indicating that FMCSA is participating in the development of the Project.

**Section 27.     Drug Free Workplace.**

By signing this agreement, the Recipient certifies that it is in compliance with the Drug-Free Workplace Act (41 U.S.C. §§ 701 et seq.) and implementing regulations (49 C.F.R. part 32), which require, in part, that Recipients prohibit drug use in the workplace, notify the FMCSA of employee convictions for violations of criminal drug laws occurring in the workplace, and take appropriate personnel action against a convicted employee or require the employee to participate in a drug abuse assistance program.

**Section 28.     Background Screening.**

FMCSA reserves the right to perform individual background screening on key individuals of organizational units associated with the application at the effective date and at another interval thereafter for the life of the award. If in performance of a grant award requires Recipient organization personnel to have unsupervised physical access to a federally controlled facility for

more than 180 days or access to a Federal information system, such personnel must undergo the personal identity verification credential process under Homeland Security Presidential Directive 12.

**Section 29.     Site Visits.**

FMCSA, through its authorized representatives, has the right, at all reasonable times, to make site visits to review Project accomplishments and management control systems and to provide such technical assistance as may be required. If any site visit is made by FMCSA on the premises of the Recipient, Subrecipient, or contractor under this Agreement, the Recipient shall provide and shall require its Subrecipients or contractors to provide, all reasonable facilities and assistance for the safety and convenience of FMCSA representatives in the performance of their duties. All site visits and evaluations shall be performed in such a manner as will not unduly delay work being conducted by the Recipient, Subrecipient, or subcontractor.

**Section 30.     Liability.**

The Recipient acknowledges it is responsible for any act or omission of Recipient or Subrecipient, its officers, contractors, employees, or members, participants, agents, representatives, as appropriate, arising out of or in any way connected to activities authorized pursuant to this Agreement.

The Recipient acknowledges that FMCSA is not responsible for any act or omission of Recipient or Subrecipient, its officers, contractors, employees, or members, participants, agents, representatives, as appropriate, arising out of or in any way connected to activities authorized pursuant to this Agreement. This provision shall survive the expiration or termination of this Agreement.

**Section 31.     Right of FMCSA to Terminate Agreement.**

   **a.   General Right to Suspend or Terminate Assistance Agreement.**

      Upon written notice, the Recipient agrees that FMCSA may suspend or terminate all or part of the financial assistance provided herein if the Recipient has violated the terms of the Grant Agreement or these Standard Terms and Conditions, or if FMCSA determines that the purposes of the statute under which the Project is authorized would not be adequately served by continuation of Federal financial assistance for the Project. Any failure to make reasonable progress on the Project or other violation of this Agreement that significantly endangers substantial performance of the Project shall provide sufficient grounds for FMCSA to terminate this Agreement. The Recipient agrees to give the Federal Motor Carrier Safety Administration at least 90 days' notice of its intention to terminate this agreement.

   **b.   Financial Obligations of the Government.**

      In general, termination of any financial assistance under this Agreement will not

invalidate obligations properly incurred by the Recipient and concurred by FMCSA before the termination date; to the extent those correctly accrued obligations cannot be cancelled.

However, if FMCSA determines that the Recipient has willfully misused Federal assistance funds by failing to make adequate progress, failing to make reasonable use of the Project property, facilities, or equipment, or failing to adhere to the terms of this Agreement, meet required match/cost sharing or maintenance of effort (MOE) levels, FMCSA reserves the right to require the Recipient to refund the entire amount of FMCSA funds provided under this Agreement or any lesser amount as may be determined by FMCSA.

   c.  **De-obligation of Funds.**

FMCSA reserves the right to unilaterally de-obligate any remaining grant or cooperative agreement funds due to the time elapsed since the effective date, lack of payment vouchers from the Recipient, lack of plans to expend funds based on this grant, failure to provide quarterly progress reports, or other such determination made by FMCSA. If FMCSA takes action to deobligate funds, a grant amendment/modification must be in place.

**Section 32.    Project Completion, Settlement, and Closeout.**

   a.  **Project Completion.**

Within 120 days of the Project completion date or termination by FMCSA, the Recipient agrees to submit a final SF-425, Federal Financial Report, a certification or summary of Project expenses, and third-party au it reports, as applicable.

   b.  **Remittance of Excess Payments.**

If FMCSA has made payments to the Recipient in excess of the total amount of FMCSA Federal funding due to cover accumulated expenses, the Recipient agrees to promptly remit that excess and interest as may be required by the "Payment by FMCSA" section of this Attachment.

   c.  **Closeout.**

Closeout, as defined in 2 C.F.R. § 200.1, occurs when all required Project work and all administrative procedures described in 2 C.F.R. § 200.344, as applicable, have been completed, and when FMCSA notifies the Recipient and forwards the final Federal assistance payment, or when FMCSA acknowledges the Recipient's remittance of the proper refund amount. Project closeout shall not invalidate any continuing obligations imposed by allowable, allocable, and reasonable costs on the Recipient by this Agreement that supports the project plan(s) or by the FMCSA's final notification or acknowledgment, if it occurs within the period of performance.

**Section 33.    Severability.**

If any provision of this Agreement is held invalid, all remaining provisions of this Agreement shall continue in full force and effect to the extent not inconsistent with such holding.

**Section 34.    Entire Agreement and Amendments.**

This Agreement constitutes the entire agreement between the parties. All prior discussions and understandings concerning such scope and subject matter are superseded by this Agreement.

Any modification not specifically permitted by this agreement requires an Amendment. These modifications may be made only in writing, signed by each party's authorized representative, and specifically referred to as an Amendment to this Agreement. Electronic signatures are binding. However, retroactive modifications to the project plan(s) or any aspects of the budget will not be approved.

**Section 35.    Use of Information Obtained.**

Information obtained under this agreement may only be used by the Recipient to accomplish the project plan under this agreement.

Any information obtained or exchanged between FMCSA and the grant Recipient, to carry out each party 's responsibility under this agreement and project plan, shall not be released by the Recipient to any third-party without the written permission of FMCSA.

Recipient shall ensure that all its employees authorized to access FMCSA data and information systems sign and submit information technology user agreements provided by FMCSA.

**Section 36.    Miscellaneous Provisions.**

**a.  Prohibition on Human Trafficking.**

The Recipient agrees to comply, as applicable, with the provisions of Section 7104(g) of the Trafficking Victims Protection Act of 2000, 22 U.S.C. § 7104 as amended.

**b.  Wild and Scenic Rivers Act of 1968.**

The Recipient agrees to comply, as applicable, with the Wild and Scenic Rivers Act of 1968 (16 U.S.C. §§1271 et seq.) related to protecting components or potential components of the national wild and scenic rivers system.

**c.  Fly America Act.**

The Recipient shall comply with the provisions of the Fly America Act, 49 U.S.C. § 401 18.

**d. Criminal and Prohibited Activities.**

The Recipient will adhere to the Program Fraud Civil Remedies Act, 31 U.S.C. § 3801-3812, which provides for the imposition of civil penalties against persons who make false, fictitious, or fraudulent claims to the Federal Government for money. Recipient will also adhere to the False Statements Act, 18 U.S.C. §§ 287 and 1001 which provides that whoever makes or presents any false, fictitious, or fraudulent statements, representation, or claims against the United States shall be subject to imprisonment of not more than 5 years and shall be subject to a fine in the amount provided by 18 U.S.C. § 287. Recipient shall also adhere to the False Claims Act, 31 U.S.C. § 3729, which provides that suits under this act can be brought by the Government or a person on behalf of the Government, for false claims under the Federal assistance programs. Recipient shall also adhere to the Copeland "Anti-Kickback" Act, 18 U.S.C. § 874 and 40 U.S.C. § 3145, which prohibits a person or organization engaged in a federally supported project from enticing an employee working on the project from giving up a part of his compensation under an employment contract.

## Section 37. Laptop Encryption.

All laptops used by Recipients, Subrecipients, and contractors in carrying out the Recipient 's project plan, which contain FMCSA-related data, including sensitive information and Personally Identifiable Information (PII), must be encrypted to the same standards utilized by FMCSA. The FMCSA encryptions standards prescribe whole disk encryption (FOE), which requires software or hardware to encrypt all data on a disk, including the partition tables, whole physical disk, master boot record, and available files. FMCSA requires that each Recipient who utilizes FMCSA sensitive information or PII complete installation of FOE on all laptop computers as soon as practicable, but no later than thirty (30) days from the execution of this agreement and prior to using the laptop to access FMCSA data systems or store FMCSA related data.

## Section 38. Innovative Technology Deployment (ITD) provisions.

The following provisions apply where applicable.

**a. Compliance with the National ITS Architecture.**

The recipient will ensure that Innovative Technology Deployment (ITD) activities, such as hardware procurement, software and system development, infrastructure modifications, etc., are consistent with the National ITS and commercial motor vehicle information and systems architectures and available standards and promote interoperability and efficiency to the extent practicable and required by law.

**b. Interoperability.**

For implementing ITD capabilities, the recipient will complete interoperability tests and ensure architectural conformance throughout the life of the project. Perform pairwise and end-to-end tests to demonstrate conformance with the standards and interoperability, verify that interfaces between selected products/systems meet the applicable standards, verify dataflow and data usage among the products/systems.

c.  **Independent Evaluation.**

The FMCSA may conduct an independent evaluation of the effectiveness of the project in achieving Federal and State program goals. The independent evaluation will be conducted using existing Federal resources. Participants of projects that are selected for independent evaluations shall cooperate with the independent evaluators and participate in evaluation planning and progress review meetings to ensure a mutually acceptable, successful implementation of the independent evaluation. The FMCSA may contract with one or more independent evaluation contractor(s) to evaluate the projects.

d.  **Dedicated Short-Range Communications.**

If applicable, the State shall also require that its contractors only install Dedicated Short Range Communications (DSRC) equipment that is interoperable and compatible at layers 1 and 2 of the Open Systems Interconnect Reference Model with equipment in operation on the North American Preclearance and Safety System and the Heavy Vehicle Electronic License Plate Inc.'s PrePass™ System deployments as well as the International Border Crossing Operational Tests, based upon on ASTM Draft 6, dated February 23, 1996.

**Section 39.    Federal Funding Accountability and Transparency Act.**

The Federal Funding Accountability and Transparency Act (FFATA) of 2006 (Public Law 109-282) requires for each Federal award of $30,000 or more that OMB create a searchable, no cost, publicly accessible website(http://usaspending.gov/) that includes basic information about the recipient and the project being funded. The Government Funding Transparency Act of 2008 (Public Law 110-252) amended FFATA, requiring recipients to report certain information about themselves and their first tier Subrecipient awards obligated as of October 1, 2010. Prime grant recipients/awardees of new non-Recovery Act federally funded grants and cooperative agreements of $30,000 or more awarded on or after October 1, 2024 are subject to FFATA reporting, sub-award reporting requirements and executive compensation reporting requirements as outlined in the Office of Management and Budgets guidance issued August 27, 2010. The prime awardee is required to file a FFATA sub-award report by the end of the month following the month in which the prime recipient awards any sub-grant greater than or equal to $30,000.

**Section 40.    Executive Order 13513.**

Executive Order 13513 (E.O. 13513) requires each Federal agency to encourage contractors, subcontractors, and grant and cooperative agreement recipients and subrecipients to adopt and enforce policies that ban text messaging while driving company-owned or -rented vehicles or Government Owned Vehicles, or while driving Personally Owned Vehicles when on official Government business or when performing any work for or on behalf of the Government. To further the requirement of encouraging such policies, the FMCSA encourages recipients to consider new rules and programs, reevaluate existing programs to prohibit text messaging while driving, and conduct education, awareness, and other outreach for employees about the risks associated with texting while driving. These initiatives should encourage voluntary compliance with the recipient agency's text messaging policy while off duty. For the purposes of these Grant Provisions and Assurances and pursuant to E.O. 13513, the following definitions apply:

"Texting" or "Text Messaging" means reading from or entering data into any handheld or other electronic device, including for the purpose of SMS texting, e-mailing, instant

messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication.

"Driving" means operating a motor vehicle on an active roadway with the motor running, including while temporarily stationary because of traffic, a traffic light or stop sign, or otherwise. It does not include operating a motor vehicle with or without the motor running when one has pulled over to the side of, or off, an active roadway and has halted in a location where one can safely remain stationary.

## Section 41.    Prohibition on Expending FMCSA Grant Award Funds for Covered Telecommunications Equipment or Services

2 CFR 200.216, *Prohibition on certain telecommunication and video surveillance services or equipment,* prohibits Federal award recipients from using government funds to procure or obtain, or enter contracts to procure or obtain equipment, services, or systems that use covered telecommunications equipment or services.

In accordance with 2 CFR 200.216 and 200.471, FMCSA recipients and subrecipients are prohibited from expending grant funds to:

1. Procure or obtain; or
2. Extend or renew a contract to procure or obtain; or
3. Enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that use covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

    i.   For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).
    ii.  Telecommunications or video surveillance services provided by such entities or using such equipment.
    iii. Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

## Section 42.    Research Activities Involving Human Subjects

Any application that includes research activities involving human subjects, human tissue/cells, or data or recordings from or about human subjects, must satisfy the requirements of the Common Rule for the Protection of Human Subjects ("Common Rule"), codified for the Department of Transportation at 49 C.F.R. Part 11. Research activities involving human subjects that fall within one or more of the classes of vulnerable subjects found in 45 C.F.R. Part 46, Subparts B, C and D must satisfy the requirements of the applicable subpart(s). In addition, any such application that

includes research activities on these subjects must be in compliance with all applicable statutory requirements imposed upon the Department of Health and Human Services (DHHS) and other Federal agencies, all regulations, policies and guidance adopted by DHHS, the Food and Drug Administration (FDA), and other Federal agencies on these topics, and all Executive Orders and Presidential statements of policy on applicable topics. (Regulatory Resources: http://www.hhs.gov/ohrp/humansubjects/index.html which includes links to FDA regulations but may not include all applicable regulations and policies).

FMCSA uses the following Common Rule definitions for research and human subjects research:

**Research:** A systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge. Activities which meet this definition constitute research for purposes of this policy, whether or not they are conducted or supported under a program which is considered research for other purposes. For example, some demonstration and service programs may include research activities.

**Human Subject:** A living individual about whom an investigator (whether professional or student) conducting research:

    (i)    Obtains information or biospecimens through intervention or interaction with the individual, and uses, studies, or analyzes the information or biospecimens; or

    (ii)    Obtains, uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens.

    (1)  Intervention includes both physical procedures by which information or biospecimens are gathered and manipulations of the subject or the subject's environment that are performed for research purposes.

    (2)  Interaction includes communication or interpersonal contact between investigator and subject.

    (3)  Private information includes information about behavior that occurs in a context in which an individual can reasonably expect that no observation or recording is taking place, and information which has been provided for specific purposes by an individual and that the individual can reasonably expect will not be made public (for example, a medical record). Private information must be individually identifiable (i.e., the identity of the subject is or may readily be ascertained by the investigator associated with the information) in order for obtaining the information to constitute research involving human subjects.

    (4)  Identifiable biospecimen includes a biospecimen for which the identity of the subject is or may readily be ascertained by the investigator or associated with the biospecimen. See 49 C.F.R. § 11.102 (Definitions).

    (5)  Identifiable private information is private information for which the identity of the subject is or may readily be ascertained by the investigator or associated with the information.

rev. **12 FEB 2025**

**Section 43.     Publications and Identification of Federal Assistance**

The Recipient reserves the right to publish the results of its research on the work. Before publishing or making a presentation, however, the Recipient agrees to submit copies of any manuscript proposed for publication to FMCSA at least thirty (30) days in advance of the presentation or publication date to identify any inadvertent disclosure of any FMCSA proprietary information. If the Recipient does not ask to defer publication within thirty (30) days after receipt of the manuscript so that patent applications may be filed or proprietary information may be removed, the Recipient may proceed with publication or presentation. In the event FMCSA asks to defer publication, the Recipient shall not publish or otherwise disclose to any third party any of the information contained in the manuscript until such time as a patent application has been filed or the expiration of sixty (60) days after the date of submission of the manuscript to FMCSA, whichever occurs first.  To comply with scientific publication standards, FMCSA may be identified as the source of funding for the research.

Except for confidential, privileged, or proprietary information in the Report, FMCSA may publish the Report, and make it available for publication on the Internet or in any other venue. The Recipient agrees that: (i) It will display information on any product developed with federal assistance for which the U.S. Department of Transportation, Federal Motor Carrier Safety Administration provided federal assistance to support the development of the product that is tangible and is produced from, or is a result of, a Project, is a deliverable, and visible to the public, or is or will be made available to other research organizations, or public transportation providers, and consists of equipment, a prototype, hardware, construction, reports, data, software, internet pages, or any similar item. (ii) The information required will be given using an appropriate sign, designation, or notice.

**Section 44.   Certification.**

The Recipient certifies that the statements it made in the grant application are true and correct, and Recipient understands that any false statements made as part of these certifications can be prosecuted.

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants.* |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 50

## Declaration of Katherine Chapman-See

## DECLARATION OF KATHERINE "K.D." CHAPMAN-SEE

Pursuant to 28 U.S.C. § 1746(2), I, Katherine "K.D." Chapman-See, hereby declare as follows:

1.   I am over the age of 18, and I make this Declaration based on my personal knowledge, as well as my review of pertinent records maintained in the ordinary course of business by the federal government and Washington State agencies.

2.   I am the Director of the Office of Financial Management (OFM) for the State of Washington. I have served as Director of OFM since my appointment January 15, 2025. I have over 13 years of experience in budgeting and policy development. Prior to becoming Director of OFM, I spent two years as Legislative Affairs Liaison for OFM. Prior to working for OFM, I served as Policy Director, Deputy Policy Director, and as a Policy Analyst for the Washington State House of Representatives between 2011 and 2022, with responsibilities for advising and making recommendations to legislators on the state's operating budget, revenue, pensions, labor, higher education, agriculture and natural resource policy issues. From 2008 to 2011, I worked for the Washington State Office of the Lieutenant Governor as the office's Legislative and Community Liaison. I hold a bachelor's degree in Anthropology from the University of Chicago.

3.   OFM provides vital information, fiscal services and policy support that the Governor, Legislature, and State agencies need to serve the people of Washington State. OFM plays a central role in budget planning, policy development, and fiscal administration for the executive branch. OFM prepares the executive budget proposal and monitors budget implementation. OFM also manages statewide human resource policy functions including classification, compensation, workforce data, recruitment, and other policy functions.

4.   As OFM's Director, I oversee all aspects of OFM and ensure that OFM is providing accurate budgetary information and policy support to the Governor, Legislature, State agencies, and the public.

1

5.      I submit this Declaration regarding the amount of grant funding Washington agencies expended from U.S. Department of Transportation (USDOT) grant programs in state Fiscal Years (FY) 2022, 2023, and 2024.

6.      FY 2022 covers the period of July 1, 2021, through June 30, 2022. FY 2023 covers the period of July 1, 2022, through June 30, 2023. And FY 2024 covers the period of July 1, 2023, through June 30, 2024.

7.      As part of its fiscal management and budget implementation responsibilities, and in accordance with federal law, OFM regularly calculates its State Expenditure of Federal Awards ("SEFA"). The SEFA calculation includes all federal funds that the State expends in a given fiscal year.

8.      As reflected in the three most recent SEFA reports, Washington agencies spent $1,123,502,796 from USDOT grant funds in FY 2024, $1,005,883,351 in FY 2023, and $913,706,493 in FY 2022.[1]

9.      The Legislature recently passed, and the governor is currently reviewing a biennial state transportation budget that required significant reductions and increases in state taxes to address a $2.6 billion budget shortfall over the next four years. Accordingly, it is unlikely that Washington agencies will receive additional state funding to make up for the loss of federal grant funding. Instead, the loss of federal grant funds will likely cause a decrease in the services state agencies are able to provide for Washingtonians.

---

[1] True and correct copies of SEFAs from FY 2022 – 2024 are available online. *See* State of Washington, Office of Financial Management, Annual Comprehensive Financial Report for the Fiscal Year Ended June 30, 2024 (Dec. 2024), https://ofm.wa.gov/sites/default/files/public/accounting/singleaudit/2024/16_FY24_Schedule_of_Expenditures_of_Federal_Awards.pdf; State of Washington, Schedule of Expenditures of Federal Awards for the Fiscal Year Ended June 30, 2023, https://ofm.wa.gov/sites/default/files/public/accounting/singleaudit/2023/16_FY23_Schedule_of_Expenditures_of_Federal_Awards.pdf; State of Washington, Schedule of Expenditures of Federal Awards For the Fiscal Year Ended June 30, 2022, https://ofm.wa.gov/sites/default/files/public/accounting/singleaudit/2022/16_FY22_Schedule_of_Expenditures_of_Federal_Awards.pdf.

2

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED this 16th day of May 2025 at Olympia, Washington.

Katherine "K.D." Chapman-See
Director
Washington State Office of Financial Management

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, <br><br> *Defendants.* | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 51

Declaration of Mike Gribner

## DECLARATION OF MIKE GRIBNER

I, Mike Gribner, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of 18. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am Deputy Secretary of the Washington State Department of Transportation (WSDOT). In support of the Secretary of Transportation, I oversee all aspects of WSDOT. This includes overseeing the funding WSDOT receives from both federal and state sources to ensure resources are allocated effectively to meet statewide transportation infrastructure goals. My job duties include developing and implementing agency strategies and policies for all aspects of the State's transportation system. This ensures plans and projects are developed and implemented to achieve the governor's, the legislature's, WSDOT's Strategic Plan, and other WSDOT goals. I also support the Secretary of Transportation in advocating for innovative financing methods and public-private partnerships. I help ensure these methods and partnerships finance a multimodal transportation system that is carefully planned, designed, constructed, and operated to conserve energy, apply smart technologies, and improve both operations and safety.

3.      I have been employed by WSDOT since May 1983 and have served as Deputy Secretary since January 1, 2024. In my 43 years of WSDOT service I have served in positions that range from region Project Engineer, and analyst for Capital Program and Development Management, to high level management as Regional Administrator, Chief Engineer and now the Deputy Secretary of Transportation. Over the course of my WSDOT career, I have had experience administering the numerous grants Washington has received from a variety of federal agencies, including the Department of Transportation (USDOT).

## Background

4.      WSDOT is an executive agency tasked with ensuring that Washington travelers have safe, sustainable, and cost-effective transportation options that allow their communities and businesses to prosper. As Washington's largest recipient of USDOT grant funding, WSDOT

administers a wide range of programs that support the safe and cost-effective transportation of people and goods in Washington.

5.      As part of my regular job duties, I am responsible for overseeing the executive administrators responsible for the delivery of federal grants. Within WSDOT there is no one person who oversees all grant funding. However, all the staff that do report up through the reporting structure report to the Deputy Secretary, the position I currently occupy. I have reviewed a summary of award documents for grants that were issued to WSDOT and am familiar with their contents.

6.      Although the substantial importance of USDOT grant funding to WSDOT's vision, mission, and programming is not in doubt, calculating a current WSDOT-wide snapshot of the amount of USDOT funding WSDOT *receives* in a given fiscal year is challenging because USDOT grant funds flow to multiple WSDOT divisions and support projects spanning multiple years, for which federal funds are often disbursed intermittently and on a reimbursement basis. However, WSDOT does track the total amount of federal awards *expended* each state fiscal year. During state Fiscal Year 2024, covering the period from July 1, 2023 to June 30, 2024, WSDOT reported expending $943,401,019 in USDOT  funding received from a variety of USDOT subagencies including Federal Highway Administration, Federal Aviation Administration, Federal Transit Administration, and Federal Rail Administration. That figure includes both  funding received through formula and discretionary grant programs.

7.      A loss of USDOT grant funding would severely obstruct and undermine WSDOT's vision and mission, even if the funds are restored at a later date.

**WSDOT Applies for and Receives U.S. Department of Transportation USDOT Grants**

8.      USDOT develops and administers grant programs. Many of these programs award grants to States, such as Washington. In some cases, USDOT grant funds are administered by USDOT subagencies.

9.      WSDOT typically becomes aware of funding opportunities from these and other USDOT subagencies through the publication of a Notice of Funding Opportunity (NOFO). If

WSDOT decides to apply, it submits a funding application for a specific project. The applicable USDOT subagency reviews the application and, if the project is selected for award, the subagency issues a funding award letter or email. After some initial meetings, the awarding subagency will typically request that WSDOT sign a grant agreement to formalize WSDOT's acceptance of the funds and its acknowledgment of, among other things, the applicable terms and conditions. Once the grant agreement is finalized with the awarding subagency, the funds are allocated to WSDOT, which means that WSDOT can work with the awarding agency to obligate the funds. Once funds are obligated, they can be expended and then the expenses can be billed to the awarding subagency.

10.    Generally speaking, WSDOT receives USDOT funds on a reimbursement basis. For example, a construction company can submit an invoice to WSDOT for work performed on a construction contract. WSDOT pays the contractor based on that invoice. WSDOT then bills USDOT for the expenses that are eligible for reimbursement under the grant program.

11.    For the state fiscal year ending June 30, 2024, WSDOT expended grant funds awarded by the following USDOT subagencies: Federal Aviation Administration, Federal Highway Administration, Federal Motor Carrier Safety Administration, Federal Railroad Administration, Federal Transit Administration, and Office of the Secretary of Transportation.

12.    I am familiar with the grants WSDOT has received from USDOT's subagencies, as well as the process by which USDOT funds flow into WSDOT accounts and fund real world projects in Washington. I have described below the funding WSDOT has received from several of these programs, the work on which the funds are being spent, and the irreparable harm that would happen to Washington if WSDOT is deprived of current or future USDOT grant funding.

### Grants from Federal Highway Administration and
### Office of the Secretary of Transportation

13.    The primary means by which Congress allocates highway funding to the States is through the Federal-aid Highway Program, which provides federal formula and discretionary funds to States for the planning, design, construction, maintenance, and operations of the country's

extensive highway network, including the Interstate Highway System, other principal arterials, minor arterials, collectors, and local roads.

14.    The Federal-aid Highway Program is administered by the Federal Highway Administration (FHWA), within USDOT. The Office of the Secretary of Transportation (OST) also awards Federal-aid Highway Program grant funding, and this funding is ultimately administered by FHWA.

15.    In addition to federal grants for WSDOT to make improvements to State facilities, WSDOT manages and supports FHWA discretionary grants to subrecipient Local Public Agencies (LPA's) throughout the State. WSDOT is currently supporting the implementation of approximately $450 million in discretionary grants to LPA's.

16.    As the Washington agency tasked with maintaining state highway transportation infrastructure in Washington, WSDOT has received a substantial amount of discretionary grant funding from FHWA and OST through the Federal-aid Highway Program.

17.    In state FY 2024 (July 1, 2023-June 30, 2024), WSDOT expended at least $906,170,000 in combined FHWA formula and discretionary grant funds, of which $2,600,000 came from discretionary grant programs administered by FHWA. Furthermore, WSDOT was awarded at least $729,997,000 in FHWA discretionary grant funding in the same fiscal period, which it plans to expend over the next several state fiscal years, if new terms and conditions do not interfere with its ability to allocate and obligate those funds.

18.    Current grant awards are from the following grant programs:

| Federal Funding Program Name | Description of Program |
|---|---|
| Advanced Digital Construction Management System (ADCMS) | Promotes, implements, deploys, demonstrates, showcases, supports, and documents the application of ADCMS, practices, performance, and benefits. |
| Advanced Transportation and Congestion Management Technologies Deployment (ATCMTD) Program | Provides funding to 1) help install advanced technologies at a large scale that can serve as national models and 2) improve safety and reduce travel times for drivers and transit riders. |

4

| | |
|---|---|
| Charing & Fueling Infrastructure (CFI) | Provides funding to strategically deploy publicly accessible electric vehicle charging infrastructure and other alternative fueling infrastructure. |
| Culvert Aquatic Organism Passage (AOP) | Provides funding to projects that replace, remove, or repair culverts and weirs that would meaningfully improve or restore fish passage for anadromous fish. |
| Electric Vehicle Charger Reliability and Accessibility Accelerator (EVC-RAA) | Provides grant funds to States and localities that require additional assistance to strategically deploy electric vehicle charging infrastructure. |
| High Priority Program – Innovative Technology Deployment (HP-ITD) | Supports innovative and impactful projects that advance its mission to reduce crashes, injuries, and fatalities involving large trucks and buses. |
| Infrastructure for Rebuilding America (INFRA) | Grants for multimodal freight and highway projects of national or regional significance to improve the safety, efficiency, and reliability of the movement of freight and people in and across rural and urban areas. |
| Low Carbon Transportation Materials (LCTM) | Provides funding for the use of construction materials that have substantially lower levels of greenhouse gas emissions. |
| National Infrastructure Project Assistance - MEGA | Supports large, complex projects that are difficult to fund by other means and likely to generate national or regional economic, mobility, or safety benefits. |
| Rebuilding American Infrastructure with Sustainability and Equity (RAISE) | Helps urban and rural communities move forward on projects that modernize roads, bridges, transit, rail, ports, and intermodal transportation and make our transportation systems safer and more accessible, affordable, and sustainable. |
| Strategic Highway Research Program (SHRP2) | Provides funding for applied research in four areas: safety, renewal, reliability, and capacity. The goal of the SHRP2 Safety Program is to address the role of driver performance and behavior in traffic safety. The related efforts and underlying data will provide a deeper understanding of driver behavior and how drivers interact with and adapt to their vehicles (including vehicle information systems), traffic, roadway characteristics, traffic control devices, and other environmental features. |
| Strategic Innovation for Revenue Collection (SIRC) Program | Provides grants to test the feasibility of a road usage fee and other user-based alternative revenue mechanisms (referred to in section 13001 as "user-based alternative revenue mechanisms") to help maintain the long-term solvency of the Highway Trust Fund through pilot projects at the State, local, and regional level. |
| Strengthening Mobility & Revolutionizing Transportation (SMART) | Provides grants to eligible public sector agencies to conduct demonstration projects focused on advanced smart community technologies and systems to improve transportation efficiency |

| | and safety. |
|---|---|
| State-Based Innovation Council/Deployment (STIC) | Offers technical assistance and funds to support the costs of standardizing innovative practices in a state transportation agency or other public sector STIC stakeholder. |
| Work Zone Data Exchange (WZDE) | Increase the safety of the traveling public through the production of consistent public work zone data feeds across jurisdictions. This was a one-time funding opportunity for public roadway operators to make unified work zone data feeds available for use by third parties and collaborate on the WZDX Specification development. |
| Climate Challenge (CLCH) | Provides funding and technical assistance to quantify greenhouse gas emissions from materials and practices for the design, construction, and maintenance of pavements |
| Highway Construction Training Program (HCTP) | Funds projects that will recruit, train, and place individuals into highway construction jobs. Sixteen grants will be awarded to educational institutions and State departments of transportation (State DOTs). |
| National Scenic Byways (NSB) | Provides funding to develop a State or Indian Tribe scenic byway program. Also fund projects on highways designated as National Scenic Byways, All-American Roads (collectively America's Byways®), State scenic byways, or Indian Tribe scenic byways. |

19.     The FHWA and OST grant funds awarded to WSDOT have supported a wide array of highway planning and construction projects in Washington, including, among other projects:

a.    Developing a new methodology that will integrate Light Detection and Ranging (LiDAR) technology into roadway planning, to ensure that sidewalks and curb ramps meet pedestrian accessibility standards.

b.    Conducting feasibility studies for new multi-use trail segments and local street improvements that will connect existing regional bicycle and pedestrian facilities and developing preliminary design concepts.

c.    Reconstructing two I-5 interchanges for the Tulalip Tribes in the Marysville, Washington area.

d.    Replacing two functionally obsolete and structurally deficient bridges on I-5 between Washington and Oregon across the Columbia River.

e.   Developing and installing a data-driven, advanced traveler information system for the Washington State Ferry (WSF) system, which will allow passengers to make better decisions on when and where to travel, and will help WSF better manage congestion and improve efficiency at ferry terminals and along routes.

f.   Deploying a real-time truck parking information management system at truck parking facilities along the I-5 corridor.

g.   Replacing concrete beams and girder lines along half of the Hood Canal floating bridge.

h.   Removing culverts that impede fish passage and replacing them with fish passable culverts or bridges in order to reduce the impact of Washington's roadways on fish habitat.

20.    At present, of the amount of FHWA discretionary grant funds awarded to WSDOT in connection with active highway planning and construction projects, at least $54,928,000 has been allocated. WSDOT believes the allocated funds should be available for WSDOT to continue advancing its work on these projects. However, WSDOT has been told that modifications to any of these projects that have grant agreements will be needed if WSDOT submits a modification to a federal aid project agreement. A federal aid project agreement is the tool WSDOT and FHWA use to communicate scope, schedule, and budget and obligate funds. WSDOT is also still waiting on $675,069,000 in funding to be allocated for these projects.

21.    At present, WSDOT is waiting for decisions from FHWA on at least eight grant applications that would provide up to $51,642,300 in additional federal funds. WSDOT believes the award process has been slowed down or stopped on these projects.

22.    It is not clear if FHWA will award, allocate, or obligate these grant funds under terms and conditions WSDOT can accept, however.

23.    Indeed, WSDOT recently sought approval to obligate $2,000,000 allocated under a RAISE grant. However, FHWA instructed WSDOT on May 5, 2025 that WSDOT will need to wait for a revised grant agreement before any allocated funds may be obligated.

24.     Thus, unless WSDOT signs revised grant agreements with FHWA, it may be unable to access hundreds of millions in funds that were previously awarded and, in some cases, previously allocated.

25.     If WSDOT is unable to access FHWA grant funds, it will need to cancel its active projects or seek additional state funds to make up for the loss of federal funds.

26.     Without alternative funding sources, WSDOT anticipates that critical projects will be delayed or stopped, including projects that are intended to improve traffic safety and provide multimodal connectivity, including in underserved communities, and congestion relief. For instance, WSDOT anticipates that the project described above to replace two functionally obsolete and structurally deficient bridges on I-5 between Washington and Oregon across the Columbia River could be delayed or jeopardized.

27.     WSDOT's active federal projects are currently being supported by more than $729 million in FHWA funds. It is unlikely WSDOT can secure equivalent alternative sources of funding in the near future if that federal funding becomes unavailable.

28.     Furthermore, because these federal funding programs operate on a reimbursement basis, WSDOT has already spent state funds on all the projects described above, either to provide the required match or additional necessary funds, as well as on other projects not described herein. WSDOT expended these funds with the reasonable expectation that it would be reimbursed with FHWA grant funds. If federal projects are scrapped or delayed, Washington will lose out on a substantial, expected return on those investments.

29.     Finally, because these projects are in active development, in many cases, WSDOT has signed agreements with consultants, research universities, vendors, or contractors. If federal funds cannot be used for these projects as planned, WSDOT will be forced to reconsider these agreements and may need to cancel them, which would result in costs to WSDOT and its partners.

### Grants from the Federal Transit Administration

30.     WSDOT also receives funding from grants administered by the Federal Transit Administration (FTA), through both formula and competitive discretionary grant programs.

WSDOT received formula funding through programs such as Federal Transit Formula Grants, Formula Grants for Rural Areas and Tribal Transit, Federal Lands Access Program, and State of Good Repair Grants Program. In addition, the agency competes annually for funding through the 5339(b) Bus and Bus Facilities and 5339(c) Low and No Emissions grant programs.

31.     From Federal Fiscal Year (FFY) 2023-2025, FTA apportioned approximately $103 million to WSDOT for ongoing and newly awarded public transportation projects across Washington under multiple formula grant programs.

32.     In the FY 2023-2025 period, WSDOT competed for and was awarded $32 million in 5339(b) Bus and Bus Facilities funds representing 7 projects. Of this amount, $14.485 million has been obligated for 5 projects in Clallam, Grant, Grays Harbor, and Island Transits. Two projects totaling $17,599,535 are not yet obligated (FFY24 awards for Grays Harbor and Island Transits). Grays Harbor Transit's project will provide much needed funding to renovate an aging maintenance and operations center including the replacement of deteriorating wood pilings. Additionally, Clallam County's project will replace buses and paratransit vehicles that are no longer reliable.

33.     If WSDOT does not receive, or is unable to obligate funds from the competitive awards noted above, it will not be able to contract with the transit agencies for those projects. Without funding, the infrastructure used by Grays Harbor Transit will likely continue to deteriorate and possibly impact maintenance and operations. For Clallam County Transit, not replacing these vehicles will decrease the service reliability, capacity, and comfort for the residents of Clallam County who rely on public transportation.

### Grants from the Federal Aviation Administration

34.     WSDOT receives grant funding from the Federal Aviation Administration (FAA) through the Airport Improvement Program. The Airport Improvement Program (AIP) provides federal grant funding to States and to local airport sponsors such as port authorities, cities, and counties to maintain a safe and efficient system of public-use airports that meets the present and future needs of civil aeronautics. AIP funding generally supports airport runways, taxiways, noise

abatement, and safety or emergency equipment. These funds have allowed Washington to improve the safe operation of its airports and increase the capacity of airport facilities to accommodate passenger and cargo traffic.

35.     WSDOT received $1,150,000 in AIP funds in FFY 2022, $1,000,000 in FFY 2023, and $1,280,000 in FFY 2024. WSDOT anticipates receiving a further AIP grant award in FFY 2025 for $450,000 for an airport master plan update at the Methow Valley State Airport.

36.     If WSDOT is not able to agree to the FAA's terms and conditions, this FFY 2025 grant could be withheld.

37.     The AIP grant funds WSDOT has received have been used to support Washington State Aviation System Planning, State Airport Pavement Condition Evaluations, and airport master planning and airfield improvements for the Methow Valley State Airport in Winthrop, Washington, which WSDOT owns and operates. This airport houses a National Forest Service smoke jumper base and is critical to wildfire response operations.

38.     WSDOT does not have, and is unlikely to receive, state funding that would replace the federal funding provided through the AIP grant program. Accordingly, if WSDOT is unable to access AIP funding, it will be unable to continue the planning, evaluation, and improvements work it has funded through AIP grants. Among other things, that would affect WSDOT's ability to continue conducting the State Airport Pavement Condition Evaluations, which collects valuable information about which airports in Washington have runways that need pavement improvements and would, accordingly, benefit from FAA pavement improvement funding. Without accurate information about the need for pavement improvements at Washington airports, FAA will be unlikely to prioritize funding pavement improvements at those airports, which will, over time, affect the reliability and safety of airports in Washington and the ease with which goods and people can travel by air to and from Washington.

### Grants from the Federal Railroad Administration

39.     WSDOT also receives funding from grants administered by the Federal Railroad Administration (FRA) through competitive discretionary grant programs that support Intercity

Passenger Rail (IPR) services, High-Speed Passenger Rail (HSR), and freight rail infrastructure. FRA does not provide formula funding, therefore funding provided through the competitive FRA grant process is awarded based on the merits and public benefits of the project.

40.     In the FFY 2022-FY 2025 period, WSDOT has been awarded $192,698,705 of FRA grant funding under the following FRA programs: Consolidated Rail Infrastructure and Safety Improvements (CRISI), Infrastructure for Rebuilding America (INFRA), and Corridor Identification and Development (CID).

| Federal Program | Project Name | Federal Award Amount |
|---|---|---|
| **CRISI** | | |
| FFY 2022 | WA State Rural Rail Rehabilitation – Phase II | $72,800,000 |
| FFY 2024 | WA State Rural Rail Rehabilitation – Phase III | $37,700,000 |
| | Puget Sound Rail Corridor Improvements | $6,451,894 |
| **INFRA** | | |
| FFY 2022 | Salmon Bay Bridge Rehabilitation Project | $25,000,000 |
| **CID** | | |
| FFY 2022 | Amtrak Cascades Corridor Step 1 | $500,000 |
| FFY 2022 | Cascadia Ultra-High-Speed Ground Transportation Project (UHSGT) Corridor-Step 1 | $500,000 |
| FFY 2024 | Cascadia Ultra-High-Speed Ground Transportation Project (UHSGT) Corridor Step 2 | $49,746,811 |

42.     WSDOT does not have, and is unlikely to receive, state funding that would replace the federal funding from FRA grant programs that provide for critical rail planning, safety, preservation, environmental and emission reduction, capacity, and infrastructure modernization.

**Harms to the State Caused by USDOT's Funding Conditions**

41.     On April 24, 2025, I received a letter from Secretary of Transportation Sean Duffy stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of

Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

42.    On April 22, 2025, FHWA amended its general terms and conditions for competitive grant programs. In doing so, it added the same new language to section 18.2(a), governing "Federal Law and Public Policy Requirements," which requires recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law."

43.    On May 2, 2025, the FTA also amended its Master Agreement, which provides the terms and conditions governing all FTA grants. Section 12(m) of the revised agreement addresses "Federal Law and Public Policy Requirements" and adds new language requiring recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Customs and Immigration Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

44.    On May 14, 2025, FTA posted a Notice of Funding Opportunity (NOFO) for the Low or No Emission Grant Program and the Grants for Buses and Bus Facilities Competitive Program. As noted above, these are competitive grant programs through which WSDOT has previously received funding and intends to apply for further funding. The NOFO requires applicants to certify that they "will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law." Applications under this NOFO are due by July 14, 2025.

45.    The FAA has also released a template grant agreement for FY 2025 AIP funds.

Section 32 of the template agreement obligated recipients of AIP funds to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law."

46.    On April 23, 2025, FRA amended its Attachment 1, General Terms and Conditions, for FRA Discretionary Grant Agreements. In doing so, it added the same new language to section 20.2(a), "Federal Law and Public Policy Requirements," which requires recipients to "…cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law."

47.    In my years with WSDOT, I am not aware of WSDOT staff ever being required to enforce or participate in the enforcement of federal civil immigration law.

48.    It is not clear to me what USDOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." I am not aware of definitions, citations, or criteria that might define what activities may be included in "cooperating with . . . enforcement of Federal immigration law."

49.    If WSDOT must enforce or participate in the enforcement of federal civil immigration law as a condition of receiving USDOT funding, my understanding is that WSDOT is unable to comply with the federal government's new funding conditions.

50.    Further, because WSDOT is responsible for building and maintaining Washington's transportation infrastructure, WSDOT staff has neither the expertise nor capacity to enforce immigration law.

51.    If WSDOT is unable to comply with the federal government's new funding conditions, it would be unable to receive new USDOT funds and may also be barred from obligating funds it was previously allocated for awarded projects. The loss of that funding would

13

impede Washington's ability to maintain the critical programs described above.

52.    WSDOT does not have any other appropriation in its budget that could cover the loss of the grants discussed above.

53.    The longer WSDOT cannot access these funds, the greater the risk that additional programs will be interrupted or terminated. This is particularly likely in the context of transportation planning and construction, which require substantial lead time.

54.    Losing these USDOT grants would severely obstruct and undermine WSDOT's vision and mission even if the funding were restored at a later date.


I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this 19th day of May, 2025 at Olympia, Washington.

_____

Mike Gribner

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants.* |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 52

Declaration of Scott James Lawry

## DECLARATION OF SCOTT JAMES LAWRY

I, Scott James Lawry, declare as follows:

1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Deputy Secretary of the Wisconsin Department of Transportation (WisDOT) and act as the Chief Operating Officer for that agency. My job duties include oversight of all agency operations and budget matters including working with WisDOT divisions responsible for managing federal funds. My duties also include managing all division administrators who work directly on grant implementation.

3.      I have been employed by WisDOT for 34 years.  Before assuming the role of Agency Deputy Secretary in October 2024, I served in the Division of Transportation System Development as a Staff Engineer, Project Manager, Supervisor in Project Development and Technical Services, Section Chief in Proposal Management, Director of the Bureau of Technical Services, and Deputy Administrator over statewide bureaus.

## Background

4.      WisDOT aims to provide a safe and reliable transportation network that serves all people. WisDOT oversees a comprehensive transportation system that includes about 115,000 miles of local, state, federal and Interstate highways, about 14,000 bridges, 76 public bus and shared-ride taxi systems, 87 federally eligible airports, 29 commercial ports, and 3,200 miles of railway track.

5.      In order to maintain the Wisconsin transportation system, WisDOT also maintains a significant fiber and camera system that allows WisDOT to monitor and identify issues with its system. Part of those operations include ramp metering, accident identification, system condition identification and warning (inclement weather) and user

1

assistance needs.

6.     WisDOT also operates a Division of State Patrol. This division is responsible for monitoring and managing safe travel on all state highways and interstates. The division makes routine traffic stops for road violations but more importantly, assists motorists needing help and managing accident locations, including providing first responder lifesaving efforts.

7.     As part of my regular job duties, I oversee all aspects of budget and project development decisions with respect to the disbursement of federal discretionary and formula funds received from the U.S. Department of Transportation. Formula and discretionary funds received from U.S. DOT total over $2.5 billion and constitute 29 percent of WisDOT's total annual budget.

8.     WisDOT's discretionary grant implementation information can be found at Wisconsin Department of Transportation Bipartisan Infrastructure Law (BIL), (available at https://wisconsindot.gov/Pages/doing-bus/bil.aspx). This site provides an accurate list of all federal discretionary grants received by WisDOT.

9.     WisDOT receives significant portions of its funding through open federal discretionary grant awards. This funding is used for surface transportation, passenger rail and freight rail transportation systems, and commercial driver safety. In FFY2023 FHWA allocated to WisDOT $1,293,658,444. In FFY2024, we were allocated $235,945,057. We have been awarded and expect to be obligated $58,000,000 for FFY2025.

10.     WisDOT typically receives approximately $1 billion in formula funding annually. This funding is used for highways, bridges, airports, transit capital and operations, and transportation safety and represents the ongoing development, construction, and maintenance or support functions of the Department for its own and local projects.  Wisconsin has received:

      a.     FFY2023: $1,191,513,338

      b.     FFY2024: $1,293,414,108

   c.  FFY2025: $1,142,154,239 plus any awarded redistribution.

  11.  WisDOT anticipates receiving approximately 2.1 billion in federal formula and discretionary funding for FFY2025 not including the Blatnik Bridge grant.

  12.  WisDOT works closely with state and federal agencies and Wisconsin local jurisdictions to ensure grant dollars are used effectively and efficiently throughout the state. WisDOT manages local grants to ensure appropriate development, construction, and maintenance of local highways, transit systems, rail lines, harbors, airports and pedestrian and bicycle facilities.

  13.  Safety is WisDOT's number one priority. The programs funded by these grants are vital to protect the residents of Wisconsin. Because WisDOT manages projects for all modes of transportation, funding reductions or loss of funding would be significantly detrimental to the state of Wisconsin and its residents. All modes would be impacted by delayed construction, operations support, maintenance, and administrative support. If WisDOT cannot continue with its planned projects, it will jeopardize the safety of Wisconsin's roads and ancillary facilities, railroad tracks, airports, harbors, and mass transit. Lack of funding for safety improvements results in greater injury, property damage, and loss of life.

  14.  While all federal grants received by WisDOT are too numerous to list here, the following grants from the Federal Highway Administration, Federal Transit Administration, Federal Motor Carrier Safety Administration, Federal Aviation Administration, and Federal Railroad Administration exemplify how U.S. DOT funds are critical to programs vital to keeping our roadways, airspace, waterways, transit systems, and pedestrians safe. WisDOT receives many more grants than those described herein, including essential grants from the Maritime Administration.

3

A.    **WisDOT's Use of Federal Highway Administration Funds**

15.    The Federal Highway Administration provides Wisconsin with approximately $1 billion in formula funding annually, and an expected $932,903,511 of additional funds as a result of redistribution in FFY2025 (redistribution funds are those funds not used by other states that are made available to states requesting additional funds.)

16.    For example, WisDOT is undertaking the reconstruction of a portion of Interstate Highway 94 East-West in Milwaukee. This highway was first completed in 1961 and has undergone resurfacing several times since then. It is no longer eligible for simple resurfacing under federal standards and instead requires reconstruction to mitigate significant safety concerns amid higher usage. This highway serves 26 percent of the seven-county population within five miles, and 35 percent of the seven county area businesses. This section of interstate has a higher-than-average crash rate, is significantly congested during certain travel hours, and can be difficult to navigate due to geometrics (geometrics relate to how a highway is built over the land- the curves, the grade of hills and valleys, the width, the intersections, the type of vehicles and vehicle volumes anticipated and the intended speed of the section of highway), that have outlived their usefulness and safety effectiveness. This federally funded project will correct issues with the current highway geometrics, place new pavement, and add needed capacity. The estimated cost of this work in 2023-year dollars is $1.47 billion dollars. WisDOT cannot afford this project without federal funding. The longer this highway is left in its current condition, the more unsafe it becomes. Driving on marginalized highways puts all vehicle drivers at a higher risk of crash, injury, and death.

17.    WisDOT is also currently designing a project that, in part, will alleviate increasing flooding at the I-39, I-90-94 split interchange. The larger project addresses

4

deficiencies over a larger section of the Interstates.  In this location, flooding of the Baraboo River has caused extensive damage and required lane closures in this area. In both 2008 and 2018 this area was flooded. These interstates also cross the Wisconsin River which is also subject to flooding. When this area floods, the lanes on the Interstates must be closed due to unsafe conditions disrupting tens of thousands of travelers and freight carriers, costing untold expense. Absent work to remedy these issues, Wisconsin will continue to incur significant damage costs related to this circumstance.  If this project is delayed due to lack of funding, the cost to build the required changes will escalate, the road will continue to deteriorate, and travelers will continue to experience significant and costly disruption. The total cost for this project is currently estimated to be $3.67 billion in 2024-year dollars. This is another example of a project that cannot be built without federal funding. Without completing this project, disruptions and unsafe conditions will continue to exacerbate.

18.    Another significant federally funded project is the replacement of the Blatnik Bridge between Wisconsin and Minnesota. The Blatnik Bridge, built in 1961, carries Interstate 535 (I-535) and U.S. Highway 53 (US 53) over the Saint Louis River, a tributary of Lake Superior, between Duluth, Minnesota, and Superior, Wisconsin. Over 33,000 vehicles cross the bridge a day. It is a vital artery not only for commuters but also freight and commercial traffic. The billions of dollars in goods that cross the bridge each year supports the regional economy. The bridge also facilitates trade with Canada, the region's top international trading partner. However, the bridge has experienced severe deterioration over the years. It can no longer safely hold the weight of many commercial vehicles and that traffic needs to be diverted. Though there have been efforts over the years to strengthen and reinforce the bridge, recent inspections determined that the bridge is no longer safe and must be replaced.

19.      Unless the Blatnik Bridge is replaced, it will close completely in 2030. The cost of replacing the Blatnik Bridge is $1.8 billion. The planned project will replace the bridge completely including address safety concerns at the bridge interchanges, and restore the crossing to its original operational condition. Minnesota's DOT and WisDOT will each contribute $400 million to the project, but without additional federal funding to replace the bridge, the bridge will eventually close. Neither Wisconsin nor Minnesota has funds to replace this critical infrastructure without the awarded grant funds. The Blatnik Bridge's continued operation without remediation is unsafe, and its closure in the next five years will likely have a significant impact on the regional economy.

20.      These larger projects aside, federal funds also help support local roads through programs like the Surface Transportation Program (STP)-Urban, which allocates federal funding to complete a variety of improvements to federal program eligible roads and streets in urban areas. STP-Rural allocates federal funds to complete a variety of improvements on federal program eligible highways in rural areas, and the local bridge program assists, through cost sharing, to rehabilitate and replace the most seriously deteriorating local bridges. FFY2025 funding for STP-urban is $113.4 million and for STP-rural is $69 million. Local jurisdictions are unable to meet the financial requirements to build and maintain safe and highway facilities without federal support.  WisDOT works closely with local jurisdictions and their constituencies in order to create public support and commitment to the facilities. This STP project development process includes public information opportunities, local official meetings, funding planning and oversight in all phases of a project.

21.      No state or local jurisdiction is able to fully fund the projects needed to build and maintain Wisconsin's highways. When highways are not sufficiently funded, wear and tear causes pavement and facility deterioration, geometrics become outdated, improvement in modes is not developed and capacity becomes inadequate all resulting

in less safe highways.

22.    As additional notices of funding opportunities are opened, Wisconsin will continue to apply for discretionary grants necessary to improve the state of transportation in Wisconsin.

**B.    WisDOT's Use of Federal Transit Administration Funds**

23.    Federal fiscal year 2025 formula transit funding is $120.4 million. These dollars support all small and medium transit operators, including tribal operations across the state. If these funds were disrupted, those systems would not be able to continue operations or continue operations at current levels. WisDOT passes through federal transit funding for the Federal bus, fleet operations, and bus facility programs. Wisconsin municipalities could not afford to offer transit services absent these funds. While state funds are available, they are simply insufficient to support the need of Wisconsin's communities. Absent federal funding for transit, Wisconsin residents would lose transit service. Transit is used by those residents who may have no other choice for getting to health and other appointments, grocery shopping, and work. A loss of service across the state   would   be devastating for those persons most in need of non-automobile transportation.

24.    WisDOT  also receives discretionary grant funding for transit services and will continue to apply for such funding. In economically depressed areas where many people don't own cars of their own, transit services are often the only means people have to get to work or medical appointments. A functioning and up-to-date transit system is thus essential to ensuring the safety and economic wellbeing of the community. Examples of grants received include $12 million to address bus facilities and an aging fleet in the Fox River Valley, $49,000 for tribal safety improvements to transit stop locations, $300,000 in grants for operating assistance and vehicles for Wisconsin Tribes, and $205,360 for

7

planning to increase access to healthcare in southwest Wisconsin. Tribal improvements are important because alternate funding for these types of projects has been limited. These grants allow tribal governments to perform work that is desperately needed to improve tribal transportation facilities. Regarding the Fox River Valley transit project, this grant will allow the transit provider to continue to work towards modernizing its fleet which creates efficiency and cost savings for the provider.

25.     In total, WisDOT has received approximately $195 million in discretionary program funds for urban, rural, and tribal public transit projects. Without these projects, the most vulnerable rural and tribal communities in our state would be unable to accomplish the daily activities or access essential services, like healthcare, that the rest of us take for granted.

26.     WisDOT intends to submit additional discretionary grant applications in FFY 2025.

C.     **WisDOT's Use of Federal Motor Carrier Safety Administration Funds**

27.     The Motor Carrier Safety Administration provided WisDOT with $9,427,686 in federal funds in FFY 2023 and $9,677,583 in FFY 2024. For FFY 2025, WisDOT was appropriated $9,876,275 in funding. WisDOT receives Motor Carrier Safety Assistance Program (MCSAP) and Commercial Vehicle Safety Plan (CVSP) funds which are essential to maintaining safety on Wisconsin's interstate highways. These grants fund the highway motor carrier inspector program at WisDOT. The grant provides the majority of funds required for inspector salaries. Inspectors perform essential inspections of commercial motor carriers ensuring limits on driving hours, equipment condition, and driver certifications meet federal requirements. If WisDOT does not receive these funds, it would be required to reduce staff performing these functions. As of this writing,

WisDOT has been provided an agreement for only half of its FFY 2025 formula grant funds.

28.     Without adequate commercial motor vehicle inspection, Wisconsin highways will be less safe. Motor carriers are heavy vehicles with long slowing and stopping distances. When motor carrier equipment is not inspected regularly, equipment wear gets overlooked. Failure to maintain equipment can mean the inability to slow or stop in time to avoid crashes. Lack of sleep from not following hours of service rules can cause crashes due to sleep deprivation. Motor carrier crashes are devastating to other motor vehicles causing significant property damage and injury and death. Without these funds, inspections will be significantly reduced and so will our ability to prevent crashes, damages, injury, and death.

**D.     WisDOT's Use of National Highway Transportation Safety Administration Funds**

29.     WisDOT also receives National Highway Transportation Safety (NHTSA) Grants related to increasing highway safety. NHSTA funds are formula funds. This program provides funding for: advertising campaigns related to impaired driving, seat belt use, and car seat use and general safety; special enforcement costs of state and local law enforcement related to traffic law enforcement and impaired driving; grants for car seat protection programs; motorcycle training and safety programs and campaigns; and WisDOT salaries for program personnel required to implement and administer the programs. For FFY 2023 WisDOT received $13,532,427 for this work. In FFY 2024 WisDOT received $12,479,485 for this work. In FFY 2025 WisDOT has been appropriated $13,956,101 for this work. Continued emphasis of highway safety saves lives. If these funds were not available, WisDOT could not reach Wisconsin residents with important

and necessary safety information and could not assist local jurisdictions with safety programs necessary for their unique circumstances.

30.     WisDOT intends to submit additional grant applications in FFY 2025.

E.     **WisDOT's Use of Federal Aviation Administration Funds**

31.     WisDOT has historically applied for and relied on grants under the Federal Aviation Administration's (FAA) Airport Improvement Program (AIP) to pay for improvements and necessary changes to its airports, including smaller airports. In FFY 2024, Wisconsin received AIP entitlements totaling $29.9 million and under the Airport Improvement Grant (AIG) program from the Infrastructure and Investment and Jobs Act (IIJA), Wisconsin received $11.3 million. Other major funding sources received in FFY 2024 included AIP and IIJA discretionary funds. Between these two sources, Wisconsin received $23.5 million in additional grants in FFY 2024.

32.     Since December 2024, WisDOT has sent in 40 grant applications totaling $44M federal funds. These project types and actions include: rehabilitating apron, acquire snow removal equipment, acquire runway closure markers, crack seal runways, replace navigational aids and rehabilitate taxi lanes at commercial service and general aviation airports. Milwaukee General Mitchell International Airport has applied for $7.5M to reconstruct taxiways and $14.3M for International Terminal Redevelopment. To date the FAA has not sent grant agreements for WisDOT signature for any of these funds. Therefore, to date, WisDOT has not received any FAA funding in FFY2025.

33.     Wisconsin airports will be less safe without these funds. When airport runways age they deteriorate making it less safe for planes to take off and land. When airport facilities do not keep up with federal requirements and design standards there could be an increase in safety concerns. For example, runway navigational aids and runway markers ensure pilots are able navigate safely.

10

34.     WisDOT intends to submit additional grant applications in FFY 2025.

**F.      WisDOT's Use of Federal Railroad Administration Funds**

35.     WisDOT has applied for and relied upon Federal Railroad Administration Funds to reduce congestion and ensure safety of its railways. In FFY 2024, WisDOT was awarded over $75 million from two grants under the FRA's Consolidated Rail Infrastructure and Safety Improvements (CRISI) Program. These funds will be used for the Muskego Freight Rail Yard Bypass Project to reconfigure existing track and yard facilities along the Canadian Pacific Kansas City Railway (CPKC) corridor in Milwaukee. The project will improve safety and efficiency for freight and respond to increased passenger demand for round-trips between Milwaukee and Chicago by the Hiawatha Service. The Hiawatha is one of the busiest Amtrak routes in the nation and in the Midwest, setting a record in 2019 of more than 880,000 passengers. The service is essential to economic growth in the region, and it provides connections to seven other Midwest regional passenger routes. The planned route change allows freight trains to bypass the Milwaukee Intermodal Station, reducing congestion and delays at the station. It will decrease the number of trains crossing busy streets in Milwaukee, to reduce traffic wait times and the lower the risk of pedestrian incidents. It will also rehabilitate the 100+ year old structure across Burnham Canal and the Menomonee Valley River to accommodate higher loading capacity and speed. The new track required for relieving the Milwaukee Intermodal Station congestion would not be built absent this grant, reducing efficiency of operations and rail crossing safety. It will also hamper regional economic growth.

33.     Wisconsin is contributing $20,899,451 amount to these projects; but requires the federal funding of $75,499,451. Wisconsin cannot make these improvements without these grants.

34.     WisDOT intends to submit additional grant applications in FFY 2025.

11

## The FFY 2025 Immigration Enforcement Requirements and its Impact on
## WisDOT's Grant Administration

35.      On April 24, 2025, WisDOT received a copy of the April 24, 2025 letter from Secretary of Transportation Sean Duffy issued  to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

36.      WisDOT has seen language related to immigration enforcement terms and conditions in several grants, including the Advanced Transportation Technology and Innovation Program and Motor Carrier Safety Assistance Program.

37.      It is not clear to me what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." I am not aware of what limits there may be—if any—to "cooperating with . . . enforcement of Federal immigration law." I am not aware of any definitions, citations, or criteria that might define what activities may be required to "cooperate" with ICE.

38.      In my years with WisDOT, I am not aware of WisDOT staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because WisDOT is responsible for duties related to transportation infrastructure and promoting safe driving, WisDOT staff has neither the expertise nor capacity to enforce immigration law.

12

39.      If WisDOT attempts to comply with the federal government's new funding condition, WisDOT would be required to monitor compliance with the new federal civil immigration enforcement condition as to all its many sub-grantees of grant awards. WisDOT currently does not have the capabilities or subject matter expertise to monitor sub-grantees' level of cooperation and coordination in civil immigration enforcement. In order to possess those capabilities, WisDOT would be required to allocate additional funds annually to hire staff to monitor these specified duties. This, in turn, may mean the diversion of funding that WisDOT would no longer have available for production activities such as planning, design, and construction for facility projects, as well as on the road safety positions for its highway patrol. If WisDOT had to meet these requirements, existing administrative staffing resources would have to be reallocated. This would seriously hinder the state's ability to deliver the current federal funded programs, which would put the states federal funding at risk.

40.      Alternatively, if WisDOT personnel themselves were required to participate in federal civil immigration enforcement, WisDOT would incur costs in trainings, the creation of procedures and guidelines, and lost personnel time diverted to those tasks to be included in "cooperating with . . . enforcement of Federal immigration law."

41.      Without access to FFY25 grant funding, WisDOT cannot commit funding for furtherance of its federally funded programs. WisDOT does not have any appropriations in its budget that account for delays and cancellations of funding, which have immediate and long-term consequences that cannot be undone. Projects such as the Blatnik Bridge Project require project planning years in advance and require advanced commitment of WisDOT staffing and resources, including hiring staff and negotiating and implementing contracts. If WisDOT cannot obtain the anticipated federal funding, this could lead to service cuts, layoffs, and cancellation of contracts and associated penalties. Consequently, any denials or cuts in expected federal funds will negatively

13

impact virtually all WisDOT operations. Any pause or termination in federal funding would devastate the state's ability to provide safe and reliable transportation solutions to its residents and visitors.

42.     Losing U.S. DOT grants would severely obstruct and undermine WisDOT's mission even if the funding were restored at a later date because any delay in funding equates to increases in project and program costs and lost opportunities for improved safety and functionality of the transportation system.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 20, 2025 in Madison, Wisconsin.


Scott James Lawry

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                        *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 53

Declaration of Dr. Tom K. Wong

## DECLARATION OF TOM K. WONG

I, Tom K. Wong, declare as follows:

1.      I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am an Associate Professor with tenure at the University of California, San Diego (UCSD). I work in the political science department, which is consistently ranked by U.S. News & World Report as one of the top ten political science departments nationally. I am the Founding Director of the U.S. Immigration Policy Center at UCSD, and I am also the Director of the Human Rights and Migration Program Minor at UCSD.

3.      I am an expert on immigration policy and I use, and have expertise in, quantitative social science research methods. I have written two peer-reviewed books and dozens of peer-reviewed journal articles, book chapters, and reports on immigration policy. For example, my most recent book, which was published by Oxford University Press (2017), analyzes 31,193 roll call votes on immigration-related legislation in Congress from 2005 to present, making it the most comprehensive analysis to date on contemporary immigration policies in the United States.

4.      I received a Ph.D. in political science at the end of the 2010-2011 academic year. I was a post-doctoral research fellow during the 2011-2012 academic year. I joined the political science department at UCSD during the 2012-2013 academic year. I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders, where I worked on the immigration portfolio, during the 2015-2016 academic year. I was promoted to the rank of Associate Professor with tenure at UCSD during the 2016-2017 academic year.

5.      I have attached a true and complete copy of my curriculum vitae as **Exhibit A** to this Declaration, which lists all of my publications over the past decade.

6.      Previously, I have testified as an expert at trial in the case of *El Cenizo*, *Texas, et al. v Texas*, No. 17-cv-404 (W.D. Tex.) and have also testified as an expert by deposition in the case of *United States of America v. California*, No. 18-cv-490 (E.D. Cal.).

7.     I was asked to evaluate: whether the statutes that limit entanglement between state and local law enforcement officials and immigration authorities are beneficial to public safety; whether statutes that limit entanglement between state and local law enforcement officials and immigration authorities benefit immigrant communities seeking out government services, including police, health, and education services; and whether trust between immigrant communities and state and local law enforcement officials would erode if States were forced to abandon these statutes.

8.     I agree that limiting entanglement between state and local law enforcement officials and immigration authorities is beneficial to public safety. I agree that limiting entanglement between state and local law enforcement officials and immigration authorities benefits immigrant communities, as individuals are more likely to seek out and use vital government services, including police, health, and education services, and because the "chilling effects" of interior immigration enforcement are far reaching and have negative implications on a wide range of help-seeking behaviors, which not only affects undocumented immigrants, but also American citizen children in mixed-status families. I also agree that trust between immigrant communities and state and local law enforcement officials would erode if States were forced to abandon their statutes that limit entanglement between state and local law enforcement officials and immigration authorities, as undocumented immigrants are less likely to trust local law enforcement officials to keep them or their families safe; keep their communities safe; protect their rights; protect their confidentiality as witnesses; and protect them from abuse or discrimination when local law enforcement officials are doing the work of federal immigration enforcement.

**Background**

9.     While there are no universally accepted definitions of what sanctuary policies are, these policies are generally understood to delimit the conditions under which local law enforcement agencies engage in the enforcement of federal immigration laws. Sanctuary policies

can, for example, restrict local law enforcement agencies from using resources for the purposes of

enforcing federal immigration law. Sanctuary policies can also restrict local law enforcement

agencies from responding to notification requests, wherein U.S. Immigration and Customs

Enforcement (ICE) issues a request to a local law enforcement agency to notify ICE of the

pending release of a suspected undocumented immigrant at least 48 hours prior to release.

Sanctuary policies can also restrict local law enforcement agencies from responding to

immigration detainers, wherein ICE issues a request to a local law enforcement agency to keep

an individual in custody for up to 48 business hours (and potentially beyond the time they would

have otherwise been released). Sanctuary policies can also delimit the conditions under which a

local law enforcement agency can transfer an individual into ICE custody. Moreover, sanctuary

policies can also delimit the conditions under which a local law enforcement agency can share

non-publicly available information about an individual with ICE when doing so is not required

by federal law.

### The Effects of Sanctuary Policies on Crime

10.    Debates over sanctuary policies tend to center on the impact that these policies have

on crime. Those who are opposed to sanctuary policies often argue that these policies increase

crime. However, there is currently no evidence that I am aware of that meets rigorous social

science research standards that shows that sanctuary policies increase crime—evidence showing

that sanctuary policies increase crime does not exist. In fact, the existing scholarly literature,

including my own work, suggests that sanctuary policies can decrease crime, thereby improving

public safety.

11.    I analyzed an ICE dataset on sanctuary jurisdictions obtained via a Freedom of

Information Act (FOIA) request. The FOIA request was filed by the Immigrant Legal Resource

Center. Using these data, I examined the relationship between sanctuary policies and a broad

range of indicators, including crime. My results were published in a report entitled, *The Effects of Sanctuary Policies on Crime and the Economy*.[1]

12.    These data show that crime is statistically significantly lower in sanctuary counties compared to comparable non-sanctuary counties. Moreover, the data show that economies are stronger in sanctuary counties compared to comparable non-sanctuary counties—from higher median household income, less poverty, and less reliance on public assistance, to higher labor force participation, higher employment-to-population ratios, and lower unemployment.

13.    The FOIA data include 2,492 counties nationwide that ICE distinguishes by their "Current Detainer/Notification Acceptance Status."[2] Of the State of California's 58 counties, 53 are characterized by ICE as not willing to accept either notification requests or detainer requests. Of these 53: one is characterized as not willing to accept notification and detainer requests; six are characterized as willing to accept detainer requests, but not notification requests; 11 are characterized as willing to accept notification requests, but not detainer requests; and 35 are characterized as "Considering, but (currently) not willing to accept (I-247N) Notifications and/or (I-247D) detainers." The FOIA data were current as of December 2016, which precedes the introduction, passage, and enactment of SB 54. Altogether, out of the 2,492 counties nationwide, 608 are sanctuary jurisdictions, meaning jurisdictions that do not accept notification or detainer requests.

14.    Data on crime come from the FBI Uniform Crime Reporting Program, and data on social and economic indicators come from the American Community Survey (ACS) 5-Year Estimates. I use coarsened exact matching (CEM) to statistically match sanctuary counties to comparable non-sanctuary counties. CEM is a method used for improving causal inferences that estimates the sample average treatment effect on the treated, or SATT. CEM statistically matches sanctuary counties to comparable non-sanctuary counties; compares differences in outcomes

---

[1] Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.
[2] These counties are home to 92 percent of the total population in the United States and 95 percent of the total foreign-born population in the United States.

between sanctuary counties and the matched non-sanctuary counties; allows us to evaluate these differences while controlling for differences in the size of the total population, the foreign-born percentage of the population, and the percentage of the population that is Hispanic/Latino; and then uses the results of the analysis to estimate the effect that being a sanctuary county has on crime and our other outcomes of interest.

15.     The table below reports the results of the CEM analysis. In the table, "SATT" indicates the sample average treatment effect on the treated and "SE" indicates the standard error of the estimate. A *p*-value of less than .05 is considered statistically significant.

|  | SATT | SE | *p*-value |
|---|---|---|---|
| Crimes Per 10,000 People | -35.5 | 5.9 | 0.000 |

16.     The data are clear: crime is lower in sanctuary counties compared to comparable non-sanctuary counties. There are 35.5 fewer crimes per 10,000 people in sanctuary counties compared to comparable non-sanctuary counties. This result is highly statistically significant (p <.001), which means that it is systematic and non-random.[3]

17.     This result was reported in the Washington Post in a January 27, 2017, article entitled, "Trump says sanctuary cities are hotbeds of crime. Data say the opposite."[4] The finding of 35.5 fewer crimes per 10,000 people in sanctuary counties compared to comparable non-sanctuary counties measures crime using both property crimes and violent crimes per the FBI Uniform Crime Reporting Program data. The *Washington Post* was also specifically interested in murders. After further analyzing the data, the data showed that there were approximately one fewer murders per 100,000 people in sanctuary counties compared to comparable non-sanctuary counties.

---

[3] Re-running the analysis using updated data on crime from the FBI Uniform Crime Reporting Program yields qualitatively similar results, wherein crime continues to be statistically significantly lower in sanctuary counties compared to comparable non-sanctuary counties.

[4] Christopher Ingraham, *Trump Says Sanctuary Cities are Hotbeds of Crime. Data Say the Opposite*, Wash. Post (Jan. 27, 2017), https://www.washingtonpost.com/news/wonk/wp/2017/01/27/trump-says-sanctuary-cities-are-hotbeds-of-crime-data-say-the-opposite/?noredirect=on

18.     Whereas my work on the effects of sanctuary policies focuses at the county level, there is other research that shows that there is no statistically significant relationship between sanctuary policies and increased crime at the city level.[5] Regarding research on the effects of sanctuary policies at the city level, former U.S. Attorney General Jeff Sessions, in remarks delivered on July 12, 2017, stated, "According to a recent study from the University of California, Riverside, cities with these policies have more violent crime on average than those that don't."[6] After learning about these remarks, I helped bring them to the attention of the authors of the University of California, Riverside study. The authors quickly penned an article in The Hill, writing, "As the lead authors of this study, we find it necessary to address this claim, since it is factually inaccurate […] Our study found no relationship between sanctuary policies and crime […] There was no statistically significant effect for these policies on property crime or violent crime."[7]

19.     There is a growing body of literature that concludes that sanctuary policies either do not increase crime or are associated with less crime. For example, one study published in 2019, of 107 city-level sanctuary policies, finds that sanctuary policies are actually associated with a modest decrease in robberies and have no effect on homicides. The authors of that study concluded, "[o]ur analyses contribute to the small but growing body of research on the sanctuary-crime nexus and find no evidence to support the assertion that the adoption of sanctuary policies fosters city-level violence in a systematic way."[8]

---

[5]Benjamin Gonzalez O'Brien, Loren Collingwood & Stephen Omar El-Khatib. *The politics of refuge: Sanctuary cities, crime, and undocumented immigration*, Urban Affairs Rev. Vol. 55(1) (2017).

[6] Jeff Sessions, U.S. Att'y Gen., Delivers Remarks in Las Vegas to Federal, State and Local Law Enforcement About Sanctuary Cities and Efforts to Combat Violent Crime (July 12, 2017) (transcript available at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-las-vegas-federal-state-and-local-law).

[7] Benjamin Gonzalez O'Brien & Loren Collingwood, Opinion, *How Conservative Media and Jeff Sessions Got it Wrong on Sanctuary Cities*, The Hill (July 14, 2017), http://thehill.com/blogs/pundits-blog/immigration/342043-how-conservative-media-and-jeff-sessions-got-it-wrong-on.

[8] Ricardo D. Martínez-Schuldt & Daniel E. Martínez. *Sanctuary Policies and City-level Incidents of Violence, 1990 to 2010*, Just. Q. Vol. 36, No. 4 at 567-593 (2019).

20.     Another study published in 2020, of 140 county-level sanctuary policies, finds that the estimated effect of sanctuary policies on property crime and on violent crime are statistically indistinguishable from zero. This means that sanctuary policies have no detectable effect on property crime or on violent crime. Moreover, this study also examined clearance rates, meaning the rates at which police arrest people for reported crimes. The estimated effect of sanctuary policies on clearance rates was also statistically indistinguishable from zero. This led the author to conclude, "[l]ike those previous studies, I find no evidence of significant effects of sanctuary on crime."[9]

21.     A 2021 study of 42 city-level sanctuary policies in cities with populations of at least 100,000 reached similarly clear conclusions. The study concludes, there is "no evidence that sanctuary policies cause an increase in any crime" and there is "some evidence that they may lead to a decrease in property crime, and the effect is strengthened over time after the adoption [of the sanctuary policy]."[10]

22.     More recently, a study published in 2022 using a county-level dataset finds that sanctuary policies are associated with fewer property crimes and fewer violent crimes. The study finds that there is no statistically significant relationship between sanctuary policies and crime in the first decade of the 2000s. However, after the proliferation of sanctuary policies around 2014, "both property crime and violent crime decreased more in sanctuary counties than non-sanctuary counties, net of other predictors of crime."[11] Another study published in 2022, which also uses a county-level dataset, similarly finds that counties that adopted sanctuary policies in 2014 experienced a decrease in crime. More specifically, counties that adopted sanctuary policies in 2014 experienced a decrease of 17.9 violent crimes per 100,000 people per year compared to non-sanctuary counties. The authors extrapolate this result and put it in economic terms.

---

[9] David K. Hausman, *Sanctuary Policies Reduce Deportations without Increasing Crime*, Proceedings of the National Academy of Sciences Vol. 117, No. 44 at 27262-27267 (2020).
[10] Yuki Otsu, *Sanctuary Cities and Crime*, J. of Econ. Behav. & Org. Vol. 192 at 600-615 (2021).
[11] Marta Ascheriom. *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-level Investigation in the United States*, Soc. Sci. Research Vol. 106 (2022).

According to the authors, this result implies that "sanctuary policies avoid $101 million per year in crime costs."[12]

### The Effects of Sanctuary Policies on the Economy

23.    In addition to crime, my research has examined sanctuary policies' impacts on a range of social and economic indicators, which are reported in the table below.[13]

|  | SATT | SE | *p*-value |
|---|---|---|---|
| Median Household Income | 4352.7 | 575.1 | 0.000 |
| Median Household Income—White, non-Latino | 2836.1 | 568.3 | 0.000 |
| Median Household Income—Latino | 1328.9 | 736.4 | 0.000 |
| Poverty | -2.337 | 0.306 | 0.000 |
| Poverty—White, non-Latino | -1.361 | 0.222 | 0.000 |
| Poverty—Latino | -2.966 | 0.721 | 0.000 |
| Food Stamps/SNAP | -2.559 | 0.296 | 0.000 |
| SSI | -0.879 | 0.127 | 0.000 |
| Children Under 18 in Households w/Public Assistance | -4.967 | 0.548 | 0.000 |
| Labor Force Participation | 2.456 | 0.345 | 0.000 |
| Labor Force Participation—White, non-Latino | 2.546 | 0.339 | 0.000 |
| Labor Force Participation—Latino | 1.241 | 0.741 | 0.094 |
| Employment-to-Population Ratio | 3.103 | 0.369 | 0.000 |
| Employment-to-Population Ratio—White, non-Latino | 3.165 | 0.359 | 0.000 |
| Employment-to-Population Ratio—Latino | 0.939 | 0.733 | 0.200 |
| Unemployment | -1.056 | 0.159 | 0.000 |
| Unemployment—White, non-Latino | -0.829 | 0.129 | 0.000 |
| Unemployment—Latino | 1.015 | 0.425 | 0.017 |

---

[12] Dale T. Manning & Jesse Burkhardt, *The Local Effects of Federal Law Enforcement Policies: Evidence from Sanctuary Jurisdictions and Crime*, *Contemp. Econ. Pol'y* Vol. 40, No. 3 at 423-438 (2022).
[13] *See* Wong, *supra*, note 1.

24.    Median household income is approximately $4,353 higher in sanctuary counties compared to comparable non-sanctuary counties. This result is highly statistically significant (*p* <.001). Median household income for White, non-Hispanic/Latino households is also statistically significantly higher in sanctuary counties compared to comparable non-sanctuary counties. Median household income for Hispanic/Latino households is also statistically significantly higher in sanctuary counties compared to comparable non-sanctuary counties.

25.    The poverty rate is approximately 2.3 percent lower in sanctuary counties compared to comparable non-sanctuary counties. This result is highly statistically significant (*p* <.001). The poverty rate for White, non-Hispanics/Latinos is also statistically significantly lower in sanctuary counties compared to comparable non-sanctuary counties. The poverty rate for Hispanics/Latinos is also statistically significantly lower in sanctuary counties compared to comparable non-sanctuary counties.

25.    Public benefits usage is also lower in sanctuary counties compared to comparable non-sanctuary counties. Supplemental Nutrition Assistance Program (SNAP) usage is approximately 2.6 percent lower in sanctuary counties compared to comparable non-sanctuary counties. This result is highly statistically significant (*p* < .001). Supplemental Security Income (SSI) usage is approximately 0.9 percent lower in sanctuary counties compared to comparable non-sanctuary counties. This result is highly statistically significant (*p* < .001). Moreover, the percentage of children under 18 in households with public assistance is approximately 4.9 percent lower in sanctuary counties compared to comparable non-sanctuary counties. This result is highly statistically significant (*p* < .001).

26.    Labor force participation is approximately 2.5 percent higher in sanctuary counties compared to comparable non-sanctuary counties. This result is highly statistically significant (*p* <.001). Labor force participation is calculated by dividing the number of people who are employed or who are currently looking for work by the working-age population (16 or older). Labor force participation among White, non-Hispanics/Latinos is also statistically significantly higher in sanctuary counties compared to comparable non-sanctuary counties. While labor force

participation among Hispanics/Latinos is, on average, higher in sanctuary counties compared to comparable non-sanctuary counties, this result is not statistically significant ($p$ = .094).

28.    The employment-to-population ratio is approximately 3.1 percent higher in sanctuary counties compared to comparable non-sanctuary counties. This result is highly statistically significant ($p$ < .001). The employment-to-population ratio is calculated by dividing the number of people in the labor force who are employed by the working-age population. The employment-to-population ratio among White, non-Hispanics/Latinos is also statistically significantly higher in sanctuary counties compared to comparable non-sanctuary counties. While the employment-to-population ratio among Hispanics/Latinos is, on average, higher in sanctuary counties compared to comparable non-sanctuary counties, this result is not statistically significant ($p$ = .200).

27.    Unemployment is approximately 1.1 percent lower in sanctuary counties compared to comparable non-sanctuary counties. This result is highly statistically significant (p < .001).

28.    Unemployment is the percentage of those who are in the labor force, but who are currently not employed. Unemployment among White, non-Hispanics/Latinos is also statistically significantly lower in sanctuary counties compared to comparable non-sanctuary counties. However, unemployment among Hispanics/Latinos is higher in sanctuary counties compared to comparable non-sanctuary counties, this result is not statistically significant (p = .017).

29.    Altogether, the data indicate that:

•    Crime is statistically significantly lower in sanctuary counties compared to comparable non-sanctuary counties;

•    Those who are opposed to sanctuary policies continue to argue that these policies increase crime; however, evidence showing that sanctuary policies increase crime does not exist;

•    It is important to note that there is also no clear evidence that shows that crime is lower when local law enforcement officials are doing the work of federal immigration

enforcement[14];

- Local economies—from higher median household income, less poverty, and less reliance on public assistance, to higher labor force participation, higher employment-to-population ratios, and lower unemployment—are stronger in sanctuary counties compared to comparable non-sanctuary counties.

### The "Chilling Effects" of Interior Immigration Enforcement

30.    In a 2019 resolution, the International Association of Chiefs of Police (IACP) stated that "law enforcement executives recognize that criminal enforcement of immigration law could have a chilling effect on community cooperation in reporting crime or assisting in criminal investigation" and thus recommended that non-federal enforcement of criminal violations related to immigration law be left to local, state, and tribal police executives in collaboration with elected officials, community leaders and the citizens they serve.[15]

31.    In 2017, the Major Cities Chiefs Association (MCCA), a professional association that includes many of the largest LEAs in the United States, concluded: "Enforcement of routine civil immigration by police would undermine the trust and cooperation with immigrant communities which are essential elements of community oriented policing."[16]

32.    Recent research provides evidence of the "chilling effects" described by the IACP and MCCA.

33.    I conducted a representative survey of undocumented Mexican nationals in San Diego County.[17] The survey was fielded between September 2017 and November 2017 and

---

[14] Thomas J. Miles & Adam B. Cox, *Does Immigration Enforcement Reduce Crime? Evidence from Secure Communities*, The J. of L. and Econ. Vol. 57, No. 4 at 937-973 (2014). *See also* Elina Treyger, Aaron Chalfin & Charles Loeffler, *Immigration Enforcement, Policing, and Crime*, Criminology & Pub. Pol'y Vol. 13, No. 2 at 285-322 (2014).

[15] International Association of Chiefs of Police, *Immigration Enforcement to Counter Criminal Elements in Society* (2019), https://www.theiacp.org/resources/resolution/immigration-enforcement-to-counter-criminal-elements-in-society.

[16] Major Cities Chiefs Association, *Immigration Policy* (2017), https://majorcitieschiefs.com/wp-content/uploads/2024/11/Revised-2017-Immigration-Policy.pdf.

[17] A survey is considered representative if the survey sample accurately reflects the larger population of interest. Representativeness results when the survey sample is randomly selected from the larger population of (Continued)

includes 594 respondents. In the survey, I embedded an experiment in order to better understand how interior immigration enforcement impacts undocumented immigrants.

34.    In the experiment, respondents were randomly assigned to one of two groups. In one group (n = 298 respondents), questions were prefaced with, "If the San Diego Police Department and the San Diego County Sheriff's Department said they WILL NOT WORK WITH ICE on deportation raids, would you be more or less likely to…" In the second group (n = 296 respondents), questions were prefaced with, "If the San Diego Police Department and the San Diego County Sheriff's Department WERE WORKING TOGETHER WITH ICE on deportation raids, would you be more or less likely to…"

35.    An experiment such as this is superior to analyzing observational survey data (i.e., survey data that is not based on an experimental design) because asking respondents about one scenario is insufficient for determining how their behavior may or may not change based on the second scenario; asking respondents about one scenario and then the second scenario would likely produce biased results because responses related to the first scenario would likely influence responses to the second scenario (e.g., "I said I would do this in the first scenario, so maybe I should say I wouldn't do that in the second scenario"); random assignment to one of the two groups balances the two groups across the broad range of covariates (e.g., age, gender, etc.) that need to be controlled for in observational analysis; and random assignment to one of the two groups means that differences in responses can be casually attributed to the variation in the two scenarios (i.e., the treatment effect that results when local law enforcement officials are doing the work of federal immigration enforcement).

36.    Respondents were asked about reporting a crime they witnessed to the police; reporting a crime they were a victim of to the police; using public services that require them to disclose their personal contact information; doing business that requires them to disclose their

interest so that each respondent has an equal probability of selection. This requires creating a sample frame (i.e., enumerating the larger population of interest). The sample frame from which respondents were randomly selected includes approximately 73,000 undocumented Mexican nationals in San Diego County.

personal contact information; participating in public events where police may be present; placing their children in after-school or day-care programs (among those with children); and looking for a new job. The table below provides the exact text.

| If the San Diego Police Department and the San Diego County Sheriff's Department [said THEY WILL NOT WORK WITH ICE] / [WERE WORKING TOGETHER WITH ICE] on deportation raids, would you be more or less likely to… |
|---|
| Report a crime that you witnessed to the police? |
| Report a crime that you were a victim of to the police? |
| Use public services (e.g., go to City Hall) that required you to give your personal contact information? |
| Do business (e.g., open a bank account, get a loan) that required you to give your personal contact information? |
| Participate in public events where police may be present? |
| Place your children in an after-school or day-care program? |
| Look for a new job? |

37.    If local law enforcement officials "WERE WORKING TOGETHER WITH ICE" to do the work of federal immigration enforcement, 60.8 percent of undocumented immigrants are *less likely* to report a crime they witnessed to police ($p < .001$) and 42.9 percent are less likely to report being a victim of a crime to police ($p < .001$).

38.    If local law enforcement officials say "THEY WILL NOT WORK WITH ICE" to do the work of federal immigration enforcement, 71.8 percent are more likely to report a crime they witnessed to police ($p < .001$) and 70.8 percent are more likely to report being a victim of a crime to police ($p < .001$).

39.    These results appeared in the *Washington Post* in an April 27, 2018, article entitled, "Sanctuary cities don't 'breed crime.' They encourage people to report crime."[18]

40.    These results are consistent with the IACP and MCCA positions described above. They are also consistent with previous research that shows that undocumented women who are

---

[18] Tom K. Wong, *Sanctuary Cities Don't 'Breed Crime.' They Encourage People to Report Crime*, Wash. Post, (Apr. 24, 2018), https://www.washingtonpost.com/news/monkey-cage/wp/2018/04/24/sanctuary-cities-dont-breed-crime-they-encourage-people-to-report-crime/.

victims of violent crimes[19] and undocumented women who are victims of sexual assault or domestic violence[20] are less likely to report crimes if law enforcement officials are also doing the work of federal immigration enforcement.

41.    Moreover, if local law enforcement officials "WERE WORKING TOGETHER WITH ICE" to do the work of federal immigration enforcement: 69.9 percent are *less likely* to "Use public services (e.g., go to City Hall) that required you to give your personal contact information"; 63.9 percent are *less likely* to "Do business (e.g., open a bank account, get a loan) that required you to give your personal contact information"; 68.3 percent are *less likely* to "Participate in public events where policy may be present"; 42.9 percent are *less likely* to "Place your children in an after-school or day-care program" (among those with children); and 52.1 percent are *less likely* to "Look for a new job."

42.    These results are also consistent with a growing number of studies on how interior immigration enforcement impacts undocumented immigrants. Several of these studies examine the impact of state-level laws. For example, research on the State of California's Proposition 187, which was passed in 1994, showed that tuberculosis patients who feared that going to a physician would result in an immigration enforcement action were four times more likely to delay seeking care.[21] Research on the State of Arizona's SB 1070 showed that Mexican-origin adolescent mothers were less likely to take their babies to the doctor following the passage of the law in 2010[22] and that SB 1070 negatively affected health-seeking behaviors among

---

[19] Jill Theresa Messing, David Becerra, Allison Ward-Lasher & David K. Androff, *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System* Affilia Vol. 30, No. 3 at 328-340 (2015).

[20] Radha Vishnuvajjala, *Insecure Communities: How an Immigration Enforcement Program Encourages Battered Women to Stay Silent* B.C. J. of L. & Soc. Just. Vol. 32, No. 1 (2011).

[21] Steven Asch, Barbara Leake & Lillian Gelberg, *Does Fear of Immigration Authorities Deter Tuberculosis Patients from Seeking Care?* W. J. of Med. Vol. 161, No. 4 at 373 (1994)..

[22] Russell B. Toomey, Adriana J. Umaña-Taylor, David R. Williams, Elizabeth Harvey-Mendoza, Laudan B. Jahromi & Kimberly A. Updegraff, *Impact of Arizona's SB 1070 Immigration Law on Utilization of Health Care and Public Assistance Among Mexican-origin Adolescent Mothers and their Mother Figures*, Am. J. of Pub. Health Vol. 104, No. S1 at S28-S34 (2014).

Hispanics/Latinos by increasing fear, decreasing resident's mobility, and by decreasing trust in public institutions.[23]

43.    Similarly, research on the State of Alabama's HB 56 showed a decline in the use of county public health services among undocumented immigrants in the wake of the passage of the law in 2011, including services for communicable diseases and sexually transmitted infections, even though the utilization of these services was allowed under the law.[24]

44.    Other studies have examined the impact of local policies, such as the 287(g) program. For example, a study of the public health effects of the local implementation of the 287(g) program found that Hispanic/Latino expectant mothers sought prenatal care later during pregnancy, and with lower quality care, than non-Hispanic/Latino expectant mothers.[25]

45.    More generally, research has shown how fear of separation due to deportation can have far-reaching and negative implications not only on undocumented immigrants, but also on American citizen children in mixed-status families. As it relates to health, research has shown that fear of deportation decreases Medicaid use among the eligible American citizen children of noncitizen parents.[26] As it relates to education, research has shown that children in mixed-status families face greater barriers to educational success[27]; that the American citizen children of undocumented parents often share the risks and limitations associated with undocumented

---

[23] Lisa J. Hardy, Christina M. Getrich, Julio C. Quezada, Amanda Guay, Raymond J. Michalowski & Eric Henley, *A Call for Further Research on the Impact of State-level Immigration Policies on Public Health,* Am. J. of Pu. Health Vol. 102, No. 7 at 1250-1253 (2012).

[24] Kari White, Justin Blackburn, Bryn Manzella, Elisabeth Welty & Nir Menachemi *Changes in Use of County Public Health Services Following Implementation of Alabama's Immigration Law,* J. of Health Care for the Poor & Underserved Vol. 25, No. 4 at 1844-1852 (2014).

[25] Scott D. Rhodes, et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States.*" Am. J. of Pub. Health V. 105, No. 2 at 329-337 (2015).

[26] Edward D. Vargas, *Immigration Enforcement and Mixed-status Families: The Effects of Risk of Deportation on Medicaid Use*, Child. & Youth Services Rev. Vol. 57 at 83-89 (2015).

[27] Susan Mapp & Emily Hornung, *Irregular Immigration Status Impacts for Children in the USA*, J. of Hum. Rts. & Soc. Work Vol. 1, No. 2 at 61-70 (2016).

immigration status[28]; and that the stress caused by immigration raids can sap the attention of students and thus affect their academic performance.[29]

46.    I conducted another survey experiment in order to better understand how entanglement with federal immigration enforcement officials impacts the trust that undocumented immigrants have in local law enforcement officials.[30] In the experiment, respondents were randomly assigned to one of two groups. In one group (n = 83 respondents), questions were prefaced with, "If the San Diego Police Department and the San Diego County Sheriff's Department WERE NOT WORKING TOGETHER WITH ICE on immigration enforcement, how much trust would you have that police officers and sheriffs would…" In the second group (n = 73 respondents), questions were prefaced with, "If the San Diego Police Department and the San Diego County Sheriff's Department WERE WORKING TOGETHER WITH ICE on immigration enforcement, how much trust would you have that police officers and sheriffs would…"

47.    Reiterating the discussion above, an experiment such as this is superior to analyzing observational survey data (i.e., survey data that is not based on an experimental design) because asking respondents about one scenario is insufficient for determining how their attitudes may or may not change based on the second scenario; asking respondents about one scenario and then the second scenario would likely produce biased results because responses related to the first

---

[28] Laura E. Enriquez, *Multigenerational Punishment: Shared Experiences of Undocumented Immigration Status Within Mixed-Status Families*, J. of Marriage & Fam. Vol. 77, No. 4 at 939-953 (2015).

[29] Randy Capps, Rosa Maria Castaneda, Ajay Chaudry & Robert Santos, *Paying the Price: The Impact of Immigration Raids on America's Children*, The Urban Inst. at 48 (2007), https://www.urban.org/sites/default/files/publication/46811/411566-Paying-the-Price-The-Impact-of-Immigration-Raids-on-America-s-Children.PDF.

[30] I note here that a total n of 156 respondents does not lead to statistically underpowered results given the large effect sizes. In determining the appropriate sample size for a study, it is standard to aim for .80 power, which means an 80 percent chance of determining an effect with 95 percent confidence; in other words, in determining sample size, it is standard to ask how many respondents are needed to give the study an 80 percent chance of determining a statistically significant result. The result for "Keep you and your family safe" has .97 power, which is higher than the standard .80 power. The result for "Keep your community safe" has .84 power. The result for "Protect the rights of all people, including undocumented immigrants, equally" has .96 power. The result for "Protect the confidentiality of witnesses to crime even if they were undocumented" has .99 power. The result for "Protect undocumented immigrants from abuse or discrimination" has .97 power.

scenario would likely influence responses to the second scenario (e.g., "I said I would trust in the first scenario, so maybe I should say I wouldn't trust in the second scenario"); random assignment to one of the two groups balances the two groups across the broad range of covariates (e.g., age, gender, etc.) that need to be controlled for in observational analysis; and random assignment to one of the two groups means that differences in responses can be casually attributed to the variation in the two scenarios (i.e., the treatment effect that results when local law enforcement officials are doing the work of federal immigration enforcement).

48.    Respondents were asked how much trust they would have that police officers and sheriffs would keep them and their families safe; keep their communities safe; protect the rights of all people, including undocumented immigrants; protect the confidentiality of witnesses to crimes even if they were undocumented; and protect undocumented immigrants from abuse or discrimination. The table below provides the exact text.

| If the San Diego Police Department and the San Diego County Sheriff's Department WERE [NOT] WORKING TOGETHER WITH ICE on immigration enforcement, how much trust would you have that police officers and sheriffs would… |
|---|
| Keep you and your family safe? Keep your community safe? Protect the rights of all people, including undocumented immigrants, equally? Protect the confidentiality of witnesses to crimes even if they were undocumented? Protect undocumented immigrants from abuse or discrimination? |

49.    If local law enforcement officials "WERE WORKING TOGETHER WITH ICE," 26.6 percent of undocumented immigrants are *less likely* to trust "a great deal" or "a lot" that police officers and sheriffs would keep them and their families safe ($p < .001$) and 22.9 percent are *less likely* to trust "a great deal" or "a lot" that police officers and sheriffs would keep their communities safe ($p = .002$). The data also shows that just 9.6 percent of undocumented immigrants trust "a great deal" or "a lot" that police officers and sheriffs would keep them and

their families safe if local law enforcement officials are doing the work of federal immigration enforcement and just 19.2 percent of undocumented immigrants trust "a great deal" or "a lot" that police officers and sheriffs would keep their communities safe if local law enforcement officials are doing the work of federal immigration enforcement.

50.     If local law enforcement officials "WERE WORKING TOGETHER WITH ICE," 25.4 percent of undocumented immigrants are *less likely* to trust "a great deal" or "a lot" that police officers and sheriffs would protect the rights of all people, including undocumented immigrants, equally ($p < .001$), 28.3 percent are *less likely* to trust "a great deal" or "a lot" that police officers and sheriffs would protect the confidentiality of witnesses to crimes even if they were undocumented ($p < .001$), and 24.6 percent are *less likely* to trust "a great deal" or "a lot" that police officers and sheriffs would protect undocumented immigrants from abuse or discrimination ($p < .001$). The data also shows that just 9.6 percent of undocumented immigrants trust "a great deal" or "a lot" that police officers and sheriffs would protect the rights of all people, including undocumented immigrants, equally if local law enforcement officials are doing the work of federal immigration enforcement and just 5.5 percent of undocumented immigrants trust "a great deal" or "a lot" that police officers and sheriffs would protect the confidentiality of witnesses to crimes even if they were undocumented or would protect undocumented immigrants from abuse or discrimination if local law enforcement officials are doing the work of federal immigration enforcement.

51.     Altogether, the data indicate that:

- When local law enforcement officials are doing the work of federal immigration enforcement, undocumented immigrants are *less likely* to report crimes to the police, even when they are victims;

- The chilling effects that result when local law enforcement officials are doing the work of federal immigration enforcement are far reaching: 69.9 percent are *less likely* to "Use public services (e.g., go to City Hall) that

required you to give your personal contact information"; 63.9 percent are

*less likely* to "Do business (e.g., open a bank account, get a loan) that

required you to give your personal contact information"; 68.3 percent are

*less likely* to "Participate in public events where policy may be present"; 42.9

percent are *less likely* to "Place your children in an after-school or day-care

program" (among those with children); and 52.1 percent are *less likely* to

"Look for a new job;

- A growing body of evidence makes clear that interior immigration enforcement

  has negative implications on a wide range of help-seeking behaviors—for

  example, inhibiting access to critical health services—which not only affects

  undocumented immigrants, but also affects American citizen children in

  mixed-status families; and

- When local law enforcement officials are doing the work of federal

  immigration enforcement, undocumented immigrants are *less likely* to trust

  local law enforcement to keep them safe and their families safe, keep their

  communities safe, protect their rights, protect their confidentiality as

  witnesses, and protect them from abuse or discrimination.

52.    A 2021 study reinforces these main results. Using the National Crime

Victimization Survey, which is a nationally representative survey of U.S. households that

includes information on the crime victimization experiences of household members who

are at least 12 years old, and data on sanctuary policies at the Metropolitan Statistical

Area (MSA) level, the authors show "Our analyses of more than 35,000 incidents of

violent crime and 130,000 incidents of property crime across 40 MSAs and over 25 years

find that Latinos have a higher probability (by 12 percentage points) of reporting violent

crime victimization to law enforcement after a sanctuary policy is adopted within their MSA of residence."[31]

53.    A 2022 study also finds that the adoption of sanctuary policies leads to a decrease of 0.012 homicides per 100,000 people among Hispanic women, which is a 62 percent decrease in the homicide rate when compared to prior to the implementation of sanctuary policies. The authors attribute this result to greater domestic violence crime reporting among Hispanic women in sanctuary localities and conclude, "sanctuary policies appear effective in offering Hispanic women a true sanctuary against domestic violence."[32]

### Conclusion

54.    There is no clear evidence to suggest that sanctuary policies "breed crime" (or that crime is lower when local law enforcement officials are doing the work of federal immigration enforcement).

55.    Instead, the data show that crime—and violent crime, in particular—is lower in sanctuary counties compared to comparable non-sanctuary counties.

56.    Moreover, local economies are also stronger in sanctuary counties compared to comparable non-sanctuary counties—from higher median household income, less poverty, and less reliance on public assistance, to higher labor force participation, higher employment-to-population ratios, and lower unemployment.

57.    Also, when local law enforcement officials are not doing the work of federal immigration enforcement, undocumented immigrants are *more likely* to report crimes they witness, as well as crimes they are victims of, to police.

---

[31] Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, Am. Socio. Rev. Vol. 86, No. 1 at 154-185 (2021).
[32] Catalina Amuedo-Dorantes & Monica Deza, *Can Sanctuary Policies Reduce Domestic Violence?* Am. L. & Econ. Rev. Vol. 24, No. 1 at 116-170 (2022).

58.     This affirms the position of the IACP and the MCCA: when undocumented immigrants feel secure enough to cooperate with law enforcement, it makes it easier for law enforcement officers to do their jobs.

59.     When local law enforcement officials are doing the work of federal immigration enforcement, undocumented immigrants are *less likely* to use public services that require them to disclose their personal contact information, *less likely* to participate in public events where police may be present, *less likely* to place their children in after-school or day-care programs, and *less likely* to look for a new job.

60.     This affirms a growing body of evidence that makes clear that the chilling effects of interior immigration enforcement are far reaching and have negative implications on a wide range of help-seeking behaviors, which not only affects undocumented immigrants, but also affects American citizen children in mixed-status families.

61.     When local law enforcement officials are doing the work of federal immigration enforcement, undocumented immigrants are *less likely* to trust that police officers and sheriffs will keep them and their families safe, keep their communities safe, protect their rights, protect their confidentiality as witnesses, and protect them from abuse or discrimination.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on 5/14/25 in San Diego, California.

Tom K. Wong

# EXHIBIT A

# TOM K. WONG, PH.D.

Email: tomkwong@ucsd.edu | Cell: (951) 907-9989

## APPOINTMENTS

**2019 -**  **DIRECTOR, U.S. IMMIGRATION POLICY CENTER (USIPC)**
University of California, San Diego

**2018 - 2021**  **APPOINTED MEMBER (GUBERNATORIAL APPOINTMENT)**
**STATE OF CALIFORNIA CENSUS COMPLETE COUNT COMMITTEE**

**2017 -**  **ASSOCIATE PROFESSOR (W/TENURE), POLITICAL SCIENCE**
University of California, San Diego

**2016**  **ADVISOR, IMMIGRATION PORTFOLIO**
**WHITE HOUSE INITIATIVE ON ASIAN AMERICANS AND PACIFIC ISLANDERS**

**2016 -**  **SENIOR FELLOW**
**CENTER FOR AMERICAN PROGRESS**

**2013 -**  **DIRECTOR, INTERNATIONAL MIGRATION STUDIES PROGRAM MINOR**
**CO-DIRECTOR, HUMAN RIGHTS AND MIGRATION PROGRAM MINOR**
University of California, San Diego

**2012 - 2017**  **ASSISTANT PROFESSOR, POLITICAL SCIENCE**
University of California, San Diego

## EDUCATION

**2011**  **PH.D. IN POLITICAL SCIENCE**
University of California, Riverside

**2005**  **B.A. IN POLITICAL SCIENCE**
University of California, Riverside
*Magna Cum Laude*

## BOOKS

(2) Tom K. Wong. 2017. *The Politics of Immigration: Partisanship, Changing Demographics, and American National Identity.*
Oxford University Press.
NPR, ABC News/Yahoo.com, LA Times, Univision, Monkey Cage

(1) Tom K. Wong. 2015. *Rights, Deportation, and Detention in the Age of Immigration Control.* Stanford University Press.

## JOURNAL ARTICLES

(11) Tom K. Wong and Karina Shklyan. 2024. "The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants," *Journal of Race, Ethnicity, and Politics.* [Research Design: TKW; Analysis: TKW; Literature Review: TKW, KS]

(10) Tom K. Wong, Andrea Silva, and Karina Shklyan. 2022. "The Effect of Intergovernmental Policy Conflict on Immigrants' Behavior: Evidence from a Survey Experiment in California," *Publius* vol. 52 no. 1: 107-132. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, AS, KS]

(9) Tom K. Wong, S. Deborah Kang, Carolina Valdivia, Josefina Espino, Michelle Gonzalez, and Elia Peralta. 2021. "How Interior Immigration Enforcement Affects Trust in Law Enforcement," *Perspectives on Politics* vol. 19 no. 2: 357-370. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, SDK, CV, JE, MG, EP]

(8) Justin Gest, Ian M. Keysil, and Tom K. Wong. 2019. "Protecting and Benchmarking Migrants' Rights: An Analysis of the Global Compact for Safe, Orderly and Regular Migration," *International Migration* https://doi.org/10.1111/imig.12635 [Equal contributions from all authors]

(7) Tom K. Wong, Angela Garcia, and Carolina Valdivia. 2018. "The Political Incorporation of Undocumented Youth," *Social Problems* vol. 66 no. 3: 356-372. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, AG, CV]

(6) Tom K. Wong and Hillary Kosnac. 2017. "Does the Legalization of Undocumented Immigrants in the US Encourage Unauthorized Immigration from Mexico? An Empirical Analysis of the Moral Hazard of Legalization," *International Migration* vol. 55 no. 2: 159-173. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, HK]

(5) Tom K. Wong and Angela Garcia. 2016. "Does Where I Live Affect Whether I Apply? The Contextual Determinants of Applying for Deferred Action for Childhood Arrivals (DACA)," *International Migration Review* vol. 50 no. 3: 699-727. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, AG] C-Span, Associated Press

(4) Tom K. Wong, Donald Kerwin, Jeanne M. Atkinson, and Mary Meg McCarthy. 2014. "Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey," *Journal of Migration and Human Security* vol. 2 no 4: 287-304. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, DW, JMA, MMM] NBC News.com

(3) Tom K. Wong. 2014. "The Politics of Interior Immigration Enforcement," *California Journal of Politics and Policy* vol. 6 no 3: 381-399.

(2) Tom K. Wong and Justin Gest. 2013. "Organizing Disorder: Indexing Migrants' Rights and International Migration Policy," *Georgetown Immigration Law Journal* vol. 28 no 1: 257-269. [Equal contributions from all authors]

(1) Tom K. Wong. 2012. "The Politics of Interior Immigration Control in the United States: Explaining Local Cooperation with Federal Immigration Authorities," *Journal of Ethnic and Migration Studies* vol. 38 no. 5: 737-756.

## POLICY REPORTS

(23) Tom K. Wong. 2024. *Expanded Legal Pathways to Enter the U.S. Reduce Irregular Migration*. Washington D.C.: Center for American Progress.

(22) Tom K. Wong. 2023. *Lives in Danger: Seeking Asylum Against the Backdrop of Increased Border Enforcement*. La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego.

(21) Tom K. Wong, Maya Lu, and Lily Amirjavadi. 2022. *New American Voters 2022: Harnessing the Power of Naturalized Citizens*. Chicago, IL and La Jolla, CA: National Partnership for New Americans (NPNA) and U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW, ML, LA; Literature Review: TKW]

(20) Tom K. Wong, et al. 2022. *Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship*. Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(19) Tom K. Wong, et al. 2020. *Do TPS Designations Increase Irregular Migration to the United States?* Washington, D.C.: Center for American Progress.

(18) Tom K. Wong, et al. 2020. *Nepali TPS Holders Make Significant Contributions to America*. Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(17) Tom K. Wong et al. 2020. *Amid Changes to the DACA Program and COVID-19, DACA Recipients are Fired Up and Civically Engaged*. Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(16) Tom K. Wong. 2020. *COVID-19 and the Remaking of U.S. Immigration Policy? Empirically Evaluating the Myth of Immigration and Disease*. La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego

(15) Tom K. Wong et al. 2019. *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November*. Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(14) Tom K. Wong and Vanessa Ceceña. 2019. *Seeking Asylum: Part 2*. La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW]

(13) Tom K. Wong, Sebastian Bonilla, and Anna Coleman. 2019. *Seeking Asylum: Part 1*. La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW]

(12) Tom K. Wong, Jeremiah Cha, and Erika Villareal-Garcia. 2019. *The Impact of Changes to the Public Charge Rule on Undocumented Immigrants Living in the U.S.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, JC]

(11) Tom K. Wong, et al. 2019. *Deterrence, Displacement, and Death: The Impact of the Border Wall on Undocumented Immigration*. La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(10) Tom K. Wong, et al. 2019. *Fractured Federalism: How Dissonant Immigration Enforcement Policies Affect Undocumented Immigrants*. La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(9) Tom K. Wong, et al. 2019. *How Interior Immigration Enforcement Affects Trust in Law Enforcement* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(8) Tom K. Wong. 2018. *Do Family Separation and Detention Deter Immigration?* Washington, D.C.: Center for American Progress.

(7) Tom K. Wong et al. 2018. *Amid Legal and Political Uncertainty DACA Remains More Important Than Ever.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(6) Tom K. Wong et al. 2017. *DACA Recipients' Economic and Educational Gains Continue to Grow.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(5) Tom K. Wong. 2017. *The Effects of Sanctuary Policies on Crime and the Economy.* Washington, D.C.: Center for American Progress.

(4) Tom K. Wong et al. 2016. *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(3) Tom K. Wong et al. 2015. *Results from a Nationwide Survey of DACA Recipients Illustrate the Program's Impact.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(2) Tom K. Wong. 2014. *Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border.* Washington, D.C.: Center for American Progress.

(1) Tom K. Wong. 2013. *Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals (DACA).* Washington, D.C.: Center for American Progress.

## BOOK CHAPTERS

(5) James Hollifield and Tom K. Wong. 2022. "The Politics of International Migration." In *Migration Theory: Talking Across Disciplines* (4th edition), edited by Caroline B. Brettell and James F. Hollifield. Routledge.

(4) Tom K. Wong. 2014. "Conceptual Challenges and Contemporary Trends in Immigration Control." In *Controlling Immigration: A Global Perspective* (3rd edition), edited by James F. Hollifield, Philip Martin, and Pia Orrenius. Stanford University Press.

(3) Tom K. Wong. 2014. "Nation of Immigrants or Deportation Nation? Analyzing Deportations and Returns in the United States, 1892-2010." In *The Nation and Its Peoples: Citizens, Denizens, and Migrants*, edited by John S.W. Park and Shannon Gleeson. Routledge.

(2) James F. Hollifield and Tom K. Wong. 2014. "The Politics of International Migration: How Can We 'Bring the State Back In'?" In *Migration Theory: Talking Across Disciplines* (3rd edition), edited by Caroline B. Brettell and James F. Hollifield. Routledge.

(1) Karthick Ramakrishnan and Tom K. Wong. 2010. "Partisanship, Not Spanish: Explaining Municipal Ordinances Affecting Undocumented Immigrants." In *Taking Local Control: Immigration Policy Activism in U.S. Cities and States*, edited by Monica W. Varsanyi. Stanford University Press.

Wong: CV (1/2024)

## WORKS UNDER REVIEW/IN PROGRESS (SELECTED LIST)

(Book Project) DACA: Undocumented Youth and the Politics of Immigrant Illegality
This project leverages nearly a decade of surveying DACA recipients about their economic, societal, and civic integration. These surveys span the Obama, Trump, and Biden administrations, and include both the periods before and after the rescission of DACA. NPR, CNN, Washington Post, New York Times, NBC News, CNBC, Atlantic, Vox, Forbes, 538, Politifact, WNYC, C-Span, Associated Press

(Book Project) The Impact of Immigration Enforcement on Undocumented Immigrants.
This project draws from a first-of-its-kind probability-based survey of undocumented immigrants. This project includes several survey experiments that uncover how the day-to-day behaviors of undocumented immigrants, as well as the trust that they have in public institutions, is affected by differential levels of local law enforcement cooperation with federal immigration enforcement officials. Washington Post, NPR, KPBS, USA Today, City Lab, Chicago Tribune, Factcheck.org

(Book Project) Tom K. Wong. "Immigration, White Nationalism, and the Great Replacement Theory: Who Believes, Why do They Believe, and What Can be Done."
The Great Replacement Theory is a conspiracy theory subscribed to be White nationalists that states that immigration is being used to replace the native-born White population in the U.S. with people of color (i.e., "White genocide"). Previously relegated to the fringes of American society,
the Great Replacement Theory has emerged as a serious threat to pluralistic values, as recent mass shootings wherein shooters have left manifestos espousing the Great Replacement Theory have made clear. News media and other polling suggest that as many as one-third of Republicans (Washington Post) or one-half of native-born White Americans (SPLC) believe in some variant of the Great Replacement Theory. This book project examines the determinants of belief in the Great Replacement Theory, explores why individuals believe that immigration is being weaponized to replace native-born Whites, the extent to which those who believe are willing to resort to political violence, and what can be done to stop this.

## RESEARCH GRANTS (AS FACULTY MEMBER)

- $800,000, Coulter Foundation, "U.S. Immigration Policy Center," 2021-2024
- $150,000, Private Donor, "U.S. Immigration Policy Center," 2021-2023
- $820,000, Multiple Funders, "U.S. Immigration Policy Center," 2019-2021
- $341,127, Multiple Funders, "U.S. Immigration Policy in the 21st Century," 2017-2019
- $22,500, UCSD USMEX Fellowship, 2016-2017
- $16,000, UCLA Institute for Research on Labor and Employment, 2015-2016
- $365,000, MacArthur Foundation, 2015-2017 (partially awarded, terminated after the DAPA program was enjoined by the U.S. Supreme Court)
- $25,000, UCSD Frontiers of Innovation Scholars Program Grant, 2015-2016
- $15,000, UCSD Faculty Career Development Program Grant, 2014-2015
- $30,000, Unbound Philanthropy, 2014
- $100,000, U.S. Department of Homeland Security (DACA), 2013
- $30,000, Center for American Progress, 2013
- $10,000, UCSD Center for International, Comparative, and Area Studies Grant, 2013
- $10,000, UCSD Academic Senate, 2013
- $1,500, UCSD Diversity, Equity, and Inclusion Grant, 2013

## TEACHING AT UCSD

- Diversity, Equity, and Inclusion Teaching Award, 2014-2015
- The Politics of Immigration (upper-division, 280 students)
- International Human Rights Law: Rights of Migrants (upper-division, 200 students)
- The Politics of Multiculturalism (upper-division, 100 students)
- Immigration Politics and Policy (graduate seminar, 4 students)
- Undergraduate Honors Seminar (upper-division, 15 students)

## INVITED PRESENTATIONS — (LAST UPDATED 6/2018)

**2018** | "Surveying Undocumented Immigrants." UC Berkeley, June 12, 2018.

"The Integration of DACA Recipients." Scripps College, May 3, 2018.

"The Impact of the Trump Administration's Immigration Policies on Undocumented Immigrants: Evidence from Survey Experiments." Race, Ethnicity, and Politics Workshop, Northwestern University, April 13, 2018.

"Immigrant Political Incorporation." UC Migration Conference, UCSD, March 2, 2018.

"The Future of DACA." Columbia University, February 22, 2018.

"Immigration and DACA in the Age of Uncertainty, Middlebury College, February 20, 2018.

**2017** | "The Future of U.S. Immigration Policy in the Age of Trump." Citizenship and Equality Colloquium, University of Colorado, November 16, 2017.

"The Determinants and Effects of Sanctuary Policies." Cornell University, November 9-10, 2017.

"The Determinants and Effects of Sanctuary Policies." Presentation at the 2017 APPAM Fall Research Conference, Chicago, IL, November 2-4, 2017.

"Immigration and the U.S. Constitution." Seminar at the Robert H. Smith Center for the Constitution at James Madison's Montpelier, Orange, VA, July 31-August 2, 2017.

"The Determinants of U.S. Immigration Policy." University of California, Santa Barbara, June 1, 2017.

"Paths to Legal Status for Undocumented Immigrants." Presentation at the CLINIC annual conference, Atlanta, GA, May 25, 2017.

"The Effects of Sanctuary Policies on Crime and the Economy." Presentation at the Sanctuary Cities Convening, New York City Council, New York, NY, March 27-28, 2017.

"The Future of U.S. Immigration Policy in the Age of Trump." Yankelovich Center for Social Science Research, University of California, San Diego, March 15, 2017.

"Child Migration." World Migration Report workshop, International Organization for Migration (IOM) Geneva, Switzerland, March 9-10, 2017.

"The Politics of Immigration." American Academy of Arts and Sciences, San Diego Program Committee, University of California, San Diego, February 9, 2017.

**2016 |**   "Post-Election Panel." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, November 21, 2016.

"Mobilizing Immigrant Communities in the Age of Trump." Tulane University, October 14, 2016.

"Immigrant Integration and the Obama Administration: DACA, DAPA, and Implications for the 2016 Presidential Election." Institute for Research on Labor and Employment, UCLA, April 28, 2016.

"Mobilizing Low-Propensity Voters of Color: Towards an Electorate That Reflects a Changing America." Presentation at the Asian Americans Advancing Justice conference, Los Angeles, CA, March 31, 2016.

"Immigrants in American Society." Presentation at KPBS, San Diego, CA, March 21, 2016.

"Immigration Policy." Presentation to Mi Familia Vota, Riverside, CA, January 14, 2016.

**2015 |**   "The European Refugee Crisis." Center for Comparative Immigration Studies (CCIS), the European Studies Program, the Lifelong Learning Program of the EU, and the Scholars Strategy Network (SSN), University of California, San Diego, October 27, 2015.

"U.S. Immigration Politics and the 2016 Presidential Election." Presentation at the Wilson Center, Washington DC, October 26, 2015.

"The Political Incorporation of Undocumented Youth." Presentation at the "Challenging Borders" conference, University of California, Riverside, October 23, 2015.

"The Consequences of Inequality: Why Does it Matter and How." Symposium on Capital in the 21st Century with Thomas Piketty, University of California, San Diego, October 22, 2015.

"U.S. Immigration Politics and Policy." Presentation at the U.S. Consulate in Tijuana, October 13, 2015.

"UC National Summit on Undocumented Students." University of California Office of the President, May 7-8, 2015.

"Irregular Migration." Presentation at the "Politics and Policies of International Migration: Europe and the U.S." conference, Université Libre de Bruxelles, Belgium, April 28-29, 2015.

"Opportunities and Limits of the Executive Actions Proposed by President Obama." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, April 13-14, 2015.

"Administrative Relief Implementation and Impact Project." Presentation at the Center for Migration Studies (CMS), New York, NY, March 25, 2015.

"Research Roundtable." Presentation at the "Ready America: Implementing Immigration Action" conference, Washington DC, February 9-11, 2015.

2014 | "Insights from Implementing DACA for Administrative Relief." Presentation at the National Immigrant Integration Conference, Los Angeles, CA, December 16, 2014.

"Deferred Action for Childhood Arrivals." American Immigration Council (AIC), Washington, D.C., November 7, 2014.

"Immigration Policy and the November 2014 Midterm Elections." California Immigrant Policy Center (CIPC), October 29, 2014.

"The Many Paths to Legal Status: Results and Implications from the PERSON Survey." Presentation to the Center for Migration Studies (CMS), New York, NY, September 29, 2014.

"The Congressional Politics of Interior Immigration Enforcement." Presentation at the "Migration During Economic Downturns" workshop, German Historical Institute, Washington, DC, April 4-5, 2014.

"Mapping DACA Renewals." Presentation to U.S. Citizenship and Immigration Services (USCIS), March 13, 2014.

"Latino Politics: Left, Right, or Down the Middle?" Presentation at the Hispanic Radio annual conference, San Diego, CA, March 10, 2014.

2013 | "Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, October 2, 2013.

"DACA Turns 1." Presentation at the Center for American Progress, Washington, DC, August 15, 2013. **[Televised on CSPAN]**

"The Prospects for Comprehensive Immigration Reform." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, August 12, 2013.

"A Look at the Stats: How Will Congressional Representatives Vote on Comprehensive Immigration Reform?" Presentation at the "Changing Face of America" conference, University of California, Berkeley, May 3, 2013.

"Will Comprehensive Immigration Reform Pass? Predicting Legislative Support and Opposition to CIR." Center for Comparative Immigration Studies (CCIS), Univeristy of California, San Diego, April 29, 2013.

"Race, Ethnicity, the 2012 Elections, and the Politics of Comprehensive Immigration Reform." Presentation at the *Beyond the Headlines* speaker series, UCLA, February 26, 2013.

"International Migrants Bill of Rights (IMBR) Initiative." Georgetown Law School, Washington, DC, February 8-9, 2013.

## PROFESSIONAL ACTIVITIES

- Reviewer: *American Journal of Political Science, American Political Science Review, American Politics Research, American Sociological Review, British Journal of Political Science, Citizenship Studies, Du Bois Review, International Migration, International Migration Review, International Studies Quarterly, Journal of Ethnic & Migration Studies, Journal of Peace Research, Journal of Politics, Journal of Race, Ethnicity, and Politics, Law & Social Inquiry, Migration Studies, National*

*Science Foundation, Oxford University Press, Perspectives on Politics, Politics, Groups, and Identities, Political Research Quarterly, Proceedings of the National Academies of Sciences, Russell Sage Foundation, Social Identities, Social Problems*

- Advisory Board, Center for Comparative Immigration Studies (CCIS), 2012-2018
- Advisory Board, Integrated Voter Engagement study, 2016
- Advisory Board, Unbound Philanthropy, 2015-2017
- APSA, Executive Committee, Migration and Citizenship Section, Treasurer, 2012-2015
- APSA, Migration and Citizenship Section Program Co-Chair, 2018
- Editorial Board, *Journal of Ethnic and Migration Studies* (JEMS), 2024-2028
- Editorial Board, *Journal of Migration and Human Security* (JMHS), 2014-present
- Editorial Board, *Politics, Groups, and Identities* (PGI), 2016-present
- Editorial Board, *Polity*, 2016-present
- Editorial Search Committee, *Perspectives on Politics* Editor-in-Chief search committee, 2022-2023
- Executive Committee, Center for Comparative Immigration Studies (CCIS), 2015-2018
- MPSA, International Relations and Domestic Politics Section Program Chair, 2016
- WPSA, (Im)Migration and Citizenship Section Program Chair, 2015, 2017
- WPSA, Dissertation award committee, 2016

## PUBLIC SCHOLARSHIP

Wong is one of the country's top experts on immigration politics and policy. Wong and his work have been covered by The *New York Times*, The *Los Angeles Times*, The *Washington Post*, NPR and major media outlets across the country in hundreds of articles. A sample can be found here: https://usipc.ucsd.edu/media/index.html