# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

                              *Plaintiffs*,

**v.**                                              No. 1:25-cv-00208-JJM-PAS

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                              *Defendants*.

# DECLARATION OF DEYLIN THRIFT-VIVEROS IN SUPPORT OF PLAINTIFF STATES' AMENDED MOTION FOR A PRELIMINARY INJUNCTION

## <u>DECLARATION OF DEYLIN THRIFT-VIVEROS</u>

I, Deylin Thrift-Viveros, declare as follows:

1.     I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.     I am an attorney licensed to practice in the State of California. I am a Deputy Attorney General in the California Department of Justice, located at 300 S. Spring Street, Los Angeles, CA 90013. I am counsel of record for the State of California, one of the Plaintiff States in the above-captioned proceeding.

3.     On May 22, 2025, Plaintiff States filed a Motion for Preliminary Injunction, ECF No. 41.

4.     On May 23, 2025, counsel for Plaintiff States identified a technical error that caused the misnumbering of some of the exhibits cited in the Motion for Preliminary Injunction.

5.     Plaintiff States are filing this Amended Motion for Preliminary Injunction to correct these errors. The only changes made by Plaintiff States are the numbers of certain cited exhibits.

6.     Attached as Exhibit 1 to this Declaration is a true and correct copy of the original Motion for Preliminary Injunction with all changes tracked.

7.     The Exhibits in Support of Plaintiff States' Motion for Preliminary Injunction, ECF No. 42, have not been amended.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 23, 2025 in Pasadena, California.

_____/s/ Deylin Thrift-Viveros_____
Deylin Thrift-Viveros

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

                        *Plaintiffs*,

       **v.**

UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,

                        *Defendants*.

No. 1:25-cv-00208-JJM-PAS

**PLAINTIFF STATES'**
**AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Statement of Facts ..................................................................................................... 2

I.    Congress Has Consistently Directed Funding to States to Support their
      Efforts to Develop and Safely Maintain Transportation Infrastructure. ................. 2

II.   Plaintiff States Exercise their Sovereign Prerogative to Protect Residents. ........... 7

III.  The Department of Transportation Announces the Immigration
      Enforcement Condition It Intends to Apply Across All U.S. DOT Grants. ......... 10

Argument ................................................................................................................ 14

I.    Plaintiff States are Likely to Succeed on the Merits. ........................................... 15

      A.   U.S. DOT Lacks Statutory Authority to Impose the Immigration
           Enforcement Condition. ........................................................................... 15

           1.   Congress Did Not Authorize Defendants to Impose a
                Categorical Rule Requiring Recipients to Cooperate in the
                Enforcement of Federal Immigration Law.................................... 15

           2.   The Relevant Grant Statutes Likewise Do Not Authorize
                Defendants to Impose a Federal Civil Immigration
                Enforcement Requirement. ......................................................... 16

      B.   U.S. DOT's Blanket Policy of Imposing the Immigration
           Enforcement Condition on All Transportation Funding is Arbitrary
           and Capricious............................................................................................ 20

           1.   U.S. DOT Failed to Consider Whether Grant-Authorizing
                Statutes Permitted Imposing the Immigration Enforcement
                Condition................................................................................... 21

           2.   U.S. DOT Failed to Consider the States' Reliance Interests
                on Billions of Dollars in Federal Funding.................................... 22

           3.   U.S. DOT Failed to Consider the Immigration Enforcement
                Condition's Consequences on Public Safety................................. 24

           4.   U.S. DOT Failed to Consider Alternatives to Its Sweeping
                Policy. ...................................................................................... 25

      C.   The Immigration Enforcement Condition Violates the Spending
           Clause......................................................................................................... 25

           1.   The Immigration Enforcement Condition is Not Reasonably
                Related to the Funding Programs to Which It Applies. ............... 26

           2.   The Immigration Enforcement Condition is Coercive
                Because it Leaves States with "No Real Option" but to
                Comply....................................................................................... 29

           3.   The Immigration Enforcement Condition is Impermissibly
                Ambiguous. ................................................................................ 31

II.   Defendants' Restrictions on Billions of Dollars in Transportation and
      Public Safety Funding Inflict Irreparable Harm Upon Plaintiff States and
      Their Communities. ............................................................................................. 34

III.  The Balance of Equities and the Public Interest Weigh in Plaintiff States'
      Favor. .................................................................................................................. 40

**TABLE OF CONTENTS**
(continued)

**Page**

Conclusion ........................................................................................................................ 42

# TABLE OF AUTHORITIES

**Pages(s)**

**CASES**

*Agency for Int'l Dev. v. All. for Open Socy's*
    570 U.S. 205 (2013) ................................................................................................ 28

*Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*
    52 F.3d 1113 (D.C. Cir. 1995) ................................................................................ 18

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1233, 1250-
    51 (9th Cir. 2001) ................................................................................................... 33

*Arlington Cent. Sch. Dist. v. Murphy*
    548 U.S. 291 (2006) ................................................................................................ 32

*Bennett v. Spear*
    520 U.S. 154 (1997) ................................................................................................ 15

*Bowen v. Massachusetts*
    487 U.S. 879 (1988) ................................................................................................ 24

*BST Holdings, LLC v. OSHA*
    17 F.4th 604 (5th Cir. 2021) ................................................................................... 22

*California v. Dep't of Educ.*
    132 F.4th 92 (1st Cir. 2025) .................................................................................... 21

*Cf. Util. Air Regul. Grp. v. EPA*
    573 U.S. 302 (2014) ................................................................................................ 18

*City & Cnty. of San Francisco v. Barr*
    965 F.3d 753 (9th Cir. 2020) ............................................................................. 33, 41

*City & Cnty. San Francisco v. Sessions*
    349 F. Supp. 3d 924, 958 (N.D. Cal. 2018) ...................................................... 33, 36

*City & Cnty. of San Francisco v. Trump*
    897 F.3d 1225 (9th Cir. 2018) ........................................................................... 37, 41

*City and County of San Francisco v. Trump*
    No. 3:25-cv-1350 (N.D. Cal. Mar. 31, 2025) ........................................................ 22

*City of Arlington v. FCC*
    569 U.S. 290 (2013) ......................................................................................... 15, 20

**TABLE OF AUTHORITIES**
(continued)

**Page**

*City of Chicago v. Sessions*
    264 F. Supp. 3d 933 (N.D. Ill. 2017) ................................................. 34

*City of Chicago v. Sessions*
    321 F. Supp. 3d 855 (N.D. Ill. 2018) ................................................. 37

*City of Chicago v. Sessions*
    888 F.3d 272 (7th Cir. 2018)................................................... 36, 41

*City of Chicago v. Sessions*
    No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) .................... 37

*City of Evanston v. Sessions*
    2018 WL 10228461 (N.D. Ill. Aug. 9, 2018)............................... 36, 38

*City of Los Angeles v. Barr*
    929 F.3d 1163 (9th Cir. 2019)............................................... 25

*City of Philadelphia v. Sessions*
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ............................... 34, 37, 39

*City of Providence v. Barr*
    954 F.3d 23 (1st Cir. 2020) ..................................................*passim*

*Cnty. of Ocean v. Grewal*
    475 F. Supp. 3d 355, 363 n.5 (D.N.J. 2020) ............................... 8

*Cnty. of Santa Clara v. Trump*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ............................... 36, 38

*Coleman v. Paccar, Inc.*
    424 U.S. 1301 (1976) (Rehnquist, J., in chambers) ........................... 40

*Colorado v. U.S. Dep't of Just.*
    455 F. Supp. 3d 1034 (D. Colo. 2020) ................................... 36

*Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*
    434 U.S. 1316 (1977)........................................................... 37

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*
    67 F.4th 1027 (9th Cir. 2023) ............................................... 21

*Cummings v. Premier Rehab Keller, PLLC*
    596 U.S. 212 (2022)..................................................... 15, 31

## TABLE OF AUTHORITIES
(continued)

**Page**

*Dep't of Homeland Security v. Regents of Univ. of Cal.*
   591 U.S. 1 (2020) ................................................................................... 21, 22, 24, 25

*Francisco Sanchez v. Esso Standard Oil Co.*
   572 F.3d 1 (1st Cir. 2009) ............................................................................... 41

*Gonzales v. Oregon*
   546 U.S. 243 (2006) ........................................................................................ 18

*Gregory v. Ashcroft*
   501 U.S. 452 (1991) ........................................................................................ 16

*Haight v. Thompson*
   763 F.3d 554 (6th Cir. 2014) .......................................................................... 29

*Hikvision USA, Inc. v. FCC*
   97 F.4th 938 (D.C. Cir. 2024) ......................................................................... 22

*Int'l Ass'n of Machinists & Aerospace Workers*, 925 F.2d 6, 9 (1st Cir. 1991) ........................... 42

*Int'l Org. of Masters v. NLRB*
   61 F.4th 169 (D.C. Cir. 2023) ......................................................................... 24

*Kansas v. United States*
   249 F.3d 1213 (10th Cir. 2001) ...................................................................... 35

*Kearns v. Cuomo*
   981 F.3d 200 (2d Cir. 2020) ........................................................................... 33

*Kentucky v. Yellen*
   54 F.4th 325 (6th Cir. 2020) ..................................................................... 16, 29

*King v. Burwell*
   576 U.S. 473 (2015) ........................................................................................ 18

*Kisor v. Wilkie*
   588 U.S. 558 (2019) ........................................................................................ 32

*La. Pub. Serv. Comm'n v. FCC*
   476 U.S. 355 (1986) ........................................................................................ 15

*Little Sisters of the Poor v. Pennsylvania*
   591 U.S. 657 (2020) ................................................................................... 21, 22

*Loper Bright Enters. v. Raimondo*
   603 U.S. 369 (2024) ........................................................................................ 15

## TABLE OF AUTHORITIES
(continued)

**Page**

*Lunn v. Commonwealth*
477 Mass. 517 (2017) ........................................................................... 10

*Massachusetts v. United States*
435 U.S. 444 (1978) .............................................................................. 26

*McHenry Cnty. v. Raoul*
44 F.4th 581 (7th Cir. 2022) .................................................................... 9

*Miranda-Olivares v. Clackamas Cnty.*
No. 12-cv-2317, 2014 WL 1414305 (D. Or. Apr. 11, 2014) ................... 32

*Morales v. Chadbourne*
793 F.3d 208 (1st Cir. 2015) .................................................................. 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) .................................................................. 20, 21, 24

*Nat'l Council of Nonprofits v. OMB*
No. 25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ..................... 25

*Nat'l Fed. of Indep. Bus. v. Sebelius*
567 U.S. 519 (2012) ...................................................... 26, 29, 30, 31

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*
595 U.S. 109 (2022) .............................................................................. 20

*Nat'l Urban League v. Ross*
977 F.3d 770 (9th Cir. 2020) .................................................................. 21

*New York v. Trump*
No. 25-CV-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ......... 4, 21

*Nieves-Marquez v. Puerto Rico*
353 F.3d 108 (1st Cir. 2003) ............................................................. 26, 31

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*
969 F.3d 12 (1st Cir. 2020) .................................................................... 14

*Ocean Cnty. Bd. of Commissioners v. Att'y Gen. of State of New Jersey*
8 F.4th 176 (3d Cir. 2021) .................................................................... 8, 9

*Ohio v. EPA*
603 U.S. 279 (2024) .............................................................................. 35

## TABLE OF AUTHORITIES
(continued)

**Page**

*Oklahoma v. Castro-Huerta*
597 U.S. 629 (2022) ................................................................................................. 25

*P.R. Conservation Found. v. Larson*
797 F. Supp. 1066 (D.P.R. 1992) ............................................................................. 41

*Pennhurst State Sch. & Hosp. v. Halderman*
451 U.S. 1 (1981) ....................................................................................... 21, 31, 32, 33

*Penobscot Nation v. Frey*
3 F.4th 484 (1st Cir. 2021) ....................................................................................... 27

*Philadelphia v. Sessions*
309 F. Supp. 3d 271 (E.D. Pa. 2018) ...................................................................... 36

*Planned Parenthood of Greater Washington & North Idaho v. U.S. Dep't of
Health & Human Services*
946 F.3d 1100 (9th Cir. 2020) ................................................................................. 18

*Printz v. United States*
521 U.S. 898 (1997) .................................................................................................. 10

*Rio Grande Cmty. Health Ctr. v. Rullan*
397 F.3d 56 (1st Cir. 2005) ...................................................................................... 34

*Robbins v. Reagan*
780 F.2d 37 (D.C. Cir. 1985) ................................................................................... 18

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
102 F.3d 12 (1st Cir. 1996) .................................................................................. 39, 40

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
217 F.3d 8 (1st Cir. 2000) ........................................................................................ 37

*Ryan v. U.S. Immigr. & Customs Enforcement*
974 F.3d 9 (1st Cir. 2020) ........................................................................................ 16

*Sasen v. Spencer*
879 F.3d 354 (1st Cir. 2018) .................................................................................... 19

*Sierra Club v. Trump*
929 F.3d 670 (9th Cir. 2019) ................................................................................... 15

*Smith v. Goguen*
415 U.S. 566 (1974) .................................................................................................. 34

# TABLE OF AUTHORITIES
(continued)

**Page**

*South Dakota v. Dole*
483 U.S. 203 (1987) ....................................................................................... *passim*

*Starlight Sugar, Inc. v. Soto*
114 F.3d 330 (1st Cir. 1997) ................................................................................ 38

*State of Tennessee v. Dep't of Educ.*
104 F.4th 577 (6th Cir. 2024) ............................................................................. 35

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
578 U.S. 590 (2016) ........................................................................................... 15

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*
481 U.S. 1301 (1987) ......................................................................................... 41

*United States v. California*
921 F.3d 865 (9th Cir. 2019) ................................................................................ 9

*United States v. Morrison*
529 U.S. 598 (2000) ............................................................................................. 8

*United States v. North Carolina*
192 F. Supp. 3d 620 (M.D.N.C. 2016) ............................................................. 37

*Va. Dep't of Educ. v. Riley*
106 F.3d 559 (4th Cir. 1997) (en banc) ............................................................ 16

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) ............................................................................................... 40

**STATUTES**

5 U.S.C.
§ 704 ................................................................................................................... 14
§ 706(2)(A) ................................................................................................... 14, 20
§ 706(2)(C) ......................................................................................................... 15

## TABLE OF AUTHORITIES
(continued)

**Page**

23 U.S.C.

  § 101(b)(1) ................................................................................................ 40

  § 104 .................................................................................................... 5, 29

  § 104(c) .................................................................................................... 5

  § 117 ........................................................................................................ 6

  § 117(a)(2) ............................................................................................. 27

  § 117(h) ............................................................................................. 6, 19

  § 119 .................................................................................................... 5, 17

  § 119(b) ................................................................................................. 27

  § 130 .................................................................................................... 5, 17

  § 133 ........................................................................................................ 5

  § 134 ........................................................................................................ 5

  § 148 .................................................................................................... 5, 17

  § 149 .................................................................................................... 5, 17

  § 158 ..................................................................................................... 29

  § 167 .................................................................................................... 5, 17

  § 171 ..................................................................................................... 27

  § 171(a) ................................................................................................. 19

  § 175 .................................................................................................... 5, 17

  § 176 .................................................................................................... 5, 17

  § 402 ..................................................................................................... 17

  § 402(a)(1)(i) .......................................................................................... 6

  § 402(c)(2) ......................................................................................... 6, 17

  § 405 ..................................................................................................... 17

  § 405(a) ............................................................................................... 5, 6

46 U.S.C. § 54301(a)(3) ........................................................................ 19

49 U.S.C.

  § 101(b)(3) ............................................................................................ 41

  § 5301 ................................................................................................... 40

  § 5301(b) ................................................................................................. 5

  § 5302(4) ................................................................................................. 5

  § 5307 ................................................................................................. 5, 17

  § 5310(b)(1)(A) ................................................................................... 5, 17

  § 5310(c) ................................................................................................. 5

**TABLE OF AUTHORITIES**
(continued)

**Page**

§ 5311 .............................................................................................................. 5, 17
   § 22905(a) ................................................................................................. 19
   § 22909(b) ............................................................................................. 6, 19
   § 22909(b)(1) ............................................................................................. 28
   § 22909(f) ................................................................................................... 7
   § 24101 ..................................................................................................... 41
   § 47128(a) .................................................................................................. 7
   § 60102 .............................................................................................. 17, 28

5 Ill. Comp. Stat. 805/1 *et seq.* ....................................................................... 8

5 Ill. Comp. Stat. 805/15 ................................................................................. 9

Administrative Procedure Act .......................................................... 1, 14, 15, 39

Airport & Airway Improvement Act of 1982, Pub. L. No. 97-248, 96 Stat. 671 ........ 28

American Relief Act, Pub. L. No. 118-158, 138 Stat. 1722, 1758 (2024) .................. 13

Cal. Gov't Code
   § 7282-7282.5 ............................................................................................ 8
   § 7282.5(a) ................................................................................................. 9
   § 7284-7284.12 .......................................................................................... 8
   § 7284.2 ..................................................................................................... 8
   § 7284.6(a) ................................................................................................. 9
   § 7284.6(a)(1)(C) ........................................................................................ 9
   § 7284.6(a)(4) ............................................................................................ 9
   § 7284.6(e) ................................................................................................. 9

Cal. Penal Code § 422.93(a), (b) ...................................................................... 8

Colo. Rev. Stat. § 24-76.6-102 to -103 ............................................................. 8

Conn. Gen. Stat. § 54-192h .............................................................................. 8

Federal-Aid Highway Act of 1956, Pub. L. No. 84-627, 70 Stat. 374 ..................... 3

Federal Aid Road Act of 1916, Pub. L. No. 64-156, 39 Stat. 355 .......................... 2

Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731 ........................... 3

Fixing America's Surface Transportation Act of 2015, Pub. L. No. 114-94, § 1105,
   129 Stat. 1312, 1332 ................................................................................... 6

Illinois TRUST Act ......................................................................................... 9

**TABLE OF AUTHORITIES**
(continued)

**Page**

Immigration and Nationality Act ................................................................... 22

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021) .......................................................................................... 3, 4

Md. Code Ann., Crim. Proc. § 5-104 ............................................................. 8

Merchant Marine Act of 1936, Pub. L. No. 74-835, 49 Stat. 1985 ................... 3

N.J. Att'y Gen. Directive 2018-6 (rev. 2019) .............................................. 8, 9

Or. Rev. Stat. § 181.850 ............................................................................. 8

Or. Rev. Stat. § 181A.820 ........................................................................... 8

Pub. L. No. 106-386, § 1513(a)(2)(A), 114 Stat. 1464, 1533 (2000) ............. 24

Vt. Stat. Ann. Title 20
    § 2366 .................................................................................................. 8
    § 4651 .................................................................................................. 8

Wash. Rev. Code Ann.
    § 10.93.160 ........................................................................................... 8
    § 43.10.315 ........................................................................................... 8

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution Spending Clause .......................................................... *passim*

**OTHER AUTHORITIES**

Exec. Order No. 14159, 90 Fed. Reg. 8443 (2025) ...................................... 10

N.Y. Exec. Orders 170 ................................................................................ 8

N.Y. Exec. Orders 170.1 ............................................................................. 8

R.I. State Police Gen. Order 56A10 ............................................................. 8

## INTRODUCTION

The federal government seeks to strong-arm States into participating in federal civil immigration enforcement by threatening to cut off billions of dollars in transportation funding unless the States submit. On April 24, 2025, United States Secretary of Transportation Sean Duffy issued a letter (the "Duffy Directive") to all recipients of U.S. Department of Transportation (U.S. DOT) funding, declaring for the first time that all recipients must cooperate with the federal enforcement of immigration law or else risk losing funding (the "Immigration Enforcement Condition"). Consistent with the Duffy Directive, U.S. DOT has begun imposing the Immigration Enforcement Condition in both the general and specific terms and conditions for U.S. DOT grant agreements administered across U.S. DOT's sub-agencies, including the Federal Highway Administration, Federal Transit Administration, Motor Carrier Safety Administration, Federal Railway Administration, Federal Aviation Administration, Federal Maritime Administration, and Pipeline and Hazardous Materials Safety Administration. In several instances, U.S. DOT has demanded that Plaintiff States' agencies execute agreements with this new Immigration Enforcement Condition in a matter of days.

U.S. DOT's requirement that recipients "cooperate" in the federal enforcement of civil immigration law, however, has no basis in the laws that govern transportation funding. Congress has directed the funds at issue to Plaintiff States for transportation and safety purposes—repairing roads, replacing decaying bridges, and preventing deaths and injuries from traffic accidents. These funds have nothing to do with immigration enforcement. And Congress imposed no requirement for States to cooperate with federal civil immigration enforcement as a condition for receiving funding. By fashioning its own Immigration Enforcement Condition on funding, U.S. DOT is attempting to seize Congress's power of the purse to advance the Administration's own, unrelated ends. Such seizure of power exceeds Defendants' statutory authority under the Administrative Procedure Act (APA) and is *ultra vires*. Defendants' decision to impose the Immigration Enforcement Condition is also arbitrary and capricious under the APA because it reflects an

1

unreasoned change in position and because Defendants failed to address either the agency's statutory authority for the Condition or various important aspects of their action. Those additional aspects include Plaintiff States' reliance interests in the continued funding, Plaintiff States' sovereign authority to decide whether or when to cooperate with federal civil immigration enforcement efforts, and the harms Plaintiff States will experience if forced to entangle their officers with federal civil immigration efforts. Further, even if Defendants had statutory authority to impose the Immigration Enforcement Condition and promulgated it through a reasoned decision-making process, imposing a uniform immigration enforcement condition across numerous grants would nevertheless violate the Spending Clause of the U.S. Constitution. The Immigration Enforcement Condition is wholly unrelated to the funding programs it encumbers, is fatally ambiguous, and reflects an unlawful attempt to coerce States into doing the federal government's bidding.

Defendants' unlawful actions irreparably harm Plaintiff States by forcing them into an impossible dilemma. On the one hand, Plaintiff States can collectively lose tens of billions of dollars in critical funding for transportation and safety programs. On the other hand, Plaintiff States can surrender their sovereign police powers and submit to an unlawful Immigration Enforcement Condition that could divert Plaintiff States' limited resources and undermine public safety by reducing immigrants' willingness to participate in public health programs or assist law enforcement in the prosecution of crime.

This Court should enjoin Defendants from implementing the Duffy Directive and imposing the Immigration Enforcement Condition on U.S. DOT funding.

## STATEMENT OF FACTS

I. **CONGRESS HAS CONSISTENTLY DIRECTED FUNDING TO STATES TO SUPPORT THEIR EFFORTS TO DEVELOP AND SAFELY MAINTAIN TRANSPORTATION INFRASTRUCTURE.**

For more than a century, Congress has directed federal funding to the States to support the development of the transportation infrastructure that knits together the Nation's communities. *See, e.g.*, Federal Aid Road Act of 1916, Pub. L. No. 64-156, 39 Stat. 355. Across the decades, Congress

has consistently and steadily increased the federal government's financial assistance to state and local governments for all manner of transportation across the roads, seas, and skies. *See, e.g.*, Merchant Marine Act of 1936, Pub. L. No. 74-835, 49 Stat. 1985; Federal-Aid Highway Act of 1956, Pub. L. No. 84-627, 70 Stat. 374; Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731; Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021). By providing federal funding, Congress has enabled Plaintiff States to develop safe and effective means of transportation for hundreds of millions of Americans in ways they could not without this financial support. This financial support develops and sustains the highways that carry our residents to and from home; the airports that enable them to cross the country; the safety measures that protect drivers from fatal accidents; the signals and barriers that prevent train collisions; and the firefighters that inspect and ensure safe pipelines that cross millions of miles throughout Plaintiff States. *See, e.g.*, Ex. 29 (Mohler Decl.), ¶ 6; Ex. 46 (Pappas Decl.), ¶ 11; Ex. 31 (Van Note Decl.), ¶ 6; Ex. ~~1~~30 (Wiedefeld Decl.), ¶¶ 6-10. Due to the consistent, regular receipt of these funds, and the multi-year cycles for which these funds are granted, these federally funded activities are closely woven together with Plaintiff States' efforts to improve and ensure the safety of their roads, bridges, highways, railroads, ferries, ports, and airports. *See, e.g.,* Ex. ~~2~~21 (Hastings Decl.), ¶¶ 14-15; Ex. 48 (Baldwin Decl.), ¶¶ 15-20.

U.S. DOT administers these funds across a range of sub-agencies reflecting these varied means of transportation, including the Federal Highway Administration, Federal Railroad Administration, Federal Transit Administration, Federal Motor Carrier Safety Administration, National Highway Traffic Safety Administration, Federal Aviation Administration, Maritime Administration, and Pipeline and Hazardous Materials Safety Administration.

For example, Plaintiff States rely on funding from U.S. DOT's Maritime Administration to rebuild vital but deteriorating shipping ports, thereby improving safety and capacity for economically essential cargo operations. Ex. ~~3~~44 (King Decl.), ¶¶ 10-15; Ex. ~~4~~22 (Sniffen Decl.), ¶¶ 17, 90-93; Ex. ~~5~~30 (Wiedefeld Decl.), ¶ 21. To upgrade aging commuter lines before they break down or become unsafe, Plaintiff States rely on grants from the Federal Transit Administration.

Ex. 628 (Heffernan Decl.), ¶ 31; Ex. 730 (Wiedefeld Decl.), ¶ 25. And through grants from the National Highway Traffic Safety Administration, Plaintiff States have supported programs funding hundreds of law enforcement agencies, tribes, non-profits, state agencies, universities, and city and county governments to expand traffic enforcement units, toxicology positions, and the expansion of educational driver safety programs to prevent traffic accidents and reduce serious injuries and deaths. *See, e.g.*, Ex. 820 (Higgins Decl.), ¶¶ 18-27, 31-37; Ex. 48 (Baldwin Decl.), ¶ 21.

The statutes Congress enacted to authorize and allocate federal transportation funding vary in some ways, but they share key themes. All provide support to States and localities based on criteria that center on transportation infrastructure and aim to ensure the safe passage of people and goods within and between the States. None of these statutes concern federal civil immigration enforcement, much less identify federal civil immigration enforcement as a prerequisite for federal funding. And none of these statutes anoint U.S. DOT or its sub-agencies with freestanding authority to attach new conditions on funding unrelated to transportation.

At Congress's direction, U.S. DOT administers several types of funding, including those based on a prescribed formula, those that preserve some measure of discretion for U.S. DOT, and those that give greater flexibility to recipients, like Plaintiff States, in how to employ those funds.

*First*, Congress has directed U.S. DOT and its sub-agencies to administer numerous "formula" funding programs—programs that distribute a set minimum, percentage, or amount of federal funding to States based on specific and objective factors, such as a State's population. *See, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (setting out the statutory factors determining eligibility for one particular formula grant); *New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *2 (D.R.I. Mar. 6, 2025) (describing "formula grants where money is allocated on the basis of enumerated statutory factors such as population or the expenditure of qualifying state funds").

For instance, the Federal-Aid Highway Program, administered by the Federal Highway Administration within U.S. DOT, is the primary means by which Congress allocates funding to

the States to develop and construct highways. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021) (authorizing $273.1 billion for fiscal years 2022 through 2026 to be appropriated for the Federal-Aid Highway Program). The Federal-Aid Highway Program distributes funding to States through nine core formula funding programs. *See* 23 U.S.C. §§ 104, 119, 130, 133, 134, 148, 149, 167, 175, 176. Though these programs serve various purposes, *see* App., the authorizing statute specifies that each State "shall" receive a "[g]uaranteed" amount of federal funding for each these programs, depending upon the total funding apportioned by Congress and the State's relative share of funding in prior apportionments, 23 U.S.C. § 104(c).

Similarly, the Federal Transit Administration within U.S. DOT distributes several formula grants to the States to support public transportation programs, including the acquisition of buses and bus facilities. *See* 49 U.S.C. §§ 5301(b), 5302(4). These formula grants support public transportation programs in urban and rural areas, as well as programs "to meet the special needs of seniors and individuals with disabilities," 49 U.S.C. §§ 5307, 5311, 5310(b)(1)(A). The statutes authorizing these programs, in turn, require the Federal Transit Administration to distribute funding based on a certain percentage of the net project cost, *id.*, § 5307(d); a certain percentage of the funding appropriated each fiscal year, *id.* § 5311(c)(1); or the relative proportion of seniors and individuals with disabilities in each area, *id.* § 5310(c). Plaintiff States expect to receive nearly $9 billion in funding from these programs for fiscal year 2025. Ex. 11; *see, e.g.*, Ex. 29 (Mohler Decl.), ¶ 11; Ex. 9̶30 (Wiedefeld Decl.), ¶ 16; Ex. 1̶0̶27 (Osborn Decl.), ¶ 10.

Likewise, the National Highway Traffic Safety Administration administers formula grant programs to prevent deaths and injuries that result from traffic crashes. The National Highway Traffic Safety Administration's two largest grant programs—the National Priority Safety Program and the State and Community Highway Safety Program—both provide formula funding to the States. The National Priority Safety Program provides several grants to encourage States to promote the use of seat belts and child restraints; reduce impaired or distracted driving; require graduated licenses for teen drivers; address the safety of motorcyclists, bicyclists, and pedestrians;

and improve the quality of state traffic safety information systems. 23 U.S.C. § 405(a). Funds appropriated to carry out the National Priority Safety Program are apportioned to States pursuant to a statutory formula based on the population and total public road mileage of each State, subject to a minimum apportionment for all States that meet certain requirements. 23 U.S.C. § 405(a). Meanwhile, the Highway Safety Program provides grants to States to support the implementation of their general highway safety programs to reduce traffic crashes and deaths, injuries, and property damage resulting from those crashes. 23 U.S.C. § 402(a)(1)(i). Like the National Priority Safety Program, funds appropriated to carry out the Highway Safety Program "shall be apportioned" to States pursuant to a statutory formula based on population and total public road mileage of each State, subject to a minimum apportionment for all States. 23 U.S.C. § 402(c)(2).

All of these formula programs require U.S. DOT to apportion certain amounts of funding to States so long as the States satisfy the limited criteria enumerated in the respective authorizing statutes.

*Second*, a number of grant program statutes permit U.S. DOT or its sub-agencies some degree of discretion over the disbursement of federal funds, but set out objective, transportation-related criteria that define the limits of U.S. DOT's discretion. One such example is the Infrastructure for Rebuilding America (INFRA) program, which provides funding to assist States in developing improvements to freight and highway projects of national or regional significance. 23 U.S.C. § 117; *see also* Fixing America's Surface Transportation Act of 2015, Pub. L. No. 114-94, § 1105, 129 Stat. 1312, 1332. Though the grant is competitive, involving some degree of discretion, the statute specifies that when "making a grant under this section, the Secretary *shall* consider" various factors, such as the use of "innovative design and construction techniques," "geographic diversity among grant recipients," and increased "resilience to natural hazards or disasters," among other things. 23 U.S.C. § 117(h) (emphasis added). None of those factors relate to federal civil immigration enforcement. *See id.*

As another example, the Railroad Crossing Elimination grant provides funding to eliminate the dangers caused by stopped trains blocking rail grade crossings. *See* 49 U.S.C. § 22909(b).

Though a discretionary grant, the statute again defines the scope of U.S. DOT's discretion: the Secretary "shall" evaluate certain criteria for selecting projects funded by the grants, including, among other things, whether the proposed projects would "improve safety at highway-rail or pathway-rail crossings"; "grade separate, eliminate, or close highway-rail or pathway-rail crossings"; "improve the mobility of people and goods"; "reduce emissions, protect the environment, and provide community benefits, including noise reduction"; "improve access to emergency services"; "provide economic benefits"; and "improve access to communities separated by rail crossings." 49 U.S.C. § 22909(f). None of these criteria have anything to do with federal immigration enforcement.

*Third*, still more programs provide block grant funding to States, with minimal strings attached. Unlike formula or competitive grants, which specify the precise purposes for which federal funding must be used, block grants give the States greater flexibility in deciding how they use the funds awarded to them. *See, e.g.*, 49 U.S.C. § 47128(a) (discussing block grant funding for certain States that "assume administrative responsibility for all airport grant amounts available under this subchapter").

Thus, while varied in their form and structure, the statutes authorizing these non-formula funding programs specify the purposes for the funding authorized; the eligibility criteria for applicants; and the criteria that the Secretary must consider when determining how to award that funding. None of these statutes identify federal civil immigration enforcement as a purpose for the funding they authorize. And none of these statutes identify cooperation with federal civil immigration enforcement as a criterion that the U.S. DOT Secretary may consider when awarding funding.

## II. PLAINTIFF STATES EXERCISE THEIR SOVEREIGN PREROGATIVE TO PROTECT RESIDENTS.

Plaintiffs are the States of California, Illinois, New Jersey, Rhode Island, Maryland, Colorado, Connecticut, Delaware, Hawai'i, Maine, the Commonwealth of Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont,

Washington, and Wisconsin (Plaintiff States). Plaintiff States are responsible for maintaining the day-to-day safety of all residents of their communities. Plaintiff States enact statutes and establish policies about the best use of law-enforcement time and energy to ensure that their residents are protected from crime and violence. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). One critical choice that Plaintiff States must make in doing so is whether, when, and how to task their law enforcement officers with assisting the federal government in enforcing federal civil immigration law.

Many Plaintiff States have chosen to focus their law enforcement resources on state and local matters, and so limit the circumstances under which state and local law enforcement participate in federal immigration enforcement. *See, e.g.*, Cal. Penal Code § 422.93(a), (b); Cal. Gov't Code §§ 7282-7282.5, 7284-7284.12; 5 Ill. Comp. Stat. 805/1 to /20; N.J. Att'y Gen. Directive 2018-6 (rev. 2019); Md. Code Ann., Crim. Proc. § 5-104; Colo. Rev. Stat. § 24-76.6-102 to -103; Conn. Gen. Stat. § 54-192h; N.Y. Exec. Orders 170 and 170.1; Or. Rev. Stat. §§ 181.850, 181A.820; R.I. State Police Gen. Order 56A10; Vt. Stat. Ann. tit. 20, §§ 2366, 4651; Wash. Rev. Code Ann. §§ 10.93.160, 43.10.315. These States have concluded that such policies best promote public safety, both because they ensure that state and local law enforcement spend their time addressing crime, rather than civil immigration enforcement, and because undocumented immigrants and their families are less willing to report crimes if their engagement with law enforcement could risk deportation. *See* Ex. ~~11~~47 (Perez Decl.) ¶¶ 8-10; Ex. 18 (Rosen Decl.), ¶¶ 8-11; Ex. 53 (Wong Decl.) ¶¶ 10-22, 46-53. *See also* Cal. Gov't Code § 7284.2 (recognizing that entangling state and local law enforcement with federal civil immigration enforcement may cause immigrants to "fear approaching police when they are victims of, and witnesses to, crimes . . . to the detriment of public safety and the well-being of all Californians"); N.J. Att'y Gen. Directive 2018-6 (N.J. Directive) at 1; *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 363 n.5 (D.N.J. 2020) (noting "studies that confirm that immigration-related fears prevent individuals from reporting

crimes"), *aff'd sub nom. Ocean Cnty. Bd. of Commissioners v. Att'y Gen. of State of New Jersey*, 8 F.4th 176 (3d Cir. 2021).

Many of these state policies seek to promote the public's cooperation with law enforcement by clearly distinguishing between the roles of state and local officers, who enforce state criminal law, and the roles of federal immigration officers, who enforce federal civil immigration law. Illinois's TRUST Act, for instance, restricts state and local law enforcement officers from voluntarily assisting in the civil enforcement of federal immigration law, including by arresting or detaining individuals based on their immigration status; by providing federal civil immigration officials with access to state or local law enforcement facilities; and by giving notice to civil immigration officials of detainees' upcoming release dates from state custody. 5 Ill. Comp. Stat. 805/15; *see also, e.g.*, Cal. Gov't Code § 7284.6(a); N.J. Directive at 3-4. But most of these statutes and directives contain important exceptions to ensure compliance with federal law and to protect the public from violent criminals. Many authorize state and local law enforcement to work with federal civil immigration officials to facilitate the removal of certain criminals, *e.g.*, 5 Ill. Comp. Stat. 805/15(h), (i); Cal. Gov't Code §§ 7282.5(a), 7284.6(a)(1)(C), 7284.6(a)(4); N.J. Directive at §§ II.B.5-6, and expressly allow officers to cooperate with immigration enforcement as required by federal law, *e.g.*, 5 Ill. Comp. Stat. 805/15(h); Cal. Gov't Code § 7284.6(e); N.J. Directive at 1-2. Most of these policies have been in place for years, and many were passed with bipartisan support: Illinois's, for instance, was signed into law in 2017 by Republican Governor Bruce Rauner. And those policies that have been challenged in court have uniformly been upheld. *See, e.g.*, *McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022); *Ocean Cnty.*, 8 F.4th 176; *United States v. California*, 921 F.3d 865 (9th Cir. 2019).

Other Plaintiff States have not codified directives regarding the use of law-enforcement resources to assist in federal immigration law. Although these States have not imposed categorical *limitations* on the use of law-enforcement resources to assist in the enforcement of federal immigration law, they nonetheless do not impose categorical *requirements* of this kind on state and local law enforcement officers, either. Many of these States have concluded that they can best

protect their residents by maintaining control over state and local law enforcement resources, or by empowering law enforcement officials to exercise discretion in determining when it would best promote public safety to assist federal immigration enforcement efforts, rather than requiring those officers to devote resources to federal immigration enforcement on the federal government's command. Other Plaintiff States are subject to different rules in this context. For instance, some Plaintiff States must comply with state court rulings that prevent them from cooperating with civil immigration detainer requests. *See, e.g.*, *Lunn v. Commonwealth*, 477 Mass. 517, 518-19 (2017). Still other Plaintiff States have concluded that participating in federal immigration enforcement efforts imposes substantial costs on local jurisdictions, not only in the form of personnel and resources but also in the form of potential civil liability. While Plaintiff States' decisions in this area have differed, *all* are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521 U.S. 898, 928 (1997)—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

### III. THE DEPARTMENT OF TRANSPORTATION ANNOUNCES THE IMMIGRATION ENFORCEMENT CONDITION IT INTENDS TO APPLY ACROSS ALL U.S. DOT GRANTS.

On January 20, 2025, President Trump directed the U.S. Attorney General and the Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, 90 Fed. Reg. 8443 (2025). Days later, U.S. Secretary of Transportation Sean Duffy issued an order to "update[] and reset[] the principles and standards underpinning U.S. Department of Transportation . . . policies, programs, and activities." Ex. 1 at 1 (the "Duffy Order"). Among these changes, the Duffy Order states, "[t]o the maximum extent permitted by law, DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State Contracts, shall prioritize projects and goals" that "require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary." *Id.* at 2-3.

On April 24, 2025, Secretary Duffy issued a letter to "all recipients" of U.S. DOT funding announcing U.S. DOT's policy of imposing an Immigration Enforcement Condition as a requirement for all U.S. DOT funding. Ex. 2 (Duffy Directive). The Duffy Directive purports to "clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements," including "terminat[ion of] funding." *Id.* It then asserts that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *Id.* at 2 (the "Immigration Enforcement Condition"). The Duffy Directive further claims that there are "reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement." *Id.* It warns that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT." *Id.* at 3. The Duffy Directive does not describe any limits to the requirement that recipients "cooperate . . . in the enforcement of Federal immigration law." *Id.* at 2.

Numerous state agencies within Plaintiff States received a copy of the Duffy Directive directly from U.S. DOT. Additionally, the Duffy Directive was published on the U.S. DOT website along with a press release quoting Secretary Duffy as stating, among other things, that "Federal grants come with a clear obligation to adhere to federal laws," that recipients must "enforce our immigration rules," and that Secretary Duffy "will take action to ensure compliance." Ex. 3.

In recent weeks, U.S. DOT has added the Immigration Enforcement Condition to general terms and conditions governing the entirety of federal funding administered by several subagencies within U.S. DOT, as well as to the terms and conditions for specific federal grants. For example,

on April 16, 2025, the Federal Railroad Administration amended its general terms and conditions for all federal funding administered by the agency to include language requiring recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law." Ex. 4. So, too, did the Federal Transit Administration, the Federal Highway Administration, the Maritime Administration, the Federal Aviation Administration, the Motor Carrier Safety Administration, and the Pipeline and Hazardous Materials Safety Administration. Within the last month and a half, seven sub-agencies within U.S. DOT have added the Immigration Enforcement Condition to grants that they administer. *See* Exs. 4–9; Ex. 23 (Khayyat Decl.), ¶ 16 & Ex. A; Ex. ~~12~~49 (Bosman Decl.), ¶ 19 & Ex. A.

Nearly identical language was also recently added to the terms and conditions for specific grant programs or award documents. For example, on March 31, 2025, the Maritime Administration amended its general terms and conditions governing Port Infrastructure Development Program grants to include the Immigration Enforcement Condition. Ex. 9. Since issuing its revised Master Agreement, the Federal Transit Administration has issued administrative amendments to several *existing* grants made to the Maryland Transit Administration. Ex. ~~13~~30 (Wiedefeld Decl.), ¶¶ 13-14, 24-25. These amendments have the effect of conditioning Maryland's access to hundreds of millions of dollars in funding—which have already been allocated and awarded—upon acceptance of the Immigration Enforcement Condition.[1]

In the last few weeks, Plaintiff States are aware of U.S. DOT imposing the Immigration Enforcement Condition on at least the following grants being awarded to: California (Bridge Investment Program and Advanced Transportation Technology and Innovation Program); Colorado (Advanced Transportation Technology and Innovation Program); Illinois (Formula

---

[1] On May 15, 2025, before a subcommittee of the Senate Committee on Appropriations, Secretary Duffy testified that the Department is not seeking to apply the Immigration Enforcement Condition to existing grants. *See* https://tinyurl.com/47zb68y5 (1:59:52). But the Federal Transit Administration has not withdrawn the above-described requests that Maryland authorities accept the Immigration Enforcement Condition.

Airport Infrastructure Grants, MEGA, and INFRA Grant Programs); Maryland (Rail Crossing
Elimination Program and Wildlife Crossing Pilot Project); Massachusetts (Rail Crossing
Elimination Program); Michigan (Advanced Transportation Technology Innovation and Wildlife
Crossing Pilot Project); New York (Motor Carrier Safety Assistance Program and Wildlife
Crossing Pilot Program); Washington (Motor Carrier Safety Assistance Program); and Wisconsin
(Advanced Transportation Technology and Innovation Program and Motor Carrier Safety
Assistance Program). Ex. ~~14~~17 (Lam Decl.), ¶¶ 12, 14; Ex. 19 (Chafee Decl.), ¶ 20; Ex. 24
(Bieneman Decl.), ¶ 28; Ex. ~~15~~27 (Osborn Decl.), ¶¶ 26, 31; Ex. ~~16~~30 (Wiedefeld Decl.), ¶¶ 43-
44; Ex. 29 (Mohler Decl.), ¶ 22; Ex. ~~17~~32 (Wieferich Decl.), ¶ 12; Ex. 38 (Ho Decl.), ¶¶ 28, 33;
Ex. ~~18~~49 (Bosman Decl.), ¶¶ 19-20; Ex. ~~19~~52 (Lawry Decl.), ¶ 36.

In some instances, U.S. DOT staff have demanded that state officials execute these grant
agreements containing the Immigration Enforcement Condition in a matter of days. In the last two
weeks, U.S. DOT staff demanded that state agencies in Maryland, Massachusetts, Michigan, New
York execute grant agreements for the Wildlife Crossing Pilot Project containing the Immigration
Enforcement Condition by approximately May 20. *E.g.*, Ex. ~~20~~30 (Wiedefeld Decl.), ¶ 44; Ex. 29
(Mohler Decl.), ¶ 22. In another instance, a senior Federal Highway Administration official
verbally requested that the Maryland State Highway Administration submit two pending grant
agreements to Federal Highway Administration, and warned that failure to agree to the new
template agreement terms expeditiously could endanger not only those two grants (totaling about
$1.75 million), but *all* federal funding, including formula funds and funding for the replacement
of the Francis Scott Key Bridge, which collapsed in 2024 when the cargo ship *Dali* crashed into
one of its piers. Ex. ~~21~~30 (Wiedefeld Decl.), ¶ 45. Combined, the Key Bridge funding and the
Federal Highway Administration formula funds amount to billions of dollars in estimated annual
funding. Ex. ~~22~~30 (Wiedefeld Decl.), ¶ 45; *see also See* American Relief Act, Pub. L. No. 118-

158, 138 Stat. 1722, 1758 (2024) (providing for the Federal Highway Administration to fund 100 percent of the reconstruction of the bridge through the Emergency Relief Program).[2]

U.S. DOT's demands leave Plaintiff States with no realistic choice. The States can either attempt to comply with an unlawful and unconstitutional condition that would surrender their sovereign control over their own law enforcement officers and reduce immigrants' willingness to report crimes and participate in public health programs—or they can forfeit tens of billions of dollars of funds they rely on regularly to support the roads, highways, railways, airways, ferries, and bridges that connect their communities and homes.

## ARGUMENT

"When assessing a request for a preliminary injunction, a district court must consider '(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest.'" *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). All four factors support a preliminary injunction. Plaintiff States are likely to succeed on the merits because U.S. DOT lacks statutory authority to categorically impose the Immigration Enforcement Condition; its policy to do so is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A); and its attempt to do so strays beyond even the limits placed on Congress by the Spending Clause. Further, U.S. DOT's policy threatens irreparable harm to Plaintiff States because it attempts to coerce Plaintiff States into either surrendering their sovereignty, risking the public safety of their residents, or forfeiting billions of dollars that Plaintiff States rely upon for critical transportation infrastructure. For similar reasons, the balance of equities and public interest cut sharply in favor of a preliminary injunction, as U.S. DOT's policy threatens devastating harm to Plaintiff States, whereas U.S. DOT suffers no harm from being required to follow the congressional directives that it has the duty to implement.

---

[2] In addition to pending grant agreements, U.S. DOT has begun issued notices of funding opportunity for future funding awards that require applicants to agree to the Immigration Enforcement Condition. Some of these notices have application deadlines as soon as June 20, 2025. *See* Ex. ~~55~~23 (Khayyat Decl.) ¶ 15; Ex. ~~48~~41 (Sugahara Decl.), ¶ 13.

I.    **PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS.**

   A.    **U.S. DOT Lacks Statutory Authority to Impose the Immigration Enforcement Condition.**

At the threshold, the agency's decision to impose the Immigration Enforcement Condition qualifies as "final agency action" reviewable under the APA, 5 U.S.C. § 704. It "mark[s] the consummation of the agency's decisionmaking process" rather than a "merely tentative or interlocutory" waypoint. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). And it engenders "legal consequences" in that it defines a new prerequisite for States to qualify for federal funding. *Id.*; *see also id.* at 599 (holding that a court should take a "pragmatic" approach when assessing finality).[3]

As discussed further below, Defendants lack any statutory authority to impose the Immigration Enforcement Condition on U.S. DOT funding. U.S. DOT thus acted *ultra vires* and "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(C), by adopting its policy imposing the Immigration Enforcement Condition on U.S. DOT funding.[4]

   1.    **Congress Did Not Authorize Defendants to Impose a Categorical Rule Requiring Recipients to Cooperate in the Enforcement of Federal Immigration Law.**

U.S. DOT and its sub-agencies are "charged with administering congressional statutes," which means that "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Accordingly, Defendants have "no power to act . . . unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). This is especially true when it concerns federal funding, as the Constitution assigns Congress the power to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the Administrative

---

[3] The Plaintiff States' claims also are not impliedly precluded by the Tucker Act. The Plaintiff States do not bring any claims that seek compensatory damages or enforcement of a contract; rather, they challenge a generally applicable policy that attempts to disqualify them for federal funding.

[4] "[T]he availability of an APA cause of action" does not "foreclose[] other causes of action," such as constitutional or equitable claims. *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019).

Procedure Act." *Providence*, 954 F.3d at 31 (citations omitted); 5 U.S.C. § 706(2)(C). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

Additionally, if a federal agency seeks to upset the balance of federal-state power, the agency must have a "clear statement" from a federal statute demonstrating that Congress "in fact . . . intended to" empower the agency to do so. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991); *see also Ryan v. U.S. Immigr. & Customs Enforcement*, 974 F.3d 9, 29 (1st Cir. 2020) ("[T]he federalism canon of statutory construction . . . reflect[s] a reluctance to ascribe to Congress an intent to interfere with a state's exercise of its sovereign powers . . . and Congress must clearly state such an intent if the presumption . . . is to be rebutted."); *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2020) (explaining courts "must employ a federalism-based clear-statement rule when construing spending legislation as a matter of statutory interpretation"). Here, U.S. DOT asserts the authority to require States to change their policies concerning federal civil immigration enforcement as a condition to access *all* transportation funding, dramatically disturbing the federal-state balance. Yet Defendants have never identified any statute that could plausibly authorize this sweeping imposition of the Immigration Enforcement Condition on all U.S. DOT funding, much less an "unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds" on their cooperation in the enforcement of federal immigration law. *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc). Because U.S. DOT lacks statutory authority to impose the Immigration Enforcement Condition categorically across all U.S. DOT funding, it plainly exceeds its authority and acts *ultra vires*, and this Court need go no further.

> **2.     The Relevant Grant Statutes Likewise Do Not Authorize Defendants to Impose a Federal Civil Immigration Enforcement Requirement.**

Not only does U.S. DOT lack any statute giving it general authority to impose the kind of categorical rule set forth in the Immigration Enforcement Condition, Congress's transportation statutes likewise do not permit U.S. DOT to condition transportation funding on adherence to the

President's immigration priorities. Indeed, as discussed, *supra* pp. 2-4, these statutes provide support to States and localities to support the development, maintenance, and safety of roads, highways, railways, waterways, and airways. They do not confer on U.S. DOT the discretion to defund States that choose, in a valid exercise of their own sovereign authority, to limit cooperation with federal immigration enforcement.

As explained, *supra* pp. 4-7, Congress has generally authorized U.S. DOT and its sub-agencies to provide funding to States through either (1) "formula" grant programs (i.e., grants disbursed to States based on fixed statutory factors, like state population) or (2) discretionary grant programs for specific infrastructure projects, such as bridges, railroads, and seaports. Neither framework gives U.S. DOT the power to limit funding to only those States that agree to cooperate in federal immigration enforcement efforts.

Congress plainly did not permit U.S. DOT to invent new immigration enforcement conditions for the many formula and block grant programs Congress created, which provide Plaintiff States with a substantial portion of their transportation funds. *See, e.g.*, 23 U.S.C. § 119 (National Highway Performance Program); *id.* § 133 (Surface Transportation Block Grant Program); *id.* § 148 (Highway Safety Improvement Program); *id.* § 130 (Railway-Highway Crossings Program); *id.* § 149 (Congestion Mitigation and Air Quality Improvement Program); *id.* § 167 (National Highway Freight Program); *id.* § 175 (Carbon Reduction Program); *id.* § 176 (PROTECT Formula Program); 49 U.S.C. § 5307 (Urbanized Area Formula Grants); *id.* § 5311 (Formula Grants for Rural Areas); *id.* § 5310(b)(1)(A) (Formula Grants for Seniors and Individuals with Disabilities); 23 U.S.C. § 405 (National Priority Safety Program); 23 U.S.C. § 402 (Highway Safety Program); 49 U.S.C. § 60102 (State Pipeline Safety Program). Although these statutes work in different ways, as a general matter, they direct U.S. DOT sub-agencies to provide States annual allocations based on population, road mileage, or some other objective measure, in some instances specifying the exact proportion—by statute—that each State is to receive. *See, e.g.*, 23 U.S.C. § 402(c)(2) (Highway Safety Program funding "*shall* be apportioned" based on population and total public road mileage (emphasis added)). For these programs, U.S. DOT plainly lacks authority

to impose unrelated substantive conditions on the receipt of funds. As the First Circuit explained, when it rejected a similar attempt to conscript States and localities into federal immigration enforcement, "the statutory formula[s]" at issue in programs of this sort "simply do[] not allow" federal agencies "to impose by brute force" conditions on federal funds "to further [those agencies'] unrelated law enforcement priorities." *Providence*, 954 F.3d at 34-35. Indeed, the specificity of the statutory schemes at issue here "strongly implies that Congress did not intend to give" U.S. DOT "the power to advance its own priorities by means of grant conditions." *Id.* at 35. U.S. DOT accordingly lacks authority to impose the Immigration Enforcement Condition on these programs.

The same is true for the discretionary grants that U.S. DOT and its sub-agencies administer. *See supra* pp. 6-7. Although Congress permits these agencies some discretion in disbursing these funds, they must exercise that discretion within the parameters defined by Congress. *Cf. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326, (2014). "When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985); *see also Planned Parenthood of Greater Washington & North Idaho v. U.S. Dep't of Health & Human Services*, 946 F.3d 1100 (9th Cir. 2020) (holding that agency's grant criteria was unlawful because it deviated from the purposes of the authorizing statute). This principle flows from a broader rule of administrative law: Where Congress sets out specific grants of authority, the courts are "unwilling to construe the ambiguous provisions" as conferring authority for some other purpose. *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (quoting *Fed. Maritime Comm'n v. Seatrain Lines*, 411 U.S. 726, 744 (1973)); *Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) (holding that a federal agency "cannot rely on its general authority to make rules . . . when a specific statutory directive defines the relevant functions of [the agency] in a particular area"); *cf. also King v. Burwell*, 576 U.S. 473, 485–86 (2015) (where challenged policy involves "billions of dollars in spending each year," it is

"especially unlikely that Congress would have delegated" a decision to an agency in an area in which the agency "has no expertise").

Here, each of the statutes authorizing discretionary transportation funding defines the scope of U.S. DOT's discretion in ways that do not permit the Immigration Enforcement Condition. *First*, they identify the specific projects and purposes that Congress intended that federal funding to support and direct U.S. DOT to provide funds for those purposes, and no other. *See, e.g.*, 49 U.S.C. § 22909(b) (Rail Crossing Elimination Grant providing funding to eliminate the hazards associated with railway crossings); 23 U.S.C. § 171(a) (Wildlife Crossing Pilot Program Grant provides funding to reduce the "more than 1,000,000 wildlife-vehicle collisions every year" that result in "tens of thousands of serious injuries and hundreds of fatalities on the roadways of the United States"). Congress never gave U.S. DOT discretion to turn a wildlife-protection program into a tool for conscripting support for civil-immigration enforcement. *Second*, they include detailed provisions identifying the eligibility criterion for this funding, but do not include cooperation with federal immigration enforcement within any of those criteria. *See, e.g.*, *supra* pp. 6-7; 46 U.S.C. § 54301(a)(3) (Port Infrastructure Development Program defining eligible projects to include those that "improve the safety, efficiency, or reliability" of "the loading and unloading of goods at the port, such as for marine terminal equipment"). *Third*, they describe the factors that U.S. DOT *must* consider when awarding the grant, but again make no mention of federal civil immigration enforcement. *See, e.g.*, 23 U.S.C. § 117(h) (highway program stating that the "Secretary *shall* consider" factors such as "contributions to geographic diversity" or "enhancements of freight resilience to natural hazards or disasters" (emphasis added)). *Fourth*, these statutes identify specific conditions and prohibited uses of funding that *Congress* chose to employ, none of which includes federal civil immigration enforcement. *See, e.g.*, 49 U.S.C. § 22905(a) (noting "[g]rant conditions" requiring transportation funding for rail improvement "only if the steel, iron, and manufactured goods used . . . are produced in the United States").

By providing such detailed parameters for U.S. DOT's discretion, Congress made a conscious decision to specify what U.S. DOT may and must consider, and thereby what it may not.

*See Sasen v. Spencer*, 879 F.3d 354, 362 (1st Cir. 2018) ("[T]he venerable canon of statutory construction *inclusio unius est exclusio alterius* . . . teaches that if one of a category is expressly included within the ambit of a statute, others of that category are implicitly excluded."). None of these provisions—relating to purpose, eligibility, required considerations, or conditions—identifies federal immigration enforcement as a requirement or consideration. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 118 (2022) (rejecting the Occupational Safety and Health Administration's authority to impose public health requirements where "no provision of the Act addresses public health more generally, which falls outside of OSHA's expertise").

Ultimately, though each transportation funding program Congress created operates in its own way, the limits of administrative agency power remain the same: Congress instructed U.S. DOT on how to provide money to the States for transportation development and safety, and it gave U.S. DOT no authority to ignore or thwart the purposes for which those funds were appropriated. Congress did not write U.S. DOT a blank check permitting it to use funding programs to command States to enforce federal immigration policy, and U.S. DOT cannot withhold funds until States comply with the new administration's political priorities. To permit an administrative agency that power would overturn the basic rule of administrative law: that an agency's "power to act and how [it is] to act" are both "authoritatively prescribed by Congress." *City of Arlington*, 569 U.S. at 291.

**B.    U.S. DOT's Blanket Policy of Imposing the Immigration Enforcement Condition on All Transportation Funding is Arbitrary and Capricious.**

In addition to lacking statutory authority to impose the Immigration Enforcement Condition, U.S. DOT's decision to do so is also arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Moreover, when an agency changes its position, it must first consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" engendered by the status quo. *Dep't of Homeland Security v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up).

U.S. DOT's across-the-board imposition of the Immigration Enforcement Condition is arbitrary and capricious because U.S. DOT: (1) failed to consider whether any of the statutes authorizing the grant programs actually allow imposing the conditions; (2) ignored the States' profound reliance interests on federal funding; (3) neglected the Immigration Enforcement Condition's inevitable safety impacts to Plaintiff States; and (4) overlooked obvious alternatives.

### 1.    U.S. DOT Failed to Consider Whether Grant-Authorizing Statutes Permitted Imposing the Immigration Enforcement Condition.

Generally, whether an agency has "entirely failed to consider an important aspect of the problem" or "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, depends on "what the relevant substantive statute makes important." *Nat'l Urban League v. Ross*, 977 F.3d 770, 777 (9th Cir. 2020) (cleaned up); *see also California v. Dep't of Educ.*, 132 F.4th 92, 98-99 (1st Cir. 2025) (requiring that agency show whether it considered "all relevant data" and show that it did not rely on factors Congress did not intend it to consider). It is thus arbitrary and capricious for the agency to neither "look to" nor "discuss" statutory "requirements." *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 682 (2020), or to "rel[y] on factors which Congress has not intended it to consider" in making its decision, *State Farm*, 463 U.S. at 43; *see Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023).

The need for an agency to engage in reasoned consideration of its statutory authority is even more pressing when it comes to funding. Because "*Congress* may fix the terms on which it shall disburse federal money to the States," any "federally imposed conditions" on States must square with the relevant "legislation enacted pursuant to the spending power." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Thus, an agency cannot impose any grant conditions

without first ensuring that the relevant statute allows it. *See New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at \*12 (D.R.I. Mar. 6, 2025) (McConnell, C.J.) (agencies acted arbitrarily and capriciously by failing to consider whether action "fell within the bounds of their statutory authority").

Here, U.S. DOT has made no effort to ascertain whether the applicable funding statutes allow for the Immigration Enforcement Condition. The Duffy Directive instead cites solely to provisions of the Immigration and Nationality Act—provisions that U.S. DOT plays no role in enforcing. *See* Ex. 2 at 3. The arbitrariness is particularly striking because U.S. DOT has copied and pasted the same exact condition into dozens of different grant programs, each of which has its own authorizing statute, purposes, conditions, formulas, eligibility criteria, and other considerations. *See, e.g.*, *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 949-50 (D.C. Cir. 2024) (rejecting agency action as "arbitrarily broad"); *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604, 612 (5th Cir. 2021) (rejecting agency's "one-size-fits-all sledgehammer"). Indeed, elsewhere, the United States has correctly conceded that "the degree of agency discretion in implementing grant programs"—including imposing conditions—"varies depending on the type of grant program and the terms of the authorizing legislation." Dkt. 93, Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction at 20, *City and County of San Francisco v. Trump*, No. 3:25-cv-1350 (N.D. Cal. Mar. 31, 2025). By failing to "look to" the statutory formula "requirements" or "discuss [them] at all" when imposing the Immigration Enforcement Condition, U.S. DOT's actions are arbitrary and capricious. *Little Sisters*, 591 U.S. at 682.

### 2.    U.S. DOT Failed to Consider the States' Reliance Interests on Billions of Dollars in Federal Funding.

Imposition of the Immigration Enforcement Condition is also arbitrary and capricious because U.S. DOT failed to consider Plaintiff States' legitimate reliance on the existing funding landscape. *See Regents*, 591 U.S. at 30. As the Supreme Court has explained, "[w]hen an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 30,

33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id.* at 30 (citations omitted).

But that is precisely what U.S. DOT did here. Especially for formula grants, Plaintiff States substantially rely on the annual receipt of *billions* of dollars in federal funding that the Immigration Enforcement Condition now endangers. The sudden loss of *billions* of dollars—chopping Plaintiff States' budgets for transportation infrastructure in half in many cases, Ex. 2335 (O'Connor Decl.), ¶ 8 (federal funding supplies 61 percent of the New Jersey DOT capital budget); Ex. 38 (Ho Decl.), ¶ 14 (55 percent in New York); Ex. 31 (Van Note Decl.), ¶ 5 (48 percent in Maine); Ex. 24 (Bieneman Decl.), ¶ 22 (over 50 percent in Illinois)—would result in substantial interruptions, delays, or terminations of crucial transportation projects, Ex. 2433 (Cownie Decl.), ¶ 31; Ex. 2532 (Wieferich Decl.), ¶ 17. These include marine terminal reconstruction, the development of new interstate commuter-rail networks, the rebuilding of international airport runways, and even the wholesale replacement of dated bridges and viaducts. Ex. 2644 (King Decl.), ¶ 20; Ex. 2730 (Wiedefeld Decl.), ¶¶ 21-22; Ex. 2833 (Cownie Decl.), ¶¶ 14, 31; Ex. 2922 (Sniffen Decl.), ¶¶ 20; Ex. 38 (Ho Decl.), ¶ 40. Sudden loss of these funds would also force States to defer maintenance and improvements to vehicles and infrastructure, heightening the risk of aviation disasters, train derailments, and traffic deaths. Ex. 3021 (Hastings Decl.), ¶¶ 28-30; Ex. 3130 (Wiedefeld Decl.), ¶ 25.

In addition to neglecting the reliance interests of Plaintiff States on U.S. DOT funding for their programs, U.S. DOT failed to consider the impact the interruption of funding would have on the States' budgets as a whole. Indeed, ample record evidence confirms that the States depend on steady, reliable federal funding streams as part of their budgeting process, *see, e.g.*, Ex. 16 (Duncan Decl.), ¶¶ 23-24; Ex. 19 (Chafee Decl.), ¶¶ 23-24, and cannot fill the gaping hole that their termination would create, Ex. 29 (Mohler Decl.), ¶¶ 25-26; Ex. 3230 (Wiedefeld Decl.), ¶ 46; Ex. 15 (Dougherty Decl.), ¶¶ 50-51; Ex. 3350 (Chapman-See Decl.), ¶ 9. Every year, for example, the New Jersey legislature appropriates expected federal funding to individual state agencies and New Jersey expected to count on approximately $1.9 billion of U.S. DOT funding in state fiscal

year 2025, comprising 61 percent of the total budget of the New Jersey Department of
Transportation (NJDOT). Ex. ~~34~~35 (O'Connor Decl.), ¶ 12. Through the end of fiscal year 2025,
the NJDOT is scheduled to be reimbursed over $120 million in federal spending that it has already
billed, in addition to tens of millions more that it plans to bill pursuant to federal grants and funds
through the end of the fiscal year. Ex. ~~35~~35 (O'Connor Decl.), ¶ 39. If the current uncertainty
continues through the spring, New Jersey will need to begin contingency planning for how to wind
down or substantially cut program activities that relied on federal funding, imposing a significant
operational burden. Ex. ~~36~~35 (O'Connor Decl.), ¶¶ 40-50. Plaintiff States' "interest in planning
future programs" is an "important" one, *Bowen v. Massachusetts*, 487 U.S. 879, 906-07 (1988),
but U.S. DOT ignored it.

In imposing the Immigration Enforcement Condition, U.S. DOT not only failed to "weigh"
these longstanding, substantial reliance interests "against competing policy concerns"; it "ignored"
them altogether. *Regents*, 591 U.S. at 30-33. Because the Conditions were adopted "with no regard
for the [States'] reliance interests," and U.S. DOT "did not acknowledge—much less justify—its
adoption" of the new conditions, they must be vacated "for want of reasoned decision making."
*Int'l Org. of Masters v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023).

### 3. U.S. DOT Failed to Consider the Immigration Enforcement Condition's Consequences on Public Safety.

U.S. DOT "entirely failed to consider" another "important aspect of the problem": the
adverse impact to Plaintiff States' criminal enforcement and public safety if they were to adhere
to the Immigration Enforcement Condition. *State Farm*, 463 U.S. at 43. U.S. DOT's Immigration
Enforcement Condition requires States to "cooperate . . . in the enforcement of Federal
immigration law." Ex. 2 at 2. Many Plaintiff States, however, limit their participation in federal
civil immigration enforcement to preserve their resources for core public-safety missions and to
"build trust between their law enforcement agencies and immigrant communities and ensure that
noncitizens feel comfortable reporting crimes, cooperating with investigators, and serving as
witnesses." *Providence*, 954 F.3d at 30. Both the experience of law enforcement officers and

substantial research support this approach. *See, e.g.*, Ex. 18 (Rosen Decl.), ¶¶ 8-11; Ex. 53 (Wong Decl.), ¶¶ 10-22, 46-53; Ex. ~~37~~47 (Perez Decl.), ¶¶ 8-14. Indeed, Congress recognized this same reality in creating the U-Visa program for immigrants who are victimized by crime. *See* Pub. L. No. 106-386, § 1513(a)(2)(A), 114 Stat. 1464, 1533 (2000) (visa program for crime victims "will encourage law enforcement officials to better serve immigrant crime victims and to prosecute crimes committed against aliens"). The Immigration Enforcement Condition thus runs up against the Plaintiff States' "strong sovereign interest in ensuring public safety and criminal justice." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 651 (2022).

### 4.    U.S. DOT Failed to Consider Alternatives to Its Sweeping Policy.

Finally, in adding the Immigration Enforcement Condition to all its grants, U.S. DOT overlooked the "alternatives" that were "within the ambit of the existing" landscape. *Regents*, 591 U.S. at 30 (quoting *State Farm*, 463 U.S. at 51). As *Regents* makes clear, it is arbitrary and capricious for an agency to change a program in its entirety without first assessing whether it should instead alter only certain parts of the program. *See id.* at 26-30. But U.S. DOT never considered several less drastic alternatives to its sweeping decision to broadly impose the Immigration Enforcement Condition. Namely, the agency could have limited the Immigration Enforcement Condition to certain grants—assuming that any of the grant statutes allowed them, *but see supra* pp. 14-20—rather than announcing a sweeping policy spanning all grant programs and encumbering many billions of dollars in annual funds to the States. *Cf. e.g., Nat'l Council of Nonprofits v. OMB*, No. 25-239, __ F. Supp. 3d __, 2025 WL 597959, at *14 & n.10 (D.D.C. Feb. 25, 2025) (distinguishing "targeted pauses of funding for specific projects" from a "nationwide suspension of *all* federal financial assistance"). Instead of "taking a measured approach," U.S. DOT seeks to "cut the fuel supply" "without any consideration for the consequences of that decision," an approach that is "not—and could never be—rational." *Id.*

### C.    The Immigration Enforcement Condition Violates the Spending Clause.

The Plaintiff States are also likely to prevail in showing that Defendants' efforts to impose the Immigration Enforcement Condition violate the Spending Clause for three independent reasons:

(1) they impose a requirement not reasonably related to the statutory purpose of the grants themselves; (2) they are unconstitutionally coercive; and (3) they are impermissibly vague and ambiguous. *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 n.6 (9th Cir. 2019) ("[T]he principles of *Dole* and *NFIB* apply to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants.").

### 1. The Immigration Enforcement Condition is Not Reasonably Related to the Funding Programs to Which It Applies.

First, the Immigration Enforcement Condition is unconstitutional because it is unrelated to the purposes of each of the transportation funding programs at issue. Under the Spending Clause, conditions on federal grants must be "reasonably related to the federal interest in particular national projects or programs." *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Funding conditions that are not germane to the ultimate federal interest served by the funds necessarily serve as an undue restriction on the sovereignty of the recipient States and overstep the federal government's authority. *See Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003) (funding "conditions must not be 'unrelated to the federal interest in particular national projects or programs' funded under the challenged legislation"). The Immigration Enforcement Condition here plainly bears no relationship to the purposes of U.S. DOT grants that fund the development, maintenance, and safety of roads, highways, and other transportation projects.

Congress has established that U.S. DOT's grant programs exclude federal immigration enforcement purposes. Take, for instance, the funding administered through the Federal Highway Administration, within U.S. DOT. The Federal Highway Administration administers nine core formula grant programs, as well as numerous smaller grant programs. Each of these programs' authorizing language sets out that program's purposes, none of which includes civil immigration enforcement. The National Highway Performance Program's statute, for example, states that its purposes are:

> (1) to provide support for the condition and performance of the National Highway System; (2) to provide support for the construction of new facilities on the National

Highway System; (3) to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in an asset management plan of a State for the National Highway System; and (4) to provide support for activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters.

23 U.S.C. §119(b).

Congress, in other words, spoke with great precision in laying out the specific national interests that the National Highway Performance Program serves. It is well-established that statutes' purposes guide courts in interpreting them. *See Penobscot Nation v. Frey*, 3 F.4th 484, 501 (1st Cir. 2021) ("[W]e cannot interpret . . . statutes to negate their own stated purposes.") (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)). And precision matters: just like a detailed scheme lets Congress explain where it does and does not allow departures from a formula grant program, *see, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 28 (1st Cir. 2020), carefully crafted statutory purposes make clear the specific national interests that the National Highway Performance Program is intended to support.

That precision is typical of many of the grant programs where U.S. DOT now seeks to add the Immigration Enforcement Condition. Each of the core Federal Highway Administration formula programs has a highly detailed purpose set by statute. *See* App. The same goes for numerous competitive grant programs that the Federal Highway Administration administers, including the INFRA Program, which sets aside funds for various highway and bridge projects to "improve the safety, efficiency, and reliability of the movement of freight and people in and across rural and urban areas"; "generate national or regional economic benefits"; and "address the impact of population growth on the movement of people and freight," 23 U.S.C. §117(a)(2), or the Wildlife Crossing Pilot Program, which is designed to help States make motorists safer by reducing vehicle-wildlife collisions. *See* 23 U.S.C. §171. None of these statutes designate civil immigration enforcement as a purpose of any of the Federal Highway Administration's grant programs. But by slapdashedly applying the Immigration Enforcement Condition to *all* of the Federal Highway Administration's grant programs, U.S. DOT ignores *any* of their purposes.

The same problem goes for the remainder of the grants that the Immigration Enforcement Condition threatens. The statutes governing all of U.S. DOT's other grant programs—whether administered by the Federal Transit Administration, Federal Railroad Administration, Federal Motor Carrier Safety Administration, National Highway Traffic Safety Administration, Federal Aviation Administration, Federal Maritime Administration, or the Pipeline and Hazardous Materials Safety Administration—are also designed to serve specific purposes under the broad umbrella of funding transportation improvements. *See generally* App. As with the Federal Highway Administration funding programs, however, the Immigration Enforcement Condition ignores all of that, lacking any tie to their much narrower purposes.

Pressing the States into federal civil immigration enforcement does nothing to advance any of the U.S. DOT grants' purposes. There is no plausible connection between co-opting local law enforcement for federal immigration enforcement purposes and, for example: eliminating grade crossings where trains block car traffic, *see* 49 U.S.C. § 22909(b)(1); expanding airport capacity and maintaining runway pavement, Airport & Airway Improvement Act of 1982, Pub. L. No. 97-248, 96 Stat. 671; or inspecting the safety of pipeline facilities, 49 U.S.C. § 60102. Unsurprisingly, nowhere does the Immigration Enforcement Condition attempt to explain how it advances any of the grant programs' goals. Instead, the Immigration Enforcement Condition impermissibly seeks "to leverage funding to regulate [States' activities] outside the contours of the [grant] program[s]." *Agency for Int'l Dev. v. All. for Open Socy's*, 570 U.S. 205, 206 (2013) (applying similar principle in First Amendment context), contrary to foundational federalism principles.

Indeed, Defendants' public statements make clear that they view the Immigration Enforcement Condition not as a lawful exercise of authority conferred by Congress, but as part of a broader effort to coerce the States into exercising their police powers in a way that aligns with the federal government's policy preferences. *See supra* pp. 10-14; *see also* Ex. 1 (Duffy Order announcing change in policy to "require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or

the Secretary"). Such attempts to use critically important transportation funding as a means of implementing an entirely unrelated immigration policy contravenes the Spending Clause.

### 2.    The Immigration Enforcement Condition is Coercive Because it Leaves States with "No Real Option" but to Comply.

Second, and independently, U.S. DOT's policy of imposing the Immigration Enforcement Condition unconstitutionally attempts to coerce the States by withholding a staggering sum of money—tens of billions of dollars in transportation funding that the States cannot realistically turn down. The Spending Clause gives Congress some power to "cajole the states to enact policies indirectly (through a spending inducement) that it could never *directly* order them to perform with its other enumerated powers." *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022). But that comes with a unique danger—"allow[ing] Congress to exceed its otherwise limited and enumerated powers by regulating in areas that the vertical structural protections of the Constitution would not otherwise permit." *Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014). In particular, the federal government may not use its spending power to "commandeer" and "force the States to implement a federal program." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) (*NFIB*) (opinion of Roberts, C.J.). The Spending Clause thus prohibits conditions upon funding "so coercive [upon the States] as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211. In the Supreme Court's words, a State must remain free from "coercion" and be able to reject the condition and decline the funds "not merely in theory but in fact." *Id.*

To determine "where persuasion gives way to coercion," courts must examine all relevant facts and circumstances, including both "the programs at issue" and "the nature of the threat" posed by the condition. *NFIB*, 567 U.S. at 579-80, 585 (quoting *Steward Machine*, 301 U.S. at 591). A condition that merely provides "mild encouragement" is permissible, as in *Dole*, where the funding condition at issue only resulted in the States being deprived of "5% of the funds otherwise obtainable under specified highway grant programs" if they did not adopt a minimum drinking age of 21. 483 U.S. at 211. Those "specified highway grant" programs included just those funds appropriated under 23 U.S.C. §104—in other words, *Dole* involved just a twentieth of a fraction

of the funds jeopardized by the Immigration Enforcement Condition here. *See* 23 U.S.C. §158. The *Dole* conditions were permissible because, even if the States rejected them, they could still spend the remaining 95 percent of their federal highway funds to ensure that roads within their States remained safe. *See* 483 U.S. at 211 (observing that the "argument as to coercion is shown to be more rhetoric than fact"). The *NFIB* Court, by contrast, found that the federal government had crossed the line when it imposed as its condition for a State refusing to expand Medicaid the loss of not "merely 'a relatively small percentage' of its existing Medicaid funding, but *all* of it." 567 U.S. at 581.

The Immigration Enforcement Condition leaps past that line. As an initial matter, U.S. DOT admits that it employs this condition to coerce States into changing their policies on participation in federal civil immigration enforcement. The Duffy Directive announces the States' "obligations" and threatens the States with "a loss of Federal funding from DOT" should they "fail[] to cooperate generally with Federal authorities in the enforcement of federal law." Ex. 2 at 2-3; *see NFIB*, 567 U.S. at 577-78 ("[W]hen 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism."). And, just like in *NFIB*, U.S. DOT threatens to withhold not just a "small percentage" of Plaintiff States' federal transportation funding, but literally "*all* of it." 567 U.S. at 580. The Duffy Directive's announcement of an Immigration Enforcement Condition imposed on literally every dollar of transportation funding for "All Recipients of U.S. Department of Transportation funding," Ex. 2 at 1, is not merely "mild encouragement," but "a gun to the head." *NFIB*, 567 U.S. at 581. Plaintiff States have no real ability to turn down billions of dollars per year in longstanding federal funding for transportation infrastructure that is essential to carry their millions of residents per day and billions of dollars in commerce per year. Ex. 24 (Bieneman Decl.), ¶¶ 22-23; Ex. 38 (Ho Decl.), ¶¶ 14; Ex. 3830 (Wiedefeld Decl.), ¶¶ 41, 46.

Moreover, the nature (and not just the volume of dollars) affects the coercive impact on Plaintiff States, too: forgoing the billions of dollars in U.S. DOT funding would force them to abruptly terminate numerous ongoing safety initiatives, putting millions of residents of Plaintiff States at risk on their roads, highways, railways, airways, and waterways; and disrupting commutes

and commerce of still millions more. *See NFIB*, 567 at 579-80. These include programs to operate specialized DUI courts that prevent dangerous recidivism, surge resources to enforce commercial vehicle safety standards in high-risk crash corridors, and replace commuter rail vehicles that have become unsafe and unreliable. Ex. 48 (Baldwin Decl.), ¶ 40; Ex. ~~39~~20 (Higgins Decl.), ¶ 59; Ex. ~~40~~30 (Wiedefeld Decl.), ¶ 25. Moreover, Plaintiff States have planned for and rely on U.S. DOT funding. Decades of past infrastructure investments and preexisting commitments to state employees and contractors mean that Plaintiff States' other resources are largely tied up. *See, e.g.*, Ex. 31 (Van Note Decl.), ¶¶ 17; Ex. 19 (Chafee Decl.), ¶ 24; Ex. ~~41~~35 (O'Connor Decl.), ¶ 16. Plaintiff States therefore cannot pay for these programs in the absence of federal funds. Without them, Plaintiff States will have to terminate critical infrastructure safety and resilience programs, *e.g.*, Ex. ~~42~~32 (Wieferich Decl.), ¶ 17; Ex. 48 (Baldwin Decl.), ¶ 23, 35-42; Ex. 31 (Van Note Decl.), ¶¶ 18-20, supported by U.S. DOT grants, resulting in an immediate adverse impact to their residents' safety and well-being. U.S. DOT's attempt to hold this funding hostage to the Administration's policy priorities is unconstitutionally coercive.

### 3. The Immigration Enforcement Condition is Impermissibly Ambiguous.

Finally, the Immigration Enforcement Condition exceeds constitutional limits on the federal government's spending power because it lacks the clarity the Constitution requires. Under the Spending Clause, the conditions the federal government imposes on federal funds must be unambiguous, so that States deciding whether to accept such funding can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207; *see also NFIB*, 567 U.S. at 577 (opinion of Roberts, C.J.); *Pennhurst*, 451 U.S. at 24; *Nieves-Marquez*, 353 F.3d at 128. By the same logic, the federal government's spending power "does not include surprising participating States with post-acceptance or 'retroactive'" grant conditions. *NFIB*, 567 U.S. at 584.

Here, the Immigration Enforcement Condition fails to provide States with any meaningful notice of what they must do. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219

(2022) ("Recipients cannot 'knowingly accept' the deal with the Federal Government unless they "would clearly understand . . . the obligations' that would come along with doing so." (citation omitted)). Each U.S. DOT sub-agency that has updated its funding terms and conditions in recent weeks has simply recited a vague excerpt from the text of the Duffy Directive, requiring recipients to "cooperate with Federal officials in the enforcement of Federal Law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law." Exs. 4–9; Ex. ~~43~~23 (Khayyat Decl.), ¶ 16 & Ex. A; Ex. ~~44~~49 (Bosman Decl.), ¶ 19 & Ex. A. When read within the grant conditions themselves, this language is fatally open-ended. *Cf. Kisor v. Wilkie*, 588 U.S. 558, 581 (2019) (describing language as ambiguous if it "remains genuinely susceptible to multiple reasonable meanings").

The Immigration Enforcement Condition does not say what actions constitute "cooperating," or how they differ from what would be required for a State to be "not impeding." For instance, the Immigration Enforcement Condition's language does not clearly indicate whether it might require States to detain and hold individuals for the purposes of transferring them into the custody of immigration enforcement officials—which could risk States potentially violating the Fourth Amendment or similar state constitutional guarantees. *See Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) (articulating Fourth Amendment requirements for stops and detentions of undocumented individuals); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-2317, 2014 WL 1414305 (D. Or. Apr. 11, 2014) (applying Fourth Amendment requirements to county's detention of Miranda-Olivares after she was entitled to pre-trial release on bail and again after she was entitled to release after resolution of her state charges); *see also, e.g.*, Ex. 19 (Chafee Decl.), ¶ 21; Ex. 24 (Bieneman Decl.), ¶ 26; Ex. ~~45~~45 (Longolucco Decl.), ¶ 19. Further, because the Plaintiff State agencies that sign these funding agreements also typically do not handle federal immigration enforcement, it also remains unclear whether U.S. DOT expects immigration enforcement cooperation from just the recipient Plaintiff State agency or from the Plaintiff State as a whole. These ambiguities leave Plaintiff States "unable to ascertain what is expected of" them, which is

precisely the sort of "indetermina[cy]" that flunks the Spending Clause's clear statement requirement. *Pennhurst*, 451 U.S. at 17, 25. "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006). So where, as here, they are left to guess at what the federal government requires of them, the Immigration Enforcement Condition's vague terms undermine any legitimacy of its exercise of power under the Spending Clause. *Pennhurst*, 451 U.S. at 17.

The Duffy Order and Duffy Directive do not offer helpful context for understanding the scope of the Immigration Enforcement Condition's  meaning. The Duffy Order asserts that U.S. DOT-supported grant programs should "require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President" or Transportation Secretary. Ex. 1 at 3. Again, the outer limits of "compliance or cooperation" with federal immigration enforcement is left unspecified. Worse, the "other goals and objectives" language is so open-ended as to provide a total lack of guidance or limiting construction to U.S. DOT's requirements. *Cf. Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1233, 1250-51 (9th Cir. 2001) ("[I]t was arbitrary and capricious for [a federal agency] to issue terms and conditions so vague as to preclude compliance therewith.").

The Duffy Directive likewise demands that jurisdictions engage in "cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding" federal immigration authorities, but again fails to explain what "cooperation" entails. Through the Duffy Directive, U.S. DOT seeks to essentially give itself a free hand to impose additional conditions and force additional policy changes by the States throughout the lifetime of its grants, with no tool for States to predict what sorts of conditions or changes those will be. That makes it impossible for States to be, as the Spending Clause requires, "cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207.

The Duffy Directive compounds the ambiguity by impugning the practice of issuing licenses to unauthorized immigrant drivers. This prevalent state practice is authorized by Congress. *See, e.g., Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020). The Duffy Directive supplies no legal

rationale for attacking it and does not explain whether continuing the practice would constitute a lack of "cooperation." Using such inscrutable examples together with the broad term "cooperate," which is susceptible to either reasonable disagreement or "evolving interpretations," *City & Cnty. San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018), *vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020), results in textbook unconstitutional ambiguity. *See also Smith v. Goguen*, 415 U.S. 566, 575 (1974) (striking down use of "treats contemptuously" as unconstitutionally vague). For similar reasons, such language in the Immigration Enforcement Condition fails to put the States on notice about what U.S. DOT and its agencies require, violating the Spending Clause by removing any bounds on U.S. DOT's ability to shape what it requires from Plaintiff States.

For all the reasons discussed above, the Immigration Enforcement Condition would be unconstitutional, even if it had been authorized by Congress.

## II. DEFENDANTS' RESTRICTIONS ON BILLIONS OF DOLLARS IN TRANSPORTATION AND PUBLIC SAFETY FUNDING INFLICT IRREPARABLE HARM UPON PLAINTIFF STATES AND THEIR COMMUNITIES.

Absent preliminary relief from this Court, Plaintiff States will be severely and irreparably harmed by U.S. DOT's decision to impose the Immigration Enforcement Condition. With no injunction, Plaintiff States face an impossible choice between two stark alternatives: forgoing billions in federal funding to improve and ensure safe transportation infrastructure, or relinquishing their sovereign right to decide how to use their own police officers. This forced choice inflicts irreparable harm on the States. *See, e.g.*, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017) ("a 'Hobson's choice' can establish irreparable harm") (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (being faced with a choice "between, on the one hand, complying with a law [one] credibly believes is unconstitutional, and on the other hand, foregoing funds it plans to use for life-saving projects" establishes irreparable harm). As discussed below, either option alone would also inflict irreparable harm. *See Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (asking if plaintiffs would suffer "irreparable harm" because injuries "cannot

adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy").

The coercive effect of the Immigration Enforcement Condition is being felt right now—and grows worse by the day. *Supra* pp. 10-14. Multiple Plaintiff States in the process of being awarded U.S. DOT funds have been asked to execute award documents agreeing to the Immigration Enforcement Condition now or forever lose access to those funds. For example, in recent weeks, FHWA officials advised that State transportation authorities in Maryland, Massachusetts, Michigan, and New York would need to execute agreements for Wildlife Crossing Pilot Program grants incorporating the Immigration Enforcement Condition in a matter of days, even though there was no apparent legal or practical reason for that deadline. Ex. 4630 (Wiedefeld Decl.) ¶ 44; Ex. 29 (Mohler Decl.), ¶ 22; Ex. 16 (Duncan Decl.), ¶¶ 9-10. Others have received notices of future funding opportunities that include the Immigration Enforcement Condition and require States to apply within the next few weeks. *See* Ex. 4723 (Khayyat Decl.) ¶ 15; Ex. 4841 (Sugahara Decl.), ¶ 13. All Plaintiff States will soon face a similar choice: the application cycle for FY 2025 or 2026 grants will open shortly, with applications due soon thereafter and funding decisions made within three to four months. Ex. 31 (Van Note Decl.) ¶ 11; Ex. 4933 (Cownie Decl.) ¶ 16. Without intervention from this Court, Plaintiff States will either have to give up their chances to obtain this critical funding, on which they have relied for years, or give up an essential component of their sovereignty.

Either path leads to irreparable harm. Acceding to the challenged conditions to preserve access to critical grant funds would intrude on Plaintiff States' sovereignty. The impact of this invasion of state sovereignty "cannot be economically quantified" and thus constitutes irreparable harm. *State of Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (alterations omitted) (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022)). States suffer an irreparable injury when forced to abandon their "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see also Ohio v. EPA*, 603 U.S. 279, 291 (2024) (impairment of States' "sovereign interests in regulating their own industries and citizens" is

irreparable harm). Forcing Plaintiff States to abandon specific public policies governing their limited law enforcement resources is exactly what the Immigration Enforcement Condition would require.

Courts uniformly viewed this same type of demand as a source of irreparable harm during the first Trump Administration. When presented with similar immigration-related grant conditions from the Department of Justice, courts held that States and localities would suffer "an affront to their sovereignty" if the United States were "permitted to direct their behavior in an unauthorized way." *City of Evanston v. Sessions*, 2018 WL 10228461, at *4 (N.D. Ill. Aug. 9, 2018). These "Tenth Amendment violations constitute[d] irreparable harm." *Philadelphia v. Sessions*, 309 F. Supp. 3d 271, 340 (E.D. Pa. 2018); *see also Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1061 (D. Colo. 2020); *City & Cnty. of San Francisco*, 349 F. Supp. 3d at 970; *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017).[5]

The sovereign harm that would result from accepting these unlawful conditions also produces tangible harm to the public safety of Plaintiff States' communities. Immigrants will decline to participate in public health programs, to the detriment of the entire community, and crime victims will stop reporting crimes in Plaintiff States, fearful that their local officials are now at the beck-and-call of federal immigration agents. Ex. 53 (Wong Decl.) ¶¶ 10-22, 42-53. As multiple declarations from law enforcement in Plaintiff States attest, a clear line between local police and federal immigration enforcement builds trust with immigrant communities and, in doing so, helps solve crimes and protect crime victims. *See* Ex. 5047 (Perez Decl.) ¶¶ 10-14; Ex. 18 (Rosen Decl.), ¶¶ 8-11; Ex. 53 (Wong Decl.) ¶¶ 10-22, 46-53. That is one reason that many Plaintiff States have implemented express policies designed to foster trust between immigrant communities and local police. *See supra* pp. 8-9. Acquiescing to the Immigration Enforcement Condition would

---

[5] Though some of these district court cases framed the constitutional violation in terms of the Tenth Amendment, these constitutional harms raise the same issue addressed by Spending Clause coercion—which is animated by Tenth Amendment principles. *See Dole*, 483 U.S. at 210 (discussing limits to Spending Clause authority and how a "perceived Tenth Amendment limitation" might affect "the range of conditions legitimately placed on federal grants" based on whether a State could refuse to yield to the condition).

damage those relationships and, as a result, materially disadvantage Plaintiff States in their enforcement of state and local criminal law—a result that many courts held constituted irreparable harm in similar cases. *See City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) (crediting state and local governments' conclusion that "the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein");[6] *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 877-78 (N.D. Ill. 2018) ("Trust once lost is not easily restored, and as such, this is an irreparable harm for which there is no adequate remedy at law."); *Philadelphia*, 280 F. Supp. 3d at 657 (compliance with conditions would inflict "irreparable reputational harm"); *accord Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("Because injuries to goodwill and reputation are not easily quantifiable, courts often find this type of harm irreparable.").

The other path left open by the Immigration Enforcement Condition—forgoing billions in federal funds—also leads to irreparable harm. The scale of the potential funding loss to Plaintiff States—over $24 billion annually, in Federal Highway funds alone, Ex. 10; *e.g.*, Ex. 16 (Duncan Decl.), ¶ 5; Ex. 51~~30~~ (Wiedefeld Decl.), ¶ 9—makes the harm irreparable. Just as the risk of being "driven out of business" constitutes "irreparable harm" in the commercial context, a significant loss of funding for a government can also be "catastrophic" such that money damages are inadequate. *Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*, 434 U.S. 1316, 1320 (1977)*; City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). Risk to a much narrower set of grant funds constituted potential irreparable harm when the first Trump Administration sought to impose immigration-related conditions on San Francisco. *City & Cnty. of San Francisco*, 897 F.3d at 1244. The grant funds at issue here are orders of magnitude larger. Depriving Plaintiff States of these funds will oblige them to lay off staff and terminate entire program capabilities. *See, e.g.*, Ex. 38 (Ho Decl.), ¶ 43; Ex. 52~~44~~ (King Decl.), ¶ 22; Ex. 48

---

[6] Limited en banc review of this decision was initially granted, but subsequently vacated, exclusively on the issue of whether the injunctive relief should extend nationwide. *See City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). The government did not challenge the district court's irreparable harm ruling on appeal.

(Baldwin Decl.), ¶¶ 23, 35-42. Loss of this funding will "have an immediate impact on [Plaintiff States'] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding is subsequently reinstated." *United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016); *see also Evanston*, 412 F. Supp. 3d at 886; *Santa Clara*, 250 F. Supp. 3d at 537.

Furthermore, if Plaintiff States are unable to accept grant awards under Defendants' unlawful conditions, Plaintiff States will permanently lose the ability to obtain the funds if they are later withdrawn or their obligation authority expires. *See* Ex. 38 (Ho Decl.), ¶ 15 ("Interruption to federal funding . . . could permanently jeopardize [the State's] ability to utilize the remainder of this year's federal obligation authority, as [the] unused obligation limit is not carried over to following fiscal years."); Ex. 53̶30 (Wiedefeld Decl.), ¶ 23 ("For the vast majority of these grant awards, if MDOT is unable to move forward with the awards, the funding may be lost to MDOT if USDOT decides to pull the award or award the money to another state or entity."). These permanent losses of funding qualify as irreparable harm. *See Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332 (1st Cir. 1997) (recognizing loss of a transient opportunity as irreparable harm).

Moreover, forgoing federal transportation funding would upend intricate and intertwined development plans in which Plaintiff States have heavily invested, resulting in further irreparable harms. Infrastructure developments like the construction or replacement of highways and bridges are complex projects that take years of planning and coordination, sometimes as required by federal law. *See, e.g.*, Ex. 38 (Ho Decl.), ¶ 19 (describing statewide transportation plan that must be approved by federal agencies); Ex. 29 (Mohler Decl.), ¶ 13 (describing multiple public review procedures required at stages of infrastructure design process). For Plaintiff States, then, much of the expected federal funding will support projects already in progress. *See, e.g.*, Ex. 28 (Heffernan Decl.), ¶ 32 ("We have made plans and allocated funding for over a hundred current projects based on our continued ability to draw down on promised federal funding."); Ex. 19 (Chafee Decl.) ¶ 24; Ex. 21 (Hastings Decl.), ¶ 28. A denial of funding at this point in time would therefore derail countless contracts, designs, and development plans painstakingly put together. *See, e.g.*, Ex. 32

(Wieferich Decl.), ¶ 17 (describing "domino effect" of delays and cancellations). This, in turn, will result in cascading harms to Plaintiff States in the form of cancelled contracts, thousands of employees or contractors who lose their jobs, harms to state credit, and the compounding deterioration of infrastructure as repair is delayed. *See, e.g.*, Ex. 51 (Gribner Decl.), ¶ 29; Ex. 35 (O'Connor Decl.), ¶ 16 ("The thousands of contractors, professional services firms, law enforcement workers, utility workers, and NJDOT employees who are required to deliver these projects would lose their jobs."); *id.* ¶ 46 (New Jersey's Department of Transportation "will not be able to meet its debt service obligations on the already-used bonds—and its credit rating will be downgraded accordingly"); Ex. 30 (Wiedefeld Decl.), ¶ 22 (risk of losing largest publicly owned terminal in the Port of Baltimore that directly supports 650 jobs). These reflect additional, irreparable harms that cannot be redressed by the potential restoration of federal funding at a later date—and to the extent the denial of funds produces additional costs beyond the amount of the federal award, Plaintiff States cannot seek damages remedies here because neither the Spending Clause nor the APA provide such a remedy. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (irreparable harm established "if the plaintiff shows that its legal remedies are inadequate").

Finally, losing federal transportation funding would result in irreparable harm because Plaintiff States would have to scale back or shut down a wide range of efforts that protect and save lives. *See Philadelphia*, 280 F. Supp. at 579 (likely "loss of human life" constitutes irreparable harm). Plaintiff States rely on this essential funding to ensure safe roads, *see, e.g.*, Ex. 19 (Chafee Decl.), ¶ 25 (needing federal funding for "necessary and urgent safety repairs" that would "prevent 2.4 fatalities a year"); safe airports, *see, e.g.*, Ex. ~~54~~51 (Gribner Decl.), ¶¶ 34, 37 (funding to improve airport safety and efficiency, including an airport that houses wildfire response operations); and programs preventing deaths and serious injuries from traffic accidents, *see* Ex. 15 (Dougherty Decl.), ¶ 14 ("According to NHTSA, 40,901 people were killed in motor vehicle traffic crashes on U.S. roadways during 2023."). For example, federal funding sustains a substantial majority of Plaintiff States' traffic safety programs. *See, e.g.*, Ex. 15 (Dougherty Decl.), ¶ 50

("[A]pproximately 99% of the [Office of Traffic Safety] budget comes from federal funding."); Ex. 48 (Baldwin Decl.), ¶¶ 32-34 (federal funding provides nearly 80 percent of Washington Traffic Safety Commission's operating budget). Moreover, Plaintiff States rely on U.S. DOT funding to prevent and respond to hazardous material emergencies, such as toxic leaks. Ex. ~~55~~23 (Khayyat Decl.), ¶ 4 (noting use of U.S. DOT funding to respond to incidents like a 4,000-gallon ammonia leak); Ex. 46 (Pappas Decl.), ¶¶ 10-12 (federal funding supports six hazardous material teams, four decontamination teams, and the Rhode Island State Fire Academy). In sum, losing this funding increases the daily risk that more natural gas pipelines may explode, or that more cars, planes, or trains may crash, causing serious injuries and death. *See, e.g.*, Ex. ~~56~~52 (Lawry Decl.), ¶ 13; *see Coleman v. Paccar, Inc.*, 424 U.S. 1301, 1307-08 (1976) (Rehnquist, J., in chambers) (delay in implementation of transportation safety measures qualified as irreparable harm).

### III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN PLAINTIFF STATES' FAVOR.

Last, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,20 (2008). Through the Immigration Enforcement Condition, U.S. DOT aims to conscript state and local officials as enforcers of federal immigration law or, failing that, to withhold funding to Plaintiff States under all programs administered by any component of U.S. DOT. Either result would impose severe hardship on Plaintiff States and contravene the public interest. Enjoining this unconstitutional action, on the other hand, would impose no cognizable hardship on Defendants. Therefore, "the hardship to the nonmovant if enjoined" pales in comparison to "the hardship to the movant if no injunction issues." *Ross-Simons*, 102 F.3d at 15.

As described above, the balance of the hardships and the public interest sharply favors an injunction due to the devastating and irreparable harm Plaintiff States face by either surrendering their sovereignty and undermining public safety or losing billions of dollars in public safety funding. *See, e.g.*, *supra* pp. 34-40; Ex. 38 (Ho Decl.), ¶ 55; Ex. ~~57~~30 (Wiedefeld Decl.), ¶¶ 19, 42; Ex. 16 (Duncan Decl.), ¶¶ 23-24. As Congress has decided, federal funding is essential to

support the States in improving and maintaining a safe and robust transportation system upon which millions rely. *See, e.g.*, 23 U.S.C. § 101(b)(1) ("[I]t is in the national interest to accelerate the construction of Federal-aid highway systems."); 49 U.S.C. § 5301 ("It is in the interest of the United States, including the economic interest of the United States, to foster the development and revitalization of public transportation systems . . . ."); 49 U.S.C. § 24101 ("Modern and efficient intercity passenger and commuter rail passenger transportation is important to the viability and well-being of major urban and rural areas and to the energy conservation and self-sufficiency goals of the United States."). And as courts have found, "the public interest would appear to be better served if the [State] did not have to choose between the . . . grant funds . . . and the health of [its] relationship with the immigrant communities." *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 970 (N.D. Cal. 2018), *aff'd in part, vacated in part on other grounds, sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020) (internal quotation marks omitted). An injunction here would "bring[] clarity to all parties and to citizens dependent on public services," including the roads, buses, and ferries they rely upon every day to travel to their workplaces and their homes. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

On the other side of the ledger, Defendants would suffer no harm by simply maintaining the status quo, in which they disburse these congressionally mandated funds without the Immigration Enforcement Condition attached. *See Sessions*, 888 F.3d at 291 (no harm to the government where it can "distribute the funds without mandating the conditions—as has been done for over a decade"). "Continuation of [that] status quo will not work an irreparable harm" on Defendants. *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers); *see also Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009) ("[T]he purpose of a preliminary injunction is to preserve the status quo *before* the merits have been resolved."). Put another way, "if any injury to defendants ensues, it would be self-inflicted, the result of improper agency decision to steamroll the implementation of its plans." *P.R. Conservation Found. v. Larson*, 797 F. Supp. 1066, 1072-73 (D.P.R. 1992). Congress charged U.S. DOT with "encourage[ing] cooperation of Federal, State, and local governments . . . to

achieve *transportation* objectives," 49 U.S.C. § 101(b)(3) (emphasis added). They cannot complain of an injunction that merely obliges them to perform that duty without attaching sweeping funding conditions never contemplated by Congress.[7]

## CONCLUSION

This Court should grant the motion for a preliminary injunction, enjoin Defendants from implementing the Duffy Directive, and enjoin Defendants from imposing the Immigration Enforcement Condition on U.S. DOT funding.

May 2123, 2025                                    Respectfully submitted,

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
James E. Stanley
  *Supervising Deputy Attorneys General*
Brandy Doyle
Luke Freedman
Newton Knowles
Christopher Medeiros
Alexis Piazza
Deylin Thrift-Viveros
Delbert Tran
  *Deputy Attorneys General*

/s/ Delbert Tran
Delbert Tran
  *Deputy Attorney General*
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
(415) 229-0110
delbert.tran@doj.ca.gov

*Attorneys for the State of California*

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

---

[7] For similar reasons, the Court should not require payment of a bond. *See Int'l Ass'n of Machinists & Aerospace Workers*, 925 F.2d 6, 9 (1st Cir. 1991) (court has discretion whether to require a bond and in what amount).

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
  *Deputy Solicitor General*
Mayur P. Saxena
  *Assistant Attorney General*
Maryanne M. Abdelmesih
Surinder K. Aggarwal
Yael Fisher
Nathaniel F. Rubin
  *Deputy Attorneys General*
25 Market St., PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*


**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

/s/ James C. Luh
James C. Luh
  *Senior Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorneys for the State of Maryland*


**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Michael K. Skold
Michael K. Skold
  *Solicitor General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
michael.skold@ct.gov

*Attorneys for the State of Connecticut*


**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Patrick Reynolds
Kathryn M. Sabatini (RI Bar No. 8486)
  *Civil Division Chief*
  *Special Assistant Attorney General*
Patrick Reynolds (RI Bar No. 10459)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
preynolds@riag.ri.gov
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*


**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO

/s/ Sam Wolter
Sam Wolter
  *Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
samuel.wolter@coag.gov

*Attorneys for the State of Colorado*


**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
David D. Day
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
  *Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of
  Massachusetts*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*

**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail
  *Deputy Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
vivian.mikhail@maine.gov

*Attorneys for the State of Maine*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti
Michael Dittenber
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
DittenberM@michigan.gov

*Attorneys for the People of the State of
  Michigan*

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Attorneys for the State of Nevada*

**RAÚL TORREZ**
   ATTORNEY GENERAL OF NEW MEXICO

/s/ Steven Perfrement
Steven Perfrement
   *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
sperfrement@nmdoj.gov

*Attorneys for the State of New Mexico*

**LETITIA JAMES**
   ATTORNEY GENERAL OF NEW YORK

/s/ Zoe Levine
Zoe Levine
   *Special Counsel for Immigrant Justice*
Julie Dona
   *Special Counsel*
Rabia Muqaddam
   *Special Counsel for Federal Initiatives*
Mark Ladov
   *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 907-4589
zoe.levine@ag.ny.gov

*Attorneys for the State of New York*

**DAN RAYFIELD**
   ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli
   *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
   ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Julio A. Thompson
   *Assistant Attorney General*
   *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3657
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

NICHOLAS W. BROWN
  ATTORNEY GENERAL OF WASHINGTON

/s/ Benjamin Seel
Benjamin Seel
Tyler Roberts
Cristina Sepe
Marsha Chien
  *Assistant Attorneys General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov
Tyler.Roberts@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Marsha.Chien@atg.wa.gov

*Attorneys for the State of Washington*

JOSHUA L. KAUL
  ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reynolds Colbert
Frances Reynolds Colbert
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*