## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, et al.,

      Plaintiffs,

      v.

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

      Defendants.

Civil Action No.
25-cv-000208-JJM-PAS

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

BACKGROUND.................................................................................................4

STANDARDS OF REVIEW .................................................................................9

I.    SUBJECT MATTER JURISDICTION................................................9

II.   PRELIMINARY INJUNCTION.......................................................10

ARGUMENT...................................................................................................11

I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS...................................................................................................11

      A.   This Court Lacks Jurisdiction over Certain of Plaintiffs' Claims Because they are Within the Exclusive Jurisdiction of the Circuit Courts. ..........................................11

      B.   The Court of Federal Claims has Jurisdiction to Hear Plaintiffs' Remaining Claims Seeking Compulsion of Payments of the Remaining Federal Grants. ...................................15

      C.   Framing Plaintiffs' Contractual Claims As Constitutional Claims Does Not Provide Jurisdiction in this Court.........................19

           1. Plaintiffs Seek to Enforce Contract Rights. ........................................21

           2. Plaintiffs Seek Contract Remedies. ......................................23

II.   PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS. ..............................................................25

      A.   Plaintiffs are Unlikely to Succeed on their APA or Separation of Powers Claims.................................................25

           1. Standard of Review ........................................................25

           2. Clear DOT Congressional Authority Forecloses Plaintiffs' Claims.........................................................27

      B.   Plaintiffs Cannot Prevail on their Spending Clause Claim..............30

C.    Plaintiffs Are Incorrect in Their Claim that The Immigration Conditions Are Impermissibly Ambiguous Grant Terms. ........................................................................... 34

III.    PLAINTIFFS HAVE NOT PROVEN IRREPARABLE HARM. ................. 37

IV.    IF THE COURT ENTERS A PRELIMINARY INJUNCTION, THE HARM TO THE GOVERNMENT CANNOT BE REMEDIED. ........................................................................... 40

V.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN THE FEDERAL GOVERNMENT'S FAVOR. ................................................................................... 40

VI.    THE COURT SHOULD LIMIT ANY INJUNCTIVE RELIEF TO GRANTS PLAINTIFFS SPECIFICALLY IDENTIFY AND ONLY TO ANY REQUIREMENTS THAT GO BEYOND EXISTING OBLIGATIONS TO COMPLY WITH FEDERAL LAW. ................................................................................... 41

VII.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND BE ACCOMPANIED BY A BOND. ....................................... 42

CONCLUSION ........................................................................... 43

## INTRODUCTION

Twenty states ask this Court to enjoin the U.S. Department of Transportation ("DOT") from withholding or conditioning grant funds on certain immigration related conditions (the "Immigration Conditions"). Plaintiffs' claims face a threshold barrier: this Court lacks subject-matter jurisdiction over them. At base, Plaintiffs are asserting that they are entitled to payment by the Government under grant agreements. These claims are either subject to the exclusive statutory jurisdiction of the appeals courts or are Tucker Act actions over which the Court of Federal Claims has exclusive jurisdiction. 49 U.S.C. §§ 46110, 47311, 60119, 20114(c), 8 U.S.C. §§ 1346(a)(2), 1491(a)(1). Plaintiffs' separation-of-powers and Spending Clause claims are statutory challenges to conditions of the grants by another name, for which there is no jurisdiction in this Court.

Because this Court lacks jurisdiction, it need not consider Plaintiffs' other arguments. If it does, however, Plaintiffs' bid for an injunction fails for additional reasons. First, Plaintiffs cannot show they are likely to succeed on the merits of their claims. Their argument that DOT lacks statutory authority for its action is contrary to explicit grants of authority to the Secretary of DOT. For example, pursuant to 49 U.S.C. § 5334(a)(1), DOT is authorized to "prescribe terms for a project that receives Federal Financial assistance" for all Federal Transit Administration grants. *Id.* Where, as here, Congress has provided the relevant authority to the agency, there is no valid separation of powers issue.

Moreover, Plaintiffs' Administrative Procedure Act ("APA") claims fail because, as explained above, the Secretary of Transportation has the authority to prescribe terms for these grants. The decision to place conditions on grants is therefore committed to agency discretion by this explicit grant of authority, and requiring compliance with federal law and cooperation with federal law enforcement is a reasonable exercise of that discretion.

Plaintiffs also have not demonstrated any violation of the Spending Clause here. The Supreme Court, in *South Dakota v. Dole*, 483 U.S. 203, 210-212 (1987), explicitly recognized that the Federal Government may impose conditions on funding to further its own policies and priorities. Nor does *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (hereinafter, "*NFIB*") hold otherwise. To the contrary, although the Supreme Court in *NFIB* ruled that the withholding of all Medicaid funding would be too great a burden to impose on the states to induce them to expand their Medicaid programs, the Court made clear that this was due to the size and scope of the funding being threatened—and the expansive new program being required. *Id.* at 587. Plaintiffs have not demonstrated such a level of threat here.

In addition, Plaintiffs cannot show imminent, irreparable harm warranting emergency relief. The harm they face is monetary, which is quintessential reparable harm. Moreover, to the extent that the Immigration Conditions are read to require compliance with federal law or to prohibit obstruction of federal

law enforcement, there can be no harm, let alone irreparable harm, because the Plaintiffs are already required to comply with federal law.

The public interest and balance of equities also do not favor an injunction because much of the disbursement of public funds to Plaintiffs is likely irreversible, and the Government has an interest in ensuring federal funds are used in compliance with federal conditions and federal law.

Lastly, if the Court nonetheless grants Plaintiffs' motion, any injunctive relief should be narrowly tailored to the specific conditions and grants at issue, allow for lawful agency activity, apply only to Plaintiffs, and be secured by an appropriate bond. Any relief that this Court grants should be narrowly tailored to those issues as to which the record supports a finding of irreparable harm. Since compliance with federal law is a legal requirement in any event under the Supremacy Clause, any relief should be limited to enjoining only those portions of the Immigration Conditions that could be read as requiring more than that. As to any remaining Immigration Conditions, rather than take the extraordinary step of issuing a preliminary injunction based on Plaintiffs' conjecture about how those conditions may be applied, the Court should chart a more cautious path and wait to address any actual application of these provisions that goes beyond simply requiring compliance with federal law. Regardless, any relief should be stayed pending a determination by the Solicitor General whether to appeal and, if appeal is authorized, pending any appeal.

The United States incorporates by reference the Hubbard Declaration attached to this Opposition.

## BACKGROUND

DOT administers various grant programs relating to transportation. Some are discretionary, while others are "formula" grants, in which Congress designates specific sums to be made available for transit projects based on statutory formulas. Hubbard Decl. ¶ 3.

DOT administers grants through many of its subagencies (also referred to as "modes"), including the Federal Aviation Administration ("FAA"), Federal Highway Administration ("FHWA"), Federal Motor Carrier Safety Administration ("FMCSA"), Federal Railroad Administration ("FRA"), Federal Transit Administration ("FTA"), Maritime Administration ("MARAD"), National Highway Traffic Safety Administration ("NHTSA"), Office of the Secretary of Transportation ("OST"), and Pipeline and Hazardous Materials Safety Administration ("PHMSA"). *Id.* ¶ 4. DOT formula funds are distributed, according to a Congressionally-predetermined formula, to states, federally recognized Tribal recipients, and transit agencies, which may then allocate amounts to eligible local entities. *See* Federal Funding and Financing: Grants, US DOT, https://www.transportation.gov/rural/grant-toolkit/funding-and-financing/grants-overview.

For competitive grants, each DOT mode solicits applications and selects projects based on program and applicant eligibility, evaluation criteria, and De-

partmental or program priorities, therefore making it "competitive." *Id.* In general, to apply for discretionary grants, an eligible applicant must submit a proposal in response to a Notice of Funding Opportunity ("NOFO") outlining program eligibility criteria and requirements. Hubbard Decl. ¶ 5.

DOT conducts merit reviews of submitted applications and selects recipients to award funding based on the stated criteria in the NOFO. *Id.* If an application is selected for award, before DOT will proceed with the execution of the grant agreement, the applicant must demonstrate that they have met certain pre-award requirements, which vary based on the nature of the planned activities. *Id.* If selected, the applicant settles upon matters such as the scope, schedule or budget of the project, and signs a grant or project agreement with DOT. *See* Grant Application Roadmap, US DOT, https://www.transportation.gov/rural/grant-toolkit/grant-application-process/grant-applicant-roadmap. Once the grant project agreement has been executed, DOT disburses funds, and the grantee implements the awarded project and adheres to all necessary conditions of the award. *Id.* DOT may disburse funds as an advance payment or as a reimbursement for eligible expenses incurred. *Id.*

In general, the grant agreement incorporates by reference General Terms and Conditions that impose obligations on the recipient. Hubbard Decl. ¶ 6. The subagencies routinely update their General Terms and Conditions that apply to their programs to reflect changes in applicable law or policy. *Id.* at ¶ 7. When a

DOT subagency updates its General Terms and Conditions, it makes this information available to all applicants selected for award prior to grant agreement execution and posts a copy of the latest version on its public website before incorporating the new version into new federal grants or grant amendments. *Id.*

On January 29, 2025, DOT Secretary Duffy issued an order which set forth a set of principles to govern the implementation and administration of all DOT policies, programs, and activities: including,

> (f) ***To the maximum extent permitted by law***, DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts, shall prioritize projects and goals that: . . .
>
>> (v) require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary.

ECF No. 42, Plaintiffs' Exh. 1 at 2 (emphasis added).

On April 24, 2025, Secretary Duffy sent a letter to all recipients of DOT funding to, among other things,

> clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

*Id.*, Plaintiffs' Exh. 2 at 1. Among other things, the letter reminded recipients of their legal obligations not to discriminate in violation of federal law. *Id.* It also provided:

In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including co-operating with and not impeding U.S. Immigration Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistant programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and cooperate with Federal officials in the enforcement of Federal immigration law.

*Id.* at 2-3. The letter further provides:

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support though its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

*Id.* at 3.

Various subagencies of DOT added language to reflect or reiterate this reminder in their grant terms or conditions. For example, the FRA General Terms and Conditions, issued on April 23, 2025, provide:

7

Federal Law and Public Policy Requirements

(a) The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

*Id.*, Plaintiffs' Exh. 4 at 28-29; *see also id.*, Plaintiffs' Exh. 5 at 25 (FHWA Competitive Grant Program General Terms & Conditions, providing same).

These revised terms do not apply retroactively to impact funds that have already been disbursed to recipients. Hubbard Decl. ¶ 10. Further, DOT's grant agreements require the agency to provide the recipient written notice of any perceived violation of the agreement, as do DOT's procedural requirements. *Id.* at ¶ 9. DOT issued a memorandum in March 2025 clarifying and reiterating DOT's policy to provide fair notice and due process in any enforcement action. *Id.*; *see also* Memorandum re. Procedural Requirements for DOT Enforcement Actions, Dep't of Transp. (Mar. 11, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-03/Procedural%20Requirements%20for%20DOT%20Enforcement%20Actions.Cote%20Memo.Signed.03-11-2025.pdf.

## STANDARDS OF REVIEW

### I.    SUBJECT MATTER JURISDICTION

To proceed on their claims, the Plaintiff states must first establish subject-matter jurisdiction in this Court—specifically, by showing whether Congress has waived sovereign immunity and, if so, whether this Court may hear their claims. *See, e.g.*, *Hanley v. United States*, No. 94-1315, 1994 WL 723678, at *2 (1st Cir. Oct. 5, 1994) (per curiam) (affirming R. 12(b)(1) dismissal) ("A plaintiff has the burden of showing a waiver of sovereign immunity."). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *Griffith v. Bowen*, 678 F. Supp. 942, 944 (D. Mass. 1988) ("[T]his Court must decide whether it has jurisdiction over the subject matter of the dispute before it may proceed any further.").

Federal courts "presume [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (cleaned up). The test for deciding whether sovereign immunity has been waived is "stringent," the waiver must be "unmistakably clear," and the Court must "indulge every reasonable presumption against" waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999); *F.A.A. v. Cooper*, 566 U.S. 284, 290 (2012) ("[A] waiver of sovereign immunity must be unequivocally expressed in statutory text.") (cleaned up).

The plaintiff has the burden of alleging facts sufficient to establish the court's subject matter jurisdiction. *See Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996); *see also Padilla-Mangual v. Pavía Hosp.*, 516 F.3d 29, 31 (1st Cir. 2008) (once challenged, "the party invoking subject matter jurisdiction . . . has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction").

## II.   PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). A plaintiff must establish that: (i) it likely will succeed on the merits; (ii) absent preliminary relief, it likely will suffer irreparable harm; (iii) the balance of the equities tips in its favor; and (iv) an injunction is in the public interest." *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025) (citing *Winter*, 555 U.S. at 20). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gamble*, 480 U.S. 531, 542 (1987). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor[,]" using "any relevant evidence" to support its conclusions. *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18, 19 (1st Cir. 2006).

In evaluating whether the Plaintiffs have demonstrated a likelihood of success on the merits, the merits need not be "conclusively determine[d];" instead, at this stage, decisions "'are to be understood as statements of probable outcomes' only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## ARGUMENT

### I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.

#### A. This Court Lacks Jurisdiction over Certain of Plaintiffs' Claims Because they are Within the Exclusive Jurisdiction of the Circuit Courts.

As a preliminary matter, some of the claims that Plaintiffs assert may be specifically designated by statute to the exclusive jurisdiction of the circuit courts.  For example, the Federal Aviation Act, 49 U.S.C. § 46110 provides that a challenge an order by the Secretary of DOT, the Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the case must be done by "filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has

its principal place of business. The petition must be filed not later than 60 days after the order is issued." 49 U.S.C. § 46110(a). It further provides that the circuit court in which the petition is filed has "exclusive jurisdiction to affirm, amend, modify or set aside any part of the order and may order the Secretary [and other DOT officials] to conduct further proceedings. *Id.* § 46110(c). And that any such decision by the circuit court "may be reviewed only by the Supreme Court." *Id.* § 46110(e). Similarly, 49 U.S.C. § 47111(d)(3) provides with respect to aviation program grants:

> A person adversely affected by an order of the Secretary withholding a payment may apply for review of the order by filing a petition in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the project is located. The petition must be filed not later than 60 days after the order is served on the petitioner.

*Id.*

In *Tulsa Airports Improvements Tr. v. United States*, 120 Fed. Cl. 254 (2015), the Court of Federal Claims held that 49 U.S.C. § 46110 displaced Tucker Act jurisdiction with respect to claims challenging FAA's denial of reimbursement for certain costs under grant agreement. The court explained:

> '[U]nless the Tucker Act has been displaced or modified by explicit federal statutory law or treaty,' the Act grants this court general jurisdiction over claims arising under contracts with the federal government. . . . 'The [displacing] exceptions [to Tucker Act jurisdiction] are few and far between.'

*Id.* at 259 (citing *Bos. Edison Co. v. United States*, 64 Fed. Cl. 167, 175 (2005).

12

The court then found that 49 U.S.C. §§ 46110 and 47111 are examples of those statutes that displace the jurisdiction of the Court of Claims under the Tucker Act. *Id.* at 259-60, 263; *see also, e.g., Pucciariello v. United States,* 116 Fed. Cl. 390, 409 (2014) (finding "the specific and exclusive jurisdictional authority granted to the federal courts of appeals in 49 U.S.C. § 46110 controls and takes precedence over the general and non-exclusive jurisdictional authority afforded by the Tucker Act."); *Blitz v. Napolitano,* 700 F.3d 733, 740 (4th Cir. 2012) ("Congress clearly expressed its intention that any legal challenge to a § 46110 order . . . be brought in the first instance in a court of appeals."); *Jones v. United States,* 625 F.3d 827, 829 (5th Cir. 2010) ("Section 46110(a) of the Federal Aviation Act vests the exclusive jurisdiction over challenges to FAA orders in certain United States Courts of Appeals."); *Americopters, LLC v. F.A.A.,* 441 F.3d 726, 732 (9th Cir. 2006) ("We have direct and exclusive jurisdiction over the review of FAA final orders under 49 U.S.C. § 46110."); *St. John's United Church of Christ v. City of Chi.,* 502 F.3d 616, 628 (7th Cir. 2007) (holding that "exclusive jurisdiction" over disputes concerning airport development rests in the court of appeals); *Diaz Aviation Corp. v. Alvarez,* 556 F. Supp. 2d 94, 97 (D.P.R. 2008) (noting that the Federal Aviation Act provides that the courts of

appeals have "exclusive jurisdiction to affirm, amend, modify, or set aside" orders of the National Transportation Safety Board ("NTSB") or the FAA).[1]

Moreover, as the First Circuit has explained:

The term 'order' is read expansively in review statutes generally, 5 U.S.C. § 551(6) (1994) (an 'order' includes 'the whole or a part of a final disposition, [including those] declaratory in form'), and this statute [49 U.S.C. § 46110] specifically[.]

*Aviators for Safe & Fairer Regulation, Inc. v. FAA*, 221 F.3d 222, 225 (1st Cir. 2000) (citations omitted) (holding that exclusive review over a challenge to the FAA pilot rest policy under § 46110 lies with the First Circuit). The definition of an order includes decisions by letter such as those at issue here. The Tenth Circuit has explained:

A communication need not be formal to constitute a final agency action. Numerous circuits have held that letters from the FAA, including those not issued by the Administrator, constitute 'orders' for purposes of 49 U.S.C. § 46110. *Aerosource, Inc.,* 142 F.3d at 577-78 (collecting cases). Further, under a similar statute, we have concluded that an informal agency communication may constitute an order suitable for judicial review. *TransAm Trucking, Inc. v. Fed. Motor Carrier Safety Admin.*, 808 F.3d 1205, 1212 n.4 (10th Cir. 2015) ("[T]he informal nature of the email communication doesn't necessarily determine whether it was a 'final order' within the meaning of [28 U.S.C.] § 2342(3)(A).").

---

[1] Statutes "such as Section 46110(c) that vest judicial review of administrative orders exclusively in the court of appeals also preclude district courts from hearing claims that are inescapably intertwined with the review of such orders." *Merritt v. Shuttle,* 245 F.3d 182, 187-88 (2d Cir. 2001) (internal quotation and citation omitted). "A claim is inescapably intertwined with the review of an administrative order if it alleges that the plaintiff was injured by such an order and that the court of appeals has authority to hear the claim on direct review of the agency order." *Diaz Aviation Corp.,* 556 F. Supp. 2d at 98 (quotations and citations omitted).

*Tulsa Airports Improvement Tr. v. F.A.A.*, 839 F.3d 945, 949 (10th Cir. 2016) (agreeing, after transfer, that jurisdiction lay in the Court of Appeals).

Thus, to the extent that the Plaintiffs are challenging an order of the Secretary to implement these conditions with respect to matters relating to programs covered by such explicit jurisdictional carve-outs, such as the FAA's Airport Improvement Program, the PHMSA's State Pipeline Safety Grants, and the FRA's Railroad Safety State Participation Grant Program, *see* ECF No. 1 at ¶¶ 86, 125-34, 151-55, there is no subject matter jurisdiction in this Court.[2]

### B. The Court of Federal Claims has Jurisdiction to Hear Plaintiffs' Remaining Claims Seeking Compulsion of Payments of the Remaining Federal Grants.

This Court lacks jurisdiction over the remainder of Plaintiffs' claims because they arise from Plaintiffs' contracts with the Government and should therefore be heard in the Court of Federal Claims. The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded either

---

[2] Other such jurisdictional exceptions relating to other DOT modes may place jurisdiction only in circuit courts. *See, e.g.*, 49 U.S.C. § 60119 (providing direct review at the circuit court for a person adversely affected by a regulation or order prescribed under the pipeline safety chapter, applied to PHMSA); 49 U.S.C. § 20114(c) (a Federal Railroad Administration statute that states, "[e]xcept as provided in section 20104(c) of this title, a proceeding to review a final action of the Secretary of Transportation under [PART A] or, as applicable to railroad safety, chapter 51 or 57 of this title shall be brought in the appropriate court of appeals as provided in chapter 158 of title 28."); *see also* 28 U.S.C. § 2342 (providing direct review at the court of appeals as exclusive jurisdiction to challenge final orders issued by DOT pursuant to section 50501, 50502, 56101-56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49).

upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Thus, where a party seeks funding that it believes the Government is obligated to pay under a contract, their suit must proceed only in the Court of Federal Claims. *See, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983) (vacating district court judgment; concluding district court lacked jurisdiction under 5 U.S.C. § 702 to award money judgment); *id.* ("[E]ven if we agreed with [claimant] that the award was equitable and did not constitute 'money damages,' we would still find that section 702 did not remove the defense of sovereign immunity."); *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978) ("Irrespective of the terminology employed . . . the object of the instant suit is clearly to compel appellants [the agency] in their official capacities to specifically perform a contract") (citations and quotations omitted). This prohibition on district court jurisdiction extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

In April, the Supreme Court stayed a district court order to make payments based on grants because the Government was "likely to succeed in showing that the District Court lacked jurisdiction" to bar termination of various education-related grants. *U.S. Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). The Supreme

Court held the injunction was effectively an order "to enforce a contractual obligation to pay money," and thus not covered by the APA's limited waiver of sovereign immunity; instead, the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over such suits. *Id.* This Court should follow the Supreme Court's stay ruling. *See McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991) (noting that "courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings"); *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) ("[T]his court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements."); *Am. Civ. Liberties Union of Ky. v. McCreary Cnty.*, 607 F.3d 439, 447 (6th Cir. 2010) (lower courts "obligated to follow Supreme Court dicta" absent "substantial reason for disregarding it, such as age or subsequent statements undermining its rationale").

Nor does *Massachusetts v. Bowen*, 487 U.S. 879 (1988), require a different result. In *California*, the Supreme Court specifically considered and distinguished *Bowen* in finding that the Tucker Act applied to that case. *California*, 145 S. Ct. at 968. The district court in *California* had held that it had jurisdiction based on an expansive reading of *Bowen*. *See California v. U.S. Dep't of Educ.*, No. 25-cv-10548, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025) (adopting reasoning of *Massachusetts. v. Nat'l Inst. of Health*, No. 25-cv-10340, 2025 WL 702163, at *7-8 (D. Mass. Mar. 5, 2025)). The Supreme Court, however, rejected

that holding in its stay order, ruling the district court likely did not have juris-diction. *California*, 145 S. Ct. at 968.

The United States recognizes that this Court and others have rejected the applicability of the Tucker Act in similar cases even after the Supreme Court's ruling in *California*.[3] However, the D.C. Circuit recently stayed enforcement of two district court injunctions restoring or extending plaintiffs' federal grants, on the ground that the lower courts "likely lacked jurisdiction" to issue the injunc-tions. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025), *petition for rehearing en banc denied*, 2025 WL 1521355 (D.C. Cir. May 28, 2025); *RFE/RL, Inc. v. Lake*, No. 25-5158, 2025 WL 1453770, at *3 (D.C. Cir. May 7, 2025). The D.C. Circuit stayed enforcement of these injunctions because it concluded that the Government was likely to succeed in showing that "the in-herently contractual nature of the relief afforded" made the Court of Federal Claims the exclusive forum for the suit. *Widakuswara*, 2025 WL 1288817, at *4;

---

[3] *See e.g., Assoc. of Am.. Univ. v. U.S. Dep't of Energy*, No. 25-cv-10912, 2025 WL 1414135 (D. Mass May 15, 2025); *Massachusetts v. Kennedy*, No. 25-cv-10814, 2025 WL 1371785 (D Mass. May 12, 2025) *Rhode Island v. Trump*, No. 25-cv-128, 2025 WL 1303868, at *5 (D.R.I. May 6, 2025); *Colorado v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-00121, 2025 WL 1426226 (D.RI. May 16, 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't. of Agric.*, No. 25-cv-00097, 2025 WL 1116157 (D.R.I. April 15, 2025); *Maine v. U.S. Dep't. of Agric.,* No. 25-cv-00131, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025) (rejecting Tucker Act jurisdiction in case challenging termination of education-related grants); *New York v. Trump*, No. 25-cv-39, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025) (rejecting Tucker Act jurisdiction in case challenging alleged federal implementation of categorial freeze on obligated funds), *appeal filed*, No. 25-1413 (1st Cir. Apr. 28, 2025).

*see RFE/RL*, 2025 WL 1453770, at *37. While the D.C. Circuit has administratively stayed the stays in *RFE/RL* and *Widakuswara*, it noted specifically that the administrative stay conveyed no judgment about the merits of the cases. *Middle E. Broad. Networks, Inc. v. United States*, No. 25-5150, 2025 WL 1378735, at *1 (D.C. Cir. May 7, 2025) (en banc) (per curiam).

Similarly, in *Massachusetts Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, No. 25-cv-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025), a court granted a motion to dissolve the court's Temporary Restraining Order ("TRO") based upon the Supreme Court's stay in *U.S. Dep't of Educ. v. California* and stating that the court likely lacked jurisdiction for the case challenging whether agency-terminated grants in violation of the terms of the agreement was subject to the Tucker Act. The court explained that even if the plaintiffs had a likelihood of success on the merits, the court "is merely deferring (as it must) to the Supreme Court's unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims." *Id.* The same is true here, and the Court lacks jurisdiction over the Plaintiff states' claims as a result.

### C.    Framing Plaintiffs' Contractual Claims As Constitutional Claims Does Not Provide Jurisdiction in this Court.

That Plaintiffs frame some of their claims here as constitutional does not change the analysis. The Federal Circuit has emphasized, that "in determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, we must look beyond the form of the pleadings to the substance of the claim. We have cautioned litigants that dressing up a claim for money as one for

equitable relief will not remove the claim from Tucker Act jurisdiction to make it an APA case." *Suburb. Mortg. Assocs., Inc.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007); *see also Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) ("[A] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.") (citation omitted); *Consol. Edison Co. of New York, Inc. v. U.S. Dep't. of Energy*, 247 F.3d 1378, 1385 (Fed. Cir. 2001) ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."); *Vill. W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*, 618 F.Supp.2d 134, 139-40 (D.R.I. 2009) (rejecting as "without merit" the "familiar argument" that by seeking a prospective declaration regarding future agency actions, the Court of Federal Claims could not provide adequate relief in case where the Tucker Act applies).

The real question, then, is not how Plaintiffs have characterized their claims, but "whether the cause is one over which the Court of Federal Claims has jurisdiction under the Tucker Act" and thus whether there is an adequate remedy in a court other than the district court, thereby precluding APA jurisdiction under 5 U.S.C. § 704. *See Suburb. Mortg. Assocs., Inc.*, 480 F.3d at 1125. "If the suit is at base a claim for money, and the relief available through the Court of Federal Claims under the Tucker Act—a money judgment—will provide an adequate remedy, the inquiry is at an end." *Id.*; *see also 112 Genesee St., LLC v. United States*,

172 Fed. Cl. 426, 438 (Fed. Cl. 2024) (finding Tucker Act provided Court of Federal Claims jurisdiction over claims that the Small Business Administration failed to award plaintiffs certain COVID-related grants and noting that the Supreme Court's holding in *Bowen* "has been narrowly interpreted by the Federal Circuit"), *appeal filed*, No. 25-1373 (Fed. Cir. Jan. 17, 2025).

To determine whether a particular action is "at its essence a contract action" subject to the Tucker Act, a court must examine "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Here, Plaintiffs' claims fail both prongs of that test: (1) Plaintiffs seek to enforce rights under their contracts with the Government; and (2) as relief, Plaintiffs seek specific performance of those contracts.

### 1. Plaintiffs Seek to Enforce Contract Rights.

To determine whether the source of the rights in question is contractual, a court must consider whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights exist prior to and apart from rights created under the contract"; and whether "the plaintiff seeks to enforce any duty imposed upon the government by the . . . relevant contracts to which the government is a party." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (cleaned up).

Here, the source of Plaintiffs' claimed rights is their grant agreements. Plaintiffs seek to challenge the Immigration Conditions "in both the general and specific

terms and conditions for U.S. DOT grant agreements." ECF No. 49 at 1. Thus, their allegations make clear that the purpose of the suit is to challenge contractual terms.

Courts have routinely held that such "grant agreements [are] contracts when the standard conditions for a contract are satisfied." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004) (treating a "Program Participation Agreement" and related grants under the Higher Education Act as a contract). In general, if the grant agreements to which Plaintiffs are party had never existed, Plaintiffs would have no claim to funds from the agencies. That means the source of Plaintiffs' rights are contractual, and this Court lacks jurisdiction. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (court lacks subject-matter jurisdiction because asserted right to payment "in no sense . . . exist[ed] independently of that contract"). Whether labeled as APA or constitutional claims, absent other exclusive statutory jurisdiction, the Tucker Act governs where the "essential rights at stake" are contractual, "despite plaintiff's allegations of statutory and constitutional violations." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77-78 (D.C. Cir. 1985).

Lastly, even if this Court concludes the Tucker Act does not remove jurisdiction over all of Plaintiffs' claims, it still must dismiss or transfer the claims that indisputably sound in contract, because "pendent jurisdiction has no application to a claim against the United States." *Lenoir v. Porters Creek Watershed Dist.*, 586 F.2d 1081, 1087 (6th Cir. 1978); *see McKay v. United States*, 703 F.2d

464, 470-71 (10th Cir. 1983) (rejecting jurisdiction where plaintiff sought to bring Tucker Act claim, for which jurisdiction lies exclusively with the Claims Court, as a pendent claim to a claim properly before the court); *see also RFE/RL*, 2025 WL 1453770, at *2 (holding the district court likely lacked jurisdiction to enforce payment under contracts that were under negotiation).[4]

### 2. Plaintiffs Seek Contract Remedies.

Second, to determine whether a claim sounds in contract, the Court must examine what relief Plaintiffs seek. Where, as here, a plaintiff seeks to enforce a contractual agreement with the Federal Government and obtain payment of money, the inquiry is straightforward: a district court "cannot order the Government to pay money due on a contract." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 25-cv-00465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025). A request for an order that the Government "must perform" on its contract (unless subject to direct appellate review by statute) is one that "must be resolved by the Claims Court." *Id.* (quoting *Ingersoll-Rand Co.*, 780 F.2d at 80); *see also California*, 145 S. Ct. at 968. It makes no difference that Plaintiffs frame the relief they seek as an injunction barring Defendants from terminating their grants under

---

[4] In *RFE/RL*, Congress's FY2024 appropriations act required the agency to fund the plaintiff specifically; because the plaintiff was therefore seeking to enforce statutory rights rather than contract rights, the D.C. Circuit noted the district court likely had jurisdiction to consider whether the statute required the agency to enter into a grant agreement at all. *RFE/RL*, 2025 WL 1453770, at *2. But, even so, the court held the district court likely had no jurisdiction to dictate the terms and conditions of that agreement or to require the agency to pay out funds under it—precisely the relief Plaintiffs seek here. *Id.*

certain circumstances and requiring them to pay out on them—for the plaintiffs in *California* did the same. *California*, 145 S. Ct. at 968. Just as the Supreme Court observed in that case, a district court cannot grant any such relief.

Here, the purportedly non-monetary injunctive relief Plaintiffs seek—an order requiring that specific terms of their contracts be excised—is inseparable from the fundamentally contractual relief they seek—uninterrupted grant funding under those contracts. If Plaintiffs were not grantees of the agencies, they would have no way to negotiate the terms under which the Government administers its funds or to receive them. Accordingly, the equitable relief they request is auxiliary to their contractual claims. Plaintiffs cannot evade the exclusive jurisdiction of other courts merely by requesting equitable relief. *See N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994).

Plaintiffs are, in fact, seeking this Court to mandate continued payment of grants by DOT, as in *California*. *See* 145 S. Ct. at 968; *see also Cath. Bishops*, 2025 WL 763738, at *5, ("Stripped of its equitable flair, the requested relief seeks one thing: The Conference wants the Court to order the Government to stop withholding the money due under the Cooperative Agreements. In even plainer English: The Conference wants the Government to keep paying up. . . But this Court cannot order the Government to pay money due on a contract."); *Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (although "[plaintiff] attempts to couch his claims in the language of equitable and declaratory relief,

the only relief he seems to be seeking apart from monetary damages is reconsideration of his proposal or perhaps an order directing that his proposal be funded. Because . . . at bottom what he seeks is monetary relief based on what he perceived as a contract created by the communications he received in response to his proposal, [plaintiff] cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act"). Therefore, this Court lacks jurisdiction over Plaintiffs' claims.

## II.    PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS.

Because this Court lacks jurisdiction over Plaintiffs' claims, Plaintiffs cannot succeed on the merits. As the First Circuit has often recognized, proving likelihood of success on the merits is the "*sine qua non*" of a preliminary injunction." *See, e.g.*, *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Therefore, "[i]f the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *Id.* Even apart from the jurisdictional obstacles, Plaintiffs have not shown a likelihood of success on the merits because the agency's actions were not contrary to law, arbitrary, or capricious, nor did they violate the Constitution.

### A.    Plaintiffs are Unlikely to Succeed on their APA or Separation of Powers Claims.

#### 1.  Standard of Review

The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope

of review under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted); *see also Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (noting narrowness of arbitrary-and-capricious standard and that "a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'") (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). This deferential standard requires only that "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The explanation need only be clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review, not an explanation of "ideal clarity." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281, 286 (1974).

Moreover, in general, agencies have broad discretion in creating, awarding, and terminating specific grants. In *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), the Supreme Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* As the Supreme Court has acknowledged, in such circumstances, it is squarely within an

agency's discretion to determine whether to fund any specific program at all to meet permissible statutory objectives. *Id.* at 193. "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But as long as the agency abides by the relevant statutes, the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*

### 2.  Clear DOT Congressional Authority Forecloses Plaintiffs' Claims.

Plaintiffs are not likely to prevail on any of their APA or separation of powers claims because they seek to challenge decisions quintessentially "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). An agency's determination of how best to condition appropriated funds to fulfill its legal mandates is classic discretionary agency action. *See Lincoln*, 508 U.S. at 193.

Plaintiffs argue that the Immigration Conditions violate the APA and the separation of powers because the Secretary lacked authority to add such conditions. However, the Secretary is permitted to set terms for the projects DOT funds with grants. For example, 49 U.S.C. § 5334(a)(1), governing FTA, provides:

> (a) GENERAL AUTHORITY.—In carrying out this chapter, the Secretary of Transportation may—
>
> > (1) prescribe terms for a project that receives Federal financial assistance under this chapter . . . .

*Id.* As part of that general authority, the Secretary of Transportation may "include in an agreement or instrument . . . a covenant or term the Secretary . . .

considers necessary." *Id.* § 5334(a)(9).  Congress granted the Secretary of Transportation similar authority over several other DOT subagencies as well.[5]

Thus, this case is unlike the situation in *City of Providence*, 954 F.3d 23 (1st Cir. 2020), where this Court ruled on a summary judgment motion by the Rhode Island affected cities, and the First Circuit affirmed, finding that a grant condition relating to immigration was not within the authority of the DOJ Assistant Attorney General administering the Byrne grants. *Id.* at 39. The First Circuit's analysis in that case was focused on the statutory language at issue, which required grant applicants to comply with "all other applicable Federal laws," and the duties and functions of the Assistant Attorney General as delegated by statute. *See generally id.* at 36-39.

Here, the grants at issue are authorized by different statutes using different language for administration by a different agency with a different purpose, and thus the questions in this case are distinct from the First Circuit's statute-specific analysis

---

[5] *See also, e.g.,* 23 U.S.C. § 315 (re FHWA: "[except as otherwise provided] the Secretary is authorized to prescribe and promulgate all needful rules and regulations for the carrying out of the provisions of his title"); 46 U.S.C. § 54101(f)(1) (re MARAD: "To be eligible for assistance under this section, an applicant shall submit an application, in such form, and containing such information and assurances as the Administrator may require"); 49 U.S.C. § 24911(d) (re FRA: "In selecting a project for funding under this section—(vii)any other relevant factors, as determined by the Secretary); 49 U.S.C. § 47108(a) (re FAA: "The Secretary may impose terms on the offer that the Secretary considers necessary to carry out this subchapter and regulations prescribed under this subchapter"); 49 U.S.C. § 31104(e) (re FMCSA: The Secretary shall establish criteria for eligible activities to be funded with financial assistance agreements under this section"); 49 U.S.C. § 5116(i)(8) (re PHMSA: "The Secretary may impose such additional terms and conditions on grants to be made under this subsection as the Secretary determines are necessary to protect the interests of the United States and to carry out the objectives of this subsection.").

in *City of Providence*. Moreover, in *City of Providence*, the First Circuit endorsed language that Congress used in other circumstances to delegate the power to impose grant conditions. *Id.* at 41-42. This included language stating that an agency "may impose reasonable conditions on grant award to ensure that the States meet statutory, regulatory, and other program requirements," or that tasked officials with "awarding and allocating funds . . . on terms and conditions determined . . . to be consistent" with the statute. *See id.* This is similar to the language used by Congress in the statutes at issue in this case. Here, the DOT modes have explicit authority from Congress to decide the terms and conditions of their grants.

Also unlike the circumstances in *City of Providence*, the Secretary specifically explained the connection between the Immigration Conditions and the DOT mission in his letter, which stated: "It is the policy of the Department to award and continue to provide Federal financial assistance only to those recipients who comply with their legal obligations." ECF No. 42, Plaintiffs' Exh. 2 at 1. The Secretary further explained that actions that impede ICE investigations and Federal law enforcement in the area of immigration law "compromise the safety and security of the transportation systems supported by DOT financial assistance" among other things. *Id.* at 2-3. Thus, the Secretary has determined that compliance with the Immigration Conditions is necessary to the programs pursuant to which DOT is providing the grants at issue here. *See, e.g.*, 49 U.S.C. § 5334(a)(9). The Secretary also made clear that these restrictions were to extend only so far

as is consistent with existing law by ordering the implementation of these provisions only "[t]o the maximum extent permitted by law." ECF No. 42, Plaintiffs' Exh. 1 at 2. The Secretary's decision pursuant to his Congressionally authorized authority as to the terms under which states may receive federal grants, and consistent with the existing law, remains within the agency's discretion under *Lincoln*, 508 U.S. at 192-93.

### B. Plaintiffs Cannot Prevail on their Spending Clause Claim.

The Plaintiffs are also unlikely to succeed on the merits of their Spending Clause claim. The Federal Government is empowered to decide when it will fund certain activities by the states and under what conditions. Plaintiffs' assumption that Spending Clause doctrine requires Congress to set out by statute every requirement of a grant program in order for the requirement to be enforceable is not supported by Supreme Court precedent. For example, the Supreme Court upheld agency-imposed conditions on the Medicare and Medicaid programs in *Biden v. Missouri*. 595 U.S. 87, 90, 94 (2022) (per curiam) (finding that a new condition of participation in Medicare and Medicaid requiring facilities to ensure that staff are vaccinated against COVID-19 did not exceed applicable statutory authority, as HHS had "established long lists of detailed conditions with which facilities must comply to be eligible to receive Medicare and Medicaid funds" and was not limited to issuing "bureaucratic rules regarding the technical administration of" the programs); *see also Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) (stating that Congress cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements");

*West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023) ("[W]e do not question an agency's authority to fill in gaps that may exist in a spending condition."); *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 & n.22 (1983) (Marshall, J., dissenting) (noting that assurances of compliance with Title VI as part of applications for federal assistance are given "in consideration of" federal aid, "and the federal government extends assistance 'in reliance on' the assurance of compliance") (citation omitted).

Moreover, the Supreme Court has made clear that, even where the Federal Government may not be able to *compel* them to do a particular activity, it may *encourage* States and municipalities to implement federal regulatory programs. *See New York v. United States*, 505 U.S. 144, 149 (1992). Thus, the Federal Government can, constitutionally, use conditions on federal funds to "induce the States to adopt policies that the Federal Government itself could not impose." *NFIB*, 567 U.S. at 537. It may, for example, make certain federal funds available only to localities that enact a given regulatory regime. *Dole*, 483 U.S. 203, 205-08 (upholding federal statute conditioning state receipt of federal highway funds on state adoption of minimum drinking age of twenty-one). "[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment

violation." *Env't Def. Ctr. v. U.S. EPA,* 344 F.3d 832, 847 (9th Cir. 2003) (quotation omitted). The key is whether the financial inducement is "so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211.

Plaintiffs contend that the contested terms here cannot apply to DOT grants because those terms improperly "coerce" the states' compliance, as the Supreme Court found that new Medicaid initiatives improperly did in *NFIB*. ECF No. 49 at 29. Under the Plaintiffs' overbroad reading of *NFIB*, all widely imposed conditions would be unconstitutionally coercive, simply because so much of local governments' funding derives from the Federal Government. But that is not the law. To the contrary, the Court's *NFIB* opinion stressed (and as Justice Ginsburg's concurrence in the judgment observed) that this coercion arose from the unexpected imposition on the states to accept a new, dramatically broadened, independent grant program at the risk of losing all federal assistance of longstanding, traditional Medicaid coverage. *NFIB*, 567 U.S. at 579-81; *id.* at 624-25 (Ginsburg, J., concurring in judgment, dissenting in reasoning). The Court held that the combination of the nature and size of the threatened funding loss distinguished that case from *Dole*. *Id.*

Here, however, the Secretary is not purporting to impose retroactive conditions on existing grants. Hubbard Decl. ¶ 10. Rather, applicants for new projects or existing recipients seeking to execute new grant agreements are already on notice of the revised terms prior to requesting funding from the subagencies. Nor do the conditions require states to expand any particular program broadly. As the Supreme Court in *NFIB* specifically noted,

> Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds. In the typical case we look to the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments when they do not want to embrace the federal policies as their own.

*NFIB*, 567 U.S. at 579 (internal quotations omitted).

In *NFIB*, the Supreme Court underscored that the federal funds at stake in *Dole* constituted less than half of one percent of South Dakota's budget at the time and found the loss of those funds was not such coercion as to violate the Spending Clause. *Id.* at 581. By contrast, the Court found that the threatened loss of all Medicaid funds, which was approximately 20 percent of the average state's total, to induce the states to further expand their Medicaid program was so coercive as to violate the Spending Clause. *Id.* Because the monetary value of the "coercion" in *NFIB* was such an outsized percentage of the states' total budgets, *NFIB* should be viewed as the exception rather than the general rule.

As explained in *NFIB*, the Court has not "fix[ed] 'the outermost line' where persuasion gives way to coercion." 567 U.S. at 585 (citing *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 591 (1937)). That point has not been passed here. DOT grants are nowhere near as large a portion of federal grants to state budgets as Medicaid. In FY 2024, for example, federal funds for transportation comprised under three percent of Rhode Island's total budget. *See* State of Rhode Island FY 2025 Budget Proposal at 1, 116, https://omb.ri.gov/sites/g/files/xkg-bur751/files/2024-02/02.12.24_Executive%20Summary_Errata.pdf (of a statewide budget total of $14.409 billion in FY 2024, federal funds to the Rhode

33

Island Department of Transportation amounted to $417,382,706).[6] Thus, the facts of this case fall in the range of the inducements considered acceptable in *Dole*, rather than the threat of a loss of all Medicaid funds considered in *NFIB*.

Also, unlike the agency in *NFIB*, DOT is not creating new grant programs, but instead modified its existing standard terms and conditions that apply to existing grant programs. The new Immigration Conditions, on their face, require compliance with federal law and cooperation with federal law enforcement, but do not require states to expand any particular program broadly. Such an addition of terms affecting only a small fraction of the state budget is not so coercive as to violate the Spending Clause.

### C. Plaintiffs Are Incorrect in Their Claim that The Immigration Conditions Are Impermissibly Ambiguous Grant Terms.

Plaintiffs also argue that the provisions of the Immigration Condition are too ambiguous for them to comply. ECF No. 49 at 31-34. However, these provisions, which use common legal terms such as "cooperation," "compliance," and "lack of interference with law enforcement," are no more ambiguous than a host of previously upheld grant provisions. Also, the requirement to comply with the laws and not obstruct them "does not place upon a recipient any unanticipated

---

[6] *See also* 2024 State Expenditure Report at 1, Nat's Ass'n of State Budget Officers https://higherlogicdownload.s3.amazonaws.com/NASBO/9d2d2db1-c943-4f1b-b750-0fca152d64c2/UploadedImages/SER%20Archive/2024_SER/Executive_Summary-2024_State_Expenditure.pdf (showing Medicaid as 29.8% of state expenditures for all states and transportation as 8% of state expenditures).

burdens because any recipient must anticipate having to comply with the law." *Guardians*, 463 U.S. at 630 (Marshall, J., dissenting).

As a preliminary matter, the Supreme Court has set a high bar for supposed "vagueness" in government funding conditions. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588-89 (1998). In *Finley*, plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court acknowledged that these terms were "undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. But, the Court reasoned, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589.

Even criminal statutes need not define every ordinary word they use. Where challenged language does not define a word, it is simply read with "its ordinary meaning." *United States v. Kuzma*, 967 F.3d 959, 968-69 (9th Cir. 2020) (holding the word "designed" in a criminal statute was not unconstitutionally vague). Moreover, courts have rejected facial vagueness challenges to such ordinary terms as Plaintiffs criticize here, even under the higher standard applied to criminal laws. *See, e.g., Marquez-Reyes v. Garland*, 36 F.4th 1195, 1201-07 (9th Cir. 2022) (rejecting facially overbroad challenge to statute that made noncitizens

ineligible for relief from removal if they knowingly "encouraged" another noncitizen to unlawfully enter the United States because its meaning was clear in the context of criminal law); *Am. Civ. Liberties Union of Tenn. v. City of Memphis*, No. 17-cv-02120, 2020 WL 5630418, at *17 (W.D. Tenn. Sept. 21, 2020) (finding the phrase "cooperate with" is not ambiguous and not overly broad or confusing in the context of a consent decree). And, again, the standard is far lower for government grant conditions. *See Finley*, 524 U.S. at 589 (holding that funds awarded for "subjective criteria such as 'excellence'" are selective subsidies not void for vagueness). If the words "encourage" or "cooperate" are not unconstitutionally vague or overbroad in the criminal context, then those same words surely cannot be in the context of a government grant agreement.

Moreover, to the extent that the Immigration Condition requires compliance with federal law, that is a clear and unequivocal requirement only that a grantee abide by existing law. A requirement that a grantee abide by existing law cannot be vague. The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While this doctrine may demand scrutiny of laws that identify *new* conduct for punishment, it has little bite with respect to existing laws.

Plaintiffs' reliance upon *Pennhurst State School v. Halderman*, 451 U.S. 1, 24-25 (1981) for their argument that the terms are not sufficiently clear, (ECF

No. 49 at 31) is misplaced. *Pennhurst* simply ruled as a matter of statutory inter-pretation that Congress had not in fact imposed any obligation on states who had accepted federal disability law funds because the relevant statute "lack[ed] con-ditional language." *Id.* at 2-3, 24-25. Moreover, the Court reaffirmed the power of Congress to impose conditions in return for federal funds so long as it gives clear notice of the fact that the terms are conditions of the receipt of the funds. *Id.* at 24-25. Here, Plaintiffs are clearly on notice that, going forward, the Secretary has made the Immigration Conditions a term of DOT funding and thus there is no "surprise" that these terms will apply to their grants going forward.

Finally, because the recipient would receive notice of any cancellation of funding and an opportunity to appeal the determination, there is a due process opportunity to address any such issues. *See* 2 C.F.R. § 200.340(c). The agency has also provided the opportunity to seek guidance from the agency with respect to these provisions. *See* ECF No. 42, Plaintiffs' Exh. 2. Thus, there is no lack of fair notice as to these provisions.

## III.    PLAINTIFFS HAVE NOT PROVEN IRREPARABLE HARM.

Plaintiffs' motion should be denied solely on the basis that they have failed to demonstrate irreparable harm. "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsub-stantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases—and the case

at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."); *see also Narragansett Indian Tribe*, 934 F.2d at 6-7 ("[S]peculative injury does not constitute a showing of irreparable harm.") (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987)). Plaintiffs' sweeping assertion of harm fails to address a fundamental problem that the relief they seek is monetary damages in the form of payments on the grants—the classic example of reparable harm.

Plaintiffs ultimately seek an order from this Court to force the Federal Government to pay them money despite their lack of agreement to the terms. Thus, their claims are essentially for money damages. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g., Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 230 (D. Mass. 2020) ("[E]conomic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction") (citation omitted); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, No. 22-cv-11091-IT, 2023 WL 3660689, at *7 (D. Mass. May 25, 2023) ("Plaintiffs have not demonstrated 'irreparable harm,' but at most, economic loss") (citation omitted); *see also e.g., Weinberger*, 456 U.S. at 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."); *Danielson v. Local 275, Laborers Int'l Union*, 479 F.2d 1033, 1037 (2d Cir. 1973) ("Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate.").

The Plaintiffs' purported inability to continue certain programs results solely from the loss of funding. DOT is not taking any actions—other than withholding future money—that impede Plaintiffs' ability to carry on with these programs. The only thing that DOT might do is stop footing the bill. That is an economic loss. Otherwise, one could always convert the relevant harm for purposes of a preliminary injunction from (i) an economic loss to (ii) the inability to do things that cost money—thus swallowing the general rule that "[e]conomic loss alone does not usually rise to the level of irreparable harm." *Akebia*, 443 F. Supp. 3d at 230.

Finally, even if the Court were to find that the Secretary failed to comply with the APA, the appropriate remedy would be to remand to the agency for further consideration or explanation. If that is the relief Plaintiffs would theoretically be entitled to, it is not appropriate to grant the broader relief of requiring continued payment under the grants at this preliminary stage. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) ("bedrock principles of administrative law preclude us from declaring definitively that the Secretary's decision was arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation") (citation omitted).

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that alleged harm through individualized, specific lawsuits

challenging particular funding denials for specific grants. Plaintiffs' declarations do not establish the need for the exceedingly broad relief they claim.

## IV.    IF THE COURT ENTERS A PRELIMINARY INJUNCTION, THE HARM TO THE GOVERNMENT CANNOT BE REMEDIED.

A federal court may not issue an equitable remedy that is "more burdensome to the defendant than necessary to redress the complaining parties." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Gill v. Whitford*, 585 U.S. 48, 68 (2018) ("a remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.") (quotation and citation omitted). If an injunction were granted, and allowed Plaintiffs to use the funds, the Government would be "unlikely to recover the grant funds once they are dispersed." *See California*, 145 S. Ct. at 969. As the Supreme Court recognized in *California*, in which the district court did not impose a bond to guarantee recovery of funds if Defendants later prevail, "[n]o grantee 'promised to return withdrawn funds should its grant termination be reinstated.'" *Id.* Given the exceptionally broad relief Plaintiffs seek, the harm to the Federal Government would be tremendous. Therefore, relief should be denied.

## V.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN THE FEDERAL GOVERNMENT'S FAVOR.

Even if Plaintiffs could establish irreparable harm, they have not shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Traditionally, a court first determines whether the movant's likely harm "will outweigh the harm which granting the injunction would inflict on [the defendant]." *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass.

2014).  Plaintiffs must demonstrate that their claimed injury outweighs any harm that granting the injunctive relief would inflict upon Defendants. *Lancor v. Lebanon Hous. Auth.*, 760 F. 2d 361, 362 (1st Cir. 1985).  Next, courts consider whether "the public interest will not be adversely affected by the granting of the injunction." *Id.* But where, as here, the Government is the defendant, these factors simply "merge." *Nken*, 556 U.S. at 435.

If the Court does not issue a preliminary injunction, DOT may hold the grant money at issue during the pendency of the case, and the Plaintiffs can obtain money damages at the end of the case if they are successful. But the opposite is not true—if the grantees are given access now, and draw down the funds throughout the litigation, Defendants will be left with no meaningful recourse even if they prevail. Accordingly, DOT will bear all the risk if the Court enters a preliminary injunction. The Supreme Court recognized precisely that dynamic in *California* when it stayed the TRO granted by the district court in that case. *California*, 145 S. Ct. at 969.

## VI.    THE COURT SHOULD LIMIT ANY INJUNCTIVE RELIEF TO GRANTS PLAINTIFFS SPECIFICALLY IDENTIFY AND ONLY TO ANY REQUIREMENTS THAT GO BEYOND EXISTING OBLIGATIONS TO COMPLY WITH FEDERAL LAW.

Relief under the APA is limited; courts may either "compel agency action unlawfully withheld or unreasonably delayed" or "hold unlawful and set aside agency action." 5 U.S.C. § 706; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (explaining how the "principal purpose" of the APA's limits on relief is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements").

Injunctive relief should not provide "a remedy beyond what [is] necessary to provide relief" to injured parties. *Lewis v. Casey*, 518 U.S. 343, 360 (1996). Accordingly, to the extent the Court is inclined to grant the Plaintiffs' request for a preliminary injunction, any such relief should be narrowly tailored to apply only to the grants identified in Plaintiffs' declarations. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable practice."); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281-82 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Further, any relief should at most enjoin only those portions of the Immigration Conditions which can be read to require actions beyond complying with federal law. There can be no irreparable harm from a condition that mandates an agreement to comply with federal law. The Supremacy Clause already requires this of all states.

## VII. ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND BE ACCOMPANIED BY A BOND.

If the Court grants Plaintiffs' Motion for a Preliminary Injunction, it should stay any such order pending any appeal, because Defendants are likely to succeed on appeal and will face irreparable harm absent a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay").

On the whole, as argued above, a stay is warranted. At a minimum, the court should administratively stay any injunctive relief it intends to order for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

The Defendants also respectfully requests that any injunctive relief accompany a bond under Federal Rule of Civil Procedure 65(c), which provides that "[t]he court may issue a pre-liminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Id.* (emphasis added). A bond is appropriate here given that any preliminary relief would potentially mandate that DOT spend money that may not be recouped once distributed.

## CONCLUSION

For the reasons set forth above, the Court should deny the Plaintiffs' motion for a preliminary injunction. Moreover, if the Court is inclined to grant any injunctive relief, it should be narrowly tailored and should not enjoin any general requirement of compliance with federal law. Defendants also request that any order be secured by a bond and stayed pending a decision whether to appeal and, if appeal is authorized, stayed pending appeal.

Dated: June 5, 2025

Respectfully submitted,

U.S. DEPARTMENT OF
TRANSPORTATION, et al
By their Attorneys,

/s/ *Sara Miron Bloom*

SARA MIRON BLOOM
Acting United States Attorney
RACHNA VYAS
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
Rachna.vyas@usdoj.gov

## CERTIFICATION OF SERVICE

I hereby certify that, June 5, 2025, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rules Gen 304.

/s/ Sara Miron Bloom
Acting United States Attorney