# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 1:25-cv-00208-JJM-PAS |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| *Defendants*. | |

## PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR AMENDED MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Introduction ...........................................................................................................................1

Argument ..............................................................................................................................2

I.  This Court Has Jurisdiction to Issue a Preliminary Injunction to Protect Plaintiff States. ...............................................................................................2

    A.  This Court Has Jurisdiction Because Plaintiff States Challenge the Policy Adopted by U.S. DOT Writ Large, Not an Order "Under" Specific Sub-Agencies or Statutory Chapters. ...............................................2

    B.  Plaintiff States Do Not Raise Contract Claims Belonging to the Court of Federal Claims; They Challenge Defendants' Attempt to Impose Federal Funding Conditions in Violation of Federal Law. ............5

II.  Plaintiffs are Likely to Succeed on the Merits. ........................................................8

    A.  Defendants' Actions are Not Committed to Agency Discretion Under Section 701(a)(2) of the APA. ..........................................................8

    B.  Defendants Lack Statutory Authority. .......................................................11

    C.  Defendants' Policy is Arbitrary and Capricious. ......................................14

    D.  The Immigration Enforcement Condition Violates the Spending Clause. ..........................................................................................................16

        1.  The Immigration Enforcement Condition is Not Reasonably Related to the Funding Programs to Which It Applies. ...............................................................................................16

        2.  The Immigration Enforcement Condition is Coercive Because it Leaves States with "No Real Option" but to Comply. ...........................................................................................17

        3.  The Immigration Enforcement Condition is Impermissibly Ambiguous. ......................................................................................19

III.  The Remaining *Winter* Factors Favor the Issuance of a Preliminary Injunction. ...............................................................................................................23

    A.  A Preliminary Injunction is Necessary to Prevent Irreparable Harm. .............................................................................................................23

    B.  The Balance of Equities and the Public Interest Weigh in Plaintiff States' Favor. .................................................................................24

IV.  The Court Should Issue a Preliminary Injunction that Prevents Defendants from Implementing the Duffy Directive or Imposing the Immigration Enforcement Condition on U.S. DOT funding. ....................................................26

    A.  This Court Should Not Limit the Scope of the Preliminary Injunction. ....................................................................................................26

    B.  This Court Should Issue a Preliminary Injunction Without Bond. ............27

    C.  Plaintiff States Require Relief Urgently and No Later Than June 20, 2025 ..........................................................................................................29

Conclusion ...........................................................................................................................30

i

# INTRODUCTION

Defendants do not raise any serious dispute that federal civil immigration enforcement has nothing to do with the tens of billions of U.S. Department of Transportation (U.S. DOT) funding at stake. Nor do they dispute the sweeping nature of Defendants' policy to impose the Immigration Enforcement Condition on *all* U.S. DOT funding—without regard to statutory authority or to the immense harm this will inflict on States that have long relied on this funding. Instead, Defendants raise a mish-mash of jurisdictional, merits, and scope of relief arguments. All are unavailing.

Defendants' jurisdictional arguments fail because they mischaracterize the claims and controversy. Defendants first insist that the Court of Appeals has exclusive jurisdiction for a fraction of Plaintiff States' claims. But Defendants rely on provisions that narrowly apply only to challenges of orders issued by, or specific to, U.S. DOT sub-agencies under enumerated statutory provisions—none of which govern the blanket U.S. DOT policy challenged by Plaintiff States here. Defendants next contend that Plaintiff States' claims amount to contract claims subject to the Court of Federal Claims' exclusive jurisdiction. But Plaintiff States challenge Defendants' policy of categorically imposing an Immigration Enforcement Condition on tens of billions of dollars in transportation funding, a claim that relies not on contract law, but on Defendants' lack of statutory and constitutional authority to adopt such policies in the first place.

Defendants' merits arguments fare no better. Regarding their lack of statutory authorization, while Defendants cite snippets of statutory language that give Defendants some discretion in some programs to make choices advancing *transportation* goals, these statutes neither permit the sweeping policy adopted by Defendants, nor permit Defendants to impose entirely unrelated restrictions dealing with federal civil immigration enforcement. Regarding the arbitrary and capricious claims, Defendants do not respond to Plaintiff States' arguments that Defendants failed to consider whether the specific funding statutes authorize immigration-related conditions, the reliance interests of Plaintiff States, or available alternatives—requirements that the Supreme Court has held are mandatory. Regarding the Spending Clause, Defendants fail to respond to

Plaintiff States' observation that the Immigration Enforcement Condition is wholly unrelated to the purposes of the transportation programs at issue. And their arguments do little to dispel the coercive and ambiguous nature of the Immigration Enforcement Condition imposed on tens of billions of dollars in critical infrastructure funding.

Finally, Defendants' scope of relief arguments rest on similar grounds as their other claims, failing for the same reasons. The scope of the harm Defendants have caused is extensive, as described in detail by the unrebutted state agency declarations discussing the thousands of projects and programs that depend upon federal transportation funding. Such harm requires a full remedy. In the same way that a bridge depends on every pillar that holds it up, Plaintiff States cannot obtain relief without the full scope of the preliminary injunction they request.

## ARGUMENT

### I. THIS COURT HAS JURISDICTION TO ISSUE A PRELIMINARY INJUNCTION TO PROTECT PLAINTIFF STATES.

Defendants argue that this Court lacks jurisdiction because: (1) certain claims by Plaintiff States "may" fall within the exclusive jurisdiction of federal appellate courts, based on statutory provisions applicable to specific orders or U.S. DOT sub-agencies; and (2) Plaintiff States' remaining claims belong in the Court of Federal Claims because they seek monetary relief or sound in contract. ECF No. 51 (PI Opp.) at 11-25. But Defendants' arguments incorrectly characterize the claims and controversy at issue, as Plaintiff States seek to stop Defendants from categorically and unlawfully imposing an Immigration Enforcement Condition on funding for transportation programs entirely unrelated to federal immigration enforcement.

#### A. This Court Has Jurisdiction Because Plaintiff States Challenge the Policy Adopted by U.S. DOT Writ Large, Not an Order "Under" Specific Sub-Agencies or Statutory Chapters.

Defendants contend that a fraction of Plaintiff States' claims "may" be subject to statutory provisions that confer exclusive jurisdiction on federal appellate courts to hear challenges to, for example, orders issued by the Federal Aviation Administration. PI Opp. at 11-15.[1] But those

---

[1] For example, the total funding Plaintiff States received in fiscal year 2024 from formula Airport Improvement Grants—one of the grant programs Defendants claim to be subject to these (continued…)

provisions do not apply here because Plaintiff States do not challenge orders issued by particular sub-agencies or under the provisions specified. Instead, Plaintiff States challenge a categorical policy issued by U.S. DOT.

Defendants invoke the jurisdictional provisions of 49 U.S.C. §§ 46110, 47111, 60119, 20114(c) and 28 U.S.C. § 2342. All of these statutes, however, share the same narrow scope: they all specify that federal appellate courts have exclusive jurisdiction only for challenges to an "order" issued "under" the specific statutes enumerated. For example, 49 U.S.C. § 46110 applies only to an order issued "in whole or in part under [Part A of Subtitle VII of Title 49], part B, or subsection (*l*) or (r) of section 114," i.e., only certain Federal Aviation Administration provisions. *See Americopters, LLC v. F.A.A.*, 441 F.3d 726, 735-36 (9th Cir. 2006) (noting that this limiting language means the statute does not give federal appellate courts "direct and exclusive jurisdiction over every possible dispute involving the FAA," nor does it "bar all manner of review of FAA orders by the district court"); *see, e.g.*, *Blitz v. Napolitano*, 700 F.3d 733, 735 (4th Cir. 2012) (applying section 46110 to claims challenging TSA standard operating procedures regarding "use of advanced imaging technology ('AIT') scanners and invasive pat-downs at airport screening").[2]

These narrow jurisdictional provisions do not apply here. Defendants cannot plausibly assert that U.S. DOT is exercising its authority "under" the specific statutes enumerated in these jurisdictional provisions to issue its policy of categorically imposing the Immigration Enforcement Condition on *all* U.S. DOT financial assistance. *See Nat'l Ass'n of Mfrs. v. D.O.D.*, 583 U.S. 109, 124 (2018) (interpreting "under section 1311" to mean "that the . . . limitation must be approved or promulgated 'pursuant to' or 'by reason of the authority of' § 1311").

Further, the jurisdictional provisions apply at most to orders issued by or governing conduct specific to particular sub-agencies, and Plaintiff States challenge a policy issued not by the FAA,

---

jurisdictional provisions, PI Opp. at 15—was about $86.8 million, which amounts to 0.3 percent of the $24 billion in funding Plaintiff States expect to receive annually solely from federal highway formula funds. *Compare* ECF No. 42, Ex. 10 *with id.*, Ex. 14.

[2] Section 47111, for example, "only applies to . . . situations in which . . . payment is withheld due to a violation of the grant agreement." *Tulsa Airports Improvement Trust ex rel. Cinnabar Serv. Co. v. F.A.A.*, 839 F.3d 945, 948-49 (10th Cir. 2016).

for instance, but by U.S. DOT writ large. For claims challenging U.S. DOT's overarching policies, "jurisdiction rests with the district court," in contrast to the cases Defendants cite, which "tended to involve relatively simple rules issued by a single [sub-]agency." *Loan Syndications & Trading Ass'n v. S.E.C.*, 818 F.3d 716, 722 (D.C. Cir. 2016); *see also City of Los Angeles v. F.A.A.*, 239 F.3d 1033, 1036-37 (9th Cir. 2001) ("In essence, the City seems to be making a 'broad constitutional challenge' to . . . the FAA's actions (to the extent that the FAA is making policy) . . . such a claim is not one subject to judicial review in the court of appeals but rather is reviewable by the district court."). Defendants' cited authorities underscore this point, invoking the federal appellate courts' jurisdiction only when the case involves challenges to orders issued by or applicable to a particular sub-agency's functions. *See* PI Opp. at 13-14 (citing, e.g., *Jones v. United States*, 625 F.3d 827, 829 (5th Cir. 2010) ("Section 46110(a) of the Federal Aviation Act vests the exclusive jurisdiction over challenges *to FAA orders* in certain United States Courts of Appeals." (emphasis added)); *Americopters*, 441 F.3d at 732 ("We have direct and exclusive jurisdiction over the review of *FAA final orders* under 49 U.S.C. § 46110." (emphasis added))).

Defendants' interpretation of the jurisdictional provisions would erase the text that Congress wrote. Congress specified that the federal appellate courts had exclusive jurisdiction only for a narrow set of orders under statutes specific to particular U.S. DOT sub-agencies. *See* 49 U.S.C. §§ 46110, 47111(d)(3), 60119, 20114(c); 28 U.S.C. § 2342. Defendants' interpretation would nullify those limitations by applying those jurisdictional provisions to any challenge to a broader U.S. DOT action, despite Congress's intentional decision to bestow federal appellate jurisdiction on only specific agency orders, not all of them. "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning (*expressio unius est exclusio alterius*). The government's interpretation defies this traditional rule of statutory construction." *Bittner v. United States*, 598 U.S. 85, 94 (2023).

**B.    Plaintiff States Do Not Raise Contract Claims Belonging to the Court of Federal Claims; They Challenge Defendants' Attempt to Impose Federal Funding Conditions in Violation of Federal Law.**

Plaintiff States' claims are not contract claims within the jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a), and they fall well within the Administrative Procedure Act's (APA) waiver of sovereign immunity, 5 U.S.C. § 702.

Under the Tucker Act, certain claims against the federal government seeking monetary compensation over $10,000 or enforcement of contracts fall within the exclusive jurisdiction of the Court of Federal Claims and cannot be brought in federal district court. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam order); *Rhode Island v. Trump*, C.A. No. 1:25-cv-128-JJM-LDA, 2025 WL 1303868, at *5 (D.R.I. May 6, 2025), *appeal docketed*, No. 25-1477 (1st Cir. May 21, 2025).

But the Tucker Act has no application here. Plaintiff States' claims do not seek monetary compensation; they seek declaratory and injunctive relief against Defendants' unlawful adoption of the Immigration Enforcement Condition. *See Bowen v. Massachusetts*, 487 U.S. 879, 892-901 (1988) (claims seeking enforcement of statutory requirements governing federal funding fell within APA § 702); *Rhode Island*, 2025 WL 1303868, at *6; *New York v. Trump*, No. 1:25-cv-39-JJM-PAS, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025), *appeal docketed*, No. 24-1413 (2d Cir. Apr. 28, 2025). The claims therefore fall well within the heartland of APA § 702. *See, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 26 (1st Cir. 2020) (noting adjudication of APA claims against use of immigration conditions on federal funding in federal district court and the corresponding federal appellate court); *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 279 (3d Cir. 2019) (same); *City of Chicago v. Barr*, 961 F.3d 882, 886-87 (7th Cir. 2020) (same); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 756-58 (9th Cir. 2020); *City of Los Angeles v. Barr*, 941 F.3d 931, 938 (9th Cir. 2019) (same). Defendants' suggestion that any connection to grants or contracts removes a claim from the reach of APA § 702 is not supported by the Supreme Court's per curiam order in *Department of Education v. California*, 145 S. Ct. 966, or any other source of law. The plain text of the APA specifies that a "grant of money" is a kind of "agency action"

governed by and subject to judicial review under its terms. 5 U.S.C. § 551(11)(A) (explicitly including a "grant of money" as a form of "relief" whose provision or denial qualifies as "agency action" under the APA).

Plaintiff States' claims also are not based on contract rights; they are based on statutory and constitutional limitations on Defendants' administration of federal funding. *See Rhode Island*, 2025 WL 1303868, at *6; *New York*, 2025 WL 1098966, at *2. Indeed, Plaintiff States are suing precisely because they cannot submit to the terms Defendants intend to include in *future* agreements. This sets this case even further apart from *Department of Education*, which involved the termination of grants for which agreements were already in place. 145 S. Ct. at 968. The other decisions Defendants have cited are likewise inappropriate for the same reasons—those cases all dealt with claims for the specific performance of existing grants. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *4 (D.C. Cir. May 3, 2025); *RFE/RL, Inc. v. Lake*, No. 25-5158, 2025 WL 1453770, at *1 (D.C. Cir. May 7, 2025); *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, No. 25-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025). Even if those cases fell within the jurisdiction of the Court of Federal Claims—which is doubtful, *see Rhode Island*, 2025 WL 1303868, at *5-7—this case still would not.

Plaintiff States also do not seek contract remedies or anything resembling contract remedies. Contract remedies would consist of damages or specific performance of contract terms. *See, e.g.*, *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007). Plaintiff States do not seek relief that would require damages for payments not provided; they seek only relief against implementation of the Immigration Enforcement Condition and the resulting wholesale exclusion of the Plaintiff States from federal funding programs. *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (discussing jurisdiction in a district court as appropriate where "the suit was not merely for past due sums, but for an injunction to correct the method of calculating payments going forward"); *see also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) (explaining that the "complex ongoing relationship" between the litigants in *Bowen* "made it important that a district court adjudicate

6

future disputes"). Even if the Court grants the full relief Plaintiff States have requested, Defendants would still be able to withhold grants or payment on existing grants if they had lawful reasons for doing so. Claims that are this far removed from any demand for payment are not contract claims. *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 198-99 (Fed Cir. 1997) (concluding that plaintiff's claims were not properly considered contract claims within Tucker Act jurisdiction, noting that plaintiff asserted violations of statutes and was not seeking an "unconditional payment," and that plaintiff's right to payment would be contingent on future events).

Moreover, Plaintiff States' claims do not rely exclusively on the APA § 702 sovereign immunity waiver. The sovereign immunity of the United States does not bar claims against federal officers acting *ultra vires*, or outside their statutory authority. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949). It also does not bar claims against federal officers seeking injunctive relief against violations of federal law. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

Defendants also halfheartedly suggest that a Tucker Act suit would provide an "adequate remedy" that would preclude review under the APA, 5 U.S.C. § 704.[3] PI Opp. at 20. But accepting the Immigration Enforcement Condition and then challenging its validity in the Court of Federal Claims is not an adequate remedy for Plaintiff States. Practically speaking, Plaintiff States cannot make large transportation investments when funding would be contingent on the results of a future lawsuit. *See El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1273 (D.C. Cir. 2005) (holding that a statutory mechanism for removal to federal court was not an adequate remedy for denial of malpractice coverage because physicians would have to take on risk of personal liability before invoking the removal provision); *Bowen*, 487 U.S. at 906-07 (holding that a suit for monetary relief was not an adequate remedy in part because uncertainty would impair States' planning of future programs). And a suit in the Court of Federal Claims would be legally inadequate as well. As discussed above, Plaintiff States' claims

---

[3] The presence of an adequate remedy under APA § 704 is a merits issue, not a jurisdictional issue. *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *cf. R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002).

here do not seek damages and are not based on contract principles; they seek nonmonetary relief to enforce statutory and constitutional limitations on U.S. DOT's power to impose grant-funding conditions. Such claims are outside the jurisdiction of the Court of Federal Claims. *See, e.g.*, *Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1353-54 (Fed. Cir. 2021) (noting that the Court of Federal Claims lacks jurisdiction to hear claims for equitable relief); *cf. Bowen*, 487 U.S. at 904-07 (holding that a suit for monetary relief under the Tucker Act was not an adequate remedy in part because prospective relief would be unavailable).

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

As a threshold matter, Defendants' argument that their challenged conduct is committed to agency discretion fails, as this case follows the well-trodden path of cases adjudicating whether federal agencies can adopt categorical policies or impose unlawful conditions on federal funding. Defendants' statutory arguments also fail because they rely on piecemeal provisions that do not justify the sweeping breadth of power they claim. Defendants further do not contest that they failed to at all consider the statutory basis for their policy, the reliance interests of States, or available alternatives; their only response points to further error in reasoning because they cite plainly erroneous legal conclusions. Finally, with respect to the Spending Clause, Defendants do not respond to Plaintiff States' contention that the Immigration Enforcement Condition is entirely unrelated to the purposes of the funding programs which it encumbers. And Defendants cannot rebut the conclusion that the factual and legal record proves the coercive and ambiguous nature of their policy.

### A.    Defendants' Actions are Not Committed to Agency Discretion Under Section 701(a)(2) of the APA.

Contrary to Defendants' argument, PI Opp. at 27, 5 U.S.C. § 701(a)(2) does not preclude judicial review of Plaintiff States' claims. The Supreme Court has interpreted § 701(a)(2) "quite narrowly" to apply only in "rare circumstances" where the law supplies "no meaningful standard" for judicial review. *Dep't of Commerce v. New York*, 588 U.S. 752, 771-72 (2019); *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17-19 (1st Cir. 2020).

Section 701(a)(2) does not apply here because courts are well-equipped to determine whether Defendants' actions are authorized by the statutory schemes governing U.S. DOT's funding programs or comply with the Constitution. *See Dep't of Commerce*, 588 U.S. at 772-73; *Martin Luther King, Jr. County v. Turner*, No. 2:25-cv-814, 2025 WL 1582368, at *12-13 (W.D. Wash. June 3, 2025) (rejecting U.S. DOT's § 701(a)(2) argument). U.S. DOT's imposition of the Immigration Enforcement Condition is exactly the type of agency action that courts scrutinize carefully for compliance with statutory authorizations and constitutional guardrails. *See Providence*, 954 F.3d at 31-32; *Colorado v. Dep't of Health & Human Servs.*, No. 1:25-cv-121-MSM-LDA, 2025 WL 1426226, at *19 (D.R.I. May 16, 2025) (explaining that Congress has "the 'exclusive power' to impose conditions on appropriated funds" (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018))).

The Supreme Court's decision in *Lincoln v. Vigil*, 508 U.S. 182 (1993)—the only case Defendants cite for their § 701(a)(2) argument, PI Opp. at 26-27—is not to the contrary. As the Western District of Washington has explained, *Lincoln* involved a "'lump sum' appropriation" that did not even mention the funding program at issue in the case. *King County*, 2025 WL 1582368, at *13. Congress had broadly authorized the Indian Health Service to spend the lump sum for the "benefit, care, and assistance" of Native Americans, and the Indian Health Service exercised this broad discretion to create and then transition away from a particular clinical care program. *Lincoln* at 185-190. By contrast, the U.S. DOT funding at issue here includes countless funding streams to the States that Congress specifically authorized for specific purposes. *See* ECF No. 49 (PI Mot.) at 26-28. Indeed, many are subject to precise formulas set forth by statute. *See id.* at 4-6.

Furthermore, Plaintiff States do not challenge a discrete decision by Defendants about how to allocate limited funds among multiple qualified applicants or projects; they challenge blanket requirements Defendants have unlawfully imposed on all federal funding. *See Union of Concerned Scientists*, 954 F.3d at 18 n.5 (noting that although individual hiring decisions were arguably discretionary, an "agency-wide policy" governing those decisions was not); *Ward v. Skinner*, 943

F.2d 157, 160 (1st Cir. 1991) (explaining that although agency's broad power to grant waivers might make it difficult to challenge agency's judgment that a particular denial was unwarranted, it would not preclude review of whether a denial violated specific constitutional or statutory requirements).

Defendants also err by arguing that 49 U.S.C. § 5334(a) somehow blocks judicial review by authorizing U.S. DOT to "prescribe terms for a project" and to "include in an agreement or instrument under this chapter a covenant or term the Secretary of Transportation considers necessary to carry out this chapter." *See* PI Opp. at 27-28. That statute, as discussed further below, merely authorizes U.S. DOT to take administrative measures necessary to manage its funding programs; it does not confer "unbounded discretion" to inject an unrelated immigration agenda into those programs and therefore does not trigger application of § 701(a)(2). *King County*, 2025 WL 1582368, at \*16; *see Dep't of Commerce*, 588 U.S. at 772. Indeed, the Supreme Court and the First Circuit have rejected application of § 701(a)(2) even where statutes have conferred much greater discretionary authority on federal agencies than anything § 5334(a) confers on Defendants. *See Dep't of Commerce*, 588 U.S. at 771-72 (rejecting application of § 701(a)(2) even where the Census Act "confer[red] broad authority" on the Secretary of Commerce to take the census "in such form and content as he may determine"); *Union of Concerned Scientists*, 954 F.3d at 19 ("Nor does the fact that [a] statute leaves a great deal of discretion to the agency make actions taken pursuant to it unreviewable." (citation omitted)).[4]

---

[4] For the same reasons, the statutes listed by Defendants in footnote five of their opposition brief, PI Opp. at 28 n.5, merely confer administrative authority to implement funding programs; they do not confer the measure of absolute discretion required to trigger the § 701(a)(2) bar. *See, e.g.*, 49 U.S.C. § 47108(a) ("The Secretary may impose terms on the offer that the Secretary considers necessary *to carry out this subchapter and regulations prescribed under this subchapter.*" (emphasis added)).

**B.    Defendants Lack Statutory Authority.**

Defendants incorrectly assert that the Secretary has statutory authority to impose the Immigration Enforcement Condition, an argument for which they cite primarily to 49 U.S.C. § 5334(a) as an example. *See* PI Opp. at 27-30.[5]

To begin, Defendants point only to provisions specific to particular U.S. DOT programs—they identify no statutory authority to categorically impose the Immigration Enforcement Condition on all U.S. DOT funding. For instance, section 5334(a) authorizes the Secretary of Transportation to conduct a list of eleven distinct activities "[i]n carrying out this chapter." 49 U.S.C. § 5334(a). The referenced chapter, Chapter 53 of 49 U.S.C. Subtitle III, addresses "Public Transportation." The statute does not authorize U.S. DOT to impose terms or conditions on grants in any other context, let alone the blanket Immigration Enforcement Condition it has adopted here. *See id.* § 5301(b) ("The purposes of this chapter are to. . . provide funding to support public transportation . . . ."). Defendants' abbreviated reference to other quite-specific statutes similarly fails to establish any authority for the broad, Department-wide conditions here. *See* PI Opp. 28 n.5.

Second, Defendants' cited statutes do not provide U.S. DOT with anything like the authority it asserts even within each particular area to which each statute applies. "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U. S. A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019). Even where a statutory phrase, "standing alone, is broad," it cannot be "construed in a vacuum." *Id.* Defendants primarily rely on section 5334(a), which applies to public transportation. Section 5334 is titled "Administrative provisions," signaling that it is intended to delegate authority "to administer the [public transportation] programs, not to inject substantive policies into them." *King County*, 2025 WL 1582368, at *16. "This is particularly true in this case given that the challenged conditions not only are unrelated to the subject matter of the statutes at issue, but also reflect divisive and hotly debated policy

---

[5] As explained below, Defendants cannot save the Immigration Enforcement Condition by claiming that statutes give them discretion to "requir[e] compliance with federal law," PI Opp. at 2, because the Immigration Enforcement Condition, on its face, requires more than mere compliance. *See infra* at 20. Even if the Immigration Enforcement Condition was so narrowly crafted, however, Defendants identify no statute specifically authorizing U.S. DOT to require grant recipients to comply with immigration laws. *See Providence*, 954 F.3d at 39.

choices." *Id.* Congress does not "hide elephants in mouseholes"; it did not hide the authority to dictate States' participation in federal immigration enforcement in a statute about administering public transportation programs. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Further, the canon of construction *noscitur a sociis* (a word is known by the company it keeps) also contradicts Defendants' reading of the statutes. *Noscitur a sociis* "dictates that words grouped in a list should be given related meaning." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) (internal quotation marks omitted). It is "wisely applied . . . in order to avoid the giving of unintended breadth to the Acts of Congress." *McDonnell v. United States*, 579 U.S. 550, 569 (2016). The two provisions cited by Defendants under section 5334—section 5334(a)(1) (granting authority to "prescribe terms for a project that receives Federal financial assistance under this chapter") and section 5334(a)(9) (granting authority to "include in an agreement or instrument under this chapter a covenant or term the Secretary of Transportation considers necessary to carry out this chapter")—are both contained within the list of eleven activities authorized in section 5339(a). The other items in the list reflect the kinds of administrative functions necessary to carry out the agency's public transportation programs, such as the authority to buy or sell property, 49 U.S.C. § 5339(a)(4)-(5); obtain loss insurance, *id.*, § 5339(a)(7); or collect fees to cover the costs of training or conferences, *id.* § 5339(10). The specificity of these items and their nexus with the administrative needs of managing U.S. DOT's public transportation programs reflect the scope of authority Congress intended to grant through section 5339(a). *See Providence*, 954 F.3d at 34 (applying *noscitur a sociis* to conclude that "the broad authorization [to impose grant conditions requiring cooperation with immigration enforcement] that the DOJ purports to find in these provisions . . . is implausible in this context"); *see also King County*, 2025 WL 1582368, at *16 (using the related canon of construction *ejusdem generis* to reject U.S. DOT's interpretation of § 5334(a) because it must be read in the limiting context of the other specific grants of authority in the statute).

Moreover, the provisions cited provide a "wafer-thin reed" to attempt to authorize Defendants to assert unbridled discretion to impose substantive immigration enforcement

requirements. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021). "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (internal quotation marks omitted) (alteration in original); *Sackett v. Envtl. Prot. Agency*, 598 U.S. 651, 677 (2023) ("[I]t would be odd indeed if Congress had tucked an important expansion to the reach of the CWA into convoluted language in a relatively obscure provision concerning state permitting programs. . . . We cannot agree with such an implausible interpretation here.").

Similarly, Defendants' claim of sweeping statutory authority conflicts with the principle that statutes should not be read to alter the "usual constitutional balance between the States and the Federal Government" unless that intention is "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see also Gonzales v. Oregon*, 546 U.S. 243, 275-76 (2006). Here, Defendants' claim of authority to dictate the participation of States in federal immigration enforcement using tens of billions of dollars of unrelated transportation funding cannot be read into the law without a much clearer mandate from Congress.

The other provisions cited by Defendants likewise do not support their claim of statutory authority, which perhaps explains why they relegated these to a footnote. S*ee* PI Opp. at 28 n.5. Two of the statutes Defendants cite are irrelevant, involving grant programs that do not even go to States. *See* 49 U.S.C. § 5116(i)(1) (concerning "grants to national nonprofit fire service organizations"); 46 U.S.C. § 54101(f)(1) (concerning the Small Shipyard Grant, which is awarded to the operating companies of shipyard facilities).[6] The remaining statutory provisions cited by Defendants authorize them to impose terms or criteria on specific grant programs only if necessary or relevant to advancing the *transportation* programs described in statute. *See* 23 U.S.C. § 315 ("[T]he Secretary is authorized to prescribe and promulgate all needful rules and regulations *for the carrying out of the provisions of this title*." (emphasis added)); 49 U.S.C. § 47108(a) ("The

---

[6] *See* U.S. Maritime Admin., 2024 MARAD Small Shipyard Grant Awardees (July 24, 2024), https://tinyurl.com/34ermwm2.

Secretary may impose terms on the offer that the Secretary considers *necessary to carry out this subchapter* and regulations prescribed under this subchapter." (emphasis added)); *id.* § 31104(e) ("The Secretary shall establish criteria for eligible activities to be funded with financial assistance agreements *under this section . . . .*" (emphasis added)); *id.* § 24911(d) (providing—at the end of a long list of criteria related to intercity rail finances, reliability, etc.—that the Secretary may consider "any other relevant factors"). Defendants' suggestion that these empower the Secretary to proclaim any eligibility criteria or pursue anything he unilaterally deems "necessary" or "relevant" transgresses bedrock limitations of administrative power. *See Ala. Ass'n of Realtors*, 594 U.S. at 764-65 (rejecting interpretation of the term "necessary" to give agency "sweeping power" where it "is hard to see what measures this interpretation would place outside the [agency's] reach, and the Government has identified no limit . . . beyond the requirement that the [agency] deem a measure "necessary").[7]

Ultimately, there is simply no evidence that Congress intended for administrative provisions that are specific to particular funding programs to hide a vast new role for U.S. DOT to shape federal-state relations and domestic immigration policy.

### C. Defendants' Policy is Arbitrary and Capricious.

On the arbitrary and capricious claims, Defendants do not dispute that U.S. DOT failed to consider the reliance interests of Plaintiff States before injecting an immigration agenda into its transportation funding programs. *See* PI Opp. at 29-30; *see also* PI Mot. at 23 ("[A]mple record evidence confirms that the States depend on steady, reliable federal funding streams . . . ."). The U.S. DOT action violates the APA for this reason alone. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020) ("[The agency] *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."). Nor do Defendants dispute that they failed to consider the statutory requirements and purposes of particular funding schemes and instead arbitrarily applied

---

[7] In any event, Defendants' reliance on all of these provisions reflect the same general defects discussed in greater detail above and in Plaintiff States' preliminary injunction motion. *See supra* at 11-13; PI Mot. at 18-20.

the Immigration Enforcement Condition across the board to its array of unique subagencies and programs. *See* PI Opp. at 29-30; *see also* PI Mot. at 22 ("U.S. DOT has copied and pasted the same exact condition into dozens of different grant programs, each of which has its own authorizing statute . . . ."). Defendants also do not contest that U.S. DOT failed to consider the other "important aspects of the problem" that Plaintiff States have identified, including the public safety consequences of the action, and the availability of alternative actions. *See* PI Mot. at 20-25. Again, U.S. DOT's failure to consider these issues renders its action arbitrary and capricious. *See Regents*, 591 U.S. at 25; *King County*, 2025 WL 1582368, at *17 ("Defendants have failed to demonstrate that the new funding conditions were the result of 'reasoned decisionmaking,' let alone have been 'reasonably explained.").

Defendants make only one argument on the merits of the arbitrary and capricious claims: that the Duffy Directive contains a satisfactory explanation of the decision to impose the Immigration Enforcement Condition. PI Opp. at 29-30. But even leaving aside its failure to address reliance interests and other important aspects of its decision, the Duffy Directive reflects arbitrary and capricious decisionmaking. The two paragraphs that it dedicates to the Immigration Enforcement Condition plainly misstate the law. The Directive asserts that States undermine "federal sovereignty" by issuing licenses to undocumented residents. ECF No. 42, Ex. 2 at 2. But it cites no authority for the proposition, and to the contrary, Congress has authorized this activity. *See Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020). The Directive also asserts that "[d]eclining to cooperate with the enforcement of Federal immigration law . . . contravenes Federal law and may give rise to civil and criminal liability." ECF No. 42, Ex. 2 at 3. But federal law does not— and cannot—impose any requirement on the States to contribute state agency resources to the federal immigration program. *See Printz v. United States*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers . . . to administer or enforce a federal regulatory program."). An agency explanation that is "illogical on its own terms" and that "misconceive[s] the law" in this way cannot satisfy the APA. *Am. Fed'n of Gov't Emps., Local 2924 v. Fed. Labor Relations Auth.*,

470 F.3d 375, 380 (D.C. Cir. 2006); *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

### D.    The Immigration Enforcement Condition Violates the Spending Clause.

As explained in Plaintiff States' motion for a preliminary injunction, Defendants' efforts to impose the Immigration Enforcement Condition violate the Spending Clause for three independent reasons: (1) they impose a requirement not reasonably related to the statutory purposes of the grants themselves; (2) they are unconstitutionally coercive; and (3) they are impermissibly ambiguous. Defendants do not dispute the first point, and their arguments on the latter two points are unavailing.

### 1.    The Immigration Enforcement Condition is Not Reasonably Related to the Funding Programs to Which It Applies.

Notably, Defendants do not attempt to make any argument that the Immigration Enforcement Condition is related, reasonably or otherwise, to the statutory purposes of the transportation funding programs. *See* PI Opp. at 30-31. Instead, Defendants contend that the U.S. DOT has unbridled discretion to decide "when it will fund certain activities by the states and under what conditions." PI Opp. at 30. This argument fails because, as the Supreme Court has made clear, conditions imposed under the Spending Clause must be germane or related to the purpose of federal funding. *South Dakota v. Dole*, 483 U.S. 203, 208-09 (1987). Congress plainly laid out the purposes of U.S. DOT funding within each statute authorizing each funding program. *See generally* App'x to PI Mot. Defendants have not pointed to any provision in these statutes (or any federal statutes) that allows U.S. DOT to impose conditions for purposes beyond those specified by the grant authorizing statutes.

Plainly, the U.S. DOT funding at issue has nothing to do with federal civil immigration enforcement. The purpose of these funding statutes is to provide States with sufficient funding to inspect, maintain, and develop the nation's transportation infrastructure. *See Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002) (requiring the identification of "a discernible relationship imposed by a . . . condition . . . and a federal interest in a program it funds"); *see also* Mot. PI at 26-28 (highlighting purposes of U.S. DOT funding statutes). Additionally, the Duffy

Directive and Immigration Enforcement Condition attempt to pursue objectives beyond U.S. DOT's authority and expertise, further underscoring the lack of reasonable relationship to the purposes of the transportation funding.

### 2. The Immigration Enforcement Condition is Coercive Because it Leaves States with "No Real Option" but to Comply.

Defendants concede that they expressly adopted their policy to pressure States to change their laws. *See* PI Opp. at 31; ECF No. 42, Ex. 2 at 3.[8] Defendants contend, however, that their policy of imposing the Immigration Enforcement Condition on all U.S. DOT funding is not coercive because the impact to Plaintiff States does not rise to the level of compulsion. PI Opp. at 31. But that is wrong. Unlike the condition at issue in *Dole*, the Immigration Enforcement Condition affects *all* U.S. DOT funding, not just "5% of the funds . . . under specified highway grant programs." 483 U.S. at 211. Defendants thus encumber tens of billions of dollars in funding, including funding that is critical to the maintenance, safety, and improvement of the nation's infrastructure system.

The Immigration Enforcement Condition is therefore coercive: Plaintiff States have no true ability to refuse the more than $33.7 billion of U.S. DOT funding impacted by the condition, *see* ECF No. 42, Exs. 10-14 (accounting for only a subset of U.S. DOT funding across five sub-agencies). To avoid that conclusion, Defendants mischaracterize the opinion of Chief Justice Roberts in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) (opinion of Roberts, C.J.) (*NFIB*), by attempting to limit it to "new, dramatically broadened, independent grant program[s]." *See* PI Opp. at 32. But even setting aside the fact that Defendants' Immigration Enforcement Condition does threaten to create a new, dramatically broad, and independent scope of obligation for all U.S. DOT grantees, the principles of unconstitutional coercion apply to "[c]onditions that do not govern the use of funds" and that "take the form of threats to terminate

---

[8] *See also* ECF No. 42, Ex. 3 (U.S. DOT press release citing Exec. Order 13,768, 82 Fed. Reg. 8,799 (Jan. 25, 2017), which directed the U.S. Attorney General and Secretary of Homeland Security to deny federal funding to so-called "sanctuary jurisdictions"); *cf.* Dep't of Homeland Security, DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law (May 29, 2025), https://tinyurl.com/3mmk49t8 ("DHS demands that these [so-called sanctuary] jurisdictions immediately review and revise their policies to align with federal immigration laws.").

other significant independent grants" to "pressur[e] the States to accept policy changes." *NFIB*, 567 U.S. at 580. That is exactly the situation here: U.S. DOT has inserted an immigration condition into the entirely separate matter of transportation funding to compel States to change their policies. *See id.*

Defendants' arguments also incorrectly draw the outer boundary for coercion at the scope of the Medicaid program discussed in *NFIB*, despite quoting the *NFIB* opinion's very statement that it does not draw the outer boundary for where persuasion gives way to coercion. PI Opp. at 33 (quoting *NFIB*, 567 U.S. at 585). Rather, as *NFIB* makes clear, the line of coercion is crossed where the federal government "leaves the States no real option but to acquiesce" to the federal government's unlawful condition. 567 U.S. at 582. That is the case here, where the tens of billions of dollars at stake are essential to public safety and economic vitality in the Plaintiff States. *See* PI Mot. at 30-31, 37-40. Further, much like the Medicaid dollars at stake in *NFIB*, the Immigration Enforcement Condition threatens *all* U.S. DOT funding, representing a shift in kind and not merely degree. *See* ECF No. 40, Ex. 2, at 1.[9]

The imminent deadlines that Defendants force upon Plaintiff States make the coercion here even worse than the coercion at issue in *NFIB*. Whereas the States in *NFIB* had years to consider how to react to the "gun to the head," 567 U.S. at 581, Plaintiff States here have been told to accept the condition in days or lose all future funding, *see, e.g.*, ECF No. 42-1, Ex. 30 (Wiedefeld Decl.), ¶ 45. Defendants immediately imposed the Immigration Enforcement Condition on numerous, if not most, U.S. DOT funding programs. *Id.* ¶ 19; PI Mot. at 12-13 (listing grants to which condition already applies). And Defendants continue to impose imminent deadlines for executing transportation funding agreements with the challenged Immigration Enforcement Condition— some deadlines within days of the filing of this brief—further piling on Defendants' coercive

---

[9] Defendants' arguments also incorrectly assert that constitutional coercion arises *only* where the condition is imposed retroactively. *See* PI Opp. at 32. *NFIB* discussed retroactivity largely because the federal government claimed authority to enact the expansion based on statutory provisions permitting it to "alter" or "amend" the terms of the Medicaid program. 567 U.S. at 582-84. Retroactivity or notice does not affect the analysis of coercion. The Medicaid expansion at issue in *NFIB* was not to take effect until four years after the passage of the Affordable Care Act and two years after the Supreme Court's disposition. *See id.* at 519.

pressure. *Cf. United States v. Eghobor*, 812 F.3d 352, 358 (5th Cir. 2015) (warning against "coercive deadlines" for jury deliberations); *Hill v. England*, No. CV F 03-6903 LJO TAG, 2007 WL 3096707, at *9 (E.D. Cal. Oct. 22, 2007) (listing "time pressure" as a factor that can render an action "involuntary").

Finally, Defendants' reasoning assumes that Plaintiff States can use their general funds to cover the shortfall from the loss of these federal grants. But Plaintiff States' declarations prove the contrary. State budgets are generally committed to other or preexisting obligations, and as stated in the dozens of unrebutted state agency declarations, no state appropriations are available to cover the loss of federal funding. *See* ECF No. 42-1, Ex. 50 (Chapman-See Decl.), ¶ 9; *see also, e.g., id.*, Ex. 35 (O'Connor Decl.), ¶¶ 41-42 ("NJDOT does not have sufficient appropriation in its remaining . . . budgets that could cover the loss of the grants and formula funding discussed above," and "[i]f NJDOT cannot access federal funds, NJDOT will not have funds to immediately cover the 1,296 unique active projects made possible in whole or in part by federal funding."); *id.*, Ex. 40 (Brouwer Decl.), ¶ 39 (similar); *id.*, Ex. 42 (Brady Decl.), ¶ 17 (similar). Every Plaintiff State relies on federal funds for their vital infrastructure transportation projects; Plaintiff States cannot simply cut other services and programs to make up the potential loss of federal funds. *See, e.g.*, ECF No. 42-1, Ex. 50 (Chapman-See Decl.), ¶ 9. And even if the funds are fully disbursed at a later date, the delay in funding has already derailed projects and harms Plaintiff States' budgeting and project planning processes. *See, e.g.*, ECF No. 42, Ex. 15 (Dougherty Decl.), ¶¶ 49-56; *id.*, Ex. 27 (Osborn Decl.), ¶¶ 25-26, 34-36; ECF No. 42-1, Ex. 30 (Wiedefeld Decl.), ¶¶ 43-54; *id.*, Ex. 42 (Brady Decl.), ¶¶ 17-19. The deprivation of these funds therefore threatens losses and reductions of critical public safety programs, loss of jobs, liabilities from lost contracts, and a host of other harms. *See* PI Mot. at 37-40.

### 3.    The Immigration Enforcement Condition is Impermissibly Ambiguous.

Defendants argue that the Immigration Enforcement Condition provides sufficient notice of what it requires because it purportedly only requires compliance with federal laws and because courts have rejected vagueness challenges to language using terms like "cooperate" and "comply."

PI Opp. at 34-37. These arguments fail because: (1) the language of the Immigration Enforcement Condition, on its face, does not require compliance with law but rather injects ambiguity by broadly requiring "cooperation" with "enforcement" of federal immigration law, without any limit to what that might require; and (2) the Immigration Enforcement Condition lacks any limiting context because the operative language of the Immigration Enforcement Condition does not actually reference any provisions of federal law, and the federal government's evolving and erroneous interpretations of federal law provide little limit. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.").

First, contrary to Defendants' argument, the text of the challenged Immigration Enforcement Condition, on its face, demands more than mere compliance with applicable federal law; it requires "cooperating" in the "enforcement of Federal immigration law" as well. The Immigration Enforcement Condition, as it reads nearly identically in every place it has been imposed, states:

> *Federal Law and Public Policy Requirements*. The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

*See, e.g.*, ECF No. 42, Exs. 4-7. The language preceding the Immigration Enforcement Condition already states that U.S. DOT funding recipients "shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory" requirements. *Id.* The Immigration Enforcement Condition's requirement that recipients must do this "*and* . . . cooperate with Federal officials in the enforcement of . . . Federal immigration law" thus requires something entirely different. *Cf. Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[C]ourts 'must give effect, if possible, to every clause and word of a statute.'"); *cf. also Bufkin v. Collins*, 145 S. Ct. 728, 741 (2025) ("We are reluctant to treat statutory terms as surplusage in any setting."). But the

20

scope of what is required by "cooperating" with "enforcement" is entirely without definition or limit.

Second, Defendants' cited case involving the phrase "cooperate with" proves Plaintiff States' point, as the court there held that the phrase was concrete only because the surrounding context defined its clear limits. *See ACLU of Tennessee, Inc. v. City of Memphis, Tennessee*, No. 217CV02120JPMJAY, 2020 WL 5630418, at *17 (W.D. Tenn. Sept. 21, 2020) (finding term "cooperate with" concrete when "read in context of [its] limiting phrase" that prohibited discrete acts that violated the consent decree). Here, by contrast, the terms "cooperate with" lack any limiting context, as the operative language of the Immigration Enforcement Condition does not actually reference any specific provisions of federal law or otherwise define the limits of what it requires. *See, e.g.*, ECF No. 42, Ex. 3. Nor does Defendants' attempt to rewrite the Immigration Enforcement Condition to require only compliance with federal immigration law save it. *See, e.g.*, PI Opp at 34. Defendants have adopted "evolving" and erroneous interpretations of federal law. *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018), *vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020); *see also supra* at 15. And those laws, in any event, do not apply to transportation programs or recipients of federal funding, reinforcing the unconstitutional ambiguity of what the condition would require. *See Providence*, 954 F.3d at 39 (rejecting argument that federal immigration laws were laws "applicable" to Byrne JAG funding programs); *see also, e.g.*, ECF No. 42, Ex. 15 (Dougherty Decl.), ¶¶ 45-48; ECF No. 42-1, Ex. 30 (Wiedefeld Decl.), ¶¶ 38-39; *id.*, Ex. 42 (Brady Decl.), ¶¶ 15-16.

Defendants also seek to limit the holding of *Pennhurst* by stating that it only requires "clear notice of the fact that the terms are conditions of the receipt of the funds." PI Opp. at 37 (citing *Pennhurst*, 451 U.S. at 24-25). However, the Court in *Pennhurst* went on to state: "The crucial inquiry, . . . is not whether a State would knowingly undertake that obligation, but whether Congress *spoke so clearly* that we can fairly say that the State could make an informed choice." 451 U.S. at 25. Ambiguous grant condition terms foreclose the possibility of a State making the

"informed choice" to undertake the obligation asked of it. Additionally, Defendants' argument that Plaintiff States are given fair notice because they would receive notice of any cancellation of funding and have an opportunity to appeal that determination is inapposite. *See* PI Opp at 37. *Pennhurst* requires States to have clear notice of the conditions *before* agreeing to them—not afterward in the context of remedial action. 451 U.S. at 25. Further, the ability to contest termination of funding based on an ambiguous grant condition provides little solace when the condition is so ambiguous that it affords Defendants limitless grounds on which to deny Plaintiff States funding. *Cf. City of Chicago v. Morales*, 527 U.S. 41, 61 (1999) (noting the "vast amount of discretion" given by ambiguous requirements).

Finally, contrary to Defendants' assertions, the Supreme Court has not set a lower standard for ambiguous terms in government contracts. *See* PI Opp. at 35. The Court in *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), considered a First and Fifth Amendment facial constitutional challenge to a statutory NEA grant program for support of the arts that considered such factors as "artistic excellence," "artistic merit," "decency," and "respect for diverse beliefs." *Id.* at 572. After acknowledging that the terms were "undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns," the Court upheld the statute as not unconstitutionally vague, in the context of subsidies in the arts and education. *Id.* at 589. *Finley* has no relevance here. While a term such as "excellence" may be interpreted as sufficiently unambiguous in the context of "selective subsidies" of scholarships and grants given for "artistic excellence and artistic merit," *id.*, it bears repeating that the vague language used in the Immigration Enforcement Condition applies to *all* U.S. DOT funding, including formula and discretionary grants, and has no relationship with the statutory purposes of that funding.

### III. THE REMAINING *WINTER* FACTORS FAVOR THE ISSUANCE OF A PRELIMINARY INJUNCTION.

#### A. A Preliminary Injunction is Necessary to Prevent Irreparable Harm.

Defendants argue that Plaintiff States' temporary loss of access to federal funding does not pose irreparable harm as it is a purely economic loss that can be adequately compensated at a later date. PI Opp. at 38. However, this argument mischaracterizes Plaintiff States' injuries, fails to rebut the evidence of irreparable harm presented by Plaintiff States, and misreads binding case law.

To begin, Defendants simply ignore that Plaintiff States have suffered a sovereign harm. They fail to answer Plaintiff States' observation that the challenged policy inflicts irreparable harm because it forces Plaintiff States into an impossible dilemma where they must either submit to an illegal condition or forfeit tens of billions of dollars in critical transportation funding. *See* PI Mot. at 34*; Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 381 (1992) (injunctive preliminary relief is available when plaintiffs face a "Hobson's choice" of whether to comply with the challenged policy).

Further, Defendants fail to answer Plaintiff States' arguments that if they accede to Defendants' unlawful policy, doing so surrenders and harms Plaintiff States' sovereign prerogative to decide how best to deploy their state agencies and personnel. Such sovereign harm would result in other irreparable harms to Plaintiff States' public safety (for instance, by decreasing immigrants' willingness to report crimes, which will result in a proven increase in crimes). *See* PI Mot. at 35-37; *see also Clinton v. City of New York*, 524 U.S. 417, 449-50 (1998) (Kennedy, J. concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers.").

Additionally, Defendants improperly dismiss the irreparable harm from forfeiting tens of billions of dollars in critical federal transportation funding. Defendants' argument that economic loss, alone, does not constitute irreparable harm, PI Opp. at 38-39, misses the point. As Plaintiff States have demonstrated through nearly 40 unrebutted declarations, the loss of funding not only results in economic loss, but has staggering consequences on, among other things: critical

infrastructure projects; Plaintiff States' budgeting, design, and planning processes; and the lives and safety of Plaintiff States' residents. *See generally* ECF Nos. 42, 42-1; *see* PI Opp. at 37-40. Defendants further do not dispute the evidence demonstrating that even a temporary delay in funding would cause this irreparable harm, even if funding were later restored; nor do they dispute evidence showing that, in some instances, the funding may be lost forever if Plaintiff States are denied the ability to access or apply for those funds now. *See* PI Mot. at 23 (Plaintiff States rely on steady funding and cannot fill the gaps created by a pause); *id.* at 30-31 (safety initiatives and infrastructure projects would be terminated if funding were paused); *id.* at 35 (many crucial funding decisions need to be made by Plaintiff States in the coming days, weeks, and months); *id.* at 38 (Plaintiff States will permanently lose the ability to obtain the funds if they are later withdrawn or their obligation authority expires).

"It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended." *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 715621, at *13 (D.R.I. Mar. 6, 2025); *see Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, C.A. No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *22 (D.R.I. Apr. 15, 2025) (interruptions of long-term project planning qualify as irreparable harm), *appeal docketed*, 25-1428 (1st Cir. May 1, 2025).

## B.    The Balance of Equities and the Public Interest Weigh in Plaintiff States' Favor.

The balancing of equities and the public interest strongly favor a preliminary injunction. Defendants argue that the equities weigh in their favor as Plaintiff States could eventually receive money damages to compensate for lost funding, whereas the Defendants will not be able to reclaim funding that is administered during the course of the litigation. PI Opp. at 40-41. As explained *supra* at 22-24, this argument both misstates the harm caused to Plaintiff States and does not accurately reflect the legality of Defendant's conduct.

Defendants have flouted constitutional principles and statutory commands and now attempt to recast their inability to act with impunity as a grave injustice. The courts disagree. A party "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnso*n, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). "The Defendants are not harmed where the order requires them to disburse funds that Congress has appropriated to States and that they have obligated." *New York*, 2025 WL 715621, at *16. Indeed, Plaintiff States' requested relief only prevents Defendants from imposing an unlawful and unconstitutional requirement on federal funding—it does not directly result in the transfer of funding. *See supra* at 6-7.

In contrast, the broader public has a clear stake in consistent access to federal funding to support the development and improvement of transportation infrastructure and the safety of the millions of people who rely on it. Beyond the funding and the critical transportation projects it serves, the balance of equities also clearly disfavors allowing this type of abuse of power. If no relief is granted, "Congressional control of spending will have been usurped by the Executive without constitutional or statutory authority." *New York*, 2025 WL 715621, at *16. When a Constitutional violation is likely, the balance of interests weighs heavily in favor of injunctive relief. *Acosta v. Pablo Restrepo*, 470 F. Supp. 3d 161, 168 (D.R.I. 2020); *Am. Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 649 (6th Cir. 2015).

Defendants cite *Department of Education v. California* to assert that the equities favor Defendants and that the federal government in this case bears all the risk. However, this case is distinguished by two major factors. First, the Supreme Court believed (albeit erroneously) that respondents in that case had "the financial wherewithal to keep their programs running." *Dep't of Educ.*, 145 S. Ct. at 969. Here, the record demonstrates that Plaintiff States would be forced to pause or end numerous transportation projects and initiatives. *See* PI Mot. at 37-40. Second, the Supreme Court based its stay order in *Department of Education* on its determination that the "Government is likely to succeed in showing the District Court lacked jurisdiction" to order payment under a contract. *Id.* at 968. But as explained above, the Tucker Act issues do not apply

here and so a major factor motivating the Supreme Court's decision does not apply.[10] *See supra* at 5-8.

Indeed, Plaintiff States have established both that this Court has jurisdiction to resolve this dispute and that Plaintiff States will prevail on the merits. This likelihood of success on the merits is itself a "strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). As it stands now, Plaintiff States are forced to choose between tens of billions of dollars in federal funding and acceding to a usurpation of congressional and state power. With so much at risk, the public interest calls for a preliminary injunction.

**IV. THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION THAT PREVENTS DEFENDANTS FROM IMPLEMENTING THE DUFFY DIRECTIVE OR IMPOSING THE IMMIGRATION ENFORCEMENT CONDITION ON U.S. DOT FUNDING.**

**A.    This Court Should Not Limit the Scope of the Preliminary Injunction.**

Defendants contend that the Court should limit the scope of the preliminary injunction to: (1) "apply only to the grants identified in Plaintiffs' declarations"; and (2) to prohibit "only those portions of the Immigration Conditions which can be read to require actions beyond complying with federal law." PI Opp. at 42. Those requests would deprive Plaintiff States of meaningful relief and should be rejected.

First, an injunction applicable to all U.S. DOT funding sought or received by Plaintiff States is necessary to protect Plaintiff States from the Duffy Directive's unequivocal declaration that Defendants will impose the Immigration Enforcement Condition on *all* U.S. DOT funding. ECF No. 42, Ex. 2; *see also* ECF No. 42-1, Ex. 30 (Wiedefeld Decl.), ¶ 45 ("The senior FHWA official indicated that Maryland must use the new template agreement terms, and that failure to submit the agreements expeditiously could endanger not only these two grants, but *all* federal funding . . . ."). Further, the sheer scope of Defendants' unlawful conduct makes it impracticable for Plaintiff

---

[10] Defendants also overstate the significance of the *Department of Education* order. *See Rhode Island v. Trump*, No. 1:25-cv-128-JJM-LDA, 2025 WL 1303868, at *6 (D.R.I. May 6, 2025) (noting that the per curiam order has limited precedential value as it was issued on the Supreme Court's emergency docket, was not a decision on the merits, and does not "displace governing law").

States to list the thousands of different funding programs that will be affected. *See, e.g.*, ECF No. 42, Ex. 24 (Bieneman Decl.), ¶ 8 ("IDOT is responsible for administering thousands of projects funded by federal grants from USDOT . . . . too numerous to list in full . . . ."); ECF No. 42-1, Ex. 42 (Brady Decl.), ¶ 9 ("RIDOT is responsible for administering the majority of federal grants received . . . from USDOT," which are "too numerous to list here"). A piecemeal injunction would only lead to further litigation. Enjoining the entirety of Defendants' broad directive avoids this inefficiency. To the extent Defendants suggest that the Court cannot enjoin these promised future implementations of the Immigration Enforcement Condition, "Damocles's sword does not have to actually fall on all . . . before the court will issue an injunction." *League of Women Voters*, 838 F.3d at 8-9.

Second, as explained *supra* at 20, the Court cannot limit the preliminary injunction to only those actions "beyond complying with federal law" because the text of the challenged Immigration Enforcement Condition, on its face, demands more than mere compliance: it requires "cooperation" in its "*enforcement*." *See, e.g.*, ECF No. 42, Ex. 3 (emphasis added). Defendants have not, and could not, cite any provision of federal immigration law requiring such cooperation. As the Supreme Court has repeatedly stated, we read text to "say[] what it means," *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (quotation omitted), and here, Defendants did not write the Immigration Enforcement Condition to say that it merely requires compliance with federal law. And in any event, the federal government's evolving and erroneous interpretations of what compliance requires prevents this reading from providing relief. *See supra* at 15, 21.

### B.    This Court Should Issue a Preliminary Injunction Without Bond.

Defendants ask this Court to: (1) refuse an injunction because remand would be the proper final remedy; (2) stay any preliminary injunction this Court issues, pending appeal; and (3) impose a bond on the preliminary injunction. PI Opp. at 39, 42-43. This Court should decline these requests as well.

Defendants first argue that preliminary relief is inappropriate because the remedy on final judgment would be to remand to the agency without vacating Defendants' actions. PI Opp. at 39.

But the possible form of remedy on final judgment does not speak to whether preliminary relief is warranted to preserve the status quo during the litigation. The APA specifically provides for suspending agency action during the litigation. *See* 5 U.S.C. § 705; *see also Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974) (explaining that § 705 was intended to reflect courts' previously recognized authority to suspend the effect of agency action to preserve the status quo during litigation). Moreover, Defendants' premise is flawed; vacatur of Defendants' actions and declaratory and injunctive relief are available remedies on final judgment and would be the most appropriate remedies here. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (noting that "vacatur is the normal remedy"). Here, the "seriousness of the [challenged actions'] deficiencies," *id.*—including the total absence of statutory authority, lack of adequate explanation, and constitutional violations—would call for vacatur.

In any event, remanding to U.S. DOT to try again would do nothing to protect Plaintiff States from Defendants' unlawful and unconstitutional efforts to hold transportation funding hostage in an attempt to coerce Plaintiff States into fulfilling the federal government's own, unrelated immigration policies. Indeed, remand would only worsen Plaintiff States' injuries by causing further delay, further harming Plaintiff States who need to secure their ability to access U.S. DOT funding now. *See, e.g.*, ECF No. 42, Ex. 28 (Heffernan Decl.), ¶ 30; ECF No. 42-1, Ex. 30 (Wiedefeld Decl.), ¶¶ 19-22, 25; *id.*, Ex. 35 (O'Connor Decl.), ¶ 42.

Second, a stay pending appeal is appropriate only if "the stay applicant has made a strong showing" that (1) its appeal will "likely . . . succeed on the merits"; (2) it "will be irreparably injured absent a stay"; (3) "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) the stay would be in "the public interest." *Does 1-3 v. Mills*, 39 F.4th 20, 24 (1st Cir. 2022) (quoting *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, 996 F.3d 37, 44 (1st Cir. 2021)); s*ee Republic Maximal LLC v. Romulus Cap. Partners II, LLC*, 754 F. Supp 3d 264, 271 (D. Mass. 2024) (same factors apply for district court); *see also Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co.*, 527 F. Supp. 3d 40, 58 (D. Mass. 2021). Importantly, Defendants, as the parties moving for a stay, would bear the burden to establish these

factors. Defendants' request for a stay pending appeal rests entirely on Defendants' assertions that they "are likely to succeed on appeal and will face irreparable harm absent a stay." PI Opp. at 42. As explained above, Defendants are neither likely to prevail on appeal, nor do they face irreparable harm.

Third, Defendants have not shown that they are entitled to a bond under Federal Rule of Civil Procedure 65(c). *See* PI Opp. at 43. "[T]here is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc*., 925 F.2d 6, 9 (1st Cir. 1991); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("The district court has discretion to dispense with the security requirement, or to require mere nominal security . . . ."). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *24 (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases)). Courts have recently declined to issue bonds in similar cases, finding that "where the Government is alleged to have unlawfully withheld large sums of previously committed funds to numerous recipients, it would defy logic . . . to hold the [Plaintiffs] hostage for the resulting harm." *Id.* The same logic applies here—Defendants attempt to hold hostage tens of billions of transportation dollars to coerce Plaintiff States into becoming mere arms of the federal government's immigration enforcement efforts. Requiring Plaintiff States to post a bond to get out of that hostage situation would defeat the purpose of the relief Plaintiff States seek.

### C. Plaintiff States Require Relief Urgently and No Later Than June 20, 2025.

As stated in Plaintiff States' preliminary injunction motion, Defendants have continued to impose imminent deadlines on U.S. DOT funding that is encumbered with the Immigration Enforcement Condition, including deadlines to submit applications for such grants by June 20, 2025. *See, e.g.*, ECF No. 42, Ex. 23 (Khayyat Decl.), ¶ 15; *id.*, Ex. 27 (Osborn Decl.), ¶ 26; ECF No. 42-1, Ex. 41 (Sugahara Decl.), ¶ 13; *see also* U.S. Dep't of Transp., Regional Infrastructure Accelerator Program NOFO – FY2024 Tier 2, at 9, 17 (June 9, 2025),

https://tinyurl.com/cvvfats9.[11] Plaintiff States do not request urgent relief lightly. Plaintiff States understand that it imposes a significant burden on the Court. But the States have not created this exigency. Defendants' multiple, imminent deadlines leave Plaintiff States with no choice but to request relief by June 20, 2025.

## CONCLUSION

This Court should grant the motion for a preliminary injunction, enjoin Defendants from implementing the Duffy Directive, and enjoin Defendants from imposing the Immigration Enforcement Condition on U.S. DOT funding.

June 9, 2025                                   Respectfully submitted,

ROB BONTA
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
James E. Stanley
  *Supervising Deputy Attorneys General*
Brandy Doyle
Luke Freedman
Newton Knowles
Christopher Medeiros
Deylin Thrift-Viveros
Delbert Tran
  *Deputy Attorneys General*

/s/ Delbert Tran
Delbert Tran
  *Deputy Attorney General*
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
(415) 229-0110
delbert.tran@doj.ca.gov

*Attorneys for the State of California*

KWAME RAOUL
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

---

[11] Plaintiff States request that the Court take judicial notice of this notice of funding opportunity because it is a government publication. *See, e.g.*, *Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005). Though the notice of funding opportunity PDF imposes a June 16, 2025 deadline, Defendants agreed to a several-day extension of that specific deadline to allow the Court to issue its decision on the preliminary injunction motion by June 20.

MATTHEW J. PLATKIN
   ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
   *Deputy Solicitor General*
Mayur P. Saxena
   *Assistant Attorney General*
Maryanne M. Abdelmesih
Surinder K. Aggarwal
Yael Fisher
Nathaniel F. Rubin
   *Deputy Attorneys General*
25 Market St., PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*


ANTHONY G. BROWN
   ATTORNEY GENERAL OF MARYLAND

/s/ James C. Luh
James C. Luh
   *Senior Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorneys for the State of Maryland*


PETER F. NERONHA
   ATTORNEY GENERAL OF RHODE ISLAND

/s/ Patrick Reynolds
Kathryn M. Sabatini (RI Bar No. 8486)
   *Civil Division Chief*
   *Special Assistant Attorney General*
Patrick Reynolds (RI Bar No. 10459)
   *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
preynolds@riag.ri.gov
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*


PHILIP J. WEISER
   ATTORNEY GENERAL OF COLORADO

/s/ Sam Wolter
Sam Wolter
   *Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
samuel.wolter@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Michael K. Skold
Michael K. Skold
  *Solicitor General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
michael.skold@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAI'I

/s/ Kaliko'onālani D. Fernandes
David D. Day
  *Special Assistant to the Attorney General*
Kaliko'onālani D. Fernandes
  *Solicitor General*
Department of the Hawai'i Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawai'i*

**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail
  *Deputy Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
vivian.mikhail@maine.gov

*Attorneys for the State of Maine*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of
  Massachusetts*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti
Michael Dittenber
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
DittenberM@michigan.gov

*Attorneys for the People of the State of
  Michigan*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*


**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

/s/ Steven Perfrement
Steven Perfrement
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
sperfrement@nmdoj.gov

*Attorneys for the State of New Mexico*


**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*


**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Attorneys for the State of Nevada*


**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Zoe Levine
Zoe Levine
  *Special Counsel for Immigrant Justice*
Julie Dona
  *Special Counsel*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
Mark Ladov
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 907-4589
zoe.levine@ag.ny.gov

*Attorneys for the State of New York*


**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Julio A. Thompson
  *Assistant Attorney General*
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3657
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

/s/ Benjamin Seel
Benjamin Seel
Tyler Roberts
Cristina Sepe
Marsha Chien
*Assistant Attorneys General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov
Tyler.Roberts@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Marsha.Chien@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reynolds Colbert
Frances Reynolds Colbert
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*

## CERTIFICATE OF SERVICE

I certify that, on June 9, 2025, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rules Gen 304.


Dated: June 9, 2025                                                    /s/ Delbert Tran
                                                                       Delbert Tran