# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, et al.,

    Plaintiffs,

    v.

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,

    Defendants.

Civil Action No.
25-cv-000208-JJM-PAS

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## **Table of Contents**

INTRODUCTION ..................................................................................... 1

BACKGROUND ....................................................................................... 5

STANDARDS OF REVIEW ................................................................... 11

I.    SUBJECT MATTER JURISDICTION .......................................... 11

II.   SUMMARY JUDGMENT ............................................................... 12

ARGUMENT ........................................................................................... 14

I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS'
      CLAIMS. .......................................................................................... 14

      A.    This Court Lacks Jurisdiction over Certain of Plaintiffs'
            Claims Because they are Within the Exclusive
            Jurisdiction of the Circuit Courts. ........................................ 14

      B.    The Court of Federal Claims has Jurisdiction to Hear
            Plaintiffs' Remaining Claims Seeking Compulsion of
            Payments of the Remaining Federal Grants. ....................... 19

II.   DEFENDANTS HAVE NOT VIOLATED THE LAW. ................... 30

      A.    The Executive Has Broad Discretion in the Enforcement
            of Immigration Law and Congress Intended for State and
            Local Governments to Work with the Federal Government
            in Carrying Out Immigration Enforcement. ........................ 30

      B.    Congress Did Not Preclude the Implementation of Specific
            Terms and Conditions and Has Granted DOT Broad
            Authority to Set Terms and Conditions for Discretionary
            Grants. .................................................................................... 31

      C.    The Constitution Permits Agencies to Set Terms and
            Conditions. .............................................................................. 40

      D.    Plaintiffs Are Incorrect in Their Claim that the
            Immigration Conditions are Impermissibly Ambiguous
            Grant Terms. .......................................................................... 46

      E.    Plaintiffs' APA Claims Lack Merit. ...................................... 51

III.  **THE COURT SHOULD LIMIT ANY RELIEF TO THE GRANT PROGRAMS IDENTIFIED IN PLAINTIFFS' AMENDED COMPLAINT AND TO THE PLAINTIFFS. ....................66**

**CONCLUSION ........................................................................................................ 66**

# INTRODUCTION

Twenty-one states and the District of Columbia ("Plaintiffs") ask this Court to enjoin the U.S. Department of Transportation ("DOT") from withholding or conditioning grant funds on certain immigration related conditions (the "Immigration Conditions"). Plaintiffs ask this Court to invalidate the new conditions and require DOT and its subagencies (also referred to as "modes") to provide funding to each Plaintiff whether or not they comply with federal law. They ask for this relief regardless of the level of discretion Congress has delegated to the Agency for each program and even if they were to impede DOT's efforts to fulfill its mission of addressing safety in the transportation of people and goods in violation of existing federal law.

Plaintiffs' claims face a threshold barrier: this Court lacks subject-matter jurisdiction over them. This case is, at its essence, a dispute about changes by one party to grant language agreement. At base, Plaintiffs are asserting that they are entitled to payment by the Government under grant agreements. These claims are either subject to the exclusive statutory jurisdiction of the appeals courts or are Tucker Act actions over which the Court of Federal Claims has exclusive jurisdiction. 49 U.S.C. §§ 46110, 47111, 60119, 20114(c); 8 U.S.C. §§ 1346(a)(2), 1491(a)(1). Plaintiffs' separation-of-powers and Spending Clause claims are challenges to conditions of the grants by another name, for which there is no jurisdiction in this Court.

Because this Court lacks jurisdiction, it need not consider Plaintiffs' other arguments. If it does, however, Plaintiffs' complaint fails for additional reasons. First, Plaintiffs argument that DOT lacks statutory authority for its action is contrary to explicit grants of authority to the Secretary of DOT. For example,

pursuant to 49 U.S.C. § 5334(a)(1), DOT is authorized to "prescribe terms for a project that receives Federal financial assistance" for all Federal Transit Administration grants. *Id*. Where, as here, Congress has provided the relevant authority to the agency, there is no valid separation of powers issue. Congress has given broad authority to DOT to administer its programs within general statutory purposes. In appropriating money to DOT, Congress intended the Agency to use those funds to address transportation safety concerns that rely on the cooperation that the challenged Immigration Conditions promote.

Moreover, Plaintiffs' Administrative Procedure Act ("APA") claims fail because, as explained above, the Secretary of Transportation has the authority to prescribe terms for these grants. The decision to place conditions on grants is therefore committed to agency discretion by the Congressional grant of authority to impose terms and conditions and the statement of purpose for the agency. Requiring compliance with existing federal law in this manner is a permissible exercise of that discretion.

Plaintiffs also have not demonstrated any violation of the Spending Clause here. The Supreme Court, in *South Dakota v. Dole*, 483 U.S. 203, 206, 210-212 (1987), explicitly recognized that the Federal Government may impose conditions on funding to further its own policies and priorities. Nor does *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (hereinafter, "*NFIB*") hold otherwise. To the contrary, although the Supreme Court in *NFIB* ruled that the withholding of all Medicaid funding would be too great a burden to impose on the states to induce

them to expand their Medicaid programs, the Court made clear that this was due to the size and scope of the funding being threatened—and the expansive new program being required. *Id.* at 587. Plaintiffs have not demonstrated such a level of threat or any expansion of obligations here.

Ultimately, Plaintiffs cannot prevail on their facial challenge to the inclusion of these provisions and any challenge to the hypothetical application of these provisions is unripe. The Secretary of Transportation has stated that the Immigration Conditions simply reiterate the requirements of existing federal law. Smith Decl. at ¶¶ 7-8; Letter from the Secretary, July 2, 2025 (Exhibit C to the Smith Declaration). Plaintiffs are already required to comply with federal law under the Supremacy Clause of the Constitution.

This clarification by the Secretary in the July 2025 Letter and attached Smith Declaration also removes the concern expressed by the Court in granting the preliminary injunction that Defendants were asking the Court to interpret the Immigration Conditions in a manner contrary to their intent or how they will be implemented. *See* Order at 7 n.4. DOT has now made clear that its intent and commitment is to interpret these provisions as only requiring compliance with existing federal laws. It has further specifically committed to only enforcing the provisions consistent with this interpretation. DOT has stated unequivocally that

> The grant conditions requiring DOT funding recipients to cooperate with Federal immigration enforcement do not create a new legal obligation or require recipients to take any action that is not already required by law. Instead, the conditions merely emphasize that recipients, consistent with grant conditions generally requiring com-

3

pliance with Federal law, must comply with their existing obliga-
tions under immigration-related Federal statutes and regulations,
including 8 U.S.C. § 1324 and 8 U.S.C. § 1327 (as also explained in
the Secretary's April 24 letter).

Smith Decl. ¶ 8. Furthermore, the DOT has committed to the following:

DOT will not take any investigative or enforcement actions that are
inconsistent with the interpretation of the grant conditions that is
expressed in this paragraph.

*Id.*

Thus, to the extent that the Court viewed the Immigration Conditions as
capable of an interpretation that goes beyond requiring compliance with existing
federal laws, that is no longer a concern. Also, because Plaintiffs have always
been obligated to comply with federal laws, they cannot prevail on claims that
such conditions are ultra vires, in violation of the Spending Clause, in excess of
statutory authority, arbitrary and capricious, or contrary to constitutional rights.

No actual application of the Immigration Conditions is before this Court.
Plaintiffs' complaint is premised on their conjecture about how those conditions
may be applied and invites the Court to rule that Plaintiffs are free to violate federal
law. The Court should not accept Plaintiffs' sweeping invitation to enjoin whole-
sale any inclusion of these provisions, without regard to the statutory authority
to do so, and without regard to whether any money will actually be withheld and
on what basis.

The United States incorporates by reference the Smith and Louie Declara-
tions attached to this Motion.

## BACKGROUND

DOT administers various grant programs relating to transportation. Some are discretionary, while others are "formula" grants, in which Congress designates specific sums to be made available for transit projects based on statutory formulas. Louie Decl. ¶ 3.

DOT administers grants through many of its modes, including the Federal Aviation Administration ("FAA"), Federal Highway Administration ("FHWA"), Federal Motor Carrier Safety Administration ("FMCSA"), Federal Railroad Administration ("FRA"), Federal Transit Administration ("FTA"), Maritime Administration ("MARAD"), National Highway Traffic Safety Administration ("NHTSA"), Office of the Secretary of Transportation ("OST"), and Pipeline and Hazardous Materials Safety Administration ("PHMSA"). *Id.* ¶ 4. DOT formula funds are distributed, according to a Congressionally predetermined formula, to states, federally recognized Tribal recipients, and transit agencies, which may then allocate amounts to eligible local entities. *See* Federal Funding and Financing: Grants, US DOT, https://www.transportation.gov/rural/grant-toolkit/funding-and-financing/grants-overview.

For competitive grants, each DOT mode solicits applications and selects projects based on program and applicant eligibility, evaluation criteria, and Departmental or program priorities, therefore making it "competitive." *Id.* In general, to apply for discretionary grants, an eligible applicant must submit a proposal in response to a Notice of Funding Opportunity ("NOFO") that sets forth

5

the grant program's objectives, policy priorities, and eligibility criteria. Louie Decl. ¶ 5.

DOT conducts merit reviews of submitted applications and selects recipients to award funding based on the stated criteria in the NOFO. *Id.* at ¶ 7. If an application is selected for award, before DOT will proceed with the execution of the grant agreement, the applicant must demonstrate that they have met certain pre-award requirements, which vary based on the nature of the planned activities. *Id.* If selected, the applicant settles upon matters such as the scope, schedule or budget of the project, and signs a grant or project agreement with DOT. *See* Grant Application Roadmap, US DOT, https://www.transportation.gov/rural/grant-toolkit/grant-application-process/grant-applicant-roadmap. Once the grant project agreement has been executed, DOT disburses funds, and the grantee implements the awarded project and adheres to all necessary conditions of the award. *Id.* DOT may disburse funds as an advance payment or as a reimbursement for eligible expenses incurred. *Id.*

In general, the grant agreement incorporates by reference General Terms and Conditions that impose obligations on the recipient. Louie Decl. ¶ 8. The modes routinely update their General Terms and Conditions that apply to their programs to reflect changes in applicable law or policy. *Id.* at ¶ 9. When a mode updates its General Terms and Conditions, it makes this information available to all applicants selected for award prior to grant agreement execution and posts

a copy of the latest version on its public website before incorporating the new version into new federal grants or grant amendments. *Id.*

On January 29, 2025, DOT Secretary Duffy issued an order which set forth a set of principles to govern the implementation and administration of all DOT policies, programs, and activities: including,

> (f) ***To the maximum extent permitted by law***, DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts, shall prioritize projects and goals that: . . .
>
> > (v) require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary.

Smith Decl., Ex. A at 2-3 (emphasis added).

On April 24, 2025, Secretary Duffy sent a letter to all recipients of DOT funding to, among other things,

> clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

*Id.*, Ex. B at 1. Among other things, the letter reminded recipients of their legal obligations not to discriminate in violation of federal law. *Id.* at 1-2 It also provided:

> In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration Customers Enforcement (ICE) and other Federal offices and components of the De-

partment of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistant programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and cooperate with Federal officials in the enforcement of Federal immigration law.

*Id.* at 2-3. The letter further provides:

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support though its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

*Id.* at 3.

At the direction of the Office of Transportation Policy, operating administrations within the Department added language to reflect the reminder in Secretary Duffy's April 24, 2025 letter in DOT grant agreements. Smith Decl. at ¶ 6. In general, the added language requires recipients to cooperate with Federal officials in the enforcement of Federal immigration law, including cooperating

8

with and not impeding U.S. Immigration and Customs Enforcement and other
Federal offices and components of the Department of Homeland Security in the
enforcement of Federal immigration law. *Id.* For example, the FRA General
Terms and Conditions, issued on April 23, 2025, provide:

> 20.2 Federal Law and Public Policy Requirements
>
> (a) The Recipient will ensure that Federal funding is expended in
> full accordance with the United States Constitution, Federal
> law, and statutory and public policy requirements: including but
> not limited to, those protecting free speech, religious liberty,
> public welfare, the environment, and prohibiting discrimination
> and the Recipient will cooperate with Federal officials in the en-
> forcement of Federal law, including cooperating with and not
> impeding U.S. Immigration and Customs Enforcement (ICE)
> and other Federal offices and components of the Department of
> Homeland Security in and the enforcement of Federal immigra-
> tion law.

FRA General Terms and Conditions (April 16, 2025) at 28-29, ECF No. 42, Pl. Ex.
4; *see also* FHWA Competitive Grant Program General Terms & Conditions (April
22, 2025) at 25, ECF No. 42, Pl. Ex. 5 (providing same).

These revised terms do not apply retroactively to impact funds that have
already been disbursed to recipients. *See* Louie Decl. at ¶13. Further, DOT's grant
agreements require the agency to provide the recipient written notice of any per-
ceived violation of the agreement, as do DOT's procedural requirements. *Id.* at
¶ 11. DOT issued a memorandum in March 2025 clarifying and reiterating DOT's
policy to provide fair notice and due process in any enforcement action. *Id.*; *see
also* Cote Memorandum re. Procedural Requirements for DOT Enforcement Ac-
tions, Dep't of Transp. (Mar. 11, 2025), https://www.transportation.gov/si-

tes/dot.gov/files/2025-03/Procedural%20Require-

ments%20for%20DOT%20Enforcement%20Actions.Cote%20Memo.Signed.03-

11-2025.pdf.

On July 2, 2025, Secretary Duffy sent a letter to all recipients of DOT fi-

nancial assistance to inform them that DOT will no longer enforce certain Biden

Administration requirements related to climate change, diversity, equity, and

inclusion, environmental justice, and other matters. *See* Smith Decl., Ex. C. The

letter contrasts those mandates—as not required by statute or regulation—with

language the Trump Administration has inserted into agreements requiring

compliance with *already existing legal requirements* . . . including, among oth-

ers, *existing legal requirements related to immigration enforcement* and the pro-

hibition of discrimination" (emphasis added). *Id.* at 2; Smith Decl. at ¶ 7.

DOT has made clear that the condition requiring DOT funding recipients

to cooperate with Federal immigration enforcement does not create a new legal

obligation or require recipients to take any action that is not already required

by law. *See* Smith Decl., Ex. C at 2; *id.* at ¶ 8. Instead, this condition only re-

quires recipients to comply with their obligations under Federal statutes and

regulations, including 8 U.S.C. § 1324 and 8 U.S.C. § 1327. Smith Decl. ¶¶ 7-8;

*id.* at Ex. C. DOT has also stated that it will not take any investigative or en-

forcement actions that are inconsistent with this interpretation of the funding

condition. Smith Decl. at ¶ 8.

10

## STANDARDS OF REVIEW

### I.   SUBJECT MATTER JURISDICTION

To proceed on their claims, Plaintiffs must first establish subject-matter juris-diction in this Court—specifically, by showing whether Congress has waived sover-eign immunity and, if so, whether this Court may hear their claims. *See, e.g.*, *Daval-lou v. United States*, 998 F.3d 502, 504 (1st Cir. 2021) (affirming R. 12(b)(1) dismis-sal). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for juris-diction.").

Federal courts "presume [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citations omitted). The test for deciding whether sovereign immunity has been waived is "strin-gent," the waiver must be "unmistakably clear," and the Court must "indulge every reasonable presumption against" waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecond-ary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999); *Paret-Ruiz v. United States*, 827 F.3d 167, 176 (1st Cir. 2016) ("Sovereign immunity protects the United States from suit absent consent that is 'unequivocally expressed.'") (quoting *United States v. Bormes*, 568 U.S. 6, 9-10 (2012)).

The plaintiff has the burden of alleging facts sufficient to establish the court's subject matter jurisdiction. *See Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996); *see also Padilla-Mangual v. Pavía Hosp.*, 516 F.3d 29, 31 (1st Cir. 2008) (once

challenged, "the party invoking subject matter jurisdiction . . . has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction").

## II.    SUMMARY JUDGMENT

Summary judgment is proper when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence . . . would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

"The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006). In such circumstances, courts "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered." *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996).

"[T]he summary judgment rubric has a special twist in the administrative law context." *Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (citation omitted). There, "summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id.*

The Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Lab. Relations Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 23 (1st Cir. 1999) (quoting 5 U.S.C. § 706(2)(A)). The standard of review is "narrow" and "a reviewing court may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citation omitted).

"The burden is on the party challenging the agency decision"—here, Plaintiffs—"to show that the arbitrary and capricious standard has been met." *Bluestone Envtl. Grp., Inc. v. Zapisek*, No. 3:21-cv-30056, 2022 WL 16857173, at *4 (D. Mass. Nov. 10, 2022). "Under the APA, agency action is presumptively valid," and that standard "precludes a reviewing court from substituting its own judgment for that of the agency." *R.I. Hosp. v. Leavitt*, 548 F.3d 29, 33-34 (1st Cir. 2008). "While this is a highly deferential standard of review, it is not a rubber stamp." *Beverly Enters.-Mass.*, 174 F.3d at 24 (quoting *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 720 (1st Cir. 1999)). "The reviewing court must 'look to see if the agency decision, in the context of the record, is too unreasonable (given its statutory and factual context) for the law to permit it to stand.'" *Id.* at 23 (quoting *Sierra Club v. Marsh*, 976 F.2d 763, 769 (1st Cir. 1992)). Accordingly, an agency decision need only be "rational" to "pass muster under the APA's arbitrary and capricious test[.]" *Id.* at 24 (citation omitted); *see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983) ("We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (citation omitted).

**ARGUMENT**

**I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.**

> **A.    This Court Lacks Jurisdiction over Certain of Plaintiffs' Claims Because they are Within the Exclusive Jurisdiction of the Circuit Courts.**

As a preliminary matter, some of the claims that Plaintiffs assert are specifically designated by statute to the exclusive jurisdiction of the circuit courts. For example, the Federal Aviation Act, 49 U.S.C. § 46110 provides that a challenge to an order by the Secretary of DOT, the Administrator of the Transportation Security Administration ("TSA"), or Administrator of the FAA, must be brought by "filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." 49 U.S.C. § 46110(a). Furthermore, the petition must be filed not later than 60 days after the order is issued. *Id.* It further provides that the circuit court in which the petition is filed has "exclusive jurisdiction to affirm, amend, modify or set aside any part of the order and may order the Secretary [and other DOT officials] to conduct further proceedings. *Id.* at § 46110(c). And that any such decision by the circuit court "may be reviewed only by the Supreme Court." *Id.* at § 46110(e). Similarly, 49 U.S.C. § 47111(d)(3) provides, with respect to aviation program grants:

14

A person adversely affected by an order of the Secretary withholding a payment may apply for review of the order by filing a petition in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the project is located. The petition must be filed not later than 60 days after the order is served on the petitioner.

*Id.*

Other similar jurisdictional exceptions relating to other DOT modes also place jurisdiction only in circuit courts:

| Statute | Description |
|---|---|
| **49 U.S.C. § 60119** | Provides direct review at the circuit court for a person adversely affected by a regulation or order prescribed under the pipeline safety chapter, applied to PHMSA. |
| **49 U.S.C. § 20114(c)** | FRA statute that states, "[e]xcept as provided in section 20104(c) of this title, a proceeding to review a final action of the Secretary of Transportation under [PART A] or, as applicable to railroad safety, chapter 51 or 57 of this title shall be brought in the appropriate court of appeals as provided in chapter 158 of title 28.") |
| **28 U.S.C. § 2342(3)(A)** | Provides direct review at the court of appeals as exclusive jurisdiction to challenge final orders issued by DOT pursuant to:<br>• 46 U.S.C. §§ 50501, 50502, 56101-56104, 57109 (pertaining to merchant marines);<br>• 49 U.S.C. Subtitle IV, Part B (§§ 13101-14916) (pertaining to motor carriers, water carriers, brokers, and freight forwarders);<br>• 49 U.S.C. Subtitle IV, Part C (§§ 15101-16106) (pertaining to pipeline carriers); and<br>• 49 U.S.C. Subtitle VI, Part B, Chapters 311, 313, 315 (§§ 31100-31504) (pertaining to commercial motor vehicle safety) |
| **49 U.S.C. §§ 46110(a), (c), (e)** | Except for an order related to a foreign air carrier . . ., a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the [TSA] with respect to security duties and powers . . . or the Administrator of the [FAA] with respect to aviation duties and powers . . .) in whole or in |

| | part under this part, part B, or subsection (l) or (r) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued . . . the court has ***exclusive jurisdiction*** to affirm, amend, modify or set aside any part of the order . . . A decision by a court under this section may be reviewed ***only*** by the Supreme Court . . . ." |
|---|---|
| **49 U.S.C. § 47111(d)(3)** | Provides direct review at the circuit court of orders withholding payments for airport improvement programs. |

In *Tulsa Airports Improvements Tr. v. United States*, 120 Fed. Cl. 254 (2015), the Court of Federal Claims held that 49 U.S.C. § 46110 displaced Tucker Act jurisdiction with respect to claims challenging FAA's denial of reimbursement for certain costs under grant agreement. The court explained:

> '[U]nless the Tucker Act has been displaced or modified by explicit federal statutory law or treaty,' the Act grants this court general jurisdiction over claims arising under contracts with the federal government. . . . 'The [displacing] exceptions [to Tucker Act jurisdiction] are few and far between.'

*Id.* at 259 (citing *Bos. Edison Co. v. United States*, 64 Fed. Cl. 167, 175 (2005).

The court then found that 49 U.S.C. §§ 46110 and 47111 are examples of those statutes that displace the jurisdiction of the Court of Claims under the Tucker Act. *Id.* at 259-60, 263; *see also Pucciariello v. United States,* 116 Fed. Cl. 390, 409 (2014) (finding "the specific and exclusive jurisdictional authority granted to the federal courts of appeals in 49 U.S.C. § 46110 controls and takes precedence over the general and non-exclusive jurisdictional authority afforded by the Tucker Act."); *Blitz v. Napolitano,* 700 F.3d 733, 740 (4th Cir. 2012)

("Congress clearly expressed its intention that any legal challenge to a § 46110 order . . . be brought in the first instance in a court of appeals."); *Jones v. United States,* 625 F.3d 827, 829 (5th Cir. 2010) ("Section 46110(a) of the Federal Aviation Act vests the exclusive jurisdiction over challenges to FAA orders in certain United States Courts of Appeals."); *Americopters, LLC v. FAA,* 441 F.3d 726, 732 (9th Cir. 2006) ("We have direct and exclusive jurisdiction over the review of FAA final orders under 49 U.S.C. § 46110."); *St. John's United Church of Christ v. City of Chicago,* 502 F.3d 616, 628 (7th Cir. 2007) (holding that "exclusive jurisdiction" over disputes concerning airport development rests in the court of appeals); *Diaz Aviation Corp. v. Alvarez*, 556 F. Supp. 2d 94, 97 (D.P.R. 2008) (noting that the Federal Aviation Act provides that the courts of appeals have "exclusive jurisdiction to affirm, amend, modify, or set aside" orders of the National Transportation Safety Board or the FAA).

Statutes "such as Section 46110(c) that vest judicial review of administrative orders exclusively in the court of appeals also preclude district courts from hearing claims that are inescapably intertwined with the review of such orders." *Merritt v. Shuttle,* 245 F.3d 182, 187-88 (2d Cir. 2001) (citation omitted). "A claim is inescapably intertwined with the review of an administrative order if it alleges that the plaintiff was injured by such an order and that the court of appeals has authority to hear the claim on direct review of the agency order." *Diaz Aviation Corp.,* 556 F. Supp. 2d at 98 (citations omitted).

Moreover, as the First Circuit has explained:

> The term 'order' is read expansively in review statutes generally, 5 U.S.C. § 551(6) (1994) (an 'order' includes 'the whole or a part of a final disposition, [including those] declaratory in form'), and this statute [49 U.S.C. § 46110] specifically[.]

*Aviators for Safe & Fairer Regulation, Inc. v. FAA*, 221 F.3d 222, 225 (1st Cir. 2000) (citations omitted) (holding that exclusive review over a challenge to the FAA pilot rest policy under § 46110 lies with the First Circuit). The definition of an order includes decisions by letter such as those at issue here. The Tenth Circuit has explained:

> A communication need not be formal to constitute a final agency action. Numerous circuits have held that letters from the FAA, including those not issued by the Administrator, constitute 'orders' for purposes of 49 U.S.C. § 46110. *Aerosource, Inc. [v. Slater,* 142 F.3d 572, 577-78 (3d Cir. 1998)] (collecting cases). Further, under a similar statute, we have concluded that an informal agency communication may constitute an order suitable for judicial review. *TransAm Trucking, Inc. v. [FMCSA]*, 808 F.3d 1205, 1212 n.4 (10th Cir. 2015) ("[T]he informal nature of the email communication doesn't necessarily determine whether it was a 'final order' within the meaning of [28 U.S.C.] § 2342(3)(A).").

*Tulsa Airports Improvement Tr. v. FAA*, 839 F.3d 945, 949 (10th Cir. 2016) (agreeing, after transfer, that jurisdiction lay in the Court of Appeals).

Thus, to the extent that Plaintiffs are challenging an order of the Secretary to implement these conditions with respect to matters relating to programs covered by such explicit jurisdictional carve-outs, such as the FAA's Airport Improvement Program, the PHMSA's State Pipeline Safety Grants, and the FRA's

Railroad Safety State Participation Grant Program, *see* ECF No. 61 at ¶¶ 88, 127-138, 152-157, there is no subject matter jurisdiction in this Court.[1]

### B. The Court of Federal Claims has Jurisdiction to Hear Plaintiffs' Remaining Claims Seeking Compulsion of Payments of the Remaining Federal Grants.

The core of Plaintiffs' claims is that the government has illegally changed the standard terms in its grant agreements, and they seek an order that the government set aside these grant terms and ask the Court to permanently enjoin Defendants from ever including these grant terms that reiterate the grantees' existing obligations to comply with federal immigration laws. At bottom, Plaintiffs seek to modify the DOT subagencies' grant terms to align with terms they would prefer. These claims are based on Plaintiffs' contractual relationships with the federal government. That triggers jurisdiction in the Court of Federal Claims under the Tucker Act, and thus this Court lacks jurisdiction to provide the relief that Plaintiffs seek. The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract

---

[1]    After the government raised this issue, Plaintiffs filed a Protective Petition with the First Circuit relating to these claims. Petition for Review, *California v. Duffy*, No. 25-1613 (*filed* 1st Cir. June 23, 2025). Pursuant to the Defendants' unopposed motion, the First Circuit has placed that petition in abeyance pending these proceedings in the District Court. Order, *id.* (1st Cir. July 29, 2025).

with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

That Plaintiffs frame some of their claims here as constitutional or requests for declaratory relief does not change the analysis. The Federal Circuit has emphasized, that

> in determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, we must look beyond the form of the pleadings to the substance of the claim. We have cautioned litigants that dressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction to make it an APA case.

*Suburban Mortg. Assocs., Inc.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007); *see also Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) ("[A] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.") (citation omitted); *Consol. Edison Co. of New York, Inc. v. U.S. Dep't. of Energy*, 247 F.3d 1378, 1385 (Fed. Cir. 2001) ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."); *Vill. W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 139-40 (D.R.I. 2009) (rejecting as "without merit" the "familiar argument" that by seeking a prospective declaration regarding future agency actions, the Court of Federal Claims could not provide adequate relief in case where the Tucker Act applies).

As the First Circuit has long recognized, the Court lacks jurisdiction where "the essence of the action is in contract"—and plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise[.]" *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Ct. of the U.S.*, 340 F.2d 947, 948 (1st Cir. 1965)). Thus, regardless of how a claim is styled, a case must proceed only in the Court of Federal claims if a case "is in 'its essence' contractual[.]" *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).[2]

This prohibition on district court jurisdiction extends to claims founded on grants implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). Courts have routinely held that such "grant agreements [are] contracts when the standard conditions for a contract are satisfied." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004) (treating a "Program Participation Agreement" and related grants under the Higher Education Act as a contract).

---

[2]    *See also Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the [challenged action] was wrongful.").

Determining whether "a particular action" is "at its essence a contract action" outside the jurisdiction of district courts requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (applying *Megapulse*). Both prongs point toward a lack of district court jurisdiction here.

### 1. The Source of Rights Plaintiffs Assert Are the Grant Agreements.

To determine whether the source of the rights in question is contractual, a court must consider whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights exist prior to and apart from rights created under the contract"; and whether "the plaintiff seeks to enforce any duty imposed upon the government by the . . . relevant contracts to which the government is a party." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (cleaned up).

No funds are available to any prospective applicant for a particular competitive grant program for FY 2025 until after DOT has issued a NOFO advertising such funds, selected recipients under the NOFO, and signed a grant agreement with the selected recipients. Louie Decl. at ¶ 12. As such, any right that Plaintiffs would have to competitive DOT funding is not in the various statutes that create the grant programs, but in the language of the grant agreements themselves.

The FRA's General Terms and Conditions, for instance, provide:

> (1) the terms and conditions impose obligations on the Recipient and that the Recipient's non-compliance with the terms and conditions

22

> may result in remedial action, including terminating the Agreement, disallowing costs incurred for the Project, requiring the Recipient to refund Federal contributions to [the subagency], and reporting the non-compliance in the Federal-government-wide integrity and performance system. Recipient acknowledges that the terms and conditions impose such obligations on the Recipient whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

FRA General Terms and Conditions (April 16, 2025) at 28-29, ECF No. 42, Pl. Ex. 4. Similarly, if a grant applicant were delinquent in its repayment of any federal debt, it would not be eligible for grant funding. *See* FAA Airport Infrastructure Grant Template Agreement (May 6, 2025) at 11, ECF No. 42, Pl. Ex. 8. Under the applicable regulations for federal grants, if a state "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," DOT has the authority to "implement specific conditions," including "suspend[ing] or terminat[ing] the Federal award in part or in its entirety." 2 C.F.R. § 200.339 (emphasis added). This is because Congress has given DOT broad authority to implement grant programs, and no statute provides any rights to an individual state to obtain those funds regardless of whether they meet DOT's terms and conditions for the grant.

Congress intended for the Agency to set terms and conditions, *see generally* 2 C.F.R. §§ 200 *et seq.* (providing uniform requirements for federal awards, authorized by 31 U.S.C. §§ 503, 6101-6106, 6307, and 7501-7507), and this dispute is about a change in those terms. That means the source of Plaintiffs' claims is contractual in nature, and this Court lacks subject-matter jurisdiction. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (court

23

lacks subject-matter jurisdiction because asserted right to payment "in no sense . . . exist[ed] independently of [its] contract").

Plaintiffs assert that the Duffy Directive's announcement of the Immigration Conditions exceeds Defendants' legal authority, yet acknowledge that their challenge to the Immigration Conditions lies in the specific terms and conditions of the grant agreements administered by the DOT modes. *See* ECF No. 61 at ¶¶ 9, 185-89. Though Plaintiffs challenge grant terms under various theories, all ultimately stem from contracts without which no claims would exist. The *ultra vires* and Spending Clause claims challenge the premise of including the challenged terms in the grant agreements *ab initio*; the Spending Clause claim also alleges that the challenged terms are too vague; the APA claims rehash the prior claims by asserting that the challenged terms were promulgated without authority or sufficient process to support them or were not sufficiently reasoned. In other words, "it is likely that no cause of action would exist at all" in the absence of the grants. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted); *see also Consol. Edison Co. of N.Y.*, 247 F.3d at 1385-86 (directing court to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract).

In general, if the grant agreements to which Plaintiffs are party had never existed, Plaintiffs would have no claim to funds from the agencies. That means the source of Plaintiffs' rights are contractual, and this Court lacks jurisdiction. Whether labeled as APA or constitutional claims, absent other exclusive statutory jurisdiction, the Tucker Act governs where the "essential rights at stake" are contractual, despite

plaintiffs' allegations of statutory and constitutional violations. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77-78 (D.C. Cir. 1985). Thus, their allegations make clear that the purpose of the suit is to challenge contractual terms.

Lastly, even if this Court concludes the Tucker Act does not remove jurisdiction over all of Plaintiffs' claims, it still must dismiss or transfer the claims that indisputably sound in contract, because "pendent jurisdiction has no application to a claim against the United States." *Lenoir v. Porters Creek Watershed Dist.*, 586 F.2d 1081, 1087 (6th Cir. 1978); *see McKay v. United States*, 703 F.2d 464, 470-71 (10th Cir. 1983) (rejecting jurisdiction where plaintiff sought to bring Tucker Act claim, for which jurisdiction lies exclusively with the Claims Court, as a pendent claim to a claim properly before the court).

## 2. Plaintiffs Seek Contract Remedies.

The relief prong likewise weighs against jurisdiction. Where, as here, a plaintiff seeks to enforce a contractual agreement with the Federal Government and obtain payment of money, the inquiry is straightforward: a district court "cannot order the Government to pay money due on a contract." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025). A request for an order that the Government "must perform" on its contract (unless subject to direct appellate review by statute) is one that "must be resolved by the Claims Court." *Id.* (quoting *Ingersoll-Rand Co.*, 780 F.2d at 80).

In April, the Supreme Court stayed a district court order to make payments based on grants because the Government was "likely to succeed in showing that the District Court lacked jurisdiction" to bar termination of various education-related

grants. *U.S. Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). The Supreme Court held the injunction was effectively an order "to enforce a contractual obligation to pay money," and thus not covered by the APA's limited waiver of sovereign immunity; instead, the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over such suits. *Id.* In *California*, several plaintiffs brought an APA challenge to termination of federal education-related grants. *Id.* The Supreme Court concluded the district court lacked jurisdiction over both Plaintiffs' pre- and post-termination claims. *Id.*[3]

It makes no difference that Plaintiffs frame the relief they seek as an injunction barring Defendants from implementing a term of the grants or from terminating their grants under certain circumstances and requiring them to pay out on them, rather than a specified amount of damages--the plaintiffs in *California* did the same. *California*, 145 S. Ct. at 968. The heart of this dispute is about the unilateral change of grant terms used year after year by the parties and that could prevent Plaintiffs from recovering federal funds if implemented. Just as the

---

[3]    This Court should follow the Supreme Court's stay ruling. *See Trump v. Boyle,* 145 S. Ct. 2653, 2654 (July 23, 2025) *(*"Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases.*"); McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991) (noting that "courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings"); *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) ("[T]his court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements."); *ACLU of Ky. v. McCreary Cty.*, 607 F.3d 439, 447 (6th Cir. 2010) ("Lower courts are 'obligated to follow Supreme Court dicta'" absent "substantial reason for disregarding it, such as age or subsequent statements undermining its rationale") (citation omitted).

Supreme Court observed in *California*, a district court cannot grant any such relief. That is a dispute for the Court of Federal Claims.

The purportedly non-monetary injunctive relief Plaintiffs seek—an order requiring that specific terms of their contracts be excised—is inseparable from the fundamentally contractual relief they seek: uninterrupted grant funding under those contracts. If Plaintiffs were not grantees of the agencies, they would have no way to negotiate the terms under which the Government administers its funds or to receive them. Accordingly, the equitable relief they request is auxiliary to their contractual claims. Plaintiffs cannot evade the exclusive jurisdiction of other courts merely by requesting equitable relief. *See N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994).

Plaintiffs are, in fact, seeking this Court to mandate continued payment of grants by DOT, as in *California. See* 145 S. Ct. at 968; *see also Catholic Bishops*, 770 F. Supp. 3d at 163 ("Stripped of its equitable flair, the requested relief seeks one thing: The Conference wants the Court to order the Government to stop withholding the money due under the Cooperative Agreements. In even plainer English: The Conference wants the Government to keep paying up. . . But this Court cannot order the Government to pay money due on a contract."); *Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) ("[W]hile [plaintiff] attempts to couch his claims in the language of equitable and declaratory relief, the only relief he seems to be seeking apart from monetary damages is reconsideration of his proposal or perhaps an order directing that his proposal be funded. Because . . . at bottom what he

27

seeks is monetary relief based on what he perceived as a contract created by the communications he received in response to his proposal, [plaintiff] cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act"); *see also Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual obligations."). Therefore, this Court lacks jurisdiction over Plaintiffs' claims.

This Court should follow the Supreme Court's ruling in *California*. Plaintiffs are either current or future recipients of DOT grants. Their claims hinge on continued receipt of funding under the grant agreements. For example, Plaintiffs state they have "relied on these federal funding programs" and that a failure to order the requested relief would cause Plaintiffs to "lose billions in federal funding" and "scale back or even terminate many of these programs and projects" because they allegedly "do not have sufficient funding or budgetary flexibility to cover the loss of U.S. DOT funding." ECF No. 61 at ¶¶ 4, 10, 47. Plaintiffs' requested relief is inextricably linked to continued grant funding.

Nor does *Massachusetts v. Bowen*, 487 U.S. 879 (1988), require a different result. In *California*, the Supreme Court specifically considered and distinguished *Bowen* in finding that the Tucker Act applied to that case. *California*, 145 S. Ct. at 968. The district court in *California* had held that it had jurisdiction based on an expansive reading of *Bowen*. *See California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 75-76 (D. Mass. 2025) (adopting reasoning of *Massachusetts.*

*v. Nat'l Inst. of Health*, 770 F. Supp. 3d 277, 292-95 (D. Mass. 2025)). The Supreme Court, however, rejected that holding in its stay order, ruling the district court likely did not have jurisdiction. *California*, 145 S. Ct. at 968.

The First Circuit's recent denial of the government's request for a stay in *Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, 145 F.4th 39, 48-56 (1st Cir. 2025) is also not inconsistent with the Defendants' position or the Supreme Court's ruling in *California*. In *Am. Pub. Health Ass'n*, the court ruled that the government was unlikely to succeed in showing that the district court lacked jurisdiction with respect to claims challenging funding prohibitions and grant terminations by the National Institutions of Health and Department of Health and Human Services ("HHS"). *Id.* at 48-50. The government has filed an application for a stay of the First Circuit's ruling with the Supreme Court, arguing that the case was incorrectly decided. *See Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, No. 25A103 (U.S. July 24, 2025). Regardless, the First Circuit's decision turned in part on the fact that the plaintiffs' claims did not depend on the terms or conditions of any contract. *Am. Pub. Health Ass'n*, 145 F.4th at 50. In this case, by contrast, Plaintiffs expressly challenge grant terms and conditions and thus these challenges are subject to the Tucker Act.[4]

---

[4]    Defendants acknowledge that courts are divided on whether the Tucker Act precludes claims in district court regarding changes to grant funding and that this district and others have rejected the applicability of the Tucker Act in similar cases despite *California*. *See, e.g., R.I. Coal. Against Domestic Violence v. Bondi*, No. 25-cv-279, 2025 WL 2271867 (D.R.I. August 8, 2025). The state of this developing case law on this topic was recently reviewed by the district courts in *Urban Sustainability v. Dir. Network v. United States*, No. 25-cv-1775, 2025 WL 2374528 (D.D.C. August 14,

## II.    DEFENDANTS HAVE NOT VIOLATED THE LAW.

### A.    The Executive Has Broad Discretion in the Enforcement of Immigration Law and Congress Intended for State and Local Governments to Work with the Federal Government in Carrying Out Immigration Enforcement.

The Federal Government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress has granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States, and to administer and enforce the immigration laws.

The INA contains several provisions that address the involvement of state and local authorities in the enforcement of immigration law. For example, 8 U.S.C. § 1373, prevents state and local actors from restricting the sharing of immigration-related information with the Executive as follows:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

*Id.* § 1373(a). Section 1373(b) further proscribes, "[n]otwithstanding any other provision of Federal, State, or local law," any government entity from prohibiting or restricting "[m]aintaining," or "[s]ending," or "[e]xchanging" information regarding the

---

2025) (rejecting Tucker Act argument and finding jurisdiction in the district court), and *New York v. NSF*, No. 25-cv-4452 2025 WL 2180478 (S.D.N.Y. August 1, 2025) (finding Tucker Act precluded jurisdiction over claims in district court).

immigration status of any individual. *Id.* at § 1373(b). Section 1373(c), in turn, provides that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." *Id.* at § 1373(c). Similarly, 8 U.S.C. § 1644, entitled "Communication between State and local government agencies and Immigration and Naturalization Service" provides:

> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [federal immigration authorities] information regarding the immigration status, lawful or unlawful, of an alien in the United States.

Thus, Congress envisioned that local governments would cooperate with the federal Government in the enforcement of immigration laws through information sharing.

### B. Congress Did Not Preclude the Implementation of Specific Terms and Conditions and Has Granted DOT Broad Authority to Set Terms and Conditions for Discretionary Grants.

The Court should enter summary judgment in favor of the Defendants because Defendants did not act *ultra vires* or otherwise contrary to law. Plaintiffs focus much of their argument on the absence of specific statutory language from Congress listing the exact Immigration Conditions at issue here within the broader authority given by Congress to the Agency to provide grant funding. *See, e.g.*, ECF No. 61 at ¶ 1, 6, 208-19. However, Congress has instructed the Secretary of Transportation, "under the direction of the President, [to] exercise

31

leadership in transportation matters, including those matters affecting national defense and those matters involving national or regional emergencies." 49 U.S.C. § 301(1). Commensurate with that authority, the Secretary is permitted to set terms for the projects DOT funds with grants. For example, 49 U.S.C. § 5334(a)(1), governing FTA, provides:

> (a) GENERAL AUTHORITY.—In carrying out this chapter, the Secretary of Transportation may—
>
> > (1) prescribe terms for a project that receives Federal financial assistance under this chapter . . . .

*Id.* As part of that general authority, the Secretary of Transportation may "include in an agreement or instrument . . . a covenant or term the Secretary . . . considers necessary." *Id.* at § 5334(a)(9). Congress granted the Secretary of Transportation similar authority over several other DOT modes as well:

| MODE | AUTHORITY | RELEVANT LANGUAGE |
|---|---|---|
| **ALL DOT MODES** | 2 CFR § 200.211(c)(1), (e) | The Federal award must include the following information: <br> (c) General terms and conditions. <br>   (1) Federal agencies **must incorporate the following general terms and conditions either in the Federal award or by reference, as applicable:** <br>     (i) *Administrative requirements.* Administrative requirements implemented by the Federal agency as specified in this part. <br>     (ii) ***National policy requirements. These include statutory, executive order, other Presidential directive, or regulatory requirements that apply by specific reference and are not program-specific.*** See § 200.300 Statutory and national policy requirements. <br> (e) Federal agency requirements. Any other information required by the Federal agency. |

| ALL DOT MODES | 2 C.F.R. § 200.300 | Statutory and national policy requirements. (a) The Federal agency or pass-through entity must manage and administer the Federal award in a manner so as to ensure that **Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations—including provisions protecting free speech, religious liberty, public welfare, and the environment, and those prohibiting discrimination—and the requirements of this part. The Federal agency or pass-through entity must communicate to a recipient or subrecipient all relevant requirements, including those contained in general appropriations provisions, and incorporate them directly or by reference in the terms and conditions of the Federal award.** |
|---|---|---|
| FAA | 49 U.S.C. §§ 47108(a), 47107 | 49 U.S.C. § 47108(a): The Secretary **may impose terms on the offer that the Secretary considers necessary to carry out this subchapter and regulations prescribed under this subchapter.** 49 U.S.C. § 47107(g)(1)(A): To ensure compliance with this section, the Secretary of Transportation shall prescribe requirements for sponsors that the Secretary considers necessary. 49 U.S.C. § 47107(h)(1): Permitting the Secretary to require compliance with an additional assurance from a person receiving a grant under this subchapter. |
| FHWA | 23 U.S.C. § 315 | Except as provided in sections 202(a)(5), 203(a)(3), and 205(a) of this title, the Secretary is authorized to prescribe and promulgate **all needful rules and regulations for the carrying out of the provisions of this title.** |
| FMCSA | 49 U.S.C. § 31104(e) | The Secretary shall **establish criteria for eligible activities to** be funded with financial assistance agreements under this section and publish those criteria in a notice of funding availability before the financial assistance program application period. |

| FRA | 49 U.S.C. §§ 103(i), 22907(e)(2)(F), 22908(d)(8), 24911(d)(2)(B)(vii) | 49 U.S.C. § 103(i): Subject to the provisions of subtitle I of title 40 and division C (except sections 3302, 3501(b), 3509, 3906, 4710, and 4711) of subtitle I of title 41, the Secretary of Transportation may make, enter into, and perform such contracts, grants, leases, cooperative agreements, and other similar transactions with Federal or other public agencies (including State and local governments) and private organizations and persons, and make such payments, by way of advance or reimbursement, **as the Secretary may determine to be necessary or appropriate to carry out functions at the Administration**. The authority of the Secretary granted by this subsection shall be carried out by the Administrator. Notwithstanding any other provision of this chapter, no authority to enter into contracts or to make payments under this subsection shall be effective, except as provided for in appropriations Acts.<br><br>49 U.S.C. § 22907(e)(2)(F): In selecting a recipient of a grant for an eligible project, the Secretary shall also **consider such factors as the Secretary considers relevant to the successful delivery of the project**.<br><br>49 U.S.C. § 22908(d)(8): In awarding grants under this section, the Secretary shall give priority to applications that would provide **other non-transportation benefits.**<br><br>49 U.S.C. § 24911(d)(2)(B)(vii): Project Selection Criteria. In selecting a project for funding under this section, the Secretary shall take into account **any other relevant factors, as determined by the Secretary.** |
| FTA | 49 U.S.C. §§ 5334(a)(1) and (9) | General Authority.—In carrying out this chapter, the Secretary of Transportation may— (1) **prescribe terms for a project that receives Federal financial assistance under this chapter** (except terms the Secretary of Labor prescribes under section 5333(b) of this title); . . . (9) **include in an agreement or instrument under this chapter a covenant or term the Secretary of Transportation considers necessary to carry out this chapter** |

| MARAD | 46 U.S.C. §§ 54301(a)(5)(A)(i), 55601(a)(2), 54101(f)(1) | 46 U.S.C. § 54301(a)(5)(A)(i): Ports and Intermodal Improvement Program.—Applications.—In general.—To be eligible for a grant under this subsection or subsection (b), an eligible applicant shall submit to the Secretary an application **in such form, at such time, and containing such information as the Secretary considers appropriate**. 46 U.S.C. § 55601(a)(2): In carrying out the program established under this subsection, the Secretary of Transportation may— (A) coordinate with ports, State departments of transportation, localities, other public agencies, and appropriate private sector entities on the development of landside facilities and infrastructure to support marine highway transportation; and (B) develop performance measures for the program. 46 U.S.C. § 54101(f)(1) Applications.—In general.— **To be eligible for assistance under this section, an applicant shall submit an application, in such form, and containing such information and assurances as the Administrator may require,** within 60 days after the date of enactment of the appropriations Act for the fiscal year concerned. |
|---|---|---|
| NHTSA | 23 U.S.C. §§ 401, 406 | General requirements for Federal assistance. 23 U.S.C. § 401: Authority of the Secretary. The Secretary is authorized and directed to assist and cooperate with other Federal departments and agencies, **State and local governments**, private industry, and other interested parties, to increase highway safety. For the purposes of this chapter, the term "State" means any one of the fifty States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. 23 U.S.C. § 406: General requirements for Federal assistance. (b) Regulatory Authority.—Each funded project shall be carried out **in accordance with applicable regulations promulgated by the Secretary**. . . . (d) Grant Application and Deadline.—(1) Applications.—To be eligible to receive a grant under this chapter, a State shall submit to the Secretary an application at such time, in such manner, and containing such information **as the Secretary may require**. |

| PHMSA | 49 U.S.C. § 5116(i)(8) | [For grants for training programs related to hazardous materials,] **the Secretary may impose such additional terms and conditions on grants to be made under this subsection as the Secretary determines are necessary to protect the interests of the United States and to carry out the objectives of this subsection**. |
|---|---|---|

A review of the statutory language with respect to the grants at issue in this case thus demonstrates that Congress did not entitle states to funding notwithstanding any Agency-imposed conditions. Instead, many of the grant programs come from statutes through which Congress provided few restrictions on how DOT could spend, allocate or condition the money and thus delegated to the Agency to determine how to achieve the policy objectives those funds may promote.

Thus, this case is unlike the situation in *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020), where this Court ruled on a summary judgment motion by the Rhode Island affected cities, and the First Circuit affirmed, finding that a grant condition relating to immigration was not within the authority of the DOJ Assistant Attorney General administering the Byrne grants. *Id*. at 39. The First Circuit's analysis in that case was focused on the statutory language at issue, which required grant applicants to comply with "all other applicable Federal laws," and the duties and functions of the Assistant Attorney General as delegated by statute. *See generally id*. at 36-39.

Contrary to Plaintiffs' suggestion, specific Congressional authority for each individual grant condition is not required by either the Constitution or the APA. Instead, the statutes at issue provide discretion to the Agency to set grant

terms and conditions, using different language for administration by a different agency with a different purpose, and thus the questions in this case are distinct from the First Circuit's statute-specific analysis in *City of Providence*. Moreover, in *City of Providence*, the First Circuit endorsed language that Congress used in other circumstances to delegate the power to impose grant conditions. *Id.* at 41-42. This included language stating that an agency "may impose reasonable conditions on grant award to ensure that the States meet statutory, regulatory, and other program requirements," or that tasked officials with "awarding and allocating funds . . . on terms and conditions determined . . . to be consistent" with the statute. *See id.* (citations omitted). This is similar to the language used by Congress in the statutes at issue in this case. Here, the DOT modes have explicit authority from Congress to decide the terms and conditions of their grants. The modes' exercise of that broad discretion does not encroach on the Congressional spending authority that Congress chose to delegate. It is thus appropriate for the modes to allocate their federal funding in a way that is consistent with the Agency's view of the purposes of the agency and the programs at issue.

Also unlike the circumstances in *City of Providence*, the Secretary specifically explained the connection between the Immigration Conditions and the DOT mission in his letter, which stated: "It is the policy of the Department to award and continue to provide Federal financial assistance only to those recipients who comply with their legal obligations." Smith Decl. at ¶ 5; *id.*, Ex. B at 1. The Secretary further explained

that actions that impede ICE investigations and Federal law enforcement in the area of immigration law "compromise the safety and security of the transportation systems supported by DOT financial assistance" among other things. Smith Decl., Ex. B at 2-3. Thus, consistent with many of the Congressionally-established purposes of DOT that discuss the Agency's overall purpose of promoting safety and security, *see, e.g.*, 49 U.S.C. §§ 101(a), (b)(6), 302(c), the Secretary has determined that compliance with the Immigration Conditions is necessary to the programs pursuant to which DOT is providing the grants at issue here. *See, e.g.*, 49 U.S.C. § 5334(a)(9).

The Secretary also made clear that these restrictions extend only so far as is consistent with existing law by ordering the implementation of these provisions only "[t]o the maximum extent permitted by law." Smith Decl., Ex. A at 2. The Secretary's decision pursuant to his Congressionally authorized authority as to the terms under which states may receive federal grants, and consistent with the existing law, remains within the agency's discretion under *Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1993).

Plaintiffs' assertion that federal immigration efforts bear no relation to transportation programs, ECF No. 61 at ¶ 15, overlooks the integral role such enforcement plays in advancing national objectives. Smith Decl. at ¶ 3. The enforcement of federal immigration laws is a national objective, and DOT's grant programs are designed to promote the Agency's core mission of "general welfare, economic growth and stability, and security of the United States." *Id.*; 49 U.S.C. § 101(a). And because partnership and coordination are essential elements of

38

this mission, *see, e.g.*, 23 U.S.C. § 401, 46 U.S.C. § 55601(a)(2), because that mission includes immigration enforcement, Smith Decl. at ¶ 3, DOT reasonably determined that state and local governments that refuse to cooperate to the extent required by federal law, or actively obstruct immigration enforcement, hinder DOT's ability to ensure the development and administration of safe and effective transportation programs.

Congress determined that "[a] Department of Transportation is necessary in the public interest and to . . . encourage cooperation of Federal, State, and local governments, carriers, labor, and other interested persons to achieve transportation objectives" that are "consistent with . . . other national objectives." *See* 49 U.S.C. §§ 101(a), (b)(3). It could be counterproductive to this Congressionally mandated goal if recipients could choose not to agree to cooperate with federal immigration enforcement. Thus, DOT reasonably determined that the Immigration Conditions promote the "national objectives of general welfare, economic growth and stability, and security of the United States" that Congress intended the Agency's transportation policies and programs to further. *Id.* at § 101(a). Federal agencies have a legitimate interest in ensuring state cooperation, to the extent mandated by existing federal law, to serve these national interests.

Congress has given DOT the discretion to implement appropriate standard terms and conditions to its grant programs that follow from the Agency's core purpose and goals, which include the development of transportation policies and programs that contribute to security of the United States. *See generally id.* at § 101 (Purpose of

39

the Department of Transportation). Defendants therefore did not act *ultra vires*, in violation of the Spending Clause, or otherwise contrary to law.

### C. The Constitution Permits Agencies to Set Terms and Conditions.

Plaintiffs attempt to bring a facial constitutional challenge to the Immigration Conditions, but in order to do so successfully, Plaintiffs must show that the Immigration Conditions would be unconstitutional in *all* their applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial challenge must establish that "no set of circumstances exists under which [the enactment] would be valid"); *see also Am. Fed'n of State, Cty. & Mun. Emps. v. Scott*, 717 F.3d 851, 857-58 (7th Cir. 2013); *Nat'l Treasury Emps. Union v. Bush*, 891 F.2d 99, 101 (5th Cir. 1989). This is a "very heavy burden," and Plaintiffs do not meet it. *See Bush*, 891 F.2d at 101.

Congress frequently authorizes the executive branch to impose discretionary conditions on the receipt of federal grants. As the Supreme Court has held, "Congress may attach conditions on the receipt of federal funds and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Dole*, 483 U.S. at 206 (citation omitted). The *Dole* Court outlined certain limitations including that "the exercise of the spending power must be in pursuit of 'the general welfare,'" that conditions on the receipt of federal funds must be stated "unambiguously" so that recipients

can "exercise their choice knowingly, cognizant of the consequences of their participation," that conditions may be a concern if unrelated to the federal interest in particular national projects or programs, and that the conditions are otherwise constitutional. *Id.* at 207 (citations omitted).[5]

Plaintiffs' assumption that the Constitution's Spending Clause requires Congress to set out by statute every requirement of a grant program in order for the requirement to be enforceable, *see* ECF No. 61 at ¶ 219, is not supported by Supreme Court precedent, including the Supreme Court's decision upholding agency-imposed conditions on the Medicare and Medicaid programs in *Biden v. Missouri*. 595 U.S. 87, 90, 94 (2022) (per curiam) (finding that a new condition of participation in Medicare and Medicaid requiring that facilities ensure that staff are vaccinated against COVID-19 did not exceed the applicable statutory authority). As explained in *Biden v. Missouri*, the Secretary of HHS had "established long lists of detailed conditions with which facilities must comply to be eligible to receive Medicare and Medicaid funds" and was not limited to simply issuing "bureaucratic rules regarding the technical administration of" the programs. *Id.* ("[T]he Secretary's role in administering Medicare and Medicaid goes far beyond that of a mere bookkeeper."); *see also Bennett v. Ky. Dep't of Educ.*,

---

[5]     Nor does *City of Providence* support Plaintiffs' Spending Clause claim. As discussed above, *see supra* section II.B, the First Circuit's analysis in that case did not rely upon the Spending Clause and focused exclusively on the statutory language at issue. *See generally City of Providence*, 954 F.3d at 36-39.

470 U.S. 656, 669 (1985) (the government cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements"); *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 (1983) (Marshall, J., dissenting) (noting that assurances of compliance with Title VI as part of applications for federal assistance are "given in consideration of federal aid, and the federal government extends assistance in reliance on the assurance of compliance") (citation omitted).

Moreover, the Supreme Court has made clear that the government may *encourage* States and municipalities to implement federal regulatory programs. *See New York v. United States*, 505 U.S. 144, 149 (1992). Accordingly, the Federal Government can, constitutionally, use conditions on federal funds to "induce the States to adopt policies that the Federal Government itself could not impose." *NFIB*, 567 U.S. at 537. It may, for example, make certain federal funds available only to localities that enact a given regulatory regime. *See generally Dole*, 483 U.S. at 205-08 (upholding federal statute conditioning state receipt of federal highway funds on state adoption of minimum drinking age of twenty-one). "[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation." *Envtl. Def. Ctr. v. EPA,* 344 F.3d 832, 847 (9th Cir. 2003) (citation omitted). The key is whether the financial inducement is "so coercive as

to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211 (citation omitted).

Plaintiffs contend that the contested terms here cannot apply to DOT grants because those terms improperly "coerce" the states' compliance, as the Supreme Court found that new Medicaid initiatives improperly did in *NFIB*. ECF No. 61 at ¶¶ 15, 173, 222-24. Under Plaintiffs' overbroad reading of *NFIB*, *id.* at ¶ 222-24, all widely imposed conditions would be unconstitutionally coercive, simply because so much of local governments' funding derives from the Federal Government. But that is not the law. To the contrary, the Court's *NFIB* opinion stressed (and as Justice Ginsburg's concurrence in the judgment observed) that this coercion arose from the unexpected imposition on the states to accept a new, dramatically broadened, independent grant program at the risk of losing all federal assistance of longstanding, traditional Medicaid coverage. *NFIB*, 567 U.S. at 579-81; *id.* at 624-25 (Ginsburg, J., concurring in judgment, dissenting in reasoning). The Court held that the combination of the nature and size of the threatened funding loss distinguished that case from *Dole*. *Id.* at 580-81.

Here, however, the Secretary is not purporting to impose retroactive conditions on existing grants. Louie Decl. ¶ 13. Rather, applicants for new projects or existing recipients seeking to execute new grant agreements are already on notice of the revised terms prior to requesting funding from the modes. Nor do the conditions require

states to expand any particular program broadly. To the contrary, as clarified by De-
clarant Smith, they simply require grantees to comply with existing federal law.
Smith Decl. at ¶ 8. As the Supreme Court in *NFIB* specifically noted,

> Congress may attach appropriate conditions to federal taxing and
> spending programs to preserve its control over the use of federal
> funds. In the typical case we look to the States to defend their
> prerogatives by adopting 'the simple expedient of not yielding' to
> federal blandishments when they do not want to embrace the federal
> policies as their own.

*NFIB*, 567 U.S. at 579 (citation omitted).

In *NFIB*, the Supreme Court underscored that the federal funds at stake
in *Dole* constituted less than half of one percent of South Dakota's budget at the
time and found the loss of those funds was not such coercion as to violate the
Spending Clause. *Id*. at 581. By contrast, the Court found that the threatened
loss of all Medicaid funds—which was over 20 percent of the average state's total
budget—to induce the states to further expand their Medicaid program was so
coercive as to violate the Spending Clause. *Id*. at 581-82. Because the monetary
value of the "coercion" in *NFIB* was such an outsized percentage of the states'
total budgets, *NFIB* should be viewed as the exception rather than the general
rule.

As explained in *NFIB*, the Court has not "fix[ed] 'the outermost line' where
persuasion gives way to coercion." *Id*. at 585 (citing *Charles C. Steward Mach.
Co. v. Davis*, 301 U.S. 548, 591 (1937)). That point has not been passed here. DOT
grants are nowhere near as large a portion of federal grants to state budgets as
Medicaid. In FY 2024, for example, federal funds for transportation comprised

44

under three percent of Rhode Island's total budget. *See* State of Rhode Island FY 2025 Budget Proposal at 1, 116, https://omb.ri.gov/sites/g/files/xkgbur751/files/2024-02/02.12.24_Executive%20Summary_Errata.pdf (of a statewide budget total of $14.409 billion in FY 2024, federal funds to the Rhode Island Department of Transportation amounted to $417,382,706).[6] Thus, the facts of this case fall in the range of the inducements considered acceptable in *Dole*, rather than the threat of a loss of all Medicaid funds considered in *NFIB*.

Also, unlike the agency in *NFIB*, DOT is not creating new grant programs but instead modified its existing standard terms and conditions that apply to existing grant programs. The new Immigration Conditions merely require compliance with federal law. Smith Decl. ¶¶ 7-8; *id.* at Ex. C. They do not require states to expand any particular program beyond the existing requirements of federal law. Such an addition of terms affecting only a small fraction of the state budget and requiring nothing new is not so coercive as to violate the Spending Clause.

---

[6]     *See also* 2024 State Expenditure Report at 1, NAT'S ASS'N OF STATE BUDGET OFFICERS https://higherlogicdownload.s3.amazonaws.com/NASBO/9d2d2db1-c943-4f1b-b750-0fca152d64c2/UploadedImages/SER%20Archive/2024_SER/Executive_Summary-2024_State_Expenditure.pdf (showing Medicaid as 29.8% of state expenditures for all states and transportation as 8% of state expenditures).

### D. Plaintiffs Are Incorrect in Their Claim that the Immigration Conditions are Impermissibly Ambiguous Grant Terms.

Plaintiffs also argue that the provisions of the Immigration Condition violate the Spending Clause because they are too ambiguous for them to comply. ECF No. 61 at ¶ 220. This allegation fails at the threshold and on the merits.

First, the appropriate posture for the void-for-vagueness doctrine under the Fifth Amendment's Due Process clause is as-applied. Facial challenges in the Due Process context are "disfavored" because they "often rest on speculation" and "raise the risk of premature interpretation of statutes." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008); *see also Love v. Butler*, 952 F.2d 10, 13 (1st Cir. 1991) ("It is well-established that vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.") (citation omitted). The First Circuit has recognized that even where an enactment is alleged to be "impermissibly vague in all of its applications, . . . it is clear that such an allegation must first be considered in light of the facts of the case—i.e., on an as-applied basis." *Love*, 952 F.2d at 13 (citation omitted). Because Defendants have not sought to enforce any of the challenged terms against Plaintiffs, Plaintiffs' Spending Clause claim fails insofar as it is premised on the void-for-vagueness doctrine.

Second, as the Secretary has made clear, the Immigration Condition require nothing more than compliance with existing federal law. Smith Decl., Ex. C at 2. A requirement that a grantee abide by existing law cannot be facially

vague. To the extent Plaintiffs worry Defendants may try to enforce one of these provisions in an allegedly legally unjustifiable way, such speculation cannot justify facial invalidation. *See Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) ("The mere possibility that some agency might make a legally suspect decision to award a contract *or to deny funding for a project* does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration.") (emphasis added). Plaintiffs cannot ask the Court to assume in advance that Defendants will adopt unlawful interpretations of existing laws. In fact, in this posture, the Court is required to assume the opposite. *See Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 113 (1st Cir. 2015) ("As we have said before, the agency's actions are presumed to be valid[.]") (citation omitted). Here, the Agency has committed to restricting any enforcement of the Immigration Conditions to requiring compliance with existing federal law. Moreover, should the Agency in the future determine that a party has violated existing federal law, that party would have notice and the opportunity to challenge that determination. Louie Decl. at ¶ 11. No such case or controversy is before this Court or even exists at this time.

In addition, the void-for-vagueness doctrine under the Fifth Amendment's Due Process Clause does not apply to contracts between specific parties. Rather, the doctrine "guarantees that ordinary people have 'fair notice' of the conduct a *statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018) (plurality)

(emphasis added) (citation omitted). When courts have applied this doctrine beyond the statutory context, they have applied it to mandatory regulations of the general public's primary conduct or where the government's actions threatened to inhibit the exercise of constitutionally protected rights. *See, e.g., FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (applying the doctrine to "[a] conviction or punishment" obtained under a "statute or regulation"); *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (noting the Fifth Amendment's "requirement of clarity" applies when the government imposes "civil penalties") (citations omitted); *see also id.* at 665 ("because the suspension of a [special press credential" implicate[s] important first amendment rights, . . .we evaluate [the plaintiff's] suspension under a particularly stringent vagueness [and fair-notice] test[.]") (citations omitted).

In any event, these provisions, which use common legal terms such as "cooperation," "compliance," and "lack of interference with law enforcement," are no more ambiguous than a host of previously upheld grant provisions. The grant terms do not target any conduct that is not already illegal under existing laws. All Plaintiffs must do is comply with federal law itself—longstanding federal statutes that are not challenged here on vagueness or any other grounds. The requirement to comply with the laws and not obstruct them "does not place upon a recipient any unanticipated burdens because any recipient must anticipate having to comply with the law. Certainly no applicant has a legitimate expectation

48

that he can evade the statutory obligation and the expense that compliance may entail." *Guardians Ass'n*, 463 U.S. at 630 (Marshall, J., dissenting).

Also, the Supreme Court has set a high bar for supposed "vagueness" in government funding conditions. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588-89 (1998). In *Finley*, plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court acknowledged that these terms were "undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. But, the Court reasoned, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589.

Even criminal statutes need not define every ordinary word they use. Where challenged language does not define a word, it is simply read with "its ordinary meaning." *United States v. Kuzma*, 967 F.3d 959, 968-70 (9th Cir. 2020) (holding the word "designed" in a criminal statute was not unconstitutionally vague). Moreover, courts have rejected facial vagueness challenges to such ordinary terms as Plaintiffs criticize here, even under the higher standard applied to criminal laws. *See, e.g., Marquez-Reyes v. Garland*, 36 F.4th 1195, 1201-07 (9th Cir. 2022) (rejecting facially overbroad challenge to statute that made noncitizens

49

ineligible for relief from removal if they knowingly "encouraged" another noncitizen to unlawfully enter the United States because its meaning was clear in the context of criminal law); *ACLU of Tenn. v. City of Memphis*, No. 2:17-cv-02120, 2020 WL 5630418, at *17 (W.D. Tenn. Sept. 21, 2020) (finding the phrase "cooperate with" was not ambiguous and not overly broad or confusing in the context of a consent decree). To reiterate, the standard is far lower for government grant conditions. *See Finley*, 524 U.S. at 589 (holding that funds awarded for "subjective criteria such as 'excellence'" in the context of selective subsidies not void for vagueness) (citation omitted). If the words "encourage" or "cooperate" are not unconstitutionally vague or overbroad in the criminal context, then those same words surely cannot be in the context of a government grant agreement.

Plaintiffs' reliance upon *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24-25 (1981) in their reply in support of their motion for a preliminary injunction for their argument that the terms are not sufficiently clear and that the States failed to receive required notice of the Immigration Conditions, ECF No. 53 at 21-22, is erroneous and misplaced. The Court in *Pennhurst* reaffirmed the power of Congress to impose conditions in return for federal funds so long as it gives clear notice of the fact that the terms are conditions of the receipt of the funds. *Id.* at 24-25. Here, Plaintiffs are clearly on notice that, going forward, the Secretary has made the Immigration Conditions a term of DOT funding and thus there is no "surprise" that these terms will apply to their grants going forward.

Finally, because the sponsor would receive notice of any cancellation of funding and an opportunity to appeal the determination, there is a due process opportunity to address any such issues. *See* Louie Decl. at ¶ 11; 2 C.F.R. § 200.340(c). The agency has also provided the opportunity to seek guidance from the agency with respect to these provisions. *See* Smith Decl., Ex. B at 3. Thus, there is no lack of fair notice as to these provisions. Any challenge to potential implementation of these conditions is therefore unripe and not a case in controversy before this Court.

### E.  Plaintiffs' APA Claims Lack Merit.

#### 1.  Plaintiffs' Challenges to Potential Agency Actions Are Not Ripe Nor Are They Final Agency Action.

Plaintiffs ultimately seek an order from this Court to enjoin the federal government from requiring that they comply with existing federal law—in the absence of any particular example of withholding of funds on this basis. In this way, the posture of this case is completely different from *City of Providence*, where Plaintiffs challenged the actual withholding of federal funds. *See City of Providence v. Barr*, 385 F. Supp. 3d 160, 164 (D.R.I. 2019) (finding that the plaintiffs had experienced an "unreasonable delay of almost two years" following receipt of their award letters from DOJ), *aff'd* 954 F.3d 23. Here, rather than challenge the agency's final decision to deny specific grant funds to Plaintiffs—a decision that has not yet occurred—Plaintiffs challenge agency directives that call for an evaluation of possible, lawful, prospective federal funding conditions. To be clear, none of the challenged conditions or

agency directives has impacted any federal funding provided to Plaintiffs. There simply is no real case or controversy at this time.

"Ripeness is a justiciability doctrine" whose purpose is to "prevent courts from entangling themselves in abstract disagreements over administrative policies and from improperly interfering in the administrative decision-making process." *City of Fall River v. Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (citations omitted). "The burden to prove ripeness is on the party seeking jurisdiction." *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (affirming dismissal of pre-enforcement judicial review on ripeness grounds). Courts apply a two-part test to determine whether a case is ripe for review, and both favor the Defendants.

***First***, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations omitted); *see also City of Fall River*, 507 F.3d at 6-7 (declining to review agency's conditional project approval for lack of ripeness). Additionally, agency action is not ripe for judicial review under the APA until an agency has made a final decision. *See* 5 U.S.C. § 704; *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024); *W.R. Grace & Co. –Conn. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). And, for an agency review to be final, it must be both (a) "the consummation of the agency's decisionmaking process," and (b) a decision "by which rights or obligations have been determined,

or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *Abbott Labs.*, 387 U.S. at 148-49. Ripeness thus overlaps with the APA's independent requirement of final agency action. *See* 5 U.S.C. § 704.

In *Standard Oil*, the Supreme Court held that the Federal Trade Commission's issuance of a complaint averring there was "reason to believe" that a party was in violation of the Federal Trade Commission Act was insufficient to satisfy the finality requirement. *Fed. Trade Comm'n v. Standard Oil Co. of California*, 449 U.S. 232, 238-39, 243 (1980). The Supreme Court explained that "reason to believe" was merely a determination that adjudicatory proceedings would begin, and the actual issuance of the complaint was sufficient only to initiate the proceedings. *See id.* at 242. The complaint had no effect on the daily operations of defendant's business, nor did it legally compel a party to do something or refrain from doing something. *See id*; *see also Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (finding no final agency action where "the Secretary's report to the President carries no direct consequences for the reapportionment, it serves more like a tentative recommendation than a final and binding determination").

Among the relief Plaintiffs seek is a permanent injunction prohibiting Defendants from "withholding or terminating federal funding" or "taking adverse action against any state entity or local jurisdiction, including debarring it or making it ineligible for federal funding" based on the Immigration Conditions. ECF No. 61 at 57-58. Plaintiffs allege that the Defendants run aground of the

Spending Clause in attempting to "hold hostage" federal funds that bear no relation to immigration enforcement. *See, e.g.*, *id*. at ¶ 15. Missing from Plaintiffs' equation, however, is the identification of any funding awarded to Plaintiffs that has been or will be refused on this basis. Nor have Plaintiffs identified any entities that have been subject to legal penalties pursuant to the updated grant terms. No meaningful analysis can occur without these facts. *See e.g., New York*, 505 U.S. at 167 (evaluating the relationship between the conditions and the purpose of the federal spending to determine if such conditions violated Spending Clause); *Dole*, 483 U.S. at 206-07 (1987) (same). Plaintiffs' hypothetical injury—that the federal Government may withhold funding or otherwise penalize them for violating the challenged conditions (and existing federal law)—is therefore too speculative for this Court to adjudicate or redress at this time. Specifically, it is too early to meaningfully assess the merits of any specific alleged injury with respect to Plaintiffs' claims—which may never actually arise.

DOT modes do not disburse funds for competitive grant programs until after applications are submitted and reviewed in response to a particular NOFO for those particular grant programs, *and* the selected applicants have signed a grant agreement with the subagency. Louie Decl. at ¶ 12. The mere issuance of a NOFO does not determine rights and obligations to potential applicants. Rather, the NOFO is an interlocutory determination from which no legal consequences flow. *See Bennett*, 520 U.S. at 177-78; *see also* 5 U.S.C. § 704 (explaining that "preliminary, procedural, or intermediate" agency actions are not directly reviewable,

but may be reviewed on final agency action). Because the NOFO is merely a document setting out the application process for receiving potential funding, it has no definitive legal effect and cannot be final agency action. Accordingly, the Court should not exercise authority over future NOFOs or future grant awards as Plaintiffs request, as "[f]or [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel." *EPA v. Brown*, 431 U.S. 99, 104 (1977).

The Immigration Conditions simply give notice to Plaintiffs and all recipients that failure to comply with these terms—*i.e.*, existing federal law, *could* be a basis for withholding grant funds. *See* Smith Decl., Ex. B at 3. They do not guarantee that such a violation will result in a delay or termination of any grant funds. Without this agency action, it is unclear what the Court would be assessing, how, and on what grounds, as well as what relief it could grant. *See, e.g., Broderick v. di Grazia*, 504 F.2d 643, 645 (1st Cir. 1974) (action for declaratory judgment that statement by Police Commissioner would deprive police officers of due process in future administrative proceedings not ripe because "[a] court could only guess at how [the statement] might be translated into practice"); *Carman v. Yellen*, 112 F.4th 386, 402 (6th Cir. 2024) (explaining that a pre-enforcement facial vagueness challenge is not ripe for review) ("We cannot invalidate [a law] based on scenarios that may never come to pass."); *City of Fall River*, 507 F.3d at 6 ("[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (citation omitted); *Cont'l Air Lines, Inc. v. Civil Aeronautics*

55

*Bd.*, 522 F.2d 107, 125 (D.C. Cir. 1974) ("If the [agency's] position is likely to be abandoned or modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision."); *cf. Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 79 (1st Cir. 1997) ("[D]isregarding available administrative processes thrusts parties prematurely into overcrowded courts and weakens an agency's effectiveness by encouraging end-runs around it.").

Though Plaintiffs challenge the DOT modes' modification of their standard grant terms, no funding has yet been impacted. Their suit cuts at the heart of anticipated, programmatic changes, which are squarely precluded from APA review. Unless and until the DOT actually withholds funds based upon a Plaintiff's violation of the conditions, there is simply no case and no final agency action. Therefore, Plaintiffs cannot succeed on their APA claim.

***Second***, a court must consider the hardship to both parties, but there is no hardship to Plaintiffs because "the impact of the regulation could not be said to be felt immediately by those subject to it in conducting their day-to-day affairs and no irremediably adverse consequences [will] flow[] from requiring a later challenge." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 810 (2003) (citing *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967)) (cleaned up). There can be no harm to the Plaintiffs from agreeing to comply with existing federal law. They are legally required to comply with federal law by the Supremacy Clause. In fact, some

have already affirmed their intent to comply with existing federal law. *See, e.g.*, Declaration of Oscar L. Perez at ¶ 15, ECF No. 42-1, Pl. Ex. 47 ("The City of Providence and the Providence Police Department fully comply with all relevant provisions of state and federal law.").

Plaintiffs' allegations reduce to the theory that the mere existence of a so-called DOT policy of imposing an immigration enforcement condition requiring compliance with existing federal law on DOT funding somehow interferes with their state and local sovereignty. ECF No. 61 at ¶ 40. But Plaintiffs' speculation about the possibility of some future harm stemming from the application of this executive guidance contrary to DOT's stated intent is insufficient to establish a case or controversy over which the Court may preside. Thus, Plaintiffs' parade of horribles about DOT employees being dragooned into arresting immigrants is not at issue. The conditions do not require action beyond that required by existing law, with which Plaintiffs are already required to comply. At this stage, no Article III "case or controversy" exists.

Finally, even if the Court were to find that the Secretary failed to comply with the APA, the appropriate remedy would be to remand to the agency for further consideration or explanation. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) ("bedrock principles of administrative law preclude

us from declaring definitively that [the Secretary's] decision was arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation") (citation omitted).

Ultimately, even if Plaintiffs can claim some concrete imminent harm, there is no reason why they cannot vindicate that alleged harm through individualized, specific lawsuits challenging particular funding denials for specific grants. Plaintiffs' declarations do not establish the need for the exceedingly broad relief they claim.

2.  <u>Allocation of Discretionary Grant Funding is Committed to Agency Discretion and Is Unreviewable Under the APA</u>

As another independent ground for awarding summary judgment to the Defendants, Plaintiffs seek to challenge decisions quintessentially "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). Several grant programs at issue in this case are discretionary in nature. For these grants, Congress has not directed that a specific amount of funding be directed to recipients who meet all applicable criteria, terms, and conditions. Instead, Congress has simply appropriated funding for the program generally, for the Agency to in turn distribute as appropriate. *See* Louie Decl. at ¶ 3.

An agency's determination of how best to condition appropriated funds to fulfill its legal mandates is classic discretionary agency action. *See Lincoln*, 508 U.S. at 193. In *Lincoln v. Vigil*, the Supreme Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing

58

circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. As the Supreme Court has acknowledged, in such circumstances, it is squarely within an agency's discretion to determine whether to fund any specific program at all to meet permissible statutory objectives. *Id.* at 193. "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* at 192-93. But as long as the agency abides by the relevant statutes, the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.* at 193.

Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys [for a particular program] could best be distributed consistent with [the agency's] general polic[ies]." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like those about how best to allocate lump-sum appropriations—"clearly require[] 'a complicated balancing of a number of factors which are peculiarly within [the Secretary's] expertise.'" *Id.* at 752 (citation omitted); *see Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.); *Cmty. Action of Laramie Cty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.") (citation omitted). As another court recently held, although an agency

is required to use earmarked funds for their specified purpose, an agency may still exercise discretion *within* the earmark. If, for example, Congress earmarks funds for the Navy to build a certain type of ship, the Navy has discretion to use the money to complete construction of two less expensive ships or to spend the money on one more expensive ship.

*Amica Ctr. for Immigrant Rights v. U.S. Dep't of Justice*, No. 25-cv-298, 2025 WL 1852762, at *14 (D.D.C. July 6, 2025) (emphasis in original) (agency's decision to terminate certain grant programs not subject to judicial review under the APA).

The discretionary grants at issue in this case fit within *Lincoln's* analytical framework for agency discretion. For these competitive DOT grants, not only did Congress expressly provide for significant discretion by the executive branch, but it did not provide any "meaningful standard against which to judge the agency's exercise of discretion." *See Lincoln*, 508 U.S. at 191 (citation omitted). The Agency is left to determine whether any particular applicant is the best recipient for DOT funding within the purpose of each specific grant program, including through conditions set by the Agency in keeping with the Agency's purpose and mandate.

Plaintiffs do not argue that the Agency is refusing to spend the money allocated by Congress for the grant programs at issue; only that it is possible that the Agency will withhold or terminate funds. But with respect to the discretionary grant programs, Congress has not required that Plaintiffs receive this funding. Instead, the Agency has discretion as to how to use its funding within the purpose Congress proscribed and this Court is precluded from reviewing DOT's exercise of that discretion.

Moreover, the APA precludes "broad programmatic attack[s]" on an agency's administration of a program. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). In challenging the Duffy Directive regarding the Immigration Conditions and the modes' adoption of the Conditions into grant agreements, Plaintiffs seek broad-based relief against innumerable future funding decisions by all the DOT modes without regard for the Agency's decision-making process. Specifically, Plaintiffs seek to permanently enjoin Defendants from ever including the terms they find objectionable in all future funding agreements for all grant programs, whether or not they ever apply for a particular grant program or execute a particular grant agreement. This request is, by definition, a broad programmatic attack that cannot be based on the consummation of an agency's decision-making process. A plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire grant-making structure of the Executive Branch. *Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). Indeed, by Congressional ordering, the APA does not permit Plaintiffs to "seek wholesale improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

Plaintiffs' claims cannot circumvent the programmatic challenge limitations set forth in *Lujan*. The Court in *Lujan* emphasized that § 702 only allows for review of "identifiable 'agency action,'" and that the APA requires challenge

to agency action on a "case-by-case" basis, rather than pursuing "wholesale improvement of [an agency] program by court decree." *Id*. at 890-94 (emphasis and citations omitted). The Court's prohibition on programmatic challenges was motivated by institutional limits on Article III courts, which constrain their review to narrow and concrete actual controversies. *See id*. at 891-94. "Because an ongoing program or policy is not, in itself, a "final agency action" under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform." *Id*. Thus, with respect to the discretionary grants at issue, the APA does not allow for judicial review.

### 3. The Agency's Actions Are Neither Contrary to Law Nor Arbitrary and Capricious

Even if the Court were to reach the merits of Plaintiffs' APA claims, the claims would still fail. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under the "arbitrary and capricious" standard, *id.*, is "narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43; *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (same) (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). The "arbi-

trary and capricious" standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted). This deferential standard requires only that "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The explanation need only be clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review, not an explanation of "ideal clarity." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Plaintiffs' challenge to DOT's priorities in this context are matters of policy discretion and not of "factual findings." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And all the APA requires for a policy change is that an agency "display awareness that it is changing position." *Id.* (emphasis omitted). The agency

> need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.

*Id.* (emphasis in original).

Plaintiffs' argument that the Agency's actions are contrary to law rests on Plaintiffs' contention that the Defendants violated the Spending Clause of the Constitution. But as discussed above, Plaintiffs have not established that all potential applications of the Immigration Conditions would violate the Constitution, and thus

they also have not established that the Immigration Conditions are contrary to law under the APA. *See* supra sections II.B-D.

Even if the Court applied arbitrary and capricious review, the challenged grant terms survive. Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano*, 430 U.S. 99; *see also Prometheus Radio Project*, 592 U.S. at 423. A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Fox Television Stations, Inc.*, 556 U.S. at 513-14 (citation omitted). And the judiciary affords a particularly lenient standard of review to agency action in the contracting context. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[D]etermining an agency's minimum needs is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." (citation omitted); *cf. Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260-61 (Fed. Cl. 2016) ("Effective contracting demands broad discretion" so contracting decisions are subject to a "highly deferential rational basis review.") (citations omitted), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018).

"As an agency under the direction of the executive branch," DOT "must implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). It cannot be irrational for DOT to comply with the law in such a manner. Indeed, requiring a federal agency to articulate a

rationale for its action—beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *See Franklin*, 505 U.S. at 800-01.

The requirement that states that receive DOT funding comply with federal law, and do not impede DOT's duties to enforce federal law, follow from DOT's core purpose. It is neither arbitrary nor capricious for DOT to ensure that states will provide such cooperation when receiving funding specifically for those purposes. These are all "rational reasons" that support the Agency's decision to add the new challenged condition and withstand arbitrary and capricious review. *See Ohio v. Becerra*, 87 F.4th 759, 775 (6th Cir. 2023) (upholding HHS's implementation of a requirement that Title X projects offer pregnant patients with an opportunity to receive information and nondirective counseling on all options, including abortion).

Plaintiffs argue that the government failed to consider the states' reliance on federal funding, the effects on public safety. However, Plaintiffs are already required to comply with federal law and thus there is no harm to them from the reiteration of those requirements in the grant agreements. In addition, as discussed above, the Immigration Conditions are designed with the stated goal of improving public safety, and the states' reliance on federal funding from the grant programs to which DOT may apply the conditions is limited in that they make up a small portion of overall federal funding. Nor is it arbitrary for a grant program NOFO to provide guidance to applicants about a grant's scope. Plaintiffs cite no case to support their novel position

that agencies cannot take such action without first considering potential applicants who are not entitled to federal funds—because they intent to violate existing federal law. The Court should accordingly reject Plaintiffs' arbitrary and capricious claim because the grant terms are "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

## III.   THE COURT SHOULD LIMIT ANY RELIEF TO THE GRANT PROGRAMS IDENTIFIED IN PLAINTIFFS' AMENDED COMPLAINT AND TO THE PLAINTIFFS.

As detailed above, Plaintiffs seek a sweeping order regarding the implementation of the Immigration Conditions to all DOT grant programs. If the Court is inclined to rule in favor of Plaintiffs, any order it issues should (1) not enjoin the potential implementation of the Immigration Conditions to grant programs for which Plaintiffs have not alleged that they submitted an application for FY 25 or under which they have been selected to receive an award for FY 25, and (2) only apply to grants awarded to the Plaintiffs.

Regardless, any relief should be stayed pending a determination by the Solicitor General whether to appeal and, if appeal is authorized, pending any appeal.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion for summary judgment and grant the Defendants' motion for summary judgment. Moreover, if the Court is inclined to grant Plaintiffs' motion, it should be narrowly tailored and should not enjoin any general requirement of compliance with federal law.

Dated: August 19, 2025

Respectfully submitted,

U.S. DEPARTMENT OF
TRANSPORTATION, et al
By their Attorneys,

/s/ *Sara Miron Bloom*

SARA MIRON BLOOM
Acting United States Attorney
RACHNA VYAS
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
Rachna.vyas@usdoj.gov

## CERTIFICATION OF SERVICE

I hereby certify that, on August 19, 2025, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rules Gen 304.

/s/ *Sara Miron Bloom*
Acting United States Attorney