# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

*Plaintiffs*,

**v.**

No. 1:25-cv-00208-JJM-PAS

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

*Defendants*.

# PLAINTIFF STATES'
# MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Introduction ......................................................................................................................... 1

Statement of Facts ............................................................................................................ 3

    I.      Congress Has Consistently Directed Funding to States to Support their Efforts to Develop and Safely Maintain Transportation Infrastructure. ................. 3

    II.     Plaintiff States Exercise their Sovereign Prerogative to Protect Residents. .......... 8

    III.    The Department of Transportation Announces the Immigration Enforcement Condition It Intends to Apply Across All U.S. DOT Grants. ......... 11

    IV.    Procedural History .......................................................................................... 15

Argument ......................................................................................................................... 15

    I.      Standards Governing Summary Judgment .......................................................... 15

    II.     U.S. DOT's Immigration Enforcement Condition Is Unlawful. ........................... 16

          A.    U.S. DOT Lacks Statutory Authority to Impose the Immigration Enforcement Condition. ........................................................................... 16

               1.    Congress Did Not Authorize Defendants to Impose a Categorical Rule Requiring Recipients to Cooperate in the Enforcement of Federal Immigration Law. ................................... 17

               2.    The Relevant Grant Statutes Do Not Authorize Defendants to Impose a Federal Civil Immigration Enforcement Requirement. ................................................................................. 19

          B.    U.S. DOT's Blanket Policy of Imposing the Immigration Enforcement Condition on All Transportation Funding Is Arbitrary and Capricious. ........................................................................................ 23

               1.    U.S. DOT Failed to Consider Whether Grant-Authorizing Statutes Permitted Imposing the Immigration Enforcement Condition. .................................................................................. 24

               2.    U.S. DOT Failed to Consider the States' Reliance Interests on Billions of Dollars in Federal Funding. ................................... 25

               3.    U.S. DOT Failed to Consider the Immigration Enforcement Condition's Consequences on Public Safety. ................................ 27

               4.    U.S. DOT Failed to Consider Alternatives to Its Sweeping Policy. ...................................................................................... 28

               5.    U.S. DOT Failed to Adequately Explain What Is Required under Its Immigration Enforcement Condition. ........................... 28

          C.    The Immigration Enforcement Condition Violates the Spending Clause. ....................................................................................................... 29

               1.    The Immigration Enforcement Condition Is Not Reasonably Related to the Funding Programs to Which It Applies. ............... 30

               2.    The Immigration Enforcement Condition Is Coercive Because It Leaves Plaintiff States with "No Real Option" but to Comply. ................................................................................ 33

               3.    The Immigration Enforcement Condition Is Impermissibly Ambiguous. ................................................................................. 36

i

# TABLE OF CONTENTS
(continued)

III. The Court Should Grant Plaintiff States the Relief They Request ........................ 39

    A. The Court Should Vacate the Immigration Enforcement Condition. ....... 39

    B. The Court Should Permanently Enjoin Defendants from Implementing or Enforcing the Immigration Enforcement Condition Against Plaintiff States. ............................................................ 40

        1. Defendants' Restrictions on Billions of Dollars in Transportation and Public Safety Funding Inflict Irreparable Harm Upon Plaintiff States and Their Communities. ................... 40

        2. The Balance of Equities and the Public Interest Weigh in Plaintiff States' Favor. ............................................................... 46

    C. The Court Should Declare that the Imposition of the Immigration Enforcement Condition Is Unlawful. ........................................................ 47

Conclusion ..................................................................................................................... 48

# TABLE OF AUTHORITIES

**Pages(s)**

C<small>ASES</small>

*Agency for Int'l Dev. v. All. for Open Soc'ys*
570 U.S. 205 (2013) ........................................................................................ 32

*Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*
52 F.3d 1113 (D.C. Cir. 1995) ...................................................................... 21

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*
145 F.4th 39 (1st Cir. 2025) .......................................................................... 17

*Amalgamated Transit Union v. Skinner*
894 F.2d 1362 (D.C. Cir. 1990) .................................................................... 21

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife*
273 F.3d 1229 (9th Cir. 2001) ................................................................. 29, 38

*Arlington Cent. Sch. Dist. v. Murphy*
548 U.S. 291 (2006) ........................................................................................ 37

*Bennett v. Spear*
520 U.S. 154 (1997) ........................................................................................ 17

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*
838 F.3d 42 (1st Cir. 2016) ............................................................................ 16

*Bowen v. Massachusetts*
487 U.S. 879 (1988) ........................................................................................ 27

*BST Holdings, LLC v. Occupational Safety & Health Admin.*
17 F.4th 604 (5th Cir. 2021) .......................................................................... 25

*California v. Dep't of Educ.*
132 F.4th 92 (1st Cir. 2025) .......................................................................... 24

*Cf. Util. Air Regul. Grp. v. EPA*
573 U.S. 302 (2014) ........................................................................................ 20

*City & Cnty. of San Francisco v. Barr*
965 F.3d 753 (9th Cir. 2020 ..................................................................... 38, 47

*City & Cnty. San Francisco v. Sessions*
349 F. Supp. 3d 924, 958 (N.D. Cal. 2018) .......................................... 38, 42

*City & Cnty. of San Francisco v. Trump*
    897 F.3d 1225 (9th Cir. 2018) ........................................................................... 43, 47

*City & Cnty. of San Francisco v. Trump*
    No. 25-CV-01350-WHO, 2025 WL 1738675 (N.D. Cal. June 23, 2025) ........................ 18, 34

*City & Cnty. of San Francisco v. Trump*
    No. 3:25-cv-1350 (N.D. Cal. Mar. 31, 2025) ........................................................ 25

*City of Arlington v. Fed. Commc'ns Comm'n*
    569 U.S. 290 (2013) ......................................................................................... 17, 23

*City of Chicago v. Sessions*
    264 F. Supp. 3d 933 (N.D. Ill. 2017) .................................................................. 41

*City of Chicago v. Sessions*
    321 F. Supp. 3d 855 (N.D. Ill. 2018) .................................................................. 42

*City of Chicago v. Sessions*
    888 F.3d 272 (7th Cir. 2018) ............................................................................. 42, 47

*City of Chicago v. Sessions*
    No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) ...................................... 42

*City of Evanston v. Sessions*
    2018 WL 10228461 (N.D. Ill. Aug. 9, 2018) ...................................................... 41, 43

*City of Houston v. Dep't of Hous. & Urb. Dev.*
    24 F.3d 1421 (D.C. Cir. 1994) .......................................................................... 43

*City of Los Angeles v. Barr*
    929 F.3d 1163 (9th Cir. 2019) ........................................................................... 29

*City of Philadelphia v. Sessions*
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ................................................................ 41, 42, 45

*City of Providence v. Barr*
    954 F.3d 23 (1st Cir. 2020) ............................................................................. *passim*

*Cnty. of Ocean v. Grewal*
    475 F. Supp. 3d 355, 363 n.5 (D.N.J. 2020) ...................................................... 9

*Cnty. of Santa Clara v. Trump*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ............................................................... 42, 43

*Coleman v. Paccar, Inc.*
424 U.S. 1301 (1976) (Rehnquist, J., in chambers) ............................................................ 46

*Colorado v. U.S. Dep't of Just.*
455 F. Supp. 3d 1034 (D. Colo. 2020) ............................................................................... 41

*Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*
434 U.S. 1316 (1977) ........................................................................................................ 43

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*
603 U.S. 799 (2024) (Kavanaugh, J., concurring) ............................................................. 39

*Ctr. for Biological Diversity v. Env't Prot. Agency*
141 F.4th 153 (D.C. Cir. 2025) .......................................................................................... 39

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*
67 F.4th 1027 (9th Cir. 2023) ............................................................................................. 24

*Cummings v. Premier Rehab Keller, PLLC*
596 U.S. 212 (2022) ..................................................................................................... 17, 36

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*
591 U.S. 1 (2020) .................................................................................................. 23, 25, 27, 28

*eBay Inc. v. MercExchange, LLC*
547 U.S. 388 (2006) .......................................................................................................... 40

*Enrique Ahumada-Meza v. City of Marysville*
No. 2:19-cv-1165-TSV (W.D. Wash. 2019) ..................................................................... 11

*Ernst & Young v. Depositors Econ. Prot. Corp.*
45 F.3d 530 (1st Cir. 1995) ............................................................................................... 48

*Gonzales v. Oregon*
546 U.S. 243 (2006) .......................................................................................................... 20

*Gregory v. Ashcroft*
501 U.S. 452 (1991) .......................................................................................................... 18

*Griffin v. HM Fla.-ORL, LLC*
144 S. Ct. 1 (2023) ............................................................................................................ 39

*Harrington v. Chao*
280 F.3d 50 (1st Cir. 2002) ............................................................................................... 39

*Healey v. Spencer*
   765 F.3d 65 (1st Cir. 2014) ................................................................. 40

*Hikvision USA, Inc. v. Fed. Commc'ns Comm'n*
   97 F.4th 938 (D.C. Cir. 2024) ............................................................ 25

*Hill v. England*
   No. CV F 03-6903 LJO TAG, 2007 WL 3096707 (E.D. Cal. Oct. 22, 2007) ...................... 36

*Int'l Org. of Masters v. Nat'l Labor Relations Bd.*
   61 F.4th 169 (D.C. Cir. 2023) ............................................................ 27

*K–Mart Corp. v. Oriental Plaza, Inc.*
   875 F.2d 907 (1st Cir. 1989) ......................................................... 40, 45

*Kansas v. United States*
   249 F.3d 1213 (10th Cir. 2001) .......................................................... 41

*Kearns v. Cuomo*
   981 F.3d 200 (2d Cir. 2020) .......................................................... 29, 38

*Kentucky v. Yellen*
   54 F.4th 325 (6th Cir. 2020) ......................................................... 18, 33

*King v. Burwell*
   576 U.S. 473 (2015) ..................................................................... 21

*Kisor v. Wilkie*
   588 U.S. 558 (2019) ..................................................................... 37

*La. Pub. Serv. Comm'n v. FCC*
   476 U.S. 355 (1986) ..................................................................... 17

*Little Sisters of the Poor v. Pennsylvania*
   591 U.S. 657 (2020) .................................................................. 24, 25

*Loper Bright Enters. v. Raimondo*
   603 U.S. 369 (2024) ..................................................................... 17

*Lunn v. Commonwealth*
   477 Mass. 517 (2017) .................................................................... 10

*Martin Luther King, Jr. Cnty. v. Turner*
   No. 2:25-CV-814, 2025 WL 1582368 (W.D. Wash. June 3, 2025) .................... 18, 29, 32

*Massachusetts v. United States*
435 U.S. 444 (1978) .................................................................... 30

*McHenry Cnty. v. Raoul*
44 F.4th 581 (7th Cir. 2022) ........................................................ 10

*MedImmune, Inc. v. Genentech, Inc.*
549 U.S. 118 (2007) .................................................................... 48

*Miranda-Olivares v. Clackamas Cnty.*
No. 12-cv-2317, 2014 WL 1414305 (D. Or. Apr. 11, 2014) ................ 37

*Morales v. Chadbourne*
793 F.3d 208 (1st Cir. 2015) ........................................................ 37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) .......................................................... 23, 24, 27

*Nat'l Council of Nonprofits v. OMB*
No. 25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ................. 28

*Nat'l Fed. of Indep. Bus. v. Sebelius*
567 U.S. 519 (2012) .............................................................. *passim*

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*
595 U.S. 109 (2022) ................................................................ 22, 32

*Nat'l Urban League v. Ross*
977 F.3d 770 (9th Cir. 2020) ........................................................ 24

*National Mining Ass'n v. U.S. Army Corps of Engineers*
145 F.3d 1399 (D.C. Cir. 1998) ................................................ 39, 40

*New York v. Trump*
769 F. Supp. 3d 119 (D.R.I. 2025) .............................................. 5, 24

*Nieves-Marquez v. Puerto Rico*
353 F.3d 108 (1st Cir. 2003) .................................................... 30, 36

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of New Jersey*
8 F.4th 176 (3d Cir. 2021) ........................................................ 9, 10

*Ohio v. EPA*
603 U.S. 279 (2024) .................................................................... 41

*Oklahoma v. Castro-Huerta*
  597 U.S. 629 (2022) .......................................................... 28

*Olivera Silva v. Campbell*
  No. 1:17-cv-3215-SMJ (E.D. Wash. Sept. 24, 2018), ECF No. 60 ...................................... 11

*P.R. Conservation Found. v. Larson*
  797 F. Supp. 1066 (D.P.R. 1992) ........................................ 47

*Pennhurst State Sch. & Hosp. v. Halderman*
  451 U.S. 1 (1981) ............................................... 24, 36, 37, 38

*Penobscot Nation v. Frey*
  3 F.4th 484 (1st Cir. 2021) ................................................ 31

*Philadelphia v. Sessions*
  309 F. Supp. 3d 271 (E.D. Pa. 2018) ................................ 41

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*
  946 F.3d 1100 (9th Cir. 2020) ........................................... 20

*Printz v. United States*
  521 U.S. 898 (1997) ........................................................ 11

*Quintana-Dieppa v. Dep't of Army*
  130 F.4th 1 (1st Cir. 2025) ............................................... 16

*Rio Grande Cmty. Health Ctr. v. Rullan*
  397 F.3d 56 (1st Cir. 2005) .............................................. 41

*Robbins v. Reagan*
  780 F.2d 37 (D.C. Cir. 1985) ........................................... 20

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
  102 F.3d 12 (1st Cir. 1996) .......................................... 45, 46

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
  217 F.3d 8 (1st Cir. 2000) ............................................... 43

*Ryan v. U.S. Immigr. & Customs Enforcement*
  974 F.3d 9 (1st Cir. 2020) ............................................... 18

*Sasen v. Spencer*
  879 F.3d 354 (1st Cir. 2018) ........................................... 22

*Sierra Club v. Trump*
  929 F.3d 670 (9th Cir. 2019)............................................................. 17

*Smith v. Goguen*
  415 U.S. 566 (1974)......................................................................... 38

*South Dakota v. Dole*
  483 U.S. 203 (1987)....................................................................*passim*

*Starlight Sugar, Inc. v. Soto*
  114 F.3d 330 (1st Cir. 1997)........................................................... 44

*Tennessee v. Dep't of Educ.*
  104 F.4th 577 (6th Cir. 2024).......................................................... 41

*Trump v. CASA, Inc.*
  145 S. Ct. 2540 (2025)..................................................................... 40

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
  578 U.S. 590 (2016)......................................................................... 16

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*
  481 U.S. 1301 (1987)....................................................................... 47

*Ulstein Mar., Ltd. v. United States*
  833 F.2d 1052 (1st Cir. 1987).......................................................... 48

*United States v. California*
  921 F.3d 865 (9th Cir. 2019)........................................................... 10

*United States v. Eghobor*
  812 F.3d 352 (5th Cir. 2015)........................................................... 36

*United States v. Illinois*
  No. 25 CV 1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) ...................................... 10, 11

*United States v. Morrison*
  529 U.S. 598 (2000)........................................................................... 8

*United States v. North Carolina*
  192 F. Supp. 3d 620 (M.D.N.C. 2016).............................................. 43

*Vazquez-Velazquez v. Puerto Rico Highways & Transportation Auth.*
  73 F.4th 44 (1st Cir. 2023)........................................................... 16, 47

# TABLE OF AUTHORITIES
(continued)

**Page**

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) ........................................................................... 46

**STATUTES**

5 U.S.C.
§ 703 ................................................................................................. 40
§ 704 ................................................................................................. 16
§ 706 ................................................................................................. 16
§ 706(2) ........................................................................................... 39
§ 706(2)(A) ................................................................................ 16, 23
§ 706(2)(C) ...................................................................................... 17

23 U.S.C.
§ 101(b)(1) ...................................................................................... 46
§ 104 ............................................................................................ 5, 33
§ 104(c) .............................................................................................. 5
§ 117 ................................................................................................... 7
§ 117(a)(2) ....................................................................................... 31
§ 117(h) ........................................................................................ 7, 22
§ 119 ............................................................................................ 5, 19
§ 119(b) ........................................................................................... 31
§ 130 ............................................................................................ 5, 19
§ 133 ................................................................................................... 5
§ 134 ................................................................................................... 5
§ 148 ............................................................................................ 5, 19
§ 149 ............................................................................................ 5, 19
§ 158 ................................................................................................. 33
§ 167 ............................................................................................ 5, 19
§ 171 ................................................................................................. 31
§ 171(a) ........................................................................................... 22
§ 175 ............................................................................................ 5, 19
§ 176 ............................................................................................ 5, 19
§ 402(a)(1)(i) ............................................................................... 6, 19
§ 402(c)(2) ......................................................................................... 6
§ 402(c)(2)(B)(i) ............................................................................. 20
§ 405(a) .............................................................................................. 6
§ 405(b) .............................................................................................. 6

28 U.S.C. § 2201(a) .......................................................................... 48

31 U.S.C. § 1552(a) .......................................................................... 43

46 U.S.C. § 54301(a)(3) .................................................................... 22

49 U.S.C.
  § 101(b)(3) ............................................................................................ 47
  § 5301 .................................................................................................. 46
  § 5301(b) ............................................................................................... 5
  § 5302(4) ............................................................................................... 5
  § 5307 ............................................................................................... 5, 19
  § 5310(b)(1)(A) ................................................................................. 5, 19
  § 5310(c) ............................................................................................... 6
  §5311 ............................................................................................... 5, 19
  § 22905(a) ........................................................................................... 22
  § 22909(b) ...................................................................................... 7, 22
  § 22909(b)(1) ....................................................................................... 32
  § 22909(f) .............................................................................................. 7
  § 24101 ................................................................................................ 46
  § 47101(a)(12) ..................................................................................... 32
  § 47128(a) .............................................................................................. 7
  § 60102 .......................................................................................... 19, 32

5 Ill. Comp. Stat. 805/1 *et seq.* .................................................................. 8

5 Ill. Comp. Stat. 805/15 ............................................................................ 10

Administrative Procedure Act ............................................................... *passim*

American Relief Act, Pub. L. No. 118-158, 138 Stat. 1722, 1758 (2024) .................... 14

Cal. Gov't Code
  § 7282-7282.5 ....................................................................................... 8
  § 7282.5(a) ...................................................................................... 9, 10
  § 7284-7284.12 ..................................................................................... 8
  § 7284.2 ................................................................................................ 9
  § 7284.6(a) ...................................................................................... 9, 10
  § 7284.6(a)(1)(C) ............................................................................. 9, 10
  § 7284.6(a)(4) .................................................................................. 9, 10
  § 7284.6(e) .......................................................................................... 10

Cal. Penal Code § 422.93(a), (b) .................................................................. 8

Colo. Rev. Stat. § 24-76.6-102 to -103 ......................................................... 8

Conn. Gen. Stat. § 54-192h ........................................................................ 8

Federal-Aid Highway Act of 1956, Pub. L. No. 84-627, 70 Stat. 374 ...................... 3

Federal Aid Road Act of 1916, Pub. L. No. 64-156, 39 Stat. 355 ........................... 3

Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731 .................................................. 3

Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1105, 129
  Stat. 1312, 1332 (2015) .............................................................................................. 7

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) ................... 3, 5

Md. Code Ann., Crim. Proc. § 5-104 ....................................................................................... 8

Merchant Marine Act of 1936, Pub. L. No. 74-835, 49 Stat. 1985 ........................................... 3

Or. Rev. Stat. § 181A.820 ..................................................................................................... 8

Victims of Trafficking and Violence Protection Act, Pub. L. No. 106-386,
  § 1513(a)(2)(A), 114 Stat. 1464, 1533 (2000) ...................................................... 27

Vt. Stat. Ann. Title 20
  § 2366 ............................................................................................................................ 9
  § 4651 ............................................................................................................................ 9

Wash. Rev. Code Ann.
  § 10.93.160 .................................................................................................................... 9
  § 43.10.315 .................................................................................................................... 9

**CONSTITUTIONAL PROVISIONS**

Fourth Amendment ................................................................................................................ 37

Tenth Amendment ............................................................................................................. 41, 42

U.S. Constitution Spending Clause ................................................................................... *passim*

**COURT RULES**

Fed. R. Civ. P. 56(a) ............................................................................................................. 15

**OTHER AUTHORITIES**

Appellant's Opening Br., ECF No. 11, *King Cnty. v. Turner*, No. 25-3664 (9th Cir.
  July 8, 2025) ................................................................................................................. 18

N.J. Att'y Gen. Directive 2018-6 (rev. 2019) ................................................................... 8, 9, 10

N.Y. Exec. Orders 170 ........................................................................................................... 8

N.Y. Exec. Orders 170.1 ........................................................................................................ 8

**Page**

President Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ........................................ 11

R.I. State Police Gen. Order 56A10 ................................................................................................. 9

**INTRODUCTION**

On June 19, 2025, this Court granted Plaintiff States' motion for a preliminary injunction to prevent Defendants from coercing Plaintiff States into participating in federal civil immigration enforcement by threatening to cut off tens of billions of dollars in transportation funding. When granting the Plaintiff States a preliminary injunction, this Court held that "the States' claims are likely to succeed because the Defendants' actions here violate the Constitution and statutes of the United States." ECF No. 57 at 6. The material facts have not changed in the intervening period, and those same conclusions of law now call for summary judgment to be granted to Plaintiff States.

On April 24, 2025, United States Secretary of Transportation Sean Duffy issued a letter (the "Duffy Directive") to all recipients of U.S. Department of Transportation (U.S. DOT) funding, declaring for the first time that all recipients must cooperate with the federal enforcement of immigration law or else risk losing funding (the "Immigration Enforcement Condition"). Consistent with the Duffy Directive, U.S. DOT has imposed the Immigration Enforcement Condition in both the general and specific terms and conditions for U.S. DOT grant agreements administered across U.S. DOT's sub-agencies, including the Federal Highway Administration, Federal Transit Administration, Federal Motor Carrier Safety Administration, Federal Railway Administration, Federal Aviation Administration, National Highway Traffic Safety Administration, Maritime Administration, Pipeline and Hazardous Materials Safety Administration, and Office of the Secretary.

U.S. DOT's requirement that recipients "cooperate" in the federal enforcement of civil immigration law, however, has no basis in the laws that govern transportation funding. Congress has directed the funds at issue to Plaintiff States for transportation and safety purposes—repairing roads, replacing decaying bridges, and preventing deaths and injuries from traffic accidents. These funds have nothing to do with immigration enforcement. And Congress imposed no requirement for States to cooperate with federal civil immigration enforcement as a condition for receiving funding. By fashioning its own Immigration Enforcement Condition on funding, U.S. DOT is

attempting to seize Congress's power of the purse to advance the Administration's own, unrelated ends. Such seizure of power exceeds Defendants' statutory authority under the Administrative Procedure Act (APA) and is *ultra vires*. Defendants' decision to impose the Immigration Enforcement Condition is also arbitrary and capricious under the APA because it reflects an unreasoned change in position. Defendants failed to address—let alone explain—important aspects of their action, including: the agency's statutory authority to impose the Immigration Enforcement Condition; Plaintiff States' reliance interests in the continued funding; Plaintiff States' sovereign authority to decide whether or when to cooperate with federal civil immigration enforcement efforts; and the harms Plaintiff States will experience if forced to entangle their officers with federal civil immigration efforts. Further, even if Defendants had statutory authority to impose the Immigration Enforcement Condition and promulgated it through a reasoned decision-making process, imposing a uniform immigration enforcement condition across numerous grants would nevertheless violate the Spending Clause of the U.S. Constitution. The Immigration Enforcement Condition is wholly unrelated to the transportation programs it encumbers, is fatally ambiguous, and reflects an unlawful attempt to coerce States into doing the federal government's bidding.

Without permanent relief, Defendants' unlawful actions pose a continuous threat of irreparable harm by forcing Plaintiff States into an impossible dilemma. On the one hand, if the Immigration Enforcement Condition returned to force, Plaintiff States could collectively lose tens of billions of dollars in critical funding for transportation and safety programs by refusing or failing to comply with the term. On the other hand, Plaintiff States could surrender their sovereign police powers and submit to an unlawful Immigration Enforcement Condition that could divert Plaintiff States' limited resources and undermine public safety by reducing immigrants' willingness to participate in public health programs or assist law enforcement in the prosecution of crime.

This Court should grant Plaintiff States summary judgment, declare the Immigration Enforcement Condition unlawful, vacate the Immigration Enforcement Condition, and permanently enjoin Defendants from implementing or enforcing the Immigration Enforcement

Condition on U.S. DOT funding with respect to Plaintiff States, their cities and counties, and their instrumentalities.

## STATEMENT OF FACTS

I. CONGRESS HAS CONSISTENTLY DIRECTED FUNDING TO STATES TO SUPPORT THEIR EFFORTS TO DEVELOP AND SAFELY MAINTAIN TRANSPORTATION INFRASTRUCTURE.

For more than a century, Congress has directed federal funding to the States to support the development of the transportation infrastructure that knits together the Nation's communities. *See, e.g.*, Federal Aid Road Act of 1916, Pub. L. No. 64-156, 39 Stat. 355. Across the decades, Congress has consistently and steadily increased the federal government's financial assistance to state and local governments for all manner of transportation across the roads, seas, and skies. *See, e.g.*, Merchant Marine Act of 1936, Pub. L. No. 74-835, 49 Stat. 1985; Federal-Aid Highway Act of 1956, Pub. L. No. 84-627, 70 Stat. 374; Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731; Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021). By providing federal funding, Congress has enabled Plaintiff States to develop safe and effective means of transportation for hundreds of millions of Americans in ways they could not without this financial support. This financial support develops and sustains the highways that carry our residents to and from home; the airports that enable them to cross the country; the safety measures that protect drivers from fatal accidents; the signals and barriers that prevent train collisions; and the firefighters that inspect and ensure safe pipelines that cross millions of miles throughout Plaintiff States. *See, e.g.*, Ex. 37 (Mohler Decl.), ¶ 6; Ex. 55 (Pappas Decl.), ¶ 11; Ex. 39 (Van Note Decl.), ¶ 6; Ex. 38 (Wiedefeld Decl.), ¶¶ 6-10. Due to the consistent, regular receipt of these funds, and the multi-year cycles for which these funds are granted, these federally funded activities are closely woven together with Plaintiff States' efforts to improve and ensure the safety of their roads, bridges, highways, railroads, ferries, ports, and airports. *See, e.g.*, Ex. 29 (Hastings Decl.), ¶¶ 14-15; Ex. 57 (Baldwin Decl.), ¶¶ 15-21.

U.S. DOT administers these funds across a range of sub-agencies reflecting these varied means of transportation, including the Federal Highway Administration, Federal Railroad

Administration, Federal Transit Administration, Federal Motor Carrier Safety Administration, National Highway Traffic Safety Administration, Federal Aviation Administration, Maritime Administration, Pipeline and Hazardous Materials Safety Administration, and Office of the Secretary.

For example, Plaintiff States rely on funding from U.S. DOT's Maritime Administration to rebuild vital but deteriorating shipping ports, thereby improving safety and capacity for economically essential cargo operations. Ex. 53 (King Decl.), ¶¶ 10-15; Ex. 30 (Sniffen Decl.), ¶¶ 17, 90-93; Ex. 38 (Wiedefeld Decl.), ¶ 21. To upgrade aging commuter lines before they break down or become unsafe, Plaintiff States rely on grants from the Federal Transit Administration. Ex. 36 (Heffernan Decl.), ¶ 31; Ex. 38 (Wiedefeld Decl.), ¶ 25. And through grants from the National Highway Traffic Safety Administration, Plaintiff States have supported programs funding hundreds of law enforcement agencies, tribes, non-profit organizations, state agencies, universities, and city and county governments to expand traffic enforcement units, toxicology positions, and the expansion of educational driver safety programs to prevent traffic accidents and reduce serious injuries and deaths. *See, e.g.*, Ex. 28 (Higgins Decl.), ¶¶ 18-33, 38-52; Ex. 57 (Baldwin Decl.), ¶ 21.

The statutes Congress enacted to authorize and allocate federal transportation funding vary in some ways, but they share key themes. All provide support to States and local governments based on criteria that center on transportation infrastructure and aim to ensure the safe passage of people and goods within and between the States. None of these statutes concern federal civil immigration enforcement, much less identify federal civil immigration enforcement as a prerequisite for federal funding. And none of these statutes anoint U.S. DOT or its sub-agencies with freestanding authority to attach new conditions on funding unrelated to transportation.

At Congress's direction, U.S. DOT administers several types of funding, including those based on a prescribed formula, those that preserve some measure of discretion for U.S. DOT, and those that give greater flexibility to recipients, like Plaintiff States, in how to employ those funds.

*First*, Congress has directed U.S. DOT and its sub-agencies to administer numerous "formula" funding programs—programs that distribute a set minimum, percentage, or amount of federal funding to States based on specific and objective factors, such as a State's population. *See, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (setting out the statutory factors determining eligibility for a formula grant); *New York v. Trump*, 769 F. Supp. 3d 119, 129 (D.R.I. 2025) (describing "formula grants where money is allocated on the basis of enumerated statutory factors such as population or the expenditure of qualifying state funds"), *appeal docketed*, No. 25-1236 (1st Cir. Mar. 10, 2025).

For instance, the Federal-Aid Highway Program, administered by the Federal Highway Administration within U.S. DOT, is the primary means by which Congress allocates funding to the States to develop and construct highways. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 443 (2021) (authorizing $273.1 billion for fiscal years 2022 through 2026 to be appropriated for the Federal-Aid Highway Program). The Federal-Aid Highway Program distributes funding to States through nine core formula funding programs. *See* 23 U.S.C. §§ 104, 119, 130, 133, 134, 148, 149, 167, 175, 176. Though these programs serve various purposes, *see* App., the authorizing statute specifies that each State "shall" receive a "[g]uaranteed" amount of federal funding for each these programs, depending upon the total funding apportioned by Congress and the State's relative share of funding in prior apportionments, 23 U.S.C. § 104(c).

Similarly, the Federal Transit Administration within U.S. DOT distributes several formula grants to the States to support public transportation programs, including the acquisition of buses and bus facilities. *See* 49 U.S.C. §§ 5301(b), 5302(4). These formula grants support public transportation programs in urban and rural areas, as well as programs "to meet the special needs of seniors and individuals with disabilities," 49 U.S.C. §§ 5307, 5311, 5310(b)(1)(A). The statutes authorizing these programs, in turn, require the Federal Transit Administration to distribute funding based on a certain percentage of the net project cost, *id.*, § 5307(d); a certain percentage of the funding appropriated each fiscal year, *id.* § 5311(c)(1); or the relative proportion of seniors

and individuals with disabilities in each area, *id.* § 5310(c). Plaintiff States expect to receive around $9.5 billion in funding from these programs for fiscal year 2025. Ex. 18; *see, e.g.*, Ex. 37 (Mohler Decl.), ¶ 11; Ex. 38 (Wiedefeld Decl.), ¶ 16; Ex. 35 (Osborn Decl.), ¶ 10.

Likewise, the National Highway Traffic Safety Administration administers formula grant programs to prevent deaths and injuries that result from traffic crashes. The National Highway Traffic Safety Administration's two largest grant programs—the National Priority Safety Program and the State and Community Highway Safety Program—both provide formula funding to the States. The National Priority Safety Program provides several grants to encourage States to promote the use of seat belts and child restraints; reduce impaired or distracted driving; require graduated licenses for teen drivers; address the safety of motorcyclists, bicyclists, and pedestrians; and improve the quality of state traffic safety information systems. 23 U.S.C. § 405(a). Funds appropriated to carry out the National Priority Safety Program are apportioned to States pursuant to a statutory formula based on the population and total public road mileage of each State, subject to a minimum apportionment for all States that meet certain requirements. 23 U.S.C. § 405(b). Meanwhile, the Highway Safety Program provides grants to States to support the implementation of their general highway safety programs to reduce traffic crashes and deaths, injuries, and property damage resulting from those crashes. 23 U.S.C. § 402(a)(1)(i). Like the National Priority Safety Program, funds appropriated to carry out the Highway Safety Program "shall be apportioned" to States pursuant to a statutory formula based on population and total public road mileage of each State, subject to a minimum apportionment for all States. 23 U.S.C. § 402(c)(2); *see* Ex. 20.

All of these formula programs require U.S. DOT to apportion certain amounts of funding to States so long as the States satisfy the limited criteria enumerated in the respective authorizing statutes.

*Second*, a number of grant program statutes permit U.S. DOT or its sub-agencies some degree of discretion over the disbursement of federal funds, but set out objective, transportation-related criteria that define the limits of U.S. DOT's discretion. One such example is the Infrastructure for Rebuilding America (INFRA) program, which provides funding to assist States

in developing improvements to freight and highway projects of national or regional significance. 23 U.S.C. § 117; *see also* Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1105, 129 Stat. 1312, 1332 (2015). Though the grant is competitive, involving some degree of discretion, the statute specifies that when "making a grant under this section, the Secretary *shall* consider" various factors, such as the use of "innovative design and construction techniques," "geographic diversity among grant recipients," and increased "resilience to natural hazards or disasters," among other things. 23 U.S.C. § 117(h) (emphasis added). None of those factors relate to federal civil immigration enforcement. *See id.*

As another example, the Railroad Crossing Elimination grant provides funding to eliminate the dangers caused by stopped trains blocking rail grade crossings. *See* 49 U.S.C. § 22909(b). Though a competitive grant, the statute again defines the scope of U.S. DOT's discretion: the Secretary "shall" evaluate certain criteria for selecting projects funded by the grants, including, among other things, whether the proposed projects would "improve safety at highway-rail or pathway-rail crossings"; "grade separate, eliminate, or close highway-rail or pathway-rail crossings"; "improve the mobility of people and goods"; "reduce emissions, protect the environment, and provide community benefits, including noise reduction"; "improve access to emergency services"; "provide economic benefits"; and "improve access to communities separated by rail crossings." 49 U.S.C. § 22909(f). None of these criteria have anything to do with federal immigration enforcement.

*Third*, still more programs provide block grant funding to States, with minimal strings attached. Unlike other grants, which may specify the precise manner in which federal funding must be used, block grants give the States greater flexibility in deciding how they use the funds awarded to them. *See, e.g.*, 49 U.S.C. § 47128(a) (discussing block grant funding for certain States that "assume administrative responsibility for all airport grant amounts available under this subchapter").

Thus, while varied in their form and structure, the statutes authorizing these non-formula funding programs specify the purposes for the funding authorized; the eligibility criteria for

applicants; and the criteria that the Secretary must consider when determining how to award that funding. None of these statutes identify federal civil immigration enforcement as a purpose for the funding they authorize. And none of these statutes identify cooperation with federal civil immigration enforcement as a criterion that the U.S. DOT Secretary may consider when awarding funding.

## II. PLAINTIFF STATES EXERCISE THEIR SOVEREIGN PREROGATIVE TO PROTECT RESIDENTS.

Plaintiffs are California, Illinois, New Jersey, Rhode Island, Maryland, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Maine, the Commonwealth of Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, Wisconsin, and Office of the Governor, *ex. rel.* Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky (collectively, "Plaintiff States"). Plaintiff States are responsible for maintaining the day-to-day safety of all residents of their communities. Plaintiff States enact statutes or establish policies about the best use of law-enforcement time and energy to ensure that their residents are protected from crime and violence. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). One critical choice that Plaintiff States must make in doing so is whether, when, and how to task their law enforcement officers with assisting the federal government in enforcing federal civil immigration law.

Many Plaintiff States have chosen to focus their law-enforcement resources on state and local matters, and so limit the circumstances under which state and local law enforcement participate in federal immigration enforcement. *See, e.g.*, Cal. Penal Code § 422.93(a), (b); Cal. Gov't Code §§ 7282-7282.5, 7284-7284.12; 5 Ill. Comp. Stat. 805/1 to /20; N.J. Att'y Gen. Directive 2018-6 (rev. 2019); Md. Code Ann., Crim. Proc. § 5-104; Colo. Rev. Stat. § 24-76.6-102 to -103; Conn. Gen. Stat. § 54-192h; N.Y. Exec. Orders 170 and 170.1; Or. Rev. Stat.

§ 181A.820; R.I. State Police Gen. Order 56A10; Vt. Stat. Ann. tit. 20, §§ 2366, 4651; Wash. Rev. Code Ann. §§ 10.93.160, 43.10.315. These States have concluded that such policies best promote public safety, both because they ensure that state and local law enforcement spend their time addressing crime, rather than civil immigration enforcement, and because undocumented immigrants and their families are less willing to report crimes if their engagement with law enforcement could risk deportation. *See* Ex. 56 (Perez Decl.), ¶¶ 8-10; Ex. 26 (Rosen Decl.), ¶¶ 8-11; Ex. 62 (Wong Decl.), ¶¶ 10-22, 46-53. *See also* Cal. Gov't Code § 7284.2 (recognizing that entangling state and local law enforcement with federal civil immigration enforcement may cause immigrants to "fear approaching police when they are victims of, and witnesses to, crimes . . . to the detriment of public safety and the well-being of all Californians"); N.J. Att'y Gen. Directive 2018-6 (N.J. Directive) at 1; *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 363 n.5 (D.N.J. 2020) (noting "studies that confirm that immigration-related fears prevent individuals from reporting crimes"), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of New Jersey*, 8 F.4th 176 (3d Cir. 2021).

Many of these state policies seek to promote the public's cooperation with law enforcement by clearly distinguishing between the roles of state and local officers, who enforce state criminal law, and the roles of federal immigration officers, who enforce federal civil immigration law. California's Values Act, for instance, sets the parameters under which state and local law enforcement officers may assist in the civil enforcement of federal immigration law. Cal. Gov't Code § 7284.6(a). For example, the Values Act: (a) prohibits compliance with requests to hold an undocumented person beyond their date of release, *id.* § 7284.6(a)(1)(B); (b) defines when California law enforcement agencies may comply with requests by immigration authorities seeking the release date and time of a person in advance of the person's release, *id.* §§ 7282.5(a), 7284.6(a)(1)(C); (c) defines when California law enforcement agencies may transfer an individual to immigration authorities—including when authorized by a judicial warrant or judicial probable cause determination, *id.* §§ 7282.5(a), 7284.6(a)(4); and (d) restricts California law enforcement agencies from "[p]roviding personal information . . . about an individual" for "immigration

enforcement purposes," unless that information is publicly available, *id.* § 7284.6(a)(1)(D). *See also, e.g.*, 5 Ill. Comp. Stat. 805/15; N.J. Directive at 3-4. Most of these statutes and directives contain important exceptions to ensure compliance with federal law and to protect the public from violent criminals. Many authorize state and local law enforcement to work with federal civil immigration officials to facilitate the removal of certain criminals, *e.g.*, Cal. Gov't Code §§ 7282.5(a), 7284.6(a)(1)(C), 7284.6(a)(4); 5 Ill. Comp. Stat. 805/15(h), (i); N.J. Directive at §§ II.B.5-6, and expressly allow officers to cooperate with immigration enforcement as required by federal law, *e.g.*, Cal. Gov't Code § 7284.6(e); 5 Ill. Comp. Stat. 805/15(h); N.J. Directive at 1-2. Most of these policies have been in place for years, and many were passed with bipartisan support: Illinois's, for instance, was signed into law in 2017 by Republican Governor Bruce Rauner. And those policies that have been challenged in court have uniformly been upheld. *See, e.g.*, *McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022); *Ocean Cnty.*, 8 F.4th 176; *United States v. California*, 921 F.3d 865 (9th Cir. 2019); *United States v. Illinois*, No. 25 CV 1285, 2025 WL 2098688, at *1 (N.D. Ill. July 25, 2025).

Other Plaintiff States have not codified directives regarding the use of law-enforcement resources to assist in federal immigration law. Although these States have not imposed categorical *limitations* on the use of law-enforcement resources to assist in the enforcement of federal immigration law, they nonetheless do not impose categorical *requirements* of this kind on state and local law enforcement officers, either. Many of these States have concluded that they can best protect their residents by maintaining control over state and local law enforcement resources, or by empowering law enforcement officials to exercise discretion in determining when it would best promote public safety to assist federal immigration enforcement efforts, rather than requiring those officers to devote resources to federal immigration enforcement on the federal government's command. Other Plaintiff States are subject to different rules in this context. For instance, some Plaintiff States must comply with state court rulings that restrict their cooperation with civil immigration detainer requests. *See, e.g.*, *Lunn v. Commonwealth*, 477 Mass. 517, 529-537 (2017). Still other Plaintiff States have concluded that participating in federal immigration enforcement

efforts imposes substantial costs on local jurisdictions, not only in the form of personnel and resources but also in the form of potential civil liability. *See, e.g.*, *Enrique Ahumada-Meza v. City of Marysville*, No. 2:19-cv-1165-TSV (W.D. Wash. 2019) (settlement of $85,000 to resolve claims that City unlawfully detained plaintiff overnight pursuant to civil immigration request); Judgment, *Olivera Silva v. Campbell*, No. 1:17-cv-3215-SMJ (E.D. Wash. Sept. 24, 2018), ECF No. 60 (judgment of $10,000 in damages and $141,986.70 in attorney fees after county jail continued to detain plaintiff based on immigration detainer); *cf. also Illinois*, 2025 WL 2098688, at *24 ("[A]s of March 31, 2025, there were 31 lawsuits pending against ICE and DHS for alleged constitutional violations arising from removal efforts[.]"). While Plaintiff States' decisions in this area have differed, *all* reflect the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521 U.S. 898, 928 (1997)—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

## III. THE DEPARTMENT OF TRANSPORTATION ANNOUNCES THE IMMIGRATION ENFORCEMENT CONDITION IT INTENDS TO APPLY ACROSS ALL U.S. DOT GRANTS.

On January 20, 2025, President Trump directed the U.S. Attorney General and the Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). Days later, U.S. Secretary of Transportation Sean Duffy issued an order to "update[] and reset[] the principles and standards underpinning U.S. Department of Transportation . . . policies, programs, and activities." Ex. 1 at 1 (the "Duffy Order"). Among these changes, the Duffy Order states, "[t]o the maximum extent permitted by law, DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State Contracts, shall prioritize projects and goals" that "require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary." *Id.* at 2-3.

On April 24, 2025, Secretary Duffy issued a letter to "all recipients" of U.S. DOT funding announcing U.S. DOT's policy of imposing an Immigration Enforcement Condition as a requirement for all U.S. DOT funding. Ex. 2 (Duffy Directive). The Duffy Directive purports to "clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements," including "terminat[ion of] funding." *Id.* It then asserts that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *Id.* at 2 (the "Immigration Enforcement Condition"). The Duffy Directive further claims that there are "reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement." *Id.* It warns that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT." *Id.* at 3. The Duffy Directive does not describe any limits to the requirement that recipients "cooperate . . . in the enforcement of Federal immigration law." *Id.* at 2.

Numerous state agencies within Plaintiff States received a copy of the Duffy Directive directly from U.S. DOT. Additionally, the Duffy Directive was published on the U.S. DOT website along with a press release quoting Secretary Duffy as stating, among other things, that "Federal grants come with a clear obligation to adhere to federal laws," that recipients must "enforce our immigration rules," and that Secretary Duffy "will take action to ensure compliance." Ex. 3.

U.S. DOT has added the Immigration Enforcement Condition to general terms and conditions governing the entirety of federal funding administered by several subagencies within U.S. DOT, as well as to the terms and conditions for specific federal grants. For example, on April

16, 2025, the Federal Railroad Administration amended its general terms and conditions for all federal funding administered by the agency to include language requiring recipients to "cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law." Ex. 4. So, too, did the Federal Transit Administration, the Federal Highway Administration, the Federal Railroad Administration, the Maritime Administration, the Federal Aviation Administration, the Federal Motor Carrier Safety Administration, the Pipeline and Hazardous Materials Safety Administration, and the Office of the Secretary. *See, e.g.*, Exs. 4–10, 58 (Bosman Decl.), ¶ 19.

Nearly identical language was also added to the terms and conditions for specific grant programs or award documents. For example, on March 31, 2025, the Maritime Administration amended its general terms and conditions governing Port Infrastructure Development Program grants to include the Immigration Enforcement Condition. Ex. 9. After issuing its revised Master Agreement, the Federal Transit Administration issued administrative amendments to several *existing* grants made to the Maryland Transit Administration. Ex. 38 (Wiedefeld Decl.), ¶¶ 13-14, 24-25. These amendments would have conditioned Maryland's access to hundreds of millions of dollars in funding—which have already been allocated and awarded—upon acceptance of the Immigration Enforcement Condition.[1]

To date, Plaintiff States are aware of U.S. DOT imposing the Immigration Enforcement Condition on at least the following grants being awarded to: California (Bridge Investment Program and Advanced Transportation Technology and Innovation Program); Colorado (Advanced Transportation Technology and Innovation Program); Illinois (Formula Airport

---

[1] On May 15, 2025, before a subcommittee of the Senate Committee on Appropriations, Secretary Duffy testified that U.S. DOT is not seeking to apply the Immigration Enforcement Condition to existing grants. *See* https://tinyurl.com/47zb68y5 (1:59:52). But other than its actions taken to comply with this Court's preliminary injunction, the Federal Transit Administration has not withdrawn the above-described requests that Maryland authorities accept the Immigration Enforcement Condition.

Infrastructure Grants, MEGA, and INFRA Grant Programs); Maryland (Rail Crossing Elimination Program and Wildlife Crossing Pilot Project); Massachusetts (Rail Crossing Elimination Program and Wildlife Crossing Pilot Project); Michigan (Advanced Transportation Technology Innovation and Wildlife Crossing Pilot Project); New York (Motor Carrier Safety Assistance Program and Wildlife Crossing Pilot Program); Washington (Motor Carrier Safety Assistance Program); and Wisconsin (Advanced Transportation Technology and Innovation Program and Motor Carrier Safety Assistance Program). Ex. 25 (Lam Decl.), ¶¶ 9-14; Ex. 27 (Chafee Decl.), ¶ 20; Ex. 32 (Bieneman Decl.), ¶ 28; Ex. 35 (Osborn Decl.), ¶¶ 26, 31; Ex. 38 (Wiedefeld Decl.), ¶¶ 43-44; Ex. 37 (Mohler Decl.), ¶ 22; Ex. 40 (Wieferich Decl.), ¶ 12; Ex. 47 (Ho Decl.), ¶¶ 28, 33; Ex. 58 (Bosman Decl.), ¶¶ 19-20; Ex. 61 (Lawry Decl.), ¶ 36.

In some instances, U.S. DOT staff demanded that state officials execute these grant agreements containing the Immigration Enforcement Condition in a matter of days. For example, on May 6, 2025 a senior Federal Highway Administration official verbally requested that the Maryland State Highway Administration submit two pending grant agreements to Federal Highway Administration by May 15 and 17, and warned that failure to agree to the new template agreement terms expeditiously could endanger not only those two grants (totaling about $1.75 million), but *all* federal funding, including formula funds and funding for the replacement of the Francis Scott Key Bridge, which collapsed in 2024 when the cargo ship *Dali* crashed into one of its piers. Ex. 38 (Wiedefeld Decl.), ¶ 45. Combined, the Key Bridge funding and the Federal Highway Administration formula funds amount to billions of dollars in estimated annual funding. Ex. 38 (Wiedefeld Decl.), ¶ 45; *see also* American Relief Act, Pub. L. No. 118-158, 138 Stat. 1722, 1758 (2024) (providing for the Federal Highway Administration to fund 100 percent of the reconstruction of the bridge through the Emergency Relief Program). *See also, e.g.*, Ex. 35 (Osborn Decl.), ¶¶ 26, 31 (receiving alterations to grant terms on April 25, 2025 to include the Immigration Enforcement Condition, and receiving May 30, 2025 deadline to agree to expiring Formula Airport Infrastructure Grants with the challenged Immigration Enforcement Condition); Ex. 31 (Khayyat Decl.), ¶¶ 16-17 (receiving changed terms and conditions, including the Immigration Enforcement

Condition, on May 15, 2025, and having a June 20, 2025 deadline to apply for federal fiscal year 2025-2027 grant funding).

## IV. PROCEDURAL HISTORY

On May 13, 2025, some of the Plaintiff States filed a complaint challenging U.S. DOT's decision to impose the Immigration Enforcement Condition on U.S. DOT funding. ECF No. 1. They filed a motion for a preliminary injunction on May 22, 2025. ECF No. 41. Following a June 18, 2025 hearing, this Court issued a preliminary injunction enjoining U.S. DOT from implementing or enforcing the Immigration Enforcement Condition against the Plaintiff States and their governmental subdivisions. ECF No. 57.

On July 8, 2025, Plaintiff States filed a First Amended Complaint solely to add two additional plaintiff parties, along with a motion to extend the Court's preliminary injunction to apply to the two additional plaintiffs, in addition to the original Plaintiff States. ECF Nos. 61, 62. The Court issued a July 17, 2025 text order granting Plaintiff States' motion to extend the existing preliminary injunction to the two added parties.

On July 24, 2025, the parties filed a stipulated schedule to proceed with summary judgment briefing, agreeing that "the disputed issues" in the case "are largely legal in nature" and that Defendants believe there is no further administrative record to produce beyond the documents already filed before the Court or disclosed to Plaintiff States.[2] ECF No. 67 at 1.

## ARGUMENT

## I. STANDARDS GOVERNING SUMMARY JUDGMENT

A court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they have the "potential to affect the outcome of the suit under the applicable law," and a genuine dispute over such facts arises if "a reasonable jury could resolve the point in favor of the

---

[2] Beyond the documents already filed with the Court during the parties' preliminary injunction briefing, Defendants identified only one other document that might constitute part of the administrative record—a July 2, 2025 letter issued by the Secretary of Transportation which references the Immigration Enforcement Condition but otherwise discusses other agency policies. *See* Ex. 22.

nonmoving party." *Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 7 (1st Cir. 2025) (citations omitted). A court must view the record in the light most favorable to the nonmovant, taking "all reasonable inferences in that party's favor," but paying "no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation.'" *Id.* (citation omitted). Where the parties cross-move for summary judgment, "the court must [examine] each motion separately, drawing inferences against each movant in turn." *Vazquez-Velazquez v. Puerto Rico Highways & Transportation Auth.*, 73 F.4th 44, 51 (1st Cir. 2023) (citation omitted).

Claims under the APA are typically resolved on summary judgment based on the agency record. *See* 5 U.S.C. § 706; *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). A court may base its review on the portions of the record presented by the parties. *See* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party.").

Here, the parties raise no genuine dispute as to any material facts. *See* ECF No. 67 at 1 (agreeing that the dispute is "largely legal in nature"). Plaintiff States are entitled to judgment as a matter of law because U.S. DOT lacks statutory authority to categorically impose the Immigration Enforcement Condition; its policy to do so is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A); and its attempt to do so strays beyond even the limits placed on Congress by the Spending Clause. Further, U.S. DOT's policy threatens irreparable harm to Plaintiff States because it attempts to coerce Plaintiff States into either surrendering their sovereignty, risking the public safety of their residents, or forfeiting billions of dollars that Plaintiff States rely upon for critical transportation infrastructure.

## II.    U.S. DOT'S IMMIGRATION ENFORCEMENT CONDITION IS UNLAWFUL.

### A.    U.S. DOT Lacks Statutory Authority to Impose the Immigration Enforcement Condition.

At the threshold, the agency's decision to impose the Immigration Enforcement Condition qualifies as "final agency action" reviewable under the APA, 5 U.S.C. § 704. It "mark[s] the consummation of the agency's decisionmaking process" rather than a "merely tentative or interlocutory" waypoint. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016)

(quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). And it engenders "legal consequences" in that it defines a new prerequisite for States to qualify for federal funding. *Id.*; *see also id.* at 599 (holding that a court should take a "pragmatic" approach when assessing finality).[3]

As discussed further below, Defendants lack any statutory authority to impose the Immigration Enforcement Condition on U.S. DOT funding. U.S. DOT thus acted *ultra vires* and "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(C), by adopting its policy imposing the Immigration Enforcement Condition on U.S. DOT funding.[4]

> **1.  Congress Did Not Authorize Defendants to Impose a Categorical Rule Requiring Recipients to Cooperate in the Enforcement of Federal Immigration Law.**

U.S. DOT and its sub-agencies are "charged with administering congressional statutes," which means that "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. Fed. Commc'ns Comm'n*, 569 U.S. 290, 297 (2013). Accordingly, Defendants have "no power to act . . . unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). This is especially true for federal funding, as the Constitution assigns Congress the power to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the Administrative Procedure Act." *Providence*, 954 F.3d at 31 (citations omitted); 5 U.S.C. § 706(2)(C). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

---

[3] As this Court previously concluded, Plaintiff States' claims also are not impliedly precluded by the Tucker Act. ECF No. 57 at 3; *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 52 (1st Cir. 2025) (holding that claims that related to grants but did not seek damages and did not rely on contract did not fall within the scope of the Tucker Act). The Plaintiff States do not bring any claims that seek compensatory damages or enforcement of a contract; rather, they challenge a generally applicable policy that attempts to disqualify them for federal funding.

[4] "[T]he availability of an APA cause of action" does not "foreclose[] other causes of action," such as constitutional or equitable claims. *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019).

Additionally, if a federal agency seeks to upset the balance of federal-state power, the agency must have a "clear statement" from a federal statute demonstrating that Congress "in fact . . . intended to" empower the agency to do so. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 68 (1989)); *see also Ryan v. U.S. Immigr. & Customs Enforcement*, 974 F.3d 9, 29 n.7 (1st Cir. 2020) ("[T]he federalism canon of statutory construction . . . reflect[s] a reluctance to ascribe to Congress an intent to interfere with a state's exercise of its sovereign powers . . . and Congress must clearly state such an intent if the presumption . . . is to be rebutted."); *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2020) (explaining courts "must employ a federalism-based clear-statement rule when construing spending legislation as a matter of statutory interpretation") (emphasis omitted). Here, U.S. DOT asserts the authority to require States to change their policies concerning federal civil immigration enforcement as a condition to access *all* transportation funding, dramatically disturbing the federal-state balance. Yet Defendants have never identified any statute that could plausibly authorize this sweeping imposition of the Immigration Enforcement Condition on all U.S. DOT funding, much less an unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds on their cooperation in the enforcement of federal immigration law. Because U.S. DOT lacks statutory authority to impose the Immigration Enforcement Condition categorically across all U.S. DOT funding, it plainly exceeds its authority and acts *ultra vires*, and this Court need go no further. *See Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368, at *17 (W.D. Wash. June 3, 2025) (concluding that plaintiffs "are likely to prevail on their claim" that U.S. DOT's Immigration Enforcement Condition "exceeds statutory authority"); *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1738675, at *4 (N.D. Cal. June 23, 2025) (noting that U.S. DOT's Immigration Enforcement Condition has been "applied without meaningful regard to statutory authority").[5]

---

[5] Although the federal government filed a Notice of Appeal in *King County v. Turner*, the federal government expressly declined to appeal the preliminary injunction that the Western District of Washington issued against U.S. DOT's Immigration Enforcement Condition. Appellant's Opening Br. at 9 n.1, ECF No. 11, *King County v. Turner*, No. 25-3664 (9th Cir. July 8, 2025).

### 2. The Relevant Grant Statutes Do Not Authorize Defendants to Impose a Federal Civil Immigration Enforcement Requirement.

Not only does U.S. DOT lack any statute giving it general authority to impose the kind of categorical rule set forth in the Immigration Enforcement Condition, Congress's transportation statutes likewise do not permit U.S. DOT to condition transportation funding on adherence to the President's immigration priorities. Indeed, as discussed, *supra* pp. 3-4, these statutes provide support to States and localities to support the development, maintenance, and safety of roads, highways, railways, waterways, and airways. They do not confer on U.S. DOT the discretion to defund States that choose, in a valid exercise of their own sovereign authority, to limit cooperation with federal immigration enforcement.

As explained, *supra* pp. 5-8, Congress has generally authorized U.S. DOT and its sub-agencies to provide funding to States through formula grant programs (i.e., grants disbursed to States based on fixed statutory factors, like state population), block grant programs that give States significant discretion in how to use funding, and competitive grant programs for specific infrastructure projects, such as bridges, railroads, and seaports. None of these frameworks gives U.S. DOT the power to limit funding to only those States that agree to cooperate in federal immigration enforcement efforts.

Congress plainly did not permit U.S. DOT to invent new immigration enforcement conditions for the many formula and block grant programs Congress created, which provide Plaintiff States with a substantial portion of their transportation funds. *See, e.g.*, 23 U.S.C. § 119 (National Highway Performance Program); *id.* § 130 (Railway-Highway Crossings Program); *id.* § 133 (Surface Transportation Block Grant Program); *id.* § 148 (Highway Safety Improvement Program); *id.* § 149 (Congestion Mitigation and Air Quality Improvement Program); *id.* § 167 (National Highway Freight Program); *id.* § 175 (Carbon Reduction Program); *id.* § 176 (PROTECT Formula Program); *id.* § 402 (Highway Safety Program); 49 U.S.C. § 5307 (Urbanized Area Formula Grants); *id.* § 5310(b)(1)(A) (Formula Grants for Seniors and Individuals with Disabilities); *id.* § 5311 (Formula Grants for Rural Areas); *id.* § 60102 (State Pipeline Safety Program). Although these statutes work in different ways, as a general matter, they

direct U.S. DOT sub-agencies to provide States annual allocations based on population, road mileage, or some other objective measure, in some instances specifying the exact proportion—by statute—that each State is to receive. *See, e.g.*, 23 U.S.C. § 402(c)(2)(B)(i) (Highway Safety Program funding "*shall* be apportioned" based on population and total public road mileage (emphasis added)). For these programs, U.S. DOT plainly lacks authority to impose unrelated substantive conditions on the receipt of funds. As the First Circuit explained, when it rejected a similar attempt to conscript States and localities into federal immigration enforcement, "the statutory formula[s]" at issue in programs of this sort "simply do[] not allow" federal agencies "to impose by brute force" conditions on federal funds "to further [those agencies'] unrelated law enforcement priorities." *Providence*, 954 F.3d at 34-35. Indeed, the specificity of the statutory schemes at issue here "strongly implies that Congress did not intend to give" U.S. DOT "the power to advance its own priorities by means of grant conditions." *Id.* at 35. U.S. DOT accordingly lacks authority to impose the Immigration Enforcement Condition on these programs.

The same is true for the competitive grants that U.S. DOT and its sub-agencies administer. *See supra* pp. 6-7. Although Congress permits these agencies some discretion in disbursing these funds, they must exercise that discretion within the parameters defined by Congress. *Cf. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326, (2014). "When Congress limits the purpose for which a grant can be made," the D.C. Circuit has explained, "it can be presumed that [Congress] intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985); *see also Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1105-06, 1113-14 (9th Cir. 2020) (holding that agency's grant criterion for competitive grants was unlawful because it deviated from the purposes of the authorizing statute). This principle flows from a broader rule of administrative law: Where Congress sets out specific grants of authority, the courts are "unwilling to construe the ambiguous provisions" as conferring authority for some other purpose. *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (quoting *Fed.*

*Maritime Comm'n v. Seatrain Lines*, 411 U.S. 726, 744 (1973)); *Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) (holding that a federal agency "cannot rely on its general authority to make rules . . . when a specific statutory directive defines the relevant functions of [the agency] in a particular area"); *cf. King v. Burwell*, 576 U.S. 473, 485–86 (2015) (where challenged policy involves "billions of dollars in spending each year," it is "especially unlikely that Congress would have delegated" a decision to an agency in an area in which the agency "has no expertise").

For example, in *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364, 1371 (D.C. Cir. 1990), the D.C. Circuit held that the Urban Mass Transit Administration—the predecessor agency to the Federal Transit Administration—lacked statutory authority to impose "uniform, national" drug-testing conditions before state and local transit authorities could receive federal funding. Though the federal agency cited statutory provisions giving it authority to prescribe "'terms and conditions' for its discretionary grants and loans," *id.* at 1364, the court held that the agency lacked authority to impose its drug-testing condition on grants it administered in light of the authorizing statute's text and structure, which "carefully circumscribed" the agency's authority to address safety and did not "confer authority upon UMTA to . . . condition receipt of federal money on compliance with those specific terms . . . ." *Id.* at 1369. The D.C. Circuit further explained that the agency lacked authority to impose the funding condition because "where Congress did delegate authority to UMTA to prescribe regulations for local transit authorities, it did so explicitly," but Congress did not provide any such language delegating authority to establish "UMTA's uniform, national anti-drug program regulations." *Id.* at 1371. And the court cited the block grant structure of numerous grants administered by the agency as further evidence that the agency lacked authority to impose its blanket condition, as the block grants reflected Congress's intent to give States flexibility to use grants for their "unique, local needs." *Id.* at 1370-71.

Similarly here, each of the statutes authorizing competitive transportation funding circumscribes the scope of U.S. DOT's discretion in ways that do not permit the Immigration Enforcement Condition. *First*, they identify the specific projects and purposes that Congress

intended that federal funding to support and direct U.S. DOT to provide funds for those purposes, and no other. *See, e.g.*, 49 U.S.C. § 22909(b) (Rail Crossing Elimination Grant providing funding to eliminate the hazards associated with railway crossings); 23 U.S.C. § 171(a) (Wildlife Crossing Pilot Program Grant provides funding to reduce the "more than 1,000,000 wildlife-vehicle collisions every year" that result in "tens of thousands of serious injuries and hundreds of fatalities on the roadways of the United States"). Congress never gave U.S. DOT discretion to turn a wildlife-protection program into a tool for conscripting support for civil-immigration enforcement. *Second*, they include detailed provisions identifying the eligibility criterion for this funding, but do not include cooperation with federal immigration enforcement within any of those criteria. *See, e.g., supra* pp. 6-7; 46 U.S.C. § 54301(a)(3) (Port Infrastructure Development Program defining eligible projects to include those that "improve the safety, efficiency, or reliability" of "the loading and unloading of goods at the port, such as for marine terminal equipment"). *Third*, they describe the factors for U.S. DOT to consider when awarding the grant, but again make no mention of federal civil immigration enforcement. *See, e.g.*, 23 U.S.C. § 117(h) (highway program stating that the "Secretary *shall* consider" factors such as "contributions to geographic diversity" or "enhancements of freight resilience to natural hazards or disasters" (emphasis added)). *Fourth*, these statutes identify specific conditions and prohibited uses of funding that *Congress* chose to employ, none of which includes federal civil immigration enforcement. *See, e.g.*, 49 U.S.C. § 22905(a) (noting "[g]rant conditions" requiring transportation funding for rail improvement "only if the steel, iron, and manufactured goods used . . . are produced in the United States").

By providing such detailed parameters for U.S. DOT's discretion, Congress made a conscious decision to specify what U.S. DOT may and must consider, and thereby what it may not. *See Sasen v. Spencer*, 879 F.3d 354, 362 (1st Cir. 2018) ("[T]he venerable canon of statutory construction *inclusio unius est exclusio alterius* . . . teaches that if one of a category is expressly included within the ambit of a statute, others of that category are implicitly excluded."). None of these provisions—relating to purpose, eligibility, required considerations, or conditions—identifies federal immigration enforcement as a requirement or consideration. *See Nat'l Fed'n of*

*Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 118 (2022) (rejecting the Occupational Safety and Health Administration's authority to impose public health requirements where "no provision of the Act addresses public health more generally, which falls outside of OSHA's sphere of expertise").

Ultimately, though each transportation funding program Congress created operates in its own way, the limits of administrative agency power remain the same: Congress instructed U.S. DOT on how to provide money to the States for transportation development and safety, and it gave U.S. DOT no authority to ignore or thwart the purposes for which those funds were appropriated. Congress did not write U.S. DOT a blank check permitting it to use funding programs to command States to enforce federal immigration policy, and U.S. DOT cannot withhold funds until States comply with the new administration's political priorities. To permit an administrative agency that power would overturn the basic rule of administrative law: that an agency's "power to act and how [it is] to act" are both "authoritatively prescribed by Congress." *City of Arlington*, 569 U.S. at 291.

## B.  U.S. DOT's Blanket Policy of Imposing the Immigration Enforcement Condition on All Transportation Funding Is Arbitrary and Capricious.

In addition to lacking statutory authority to impose the Immigration Enforcement Condition, U.S. DOT's decision to do so is also arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, when an agency changes its position, it must first consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" that may be upended. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up).

U.S. DOT's across-the-board imposition of the Immigration Enforcement Condition is arbitrary and capricious because U.S. DOT: (1) failed to consider whether any of the statutes

authorizing the grant programs actually permit it to impose the conditions; (2) ignored the States' profound reliance interests on federal funding; (3) neglected the Immigration Enforcement Condition's effect on safety in Plaintiff States; (4) overlooked obvious alternatives; and (5) failed to provide adequate explanation to even enable compliance with its ambiguous requirements.

### 1. U.S. DOT Failed to Consider Whether Grant-Authorizing Statutes Permitted Imposing the Immigration Enforcement Condition.

Generally, whether an agency has "failed to consider an important aspect of the problem" or "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, depends on "what the relevant substantive statute makes important." *Nat'l Urban League v. Ross*, 977 F.3d 770, 777 (9th Cir. 2020) (cleaned up); *see also California v. Dep't of Educ.*, 132 F.4th 92, 98-99 (1st Cir. 2025) (requiring that agency show whether it considered "all relevant data" (cleaned up)). It is thus arbitrary and capricious for the agency to neither "look to" nor "discuss" statutory "requirements," *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 682 (2020), or to "rel[y] on factors which Congress has not intended it to consider" in making its decision, *State Farm*, 463 U.S. at 43; *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023).

The need for an agency to engage in reasoned consideration of its statutory authority is even more pressing when it comes to funding. Because "*Congress* may fix the terms on which it shall disburse federal money to the States," any "federally imposed conditions" on States must stem from the relevant "legislation enacted pursuant to the spending power." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Thus, an agency cannot impose any grant conditions without first ensuring that the relevant statute allows it. *See New York*, 769 F. Supp. 3d at 142 (agencies acted arbitrarily and capriciously by failing to consider whether action "fell within the bounds of their statutory authority").

Here, U.S. DOT has made no effort to ascertain whether the applicable funding statutes allow for the Immigration Enforcement Condition. The Duffy Directive instead cites solely to provisions of the Immigration and Nationality Act—provisions that U.S. DOT plays no role in enforcing. *See*

Ex. 2 at 3. The arbitrariness is particularly striking because U.S. DOT has copied and pasted the same exact condition into dozens of different grant programs, each of which has its own authorizing statute, purposes, conditions, formulas, eligibility criteria, and other considerations. *See, e.g.*, *Hikvision USA, Inc. v. Fed. Commc'ns Comm'n*, 97 F.4th 938, 949-50 (D.C. Cir. 2024) (rejecting agency action as "arbitrarily broad"); *see also BST Holdings, LLC v. Occupational Safety & Health Admin.*, 17 F.4th 604, 612 (5th Cir. 2021) (rejecting agency's "one-size-fits-all sledgehammer"). Indeed, elsewhere, the United States has correctly conceded that "the degree of agency discretion in implementing grant programs"—including imposing conditions—"varies depending on the type of grant program and the terms of the authorizing legislation." Defs.' Opp. to Pls.' Mot. for a Prelim. Inj. at 20, ECF No. 93, *City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-1350 (N.D. Cal. Mar. 31, 2025). By failing to "look to" the statutory formula "requirements" or "discuss [them] at all" when imposing the Immigration Enforcement Condition, U.S. DOT's actions are arbitrary and capricious. *Little Sisters*, 591 U.S. at 682.

### 2. U.S. DOT Failed to Consider the States' Reliance Interests on Billions of Dollars in Federal Funding.

Imposition of the Immigration Enforcement Condition is also arbitrary and capricious because U.S. DOT failed to consider Plaintiff States' legitimate and longstanding reliance on the existing funding landscape. *See Regents*, 591 U.S. at 30. "When an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 30, 33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id.* at 30 (citations omitted).

But that is precisely what U.S. DOT did here. Especially for formula grants, Plaintiff States substantially rely on the annual receipt of *billions* of dollars in federal funding that the Immigration Enforcement Condition now endangers. The sudden loss of *billions* of dollars—chopping Plaintiff States' budgets for transportation infrastructure in half in many cases, Ex. 44 (O'Connor Decl.), ¶ 8 (federal funding supplies 61 percent of the New Jersey DOT capital budget); Ex. 47 (Ho Decl.),

¶ 14 (55 percent in New York); Ex. 39 (Van Note Decl.), ¶ 5 (48 percent in Maine); Ex. 32 (Bieneman Decl.), ¶ 22 (over 50 percent in Illinois)—would result in substantial interruptions, delays, or terminations of crucial transportation projects, Ex. 42 (Cownie Decl.), ¶ 31; Ex. 40 (Wieferich Decl.), ¶ 17. These include marine terminal reconstruction, the development of new interstate commuter-rail networks, the rebuilding of international airport runways, and even the wholesale replacement of dated bridges and viaducts. Ex. 53 (King Decl.), ¶ 20; Ex. 38 (Wiedefeld Decl.), ¶¶ 21-22; Ex. 42 (Cownie Decl.), ¶¶ 14, 31; Ex. 30 (Sniffen Decl.), ¶¶ 20; Ex. 47 (Ho Decl.), ¶¶ 39-46. Sudden loss of these funds would also force States to defer maintenance and improvements to vehicles and infrastructure, heightening the risk of aviation disasters, train derailments, and traffic deaths. Ex. 29 (Hastings Decl.), ¶¶ 28-30; Ex. 38 (Wiedefeld Decl.), ¶ 25.

In addition to neglecting the reliance interests of Plaintiff States on U.S. DOT funding for their programs, U.S. DOT failed to consider the impact the interruption of funding would have on the States' budgets as a whole. Indeed, ample record evidence confirms that the States depend on steady, reliable federal funding streams as part of their budgeting process, *see, e.g.*, Ex. 24 (Duncan Decl.), ¶¶ 23-24; Ex. 27 (Chafee Decl.), ¶¶ 23-24, and cannot fill the gaping hole that their termination would create, Ex. 37 (Mohler Decl.), ¶¶ 25-26; Ex. 38 (Wiedefeld Decl.), ¶ 46; Ex. 23 (Dougherty Decl.), ¶¶ 50-51; Ex. 59 (Williams Decl.), ¶ 9. Every year, for example, the New Jersey legislature appropriates expected federal funding to individual state agencies and New Jersey expected to count on approximately $1.9 billion of U.S. DOT funding in state fiscal year 2025, comprising 61 percent of the total budget of the New Jersey Department of Transportation (NJDOT). Ex. 44 (O'Connor Decl.), ¶ 12. Through the end of fiscal year 2025, the NJDOT is scheduled to be reimbursed over $120 million in federal spending that it has already billed, in addition to tens of millions more that it plans to bill pursuant to federal grants and funds through the end of the fiscal year. *Id.*, ¶ 39. If this funding becomes uncertain, New Jersey will need to begin contingency planning for how to wind down or substantially cut program activities that relied on federal funding, imposing a significant operational burden. *Id.*, ¶¶ 40-50. Plaintiff States'

"interest in planning future programs" is an "important" one, *Bowen v. Massachusetts*, 487 U.S. 879, 906-07 (1988), but U.S. DOT ignored it.

When imposing the Immigration Enforcement Condition, U.S. DOT not only failed to weigh these longstanding, substantial reliance interests "against competing policy concerns"; it "ignored" them altogether. *Regents*, 591 U.S. at 30-33. Because the Immigration Enforcement Condition was adopted "with no regard for the [States'] reliance interests," and U.S. DOT "did not acknowledge—much less justify—its adoption" of the new condition, it must be vacated "for want of reasoned decision making." *Int'l Org. of Masters v. Nat'l Labor Relations Bd.*, 61 F.4th 169, 180 (D.C. Cir. 2023).

### 3. U.S. DOT Failed to Consider the Immigration Enforcement Condition's Consequences on Public Safety.

U.S. DOT "entirely failed to consider" another "important aspect of the problem": the adverse impact to Plaintiff States' criminal enforcement and public safety if they were to adhere to the Immigration Enforcement Condition. *State Farm*, 463 U.S. at 43. U.S. DOT's Immigration Enforcement Condition requires States to "cooperate . . . in the enforcement of Federal immigration law." Ex. 2 at 2. Many Plaintiff States, however, limit their participation in federal civil immigration enforcement to preserve their resources for core public-safety missions and to "build trust between their law enforcement agencies and immigrant communities and ensure that noncitizens feel comfortable reporting crimes, cooperating with investigators, and serving as witnesses." *Providence*, 954 F.3d at 30. Both the experience of law enforcement officers and substantial research support this approach. *See, e.g.*, Ex. 26 (Rosen Decl.), ¶¶ 8-11; Ex. 62 (Wong Decl.), ¶¶ 10-22, 46-53; Ex. 56 (Perez Decl.), ¶¶ 8-14. Indeed, Congress recognized this same reality in creating the U-Visa program for immigrants who are victimized by crime. *See* Victims of Trafficking and Violence Protection Act, Pub. L. No. 106-386, § 1513(a)(2)(A), 114 Stat. 1464, 1533 (2000) (visa program for crime victims "will encourage law enforcement officials to better serve immigrant crime victims and to prosecute crimes committed against aliens"). The Immigration Enforcement Condition thus runs up against the Plaintiff States' "strong sovereign

interest in ensuring public safety and criminal justice." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 651 (2022).

### 4.     U.S. DOT Failed to Consider Alternatives to Its Sweeping Policy.

Further, in adding the Immigration Enforcement Condition to all its grants, U.S. DOT overlooked the "alternatives" that were "within the ambit of the existing" landscape. *Regents*, 591 U.S. at 30 (quoting *State Farm*, 463 U.S. at 51). As *Regents* makes clear, it is arbitrary and capricious for an agency to change a program in its entirety without first assessing whether it should instead alter only certain parts of the program. *See id.* at 26-30. But U.S. DOT never considered any alternatives, let alone several potential alternatives to its sweeping decision to broadly impose the Immigration Enforcement Condition. Namely, the agency could have limited the Immigration Enforcement Condition to certain grants—assuming that any of the grant statutes allowed them, *but see supra* pp. 16-23—rather than announcing a sweeping policy spanning all grant programs and encumbering many billions of dollars in annual funds to the States. *Cf., e.g.*, *Nat'l Council of Nonprofits v. OMB*, No. 25-239, 775 F. Supp. 3d 100, 125 n.10 (D.D.C. 2025) (distinguishing "targeted pauses of funding for specific projects" from a "nationwide suspension of *all* federal financial assistance"). Instead of "taking a measured approach," U.S. DOT seeks to "cut the fuel supply" "without any consideration for the consequences of that decision," an approach that is "not—and could never be—rational." *Id.* at 124.

### 5.     U.S. DOT Failed to Adequately Explain What Is Required under Its Immigration Enforcement Condition.

Finally, U.S. DOT's decision to impose the condition is arbitrary and capricious because U.S. DOT does not adequately explain the limits of what "cooperation" the condition requires of funding recipients. The Immigration Enforcement Condition states only that recipients must "cooperate with Federal officials in the enforcement of Federal Law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law." Ex. 2; *see also, e.g.*, Ex. 4. As explained further below, each U.S. DOT sub-

agency that has imposed the Immigration Enforcement Condition has recited this same ambiguous language, defining neither the types of "cooperation" required, the actions that constitute "impeding" enforcement, nor the full scope of activity that would violate these terms. *Infra* pp. 36-39; *see also Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1250-51 (9th Cir. 2001) (rejecting ambiguous agency standard because it provided "no method by which the applicant or the action agency can gauge their performance"). In the operative grant documents where it has imposed the Immigration Enforcement Condition, U.S. DOT does not even define the full scope of statutory provisions for which they expect "cooperation." *See, e.g.*, Ex. 4-7. And the limited examples U.S. DOT provided in the Duffy Directive misstate the law—for example, by citing the issuance of driver's licenses to undocumented individuals as examples of unlawful behavior, despite federal law expressly permitting this—adding further confusion as to what the Immigration Enforcement Condition requires. *Compare* Ex. 2 *with Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020). In short, U.S. DOT acted arbitrarily and capriciously by conditioning billions of dollars on a condition so unclear and with so much unexplained. *See Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1233 ("[I]t was arbitrary and capricious for [a federal agency] to issue terms and conditions so vague as to preclude compliance therewith."); *see also King County*, 2025 WL 1582368, at *17 (concluding that U.S. DOT "failed to demonstrate that the new [immigration] funding conditions were the result of 'reasoned decisionmaking,' let alone have been 'reasonably explained").

## C. The Immigration Enforcement Condition Violates the Spending Clause.

The Plaintiff States are also likely to prevail in showing that Defendants' efforts to impose the Immigration Enforcement Condition violate the Spending Clause for three independent reasons: (1) they impose a requirement not reasonably related to the statutory purpose of the grants themselves; (2) they are unconstitutionally coercive; and (3) they are impermissibly ambiguous. *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 n.6 (9th Cir. 2019) ("[T]he principles of *Dole* and *NFIB* apply to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants.").

### 1. The Immigration Enforcement Condition Is Not Reasonably Related to the Funding Programs to Which It Applies.

First, the Immigration Enforcement Condition is unconstitutional because it is unrelated to the purposes of the transportation funding programs at issue. Under the Spending Clause, conditions on federal grants must be "reasonably related to the federal interest in particular national projects or programs." *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Funding conditions that are not germane to the federal interest served by the funds necessarily serve as an undue restriction on the sovereignty of the recipient States and overstep the federal government's authority. *See Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003) (funding "conditions must not be 'unrelated to the federal interest in particular national projects or programs' funded under the challenged legislation"). The Immigration Enforcement Condition here plainly bears no relationship to the purposes of U.S. DOT grants that fund the development, maintenance, and safety of roads, highways, and other transportation projects.

Congress has specified the purposes of U.S. DOT's grant programs, making clear that those purposes do not include federal civil immigration enforcement. Take, for instance, the funding administered through the Federal Highway Administration, within U.S. DOT. The Federal Highway Administration administers nine core formula grant programs, as well as numerous competitive grant programs. Each of these programs' authorizing language sets out that program's purposes, none of which includes civil immigration enforcement. The statute for one of the formula programs—the National Highway Performance Program—for example, states that its purposes are:

> (1) to provide support for the condition and performance of the National Highway System; (2) to provide support for the construction of new facilities on the National Highway System; (3) to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in an asset management plan of a State for the National Highway System; and (4) to provide support for activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters.

23 U.S.C. §119(b); *see also* App'x at 1-6 (quoting similarly detailed purposes for each of the other core Federal Highway Administration formula programs). The same goes for numerous competitive grant programs that the Federal Highway Administration administers, including the INFRA Program, which sets aside funds for various highway and bridge projects to "improve the safety, efficiency, and reliability of the movement of freight and people in and across rural and urban areas"; "generate national or regional economic benefits"; and "address the impact of population growth on the movement of people and freight," 23 U.S.C. §117(a)(2), or the Wildlife Crossing Pilot Program, which is designed to help States make motorists safer by reducing vehicle-wildlife collisions. *See* 23 U.S.C. §171.

Congress, in other words, spoke with great precision in laying out the specific national interests served by Federal Highway Administration funding programs. *See Penobscot Nation v. Frey*, 3 F.4th 484, 501 (1st Cir. 2021) ("[W]e cannot interpret . . . statutes to negate their own stated purposes.") (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)). And precision matters: just like a detailed scheme lets Congress explain where it does and does not allow departures from a formula grant program, *see, e.g.*, *Providence*, 954 F.3d at 28, carefully crafted statutory purposes make clear the specific national interests that Federal Highway Administration programs are intended to support. None of these statutes designate civil immigration enforcement as a purpose of any of the Federal Highway Administration's grant programs. But by slapdashedly applying the Immigration Enforcement Condition to *all* of the Federal Highway Administration's grant programs, U.S. DOT failed to account for *any* of their purposes.

The same problem goes for the remainder of the grants that the Immigration Enforcement Condition threatens. The statutes governing all of U.S. DOT's other grant programs—whether administered by the Federal Transit Administration, Federal Railroad Administration, Federal Motor Carrier Safety Administration, National Highway Traffic Safety Administration, Federal Aviation Administration, Federal Maritime Administration, or the Pipeline and Hazardous Materials Safety Administration—are also designed to serve specific purposes under the broad umbrella of funding transportation improvements. *See generally* App'x. As with the Federal

Highway Administration funding programs, however, the Immigration Enforcement Condition ignores all of that, lacking any tie to their much narrower purposes.

Pressing the States into federal civil immigration enforcement does nothing to advance any of the U.S. DOT grants' purposes. As this Court recognized in its preliminary injunction order, "[t]he Government does not cite to any plausible connection between cooperating with ICE enforcement and the congressionally approved purposes of the Department of Transportation." ECF No. 57 at 6. Indeed, there is no plausible connection between co-opting local law enforcement for federal immigration enforcement purposes and, for example: eliminating grade crossings where trains block car traffic, *see* 49 U.S.C. § 22909(b)(1); expanding airport capacity and maintaining runway pavement, *see id.* § 47101(a)(12); or inspecting the safety of pipeline facilities, *see id.* § 60102. Unsurprisingly, nowhere does the Immigration Enforcement Condition attempt to explain how it advances any of the grant programs' goals. Instead, the Immigration Enforcement Condition impermissibly seeks "to leverage funding to regulate [States' activities] outside the contours of the [grant] program[s]," *Agency for Int'l Dev. v. All. for Open Soc'ys*, 570 U.S. 205, 206 (2013) (applying similar principle in First Amendment context), contrary to foundational federalism principles. "Such is not how the three equal branches of government are allowed to operate under our Constitution." ECF No. 57 at 6.

Additionally, U.S. DOT's Immigration Enforcement Condition lacks a reasonable relationship to the purposes of the transportation programs affected because it seeks to advance goals beyond the agency's expertise. *Cf. King*, 576 U.S. at 485–86; *Occupational Safety & Health Admin.*, 595 U.S. at 118. Defendants' public statements make clear that they view the Immigration Enforcement Condition not as a lawful exercise of authority conferred by Congress, but as part of a broader effort to coerce the States into exercising their police powers in a way that aligns with the federal government's policy preferences in a separate subject area. *See supra* pp. 11-15. Indeed, the Duffy Order appears to recognize no limits on the type of non-transportation objectives that U.S. DOT could seek to advance through withholding funding. *See* Ex. 1 (Duffy Order announcing change in policy to "require local compliance or cooperation with Federal immigration

enforcement and with other goals and objectives specified by the President of the United States or the Secretary"). Such attempts to use critically important transportation funding as a means of implementing an entirely unrelated immigration policy contravene the Spending Clause.

### 2. The Immigration Enforcement Condition Is Coercive Because It Leaves Plaintiff States with "No Real Option" but to Comply.

Second, U.S. DOT's policy of imposing the Immigration Enforcement Condition unconstitutionally attempts to coerce Plaintiff States by withholding a staggering sum of money— tens of billions of dollars in transportation funding that Plaintiff States cannot realistically turn down. Generally, the federal government may not "commandeer" States' resources or "force the States to implement a federal program." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) (*NFIB*) (opinion of Roberts, C.J.). While the Spending Clause gives Congress some power to "cajole the states to enact policies indirectly (through a spending inducement) that it could never *directly* order them to perform with its other enumerated powers," *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022), the Spending Clause prohibits conditions upon funding "so coercive [upon the States] as to pass the point at which 'pressure turns into compulsion,'" *Dole*, 483 U.S. at 211. To be free from unconstitutional "coercion," a State must be able to reject a condition and decline funds "not merely in theory but in fact." *Id.*

To determine "where persuasion gives way to coercion," courts must examine all relevant facts and circumstances, including both "the programs at issue" and "the nature of the threat" posed by the condition. *NFIB*, 567 U.S. at 579-80, 585 (quoting *Steward Machine*, 301 U.S. at 591). Merely "mild encouragement" is permissible, as in *Dole*, where the funding condition at issue only resulted in the States being deprived of "5% of the funds otherwise obtainable under specified highway grant programs" if they did not adopt a minimum drinking age of 21. 483 U.S. at 211. The "highway grant" programs subject to the condition in *Dole* included just those funds appropriated under 23 U.S.C. §104—in other words, just a twentieth of a fraction of the funds jeopardized by the Immigration Enforcement Condition here. *See* 23 U.S.C. §158. The *Dole* conditions were permissible because, even if the States rejected them, they could still obtain and

spend the remaining 95 percent of their federal highway funds to ensure that roads within their States remained safe. *See* 483 U.S. at 211 (observing that the "argument as to coercion is shown to be more rhetoric than fact"). The *NFIB* Court, by contrast, found that the federal government had crossed the line when its condition threatened a State refusing to expand Medicaid with losing not "merely 'a relatively small percentage' of its existing Medicaid funding, but *all* of it." 567 U.S. at 581.

The Immigration Enforcement Condition leaps past that line. As an initial matter, U.S. DOT admits that it employs this condition to coerce States into changing their policies on participation in federal civil immigration enforcement. The Duffy Directive announces the States' "obligations" and threatens the States with "a loss of Federal funding from DOT" should they "fail[] to cooperate generally with Federal authorities in the enforcement of federal law." Ex. 2 at 2-3; *see NFIB*, 567 U.S. at 577-78 ("[W]hen 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism."). And, just like in *NFIB*, U.S. DOT threatens to withhold not just a "small percentage" of Plaintiff States' federal transportation funding, but literally "*all* of it." 567 U.S. at 580. The Duffy Directive's announcement of an Immigration Enforcement Condition imposed on literally every dollar of transportation funding for "All Recipients of U.S. Department of Transportation funding," Ex. 2 at 1, is not merely "mild encouragement," but "a gun to the head." *NFIB*, 567 U.S. at 581. Plaintiff States have no real ability to turn down billions of dollars per year in longstanding federal funding for transportation infrastructure that is essential to carry their millions of residents per day and billions of dollars in commerce per year. Ex. 32 (Bieneman Decl.), ¶¶ 22-23; Ex. 47 (Ho Decl.), ¶¶ 51, 54; Ex. 38 (Wiedefeld Decl.), ¶¶ 41, 46; *see also City & Cnty. of San Francisco*, 2025 WL 1738675, at *4 ("These conditions exist to strongarm the [plaintiffs] to abandon their policies or face critical infrastructure degradation.").

Moreover, the nature of the funding (and not just the volume of dollars) affects the coercive impact on Plaintiff States, too: forgoing the billions of dollars in U.S. DOT funding would force them to abruptly terminate numerous ongoing safety initiatives, putting millions of residents of Plaintiff States at risk on their roads, highways, railways, airways, and waterways, and disrupting

commutes and commerce of still millions more. *See NFIB*, 567 U.S. at 579-80. These include programs to operate specialized DUI courts that prevent dangerous recidivism, surge resources to enforce commercial vehicle safety standards in high-risk crash corridors, and replace commuter rail vehicles that have become unsafe and unreliable. Ex. 57 (Baldwin Decl.), ¶ 40; Ex. 28 (Higgins Decl.), ¶ 59; Ex. 38 (Wiedefeld Decl.), ¶ 25. Moreover, Plaintiff States have planned for and rely on U.S. DOT funding. Decades of past infrastructure investments and preexisting commitments to state employees and contractors mean that Plaintiff States' other resources are largely tied up. *See, e.g.*, Ex. 39 (Van Note Decl.), ¶ 17; Ex. 27 (Chafee Decl.), ¶ 24; Ex. 44 (O'Connor Decl.), ¶ 16. Plaintiff States therefore cannot pay for these programs in the absence of federal funds. Without them, Plaintiff States will have to terminate critical infrastructure safety and resilience programs supported by U.S. DOT grants, such as the reconstruction of the River Raisin Bridge in Michigan, which provides access to "more than 61,000 vehicles traversing the bridge daily," forming a "crucial component of the State of Michigan's economy and the region's transportation system." Ex. 40 (Wieferich Decl.), ¶ 8; *see also, e.g.*, Ex. 38 (Wiedefeld Decl.), ¶ 45; Ex. 57 (Baldwin Decl.), ¶¶ 23, 35-42; Ex. 39 (Van Note Decl.), ¶¶ 18-20. Such project terminations would result in an immediate adverse impact to the safety and well-being of residents throughout Plaintiff States. U.S. DOT's attempt to hold this funding hostage to the Administration's policy priorities is unconstitutionally coercive.

Finally, the imminent manner in which U.S. DOT sought to withhold the funding adds to the unconstitutional coercion. Multiple Plaintiff States in the process of being awarded U.S. DOT funds were asked to execute award documents agreeing to the Immigration Enforcement Condition in rapid fashion or forever lose access to those funds. For example, FHWA officials advised state transportation authorities in Maryland that they would need to execute agreements for the Wildlife Crossing Pilot Program and other grants incorporating the Immigration Enforcement Condition in a matter of days, even though there was no apparent legal or practical reason for that deadline. Ex. 38 (Wiedefeld Decl.), ¶ 44. Others received notices of future funding opportunities that include the Immigration Enforcement Condition and required States to apply within weeks. *See, e.g.*, Ex.

31 (Khayyat Decl.), ¶¶ 16-17; Ex. 50 (Sugahara Decl.), ¶ 13. Such pressures further highlight the coercive actions taken by Defendants. *Cf. United States v. Eghobor*, 812 F.3d 352, 358 (5th Cir. 2015) (warning against "coercive deadlines" for jury deliberations); *Hill v. England*, No. CV F 03-6903 LJO TAG, 2007 WL 3096707, at *9 (E.D. Cal. Oct. 22, 2007) (listing "time pressure" as a factor that can render an action "involuntary").

### 3. The Immigration Enforcement Condition Is Impermissibly Ambiguous.

Finally, the Immigration Enforcement Condition exceeds constitutional limits on the federal government's spending power because it lacks the clarity the Constitution requires. Under the Spending Clause, the conditions the federal government imposes on federal funds must be unambiguous, so that States deciding whether to accept such funding can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207; *see also NFIB*, 567 U.S. at 577 (opinion of Roberts, C.J.); *Pennhurst*, 451 U.S. at 24; *Nieves-Marquez*, 353 F.3d at 128. By the same logic, the federal government's spending power "does not include surprising participating States with post-acceptance or 'retroactive'" grant conditions. *NFIB*, 567 U.S. at 584.

Here, the Immigration Enforcement Condition fails to provide States with any meaningful notice of what they must do. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) ("Recipients cannot 'knowingly accept' the deal with the Federal Government unless they "would clearly understand . . . the obligations' that would come along with doing so." (citation omitted)). Each U.S. DOT sub-agency that has added the Immigration Enforcement Condition to its funding terms and conditions has simply recited a vague excerpt from the text of the Duffy Directive, requiring recipients to "cooperate with Federal officials in the enforcement of Federal Law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law." *See, e.g.*, Exs. 4–10. When read within the grant conditions themselves, this language is fatally open-ended. *Cf. Kisor v. Wilkie*, 588 U.S. 558, 581

(2019) (describing language as ambiguous if it "remains genuinely susceptible to multiple reasonable meanings").

The Immigration Enforcement Condition does not say what actions constitute "cooperating," or how they differ from what would be required for a State to be "not impeding." For instance, the Immigration Enforcement Condition's language does not clearly indicate whether it might require States to detain and hold individuals for the purposes of transferring them into the custody of immigration enforcement officials—which could risk States potentially violating the Fourth Amendment or similar state constitutional guarantees. *See* Compl., ECF No. 1, *Illinois*, No. 25-cv-1285 (N.D.Il. Feb. 6, 2025) (alleging that state laws "impede the Federal Government's ability to . . . take enforcement actions against illegal aliens by preventing state law enforcement officials from . . . complying with immigration detainers or civil immigration warrants"); *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) (articulating Fourth Amendment requirements for stops and detentions of undocumented individuals); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-2317, 2014 WL 1414305 (D. Or. Apr. 11, 2014) (applying Fourth Amendment requirements to county's detention of Miranda-Olivares after she was entitled to pre-trial release on bail and again after she was entitled to release after resolution of her state charges); *see also, e.g.*, Ex. 27 (Chafee Decl.), ¶ 21; Ex. 32 (Bieneman Decl.), ¶ 26; Ex. 54 (Longolucco Decl.), ¶ 19. Further, because the Plaintiff State agencies that sign these funding agreements also typically do not handle federal immigration enforcement, it also remains unclear whether U.S. DOT expects immigration enforcement cooperation from just the recipient Plaintiff State agency or from the Plaintiff State as a whole. These ambiguities leave Plaintiff States "unable to ascertain what is expected of" them, creating precisely the sort of "indetermina[cy]" that flunks the Spending Clause's clear statement requirement. *Pennhurst*, 451 U.S. at 17, 25. "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006). So where, as here, they are left to guess at what the federal government requires of them, the Immigration Enforcement Condition's vague terms undermine any legitimacy of its exercise of power under the Spending Clause. *Pennhurst*, 451 U.S. at 17.

The Duffy Order and Duffy Directive do not offer helpful context for understanding the scope of the Immigration Enforcement Condition's meaning. The Duffy Order asserts that U.S. DOT-supported grant programs should "require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President" or Transportation Secretary. Ex. 1 at 3. Again, the outer limits of "compliance or cooperation" with federal immigration enforcement is left unspecified. Worse, the "other goals and objectives" language is so open-ended as to provide a total lack of guidance or limiting construction to U.S. DOT's requirements. *Cf. Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1250-51.

The Duffy Directive likewise demands that jurisdictions engage in "cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding" federal immigration authorities, but again fails to explain what "cooperation" entails. Through the Duffy Directive, U.S. DOT seeks to essentially give itself a free hand to impose additional conditions and force additional policy changes by the States throughout the lifetime of its grants, with no tool for States to predict what sorts of conditions or changes those will be. That makes it impossible for States to be, as the Spending Clause requires, "cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207.

The Duffy Directive compounds the ambiguity by impugning the practice of issuing licenses to unauthorized immigrant drivers. As noted above, *supra* p. 29, this prevalent state practice is authorized by Congress. *See, e.g., Kearns*, 981 F.3d at 208. The Duffy Directive supplies no legal rationale for attacking it and does not explain whether continuing the practice would constitute a lack of "cooperation." Using such inscrutable examples together with the broad term "cooperate," which is susceptible to either reasonable disagreement or "evolving interpretations," *City & Cnty. San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018), *vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020), results in textbook unconstitutional ambiguity. *See also Smith v. Goguen*, 415 U.S. 566, 575 (1974) (striking down use of "treats contemptuously" as unconstitutionally vague). For similar reasons, such language in the Immigration Enforcement Condition fails to put the States on notice about what

U.S. DOT and its agencies require, violating the Spending Clause by removing any bounds on U.S. DOT's ability to shape what it requires from Plaintiff States.

For all the reasons discussed above, the Immigration Enforcement Condition would be unconstitutional, even if it had been authorized by Congress.

## III.    THE COURT SHOULD GRANT PLAINTIFF STATES THE RELIEF THEY REQUEST

### A.    The Court Should Vacate the Immigration Enforcement Condition.

The APA authorizes a court to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of an unlawful agency action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826–27 (2024) (Kavanaugh, J., concurring); *see also Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately."); *Ctr. for Biological Diversity v. Env't Prot. Agency*, 141 F.4th 153, 182 (D.C. Cir. 2025) ("With respect to remedy, the ordinary response to a violation is to vacate the unlawful agency action."). "When a federal court sets aside an agency action, the federal court vacates that order in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring). The vacated "agency action is treated as though it had never happened." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., respecting denial of stay). This means that the parts of the agency action held unlawful are vacated as a whole—"not that their application to the individual petitioners is proscribed." *National Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Corner Post*, 603 U.S. at 830-31 (Kavanaugh, J., concurring) (collecting cases where the Supreme Court affirmed decisions that "vacated the challenged agency rules rather than merely providing injunctive relief . . . [for] the specific plaintiffs").[6] This traditional APA remedy is appropriate here.

---

[6] *See also Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 n.10 (2025) (stating that "[n]othing" in that decision "resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action").

**B.    The Court Should Permanently Enjoin Defendants from Implementing or Enforcing the Immigration Enforcement Condition Against Plaintiff States.**

This Court should also issue a permanent injunction prohibiting future implementation or enforcement of the Immigration Enforcement Condition—or materially similar language—against Plaintiff States, including their subdivisions and instrumentalities. *See* 5 U.S.C. § 703 (authorizing actions for "prohibitory or mandatory injunction" in addition to vacatur). The criteria for permanent injunctive relief mirror those for preliminary injunctions, except that a plaintiff must prevail on the merits, rather than demonstrating just a likelihood of success on the merits. *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014) (quoting *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). District courts have "broad discretion" to issue injunctive relief. *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).

In APA cases, the D.C. Circuit has held that once a court concludes that a "rule was indeed illegal," there is "no separate need to show irreparable injury, as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting 11A Fed. Prac. & Proc. § 2944 (1995)). On that ground alone, this Court can issue a permanent injunction against the unlawful Immigration Enforcement Condition. In any event, this Court has already concluded that the equitable factors favor a preliminary injunction, and those same factors call for a permanent injunction, too.

**1.    Defendants' Restrictions on Billions of Dollars in Transportation and Public Safety Funding Inflict Irreparable Harm Upon Plaintiff States and Their Communities.**

Plaintiff States will be severely and irreparably harmed by U.S. DOT's decision to impose the Immigration Enforcement Condition. As this Court has already found, "the States have demonstrated they will face irreparable and continuing harm if forced to agree to Defendants' unlawful and unconstitutional immigration conditions imposed in order to receive federal transportation funding." ECF No. 57 at 7; *see also, e.g.*, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017) ("a 'Hobson's choice' can establish irreparable harm") (quoting

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (being faced with a choice "between, on the one hand, complying with a law [one] credibly believes is unconstitutional, and on the other hand, foregoing funds it plans to use for life-saving projects" establishes irreparable harm).

Defendants' Immigration Enforcement Condition forces Plaintiff States into an impossible choice, with either path leading to irreparable harm. *See Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (asking if plaintiffs would suffer "irreparable harm" because injuries "cannot adequately be compensated . . . by a . . . damages remedy").

The first path—acceding to the challenged conditions to preserve access to critical grant funds—would intrude on Plaintiff States' sovereignty. States suffer an irreparable injury when forced to abandon their "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see also Ohio v. EPA*, 603 U.S. 279, 291 (2024) (impairment of States' "sovereign interests in regulating their own industries and citizens" is irreparable harm). Forcing Plaintiff States to abandon specific public policies governing their limited law enforcement resources is exactly what the Immigration Enforcement Condition would require. And courts uniformly view this this type of sovereign injury as a source of irreparable harm. *See Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (alterations omitted). When considering challenges to similar immigration-related grant conditions from the Department of Justice, for instance, courts held that States and localities would suffer "an affront to their sovereignty" if the United States were "permitted to direct their behavior in an unauthorized way." *City of Evanston v. Sessions*, 2018 WL 10228461, at *4 (N.D. Ill. Aug. 9, 2018). These "Tenth Amendment violations constitute[d] irreparable harm." *Philadelphia v. Sessions*, 309 F. Supp. 3d 271, 340 (E.D. Pa. 2018); *see also Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1061 (D. Colo. 2020); *City & Cnty. of San Francisco*, 349 F. Supp. 3d at 970; *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017).[7]

---

[7] Though some of these district court cases framed the constitutional violation in terms of the Tenth Amendment, these constitutional harms raise the same issue addressed by Spending
(continued…)

The sovereign harm that would result from accepting these unlawful conditions also produces tangible harm to the public safety of Plaintiff States' communities. Immigrants will decline to participate in public health programs, to the detriment of the entire community, and crime victims will stop reporting crimes in Plaintiff States, fearful that their local officials are now at the beck-and-call of federal immigration agents. Ex. 62 (Wong Decl.), ¶¶ 10-22, 42-53. As multiple declarations from law enforcement in Plaintiff States attest, a clear line between local police and federal immigration enforcement builds trust with immigrant communities and, in doing so, helps solve crimes and protect crime victims. *See* Ex. 56 (Perez Decl.), ¶¶ 10-14; Ex. 26 (Rosen Decl.), ¶¶ 8-11; Ex. 62 (Wong Decl.), ¶¶ 10-22, 46-53. That is one reason that many Plaintiff States have implemented express policies designed to foster trust between immigrant communities and local police. *See supra* pp. 8-10. Acquiescing to the Immigration Enforcement Condition would damage those relationships and, as a result, materially disadvantage Plaintiff States in their enforcement of state and local criminal law—a result that many courts held constituted irreparable harm in similar cases. *See City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) (crediting state and local governments' conclusion that "the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein");[8] *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 877-78 (N.D. Ill. 2018) ("Trust once lost is not easily restored, and as such, this is an irreparable harm for which there is no adequate remedy at law."); *Philadelphia*, 280 F. Supp. 3d at 657 (compliance with conditions would inflict "irreparable reputational harm"); *accord Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("Because injuries to goodwill and reputation are not easily quantifiable, courts often find this type of harm irreparable.").

---

Clause coercion—which is animated by Tenth Amendment principles. *See Dole*, 483 U.S. at 210 (discussing limits to Spending Clause authority and how a "perceived Tenth Amendment limitation" might affect "the range of conditions legitimately placed on federal grants" based on whether a State could refuse to yield to the condition).

[8] Limited en banc review of this decision was initially granted, but subsequently vacated, exclusively on the issue of whether the injunctive relief should extend nationwide. *See City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). The government did not challenge the district court's irreparable harm ruling on appeal.

The other path left open by the Immigration Enforcement Condition, forgoing billions in federal funds, also leads to irreparable harm. The scale of the potential funding loss to Plaintiff States—over $24 billion annually, in Federal Highway funds alone, Ex. 17; *see, e.g.*, Ex. 24 (Duncan Decl.), ¶ 5; Ex. 38 (Wiedefeld Decl.), ¶ 9—makes the harm irreparable. Just as the risk of being "driven out of business" constitutes "irreparable harm" in the commercial context, a significant loss of funding for a government can also be "catastrophic" such that money damages are inadequate. *Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*, 434 U.S. 1316, 1320 (1977)*; City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). Risk to a much narrower set of grant funds constituted potential irreparable harm when the first Trump Administration sought to impose immigration-related conditions on San Francisco. *City & Cnty. of San Francisco*, 897 F.3d at 1244. The grant funds at issue here are orders of magnitude larger. Depriving Plaintiff States of these funds will oblige them to lay off staff and terminate entire program capabilities. *See, e.g.*, Ex. 47 (Ho Decl.), ¶ 43; Ex. 53 (King Decl.), ¶ 22; Ex. 57 (Baldwin Decl.), ¶¶ 23, 35-44. Loss of this funding will "have an immediate impact on [Plaintiff States'] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding is subsequently reinstated." *United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016); *see also Evanston*, 412 F. Supp. 3d at 886; *Santa Clara*, 250 F. Supp. 3d at 537.

Furthermore, if Plaintiff States are unable to accept grant awards under Defendants' unlawful conditions, Plaintiff States will permanently lose the ability to obtain the funds if they are later withdrawn or their obligation or appropriation authority expires. *See* 31 U.S.C. § 1552(a); *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994); Ex. 47 (Ho Decl.), ¶ 15 ("Interruption to federal funding . . . could permanently jeopardize [the State's] ability to utilize the remainder of this year's federal obligation authority, as [the] unused obligation limit is not carried over to following fiscal years."); Ex. 38 (Wiedefeld Decl.), ¶ 23 ("For the vast majority of these grant awards, if MDOT is unable to move forward with the awards, the funding may be lost to MDOT if USDOT decides to pull the award or award the money to another state or entity.").

These permanent losses of funding qualify as irreparable harm. *See Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332 (1st Cir. 1997) (recognizing loss of a transient opportunity as irreparable harm).

Moreover, forgoing federal transportation funding would upend intricate and intertwined development plans in which Plaintiff States have heavily invested, resulting in further irreparable harms. Infrastructure developments like the construction or replacement of highways and bridges are complex projects that take years of planning and coordination, sometimes as required by federal law. *See, e.g.*, Ex. 47 (Ho Decl.), ¶ 19 (describing statewide transportation plan that must be approved by federal agencies); Ex. 37 (Mohler Decl.), ¶ 13 (describing multiple public review procedures required at stages of infrastructure design process). For Plaintiff States, then, much of the expected federal funding will support projects already in progress. *See, e.g.*, Ex. 36 (Heffernan Decl.), ¶ 32 ("We have made plans and allocated funding for over a hundred current projects based on our continued ability to draw down on promised federal funding."); Ex. 27 (Chafee Decl.), ¶ 24; Ex. 29 (Hastings Decl.), ¶ 28. A denial of funding at this point in time would therefore derail countless contracts, designs, and development plans painstakingly put together. *See, e.g.*, Ex. 40 (Wieferich Decl.), ¶ 17 (describing "domino effect" of delays and cancellations). This, in turn, will result in cascading harms to Plaintiff States in the form of cancelled contracts, thousands of employees or contractors who lose their jobs, harms to state credit, and the compounding deterioration of infrastructure as repair is delayed. *See, e.g.*, Ex. 60 (Gribner Decl.), ¶ 29; Ex. 44 (O'Connor Decl.), ¶ 16 ("The thousands of contractors, professional services firms, law enforcement workers, utility workers, and NJDOT employees who are required to deliver these projects would lose their jobs."); *id.* ¶ 46 (New Jersey's Department of Transportation "will not be able to meet its debt service obligations on the already-used bonds—and its credit rating will be downgraded accordingly"); Ex. 38 (Wiedefeld Decl.), ¶ 22 (risk of losing largest publicly owned terminal in the Port of Baltimore that directly supports 650 jobs). These reflect additional, irreparable harms that cannot be redressed by the potential restoration of federal funding at a later date—and to the extent the denial of funds produces additional costs beyond the amount of the federal award, Plaintiff States cannot seek damages remedies here because neither the Spending

Clause nor the APA provide such a remedy. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (irreparable harm established "if the plaintiff shows that its legal remedies are inadequate").

Finally, losing federal transportation funding would result in irreparable harm because Plaintiff States would have to scale back or shut down a wide range of efforts that protect and save lives. *See Philadelphia*, 280 F. Supp. at 579 (likely "loss of human life" constitutes irreparable harm); *see also K-Mart Corp. v. Oriental Plaza, Inc*., 875 F.2d 907, 915 (1st Cir. 1989) (affirming finding of irreparable harm, in part, because of submitted evidence suggesting that challenged conduct "interfered with . . . pedestrian safety"). Plaintiff States rely on this essential funding to ensure safe roads, *see, e.g.*, Ex. 27 (Chafee Decl.), ¶ 25 (needing federal funding for "necessary and urgent safety repairs" that would "prevent 2.4 fatalities a year"); safe airports, *see, e.g.*, Ex. 60 (Gribner Decl.), ¶¶ 34, 37 (funding to improve airport safety and efficiency, including an airport that houses wildfire response operations); and programs preventing deaths and serious injuries from traffic accidents, *see* Ex. 23 (Dougherty Decl.), ¶ 14 ("According to NHTSA, 40,901 people were killed in motor vehicle traffic crashes on U.S. roadways during 2023."). For example, federal funding sustains a substantial majority of Plaintiff States' traffic safety programs. *See, e.g.*, Ex. 23 (Dougherty Decl.), ¶ 13 ("[A]pproximately 99% of the [Office of Traffic Safety] budget comes from federal funding."); Ex. 57 (Baldwin Decl.), ¶¶ 32-34 (federal funding provides nearly 80 percent of Washington Traffic Safety Commission's operating budget). Moreover, Plaintiff States rely on U.S. DOT funding to prevent and respond to hazardous material emergencies, such as toxic leaks. Ex. 31 (Khayyat Decl.), ¶ 4 (noting use of U.S. DOT funding to respond to incidents like a 4,000-gallon ammonia leak); Ex. 55 (Pappas Decl.), ¶¶ 10-12 (federal funding supports six hazardous material teams, four decontamination teams, and the Rhode Island State Fire Academy). In sum, losing this funding increases the daily risk that more natural gas pipelines may explode, or that more cars, planes, or trains may crash, causing serious injuries and death. *See, e.g.*, Ex. 61 (Lawry Decl.), ¶ 13; *see Coleman v. Paccar, Inc.*, 424 U.S. 1301, 1307-08 (1976) (Rehnquist, J.,

in chambers) (delay in implementation of transportation safety measures qualified as irreparable harm).

### 2. The Balance of Equities and the Public Interest Weigh in Plaintiff States' Favor.

Last, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Through the Immigration Enforcement Condition, U.S. DOT aims to conscript state and local officials as enforcers of federal immigration law or, failing that, to withhold funding to Plaintiff States under all programs administered by any component of U.S. DOT. Either result would impose severe hardship on Plaintiff States and contravene the public interest. Enjoining this unconstitutional action, on the other hand, would impose no cognizable hardship on Defendants. Therefore, "the hardship to the nonmovant if enjoined" pales in comparison to "the hardship to the movant if no injunction issues." *Ross-Simons*, 102 F.3d at 15.

As described above, the balance of the hardships and the public interest sharply favors an injunction due to the devastating and irreparable harm Plaintiff States face by either surrendering their sovereignty and undermining public safety or losing billions of dollars in public safety funding. *See, e.g.*, *supra* pp. 40-46; Ex. 47 (Ho Decl.), ¶ 54; Ex. 38 (Wiedefeld Decl.), ¶¶ 19, 42; Ex. 24 (Duncan Decl.), ¶¶ 23-24. As Congress has decided, federal funding is essential to support the States in improving and maintaining a safe and robust transportation system upon which millions rely. *See, e.g.*, 23 U.S.C. § 101(b)(1) ("[I]t is in the national interest to accelerate the construction of Federal-aid highway systems."); 49 U.S.C. § 5301 ("It is in the interest of the United States, including the economic interest of the United States, to foster the development and revitalization of public transportation systems . . . ."); 49 U.S.C. § 24101 ("Modern and efficient intercity passenger and commuter rail passenger transportation is important to the viability and well-being of major urban and rural areas and to the energy conservation and self-sufficiency goals of the United States."). And as courts have found, "the public interest would appear to be better served if the [State] did not have to choose between . . . grant funds . . . and the health of [its]

relationship with the immigrant communities." *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 970 (N.D. Cal. 2018), *aff'd in part, vacated in part on other grounds, sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020) (internal quotation marks omitted). An injunction here would "bring[] clarity to all parties and to citizens dependent on public services," including the roads, buses, and ferries they rely upon every day to travel to their workplaces and their homes. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

Meanwhile, Defendants would suffer no harm by simply maintaining the status quo, in which they disburse these congressionally mandated funds without the Immigration Enforcement Condition attached. *See Sessions*, 888 F.3d at 291 (no harm to the government where it can "distribute the funds without mandating the conditions—as has been done for over a decade"). "Continuation of [that] status quo will not work an irreparable harm" on Defendants. *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers). Put another way, "if any injury to defendants ensues, it would be self-inflicted, the result of improper agency decision to steamroll the implementation of its plans." *P.R. Conservation Found. v. Larson*, 797 F. Supp. 1066, 1072-73 (D.P.R. 1992). Congress charged U.S. DOT with "encourage[ing] cooperation of Federal, State, and local governments . . . to achieve *transportation* objectives," 49 U.S.C. § 101(b)(3) (emphasis added). They cannot complain of an injunction that merely obliges them to perform that duty without attaching sweeping funding conditions never contemplated by Congress.

## C. The Court Should Declare that the Imposition of the Immigration Enforcement Condition Is Unlawful.

Additionally, the Court should declare that U.S. DOT lacks statutory authority to impose or enforce the Immigration Enforcement Condition, and that its decision to do so is arbitrary and capricious and violates the Constitution. "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007); *see also Ulstein*

*Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987). Declaratory relief "serves a valuable purpose" by enabling litigants "to clarify legal rights and obligations before acting upon them." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995). With so much at stake, such clarity should be provided here.

## CONCLUSION

This Court should grant Plaintiff States' motion for summary judgment; declare that U.S. DOT's decision to impose the Immigration Enforcement Condition violates federal statutes and the Constitution of the United States; vacate the Immigration Enforcement Condition; and permanently enjoin U.S. DOT from implementing or enforcing the Immigration Enforcement Condition—or any materially similar language—against Plaintiff States, including their subdivisions and instrumentalities.

August 19, 2025

Respectfully submitted,

**ROB BONTA**
   ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
   *Senior Assistant Attorney General*
Joel Marrero
James E. Stanley
   *Supervising Deputy Attorneys General*
Brandy Doyle
Luke Freedman
Newton Knowles
Christopher Medeiros
Lee Sherman
Deylin Thrift-Viveros
Delbert Tran
   *Deputy Attorneys General*

/s/ Delbert Tran
Delbert Tran
   *Deputy Attorney General*
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
(415) 229-0110
delbert.tran@doj.ca.gov

*Attorneys for the State of California*

**KWAME RAOUL**
   ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
   *Deputy Solicitor General*
Michael M. Tresnowski
R. Henry Weaver
   *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**MATTHEW J. PLATKIN**
   ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
   *Deputy Solicitor General*
Mayur P. Saxena
   *Assistant Attorney General*
Maryanne M. Abdelmesih
Surinder K. Aggarwal
Yael Fisher
Nathaniel F. Rubin
   *Deputy Attorneys General*
25 Market St., PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
   ATTORNEY GENERAL OF RHODE ISLAND

/s/ Patrick Reynolds
Kathryn M. Sabatini (RI Bar No. 8486)
   *Civil Division Chief*
   *Special Assistant Attorney General*
Patrick Reynolds (RI Bar No. 10459)
   *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
preynolds@riag.ri.gov
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*

**ANTHONY G. BROWN**
   ATTORNEY GENERAL OF MARYLAND

/s/ James C. Luh
James C. Luh
   *Senior Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorneys for the State of Maryland*


**WILLIAM TONG**
   ATTORNEY GENERAL OF CONNECTICUT

/s/ Michael K. Skold
Michael K. Skold
   *Solicitor General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
michael.skold@ct.gov

*Attorneys for the State of Connecticut*


**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
   *Senior Counsel to the Attorney General*
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*


**PHILIP J. WEISER**
   ATTORNEY GENERAL OF COLORADO

/s/ Sam Wolter
Sam Wolter
   *Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
samuel.wolter@coag.gov

*Attorneys for the State of Colorado*


**KATHLEEN JENNINGS**
   ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
   *Director of Impact Litigation*
Vanessa L. Kassab
   *Deputy Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*


**ANNE E. LOPEZ**
   ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
David D. Day
   *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
   *Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR** *EX REL.* **ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY

/s/ S. Travis Mayo
S. Travis Mayo
  *General Counsel*
Taylor Payne
  *Chief Deputy General Counsel*
Laura C. Tipton
Deputy General Counsel
  *Office of the Governor*
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail
  *Deputy Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
vivian.mikhail@maine.gov

*Attorneys for the State of Maine*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
Hannah C. Vail
  *Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
hannah.vail@mass.gov

*Attorneys for the Commonwealth of
  Massachusetts*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti
Michael Dittenber
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
DittenberM@michigan.gov

*Attorneys for the People of the State of
  Michigan*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*


**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

/s/ Steven Perfrement
Steven Perfrement
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
sperfrement@nmdoj.gov

*Attorneys for the State of New Mexico*


**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*


**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Attorneys for the State of Nevada*


**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Zoe Levine
Zoe Levine
  *Special Counsel for Immigrant Justice*
Julie Dona
  *Special Counsel*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
Mark Ladov
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 907-4589
zoe.levine@ag.ny.gov

*Attorneys for the State of New York*


**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Julio A. Thompson
  *Assistant Attorney General*
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3657
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
   ATTORNEY GENERAL OF WASHINGTON

/s/ Benjamin Seel
Benjamin Seel
Tyler Roberts
Cristina Sepe
Marsha Chien
   *Assistant Attorneys General*
Washington State Office of the Attorney
   General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov
Tyler.Roberts@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Marsha.Chien@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
   ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reynolds Colbert
Frances Reynolds Colbert
   *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*

**Statutory Purposes of DOT Funding Programs[1]**

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| **Federal Highway Administration (FHWA) Funding Programs** | | |
| Accelerated Innovation Deployment (AID) Demonstration Program | FHWA | To "(i) establish and carry out demonstration programs; (ii) provide technical assistance, and training to researchers and developers; and (iii) develop and deploy improved tools and methods to accelerate the adoption of early-stage and proven innovative practices and technologies and . . . support continued implementation of proven innovative practices and technologies as standard practices." 23 U.S.C. § 503(c)(2)(B). |
| Active Transportation Infrastructure Investment Program (ATIIP) | FHWA | "[T]o . . . construct eligible projects to provide safe and connected active transportation facilities," such as "the development of walking and bicycling infrastructure . . . ." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 11529(a), (c), 135 Stat. 429, 612-13 (2021). |
| Advanced Transportation and Congestion Management Technologies Deployment (ATCMTD) Program | FHWA | "[T]o develop model deployment sites for large scale installation and operation of advanced transportation technologies to improve safety, efficiency, system performance, and infrastructure return on investment." Fixing America's Surface Transportation Act, Pub. L. No. 111-94, § 6004, 129 Stat. 1312, 1562 (2015). |
| Advanced Transportation Technology and Innovation (ATTAIN) Program | FHWA | "The Secretary shall provide grants to eligible entities to deploy, install, and operate advanced transportation technologies to improve safety, mobility, efficiency, system performance, intermodal connectivity, and infrastructure return on investment." 23 U.S.C. § 503(c)(4)(A). |

---

[1] The list of U.S. DOT funding programs discussed in this appendix is illustrative, not exhaustive.

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| Bridge Formula Program | FHWA | For "bridge replacement, rehabilitation, preservation, protection, and construction" Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1420 (2021). |
| Bridge Investment Program | FHWA | "The goals of the program shall be—(A) to improve the safety, efficiency, and reliability of the movement of people and freight over bridges; (B) to improve the condition of bridges in the United States . . . ." 23 U.S.C. § 124(b)(2). |
| Carbon Reduction Program | FHWA | "[T]o reduce transportation emissions." 23 U.S.C. § 175(b). |
| Charging and Fueling Infrastructure (CFI) | FHWA | "[F]or acquisition and installation of publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, or natural gas fueling infrastructure that is directly related to the charging or fueling of a vehicle." 23 U.S.C. § 151(f)(6). |
| Congestion Mitigation and Air Quality Improvement Program | FHWA | To "establish and implement a congestion mitigation and air quality improvement program in accordance" with a detailed breakdown of eligible projects. 23 U.S.C. § 149(a)-(b). |
| Congestion Relief Program | FHWA | "The goals of the program are to reduce highway congestion, reduce economic and environmental costs associated with that congestion, including transportation emissions, and optimize existing highway capacity and usage of highway and transit systems . . . ." 23 U.S.C. § 129(d)(3). |
| Federal Lands Access Program | FHWA | "[T]o pay the cost of" various projects for "transportation facilities located on or adjacent to, or that provide access to, Federal land." 23 U.S.C. § 204(a)(1)(A)-(C). |
| Ferry Boat Program | FHWA | "[F]or construction of ferry boats and ferry terminal facilities in accordance with section 129(c)." 23 U.S.C. § 147(a). |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| Highway Construction Training Program | FHWA | "(A) to develop, test, and review new curricula and education programs to train individuals at all levels of the transportation workforce; or (B) to implement the new curricula and education programs to provide for hands-on career opportunities to meet current and future needs." 23 U.S.C. § 504(f). |
| Highway Safety Improvement Program | FHWA | "[T]o achieve a significant reduction in traffic fatalities and serious injuries on all public roads, including non-State-owned public roads and roads on tribal land." 23 U.S.C. § 148(b)(2). |
| Metropolitan Planning Program | FHWA | "(1) [T]o encourage and promote the safe and efficient management, operation, and development of surface transportation systems that will serve the mobility needs of people and freight, foster economic growth and development with and between States and urbanized areas, better connect housing and employment, and take into consideration resiliency needs while minimizing transportation-related fuel consumption and air pollution . . .; and (2) to encourage the continued improvement and evolution of the metropolitan and statewide transportation planning processes by metropolitan planning organizations, State departments of transportation, and public transit operators as guided by" a further enumerated list of planning factors. 23 U.S.C. § 134(a). |
| National Culvert Removal, Replacement and Restoration Grants Program (Culvert AOP Program) | FHWA | "[F]or the replacement, removal, and repair of culverts or weirs that—(1) would meaningfully improve or restore fish passage for anadromous fish; and (2) with respect to weirs, may include— (A) infrastructure to facilitate fish passage around or over the weir; and (B) weir improvements." 49 U.S.C. § 6703(b). |
| National Highway Freight Program | FHWA | "[T]o improve the condition and performance of the National Highway Freight Network . . . to ensure that the Network provides the foundation |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | for the United States to compete in the global economy and achieve" other enumerated goals related to improving the National Highway Freight Network. 23 U.S.C. § 167(a)-(b). |
| National Highway Performance Program | FHWA | "The purposes of the national highway performance program shall be—<br>(1) to provide support for the condition and performance of the National Highway System;<br>(2) to provide support for the construction of new facilities on the National Highway System;<br>(3) to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in an asset management plan of a State for the National Highway System; and<br>(4) to provide support for activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters." 23 U.S.C. § 119(b). |
| National Scenic Byways (NSB) | FHWA | To "recognize[] roads having outstanding scenic, historic, cultural, natural, recreational, and archaeological qualities by designating the roads as—<br>(A) National Scenic Byways;<br>(B) All-American Roads; or<br>(C) America's Byways." 23 U.S.C. § 162(a)(1). |
| Pollinator-Friendly Practices Program | FHWA | "[T]o provide grants to eligible entities to carry out activities to benefit pollinators on roadsides and highway rights-of-way, including the planting and seeding of native, locally-appropriate grasses and wildflowers, including milkweed." 23 U.S.C. § 332(a). |
| Prioritization Process Pilot Program | FHWA | "The purpose of the prioritization process pilot program shall be to support data-driven approaches to planning that, on completion, can be evaluated for public benefit." Infrastructure |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | Investment and Jobs Act, Pub. L. No. 117-58, § 11204(b)(2), 135 Stat. 429, 521 (2021). |
| Promoting Resilient Operations for Transformative, Efficient, and Cost-Saving Transportation (PROTECT) Formula and Competitive Programs | FHWA | "[T]o provide grants for resilience improvements through" funding to "enable communities to assess vulnerabilities to current and future weather events and natural disasters and changing conditions, including sea level rise, and plan transportation improvements and emergency response strategies to address those vulnerabilities," and "to protect— (i) surface transportation assets by making the assets more resilient to current and future weather events and natural disasters . . . ; (ii) communities through resilience improvements and strategies that allow for the continued operation or rapid recovery of surface transportation systems . . . ; (iii) coastal infrastructure, such as a tide gate to protect highways, that is at long-term risk to sea level rise; and (iv) natural infrastructure that protects and enhances surface transportation assets while improving ecosystem conditions, including culverts that ensure adequate flows in rivers and estuarine systems." 23 U.S.C. § 176(b)(2). |
| Railway-Highway Crossings Program | FHWA | "[T]he elimination of hazards, the installation of protective devices at railway-highway crossings, the replacement of functionally obsolete warning devices," and "projects to reduce pedestrian fatalities and injuries from trespassing at grade crossings." 23 U.S.C. § 130(e)(1)(A)-(B). |
| Reduction of Truck Emissions at Port Facilities (RTEPF) | FHWA | "[T]he Secretary shall award grants to fund projects that reduce emissions at ports, including through the advancement of port electrification." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 11402(b)(1), 135 Stat. 429, 554 (2021). |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| Safe Routes to School | FHWA | "The purposes of the program . . . shall be—(1) to enable and encourage children, including those with disabilities, to walk and bicycle to school; (2) to make bicycling and walking to school a safer and more appealing transportation alternative, thereby encouraging a healthy and active lifestyle from an early age; and (3) to facilitate the planning, development, and implementation of projects and activities that will improve safety and reduce traffic, fuel consumption, and air pollution in the vicinity of schools." 23 U.S.C. § 208(c)(1)-(3). |
| State Transportation Innovation Council | FHWA | To provide "incentives to demonstrate and promote state-of-the-art technologies, elevated performance standards, and new business practices in highway construction processes that result in improved safety, faster construction, reduced congestion from construction, and improved quality and user satisfaction." 23 U.S.C. § 503(c)(1)(B). |
| Strategic Innovation for Revenue Collection | FHWA | "The Secretary shall establish a program to test the feasibility of a road usage fee and other user-based alternative revenue mechanisms" and "shall provide grants to eligible entities to carry out pilot projects under this section." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 13001(a), (b)(1), 135 Stat. 429, 622 (2021). |
| Surface Transportation Block Grant Program | FHWA | "[T]o provide flexible funding to address State and local transportation needs," including a long list of eligible project types. 23 U.S.C. § 133(a)-(b). |
| Wildlife Crossing Pilot Program | FHWA | "[T]o provide grants for projects that seek to achieve—(1) a reduction in the number of wildlife-vehicle collisions; and (2) in carrying out the purpose described in paragraph (1), improved habitat connectivity for terrestrial and aquatic species." 23 U.S.C. § 171(b). |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| **Federal Transit Administration (FTA) Funding Programs** | | |
| Accelerating Advanced Digital Construction Management Systems Program | FTA and FHWA | "[T]o promote, implement, deploy, demonstrate, showcase, support, and document the application of advanced digital construction management systems, practices, performance, and benefits." 49 U.S.C. § 5312(b)(4)(A); *see also* 23 U.S.C. § 503(c)(5) (similar). |
| Accelerating Innovative Mobility | FTA | "The Secretary may make grants and enter into contracts, cooperative agreements, and other agreements for research, development, demonstration, and deployment projects, and evaluation of research and technology of national significance to public transportation, that the Secretary determines will improve public transportation." 49 U.S.C. § 5312(b). |
| Advanced Driver Assistance Systems (ADAS) for Transit Buses Demonstration and Automated Transit Bus Maintenance and Yard Operations Demonstration Program | FTA | "The Secretary may make grants and enter into contracts, cooperative agreements, and other agreements for research, development, demonstration, and deployment projects, and evaluation of research and technology of national significance to public transportation, that the Secretary determines will improve public transportation." 49 U.S.C. § 5312(b). |
| All Stations Accessibility Program | FTA | "[T]o assist eligible entities in financing capital projects to upgrade the accessibility of legacy rail fixed guideway public transportation systems for persons with disabilities, including those who use wheelchairs, by increasing the number of existing (as of the date of enactment of this Act) stations or facilities for passenger use that meet or exceed the new construction standards of title II of the Americans with Disabilities Act of 1990 (42 U.S.C. 12131 et seq.)." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1439 (2021). |

| DOT Program | Sub-Agency | Statutory Purpose |
| --- | --- | --- |
| Areas of Persistent Poverty Program | FTA | "[T]o assist areas of persistent poverty as defined under section 6702(a)(1) of title 49, United States Code, or historically disadvantaged communities: *Provided*, That grants shall be for planning, engineering, or development of technical or financing plans for projects eligible under chapter 53 of title 49, United States Code." Consolidated Appropriations Act of 2022, Publ. L. No. 117-103, 136 Stat. 49, 714. |
| Better Utilizing Investments to Leverage Development Grant Program | FTA/OST (Office of the Secretary of Transportation) | "The goal of the program shall be to fund eligible projects that will have a significant local or regional impact and improve transportation infrastructure." 49 U.S.C. § 6702(b)(2). |
| Bus Exportable Power Systems | FTA | To "assist with the development and deployment of low or no emission vehicles (as defined in section 5339(c)(1)) or low or no emission vehicle components (as defined in section 5312(h)(1))." 49 U.S.C. § 5314(a)(2)(H). |
| Bus Safety and Accessibility Research Program | FTA | "The Secretary may make grants and enter into contracts, cooperative agreements, and other agreements for research, development, demonstration, and deployment projects, and evaluation of research and technology of national significance to public transportation, that the Secretary determines will improve public transportation." 49 U.S.C. § 5312(b)(1). |
| Buses and Bus Facilities | FTA | "[T]o assist in the financing of buses and bus facilities capital projects, including— (A) replacing, rehabilitating, purchasing, or leasing buses or related equipment; and (B) rehabilitating, purchasing, constructing, or leasing bus-related facilities." 49 U.S.C. § 5339(b)(1). |
| Capital Investment Grants - 5309 | FTA | "[T]o assist in financing—(1) new fixed guideway capital projects or small start projects, including the acquisition of real property, the |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | initial acquisition of rolling stock for the system, the acquisition of rights-of-way, and relocation, for fixed guideway corridor development for projects in the advanced stages of project development or engineering; and (2) core capacity improvement projects, including the acquisition of real property, the acquisition of rights-of-way, double tracking, signalization improvements, electrification, expanding system platforms, acquisition of rolling stock associated with corridor improvements increasing capacity, construction of infill stations, and such other capacity improvement projects . . . ." 49 U.S.C. § 5309(b). |
| Electric or Low-Emitting Ferry Pilot Program | FTA | "The Secretary shall carry out a pilot program to provide grants for the purchase of electric or low-emitting ferries and the electrification of or other reduction of emissions from existing ferries." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 71102(b), 135 Stat. 429, 1325 (2021). |
| Ferry Service for Rural Communities Program | FTA | "The Secretary shall establish a program to ensure that basic essential ferry service is provided to rural areas by providing funds to States to provide such basic essential ferry service." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 71103(b), 135 Stat. 429, 1326 (2021). |
| Formula Grants for Rural Areas | FTA | To provide funding to "recipients located in rural areas for—<br>(A) planning . . . ;<br>(B) public transportation capital projects;<br>(C) operating costs of equipment and facilities for use in public transportation;<br>(D) job access and reverse commute projects; and<br>(E) the acquisition of public transportation services, including service agreements with private providers of public transportation service." 49 U.S.C. § 5311(b)(1). |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| Formula Grants for Seniors and Individuals with Disabilities | FTA | "The Secretary may make grants under this section to recipients for—<br>(A) public transportation projects planned, designed, and carried out to meet the special needs of seniors and individuals with disabilities when public transportation is insufficient, inappropriate, or unavailable;<br>(B) public transportation projects that exceed the requirements of the Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.);<br>(C) public transportation projects that improve access to fixed route service and decrease reliance by individuals with disabilities on complementary paratransit; and<br>(D) alternatives to public transportation that assist seniors and individuals with disabilities with transportation." 49 U.S.C. § 5310(b)(1)(A)-(D). |
| Innovative Coordinated Access & Mobility (ICAM) Program | FTA | "[T]o assist in financing innovative projects for the transportation disadvantaged that improve the coordination of transportation services and nonemergency medical transportation services, including—<br>(A) the deployment of coordination technology;<br>(B) projects that create or increase access to community One-Call/One-Click Centers; and<br>(C) such other projects as determined appropriate by the Secretary." Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 3006(b)(2), 129 Stat. 1312, 1462 (2015). |
| Low or No Emission Grant Program | FTA | For "(i) acquiring low or no emission vehicles;<br>(ii) leasing low or no emission vehicles;<br>(iii) acquiring low or no emission vehicles with a leased power source;<br>(iv) constructing facilities and related equipment for low or no emission vehicles;<br>(v) leasing facilities and related equipment for low or no emission vehicles;<br>(vi) constructing new public transportation facilities to accommodate low or no emission vehicles; or |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | (vii) rehabilitating or improving existing public transportation facilities to accommodate low or no emission vehicles." 49 U.S.C. § 5339(c)(1)(B). |
| Passenger Ferry Grant | FTA | "The Secretary may make grants under this subsection to recipients for passenger ferry projects that are eligible for a grant under subsection (a)." 49 U.S.C. § 5307(h)(1). |
| Pilot Program for Transit Oriented Development (TOD) Planning | FTA | "The Secretary may make grants under this subsection to a State or local government authority to assist in financing comprehensive planning associated with an eligible project that seeks to—<br>(A) enhance economic development, ridership, and other goals established during the project development and engineering processes;<br>(B) facilitate multimodal connectivity and accessibility;<br>(C) increase access to transit hubs for pedestrian and bicycle traffic;<br>(D) enable mixed-used development;<br>(E) identify infrastructure needs associated with the eligible project; and<br>(F) include private sector participation." Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, § 20005(b)(2), 126 Stat. 405, 642 (2012). |
| State of Good Repair Grants Program | FTA | "[T]o assist State and local governmental authorities in financing capital projects to maintain public transportation systems in a state of good repair . . . ." 49 U.S.C. § 5337(b)(1). |
| State Safety Oversight (SSO) Program | FTA | "[T]o develop or carry out State safety oversight programs under this subsection." 49 U.S.C. § 5329(e)(6)(A). |
| Urbanized Area Formula Grants | FTA | "[T]o finance the operating cost of equipment and facilities for use in public transportation . . . in an |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | urbanized area with a population of not fewer than 200,000 individuals . . . ." 49 U.S.C. § 5307(a)(2). |
| **Federal Railroad Administration (FRA) Funding Programs** | | |
| Capital Grants for Class II and Class III Railroads | FRA | "[F]or projects in the public interest that-- (A)(i) rehabilitate, preserve, or improve railroad track (including roadbed, bridges, and related track structures) used primarily for freight transportation; (ii) facilitate the continued or greater use of railroad transportation for freight shipments; and (iii) reduce the use of less fuel efficient modes of transportation in the transportation of such shipments; or (B) demonstrate innovative technologies and advanced research and development that increase fuel economy, reduce greenhouse gas emissions, and lower the costs of operation." 49 U.S.C. § 22301(a)(1). |
| Capital Investment Grants to Support Intercity Passenger Rail Service | FRA | "[T]o assist in financing the capital costs of facilities, infrastructure, and equipment necessary to provide or improve intercity passenger rail transportation." 49 U.S.C. § 22902(a)(1). |
| Consolidated Rail Infrastructure and Safety Improvements (CRISI) Program | FRA | "[T]o assist in financing the cost of improving passenger and freight rail transportation systems in terms of safety, efficiency, or reliability." 49 U.S.C. § 22907(a). |
| Corridor Identification and Development Program | FRA | "[T]o facilitate the development of intercity passenger rail corridors." 49 U.S.C. § 25101(a). |
| Federal-State Partnership for Intercity Passenger Rail (FSP) Grant Program | FRA | "[T]o fund capital projects that reduce the state of good repair backlog, improve performance, or expand or establish new intercity passenger rail service, including privately operated intercity |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | passenger rail service if an eligible applicant is involved." 49 U.S.C. § 24911(b). |
| High-Speed Rail Funding | FRA | "[F]or corridor planning for up to 50 percent of the publicly financed costs associated with eligible activities," 49 U.S.C. § 26101(a)(1); "for the improvement, adaptation, and integration of proven technologies for commercial application in high-speed rail service in the United States," 49 U.S.C. § 26102(a)); and "to finance capital projects in high-speed rail corridors," 49 U.S.C. § 26106(c). |
| Local Rail Freight Assistance | FRA | "[F]or the cost of—<br>(1) acquiring, in any way the State considers appropriate, an interest in a rail line or rail property to maintain existing, or to provide future, rail freight transportation . . . ;<br>(2) improving and rehabilitating rail property on a rail line . . . ; and<br>(3) building rail or rail-related facilities . . . ." 49 U.S.C. § 22101(a). |
| Rail Crossing Elimination Grant Program | FRA | "The goals of the Program are—(1) to eliminate highway-rail grade crossings that are frequently blocked by trains; (2) to improve the health and safety of communities; (3) to reduce the impacts that freight movement and railroad operations may have on underserved communities; and (4) to improve the mobility of people and goods." 49 U.S.C. § 22909(b). |
| Rail Research and Development Center of Excellence Grant Program | FRA | "[T]o establish and maintain a center of excellence to advance research and development that improves the safety, efficiency, and reliability of passenger and freight rail transportation." 49 U.S.C. § 20108(j)(1). |
| Railroad Rehabilitation and Improvement Financing | FRA | "(A) [T]o acquire, improve, or rehabilitate intermodal or rail equipment or facilities, . . . |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | (B) to develop or establish new intermodal or railroad facilities;<br>(C) to develop landside port infrastructure for seaports serviced by rail;<br>(D) to refinance outstanding debt . . . ;<br>(E) to reimburse planning, permitting, and design expenses . . . ; or<br>(F) to finance economic development, including commercial and residential development, and related infrastructure and activities . . . ."<br>49 U.S.C. § 22402(b). |
| Railroad Safety State Participation Grant Program | FRA | For "investigative and surveillance activities necessary to enforce the safety regulations prescribed and orders issued by the Secretary that apply to railroad equipment, facilities, rolling stock, and operations in a State." 49 U.S.C. § 20105(a). |
| Railroad Safety Technology Grants | FRA | "[F]or the deployment of train control technologies, train control component technologies, processor-based technologies, electronically controlled pneumatic brakes, rail integrity inspection systems, rail integrity warning systems, switch position indicators and monitors, remote control power switch technologies, track integrity circuit technologies, and other new or novel railroad safety technology." 49 U.S.C. § 20158(a). |
| Restoration and Enhancement Grant Program | FRA | "[F]or the purpose of initiating, restoring, or enhancing intercity rail passenger transportation." 49 U.S.C. § 22908(b). |
| Special Transportation Circumstances | FRA | For "funding freight rail capital projects that are on a State rail plan" or for "funding transportation-related capital projects," depending on particular circumstances. 49 U.S.C. § 22907(*l*)(1)(A), (B). |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| State-supported Routes Operated by Amtrak | FRA | "[T]o perform requested independent technical analysis of issues" and "administrative expenses that the Secretary determines necessary." 49 U.S.C. § 24712(d)(2). |

### Federal Motor Carrier Safety Administration (FMCSA) Funding Programs

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| Commercial Driver's License Program Improvement (CDLPI) | FMCSA | "[T]o assist the State in complying with the requirements of [the Commercial Driver's License Information System]" and "to improve the State's implementation of its commercial driver's license program." 49 U.S.C. § 31313(a)(2). |
| Motor Carrier Safety Assistance Program (MCSAP) | FMCSA | "[T]o ensure that the Secretary, States, local governments . . . and other persons work in partnership to establish programs to improve motor carrier, commercial motor vehicle, and driver safety to support a safe and efficient surface transportation system by— (1) making targeted investments to promote safe commercial motor vehicle transportation, including the transportation of passengers and hazardous materials; (2) investing in activities likely to generate maximum reduction in the number and severity of commercial motor vehicle crashes and in fatalities resulting from such crashes; (3) adopting and enforcing effective motor carrier, commercial motor vehicle, and driver safety regulations and practices consistent with Federal requirements; and (4) assessing and improving statewide performance by setting program goals and meeting performance standards, measures, and benchmarks." 49 U.S.C. § 31102(b)(1)-(4). |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| **National Highway Traffic Safety Administration (NHTSA) Funding Programs** | | |
| Discretionary Safety Grants and Cooperative Agreements | NHTSA | For "research and development activities, including demonstration projects, training, education, and the collection and analysis of highway and motor vehicle safety data and related information . . . ." 23 U.S.C. § 403(b)(1). |
| Highway Safety Program | NHTSA | To have in effect "highway safety program[s] that" are "designed to reduce—(I) traffic crashes; and (II) deaths, injuries, and property damage resulting from those crashes." 23 U.S.C. § 402(a)(1)(i). |
| National Priority Safety Program | NHTSA | For enumerated purposes, including reducing "highway deaths and injuries resulting from individuals riding unrestrained or improperly restrained in motor vehicles"; "State traffic safety information system improvements"; "impaired driving countermeasures"; "laws to reduce distracted driving"; "motorcyclist safety programs"; "nonmotorized safety"; "preventing roadside deaths"; and "driver and officer safety education. 23 U.S.C. § 405(a)(2)-(9). |
| **Federal Aviation Administration (FAA) Funding Programs** | | |
| Airport Improvement Program | FAA | "To maintain a safe and efficient nationwide system of public-use airports that meets the present and future needs of civil aeronautics . . . ." 49 U.S.C. § 47104(a). |
| Airport Infrastructure Grants | FAA | "To maintain a safe and efficient nationwide system of public-use airports that meets the present and future needs of civil aeronautics . . . ." 49 U.S.C. § 47104(a). |
| Airport Terminal Program | FAA | Providing funding for "projects that qualify as 'terminal development'" . . ., projects for on- |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | airport rail access projects . . . , and projects for relocating, reconstructing, repairing, or improving an airport-owned air traffic control tower." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1418-19 (2021). |
| Aviation Research Grants Program | FAA | "[T]o conduct aviation research in areas the Administrator considers necessary for the long-term growth of civil aviation." 49 U.S.C. § 44511(a). |
| Aviation Workforce Development Grants - Maintenance Technical Workers | FAA | "[T] to provide grants for eligible projects to support the education and recruitment of aviation maintenance technical workers and the development of the aviation maintenance workforce." FAA Reauthorization Act of 2024, Pub. L. No. 118-63, § 440, 138 Stat. 1025, 1180 (2024). |
| Aviation Workforce Development Grants - Aircraft Pilots | FAA | "[T]o provide grants for eligible projects to support the education of future aircraft pilots and the development of the aircraft pilot workforce." FAA Reauthorization Act of 2024, Pub. L. No. 118-63, § 440, 138 Stat. 1025, 1180 (2024). |
| Catastrophic Failure Prevention Research Grants | FAA | "[T]o conduct aviation research related to the development of technologies and methods to assess the risk of, and prevent, defects, failures, and malfunctions of products, parts, processes, and articles manufactured for use in aircraft, aircraft engines, propellers, and appliances that could result in a catastrophic failure of an aircraft" and "to establish centers of excellence for continuing the research." 49 U.S.C. § 44512(a). |
| FAA Air Transportation Centers of Excellence | FAA | "[T]o establish and operate regional centers of air transportation excellence" which shall, among other things, conduct research on "airspace and airport planning and design." 49 U.S.C. § 44513. |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| FAA Contract Tower Program | FAA | "[F]or the construction or improvement of a nonapproach control tower, as defined by the Secretary, and for the acquisition and installation of air traffic control, communications, and related equipment to be used in that tower," as well as for reimbursements for similar costs. 49 U.S.C. § 47124(b)(4)(A). |
| **Maritime Administration (MARAD) Funding Programs** | | |
| Port Infrastructure Development Program | MARAD | "[T]o assist in funding eligible projects for the purpose of improving the safety, efficiency, or reliability of the movement of goods through ports and intermodal connections to ports." 49 U.S.C. § 54301(a)(1). |
| United States Marine Highway Program | MARAD | To "coordinate with ports, State departments of transportation, localities, other public agencies, and appropriate private sector entities on the development of landside facilities and infrastructure to support marine highway transportation." 46 U.S.C. § 55601(a)(2)(A). |
| **Pipeline and Hazardous Material Safety Administration (PHMSA) Funding Programs** | | |
| Hazardous Materials Emergency Preparedness Grant Program | PHMSA | "The purpose of this chapter is to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce." 49 U.S.C. § 5101. |
| Hazardous Materials Safety Inspection | PHMSA | "[T]he Secretary shall make grants under this section . . . for training instructors to train hazmat employees" and "for such instructors to train hazmat employees." 49 U.S.C. § 5107(e)(1). |
| One-Call Grant Program | PHMSA | "[T]o assist in improving—<br>(1) the overall quality and effectiveness of one-call notification systems in the State; |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | (2) communications systems linking one-call notification systems; (3) location capabilities, including training personnel and developing and using location technology; (4) record retention and recording capabilities for one-call notification systems; (5) public information and education; (6) participation in one-call notification systems; and (7) compliance and enforcement under the State one-call notification program" 49 U.S.C. § 6106(a) |
| Pipeline Safety Program State Base Grant | PHMSA | "[T]o provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities . . . ." 49 U.S.C. § 60102(a)(1). |
| Pipeline Emergency Response Grant | PHMSA | "[F]or emergency response management, training, and technical assistance. . . . [If] used to train emergency responders, such training shall ensure that emergency responders have the ability to protect nearby persons, property, and the environment from the effects of accidents or incidents involving gas or hazardous liquid pipelines, in accordance with existing regulations." 49 U.S.C. § 60125(b)(1). |
| State Damage Prevention Grant Program | PHMSA | "[T]o assist in improving the overall quality and effectiveness of a damage prevention program of the State authority . . ." 49 U.S.C. § 60134(a). |
| **Office of the Secretary of Transportation (OST) Funding Programs** | | |
| Better Utilizing Investments to Leverage Development (BUILD) Grant Program (formerly, RAISE) | OST, FHWA, FRA, FTA | "The goal of the program shall be to fund eligible projects that will have a significant local or regional impact and improve transportation infrastructure." 49 U.S.C. § 6702(b)(2). |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| Infrastructure for Rebuilding America Grant Program (INFRA) | OST | "[T]o provide financial assistance for projects of national or regional significance," with goals to "(A) improve the safety, efficiency, and reliability of the movement of freight and people in and across rural and urban areas; (B) generate national or regional economic benefits and an increase in the global economic competitiveness of the United States; (C) reduce highway or freight congestion and bottlenecks; (D) improve connectivity between modes of freight transportation; (E) enhance the resiliency of critical highway or freight infrastructure and help protect the environment; (F) improve roadways vital to national energy security, including highways that support movement of energy equipment; and (G) address the impact of population growth on the movement of people and freight." 23 U.S.C. § 117(a)(2). |
| National Infrastructure Project Assistance (Mega) Program | OST | "[F]or a project— (1) that is— (A) a highway or bridge project . . . (B) a freight intermodal (including public ports) or freight rail project that provides a public benefit; (C) a railway-highway grade separation or elimination project; (D) an intercity passenger rail project; (E) a public transportation project . . . ." 49 U.S.C. § 6701(d). |
| Reconnecting Communities  Program (including the Reconnecting Communities Pilot Program and Neighborhood Access and Equity Program) | OST and FHWA | "[T]o restore community connectivity— (1) to study the feasibility and impacts of removing, retrofitting, or mitigating an existing eligible facility; (2) to conduct planning activities necessary to design a project to remove, retrofit, or mitigate an existing eligible facility; and (3) to conduct construction activities necessary to |

| DOT Program | Sub-Agency | Statutory Purpose |
|---|---|---|
| | | carry out a project to remove, retrofit, or mitigate an existing eligible facility." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 11509, 135 Stat. 429, 588 (2021). |
| Strengthening Mobility and Revolutionizing Transportation (SMART) Grants | OST | "[T]o conduct demonstration projects focused on advanced smart city or community technologies and systems in a variety of communities to improve transportation efficiency and safety." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 25005, 135 Stat. 429, 840 (2021). |
| Rural Surface Transportation Grant Program | OST | "[T]o improve and expand the surface transportation infrastructure in rural areas." 23 U.S.C. § 173(b)(1). |
| Rural and Tribal Assistance Pilot Program | OST | "(A) Financial, technical, and legal assistance to evaluate potential projects reasonably expected to be eligible to receive funding or financing assistance under an eligible program . . . (B) Assistance with development-phase activities . . . (C) Information regarding innovative financing best practices and case studies, if the eligible entity is interested in using innovative financing methods." Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 21205(b)(2), 135 Stat. 429, 680-81 (2021). |
| Thriving Communities Grant Program | OST | "[F]or technical assistance and cooperative agreements to develop and implement technical assistance, planning, and capacity building to improve and foster thriving communities through transportation improvements." Consolidated Appropriations Act of 2022, Pub. L. No. 117-103 136 Stat. 49, 686. |

# CERTIFICATE OF SERVICE

Case Name: **State of California et al. v. U.S.**        No.   **1:25-cv-00208-JJM-PAS**
                    **Dep't of Transportation et al.**

I hereby certify that on August 19, 2025, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT**

- **EXHIBITS TO PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT, VOLUMES I – IV**

- **PLAINTIFF STATES' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on August 19, 2025, at Los Angeles, California.

| C. Gutierrez | /s/ C. Gutierrez |
|:---:|:---:|
| Declarant | Signature |