# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,

*Defendants*.

Case No. 1:25-cv-00208

# INDEX OF EXHIBITS
## TO PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT
## VOLUME I OF IV

## I. PUBLICATIONS

| No. | Document Title |
|---|---|
| 1 | Order from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Department Operating Administrations and Departmental Offices in the Office of the Secretary of Transportation (Jan. 29, 2025) (the "Duffy Order") |
| 2 | Letter from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Recipients of U.S. Department of Transportation Funding (Apr. 24, 2025) (the "Duffy Directive") |
| 3 | U.S. Department of Transportation Press Release (Apr. 24, 2025) |
| 4 | Federal Railroad Administration General Terms and Conditions (Apr. 23, 2025) |
| 5 | Federal Highway Administration General Terms and Conditions, Competitive Grants (Apr. 22, 2025) |
| 6 | Federal Transit Administration Master Agreement (Apr. 25, 2025) |
| 7 | Federal Transit Administration Master Agreement (Tracked Changes) (Apr. 25, 2025) |
| 8 | Federal Aviation Administration Airport Infrastructure Grant Template Agreement (May 6, 2025) |
| 9 | Maritime Administration Port Infrastructure Development Program General Terms and Conditions (Mar. 31, 2025) |
| 10 | Pipeline and Hazardous Materials Safety Administration Hazardous Materials Grants, Grant and Cooperative Agreement Terms and Conditions (May 15, 2025) |
| 11 | Department of Homeland Security, Sanctuary Jurisdictions Defying Federal Immigration Law (May 29, 2025) |
| 12 | Department of Homeland Security, Sanctuary Jurisdictions Defying Federal Immigration Law—Page Not Found (June 1, 2025) |
| 13 | Greg Norman, Department of Homeland Security Removes "Sanctuary Jurisdictions" List from its Website, Fox News (June 2, 2025). |
| 14 | U.S. Department of Justice, Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025) |
| 15 | U.S. Department of Justice, U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens (Aug. 5, 2025) |
| 16 | Letter from Pamela Bondi, U.S. Attorney General, to Gavin Newsom, Governor of California (August 13, 2025) |
| 17 | Federal Highway Administration, FY 2022-2026 Estimated Highway Apportionments under the Infrastructure Investment and Jobs Act |
| 18 | Federal Transit Administration, FY 2025 Full Year Apportionments State Totals |
| 19 | Federal Motor Carrier Safety Administration, FY 2024 Estimated MCSAP Funding – Rounded |
| 20 | National Highway Traffic Safety Administration, FY 2024 Grant Funding Table |
| 21 | Federal Aviation Administration, Fiscal Year 2024 State Apportionment |

| 22 | Letter from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Recipients of U.S. Department of Transportation Funding (July 2, 2025) |

## II. DECLARATIONS

| No. | Declarant Name | Declarant Title |
|-----|----------------|-----------------|
| 23 | Stephanie Dougherty | Director at the California Office of Traffic Safety (OTS) |
| 24 | Keith Duncan | Chief, Caltrans Division of Budgets, California Department of Transportation (Caltrans) |
| 25 | Dee Lam | Chief, Caltrans Division of Local Assistance, California Department of Transportation (Caltrans) |
| 26 | Jeffrey F. Rosen | District Attorney, Santa Clara County, California |
| 27 | Sally R. Chafee | Chief of Staff at the Colorado Department of Transportation (CDOT) |
| 28 | Ronnell A. Higgins | Commissioner, Connecticut Department of Emergency Services and Public Protection |
| 29 | Shanté A. Hastings | Cabinet Secretary at Delaware Department of Transportation (DelDOT) |
| 30 | Edwin H. Sniffen | Director, Hawaiʻi Department of Transportation (HDOT) |
| 31 | Adnan G. Khayyat | Chief Nuclear Officer of the Illinois Emergency Management Agency and Office of Homeland Security (IEMA-OHS) |
| 32 | Holly Bieneman | Director of the Office of Planning and Programming at the Illinois Department of Transportation (IDOT) |
| 33 | Brian Karr | Bureau Chief, Investigations & Compliance, at the Illinois Department of Transportation (IDOT) |
| 34 | Sarah C. Moore | Safety Programs Implementation Manager at the Illinois Department of Transportation (IDOT) |
| 35 | Jason Osborn | Director of the Office of Intermodal Project Implementation (OIPI) at the Illinois Department of Transportation (IDOT) |
| 36 | Lynsey M. Heffernan | Chief of Policy and Strategic Planning at the Massachusetts Bay Transportation Authority (MBTA) |
| 37 | David Mohler | Executive Director of the Office of Transportation Planning at the Massachusetts Department of Transportation (MassDOT) |
| 38 | Paul J. Wiedefeld | Secretary at the Maryland Department of Transportation (MDOT) |

3

| No. | Declarant Name | Declarant Title |
|---|---|---|
| 39 | Bruce A. Van Note | Commissioner of the Maine Department of Transportation (MaineDOT) |
| 40 | Bradley C. Wieferich | Director of the Michigan Department of Transportation (MDOT) |
| 41 | Bradley C. Wieferich (Supplemental) | Director of the Michigan Department of Transportation (MDOT) |
| 42 | James Cownie | Chief Counsel at the Minnesota Department of Transportation (MnDOT) |
| 43 | Cassandra O'Hern | Deputy Commissioner of the Minnesota Department of Public Safety (DPS) |
| 44 | Francis K. O'Connor | Commissioner of the New Jersey Department of Transportation (NJDOT) |
| 45 | Michael J. Rizol, Jr. | Director of the New Jersey Division of Highway Traffic Safety (NJDHTS) |
| 46 | Juan R. Urena | Bureau Chief for Pipeline Safety, Division of Reliability and Security at the New Jersey Board of Public Utilities (NJBPU) |
| 47 | Janet Ho | Assistant Commissioner for Finance and Integrated Modal Services, New York Department of Transportation |
| 48 | Jackie Bray | New York State Division of Homeland Security and Emergency Services (DHSES) |
| 49 | Travis Brouwer | Assistant Director for Revenue, Finance, and Compliance, Oregon Department of Transportation (ODOT) |
| 50 | Kenji Sugahara | Director, Oregon Department of Aviation (ODAV) |
| 51 | Meredith Brady | Associate Director, Division of Statewide Planning at Rhode Island Department of Administration |
| 52 | Walter R. Craddock | Administrator of Rhode Island Department of Motor Vehicles |
| 53 | Steven King | Managing Director of Quonset Development Corporation, Rhode Island |
| 54 | Major Ronald Longolucco | Administrative Bureau Commander at Rhode Island Department of Public Safety, State Police |
| 55 | Marc R. Pappas | Director of Rhode Island Emergency Management Agency |
| 56 | Oscar L. Perez | Chief of Police, Providence, Rhode Island Police Department |

| No. | Declarant Name | Declarant Title |
|---|---|---|
| 57 | Shelly Baldwin | Acting Director, Washington Traffic Safety Commission |
| 58 | Dennis Bosman | Captain of Commercial Vehicle Division for Washington State Patrol |
| 59 | Robyn Williams | Budget Director of the Washington Office of Financial Management |
| 60 | Mike Gribner | Deputy Secretary of Washington State Department of Transportation |
| 61 | Scott James Lawry | Deputy Secretary, the Wisconsin Department of Transportation (WisDOT) |
| 62 | Dr. Tom K. Wong | Associate Professor, University of California, San Diego |
| 63 | Sharon Kershbaum | Director, District of Columbia Department of Transportation (DDOT) |
| 64 | James P. Gray | Secretary of Kentucky Transportation Cabinet |
| 65 | Ricky Serna | Cabinet Secretary, New Mexico Department of Transportation (NMDOT) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>                        *Plaintiffs*,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION, *et al.*,<br><br>                       *Defendants.* | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 1

Duffy Order from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Department Operating Administrations and Departmental Offices in the Office of the Secretary of Transportation (Jan. 29, 2025) (the "Duffy Order")



**U.S. Department
of Transportation**

Office of the Secretary
of Transportation

SUBJECT: ENSURING
RELIANCE UPON SOUND
ECONOMIC ANALYSIS IN
DEPARTMENT OF
TRANSPORTATION POLICIES,
PROGRAMS, AND ACTIVITIES



DOT Order

1. PURPOSE

This Order updates and resets the principles and standards underpinning U.S. Department of Transportation (Department or DOT) policies, programs, and activities to mandate reliance on rigorous economic analysis and positive cost-benefit calculations and ensure that all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts bolster the American economy and benefit the American people.

2. CANCELLATION

None

3. APPLICABILITY AND SCOPE.

This Order applies to all the Department's Operating Administrations (OA) and the Departmental Offices in the Office of the Secretary of Transportation (OST).[1]

4. EFFECTIVE DATE

This Order is effective upon its date of execution.

5. POLICIES.

The following principles govern the implementation and administration of all DOT policies, programs, and activities:

     a. The Department's grantmaking, lending, policymaking, and rulemaking activities shall be based on sound economic principles and analysis supported by rigorous cost-benefit requirements and data-driven decisions. This requirement shall apply

---

[1] The terms "Operating Administration" and "OA" hereinafter refer to both the Department's operating administrations and the OST Departmental Offices.

        regardless of whether the activities in question fall below the economic threshold required for review by the Office of Information and Regulatory Affairs.

b.    To engage in grantmaking, lending, policymaking, or rulemaking, the benefits must be estimated to outweigh the costs. The calculation of the "social cost of carbon" is marked by logical deficiencies, a poor basis in empirical science, politicization, and the absence of a foundation in legislation. Consequently, the Administrator of the Environmental Protection Agency has been ordered by the President to issue guidance to address these harmful and detrimental inadequacies. Prior to issuance of that guidance, DOT shall ensure estimates to assess the value of changes in greenhouse gas emissions resulting from agency actions, including with respect to the consideration of domestic versus international effects and evaluating appropriate discount rates, are, to the extent permitted by law, consistent with the guidance contained in OMB Circular A-4 of September 17, 2003 (Regulatory Analysis).

c.    Statutes governing DOT policies, programs, and activities shall be administered to identify and avoid, to the extent practicable, relevant, appropriate, and consistent with law, adverse impacts on families and communities. Adverse impacts may include, but are not limited to, noise; water pollution; soil contamination; a denial of or a reduction in transportation services; increased difficulty in raising children in a safe and stable environment; and destruction or disruption of community cohesion, safety, or economic vitality.

d.    Statutes governing DOT policies, programs, and activities shall also be administered to maximize, to the extent practicable, relevant, appropriate, and consistent with law, benefits for families and communities. The benefits may include, but are not limited to, economic opportunities, such as increased access to jobs, healthcare facilities, recreational activities, commercial activity, or any actions or project components that will help alleviate poverty, enhance safety, and primarily benefit families and communities by improving the quality of their lives, raising their standard of living, or enabling them to participate more fully in our economy.

e.    DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts, shall not be used to further local political objectives or for projects and goals that are purely local in nature and unrelated to a proper Federal interest. DOT programs and activities should instead prioritize support and assistance for projects and goals that are consistent with the proper role of the Federal government in our system of federalism, have strong co-funding requirements, adhere faithfully to all Federal statutory Buy America requirements, and not depend on continuous or future DOT support or assistance for improvements or ongoing maintenance.

f.    To the maximum extent permitted by law, DOT-supported or -assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts, shall prioritize projects and goals that:

   i.  utilize user-pay models;

   ii.  direct funding to local opportunity zones where permitted;

   iii.  to the extent practicable, relevant, appropriate, and consistent with law, mitigate the unique impacts of DOT programs, policies, and activities on families and family-specific difficulties, such as the accessibility of transportation to families with young children, and give preference to communities with marriage and birth rates higher than the national average (including in administering the Federal Transit Administration's Capital Investment Grant program);

   iv.  prohibit recipients of DOT support or assistance from imposing vaccine and mask mandates; and

   v.  require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary.

6. <u>RESPONSIBILITIES</u>.

 a. The General Counsel is the chief legal officer of the Department with final authority on all questions of law for all components of DOT. The Office of the General Counsel (OGC) shall provide the legal advice, support, and guidance necessary to implement and effectuate this Order, including via the issuance of additional orders as warranted.

 b. OAs engaged in grantmaking, lending, policymaking, or rulemaking activities shall, in coordination and consultation with OGC, implement this Order and determine the most effective and efficient way of integrating the principles outlined in this Order with their existing regulations and guidance.

 c. In undertaking the integration with existing operations, and in coordination and consultation with OGC, OAs shall:

  1. Develop and issue guidance necessary to implement and effectuate this Order, or review and update any previously issued guidance to ensure consistency with this Order. OAs shall also engage in the notice-and-comment process, as appropriate and in accordance with DOT Order 2100.6B (Policies and Procedures for Rulemakings) and any corresponding regulations, to implement the requirements of this Order.

  2. Update and revise all Notices of Funding Opportunity, grant agreements, loan agreements, and other program documents as necessary to ensure compliance with Federal law and consistency with this Order.

  3. Review their existing grant agreements, loan agreements, and contracts, and, to the extent permitted by law, unilaterally amend the general terms and conditions as necessary to ensure compliance with Federal law and consistency with this Order, and provide corresponding notice of such to recipients.

DOT                                                                                    4

   d.  OAs shall prepare a report describing their efforts to comply with this Order and the impact of those efforts on their grantmaking, lending, policymaking, and rulemaking activities. The first of these reports shall be submitted to OGC no later than six months after the effective date of this Order, and each subsequent report shall be due no later than six months thereafter.

   e.  OAs shall also observe the following principles:

      1.  This Order should be implemented in a simple, transparent manner that avoids adding unnecessary procedural or regulatory steps or causing undue delay. The Order should not be interpreted to impose procedural or regulatory requirements that provide no benefit in the decision-making process. The Order should be carried out in a manner that considers the impact that delays in project delivery or rule-making may have on the economic vitality, safety, and well-being of the American people, their families, and communities.

      2.  OAs shall strive to promote the economic opportunities of DOT programs, policies, and activities for families and communities. Procedures shall be established or modified, as necessary, to provide meaningful opportunities for public involvement by families and communities during the planning and development of programs, policies, and activities (including the identification of potential effects, alternatives, and mitigation measures).

      3.  DOT shall ensure comprehensive public engagement, including with families and community stakeholders, and provide meaningful access to public information concerning both the costs and the benefits of DOT programs, policies, or activities.

      4.  Compliance with the terms of this Order is an ongoing responsibility. OAs shall continuously monitor their programs, policies, and activities to ensure they are administered in a manner consistent with this Order. This Order does not alter existing assignments or delegations of authority to the Operating Administrations or other DOT components.

7.  <u>DISCLAIMER</u>.

This Order is intended to improve the internal management of DOT and is not intended to, nor does it, create any rights, benefits, or trust responsibility, substantive or procedural, enforceable at law or equity, by a party against the Department, its OAs, its officers, or any person. Nor should this Order be construed to create any right to judicial review involving the compliance or noncompliance with this Order by the Department, its Operating Administrations, its officers or any other person.

_____
Secretary of Transportation

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

                *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 2

Letter from Sean P. Duffy, Secretary, U.S. Department of Transportation, to All Recipients of U.S. Department of Transportation Funding (Apr. 24, 2025) (the "Duffy Directive")



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, DC 20590

April 24, 2025

To All Recipients of U.S. Department of Transportation Funding:

The U.S. Department of Transportation (Department or DOT) distributes substantial Federal financial assistance for thousands of projects, programs, and activities operated or initiated by diverse entities, including but not limited to State and local governments. The Department administers this Federal financial assistance to support the development and maintenance of the Nation's transportation infrastructure, pursuant to statutory authority and in accordance with binding contractual agreements in the form of Federal financial assistance agreements, usually grants, cooperative agreements, and loans. Accordingly, I write to clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations.

The Equal Protection principles of the Constitution prohibit State and Federal governmental entities from discriminating on the basis of protected characteristics, including race. Indeed, as the Supreme Court declared in *Students for Fair Admission, Inc. v. Harvard (SFFA)*, 600 U.S. 181, 206 (2023), "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." The Court further noted that "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220. In ruling that race-based admissions programs at universities violated the Equal Protection Clause, the Court made clear that discrimination based on race is, has been, and will continue to be unlawful, except in rare circumstances. *Id.* at 220-21. Similarly, sex-based classifications violate the Equal Protection Clause absent "exceedingly persuasive" justification. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).

These constitutional principles are reinforced by the Civil Rights Act of 1964, which prohibits discrimination based on protected characteristics in the Federal funding and employment contexts in Title VI (42 U.S.C. § 2000d *et seq*.) and Title VII (42 U.S.C. § 2000e-2), as well as the applicable non-discrimination clauses in the Federal Aid Highway Act of 1973 (23 U.S.C. §§ 140 and 324 *et seq*.), the Airport and Airway Improvement Act of 1982, (49 U.S.C. § 47123), and Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681 *et seq*.).

Based on binding Supreme Court precedent and these Federal laws, DOT is prohibited from discriminating based on race, color, national origin, sex, or religion in any of its programs or activities. Moreover, because DOT may not establish, induce, or endorse prohibited discrimination indirectly,[1] it must ensure that discrimination based on race, color, national origin, sex, or religion does not exist in the programs or activities it funds or financially assists.

These same principles apply to recipients of Federal financial assistance from DOT, as both a matter of Federal law and by virtue of contractual provisions governing receipt of DOT funding. Accordingly, DOT recipients are prohibited from engaging in discriminatory actions in their own policies, programs, and activities, including in administering contracts, and their employment practices.

Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.

In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT

---

[1] *See SFFA*, 600 U.S. at 230; Norwood v. Harrison, 413 U.S. 455, 465 (1973).

financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law. The Department also expects its recipients to ensure that the Federal financial assistance they receive from DOT is provided only to subrecipients, businesses, or service providers that are U.S. Citizens or U.S. Nationals and Lawful Permanent Residents (LPRs) or legal entities allowed to do business in the U.S. and which do not employ illegal aliens.

This letter provides notice of the Department's existing interpretation of Federal law. The Department will vigorously enforce the law on equal terms as to all its recipients and intends to take appropriate measures to assess their compliance based on the interpretation of Federal law set forth in this letter. Adherence to your legal obligations is a prerequisite for receipt of DOT financial assistance. Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT.

The Department retains authority, pursuant to its oversight responsibilities and the terms of your agreements, to initiate enforcement actions, such as comprehensive audits and possible recovery of funds expended in a manner contrary to the terms of the funding agreement. DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest. These steps, within DOT's discretion, are intended to ensure accountability and protect the integrity of Federal programs.

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support through its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

DOT remains committed to advancing a transportation system that serves the public interest efficiently and unleashes economic prosperity and a superior quality of life for American families. This mission depends upon your strict adherence to the legal framework governing our partnership, and I trust you will take all necessary steps to comply with Federal law and satisfy your legal obligations.

Sincerely,

Sean P. Duffy

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants*. |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 3

U.S. Department of Transportation Press
Release (Apr. 24, 2025)

🇺🇸 An official website of the United States government Here's how you know ⌄

Home \ Newsroom

### In This Section                                                                              +

---

**Media Contact**

**Press Office**
US Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590
United States
Email: pressoffice@dot.gov
Phone: 1 (202) 366-4570 ☎

If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

---

## Trump's Transportation Secretary Sean P. Duffy: Follow the Law

Thursday, April 24, 2025

**WASHINGTON, D.C.** – U.S. Transportation Secretary Sean P. Duffy issued a reminder to all recipients of federal transportation funding that they must comply with federal laws. Non-compliance may lead to enforcement actions.

*"Federal grants come with a clear obligation to adhere to federal laws,"* said **U.S. Transportation Secretary Sean P. Duffy**. *"It shouldn't be controversial – enforce our immigration rules, end anti-American DEI policies, and protect free speech. These values reflect the priorities of the American people, and I will take action to ensure compliance."*

Key Letter Excerpts:
*"As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations.*

On Immigration
*"In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs."*
Cc: WHITE HOUSE EO DIRECTING DHS AND AG TO DENY FEDERAL FUNDING TO SANCTUARY JURISDICTIONS

On DEI
*"Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements."*
Cc: WHITE HOUSE EO ENDING DEI PROGRAMS WITHIN GOVERNMENT AND FACT SHEET

   

**U.S. DEPARTMENT OF TRANSPORTATION**

1200 New Jersey Avenue, SE
Washington, DC 20590
855-368-4200

**WANT TO KNOW MORE?**

Receive email updates about the latest in Safety, Innovation, and Infrastructure.

SUBSCRIBE NOW

**ABOUT DOT**

Meet the Secretary

Mission

Newsroom

Social Media

Leadership

Regulations

Transit Benefit Policy

Careers

Contact Us

**OPERATING ADMINISTRATIONS**

FAA

FHWA

FMCSA

FRA

FTA

GLS

MARAD

NHTSA

OIG

OST

PHMSA

**RESEARCH AND TECHNOLOGY**

Office of the Assistant Secretary for Research and Technology

Bureau of Transportation Statistics

Volpe Center

Ask-A-Librarian

**PRIORITIES**

Infrastructure Investment and Jobs Act

Cybersecurity

Safety

Transformation

**POLICIES, RIGHTS, AND LEGAL**

USA.gov

Privacy Policy

FOIA

Budget and Performance

No FEAR Act

Cummings Act Notices

Ethics

Web Policies and Notices

Vulnerability Disclosure Policy

Digital Accessibility

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants.* |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 4

Federal Railroad Administration General
Terms and Conditions (Apr. 23, 2025)


U.S. Department of Transportation
**Federal Railroad Administration**

## Attachment 1

# GENERAL TERMS AND CONDITIONS

Revision Date: April 16, 2025

U.S. Department of Transportation
**Federal Railroad Administration**

# General Terms and Conditions
## Table of Contents

ATTACHMENT 1 .................................................................................................................... 7

ARTICLE 1:  TERMS AND CONDITIONS ................................................................................. 7

1.1   General Terms and Conditions ................................................................................... 7

1.2   Project-Specific Terms and Conditions ...................................................................... 7

1.3   Program-Specific Clauses .......................................................................................... 7

1.4   Exhibits ...................................................................................................................... 8

ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES .................................................................. 8

2.1   FRA Role ..................................................................................................................... 8

2.2   FRA Professional Staff ................................................................................................ 8

ARTICLE 3:  RECIPIENT ROLE ............................................................................................... 9

3.1   Representations and Acknowledgments on the Project ............................................. 9

3.2   Representations on Authority and Capacity ............................................................... 9

The Recipient represents that: ............................................................................................ 9

3.3   FRA Reliance ............................................................................................................. 10

3.4   Project Delivery ........................................................................................................ 10

3.5   Rights and Powers Affecting the Project .................................................................. 10

3.6   Notification of Changes to Key Personnel ................................................................ 11

ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS ................................. 11

4.1   Federal Award Amount ............................................................................................ 11

4.2   Federal Obligations ................................................................................................. 11

4.3   Maximum Funding Amount ..................................................................................... 11

4.4   Budget Period .......................................................................................................... 11

4.5   Period of Performance ............................................................................................. 11

ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES ..................... 11

5.1   Notification Requirement ........................................................................................ 11

5.2   Scope and Statement of Work Changes ................................................................... 12

5.3   Schedule Changes .................................................................................................... 12

5.4   Budget Changes ....................................................................................................... 12

5.5   Project Cost Savings ................................................................................................. 13

5.6   FRA Acceptance of Changes .................................................................................... 13

2

**U.S. Department of Transportation**
**Federal Railroad Administration**

ARTICLE 6:  GENERAL REPORTING TERMS ......................................................................................... 14

   6.1   Alternative Reporting Methods ............................................................................... 14

   6.2   Paperwork Reduction Act Notice ............................................................................. 14

ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING ......................................................................... 14

   7.1   Quarterly Project Progress Reports and Recertifications ........................................ 14

   7.2   Final Progress Reports and Financial Information .................................................... 15

   7.3   Real Property Reporting ........................................................................................... 15

ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING ......................................................... 15

   8.1   Baseline Performance Measurement ...................................................................... 15

   8.2   Post-Project Performance Measurement ................................................................ 15

   8.3   Project Outcomes Report ......................................................................................... 16

   8.4   General Performance Measurement Requirements ................................................ 16

   8.5   Outcome Measurement and Reporting Survival ..................................................... 16

ARTICLE 9:  NONCOMPLIANCE AND REMEDIES ................................................................................. 16

   9.1   Noncompliance Determinations .............................................................................. 16

   9.2   Remedies .................................................................................................................. 17

   9.3   Other Oversight Entities .......................................................................................... 18

ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION ........................................................... 18

   10.1   Suspension of Award Activities ............................................................................... 18

   10.2   FRA Termination ...................................................................................................... 19

   10.3   Closeout Termination ............................................................................................... 19

   10.4   Post-Termination Adjustments ................................................................................ 19

   10.5   Non-Terminating Events .......................................................................................... 19

ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS ............................. 20

   11.1   Recipient Monitoring and Record Retention .......................................................... 20

   11.2   Financial Records and Audits ................................................................................... 20

   11.3   Internal Controls ...................................................................................................... 21

   11.4   FRA Record Access ................................................................................................... 21

   11.5   Site Visits .................................................................................................................. 21

ARTICLE 12:  CONTRACTING AND SUBAWARDING ............................................................................ 21

   12.1   Buy America .............................................................................................................. 21

   12.2   Small and Disadvantaged Business Requirements .................................................. 22

   12.3   Engineering and Design Services [Reserved] .......................................................... 22

**U.S. Department of Transportation**
**Federal Railroad Administration**

| 12.4 | Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment ... 22 |
|---|---|
| 12.5 | Pass-Through Entity Responsibilities ................................................................................. 22 |
| 12.6 | Local Hiring Preference for Construction Jobs ................................................................. 22 |
| 12.7 | Procurement ...................................................................................................................... 22 |

ARTICLE 13: COSTS, PAYMENTS, AND UNEXPENDED FUNDS ............................................. 23

| 13.1 | Limitation of Federal Award Amount ................................................................................ 23 |
|---|---|
| 13.2 | Project Costs ...................................................................................................................... 23 |
| 13.3 | Timing of Project Costs ..................................................................................................... 23 |
| 13.4 | Recipient Recovery of Federal Funds ............................................................................... 23 |
| 13.5 | Unexpended Agreement Federal Funds ............................................................................. 23 |
| 13.6 | Interest Earned .................................................................................................................. 24 |
| 13.7 | Timing of Payments to the Recipient ................................................................................ 24 |
| 13.8 | Payment Method ................................................................................................................ 24 |
| 13.9 | Information Supporting Expenditures ............................................................................... 24 |
| 13.10 | Reimbursement Request Timing Frequency ..................................................................... 24 |
| 13.11 | Program Income ................................................................................................................. 24 |

ARTICLE 14: PROPERTY AND EQUIPMENT ......................................................................... 25

| 14.1 | General Requirements ....................................................................................................... 25 |
|---|---|
| 14.2 | Relocation and Real Property Acquisition ....................................................................... 25 |
| 14.3 | Use for Originally Authorized Purpose ............................................................................ 25 |
| 14.4 | Maintenance ...................................................................................................................... 25 |
| 14.5 | Real Property Disposition ................................................................................................. 26 |
| 14.6 | Equipment Disposition ...................................................................................................... 26 |
| 14.7 | Recordkeeping ................................................................................................................... 26 |
| 14.8 | Encumbrance ..................................................................................................................... 26 |

ARTICLE 15: AMENDMENTS ............................................................................................... 27

| 15.1 | Bilateral Amendments ....................................................................................................... 27 |
|---|---|
| 15.2 | FRA Unilateral Amendments ............................................................................................ 27 |
| 15.3 | Other Amendments ............................................................................................................ 27 |

ARTICLE 16: [RESERVED] ................................................................................................... 27

ARTICLE 17: [RESERVED] ................................................................................................... 27

ARTICLE 18: LABOR AND WORK ........................................................................................ 27

| 18.1 | Labor and Work .................................................................................................................. 27 |
|---|---|

**U.S. Department of Transportation
Federal Railroad Administration**

ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE ........................................ 28

19.1   Critical Infrastructure Security and Resilience ............................................................ 28

ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE,  AND NATIONAL POLICY
REQUIREMENTS ............................................................................................................................ 28

20.1   Uniform Administrative Requirements for Federal Awards .................... 28

20.2   Federal Law and Public Policy Requirements ............................................ 28

20.3   Federal Freedom of Information Act ......................................................... 29

20.4   History of Performance ............................................................................. 29

20.5   Whistleblower Protection .......................................................................... 29

20.6   External Award Terms and Obligations ..................................................... 30

20.7   Incorporated Certifications ........................................................................ 30

ARTICLE 21:  ASSIGNMENT ......................................................................................................... 30

21.1   Assignment Prohibited .............................................................................. 30

ARTICLE 22:  WAIVER ................................................................................................................... 30

22.1   Waivers ...................................................................................................... 30

ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS .................................................................. 31

23.1   Disclaimer of Federal Liability ................................................................... 31

23.2   Environmental Review ............................................................................... 31

23.3   Project Maintenance Requirement ........................................................... 32

23.4   Appropriations Act Requirements ............................................................. 32

23.5   Standards of Conduct ................................................................................ 32

23.6   Changed Conditions of Performance ........................................................ 33

23.7   Litigation .................................................................................................... 33

23.8   [Reserved] .................................................................................................. 33

23.9   Equipment and Supplies ............................................................................ 33

23.10  Safety and Technology Data ...................................................................... 33

23.11  Intellectual Property ................................................................................. 33

23.12  Liquidation of Recipient Obligations ......................................................... 33

ARTICLE 24:  CONSTRUCTION AND DEFINITIONS ........................................................................ 34

24.1   Agreement ................................................................................................. 34

24.2   Construction ............................................................................................... 34

24.3   Integration ................................................................................................. 34

24.4   Definitions .................................................................................................. 34

U.S. Department of Transportation
**Federal Railroad Administration**

24.5    Calendar Dates ..................................................................................................... 35

24.6    Communication in Writing ................................................................................... 35

24.7    Severability ........................................................................................................... 35

ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE .................................... 35

25.1    Counterparts ......................................................................................................... 35

25.2    Effective Date ....................................................................................................... 36

ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES ................................................................ 36

26.1    Interstate Rail Compacts Grant Program ........................................................... 36

26.2    Railroad Crossing Elimination Program Clauses ................................................. 38

26.3    Consolidated Rail Infrastructure and Safety Improvements Grants Clauses............................ 40

26.4    Restoration and Enhancement Grants Clauses.......................................................... 42

26.5    Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State
of Good Repair Clauses ................................................................................................... 45

U.S. Department of Transportation
**Federal Railroad Administration**

# ATTACHMENT 1

This Grant Agreement (Agreement) is between the Federal Railroad Administration (FRA) and the Recipient identified in Attachment 2: Project-Specific Terms and Conditions. This Agreement, including the Agreement cover sheet, this Attachment 1, Attachment 2, and Exhibits A–C, constitutes the entire Agreement between FRA and the Recipient regarding the Project as defined in Attachment 2. All prior discussions and understandings concerning the scope and subject matter of this agreement are superseded by this Agreement.

This Agreement is governed by and subject to 2 C.F.R. part 200, Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, and the U.S. Department of Transportation (USDOT) implementing regulations at 2 C.F.R. part 1201.

# ARTICLE 1: TERMS AND CONDITIONS

**1.1    General Terms and Conditions**

This Attachment 1: General Terms and Conditions, is part of the Agreement between FRA and the Recipient. This Attachment 1 contains the standard terms and conditions governing the administration of this Agreement and the execution of the Project. The General Terms and Conditions incorporate by reference the information contained in Attachment 2 and the Exhibits to this Agreement.

**1.2    Project-Specific Terms and Conditions**

Attachment 2: Project-Specific Terms and Conditions, is part of the Agreement between FRA and the Recipient. Attachment 2 contains Project-Specific Terms and Conditions, which may include special terms and conditions.

**1.3    Program-Specific Clauses**

Article 26 of this Attachment 1 contains the applicable program-specific clauses. The Recipient will comply with the program-specific clauses below that are associated with the grant program identified in Attachment 2 of this Agreement. In the event that the Recipient's grant is not authorized under a program listed below, Article 26 does not apply.

(a)  For Projects funded under the Interstate Rail Compacts program (49 U.S.C. § 22910), the Recipient will comply with the program-specific clauses in Article 26.1.

(b)  For Projects funded under the Railroad Crossing Elimination program (49 U.S.C. § 22909), the Recipient will comply with the program-specific clauses in Article 26.2.

(c)  For Projects funded under the Consolidated Rail Infrastructure and Safety Improvements program (49 U.S.C. § 22907), the Recipient will comply with the program-specific clauses in Article 26.3.

(d)  For Projects funded under the Restoration and Enhancement program (49 U.S.C. § 22908), the Recipient will comply with the program-specific clauses in Article 26.4.

7

U.S. Department of Transportation
**Federal Railroad Administration**

(e)  For Projects funded under the Federal-State Partnership for Intercity Passenger Rail program (49 U.S.C. § 24911) and Federal-State Partnership for State of Good Repair (as authorized in Sections 11103 and 11302 of the Passenger Rail Reform and Investment Act of 2015 (Title XI of the Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94 (2015))), the Recipient will comply with the program-specific clauses in Article 26.5.

## 1.4    Exhibits

Exhibits A–C are part of the Agreement between FRA and the Recipient. The Recipient will comply with Exhibits A–C.

## ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES

## 2.1    FRA Role

(a)  FRA is responsible for funding disbursements to the Recipient under this Agreement. FRA will also conduct oversight and monitoring activities to assess Recipient progress against established performance goals and to assess compliance with terms and conditions, including the Statement of Work and other requirements of this Agreement.

(b)  If this award is made as a Cooperative Agreement, FRA will have substantial programmatic involvement. Substantial involvement means that, after award, technical, administrative, or programmatic staff will assist, guide, coordinate, or otherwise participate with the Recipient in Project activities.

(c)  If this award is made as a Grant, FRA will not have substantial programmatic involvement.

## 2.2    FRA Professional Staff

FRA may provide professional staff to review work in progress, completed products, and to provide or facilitate access to technical assistance when it is available, feasible, and appropriate. FRA professional staff may include the following:

(a)  Financial Analyst. The Financial Analyst will serve as the Recipient's point of contact for systems (e.g., GrantSolutions and the Delphi eInvoicing System) access and troubleshooting as well as for financial monitoring.

(b)  Grant Manager. The Grant Manager will serve as the Recipient's point of contact for grant administration and will oversee compliance with the terms and conditions in this Agreement. The Grant Manager reviews financial reports, performance reports, and works with the Project Manager to facilitate effective Project delivery.

(c)  Project Manager. The Project Manager will serve as the Recipient's point of contact for the technical aspects of Project delivery. The Project Manager coordinates Project deliverable review, provides technical assistance to the Recipient, and generally assesses Project progress and performance.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 3:  RECIPIENT ROLE

**3.1**    **Representations and Acknowledgments on the Project**

(a)  The Recipient represents that:

(1)  all material statements of fact in the Application were accurate when the Application was submitted and now; and

(2)  the Recipient read and understands the terms and conditions in Attachment 1 and Attachment 2 of this Agreement, the applicable program-specific clauses in Article 26 of this Attachment 1, and the information and conditions in the Exhibits.

(b)  The Recipient acknowledges that:

(1)  the terms and conditions impose obligations on the Recipient and that the Recipient's non-compliance with the terms and conditions may result in remedial action, including terminating the Agreement, disallowing costs incurred for the Project, requiring the Recipient to refund Federal contributions to FRA, and reporting the non-compliance in the Federal-government-wide integrity and performance system. Recipient acknowledges that the terms and conditions impose such obligations on the Recipient whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

(2)  The Recipient acknowledges that the requirements of this Agreement apply to the entire Project, including Project costs satisfied from sources other than Agreement Federal Funds.

(c)  By entering into this Agreement with FRA, the Recipient agrees to comply with the terms and conditions in Attachment 1 and Attachment 2, including applicable program-specific clauses in Article 26 of this Attachment 1, Exhibits A–C, and all applicable Federal laws and regulations, including those identified in this Agreement. The Recipient will ensure compliance with all terms of this Agreement and all of its parts for all tiers of subawards and contracts under this Agreement, as appropriate. The Recipient understands that the terms and conditions of this Agreement apply regardless of whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

**3.2**    **Representations on Authority and Capacity**

The Recipient represents that:

(a)  it has the legal authority to receive Federal financial assistance under this Agreement;

(b)  it has the legal authority to complete the Project;

(c)  all representations and warranties made in the Federal System for Awards Management (SAM.gov) and in the Application are true and correct;

9

U.S. Department of Transportation
**Federal Railroad Administration**

(d)  it has the capacity, including legal, technical, institutional, managerial, and financial capacity, to comply with its obligations under this Agreement and complete the Project;

(e)  the Non-Federal Funds listed in Article 6 of Attachment 2 of this Agreement are committed to fund the Project;

(f)  it has sufficient funds available to ensure that equipment and infrastructure funded under this Agreement will be operated and maintained in compliance with this Agreement and applicable Federal law;

(g)  it has sufficient funds available to ensure that operations funded under this agreement are conducted in compliance with this Agreement and applicable Federal law; and

(h)  the individual executing this agreement on behalf of the Recipient has the legal authority to enter this Agreement and make the statements and certifications in this Agreement on behalf of the Recipient.

**3.3**     **FRA Reliance**

The Recipient acknowledges that:

(a)  FRA relied on statements of fact in the Application and SAM.gov to select the Project to receive this award;

(b)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient and the Project are eligible to receive financial assistance under this Agreement;

(c)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient has the legal authority to implement the Project; and

(d)  FRA relied on statements of fact in both the Application and this Agreement to establish the terms of this Agreement; and

(e)  FRA's selection of the Project to receive this award may have prevented awards to other eligible applicants.

**3.4**     **Project Delivery**

(a)  The Recipient will implement and complete the Project to FRA's satisfaction under the terms of this Agreement.

(b)  The Recipient will ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

**3.5**     **Rights and Powers Affecting the Project**

(a)  The Recipient will not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this Agreement without written approval of FRA.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**19.1**    **Critical Infrastructure Security and Resilience**

(a)  Consistent with the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021) and the National Security Memorandum on Critical Infrastructure Security and Resilience (April 30, 2024), the Recipient will consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b)  If the Security Risk Designation in Section 1.3 of Attachment 2 of this Agreement is "Elevated," then not later that than two years after the date of this Agreement the Recipient will submit to FRA a report that:

(1)  identifies a cybersecurity point of contact for the transportation infrastructure being improved in the Project;

(2)  summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

(3)  summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)  documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)  describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**20.1**    **Uniform Administrative Requirements for Federal Awards**

The Recipient will comply, and will ensure that other entities receiving funding under this agreement will comply, with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201, regardless of whether the Recipient or other entity receiving funding under this agreement is a Non-Federal entity as defined in 2 C.F.R. § 200.1, except that subpart F of part 200 does not apply if the Recipient or Subrecipient is a for-profit entity.

**20.2**    **Federal Law and Public Policy Requirements**

(a)  The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not

U.S. Department of Transportation
**Federal Railroad Administration**

impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

(b) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d)  The failure of this Agreement to expressly identify Federal law applicable to the Recipient or activities under this Agreement does not make that law inapplicable.

**20.3    Federal Freedom of Information Act**

(a)  FRA is subject to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

(b)  The Recipient acknowledges that the Application and materials submitted to FRA by the Recipient related to this Agreement will become FRA records that may be subject to public release under 5 U.S.C. § 552. If the Recipient submits any materials to FRA related to this Agreement that the Recipient considers to include trade secret or confidential commercial or financial information, the Recipient should note that the submission contains confidential business information, mark each affected page, and highlight or otherwise denote the portions of the submission that contain confidential business information.

**20.4    History of Performance**

Under 2 C.F.R. § 200.206, any Federal awarding agency may consider the Recipient's performance under this Agreement, when assessing the risks of making a future Federal financial assistance award to the Recipient.

**20.5    Whistleblower Protection**

(a)  The Recipient acknowledges that it is a "Recipient" within the scope of 41 U.S.C. § 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b)  The Recipient will inform its employees in writing of the rights and remedies provided under 41 U.S.C. § 4712, in the predominant native language of the workforce.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 1:25-cv-00208-JJM-PAS |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| *Defendants.* | |

# EXHIBIT 5

Federal Highway Administration General
Terms and Conditions, Competitive Grants
(Apr. 22, 2025)

**FEDERAL HIGHWAY ADMINISTRATION**

**COMPETITIVE GRANT PROGRAM GENERAL TERMS AND CONDITIONS**

**Date: April 22, 2025**

**TABLE OF CONTENTS**

GENERAL TERMS AND CONDITIONS ................................................................................ 6
Article 1 PURPOSE ............................................................................................................... 6
  1.1    Purpose ....................................................................................................................... 6
Article 2 FHWA ROLE ......................................................................................................... 6
  2.1    Federal Highway Administration (FHWA) Responsibilities. ..................................... 6
Article 3 RECIPIENT ROLE ................................................................................................. 6
  3.1    Statements on the Project ........................................................................................... 6
  3.2    Statements on Authority and Capacity ...................................................................... 6
  3.3    USDOT FHWA Reliance ........................................................................................... 7
  3.4    Project Delivery. ........................................................................................................ 7
  3.5    Rights and Powers Affecting the Project. .................................................................. 7
  3.6    Subaward to Designated Subrecipient ....................................................................... 8
  3.7    Designated Subrecipient Statements and Responsibilities ........................................ 8
Article 4 AWARD AMOUNT, OBLIGATION, AND TIME PERIODS ................................ 8
  4.1    Federal Award Amount ............................................................................................. 8
  4.2    Federal Obligations. .................................................................................................. 8
  4.3    Budget Period. ........................................................................................................... 9
  4.4    Period of Performance. ............................................................................................ 10
Article 5 STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES .................. 10
  5.1    Notification Requirement ......................................................................................... 10
  5.2    Scope and Statement of Work Changes ................................................................... 10
  5.3    Schedule Changes .................................................................................................... 10
  5.4    Budget Changes. ...................................................................................................... 11
  5.5    FHWA Acceptance of Changes. .............................................................................. 12
Article 6 GENERAL REPORTING TERMS ........................................................................ 12
  6.1    Report Submission ................................................................................................... 12
  6.2    Alternative Reporting Methods ............................................................................... 12
Article 7 PROGRESS AND FINANCIAL REPORTING ...................................................... 12
  7.1    Project Progress and Financial Reports and Recertifications. .................................. 12
  7.2    Final Progress Reports and Financial Information ................................................... 13
Article 8 PERFORMANCE REPORTING ........................................................................... 13
  8.1    Baseline Performance Measurement. ....................................................................... 13
  8.2    Post-construction Performance Measurement. ......................................................... 14
  8.3    Project Outcomes Report .......................................................................................... 14
  8.4    General Performance Measures ................................................................................ 14
  8.5    Performance Reporting Survival. ............................................................................. 15
Article 9 NONCOMPLIANCE AND REMEDIES ................................................................ 15
  9.1    Noncompliance Determinations. .............................................................................. 15
  9.2    Remedies. ................................................................................................................. 15
  9.3    Other Oversight Entities .......................................................................................... 16
Article 10 AGREEMENT TERMINATION .......................................................................... 16
  10.1    FHWA Termination. ............................................................................................... 16
  10.2    Closeout Termination. ............................................................................................ 17
  10.3    Post-Termination Adjustments ............................................................................... 17
  10.4    Non-Terminating Events. ........................................................................................ 17

10.5    Other Remedies ........................................................................................... 18

Article 11 MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS
.................................................................................................................................. 18

11.1    Recipient Monitoring and Record Retention. ................................................ 18
11.2    Financial Records and Audits. ...................................................................... 18
11.3    Internal Controls ........................................................................................... 19
11.4    USDOT Record Access ................................................................................. 19
11.5    Title 23 Oversight Responsibilities .............................................................. 19

Article 12 CONTRACTING AND SUBAWARDS ...................................................... 19

12.1    Minimum Wage Rates ................................................................................... 19
12.2    Buy America. ................................................................................................. 19
12.3    Small and Disadvantaged Business Requirements........................................ 19
12.4    Engineering and Design Services .................................................................. 20
12.5    Prohibition on Certain Telecommunications and Video Surveillance Services or
         Equipment. .................................................................................................... 20
12.6    Pass-through Entity Responsibilities ............................................................ 20
12.7    Subaward and Contract Authorization. ......................................................... 20

Article 13 COSTS, PAYMENTS, AND UNEXPENDED FUNDS .............................. 20

13.1    Limitation of Federal Award Amount. .......................................................... 20
13.2    Projects Costs. ............................................................................................... 21
13.3    Timing of Project Costs. ............................................................................... 21
13.4    Recipient Recovery of Federal Funds ........................................................... 21
13.5    Unexpended Federal Funds ........................................................................... 21
13.6    Timing of Payments to the Recipient............................................................ 21
13.7    Payment Method. ........................................................................................... 21
13.8    Information Supporting Expenditures............................................................ 22
13.9    Reimbursement Frequency ............................................................................ 22

Article 14 LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY.................... 22

14.1    Liquidation of Recipient Obligations............................................................ 22

Article 15 AGREEMENT MODIFICATIONS .............................................................. 23

15.1    Bilateral Modifications .................................................................................. 23
15.2    Unilateral Contact Modifications. ................................................................. 23
15.3    FHWA Unilateral Modifications. .................................................................. 23
15.4    Other Modifications........................................................................................ 23

Article 16 Civil Rights and Title VI ............................................................................. 23

16.1    Title VI. ......................................................................................................... 23
16.2    Legacy Infrastructure and Facilities. ............................................................ 24

Article 17 CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE ..................... 24

17.1    Critical Infrastructure Security and Resilience.............................................. 24

Article 18 FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL
POLICY REQUIREMENTS.......................................................................................... 25

18.1    Uniform Administrative Requirements for Federal Awards .......................... 25
18.2    Federal Law and Public Policy Requirements. .............................................. 25
18.3    Implementation of Executive Order 14025 ................................................... 25
18.4    Implementation of Executive Order 14173 ................................................... 25
18.5    Federal Freedom of Information Act. ............................................................ 26

18.6   History of Performance ................................................................................. 26
18.7   Whistleblower Protection .............................................................................. 26
18.8   External Award Terms and Obligations ........................................................ 26
18.9   Incorporated Certifications ........................................................................... 27
Article 19 ASSIGNMENT ....................................................................................... 27
19.1   Assignment Prohibited. ................................................................................ 27
Article 20 WAIVER ................................................................................................. 27
20.1   Waivers. ........................................................................................................ 27
Article 21 ADDITIONAL TERMS AND CONDITIONS ......................................... 27
21.1   Effect of Urban or Rural Designation ........................................................... 27
21.2   Disclaimer of Federal Liability ..................................................................... 28
21.3   Relocation and Real Property Acquisition. ................................................... 28
21.4   Equipment Disposition. ................................................................................ 28
21.5   Environmental Review. ................................................................................. 28
21.6   Railroad Coordination .................................................................................. 30
Article 22 MANDATORY AWARD INFORMATION ............................................. 30
22.1   Information Contained in a Federal Award ................................................... 30
22.2   Federal Award Identification Number. .......................................................... 30
22.3   Recipient's Unique Entity Identifier. ............................................................ 30
Article 23 CONSTRUCTION AND DEFINITIONS ................................................ 31
23.1   Schedules ...................................................................................................... 31
23.2   Exhibits ......................................................................................................... 31
23.3   Construction. ................................................................................................. 31
23.4   Integration. .................................................................................................... 31
23.5   Definitions .................................................................................................... 32
Article 24 AGREEMENT EXECUTION AND EFFECTIVE DATE ........................ 32
24.1   Counterparts .................................................................................................. 32
24.2   Effective Date ............................................................................................... 32

## Index of Definitions

Environmental Review Entity ............................................................................................ 29

Federal Share ..................................................................................................................... 12

FHWA .................................................................................................................................. 6

General Terms and Conditions ......................................................................................... 32

Grant .................................................................................................................................. 32

Grant Amount .................................................................................................................... 32

Grant Program ................................................................................................................... 32

Program Statute ................................................................................................................ 32

Project ................................................................................................................................ 32

Project Closeout ................................................................................................................ 17

Project Cost Savings ......................................................................................................... 11

Technical Application ........................................................................................................ 32

Title VI ............................................................................................................................... 24

## GENERAL TERMS AND CONDITIONS

These General Terms and Conditions are incorporated by reference in this grant agreement under the Grant Program. The term "Recipient" is defined in this grant agreement. This grant agreement includes schedules A through H. The grant agreement may include special terms and conditions in grant agreement articles or schedules.

## ARTICLE 1
## PURPOSE

1.1    **Purpose.** The purpose of this award is to fund the eligible project defined in this grant agreement that has been selected to receive an award for the Grant Program. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, as modified by schedule E.

## ARTICLE 2
## FHWA ROLE

2.1    **Federal Highway Administration (FHWA) Responsibilities.**

(a)    The FHWA is the operating administration under the United States Department of Transportation ("USDOT") responsible for the administration of the Grant Program, the approval and execution of this grant agreement, and any modifications to this grant agreement under section 15.1.

## ARTICLE 3
## RECIPIENT ROLE

3.1    **Statements on the Project.** The Recipient states that:

(1)    all material statements of fact in the Technical Application were accurate when that application was submitted; and

(2)    schedule E documents all material changes in the information contained in that application.

3.2    **Statements on Authority and Capacity.** The Recipient states that:

(1)   it has the authority to receive Federal financial assistance under this grant agreement;

(2)   it has the legal authority to complete the Project;

(3)   it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this grant agreement;

(4)   not less than the difference between the total eligible project costs listed in section 3 of schedule D and the Grant Amount listed in section 1 of schedule D is committed to fund the Project;

(5)   it has sufficient funds available to ensure that infrastructure completed or improved under this grant agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)   the individual executing this grant agreement on behalf of the Recipient has authority to enter this grant agreement and make the statements in this article 3 and in section 18.9 on behalf of the Recipient.

**3.3    USDOT FHWA Reliance.** The Recipient acknowledges that:

(1)   the USDOT FHWA relied on statements of fact in the Technical Application to select the Project to receive this award;

(2)   the USDOT FHWA relied on statements of fact in both the Technical Application and this grant agreement to determine that the Recipient and the Project are eligible under the terms of the Notice of Funding Opportunity ("NOFO") in section 7 of schedule D.

(3)   the USDOT FHWA's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**3.4    Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this grant agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all Federal laws, regulations, and policies that are applicable to the Project.

**3.5    Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprive it of any rights or powers necessary to the Recipient's performance under this grant agreement without written approval of the FHWA.

(b) The Recipient shall act promptly, in a manner acceptable to the FHWA, to

(4)     documents the results of a self-assessment of the Recipient's cybersecurity
posture and capabilities; and

(5)     describes any additional actions that the Recipient has taken to consider or
address cybersecurity risk of the transportation infrastructure being improved in
the Project.

### ARTICLE 18
### FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**18.1     Uniform Administrative Requirements for Federal Awards.** The Recipient shall
comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and
1201.

**18.2     Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with
the United States Constitution, Federal law, and statutory and public policy
requirements: including but not limited to, those protecting free speech, religious
liberty, public welfare, the environment, and prohibiting discrimination; and the
Recipient will cooperate with Federal officials in the enforcement of Federal law,
including cooperating with and not impeding U.S. Immigration and Customs
Enforcement (ICE) and other Federal offices and components of the Department of
Homeland Security in the enforcement of Federal immigration law.

(b) The failure of this grant agreement to expressly identify Federal law applicable to the
Recipient or activities under this grant agreement does not make that law inapplicable.

**18.3     Implementation of Executive Order 14025.** Consistent with Executive Order
14025, "Worker Organizing and Empowerment" (Apr. 26, 2021), Schedule H, Labor
and Work, documents the consideration of job quality and labor rights, standards, and
protections related to the Project.

**18.4     Implementation of Executive Order 14173**

(a) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal
Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that
its compliance in all respects with all applicable Federal anti-discrimination laws is
material to the government's payment decisions for purposes of section 3729(b)(4)
of title 31, United States Code.

(b) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal
Discrimination And Restoring Merit-Based Opportunity, by entering into this
agreement, the Recipient certifies that it does not operate any programs promoting
diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

        *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

        *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 6

Federal Transit Administration
Master Agreement (Apr. 25, 2025)

**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL TRANSIT ADMINISTRATION**

**MASTER AGREEMENT**

**For Federal Transit Administration Agreements authorized by
49 U.S.C. chapter 53 and Title 23, United States Code (Highways), as amended by
the Infrastructure Investment and Jobs Act of 2021 (IIJA), the Fixing America's Surface
Transportation (FAST) Act, the Moving Ahead for Progress in the 21st Century Act
(MAP-21), the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy
for Users (SAFETEA-LU), the SAFETEA-LU Technical Corrections Act of 2008, or other
federal laws that FTA administers.**

**FTA MA(33)
April 25, 2025**

http://www.transit.dot.gov

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Preface ............................................................................................................................ 1

    Statutory Authorities .................................................................................................. 1

    Purpose of this Master Agreement .......................................................................... 1

Generally Applicable Provisions ................................................................................... 3

    Section 1.    Terms of this Master Agreement and Compliance ........................ 3

    Section 2.    Definitions ....................................................................................... 4

    Section 3.    Implementation. ............................................................................. 12

    Section 4.    Ethics, Political Activity, Disqualification, and Certain Criminal Activity ............... 19

    Section 5.    Federal Assistance .......................................................................... 27

    Section 6.    Non-Federal Share. ........................................................................ 28

    Section 7.    Payments to the Recipient. ............................................................ 30

    Section 8.    Records and Reports Related to the Award and the Underlying Agreement. ............ 41

    Section 9.    Record Retention and Access to Sites of Performance. ............... 47

    Section 10.    Completion, Audit, Settlement, and Closeout. .............................. 48

    Section 11.    Right of the Federal Government to Terminate. ........................... 50

    Section 12.    Civil Rights. .................................................................................... 51

    Section 13.    Planning. ......................................................................................... 59

    Section 14.    Private Enterprise. .......................................................................... 60

    Section 15.    Preference for United States Products and Services. .................... 61

    Section 16.    Procurement. .................................................................................. 62

    Section 17.    Patent Rights. ................................................................................. 68

    Section 18.    Rights in Data and Copyrights. ..................................................... 69

    Section 19.    Use of Real Property, Equipment, and Supplies. ......................... 72

    Section 20.    Transit Asset Management ............................................................. 77

    Section 21.    Insurance. ....................................................................................... 77

    Section 22.    Relocation and Real Property ........................................................ 78

    Section 23.    Construction. .................................................................................. 79

    Section 24.    Employee Protections. ................................................................... 80

    Section 25.    Early Systems Work Agreement. ................................................... 82

    Section 26.    Environmental Protections. ........................................................... 84

    Section 27.    State Management and Monitoring Systems ................................. 87

    Section 28.    Charter Service ............................................................................... 87

Section 29.     School Bus Operations. ............................................................................ 88

Section 30.     Geographic Information and Related Spatial Data. .................................... 88

Section 31.     Federal "$1 Coin" Requirements. .............................................................. 89

Section 32.     Public Transportation Safety. ..................................................................... 89

Section 33.     Motor Carrier Safety. .................................................................................. 89

Section 34.     Safe Operation of Motor Vehicles. ............................................................ 90

Section 35.     Substance Abuse. ........................................................................................ 91

Section 36.     Protection of Sensitive Security and Other Sensitive Information. ............ 92

Section 37.     Special Notification Requirements for States. ........................................... 92

Section 38.     Freedom of Information. ............................................................................. 93

Section 39.     Disputes, Breaches, Defaults, and Litigation. ............................................ 94

Section 40.     Amendments to the Underlying Agreement. ............................................... 95

Section 41.     FTA's Transit Award Management System (TrAMS). ............................... 95

Section 42.     Information Obtained through Internet Links. ............................................ 96

Section 43.     Severability. ................................................................................................ 96

Special Provisions for Specific Programs ................................................................................... 97

Section 44.     Special Provisions for All Public Transportation Innovation, Technical Assistance or
Workforce Development Programs. ................................................................... 97

Section 45.     Special Provisions for the State Safety Oversight Grant Program. ............ 99

Section 46.     Special Provisions for the State Infrastructure Bank (SIB) Program. ........ 99

Section 47.     Special Provisions for the TIFIA and RRIF Programs. ........................... 100

Section 48.     Special Provisions for the Joint FTA–FRA Program. .............................. 101

Appendix A Tribal Transit Program—Applicable Provisions ................................................. 103

### UNITED STATES DEPARTMENT OF TRANSPORTATION
### FEDERAL TRANSIT ADMINISTRATION

### MASTER AGREEMENT

### PREFACE

### Statutory Authorities

This is the official Federal Transit Administration (FTA) Master Agreement that applies to each Underlying Agreement (Grant Agreement, Cooperative Agreement, Loan Agreement, Loan Guarantee Agreement, or Line of Credit Agreement) for a specific Award authorized by:

(a)    Federal transit laws, 49 U.S.C. chapter 53, as amended, including the following:

   (1)    The Infrastructure Investment and Jobs Act of 2021 (IIJA), Public Law No. 117-58, November 15, 2021, and other authorizing legislation that may be enacted;

   (2)    The Fixing America's Surface Transportation (FAST) Act, Public Law No. 114-94, December 4, 2015;

   (3)    The Moving Ahead for Progress in the 21st Century Act (MAP-21), Public Law No. 112- 141, July 6, 2012, as amended by the Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Public Law No. 114-41, July 31, 2015; and

   (4)    The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Public Law No. 109-59, August 10, 2005, as amended by the SAFETEA-LU Technical Corrections Act of 2008, Public Law No 110-244, June 6, 2008.

(b)    Continuing Resolutions or Other Appropriations Resolutions or Acts funding the Department of Transportation during Fiscal Year 2025.

(c)    Title 23, United States Code (Highways).

(d)    Other federal legislation that FTA administers, as FTA so determines.

### Purpose of this Master Agreement

This FTA Master Agreement contains the standard terms and conditions that apply to the Underlying Agreement with the Recipient, which Underlying Agreement may take the form of an:

1

(a)     FTA Grant Agreement, including an FTA Grant Agreement for an award of federal
        assistance under the Tribal Transit Program;

(b)     FTA Cooperative Agreement; or

(c)     Transportation Infrastructure Finance Innovation Act (TIFIA) or Railroad
        Rehabilitation and Improvement Financing (RRIF) Loan, Loan Guarantee, Line of
        Credit, Master Credit Agreement for a Project overseen by FTA, or State
        Infrastructure Bank (SIB) Cooperative Agreement.

THEREFORE, in consideration of the mutual covenants, promises, and representations herein,
FTA and the Recipient agree as follows:

## GENERALLY APPLICABLE PROVISIONS

**Section 1.    Terms of this Master Agreement and Compliance.**

(a)    The Recipient must comply with all applicable federal laws, regulations, and requirements, and should follow applicable federal guidance, except as FTA determines otherwise in writing.

(b)    To assure compliance with federal laws, regulations, and requirements, the Recipient must take measures to assure that other participants in its Underlying Agreements (e.g., Third Party Participants) comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing.

(c)    FTA may take enforcement action if the Recipient or a Third Party Participant violates an applicable federal law, regulation, or requirement, or does not follow applicable federal guidance.

(d)    FTA and the Recipient agree that not every provision of this Master Agreement will apply to every Recipient or Underlying Agreement.

    (1)    FTA has divided this Master Agreement into the "Preface," "Generally Applicable Provisions," and "Special Provisions for Specific Programs."

    (2)    This Master Agreement has an Appendix A illustrating the specific provisions of this Master Agreement that apply to the Tribal Transit Programs.

    (3)    Criteria determining which federal laws, regulations, requirements, and guidance apply include the type of Award, the federal law authorizing federal assistance for the Award, the federal law, regulations, or requirements governing how the Award must be implemented, the federal guidance pertaining to the Award, and the Recipient's legal status as a "state," "state instrumentality," a "local government," a federally recognized Indian Tribe (Indian Tribe), a "private nonprofit entity," a "private for-profit entity," or an individual.

(e)    As provided in federal laws, regulations, requirements, and guidance, FTA will enforce only those federal laws, regulations, requirements, and guidance that apply to the specific FTA Recipient, its Third Party Participants, or to any Project and related activities encompassed in the Award, the accompanying Underlying Agreement, and any Amendments thereto.

(f)     Each provision of this Master Agreement must be interpreted in context with all other provisions of this Master Agreement and the Underlying Agreement. If a single provision is read apart from the rest of this Master Agreement or the Underlying Agreement, that provision might not convey the extent of the Recipient's responsibility to comply with the requirements of this Master Agreement and the Underlying Agreement.

(g)     This Master Agreement does not have an Expiration Date. This Master Agreement continues to apply to the Recipient and its Underlying Agreement, until modified or superseded by a more recently enacted or issued applicable federal law, regulation, requirement, or guidance, or Amendment to this Master Agreement or the Underlying Agreement.

**Section 2.     Definitions.**

(a)     *List of Definitions*. In addition to the definitions provided in 49 U.S.C. § 5302, as amended, or in previous legislation if circumstances may require, the Recipient agrees that the following definitions apply:

(1)     *Application* means the request for federal assistance submitted that is signed and dated by the Applicant or an official authorized to act on the behalf of the Applicant, and includes all explanatory, supporting, and supplementary documents filed with FTA by or on behalf of the Applicant, and has been reviewed by FTA staff and addresses FTA's comments and concerns. An application for federal assistance in the form of a Grant or Cooperative Agreement must be submitted in FTA's Transit Award Management System (TrAMS).

(2)     *Approval*, unless FTA determines otherwise in writing, means a written statement of an authorized federal official transmitted electronically or in typewritten hard copy expressly permitting the Recipient to take or omit an action in connection with its Underlying Agreement, and signed by a federal official authorized to permit the Recipient to take or omit an action that may not be taken or omitted without the Federal Government's permission. Approval does not mean permission to take or omit a similar action other than the specific action for which approval was given and does not include an oral permission or interpretation, which has no legal force, authority, or effect. For purposes of this Master Agreement, the definition of "approval" also applies to "concurrence" and "waiver."

(3)     *Associated Transit Improvement* means, with respect to a Project or an area to be served by a Project, an activity that is designed to enhance transit service or use and that is physically or functionally related to transit facilities.

4

(2)      The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, as amended, 42 U.S.C. § 4541, et seq.; and

(3)      The Public Health Service Act, as amended, 42 U.S.C. §§ 290dd – 290dd-2.

(j)      *Access to Services for Persons with Limited English Proficiency*. The Recipient agrees to provide meaningful access to public transportation services to persons with limited understanding of English to comply with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq.*, and its implementing regulation at 28 CFR § 42.405(d), and appliable U.S. Department of Justice guidance.

(k)      *Other Nondiscrimination Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow federal guidance prohibiting discrimination.

(l)      *Remedies*. Remedies for failure to comply with applicable federal Civil Rights laws, regulations, and requirements, and failure to follow guidance may be enforced as provided in those federal laws, regulations, requirements, or guidance.

(m)      *Federal Law and Public Policy Requirements*. The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(n)      *Federal Anti-Discrimination*.

(1)      Pursuant to section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(2)      Pursuant to section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 7

Federal Transit Administration Master
Agreement (Tracked Changes) (Apr. 25, 2025)

**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL TRANSIT ADMINISTRATION**

**MASTER AGREEMENT**

> **Commented [A1]:** This tracked-changes document is provided as a convenience to the reader, to show clearly the differences between versions of the Federal Transit Administration's Master Agreement. This document does not have the force and effect of law and is not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

**For Federal Transit Administration Agreements authorized by
49 U.S.C. chapter 53 and Title 23, United States Code (Highways), as amended by
the Infrastructure Investment and Jobs Act of 2021 (IIJA), the Fixing America's Surface
Transportation (FAST) Act, the Moving Ahead for Progress in the 21st Century Act
(MAP-21), the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy
for Users (SAFETEA-LU), the SAFETEA-LU Technical Corrections Act of 2008, or other
federal laws that FTA administers.**

**FTA MA(3~~2~~3)**

~~March 26, 2025~~DATE

http://www.transit.dot.gov

## TABLE OF CONTENTS

Table of Contents.................................................................................................................... i

Preface .................................................................................................................................. 1

   Statutory Authorities........................................................................................................ 1

   Purpose of this Master Agreement.................................................................................. 1

Generally Applicable Provisions ........................................................................................... 3

   Section 1.    Terms of this Master Agreement and Compliance........................................... 3

   Section 2.    Definitions........................................................................................................ 4

   Section 3.    Implementation. ............................................................................................. 12

   Section 4.    Ethics, Political Activity, Disqualification, and Certain Criminal Activity...... 19

   Section 5.    Federal Assistance .......................................................................................... 27

   Section 6.    Non-Federal Share. ........................................................................................ 28

   Section 7.    Payments to the Recipient.............................................................................. 30

   Section 8.    Records and Reports Related to the Award and the Underlying Agreement..... 41

   Section 9.    Record Retention and Access to Sites of Performance. ................................... 47

   Section 10.   Completion, Audit, Settlement, and Closeout.................................................. 48

   Section 11.   Right of the Federal Government to Terminate. ............................................... 50

   Section 12.   Civil Rights. .................................................................................................... 51

   Section 13.   Planning. ........................................................................................................ 59

   Section 14.   Private Enterprise. .......................................................................................... 60

   Section 15.   Preference for United States Products and Services. ....................................... 61

   Section 16.   Procurement. .................................................................................................. 62

   Section 17.   Patent Rights. ................................................................................................. 68

   Section 18.   Rights in Data and Copyrights........................................................................ 69

   Section 19.   Use of Real Property, Equipment, and Supplies. ........................................... 72

   Section 20.   Transit Asset Management. ............................................................................. 77

   Section 21.   Insurance. ....................................................................................................... 77

   Section 22.   Relocation and Real Property.......................................................................... 78

   Section 23.   Construction. .................................................................................................. 79

   Section 24.   Employee Protections. .................................................................................... 80

   Section 25.   Early Systems Work Agreement...................................................................... 82

   Section 26.   Environmental Protections. ............................................................................. 84

   Section 27.   State Management and Monitoring Systems..................................................... 87

   Section 28.   Charter Service................................................................................................ 87

i

Section 29.    School Bus Operations. ................................................................. 88

Section 30.    Geographic Information and Related Spatial Data. ................................. 88

Section 31.    Federal "$1 Coin" Requirements. .................................................... 89

Section 32.    Public Transportation Safety. ........................................................ 89

Section 33.    Motor Carrier Safety. .................................................................. 89

Section 34.    Safe Operation of Motor Vehicles. ................................................... 90

Section 35.    Substance Abuse. ...................................................................... 91

Section 36.    Protection of Sensitive Security and Other Sensitive Information. ............. 92

Section 37.    Special Notification Requirements for States. ...................................... 92

Section 38.    Freedom of Information. .............................................................. 93

Section 39.    Disputes, Breaches, Defaults, and Litigation. ..................................... 94

Section 40.    Amendments to the Underlying Agreement. ......................................... 95

Section 41.    FTA's Transit Award Management System (TrAMS). ............................. 95

Section 42.    Information Obtained through Internet Links. ...................................... 96

Section 43.    Severability. ........................................................................... 96

Special Provisions for Specific Programs ........................................................... 97

Section 44.    Special Provisions for All Public Transportation Innovation, Technical Assistance or Workforce Development Programs. .................................................. 97

Section 45.    Special Provisions for the State Safety Oversight Grant Program. .............. 99

Section 46.    Special Provisions for the State Infrastructure Bank (SIB) Program. .......... 99

Section 47.    Special Provisions for the TIFIA and RRIF Programs. ......................... 100

Section 48.    Special Provisions for the Joint FTA–FRA Program. ........................... 101

Appendix A Tribal Transit Program—Applicable Provisions ................................... 103

ii

**UNITED STATES DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**MASTER AGREEMENT**

**PREFACE**

**Statutory Authorities**

This is the official Federal Transit Administration (FTA) Master Agreement that applies to each Underlying Agreement (Grant Agreement, Cooperative Agreement, Loan Agreement, Loan Guarantee Agreement, or Line of Credit Agreement) for a specific Award authorized by:

(a)     Federal transit laws, 49 U.S.C. chapter 53, as amended, including the following:

  (1)     The Infrastructure Investment and Jobs Act of 2021 (IIJA), Public Law No. 117-58, November 15, 2021, and other authorizing legislation that may be enacted;

  (2)     The Fixing America's Surface Transportation (FAST) Act, Public Law No. 114-94, December 4, 2015;

  (3)     The Moving Ahead for Progress in the 21st Century Act (MAP-21), Public Law No. 112- 141, July 6, 2012, as amended by the Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Public Law No. 114-41, July 31, 2015; and

  (4)     The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Public Law No. 109-59, August 10, 2005, as amended by the SAFETEA-LU Technical Corrections Act of 2008, Public Law No 110-244, June 6, 2008.

(b)     Continuing Resolutions or Other Appropriations Resolutions or Acts funding the Department of Transportation during Fiscal Year 2025.

(c)     Title 23, United States Code (Highways).

(d)     Other federal legislation that FTA administers, as FTA so determines.

**Purpose of this Master Agreement**

This FTA Master Agreement contains the standard terms and conditions that apply to the Underlying Agreement with the Recipient, which Underlying Agreement may take the form of an:

1

(a)    FTA Grant Agreement, including an FTA Grant Agreement for an award of federal assistance under the Tribal Transit Program;

(b)    FTA Cooperative Agreement; or

(c)    Transportation Infrastructure Finance Innovation Act (TIFIA) or Railroad Rehabilitation and Improvement Financing (RRIF) Loan, Loan Guarantee, Line of Credit, Master Credit Agreement for a Project overseen by FTA, or State Infrastructure Bank (SIB) Cooperative Agreement.

THEREFORE, in consideration of the mutual covenants, promises, and representations herein, FTA and the Recipient agree as follows:

2

## GENERALLY APPLICABLE PROVISIONS

**Section 1.    Terms of this Master Agreement and Compliance.**

(a)    The Recipient must comply with all applicable federal laws, regulations, and requirements, and should follow applicable federal guidance, except as FTA determines otherwise in writing.

(b)    To assure compliance with federal laws, regulations, and requirements, the Recipient must take measures to assure that other participants in its Underlying Agreements (e.g., Third Party Participants) comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing.

(c)    FTA may take enforcement action if the Recipient or a Third Party Participant violates an applicable federal law, regulation, or requirement, or does not follow applicable federal guidance.

(d)    FTA and the Recipient agree that not every provision of this Master Agreement will apply to every Recipient or Underlying Agreement.

    (1)    FTA has divided this Master Agreement into the "Preface," "Generally Applicable Provisions," and "Special Provisions for Specific Programs."

    (2)    This Master Agreement has an Appendix A illustrating the specific provisions of this Master Agreement that apply to the Tribal Transit Programs.

    (3)    Criteria determining which federal laws, regulations, requirements, and guidance apply include the type of Award, the federal law authorizing federal assistance for the Award, the federal law, regulations, or requirements governing how the Award must be implemented, the federal guidance pertaining to the Award, and the Recipient's legal status as a "state," "state instrumentality," a "local government," a federally recognized Indian Tribe (Indian Tribe), a "private nonprofit entity," a "private for-profit entity," or an individual.

(e)    As provided in federal laws, regulations, requirements, and guidance, FTA will enforce only those federal laws, regulations, requirements, and guidance that apply to the specific FTA Recipient, its Third Party Participants, or to any Project and related activities encompassed in the Award, the accompanying Underlying Agreement, and any Amendments thereto.

3

(f)     Each provision of this Master Agreement must be interpreted in context with all other provisions of this Master Agreement and the Underlying Agreement. If a single provision is read apart from the rest of this Master Agreement or the Underlying Agreement, that provision might not convey the extent of the Recipient's responsibility to comply with the requirements of this Master Agreement and the Underlying Agreement.

(g)     This Master Agreement does not have an Expiration Date. This Master Agreement continues to apply to the Recipient and its Underlying Agreement, until modified or superseded by a more recently enacted or issued applicable federal law, regulation, requirement, or guidance, or Amendment to this Master Agreement or the Underlying Agreement.

**Section 2.     Definitions.**

(a)     *List of Definitions*. In addition to the definitions provided in 49 U.S.C. § 5302, as amended, or in previous legislation if circumstances may require, the Recipient agrees that the following definitions apply:

(1)     *Application* means the request for federal assistance submitted that is signed and dated by the Applicant or an official authorized to act on the behalf of the Applicant, and includes all explanatory, supporting, and supplementary documents filed with FTA by or on behalf of the Applicant, and has been reviewed by FTA staff and addresses FTA's comments and concerns. An application for federal assistance in the form of a Grant or Cooperative Agreement must be submitted in FTA's Transit Award Management System (TrAMS).

(2)     *Approval*, unless FTA determines otherwise in writing, means a written statement of an authorized federal official transmitted electronically or in typewritten hard copy expressly permitting the Recipient to take or omit an action in connection with its Underlying Agreement, and signed by a federal official authorized to permit the Recipient to take or omit an action that may not be taken or omitted without the Federal Government's permission. Approval does not mean permission to take or omit a similar action other than the specific action for which approval was given and does not include an oral permission or interpretation, which has no legal force, authority, or effect. For purposes of this Master Agreement, the definition of "approval" also applies to "concurrence" and "waiver."

(3)     *Associated Transit Improvement* means, with respect to a Project or an area to be served by a Project, an activity that is designed to enhance transit service or use and that is physically or functionally related to transit facilities.

4

(1)    The Drug Abuse Office and Treatment Act of 1972, as amended, 21 U.S.C. § 1101, et seq.;

(2)    The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, as amended, 42 U.S.C. § 4541, et seq.; and

(3)    The Public Health Service Act, as amended, 42 U.S.C. §§ 290dd – 290dd-2.

(j)    *Access to Services for Persons with Limited English Proficiency*. The Recipient agrees to provide meaningful access to public transportation services to persons with limited understanding of English to comply with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq.*, and its implementing regulation at 28 CFR § 42.405(d), and appliable U.S. Department of‑ Justice guidance.

(k)    *Other Nondiscrimination Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow federal guidance prohibiting discrimination.

(l)    *Remedies*. Remedies for failure to comply with applicable federal Civil Rights laws, regulations, and requirements, and failure to follow guidance may be enforced as provided in those federal laws, regulations, requirements, or guidance.

(m)    *Promoting Free Speech and Religious Liberty Federal Law and Public Policy Requirements*. The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(n)    *Federal Anti-Discrimination*.

(1)    Pursuant to section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(2)    Pursuant to section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this Agreement, the Recipient certifies that it does not operate any programs

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants.* |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 8

Federal Aviation Administration
Airport Infrastructure Grant
Template Agreement (May 6, 2025)



**U.S. Department
of Transportation
Federal Aviation
Administration**

### FY 2025 AIRPORT INFRASTRUCTURE GRANT
*TEMPLATE ONLY ** GRANT AGREEMENT ** TEMPLATE ONLY*
**Part I - Offer**

---

Federal Award Offer Date          {{DateTime_es_:signer1:calc(now()):format(date," mmmm d, yyyy")}}

Airport/Planning Area             [Selection Criteria: Airport Name or Planning Area]

Airport Infrastructure Grant
Number                            [Selection Criteria: Grant Number Formatted]

Unique Entity Identifier          [Selection Criteria: DUNS Number]

TO:    [Selection Criteria: Sponsor Name]

**(herein called the "Sponsor") (For Co-Sponsors, list all Co-Sponsor names. The word "Sponsor" in this Grant Agreement also
applies to a Co-Sponsor.)**
[Please Enter Co-Sponsor Name(s)]

FROM:  **The United States of America** (acting through the Federal Aviation Administration, herein
called the "FAA")

**WHEREAS**, the Sponsor has submitted to the FAA a Project Application dated [Selection Criteria: Project
Application Date], for a grant of Federal funds for a project at or associated with the [Selection Criteria:
Airport Name or Planning Area], which is included as part of this Grant Agreement; and

**WHEREAS**, the FAA has approved a project for the [Selection Criteria: Airport Name or Planning Area]
(herein called the "Project") consisting of the following:

[Selection Criteria: Project Description]

which is more fully described in the Project Application.

**NOW THEREFORE**, Pursuant to and for the purpose of carrying out the Infrastructure Investment and
Jobs Act (IIJA) (Public Law number (P.L.) 117-58) of 2021; FAA Reauthorization Act of 2024 (P.L. 118-63);
and the representations contained in the Project Application; and in consideration of: (a) the Sponsor's
adoption and ratification of the attached Grant Assurances dated April 2025, interpreted, and applied
consistent with the FAA Reauthorization Act of 2024; (b) the Sponsor's acceptance of this Offer; and (c)
the benefits to accrue to the United States and the public from the accomplishment of the Project and
compliance with the Grant Assurance and conditions as herein provided;

1

THE FEDERAL AVIATION ADMINISTRATION, FOR AND ON BEHALF OF THE UNITED STATES, HEREBY
OFFERS AND AGREES to pay [%Selection Criteria: Federal Share Percent%] % of the allowable costs
incurred accomplishing the Project as the United States share of the Project.

Assistance Listings Number (Formerly CFDA Number): 20.106

This Offer is made on and SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

## CONDITIONS

1. **Maximum Obligation.** The maximum obligation of the United States payable under this Offer is
$[Selection Criteria: Obligation Amount].

   The following amounts represent a breakdown of the maximum obligation for the purpose of
establishing allowable amounts for any future grant amendment, which may increase the
foregoing maximum obligation of the United States under the provisions of 49 U.S.C. § 47108(b):
$[Selection Criteria: Planning Amount] for planning
$[Selection Criteria: Noise Amount] airport development or noise program implementation; and,
$[Selection Criteria: Land Acquisition Amount] for land acquisition.

2. **Grant Performance.** This Grant Agreement is subject to the following Federal award
requirements:

   a. Period of Performance:

      1. Shall start on the date the Sponsor formally accepts this Agreement and is the date
signed by the last Sponsor signatory to the Agreement. The end date of the Period of
Performance is 4 years (1,460 calendar days) from the date of acceptance. The Period of
Performance end date shall not affect, relieve, or reduce Sponsor obligations and
assurances that extend beyond the closeout of this Grant Agreement.

      2. Means the total estimated time interval between the start of an initial Federal award and the
planned end date, which may include one or more funded portions or budget periods
(2 Code of Federal Regulations (CFR) § 200.1) except as noted in 49 U.S.C § 47142(b).

   b. Budget Period:

      1. For this Grant is 4 years (1,460 calendar days) and follows the same start and end date as
the Period of Performance provided in paragraph 2(a)(1). Pursuant to 2 CFR § 200.403(h),
the Sponsor may charge to the Grant only allowable costs incurred during the Budget
Period and as stated in 49 U.S.C § 47142(b). Eligible project-related costs incurred on
or after November 15, 2021, that comply with all Federal funding procurement
requirements and FAA standards are allowable costs.

      2. Means the time interval from the start date of a funded portion of an award to the end
date of that funded portion during which Sponsors are authorized to expend the funds
awarded, including any funds carried forward or other revisions pursuant to 2 CFR
§ 200.308.

   c. Close Out and Termination

      Unless the FAA authorizes a written extension, the Sponsor must submit all Grant closeout
documentation and liquidate (pay-off) all obligations incurred under this award no later
than 120 calendar days after the end date of the Period of Performance. If the Sponsor does
not submit all required closeout documentation within this time period, the FAA will
proceed to close out the grant within one year of the Period of Performance end date with

the information available at the end of 120 days (2 CFR § 200.344). The FAA may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

(a) (1) The Sponsor fails to obtain or provide any Sponsor grant contribution as required by the agreement;

(2) A completion date for the Project or a component of the Project is listed in the agreement and the Recipient fails to meet that milestone by six months after the date listed in the agreement;

(3) The Sponsor fails to comply with the terms and conditions of this agreement, including a material failure to comply with the Project Schedule even if it is beyond the reasonable control of the Sponsor;

(4) Circumstances cause changes to the Project that the FAA determines are inconsistent with the FAA's basis for selecting the Project to receive a grant; or

(5) The FAA determines that termination of this agreement is in the public interest.

(b) In terminating this agreement under this section, the FAA may elect to consider only the interests of the FAA.

(c) The Sponsor may request that the FAA terminate the agreement under this section.

3.  **Ineligible or Unallowable Costs.** In accordance with P.L. 117-58, Division J, Title VIII  49 U.S.C. § 49 U.S.C. § 47110, the Sponsor is prohibited from including any costs in the grant funded portions of the project that the FAA has determined to be ineligible or unallowable, including costs incurred to carry out airport development implementing policies and initiatives repealed by Executive Order 14148, provided such costs are not otherwise permitted by statute.

4.  **Indirect Costs - Sponsor.** The Sponsor may charge indirect costs under this award by applying the indirect cost rate identified in the project application as accepted by the FAA, to allowable costs for Sponsor direct salaries and wages.

5.  **Determining the Final Federal Share of Costs.** The United States' share of allowable project costs will be made in accordance with 49 U.S.C. § 47109, the regulations, policies, and procedures of the Secretary of Transportation ("Secretary"), and any superseding legislation. Final determination of the United States' share will be based upon the final audit of the total amount of allowable project costs and settlement will be made for any upward or downward adjustments to the Federal share of costs.

6.  **Completing the Project Without Delay and in Conformance with Requirements.** The Sponsor must carry out and complete the project without undue delays and in accordance with this Agreement, IIJA (P.L. 117-58), and the regulations, policies, and procedures of the Secretary. Per 2 CFR § 200.308, the Sponsor agrees to report and request prior FAA approval for any disengagement from performing the project that exceeds three months or a 25 percent reduction in time devoted to the project. The report must include a reason for the project stoppage. The Sponsor also agrees to comply with the grant assurances, which are part of this Agreement.

b.  certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

32. **Federal Law and Public Policy Requirements.** The Sponsor shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Sponsor will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

33. **National Airspace System Requirements.**

(a)  The Sponsor shall cooperate with FAA activities installing, maintaining, replacing, improving, or operating equipment and facilities in or supporting the National Airspace System, including waiving permitting requirements and other restrictions affecting those activities to the maximum extent possible, and assisting the FAA in securing waivers of permitting or other restrictions from other authorities. The Sponsor shall not take actions that frustrate or prevent the FAA from installing, maintaining, replacing, improving, or operating equipment and facilities in or supporting the National Airspace System.

(b)  If the FAA determines that the Sponsor has violated subsection (a), the FAA may impose a remedy, including:

1)  additional conditions on the award;
2)  consistent with 49 U.S.C. chapter 471, any remedy permitted under 2 CFR 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs; requiring refunds from the Recipient to the DOT; suspension or termination of the award; or suspension and debarment under 2 CFR part 180; or
3)  any other remedy legally available.

(c)  In imposing a remedy under this condition, the FAA may elect to consider the interests of only the FAA.

(d)  The Sponsor acknowledges that amounts that the FAA requires the Sponsor to refund to the FAA due to a remedy under this condition constitute a debt to the Federal Government that the FAA may collect under 2 CFR 200.346 and the Federal Claims Collection Standards (31 CFR parts 900–904).

34. **Signage Costs for Construction Projects.** The Sponsor agrees that it will require the prime contractor of a Federally assisted airport improvement project to post signs consistent with a DOT/FAA-prescribed format, as may be requested by the DOT/FAA, and further agrees to remove any signs posted in response to FAA requests received prior to February 1, 2025.

35. **Title 8 - U.S.C., Chapter 12, Subchapter II - Immigration.** The sponsor will follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter.

11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

                *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants*.

---

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 9

Maritime Administration Port Infrastructure
Development Program General Terms and
Conditions (Mar. 31, 2025)

**U.S. DEPARTMENT OF TRANSPORTATION**
**MARITIME ADMINISTRATION**

**GENERAL TERMS AND CONDITIONS UNDER THE**
**FISCAL YEAR 2024 PORT INFRASTRUCTURE DEVELOPMENT PROGRAM**
**GRANTS**

**March 31, 2025**

## Table of Contents

Article 1 Purpose.................................................................................................................. 6
   1.1   Purpose. ..................................................................................................................... 6
Article 2 MARAD Role ........................................................................................................ 7
   2.1   Administration. .......................................................................................................... 7
   2.2   MARAD Program Contacts. ...................................................................................... 7
Article 3 Recipient Role........................................................................................................ 7
   3.1   Statements on the Project. ......................................................................................... 7
   3.2   Statements on Authority and Capacity. ..................................................................... 7
   3.3   MARAD Reliance. ..................................................................................................... 8
   3.4   Project Delivery......................................................................................................... 8
   3.5   Rights and Powers Affecting the Project. ................................................................. 8
   3.6   Notification of Changes to Key Personnel. ............................................................... 8
Article 4 Award Amount, Obligation, and Time Periods ..................................................... 9
   4.1   Federal Award Amount. ............................................................................................ 9
   4.2   Federal Funding Source. ........................................................................................... 9
   4.3   Federal Obligations. .................................................................................................. 9
Article 5 Statement of Work, Schedule, and Budget Changes ............................................. 9
   5.1   Change Notification Requirement. ............................................................................ 9
   5.2   Scope and Statement of Work Changes. ................................................................... 9
   5.3   Schedule Changes. ................................................................................................... 10
   5.4   Budget Changes. ...................................................................................................... 10
   5.5   MARAD Acceptance of Changes. ........................................................................... 11
Article 6 General Reporting Terms ..................................................................................... 11
   6.1   Report Submission. .................................................................................................. 11
   6.2   Alternative Reporting Methods. ............................................................................... 11
   6.3   Paperwork Reduction Act Notice. ........................................................................... 11
Article 7 Progress and Financial Reporting ....................................................................... 12
   7.1   Quarterly Project Progress Reports and Recertifications........................................ 12
   7.2   Final Progress Reports and Financial Information .................................................. 12
Article 8 Performance Reporting ........................................................................................ 12
   8.1   Baseline Performance Measurement. ...................................................................... 12
   8.2   Post-construction Performance Measurement.......................................................... 12
   8.3   Project Outcomes Narrative. .................................................................................... 13
Article 9 Civil Rights and Title VI ..................................................................................... 13
   9.1   Civil Rights and Title VI. ........................................................................................ 13
   9.2   Legacy Infrastructure and Facilities. ...................................................................... 14
Article 10 Critical Infrastructure Security and Resilience .................................................. 14
   10.1  Critical Infrastructure Security and Resilience. ...................................................... 14
Article 11 PIDP Designations ............................................................................................. 15
   11.1  Effect of Urban or Rural Designation. .................................................................... 15
   11.2  Effect of Discretionary or CPF Designation…………………………………………15
Article 12 Contracting and Subawards ............................................................................... 16
   12.1  Minimum Wage Rates. ............................................................................................ 16
   12.2  Buy America. ........................................................................................................... 16
   12.3  Small and Disadvantaged Business Requirements.................................................. 17

| | | |
|---|---|---|
| 12.4 | Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment. | 17 |
| 12.5 | Pass-through Entity Responsibilities | 17 |
| 12.6 | Disclosing Conflict of Interest. | 18 |
| 12.7 | Securing Logistics Information Data of the United States | 18 |

Article 13 Noncompliance and Remedies. ............................................................................ 19
| 13.1 | Noncompliance Determinations. | 19 |
| 13.2 | Remedies. | 19 |
| 13.3 | Other Oversight Entities. | 20 |

Article 14 Agreement Termination .................................................................................... 20
| 14.1 | MARAD Termination. | 20 |
| 14.2 | Closeout Termination. | 21 |
| 14.3 | Post-Termination Adjustments. | 21 |
| 14.4 | Non-Terminating Events. | 21 |
| 14.5 | Other Remedies. | 22 |

Article 15 Costs, Payments, and Unexpended Funds ........................................................ 22
| 15.1 | Limitation of Federal Award Amount. | 22 |
| 15.2 | Projects Costs. | 22 |
| 15.3 | Timing of Project Costs. | 22 |
| 15.4 | Recipient Recovery of Federal Funds. | 22 |
| 15.5 | Unexpended Federal Funds. | 23 |
| 15.6 | Timing of Payments to the Recipient. | 23 |
| 15.7 | Payment Method. | 23 |
| 15.8 | Information Supporting Expenditures. | 23 |
| 15.9 | Reimbursement Request Timing Frequency. | 24 |

Article 16 Liquidation, Adjustments, and Funds Availability ........................................... 24
| 16.1 | Liquidation of Recipient Obligations. | 24 |
| 16.2 | Funds Cancellation. | 24 |

Article 17 Agreement Modifications ................................................................................. 25
| 17.1 | Bilateral Modifications. | 25 |
| 17.2 | Unilateral Contact Modifications. | 25 |
| 17.3 | MARAD Unilateral Modifications. | 25 |
| 17.4 | Other Modifications. | 25 |

Article 18 Federal Financial Assistance, Administrative, and National Policy Requirements .... 25
| 18.1 | Uniform Administrative Requirements for Federal Awards. | 25 |
| 18.2 | Federal Law and Public Policy Requirements. | 25 |
| 18.3 | Federal Freedom of Information Act. | 26 |
| 18.4 | History of Performance. | 26 |
| 18.5 | Whistleblower Protection. | 26 |
| 18.6 | External Award Terms and Obligations. | 26 |
| 18.7 | Incorporated Certifications. | 27 |
| 18.8 | Labor and Work | 27 |

Article 19 Monitoring, Financial Management, Controls, and Records ............................ 27
| 19.1 | Recipient Monitoring and Record Retention. | 27 |
| 19.2 | Financial Records and Audits. | 28 |
| 19.3 | Internal Controls. | 28 |

  19.4  MARAD Record Access. ................................................................................................ 28
Article 20 Notices ...................................................................................................................... 29
  20.1  Form of Notice. ....................................................................................................... 29
  20.2  Method of Notice to MARAD. ............................................................................... 29
  20.3  Method of Notice to Recipient. .............................................................................. 29
  20.4  Recipient Contacts for Notice. ............................................................................... 30
  20.5  Additional Mandatory Notices to MARAD. .......................................................... 30
  20.6  Scope of Notice Requirements. .............................................................................. 30
Article 21 Information Requests ................................................................................................ 30
  21.1  MARAD Information Requests. .............................................................................. 30
Article 22 Assignment ............................................................................................................... 31
  22.1  Assignment Prohibited. .......................................................................................... 31
Article 23 Waiver ...................................................................................................................... 31
  23.1  Waivers. ................................................................................................................... 31
Article 24 Additional Terms and Conditions ............................................................................ 31
  24.1  Disclaimer of Federal Liability. ............................................................................. 31
  24.2  Relocation and Real Property Acquisition. ............................................................ 31
  24.3  Real Property and Equipment Disposition. ............................................................ 32
  24.4  Environmental Review. ........................................................................................... 32
Article 25 Mandatory Award Information ................................................................................. 33
  25.1  Information Contained in a Federal Award ............................................................. 33
  25.2  Federal Award Identification Number. ................................................................... 34
  25.3  Recipient's Unique Entity Identifier. ..................................................................... 34
  25.4  Budget Period. ........................................................................................................ 34
  25.5  Period of Performance. ........................................................................................... 34
Article 26 Construction and Definitions ................................................................................... 34
  26.1  Schedules. ............................................................................................................... 34
  26.2  Exhibits. .................................................................................................................. 34
  26.3  Construction. ........................................................................................................... 34
  26.4  Integration. .............................................................................................................. 35
  26.5  Definitions. .............................................................................................................. 35
  26.6  References to Times of Day. ................................................................................... 36
Article 27 Agreement Execution and Effective Date ................................................................ 36
  27.1  Counterparts. ........................................................................................................... 36
  27.2  Effective Date. ........................................................................................................ 36

## Index of Definitions

Federal Share .................................................................................................................... 11

General Terms and Conditions ............................................................................................ 34

MARAD ............................................................................................................................. 7

NOFO ................................................................................................................................ 6

OMB .................................................................................................................................. 12

PIDP Grant ........................................................................................................................ 35

Program Statute ................................................................................................................. 34

Project ............................................................................................................................... 35

Project Closeout ................................................................................................................ 21

Project Cost Savings .......................................................................................................... 10

Recipient ............................................................................................. Project-Specific Recitals

Technical Application ......................................................................................................... 35

Title VI ............................................................................................................................. 14

USDOT .............................................................................................................................. 6

**GENERAL TERMS AND CONDITIONS**

The Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), and the Consolidated Appropriations Act, 2024, Pub. L. No. 118-42 (Mar. 9, 2024) ("**Consolidated Appropriations Act, 2024**" or "**the Act**") appropriated funds to the United States Department of Transportation (the "**USDOT**") Maritime Administration ("**MARAD**") for fiscal year (FY) 2024 under the heading "Port Infrastructure Development Program." Of the amount appropriated, $500,000,000 is available to make grants to improve port facilities at coastal seaports, inland river ports, or Great Lakes ports. The Consolidated Appropriations Act, 2024 also appropriated $70,460,124 for Port Infrastructure Development Program (PIDP) grants for Community Project Funding (CPF), also known as Congressionally Directed Spending. The list of projects selected for CPF are found in the table entitled "Community Project Funding/Congressionally Directed Spending" included in the Act's accompanying explanatory statement. The MARAD program administering these funds is the Port Infrastructure Development Program (the "**PIDP**").

On December 27, 2023, MARAD posted a funding opportunity at Grants.gov with funding opportunity title "Port Infrastructure Development Program" and funding opportunity number MA-PID-24-001. The notice of funding opportunity posted at Grants.gov (the "**NOFO**") solicited applications for Federal financial assistance under the FY 2024 PIDP for the available FY 2024 PIDP discretionary funding.

These general terms and conditions are incorporated by reference in a project-specific agreement under the FY 2024 PIDP. The term "Recipient" is defined in the project-specific portion of the agreement. The project-specific portion of the agreement includes schedules A through H. The project-specific portion of the agreement may include special terms and conditions in project-specific articles.

**ARTICLE 1**
**PURPOSE**

1.1    **Purpose.** The purpose of this award is to make grants to improve port facilities at coastal seaports, inland river ports, or Great Lakes ports. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, if applicable, as modified by schedule D.

(c) Section 4.2 identifies the specific source or sources of funding for this award.

## ARTICLE 17
## AGREEMENT MODIFICATIONS

17.1    **Bilateral Modifications.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by MARAD and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

17.2    **Unilateral Contact Modifications.**

(a)    The Recipient may update the contacts who are listed in section 3 of schedule A by written notice to all of the MARAD contacts who are listed in section 5 of schedule A and section 2.2.

(b)    MARAD may update the contacts who are listed in section 5 of schedule A and section 2.2 by written notice to all of the Recipient contacts who are listed in section 3 of schedule A.

17.3    **MARAD Unilateral Modifications.**

(a)    MARAD may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b)    To unilaterally modify this agreement under this section 17.3, MARAD must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

17.4    **Other Modifications.** The parties shall not amend, modify, or supplement this agreement except as permitted under sections 17.1, 17.2, or 17.3. If an amendment, modification, or supplement is not permitted under section 17.1, not permitted under section 17.2, or not permitted under section 17.3, it is void.

## ARTICLE 18
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

18.1    **Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 CFR Parts 200 and 1201.

18.2    **Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

(c) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(d) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

**18.3    Federal Freedom of Information Act.**

(a) MARAD is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to MARAD by the Recipient related to this agreement may become MARAD records subject to public release under 5 U.S.C. 552.

**18.4    History of Performance.** Under 2 CFR 200.206, any Federal awarding agency may consider the Recipient's performance under this agreement, when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**18.5    Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**18.6    External Award Terms and Obligations.**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants*. |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 10

Pipeline and Hazardous Materials Safety
Administration Hazardous Materials
Grants, Grant and Cooperative Agreement
Terms and Conditions (May 15, 2025)

# Department of Transportation
# Pipeline and Hazardous Materials Safety Administration (PHMSA)
### Hazardous Materials Grants

## Grant and Cooperative Agreement Terms and Conditions

## Table of Contents

1. Definitions ................................................................................................................. 3
2. Recipient Responsibilities ......................................................................................... 3
3. Compliance with Award Terms and Conditions........................................................ 3
4. Order of Precedence .................................................................................................. 3
Terms and Conditions of this award. ............................................................................. 4
5. Applicable Federal Law and Regulations .................................................................. 4
6. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR 200) ................................................................................ 5
7. Federal Law and Public Policy Requirements............................................................ 6
8. Restrictions on Use of Funds for Lobbying, Support of Litigation, or Direct Advocacy costs associated with obtaining Federal assistance awards ........................ 6
9. Nondiscrimination ..................................................................................................... 6
10. Government-wide Debarment and Suspension (Non-procurement)........................... 7
11. Drug-Free Workplace ................................................................................................ 7
12. Small and Disadvantaged Business Requirements .................................................... 7
13. eInvoicing (PHMSA May 2024) ............................................................................... 7
14. Payments ................................................................................................................... 9
15. Advance Payment ...................................................................................................... 10
16. Advance Payment Process ......................................................................................... 11
17. Adherence to Original Project Objectives and Budget Estimates.............................. 11
18. Prior Approvals ......................................................................................................... 11
19. Seat Belt Use Policies and Programs ........................................................................ 12
20. Ban on Text Messaging While Driving ..................................................................... 12
21. Rights in Technical Data ........................................................................................... 13
22. Notice of News Releases, Public Announcements, and Presentations........................ 13
23. Violation of Award Terms ......................................................................................... 13
24. Reporting Fraud, Waste, or Abuse ............................................................................ 13
25. Reporting Grantee Executive Compensation/First Tier Sub-Awards (PHMSA May 2024) ......... 13
26. 811, Call Before You Dig Program (PHMSA May 2024) ......................................... 16
27. Access to Electronic and Information Technology (PHMSA May 2024)................... 16
28. Combating Trafficking in Persons (PHMSA May 2024)........................................... 16
29. Prohibition on Awarding to Entities that Require Certain Internal Confidentiality Agreements (PHMSA FEB 2015)............................................................................. 17
30. Copyrights................................................................................................................. 18
31. American Materials Required (PHMSA MAY 2024) ................................................ 18
32. Reporting ................................................................................................................... 18

**Tentative Grant and Cooperative Agreement - Award Terms and Conditions**
**Revised: May 15, 2025**

**Tentative Grant and Cooperative Agreement - Award Terms and Conditions**
**Revised: May 15, 2025**

1. **Definitions**
   a) **Recipient** – A non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program. The term "recipient" does not include subrecipients.
   b) **Program Authorizing Official (PAO) –** The PAO is the delegated authority to execute the grant agreement. Should any changes to the scope, budget, schedule, or any other terms become necessary, the PAO in coordination with the AO has the authority to amend the award agreement.
   c) **Agreement Officer (AO) –** The AO has the authority to obligate the Government to the expenditures of Federal funds under this award.
   d) **Grant Specialist (GS) –** The GS is responsible for the daily administration of the award. The GS is NOT AUTHORIZED to change the scope, budget, specifications, and terms and conditions as stated in the award, to make any commitments that otherwise obligates the Government or authorize changes which affect the award budget, delivery schedule, period of performance, or other terms and conditions.
   e) **Recipient Authorized Grantee Official –** The individual with the Recipient organization who has authority to bind the organization legally and financially. It is the Recipient's responsibility to follow their agency's policies and procedures for ensuring that authorized officials are up to date, sign the grant agreement, and endorse any prior approval actions.
   f) **Recipient Project Director –** The individual designated by the recipient who is responsible for the technical direction of the program or project.

2. **Recipient Responsibilities**
   In accepting a PHMSA financial assistance award (grant or cooperative agreement), the Recipient assumes legal, financial, administrative, and programmatic responsibility for administering the award in accordance with the laws, rules, regulations, and Executive Orders governing grants and cooperative agreements, and these Award Terms and Conditions, including responsibility for complying with any provisions included in the award.

3. **Compliance with Award Terms and Conditions**
   Submission of a signed Request for Advance or Reimbursement (payment request) form constitutes the Recipient's agreement to comply with and spend funds consistent with all the terms and conditions of this award. If PHMSA determines that noncompliance by the Recipient cannot be remedied by imposing additional conditions, PHMSA may take one or more of the following actions, as appropriate in the circumstances:
   a) Temporarily withhold cash payments pending correction of the deficiency by the Recipient.
   b) Disallow all, or part of, the cost of the activity or action not in compliance.
   c) Wholly or partly suspend or terminate the Federal award.
   d) Initiate suspension or debarment proceedings as authorized under 2 CFR part 180.
   e) Withhold further Federal awards for the project or program.
   f) Take other remedies that may be legally available.

4. **Order of Precedence**
   Any inconsistency or conflict in the terms and conditions specified in this award will be resolved according to the following order of precedence:

a) The Federal statute authorizing this award or any other Federal statutes, laws, regulations, or directives directly affecting performance of this award.

Terms and Conditions of this award.**Applicable Federal Law and Regulations**

By entering into this agreement for a FY 2025 Hazardous Material Emergency Preparedness Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

General Federal Legislation

a) Hatch Act - 5 U.S.C. §§ 1501, et seq., but see 49 U.S.C. § 5323(l)(2)
b) Age Discrimination Act of 1975 - 42 U.S.C. §§ 6101, et seq.
c) American Indian Religious Freedom Act, Pub. L. No. 95-341, as amended
d) Drug Abuse Office and Treatment Act of 1972, as amended, 21 U.S.C. §§ 1101, et seq.
e) The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, Pub. L. No. 91-616, as amended - 42 U.S.C. §§ 4541, et seq.
f) Sections 523 and 527 of the Public Health Service Act of 1912, as amended, 42 U.S.C. §§ 290dd through 290dd-2
g) Contract Work Hours and Safety Standards Act - 40 U.S.C. § 3701, et seq.
h) National Environmental Policy Act of 1969 - 42 U.S.C. §§ 4321, et seq.
i) Single Audit Act of 1984 - 31 U.S.C. §§ 7501, et seq.
j) Americans with Disabilities Act of 1990 - 42 U.S.C. § 12101, et seq.
k) Title IX of the Education Amendments of 1972, as amended - 20 U.S.C. § 1681 through § 1683, and § 1685 through § 1687
l) Section 504 of the Rehabilitation Act of 1973, as amended - 29 U.S.C. § 794
m) Title VI of the Civil Rights Act of 1964 - 42 U.S.C. §§ 2000d *et seq.*
n) Title IX of the Federal Property and Administrative Services Act of 1949 - 40 U.S.C. §§ 1101 -1104, 541, et seq.
o) Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. § 1352
p) Freedom of Information Act - 5 U.S.C. § 552, as amended
q) Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. 303 and 23 U.S.C. § 138
r) The Federal Funding Accountability and Transparency Act of 2006, as amended (Pub. L. No. 109-282, as amended by section 6202 of Pub. L. No. 110–252)
s) Cargo Preference Act of 1954 – 46 U.S.C. § 55305
t) Build America, Buy America Act, Pub. L. No. 117-58, div. G §§ 70901–70927
u) Bringing in and harboring certain aliens – 8 U.S.C. 1324
v) Aiding or assisting certain aliens to enter – 8 U.S.C. 1327

Executive Orders

a) Executive Order 11990 – Protection of Wetlands
b) Executive Order 12372 – Intergovernmental Review of Federal Programs
c) Executive Order 12549 – Debarment and Suspension

d)  Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
e)  Executive Order 14025 – Worker Organizing and Empowerment
f)  Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship
g)  Executive Order 14154, Unleashing American Energy
h)  Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing
i)  Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
j)  Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

General Federal Regulations

a)  Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 CFR Parts 200, 1201
b)  Non-procurement Suspension and Debarment – 2 CFR Parts 180, 1200
c)  Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 CFR Parts 60, et seq.
d)  New Restrictions on Lobbying – 49 CFR Part 20
e)  Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 CFR Part 21, including any amendments thereto
f)  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 CFR Part 25
g)  Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 CFR Part 27
h)  Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 CFR Part 28
i)  Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 CFR Part 32
j)  DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 CFR Parts 37 and 38
k)  Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 CFR Part 26 (as applicable under section 12 of this agreement), including any amendments thereto
l)  National Environmental Policy Act implementing regulations– 40 CFR 1500 - 1508

Specific assurances required to be included in the FY 2025 Hazardous Material Emergency Preparedness Grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this agreement.

**6.  Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR 200)**
The recipient (and any subrecipients) must comply with these requirements including the cost principles which apply to the recipient, and the audit requirements the recipient must follow. A

recipient who expends $1,000,000 or more of federal funds, in the recipient's fiscal year, must have an audit conducted.

**2 CFR 200** is incorporated by reference into this award

7. **Federal Law and Public Policy Requirements.**

   a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

   b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

   c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

   d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

8. **Restrictions on Use of Funds for Lobbying, Support of Litigation, or Direct Advocacy costs associated with obtaining Federal assistance awards.**
   The Recipient and its contractors may not use grant funds for lobbying in direct support of litigation, or in direct advocacy for, or against, a pipeline construction or expansion project.

   The Recipient and its contractors may not conduct political lobbying, as defined in the statutes, regulations, and **2 CFR 200.450** – "Lobbying," within the Federally-supported project. The Recipient and its contractors may not use Federal funds for lobbying specifically to obtain grants and cooperative agreements. The Recipient and its contractors must comply with 49 CFR 20, U.S. Department of Transportation "New Restrictions on Lobbying."

   **49 CFR 20** is incorporated by reference into this award.

9. **Nondiscrimination**
   The Recipient must comply with Title VI of the Civil Right Act of 1964, which provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied benefits of, be subject to discrimination under any program or activity receiving Federal financial assistance. The Recipient must comply with 49 CFR 21,

"Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—
Effectuation of Title VI of the Civil Rights Act of 1964."

**49 CFR 21** is incorporated by reference into this award.

The purpose of Section 9 is to ensure that the Recipient has a plan to comply with Title VI and 49
C.F.R. part 21, including any amendments thereto.

If the Recipient is a non-State DOT and does not have a current Title VI Plan on file with PHMSA
then as described in chapter II, section 2 of DOT Order 1000.12C, including any amendments or
updates thereto, PHMSA must complete a Title VI Assessment of the Recipient before entering this
grant agreement. Until DOT guidance on conducting such an assessment is finalized, PHMSA may
rely on the date of Title VI assurances provided with the signing of the grant agreement.

To ensure that all Recipients of PHMSA funds are aware of their responsibilities under the
various civil rights laws and regulations, the PHMSA Office of Civil Rights has developed an
information tool and training. These documents are found on the PHMSA website at
http://www.phmsa.dot.gov/org/civilrights/grantrecipientinformation. If you should have any
questions concerning your responsibilities under the External Civil Rights Program, please
contact Rosanne Goodwill, Civil Rights Director, at 202-366-9638 or by e-mail at
rosanne.goodwill@dot.gov.

10. **Government-wide Debarment and Suspension (Non-procurement)**

The Recipient must review the "list of parties excluded from federal procurement or non-
procurement programs" located on the System for Award Management (SAM) website before
entering into a sub-award. https://www.sam.gov No sub-award may be issued to an entity or person
identified in the "list of parties excluded from federal procurement or non- procurement programs."

**2 CFR 1200** is incorporated by reference into this award.

The Recipient must inform the PAO if the recipient suspends or debars a sub-awardee.

11. **Drug-Free Workplace**

The Recipient must comply with the provisions of Public Law 100-690, Title V, Subtitle D, "Drug-
Free Workplace Act of 1988," which require the Recipient to take steps to provide a drug-free
workplace. The Recipient must comply with **49 CFR 32**, "Government-wide Requirements for
Drug Free Workplace (Financial Assistance)" which is incorporated by reference into this award.

12. **Small and Disadvantaged Business Requirements**

If any funds under this award are administered by or through a State Department of Transportation,
the Recipient shall expend those funds in compliance with the requirements at 49 CFR part 26,
including any amendments thereto.

If any funds under this award are not administered by or through a State Department of
Transportation, the Recipient shall expend those funds in compliance with the requirements at 2
CFR 200.321, including any amendments thereto.

13. **eInvoicing (PHMSA May 2024)**

Recipients of PHMSA grants and cooperative agreements must use the DOT Delphi eInvoicing

System.

a) Recipients' Requirements:

Recipients must:

i. Have internet access to register and submit payment requests through the Delphi eInvoicing system;

ii. Submit payment requests electronically and receive payment electronically.

New Grant Recipient User: Once a grant is fully executed, the grant management specialist will submit the recipients' request (External Delphi UAR Form) to the PHMSA Delphi Access Administrator via email PHMSAinvoicing@dot.gov for a new user account to be granted Delphi. Once a Grantee has completed the registration process and obtained their username and password, they can access the Delphi eInvoicing System. Grantees should activate their system account within 3 days of receiving their credentials to prevent the account from being deactivated. A user account will remain valid unless it is deactivated due to a period of inactivity (it has not been logged into for 45 days) or your agency requests it to be deactivated. If a Grantees account has been deactivated due to a period of inactivity for any reason, they should contact the ESC Production Helpdesk, who can be reached at 866-641-3500, Option 4 , 3.

NOTE: The "Delphi External Access Request" form should be completed at the time of grant award execution to ensure that the Grant Recipient has access to the system in order to submit invoices as needed. The following tutorial outlines the steps that each grant recipient user must take to become authenticated and activate his/her Delphi eInvoicing System account – Please share this link with new grantees who need new accounts in Delphi System: ESC: Delphi eInvoicing System - Home.

b) System User Requirements:

iii. Contact the assigned grant specialist directly to sign up for the system. PHMSA will provide the recipient's name and email address to the DOT Financial Management Office. The DOT Financial Management Office will then invite the recipient to sign up for the system;

iv. DOT will send the recipient a User Account Application form to verify identity. The recipient must complete the form and present it to a Notary Public for verification. The recipient will return the notarized form as follows:

Via U.S. Postal Service (certified):
DOT Enterprise Services Center
FAA Accounts Payable
AMZ-100 PO Box 25710
Oklahoma City, OK 73125

Via FedEx or UPS:
DOT Enterprise Services Center MMAC-FAA/ESC/AMZ-150
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169

**Note:** Additional information, including training materials, and helpdesk support can be found on the DOT Delphi eInvoicing website ESC: Delphi eInvoicing System - Home.

c) Waivers

DOT Financial Management officials may, on a case by case basis, waive the requirement to register, and use, the electronic payment system. Waiver request forms can be obtained on the DOT eInvoicing website (http://www.transportation.gov/cfo/delphi-einvoicing-system.html) or by contacting the PHMSA Agreement Officer. Recipients must explain why they are unable to use or access the internet to submit payment requests.

**14. Payments**

Reimbursement payments will be made after the electronic receipt via the DOTeInvoicing System of "Request for Advance or Reimbursement" (Standard Form SF-270).

a) Method of payment
   i)   PHMSA will make all payments under this agreement by electronic funds transfer (EFT), except as provided by paragraph (a)(ii) of this clause. As used in this clause, the term "EFT" refers to the funds transfer and may also include the payment information transfer.
   ii)  If PHMSA is unable to release one or more payments by EFT, the Recipient agrees either to –
        i)  Accept payment by check or some other mutually agreeable method of payment; or
        ii) Request the Government to extend the payment due date until such time as the Government can make payment by EFT (but see paragraph d. of this clause).

b) Recipient's EFT information. The Government will make payment to the Recipient using the EFT information contained in the System for Award Management (SAM) database. If the EFT information changes, the Recipient is responsible for providing the updated information into the System for Award Management (SAM) at: https://www.sam.gov

c) Mechanisms for EFT payment. The Government may make payment by EFT through either the Automated Clearing House (ACH) network, subject to the rules of the National Automated Clearing House Association, or the Fedwire Transfer System. The rules governing Federal payments through the ACH are contained in 31 CFR Part 210.

d) Suspension of payment. If the Recipient's EFT information in the SAM database is incorrect, the Government is not obligated to make payment to the Recipient under this agreement until the correct EFT information is entered into the SAM database. An invoice or agreement-financing request is not a proper invoice for the purpose of prompt payment under this agreement.

e) Recipient EFT arrangements. If the Recipient has identified multiple payment receiving points (i.e., more than one remittance address and/or EFT information set) in the SAM database, and the Recipient has not notified the Government of the payment receiving point applicable to this agreement, the Government will make payment to the first payment receiving point (EFT information set or remittance address as applicable) listed in the SAM database.

f) Liability for uncompleted or erroneous transfers.
   i)   If an uncompleted or erroneous transfer occurs because the Government used the Recipient's EFT information incorrectly, the Government remains responsible for –
        i)  Making a correct payment;

      ii)  Paying any prompt payment penalty due; and

      iii)  Recovering any erroneously directed funds.

  ii)  If an uncompleted or erroneous transfer occurs because the Recipient's EFT information was incorrect, or was revised within 30 days of Government release of the EFT payment transaction instruction to the Federal Reserve System, and –

      i)  If the funds are no longer under the control of the payment office, the Government is deemed to have made payment and the Recipient is responsible for recovery of any erroneously directed funds; or

      ii)  If the funds remain under the control of the payment office, the Government will not make payment, and the provisions of paragraph d. of this clause apply.

g) EFT and prompt payment. A payment will have been made in a timely manner in accordance with the prompt payment terms of this agreement if, in the EFT payment transaction instruction released to the Federal Reserve System, the date specified for settlement of the payment is on or before the prompt payment due date, provided the specified payment date is a valid date under the rules of the Federal Reserve System.

h) EFT and assignment of claims. If the Recipient assigns the proceeds of this agreement, the Recipient must require, as a condition of any such assignment, that the assignee register in the SAM database and be paid by EFT in accordance with the terms of this clause. In all respects, the requirements of this clause will apply to the assignee as if it were the Recipient. EFT information that shows the ultimate recipient of the transfer to be other than the Recipient, in the absence of a proper assignment of claims acceptable to the Government, is incorrect EFT information within the meaning of paragraph d. of this clause.

i) Liability for change of EFT information by financial agent. The Government is not liable for errors resulting from changes to EFT information made by the Recipient's financial agent.

j) Payment information. The payment or disbursing office will forward to the Recipient available payment information that is suitable for transmission as of the date of release of the EFT instruction to the Federal Reserve System. The Government may request the Recipient to designate a desired format and method(s) for delivery of payment information from a list of formats and methods the payment office is capable of executing. However, the Government does not guarantee that any particular format or method of delivery is available at any particular payment office and retains the latitude to use the format and delivery method most convenient to the Government. If the Government makes payment by check in accordance with paragraph a. of this clause, the Government will mail the payment information to the remittance address contained in the SAM database.

## 15. Advance Payment

49 CFR § 110.50 authorizes PHMSA to issue advance payments to grant recipients. Recipient must receive prior approval from PHMSA and must meet the required criteria for advance payments be made.

a) Recipient must possess financial management systems that meet the standards for fund control and accountability as established in 2 CFR 200.302 for awards issued after that date.  Recipient must ensure that advance payment requests are limited to the  minimum amounts needed and be timed to be in accordance with the actual,  immediate cash

requirements in carrying out the purpose of the approved program or project. Recipient must deposit and maintain advance payments in insured accounts whenever possible unless the recipient receives less than $120,000 in federal awards from all sources or can demonstrate the best reasonably available interest-bearing account would not be expected to earn interest in excess of $500 per year on Federal cash balances. $250 for awards issued prior to December 26, 2014.

b) Recipient submits advance payments based on cash payment needs and not accrued liabilities.
c) Recipient must remain in compliance with the terms and conditions of their award.
d) Recipient is not indebted to the United States Government.
e) Recipient's SAM.gov registration is current and active at the time of the advance payment request.
f) The recipient maintains supporting documentation in their files and makes them available upon request to PHMSA in order to determine if the costs adhere to the applicable cost principles, statutes and regulations. PHMSA will also monitor to ensure grantee has not requested advance payments beyond immediate disbursing needs and that excess balances were promptly returned to the Treasury.

## 16. Advance Payment Process

To request an advance payment, log into the DOT Electronic Payment System (Delphi E-Invoicing), create and submit a standard invoice, and complete an SF270 form with the Advance Payment Request. This process is similar to requesting a reimbursement. The grant specialist assigned to your account will receive an email generated from the system with the invoice details.

a) Advance payments must be fully disbursed (example: checks written, signed, and issued to the payees) within 30 days of the date you receive the advance funds from the U.S. Treasury.
b) Advance payment requests should be submitted no earlier than 10 business days prior to the beginning of the period for which the funds are requested.
c) PHMSA will check for all of the following criteria:
   i. Your award balance is sufficient to meet the advance amount requested.
   ii. Evaluations will be based on cash payments and not on accrued liabilities.
   iii. You have satisfied program requirements including submission of required federal financial reports for prior quarters/periods.
   iv. The request is for allowable expenditures.

## 17. Adherence to Original Project Objectives and Budget Estimates

a) The Recipient is responsible for any commitments or expenditures it incurs in excess of the funds provided by an award. Pre-award costs are those incurred prior to the effective date of the Federal award directly pursuant to the negotiation and in anticipation of the Federal award where such costs are necessary for efficient and timely performance of the scope of work. Such costs are allowable only to the extent that they would have been allowable if incurred after the date of the Federal award, *and only with the written approval of the Program Authorizing Official or delegate.*
b) The Recipient must submit any proposed change, that requires PHMSA's written approval, 30 days prior to the requested effective date of the proposed change. PHMSA will not approve any change to the award during the last 30 days of the award period.

## 18. Prior Approvals

a) The following expenditures require the PAO's advance written approval:
   i) Changes in the scope, objective, or key personnel referenced in the Recipient's

proposal.
    ii) Change in the project period. PHMSA must receive this request no later than 30 calendar days prior to the end of the project period. The Recipient must submit a revised budget indicating the planned use of all unexpended funds during the extension period.

b) The Recipient must submit a revised financial estimate and plan for i) and ii) above.

c) PHMSA will notify the Recipient in writing within 30 calendar days after receipt of the request for revision or adjustment whether the request has been approved.

**19. Seat Belt Use Policies and Programs**

In accordance with Executive Order 13043, the Recipient is encouraged to adopt on-the-job seat belt use policies and programs for its employees when operating company-owned, rented, or personally owned vehicles. The National Highway Traffic Safety Administration (NHTSA) is responsible for providing leadership and guidance in support of this presidential initiative. For information on how to implement such a program or for statistics on the potential benefits and cost-savings to your company or organization, please visit the Buckle Up America section on NHTSA's website at www.nhtsa.dot.gov. Additional resources are available from the Network of Employers for Traffic Safety (NETS), a public-private partnership headquartered in Washington, D.C. dedicated to improving the traffic safety practices of employers and employees. NETS is prepared to help with technical assistance, a simple, user-friendly program kit, and an award for achieving the President's goal of 85 percent seat belt use. NETS can be contacted at 1-888-221-0045 or visit its website at www.trafficsafety.org.

**20. Ban on Text Messaging While Driving**

    a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10 and the E.O. For clarification purposes, they may expand upon the definitions in the E.O.

      "Driving"-
        i) Means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic, a traffic light, stop sign, or otherwise.
        ii) It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

      "Text messaging" --- means reading from or entering data into any handheld or other electronic device, including for the purpose of short message service texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless the practice is prohibited by State or local law.

    b) In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving, October 1, 2009, and DOT Order 3902.10, Text Messaging While Driving, December 30, 2009, financial assistance recipients and subrecipients of grants and cooperative agreements are encouraged to:

      1) Adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving--
        i) Company-owned or -rented vehicles or Government-owned, leased or

              rented vehicles; or

       ii)  Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

   2)  Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as-

       i)  Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

       ii)  Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

  c)  *Assistance Awards.* All recipients and subrecipients of financial assistance to include: grants, cooperative agreements, loans and other types of assistance, shall insert the substance of this clause, including this paragraph (c), in all assistance awards.

## 21. Rights in Technical Data

Rights to intangible property under this agreement are governed in accordance with **2 CFR 200.315** - "Intangible Property."

## 22. Notice of News Releases, Public Announcements, and Presentations

The Recipient must have the PAO's prior approval for all press releases, formal announcements, or other planed written issuance containing news or information concerning this Agreement before issuance. The Recipient must provide two copies of the document to the PAO for review prior to release. Also, the PAO must approve any planned presentations/briefings related to this Agreement, as well as the actual presentation (e.g. slides/vu-graphs) to be used.

## 23. Violation of Award Terms

If the Recipient has materially failed to comply with any term of the award, the PAO may suspend, terminate, or take other remedies as may be legally available and appropriate in the circumstances.

## 24. Reporting Fraud, Waste, or Abuse

The DOT Inspector General maintains a toll-free hotline for receiving information concerning fraud, waste, or abuse under grants and cooperative agreements. Such reports are kept confidential and callers may decline to give their names if they choose to remain anonymous. The number is: (800) 424-9071.

The mailing address is:
DOT Inspector General Hotline
1200 New Jersey Ave SE
West Bldg. 7th Floor
Washington, DC 20590
Email: hotline@oig.dot.gov
Web: http://www.oig.dot.gov/Hotline

## 25. Reporting Grantee Executive Compensation/First Tier Sub-Awards (PHMSA May 2024)

  a)  *Definitions.* As used in this provision:

      "Executive" means an officer or any other employee in a management position.

"First-tier sub-award" means an award issued directly by the prime Awardee to a sub-awardee to provide support for the performance of any portion of the substantive project or program for which the award was received. A sub-award includes an agreement that the prime Awardee or a sub-awardee considers a contract.

"Total compensation" means the cash and noncash dollar value earned by the executive during the Awardee's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

    i)    Salary and bonus.

    ii)    Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Financial Accounting Standards Board's Accounting Standards Codification (FASB ASC) 718, Compensation-Stock Compensation.iii) Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives, and are available generally to all salaried employees.

    iii)    Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

    iv)    Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

    v)    Above-market earnings on deferred compensation which is not tax-qualified.

    vi)    Other compensation, if the aggregate value of all such other compensation (*e.g.*, severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

b)    *System for Award Management (SAM).* As a recipient of a Federal award you are required to register in the System for Award Management (SAM) at: https://www.sam.gov

c)    *Notification to Sub-Awardees.* Awardees are required to report information on sub-awards. The law requires all reported information be made public; therefore, the Awardee is responsible for notifying its sub-awardees that the required information will be made public.

d)    *Reporting of First-Tier Sub-Awards.* By the end of the month following the month of award of a first-tier sub-award with a value of $25,000 or more, the Awardee shall report the information below at http://www.fsrs.gov for each first-tier sub-award. (The Awardee shall follow the instructions at http://www.fsrs.gov to report the data.) If the Awardee, in the previous tax year, had gross income from all sources under $300,000, the Awardee is exempt from the requirement to report subcontractor awards. If a sub-awardee, in the previous tax year had gross income from all sources under $300,000, the

**Tentative Grant and Cooperative Agreement - Award Terms and Conditions**
**Revised: May 15, 2025**

Awardee does not need to report awards made to that sub-awardee.

    i)  Unique Entity Identifier (The Unique Entity ID is a 12-character alphanumeric ID assigned to an entity by SAM.gov) for the sub-awardee receiving the award, and for the sub-awardee's parent company, if the sub-awardee has a parent company.

    ii)  Name of the sub-awardee.

    iii)  Amount of the sub-award.

    iv)  Date of the sub-award.

    v)  A description of the effort being provided under the sub-award, including the overall purpose and expected outcome or result of the sub-award.

    vi)  Sub-award number (assigned by the Awardee).

    vii)  Sub-awardee's physical address including street address, city, state, country, 9-digit zip code, and congressional district.

    viii)  Sub-awardee's primary performance location including street address, city, state, country, 9-digit zip code, and congressional district.

    ix)  The prime award number (assigned by PHMSA)

    x)  Awarding agency name. (PHMSA)

    xi)  Funding agency name. (PHMSA)

    xii)  Government awarding office code. (56)

    xiii)  Treasury account symbol (TAS) as reported in Federal Assistance Award Data System.

    xiv)  The applicable North American Industry Classification System (NAICS) code.

e)  *Reporting Executive Compensation of Awardee.* If the Awardee, in the previous tax year, had gross income from all sources under $300,000, the Awardee is exempt from the requirement to its executive compensation.

By the end of the month following the month of receipt of a prime award, and annually thereafter, the Awardee shall report the names and total compensation of each of the five most highly compensated executives for the Awardee's preceding completed fiscal year at https://www.sam.gov if, in the Awardee's preceding fiscal year, the Awardee received:

    i)  80 percent or more of its annual gross revenues from Federal contracts (and subcontracts), loans, grants (and sub-awards), cooperative agreements, other transaction agreements; and

    ii)  $25,000,000 or more in annual gross revenues from Federal contracts (and subcontracts), loans, grants (and sub-awards), cooperative agreements, other transaction agreements; and

    iii)  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

f)  *Reporting Executive Compensation of Sub-Awardees.* If the Awardee, in the previous tax year, had gross income from all sources under $300,000, the Awardee is exempt from the requirement to report the executive compensation of sub-awardees. If a sub-awardee, in the previous tax year had gross income from all sources under $300,000, the Awardee does not need to report the executive compensation of that sub-awardee.

By the end of the month following the month of a first-tier sub-award with a value of $25,000 or more, and annually thereafter, the Awardee shall report the names and total compensation of each of the five most highly compensated executives for each first-tier sub- awardee for the sub-awardee's preceding completed fiscal year at http://www.fsrs.gov, if in the sub-awardee's preceding fiscal year, the sub-awardee received:

i)  80 percent or more of its annual gross revenues from Federal contracts (and subcontracts), loans, grants (and sub-awards), cooperative agreements, other transaction agreements; and

ii)  $25,000,000 or more in annual gross revenues from Federal contracts (and subcontracts), loans, grants (and sub-awards), cooperative agreements, other transaction agreements; and

iii)  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

## 26. 811, Call Before You Dig Program (PHMSA May 2024)

Damage to pipelines during excavation is a leading cause of accidents resulting in serious injuries and fatalities, but these accidents are preventable, and you can help in preventing them. 811 is designated as the national call-before-you-dig number. Every state has a one-call law requiring excavators to have underground utilities marked before digging. The recipient is encouraged to adopt the "811, Call Before You Dig" program for its employees and contractors when digging on company-owned, leased, or personally owned property. For information on how to implement such a program please visit the *811 – Call Before You Dig* section of Pipeline and Hazardous Materials Safety Administration's (PHMSA's) website at www.phmsa.dot.gov.

## 27. Access to Electronic and Information Technology (PHMSA May 2024)

Each Electronic and Information Technology (EIT) product or service, furnished under this award, must be in compliance with the Electronic and Information Technology Accessibility Standard (36 CFR 1194), which implements Section 508 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794d. The PHMSA Office of Civil Rights will respond to any questions and will certify Section 508 compliance for the requirement. You can reach the PHMSA Office of Civil Rights at phmsa.civilrights@dot.gov, or 202-366-9638.

## 28. Combating Trafficking in Persons (PHMSA May 2024)

PHMSA may terminate grants, cooperative agreements, or take any of the other remedial actions authorized under 22 U.S.C. 7104(g), without penalty, if the grantee or any subgrantee, engages in, or uses labor recruiters, brokers, or other agents who engage in-

a) severe forms of trafficking in persons;
b) the procurement of a commercial sex act during the period of time that the grant, or cooperative agreement is in effect;
c) the use of forced labor in the performance of the grant or cooperative agreement; or
d) acts that directly support or advance trafficking in persons, including the following acts:

   i) Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents.
   ii) Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless-
      1) exempted from the requirement to provide or pay for such return transportation by the Federal department or agency providing or entering into the grant, or cooperative agreement; or
      2) the employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action.
   iii) Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment.
   iv) Charging recruited employees unreasonable placement or recruitment fees, such as fees equal to or greater than the employee's monthly salary, or recruitment fees that violate the laws of the country from which an employee is recruited.
   v) Providing or arranging housing that fails to meet the host country housing and safety standards.

**29. Prohibition on Awarding to Entities that Require Certain Internal Confidentiality Agreements (PHMSA FEB 2015)**

a) The Recipient shall not require employees or subcontractors seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting such waste, fraud or abuse to a designated investigative or law enforcement representative of a federal department or agency authorized to receive such information.

b) The Recipient shall notify employees that the prohibitions and restrictions of any internal confidentiality agreements covered herein are no longer in effect.

c) The prohibition in paragraph (a) above does not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d) In accordance with section 743 of Division E, Title VII, of the Consolidated and Further Continuing Resolution Appropriations Act, 2015 (P.L. 113-235), use of funds appropriated (or otherwise made available) under that or any other Act may be prohibited, if the Government determines that the Recipient is not in compliance with the provisions herein. The Government may seek any available remedies in the event the Recipient fails to

comply with the provisions herein.

**30. Copyrights**

PHMSA reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use, for Federal government purposes:

   a) The copyright in any work developed under a grant, sub award, or contract under a grant or sub award; and

   b) Any rights of copyright to which a Recipient, sub recipient or a contractor purchases ownership with grant support.

**31. American Materials Required (PHMSA MAY 2024)**

If articles, materials, or supplies, are required:  Per 41 USC 8302, only unmanufactured articles, materials, and supplies, that have been mined or produced in the United States, and only manufactured articles, materials, and supplies that have been manufactured in the United States substantially all from articles, materials, or supplies minded, produced, or manufactured in the United States, shall be acquired under this award unless PHMSA determines their acquisition to be inconsistent with the public interest of their cost to be unreasonable.

This requirement does not apply:

   a) to articles, materials, or supplies for use outside the United States;
   b) if articles, materials, or supplies of the class or kind to be used, or the articles, materials, or supplies from which they are manufactured, are not mined, produces, or manufactured in the United States in sufficient and reasonably available commercial quantities and are not of a satisfactory quality; and
   c) to manufactured articles, materials, or supplies procured under any contract with an award value that is not more than the micro-purchase threshold.

**32. Reporting**

   a) *Annual Federal Financial Report (FFR) (SF-425)* – The Annual FFR provides an update on the status of funds for the performance period. This report is cumulative. The Annual FFR is due no later than 11:59pm Eastern Standard Time (EST), December 30th of the performance  year.

   b) *Annual Progress Reports* – Each grant recipient is required to submit a progress report to show progression of approved projects and activities. Grant recipients with a performance period longer than twelve (12) months are required to submit an annual progress report and must follow the instructions outlined in the terms and conditions of the grant award.

   c) *Final FFR*– The Final FFR closes-out the financial reporting for the performance period. A Final FFR is due no later than 11:59pm Eastern Standard Time (EST), 120 days after the end of the performance period.

   d) *Final Progress Report* – The Final Progress Report provides the status of the activities performed during the entire performance period. The final progress report is due no is due no later than 11:59pm Eastern Standard Time (EST), 120 days after the end of the performance period.

A request for extension of the due date for a mid and end of year reports must be made in writing to PHMSA no later than **15 days** before the reports are due. The request must include the reason for the request and the requested due date.

(End of provision)

**Tentative Grant and Cooperative Agreement - Award Terms and Conditions**

**Revised: May 15, 2025**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants*.

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 11

Department of Homeland Security, Sanctuary
Jurisdictions Defying Federal Immigration Law
(May 29, 2025)

6/2/25, 1:04 PM                    Sanctuary Jurisdictions Defying Federal Immigration Law | Homeland Security

The Wayback Machine - https://web.archive.org/web/20250529215954/https://www.dhs.gov/sanctuary-jurisdictions

 **Homeland Security**

U.S. Department of Homeland Security

# Sanctuary Jurisdictions Defying Federal Immigration Law

Sanctuary jurisdictions undermine the rule of law and endanger the lives of Americans and Law Enforcement

Executive Order 14287: *Protecting American Communities from Criminal Aliens* requires that a list of states and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions) be published. Sanctuary jurisdictions including cities, counties, and states that are deliberately and shamefully obstructing the enforcement of federal immigration laws endangering American communities. Sanctuary cities protect dangerous criminal aliens from facing consequences and put law enforcement in peril.

The list below was created to identify sanctuary jurisdictions, which are determined by factors like compliance with federal law enforcement, information restrictions, and legal protections for illegal aliens.

Each jurisdiction listed will receive formal notification of its non-compliance with Federal statutes. DHS demands that these jurisdictions immediately review and revise their policies to align with Federal immigration laws and renew their obligation to protect American citizens, not dangerous illegal aliens.

Note that the list can be reviewed and changed at any time and will be updated regularly. No one should act on this information without conducting their own evaluation of the information.

↗ Close all    ↙ Open all

## Sanctuary Jurisdiction List

### Alaska

### Cities

- City of Anchorage

### California

### State

- Self-Identification as a State Sanctuary Jurisdiction

### County

- Alameda County
- Amador County
- Butte County
- Calaveras County
- Colusa County
- Del Norte County
- El Dorado County

- Glenn County
- Humboldt County
- Imperial County
- Lake County
- Lassen County
- Los Angeles County
- Madera County
- Mariposa County
- Mendocino County
- Merced County
- Modoc County
- Mono County
- Monterey County
- Nevada County
- Plumas County
- Riverside County
- Sacramento County
- San Benito County
- San Bernardino County
- San Francisco County
- San Joaquin County
- San Luis Obispo County
- San Mateo County
- Santa Clara County
- Santa Cruz County
- Santa Barbara County
- San Diego County
- Shasta County
- Sierra County
- Siskiyous County
- Solano County
- Sonoma County
- Stanislaus County
- Sutter County
- Tehama County
- Tuolumne County
- Trinity County
- Tulare County
- Ventura County
- Yolo County
- Yuba County

## Cities

- Alameda
- Albany
- Arcata
- Baldwin Park
- Belmont
- Benicia
- Berkeley
- Calipatria
- Cathedral City
- Chula Vista
- City of San Rafael
- Coachella

- Concord
- Culver City
- Davis
- El Cerrito
- Emeryville
- Eureka
- Fort Bragg
- Fremont
- Fresno
- Hayward
- Healdsburg
- Huntington Beach
- Huron
- Imperial
- La Puente
- Long Beach
- Los Angeles
- Madera
- Malibu
- Martinez
- Maywood
- Menlo Park
- Mountain View
- Newark
- Oakland
- Pacifica
- Palm Springs
- Pasadena
- Petaluma
- Pleasanton
- Represa
- Richmond
- Sacramento
- Salinas
- San Diego
- San Francisco
- San Jose
- San Leandro
- San Luis Obispo
- San Pablo
- Santa Cruz
- Santa Rosa
- Santee
- Soledad
- Stockton
- Union City
- Ventura
- Vista
- Watsonville
- West Hollywood
- Williams

## Colorado

## State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Adams County
- Arapahoe County
- Baca County
- Bent County
- Boulder County
- Broomfield County
- Chafee County
- Cheyenne County
- Clear Creek County
- Conejos County
- Costilla County
- Custer County
- Denver County
- Eagle County
- El Paso County
- Garfield County
- Gilpin County
- Gunnison County
- Huerfano County
- Jefferson County
- Kiowa County
- Kit Carson County
- La Plata County
- Lake County
- Larimer County
- Las Animas County
- Lincoln County
- Logan County
- Morgan County
- Otero County
- Park County
- Pitkin County
- Prowers County
- Pueblo County
- Rio Grande County
- Saguache County
- San Miguel County
- Summit County
- Washington County
- Weld County
- Yuma County

## Cities

- Aurora
- Boulder
- City of Durango
- City of Fort Collins
- Denver
- Lafeyette
- Lakewood
- Longmont

- Northglen
- Town of Avon
- Town of Basalt
- Town of Carbondale
- Town of Dillion
- Town of Eagle
- Town of Vail

**Connecticut**

**State**

- Self-Identification as a State Sanctuary Jurisdiction

## Cities

- East Haven
- Hamden
- Hartford
- New Haven
- New London
- Windham

**Delware**

**State**

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- New Castle County

## Cities

- Camden
- Newark

**District of Columbia**

## Cities

- Self-Identification as Local Sanctuary Jurisdiction

**Georgia**

## Counties

- Athens-Clarke County

- DeKalb County
- Douglas County
- Fulton County

## Cities

- Athens
- Atlanta

## Hawaii

### Cities

- City of Honolulu

## Idaho

### Cities

- City of Boise

## Illinois

### State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Adams County
- Alexander County
- Bond County
- Boone County
- Bureau County
- Calhoun County
- Carroll County
- Cass County
- Champaign County
- Christian County
- Clark County
- Clay County
- Clinton County
- Coles County
- Cook County
- Crawford County
- Cumberland County
- DeKalb County
- Dewitt County
- Douglas County
- DuPage County
- Edgar County

- Effingham County
- Fayette County
- Ford County
- Franklin County
- Fulton County
- Gallatin County
- Greene County
- Grundy County
- Hancock County
- Hardin County
- Henderson County
- Henry County
- Iroquois County
- Jackson County
- Jersey County
- Jo Daviess County
- Johnson County
- Kane County
- Kankakee County
- Kendall County
- Knox County
- Lake County
- LaSalle County
- Lawrence County
- Lee County
- Livingston County
- Logan County
- Macon County
- Macoupin County
- Madison County
- Marion County
- Marshall County
- Mason County
- Massac County
- McDonough County
- McLean County
- Mercer County
- Menard County
- Monroe County
- Montgomery County
- Morgan County
- Moultrie County
- Ogle County
- Peoria County
- Perry County
- Piatt County
- Pike County
- Pope County
- Pulaski County
- Putnam County
- Randolph County
- Richland County
- Rock Island County
- Saint Clair County
- Saline County
- Sangamon County

- Schuyler County
- Scott County
- Shelby County
- Stark County
- Stephenson County
- Tazewell County
- Union County
- Vermilion County
- Wabash County
- Warren County
- Washington County
- Wayne County
- White County
- Whiteside County
- Will County
- Williamson County
- Winnebago County
- Woodford County

## Cities

- Berwyn City
- Chicago
- Evanston
- Oak Park Village
- Skokie
- St. Joseph
- Urbana

**Indiana**

## Counties

- Monroe County

**Kansas**

## County

- Lawrence

## Cities

- Douglas County

**Kentucky**

## Counties

- Cambell County
- Franklin County

- Jefferson County
- Scott County

## Cities

- Louisville

## Louisiana

## Cities

- New Orleans/Orleans (Parish)

## Maine

## Counties

- Cumberland County
- Hancock County

## Cities

- Portland

## Maryland

## State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Anne Arundel County
- Baltimore County
- Charles County
- Howard County
- Montgomery County
- Prince George's County
- Queen Anne's County
- Talbot County

## Cities

- Annapolis
- Baltimore City
- Cheverly
- College Park
- Edmonston
- Greenbelt
- Hyattsville
- Mount Rainier

- Rockville
- Tacoma Park

**Massachusetts**

## State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Barnstable County
- Berkshire County
- Bristol County
- Dukes County
- Essex County
- Franklin County
- Hampshire County
- Middlesex County
- Nantucket County
- Norfolk County
- Plymouth County
- Suffolk County
- Worcester County

## Cities

- Amherst
- Boston
- Cambridge
- Chelsea
- Concord
- Holyoke
- Lawrence
- Newton
- Northampton
- Orleans
- Somerville
- Springfield

**Michigan**

## Counties

- Kalamazoo County
- Kent County
- Oakland County
- Washtenaw County
- Wayne County
- Wexford County

## Cities

- Ann Arbor
- East Lansing

**Minnesota**

## State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Anoka County
- Carver County
- Cottonwood County
- Goodhue County
- Hennepin County
- Le Sueur County
- Lincoln County
- Lyon County
- Martin County
- Nicollet County
- Nobles County
- Otter Tail County
- Pipestone County
- Ramsey County
- Scott County
- Stearns County
- Steele County
- Todd County
- Watonwan County
- Wright County

## Cities

- Minneapolis
- St. Paul

**Nebraska**

## Counties

- Arthur County
- Blaine County
- Grant County
- Greenley County
- Hooker County
- Howard County
- Logan County
- Loup County
- McPherson County
- Thomas County

**Nevada**

## Cities

- Las Vegas City

**New Hampshire**

## Cities

- Hanover
- Lebanon

**New Jersey**

## State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Burlington County
- Cumberland County
- Warren County

## Cities

- Asbury Park
- Bloomfield
- Camden
- East Orange
- Hoboken
- Jersey City
- Leonia
- Linden
- Maplewood
- Montclair Township
- Newark
- North Bergen
- Paterson
- Plainfield
- Prospect Park
- South Orange
- Trenton
- Union City

**New Mexico**

## Counties

- Bernalillo County
- Chaves County
- Colfax County
- De Baca County
- Dona Ana County
- Eddy County
- Grant County
- Hidalgo County
- Lincoln County
- Los Alamos County
- Luna County
- McKinley County
- Otero County
- Quay County
- Rio Arriba County
- Roosevelt County
- San Juan County
- San Miguel County
- Sandoval County
- Santa Fe County
- Sierra County
- Socorro County
- Taos County

## Cities

- Albuquerque
- Santa Fe

## New York

## State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Albany County
- Dutchess County
- Monroe County
- Orange County
- Putnam County
- Rockland County
- Saratoga County
- Suffolk County
- Sullivan County
- Tompkins County
- Ulster County
- Warren County
- Wayne County
- Westchester County

- Yates County

## Cities

- Albany
- Beacon
- East Hampton
- Hudson
- Ithaca
- Kingston
- New Paltz
- New York City
- Newburgh
- Poughkeepsie
- Rochester
- Syracuse

**North Carolina**

## Counties

- Buncombe County
- Chatham County
- Durham County
- Orange County
- Watauga County

**North Dakota**

## Counties

- Billings County
- Golden Valley County
- Grant County
- Morton County
- Ramsey County
- Sioux County
- Slope County

**Ohio**

## Counties

- Franklin County
- Lorain County
- Warren County

## Cities

- Cincinnatti

- Columbus

**Oregon**

**State**

- Self-Identification as a State Sanctuary Jurisdiction

**Counties**

- Clatsop County
- Columbia County
- Harney County
- Klamath County
- Lake County
- Lane County
- Lincoln County
- Linn County
- Marion County
- Multnomah County
- Tillamook County
- Umatilla County
- Union County
- Washington County
- Yamhill County

**Cities**

- Beaverton
- Eugene
- Hood River
- Portland

**Pennsylvania**

**Counties**

- Adams County
- Allegheny County
- Centre County
- Chester County
- Clarion County
- Dauphin County
- Delaware County
- Lehigh County
- Montgomery County
- Montour County
- Northampton County

**Cities**

- Gettysburg

- Philadelphia
- Pittsburgh
- State College
- York

**Rhode Island**

**State**

- Court Order Requiring State Sanctuary Requirements

**Cities**

- Central Falls
- Providence

**Tennessee**

**Counties**

- Shelby County

**Cities**

- Nashville

**Vermont**

**State**

- Self-Identification as a State Sanctuary Jurisdiction

**Cities**

- Burlington
- Montpelier
- Winooski

**Virginia**

**Counties**

- Albemarle County
- Amherst County
- Arlington County
- Augusta County
- Brunswick County
- Charlotte County
- Chesterfield County

- Dinwiddie County
- Fairfax County
- Gloucester County
- Halifax County
- Hanover County
- Henrico County
- Martinsville County
- Middlesex County
- Prince William County
- Rappahannock County
- Richmond County
- Tazewell County
- Warren County

## Cities

- Abingdon
- Alexandria
- Charlottesville
- Duffield
- Hampton
- Lynchburg
- Manassas
- Martinsville
- Newport News
- Portsmouth City
- Richmond
- Tazewell
- Virginia Beach

## Washington

## State

- Self-Identification as a State Sanctuary Jurisdiction

## Counties

- Asotin County
- Benton County
- Chelan County
- Clallam County
- Clark County
- Columbia County
- Cowlitz County
- Ferry County
- Franklin County
- Garfield County
- Grant County
- Grays Harbor County
- Island County
- Jefferson County
- King County
- Kitsap County
- Kittitas County

- Lewis County
- Lincoln County
- Mason County
- Okanogan County
- Pacific County
- Pend Oreille County
- Pierce County
- San Juan County
- Skagit County
- Skamania County
- Snohomish County
- Spokane County
- Stevens County
- Swinomish County
- Thurston County
- Wakhiakum County
- Walla Walla County
- Whatcom County
- Whitman County

## Cities

- City of Everett
- City of Olympia
- City of Tacoma
- Seattle
- Yakima

### Wisconsin

## Counties

- Dane County
- Shawano County

## Cities

- Madison
- Milwaukee

### Keywords

IMMIGRATION (/WEB/20250529215954/HTTPS://WWW.DHS.GOV/KEYWORDS/IMMIGRATION)      ALIEN (/WEB/20250529215954/HTTPS://WWW.DHS.GOV/KEYWORDS/ALIEN)

BORDER SECURITY (/WEB/20250529215954/HTTPS://WWW.DHS.GOV/KEYWORDS/BORDER-SECURITY)

LAW ENFORCEMENT (/WEB/20250529215954/HTTPS://WWW.DHS.GOV/KEYWORDS/LAW-ENFORCEMENT)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                    *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                    *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 12

Department of Homeland Security, Sanctuary
Jurisdictions Defying Federal Immigration Law
—Page Not Found (June 1, 2025)



## U.S. Department of Homeland Security

# Page Not Found

### It looks like K–9 Scout wasn't able to find the page that you are searching for.

The page may have been moved, deleted, or is otherwise unavailable.

To help you find what you are looking for, please try one or more of the following:

1. Search for what you are looking for in our search box in the upper right corner of this page.
2. Check the URL (web address) for proper spelling and completeness.



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>        *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION, *et al.*,<br><br>        *Defendants.* | No. 1:25-cv-00208-JJM-PAS |

# EXHIBIT 13

Greg Norman, Department of Homeland Security
Removes "Sanctuary Jurisdictions" List from its
Website, Fox News (June 2, 2025)

Log In    Watch TV

**Trump action plan lays out 'contingency plans' if AI...**

**Kohberger sentencing is an 'opportunity for healing' f...**

**Senate majority leader accuses Democrats of...**

**Data reveal pressure m**

HOMELAND SECURITY

# Homeland Security removes 'sanctuary jurisdictions' list from its website

The list identifying sanctuary jurisdictions has disappeared from Homeland Security's website after being unveiled last week

 By **Greg Norman**   ·   **Fox News**

Published June 2, 2025 2:42pm EDT



BREAKING NEWS

## WATCH LIVE: President Trump speaks at Federal Reserve

Want to get these alerts sent to you directly? Click here.

×

**Recommended Videos**

| | | | |
|---|---|---|---|
| **Trump action plan lays out 'contingency plans' if AI...** | **Kohberger sentencing is an 'opportunity for healing' f...** | **Senate majority leader accuses Democrats of...** | **Data reveal pressure m** |

The Department of Homeland Security's list of "sanctuary jurisdictions" has disappeared from its website.

The list, unveiled last Thursday, outlined portions of 35 states and the District of Columbia that, according to the DHS, "undermine the rule of law and endanger the lives of Americans and law enforcement."

"We are exposing these sanctuary politicians who harbor criminal illegal aliens and defy federal law," the DHS wrote on X while announcing the list.

However, users who now try to access the list on Homeland Security's website are greeted with a "Page Not Found" message and a note that "The page may have been moved, deleted, or is otherwise unavailable."

**BREAKING NEWS**

**WATCH LIVE: President Trump speaks at Federal Reserve**      ✕

Want to get these alerts sent to you directly? Click here.

**Recommended Videos**

| Trump action plan lays out 'contingency plans' if AI... | Kohberger sentencing is an 'opportunity for healing' f... | Senate majority leader accuses Democrats of... | Data reveal pressure m |
|---|---|---|---|

[DEMOCRAT COUNTY EXECUTIVE DINGS TRUMP ADMINISTRATION OVER SANCTUARY JURISDICTION DESIGNATION](#)



Immigration and Customs Enforcement agents walk down a street during an enforcement operation in Chicago on Jan. 26. Chicago was listed as a "sanctuary jurisdiction" by Homeland Security. (Christopher Dilts/Bloomberg via Getty Images)

When asked about the matter on Monday, a senior Homeland Security official told Fox News Digital, "As we have previously stated, the list is being constantly reviewed and can be changed at any time and will be updated regularly."

**BREAKING NEWS**

**WATCH LIVE: President Trump speaks at Federal Reserve**   ×

Want to get these alerts sent to you directly? Click here.

**Recommended Videos**

**Trump action plan lays out 'contingency plans' if AI...**

**Kohberger sentencing is an 'opportunity for healing' f...**

**Senate majority leader accuses Democrats of...**

**Data reveal pressure m**

When Homeland Security Secretary Kristi Noem was asked on Fox News' "Sunday Morning Futures" about the disappearance of the list, she said, "The president put out an executive order that directed us to recognize these sanctuary cities and to cooperate with the Department of Justice and Homeland Security to identify them and how they are making are jobs much more difficult to keep America safe and to make it a place that our families can raise their children again.

"That list – going forward – some of the cities have pushed back. They think because they don't have one law or another on the books that they don't qualify, but they do qualify," Noem continued. "They are giving sanctuary to criminals because they are not backing up our ICE officers, because they are not out there honoring detainers, they are not letting us know when these dangerous criminals are being released from their courthouses, and it's making it much more difficult for us to ensure that these individuals that have broken our laws, that have perpetuated violence are brought to justice and are gotten out of our country.

"So that list is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice," Noem also said.

**BREAKING NEWS**

**WATCH LIVE: President Trump speaks at Federal Reserve**

Want to get these alerts sent to you directly? Click here.

×

**Recommended Videos**

**Trump action plan lays out 'contingency plans' if AI...**

**Kohberger sentencing is an 'opportunity for healing' f...**

**Senate majority leader accuses Democrats of...**

**Data reveal pressure m**

## ALLEGED BOULDER TERRORIST OVERSTAYED VISA, GRANTED WORK PERMIT BY BIDEN ADMINISTRATION



Secretary Kristi Noem attends an Oval Office meeting in the White House on April 14. (Ken Cedeno/UPI/Bloomberg via Getty Images)

Before the list was taken down, DHS said on its website, "Each jurisdiction listed will receive formal notification of its non-compliance with Federal statutes.

"DHS demands that these jurisdictions immediately review and revise their policies to align with

**BREAKING NEWS**

**WATCH LIVE: President Trump speaks at Federal Reserve**

Want to get these alerts sent to you directly? Click here.

**Recommended Videos**

**Trump action plan lays out 'contingency plans' if AI...**

**Kohberger sentencing is an 'opportunity for healing' f...**

**Senate majority leader accuses Democrats of...**

**Data reveal pressure m**

Some of the jurisdictions on the list received pushback from local officials, according to the Associated Press.

In California, the city of Huntington Beach made the list even though it had filed a lawsuit challenging the state's immigration sanctuary law and passed a resolution this year declaring the community a "non-sanctuary city."

Jim Davel, administrator for Shawano County, Wisconsin, told the AP that the inclusion of his community must have been a clerical error. Davel voted for Trump, as did 67% of Shawano County.



**BREAKING NEWS**

## WATCH LIVE: President Trump speaks at Federal Reserve

Want to get these alerts sent to you directly? Click here.

×

**Recommended Videos**

Trump action plan lays out 'contingency plans' if AI...

Kohberger sentencing is an 'opportunity for healing' f...

Senate majority leader accuses Democrats of...

Data reveal pressure m

**CLICK HERE TO GET THE FOX NEWS APP**

Davel thinks the administration may have confused the county's vote in 2021 to become a "Second Amendment Sanctuary County" that prohibits gun control measures with it being a safe haven for immigrants. He said the county has approved no immigration sanctuary policies.

*The Associated Press contributed to this report.*

Greg Norman is a reporter at Fox News Digital.

**Sponsored Stories**

**Prostate: If You Pee More Than 2x at Night, Do This Immediately!**
Natural Healthy Way

**How Robotic Dogs Could Protect Federal Facilities**
FedTech Magazine

**California Will Cover Cost to Install Solar in These Zips**
EasySolar

**A Long-Forgotten Tea Will Quickly Unclog Blood Vessels**
trending report.com

**BREAKING NEWS**
**WATCH LIVE: President Trump speaks at Federal Reserve**
Want to get these alerts sent to you directly? Click here.     ✕

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 1:25-cv-00208-JJM-PAS |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| *Defendants*. | |

# EXHIBIT 14

U.S. Department of Justice, Justice
Department Publishes List of Sanctuary
Jurisdictions (Aug. 5, 2025)



**PRESS RELEASE**

# Justice Department Publishes List of Sanctuary Jurisdictions

Tuesday, August 5, 2025

**For Immediate Release**

Office of Public Affairs

WASHINGTON – Today, the Justice Department published a list of states, cities, and counties identified as having policies, laws, or regulations that impede enforcement of federal immigration laws.

"Sanctuary policies impede law enforcement and put American citizens at risk by design," said Attorney General Pamela Bondi. "The Department of Justice will continue bringing litigation against sanctuary jurisdictions and work closely with the Department of Homeland Security to eradicate these harmful policies around the country."

On April 28, 2025, President Trump signed Executive Order 14287: Protecting American Communities from Criminal Aliens. The Executive Order recognized that "some State and local officials . . . continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws" and "[i]t is imperative that the Federal Government restore the enforcement of United States law." The Executive Order directed the Justice Department, in collaboration with the Department of Homeland Security, to publish a list of such jurisdictions. Accordingly, the following states, cities, and counties have been identified as sanctuary jurisdictions:

**STATES:**

- California

- Colorado
- Connecticut
- Delaware
- District of Columbia
- Illinois
- Minnesota
- Nevada
- New York
- Oregon
- Rhode Island
- Vermont
- Washington

**COUNTIES:**

- Baltimore County, MD
- Cook County, IL
- San Diego County, CA
- San Francisco County, CA

**CITIES:**

- Albuquerque, NM
- Berkeley, CA
- Boston, MA
- Chicago, IL
- Denver, CO
- East Lansing, MI
- Hoboken, NJ
- Jersey City, NJ
- Los Angeles, CA
- New Orleans, LA

- New York City, NY

- Newark, NJ

- Paterson, NJ

- Philadelphia, PA

- Portland, OR

- Rochester, NY

- Seattle, WA

- San Francisco City, CA

In recent months, the Justice Department has filed several lawsuits against sanctuary jurisdictions seeking to compel compliance with federal law, including one against New York City on July 24th. Recently, the Mayor of Louisville agreed to revoke their sanctuary policies following a letter from the Justice Department threatening legal action.

Read more about the sanctuary jurisdiction list and the criteria for inclusion here. This list is not exhaustive and will be updated as federal authorities gather further information. The federal government will assist any jurisdiction that desires to be taken off this list to identify and eliminate their sanctuary policies, so they no longer stand in opposition to federal immigration enforcement.

*Updated August 5, 2025*

## Topics

| IMMIGRATION | NATIONAL SECURITY |

## Component

Office of the Attorney General

Press Release Number: 25-809

# Related Content

**PRESS RELEASE**

## Department of Justice, CIA Transmit Declassified Durham Documents to Senator Chuck Grassley

WASHINGTON – Today, the Department of Justice transmitted the declassified Appendix of the Durham Report to the Senate Judiciary Committee following collaboration with the Central Intelligence Agency (CIA). This transmission...

July 31, 2025

**PRESS RELEASE**

## Justice Department Sues New York City Over Sanctuary Policies

WASHINGTON – Today, the Justice Department filed a lawsuit against New York City, Mayor Eric Adams, and several other city officials to challenge New York's sanctuary city laws.

July 24, 2025

**PRESS RELEASE**

## Justice Department Announces Formation of Strike Force to Assess Evidence Publicized by ODNI

WASHINGTON – Today, the Department of Justice announced the formation of a Strike Force to assess the evidence publicized by Director of National Intelligence Tulsi Gabbard and investigate potential next...

July 23, 2025

✉ **Office of Public Affairs**

**U.S. Department of Justice**

**950 Pennsylvania Avenue, NW**

**Washington DC 20530**

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 15

U.S. Department of Justice, U.S. Sanctuary
Jurisdiction List Following Executive Order 14287:
Protecting American Communities from Criminal
Aliens (Aug. 5, 2025)



# U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities From Criminal Aliens

The U.S. Department of Justice has designated the below initial list as Sanctuary Jurisdictions, based on actions and policies that materially impede enforcement of federal immigration statutes and regulations. These designations were made after a thorough review of documented laws, ordinances, and executive directives by the listed jurisdictions. This initial list of designated Sanctuary Jurisdictions will be reviewed regularly, to include additional jurisdictions and remove jurisdictions that have remediated their policies, practices, and laws. Each state, county, and city will have an opportunity to respond to its placement on the list.

## Sanctuary Jurisdiction characteristics include:

1. *Public Declarations:* Cities, states, or counties that publicly declare themselves a sanctuary jurisdiction or equivalent, with the intent to undermine federal immigration enforcement.

2. *Laws, Ordinances, Executive Directives:* Cities, states, or counties that have laws, ordinances, regulations, resolutions, policies, or other formalized practices that obstruct or limit local law enforcement cooperation with U.S. Immigration and Customs Enforcement (ICE).

3. *Restrictions on Information Sharing:* Cities, states, or counties that limit whether and how local agencies share information about immigration status of detainees with federal authorities.

4. *Funding Restrictions:* Cities, states, or counties that prohibit local funds or resources from

being used to support federal immigration enforcement efforts.

5. *Non-cooperation with Federal Immigration Enforcement:* Cities, states, or counties that provide training to city employees and police on enforcing sanctuary policies and declining to respond to ICE requests for information.

6. *Limits on ICE Detainers:* Cities, states, or counties that refuse to honor ICE detainer requests unless there is a warrant signed by a judge.

7. *Jail Access Restrictions:* Cities, states, or counties that restrict ICE agents' ability to interview detainees absent detainee consent.

8. *Immigrant Community Affairs Offices:* Cities, states, or counties that create dedicated offices to engage and advise illegal alien communities on evading federal law enforcement officers.

9. *Federal Benefit Programs:* Cities, states, or counties that circumvent federal laws prohibiting the provision of federal benefits to illegal aliens and provide them with access to benefits, including health care assistance, legal aid, food and housing assistance, and other subsidies. This includes cities, states, or counties that establish stand-alone benefit programs or equivalents.

# States:

- California
- Colorado
- Connecticut
- Delaware
- District of Columbia
- Illinois
- Minnesota
- Nevada
- New York
- Oregon
- Rhode Island
- Vermont
- Washington

# Counties:

- Baltimore County, MD

- Cook County, IL

- San Diego County, CA

- San Francisco County, CA

# Cities:

- Albuquerque, NM

- Berkeley, CA

- Boston, MA

- Chicago, IL

- Denver, CO

- East Lansing, MI

- Hoboken, NJ

- Jersey City, NJ

- Los Angeles, CA

- New Orleans, LA

- New York City, NY

- Newark, NJ

- Paterson, NJ

- Philadelphia, PA

- Portland, OR

- Rochester, NY

- Seattle, WA

- San Francisco City, CA

*Updated August 5, 2025*



✉ **U.S. Department of Justice**

950 Pennsylvania Avenue NW

Washington DC 20530

📞 Contact the Department

Phone: 202-514-2000

TTY/TDD: 800-877-8339

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                          *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                          *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 16

Letter from Pamela Bondi, U.S. Attorney General,
to Gavin Newsom, Governor of California
(August 13, 2025)



# Office of the Attorney General
## Washington, D. C. 20530

August 13, 2025

Gavin Newsom
Governor of California
c/o David B. Sapp, Legal Affairs Secretary
1021 O Street, Suite 9000
Sacramento, CA 95814

Dear Governor Newsom,

The United States has a long history of cooperation with state and local law enforcement agencies, including for immigration enforcement. Such cooperation is vital to enforce federal law and protect national security. Recognizing that need, Congress has codified the duty of states and local governments to cooperate in immigration enforcement efforts.

For too long, so-called sanctuary jurisdiction policies have undermined this necessary cooperation and obstructed federal immigration enforcement, giving aliens cover to perpetrate crimes in our communities and evade the immigration consequences that federal law requires.

Under President Trump's leadership, full cooperation by state and local governments in immigration enforcement efforts is a top priority. To ensure such cooperation, the President has directed the Attorney General of the United States, in coordination with the Secretary of Homeland Security, to identify sanctuary jurisdictions and notify them of their unlawful sanctuary status and potential violations of federal law. Additionally, the President directed federal agencies to identify and evaluate their statutory authority to issue grants, contracts, and federal funds, to determine where immigration-related terms and conditions may be added to combat sanctuary policies that violate federal immigration law. *See* Executive Order 14,287, *Protecting American Communities from Criminal Aliens*, 90 Fed. Reg. 18761 (April 28, 2025). As contemplated by the Executive Order, designation as a sanctuary jurisdiction may result in additional consequences and further agency actions as permitted by law. *See id.*

As the chief law enforcement officer of the United States, I am committed to identifying state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations, and taking legal action to challenge such laws, policies, or practices. Individuals operating under the color of law, using their official position to obstruct federal immigration enforcement efforts and facilitating or inducing illegal immigration may be subject to criminal charges. As such, I have instructed that all litigating components of the Department and each U.S. Attorney's Office shall investigate incidents involving any such potential unlawful conduct and shall, where supported by the evidence, prosecute violations of federal laws such as 8 U.S.C. § 1324, 18 U.S.C. § 371, 18 U.S.C. § 1071, and 18 U.S.C. § 1505. State and local entities, particularly those with policies in violation of 8 U.S.C. § 1373 and

Letter to Gavin Newsom                                                          Page 2
       Governor of California

§ 1644, may also be subject to civil liability.

       Further, pursuant to President Trump's directive in Executive Order 14,287, the Department has compiled a list of sanctuary jurisdictions.[1] This list is based on a review of laws, policies, and practices of the identified jurisdictions.

       You are hereby notified that your jurisdiction has been identified as one that engages in sanctuary policies and practices that thwart federal immigration enforcement to the detriment of the interests of the United States. This ends now. By Tuesday, August 19, 2025, please submit a response to this letter that confirms your commitment to complying with federal law and identifies the immediate initiatives you are taking to eliminate laws, policies, and practices that impede federal immigration enforcement. This letter does not constitute final agency action and nothing in this letter creates any right or benefit enforceable at law against the United States.

                              Sincerely,

                              Pamela Bondi
                              Attorney General

cc: Rob Bonta
    California Attorney General
    455 Golden Gate Ave.
    San Francisco, CA 94102

---

[1] https://www.justice.gov/ag/us-sanctuary-jurisdiction-list-following-executive-order-14287-protecting-american-communities

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

               *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

               *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 17

Federal Highway Administration, FY 2022-2026
Estimated Highway Apportionments under the
Infrastructure Investment and Jobs Act

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2022 - FY 2023 ACTUAL AND FY 2024 - 2026 ESTIMATED STATE-BY-STATE FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS**
**AND FUNDING FOR THE BRIDGE FORMULA PROGRAM, NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT**
**HIGHWAY SYSTEM UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Actual FY 2022 | Actual FY 2023 | Estimated FY 2024 | Estimated FY 2025 | Estimated FY 2026 | FY 2022- FY 2026 Total | FY 2022- FY 2026 Average |
|---|---|---|---|---|---|---|---|
| Alabama | 1,135,711,148 | 1,160,967,961 | 1,181,473,491 | 1,202,389,028 | 1,223,722,892 | 5,904,264,520 | 1,180,852,904 |
| Alaska | 717,034,371 | 733,726,742 | 747,278,962 | 761,102,159 | 775,201,831 | 3,734,344,065 | 746,868,813 |
| Arizona | 1,025,628,311 | 1,049,985,683 | 1,069,760,974 | 1,089,931,671 | 1,110,505,798 | 5,345,812,437 | 1,069,162,487 |
| Arkansas | 754,076,243 | 771,312,121 | 785,305,604 | 799,578,887 | 814,137,647 | 3,924,410,502 | 784,882,100 |
| California | 5,494,022,066 | 5,616,208,254 | 5,715,408,918 | 5,816,593,087 | 5,919,801,027 | 28,562,033,352 | 5,712,406,670 |
| Colorado | 769,878,276 | 787,883,181 | 802,501,025 | 817,411,151 | 832,619,492 | 4,010,293,125 | 802,058,625 |
| Connecticut | 794,336,060 | 811,056,620 | 824,631,729 | 838,478,269 | 852,601,752 | 4,121,104,430 | 824,220,886 |
| Delaware | 271,719,442 | 277,350,821 | 281,922,831 | 286,586,258 | 291,342,958 | 1,408,922,310 | 281,784,462 |
| Dist. of Col. | 258,853,235 | 264,165,037 | 268,477,590 | 272,876,372 | 277,363,132 | 1,341,735,366 | 268,347,073 |
| Florida | 2,592,029,587 | 2,655,103,711 | 2,706,312,404 | 2,758,545,009 | 2,811,822,310 | 13,523,813,021 | 2,704,762,604 |
| Georgia | 1,789,195,485 | 1,832,537,410 | 1,867,596,826 | 1,903,193,111 | 1,939,770,298 | 9,332,293,130 | 1,866,458,626 |
| Hawaii | 299,536,432 | 305,166,987 | 309,738,329 | 314,401,073 | 319,157,077 | 1,547,999,898 | 309,599,980 |
| Idaho | 428,346,424 | 437,868,204 | 445,598,758 | 453,483,884 | 461,526,718 | 2,226,823,988 | 445,364,798 |
| Illinois | 2,202,798,566 | 2,250,129,111 | 2,288,555,888 | 2,327,751,005 | 2,367,730,058 | 11,436,964,628 | 2,287,392,926 |
| Indiana | 1,351,621,574 | 1,383,342,389 | 1,409,095,921 | 1,435,364,391 | 1,462,158,254 | 7,041,582,529 | 1,408,316,506 |
| Iowa | 752,097,213 | 768,458,085 | 781,741,170 | 795,289,848 | 809,109,512 | 3,906,695,828 | 781,339,166 |
| Kansas | 551,483,145 | 564,063,481 | 574,277,220 | 584,695,180 | 595,321,510 | 2,869,840,536 | 573,968,107 |
| Kentucky | 998,656,077 | 1,021,128,611 | 1,039,245,926 | 1,057,563,088 | 1,076,512,716 | 5,193,106,418 | 1,038,621,284 |
| Louisiana | 1,159,746,350 | 1,183,111,312 | 1,202,080,885 | 1,221,429,752 | 1,241,165,613 | 6,007,533,912 | 1,201,506,782 |
| Maine | 292,406,247 | 298,551,460 | 303,540,644 | 308,629,585 | 313,820,310 | 1,516,948,246 | 303,389,649 |
| Maryland | 904,624,136 | 924,735,113 | 941,024,697 | 957,591,494 | 969,230,067 | 4,697,205,507 | 939,441,101 |
| Massachusetts | 1,057,538,628 | 1,077,757,412 | 1,094,172,661 | 1,110,916,132 | 1,127,994,486 | 5,468,379,319 | 1,093,675,864 |
| Michigan | 1,532,773,711 | 1,567,824,375 | 1,596,281,349 | 1,625,307,315 | 1,654,913,827 | 7,977,100,577 | 1,595,420,115 |
| Minnesota | 939,132,075 | 960,840,129 | 978,464,488 | 996,441,246 | 1,014,777,554 | 4,889,655,492 | 977,931,098 |
| Mississippi | 703,499,949 | 712,509,812 | 722,387,151 | 735,720,418 | 749,320,362 | 3,623,437,692 | 724,687,538 |
| Missouri | 1,373,497,925 | 1,405,013,473 | 1,430,600,353 | 1,456,698,839 | 1,483,319,318 | 7,149,129,908 | 1,429,825,982 |
| Montana | 594,906,217 | 608,565,114 | 619,654,515 | 630,965,648 | 642,503,013 | 3,096,594,507 | 619,318,901 |
| Nebraska | 432,394,258 | 442,016,586 | 449,828,773 | 457,797,164 | 465,924,929 | 2,247,961,710 | 449,592,342 |
| Nevada | 531,679,480 | 543,767,872 | 553,582,209 | 563,592,784 | 573,803,578 | 2,766,425,923 | 553,285,185 |
| New Hampshire | 266,445,004 | 271,945,376 | 276,411,025 | 280,965,963 | 285,612,004 | 1,381,379,372 | 276,275,874 |
| New Jersey | 1,584,327,338 | 1,617,566,438 | 1,644,552,638 | 1,672,078,424 | 1,700,154,749 | 8,218,679,587 | 1,643,735,917 |
| New Mexico | 537,183,609 | 549,408,761 | 559,334,133 | 569,457,960 | 579,784,273 | 2,795,168,736 | 559,033,747 |
| New York | 2,658,697,807 | 2,714,577,528 | 2,759,945,221 | 2,806,220,036 | 2,853,420,386 | 13,792,860,978 | 2,758,572,196 |
| North Carolina | 1,512,678,170 | 1,548,003,284 | 1,576,464,501 | 1,605,216,850 | 1,634,999,697 | 7,877,362,502 | 1,575,472,500 |
| North Dakota | 377,745,465 | 386,010,391 | 392,720,527 | 399,564,833 | 406,546,031 | 1,962,587,247 | 392,517,449 |
| Ohio | 1,919,351,031 | 1,964,813,284 | 2,001,420,018 | 2,038,373,122 | 2,076,697,098 | 10,000,654,553 | 2,000,130,911 |
| Oklahoma | 907,613,189 | 928,726,370 | 945,867,765 | 963,351,898 | 981,185,730 | 4,726,744,952 | 945,348,990 |
| Oregon | 727,592,337 | 744,231,862 | 757,741,179 | 771,520,612 | 785,575,648 | 3,786,661,638 | 757,332,328 |
| Pennsylvania | 2,569,505,061 | 2,624,822,928 | 2,669,482,647 | 2,714,715,118 | 2,761,376,958 | 13,339,902,712 | 2,667,980,542 |
| Puerto Rico | 47,020,490 | 47,915,577 | 47,909,472 | 47,908,724 | 47,906,890 | 238,661,153 | 47,732,231 |
| Rhode Island | 344,104,764 | 351,385,309 | 357,296,247 | 363,325,373 | 369,475,087 | 1,785,586,780 | 357,117,356 |
| South Carolina | 956,720,483 | 979,012,552 | 997,111,062 | 1,015,571,451 | 1,034,401,064 | 4,982,816,612 | 996,563,322 |
| South Dakota | 422,971,713 | 432,359,994 | 439,982,162 | 447,756,734 | 455,686,805 | 2,198,757,408 | 439,751,482 |
| Tennessee | 1,227,957,438 | 1,256,554,233 | 1,279,603,284 | 1,302,899,377 | 1,327,011,765 | 6,394,026,097 | 1,278,805,219 |
| Texas | 5,343,578,031 | 5,473,439,501 | 5,578,871,584 | 5,686,411,768 | 5,796,102,848 | 27,878,403,732 | 5,575,680,746 |
| Utah | 510,396,451 | 521,956,240 | 531,341,415 | 540,914,245 | 550,914,651 | 2,655,286,891 | 531,057,378 |
| Vermont | 317,014,677 | 323,771,127 | 329,256,562 | 334,851,677 | 340,558,699 | 1,645,452,742 | 329,090,548 |
| Virginia | 1,499,438,296 | 1,534,295,136 | 1,562,240,646 | 1,590,294,635 | 1,619,647,537 | 7,805,916,250 | 1,561,183,250 |
| Washington | 1,039,267,462 | 1,061,835,481 | 1,080,158,030 | 1,098,846,937 | 1,117,909,637 | 5,398,017,547 | 1,079,603,509 |
| West Virginia | 732,670,553 | 749,907,732 | 762,930,651 | 774,978,420 | 789,291,628 | 3,809,778,984 | 761,955,797 |
| Wisconsin | 1,053,457,774 | 1,078,506,444 | 1,098,842,987 | 1,119,586,158 | 1,140,744,208 | 5,491,137,571 | 1,098,227,514 |
| Wyoming | 388,355,601 | 396,884,068 | 403,808,170 | 410,870,718 | 418,074,523 | 2,017,993,080 | 403,598,616 |
| | | | | | | | |
| **Apportioned Total** [1] | **58,653,315,375** | **59,973,076,683** | **61,043,833,217** | **62,136,004,881** | **63,250,019,844** | **305,056,250,000** | **61,011,250,000** |

[1] Amounts attributed to the Federal-aid Highway Program apportionments are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2022 FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,**
**NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM**
**UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,005,097,347 | 45,000,000 | 11,738,801 | 73,875,000 | 1,135,711,148 |
| Alaska | 664,276,131 | 45,000,000 | 7,758,240 | - | 717,034,371 |
| Arizona | 969,307,549 | 45,000,000 | 11,320,762 | - | 1,025,628,311 |
| Arkansas | 685,903,768 | 60,161,625 | 8,010,850 | - | 754,076,243 |
| California | 4,862,447,187 | 574,785,473 | 56,789,406 | - | 5,494,022,066 |
| Colorado | 716,509,999 | 45,000,000 | 8,368,277 | - | 769,878,276 |
| Connecticut | 665,399,513 | 121,165,205 | 7,771,342 | - | 794,336,060 |
| Delaware | 224,102,103 | 45,000,000 | 2,617,339 | - | 271,719,442 |
| Dist. of Col. | 211,384,428 | 45,000,000 | 2,468,807 | - | 258,853,235 |
| Florida | 2,510,641,078 | 52,673,067 | 29,315,442 | - | 2,592,029,587 |
| Georgia | 1,710,585,738 | 45,000,000 | 19,978,342 | 13,631,405 | 1,789,195,485 |
| Hawaii | 224,069,212 | 72,850,264 | 2,616,956 | - | 299,536,432 |
| Idaho | 378,920,913 | 45,000,000 | 4,425,511 | - | 428,346,424 |
| Illinois | 1,883,531,823 | 297,268,565 | 21,998,178 | - | 2,202,798,566 |
| Indiana | 1,262,335,681 | 74,542,768 | 14,743,125 | - | 1,351,621,574 |
| Iowa | 651,082,865 | 93,410,180 | 7,604,168 | - | 752,097,213 |
| Kansas | 500,636,086 | 45,000,000 | 5,847,059 | - | 551,483,145 |
| Kentucky | 880,232,681 | 94,549,890 | 10,280,470 | 13,593,036 | 998,656,077 |
| Louisiana | 929,811,198 | 219,075,640 | 10,859,512 | - | 1,159,746,350 |
| Maine | 244,550,089 | 45,000,000 | 2,856,158 | - | 292,406,247 |
| Maryland | 796,122,349 | 88,130,751 | 9,298,080 | 11,072,956 | 904,624,136 |
| Massachusetts | 804,613,425 | 243,527,965 | 9,397,238 | - | 1,057,538,628 |
| Michigan | 1,394,849,821 | 121,633,126 | 16,290,764 | - | 1,532,773,711 |
| Minnesota | 863,876,119 | 65,166,538 | 10,089,418 | - | 939,132,075 |
| Mississippi | 640,731,237 | 45,000,000 | 7,483,268 | 10,285,444 | 703,499,949 |
| Missouri | 1,254,165,237 | 104,684,966 | 14,647,722 | - | 1,373,497,925 |
| Montana | 543,557,867 | 45,000,000 | 6,348,350 | - | 594,906,217 |
| Nebraska | 382,922,015 | 45,000,000 | 4,472,243 | - | 432,394,258 |
| Nevada | 481,061,066 | 45,000,000 | 5,618,414 | - | 531,679,480 |
| New Hampshire | 218,888,554 | 45,000,000 | 2,556,450 | - | 266,445,004 |
| New Jersey | 1,322,761,164 | 246,117,384 | 15,448,790 | - | 1,584,327,338 |
| New Mexico | 486,501,632 | 45,000,000 | 5,681,977 | - | 537,183,609 |
| New York | 2,223,753,281 | 408,972,882 | 25,971,644 | - | 2,658,697,807 |
| North Carolina | 1,381,698,847 | 98,692,801 | 16,137,196 | 16,149,326 | 1,512,678,170 |
| North Dakota | 328,904,113 | 45,000,000 | 3,841,352 | - | 377,745,465 |
| Ohio | 1,775,790,242 | 104,290,441 | 20,739,853 | 18,530,495 | 1,919,351,031 |
| Oklahoma | 840,201,301 | 57,598,954 | 9,812,934 | - | 907,613,189 |
| Oregon | 662,172,634 | 57,686,024 | 7,733,679 | - | 727,592,337 |
| Pennsylvania | 2,173,656,077 | 353,377,923 | 25,386,631 | 17,084,430 | 2,569,505,061 |
| Puerto Rico | - | 45,000,000 | 2,020,490 | - | 47,020,490 |
| Rhode Island | 289,730,682 | 50,990,247 | 3,383,835 | - | 344,104,764 |
| South Carolina | 887,115,380 | 59,244,248 | 10,360,855 | - | 956,720,483 |
| South Dakota | 373,608,250 | 45,000,000 | 4,363,463 | - | 422,971,713 |
| Tennessee | 1,119,497,252 | 80,654,726 | 13,074,884 | 14,730,576 | 1,227,957,438 |
| Texas | 5,167,860,243 | 115,361,082 | 60,356,706 | - | 5,343,578,031 |
| Utah | 460,023,720 | 45,000,000 | 5,372,731 | - | 510,396,451 |
| Vermont | 268,874,430 | 45,000,000 | 3,140,247 | - | 317,014,677 |
| Virginia | 1,348,139,636 | 115,591,255 | 15,745,244 | 19,962,161 | 1,499,438,296 |
| Washington | 898,099,090 | 130,679,262 | 10,489,110 | - | 1,039,267,462 |
| West Virginia | 578,956,849 | 109,616,748 | 6,761,785 | 37,335,171 | 732,670,553 |
| Wisconsin | 996,815,713 | 45,000,000 | 11,642,061 | - | 1,053,457,774 |
| Wyoming | 339,391,760 | 45,000,000 | 3,963,841 | - | 388,355,601 |
| **Apportioned Total** | 52,484,565,375 | 5,307,500,000 | 615,000,000 | 246,250,000 | 58,653,315,375 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2023 FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,**
**NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM**
**UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,025,200,694 | 45,000,000 | 16,892,267 | 73,875,000 | 1,160,967,961 |
| Alaska | 677,562,547 | 45,000,000 | 11,164,195 | - | 733,726,742 |
| Arizona | 988,694,979 | 45,000,000 | 16,290,704 | - | 1,049,985,683 |
| Arkansas | 699,622,792 | 60,161,625 | 11,527,704 | - | 771,312,121 |
| California | 4,959,702,186 | 574,785,473 | 81,720,595 | - | 5,616,208,254 |
| Colorado | 730,841,136 | 45,000,000 | 12,042,045 | - | 787,883,181 |
| Connecticut | 678,708,366 | 121,165,205 | 11,183,049 | - | 811,056,620 |
| Delaware | 228,584,441 | 45,000,000 | 3,766,380 | - | 277,350,821 |
| Dist. of Col. | 215,612,396 | 45,000,000 | 3,552,641 | - | 264,165,037 |
| Florida | 2,560,245,393 | 52,673,067 | 42,185,251 | - | 2,655,103,711 |
| Georgia | 1,744,799,753 | 45,000,000 | 28,749,059 | 13,988,598 | 1,832,537,410 |
| Hawaii | 228,550,894 | 72,850,264 | 3,765,829 | - | 305,166,987 |
| Idaho | 386,499,844 | 45,000,000 | 6,368,360 | - | 437,868,204 |
| Illinois | 1,921,204,920 | 297,268,565 | 31,655,626 | - | 2,250,129,111 |
| Indiana | 1,287,584,098 | 74,542,768 | 21,215,523 | - | 1,383,342,389 |
| Iowa | 664,105,422 | 93,410,180 | 10,942,483 | - | 768,458,085 |
| Kansas | 510,649,497 | 45,000,000 | 8,413,984 | - | 564,063,481 |
| Kentucky | 897,838,554 | 94,549,890 | 14,793,712 | 13,946,455 | 1,021,128,611 |
| Louisiana | 948,408,712 | 219,075,640 | 15,626,960 | - | 1,183,111,312 |
| Maine | 249,441,417 | 45,000,000 | 4,110,043 | - | 298,551,460 |
| Maryland | 812,045,826 | 88,130,751 | 13,380,042 | 11,178,494 | 924,735,113 |
| Massachusetts | 820,706,715 | 243,527,965 | 13,522,732 | - | 1,077,757,412 |
| Michigan | 1,422,748,656 | 121,633,126 | 23,442,593 | - | 1,567,824,375 |
| Minnesota | 881,154,805 | 65,166,538 | 14,518,786 | - | 960,840,129 |
| Mississippi | 653,546,748 | 45,000,000 | 10,768,508 | 3,194,556 | 712,509,812 |
| Missouri | 1,279,250,270 | 104,684,966 | 21,078,237 | - | 1,405,013,473 |
| Montana | 554,429,767 | 45,000,000 | 9,135,347 | - | 608,565,114 |
| Nebraska | 390,580,978 | 45,000,000 | 6,435,608 | - | 442,016,586 |
| Nevada | 490,682,911 | 45,000,000 | 8,084,961 | - | 543,767,872 |
| New Hampshire | 223,266,616 | 45,000,000 | 3,678,760 | - | 271,945,376 |
| New Jersey | 1,349,218,071 | 246,117,384 | 22,230,983 | - | 1,617,566,438 |
| New Mexico | 496,232,332 | 45,000,000 | 8,176,429 | - | 549,408,761 |
| New York | 2,268,231,158 | 408,972,882 | 37,373,488 | - | 2,714,577,528 |
| North Carolina | 1,409,334,688 | 98,692,801 | 23,221,608 | 16,754,187 | 1,548,003,284 |
| North Dakota | 335,482,642 | 45,000,000 | 5,527,749 | - | 386,010,391 |
| Ohio | 1,811,308,387 | 104,290,441 | 29,844,883 | 19,369,573 | 1,964,813,284 |
| Oklahoma | 857,006,493 | 57,598,954 | 14,120,923 | - | 928,726,370 |
| Oregon | 675,416,987 | 57,686,024 | 11,128,851 | - | 744,231,862 |
| Pennsylvania | 2,217,132,087 | 353,377,923 | 36,531,648 | 17,781,270 | 2,624,822,928 |
| Puerto Rico | - | 45,000,000 | 2,915,577 | - | 47,915,577 |
| Rhode Island | 295,525,686 | 50,990,247 | 4,869,376 | - | 351,385,309 |
| South Carolina | 904,858,917 | 59,244,248 | 14,909,387 | - | 979,012,552 |
| South Dakota | 381,080,922 | 45,000,000 | 6,279,072 | - | 432,359,994 |
| Tennessee | 1,141,888,715 | 80,654,726 | 18,814,906 | 15,195,886 | 1,256,554,233 |
| Texas | 5,271,224,439 | 115,361,082 | 86,853,980 | - | 5,473,439,501 |
| Utah | 469,224,819 | 45,000,000 | 7,731,421 | - | 521,956,240 |
| Vermont | 274,252,276 | 45,000,000 | 4,518,851 | - | 323,771,127 |
| Virginia | 1,375,104,236 | 115,591,255 | 22,657,583 | 20,942,062 | 1,534,295,136 |
| Washington | 916,062,271 | 130,679,262 | 15,093,948 | - | 1,061,835,481 |
| West Virginia | 590,536,780 | 109,616,748 | 9,730,285 | 40,023,919 | 749,907,732 |
| Wisconsin | 1,016,753,387 | 45,000,000 | 16,753,057 | - | 1,078,506,444 |
| Wyoming | 346,180,057 | 45,000,000 | 5,704,011 | - | 396,884,068 |
| | | | | | |
| **Apportioned Total** | 53,534,326,683 | 5,307,500,000 | 885,000,000 | 246,250,000 | 59,973,076,683 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2024 ESTIMATED FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,**
**NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM**
**UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,045,706,107 | 45,000,000 | 16,892,384 | 73,875,000 | 1,181,473,491 |
| Alaska | 691,114,690 | 45,000,000 | 11,164,272 | - | 747,278,962 |
| Arizona | 1,008,470,158 | 45,000,000 | 16,290,816 | - | 1,069,760,974 |
| Arkansas | 713,616,196 | 60,161,625 | 11,527,783 | - | 785,305,604 |
| California | 5,058,902,284 | 574,785,473 | 81,721,161 | - | 5,715,408,918 |
| Colorado | 745,458,896 | 45,000,000 | 12,042,129 | - | 802,501,025 |
| Connecticut | 692,283,397 | 121,165,205 | 11,183,127 | - | 824,631,729 |
| Delaware | 233,156,425 | 45,000,000 | 3,766,406 | - | 281,922,831 |
| Dist. of Col. | 219,924,924 | 45,000,000 | 3,552,666 | - | 268,477,590 |
| Florida | 2,611,453,794 | 52,673,067 | 42,185,543 | - | 2,706,312,404 |
| Georgia | 1,779,698,048 | 45,000,000 | 28,749,258 | 14,149,520 | 1,867,596,826 |
| Hawaii | 233,122,210 | 72,850,264 | 3,765,855 | - | 309,738,329 |
| Idaho | 394,230,354 | 45,000,000 | 6,368,404 | - | 445,598,758 |
| Illinois | 1,959,631,478 | 297,268,565 | 31,655,845 | - | 2,288,555,888 |
| Indiana | 1,313,337,483 | 74,542,768 | 21,215,670 | - | 1,409,095,921 |
| Iowa | 677,388,431 | 93,410,180 | 10,942,559 | - | 781,741,170 |
| Kansas | 520,863,178 | 45,000,000 | 8,414,042 | - | 574,277,220 |
| Kentucky | 915,796,546 | 94,549,890 | 14,793,815 | 14,105,675 | 1,039,245,926 |
| Louisiana | 967,378,177 | 219,075,640 | 15,627,068 | - | 1,202,080,885 |
| Maine | 254,430,572 | 45,000,000 | 4,110,072 | - | 303,540,644 |
| Maryland | 828,287,771 | 88,130,751 | 13,380,134 | 11,226,041 | 941,024,697 |
| Massachusetts | 837,121,871 | 243,527,965 | 13,522,825 | - | 1,094,172,661 |
| Michigan | 1,451,205,467 | 121,633,126 | 23,442,756 | - | 1,596,281,349 |
| Minnesota | 898,779,064 | 65,166,538 | 14,518,886 | - | 978,464,488 |
| Mississippi | 666,618,569 | 45,000,000 | 10,768,582 | - | 722,387,151 |
| Missouri | 1,304,837,004 | 104,684,966 | 21,078,383 | - | 1,430,600,353 |
| Montana | 565,519,105 | 45,000,000 | 9,135,410 | - | 619,654,515 |
| Nebraska | 398,393,121 | 45,000,000 | 6,435,652 | - | 449,828,773 |
| Nevada | 500,497,192 | 45,000,000 | 8,085,017 | - | 553,582,209 |
| New Hampshire | 227,732,239 | 45,000,000 | 3,678,786 | - | 276,411,025 |
| New Jersey | 1,376,204,117 | 246,117,384 | 22,231,137 | - | 1,644,552,638 |
| New Mexico | 506,157,647 | 45,000,000 | 8,176,486 | - | 559,334,133 |
| New York | 2,313,598,592 | 408,972,882 | 37,373,747 | - | 2,759,945,221 |
| North Carolina | 1,437,523,246 | 98,692,801 | 23,221,768 | 17,026,686 | 1,576,464,501 |
| North Dakota | 342,192,740 | 45,000,000 | 5,527,787 | - | 392,720,527 |
| Ohio | 1,847,536,896 | 104,290,441 | 29,845,089 | 19,747,592 | 2,001,420,018 |
| Oklahoma | 874,147,790 | 57,598,954 | 14,121,021 | - | 945,867,765 |
| Oregon | 688,926,227 | 57,686,024 | 11,128,928 | - | 757,741,179 |
| Pennsylvania | 2,261,477,616 | 353,377,923 | 36,531,901 | 18,095,207 | 2,669,482,647 |
| Puerto Rico | - | 45,000,000 | 2,909,472 | - | 47,909,472 |
| Rhode Island | 301,436,590 | 50,990,247 | 4,869,410 | - | 357,296,247 |
| South Carolina | 922,957,324 | 59,244,248 | 14,909,490 | - | 997,111,062 |
| South Dakota | 388,703,046 | 45,000,000 | 6,279,116 | - | 439,982,162 |
| Tennessee | 1,164,728,007 | 80,654,726 | 18,815,036 | 15,405,515 | 1,279,603,284 |
| Texas | 5,376,655,920 | 115,361,082 | 86,854,582 | - | 5,578,871,584 |
| Utah | 478,609,941 | 45,000,000 | 7,731,474 | - | 531,341,415 |
| Vermont | 279,737,680 | 45,000,000 | 4,518,882 | - | 329,256,562 |
| Virginia | 1,402,608,129 | 115,591,255 | 22,657,740 | 21,383,522 | 1,562,240,646 |
| Washington | 934,384,716 | 130,679,262 | 15,094,052 | - | 1,080,158,030 |
| West Virginia | 602,348,309 | 109,616,748 | 9,730,352 | 41,235,242 | 762,930,651 |
| Wisconsin | 1,037,089,814 | 45,000,000 | 16,753,173 | - | 1,098,842,987 |
| Wyoming | 353,104,119 | 45,000,000 | 5,704,051 | - | 403,808,170 |
| **Apportioned Total** | 54,605,083,217 | 5,307,500,000 | 885,000,000 | 246,250,000 | 61,043,833,217 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2025 ESTIMATED FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,**
**NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM**
**UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,066,621,629 | 45,000,000 | 16,892,399 | 73,875,000 | 1,202,389,028 |
| Alaska | 704,937,877 | 45,000,000 | 11,164,282 | - | 761,102,159 |
| Arizona | 1,028,640,841 | 45,000,000 | 16,290,830 | - | 1,089,931,671 |
| Arkansas | 727,889,469 | 60,161,625 | 11,527,793 | - | 799,578,887 |
| California | 5,160,086,384 | 574,785,473 | 81,721,230 | - | 5,816,593,087 |
| Colorado | 760,369,012 | 45,000,000 | 12,042,139 | - | 817,411,151 |
| Connecticut | 706,129,928 | 121,165,205 | 11,183,136 | - | 838,478,269 |
| Delaware | 237,819,849 | 45,000,000 | 3,766,409 | - | 286,586,258 |
| Dist. of Col. | 224,323,703 | 45,000,000 | 3,552,669 | - | 272,876,372 |
| Florida | 2,663,686,363 | 52,673,067 | 42,185,579 | - | 2,758,545,009 |
| Georgia | 1,815,294,309 | 45,000,000 | 28,749,282 | 14,149,520 | 1,903,193,111 |
| Hawaii | 237,784,951 | 72,850,264 | 3,765,858 | - | 314,401,073 |
| Idaho | 402,115,475 | 45,000,000 | 6,368,409 | - | 453,483,884 |
| Illinois | 1,998,826,568 | 297,268,565 | 31,655,872 | - | 2,327,751,005 |
| Indiana | 1,339,605,935 | 74,542,768 | 21,215,688 | - | 1,435,364,391 |
| Iowa | 690,937,100 | 93,410,180 | 10,942,568 | - | 795,289,848 |
| Kansas | 531,281,131 | 45,000,000 | 8,414,049 | - | 584,695,180 |
| Kentucky | 934,113,696 | 94,549,890 | 14,793,827 | 14,105,675 | 1,057,563,088 |
| Louisiana | 986,727,031 | 219,075,640 | 15,627,081 | - | 1,221,429,752 |
| Maine | 259,519,510 | 45,000,000 | 4,110,075 | - | 308,629,585 |
| Maryland | 844,854,556 | 88,130,751 | 13,380,146 | 11,226,041 | 957,591,494 |
| Massachusetts | 853,865,330 | 243,527,965 | 13,522,837 | - | 1,110,916,132 |
| Michigan | 1,480,231,414 | 121,633,126 | 23,442,775 | - | 1,625,307,315 |
| Minnesota | 916,755,809 | 65,166,538 | 14,518,899 | - | 996,441,246 |
| Mississippi | 679,951,827 | 45,000,000 | 10,768,591 | - | 735,720,418 |
| Missouri | 1,330,935,473 | 104,684,966 | 21,078,400 | - | 1,456,698,839 |
| Montana | 576,830,230 | 45,000,000 | 9,135,418 | - | 630,965,648 |
| Nebraska | 406,361,506 | 45,000,000 | 6,435,658 | - | 457,797,164 |
| Nevada | 510,507,760 | 45,000,000 | 8,085,024 | - | 563,592,784 |
| New Hampshire | 232,287,174 | 45,000,000 | 3,678,789 | - | 280,965,963 |
| New Jersey | 1,403,729,884 | 246,117,384 | 22,231,156 | - | 1,672,078,424 |
| New Mexico | 516,281,467 | 45,000,000 | 8,176,493 | - | 569,457,960 |
| New York | 2,359,873,375 | 408,972,882 | 37,373,779 | - | 2,806,220,036 |
| North Carolina | 1,466,275,575 | 98,692,801 | 23,221,788 | 17,026,686 | 1,605,216,850 |
| North Dakota | 349,037,041 | 45,000,000 | 5,527,792 | - | 399,564,833 |
| Ohio | 1,884,489,975 | 104,290,441 | 29,845,114 | 19,747,592 | 2,038,373,122 |
| Oklahoma | 891,631,912 | 57,598,954 | 14,121,032 | - | 963,351,898 |
| Oregon | 702,705,651 | 57,686,024 | 11,128,937 | - | 771,520,612 |
| Pennsylvania | 2,306,710,056 | 353,377,923 | 36,531,932 | 18,095,207 | 2,714,715,118 |
| Puerto Rico | - | 45,000,000 | 2,908,724 | - | 47,908,724 |
| Rhode Island | 307,465,712 | 50,990,247 | 4,869,414 | - | 363,325,373 |
| South Carolina | 941,417,700 | 59,244,248 | 14,909,503 | - | 1,015,571,451 |
| South Dakota | 396,477,613 | 45,000,000 | 6,279,121 | - | 447,756,734 |
| Tennessee | 1,188,024,084 | 80,634,726 | 18,815,052 | 15,405,515 | 1,302,899,377 |
| Texas | 5,484,196,031 | 115,361,082 | 86,854,655 | - | 5,686,411,768 |
| Utah | 488,182,764 | 45,000,000 | 7,731,481 | - | 540,914,245 |
| Vermont | 285,332,791 | 45,000,000 | 4,518,886 | - | 334,851,677 |
| Virginia | 1,430,662,099 | 115,591,255 | 22,657,759 | 21,383,522 | 1,590,294,635 |
| Washington | 953,073,610 | 130,679,262 | 15,094,065 | - | 1,098,846,937 |
| West Virginia | 614,396,069 | 109,616,748 | 9,730,361 | 41,235,242 | 774,978,420 |
| Wisconsin | 1,057,832,970 | 45,000,000 | 16,753,188 | - | 1,119,586,158 |
| Wyoming | 360,166,662 | 45,000,000 | 5,704,056 | - | 410,870,718 |
| **Apportioned Total** | 55,697,254,881 | 5,307,500,000 | 885,000,000 | 246,250,000 | 62,136,004,881 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL HIGHWAY ADMINISTRATION**

**FY 2026 ESTIMATED  FEDERAL-AID HIGHWAY PROGRAM APPORTIONMENTS AND FUNDING FOR THE BRIDGE FORMULA PROGRAM,
NATIONAL ELECTRIC VEHICLE INFRASTRUCTURE FORMULA PROGRAM, AND APPALACHIAN DEVELOPMENT HIGHWAY SYSTEM
UNDER THE INFRASTRUCTURE INVESTMENT AND JOBS ACT, PUBLIC LAW 117-58**

| State | Federal-aid Highway Program Apportionments [1] | Bridge Formula Program | National Electric Vehicle Infrastructure Formula Program | Appalachian Development Highway System | Total |
|---|---|---|---|---|---|
| Alabama | 1,087,955,458 | 45,000,000 | 16,892,434 | 73,875,000 | 1,223,722,892 |
| Alaska | 719,037,526 | 45,000,000 | 11,164,305 | - | 775,201,831 |
| Arizona | 1,049,214,934 | 45,000,000 | 16,290,864 | - | 1,110,505,798 |
| Arkansas | 742,448,205 | 60,161,625 | 11,527,817 | - | 814,137,647 |
| California | 5,263,294,154 | 574,785,473 | 81,721,400 | - | 5,919,801,027 |
| Colorado | 775,577,328 | 45,000,000 | 12,042,164 | - | 832,619,492 |
| Connecticut | 720,253,388 | 121,165,205 | 11,183,159 | - | 852,601,752 |
| Delaware | 242,576,541 | 45,000,000 | 3,766,417 | - | 291,342,958 |
| Dist. of Col. | 228,810,456 | 45,000,000 | 3,552,676 | - | 277,363,132 |
| Florida | 2,716,963,577 | 52,673,067 | 42,185,666 | - | 2,811,822,310 |
| Georgia | 1,851,602,490 | 45,000,000 | 28,749,342 | 14,418,466 | 1,939,770,298 |
| Hawaii | 242,540,947 | 72,850,264 | 3,765,866 | | 319,157,077 |
| Idaho | 410,158,296 | 45,000,000 | 6,368,422 | - | 461,526,718 |
| Illinois | 2,038,805,555 | 297,268,565 | 31,655,938 | - | 2,367,730,058 |
| Indiana | 1,366,399,754 | 74,542,768 | 21,215,732 | - | 1,462,158,254 |
| Iowa | 704,756,741 | 93,410,180 | 10,942,591 | - | 809,109,512 |
| Kansas | 541,907,443 | 45,000,000 | 8,414,067 | - | 595,321,510 |
| Kentucky | 952,797,188 | 94,549,890 | 14,793,858 | 14,371,780 | 1,076,512,716 |
| Louisiana | 1,006,462,859 | 219,075,640 | 15,627,114 | - | 1,241,165,613 |
| Maine | 264,710,226 | 45,000,000 | 4,110,084 | - | 313,820,310 |
| Maryland | 861,752,674 | 88,130,751 | 13,380,174 | 5,966,468 | 969,230,067 |
| Massachusetts | 870,943,656 | 243,527,965 | 13,522,865 | - | 1,127,994,486 |
| Michigan | 1,509,837,877 | 121,633,126 | 23,442,824 | - | 1,654,913,827 |
| Minnesota | 935,092,087 | 65,166,538 | 14,518,929 | - | 1,014,777,554 |
| Mississippi | 693,551,748 | 45,000,000 | 10,768,614 | - | 749,320,362 |
| Missouri | 1,357,555,908 | 104,684,966 | 21,078,444 | - | 1,483,319,318 |
| Montana | 588,367,576 | 45,000,000 | 9,135,437 | - | 642,503,013 |
| Nebraska | 414,489,258 | 45,000,000 | 6,435,671 | - | 465,924,929 |
| Nevada | 520,718,537 | 45,000,000 | 8,085,041 | - | 573,803,578 |
| New Hampshire | 236,933,208 | 45,000,000 | 3,678,796 | - | 285,612,004 |
| New Jersey | 1,431,806,163 | 246,117,384 | 22,231,202 | - | 1,700,154,749 |
| New Mexico | 526,607,763 | 45,000,000 | 8,176,510 | - | 579,784,273 |
| New York | 2,407,073,648 | 408,972,882 | 37,373,856 | - | 2,853,420,386 |
| North Carolina | 1,495,602,947 | 98,692,801 | 23,221,836 | 17,482,113 | 1,634,999,697 |
| North Dakota | 356,018,227 | 45,000,000 | 5,527,804 | - | 406,546,031 |
| Ohio | 1,922,182,110 | 104,290,441 | 29,845,177 | 20,379,370 | 2,076,697,098 |
| Oklahoma | 909,465,714 | 57,598,954 | 14,121,062 | - | 981,185,730 |
| Oregon | 716,760,663 | 57,686,024 | 11,128,961 | - | 785,575,648 |
| Pennsylvania | 2,352,847,139 | 353,377,923 | 36,532,008 | 18,619,888 | 2,761,376,958 |
| Puerto Rico | - | 45,000,000 | 2,906,890 | - | 47,906,890 |
| Rhode Island | 313,615,416 | 50,990,247 | 4,869,424 | - | 369,475,087 |
| South Carolina | 960,247,282 | 59,244,248 | 14,909,534 | - | 1,034,401,064 |
| South Dakota | 404,407,671 | 45,000,000 | 6,279,134 | - | 455,686,805 |
| Tennessee | 1,211,786,080 | 80,654,726 | 18,815,091 | 15,755,868 | 1,327,011,765 |
| Texas | 5,593,886,930 | 115,361,082 | 86,854,836 | - | 5,796,102,848 |
| Utah | 497,947,043 | 45,000,000 | 7,731,497 | - | 550,678,540 |
| Vermont | 291,039,804 | 45,000,000 | 4,518,895 | - | 340,558,699 |
| Virginia | 1,459,277,145 | 115,591,255 | 22,657,806 | 22,121,331 | 1,619,647,537 |
| Washington | 972,136,279 | 130,679,262 | 15,094,096 | - | 1,117,909,637 |
| West Virginia | 626,684,783 | 109,616,748 | 9,730,381 | 43,259,716 | 789,291,628 |
| Wisconsin | 1,078,990,986 | 45,000,000 | 16,753,222 | - | 1,140,744,208 |
| Wyoming | 367,370,456 | 45,000,000 | 5,704,067 | - | 418,074,523 |
| **Apportioned Total** | 56,811,269,844 | 5,307,500,000 | 885,000,000 | 246,250,000 | 63,250,019,844 |

[1] Amounts are before sequestration and reflect the $3,500,000 takedown for safety-related programs.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF CALIFORNIA, *et al.*,

                *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants.*

No. 1:25-cv-00208-JJM-PAS

---

# EXHIBIT 18

Federal Transit Administration, FY 2025
Full Year Apportionments State Totals

**FEDERAL TRANSIT ADMINISTRATION**

**FY 2025 FULL YEAR APPORTIONMENTS BY STATE FOR SELECTED FTA
PROGRAMS THROUGH SEPTEMBER 30, 2025.**

The information in this table includes apportionments for formula programs published **in May of 2025**.

| State | State Total |
|---|---|
| Alabama | $82,303,735 |
| Alaska | $84,962,312 |
| American Samoa | $1,451,600 |
| Arizona | $196,328,909 |
| Arkansas | $49,193,649 |
| California | $2,085,116,209 |
| Colorado | $200,765,144 |
| Commonwealth of the Northern Mariana Islands | $1,437,838 |
| Connecticut | $265,353,760 |
| Delaware | $37,469,784 |
| District Of Columbia | $479,149,329 |
| Florida | $651,696,770 |
| Georgia | $289,752,651 |
| Guam | $4,506,144 |
| Hawaii | $65,879,982 |
| Idaho | $44,153,394 |
| Illinois | $860,700,111 |
| Indiana | $138,916,541 |
| Iowa | $63,702,680 |
| Kansas | $52,676,837 |
| Kentucky | $78,587,980 |
| Louisiana | $96,319,595 |
| Maine | $50,281,879 |
| Maryland | $364,735,296 |
| Massachusetts | $545,571,942 |
| Michigan | $203,427,466 |
| Minnesota | $174,069,813 |
| Mississippi | $42,270,372 |
| Missouri | $145,125,329 |
| Montana | $37,368,388 |
| Nebraska | $40,672,455 |
| Nevada | $105,591,696 |
| New Hampshire | $24,609,806 |
| New Jersey | $868,923,367 |
| New Mexico | $78,497,808 |
| New York | $2,331,328,789 |
| North Carolina | $186,613,080 |
| North Dakota | $23,517,871 |
| Ohio | $275,075,377 |
| Oklahoma | $72,364,888 |
| Oregon | $164,236,846 |
| Pennsylvania | $630,696,438 |
| Puerto Rico | $78,251,101 |
| Rhode Island | $59,539,397 |
| South Carolina | $79,197,074 |
| South Dakota | $26,469,118 |
| Tennessee | $132,363,425 |
| Texas | $722,277,349 |
| Utah | $141,537,101 |
| Vermont | $16,014,805 |
| Virgin Islands | $3,162,685 |
| Virginia | $241,825,074 |
| Washington | $390,420,253 |
| West Virginia | $41,467,863 |
| Wisconsin | $120,360,892 |
| Wyoming | $19,181,366 |

*State Totals include apportionments for the following programs:

| | |
|---|---|
| Section 5303 | Metropolitan Transportation Planning Program |
| Section 5304 | Statewide Transportation Planning Program |
| Section 5307+5340 | Urbanized Area Formula Program |
| Section 5310 | Enhanced Mobility of Seniors and Individuals with Disabilities |
| Section 5311 + 5340 | Formula Grants for Rural Areas |
| Section 5311(b)(3) | Rural Transit Assistance Program (RTAP) |
| Section 5311(c)(3) | Appalachian Development Public Transportation Assistance Program |
| Section 5311(c)(2)(B) | Public Transportation on Indian Reservations Formula |
| Section 5337 | State of Good Repair Formula |
| Section 5339 | Buses and Bus Facilities Formula |
| Section 5329 | State Safety Oversight Program |
| Section 601, Division B, PRIIA | Passenger Rail Investment and Improvement (WMATA) |

* This table includes all amounts apportioned to a State, including those apportioned to large Urbanized Areas (UZAs) in each State. Amounts attributable to each State of a multi-state UZA with a population of at least 200,000 are for illustrative purposes only. They are not intended to indicate any preference by FTA for suballocation amounts, nor do they have any force of law or indication of expected practice. Designated recipients in large UZAs shall continue to suballocate funds apportioned to a UZA based on a locally determined process, consistent with Section 5307 statutory requirements. Each State's share of a multi-state UZA was calculated based on the percentage of population attributable to the respective State in the UZA, as determined by the Census.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 1:25-cv-00208-JJM-PAS |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | |
| *Defendants*. | |

# EXHIBIT 19

Federal Motor Carrier Safety
Administration, FY 2024 Estimated
MCSAP Funding - Rounded

| | FY 2024 Estimated MCSAP Funding - Rounded | | | | |
| | Federal Grant (95%) | | | State Match (5%) | Total (100%) |
| State | Federal Grant (No Supplemental) Rounded | $80 M Supplemental Rounded | Total Federal Grant (BIL + 80M) Rounded | State Match Rounded | BIL + 80M + State Match Rounded |
|---|---|---|---|---|---|
| Alabama | $ 7,326,788.00 | $ 1,441,926.00 | $ 8,768,714.00 | $ 461,511.00 | $ 9,230,225.00 |
| Alaska | $ 1,632,175.00 | $ 321,215.00 | $ 1,953,390.00 | $ 102,810.00 | $ 2,056,200.00 |
| Arizona | $ 13,144,753.00 | $ 2,586,913.00 | $ 15,731,666.00 | $ 827,982.00 | $ 16,559,648.00 |
| Arkansas | $ 5,199,142.00 | $ 1,023,201.00 | $ 6,222,343.00 | $ 327,492.00 | $ 6,549,835.00 |
| California | $ 25,477,506.00 | $ 5,014,023.00 | $ 30,491,529.00 | $ 1,604,817.00 | $ 32,096,346.00 |
| Colorado | $ 6,614,189.00 | $ 1,301,685.00 | $ 7,915,874.00 | $ 416,625.00 | $ 8,332,499.00 |
| Connecticut | $ 3,566,870.00 | $ 701,967.00 | $ 4,268,837.00 | $ 224,676.00 | $ 4,493,513.00 |
| Delaware | $ 1,545,160.00 | $ 304,091.00 | $ 1,849,251.00 | $ 97,329.00 | $ 1,946,580.00 |
| District of Columbia | $ 1,545,160.00 | $ 304,091.00 | $ 1,849,251.00 | $ 97,329.00 | $ 1,946,580.00 |
| Florida | $ 17,361,979.00 | $ 3,416,872.00 | $ 20,778,851.00 | $ 1,093,624.00 | $ 21,872,475.00 |
| Georgia | $ 14,592,547.00 | $ 2,871,842.00 | $ 17,464,389.00 | $ 919,178.00 | $ 18,383,567.00 |
| Hawaii | $ 1,545,160.00 | $ 304,091.00 | $ 1,849,251.00 | $ 97,329.00 | $ 1,946,580.00 |
| Idaho | $ 3,098,532.00 | $ 609,797.00 | $ 3,708,329.00 | $ 195,175.00 | $ 3,903,504.00 |
| Illinois | $ 14,568,608.00 | $ 2,867,131.00 | $ 17,435,739.00 | $ 917,670.00 | $ 18,353,409.00 |
| Indiana | $ 8,963,192.00 | $ 1,763,974.00 | $ 10,727,166.00 | $ 564,588.00 | $ 11,291,754.00 |
| Iowa | $ 5,935,448.00 | $ 1,168,108.00 | $ 7,103,556.00 | $ 373,871.00 | $ 7,477,427.00 |
| Kansas | $ 5,345,324.00 | $ 1,051,970.00 | $ 6,397,294.00 | $ 336,700.00 | $ 6,733,994.00 |
| Kentucky | $ 5,952,485.00 | $ 1,171,461.00 | $ 7,123,946.00 | $ 374,945.00 | $ 7,498,891.00 |
| Louisiana | $ 5,509,841.00 | $ 1,084,348.00 | $ 6,594,189.00 | $ 347,063.00 | $ 6,941,252.00 |
| Maine | $ 2,110,067.00 | $ 415,265.00 | $ 2,525,332.00 | $ 132,912.00 | $ 2,658,244.00 |
| Maryland | $ 6,658,350.00 | $ 1,310,376.00 | $ 7,968,726.00 | $ 419,407.00 | $ 8,388,133.00 |
| Massachusetts | $ 6,825,782.00 | $ 1,343,327.00 | $ 8,169,109.00 | $ 429,953.00 | $ 8,599,062.00 |
| Michigan | $ 11,695,508.00 | $ 2,301,699.00 | $ 13,997,207.00 | $ 736,695.00 | $ 14,733,902.00 |
| Minnesota | $ 8,200,641.00 | $ 1,613,902.00 | $ 9,814,543.00 | $ 516,555.00 | $ 10,331,098.00 |
| Mississippi | $ 5,216,647.00 | $ 1,026,646.00 | $ 6,243,293.00 | $ 328,594.00 | $ 6,571,887.00 |
| Missouri | $ 8,940,243.00 | $ 1,759,457.00 | $ 10,699,700.00 | $ 563,142.00 | $ 11,262,842.00 |
| Montana | $ 3,662,763.00 | $ 720,839.00 | $ 4,383,602.00 | $ 230,716.00 | $ 4,614,318.00 |
| Nebraska | $ 4,374,204.00 | $ 860,852.00 | $ 5,235,056.00 | $ 275,529.00 | $ 5,510,585.00 |
| Nevada | $ 3,608,871.00 | $ 710,233.00 | $ 4,319,104.00 | $ 227,321.00 | $ 4,546,425.00 |
| New Hampshire | $ 1,659,534.00 | $ 326,599.00 | $ 1,986,133.00 | $ 104,533.00 | $ 2,090,666.00 |
| New Jersey | $ 9,322,558.00 | $ 1,834,698.00 | $ 11,157,256.00 | $ 587,224.00 | $ 11,744,480.00 |
| New Mexico | $ 5,634,115.00 | $ 1,108,805.00 | $ 6,742,920.00 | $ 354,890.00 | $ 7,097,810.00 |
| New York | $ 16,586,162.00 | $ 3,264,189.00 | $ 19,850,351.00 | $ 1,044,755.00 | $ 20,895,106.00 |
| North Carolina | $ 12,366,879.00 | $ 2,433,826.00 | $ 14,800,705.00 | $ 778,984.00 | $ 15,579,689.00 |
| North Dakota | $ 3,244,314.00 | $ 638,487.00 | $ 3,882,801.00 | $ 204,358.00 | $ 4,087,159.00 |
| Ohio | $ 13,090,235.00 | $ 2,576,184.00 | $ 15,666,419.00 | $ 824,548.00 | $ 16,490,967.00 |
| Oklahoma | $ 7,036,896.00 | $ 1,384,875.00 | $ 8,421,771.00 | $ 443,251.00 | $ 8,865,022.00 |
| Oregon | $ 5,280,941.00 | $ 1,039,300.00 | $ 6,320,241.00 | $ 332,644.00 | $ 6,652,885.00 |
| Pennsylvania | $ 14,237,777.00 | $ 2,802,022.00 | $ 17,039,799.00 | $ 896,832.00 | $ 17,936,631.00 |
| Puerto Rico | $ 1,889,326.00 | $ 371,823.00 | $ 2,261,149.00 | $ 119,008.00 | $ 2,380,157.00 |
| Rhode Island | $ 1,545,160.00 | $ 304,091.00 | $ 1,849,251.00 | $ 97,329.00 | $ 1,946,580.00 |
| South Carolina | $ 6,605,469.00 | $ 1,299,969.00 | $ 7,905,438.00 | $ 416,076.00 | $ 8,321,514.00 |
| South Dakota | $ 2,795,165.00 | $ 550,094.00 | $ 3,345,259.00 | $ 176,066.00 | $ 3,521,325.00 |
| Tennessee | $ 8,844,186.00 | $ 1,740,553.00 | $ 10,584,739.00 | $ 557,092.00 | $ 11,141,831.00 |
| Texas | $ 41,365,988.00 | $ 8,140,908.00 | $ 49,506,896.00 | $ 2,605,626.00 | $ 52,112,522.00 |
| Utah | $ 4,127,175.00 | $ 812,236.00 | $ 4,939,411.00 | $ 259,969.00 | $ 5,199,380.00 |
| Vermont | $ 1,743,541.00 | $ 343,132.00 | $ 2,086,673.00 | $ 109,825.00 | $ 2,196,498.00 |
| Virginia | $ 9,302,446.00 | $ 1,830,740.00 | $ 11,133,186.00 | $ 585,957.00 | $ 11,719,143.00 |
| Washington | $ 8,218,305.00 | $ 1,617,379.00 | $ 9,835,684.00 | $ 517,668.00 | $ 10,353,352.00 |
| West Virginia | $ 2,844,479.00 | $ 559,799.00 | $ 3,404,278.00 | $ 179,173.00 | $ 3,583,451.00 |
| Wisconsin | $ 8,051,537.00 | $ 1,584,558.00 | $ 9,636,095.00 | $ 507,163.00 | $ 10,143,258.00 |
| Wyoming | $ 2,430,407.00 | $ 478,309.00 | $ 2,908,716.00 | $ 153,090.00 | $ 3,061,806.00 |
| States Total | $ 398,440,530.00 | $ 78,413,878.00 | $ 476,854,408.00 | $ 25,097,599.00 | $ 501,952,007.00 |
| | | | | | |
| American Samoa | $ 389,512.00 | $ 76,657.00 | $ 466,169.00 | $ - | $ 466,169.00 |
| Guam | $ 691,701.00 | $ 136,128.00 | $ 827,829.00 | $ - | $ 827,829.00 |
| Northern Marianas | $ 382,602.00 | $ 75,297.00 | $ 457,899.00 | $ - | $ 457,899.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Virgin Islands | $ | 498,157.00 | $ | 98,038.00 | $ | 596,195.00 | $ | - | $ | 596,195.00 |
| Territories Total | $ | 1,961,972.00 | $ | 386,120.00 | $ | 2,348,092.00 | $ | - | $ | 2,348,092.00 |
| | | | | | | | | | |
| National Total | $ | 400,402,502.00 | $ | 78,799,998.00 | $ | 479,202,500.00 | | 25,097,599.00 | $ | 504,300,099.00 |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                    *Plaintiffs*,

    v.                                                    No. 1:25-cv-00208-JJM-PAS

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                    *Defendants.*

# EXHIBIT 20

National Highway Traffic Safety
Administration, FY 2024 Grant Funding Table

National Highway Traffic Safety Administration
Office of Grants Management and Operations
Table of the Authorized Not-To-Exceed Grant Amounts for FY 2024 Sections 402, 405, 1906, 154 and 164
For the Period of October 1, 2023 to September 30, 2024

| | S. 402 | S. 402 | S. 402 | S. 405b | S. 405b | S. 405b | S. 405c | S. 405c |
|---|---|---|---|---|---|---|---|---|
| State | HTF Formula Grants | Supplemental Formula Grants | Total 402 Formula Grants | HTF Occupant Protection | Supplemental Occupant Protection | Total Occupant Protection | HTF State Traffic Safety Information Systems | Supplemental State Traffic Safety Information Systems |
| Alabama | $5,983,567.36 | $319,319.44 | $6,302,886.80 | $778,693.55 | $48,461.83 | $827,155.38 | $881,696.20 | $54,872.18 |
| Alaska | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Arizona | $7,049,493.69 | $376,203.73 | $7,425,697.42 | $751,355.01 | $46,760.42 | $798,115.43 | $850,741.42 | $52,945.71 |
| Arkansas | $4,428,382.46 | $236,325.34 | $4,664,707.80 | $584,856.01 | $36,398.39 | $621,254.40 | $662,218.56 | $41,213.03 |
| California | $34,020,372.18 | $1,815,533.37 | $35,835,905.55 | $4,309,450.65 | $268,197.77 | $4,577,648.42 | $4,879,488.54 | $303,673.96 |
| Colorado | $6,325,243.82 | $337,553.36 | $6,662,797.18 | $736,164.83 | $45,815.06 | $781,979.89 | $833,541.94 | $51,875.31 |
| Connecticut | $3,205,326.63 | $171,055.66 | $3,376,382.29 | $444,905.85 | $27,688.62 | $472,594.47 | $503,756.32 | $31,351.17 |
| Delaware | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| District of Columbia | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Florida | $19,062,080.57 | $1,017,321.58 | $20,080,402.15 | $2,149,342.62 | $133,763.89 | $2,283,106.51 | $2,433,649.56 | $151,457.68 |
| Georgia | $10,895,778.41 | $581,464.81 | $11,477,243.22 | $1,261,696.91 | $78,521.44 | $1,340,218.35 | $1,428,589.42 | $88,907.96 |
| Hawaii | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Idaho | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Illinois | $12,900,014.27 | $688,422.99 | $13,588,437.26 | $1,797,388.05 | $111,860.07 | $1,909,248.12 | $2,035,139.76 | $126,656.50 |
| Indiana | $7,254,293.73 | $387,133.10 | $7,641,426.83 | $959,957.33 | $59,742.74 | $1,019,700.07 | $1,086,936.87 | $67,645.29 |
| Iowa | $4,906,901.28 | $261,862.01 | $5,168,763.29 | $655,014.96 | $40,764.72 | $695,779.68 | $741,657.87 | $46,156.92 |
| Kansas | $5,233,026.70 | $279,266.04 | $5,512,292.74 | $702,319.23 | $43,708.69 | $746,027.92 | $795,219.38 | $49,490.31 |
| Kentucky | $5,146,489.14 | $274,647.87 | $5,421,137.01 | $679,640.46 | $42,297.28 | $721,937.74 | $769,540.74 | $47,892.21 |
| Louisiana | $4,967,118.46 | $265,075.56 | $5,232,194.02 | $677,881.73 | $42,187.83 | $720,069.56 | $767,549.37 | $47,768.27 |
| Maine | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Maryland | $5,404,106.19 | $288,395.87 | $5,692,502.06 | $686,767.58 | $42,740.83 | $729,508.41 | $777,610.61 | $48,394.43 |
| Massachusetts | $6,145,253.08 | $327,947.97 | $6,473,201.05 | $818,946.56 | $50,966.97 | $869,913.53 | $927,273.72 | $57,708.69 |
| Michigan | $10,301,291.18 | $549,739.36 | $10,851,030.54 | $1,467,434.50 | $91,325.48 | $1,558,759.98 | $0.00 | $0.00 |
| Minnesota | $7,431,011.95 | $396,563.86 | $7,827,575.81 | $948,026.62 | $59,000.24 | $1,007,026.86 | $1,073,428.01 | $66,804.57 |
| Mississippi | $3,929,930.83 | $209,724.94 | $4,139,655.77 | $533,260.70 | $33,187.37 | $566,448.07 | $603,798.41 | $37,577.27 |
| Missouri | $7,544,496.93 | $402,620.11 | $7,947,117.04 | $998,673.88 | $62,152.26 | $1,060,826.14 | $1,130,774.70 | $70,373.53 |
| Montana | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Nebraska | $3,552,907.01 | $189,604.66 | $3,742,511.67 | $458,741.53 | $28,549.68 | $487,291.21 | $519,422.13 | $32,326.13 |
| Nevada | $3,384,193.30 | $180,601.07 | $3,564,794.37 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| New Hampshire | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| New Jersey | $7,906,423.23 | $421,934.69 | $8,328,357.92 | $1,059,833.61 | $65,958.52 | $1,125,792.13 | $1,200,024.41 | $74,683.27 |
| New Mexico | $3,167,408.73 | $169,032.13 | $3,336,440.86 | $399,641.29 | $24,871.59 | $424,512.88 | $452,504.33 | $28,161.51 |
| New York | $17,839,996.15 | $952,050.38 | $18,792,046.53 | $2,465,112.33 | $153,415.76 | $2,618,528.09 | $2,791,188.10 | $173,709.01 |

National Highway Traffic Safety Administration
Office of Grants Management and Operations
Table of the Authorized Not-To-Exceed Grant Amounts for FY 2024 Sections 402, 405, 1906, 154 and 164
For the Period of October 1, 2023 to September 30, 2024

| | S. 402 | S. 402 | S. 402 | S. 405b | S. 405b | S. 405b | S. 405c | S. 405c |
|---|---|---|---|---|---|---|---|---|
| State | HTF Formula Grants | Supplemental Formula Grants | Total 402 Formula Grants | HTF Occupant Protection | Supplemental Occupant Protection | Total Occupant Protection | HTF State Traffic Safety Information Systems | Supplemental State Traffic Safety Information Systems |
| North Carolina | $10,280,399.66 | $548,624.47 | $10,829,024.13 | $1,205,282.07 | $75,010.48 | $1,280,292.55 | $1,364,712.24 | $84,932.58 |
| North Dakota | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Ohio | $11,630,578.62 | $620,678.20 | $12,251,256.82 | $1,637,230.09 | $101,892.67 | $1,739,122.76 | $1,853,796.72 | $115,370.65 |
| Oklahoma | $5,503,079.32 | $293,677.68 | $5,796,757.00 | $710,569.69 | $44,222.15 | $754,791.84 | $804,561.17 | $50,071.69 |
| Oregon | $4,931,431.02 | $263,171.06 | $5,194,602.08 | $556,073.81 | $34,607.13 | $590,680.94 | $629,629.16 | $39,184.84 |
| Pennsylvania | $12,524,660.55 | $668,391.84 | $13,193,052.39 | $1,731,777.32 | $107,776.80 | $1,839,554.12 | $1,960,850.30 | $122,033.11 |
| Puerto Rico | $2,931,846.76 | $156,461.12 | $3,088,307.88 | $476,469.26 | $29,652.96 | $506,122.22 | $539,494.82 | $33,575.34 |
| Rhode Island | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| South Carolina | $5,587,107.08 | $298,161.91 | $5,885,268.99 | $641,188.75 | $39,904.25 | $681,093.00 | $726,002.79 | $45,182.63 |
| South Dakota | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $0.00 | $0.00 | $0.00 | $402,322.84 | $25,038.47 |
| Tennessee | $7,338,550.89 | $391,629.58 | $7,730,180.47 | $901,041.66 | $56,076.14 | $957,117.80 | $1,020,228.05 | $63,493.68 |
| Texas | $29,155,313.21 | $1,555,904.32 | $30,711,217.53 | $3,223,108.94 | $200,589.52 | $3,423,698.46 | $3,649,449.65 | $227,122.75 |
| Utah | $3,546,554.99 | $189,265.68 | $3,735,820.67 | $377,807.09 | $23,512.74 | $401,319.83 | $427,781.99 | $26,622.92 |
| Vermont | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Virginia | $8,199,325.99 | $437,565.76 | $8,636,891.75 | $1,005,503.48 | $62,577.30 | $1,068,080.78 | $1,138,507.69 | $70,854.79 |
| Washington | $7,578,924.34 | $404,457.36 | $7,983,381.70 | $902,469.18 | $56,164.98 | $958,634.16 | $1,021,844.40 | $63,594.27 |
| West Virginia | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| Wisconsin | $6,982,170.11 | $372,610.94 | $7,354,781.05 | $931,540.23 | $57,974.21 | $989,514.44 | $0.00 | $0.00 |
| Wyoming | $2,810,775.00 | $150,000.00 | $2,960,775.00 | $355,322.16 | $22,113.40 | $377,435.56 | $402,322.84 | $25,038.47 |
| American Samoa | $936,925.00 | $50,000.00 | $986,925.00 | $0.00 | $0.00 | $0.00 | $134,107.61 | $8,346.15 |
| Guam | $936,925.00 | $50,000.00 | $986,925.00 | $118,440.72 | $7,371.13 | $125,811.85 | $0.00 | $0.00 |
| Northern Mariana Islands | $936,925.00 | $50,000.00 | $986,925.00 | $118,440.72 | $7,371.13 | $125,811.85 | $134,107.61 | $8,346.15 |
| Virgin Islands | $936,925.00 | $50,000.00 | $986,925.00 | $118,440.72 | $7,371.13 | $125,811.85 | $134,107.61 | $8,346.15 |
| Bureau of Indian Affairs | $7,495,400.00 | $400,000.00 | $7,895,400.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Grand Total | $ 374,769,999.82 | $ 19,999,999.82 | $ 394,769,999.64 | $ 45,954,999.76 | $ 2,859,999.77 | $ 48,814,999.53 | $ 49,719,774.78 | $ 3,094,299.66 |
| | | | 50 States, DC, PR, 4 Terr., BIA | | | 49 States, DC, PR, 3 Terr. | | |

| S. 405c | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S. 405e | S. 405e | S. 405e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total State Traffic Safety Information Systems | HTF Impaired Driving Countermeasures | Supplemental Impaired Driving Countermeasures | Total Impaired Driving Countermeasures | HTF Impaired Driving Ignition Interlock | Supplemental Impaired Driving Ignition Interlock | Total Impaired Driving Ignition Interlock | HTF Impaired Driving 24-7 | Supplemental Impaired Driving 24-7 | Total Impaired Driving 24-7 | HTF Distracted Driving Laws | Supplemental Distracted Driving Laws | Total Distracted Driving Laws |
| $936,568.38 | $3,109,563.94 | $194,040.91 | $3,303,604.85 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $903,687.13 | $3,000,392.71 | $187,228.49 | $3,187,621.20 | $420,988.47 | $26,270.23 | $447,258.70 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $703,431.59 | $2,335,510.76 | $145,738.97 | $2,481,249.73 | $271,341.87 | $16,932.09 | $288,273.96 | $0.00 | $0.00 | $0.00 | $375,479.44 | $35,024.14 | $410,503.58 |
| $5,183,162.50 | $17,208,967.78 | $1,073,862.43 | $18,282,830.21 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,383,340.57 | $129,035.88 | $1,512,376.45 |
| $885,417.25 | $2,939,733.60 | $183,443.27 | $3,123,176.87 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $535,107.49 | $1,776,646.51 | $110,865.10 | $1,887,511.61 | $196,130.13 | $12,238.78 | $208,368.91 | $0.00 | $0.00 | $0.00 | $285,630.98 | $26,643.21 | $312,274.19 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $171,601.53 | $10,708.16 | $182,309.69 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $2,585,107.24 | $8,582,989.08 | $535,589.91 | $9,118,578.99 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $1,517,497.38 | $5,038,345.53 | $314,399.44 | $5,352,744.97 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $2,161,796.26 | $7,177,525.75 | $447,887.13 | $7,625,412.88 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $288,482.22 | $26,909.17 | $315,391.39 |
| $1,154,582.16 | $3,833,406.19 | $239,209.63 | $4,072,615.82 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $787,814.79 | $2,615,677.10 | $163,221.72 | $2,778,898.82 | $0.00 | $0.00 | $0.00 | $75,073.99 | $4,684.71 | $79,758.70 | $0.00 | $0.00 | $0.00 |
| $844,709.69 | $2,804,577.69 | $175,009.37 | $2,979,587.06 | $322,025.01 | $20,094.78 | $342,119.79 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $817,432.95 | $2,714,014.33 | $169,358.09 | $2,883,372.42 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $815,317.64 | $2,706,991.17 | $168,919.84 | $2,875,911.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $228,117.97 | $21,278.49 | $249,396.46 |
| $826,005.04 | $2,742,475.12 | $171,134.08 | $2,913,609.20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $984,982.41 | $3,270,306.61 | $204,071.47 | $3,474,378.08 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $525,766.32 | $49,042.67 | $574,808.99 |
| $0.00 | $5,859,919.29 | $365,666.74 | $6,225,586.03 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $1,140,232.58 | $3,785,763.19 | $236,236.64 | $4,021,999.83 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $152,159.03 | $14,193.16 | $166,352.19 |
| $641,375.68 | $2,129,474.72 | $132,882.04 | $2,262,356.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $1,201,148.23 | $3,988,013.36 | $248,857.32 | $4,236,870.68 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $42,900.38 | $2,677.04 | $45,577.42 | $0.00 | $0.00 | $0.00 |
| $551,748.26 | $1,831,896.66 | $114,312.78 | $1,946,209.44 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.18 | $88,541.95 | $1,507,453.13 | $207,545.52 | $12,951.11 | $220,496.63 | $51,886.38 | $3,237.77 | $55,124.15 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $228,117.97 | $21,278.49 | $249,396.46 |
| $1,274,707.68 | $4,232,243.05 | $264,097.58 | $4,496,340.63 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $680,416.58 | $63,468.21 | $743,884.79 |
| $480,665.84 | $1,595,891.15 | $99,585.72 | $1,695,476.87 | $193,847.22 | $12,096.32 | $205,943.54 | $0.00 | $0.00 | $0.00 | $256,570.99 | $23,932.54 | $280,503.53 |
| $2,964,897.11 | $9,843,955.09 | $614,275.86 | $10,458,230.95 | $1,089,949.99 | $68,014.32 | $1,157,964.31 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

| S. 405c | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S.405d | S. 405e | S. 405e | S. 405e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total State Traffic Safety Information Systems | HTF Impaired Driving Countermeasures | Supplemental Impaired Driving Countermeasures | Total Impaired Driving Countermeasures | HTF Impaired Driving Ignition Interlock | Supplemental Impaired Driving Ignition Interlock | Total Impaired Driving Ignition Interlock | HTF Impaired Driving 24-7 | Supplemental Impaired Driving 24-7 | Total Impaired Driving 24-7 | HTF Distracted Driving Laws | Supplemental Distracted Driving Laws | Total Distracted Driving Laws |
| $1,449,644.82 | $4,813,063.66 | $300,341.56 | $5,113,405.22 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $42,900.38 | $2,677.04 | $45,577.42 | $228,117.97 | $21,278.49 | $249,396.46 |
| $1,969,167.37 | $6,537,965.55 | $407,977.72 | $6,945,943.27 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,051,106.97 | $98,045.64 | $1,149,152.61 |
| $854,632.86 | $2,837,524.31 | $177,065.28 | $3,014,589.59 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $668,814.00 | $2,220,574.54 | $138,566.79 | $2,359,141.33 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $357,001.17 | $33,300.52 | $390,301.69 |
| $2,082,883.41 | $6,915,521.86 | $431,537.74 | $7,347,059.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $573,070.16 | $1,902,688.98 | $118,730.31 | $2,021,419.29 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $228,117.97 | $21,278.49 | $249,396.46 |
| $771,185.42 | $2,560,464.79 | $159,776.40 | $2,720,241.19 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $42,900.38 | $2,677.04 | $45,577.42 | $0.00 | $0.00 | $0.00 |
| $1,083,721.73 | $3,598,137.70 | $224,528.56 | $3,822,666.26 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $3,876,572.40 | $12,870,869.74 | $803,159.35 | $13,674,029.09 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $454,404.91 | $1,508,700.44 | $94,144.91 | $1,602,845.35 | $0.00 | $0.00 | $0.00 | $54,163.77 | $3,379.89 | $57,543.66 | $242,553.36 | $22,625.00 | $265,178.36 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $228,117.97 | $21,278.49 | $249,396.46 |
| $1,209,362.48 | $4,015,286.03 | $250,559.17 | $4,265,845.20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $1,085,438.67 | $3,603,838.25 | $224,884.29 | $3,828,722.54 | $0.00 | $0.00 | $0.00 | $116,332.63 | $7,259.31 | $123,591.94 | $579,388.11 | $54,044.43 | $633,432.54 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $3,719,927.93 | $232,128.44 | $3,952,056.37 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $427,361.31 | $1,418,911.17 | $88,541.94 | $1,507,453.11 | $0.00 | $0.00 | $0.00 | $42,900.38 | $2,677.04 | $45,577.42 | $0.00 | $0.00 | $0.00 |
| $142,453.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $142,453.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $142,453.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $ 52,814,074.44 | $ 183,512,511.72 | $ 11,451,424.16 | $ 194,963,935.88 | $ 2,873,429.74 | $ 179,305.79 | $ 3,052,735.53 | $ 469,058.29 | $ 29,269.84 | $ 498,328.13 | $ 7,318,485.59 | $ 682,657.02 | $ 8,001,142.61 |
| | | | $198,514,999.54 | | | | | | | | | $26,91... |
| 48 States, DC, PR, 3 Terr. | | | 50 States, DC, PR | | | 7 States, DC | | | 8 States | | | 17 States |

| S. 405e | S. 405e | S. 405e | S. 405f | S. 405f | S. 405f | S. 405g | S. 405g | S. 405g | S. 405h | S. 405h | S. 405h | S. 405i |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HTF Distracted Driving Awareness | Supplemental Distracted Driving Awareness | Total Distracted Driving Awareness | HTF Motorcyclist Safety | Supplemental Motorcyclist Safety | Total Motorcyclist Safety | HTF Nonmotorized Safety | Supplemental Nonmotorized Safety | Total Nonmotorized Safety | HTF Preventing Roadside Deaths | Supplemental Preventing Roadside Deaths | Total Preventing Roadside Deaths | HTF Driver and Officer Safety Education |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $237,425.71 | $14,776.14 | $252,201.85 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $92,436.27 | $5,752.75 | $98,189.02 | $502,054.25 | $31,245.24 | $533,299.49 | $0.00 | $0.00 | $0.00 | $0.00 |
| $382,549.46 | $25,620.00 | $408,169.46 | $71,952.55 | $4,477.95 | $76,430.50 | $390,799.87 | $24,321.35 | $415,121.22 | $97,733.42 | $6,082.41 | $103,815.83 | $0.00 |
| $2,818,775.90 | $188,778.32 | $3,007,554.22 | $530,174.91 | $32,995.32 | $563,170.23 | $2,879,568.21 | $179,209.33 | $3,058,777.54 | $0.00 | $0.00 | $0.00 | $3,110,190.22 |
| $0.00 | $0.00 | $0.00 | $90,567.48 | $5,636.44 | $96,203.92 | $0.00 | $0.00 | $0.00 | $139,178.37 | $8,661.73 | $147,840.10 | $0.00 |
| $291,009.22 | $19,489.40 | $310,498.62 | $54,735.03 | $3,406.42 | $58,141.45 | $297,285.39 | $18,501.49 | $315,786.88 | $70,643.23 | $4,396.46 | $75,039.69 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $2,720.52 | $46,434.42 | $237,425.71 | $14,776.14 | $252,201.85 | $61,808.39 | $3,846.63 | $65,655.02 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $0.00 | $ - | $0.00 | $237,425.71 | $14,776.14 | $252,201.85 | $0.00 | $0.00 | $0.00 | $0.00 |
| $1,405,867.16 | $94,153.36 | $1,500,020.52 | $264,425.24 | $16,456.45 | $280,881.69 | $1,436,187.39 | $89,380.82 | $1,525,568.21 | $0.00 | $0.00 | $0.00 | $0.00 |
| $825,265.47 | $55,269.46 | $880,534.93 | $155,221.65 | $9,660.18 | $164,881.83 | $843,063.91 | $52,467.90 | $895,531.81 | $240,603.81 | $14,973.92 | $255,577.73 | $0.00 |
| $0.00 | $0.00 | $0.00 | $43,713.90 | $2,720.52 | $46,434.42 | $237,425.71 | $14,776.14 | $252,201.85 | $0.00 | $0.00 | $0.00 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $2,720.52 | $46,434.42 | $0.00 | $0.00 | $0.00 | $61,808.39 | $3,846.63 | $65,655.02 | $0.00 |
| $1,175,656.60 | $78,735.77 | $1,254,392.37 | $221,125.64 | $13,761.70 | $234,887.34 | $1,201,011.89 | $74,744.72 | $1,275,756.61 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $118,099.80 | $7,349.91 | $125,449.71 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $80,583.93 | $5,015.12 | $85,599.05 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $459,381.18 | $30,765.55 | $490,146.73 | $86,403.59 | $5,377.31 | $91,780.90 | $0.00 | $0.00 | $0.00 | $115,988.75 | $7,218.53 | $123,207.28 | $483,903.36 |
| $444,547.18 | $29,772.09 | $474,319.27 | $83,613.51 | $5,203.67 | $88,817.18 | $0.00 | $0.00 | $0.00 | $108,358.28 | $6,743.65 | $115,101.93 | $0.00 |
| $443,396.81 | $29,695.05 | $473,091.86 | $83,397.14 | $5,190.20 | $88,587.34 | $452,959.51 | $28,189.84 | $481,149.35 | $108,358.28 | $6,743.65 | $115,101.93 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $2,720.52 | $46,434.42 | $0.00 | $0.00 | $0.00 | $61,808.39 | $3,846.63 | $65,655.02 | $0.00 |
| $449,208.97 | $30,084.30 | $479,293.27 | $84,490.33 | $5,258.23 | $89,748.56 | $458,897.02 | $28,559.36 | $487,456.38 | $118,856.64 | $7,397.01 | $126,253.65 | $236,366.42 |
| $0.00 | $0.00 | $0.00 | $100,751.80 | $6,270.26 | $107,022.06 | $547,218.81 | $34,056.05 | $581,274.86 | $135,219.73 | $8,415.37 | $143,635.10 | $0.00 |
| $0.00 | $0.00 | $0.00 | $180,532.74 | $11,235.41 | $191,768.15 | $980,537.44 | $61,023.54 | $1,041,560.98 | $226,867.60 | $14,119.05 | $240,986.65 | $0.00 |
| $620,096.35 | $41,528.93 | $661,625.28 | $116,632.01 | $7,258.56 | $123,890.57 | $633,469.91 | $39,423.87 | $672,893.78 | $163,208.40 | $10,157.24 | $173,365.64 | $0.00 |
| $653,224.30 | $43,747.56 | $696,971.86 | $122,862.95 | $7,646.35 | $130,509.30 | $667,312.33 | $41,530.04 | $708,842.37 | $166,213.10 | $10,344.23 | $176,557.33 | $693,438.59 |
| $300,059.02 | $20,095.47 | $320,154.49 | $56,437.18 | $3,512.35 | $59,949.53 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $2,720.52 | $46,434.42 | $237,425.71 | $14,776.14 | $252,201.85 | $74,754.89 | $4,652.35 | $79,407.24 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $2,720.52 | $46,434.42 | $237,425.71 | $14,776.14 | $252,201.85 | $0.00 | $0.00 | $0.00 | $0.00 |
| $693,228.37 | $46,426.71 | $739,655.08 | $130,387.19 | $8,114.62 | $138,501.81 | $708,179.17 | $44,073.38 | $752,252.55 | $174,068.82 | $10,833.13 | $184,901.95 | $0.00 |
| $261,402.05 | $17,506.55 | $278,908.60 | $49,166.31 | $3,059.85 | $52,226.16 | $267,039.69 | $16,619.16 | $283,658.85 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $303,273.15 | $18,874.14 | $322,147.29 | $1,647,184.22 | $102,512.17 | $1,749,696.39 | $0.00 | $0.00 | $0.00 | $0.00 |

| S. 405e | S. 405e | S. 405e | S. 405f | S. 405f | S. 405f | S. 405g | S. 405g | S. 405g | S. 405h | S. 405h | S. 405h | S. 405i |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HTF Distracted Driving Awareness | Supplemental Distracted Driving Awareness | Total Distracted Driving Awareness | HTF Motorcyclist Safety | Supplemental Motorcyclist Safety | Total Motorcyclist Safety | HTF Nonmotorized Safety | Supplemental Nonmotorized Safety | Total Nonmotorized Safety | HTF Preventing Roadside Deaths | Supplemental Preventing Roadside Deaths | Total Preventing Roadside Deaths | HTF Driver and Officer Safety Education |
| $0.00 | $0.00 | $0.00 | $148,281.15 | $ 9,228.24 | $157,509.39 | $805,367.60 | $50,121.88 | $855,489.48 | $226,210.29 | $14,078.15 | $240,288.44 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $ 2,720.52 | $46,434.42 | $0.00 | $0.00 | $0.00 | $61,808.39 | $3,846.63 | $65,655.02 | $0.00 |
| $1,070,898.61 | $71,719.94 | $1,142,618.55 | $201,422.03 | $ 12,535.45 | $213,957.48 | $1,093,994.59 | $68,084.52 | $1,162,079.11 | $256,145.13 | $15,941.13 | $272,086.26 | $0.00 |
| $464,777.73 | $31,126.97 | $495,904.70 | $87,418.61 | $ 5,440.47 | $92,859.08 | $474,801.56 | $29,549.17 | $504,350.73 | $0.00 | $0.00 | $0.00 | $0.00 |
| $363,723.27 | $24,359.18 | $388,082.45 | $68,411.59 | $ 4,257.58 | $72,669.17 | $371,567.65 | $23,124.43 | $394,692.08 | $108,590.08 | $6,758.08 | $115,348.16 | $453,036.20 |
| $1,132,741.17 | $75,861.64 | $1,208,602.81 | $213,053.81 | $ 13,259.36 | $226,313.17 | $1,157,170.91 | $72,016.29 | $1,229,187.20 | $0.00 | $0.00 | $0.00 | $0.00 |
| $311,654.59 | $20,872.04 | $332,526.63 | $0.00 | $ - | $0.00 | $318,376.02 | $19,814.06 | $338,190.08 | $0.00 | $0.00 | $0.00 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $ 2,720.52 | $46,434.42 | $237,425.71 | $14,776.14 | $252,201.85 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $78,882.95 | $ 4,909.26 | $83,792.21 | $428,441.32 | $26,663.95 | $455,105.27 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $ - | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $110,851.64 | $ 6,898.82 | $117,750.46 | $602,074.63 | $37,469.99 | $639,544.62 | $161,536.80 | $10,053.20 | $171,590.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $396,526.52 | $ 24,677.74 | $421,204.26 | $2,153,676.37 | $134,033.60 | $2,287,709.97 | $0.00 | $0.00 | $0.00 | $0.00 |
| $247,120.48 | $16,550.09 | $263,670.57 | $46,480.13 | $ 2,892.68 | $49,372.81 | $252,450.11 | $15,711.18 | $268,161.29 | $78,036.03 | $4,856.55 | $82,892.58 | $325,565.19 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $ 2,720.52 | $46,434.42 | $237,425.71 | $14,776.14 | $252,201.85 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $123,703.17 | $ 7,698.64 | $131,401.81 | $671,875.86 | $41,814.05 | $713,689.91 | $180,485.75 | $11,232.49 | $191,718.24 | $0.00 |
| $590,297.60 | $39,533.25 | $629,830.85 | $111,027.26 | $ 6,909.75 | $117,937.01 | $603,028.50 | $37,529.35 | $640,557.85 | $167,605.33 | $10,430.88 | $178,036.21 | $0.00 |
| $232,413.27 | $15,565.12 | $247,978.39 | $43,713.90 | $ 2,720.52 | $46,434.42 | $0.00 | $0.00 | $0.00 | $61,808.39 | $3,846.63 | $65,655.02 | $0.00 |
| $0.00 | $0.00 | $0.00 | $114,603.76 | $ 7,132.34 | $121,736.10 | $0.00 | $0.00 | $0.00 | $153,845.10 | $9,574.51 | $163,419.61 | $0.00 |
| $0.00 | $0.00 | $0.00 | $43,713.90 | $ 2,720.52 | $46,434.42 | $0.00 | $0.00 | $0.00 | $61,808.39 | $3,846.63 | $65,655.02 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $ 17,729,014.19 | $ 1,187,342.83 | $ 18,916,357.02 | $ 5,302,499.82 | $ 329,999.76 | $ 5,632,499.58 | $ 24,744,999.81 | $ 1,539,999.85 | $ 26,284,999.66 | $ 3,534,999.89 | $ 219,999.85 | $ 3,754,999.74 | $ 5,302,499.98 |
| 7,499.63 | | 30 States, DC, PR | | | 46 States | | | 34 States, DC, PR | | | 27 States | |

| S. 405i | S. 405i | S. 405 | S. 1906 | S. 154 | S. 164 | TOTAL |
|---|---|---|---|---|---|---|
| Supplemental Driver and Officer Safety Education | Total Driver and Officer Safety Education | Total 405 | Racial Profiling Data Collection | Open Container | Repeat Offender | FY 2024 |
| $0.00 | $0.00 | $5,067,328.61 | $0.00 | $0.00 | $0.00 | $11,370,215.41 |
| $0.00 | $0.00 | $2,564,451.83 | $0.00 | $0.00 | $0.00 | $5,525,226.83 |
| $0.00 | $0.00 | $5,968,170.97 | $0.00 | $0.00 | $0.00 | $13,393,868.39 |
| $0.00 | $0.00 | $5,508,250.27 | $0.00 | $0.00 | $0.00 | $10,172,958.07 |
| $193,562.05 | $3,303,752.27 | $39,489,271.84 | $1,150,000.00 | $0.00 | $41,298,661.00 | $117,773,838.39 |
| $0.00 | $0.00 | $5,034,618.03 | $0.00 | $0.00 | $895,275.00 | $12,592,690.21 |
| $0.00 | $0.00 | $4,175,323.31 | $1,150,000.00 | $5,888,910.00 | $0.00 | $14,590,615.60 |
| $0.00 | $0.00 | $2,924,519.66 | $0.00 | $1,410,758.00 | $0.00 | $7,296,052.66 |
| $0.00 | $0.00 | $2,994,739.91 | $575,000.00 | $0.00 | $0.00 | $6,530,514.91 |
| $0.00 | $0.00 | $17,293,263.16 | $0.00 | $0.00 | $0.00 | $37,373,665.31 |
| $0.00 | $0.00 | $10,406,987.00 | $0.00 | $0.00 | $0.00 | $21,884,230.22 |
| $0.00 | $0.00 | $2,610,886.25 | $0.00 | $1,258,331.00 | $1,258,331.00 | $8,088,323.25 |
| $0.00 | $0.00 | $2,672,317.81 | $0.00 | $0.00 | $0.00 | $5,633,092.81 |
| $0.00 | $0.00 | $14,776,884.97 | $0.00 | $0.00 | $0.00 | $28,365,322.23 |
| $0.00 | $0.00 | $6,372,347.76 | $0.00 | $0.00 | $2,903,969.00 | $16,917,743.59 |
| $0.00 | $0.00 | $4,427,851.04 | $0.00 | $0.00 | $0.00 | $9,596,614.33 |
| $30,115.62 | $514,018.98 | $6,131,598.35 | $0.00 | $0.00 | $0.00 | $11,643,891.09 |
| $0.00 | $0.00 | $4,985,879.56 | $0.00 | $0.00 | $0.00 | $10,407,016.57 |
| $0.00 | $0.00 | $5,569,228.69 | $575,000.00 | $1,760,316.00 | $1,760,316.00 | $14,897,054.71 |
| $0.00 | $0.00 | $2,921,714.27 | $575,000.00 | $0.00 | $0.00 | $6,457,489.27 |
| $14,710.21 | $251,076.06 | $5,902,951.14 | $575,000.00 | $0.00 | $0.00 | $12,170,453.20 |
| $0.00 | $0.00 | $6,736,015.03 | $0.00 | $0.00 | $0.00 | $13,209,216.08 |
| $0.00 | $0.00 | $9,258,661.79 | $0.00 | $0.00 | $2,171,627.00 | $22,281,319.33 |
| $0.00 | $0.00 | $7,967,386.73 | $0.00 | $0.00 | $9,523,828.00 | $25,318,790.54 |
| $0.00 | $0.00 | $3,470,180.51 | $0.00 | $6,045,664.00 | $0.00 | $13,655,500.28 |
| $43,156.00 | $736,594.59 | $8,948,320.50 | $0.00 | $5,895,944.00 | $0.00 | $22,791,381.54 |
| $0.00 | $0.00 | $2,404,261.82 | $0.00 | $0.00 | $1,731,591.00 | $7,096,627.82 |
| $0.00 | $0.00 | $3,365,352.93 | $1,150,000.00 | $0.00 | $0.00 | $8,257,864.60 |
| $0.00 | $0.00 | $3,213,892.68 | $575,000.00 | $0.00 | $2,125,934.00 | $9,479,621.05 |
| $0.00 | $0.00 | $3,108,261.10 | $0.00 | $0.00 | $0.00 | $6,069,036.10 |
| $0.00 | $0.00 | $9,456,036.62 | $0.00 | $0.00 | $0.00 | $17,784,394.54 |
| $0.00 | $0.00 | $3,701,896.27 | $0.00 | $0.00 | $7,287,950.00 | $14,326,287.13 |
| $0.00 | $0.00 | $19,271,464.14 | $0.00 | $0.00 | $0.00 | $38,063,510.67 |

| S. 405i | S. 405i | S. 405 | S. 1906 | S. 154 | S. 164 | TOTAL |
|---|---|---|---|---|---|---|
| Supplemental Driver and Officer Safety Education | Total Driver and Officer Safety Education | Total 405 | Racial Profiling Data Collection | Open Container | Repeat Offender | FY 2024 |
| $0.00 | $0.00 | $9,096,629.90 | $0.00 | $0.00 | $0.00 | $19,925,654.03 |
| $0.00 | $0.00 | $2,967,291.69 | $0.00 | $0.00 | $912,417.00 | $6,840,483.69 |
| $0.00 | $0.00 | $14,594,127.41 | $0.00 | $0.00 | $1,596,681.00 | $28,442,065.23 |
| $0.00 | $0.00 | $5,717,128.80 | $0.00 | $0.00 | $0.00 | $11,513,885.80 |
| $28,194.61 | $481,230.81 | $5,460,960.63 | $1,150,000.00 | $0.00 | $0.00 | $11,805,562.71 |
| $0.00 | $0.00 | $13,933,600.31 | $0.00 | $0.00 | $0.00 | $27,126,652.70 |
| $0.00 | $0.00 | $3,771,328.38 | $0.00 | $1,197,794.00 | $1,197,794.00 | $9,255,224.26 |
| $0.00 | $0.00 | $3,108,261.10 | $0.00 | $0.00 | $2,661,636.00 | $8,730,672.10 |
| $0.00 | $0.00 | $4,711,417.09 | $0.00 | $0.00 | $0.00 | $10,596,686.08 |
| $0.00 | $0.00 | $1,980,391.84 | $0.00 | $0.00 | $1,726,591.00 | $6,667,757.84 |
| $0.00 | $0.00 | $6,792,390.87 | $0.00 | $13,662,766.00 | $0.00 | $28,185,337.34 |
| $0.00 | $0.00 | $23,683,214.18 | $0.00 | $0.00 | $0.00 | $54,394,431.71 |
| $20,261.48 | $345,826.67 | $3,791,216.03 | $0.00 | $0.00 | $0.00 | $7,527,036.70 |
| $0.00 | $0.00 | $3,108,261.10 | $0.00 | $0.00 | $651,457.00 | $6,720,493.10 |
| $0.00 | $0.00 | $7,580,098.42 | $1,150,000.00 | $24,659,845.00 | $0.00 | $42,026,835.17 |
| $0.00 | $0.00 | $8,196,181.77 | $0.00 | $0.00 | $1,217,189.00 | $17,396,752.47 |
| $0.00 | $0.00 | $2,672,317.81 | $0.00 | $0.00 | $0.00 | $5,633,092.81 |
| $0.00 | $0.00 | $5,226,726.52 | $0.00 | $0.00 | $0.00 | $12,581,507.57 |
| $0.00 | $0.00 | $2,469,916.84 | $0.00 | $0.00 | $0.00 | $5,430,691.84 |
| $0.00 | $0.00 | $142,453.76 | $0.00 | $0.00 | $0.00 | $1,129,378.76 |
| $0.00 | $0.00 | $125,811.85 | $0.00 | $0.00 | $0.00 | $1,112,736.85 |
| $0.00 | $0.00 | $268,265.61 | $0.00 | $0.00 | $0.00 | $1,255,190.61 |
| $0.00 | $0.00 | $268,265.61 | $0.00 | $0.00 | $0.00 | $1,255,190.61 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,895,400.00 |
| $ 329,999.97 | $ 5,632,499.95 | $ 368,366,572.07 | $ 8,625,000.00 | $ 61,780,328.00 | $ 80,921,247.00 | $ 914,463,146.71 |
| | 6 States | | 9 States, DC | 8 States, PR | 16 States, PR | |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

        *Plaintiffs*,

  v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

        *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 21

Federal Aviation Administration,
Fiscal Year 2024 State
Apportionment

**Fiscal Year 2024**
**State Apportionment**

| | Total FY 2024 State Apportionment |
|---|---|
| **State Apport. + Insular** | **$235,518,464.00** |
| State Apport.(99.38%) | $234,058,250.00 |
| Insular (0.62%) | $1,460,214.00 |

| State Code | State | Region | ADO | Total FY 2024 State Apportionment |
|---|---|---|---|---|
| AL | Alabama | SO | JAN | $3,370,084 |
| AK | Alaska | AL | AAL | $20,737,189 |
| AZ | Arizona | WP | PHX | $6,008,954 |
| AR | Arkansas | SW | AROK | $2,689,737 |
| CA | California | WP | LAX | $18,861,826 |
| CO | Colorado | NM | DEN | $5,222,633 |
| CT | Connecticut | NE | ANE | $1,431,328 |
| DE | Delaware | EA | HAR | $422,708 |
| DC | District Of Columbia | EA | WAS | $243,181 |
| FL | Florida | SO | ORL | $9,554,166 |
| GA | Georgia | SO | ATL | $5,574,195 |
| HI | Hawaii | WP | HNL | $845,270 |
| ID | Idaho | NM | HLN | $3,215,268 |
| IL | Illinois | GL | CHI | $6,262,073 |
| IN | Indiana | GL | CHI | $3,493,345 |
| IA | Iowa | CE | ACE | $2,847,507 |
| KS | Kansas | CE | ACE | $3,559,693 |
| KY | Kentucky | SO | MEM | $2,819,085 |
| LA | Louisiana | SW | LANM | $3,240,651 |
| ME | Maine | NE | ANE | $1,565,306 |
| MD | Maryland | EA | WAS | $2,541,522 |
| MA | Massachusetts | NE | ANE | $2,782,647 |
| MI | Michigan | GL | DET | $6,500,087 |
| MN | Minnesota | GL | DMA | $4,671,007 |
| MS | Mississippi | SO | JAN | $2,526,063 |
| MO | Missouri | CE | ACE | $4,297,471 |
| MT | Montana | NM | HLN | $4,905,004 |
| NE | Nebraska | CE | ACE | $3,066,571 |
| NV | Nevada | WP | PHX | $4,488,870 |
| NH | New Hampshire | NE | ANE | $769,379 |
| NJ | New Jersey | EA | HAR | $3,516,075 |
| NM | New Mexico | SW | LANM | $4,482,919 |
| NY | New York | EA | NYC | $8,741,925 |
| NC | North Carolina | SO | MEM | $5,306,363 |
| ND | North Dakota | GL | DMA | $2,448,507 |
| OH | Ohio | GL | DET | $5,505,038 |
| OK | Oklahoma | SW | AROK | $3,535,772 |
| OR | Oregon | NM | SEA | $4,509,547 |
| PA | Pennsylvania | EA | HAR | $5,963,537 |
| PR | Puerto Rico | SO | ATL | $1,312,698 |
| RI | Rhode Island | NE | ANE | $431,216 |
| SC | South Carolina | SO | ATL | $2,775,092 |
| SD | South Dakota | GL | DMA | $2,683,645 |
| TN | Tennessee | SO | MEM | $3,713,364 |
| TX | Texas | SW | TEX | $18,457,271 |
| UT | Utah | NM | DEN | $3,756,972 |
| VT | Vermont | NE | ANE | $520,827 |
| VA | Virginia | EA | WAS | $4,334,312 |
| WA | Washington | NM | SEA | $4,888,477 |
| WV | West Virginia | EA | BKW | $1,372,924 |
| WI | Wisconsin | GL | CHI | $4,076,549 |
| WY | Wyoming | NM | DEN | $3,212,400 |
| Insular | Insular | WP | HNL | $1,460,214 |
| | **Total** | | | $235,518,464 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

                    *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                    *Defendants*.

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 22

Letter from Sean P. Duffy, Secretary, U.S.
Department of Transportation, to All Recipients
of U.S. Department of Transportation Funding
(July 2, 2025) )



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, DC 20590

July 2, 2025

To All Recipients of U.S. Department of Transportation Funding:

The U.S. Department of Transportation (Department or DOT) distributes substantial Federal financial assistance for thousands of projects, programs, and activities operated or initiated by diverse entities, including but not limited to State and local governments. DOT administers this Federal financial assistance to support the development and maintenance of the Nation's transportation infrastructure, pursuant to statutory authority and in accordance with binding contractual agreements in the form of Federal financial assistance agreements, usually grants, cooperative agreements, and loans.

As part of President Trump's agenda to end illegal discrimination, inefficient climate change policies, and other harmful initiatives in Federal programs, the President has issued several Executive Orders (E.O.) including those titled as follows: E.O. 14170, Reforming The Federal Hiring Process And Restoring Merit To Government Service; E.O. 14151, Ending Radical And Wasteful Government DEI Programs And Preferencing; E.O. 14168, Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government; E.O. 14149, Restoring Freedom of Speech and Ending Federal Censorship; E.O. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity; and E.O. 14154, Unleashing American Energy.

These E.O.s direct Federal agencies, where and as consistent with law, to identify and eliminate all orders, directives, rules, regulations, notices, guidance documents, funding agreements, programs, and policy statements, or portions thereof, which were authorized, adopted, or approved between noon on January 20, 2021 and noon on January 20, 2025, and which reference or relate in any way to climate change, "greenhouse gas" emissions, racial equity, gender identity, "diversity, equity, and inclusion" goals, environmental justice, or the Justice 40 Initiative.

Between noon on January 20, 2021 and noon on January 20, 2025, DOT incorporated these types of policies into the terms, schedules, exhibits, and attachments of the Department's Federal financial assistance agreements. Accordingly, I write to clarify that the Department will no longer enforce these policies, or any other requirements incorporated into its Federal financial assistance agreements that are inconsistent with the policy objectives of this Administration and current DOT leadership. More specifically, the Department considers any policies or requirements not based in statute or regulation relating or referring to climate change, "greenhouse gas" emissions, racial equity, gender identity, "diversity, equity, and inclusion" goals, environmental justice, and the Justice 40 Initiative that were incorporated into the terms, schedules, exhibits, and attachments of its Federal financial assistance agreements to be null and void and of no effect. Recipients of DOT Federal financial assistance are hereby released of their obligations to comply with these policies and requirements effective immediately.

This letter does not impose new conditions or requirements, but instead serves merely to provide notice that DOT will not enforce or require adherence to any of the aforementioned policy requirements the prior administration incorporated into the Department's Federal financial assistance agreements. The Department has removed those requirements from its Federal financial assistance agreements, and inserted language that requires compliance with already existing legal requirements, as applicable based on existing court decisions—including, among others, existing legal requirements related to immigration enforcement and the prohibition of discrimination—not the type of new sweeping policy requirements imposed by the prior administration.

As a reminder, the Department offers technical guidance and support for all recipients of DOT Federal financial assistance through its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative.

The Department remains committed to advancing a transportation system that serves the public interest efficiently and unleashes economic prosperity and a superior quality of life for American families and supports our partnership to achieve these goals.

Sincerely,

Sean P. Duffy

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF CALIFORNIA, *et al.*,

        *Plaintiffs*,

  v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

        *Defendants.*

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 23

Declaration of Stephanie Dougherty

## DECLARATION OF STEPHANIE DOUGHERTY

I, Stephanie Dougherty, declare as follows:

1.     I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2.     I am the Director at the California Office of Traffic Safety (OTS). My job duties include serving as the Governor's Representative for Highway Safety at the federal level, managing an annual budget of approximately $120 million that supports hundreds of innovative, evidence-based education, enforcement, and other behavioral safety programs and technologies designed to improve road safety.

3.     I have been employed by OTS since January 2025, and I have served as Director since January 2025. Before starting at OTS, I served as Deputy Secretary for Transportation Safety and Enforcement at the California State Transportation Agency (CalSTA) from March 2016 to December 2024. The CalSTA is a cabinet-level agency and oversees the policies and activities of California's eight state organizations that deliver transportation-related programs and services. In my role as Deputy Secretary, I provided Agency-level policy and program oversight for the OTS and other safety and enforcement programs in other CalSTA departments. I also served in various roles with the California Department of Motor Vehicles (DMV) from February 2008 to February 2016, including Chief of Enterprise Planning and Performance. In total, I have over 16 years of experience in transportation-related policy and program analysis and administration.

## Background

4.     OTS works to make roadways safe for all users. This means administering traffic

1

safety programs that help prevent death and serious injury.

5.      The California Traffic Safety Program was enacted in 1967 to implement the requirements of the recent National Highway Safety Act. OTS was then created to administer the Traffic Safety Program. Over the years, OTS has grown and expanded its work, developing the deep expertise necessary to fulfill its role.

6.      Through grant funding from the National Highway Traffic Safety Administration, and the Federal Highway Administration, both Department of Transportation (DOT) subagencies, OTS programmed approximately $163 million in federal fiscal year 2025 for road safety programs in California.

7.      OTS carefully evaluates all potential programs to ensure funding is being put to the best use. Through this work, OTS partners with state and local agencies to effectively design, implement, and evaluate roughly 500 unique grants on an annual basis. In addition to the distribution of funding, OTS leads public awareness campaigns and represents California in traffic safety efforts at the local, state, and national levels.

8.      As part of my regular job duties, I oversee federal grant managers who manage grants issued by OTS to state and local agencies and funded through federal programs including the Highway Traffic Safety Program (23 USC § 402), National Priority Safety Program (23 USC § 405(b)-(i)), and Minimum Penalties for Repeat Offenders for Driving While Intoxicated or Driving Under the Influence Program Transfer (23 USC § 164). I have reviewed the FY (Federal Fiscal Year) 2025 grant awards for these grants that were issued to OTS and associated subawards to state and local agencies and am familiar with their contents.

9.      OTS is specifically responsible for the administration of approximately $155 million in annual federal awards for approximately 500 behavioral safety grants to state and local

agencies. These grant funds support safety initiatives targeted at California's most critical traffic safety needs, including alcohol and drug-impaired driving, distracted driving, usage of seat belts and child safety seats, bicyclist and pedestrian safety, emergency medical services, police traffic services, and traffic records. State and local recipients of OTS grant funds include law enforcement agencies, probation departments, public health departments, fire departments, district attorney's offices, toxicology laboratories, universities, public works departments, and transportation agencies. A loss of these grants would cripple traffic safety efforts at both the statewide and local level and create lasting challenges to California's continued efforts to eliminate traffic fatalities and serious injuries, even if funding were restored at a later date.

## California's Annual Receipt of DOT Grants

10.     The U.S. Department of Transportation (DOT) administers many grant programs where States are the primary grant recipients. The National Highway Traffic Safety Administration (NHTSA) is a subagency of the U.S. DOT whose mission is to save lives, prevent injuries, and reduce economic costs due to road traffic crashes, through education, research, safety standards, and enforcement. NHTSA supports the administration of state highway safety grant programs to the 50 states, the District of Columbia, Puerto Rico, the U.S. Territories, and the Bureau of Indian Affairs through the development and implementation of highway safety programs that use data-driven, evidence-based solutions to save lives, prevent injuries, and reduce economic costs due to traffic crashes.

11.     The Federal Highway Administration (FHWA) is a subagency of the U.S. DOT and supports state and local governments in the design, construction, and maintenance of the Nation's highway system and various federally and tribal owned lands. The Highway Safety Improvement Program (HSIP) is a core Federal-aid program with the purpose of achieving a

3

significant reduction in traffic fatalities and serious injuries on all public roads, including non-State-owned roads and roads on tribal land. The HSIP is legislated under Section 148 of Title 23, United States Code (23 USC § 148). Section 164 of Title 23 United States Code (23 USC § 164) requires states to enact and enforce a repeat intoxicated driver law that establishes, at minimum, certain specified penalties for second and subsequent convictions of driving while intoxicated or driving under the influence. States that fail to comply with these minimum requirements have a portion of their highway funds reserved. A noncompliant state may elect to use all or a portion of the reserved funds for alcohol-impaired driving programs and for highway safety improvement program activities under Section 148 activities by the state Department of Transportation. California law does not currently meet these federal requirements for minimum penalties for repeat offenders. Since the inception of the transfer program, California has split the transfer evenly between the OTS and California Department of Transportation.

12.     In total, accounting for all program funds, DOT has obligated the following grant amounts to OTS in recent federal fiscal years:

    a.  FY 23: $108,075,512.05

    b.  FY 24: $117,773,838.39

    c.  FY 25: $119,945,331.43

13.     OTS has also received an average of approximately $1,170,000 in annual state funding over the same three-year period. In total, approximately 99% of the OTS budget comes from federal funding. As such, the work of OTS is contingent on prompt and predictable access to these federal grants.

14.     The programs funded by these grants are vital to the safety and security of those who use California's roads. Traffic fatalities are a significant public health and safety concern.

According to NHTSA, 40,901 people were killed in motor vehicle traffic crashes on U.S. roadways during 2023. In California, 4,061 people were killed in motor vehicle traffic crashes during 2023. NHTSA's early estimates of traffic fatalities for 2024 project that 39,345 people died in traffic crashes nationwide. This represents a decrease of about 3.8% compared to the 40,901 fatalities reported in 2023. Total road fatalities, however, remain significantly higher than a decade ago. The early estimates for California project that 3,807 people died in traffic crashes in 2024, a 6.3% decline but still higher than decade ago.

15.     A February 2023 report by NHTSA ("The Economic and Societal Impact of Motor Vehicle Crashes, 2019") examined the costs of one year of crashes in 2019 that killed an estimated 36,500 people, injured 4.5 million, and damaged 23 million vehicles.[1] The report estimated the total economic costs of motor vehicle crashes in the United States was $340 billion. These estimated costs include medical care, lost productivity, legal and court costs, insurance administrative costs, workplace costs, congestion impacts (travel delay, excess fuel consumption, and pollution), and property damage.

16.     The report further noted, "…in cases of serious injury or death, medical care cannot fully restore victims to their pre-crash status and human capital costs fail to capture the intangible value of lost quality-of-life that results from these injuries. In the case of death, victims are deprived of their entire remaining lifespan. In the case of serious injury, the impact on the lives of crash victims can involve extended or even lifelong impairment or physical pain, which can interfere with or prevent even the most basic living functions. These more intangible effects can be valued using studies that examine the willingness of consumers to pay to avoid risk of death or injury. Assessing the value of these impacts provides a more complete basis for

---

[1] Lawrence Blincoe et al., The Economic and Societal Impact of Motor Vehicle Crashes, DOT HS 813 403 (2023).

quantifying the harmful impacts of motor vehicle crashes on society. When these quality-of-life

valuations are considered, the total value of societal harm from motor vehicle crashes in 2019

was $1.37 trillion."

17.     Given the devastating impact of traffic crashes on individuals, families, and

communities, it is essential that OTS continues to invest in data-driven and evidence-based

traffic safety programs and assure continued progress towards the State's goal of reaching zero

traffic fatalities and serious injuries by 2050.

18.     In addition to using these U.S. DOT program funds themselves, States may pass

funds through to subgrantees for the same purposes. OTS passes approximately 93 percent of the

total program funds available to California through programs such as the Highway Traffic Safety

Program, National Priority Safety Program, and Minimum Penalties for Repeat Offenders for

Driving While Intoxicated or Driving Under the Influence Program Transfer on to other state and

local entities. Based on each subrecipient's planned objectives and activities and allowable uses

under federal rules, OTS may fund subawards to state and local agencies through one or more

DOT grant programs. For FY 2025, across these grant programs, OTS is distributing funding to

375 unique state and local government entities through 494 open subawards. Only public entities

are eligible to apply directly to OTS for subawards. State and local government subrecipients are

allowed to act as host agencies for non-profit organizations. Accordingly, some OTS

subrecipients may partner with non-profit organizations to plan and conduct project activities and

distribute a portion of their OTS subaward to those non-profit organizations.

19.     If these funds were withheld, OTS would have to immediately reduce or terminate

grant awards to state and local subrecipients. The loss of these grant funds would likely result in

state and local entities reducing or completely eliminating critical traffic safety efforts that

prevent crashes, save lives, and reduce serious injuries. These actions include education and public awareness campaigns to educate California residents about safe travel behaviors and drive behavior change, data-driven and high visibility enforcement targeted at the riskiest driving behaviors, and other proven countermeasure strategies to address impaired driving, distracted driving, speeding, bicyclist and pedestrian safety, and other significant traffic safety problem areas.

### A.  Highway Safety Program (23 USC § 402)

20.    I am familiar with the Highway Safety Program grant funding. Highway Safety Program grants provide funding to support each State's highway safety program, which works to reduce traffic crashes and resulting deaths, injuries, and property damage.

21.    Highway Safety Program grant funding is administered in California by OTS.

22.    OTS was obligated the following total amount in Highway Safety Program grant funds for FY 2025.

    a.  FY 2025: $36,376,319.08

23.    In addition to using Highway Safety Program funds themselves, States may pass funds through to subgrantees for the same purposes. OTS passes the majority of Highway Safety Program funds on to state and local entities. These grants support education, enforcement, and other behavioral safety programs that target the primary causal factors for crashes and traffic fatalities and serious injuries. Current OTS priorities for Highway Safety Program funding include implementing education and public awareness campaigns, conducting coordinated and high visibility traffic enforcement activities focused on high-risk and dangerous driving behaviors, and implementing other proven countermeasure strategies with a particular focus on driving under the influence of alcohol or drugs, distracted driving, speeding, bicyclist and pedestrian safety, emergency medical services, occupant protection, and traffic records and

7

system improvements.

24.     For example, distracted driving is any activity that shifts a motorist's focus away from driving and can lead to roadway fatalities or injuries. In California, there were 148 people killed in distracted driving traffic crashes in 2022. Distracted driving enforcement, education, and other prevention programs educate the public on the dangers of different types of distractions and encourage focused and safe driving behind the wheel. Among the FY 2025 grants in this area, the University of California, Irvine School of Medicine's B3 DrivSim Lab and Program leads the Youth Thriving in Life Transitions with Transportation program. The program educates and trains youth in traffic safety by delivering interactive education on youth development and prevention of risky behaviors related to traffic safety and transportation. Attendees are provided with professional hands-on, skills-based driver safety training and interactive education.

25.     In 2022 in California, 26 percent (or 1,158) of all motor vehicle fatalities were pedestrians, and 4 percent (or 177) of all motor vehicle fatalities were bicyclists. FY 2025 subawards focused on the safety of these vulnerable road users include 56 pedestrian and bicyclist safety grants (ten of which also use National Priority Safety Program grant funding) throughout California. OTS works with a variety of partners through these grants including public health departments, public works, local transportation agencies, law enforcement agencies, and educational institutions. Activities funded include classroom education, bicycle rodeos, community events, presentations, and workshops to improve the safety of vulnerable road users. These countermeasures are encouraged to be conducted in communities with high numbers of pedestrian- and/or bicycle-related crashes, including underserved populations, older adults, and school-aged children. OTS prioritizes funding coordinated efforts such as Safe Routes to School initiatives that work to improve the safety of school neighborhood streets and

implement safety education in school communities, the Safe System Approach which emphasizes a comprehensive approach to roadway safety that involves reducing risks across all parts of the transportation system, and working with community-based organizations to most effectively implement messaging and programs.

26.    For example, a grant to the Southern California Association of Governments (SCAG) takes a community-driven approach to its "Go Human" campaign, which is focused on reducing traffic collisions and encouraging people to walk and bike more. The campaign provides resources directly to local communities and SCAG engages County Transportation Commissions (CTCs), Public Health departments, and local community organizations to ensure messages are appropriately localized. Additionally, SCAG's Go Human Kit of Parts program provides pop-up materials to temporarily demonstrate potential and planned street design treatments and safety infrastructure to create safer and more inviting public spaces. Finally, through a community grant program, SCAG provides grant funding to eligible applicants to implement traffic safety strategies through community engagement projects.

27.    Approximately 42% of people who die in crashes are alive when the first responders arrive, which reinforces the critical need to fund strategies to improve emergency response times and emergency medical services. Among the projects funded in FY 2025 are emergency medical services subawards to 36 city, county, and regional fire agencies to fund new equipment and training for those fire departments without extrication equipment or those that have existing equipment that has reached the end of its usable lifespan and is in need of replacement. These subawards will improve each of these agency's crash response time and the time to extricate the victims of traffic crashes, thus increasing survivability. OTS is also funding the University of California, Los Angeles Department of Emergency Medicine, in collaboration

with The Lundquist Institute/Harbor-UCLA Department of Emergency Medicine and Los

Angeles County Emergency Medical Services (EMS) Agency, to conduct an evaluation of an

EMS protocol mobile application that can be accessed and used to provide just-in-time training

and decision support as first responders treat victims at the crash site.

28.     On July 31, 2025, OTS submitted its application for FY 2026 Highway Safety

Program funding to NHTSA.

### National Priority Safety Program (23 USC § 405(b)-(i))

29.     I am familiar with the National Priority Safety Program grant funding. National

Priority Safety Program grants provide funding to address safety priorities on public roadways

including safety measures for vehicle occupants such as the use of seatbelts, impaired and

distracted driving countermeasures, nonmotorized user safety, motorcyclist safety, and traffic

records systems improvements.

30.     National Priority Safety Program grant funding is administered in California by

OTS.

31.     OTS was obligated the following total amount of National Priority Safety

Program grant funds for FY 2025.

            a.   FY 2025: $39,741,693.35

32.     OTS currently distributes the majority of National Priority Safety Program

funding to state and local government entities to fund best practice strategies for each of the

priority safety areas including vehicle occupant safety, impaired and distracted driving

countermeasures, nonmotorized user safety, motorcyclist safety, and traffic records systems

improvements. These strategies include education, enforcement, community engagement, and

other behavioral safety programs targeted at the primary causal factors for crashes and traffic

10

fatalities and serious injuries in each of these priority areas. For example, funded strategies for

increasing the safety of children traveling in vehicles include providing educational materials,

child safety seat check-ups, community events, presentations, and training, properly fitting child

safety seats, and the distribution of child safety seats. For nonmotorized users, strategies to

improve the overall safety of bicyclists, pedestrians, and other vulnerable road users include

classroom education, bicycle rodeos, community events, presentations, and workshops, as well

as enforcement activities targeted at those behaviors that present the highest risk for pedestrians

and cyclists. Walk audits at locations identified to have a high incidence of serious crashes

involving pedestrians or bicyclists also help to identify potential improvements that could be

implemented.

33.    Best practice strategies to reduce the number of persons killed and injured in

crashes involving motorcycles include hands-on motorcyclist safety courses, motorcyclist helmet

usage training, classroom education, community outreach and public awareness campaigns,

educational presentations, and workshops.

34.    Strategies to improve California's core traffic record data systems (comprised of

crash, driver, vehicle, roadway, citation and adjudication, and injury surveillance systems)

include efforts to automate traffic crash database systems, promote data sharing and integration

of traffic records data systems between all traffic records stakeholders in California, and provide

traffic safety stakeholders the ability to analyze and map high-crash locations.

35.    FY 2025 subawards focused on impaired driving illustrate how California is

bringing a multi-layered approach to addressing our most critical traffic safety problems. In

California, 1,479 people were killed in alcohol-impaired traffic crashes in 2022, and 751 people

were killed in drug-involved traffic crashes in 2021. Impaired driving and associated traffic

11

crashes are best mitigated by early identification, education, and intervention strategies. Among the OTS FY 2025 subawards targeted at impaired driving is a subaward for the California Highway Patrol to train law enforcement personnel, school administrators, teachers, prosecutors, and other legal professionals to better recognize signs of alcohol and drug impairment and be better equipped to remove impaired drivers from the roadway before crashes and injuries occur. The California Department of Alcoholic Beverage Control, through presentations to youth, parents, school, and community organizations and other outreach, is educating and bringing awareness of the dangers of alcohol-impaired driving and underage drinking. Additionally, 18 District Attorney's offices and two City Attorney's offices throughout California are using Alcohol and Drug Driver Vertical Prosecution Program Project subawards to fund specialized teams to prosecute alcohol and drug impaired driving cases and deliver specialized training. These prosecutors handle cases throughout each step of the criminal process. OTS has heard from subgrantees that these specialized prosecutors have experienced a better prosecution rate, aided in part by increased communication with law enforcement.

36.    Selected examples of other FY 2025 subgrants that are supporting the delivery of strategies related to one or more traffic safety priority areas include the University of California, Berkeley SafeTREC's program, which is providing technical assistance to local jurisdictions, with an emphasis on underserved areas and populations, to reduce the number of people killed or seriously injured while walking and biking on California roads. The Community Pedestrian and Bicyclist Safety Program is a collection of community engagement programs that work with participants to develop safety action plans and local traffic safety champions.

37.    In 2022, 634 (or 14 percent) of all motor vehicle fatalities in California were motorcyclists. Through a FY 2025 project, the Hawthorne Police Department conducts hands-on

12

motorcyclist safety courses, motorcyclist helmet usage training, classroom education, community outreach and public awareness campaigns, educational presentations, and workshops to reduce the number of motorcyclist crashes. There are 14 other agencies conducting similar activities throughout the state.

38.     On July 31, 2025, OTS submitted its application for FY 2026 National Priority Safety Program funding to NHTSA.

### Minimum Penalties for Repeat Offenders for Driving While Intoxicated or Driving Under the Influence Program Transfer (23 USC § 164)

39.     I am familiar with the Minimum Penalties for Repeat Offenders for Driving While Intoxicated or Driving Under the Influence Program Transfer (23 USC § 164). Section 164 of Title 23 United States Code (23 USC § 164) requires states to enact and enforce a repeat intoxicated driver law that establishes, at minimum, certain specified penalties for second and subsequent convictions for driving while intoxicated or driving under the influence. States that fail to comply with these minimum requirements have a portion of their highway funds reserved. A noncompliant state may elect to use all or a portion of the reserved funds for Highway Safety Program (Section 402) alcohol-impaired driving initiatives and for Highway Safety Improvement Program activities under Section 148. California law currently does not meet these federal requirements for minimum penalties for repeat offenders. Since the inception of the Section 164 transfer program, California has split the transfer evenly between the OTS and the California Department of Transportation.

40.     The transfer of Section 164 funds reserved for alcohol-impaired driving programs as restricted to the Section 402 grant funding is administered in California by OTS.

41.     OTS was obligated the following total amount in Section 164 Transfer funds (23 USC § 164) for FY 2025.

13

    b. FY 2025: $42,677,319.00

 42. OTS currently distributes the majority of Section 164 funding to state and local

governments to support educational, enforcement, judicial, and other efforts to create awareness

of the dangers of impaired driving and hold impaired drivers accountable for their unsafe actions.

This includes strategies for enhanced DUI enforcement (such as DUI checkpoints, DUI

saturation patrols, and DUI warrant operations) with an emphasis on areas with high levels of

fatal alcohol-related crashes, intensive probation supervision for high-risk felony and repeat DUI

offenders to ensure compliance with court ordered conditions of probation and to prevent rearrest

on new DUI charges, and purchase of toxicology equipment to enhance testing capability in DUI

cases.  As one example, FY 2025 projects include subgrants to the San Joaquin Collaborative

Courts, San Mateo County Superior Court, and Fresno County Superior Court to implement or

expand a comprehensive and dedicated impaired-driving court program that targets high-

risk/need repeat impaired driving offenders. The goal of these programs is to reduce impaired-

driving related recidivism and decrease impaired-driving related crashes, injuries, and fatalities

by requiring multiple offenders to be actively supervised by the court and county probation, and

to ensure that offenders participate in court mandated treatment, monitoring, and counseling

programs as prescribed by the State.

 43. For FY 2026, OTS anticipates that California will request the Section 164 funds

be split and transferred to OTS in a manner consistent with past practice.

### The FY 2025 Immigration Enforcement Requirements and its Impact on California Office of Traffic Safety Grant Administration

 44. I have reviewed and am aware that on April 24, 2025, Secretary of Transportation

Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal

obligations require cooperation generally with Federal authorities in the enforcement of Federal

law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

45.     OTS does not understand what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." OTS is not aware not aware of what limits there may be—if any—to "cooperating with . . . enforcement of Federal immigration law.

46.     I am not aware of OTS staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because OTS is responsible for duties related to the highway safety program planning and grant administration, OTS lacks any capacity to enforce civil immigration law.

47.     If OTS must enforce or participate in the enforcement of federal civil immigration law as a condition of receiving DOT funding, my understanding is that OTS is unable to comply with the federal government's new funding condition.

48.     Additionally, if similar requirements are applied to OTS's subrecipients, OTS could be required to monitor compliance with the new federal civil immigration enforcement condition as to all its many sub-grantees of federal funding. OTS currently does not have the capabilities or subject matter expertise to monitor sub-grantees' level of cooperation and coordination in federal civil immigration enforcement. In order to possess those capabilities, OTS would be required to allocate additional funds annually to hire staff to monitor these

specified duties. This, in turn, would result in further diversion of funding that OTS relies upon for its critical traffic safety programs.

49.     If OTS is unable to comply with the federal government's new funding condition, the State would be unable to claim programmed FY 2025 or anticipated FY 2026 DOT grants and subawards, depriving the State of an estimated combined total of $268 million (approximately $111 million in FY 2025 programmed grants and subawards that are not yet claimed and a projected $157 million to be awarded in FY 2026) and frustrating its ability to maintain the critical programs described above.

50.     OTS does not have any other appropriation in its budget that could cover the loss of the grants discussed above. OTS is a majority federally funded office. OTS has 50 permanent and 3 limited term positions, 37 are 100% federally funded and 16 are state match funded (71.32% federal and 28.68% state). Additionally, 28.68% of all operations expenses (rent, office supplies, shared IT equipment, etc.) are state match funded.

51.     If OTS cannot access federal funds, OTS will not have funds to immediately cover at minimum approximately 500 unique grants funded by these programs. This, in turn, will result in interruptions and terminations of critical behavioral safety activities and programs throughout the state of California. The OTS budget for this year has relied on the availability of these program funds and we made plans and entered into subawards totaling approximately $163 million based on our continued ability to draw down on promised federal funding.

52.     Without access to FY 2025 or 2026 grant funding, OTS cannot commit funding for furtherance of programs. Any pause or termination in federal funding would interrupt core OTS program, planning, and administration functions that are necessary for the overall development and management of California's Highway Safety Program. This would in turn

16

interrupt state and local agencies efforts to plan and implement grant-funded safety projects and programs that improve safety for all Californians and reduce traffic fatalities and serious injuries.

53.    Without access to FY 2025 and previously obligated grant funding, OTS also will not have funds to immediately cover at minimum approximately 494 subawards to 375 subrecipients funded by the federal grant programs. The OTS grant program operates on a reimbursement basis. Grantees are required to pay for the program costs upfront and submit claims to OTS for approval and reimbursement. Federal funds for reimbursement are transferred to California on a weekly basis after NHTSA approves those expenses. California does not reimburse grantees until federal dollars are transferred to OTS. If OTS is not able to access federal funds timely to allow time to process reimbursement requests from subrecipients, it will be forced to stop funding programs and subrecipients prior to the end of their performance period, which could result in interruptions, terminations, and other harm to essential traffic safety programs and activities. Under the California Prompt Payment Act (Government Code, Section 927), State of California agencies are obligated to make payments within a 45-day payment period. If the federal funds transfer is delayed more than two weeks, the OTS may be subject to penalties or litigation.

54.    OTS is currently planning for the FY 2026 grant cycle that will begin on October 1, 2025. Any uncertainty about OTS' ability to receive FY 2026 funds may cause unnecessary delays in key OTS planning and grant development activities. These activities include development of the Annual Grant Application, which serves as a project-level planning document for the upcoming year.  On July 31, 2025, OTS submitted the FY 2026 Annual Grant Application to NHTSA for review. Once NHTSA approves the Annual Grant Application, OTS completes a collaborative process of executing subaward agreements for each of the approximately 500 state and local agencies subawards. Any delays in the Annual Grant

17

Application process could also delay the development and approval of subaward agreements with state and local entities prior to October 1, 2025. Subrecipient costs incurred and accrued prior to the start date of the subaward agreement are not reimbursable. As such, any delays in subaward agreements will correspondingly delay  the start of any grant-funded activities and may impact subrecipients' abilities to fully deliver project objectives within the time period remaining in the one-year grant cycle.

55.    The longer OTS cannot access funds, the greater the risk that additional programs will be interrupted or terminated. This may have a chilling effect on critical traffic safety programs in California. The impact will be felt not only by the state and local agencies who rely on OTS grants to deliver these proven behavioral safety countermeasure strategies, but also the public themselves who will directly suffer the harm and economic impacts from any increase in traffic crashes, fatalities, and serious injuries following the interruption or discontinuance of these essential safety programs.

56.    Losing these DOT grants would severely obstruct and undermine OTS' mission, even if the funding were restored at a later date.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on August 14, 2025 in Elk Grove, California.


Stephanie Dougherty

19

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| |
|---|
| STATE OF CALIFORNIA, *et al.*, |
| *Plaintiffs*, |
| v. |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, |
| *Defendants.* |

No. 1:25-cv-00208-JJM-PAS

# EXHIBIT 24

Declaration of Keith Duncan

## DECLARATION OF KEITH DUNCAN

I, Keith Duncan, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am a resident of the State of California.  I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the California Department of Transportation (Caltrans) as Chief, Caltrans Division of Budgets.  I have been Chief of Caltrans Division of Budgets since June 2021.  Before that, I was the Chief of the Office of Capital and Finance within the Caltrans Division of Budgets for 2 years.

3.      Caltrans' mission is to improve lives and communities through transportation.  It is responsible for managing California's highway and inter-city rail programs and supporting public transportation throughout the state.  Caltrans Division of Budgets contributes to that mission by promoting responsible resource allocation and ensuring fiscal integrity.  In my position, I am delegated the authority, on behalf of the department, for the development, adoption and management of financial policy for Caltrans including, but not limited to, managing the responsibilities designated in all departmental policies and deputy directives for budgetary roles and responsibilities, the apportionment and use of state and federal transportation funds, and the development, monitoring and reporting of the annual State of California budget for Caltrans according to State statues and mandates.

4.      As Chief, Caltrans Division of Budgets, my knowledge of the federal funding received by Caltrans is based on my review of federal statute, agreements, authorizations, funding obligations, and communications with my staff, programs, and districts within the

department, and communications with the Federal Highway Administration (FHWA), both within their California Division and in their headquarters, Federal Transit Administration, and US Department of Transportation.  It is within the course of my duties to supervise the Office of Federal Resources (OFR) which supports the full utilization of federal funding of State (and some local) transportation projects delivered on the federal-aid system.  My knowledge includes matters relayed to me by Division of Budgets and OFR staff, along with Caltrans staff from other divisions and districts assigned to the federal programs and responsible for administering and spending federal funds discussed herein, with whom I have consulted.

5.      As part of my regular job duties, I oversee approximately $5.8 billion in Federal-aid Highway funds from core formula programs that are apportioned annually to the State of California, and oversee additional grant funds that are awarded to Caltrans for state highway system needs or grant funds that may be awarded to a local agency that must flow through Caltrans, as the State DOT.  OFR works on behalf of the FHWA to ensure that State and some local projects that are delivered on the federal-aid system and federally funded conform to the requirements set forth in applicable federal laws and regulations, including Title 23 of the U.S. Code, Title 23 of the Code of Federal Regulations, and the Stewardship and Oversight Agreement between Caltrans and FHWA.  Project costs are only federally reimbursable if they are incurred after the project, or project phase, is authorized by FHWA and costs are federal-aid eligible.  A project manager tracks the project progress and conformance with federal-aid funding eligibility requirements.

6.      Funds are received for infrastructure projects through a variety of FHWA administered formula grant programs.  Once such grant program is the National Infrastructure Project Assistance (Mega) discretionary grant program.  The Mega grant program funds projects

2

that are too large or complex for traditional funding programs. Eligible projects include highway, bridge, freight, port, passenger rail, and public transportation projects that are a part of one of the other project types. The Mega program invests a total of $5 billion nationwide through 2026 to help rebuild the United States' infrastructure for the benefit of all Americans.

7.    One of the pending projects awarded with Federal Fiscal Year 2022 discretionary grant funds of $30 million to be obligated by September 30, 2025, is the Watsonville-Cruz Multimodal Corridor Program in Santa Cruz. This Mega project has two components: 1) constructing approximately 2.5 miles of State Route 1 auxiliary lanes and a Bus on Shoulder facility between Freedom Boulevard and State Park Drive; 2) constructing approximately 1.25 miles of the New Coastal Rail Trail within Santa Cruz Branch Rail Line right-of-way, including 4 pedestrian and bicycle overcrossings of State Route 1. As part of the overall corridor program, the applicant will also purchase four new zero emission buses for use in the corridor. The total estimate of project costs through completion is $211,100,000.

8.    Another federally funded program through FHWA is the Nationally Significant Freight & Highway Projects, also known as Infrastructure for Rebuilding America (INFRA). FHWA awards competitive grants for multimodal freight and highway projects of national or regional significance to improve the safety, efficiency, and reliability of the movement of freight and people in and across rural and urban areas. The INFRA grant program funding is made available under the Multimodal Project Discretionary Grant (MPDG) combined Notice of Funding Opportunity (NOFO).

9.    One of many INFRA projects administered by Caltrans is the State Route 84 – Interstate 101 Interchange project in San Mateo County to replace ramps, widen local roads connecting to the ramps, signalize ramps, and add pedestrian and bicycle paths on the local

3

connecting roads.  The current State Route 84-U.S. 101 Interchange configuration results in congestions, traffic merging issues, and traffic backup onto the U.S. 101 mainline.  This area saw 195 collisions between 2018 and 2022.  It will address significant freight bottlenecks to the nearby Port of Redwood City and reduce congestion in the Redwood City to South San Francisco Bay region of San Mateo County, a fast-growing area.  Improvements to ramps, travel lines, and intersections work together to enhance safety and operational effectiveness, leading to fewer collisions and serious injuries.  A total of $105 million was awarded for the project, but not yet obligated.  $8 million was awarded for preconstruction work on January 10, 2025, but Caltrans sent the Project Authorization request to FHWA to obligate this $8 million a few times between mid-January 2025 and March 2025 in an attempt to keep the preconstruction work on schedule.  The FHWA returned it to Caltrans unsigned for a 90-day pause.

10.    Another Project that was awarded is the Wildlife Crossing Pilot Program grant for the Gaviota Pass Wildlife Connectivity and Vehicle Reduction Project.  Caltrans will receive $8 million to reduce wildlife vehicle collisions and connect animal habitats between protected State Park lands on either side of US 101 in and around the Gaviota Pass near Santa Barbara.  This is an area, a recognized biodiversity hotspot, that has observed higher roadkill occurrences that include mountain lion, black bear, and other native species.  Improvements include increasing the size of an existing culvert and installing approximately 2.5 miles of fencing, allowing wildlife to safely cross the highway and move between Gaviota State Park and the adjacent Los Padres National Forest.  This project not only protects wildlife but also translates into substantial economic benefits, as the costs associated with wildlife-vehicle collisions exceed $8 billion annually in the U.S. alone.  By investing in wildlife crossings, states can mitigate these costs while fostering safer travel for motorists.

11.     Caltrans was recently only given partial funding of $1,892,000 for work done late last year.  A new grant agreement will be required when the additional funds are ready to be obligated.

12.     The projects funded by the various grant programs administered by FHWA are vital to develop, maintain, and ensure safety, access, and connectivity on and through roads, bridges, and critical infrastructure throughout the State.  California's transportation system is vital to achieving the state's safety, climate, equity, and economic prosperity goals.  California has immense infrastructure needs and these examples of grant awards to address transportation funding needs is imperative to ensure the State of California can maintain and sustain our multimodal transportation system.  Without adequate investment from these Grant awards and other dedicated federal funding, the state will not be able to deliver a safe system for all users that reduces greenhouse gas emissions, promotes climate resiliency, achieves transportation equity, and supports a strong economy.

13.     State and local entities are dependent upon this funding to complete these projects.

14.     If these funds are withheld, Caltrans would have to cease preconstruction work associated to these projects, which would have drastic impacts as inflationary pressures that impact project costs when delays occur.  In some instances, this may have fiscal impacts to several other highway and local transportation system projects as many of these anticipated grant funded projects are combined with other projects to gain time and fiscal efficiencies and reduce impacts to the travelling project to align construction timelines for projects within a corridor. These time and cost impacts could cost the State and local agencies millions.

15.     I am aware that on April 24, 2025, Secretary of Transportation Sean Duffy issued a letter to all recipients of DOT funding stating that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." This letter warned that "failure to cooperate . . . in the enforcement of Federal law" will "jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT."

16.     Since issuance of Secretary Duffy's April 24, 2025, letter, and as described above, Caltrans has begun to receive new terms and conditions for grant agreements for grants that were awarded, but not yet allocated, authorized or obligated.  I anticipate receiving similar terms and conditions in the award documents that would obligate all discretionary federal grant funds awarded to Caltrans.

17.     It is not clear to me what DOT means to include within the broad phrase, "cooperating with . . . U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."  I am not aware what limits there may be—if any—to "cooperating with . . . enforcement of Federal immigration law."

18.     In my years with Caltrans, I am not aware of Caltrans staff ever being required to enforce or participate in the enforcement of federal civil immigration law.  Caltrans is a transportation department, not an immigration enforcement agency.

19.     If Caltrans must enforce or participate in the enforcement of federal civil immigration law as a condition of receiving DOT funding, my understanding is that Caltrans is

unable to comply with the federal government's new funding conditions.

20.     If Caltrans attempts to comply with the federal government's new funding condition, Caltrans would be required to obtain statutory authority from the state and federal government to enforce immigration law and increase its annual budget to establish an internal program to perform these specified duties, which Caltrans does not currently have the expertise or the necessary workforce infrastructure or the enforcement authority to accomplish.

21.      The additional costs associated with funding these additional responsibilities would directly impact funding availability for future infrastructure projects.

22.     If Caltrans is unable to comply with the federal government's new funding conditions, the State would be unable to support these grant funded projects.

23.     Caltrans does not have any other appropriation in its budget that could cover the loss of the grants to the local entities.  If Caltrans is unable to proceed, it will deprive the public of important safety enhancements and transportation improvements.

24.     Project planning takes place years in advance and require advanced commitment of Caltrans staffing and resources, including hiring staff and negotiating and implementing contracts before construction work commences.  If Caltrans cannot obtain DOT grants, then it will reduce the number of projects undertaken by Caltrans to improve the transportation system vital to California's economy, mobility, and connectivity.  Consequently, any denials or cuts in expected federal funds will negatively impact virtually all Caltrans operations.

25.     The longer Caltrans cannot access funds, the greater the risk that additional projects will be interrupted or terminated.

26.     Losing these federal grants, even if funding is restored at a later date, would severely obstruct and undermine Caltrans' mission to improve lives and communities through

transportation.

I declare under penalty of perjury that the foregoing is true and correct and that this

declaration was executed on August __15__, 2025, in Sacramento, California.

_Keith Duncan_
Keith Duncan