# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NEW JERSEY; STATE OF RHODE ISLAND; STATE OF MARYLAND; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF MAINE; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
|     Plaintiffs, | ) ) |  |
| v. | ) ) | C.A. No. 25-cv-208-JJM-PAS |
| UNITED STATES DEPARTMENT OF TRANSPORTATION; and SEAN DUFFY, in his official capacity as Secretary of Transportation, | ) ) ) ) ) |  |
|     Defendants. | ) ) |  |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief Judge United States District Court.

At the heart of this case is the following question: can the executive branch leverage all federal transportation funding—totaling billions of dollars—to compel state cooperation with federal civil immigration enforcement?

Plaintiffs are twenty states (the "States") who sued the United States Department of Transportation ("DOT") and Secretary of Transportation Sean Duffy (collectively, "Defendants") after Defendants adopted a condition on federal transportation grants that requires State recipients of those grants to cooperate with federal officials in the enforcement of federal immigration law.  Before the Court are the States' and Defendants' cross-motions for summary judgment.  ECF Nos. 68, 69.  The States assert that Defendants lack statutory authority to impose the "Immigration Enforcement Condition" ("IEC") and that doing so violates both the Administrative Procedure Act ("APA") and the Spending Clause.  Defendants counter on both jurisdictional and merits grounds.

For the following reasons, the Court GRANTS the States' Motion for Summary Judgment and DENIES Defendants' Motion.

## I.    BACKGROUND

Congress has enacted a variety of statutes that allocate federal transportation funding to state and local governments.  *See, e.g.*, Merchant Marine Act of 1936, Pub. L. No. 74-835, 49 Stat. 1985; Federal-Aid Highway Act of 1956, Pub. L. No. 84-627, 70 Stat. 374; Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731; Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021).  DOT administers grant programs for this funding through a range of subagencies.  ECF No. 68-2 ¶ 4.  Funding is generally awarded through one of three ways: (1) "formula" funding programs that distribute a set minimum, percentage, or amount of federal funding based on specific and objective factors; (2) discretionary programs

awarded by DOT on a competitive basis according to statutorily prescribed factors; and (3) block grant funding that maximizes State discretion in how funds are used. *See id.* ¶ 3; ECF No. 69 at 19–21. State governments rely heavily on this funding to meet their transportation infrastructure needs. *See generally* ECF Nos. 69-3, 69-4, 69-5.

On January 20, 2025, President Trump issued an Executive Order directing the U.S. Attorney General and the Secretary of Homeland Security to "evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). On January 29, 2025, Secretary Duffy issued an order (the "Duffy Order") stating, *inter alia*, the following:

> (f) To the maximum extent permitted by law, DOT-supported or–assisted programs and activities, including without limitation, all DOT grants, loans, contracts, and DOT-supported or–assisted State contracts, shall prioritize projects and goals that: . . .
>
> > (v) require local compliance or cooperation with Federal immigration enforcement and with other goals and objectives specified by the President of the United States or the Secretary.

ECF No. 69-2 at 8–9.

Then, on April 24, 2025, Secretary Duffy issued a letter (the "Duffy Directive") to all recipients of DOT funding to, *inter alia*,

> clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

ECF NO. 69-2 at 12.  The Duffy Directive then, in relevant part, provides the following:

> In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration Customers Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.  DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement.  Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistant programs.
>
> Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI.  That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability.  *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373.  Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and cooperate with Federal officials in the enforcement of Federal immigration law.

*Id.* at 13–14.  Finally, the Duffy Directive notes the following:

> This letter provides notice of the Department's existing interpretation of Federal law.  The Department will vigorously enforce the law on equal terms as to all its recipients and intends to take appropriate measures to assess their compliance based on the interpretation of Federal law set forth in this letter.  Adherence to your legal obligations is a prerequisite for receipt of DOT financial assistance.  Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lea to a loss of Federal funding from DOT.

*Id.* at 14.

Around the time the Duffy Directive was issued, DOT began adding language to reflect the Duffy Directive's position into grant agreements. ECF No. 68-1 at 2. In general, this language—(the IEC)—requires grant recipients to cooperate with federal officials in enforcing federal immigration law. *Id.*; *see, e.g.*, ECF No. 69-2. DOT added this language to both general terms and conditions governing the entirety of federal funding administered by several DOT subagencies, as well as to terms and conditions for specific federal grants. ECF No. 69 at 26.

For example, DOT included the following language into the Federal Railroad Administration General Terms and Conditions:

> The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

ECF No. 42 at 30–31. In some instances, DOT staff reportedly demanded that state officials swiftly execute agreements containing these terms or risk jeopardizing all DOT funding. ECF No. 69 at 28–29.

Before executing any agreements containing the IEC, the States sued. ECF No. 1. After the Court issued a preliminary injunction enjoining DOT from implementing or enforcing the IEC against the States, *see* ECF No. 57, the parties

agreed to proceed to summary judgment, stipulating that the disputed issues in this case are largely legal in nature and that no additional administrative record beyond what has been filed or otherwise disclosed is needed.  ECF No. 67 at 1.

## II.    STANDARD OF REVIEW

A motion for summary judgment requires the moving party to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In ruling on a motion for summary judgment, the Court must review the entire record and consider the facts and inferences in the light most favorable to the nonmoving party.  *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  "Where the parties cross-move for summary judgment, the court must examine each motion separately, drawing inferences against each movant in turn."  *Vazquez-Velazquez v. Puerto Rico Highways & Transp. Auth.*, 73 F.4th 44, 51 (1st Cir. 2023) (cleaned up).

"[T]he summary judgment rubric has a 'special twist in the administrative law context.'"  *Boston Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)).  "In that context, a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious."  *Id.*  In making that

determination, "the court shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.

## III.    DISCUSSION

The arguments presented by the States and Defendants mirror one another. The States contend that summary judgment in their favor is warranted because the imposition of the IEC is outside DOT's statutory authority, is arbitrary and capricious, and violates the Spending Clause.  Defendants dispute this and assert that the Court lacks subject-matter jurisdiction over the States' claims on both statutory and constitutional grounds.  The Court begins its analysis by disposing of Defendants' jurisdictional arguments before proceeding to the merits.

### A.    The Court Has Subject-Matter Jurisdiction Over the States' Claims

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  This consent is generally necessary because, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  Thus, in addition to meeting the standard requirements for subject-matter jurisdiction in this Court—including proper standing and presenting a controversy ripe for judicial resolution—the States must demonstrate that their claims are not barred by sovereign immunity where applicable. *See Davallou v. United States*, 998

F.3d 502, 504 (1st Cir. 2021) ("Federal courts lack subject-matter jurisdiction over claims against the United States absent a waiver of sovereign immunity.").

Defendants challenge the Court's jurisdiction over this case on multiple fronts, which may be categorized as follows: first, Defendants argue that the Court's jurisdiction over some or all of the States' claims by either the Tucker Act or other statutes vesting jurisdiction in federal circuit courts for challenges to certain categories of agency orders, *see* ECF No. 68 at 14–19, 22–29; second, Defendants contend that the States' claims do not meet the threshold necessary for APA review, *see id.* at 52–53; and third, Defendants assert that the States' claims are not ripe for judicial resolution and present no cognizable injury, *see id.* at 51–52; ECF No. 72 at 2–7. The Court addresses each of these jurisdictional issues in turn.

### 1. Neither the Tucker Act nor Other Statutes Displace Jurisdiction

The APA waives sovereign immunity for certain suits against the federal government. *See* 5 U.S.C. § 702. However, "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (quoting 5 U.S.C. § 702). "Nor does the waiver apply to claims seeking 'money damages.'" *Id.* Instead, APA waives sovereign immunity "for all equitable actions for specific relief against a Federal agency or officer acting in an official capacity" and "applies to any suit whether under the APA or not." *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 58 (1st Cir. 2007).

Defendants contend at length that this Court lacks jurisdiction over the States' claims because, according to Defendants, the Tucker Act (28 U.S.C. § 1491) grants the Court of Federal Claims exclusive jurisdiction over those claims. ECF No. 68 at 22–29. As the Supreme Court has explained, "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money.'" *California*, 604 U.S. at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

At the outset, Defendants' argument that the Tucker Act precludes the Court's jurisdiction over *all* the States' claims rests on a faulty premise. The APA's waiver of sovereign immunity—and, by extension, the Tucker Act's possible usurpation of the Court's jurisdiction—is not required for the States' claims that Secretary Duffy acted *ultra vires*, or outside his statutory authority, because sovereign immunity does not bar those claims. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) ("[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions . . . [h]is actions are ultra vires his authority and therefore may be made the object of specific relief."). Likewise, to the extent that Secretary Duffy may have acted within his statutory discretion but in an unconstitutional manner, sovereign immunity does not bar constitutional claims challenging that action. *See Dugan v. Rank*, 372 U.S. 609, 621–22 (1963) (explaining that *Larson*'s exceptions to sovereign immunity include suits

contending "(1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void"); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015) (explaining that federal courts may grant injunctive relief against "violations of federal law by federal officials"); *Am. Policyholders Ins. Co. v. Nyacol Prods., Inc.*, 989 F.2d 1256, 1265 (1st Cir. 1993) (reviewing *Larson* and noting that it operates "as a way around the sovereign immunity of agencies").

To the extent that Defendants invoke the Tucker Act against the States' APA claims, that argument is also meritless. Senior Judge William E. Smith has found that "the Tucker Act does not cover challenges to grant funding conditions." *R.I. Coal. Against Domestic Violence v. Bondi*, No. CV 25-279 WES, 2025 WL 2271867, at *5 (D.R.I. Aug. 8, 2025); *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 52 (1st Cir. 2025) (rejecting similar Tucker Act arguments). Here, the States seek neither damages nor injunctive relief related to any executed grant agreement; instead, the States challenge Defendants' imposition of an allegedly unlawful condition on all future grant agreements. This cannot be rationally construed as a claim for "money damages" or one that arises from any "express or implied contract" because no such contract (i.e., executed grant agreement) yet exists.[1] This finding aligns with the Supreme Court's more recent ruling in *NIH v.*

---

[1] This is to say nothing of the incoherence of attempting to transfer the States' claims to the Court of Federal Claims when that court is not equipped to provide the

*American Public Health Association*, where, based on the interplay between the APA and the Tucker Act, the Supreme Court stayed a portion of a district court judgment that vacated grant terminations but denied a stay with respect to challenges to grant-related policies.  *See* 145 S. Ct. 2658 (2025).

Defendants also argue that the Court lacks jurisdiction over some subset of the States' claims because of a handful of statutory provisions that confer exclusive jurisdiction on federal appellate courts to hear challenges to some sub-agency orders. ECF No. 68 at 14–19.  Specifically, Defendants cite 28 U.S.C. § 2342(3)(A) and 49 U.S.C. §§ 60119, 20114(c), 46110(a), and 47111(d)(3) as providing specific procedures for challenges to orders made "under" or "pursuant to" those statutes.  *Id.* at 15–16. But this argument may be swiftly disposed of because the States here challenge a categorical policy that applies to *all* federal transportation grants and does not invoke any of those statutes such that it could be said to be made "under" or "pursuant to" any of them.  *Cf. Matson Navigation Co., Inc. v. U.S. Dep't of Transp.*, 895 F.3d 799, 805 (D.C. Cir. 2018) (finding no exclusive jurisdiction over a claim where DOT "never explicitly invoked" the relevant statute in making a challenged order); *see also e.g.*, *Americopters, LLC v. F.A.A.*, 441 F.3d 726, 735 (9th Cir. 2006), *aff'd sub nom. Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299 (Fed. Cir. 2008) ("Section 46110 does not grant the court of appeals direct and exclusive jurisdiction over every possible dispute involving the FAA.").

---

kind of equitable review at issue here.  *See Bowen v. Massachusetts*, 487 U.S. 879, 904–05 (1988).

2. **The States' APA Claims Properly Challenge Final Agency Action**

The APA "requires a litigant to show, at the outset of the case, that he is injured in fact by agency action" and authorizes judicial review "only for 'final agency action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 800 (2024) (cleaned up); *see* 5 U.S.C. § 704 ("Agency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court are subject to judicial review.") (emphasis added).

Defendants argue that the APA's waiver of sovereign immunity does not apply to the States' suit because, Defendants allege, the IEC does not qualify as "final agency action" reviewable under the APA. *See* ECF No. 68 at 52–53. Under the APA, a plaintiff may challenge "discrete agency action" but is precluded from a "broad programmatic attack" against an agency. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Discrete agency action is final when it satisfies two conditions: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted).

According to Defendants, "there is no final agency action unless and until Plaintiffs have signed a grant agreement and are either denied or delayed funding due to the Immigration Conditions." ECF No. 72 at 9. The Court disagrees. While the Court acknowledges some tension regarding this issue, *see Nat'l Insts. of Health*

*v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (Barrett, J., concurring), the Supreme Court has "long taken" a "pragmatic" approach to what constitutes final agency action. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 591 (2016). Here, the insertion of the IEC into all DOT grant agreements clearly represents the consummation of DOT's decision-making process regarding the terms and conditions of those grants, and this decision imposes concrete legal consequences on the States, who must choose whether to accede to an allegedly unlawful condition or else forgo billions of dollars of federal grant funding. It is as such final agency action for the purposes of APA review. *Accord R.I. Coal. Against Domestic Violence*, 2025 WL 2271867, at *6 (finding the decision to place allegedly unlawful conditions on federal grant funding to be final agency action); *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-CV-342-MRD-PAS, 2025 WL 2899764, at *5 (D.R.I. Oct. 10, 2025) (same).

As such, because the States challenge final agency action by Defendants, their claims satisfy the statutory requirements for the APA's waiver of sovereign immunity.

### 3.    The States Claim Cognizable Injuries Ripe for Resolution

Also implicating the Court's subject-matter jurisdiction over this case are Defendants' arguments that the States lack standing and that the States' claims are unripe because, according to Defendants, the IEC "require[s] no more than compliance with existing federal law," and that it therefore presents no injury to the States that is ripe for judicial resolution. ECF No. 72 at 2. Defendants point to a

July 2, 2025, letter from Secretary Duffy that, along with other statements by DOT, support their claim that the IEC creates no new legal obligations and requires no actions by the States other than what is already required by law.  *See* ECF No. 68-1 ¶ 7, 8.  Defendants contend, *ad nauseam*, that this "clarification" makes it clear that the IEC merely asks the States to certify compliance with federal law, and that "[t]o the extent that Plaintiffs fear that the government may have a different interpretation of what compliance with federal law means than they do, that is speculation that cannot support a facial challenge to all applications of the Immigration Conditions."  ECF No. 72 at 6.

The Court will not indulge Defendants' sophistry regarding the IEC.  Federal law does not require unbridled state cooperation with federal civil immigration enforcement.  *See City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement.") (emphasis in original); *accord United States v. California*, 921 F.3d 865, 887 (9th Cir. 2019).  Nevertheless, the plain text of the Duffy Order, the Duffy Directive, and the challenged grant conditions makes it unassailably clear that the IEC requires that states certify that they "will cooperate with Federal officials in the enforcement of Federal law."   ECF No. 42 at 30–31.   Defendants' post-hoc "clarification" that the required cooperation is only what is already mandated by existing federal law does nothing to disturb the obvious trap Defendants have laid for the States, which the Court has spurned.  *See California v. U.S. Dep't of Transp.*, 788

F. Supp. 3d 316, 323 n.4 (D.R.I. 2025); *see also In re Fin. Oversight & Mgmt. Bd. for P.R.*, 37 F.4th 746, 761 (1st Cir. 2022) ("[J]udicial review of agency actions is limited to the grounds that the agency invoked when it took the action.") (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020)).

To the extent that ripeness is at all implicated by the present case, its two prongs—fitness and hardship—are easily met: regarding fitness, "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat," *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); and regarding hardship, the IEC presents a "direct and immediate dilemma" to the States because it asks them to accede to an allegedly unlawful condition or else forgo billions of dollars in federal funding. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 9 F.4th 1, 10 (1st Cir. 2021). As such, the Court has no hesitation finding this case to be ripe for judicial resolution.

## B.    Imposition of the IEC Is Unlawful

Having disposed of Defendants' threshold jurisdictional arguments, the Court now turns to the merits.  The States challenge the IEC on three grounds: first, the States contend that the IEC exceeds Defendants' statutory authority under the APA and is therefore *ultra vires*; second, the States argue Defendants' decision to impose the IEC violates the APA because it is arbitrary and capricious; and third, the States allege that the IEC violates the Spending Clause because it is unreasonable, unconstitutionally coercive, and impermissibly ambiguous.  Defendants object to each of these claims as meritless.  The Court addresses each claim in turn.

### 1.    Imposing the IEC Exceeds Defendants' Statutory Authority

"When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). "It is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the Administrative Procedure Act." *Id.* (internal citations omitted). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

The States argue that Defendants acted *ultra vires* because there is no statute that could plausibly grant DOT the general authority to make the "sweeping imposition" of the IEC on all DOT funding.  ECF No. 69 at 32.  Further, the States argue that those statutes that authorize the administration of federal transportation funding plainly preclude the imposition of the IEC because the parameters Congress has set for those grants cannot reasonably be read to confer on DOT the discretion to impose conditions related to federal immigration policies.  *Id.* at 33–37.  The States also argue that the IEC necessarily upsets the balance between state and federal power and is therefore subject to the Supreme Court's admonition that Congress must

have explicitly authorized such an upset through a "clear statement" in a federal statute. *See Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991).

The thrust of Defendants' counterargument is that the executive branch has "broad discretion" and "significant authority" in its enforcement of federal immigration law and in its administration of DOT grant funding. ECF No. 68 at 33–35. According to Defendants, the relevant statutes authorizing the imposition of terms and conditions on federal transportation grants provide "few restrictions on how DOT could spend, allocate or condition the money and thus delegated to [DOT] to determine how to achieve the policy objectives those funds may promote." *Id.* at 39. Defendants cite DOT's core mission of "general welfare, economic growth and stability, and security of the United States," *see* 49 U.S.C. § 101(a), as well as the "essential elements" of "partnership and coordination" as giving rise to DOT's supposedly reasonable determination that the failure of states to cooperate with federal immigration enforcement "hinder[s] DOT's ability to ensure the development and administration of safe and effective transportation programs." ECF No. 68 at 41–42.

Essentially, Defendants' argument is that the extremely broad objectives Congress outlined for DOT in its governing statute, *see* 49 U.S.C. § 101(a), coupled with scant explicit statutory restrictions on DOT's discretion in setting terms and conditions for federal transportation funding, vest DOT with the inherent power to impose whatever conditions it wishes on grant agreements so long as DOT "reasonably determines" those conditions to advance its impossibly broad

understanding of its core mission. This cannot be so. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001). As the States identify, none of the statutes cited by DOT expressly afford it the kind of sweeping authority it claims. *See* ECF No. 73 at 36–37. And those statutes governing specific transportation grant programs that contain lists of defined terms and conditions followed by catch-all provisions affording DOT latitude to determine additional terms and conditions cannot be reasonably read as conferring on DOT the power to make those additional terms and conditions utterly unrelated to either the preceding terms or the goals of the specific transportation grant program at issue. *See, e.g.*, 49 U.S.C. § 22907(e)(2) (establishing as factors for selecting recipients for a particular grant program: (1) "private sector participation"; (2) "past performance"; (3) "capacity"; (4) "consistency of the proposed project with planning guidance"; (5) "technical evaluation ratings"; and (6) "[s]uch other factors as the Secretary considers relevant to the successful delivery of the project").

Notwithstanding Defendants' attempts to do otherwise, the Court fails to see how this case is meaningfully distinct from *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020). There, as here, a federal agency imposed a condition mandating cooperation with federal civil immigration enforcement on a grant not directly related to immigration issues. *Id.* at 29–30. In that case, the agency lacked any express authorization to impose that immigration cooperation condition on the grant, and so turned to three statutory provisions that required certification of "maintenance and reporting of programmatic information, coordination with affected agencies, and

compliance with 'all other applicable Federal laws.'" *Id.* at 32.  The agency also cited the inherent statutory authority of one of its officers to "plac[e] special conditions on all grants." *Id.* at 40 (quoting 34 U.S.C. § 10102).  The court, however, found that statutory context surrounding those cited provisions did not support such a wide grant of authority to the agency or its officer to impose the immigration cooperation condition. *Id.* at 39, 45.  As the court concluded, "[w]hen the federal government deals with state and local governments, it must turn square corners." *Id.* at 45.  Imposing the unauthorized condition was an "impermissible shortcut." *Id.*

Just as the First Circuit found in *City of Providence* that the imposition of an immigration cooperation condition on unrelated federal funding was an *ultra vires* act, so too does the Court here.  Defendants' imposition of the IEC exceeded their statutory authority.  Had Congress wished to try to make federal transportation funding contingent on cooperation with federal civil immigration enforcement, it could certainly have attempted to do so.  Absent any clear indication of such an attempt, the Court declines to find that DOT was vested with the sweeping power it asserts in setting a condition that is so obviously unrelated to the grant programs it administers.

### 2.    Imposing the IEC Is Arbitrary and Capricious

Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be, *inter alia*, "arbitrary and capricious." 5 U.S.C. § 706(2)(A).  "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio v. E.P.A.*, 603 U.S. 279, 292

(2024) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2021)).  An agency rule will normally be found to be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "When an agency rescinds a prior policy," it "must consider the alternatives that are 'within the ambit of the existing policy'" and must consider "potential reliance interests" implicated. *Regents of the Univ. of Cal.*, 591 U.S. at 30, 33 (cleaned up).

The States cite five reasons why Defendants' imposition of the IEC on all federal transportation grants is arbitrary and capricious.  ECF No. 69 at 37–38. First, the States argue that DOT failed to consider whether it was authorized to impose the IEC by any of the statutes authorizing the grant programs, "an important aspect of the problem" as it is arbitrary and capricious for an agency to neither "look to" nor "discuss" statutory requirements. *Id.* at 38 (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020)).  Second, the States allege that DOT failed to consider their reliance interests, both with respect to States' reliance on federal funding for transportation programs themselves and the impact that cessation of such funds may have on State budgets. *Id.* at 39–41.  Third, the States contend that DOT failed to consider another "important impact of the problem": States' internal strategies regarding criminal enforcement that prioritize building trust with immigrant communities over enforcement of federal civil

immigration priorities. *Id.* at 41–42. Fourth, the States allege that DOT failed to consider alternatives to the IEC, such as by limiting the imposition of the IEC to particular grants rather than applying it to every federal transportation funding program. *Id.* at 42. Fifth, the States assert that DOT failed to adequately explain what the IEC requires, as the condition makes no effort to define the extent of required "cooperation." *Id.* at 43.

Defendants' core counterargument against the merits of the States' APA claim is its repeated insistence that the IEC merely asks the States to certify compliance with federal law, and that it cannot be arbitrary or capricious for DOT to ensure this compliance. ECF No. 68 at 67–69. Defendants dismiss the States' reliance interests and public safety concerns by asserting any State reliance "is limited in that [the grant programs] make up a small portion of overall federal funding" and that the IEC is designed "with the stated goal of improving public safety." *Id.* at 68. Defendants also contend that the States "cite no case to support their novel position that agencies cannot take such action without first considering potential applicants who are not entitled to federal funds—because they inten[d] to violate existing federal law." *Id.* at 68–69.

The Court has disposed of Defendants' nakedly misleading characterization of what the IEC requires. Deprived of that gimcrack defense, Defendants' imposition of the IEC is patently arbitrary and capricious. Of particular weight to this finding is the Supreme Court's guidance that agency action is arbitrary and capricious when the agency "has relied on factors which Congress has not intended it to consider." *See*

*State Farm*, 463 U.S. at 43.  The Court has determined that Congress could not have intended to vest DOT with the authority to impose such sweeping immigration-related conditions on federal transportation funding.  It was as such impermissible for Defendants to consider factors related to State cooperation with federal civil immigration enforcement in determining conditions for federal transportation funding.  The other facts cited by the States—particularly their reliance interests and the ambiguity of the extent of the IEC's requirements—lend support to the Court's finding that Defendants acted arbitrarily and capriciously in imposing the IEC across the entirety of federal transportation funding programs.

### 3.    The IEC Violates the Spending Clause

Having found that Defendants' imposition of the IEC was both *ultra vires* and arbitrary and capricious, the Court could end its analysis here.  However, given Defendants' position that they can condition the receipt of *all* federal transportation grant funding on State cooperation with federal civil immigration enforcement, the Court finds it prudent to address the States' constitutional challenges.

"The Spending Clause grants Congress the power 'to pay the Debts and provide for the . . . general Welfare of the United States."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012) ("*NFIB*") (quoting U.S. Const. art. I, § 8, cl. 1). While the Supreme Court has "long recognized that Congress may use this power to grant federal funds to the States, and may condition such a grant upon the States' 'taking certain actions that Congress could not require them to take,'" *id.* (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686

(1999)), it has also "recognized limits on Congress's power under the Spending Clause to secure state compliance with federal objectives." *Id.* "That insight has led [the Supreme Court] to strike down federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes." *Id.* at 577.

The Supreme Court has outlined several constitutional limitations on federal funding conditions. First, "the exercise of the spending power must be in pursuit of 'the general welfare.'" *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citing *Helvering v. Davis,* 301 U.S. 619, 640–641 (1937)). Second, "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)) (cleaned up). Third, "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" *Id.* (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)); *see also Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003) (funding "conditions must not be 'unrelated to the federal interest in particular national projects or programs' funded under the challenged legislation"). Fourth, "other constitutional provisions may provide an independent bar to the conditional grant of federal funds" by prohibiting federal funds from being "used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 208, 211. Additionally, conditions on federal funds may not "be so coercive as to

pass the point at which 'pressure turns into compulsion.'" *Id.* at 211 (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)).[2]

Here, the States allege three reasons why Defendants' efforts to impose the IEC violate the Spending Clause. ECF No. 69 at 43. First, Defendants argue that the IEC is not "reasonably related" to the funding programs to which it has been applied, as the programs at issue (e.g., state transportation infrastructure) have no plausible connection to a condition mandating cooperation with federal civil immigration enforcement and is an attempt to advance a goal beyond DOT's expertise. *Id.* at 44–46. Second, the States contend that the IEC is impermissibly coercive because it passes the point at which "pressure turns into compulsion," as the billions of dollars at stake—and the vital, ongoing infrastructure projects they support—cannot realistically be declined, particularly where the States were reportedly given mere days to execute agreements containing the new condition. *Id.* at 47–50. Third, the States assert that the IEC is impermissibly ambiguous because it "fails to provide States with any meaningful notice of what they must do." *Id.* at 50 (citing *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022)).

As a threshold matter, Defendants argue that the States' claims are a facial constitutional challenge to the IEC that must therefore be shown to be "unconstitutional in all their applications." (ECF No. 68 at 43) (citing *United States*

---

[2] Although these limitations were prescribed in the context of Congressional—rather than agency—power, the Court sees "no reason why the addition of an agency middleman either expands or contracts Congress's power to 'provide for the . . . general Welfare.'" *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 n.6 (9th Cir. 2019) (quoting U.S. Const. art. I, § 8, cl. 1).

*v. Salerno*, 481 U.S. 739, 745 (1987)).  Past that threshold, Defendants' primary defense to the States' constitutional claims is to once again recite Defendants' mantra that the IEC "simply require[s] grantees to comply with existing federal law," *id.* at 47, and therefore both reasonably relates to DOT's general mission and is sufficiently unambiguous.  *Id.* at 42–45.  Apart from this excuse, Defendants contend that the IEC is not impermissibly coercive because it is not a retroactive condition on an existing grant and because States can supposedly shift funding to offset the lost funds.  *Id.* at 47–48.

The Court is not convinced that Defendants' reading of *Salerno* and its progeny, as applied to judicial review of agency action, is correct.  *See Bondi v. VanDerStok*, 604 U.S. 458, 467 n.2 (2025) (leaving "further analysis of the proper test for another day").  But even were the *Salerno* standard to apply, Defendants present no reason to suggest that this distinction would make any difference in this case.  As the First Circuit has explained in the context of facial challenges to state laws, "[t]he difficulty in mounting a facial challenge . . . arises most notably in challenges to laws that, by their terms, leave room for discretion in their application, meaning a state official could 'accord the law a limiting construction to avoid constitutional questions.'"  *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 24 (1st Cir. 2016) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).  But here, "the components of the burden" the IEC imposes "are defined by its facial terms, not by any anticipated exercise of discretion in its application."  *Id.* at 24–25.

With that established, Defendants' decision to impose the IEC blatantly violates the Spending Clause.  Defendants expressly inserted the IEC into DOT's grant agreements to coerce States into cooperating with federal civil immigration enforcement.  *See* ECF No. 68-1 at 11–12.  Notwithstanding Defendants' misconstruction of their statutory mandates, the IEC bears no reasonable relationship to the transportation infrastructure programs to which it has been attached.  And the vague language of the IEC—compounded by Defendants' own repeated insistence that, despite the plain text of the condition itself, the IEC mandates only compliance with federal law—is likely so ambiguous as to undermine the ability of the States "to exercise their choice knowingly, cognizant of the consequences of their participation."  *Dole*, 483 U.S. at 207.

## C.     **Vacatur, Injunction, and Declaratory Relief are Merited**

Based on the foregoing, the Court has determined that Defendants' imposition of the IEC on all federal transportation funding is *ultra vires* and violates both the APA and the Spending Clause.  The remaining question before the Court is the proper remedy to be granted.  Defendants argue that the Court should limit any relief to the specific grants to which the States applied, and that any relief should be stayed pending appeal.  ECF No. 68 at 69.  The States reject this proposed limitation, invoking the broad discretion afforded district courts in fashioning injunctive relief and the impracticality of listing the vast number of federal grants implicated by the IEC.  ECF No. 73 at 42–43.  The States further contend that Defendants have not

satisfied their burden of obtaining the "extraordinary" relief of a stay pending appeal. *Id.* at 43 (citing *Nken v. Holder*, 556 U.S. 418, 428 (2009)).

The APA authorizes a court to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of an unlawful agency action. *Corner Post,*, 603 U.S. at 826–27 (2024) (Kavanaugh, J., concurring); *see also Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately.") "When a federal court sets aside an agency action, the federal court vacates that order in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring). This vacation applies to the unlawful action itself, rather than merely to its application to the individual challengers. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) (declining to rule on the "distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action").

The Court agrees that vacatur is appropriate under these circumstances. As such, to the extent that the IEC has been imposed upon any DOT-administered grant programs, the IEC must be vacated.

The States also request the Court permanently enjoin Defendants from implementing or enforcing the IEC against the States. ECF No. 69 at 54. The APA authorizes "writs of prohibitory or mandatory injunction" in addition to vacatur. 5

U.S.C. § 703. "The standard for issuing a permanent injunction requires the district court to find that (1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007).

This standard is essentially the same as that for issuing a preliminary injunction, which the Court has done here. *See California*, 788 F. Supp. 3d at 324. The States have demonstrated that "they will face irreparable and continuing harm if forced to agree to Defendants' unlawful and unconstitutional immigration conditions imposed in order to receive federal transportation grant funds," *id.* at 323, because the IEC presents the States with a Hobson's choice: they must either surrender their sovereign interest in managing their own law enforcement resources or forgo billions of dollars of federal funds. *See Ohio v. EPA*, 603 U.S. 279, 291 (2024) (identifying impairment of States' "sovereign interests in regulating their own industries and citizens" as irreparable harm); *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (finding irreparable harm where an agency's decision placed a State's "sovereign interests and public policies at stake"). This is precisely the kind of irreparable harm that weighs in favor of injunctive relief. *See A.W. Chesterton Co., Inc. v. Chesterton*, 128 F.3d 1, 8 (1st Cir. 1997) ("Where the harm is not measurable, it is not an abuse of discretion to award equitable relief."); *see also*

*State of Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (finding irreparable harm where, absent an injunction, "the States will be forced to comply" with agency action, "contrary to their own policies").

Further, the Court has determined that the balance of the equities and public interest clearly favor the States: should Defendants be enjoined from imposing the IEC on grant agreements, "they would merely have to consider the applicant's application and make the awards as usual." *California*, 788 F. Supp. 3d at 233. And, as the Court has determined that the imposition of the IEC is unlawful, the balance of the equities weighs against permitting its reimposition; after all, as Defendants have so consistently reminded the Court, "there can be no harm" in requiring a party "to comply with existing federal law." ECF No. 68 at 59. On the other hand, should the Court deny an injunction, "the States will be forced to commit their state and local law enforcement (and potentially other state and local actors) to the mission of federal immigration enforcement or sacrifice securing billions of dollars in federal funding that Congress intended to be used for transportation purposes." *California*, 788 F. Supp. 3d at 233–34. Congress has repeatedly voiced its understanding that the proper disbursement of these funds serves the public interest. *See* 3 U.S.C. § 101(b)(1) ("[I]t is in the national interest to accelerate the construction of Federal-aid highway systems."); 49 U.S.C. § 5301 ("It is in the interest of the United States, including the economic interest of the United States, to foster the development and revitalization of public transportation systems . . . ."); 49 U.S.C. § 24101 ("Modern and efficient intercity passenger and commuter rail passenger transportation is

important to the viability and well-being of major urban and rural areas and to the energy conservation and self-sufficiency goals of the United States.").

To summarize, the Court finds that the States have succeeded on the merits of their claims, that they would suffer irreparable injury absent injunctive relief, and that the balance of the equities and the public interest weigh in favor of an injunction. As such, a permanent injunction enjoining Defendants from imposing the IEC is warranted.

The States further request the Court declare that the imposition of the IEC is unlawful. ECF No. 69 at 61–62. Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (noting the Declaratory Judgment Act's application where a plaintiff seeks declaratory relief against threatened action by the government). Declaratory relief "serves a valuable purpose" by enabling litigants "to clarify legal rights and obligations before acting upon them." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995).

The Court has determined that the imposition of the IEC is unlawful. Thus, to the extent that the States seek declaratory relief to this effect, the Court willingly obliges.

Finally, Defendants fail to explain why the Court should stay any ordered relief pending their decision to appeal.    As explained above, Defendants suffer no meaningful or irreparable harm from being enjoined from adding additional, unlawful conditions to federal funding programs.    Further, Defendants chose not to appeal the Court's preliminary injunction, which has been in effect for over four months. *See California*, 788 F. Supp. 3d 316.    The Court sees no reason it should stay relief now that the case has reached summary judgment.    *Cf. Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (finding a party's "cries of urgency [to be] sharply undercut by its own rather leisurely approach to the question of preliminary injunctive relief").

## IV.    CONCLUSION

To be clear, the Court does not—and indeed cannot—make any determination here regarding the relative merits of the executive branch's and the States' approaches to civil immigration enforcement.    Should Congress have wished, it could have attempted to entice State cooperation with federal civil immigration enforcement through lawful means, and it could have sought to empower federal agencies to assist it in doing so.    Here, however, Defendants have blatantly overstepped their statutory authority, violated the APA, and transgressed well-settled constitutional limitations on federal funding conditions.    The Constitution demands the Court set aside this lawless behavior.

As such, for the foregoing reasons, the Court GRANTS the States' Motion for Summary Judgment (ECF No. 69) and DENIES Defendants' Cross Motion for

Summary Judgment (ECF No. 68).  The IEC is declared unlawful and ordered vacated from all grant agreements administered by Defendants.  Defendants are permanently enjoined from implementing or enforcing the IEC against the States, or otherwise attempting to condition federal transportation funding on State cooperation with federal civil immigration enforcement.


IT IS SO ORDERED.


*s/John J. McConnell, Jr.*

_____
John J. McConnell, Jr.
Chief Judge
United States District Court

November 4, 2025